**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PETRUSS MEDIA GROUP, LLC, f/k/a TAKE 5 MEDIA GROUP, LLC, 2385 N.W. Executive Center Drive, Suite 290 Boca Raton, FL 33431 <br><br> ALEXANDER RADETICH, 2121 N.W. 30th Road Boca Raton, FL 33431 <br><br> RICHARD GLUCK, 484 E. Royal Palm Road Boca Raton, FL 33432 <br><br> RJV MARKETING CORP., 10205 Collins Avenue, Suite 809 Bal Harbour, FL 33154 <br><br>        Petitioners, <br> v. <br><br> ADVANTAGE SALES & MARKETING LLC, 15310 Barranca Parkway, Suite 100 Irvine, CA 92618 <br><br> ADVANTAGE SALES & MARKETING INC., 15310 Barranca Parkway, Suite 100 Irvine, CA 92618 <br><br> KARMAN INTERMEDIATE CORP., 18100 Von Karman Avenue, Suite 1000, Irvine, CA 92612 <br><br> ADVANTAGE SOLUTIONS INC., 18100 Von Karman Avenue, Suite 1000, Irvine, CA 92612 <br><br> KARMAN TOPCO L.P., 18100 Von Karman Avenue, Suite 1000, Irvine, CA 92612 <br><br>        Respondents. | Case No.   1:22-cv-3278 |

**PETITION TO VACATE OR SET ASIDE ARBITRATION AWARDS**[1]

Petitioners Petruss Media Group LLC, f/k/a Take 5 Media Group, LLC, Alexander Radetich, Richard Gluck, and RJV Marketing Corp. (collectively the "Take 5 Parties" or "Petitioners") hereby petition the Court, pursuant to the Federal Arbitration Act (9 U.S.C. §§ 6, 10, 12), for an Order vacating or setting aside the Interim Award entered August 4, 2022, and the Final Award entered initially on October 4, 2022 and in a modified version on October 20, 2022, (collectively the "Awards") in the underlying arbitration (AAA No. 01-19-002-7532) between Petitioners and Advantage Sales & Marketing LLC, Advantage Sales & Marketing Inc., Karman Intermediate Corp., Advantage Solutions Inc., and Karman Topco L.P. (collectively the "Advantage Parties" or "Respondents"), and as grounds therefore alleges as follows:

## INTRODUCTION

The Awards concern the systematic destruction by the Advantage Parties of a successful business built through the expertise and hard work of two individuals, Petitioners Alexander Radetich and Richard Gluck.  Over the course of the last three years, the Advantage Parties have not just destroyed what it took Radetich and Gluck nearly twenty years to build, but they systematically attacked and sought to destroy Radetich's and Gluck's reputations in the process and to ruin their lives and those of their families.  Among other things, the Advantage Parties have sought to hold RJV Marketing Corp., which is owned 100% by Gluck's father (80 year-old Jack Gluck) wholly responsible for the alleged "fraud" that served as the excuse to allow the Advantage Parties to terminate part of Radetich's and Gluck's business, take the parts of that business that the

---

[1]    Portions of this Petition have been redacted pursuant to paragraph 13 of the parties' Stipulated Order Governing the Production and Exchange of Confidential and Highly Confidential Information, executed in the underlying arbitration on July 3, 2020.  The Take 5 Parties will file this document under seal but are prepared to unseal all documents and unredact all portions herein upon the agreement of the Advantage Parties.

Advantage Parties believed were most lucrative and, in the process, seek to salvage the Advantage Parties' reputations and recoup the financial losses caused by their own mismanagement of the once successful Take 5 business.  The Advantage Parties did so through procedurally improper means, and it is not surprising that the resulting Awards therefore are sufficiently flawed such that they must be vacated.

As set forth further in the Petitioners' Motion to Vacate or Set Aside the Arbitration Awards and accompanying Memorandum of Points of Law and Authorities, the Awards should be vacated because the (1) sole arbitrator is guilty of misconduct for failing to stay the arbitration and postpone the hearing in light of a pending, parallel criminal investigation resulting in significant prejudice to the Take 5 Parties such that they were denied a fair hearing, (2) the arbitrator is guilty of misconduct for refusing to hear pertinent evidence, due to the Advantage Parties spoliation of material evidence, (3) the arbitrator exceeded or imperfectly executed his powers by entering the Awards against RJV Marketing Corp. absent any evidence in the record to support the determination, (4) the arbitrator exceeded his powers with respect to awarding certain damages due to absence of evidence in the record to support such award (5) the Awards were procured by fraud, corruption or undue means by virtue of the inducement by the Advantage Parties' of witness testimony, and (6) the arbitrator manifestly disregarded the law in a number of other ways.

## THE PARTIES

### I.     PETITIONERS

1.     Petitioner Petruss Media Group, LLC, f/k/a Take 5 Media Group, LLC ("Take 5") is a Florida limited liability company, with its principal place of business in Boca Raton, Florida.

3

2.      Petitioner Alexander Radetich is an individual residing in Boca Raton, Florida and was the Managing Partner of Take 5.  Radetich is a Beneficial Owner under the Asset Purchase Agreement and held a 44.45% membership in Take 5.

3.      Petitioner Richard Gluck is an individual residing in Boca Raton, Florida and was the Managing Partner of Take 5.  Radetich is a Beneficial Owner under the Asset Purchase Agreement and held a 44.45% membership in Take 5.

4.      Petitioner RJV Marketing Corp. ("RJV"), is a Florida corporation, with its principal place of business in Bal Harbour Village, Florida and was a member of Take 5.  RJV is a Beneficial Owner under the Asset Purchase Agreement and held a 11.10% membership in Take 5.

## II.    RESPONDENTS

5.      Respondent Advantage Sales & Marketing LLC ("ASM") is a California limited liability company, with its principal place of business in Irvine, California.  ASM is the Buyer under the Asset Purchase Agreement.

6.      Respondent Advantage Sales & Marketing Inc. ("ASM Inc.") is the parent entity of ASM, and is a Delaware corporation with its principal place of business in Irvine, California.

7.      Respondent Karman Intermediate Corp. ("KIC") is the parent entity of ASM Inc., and is a Delaware corporation with its principal place of business in Irvine, California.  ASM is an indirect, wholly-owned subsidiary of KIC.

8.      Respondent Advantage Solutions Inc. ("Advantage Solutions") is the parent entity of KIC, and is a Delaware corporation with its principal place business in Irvine, California.

9.      Respondent Karman Topco L.P. is the parent entity of Advantage Solutions, and is a Delaware limited partnership with its principal place of business in Irvine, California.

10.      Petitioners and Respondents were parties to an arbitration administered by the American Arbitration Association captioned *In the Matter of the Arbitration 01-19-002-7532, Petruss Media Group, LLC, et al. v. Advantage Sales & Marketing, LLC, et al.* ("the Arbitration"). *See Declaration of Lauren H. Evans in Support of Petition to Vacate or Set Aside Arbitration Awards* at ¶¶ 1-3, *Exs. 1-3* [*Interim Award* (Aug. 4, 2022); *Final Award* (Oct. 4, 2022); *Modified Final Award* (Oct. 20, 2022)].[2]   The issues in the Arbitration were the Parties' respective performance under an Asset Purchase Agreement (the "APA") executed in March 2018, the dissolution of the relationship between the Parties,  the Advantage Parties' decision to shut down the Take 5 business, and allegations of breach of contract, fraud, and defamation, among other things. *Ex. 4* at 5, 16 [*Take 5 Parties' Amended Statement of Claim* (Nov. 19, 2020)]; *Ex. 5* [*Exhibit A to Take 5 Parties' Statement of Claim, Asset Purchase Agreement* (Mar. 15, 2018)].   In the Arbitration, the Advantage Parties argued that the Take 5 Parties made certain misrepresentations about Take 5's business prior to the acquisition, upon which the Advantage Parties purportedly relied in entering the APA, which they contended amounted to a fraudulent scheme and breach of contract. *Ex. 6* [*Respondent and Counter-Claimant/Cross-Claimant Advantage Sales & Marketing LLC's Response to Arbitration Demand and Second Amended Counter-Demand and Cross-Demand* at ¶  35 (Nov. 16, 2020)].   The Take 5 Parties argued that the Advantage Parties' termination of the Take 5 business unit was made in a bad faith effort to avoid making additional

---

[2]      Exhibit references herein refer to the exhibits to the Declaration of Lauren H. Evans in Support of Take 5 Parties' Petition to Vacate or Set Aside Arbitration Awards filed concurrently herewith.  Note that Exhibit 7 is intentionally omitted.

payments, constituting a breach of the APA, and the resulting allegations of fraud amounted to defamation.

## JURISDICTION AND VENUE

11.    The Federal Arbitration Act governs this action because the Agreement involves "commerce among the several States" as defined in 9 U.S.C. § 1.[3]

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because Petitioners and Respondents are citizens of different states, Florida, Delaware and California, respectively, and the amount in controversy herein exceeds $75,000.00, exclusive of interest, attorneys' fees and costs because the Modified Final Award awards Respondents $48,325,822.29 in damages and the purchase price contemplated by the APA was $77,000,000.00.

13.    Venue is proper under 9 U.S.C. §§ 9 and 10, as well as §28 U.S.C. 1391, because the APA provided that "judgment upon the award rendered by the Arbitrator may be entered in any court having jurisdiction thereof" and this is the district in which the award was made.[4]

## THE  TRANSACTION

14.    Petitioners Alexander Radetich and Richard Gluck founded Take 5 in 2003.  Take 5 was a direct mail and digital consumer marketing and licensing business. *Ex. 4* at 2, 11.

15.    Take 5's most valuable asset was a massive database it built and maintained, which contained demographic, lifestyle, and contact information for hundreds of millions of consumers. Over the span of fifteen years, Take 5 developed one of the most unique and sought-after consumer

---

[3]      *See infra* ¶ *37.*
[4]      *See infra* ¶ 103.

databases in the country.  Take 5 commercialized this database by providing clients either data licensing or marketing campaigns.  Take 5's data licensing business delivered bulk data to clients, which included large national database compilers, insurance companies, credit bureaus, and automotive marketing agencies, pursuant to multi-year license agreements.  Take 5's other business line was its "omni-channel" digital marketing business, which provided highly targeted and personalized marketing campaigns for clients.  Take 5's "omni-channel" offerings included social media, mobile device advertising, email marketing, programmatic and display advertising, PPC (pay per click) advertising, targeted advertising in web browsers, and direct mail.  *Id.* at 12.

16.     In 2017, Take 5 hired an investment banking firm, Petsky Prunier, to market the business for sale and to seek prospective buyers.  Take 5 received offers from approximately seventeen buyers, including ASM.  On August 11, 2017, the Take 5 Parties and ASM signed a Nondisclosure Agreement and on December 18, 2017, ASM signed a letter of intent.  *Id.* at 2, 14-16.

17.     ASM conducted formal and comprehensive due diligence of Take 5 for a period of eight months, from December 2017 through March 2018, retaining Ernst & Young for financial diligence and Jones Day for legal diligence.  ASM also hired Parthenon Group, an Ernst & Young owned consulting business, to conduct confidential interviews of Take 5 clients before closing to assess the strength of the relationships and level of satisfaction.  Take 5 additionally engaged national independent accounting firm, Cherry Bekaert, at the request of ASM to prepare an audited Combined Financial Statement for the year ending December 31, 2017, which was delivered directly to ASM.  *Id.* at 16-19.

18.     On March 15, 2018, ASM entered into the APA with the Take 5 Parties, in which ASM agreed to pay a base purchase price of $77,000,0000, as well as an earn-out of up to $53,000,0000 for Radetich and Gluck, in consideration for purchase of the assets and liabilities of Take 5. *Id.* at 19; *Ex. 5*.

19.     The sale of Take 5's assets closed on April 1, 2018 and ASM acquired all of Take 5's assets including the database of email addresses.  As a result of the transaction, Take 5 became a business unit of ASM.  *Ex. 4* at 21; *Ex. 5* at § 1.5(j).

20.     The dispute resolution provision of the APA appears at Section 10.11.  It states:

(a) If the Parties should have a dispute (a "Dispute") involving money damages arising out of or relating to this Agreement or any Ancillary Agreement, or the Parties' respective rights and duties hereunder or thereunder  . . . then the Parties will resolve such Dispute in the following manner: . . . (iii) . . . the Parties will refer the Dispute (to the exclusion of a court of law) to a final and binding arbitration in accordance with the procedures set forth in Section 10.11(b).

*Ex. 5* at § 10.11.

21.     Section 10.11(b) provides:

Any arbitration pursuant to this agreement shall be presided over by one arbitrator in Delaware, in accordance with the then existing commercial arbitration rules (the "Rules") of the American Arbitration Association ("AAA"), and the judgment upon the award rendered by the Arbitrator may be entered in any court having jurisdiction thereof; provided, however, that the Law applicable to any controversy shall be the Law of the State of Delaware regardless of principles of conflicts of Laws. . . . Upon completion of the selection of the Arbitrator, an award or decision shall be rendered within no more than 60 days after the date of such selection. The award or decision will be a reasoned award or decision setting forth the Arbitrator's reasoning in reaching its determinations. The expenses of any litigation, including the Arbitrator and the arbitration and the reasonable out-of-pocket fees and expenses of the other Party, including fees of attorneys and experts, shall be paid by the non-prevailing Party as determined by the Arbitrator, except as provided in Section 1.3(a)(iv) and Section 1.5(c).

*Id.*

## THE UNDERLYING DISPUTE

22.    Immediately after the transaction closed, ASM designated its employee Gary Colen the Chief Executive Officer of the Take 5 business unit, sidelining Radetich and Gluck, who had built the company from scratch and lead it since its first days in existence. *Ex. 4* at 5-6, 21-25.

23.    In late 2018 and early 2019, ASM transferred business developed by Take 5 to other ASM business units and significantly cut the commissions of Take 5 sales personnel.  As a result, the financial performance of the Take 5 business began to suffer.  *Id.*

24.    The Advantage Parties claim that on or about April 11, 2019, they received two "anonymous" complaints from Take 5 employees alleging that Take 5's clients were not receiving the email marketing services they were paying for and this purported deception was being accomplished through the use of fake marketing campaign documentation. *Ex. 6* at ¶ 35.

25.    On or about April 16, 2019, the Advantage Parties asked Radetich and Gluck to accept an early exit from the business.  ASM proposed that in exchange for $770,000 and a release of the earn-out, ASM would release Radetich and Gluck from their indemnity obligations under the APA.  Radetich and Gluck rejected the offer, unwilling to walk away from up to $53 million in unpaid purchase price. *Ex. 4* at 7, 25.

26.    On May 28, 2019, the Advantage Parties engaged FTI Consulting to conduct an operational audit of Take 5 in connection with the "anonymous" complaints.  The audit was proposed to include four different phases, as well as the review of documents and electronic information.  At the recommendation of FTI, the matter was reported to the Audit Committee of

Karman Topco L.P., which engaged Latham & Watkins as counsel on June 27, 2019. *Ex. 6 at ¶* 36.

27.     During the course of their forty-four day investigation, FTI and Latham conducted interviews of twenty-seven ASM and Take 5 employees.  On July 2, 2019, FTI interviewed Alexander Radetich. *Id.* at ¶¶ 39, 50.

28.     On July 7, 2019, during only phase two of the investigation and before FTI had completed its work, the Advantage Parties decided to immediately and permanently shut down the Take 5 business unit.  On July 11, 2019, ASM called an all-hands meeting and laid off almost all employees in the Take 5 business unit effectively shutting it down. *Ex. 4 at ¶¶ 73-74*

29.     The Advantage Parties informed employees and customers that Take 5 had engaged in fraud and alleged that the Take 5 business was a fraudulent front operated by Radetich and Gluck, which had no useable data and ran no real marketing campaigns. *Id.* at ¶ 76.  The Advantage Parties additionally made an unsolicited offer to Take 5's clients of refunds or credits for other ASM services. *Id.*

30.     Advantage additionally contacted the FBI and United States Attorney's Office to report the alleged fraud by Take 5 and urged them to investigate. *Ex. 6 at 5, 27.*

## THE UNDERLYING ARBITRATION

31.     Six days after ASM took the unprecedented step of shutting down Take 5's business, on July 17, 2019, Take 5, Radetich, and Gluck sent a Notice of Dispute to the Advantage Parties, triggering the 30-day period to meet and negotiate pursuant to Section 10.11 of the APA. *Ex. 4 at ¶ 79.*

32.     Counsel for ASM responded by stating the notice of the dispute was premature and levelled false allegations that Radetich and Gluck created and directed a scheme to defraud the Advantage Parties and its clients. *Id.* at ¶ 80.

33.     On August 20, 2019, the Advantage Parties sent a Notice of Claim and Notice of Dispute pursuant to pursuant to Sections 8.4(b) and 10.11 of the APA alleging that Radetich and Gluck had falsely represented to clients that marketing emails had been deployed, delivered, and opened when emails were never sent and that Take 5 allegedly employed an algorithm that generated fictitious data to meet client expectations while engaging third-party vendors to deceptively generate traffic to clients' websites. The Parties met and conferred but were unable to resolve their dispute. *Ex. 8* [*Advantage Parties' Notice of Claim and Notice of Dispute* (Aug. 20, 2019)].

34.     On September 3, 2019, Take 5 filed a Demand for Arbitration and Statement of Claim bringing claims for breach of contract and breach of the implied covenant of good faith and fair dealing and seeking an award for amounts due and unpaid pursuant to the APA.  The Demand alleged that Advantage breached the APA by shutting down the Take 5 business unit and engaging in a course of conduct to circumvent the payment of the earn-out. *Ex. 9* [*Demand for Arbitration and Statement of Claim* (Sept. 3, 2019)].

35.     On September 19, 2019, the Advantage Parties filed counterclaims and crossclaims, bringing claims for indemnification, breach of contract, fraud in the inducement, fraud, RICO, and breach of the implied covenant of good faith and fair dealing. *Ex. 10* [*Respondent and Counter-Claimant/Cross-Claimant Advantage Sales & Marketing LLC's Response to Arbitration Demand*

*and Counter-Demand and Cross-Demand for Indemnification, Breach of Contract and Fraud* (Sept. 19, 2019)].

36.     The Take 5 Parties filed an Amended Statement of Claim on November 19, 2020, which was the operative demand at the time of the Arbitration hearing, bringing claims for breach of contract, breach of the implied covenant of good faith and fair dealing, defamation *per se*, and negligence. *Ex. 4.*  The Take 5 Parties alleged that the Advantage Parties shutdown the Take 5 business unit as a part of strategy developed to increase its IPO capitalization and to avoid payment of the earn-out pursuant to the APA. *Id.*  The Take 5 Parties further alleged that the Advantage Parties materially damaged the reputations of Radetich and Gluck. *Id.*  The negligence claim was later dismissed.

37.     The Advantage Parties filed their Second Amended Counter-Demand and Cross-Demand on November 16, 2020, bringing claims for indemnification, breach of contract, fraud in the inducement, fraud, RICO, and breach of the implied covenant of good faith and fair dealing. *Ex. 6.*  This Second Amended Counter-Demand was the Advantage Parties' operative demand at the time of the Arbitration hearing.  The Advantage Parties maintained that the Take 5 business was based on a fraudulent scheme created and maintained by Radetich and Gluck in which they promised clients that Take 5 had the ability to send a large volume of targeted emails to people within a certain demographic, track responses, and generate high quality customer traffic for the client's websites, but could not and did not actually send such emails. *Id.*  The Advantage Parties' further alleged that Radetich and Gluck developed a computer program that would fictitiously calculate numbers to be reported to client concerning how many emails had been sent, delivered and opened. *Id.*

38.     The Arbitrator determined during the course of the proceeding that the Arbitration was governed by the Federal Arbitration Act ("FAA") because the dispute involved interstate commerce. *Ex. 11* at 3 [*Order Ruling on Advangage's [sic] Motion to Dismiss Cetain [sic] Counts in Take 5's Amended Statement of Claim* (Jan. 20, 2021)].

39.     The Arbitration was administered by the American Arbitration Association ("AAA") and discovery was governed by the Federal Rules of Procedure. *Ex. 12* [*Report of Preliminary Hearings and Scheduling Order* (Jul. 19, 2020)].

40.      Each party filed motions for summary disposition on November 17, 2021, responses on December 7, 2021, and replies on December 15, 2021. *Exs.* 13-18.

41.     Shortly before the hearing, the Arbitrator denied the cross motions for summary disposition. *Ex. 19* at 1 [*Order Denying Cross Motions for Summary Disposition . . .* (Dec. 29, 2021)].

**Parallel Criminal Investigation**

42.     The Advantage Parties' demands indicated that the Advantage Parties had reported Radetich and Gluck to federal authorities.  The Advantage Parties' Second Amended Counter-Demand stated that "Advantage voluntarily reported [the results of their internal investigation into Take 5] to the FBI and United States Attorney's Office" and had "already spent and continues to spend considerable sums on attorney and advisor fees related to determining the full extent of the fraud, and cooperating with government law enforcement agencies." *Ex. 6* at ¶ 55.

43.     On April 19, 2021, an FBI agent visited Radetich's home. *Ex. 20* at 4 & n.2 [*Emergency Motion and Memorandum of Law of Take 5 Parties' in Support of Emergency Motion for Stay of Arbitration Action* (Jun. 23, 2021)].  During that visit, the FBI agent stated that Take 5

and Radetich were under criminal investigation, handed Radetich a business card, and requested that Radetich "be in touch." *Id.* at 4.

44.     Following the encounter, Radetich hired criminal defense counsel, Miles Ehrlich, who was subsequently contacted by Assistant United States Attorney for the Central District of California, Jennifer Waier, on April 20, 2019. *Id.*

45.     Based on subsequent conversations between prosecutors, FBI agents, and Radetich's criminal counsel, it became clear that that Radetich and Take 5 were targets of a criminal investigation instigated by the Advantage Parties and that "indictment may soon issue." *Id.* The criminal investigation overlapped entirely with the Advantage Parties' claims in the Arbitration.

46.     Counsel for the Advantage Parties, Wayne R. Gross, previously served as a supervisor in the United States Attorney's Office for the Central District of California and was previously the manager of the individuals who have been conducting the investigation and whom he told about Take 5's alleged acts.

47.     On June 8, 2021, counsel for the Take 5 Parties deposed Gary Colen, an Advantage employee and former CEO of the Take 5 business unit following purchase of the Take 5 business by the Advantage Parties. Redacted Pursuant to Stipulated Order

*Ex. 21* at 327:9-329:9 [*Colen Depo. Tr.* (Jun. 9, 2021].

14

48.   ███████████ Redacted Pursuant to Stipulated Order ███████████

███████████ *Id.* at 329:10-330:2.   ███ Redacted Pursuant to Stipulated Order ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███ *Id.* at 329:10-330:7.

49.   As a result of this information ███ Redacted Pursuant to Stipulated Order ███, Gluck retained criminal defense counsel, Edward Swanson. *Ex. 20* at 5.

50.   Due to the allegations concerning reports to law enforcement in the Advantage Parties' counter-demands, the Take 5 Parties included a document request in their first requests for production of documents seeking "Document Request No. 105: [a]ll communications from Respondents to the FBI, Department of Justice (including any U.S. Attorney's Office) or any other state or federal agency regarding the Seller group [a/k/a the Take 5 Parties]." *Ex. 22* at 96 [*Advantage Parties' Response to Take 5's First Request for Production of Documents and Information* (Jun. 12, 2020)].

51.   The Advantage Parties objected to this request over seven months later on the basis that the information was subject to governmental privilege. *Id*. Despite numerous meet and confers, substantial motion practice, and several discovery orders ordering the Advantage Parties to produce responsive documents, the Advantage Parties did not produce any documents responsive to Request Number 105, let alone any documents evidencing an actual criminal investigation prior to April 2021 or at any time thereafter. *See Ex. 23* at 9-11 [*Take 5 Parties' Motion to Compel* (Aug. 14, 2020)].

52.     As a result of the new information concerning the active criminal investigation and the scheduled depositions of Gluck and Radetich on June 30, 2021 and July 1, 2021, respectively, the Take 5 Parties filed an Emergency Motion for Stay of Arbitration Action on June 23, 2021, seeking to stay the arbitration proceeding for six months or until the criminal investigation was concluded, whichever was earlier. *Ex. 20.*

53.     The Take 5 Parties argued that given the ongoing criminal investigation, particularly the recent travel by government agents stationed in California to Radetich's home in Florida and the undercover conversations of which they had learned less than two weeks prior, both Radetich and Gluck would have no choice but to invoke their Fifth Amendment rights at their depositions and in response to other discovery, chilling their ability to testify and offer key evidence in the proceeding. *Id.*

54.     The Take 5 Parties further argued that the issues in the criminal and civil proceedings not only overlapped, but were identical and that Radetich and Gluck would be "severely prejudiced" by denial of a stay because they would be forced to choose between defending themselves in the Arbitration and waiving their Fifth Amendment rights or asserting the Fifth, undermining their ability to defend themselves as the purported masterminds of a multi-year fraudulent scheme. *Id.* at 7-11. Additionally, they argued that the Advantage Parties should not be able to "'have their cake and eat it too' – by pushing the Take 5 Parties into a corner in a situation of their own making" by virtue of the Advantage Parties having urged the authorities to commence an investigation and working to feed them information. *Id.* at 12.

55.     The Advantage Parties responded on June 28, 2021 arguing that Radetich and Gluck would not be prejudiced because the Arbitrator could not draw an adverse inference from

their invocation of the Fifth Amendment and that the Advantage Parties would be the ones "severely and unfairly prejudice[d]" by the granting of a stay because memories would fade and it would give Radetich and Gluck an opportunity "to conceal their assets or even to leave the jurisdiction." *Ex. 24* [*Opposition of Advantage Parties to Emergency Motion for Stay of Arbitration Action* (Jun. 28, 2021)].

56.     The Advantage Parties had previously acknowledged the significant overlap between the criminal investigation and the Arbitration arguing in an earlier unrelated opposition brief "Advantage and the USAO share a common interest in that each is litigating, or potentially litigating, the Take 5 Parties as a result of their fraudulent scheme." *Ex. 25* at 12 [*Advantage Response to Motion to Compel* (Aug. 24, 2020)].

57.     The Take 5 Parties replied on June 29, 2021, arguing that though the Advantage Parties had stated they complained to law enforcement, the fact that an actual criminal investigation had been initiated did not become known (or knowable) until April 2021. *Ex. 26* at 3 [*Reply by Take 5 Parties in Support of Emergency Motion for Stay of Arbitration Action* (Jun. 29, 2021)].  The Take 5 Parties also pointed out the Advantage Parties' contradictory position that the motion to stay was both too late because ASM has stated it reported the purported fraud to government officials prior to the commencement of the Arbitration and some discovery had taken place and too early because indictments had not yet been issued. *Id.*

58.     On June 29, 2021, after a hearing, the Arbitrator denied the Take 5 Parties' Emergency Motion for Stay.  The Arbitrator acknowledged that the "issues in the criminal investigation track or substantially overlap" the issues in the Arbitration but ultimately denied the stay because he believed the Take 5 Parties were aware of the investigation as of the date of the

Advantage Parties' Counter-Claim on September 19, 2019, that it would be "speculative" to conclude the Take 5 Parties would be prejudiced by Radetich and Gluck invoking the Fifth Amendment.  The Arbitrator further reasoned that he could not draw adverse inferences from the invocation of the Fifth Amendment under Delaware law and the stay was sought prematurely because it was prior to indictment.  *Ex. 27* at 3-4 [*Order Denying Take 5's Motion to Stay* (Jun. 29, 2021)].

59.     On July 1, 2021, Alexander Radetich was deposed. At the advice of his criminal defense counsel (as reflected in the deposition transcript), he invoked his Fifth Amendment rights in response to every question aside from his name, location, and employment in order to protect his rights in the parallel criminal investigation.  *See Ex.* 28 at 12:9-20 [*Radetich Depo. Tr.* (Jul. 1, 2021)] ("[T]he claimants, all of them, made a motion to stay this arbitration in light of a – in light of a potential criminal indictment that's looming. As a result . . . Mr. Radetich will be taking the Fifth Amendment. It's necessary for him to do so in connection with overwhelming majority of issues that are going to be raised.").

60.     On July 8, 2021, Richard Gluck did the same at his deposition, invoking his Fifth Amendment rights due to the parallel criminal proceeding and the Arbitrator's failure to stay the proceeding.  *Ex. 29* at 15:2-16:1 [*Gluck Depo. Tr.* (Jul. 8, 2021)] ("[G]iven that we're going forward today in the absence of a stay, in the absence of a continuance, we will need to be asserting the Fifth Amendment.").

61.     ██████████ Redacted Pursuant to Stipulated Order ██████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

18

████████████ Redacted Pursuant to Stipulated Order ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

**Discovery Disputes**

62.     On November 1, 2019, Take 5 served its first Request for Documents and Information wherein they requested, among other things, all documents referring to or relating to the Latham and FTI interviews conducted in July 2019, including a specific request for documents concerning the July 2, 2019 interview of Radetich.

63.     Take 5 specifically requested:

Document Request No. 52: All documents that refer or relate to any of the 27 Advantage and Take 5 employee interviews Latham and FTI conducted as set forth in paragraph 39 of the Advantage Response, or any other interviews Latham and FTI conducted in connection with their respective investigations as set forth in paragraphs 36-48 of the Advantage Response, including but not limited to any documents that are audio or video recordings of such interviews, written statements, affidavits or notes.

Document Request No. 55: All documents that refer or relate to the July 2nd interview as set forth in paragraph 43 of the Advantage Response, including all audio files, transcripts, and notes.

*Ex. 22* at 52, 54.

64.     The Take 5 Parties' additionally sought documents concerning the Advantage Parties' disclosure of information to the government in connection with a potential criminal investigation (*see supra* ¶ 50) and payments or transfers of value by the Advantage Parties to witnesses:

Document Request No. 8: For the period April 1, 2019 to the date of the hearing, all documents that refer or relate to a transfer of anything of value to, the release of

any claim against, of the assumption of any obligation of a current or former Take 5 employee or witness in this Arbitration proceeding, or any entity affiliated with such person, or a promise, contingent or otherwise, to make such a transfer, release such a claim or assume such an obligation in the future.

*Id.* at 15.

65.    Seven months later, the Advantage Parties objected to production of these documents on the basis of privilege, work product protection, and governmental privilege, among other things.  *Id.* at 15, 52, 54. However, with respect to Request No. 8, the Advantage Parties stated they would "produce any responsive, non-privileged documents found during a reasonable review of the documents from the files of Respondent custodians."  *Id.* at 15.

66.    On August 4, 2020, the Take 5 Parties served their Second Request for Documents. At least two of the requests specifically sought documents and information concerning damages:

> Document Request No. 129: A copy---or description by category and location---of all documents, ESI, and tangible things that any of the Advantage Parties has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.

> Document Request No. 130: A computation of each category of damages claimed by any of the Advantage Parties and the documents or other evidentiary material, unless privileged or protected from disclosure on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

*Ex. 31* at 12-14 [*Advantage Parties' Responses to Take 5's Second Request for Production of Documents and Information* (Sept. 3, 2020)].

67.    The Advantage Parties responded, objecting on numerous bases, including that the requests were premature, protected by privilege, and constituted expert testimony.  *Id.*

68.    The Advantage Parties never produced any documents responsive to Requests 8, 105, and 130. ████████ Redacted Pursuant to Stipulated Order ████████

████████████████████████████████████████

*Ex. 32* [*Hearing Exhibit A-0431A*].  The Take 5 Parties' later moved to exclude this information from the hearing.  *Ex. 33* [*Take 5 Parties' Motion to Preclude Testimony and Evidence Regarding the Advantage Parties' Damages Claims* (Apr. 27, 2022)]

69.     The Take 5 Parties filed a Motion to Compel on August 14, 2020 seeking to compel the production of documents responsive to Requests 52, 55, and 105, among others.  *Ex. 23*.

70.     On September 10, 2020 the Arbitrator granted the Take 5 Parties' motion to compel, in part, stating:

Redacted Pursuant to Stipulated Order

*Ex. 34* at 2-3 [*Discovery Order No 2* (Sept. 10, 2020)] (internal citation omitted).

71.     Redacted Pursuant to Stipulated Order

However, the Advantage Parties did not produce any contemporaneous notes of the interviews and did not log such notes on their privilege log.  *Ex. 35* at 8 [*Take 5 Parties' Motion for Relief* (Apr. 14, 2022)].

72.     A year after the Arbitrator's Discovery Order No 2 and months after the close of fact discovery, the Arbitrator permitted the Take 5 Parties to ask FTI employee and Advantage Parties' expert, Michael Wei, both fact and expert questions during his deposition due to the Advantage Parties late production of several categories of responsive documents.  *Ex. 36* [*Order Ruling on Take 5's Motion to Produce FTI Report* (Sept. 16, 2021)].

73.     At the September 8, 2021 hearing on this issue, the Advantage Parties' counsel affirmatively represented to the Arbitrator that there were no notes of witness interviews. *Ex. 30* at 1; *see also Ex. 37* at 8 [*Correspondence from M. Strub* (Aug. 20, 2021)] ("The Advantage Parties are not aware of any notes of those conversations, and the Take 5 Parties' counsel is free to ask Mr. Wei about those conversations when they take his deposition.")].

74.     ██████████ Redacted Pursuant to Stipulated Order ██████████

████████████████████████████████████████████████████████████

████████████████████████████████ *Ex. 30* at 5-6 *(citing* Wei Depo. Tr. at 35:16-36:15).

75.     As a result, on October 1, 2021, the Take 5 Parties moved to compel the Advantage Parties to produce the notes of the interviews for a second time. *Id.*

76.     ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████ *Ex. 38* at 3 [*Order Ruling on Take 5's Motion to Produce Notes of Witness Interviews* (Oct. 8, 2021)].

77.     The Advantage Parties made a production on October 25, 2021, which did not contain contemporaneous notes of the 2019 FTI interviews. *Ex. 39* [*Take 5's Motion to Remedy Advantage's Obstreperous Refusal to Comply with Orders* (Dec. 15, 2021)]. In response to a request by the Take 5 Parties to produce the contemporaneous interview notes, the Advantage Parties responded "[ ████████ Redacted Pursuant to Stipulated Order ████████

████████████████████████████████. The additional information you are seeking is completely

irrelevant, and the demand that we turn it over is harassment." *Id.* at 13 (*Correspondence from M. Strub* (Nov. 12, 2021)).

78.     On December 15, 2021, the Take 5 Parties moved for third time to compel the production of the contemporaneous notes.  *Id.*  The Take 5 Parties argued that the Advantage Parties conduct was "part of a documented pattern of evasiveness while professing earnestness." *Id.* at 5.

79.     The Advantage Parties responded  that they had followed the Arbitrator's October 8, 2021 order.  *Ex. 40* at 2 [*Advantage Parties' Response to Take 5 Parties' Discovery Motions* (Jan. 10, 2022)] ("The Advantage Parties did this").

80.     On February 21, 2022, after the hearing had already commenced, the Arbitrator entered an order, acknowledging that the notes existed and had not been produced, and ordering for the third time that the Advantage Parties produce the contemporaneous notes. *Ex. 41* [*Order Relating to Notes of Interviews by FTI and L&W*  (Feb. 21, 2022)] ("Advantage implicitly acknowledges that, at least in some instances, contemporaneous notes of interviews were taken and not produced.").



81.     Redacted Pursuant to Stipulated Order

*Ex. 35.*

82.     Redacted Pursuant to Stipulated Order



Redacted Pursuant to Stipulated Order

83.     On April 14, 2022, as a result of the Advantage Parties' bad faith discovery conduct,

the Take 5 Parties sought to strike the Advantage Parties' pleadings, including their answer and

counterclaims, preclusion of evidence of testimony concerning the interviews, preclusion of any Latham attorney testimony, and monetary sanctions. *Id.*

84.     The Arbitrator did not permit testimony to come in concerning the FTI interviews, including the July 2, 2019 Radetich interview, however, he did not grant any of the other relief sought by the Take 5 Parties. *Ex. 57* at 2592:14-2597:24 [*Hearing Tr. Vol. X (Day 10)*]; *see also Ex. 42* [*Correspondence from Hon. J. Eyler* (Apr. 24, 2022)].

85.     Prior to finally producing the notes, the Advantage Parties had repeated the accusation that Radetich admitted and/or confessed to the purported fraud throughout the entirety of Arbitration, including in their written submissions even though the accusation was and is unfounded. Some (but not all) examples of the Advantage Parties' claimed false statements are:

- "In fact, Mr. Radetich admitted in an interview with investigators that he and Mr. Gluck decided to lie to clients in order to maintain their business . . .  Mr. Radetich himself confessed in his interview that he and Mr. Gluck and knew of and implemented this fraudulent practice." *Ex. 8* at 2-3.

- "Recognizing the jig was up, Radetich admitted during his interview by the investigation team that Take 5 was systemically and deliberately providing false reports to its clients, at Gluck's direction, as they 'needed to lie to their clients in order to keep them.'" *Ex. 6* at 4.

- "Radetich himself admitted as much to Latham and FTI in a July 2nd interview, during which he acknowledged that he and Gluck had concluded that Take 5 needed to lie to clients in order to keep them." *Id.* at ¶ 43.

- Redacted Pursuant to Stipulated Order
*Ex. 13* at 16.

- Redacted Pursuant to Stipulated Order
*Ex. 15* at 18.

- Redacted Pursuant to Stipulated Order
*Ex. 35* at 161.

86.     In September 2021, the Take 5 Parties' counsel sought Google Analytics data in connection with the review of the expert reports of David Lasater and Michael Wei, in advance of their expert depositions.  *Ex. 43* at 12-14 [*The Take 5 Parties' Memorandum of Law in Support of Their Motion for an Adverse Inference and Sanctions for Spoliation of Evidence Against the Advantage Parties* (Nov. 24, 2021)].

87.     Shortly thereafter, the Take 5 Parties became aware that the Advantage Parties had not preserved access to the Google Analytics data pursuant to their obligations under Delaware and federal law, even though this data had been made available to the Advantage Parties' experts and counsel during the course of the Arbitration. *Id.*

88.     As set forth in the Take 5 Parties' expert rebuttal report, in order to determine "how [] clicks are generated" (i.e. where they came from and whether they were generated by real users) one must first identify the source of the clicks, which include analyzing traffic data pertaining to the source of the click.  *Ex. 44* at ¶ 49 [*Rebuttal Expert Report of Jessie Stricchiola* (Oct. 6, 2021)] ("An analysis of click validity and/or traffic quality would also include analyzing click and traffic data pertaining to the source of the click (such as server log and Google Analytics data) for client tracking URLs."); *see also Ex. 45* [*Hearing Ex. T-127, Declaration of Jessie Stricchiola* (Dec. 15, 2021)].

89.     On November 24, 2021, the Take 5 Parties moved for an adverse inference and sanctions, arguing that the Google Analytics data was relevant and material to the underlying dispute as well the expert reports, and as a result the Advantage Parties had an obligation to preserve it.  *Ex. 43*  The Take 5 Parties further argued that the Advantage Parties were aware of the importance of the Google Analytics data prior to the commencement of the Arbitration as it

was specifically referenced and attached to the Advantage Parties Notice of Claim and Notice of Dispute dated August 20, 2019.  *Id.* at 6-7, 21; *see also Ex. 8*.

90.     The Advantage Parties responded to the Take 5 Parties' motion for sanctions, but the Arbitrator reserved ruling until after the hearing.  *Ex. 40* at 2;  *Ex. 19* at 2 ("I reserve ruling on all of these motions/objections with the following caveat. Evidence that was the subject of a proper request for discovery, and should have and could have been produced in a timely manner that would have not unduly prejudiced another party, will not be considered, absent a showing of exceptional circumstances.").

91.     In the Interim Award, the Arbitrator denied the Take 5 Parties' motion finding (without significant analysis or explanation but relying exclusively on two of the Advantage witnesses whose testimony had been procured through monetary inducement) that the Google Analytics data did not contain information that would materially impact the issues in the case and declined to impose sanctions.  *Ex. 1* at 4-5.

**Third-Parties**

92.     On November 25, 2020, the Take 5 Parties sought the issuance of summonses to several former Take 5 employees.  The Arbitrator determined that Take 5 was permitted to contact these former employees informally and request information.   However, both parties to the Arbitration had significant problems with getting third parties to comply with discovery absent court subpoenas due to a circuit split concerning the enforceability of arbitration subpoenas, as well as the ongoing criminal investigation.   The Arbitrator acknowledged this issue numerous times, including during the course of the hearing.  *Ex. 46* at 1 [*December 15, 2020  Discovery Order* (Dec. 15, 2020)].  ("Take 5 has stated on several occasions . . . that the former employees refuse to cooperate.").

93.     Most of Take 5's former employees refused to testify given the ongoing criminal investigation.  The Arbitrator also acknowledged this citing it as one of three grounds in denying the parties' motion for summary judgment.  *Ex. 19* at 1 ("[S]everal fact witnesses have refused to testify, asserting the Fifth Amendment").

94.     However, some former employees were willing to testify on behalf of the Advantage Parties, despite the ongoing criminal investigation, because those witnesses were paid either directly or indirectly by the Advantage Parties.

95.     Michael Boy, a former Senior Director of the Take 5 fulfillment department, testified at his deposition ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ *Ex. 47* at 9:16-15:9 [*Boy Depo. Tr.* (May 18, 2021)].  ██████ Redacted Pursuant to Stipulated Order ██████

███████████████████████████████████████████████████████████████████████

██████████████  *Id.* at 15:23-16:12, 18:2-24.

96.     Boy testified to the same at the hearing.  *Ex. 53* at 1650:22-1657:7 [*Hearing Tr. Vol. VI (Day 6)* (Boy Cross Examination)].

97.     Eva Hodgens, a former Senior Director of the Take 5 fulfillment department, testified on behalf of the Advantage Parties and stated for the first time during the hearing that the Advantage Parties were paying her counsel's fees. *Ex. 54* at 2011:6-2012:3 [*Hearing Tr. Vol. VII (Day 7)* (Hodgens Direct Examination)].

98.     On cross examination, Ms. Hodgens testified that she was not familiar with the particulars of the arrangement with the Advantage Parties and could not recall the amount of those fees despite having received copies of the invoices.  *Ex. 55* at 2113:4-19, 2116:17-2117:15 [*Hearing Tr. Vol. VIII (Day 8)* (Hodgens Cross Examination)].  She further testified that she did not "know specifically" whether the bills since 2019 had "exceeded $20,000."  *Id.* at 2117:16-2118:12.

99.     After the Interim Award was issued, it was revealed for the first time that ███████  ████████████████████████████████████████████████████████  *Ex. 69* at 8 [*Advantage Parties' Submission on Costs and Interest* (Aug. 19, 2022)].

100.    Peter Ward, the founder of a software development company that provided services to Take 5, also testified at the hearing that the Advantage Parties were paying his legal expenses, despite having never been an employee of Advantage, but he was not aware of how long that had been taking place and did not know or recall the details of the arrangement.  *Ex. 55* at 2258:24-2260:21 (Ward Cross Examination).

101.    After the Interim Award was issued, it was revealed for the first time that ███████  ██████████████████████████████████████████████████  *Ex. 69* at 8.

**The Hearing**

102.    The evidentiary hearing proceeded and was conducted virtually over the course of sixteen days on January 25, 26, 27, 28, 31, February 1, 2, 3, 4, and May 2, 3, 4, 5, 6, June 5 and July 5, 2022.  *Exs. 48-63* [*Hearing Transcripts Volumes I-XVI*]*; see also Ex. 1* at 3.

103.    Though the hearing was conducted virtually, it was deemed to take place in Washington, DC.  *Ex. 64* at ¶ 1 [*Stipulated Order Governing Protocol for Remote Evidentiary*

29

*Hearing* (Jan. 20, 2022)] ("Pursuant to ¶ 8 of the Parties' Joint Submission to the AAA on March 23, 2020, the evidentiary hearing shall be deemed to take place in Washington, DC"); *see also Ex. 65* at 1 [*Order Ruling on Admissibility of Excerpts from Certain Depositions* (Feb. 11, 2022)] ("The situs of this proceeding is the District of Columbia").

104.    The Advantage Parties presented their case over the course of ten days, calling a total of eighteen witnesses:  eleven fact witnesses, one combination fact/expert witness, two expert witnesses, and the designated deposition testimony of four fact witnesses. *Ex. 1* at 6-24; *see also Exs. 48-57.*

105.    On Day 10 of the hearing, after the Advantage Parties' rested their case, the Take 5 Parties moved for a limited directed verdict arguing that no evidence had been presented concerning RJV, no evidence had been presented demonstrating Radetich and Gluck had personal knowledge of any of the fraud allegations, and the evidence presented was insufficient with respect to the RICO claims against all of the Take 5 Parties. *Ex. 1* at 24; *Ex. 57* at 2709:09-2713:2.

106.    Counsel for the Take 5 Parties' specifically argued:

[T]here is no evidence that Richard Gluck or Alex Radetich had personal knowledge of any of the allegations of – that have been alleged here, any of the fraud allegations. The best they have, Your Honor, the best, was after Eva Hodgens was done on her direct examination, we took a break. Mr. Strub came back and asked Eva Hodgens a few more questions, and all she said was that Alex told me the problems would be remedied after the purchase of Advantage. That's it. There's literally no evidence in front of you, Your Honor, that says that Alex Radetich or Richard Gluck, either of them, had personal knowledge of any of the fulfillment issues, of the tracking issues, et cetera.

Ex. 57 at 2709:16-25, 2710:17-2711:13.

107.    The Arbitrator declined to rule on the motion and took it under advisement. *Ex. 1* at 24; *Ex. 57* at 2709:09-2713:2.

108.    The Take 5 Parties presented twelve witnesses over the course of the remaining five days of the hearing: six fact witnesses, four expert witnesses, and video depositions of two adverse witnesses.  *Ex. 1*  at 24-31; *Exs. 57-63.*

109.    Radetich and Gluck did not testify at the hearing because they were forced to invoke their Fifth Amendment rights as a result of the ongoing criminal investigation at their respective depositions.

110.    The Parties filed post-hearing briefs on June 29, 2022. *Exs. 66-68* [*Written Summation of Petruss Media Group, LLC f/k/a Take 5 Media Group, LLC, Richard Gluck and RJV Marketing Corp.* (Jun. 29, 2022); *Post Hearing Memorandum of Law on Behalf of Alex Radetich* (Jun. 29, 2022); *The Advantage Parties' Post-Hearing Brief* (Jun. 29, 2022)]

111.    Oral closing arguments were presented on July 5, 2022.  *Ex. 63* [*Hearing Tr. Vol. XVI (Day 16)*].

## Interim Award

112.    On August 4, 2022, the Arbitrator issued an Interim Award finding that Take 5, Gluck, and Radetich committed civil fraud, the Take 5 Parties breached the APA, and denying the Advantage Parties RICO claim.  The Arbitrator denied the Take 5 Parties claims of breach of contract and defamation.  *Ex. 1.*

113.    The Interim Award awarded the Advantage Parties a total of $48,325,822.29 in damages, including: $43,633,333.34 reflecting the purchase price of Take 5 versus its "actual value"; $788,954.00 for the amounts paid to Ernst & Young, Jones Day, and others for the costs of the due diligence conducted on Take 5 prior to acquisition; $3,246,203.95 for the amounts paid to FTI and Latham & Watkins in connection with the 2019 investigation into Take 5's operations;

and $657,331.00 for the costs of termination of leases in connection with the shutdown of the Take 5 business unit. *Id.* at 41-43.

## Final Award and Modification

114.     On August 19, 2022, the Advantage Parties filed a letter requesting reimbursement of litigation expenses and interest pursuant to the Section 10.11(b) of the APA, seeking $37,765,382.77 in attorneys' fees, expert fees', costs, and interest. *Ex. 69* at 8 [*Advantage Parties' Submission on Costs and Interest* (Aug. 19, 2022)].

115.     On August 29, 2022, the Advantage Parties provided an additional letter on litigation expenses attaching supplemental authority. *Ex. 70* [*Advantage Parties' Supplemental Submission on Costs and Interest* (Aug. 29, 2022)]

116.     On September 16, 2022, the Take 5 Parties responded arguing that the Advantage Parties had failed to demonstrate their entitlement to the various categories of costs and interest. *Ex. 71* [*Take 5 Parties' Submission on Costs and Interest* (Sept. 16, 2022)].

117.     On September 20, 2022, the AAA sent the Parties a letter declaring the action closed as of September 19, 2022 and stating that "any direct exchange with the Arbitrator is terminated" and "[a]ll communications shall be directed to the AAA." *Ex. 72* [*AAA Correspondence* (Sept. 20, 2022)].

118.     Later the same day, counsel for the Advantage Parties sent correspondence directly to the Arbitrator by email improperly responding to the Take 5 Parties' Reply Submission on Costs and Interest. *Ex. 73* [*Correspondence from M. Strub attaching Advantage Parties' Response to the Take 5 Parties' Reply Submission on Costs and Interest* (Sept. 20, 2022)].

119.    Notably, the Advantage Parties admitted in their September 20, 2022 response that in the absence of them paying witnesses to provide testimony (whether through direct payments or through payment of their legal fees and expenses), the Advantage Parties would not have been able to prove fraud:

Redacted Pursuant to Stipulated Order

*Id.* at 6-7.

120.    Following objection by counsel for the Take 5 Parties, the Arbitrator responded by email stating that he would not reopen the record. *Ex. 74* [*Correspondence from Hon. J. Eyler* (Sept. 20, 2022)].

121.    On October 4, 2022, the Arbitrator issued a Final Award incorporating the Interim Award and determining that the Advantage Parties were the "prevailing parties." *Ex. 2 & 3* at 2, 10-11 ("The Interim Award is incorporated herein and made a part hereof.").The Final Award additionally awarded the Advantage Parties $13,760,862.50 in pre-judgment interest, $7,318,894.05 in attorneys' fees, $556,436.50 in expert witness fees, $279,287.99 in subscription fees, $116,782.57 in other costs, and $119,110.00 in the administrative fees and expenses of the American Arbitration Association and compensation and expenses of the Arbitrator. *Id.* at 10-11.

122.    On October 4, 2022, the AAA provided further correspondence reminding the parties that "there is to be no direct communication with the arbitrator. All communication shall be directed to the AAA." *Ex. 75* [*AAA Correspondence* (Oct. 4, 2022)].

123.     Later that same day, counsel for the Advantage Parties (again improperly) sent email correspondence directly to the Arbitrator requesting the Arbitrator enter a corrected Final Award due to a typographical issue with the final damages number provided at paragraph 1 reflecting an award of $43,633,333.34 rather than $48,325,822.29.  *Ex. 76* [*Correspondence from M. Strub* (Oct. 4, 2022)].

124.     AAA Director of ADR Services, Matthew Conger, sent correspondence to the parties acknowledging the Advantage Parties' improper email correspondence as a request under AAA Commercial Rule R-50 for modification of the Final Award and invited the Take 5 Parties to provide a substantive response in writing by October 14, 2022.  *Ex. 77* [*Correspondence from M. Conger* (Oct. 5, 2022)].

125.     The Take 5 Parties responded to the request on October 14, 2022, agreeing to the Advantage Parties proposed modification, requesting an additional clarification of the Final Award, and objecting to the Advantage Parties continued disregard of AAA procedure.  *Ex. 78* [*Take 5 Parties' Response to Request for AAA Commercial Rule R-50 Modification of Final Award* (Oct. 14, 2022)].

126.     On October 20, 2022, the Advantage Parties replied that they had no objection to the Take 5 Parties' request for additional clarification of the Final Award.  *Ex. 79* [*Correspondence from M. Strub* (Oct. 20, 2022)].

127.     Later that day, the Arbitrator issued the Modified Final Award, modifying the damages number reflected in paragraph 1 as requested by the Advantage Parties.  The AAA also provided the clarification requested by the Take 5 Parties.  *Ex. 3* at 10.

## GROUNDS FOR VACATUR

128.    As described in greater detail in Petitioners' Motion to Vacate or Set Aside the Arbitration Awards and accompanying Memorandum of Points of Law and Authorities, the Awards should be vacated pursuant to Section 10 of the Federal Arbitration Act and under common law because the Arbitrator is guilty of misconduct, exceeded his powers or imperfectly executed them, and manifestly disregarded the law.  Additionally, the Awards should be vacated because they were procured through corruption, fraud, or undue means.

129.    Pursuant to Section 10(a)(3) of the Federal Arbitration Act, the Arbitrator is guilty of misconduct in refusing to postpone the hearing or grant the Take 5 Parties' motion for a limited emergency stay in light of the parallel criminal investigation of Alexander Radetich, Richard Gluck, and other former Take 5 former employees and individuals resulting in substantial prejudice to the Take 5 Parties such that they were denied a fair hearing.

130.    Pursuant to Section 10(a)(3) of the Federal Arbitration Act, the Arbitrator is guilty of misconduct in refusing to hear evidence pertinent and material to the controversy with respect to the Google Analytics evidence spoliated or concealed by the Advantage Parties, resulting in substantial prejudice to the Take 5 Parties such that they were denied a fair hearing.

131.    Pursuant to Section 10(a)(4) of the Federal Arbitration Act, the Arbitrator exceeded his powers or imperfectly executed them in entering the Awards against RJV Marketing Corp. and by awarding certain costs as a part of the damages award because the record contains no support for the arbitrator's determinations.

132.    Pursuant to Section 10(a)(1) of the Federal Arbitration Act, the Award was procured by corruption, fraud, or undue means because the Advantage Parties used undue means

to procure witness testimony by directly or indirectly paying factual witnesses significant sums in order to induce such witnesses to testify and then withholding such information (in whole or in material part) from the Take 5 Parties and the Arbitrator.

133.    The award was issued in manifest disregard of the law with respect to the award against RJV Marketing, the failure to invoke an adverse inference or sanction the Advantage Parties for their concealment or spoliation of evidence, deeming witness testimony credible despite significant payments, awarding certain costs as damages, and awarding prejudgment interest.

WHEREFORE, Petitioners, the Take 5 Parties, respectfully request that the Court enter an Order:

(i)      vacating the Interim Award and the Modified Final Award based thereon; and

(ii)     vacating the Modified Final Award (separately and independently of the Interim Award) should the Court decline to vacate the Interim Award;

(iii)    awarding such other and further relief as the Court deems just and proper.

Dated: October 26, 2022                          Respectfully submitted,

                                                  /s/ Lisa M. Richman
                                                 Lisa M. Richman (No. 488693)
                                                 Lauren H. Evans (No. 156152)
                                                 MCDERMOTT WILL & EMERY LLP
                                                 500 North Capitol Street, NW
                                                 Washington, DC 20001
                                                 Tel.: 202-756-8000
                                                 lrichman@mwe.com
                                                 levans@mwe.com

                                                 *Attorneys for Petitioners Petruss Media Group,*
                                                 *LLC f/k/a Take 5 Media Group LLC and Cross-*
                                                 *Respondents  RJV  Marketing  Corp.,  Richard*
                                                 *Gluck, and Alexander Radetich*