# EXHIBIT 4

**AMERICAN ARBITRATION ASSOCIATION**

| |
|---|
| PETRUSS MEDIA GROUP, LLC,<br>    f/k/a Take 5 Media Group, LLC, *et al.,*<br><br>                    Claimants,<br><br>vs.<br><br>ADVANTAGE SALES & MARKETING, LLC, *et al.,*<br><br>                    Respondents. |

**Case No. 01-19-002-7532**

| |
|---|
| ADVANTAGE SALES & MARKETING,  LLC, *et al.*<br><br>            Counter-Claimant and<br>            Cross-Claimants,<br><br>vs.<br><br>PETRUSS MEDIA GROUP, LLC,<br>    f/k/a Take 5 Media Group, LLC, *et al.*<br><br>            Counter-Respondent and<br>            Cross-Respondents. |

**AMENDED STATEMENT OF CLAIM**

Claimants, Petruss Media Group, LLC f/k/a Take 5 Media Group, LLC ("Company," "PMG" or "Take 5"), Alexander Radetich ("Radetich"), Richard Gluck ("Gluck"), and RJV Marketing Corp. ("RJV") (collectively, the "Take 5 Parties"), amend their claim to state that Respondents, Karman Topco  L.P. ("KT"), Advantage Solutions, Inc. ("Advantage Solutions"), Karman Intermediate Corp. ("KIC"), Advantage Sales and Marketing Inc. ("Advantage Inc."), and Advantage Sales and Marketing LLC ("ASM") (collectively,  "Advantage")[1] engaged in wrongdoing giving rise to the legal claims herein.

---

[1]    KT, Advantage Solutions, KIC, and Advantage Inc. each availed itself to the jurisdiction of the American Arbitration Association by filing as Cross-Claimants a Cross-Demand on September 19, 2020 and an Amended Cross-Demand against the Take 5 Parties on October 18, 2019.

## SUMMARY OF CLAIMS

In 2003, Radetich and Gluck founded a company called Take 5. Their hard work over fifteen years established the company as a respected force in its field which was direct mail marketing and the burgeoning market for digital consumer data and digital consumer marketing. By 2017, Take 5's annual revenues had reached some $30 million.

In late 2016, Radetich and Gluck decided to assess the market for a strategic partner for the Company or potential sale of the Company and its database and engaged Petsky Prunier ("Petsky"), a well-regarded investment banker with expertise and experience in the telecom, media and technology sectors. Petsky conducted market research and determined significant interest for the potential acquisition of the business. Petsky engaged with the Company, developing various tools to elicit interest amongst potential buyers. One of the primary tools developed by Petsky was a Confidential Information Memorandum (the "CIM"), commonly used by investment banks to describe the business that is being marketed for sale. The CIM, in its opening paragraphs, described Take 5 as follows:

> Take 5 Media Group is a fast-growing marketing data platform that owns one of the largest, most accurate, and comprehensive consumer databases in the U.S. This robust database serves as the foundation for end-to-end, data-driven marketing solutions that enable leading national and local brands to optimize their overall business performance through advanced targeting, understanding, engagement, and retention of valuable consumer audiences. Today's top marketers are omni-channel marketers. Their most effective marketing programs deliver personalized and coordinated customer experiences across multiple media channels including multiple devices.

> According to studies from Deloitte and Abderdeen Group, omni-channel shoppers expect to spend over 70% more than single channel shoppers annually and have 30% higher lifetime value. With comprehensive and well-managed data at its core, Take 5 has developed a differentiated ability to execute complex, data-driven marketing campaigns throughout their path-to-purchase, and ultimately drive significantly increased response rates and marketing ROI.

2

CIM at 1, Exhibit B.

Having determined that there were a number of potential buyers interested in Take 5, Petsky recommended, and Radetich and Gluck agreed, that Petsky should utilize an auction process to elicit a number of potential offers from prospective buyers. Pesky established a virtual data room to house and to enable third parties to review the various key agreements and materials relating to Take 5. Petsky managed the process to enable prospective buyers to access certain items of due diligence to enable prospective buyers to submit indications of interest setting forth on a non-binding basis the terms and conditions by which the prospective buyers would purchase Take 5.

Coincidently, a multi-billion-dollar conglomerate, Advantage Solutions, had decided to "go public" aiming to achieve a $4 billion capitalization through an initial public offering ("IPO"). To reach its targeted capitalization, Advantage Solutions needed to rapidly add additional companies to its portfolio of conglomerated assets, each with good revenue generating capacity. In the Spring of 2017, Advantage Solutions publicly stated that it had spent two years acquiring 39 businesses and that it intended "to continue to seek . . . acquisition targets that provide us with . . . stockholder value." *Advantage Solutions Registration Statement*, U.S. Securities and Exchange Commission, 05/04/2017.

Advantage Solutions authorized one of its many companies, ASM, to offer to purchase the Take 5 business for $77 million up front plus substantial additional payments tied to future performance. While there were competing bids for the Take 5 business, ASM convinced Radetich and Gluck and ASM was the best fit for Take 5 going forward and, in particular, that ASM would boost Take 5's continued growth. For instance, before a definitive agreement was signed, ASM made the following pitch to Radetich and Gluck:

> Based on what we have learned about the Company from our discussions with management and the materials provided, we firmly believe Take 5 would be an excellent fit with Advantage. We see a number of opportunities to combine Take 5's proprietary database with our own data to augment our combined suite of digital marketing products. In addition, we believe we can enhance Take 5's programmatic, mobile and search capabilities and accelerate their penetration of the CPG [consumer packaged goods] and retail verticals.

*Letter of Intent ("LOI")*, 12/08/2017 (Exhibit C at 1).

Ultimately, after reviewing and assessing a number of competitive and lucrative offers, Take 5 entered into the LOI with Advantage, which specifically conditioned its offer on completing a satisfactory due diligence of Take 5. The LOI provided as follows:

> The Company will give Advantage and Advantage's management personnel, legal counsel, accountants, and technical and financial advisors, full access and opportunity to inspect, investigate and audit the books, records, contracts, filings, and other documents of the Company as it relates to its business and all of its assets and liabilities (actual or contingent), including, without limitation, inspecting its property and reviewing financial records, contracts, operating plans, and other business records, for the purposes of evaluating issues related to the operation of the Company's business. The Company further agrees to provide Advantage with such additional information as may be reasonably requested pertaining to its business and assets.

LOI at 4.

Take 5 fully complied with its obligations as Advantage engaged in a thorough and comprehensive due diligence process that extended from December 2017 through March 2018. With the assistance of global accounting and law firms Ernst & Young and Jones Day, Advantage conducted a deep dive into all aspects and elements of Take 5's business. Advantage employees interviewed Take 5 employees directly and used the Parthenon Group, a part of Ernst & Young, to conduct confidential interviews of Take 5's customers. Advantage senior management spent extensive time in discussions with Gluck and Radetich, meeting with them in Florida, New York,

4

and at Advantage's offices in California.

In the course of Advantage's financial due diligence, Take 5 made Advantage aware that its financial statements, which had only been used for internal reporting and for tax purposes, had been subject only to annual review rather than an annual audit. Advantage demanded that, as a condition to closing, Take 5 provide a set of audited financial statements for the fiscal year ending December 31, 2017. Take 5 management willingly complied and engaged Cherry Bekaert, one of the nation's largest accounting and consulting firms, to prepare and deliver to Take 5 audited Combined Financial Statements as of and for the year ended December 31, 2017, that were thereafter delivered to Advantage.

In the course of Advantage's legal due diligence, Take 5 disclosed two litigation matters in which customers raised complaints, either as plaintiffs or as counterclaimants after Take 5 initiated proceedings, about Take 5's digital marketing campaigns. Jones Day, counsel for Advantage, reviewed each of these two litigation matters in detail as part of its diligence.

Advantage—having used every tool at its disposal through months of due diligence—and Take 5 entered into the Asset Purchase Agreement on March 15, 2018, that provided for Advantage to pay $77 million in up front consideration as well as an earn-out amount of up to $53 million based on the performance of the Take 5 business post-closing. Radetich and Gluck, recognizing the integrity of the business they had built and the purported advantages and synergies of Take 5 being part of Advantage, chose Advantage as the acquirer because of the upside presented by what they viewed as an achievable earn-out.

The transaction closed on April 1, 2018. Immediately thereafter, Advantage designated its employee Gary Colen ("Colen") as the person in charge of the Take 5 business unit. Surprisingly, Colen stripped Radetich and Gluck of their authority over the Take 5 business unit, sidelining them and instructing them to limit their activities to "helping with revenue." From the outset, Colen, on

behalf of Advantage, engaged in a pattern of misconduct with the purpose and intent of circumventing Advantage's earn-out obligations by improperly depressing Take 5's revenues and increasing its expenses. Over the course of 2018 and 2019, Colen and Advantage—in violation of the Asset Purchase Agreement—sacrificed the Take 5 business unit to benefit other Advantage business units, primarily Advantage Media Solutions, LLC ("Advantage Media"), which was led by Colen's long-time associate, Joshua Pike ("Pike").

Other problems developed, including:

- Advantage began to manipulate the financials among their companies, to the detriment of the Take 5 business. Advantage "fixed" the books by shifting expenses of poorly achieving companies to the books of the Take 5 business.

- Advantage transferred lucrative business, developed by the Take 5 business, to other businesses of Advantage.

- Advantage reduced the expenses of the Take 5 business by dismissing most of its sales force.

- Advantage cut the commission rate of Take 5 sales personnel, materially affecting their livelihood and causing some to leave.

- Advantage assimilated Take 5 into the Advantage bureaucracy.  Take 5 had been an entrepreneurial company with a tight management team and sales force.  These hardworking personnel became cogs in the massive machinery of Advantage, constantly called in to meetings with management.

- The financial performance of the Take 5 business began to suffer under the practices of Advantage.

These and other practices of Advantage robbed Take 5 of its own performance and diminished the ability of Radetich and Gluck to reach the performance targets that would generate the $53 million balance of the purchase price ASM had agreed to pay.

In April of 2019, Advantage asked Radetich and Gluck to accept an early exit from the business. ASM would pay Radetich and Gluck $770,000 and release them from their indemnity obligations under the contract through which ASM had purchased the business and Radetich and Gluck would surrender their rights to the balance of the purchase price tied to future performance of the business. Not willing to walk away from the more than $50 million in unpaid purchase price, Radetich and Gluck declined ASM's offer.

In June 2019, more than a year after controlling and managing all aspects of the operation of Take 5, Advantage claimed that Take 5 employees committed fraud before the closing and then continued to do so for nearly 15 months after the closing as employees of Advantage. Advantage's allegations of fraud seem to mirror complaints made by two customers in previous litigation and disclosed to Advantage by Take 5 during the due diligence process.

Advantage's claim was false. Both before and after being acquired by ASM, Take 5 was a legitimate business delivering a successful and profitable product to many sophisticated and satisfied customers. Nevertheless, Advantage ran with the false scenario without adequately vetting it and launched a salvo of defamatory statements. Advantage told customers of the Take 5 business unit that it was abruptly shutting down the business because Advantage had determined that the business was a fraudulent front operated by Radetich and Gluck. Advantage also spread this message to other important players in the industry, whose backing was necessary for the operation of the Take 5 business. Advantage also spread this calumny to its 50,000 employees worldwide.

7

In early July 2019, Advantage abruptly terminated the Take 5 business, terminating dozens of employees, and leaving customers in the lurch on projects underway, materially damaging those customers. Advantage offered to pay customers under the guise of refunds for purportedly false charges. These refunds constituted a tiny fraction of Advantage's balance sheet and enabled Advantage to "deep six" the Take 5 business unit. By discontinuing Take 5 as a separate business Advantage violated the express terms of the Asset Purchase Agreement and the implied covenant of good faith and fair dealing. The parties negotiated a purchase price that was payable 56% at closing with 44% to be paid as part of an earn-out. As part of that deal, Advantage was obligated to attempt, in good faith, to make the Take 5 business a success, not to siphon profits to another part of Advantage, which it did, and certainly not to shut down the business. Although Advantage bargained for and received the right to *operate* the Take 5 business unit, Advantage never sought, and Radetich and Gluck never would have given, Advantage the right *not to operate* the business at all. In fact, the Asset Purchase Agreement places an affirmative obligation on Advantage to "maintain the Business as a separate business unit." Advantage breached this provision in blatant violation of the Asset Purchase Agreement.

Advantage decided to torpedo its Take 5 business unit without concern for ASM's obligations under the purchase agreement, and without considering the interests of Radetich and Gluck, their corporate entity, or the many years they spent building the company. Advantage's shutdown of the Take 5 busines was part and parcel of its prime strategy of "going public" and the public "optics" associated therewith. Advantage expanded its IPO capitalization target from $4 billion in July 2019 to $5.2 billion in 2020 via a merger with a publicly traded special purpose acquisition company. Advantage announced that its "new publicly traded" entity "implies an

initial enterprise value for Advantage of approximately $5.2 billion or 10.1x its estimated 2021 Adjusted EBITDA of $515 million." *See* businesswire.com, 09/08/2020.

In addition to depriving Radetich and Gluck of the balance of the agreed purchase price for the Take 5 business, Advantage materially damaged the reputation of Radetich and Gluck in their occupation. The false narrative spread by Advantage defamed Radetich and Gluck in their professional working capacity and thus, constituted libel *per se.*

The actions of Advantage beginning immediately following the closing of ASM's acquisition of Take 5, described in more detail below, constitute (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) defamation, and (4) negligence for which Take 5, Radetich, and Gluck are entitled to substantial monetary damages together with costs and expenses incurred by Take 5, Radetich, and Gluck, including attorneys' fees.

## **PARTIES AND RELEVANT NON-PARTIES**

1.      Claimant Petruss Media Group, LLC, f/k/a Take 5 Media Group, LLC, is a Florida limited liability company, with its principal place of business in Boca Raton, Florida.

2.      Claimant Alexander Radetich is an individual residing in Boca Raton, Florida and is Managing Partner of Petruss Media Group, LLC. Radetich is a Beneficial Owner under the Asset Purchase Agreement. Immediately prior to ASM's acquisition of Take 5, Radetich was one of two Managing Directors of Take 5. Radetich held 44.45% membership units in Take 5.

3.      Claimant Richard Gluck is an individual residing in Boca Raton, Florida and is Managing Partner of Petruss Media Group, LLC. Gluck is a Beneficial Owner under the Asset Purchase Agreement. Immediately prior to ASM's acquisition of Take 5, Gluck was the other Managing Director of Take 5. Gluck held 44.45% membership units in Take 5.

4.      Claimant RJV Marketing Corp. ("RJV"), is a Florida corporation, with its principal place of business in Bal Harbour Village, Florida and is a member of Petruss Media

Group, LLC.  RJV is a Beneficial Owner under the Asset Purchase Agreement.  Immediately prior to ASM's acquisition of Take 5, RJV Marketing Corp. held 11.1% membership units in Take 5.

5.      Respondent Advantage Sales & Marketing LLC ("ASM"), which is engaged in the provision of technology-enabled sales and marketing solutions to manufacturers and retailers, is a California limited liability company, with its principal place of business in Irvine, California. ASM is the Buyer under the Asset Purchase Agreement.

6.      Respondent Advantage Sales & Marketing Inc. ("ASM Inc."), the parent entity of ASM, is a corporation with its principal place of business in Irvine, California.

7.      Respondent Karman Intermediate Corp. ("KIC"), the parent entity of Advantage Inc., is a Delaware corporation with its principal place of business in Irvine, California.  ASM also is an indirect, wholly owned subsidiary of KIC, which in turn, is an indirect, wholly owned subsidiary of Respondent Advantage Solutions Inc.

8.      Respondent Advantage Solutions Inc. ("Advantage Solutions"), the parent entity of KIC, is a Delaware corporation with its principal place of business in Irvine, California. Advantage Solutions is a leading business solutions provider to consumer goods manufacturers and retailers.  It is headquartered in Irvine, California, and has over 160 offices and 50,000 employees in the United States and Canada from which it provides sales and marketing services to a host of Fortune 500 and other companies.

9.      Respondent Karman Topco L.P. ("KT"), the parent entity of Advantage Solutions, is a Delaware limited partnership with its principal place of business in Irvine, California.

10.     Non-Party Gary Colen is an individual residing in Pittsboro, North Carolina and is Chief Executive Officer of AMP Agency, an ASM business unit.

11.     Non-party Joshua Pike is an individual residing in Newburyport, Massachusetts and is an Executive Vice President of Strategy and Integrations of Advantage Solutions.

## JURISDICTION & VENUE

12.    Section 10.11(a) of the Asset Purchase Agreement dated March 15, 2018 provides that "[i]f the Parties should have a Dispute (a "Dispute") involving money damages arising out of or relating to this Agreement," then following a dispute resolution procedure, "the Parties will refer the Dispute (to the exclusion of a court of law) to final and binding arbitration in accordance with the procedures set forth in Section 10.11(b)."  (Exhibit A).

13.    Section 10.11(b) of the Asset Purchase Agreement further provides, in relevant part:

> Any arbitration pursuant to this agreement shall be presided over by one arbitrator in Delaware, in accordance with the then existing commercial arbitration rules (the "Rules") of the [AAA], and judgment upon the award rendered by the Arbitrator may be entered into any court having jurisdiction thereof; provided, however, that the Law applicable to any controversy shall be the Law of the State of Delaware regardless of principles of conflicts of Laws.

Exhibit A.

14. All conditions precedent have been met, waived, excused, or have occurred.

15.    Respondents KT, Advantage Solutions, KIC, and Advantage each availed itself to the jurisdiction of the American Arbitration Association by filing as Cross-Claimants a Cross-Demand on September 19, 2020, and an Amended Cross-Demand against the Take 5 Parties on October 18, 2019.

## FACTUAL BACKGROUND

### *2003 to 2016: Radetich and Gluck*
### *Grow Take 5 Media into a Successful Business*

16.    Radetich and Gluck founded Take 5 in 2003, building it into a highly successful and innovative business providing clients with consumer data as well as data marketing services and products.

17.     By 2017, Take 5 had over 90 employees across two offices. The main office was in Boca Raton, Florida and a second, smaller office was in New York, New York. Take 5 also employed one sales representative in Georgia.

18.     Take 5's most valuable asset was a massive database it built and maintained, which contained demographic, lifestyle, and contact information for hundreds of millions of consumers—such as ages, gender, household incomes, shopping preferences, mailing addresses, email addresses, and phone numbers.  Over the span of 15 years, Take 5 developed one of the most unique and sought-after consumer databases in the country. Large national database compilers, leading insurance companies, credit bureaus, and automotive marketing agencies consumed Take 5's data through well-tenured, multi-year data licensing contracts. The database represented a significant portion of Take 5's value.

19.     Take 5's database was constantly evolving capturing billions of bits of consumer data.  The higher percentage of accurate information in a massive database, drawn from many sources, increased the likelihood of results from marketing campaigns utilizing that data.  Take 5 understood the importance of hygienic cleaning of its database and performed these tasks by what is called "pinging and cleaning" the data.  Take 5 also utilized an outside vendor, HygenicsData (now known as Appriss), specializing in that hygienic process, to regularly "ping and clean" Take 5's consumer database.

20.     Take 5 commercialized this database in two ways: data delivery and marketing campaigns.  Through its data delivery services, Take 5 delivered bulk data to clients.  This business line had exceptionally high margins: it was almost pure profit. Take 5's other business line was producing highly targeted and personalized marketing campaigns. Although significantly larger in

terms of volume than the data delivery business, the marketing campaigns had a somewhat lower profit margin.

21.    Take 5's marketing campaigns delivered value to Take 5's clients because they successfully routed potential customers to those clients. Take 5 achieved this result through "omni-channel" marketing, including social media, mobile device advertising, email, programmatic advertising, targeted advertising in web browsers, and direct mail (paper mail delivered by the postal service). These comprehensive, data-driven marketing campaigns allowed its sophisticated clients to target, understand, engage, and retain valuable customers.

22.    By way of example, a car dealer client might want to target customers who live within a certain distance of one or more dealerships, who earn a particular level of income, and who own certain vehicles.  Take 5's extensive database would allow a marketing campaign to target those individuals, serving up direct mail advertising, custom social media campaigns, web-based advertisements, email or mobile device ads to steer the targeted consumer to the dealer's website.

23.    Sophisticated clients easily recognized the value that Take 5 delivered. Software platforms such as Google Analytics allow a website operator to tell how a particular user got to their website, including whether they clicked on an advertisement, a search engine link, or a link in an electronic communication. Clients could see, in some cases nearly in real time, how Take 5's marketing campaigns drove customers to their websites. Take 5 achieved a remarkable client retention of **over 90 percent** for clients that spent more than $75,000 per year. Clients lauded the Take 5 database and the tremendous return on investment that they achieved through Take 5's omni-channel marketing campaigns. The bottom line for marketing campaign clients was that Take

5 generated so much in sales that coming back for additional campaigns was a smart investment of marketing dollars.

### *2016 to 2017: Take 5's Financial Success Leads to Courtships by Strategic Buyers Including Advantage Solutions Which Was Seeking Acquisition Targets That Would Provide Stockholder Value*

24.    Seeking to capitalize on Take 5's remarkable growth and expand it even further, Radetich and Gluck contacted Petsky Prunier, an investment banker, in late 2016 to discuss introducing Take 5 to the marketplace.

25.    To elicit potential buyers, Petsky Prunier sent out a Confidential Information Memorandum ("CIM") to prospective buyers in August 2017. The CIM reflected Take 5's tremendous growth, as illustrated in the graph below.



In the CIM, Take 5 projected $30.2 million in revenue for 2017, representing year-over-year growth of 22 percent, $24.7 million of gross profit, and $12.6 million of adjusted EBITDA, equating to high margins of 82 percent and 42 percent, respectively.  (Exhibit B at 6).

26.    Coincidently, Advantage Solutions, a multi-billion-dollar conglomerate, had decided to "go public" aiming to achieve a $4 billion capitalization through an initial public

offering ("IPO").  To reach the massive, targeted capitalization, Advantage Solutions need to rapidly add additional companies to its portfolio of conglomerated assets, each with good revenue generating capacity.  In the Spring of 2017, Advantage Solutions publicly stated that it had spent two years acquiring 39 businesses and that it intended "to continued to seek . . . acquisition targets that provide us with . . . stockholder value."  *Advantage Solutions Registration Statement,* U.S. Securities and Exchange Commission, 05/04/2017.

27.    As many as 17 interested buyers made robust offers to acquire the Take 5 business, including Advantage Solutions.

28.    After receiving Advantage Solutions' expression of interest, Radetich and Gluck met with ASM representatives twice between November 1, 2017, and November 14, 2017, to discuss a potential sale.

29.    Radetich and Gluck received a Letter of Intent ("LOI") from Advantage Solutions on November 16, 2017.  Radetich and Gluck also received second round bids in the form of letters of intent from five other companies.

30.    In deciding which opportunity to pursue, Radetich and Gluck continued to discuss the potential sale to ASM with ASM's representatives.

31.    To induce Radetich and Gluck to sell Take 5 to it, ASM represented that it would provide Take 5 with access to ASM's extensive intercompany network and existing business relationships. ASM had at least 36 business units, including AMP Agency, Advantage Media, Upshot, Edge Marketing, IN Connected Marketing, and Adlucent. Advantage Solutions also has lucrative business relationships with various Fortune 500 companies. ASM promised Radetich and Gluck access to Advantage Solutions' internal network and relationships. Radetich and Gluck recognized that this access would undoubtedly increase Take 5's sales and revenue and allow the Take 5 business unit to hit the proposed earn-out milestones. Critically, ASM's representations

differentiated its offer from the other company that was still in the running—ASM represented

much greater synergies post-acquisition to improve Take 5's revenue and profitability.    For

instance, before a definitive agreement was signed, ASM made the following pitch to Radetich

and Gluck:

> Based on what we have learned about [Take 5] from our discussions with
> management and the materials provided, we firmly believe Take 5 would be
> an excellent fit with [ASM]. We see a number of opportunities to combine
> Take 5's proprietary database with our own data to augment our combined
> suite of digital marketing products. In addition, we believe we can enhance
> Take 5's programmatic, mobile and search capabilities and accelerate their
> penetration of the CPG [consumer packaged goods] and retail verticals.

*Letter of Intent*, 12/08/2017 (Exhibit C at 1).

32.    Accordingly, Radetich and Gluck turned down other highly competitive offers and

chose to sell Take 5 to ASM. Radetich and Gluck chose ASM in reliance on its representations

that it would integrate Take 5 into ASM and provide access to intracompany sales and Advantage

Solutions' large customer base and on the basis of its easily achievable earn-out structure.

### December 2017 to March 2018: Radetich and Gluck Choose ASM and ASM Conducts Extensive Due Diligence of Take 5

33.    On behalf of Take 5, Radetich and Gluck signed the LOI with ASM on December

8, 2017.

34.    Importantly here, ASM's diligence exercise of Take 5 began in earnest in December

of 2017 and lasted for months. ASM, acting through its counsel, peppered Take 5 management

with a multitude of requests that were posed to management and its representatives.

35.    In the course of this due diligence, ASM asked for, and received, audited financial

statements for 2017: for prior years, Take 5's financial statements had not been audited. To satisfy

ASM's request, Take 5 management engaged Cherry Bekaert, one of the country's largest

accounting and consulting firms in the country, to prepare and deliver to Take 5 and ASM audited

16

Combined Financial Statements as of and for the year ended December 31, 2017.

36.     Advantage engaged the global accounting firm of Ernst & Young LLP which began financial due diligence and the global law firm of Jones Day which conducted legal due diligence on Take 5. Radetich and Gluck fully cooperated with the due diligence process and provided full access to Advantage personnel, its accountants, counsel, and advisors enabling ASM to conduct an exhaustive and comprehensive due diligence investigation of Take 5. Radetich and Gluck, on behalf of Take 5, went as far as to allow Advantage to engage Ernst and Young to confidentially interview Take 5's top customers before closing to assess the strength of the relationships and the level of satisfaction that the customers had with Take 5's offering and services.

37.     The results of Ernst & Young's investigation—before ASM got its hands on Take 5 and before any adversarial relationship or made-to-order investigations—reflected Take 5's solid reputation in its industry.

38.     In legal diligence, ASM utilized three different request lists—general, supplemental, and reorganization—to conduct due diligence. For the general legal diligence request, Take 5 responded in full and provided applicable and requested documents to the virtual data room (the "VDR") over the course of December 2017.  These requests and responses included, among others, information related to general corporate governance and capitalization, contracts with Take 5's customers and vendors, historical and ongoing litigation, employee matters, intellectual property, real property, and tax.  Then, from the end of December 2017 to early March 2018, Advantage and Take 5 utilized the supplemental diligence request list as a vehicle to conduct a more detailed review of Take 5's operations. This list included a detailed dive into Take 5 whereby Advantage requested specific agreements, amendments and exhibits to certain agreements, confirmation of various provisions contained in specific agreements, specific statements of work and invoices, various licenses, trademarks and other intellectual property,

information regarding particular employees, and 55 questions on data privacy and security.

39.     Two litigation matters disclosed to Advantage during the due diligence process spoke directly to customer complaints in the omni-channel digital marketing business that Advantage now characterizes as "fraud" in an effort to excuse its breach of the Asset Purchase Agreement.  Although these two cases represent a tiny fraction of the marketing campaigns run by Take 5 over the years, their disclosure underscored what a sophisticated buyer like Advantage already knew about the omni-channel marketing business and the potential for customer complaints.

40.     The first complaint was filed by Consumerbase LLC, d/b/a/ Exact Data and alleged that Take 5 agreed to deploy an email campaign, failed to do so in accordance with the terms of the subject contract, yet subsequently provided Consumerbase with a report that misrepresented various of the performance metrics (*i.e.*, number of emails sent, "click through" rates, etc.). The litigation settled and in diligence Take 5 provided to ASM a copy of the Settlement Agreement and included it in the VDR.

41.     The second litigation matter was brought by Take 5 against Dealers United LLC, Brian Pasch, and PCG Consulting, as detailed in Section 2.12(a) of the Disclosure Schedule to the Asset Purchase Agreement. In the complaint, Take 5 alleged that Mr. Pasch and his related entities made various defamatory allegations regarding Take 5's email marketing practices with allegations similar to those made by ASM today. Dealers United asserted a counterclaim based on allegations that are very similar to those made by ASM now. As part of Take 5's obligation to update ASM on any disclosures made between the execution of the Asset Purchase Agreement and closing, Jones Day was advised on March 29, 2018, that the litigation had been settled and that a copy of the settlement agreement would be posted to the VDR, which it was.

42.    In addition to having access to Jones Day's analysis and notice of these two lawsuits, each of which settled prior to closing, ASM made full use of its rights in the due diligence process to interview Take 5 employees, including the employees who were responsible for fulfilling digital marketing campaigns. These interviews took place outside the presence of without Radetich and/or Gluck.

### March 2018: Take 5 and ASM Enter into the Asset Purchase Agreement

43.    After extensive and robust due diligence by ASM, the recommendation to purchase the Take 5 business was made by the following current or former Advantage personnel:  Darrin Kleinman, Samuel Bass, Craig Johnson, Jill Griffin, Brian Stevens, Gary Colen, and Joshua Pike.

44.    Following the recommendation, a subset of the KT Board of Directors provided final approval for the transaction, including authorizing ASM's entering into the Asset Purchase Agreement.  The subset of the KT Board of Directors included:  Tanya Domier, Chief Executive Officer of Advantage Solutions, Brian Stevens, Chief Financial Officer of Advantage Solutions, Cameron Brietner, a partner with CVC Capital Partners, a private equity firm advising funds that hold units in KT, Ryan Cotton, Jonathan Zhu, and Timothy Flynn, a partner with Leonard Green & Partners, L.P., a private equity firm that holds units in KT.

45.    ASM and the Take 5 Parties signed the Asset Purchase Agreement on March 15, 2018. All parties were represented by experienced counsel at international law firms: Jones Day represented ASM and McDermott Will & Emery represented the Take 5 Parties.  (Exhibit A).

46.    The Asset Purchase Agreement provided for two components of consideration for the Take 5 assets: (i) $77 million in up-front consideration, and (ii) an earn-out amount based on the Take 5 business unit's performance during the earn-out Period as set forth in Section 1.5 ("Earn-out"). The Earn-out Period is defined as the period beginning on the Closing Date (April 1, 2018) and concluding on the four-year anniversary of the last day of the month in which the

Closing occurs (April 30, 2022). The Asset Purchase Agreement provides for payment to Take 5 (now Petruss Media Group) of up to $53 million in Earn-out in 2022, with an interim payment in 2020. The exact amount of both the final payment and the interim payment is based on the Compound Growth Rate of the Take 5 business unit's EBITDA.  (Exhibit A).

47.    The Earn-out was a vital upside for Radetich and Gluck and heavily influenced their decision to sell Take 5 to ASM. Although ASM specifically negotiated for great autonomy to run the Take 5 business unit, to protect their potential to achieve the Earn-out, Radetich and Gluck bargained for and received several protections on how Advantage would run the Take 5 business unit, as reflected in Section 1.5(j) of the Asset Purchase Agreement:

> Following the Closing, the Buyer shall have the right to operate the Business, Purchased Assets and Assumed Liabilities in its sole and absolute discretion, including with respect to employee compensation (subject to Section 5.8(a)) and has no obligation to maintain or preserve any relationship with any client, customer, supplier, vendor, employee or contractor or the terms of any contract (including pricing). During the Earn-out Period, the Buyer shall maintain the Business as a separate business unit and shall not sell or transfer any material portion of the Purchased Assets to a third party that is not an affiliate of the Buyer, unless the acquiror of the Purchased Assets expressly assumes and has the financial resources and wherewithal to fulfil the Buyer's obligations under this Section 1.5 with respect to any earn-out payments that are due or may become due to the Company. Notwithstanding the foregoing, during the Earn-out Period, the Buyer (i) will not take any action the purpose and intent of which is to circumvent the payment of the Initial Earn-out Amount or the Final Earn-out Amount and (ii) will maintain separate accounting records for the business.

Exhibit A.

48.    Thus, although ASM bargained for the right to "operate" the Take 5 business unit, it did not bargain for the right to "not operate" the Take 5 business unit, which it improperly did within 15 months of the transaction's closing.

49.    Had ASM demanded the right to shut down the Take 5 business unit at its discretion (which would deprive the Radetich, Gluck, and RVJ as the Beneficial Owners of the ability to

achieve the Earn-out), Radetich and Gluck certainly never would have signed the Asset Purchase Agreement and would have sold the company to another interested party.

50.     Instead, Radetich and Gluck bargained for and received an affirmative promise from Advantage to "maintain the Business as a separate business unit."

51.     Radetich and Gluck also bargained for and received separate promises by ASM to "not take any action the purpose and intent of which is to circumvent the payment of the Initial Earn-out Amount or the Final Earn-out Amount" and to "maintain separate accounting records for the business" so that EBITDA (and the corresponding Earn-out) could be more easily calculated.

### *April 2018 to April 2019: ASM and its Executives Deliberately Choke Take 5's Business to Avoid Paying the Earn-out*

52.     The transaction between Take 5 and ASM closed on April 1, 2018, and Take 5 became a unit of ASM, part of the massive conglomeration of Advantage Solutions' companies. However, the honeymoon did not last long.

53.     On April 2, 2018, Mr. Colen was in the main office in Florida, addressing now former employees of the Take 5 business unit about their new status as ASM employees and the integration process to absorb Take 5 into ASM's bureaucracy.  The cultures of Take 5 and ASM immediately clashed.  Personnel of the Take 5 business unit were drawn into constant meetings with ASM management impairing the sales and production of the Take 5 business unit.

54.     From day one,  ASM asserted control over Take 5 and shifted leadership of the Take 5 business unit to Mr. Colen.  Radetich and Gluck were sidelined. Gluck's new title was Senior Vice President of Sales and Radetich's new title was Executive Vice President. Gluck reported to Radetich, who in turn reported to Mr. Colen.  The shift, however, was not just one of titles and the organizational chart. Rather, Mr. Colen took full control of and responsibility for the Take 5 business unit and instructed Radetich and Gluck to "help out with revenue."  Radetich and

Gluck reluctantly stepped aside and allowed the new owner to operate the Take 5 business unit.

55.    In addition to the Take 5 business unit, Mr. Colen also oversaw Advantage Media, which was run by Mr. Pike.

56.    Messrs. Pike and Colen had a long-standing relationship. The two came to ASM together in 2013 when ASM bought Mr. Colen's company, AMP Agency. Mr. Colen, in turn, had previously acquired Mr. Pike's company, Rock Coast Media, in 2009. Although Mr. Pike had no formal role in the Take 5 business unit, Mr. Pike often functioned as Mr. Colen's "chief of staff."

57.    Over the course of 2018 and 2019, Mr. Colen and other personnel of the Advantage Parties engaged in a pattern of improper conduct with the purpose and intent of circumventing ASM's Earn-out obligations by depressing revenues and increasing expenses of the Take 5 business unit, all while inflating the revenues and decreasing expenses of Advantage Media.

58.    Beginning in April 2018, Mr. Colen and other leaders of the Advantage Parties emphasized that all email marketing sales activities by the Take 5 business unit to Advantage's agencies (UpShot, EDGE, IN Marketing, Brand Connection, AMP, etc.) had to be conducted through Advantage Media.

59.    On at least four occasions, personnel working in the Take 5 business unit created a relationship with a prospective client and secured a sale worth hundreds of thousands of dollars or more.  ASM then would force the Take 5 business unit to relinquish the sale—and the resulting profits—to Advantage Media, drastically decreasing the revenue of the Take 5 business unit. In other words, not only were the representations false that Take 5 would have the benefit of Advantage Solutions' robust client network to increase its revenues, ASM was also using the Take 5 business unit to improperly inflate profits at another part of the company.

60.    The Asset Purchase Agreement defined the Take 5 business as "the business ... of providing (i) data-based marketing services, including email, retargeting, mobile, social media, content and direct mail marketing, and (ii) data services, including appending, enhancement, verification, and data licensing…."  (Exhibit A).

61.    Despite knowing that Take 5's marketing campaigns and associated revenues were dependent upon its omni-channel business model, Messrs. Colen and Pike repeatedly spread the word within the Advantage Solutions corporate structure that the Take 5 business unit was an email specialist, and that other Advantage Solutions business units should use Take 5 only as such. In other words, the Take 5 business unit should sell only email campaigns, and not digital, programmatic, direct mail, social media campaigns, because Mr. Pike and Advantage Media conducted those campaigns. The efforts of Messrs. Colen mischaracterized Take 5's business and significantly reduced the capacity of the Take 5 business unit to make sales and generate revenue.

62.    Some of the companies owned by Advantage were failing in 2018 and 2019, which was detrimental to Advantage Solutions' hoped-for IPO.  Advantage began shifting expenses of its failing companies on to the balance sheet of the Take 5 business unit.  Advantage also placed other unnecessary and inappropriate expenses on the books of the Take 5 business unit circumventing ASM's obligation to pay the Earn-out. These expenses included non-Take 5 employees' salaries, travel, and incidental expenses, as well as Advantage Media's subscription costs for certain subscription services, from which Take 5 received no financial benefit. Each expense subtracted from the profits of the Take 5 business unit.

63.    Advantage Solutions' promises concerning intracompany sales also turned out to be empty.  Instead of providing in-house customers for the Take 5 business unit to sell its services to, Advantage required the Take 5 business unit to sell its services at a steep discount to Advantage Media, allowing Advantage Media to resell those services at a significant mark-up.  This was

another way for Mr. Colen to try to help Mr. Pike and his business at the expense of the Take 5 business unit.

64.    Despite raiding the Take 5 business unit for the benefit of Advantage Media, Messrs. Colen and Pike were unable to rescue Mr. Pike's business. Advantage Media had a terrible year in 2018, and Advantage folded the Advantage Media business unit into another of its acquisitions, the Jun Group.

65.    Moreover, ASM leaders, including Messrs. Colen and Pike, engaged in a pattern of conduct that destroyed the morale of the employees of the Take 5 business unit such as conducting lay-offs, cancelling the holiday party, and cutting commissions and bonuses. ASM ultimately drove away key employees of the Take 5 business unit, particularly sales employees, and many of them went on to work for Take 5's competitors. ASM's conduct with respect to employees of the Take 5 business unit had the purpose and intent of circumventing the Earn-out, preventing the business unit from operating productively and efficiently.

66.    Indeed, towards the end of 2018, Advantage selected for lay-off 20 of the approximately 30 sales employees of the Take 5 business unit. As these employees were compensated by nominal salaries and commission, they were of minimal expense to ASM.  These employees, however, were invaluable to the Take 5 business unit, identifying prospective clients, promoting Take 5's products and services to them, and making sales. Consequently, the revenue of the Take 5 business unit plummeted in the months following these layoffs.

67.    In January 2019, Advantage cut bonuses for almost all employees of the Take 5 business unit. Advantage promised to issue bonuses in March, and then announced further postponement of them until August. Advantage also cut commissions and, in some cases, redirected commissions from employees in the Take 5 business unit by forcing sales to go through other ASM business units. Several key sales employees of the Take 5 business unit resigned due

to this pattern of conduct, further reducing the business unit's capacity to make sales and generate revenue. Before leaving, several of the impacted sales employees sought exemptions from the reduced commission schedule. At this point, Radetich and Gluck had been stripped of any authority to make decisions and referred the sales employees to Mr. Colen who did nothing to stop the departures.

### April 2019 to July 2019: The Relationship Falls Apart

68.    On or about April 16, 2019, Radetich and Gluck met with Mr. Colen in New York City at Mr. Colen's request. Mr. Colen offered to release Radetich and Gluck from their indemnity obligations under the Asset Purchase Agreement and pay them $770,000 if they would relinquish their rights to the balance of the purchase price for the Take 5 business.

69.    Radetich and Gluck were not willing to walk away from the balance of the agreed purchase price. They declined Advantage's offer.

70.    Radetich and Gluck were confident that, despite Mr. Colen's efforts, the Take 5 business unit would still hit the earnout milestones. ASM was close to securing a multi-year contract for Take 5's data delivery business that would result in an additional $10 million per year in revenues at exceptionally high profit margins.

71.    ASM nearly bungled the deal to the point where Mr. Colen told Radetich that he and Gluck should sue ASM over their earnout if the agreement was not signed by ASM. Eventually, the contract was signed in June 2019.

72.    Advantage Solutions, looking for short term results to bolster their $4 billion IPO in the offer, neither had the infrastructure to address the new data privacy laws on the horizon nor any patience for the process that had led to the success of the Take 5 business prior to the acquisition by ASM. Upon information and belief, an internal decision was made by Advantage to divest the Take 5 business unit and in the process find a vehicle to avoid paying the up to $53

million earnout component of the purchase price for Take 5.

### *Advantage Solutions Shuts Down The Take 5 Business Unit*

73.     On July 7, 2019, Advantage decided to immediately shut down the Take 5 business unit permanently.  That is, forty (40) days after engaging FTI to conduct the operational audit of Take 5 on May 28, 2019.

74.     On July 11, 2019, at 10:00 A.M., ASM called an all-hands meeting and laid off almost all the employees in the Take 5 business unit. During the meeting announcing these lay-offs, Mr. Colen told the employees that the Take 5 business unit had become a "toxic asset," that they are all "guilty" and had to be eliminated. The employees were summarily dismissed.

75.     Shortly thereafter, Advantage Solutions updated its public facing website to confirm that it had ceased operation of the business unit:



Take 5 Media Group has ceased operations. If you are a client seeking additional information, contact 561-819-5555 or email solutions@take5mg.org.

76.     Advantage Solutions through its management and employees launched a salvo of defamatory statements against Take 5 and its former principals, Radetich and Gluck, including:

(a)     telling Take 5's customers that the Take 5 operations were a fraud; that the customers were charged for marketing that never actually happened;

(b)     telling Take 5's customers that it was abruptly shutting down the Take 5 business unit because Advantage senior management had determined that the business was a fraudulent front operated by Radetich and Gluck which had no usable data and ran no real marketing campaigns;

(c)　　　telling Advantage's 50,000 employees that it was abruptly shutting down the Take 5 business unit because Advantage senior management had determined that the business was a fraudulent front operated by Radetich and Gluck which had no usable data and ran no real marketing campaigns; and

(d)　　　spreading the word, that Take 5 was a fraudulent front and not a real business, to other important players in the industry whose backing was necessary for the operation of the Take 5 business.

77.　　　ASM continues to own Take 5's most valuable asset—its database.

### July 2019 to August 2019: The Notice of Dispute and Retaliatory Allegations of Fraud

78.　　　By shutting down the Take 5 business unit, ASM has eliminated any possibility of Radetich and Gluck receiving an earnout under the Asset Purchase Agreement.

79.　　　Based on this flagrant breach and the other violations of the Asset Purchase Agreement described above, counsel for Radetich and Gluck and PMG f/k/a Take 5 sent a Notice of Dispute to Advantage on July 17, 2019, triggering a 30-day period during which the parties were required to meet and negotiate. *See* Exhibit A, Asset Purchase Agreement, § 10.11.

80.　　　ASM provided no substantive response for over two weeks. On August 16, 2019, by letter, counsel for ASM responded by stating that the notice of dispute was premature and, for the first time, levelled false allegations that Radetich and Gluck created and directed a scheme to defraud the Advantage Parties and its clients.

81.　　　Specifically, ASM alleged that, under the direction of Radetich and Gluck, ASM's Take 5 business unit supposedly did not send emails to consumers that it promised to its clients as part of the omni-channel marketing campaign line of business and purportedly sent false reports about the amount of emails deployed, delivered, and opened by consumers. ASM further alleged

27

that this was a practice that began prior to the sale of the Take 5 business to ASM.

82.      After a follow-up letter dated August 8, 2019 from counsel for PMG referencing the parties' duty to meet and negotiate, counsel for the PMG and counsel for ASM met and conferred by telephone on August 14, 2019, but were unable to resolve their dispute. Accordingly, Radetich and Gluck, through PMG, commenced this arbitration proceedings for damages from ASM, pursuant to Section 10.11 of the Asset Purchase Agreement.

### Advantage's First Amended Counter-Demand
### Further Reveals the Reckless Inadequacies of and Gross Negligence in
### its 40-Day "Investigation" of the Take 5 Business Unit

83.      In its October 18, 2019 First Amended Counter-Demand ("FACD"), Advantage goes to great lengths to depict Take 5 as an "email marketing" company. Indeed, the words "email" and "emails" appear over 100 times in the FACD. But as Advantage knew and as is abundantly clear in the Asset Purchase Agreement, the Take 5 business that ASM purchased was engaged multi-faceted data-based marketing campaigns. The mechanisms to conduct data-based marketing campaigns on behalf of Take 5's clients included email, social media, mobile device ads, content marketing, retargeting, and direct mail.

84.      The FACD's allegations, and the underlying conclusion-driven investigation, appear to suffer from two fundamental flaws. First, Advantage falsely claims that the ASM business unit (and Take 5 before it) only invoiced customers for "emails." In paragraph 45 of the FACD, for example, Advantage alleges that the business falsely represented the amount of "emails" it deployed on behalf of customers. The underlying invoices on their face, however, state that the customers were being charged for "digital media" and not solely "emails." The multi-colored chart depicted in paragraph 46 of the FACD appears to suffer from the same factual deficiency. Customers were invoiced for "digital media," not "emails," and the conclusion Advantage reaches – that the campaigns were fraudulent because few "emails" were "deployed"

28

or "delivered" – ignores the fact that these were omni-channel marketing campaigns.

85.     Second, Advantage and their investigators failed to consider that Take 5 retained certain subcontractors or vendors to assist in campaign fulfillment for its customers.  As Advantage well knew from the extensive due diligence prior to the acquisition (and as the investigators confirmed), Take 5 used a variety of third-party subcontractors or vendors to fulfill digital marketing campaigns.  Focusing solely on email, and solely on email sent directly by Take 5 employees, rather than accounting for all of the digital media provided by Take 5 and its third-party subcontractors or vendors, results in the highly misleading conclusion that digital media was not delivered in connection with customer's campaigns.

86.     Thus, Advantage's investigation and FACD both falsely and with reckless disregard characterize Take 5's invoices to create a baseline for "email" rather than "digital media" more generally and then fail to fully credit the Take 5 business unit for the work of its retained third-party subcontractors or vendors in delivering media impressions in connection with customer campaigns.

87.     Advantage also ignores the most important data obtained in its underlying investigation of the Take 5 business unit; that is, information on "clicks" was accurately reported to Take 5 clients.

88.     Exhibit D is a chart prepared by Advantage (or their investigators) which was delivered to Take 5 as part of the Advantage Parties' demand for indemnification.  The "Actual Clicks Per Google Analytics" column on the chart represents the traffic actually driven to the customers' websites and the true value delivered by Take 5.  The customers of Take 5 were able to independently verify the number of clicks associated with the Take 5 marketing campaigns using readily available software platforms.  This summary chart demonstrates that the number of clicks Take 5 reported to its customers for each of the ten campaigns reviewed is nearly identical

to the clicks independently verified by Google Analytics.

89.     Advantage never performed the appropriate adequate investigation before they decided to pull the plug and shut down the Take 5 business unit.  Neither Advantage nor their investigators contacted even one of Take 5's third-party subcontractors or vendors to quantify the volume of digital media delivered by the third-party subcontractors or vendors or to incorporate the work performed by them in determining whether Take 5 provided the digital media services for which it invoiced its customers.  The 40-day "investigation" by Advantage and their investigators was grossly negligent and woefully deficient.

90.     Lured by the $4 billion in lucrative returns offered by its looming IPO, Advantage took the draconian step of terminating the entire Take 5 business, laying off employees, leaving Take 5's customers who wanted Take 5 to continue providing marketing campaigns and data services in the lurch on projects underway thereby materially damaging those customers, and destroying the customer relationships and goodwill that Radetich and Gluck had spent many years building.

91.     The timeline in Advantage's FACD makes clear that the claims of fraud are an after-the-fact justification for the decision to shut down the Take 5 business rather than rooted in a genuine belief that ASM customers had been defrauded.

92.     On September 8, 2020, Advantage Solutions announced that it has entered into a merger agreement to combine with a publicly traded special purpose acquisition company. At the closing of the transaction, Advantage Solutions is expected to become a publicly traded company. According to Advantage, the SPAC transaction implies an initial enterprise value for Advantage Solutions of approximately $5.2 billion or 10.1x its estimated 2021 Adjusted EBITDA of $515 million.

## COUNT I – BREACH OF CONTRACT

93.     The Take 5 Parties repeat and re-allege each and every allegation of the paragraphs above as if fully set forth herein.

94.     ASM entered into a binding and enforceable Asset Purchase Agreement with the Take 5 Parties.

95.     Advantage, including ASM, engaged in a course of conduct with "the purpose and intent . . . to circumvent the payment of the Initial Earn-out Amount or the Final Earn-out Amount" in breach of Section 1.5(j) of the Asset Purchase Agreement.

96.     Advantage, including ASM, also failed to "maintain Take 5 as a separate business unit" during the Earn-out Period in breach of Section 1.5(j) of the Asset Purchase Agreement.

97.     Advantage, including ASM, have engaged in an anticipatory breach of the Asset Purchase Agreement by representing that ASM will not now, or ever, satisfy its contractual obligations.

98.     The breaches of contract by Advantage, including ASM, are the direct and proximate cause of substantial harm to the Take 5 Parties, and ASM is liable for all damages so incurred.

WHEREFORE, the Take 5 Parties seek: (1) a determination and declaration that ASM breached the Asset Purchase Agreement and PMG is entitled to damages in an amount to be determined at a hearing, together with costs and expenses incurred by PMG, including attorneys' fees; (2) and an award such damages, costs, and expenses; and (3) such other and further relief as the Arbitrator deems just and proper.

## COUNT II – BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

99.     The Take 5 Parties repeat and re-allege each and every allegation of the paragraphs above as if fully set forth herein.

100.    There is a covenant of good faith and fair dealing implied in every contract as a matter of law.

101.    The implied covenant of good faith and fair dealing requires each party to refrain from arbitrary or unreasonable conduct that prevents the other party from receiving the "fruits of the bargain."

102.    Advantage, including ASM, breached the implied covenant of good faith and fair dealing by engaging in arbitrary and unreasonable conduct, including terminating the operations of the Take 5 business unit, and engaged in such conduct with the intent of depriving—and succeeded in depriving—the Take 5 Parties, including Radetich and Gluck, of the opportunity to receive the Earn-out.

103.    Breach of the implied covenant of good faith and fair dealing by Advantage, including ASM, resulted in damages to the Take 5 Parties, including Radetich and Gluck, and ASM is liable for all damages so incurred.

WHEREFORE, the Take 5 Parties seek: (1) a determination and declaration that ASM breached the implied covenant of good faith and fair dealing and PMG is entitled to an award of damages in an amount to be determined at a hearing, together with costs and expenses incurred by PMG including attorneys' fees, (2) an award such damages, costs, and expenses; and (3) such other and further relief as the Arbitrator deems just and proper.

## COUNT III – DEFAMATION *PER SE*

104.    Radetich and Gluck repeat and re-allege each and every allegation of the paragraphs above as if fully set forth herein.

105.    Advantage and/or their management and employees, each acting in the scope of her/his employment at Advantage, published or verbally broadcast a false communication of fact.

106.    Each said false communication of fact is about Take 5 and/or Radetich and/or Gluck.

107.    Each said false communication of fact caused material or reputational harm to Take 5 and/or Radetich and/or Gluck.

108.    Advantage and/or their management and employees acted with gross negligence and/or reckless disregard for the truth.

109.    Each disparaging communication was intended to hurt Radetich and/or Gluck in his trade or business.

110.    The reputation and goodwill established by Take 5 and Radetich and Gluck over more than 15 years was irreparably damaged by each disparaging communication.

111.    Radetich has suffered, and continues to suffer, substantial damages and irreparable harm to his reputation.

112.    Gluck has suffered, and continues to suffer, substantial damages and irreparable harm to his reputation.

WHEREFORE, Radetich and Gluck each seek:  (1) a determination and declaration that false statements of fact occurred which constitute defamation *per se*; (2) the entry of a judgment in his favor against Advantage, jointly and severally, in an amount to be determined at a hearing, together with special damages to compensate him for the costs and expenses incurred due to the

defamation, including attorneys' fees, together with punitive damages in an amount not less than 15% of Advantage Solutions' net worth; and (3) such other and further relief as the Arbitrator deems just and proper.

## COUNT IV – NEGLIGENCE

113.    Radetich and Gluck repeat and re-allege each and every allegation of the paragraphs above as if fully set forth herein.

114.    Advantage owed a duty to Radetich and Gluck to adequately investigate the allegations of fraud prior to permanently shutting down the Take 5 business unit.

115.    Advantage breached the duty owed to Radetich and Gluck because their investigators failed to adequately investigate the allegations of fraud — made by a disgruntled employee on the same day she was suspended having been caught attempting to steal client information and campaign data from the  Take 5 business unit —prior to permanently shutting down the Take 5 business unit.

116.    Advantage's breach of the duty owed to Radetich and Gluck is the direct and proximate cause of substantial harm to the Take 5 Parties, and Advantage are liable for all damages so incurred.

117.    But for Advantage's inadequate investigation, the Take 5 business unit would not have been permanently shut down and the disparaging false statements against Take 5, Radetich and Gluck which irreparably harmed their reputations within their industry would not have been made.

118.    Radetich and Gluck sustained damages as a result of Advantage's inadequate investigation.

WHEREFORE, Radetich and Gluck each seek:  (1) a determination and declaration that Advantage acted negligently in their failure to conduct an adequate investigation and Radetich and

Gluck are entitled to an award of damages in an amount to be determined at a hearing, together with costs and expenses incurred by Radetich and Gluck including attorneys' fees, (2) an award such damages, costs, and expenses; and (3) such other and further relief as the Arbitrator deems just and proper.

Respectfully submitted,

**THE ROTH LAW FIRM, PLLC**                          **RICHARD AND RICHARD, P.A.**


  */s/ Richard A. Roth*                                        */s/ Dennis Richard*
Richard A. Roth                                      Dennis Richard
Jordan Kam                                           Melissa L. Mackiewicz
Stanislav Sharovskiy                                 825 Brickell Bay Drive
295 Madison Avenue, 22nd Floor                       Tower III, Suite 1748
New York, NY 10017                                   Miami, FL  33131
212.542.8882                                         305.374.6688
rich@rrothlaw.com                                    dennis@richardandrichard.com
jordan@rrothlaw.com                                  melissa@richardandrichard.com
stan@rrothlaw.com

*Counsel for Claimants, Counter-Respondents, and Cross-Respondents*


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY on this 19th day of November, 2020, that the forgoing was served via electronic mail on all counsel of record.

  */s/ Melissa L. Mackiewicz*
Melissa L. Mackiewicz