# EXHIBIT 5

# EXHIBIT A

EXECUTION VERSION

# ASSET PURCHASE AGREEMENT

**by and among**

**Advantage Sales & Marketing LLC,**

**as "Buyer",**

**Take 5 Media Group, LLC,**

**As the "Company",**

**Alexander Radetich ("Radetich"),**

**Richard Gluck ("Gluck"),**

**RJV Marketing Corp. ("RJV"),**

**Radetich, Gluck, and RJV, collectively as the "Beneficial Owners",**

**The Seller Related Parties signatory hereto,**

**and**

**Alexander Radetich,**

**as the Beneficial Owner Representative**

**Dated as of March 15, 2018**

# TABLE OF CONTENTS

**Page**

Article I          PURCHASE AND SALE ................................................................. 1
    Section 1.1          Purchase and Sale ................................................. 1
    Section 1.2          Closing Consideration ........................................... 7
    Section 1.3          Post-Closing Purchase Price Adjustment................. 8
    Section 1.4          Closing Date....................................................... 12
    Section 1.5          Earn Out Amount ............................................... 12
    Section 1.6          Allocation........................................................... 16
    Section 1.7          Withholding ....................................................... 17

Article II          REPRESENTATIONS AND WARRANTIES RELATED TO THE
             COMPANY......................................................................... 17
    Section 2.1          Organization ...................................................... 17
    Section 2.2          Authority ........................................................... 17
    Section 2.3          [Reserved] ......................................................... 18
    Section 2.4          No Conflicts; Consents and Approvals................... 18
    Section 2.5          Financial Statements ........................................... 18
    Section 2.6          Absence of Undisclosed Liabilities ....................... 19
    Section 2.7          Property; Sufficiency of Assets ............................ 19
    Section 2.8          Contracts ........................................................... 21
    Section 2.9          Employee Benefit Matters ................................... 23
    Section 2.10         Intellectual Property ........................................... 24
    Section 2.11         Governmental Authorizations; Compliance with Law ..................... 28
    Section 2.12         Litigation........................................................... 28
    Section 2.13         Taxes ................................................................ 28
    Section 2.14         Absence of Changes............................................ 29
    Section 2.15         Employment Matters ........................................... 30
    Section 2.16         Insurance ........................................................... 31
    Section 2.17         Related Party Transactions ................................... 31
    Section 2.18         Unlawful Payments ............................................ 32
    Section 2.19         Brokers' Fees ..................................................... 32
    Section 2.20         Data Privacy and Security ................................... 32
    Section 2.21         [Reserved].......................................................... 34
    Section 2.22         Vendors.............................................................. 34
    Section 2.23         Clients................................................................ 34
    Section 2.24         Government Contracts ......................................... 35

Article III          REPRESENTATIONS AND WARRANTIES RELATING TO THE
             BENEFICIAL OWNERS ..................................................... 35
    Section 3.1          Authorization of Transaction ............................... 35
    Section 3.2          No Conflicts; Consents or Approvals ................... 35
    Section 3.3          Litigation........................................................... 36
    Section 3.4          Equity Interests .................................................. 36
    Section 3.5          Brokers' Fees ..................................................... 36

i

# TABLE OF CONTENTS
(continued)

Page

Article IV        REPRESENTATIONS AND WARRANTIES RELATING TO THE
                  BUYER ................................................................................. 36
    Section 4.1   Organization of the Buyer; Authorization of the Contemplated
                  Transactions ........................................................................ 36
    Section 4.2   No Conflicts; Consents and Approvals .............................. 37
    Section 4.3   Financial Ability to Perform ............................................. 37
    Section 4.4   Litigation ............................................................................ 37
    Section 4.5   Brokers ................................................................................ 37
    Section 4.6   Investigation by the Buyer ................................................. 37

Article V         COVENANTS .......................................................................... 38
    Section 5.1   Conduct of Business ........................................................... 38
    Section 5.2   Access and Information ...................................................... 41
    Section 5.3   Authorizations and Consents ............................................. 42
    Section 5.4   Preservation of Books and Records .................................. 43
    Section 5.5   Public Statements ............................................................... 44
    Section 5.6   Notification; Supplemental Disclosure .............................. 44
    Section 5.7   Satisfaction of Closing Conditions .................................... 44
    Section 5.8   Employee Benefits .............................................................. 45
    Section 5.9   Post-Closing Procedures for Beneficial Owners ............... 47
    Section 5.10  Exclusivity ........................................................................... 47
    Section 5.11  Confidentiality ..................................................................... 48
    Section 5.12  Restrictive Covenants ......................................................... 48
    Section 5.13  [Reserved] ............................................................................ 50
    Section 5.14  Post-Closing Operations .................................................... 50
    Section 5.15  Receivables .......................................................................... 51
    Section 5.16  Retained Policies ................................................................. 52
    Section 5.17  Change in Name .................................................................. 52

Article VI        TAX MATTERS ...................................................................... 52
    Section 6.1   [Reserved] ............................................................................ 52
    Section 6.2   Transfer Taxes ..................................................................... 52
    Section 6.3   Tax Returns .......................................................................... 52
    Section 6.4   Employees ............................................................................ 53

Article VII       CONDITIONS TO CLOSING ................................................ 53
    Section 7.1   Conditions to Obligations of the Buyer ............................. 53
    Section 7.2   Conditions to the Obligations of the Company ................. 56
    Section 7.3   Conditions to the Obligations of Each Party ..................... 57

Article VIII      INDEMNIFICATION .............................................................. 57
    Section 8.1   Survival ................................................................................. 57
    Section 8.2   Indemnification .................................................................... 58
    Section 8.3   Limitations on Liability ...................................................... 59

ii

# TABLE OF CONTENTS
(continued)

**Page**

Section 8.4      Procedures .................................................................. 62
Section 8.5      Other Matters .............................................................. 66
Section 8.6      Right of Set-Off .......................................................... 67

Article IX        TERMINATION ................................................................ 68
Section 9.1      Termination ................................................................. 68

Article X          MISCELLANEOUS ............................................................. 69
Section 10.1     Notices ....................................................................... 69
Section 10.2     Assignment ................................................................. 70
Section 10.3     Further Assurances ....................................................... 70
Section 10.4     Rights of Third Parties ................................................. 71
Section 10.5     Expenses ..................................................................... 71
Section 10.6     Counterparts ............................................................... 71
Section 10.7     Entire Agreement ........................................................ 71
Section 10.8     Disclosure Schedule ..................................................... 71
Section 10.9     Amendments ............................................................... 72
Section 10.10    Severability ................................................................. 72
Section 10.11    Arbitration ................................................................. 72
Section 10.12    Governing Law; Jury Waiver ........................................ 73
Section 10.13    Appointment and Duties of the Beneficial Owner
                 Representative ............................................................. 74
Section 10.14    Rules of Construction ................................................. 77
Section 10.15    Specific Performance ................................................... 78

## TABLE OF CONTENTS

**Page**

Exhibit A    -    Definitions
Exhibit B    -    Form of Bill of Sale
Exhibit C    -    Form of Release
Exhibit D    -    Equity Interests
Exhibit E    -    Form of Assignment and Assumption Agreement
Exhibit F    -    Form of Trademark Assignment Agreement
Exhibit G    -    [RESERVED]
Exhibit H    -    Form of Domain Name Assignment Agreement
Exhibit I    -    Form of Employee Restrictions and Proprietary Information Agreement

Schedule I    -    Allocation Methodology
Schedule II    -    Net Working Capital

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of March 15, 2018 (the "Signing Date"), is entered into by and among Advantage Sales & Marketing LLC, a California limited liability company (the "Buyer"), Take 5 Media Group, LLC, a Florida limited liability company (the "Company"), Alexander Radetich ("Radetich"), Richard Gluck ("Gluck"), RJV Marketing Corp., a Florida corporation ("RJV", collectively with Radetich and Gluck the "Beneficial Owners" and each a "Beneficial Owner"), the Seller Related Parties signatory hereto, and Alexander Radetich (the "Beneficial Owner Representative"), solely in his capacity as representative for the Beneficial Owners.  Individually, each of the Buyer, the Company, the Beneficial Owners, and the Beneficial Owner Representative is a "Party" and, collectively, they are the "Parties." Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to them in Exhibit A attached hereto.

### RECITALS

WHEREAS, the Company is engaged in the Business;

WHEREAS, the Company, the Seller Related Parties and the Beneficial Owners desire to sell to the Buyer, and the Buyer desires to purchase from the Company, the Seller Related Parties and the Beneficial Owners, the Purchased Assets and to assume the Assumed Liabilities upon the terms and conditions set forth in this Agreement;

WHEREAS, the Parties desire to make certain representations, warranties, covenants and agreements set forth in this Agreement and also to prescribe various conditions to the Contemplated Transactions; and

WHEREAS, concurrent with the execution of this Agreement the Beneficial Owners delivered a written consent to the Buyer approving this Agreement and the Contemplated Transactions.

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I
### PURCHASE AND SALE

Section 1.1    Purchase and Sale.

(a)    Purchased Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, except as expressly set forth in Section 1.1(b), the Beneficial Owners, the Seller Related Parties and the Company agree to sell, transfer, assign and deliver to the Buyer, free and clear of all security interests, claims, liabilities, mortgages, pledges, options, rights of first refusal, assessments and other encumbrances and liens (collectively, the "Liens"), and the Buyer agrees to purchase and acquire from the Beneficial Owners, the Seller Related Parties and the Company, all of the Beneficial Owners', the Seller Related Parties' and the

Company's right, title and interest in and to, all of the Assets and Properties of the Business (other than the Excluded Assets), including, but not limited to:

(i)      All equipment, tools, fixtures, furniture, office equipment, IT Assets, phone systems, computer hardware, supplies, materials and other items of tangible personal property of every kind owned or leased by the Company (wherever located and whether or not carried on the Beneficial Owners' or the Business Books and Records), together with any express or implied warranty by the manufacturers or sellers or lessors of any item or component part thereof and all maintenance records and other documents relating thereto (collectively, the "Tangible Personal Property");

(ii)     All rights each Beneficial Owner, each Seller Related Party or the Company has or may have under (A) all Contracts listed in Schedule 1.1(a)(ii), (B) all statements of work, work orders or other ancillary agreements with customers and clients related to the Contracts listed in Schedule 1.1(a)(ii), whether or not fully delivered or performed, as applicable, as of the Closing Date, (C) all Contracts entered into between the Company and third parties (other than Related Parties) on or after the Signing Date and prior to the Closing in accordance with Section 5.1(f)(vii), (D) any other Contract which the Buyer agrees in writing, in its sole discretion, to assume in connection with this Agreement, but in all cases excluding the Excluded Contracts (the foregoing (A)-(D), collectively, the "Assumed Contracts"), and (E) all rights, whether now existing or hereafter arising thereunder and the benefit of all prepaid fees and expenses and deposits paid by the Beneficial Owners or the Company pursuant thereto, together with all rights of the Beneficial Owners or the Company to assert claims or take rightful actions against the other parties thereto with respect to breaches, defaults or other violations of any of the Assumed Contracts;

(iii)    (A) All rights the Company has or may have with respect to revenue, commission, claims for refunds, right to reimbursement, commissions receivable, accounts receivable from, and notes or other evidences of Indebtedness or payment of any Person (as well as any applicable sales Taxes thereon), including any receivables for bonus payments or expense reimbursements due from clients, suppliers, distributors or manufacturers, invoiced or billed by the Company on or prior to the Closing Date (collectively, the "Receivables"), (B) the full benefit of all security for such accounts or rights to payment and (C) any claim, remedy or other right related to any of the foregoing;

(iv)     All deposits, including with respect to any Real Property Lease, personal property or free rental periods, pre-paid rent, and other prepaid assets and prepaid expenses of the Company, excluding any prepaid Taxes;

(v)      All Owned Intellectual Property, including that Intellectual Property identified on Section 2.10(b) of the Disclosure Schedules;

(vi)     All insurance benefits, including claims, rights, recoveries and proceeds under any applicable Retained Policies, arising from or relating to the Purchased Assets and/or the Assumed Liabilities prior to the Closing (provided, however,

that except as specifically set forth herein, Retained Policies covering the Purchased Assets and Assumed Liabilities are Excluded Assets);

(vii)    All claims of the Beneficial Owners, the Seller Related Parties or the Company against third parties relating to the Purchased Assets or any Assumed Liability, whether choate or inchoate, known or unknown, contingent or non-contingent; provided that the Buyer shall not acquire any rights to or assume any obligations relating to the Plaintiff Litigation.

(viii)    All data, files, papers, plans, correspondence, and records related to the operations of the Company, including all customer, supplier, and distributor lists and records, referral sources, research and development reports and records, production reports and records, purchase records, accounting and financial records, service and warranty records, equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, and correspondence, operator information, vendor information, marketing/buyer group information, sales or leasing representative information and sales or leasing contact management information (from both employees and contract agents) and other similar documents and records of the Company and any correspondence related thereto, in whatever form (collectively, the "Business Books and Records"), but excluding (1) the Minute Books, (2) Personnel Records and (3) Privileged Records;

(ix)    All rights of the Beneficial Owners or the Company in and to any Governmental Authorizations of the Company, as applicable, and any pending applications therefore, including those set forth on Section 2.11(a) of the Disclosure Schedules, to the extent assignable (collectively, the "Assigned Permits");

(x)    All funds held for the benefit or on behalf of any client or customer of the Company in whatever form; and

(xi)    All of the intangible rights and property of the Company, including all of the Company's corporate names, goodwill, telephone, facsimile numbers, and e-mail addresses of any employee, customer or supplier, listings, proprietary and marketing information, marketing techniques and plans and all rights to and applications of any of the foregoing.

All of the assets, property and rights of the Beneficial Owners, the Seller Related Parties and the Company to be transferred hereunder are referred to collectively herein as the "Purchased Assets." To the extent any assets or property owned by the Beneficial Owners, the Company, the Seller Related Parties or any other Affiliate thereof (other than Excluded Assets) are (i) necessary to the continued conduct of the Business or (ii) otherwise used in the conduct of the Business as of the Signing Date, they shall be included within the defined term "Purchased Assets" if they would have been so included had they been owned by the Beneficial Owners, the Seller Related Parties or the Company, and the Beneficial Owners, the Seller Related Parties and the Company shall (and shall cause their Affiliates to) convey such assets and property to the Buyer at the Closing free and clear of all Liens for no additional consideration.  In confirmation of the

foregoing sale, assignment and transfer, the Beneficial Owners, the Seller Related Parties and the Company shall execute and deliver to the Buyer, at the Closing, a Bill of Sale in the form of Exhibit B (the "Bill of Sale") and such other instruments and assignments as may be reasonably requested by the Buyer and necessary to convey to the Buyer, or evidence in the Buyer, good title to the Purchased Assets.

(b)     Excluded Assets.  Notwithstanding anything to the contrary contained in this Agreement, except as expressly set forth in Section 1.1(a), the Buyer will not acquire any of the following (collectively, the "Excluded Assets");

(i)     All of the Beneficial Owners', the Seller Related Parties' or the Company's rights under this Agreement or any Ancillary Agreement and to the consideration to be delivered to the Beneficial Owners, the Seller Related Parties and the Company pursuant to this Agreement or any Ancillary Agreement;

(ii)     All minute books of the Beneficial Owners, the Seller Related Parties' and the Company, including the organizational documents of the Beneficial Owners, the Seller Related Parties' and the Company (collectively, the "Minute Books");

(iii)     All Cash;

(iv)     All Company Benefit Plans and any assets related thereto;

(v)     All Contracts, other than the Assumed Contracts, including (A) all Contracts with any Affiliate of the Beneficial Owners, the Company or a Related Party, or (B) any Contract with financial, accounting, transaction, legal or tax advisors of the Beneficial Owners or the Company (collectively, the "Excluded Contracts");

(vi)     Any Tax Return, Tax records and/or refunds or credits in respect of Taxes;

(vii)     Any of the Beneficial Owners', the Seller Related Parties' or the Company's (or their predecessors') employee and personnel records, files, papers, data and related information, including any correspondence related thereto, in whatever form (collectively, the "Personnel Records");

(viii)     Any documents or other information covered by attorney-client privilege, the attorney work product doctrine, or other similar legal protection, including all attorney-client privileged or work product communication between the Company and its legal advisors relating to the Contemplated Transactions (collectively, the "Privileged Records");

(ix)     Any equity interests of the Company held or owned by the Beneficial Owners or equity interest in the Beneficial Owners or the Seller Related Parties held or owned by the Company or the Seller Related Parties;

(x)     All Retained Policies;

(xi)    All equity or other rights of or in the Seller Related Parties; and

(xii)    Such other assets listed on the attached Schedule 1.1(b)(xi).

(c)    Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Company will assign and transfer and the Buyer will assume only the following Liabilities (collectively, the "Assumed Liabilities"):

(i)    All payment obligations of the Company with respect to current trade accounts payable solely to the extent included in the calculation of the Final Closing Date Net Working Capital pursuant to Section 1.3(a);

(ii)    Except as set forth in Section 1.1(d)(iv), all Liabilities arising under the Assumed Contracts to the extent such Liabilities arise after the Closing;

(iii)    All Liabilities of Buyer relating to employee benefits, compensation or other arrangements with respect to any Transferred Employee to the extent arising after the Closing and related to the employment of such Transferred Employee with the Buyer;

(iv)    All Liabilities for (i) Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period (or portion thereof) beginning after the Closing Date and (ii) Taxes for which Buyer is liable pursuant to Section 6.2;

(v)    All Liabilities under the Assigned Permits, to the extent such Liabilities arise from the operation or conduct of the Purchased Assets after the Closing;

(vi)    All other Liabilities arising out of or relating to Buyer's ownership or operation of the Business and the Purchased Assets on or after the Closing; and

(vii)    Such other liabilities as specifically identified on Schedule 1.1(c)(vii), if any.

In confirmation of the foregoing assignment and assumption, the Beneficial Owners, the Seller Related Parties and the Company shall execute and deliver to the Buyer, at the Closing, an Assignment and Assumption Agreement in the form of Exhibit E (the "Assignment and Assumption Agreement") and such other instruments and assignments as may be reasonably requested by the Buyer and necessary for the Company to assign the Assumed Liabilities to the Buyer.

(d)    Excluded Liabilities.  Notwithstanding anything to the contrary contained in this Agreement, and regardless of whether such Liability is disclosed in this Agreement, the Disclosure Schedules or otherwise, the Buyer will not assume or in any way be responsible for any Liabilities of the Beneficial Owners, the Company, the Seller Related Parties or their Affiliates (the "Excluded Liabilities"), including any of the following:

(i)    Indebtedness of the Beneficial Owners, the Seller Related Parties or the Company;

(ii)    Company Transaction Expenses;

(iii)    Liabilities owed by the Beneficial Owners, the Company, the Seller Related Parties or their Affiliates to each other or any other Related Parties;

(iv)    Liabilities of the Beneficial Owners, the Company, the Seller Related Parties or their Affiliates (A) arising out of or resulting from any actual or alleged breach by the Beneficial Owners, the Company, the Seller Related Parties or their Affiliates of, or nonperformance by the Beneficial Owners or their Affiliates under, any Contract (including any Assumed Contract) on or prior to the Closing, (B) accruing under or resulting from any Contract with respect to any period prior to the Closing (except to the extent (1) expressly assumed in Section 1.1(c)(ii) or (2) expressly assumed pursuant to Section 1.3(a)), or (C) accruing under any Excluded Contract;

(v)    Accounts payable of the Beneficial Owners, the Seller Related Parties or the Company, except to the extent expressly assumed in Section 1.1(c)(i);

(vi)    Liabilities related to or arising out of the Excluded Assets;

(vii)    Company Taxes;

(viii)    Liabilities related to or arising out of the operation of the Business or the ownership of the Purchased Assets on or prior to the Closing Date, except to the extent expressly assumed in Section 1.1(c)(i) or Section 1.1(c)(ii);

(ix)    Liabilities of the Company, the Beneficial Owners, the Seller Related Parties or their Affiliates:   (A) for or resulting from infringement, misappropriation or violation of any other Person's rights in Intellectual Property resulting from or in connection with the operation of the Business or the Company's or the Beneficial Owners' conduct with respect to the Owned Intellectual Property, (B) for or resulting from the operation of the Business constitutes unfair competition or deceptive trade practices, or (C) resulting from a Security Breach, in each case on or prior to the Closing (whether accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due, whether known or unknown, regardless of when asserted and whether arising prior to, on or after the Closing);

(x)    Liabilities or obligations of the Company, the Seller Related Parties, the Beneficial Owners and their respective Affiliates under this Agreement or any Ancillary Agreement;

(xi)    Liabilities of the Beneficial Owners, the Seller Related Parties or the Company to indemnify, reimburse or advance amounts to any officer, director, partner, member, manager, employee or agent of the Company, the Seller Related Parties or the Beneficial Owners, in each case in their capacity as such;

(xii)    Liabilities related to distribution of the Initial Closing Consideration and any amount payable pursuant to Section 1.3(b), Section 1.5 or Section 8.3(g) (or any portion of such amounts) by or on behalf of the Beneficial Owners,

including in accordance with the organizational documents or other agreements of the Beneficial Owners or the Company;

    (xiii)   Liabilities relating to or arising from any Company Benefit Plan, including any and all expenses incurred by Transferred Employees, other Workers or their respective beneficiaries prior to or on the Closing Date;

    (xiv)   [Reserved]

    (xv)   (A) any and all employment-related Liabilities and Liabilities in respect of all other Workers through the Closing Date, including (1) any Liabilities arising from the hiring, employing, compensating, disciplining, and/or terminating any Workers, (2) any Liabilities arising from any discrimination, harassment, and/or retaliation relating to any Workers, (3) any and all workers' compensation and other similar claims asserted by or with respect to any Workers or their respective beneficiaries in respect of any injury or other compensable event or occupational illness or disease that occurred or is attributable to any event, state of facts or conditions that existed or occurred in whole or in part prior to or on the Closing, and (4) any and all obligations to reimburse Workers for business expenses incurred before the Closing, and (B) all post-Closing Liabilities to the extent related to Workers who are not Transferred Employees;

    (xvi)   Liabilities arising from the failure to provide continuation coverage required by Section 4980B of the Code with respect to Workers (other than the Transferred Employees) or their respective beneficiaries;

    (xvii)   Liabilities of the Beneficial Owners, the Company, the Seller Related Parties or their Affiliates relating to or arising out of any Proceeding or Order, whether or not such Proceeding or Order (A) is required to be disclosed on Section 2.12(a), Section 2.12(b), or Section 2.12(c) of the Disclosure Schedules or (B) has been settled or otherwise resolved prior to the date hereof;

    (xviii)  All Liabilities of or relating to the Seller Related Parties;

    (xix)   All Liabilities related to the Beneficial Owner Representative Reserve Deposit other than the requirement to make the payment contemplated by Section 1.2(c)(i).

Section 1.2    Closing Consideration.

    (a)   Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Beneficial Owners, the Seller Related Parties and the Company will sell, transfer and deliver to the Buyer the Purchased Assets and the Assumed Liabilities, and the Buyer will purchase the Purchased Assets from the Beneficial Owners, the Seller Related Parties and the Company and assume the Assumed Liabilities for an aggregate purchase price equal to the sum of (i) seventy-seven million dollars ($77,000,000) (the "Base Purchase Price"), minus (ii) the Estimated Closing Date Indebtedness Amount, minus (iii) the Estimated Closing Date Unpaid Company Transaction Expenses, minus (iv) the Holdback Amount, minus (v) the Beneficial Owner Representative Reserve Deposit (the "Initial Closing Consideration").

(b)    <u>Payment of Initial Closing Consideration</u>.  At the Closing, the Buyer shall deposit an amount equal to the Initial Closing Consideration in an account designated by the Company.

(c)    <u>Other Closing Payments</u>.  At the Closing, the Buyer shall also make the following payments for and on behalf of the Company:

(i)    an amount equal to $50,000 (the "<u>Beneficial Owner Representative Reserve Deposit</u>") shall be deposited in a non-interest bearing account designated by the Beneficial Owner Representative to serve as the Beneficial Owner Representative Reserve Deposit, as set forth in <u>Section 1.2(g)</u>;

(ii)    the amounts set forth in the Estimated Expense Schedule as Estimated Closing Date Indebtedness Amount shall be paid in cash to the accounts and in the amounts set forth in the Pay-Off Letters to be delivered pursuant to <u>Section 7.1(g)</u>; and

(iii)    the amounts set forth in the Estimated Expense Schedule as Estimated Closing Date Unpaid Company Transaction Expenses, to the applicable recipients, which shall include the consideration to be paid to Petsky Prunier LLC, in connection with the closing of the Contemplated Transactions (the "<u>Broker Payment</u>"), as set forth in the Broker Pay-Off Letter to be delivered pursuant to <u>Section 7.1(h)</u>.

(d)    <u>Indebtedness</u>.  The Parties agree that any portion of the Indebtedness of the Company not repaid pursuant to <u>Section 1.2(c)(ii)</u> shall be an Excluded Liability and remain an obligation of the Company after the Closing.

(e)    <u>Company Transaction Expenses</u>.  The Parties agree that any portion of any Company Transaction Expenses not paid pursuant to <u>Section 1.2(c)(iii)</u> shall be an Excluded Liability and remain an obligation of the Company after the Closing.

(f)    <u>Form of Payments</u>.  All payments to be made by the Buyer pursuant to <u>Section 1.2(b)</u>, <u>Section 1.2(c)</u>, <u>Section 1.3(b)</u>, <u>Section 1.5(d)</u>, <u>Section 1.5(e)</u> and <u>Section 8.3(g)</u> shall be made by wire transfer of immediately available funds.

(g)    <u>Beneficial Owner Representative Reserve</u>.  The Beneficial Owner Representative Reserve Property shall be held and applied by the Beneficial Owner Representative for the purpose of paying Charges incurred by the Beneficial Owner Representative as contemplated by <u>Section 10.13</u>.  At such time as the Beneficial Owner Representative determines (in its reasonable discretion) that all or a portion of the Beneficial Owner Representative Reserve Property is not necessary to pay such Charges, the Beneficial Owner Representative shall cause such portion of the Beneficial Owner Representative Reserve Property to be released to the Company in accordance with <u>Section 5.9</u>, as applicable.

Section 1.3    <u>Post-Closing Purchase Price Adjustment</u>.

(a)    <u>Post-Closing Purchase Price Reconciliation</u>.

(i)    As soon as reasonably practicable following the Closing Date, but in no event more than ninety (90) days after the Closing Date, the Buyer shall prepare and deliver to the Beneficial Owner Representative a calculation (the "Closing Statement"), together with reasonably detailed supporting information, of:  (A) the Base Purchase Price, minus (B) the Net Working Capital Deficiency, if any, minus (C) Closing Date Indebtedness Amount, minus (D) the Closing Date Unpaid Company Transaction Expenses, minus (E) the Holdback Amount, minus (F) the Beneficial Owner Representative Reserve Deposit (the "Final Closing Consideration").

(ii)    From and after the delivery of the Closing Statement, the Buyer shall provide the Beneficial Owner Representative and its Representatives reasonable access to the Business Books and Records and employees of the Buyer and its Affiliates and shall cause the employees of the Buyer and its Affiliates to cooperate in all reasonable respects with the Beneficial Owner Representative in connection with its review of such work papers and other documents and information relating to the calculations set forth on the Closing Statement as the Beneficial Owner Representative shall reasonably request and that are available to the Buyer and its Affiliates or their Representatives; provided, that, in no event shall the Buyer be required to provide or make available any documents or other information (A) covered by attorney-client privilege, the attorney work product doctrine or other similar protection (it being agreed that the Buyer shall be required to notify the Beneficial Owner Representative that it is withholding documents or information because of such privilege or protection and provide documents and information (or the contents thereof) to the extent practicable without waiving such privilege or protection), (B) prepared by the Buyer or its Representatives in connection with their diligence review of the Company, the Purchased Assets, the Assumed Liabilities and the Contemplated Transactions, including any financial analyses or valuations related thereto, or (C) related to any other business activities (other than the Business) of the Buyer or its Affiliates.

(iii)    Within forty-five (45) days after the Beneficial Owner Representative's receipt of the Closing Statement, the Beneficial Owner Representative shall notify the Buyer as to whether the Beneficial Owner Representative agrees or disagrees with the Closing Statement and, if the Beneficial Owner Representative disagrees, such notice shall set forth in reasonable detail the particulars of such disagreement, specifying in reasonable detail any contested amounts and the basis therefore that the Beneficial Owner Representative has with respect to the Closing Statement, and setting forth the Beneficial Owner Representative's calculation of the Final Closing Consideration, including each component thereof (the "Objection Notice"). If the Beneficial Owner Representative provides a notice of agreement or does not provide an Objection Notice within such 45-day period, then the Beneficial Owner Representative, the Company and the Beneficial Owners shall be deemed to have accepted the calculations and the amounts set forth in the Closing Statement delivered by the Buyer, which shall then be final, binding and conclusive for all purposes hereunder. In addition, any amounts not disputed in the Objection Notice (if one is delivered) shall be deemed to be accepted by the Beneficial Owner Representative, the Company and the Beneficial Owners as final, binding and conclusive for all purposes hereunder.  If any such Objection Notice is timely provided, then the Beneficial Owner Representative and

the Buyer shall each use Reasonable Efforts for a period of thirty (30) days thereafter to resolve any disagreements with respect to the calculations in the Closing Statement. The Beneficial Owner Representative, the Company and the Beneficial Owners shall provide the Buyer and its Representatives reasonable access to the records and employees of the Beneficial Owner Representative, Beneficial Owners, the Company and their Affiliates and shall cause the employees of the Beneficial Owner Representative, the Beneficial Owners, the Company and their Affiliates to cooperate in all reasonable respects with the Buyer in connection with its review of such work papers and other documents and information relating to the calculations set forth on the Objection Notice as the Buyer shall reasonably request and that are available to the Beneficial Owner Representative, the Beneficial Owners, the Company and their Affiliates or their Representatives; provided, that, in no event shall the Beneficial Owner Representative, Beneficial Owners or the Company be required to provide or make available any documents or other information (A) covered by attorney-client privilege, the attorney work product doctrine or other similar protection (it being agreed that the Beneficial Owner Representative shall be required to notify the Buyer that it is withholding documents or information because of such privilege or protection and provide documents and information (or the contents thereof) to the extent practicable without waiving such privilege or protection), (B) prepared by the Beneficial Owners, the Company, the Beneficial Owner Representative, or any of their respective Representatives in connection with their diligence review of the Buyer and the Contemplated Transactions, including any financial analyses or valuations related thereto, or (C) related to any other business activities (other than the Business) of the Beneficial Owners, the Company, the Beneficial Owner Representative, or any of their respective Affiliates. If, at the conclusion of the 30-day resolution, there are any amounts remaining in dispute, and the aggregate total of such amounts remaining in dispute are less than or equal to $20,000, then the Neutral Auditor will not be engaged and the amounts in dispute will be deemed resolved and no amounts shall be owing to either the Buyer or the Company with respect to such remaining disputed amounts pursuant to this Section 1.3(a).

(iv)    If, at the conclusion of the 30-day resolution period, (A) there are any amounts remaining in dispute and (B) the aggregate total of such amounts remaining in dispute are greater than $20,000, then only such amounts remaining in dispute set forth in the Objection Notice may be submitted by either the Buyer or the Beneficial Owner Representative to a single arbitrator appointed by mutual agreement of the Buyer and the Beneficial Owner Representative, who is a neutral and impartial licensed certified public accountant in the State of Delaware with significant arbitration experience related to purchase price adjustment disputes relating to transactions of a similar nature and is also a licensed attorney chosen from the AAA roster of arbitrators in the State of Delaware (the "Neutral Auditor"); provided that if the Beneficial Owner Representative and the Buyer are unable to select such an arbitrator within thirty (30) calendar days after either the Buyer or the Beneficial Owner Representative elects to engage a Neutral Auditor, then Buyer and Beneficial Owner Representative shall each nominate such an arbitrator, and the two arbitrators so nominated shall appoint, within twenty (20) Business Days from the date such arbitrators were nominated, an arbitrator meeting the requirements set forth above, which such third arbitrator shall serve as the Neutral Auditor. The Neutral Auditor shall (1) consider only those items and amounts that are identified in the

Objection Notice as being items that the Beneficial Owner Representative, on the one hand, and the Buyer, on the other hand, are unable to resolve and (2) select with respect to each item in dispute an amount between or equal to the position of the Beneficial Owner Representative, on the one hand, and the Buyer, on the other hand.  The Neutral Auditor's determination will be based solely on the definitions of the disputed items contained herein.  The Neutral Auditor shall act as an arbitrator to determine, based solely on the provisions of this Section 1.3(a)(iv) and the presentations by the Beneficial Owner Representative and the Buyer, and not by independent review, only those issues still in dispute.  The Buyer and the Beneficial Owner Representative shall provide such supporting calculations and work papers requested by the Neutral Auditor that are reasonably necessary to permit the Neutral Auditor to reach a determination; provided, that, in no event shall (A) either Party be required to provide or make available any documents or other information covered by attorney-client privilege, the attorney work product doctrine or other similar protection (it being agreed that such Party shall be required to notify the Neutral Auditor that it is withholding documents or information because of such privilege or protection and provide documents and information (or the contents thereof) to the extent practicable without waiving such privilege or protection), (B) the Buyer be required to provide or make available any documents or other information prepared by the Buyer or its Representatives in connection with their diligence review of the Company, the Purchased Assets, the Assumed Liabilities and the Contemplated Transactions, including any financial analyses or valuations related thereto, (C) the Buyer be required to provide or make available any documents or other information related to any other business unit of the Buyer or its Affiliates, (D) prepared by the Beneficial Owners, the Company, the Beneficial Owner Representative, or any of their respective Representatives in connection with their diligence review of the Buyer and the Contemplated Transactions, including any financial analyses or valuations related thereto, or (E) related to any other business activities (other than the Business) of the Buyer, the Beneficial Owners, the Company, the Beneficial Owner Representative, or any of their respective Affiliates.  The Neutral Auditor's determination shall be made within thirty (30) days of the dispute being submitted for its determination, shall be set forth in a written statement delivered to the Beneficial Owner Representative and the Buyer and shall be final, non-appealable and binding on the Parties, absent manifest error or fraud.  A judgment of a court of competent jurisdiction may be entered upon the Neutral Auditor's determination.  The Neutral Auditor shall have exclusive jurisdiction over, and resort to the Neutral Auditor as provided in this Section 1.3(a)(iv) shall be the only recourse and remedy of the Parties against one another with respect to, any disputes arising out of or relating to the adjustments pursuant to this Section 1.3(a)(iv).  The fees, costs and expenses of the Neutral Auditor shall be borne by the Buyer, on the one hand, and by the Company, on the other hand (which the Beneficial Owner Representative must first pay out of the Beneficial Owner Representative Reserve Property, to the extent available), based upon the percentage which the portion of the contested amount not awarded to each Party bears to the amount actually contested by such Party.  For example, if the Buyer claims that the Final Closing Consideration is $1,000 less than the amount determined by the Beneficial Owner Representative, and the Beneficial Owner Representative contests only $500 of the amount claimed by the Buyer, and if the Neutral Auditor ultimately resolve the dispute by awarding the Buyer $300 of the $500 contested,

then the costs and expenses of the Neutral Auditor will be allocated 60% (i.e., 300/500) to the Company and 40% (i.e., 200/500) to the Buyer.

   (b) <u>Payment of Post-Closing Purchase Price Reconciliation</u>.

     (i) If the Final Closing Consideration is less than the Initial Closing Consideration, the Company shall, within five (5) Business Days after the final determination of the Final Closing Consideration pursuant to <u>Section 1.3(a)</u>, promptly pay to an account or accounts designated by the Buyer in cash by wire transfer of immediately available funds, an amount equal to such difference. Subject to the rights of set-off provided for in this Agreement, if (A) the Final Closing Consideration is more than the Initial Closing Consideration, and (B) (1) the sum of (x) the Estimated Closing Date Indebtedness Amount plus (y) the Estimated Closing Date Unpaid Company Transaction Expense is greater than (2) the sum of (x) the Closing Date Indebtedness Amount plus (y) the Closing Date Unpaid Company Transaction Expense (such amount, the "<u>Indebtedness/Expense Excess</u>"), the Buyer shall, within five (5) Business Days after the final determination of the Final Closing Consideration pursuant to <u>Section 1.3(a)</u>, promptly pay to an account or accounts designated by the Beneficial Owner Representative (for payment to the Beneficial Owners, pursuant to <u>Section 5.9</u>) in cash by wire transfer of immediately available funds, an amount equal to the Indebtedness/Expense Excess, less the amount of the Net Working Capital Deficiency, if any. (the "<u>Additional Closing Consideration</u>"). For avoidance of doubt, if the Final Closing Consideration is less than the Initial Closing Consideration, no payment shall be due to the Company under this <u>Section 1.3(b)(i)</u> even if there is an Indebtedness/Expense Excess.

     (ii) No interest shall accrue on any amounts due under this <u>Section 1.3(b)</u> if such amounts are paid within the timeframe specified in <u>Section 1.3(b)</u>.

   Section 1.4 <u>Closing Date</u>. The consummation of the Contemplated Transactions (the "<u>Closing</u>") provided for in this Agreement shall be effective as of (a) April 1, 2018 or (b) at such other place and time as the Parties shall mutually agree, subject in each case to the satisfaction or waiver of all conditions to Closing in <u>Article</u> VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions). The date on which the Closing is effective is referred to herein as the "<u>Closing Date</u>", and shall be deemed to have occurred at 12:01 A.M. New York time on such date; <u>provided</u> that if the Closing Date is not a Business Day then the exchange of electronic mail or physical documentation at the offices of Buyer shall occur on the next Business Day following the Closing Date upon confirmation of receipt of the Initial Closing Consideration as provided in <u>Section 1.2(b)</u>.

   Section 1.5 <u>Earn Out Amount</u>.

   (a) On or before the ninetieth (90th) day following the expiration of each of the Interim Period and the Earn-out Period, the Buyer shall prepare and deliver to the Beneficial Owner Representative an Earn-out Statement. The Buyer shall make each calculation contained within the Earn-out Statement in good faith.

(b)     From and after the delivery of any Earn-out Statement, the Buyer shall provide the Beneficial Owner Representative and its Representatives reasonable access to the Business Books and Records and employees of the Buyer and its Affiliates (including the Company) and shall cause the employees of the Buyer and its Affiliates (including the Company) to cooperate in all reasonable respects with the Beneficial Owner Representative in connection with its review of such work papers and other documents and information relating to the calculations set forth in any Earn-out Statement as the Beneficial Owner Representative shall reasonably request and that are available to the Buyer and its Affiliates or their Representatives. Within thirty (30) days after Beneficial Owner Representative's receipt of an Earn-out Statement, the Beneficial Owner Representative shall notify the Buyer as to whether the Beneficial Owner Representative agrees or disagrees with any Earn-out Statement and, if the Beneficial Owner Representative disagrees, such notice shall set forth in reasonable detail the particulars of such disagreement (a "Protest Notice"), and shall set forth the Beneficial Owner Representative's calculation of Adjusted EBITDA and Compound Growth Rate for the applicable period(s). If the Beneficial Owner Representative provides a notice of agreement or does not provide a Protest Notice within such 30-day period, then the Beneficial Owner Representative shall be deemed to have accepted the Buyer's calculation of Adjusted EBITDA and Compound Growth Rate set forth in such Earn-out Statement delivered by the Buyer, which shall then be final, binding and conclusive for all purposes hereunder. If any such Protest Notice is timely provided, then the Buyer and the Beneficial Owner Representative shall each use Reasonable Efforts for a period of thirty days (30) thereafter to resolve any disagreements with respect to the calculations set forth in such Earn-out Statement.

(c)     If, at the conclusion of the 30-day resolution there are any amounts remaining in dispute, then only such amounts remaining in dispute set forth in the Protest Notice will be referred to the Neutral Auditor in accordance with the procedures set forth in Section 10.11. The Neutral Auditor shall consider only those items and amounts that are identified in the Protest Notice as being items that the Beneficial Owner Representative, on the one hand, and the Buyer, on the other hand, are unable to resolve select with respect to each item in dispute an amount between or equal to the position of the Beneficial Owner Representative, on the one hand, and the Buyer, on the other hand. The Neutral Auditor's determination will be based solely on the definitions of the disputed items contained herein. The Neutral Auditor shall act as an arbitrator to determine, based solely on the provisions of this Section 1.5(c) and the presentations by the Beneficial Owner Representative and the Buyer, and not by independent review, only those issues still in dispute. The Buyer and the Beneficial Owner Representative shall provide such supporting calculations and work papers requested by the Neutral Auditor that are reasonably necessary to permit the Neutral Auditor to reach a determination; provided, that, in no event shall (A) either Party be required to provide or make available any documents or other information covered by attorney-client privilege, the attorney work product doctrine or other similar protection (it being agreed that such Party shall be required to notify the Neutral Auditor that it is withholding documents or information because of such privilege or protection and provide documents and information (or the contents thereof) to the extent practicable without waiving such privilege or protection), (B) the Buyer be required to provide or make available any documents or other information prepared by the Buyer or its Representatives in connection with their diligence review of the Company, the Purchased Assets and the Assumed Liabilities, including any financial analyses or valuations related thereto, or (C) the Buyer be required to provide or make available any documents or other information related to any other

business unit of the Buyer or its Affiliates. The Neutral Auditor's determination shall be made within thirty (30) days of the dispute being submitted for its determination, shall be set forth in a written statement delivered to the Beneficial Owner Representative and the Buyer and shall be final, non-appealable and binding on the Parties, absent manifest error or fraud. A judgment of a court of competent jurisdiction may be entered upon the Neutral Auditor's determination. The Neutral Auditor shall have exclusive jurisdiction over, and resort to the Neutral Auditor as provided in this Section 1.5(c) shall be the only recourse and remedy of the Parties against one another with respect to, any disputes arising out of or relating to the calculations pursuant to this Section 1.5(c). The fees, costs and expenses of the Neutral Auditor shall be borne by the Party whose calculation of the Compound Growth Rate is furthest from the Compound Growth Rate as finally determined by the Neutral Auditor.

(d)     Subject to the rights of set-off provided for in this Agreement and the specific conditions in Section 1.5(i), within fifteen (15) days of the determination of Adjusted EBITDA and Compound Growth Rate for the Interim Period pursuant to Section 1.5(b) or Section 1.5(c), Buyer shall pay to the Company the Interim Earn-out Amount. For purposes of this Agreement, the "Interim Earn-out Amount" means one and only one of the following amounts:

(i)     If the Compound Growth Rate for the Interim Period is less than two and one half percent (2.5%), an amount equal to $0;

(ii)     if the Compound Growth Rate for the Interim Period is greater than or equal to two and one half percent (2.5%), but less than five percent (5.0%), an amount equal to $1,350,000.00;

(iii)     if the Compound Growth Rate for the Interim Period is greater than or equal to five percent (5.0%), but less than seven and one half percent (7.5%), an amount equal to $2,700,000.00;

(iv)     if the Compound Growth Rate for the Interim Period is greater than or equal to seven and one half percent (7.5%), but less than ten percent (10.0%), an amount equal to $4,025,000.00;

(v)     if the Compound Growth Rate for the Interim Period is greater than or equal to ten percent (10.0%), but less than twelve and one half percent (12.5%), an amount equal to $5,375,000.00;

(vi)     if the Compound Growth Rate for the Interim Period is greater than or equal to twelve and one half percent (12.5%), but less than fifteen percent (15%), an amount equal to $6,725,000.00;

(vii)     if the Compound Growth Rate for the Interim Period is greater than or equal to fifteen percent (15%), but less than seventeen and a half percent (17.5%), an amount equal to $8,075,000.00;

(viii)   if the Compound Growth Rate for the Interim Period is greater than or equal to seventeen and one half percent (17.5%), but less than twenty percent (20%), an amount equal to $9,400,000.00; or

(ix)   if the Compound Growth Rate for the Interim Period is greater than or equal to twenty percent (20%), an amount equal to $10,750,000.00.

(e)   Subject to the rights of set-off provided for in this Agreement and the specific conditions in Section 1.5(i), within fifteen (15) days of the determination of Adjusted EBITDA and Compound Growth Rate for the Earn-out Period pursuant to Section 1.5(b) or Section 1.5(c), Buyer shall pay to the Company the Final Earn-out Amount.  For purposes of this Agreement, the "Final Earn-out Amount" means one and only one of the following amounts:

(i)   If the Compound Growth Rate for the Earn-out Period is less than two and one half percent (2.5%), an amount equal to $0;

(ii)   if the Compound Growth Rate for the Earn-out Period is greater than or equal to two and one half percent (2.5%), but less than five percent (5.0%), an amount equal to $5,400,000.00, minus the Interim Earn-out Amount, if any;

(iii)   if the Compound Growth Rate for the Earn-out Period is greater than or equal to five percent (5.0%), but less than seven and one half percent (7.5%), an amount equal to $10,800,000.00, minus the Interim Earn-out Amount, if any;

(iv)   if the Compound Growth Rate for the Earn-out Period is greater than or equal to seven and one half percent (7.5%), but less than ten percent (10.0%), an amount equal to $16,100,000.00, minus the Interim Earn-out Amount, if any;

(v)   if the Compound Growth Rate for the Earn-out Period is greater than or equal to ten percent (10.0%), but less than twelve and one half percent (12.5%), an amount equal to $21,500,000.00, minus the Interim Earn-out Amount, if any;

(vi)   if the Compound Growth Rate for the Earn-out Period is greater than or equal to twelve and one half percent (12.5%), but less than fifteen percent (15%), an amount equal to $26,900,000.00, minus the Interim Earn-out Amount, if any;

(vii)   if the Compound Growth Rate for the Earn-out Period is greater than or equal to fifteen percent (15%), but less than seventeen and a half percent (17.5%), an amount equal to $32,300,000.00, minus the Interim Earn-out Amount, if any;

(viii)   if the Compound Growth Rate for the Earn-out Period is greater than or equal to seventeen and one half percent (17.5%), but less than twenty percent (20%), an amount equal to $37,600,000.00, minus the Interim Earn-out Amount, if any; or

(ix)   if the Compound Growth Rate for the Earn-out Period is greater than or equal to twenty percent (20%), but less than twenty percent (30%), an amount equal to $43,000,000.00, minus the Interim Earn-out Amount, if any; or

(x)　　if the Compound Growth Rate for the Earn-out Period is greater than or equal to twenty percent (30%), an amount equal to $53,000,000.00, minus the Interim Earn-out Amount, if any.

(f)　　Notwithstanding anything to the contrary contained in this Agreement or any Ancillary Agreement, in no event shall the Aggregate Earn-out Amount exceed $53,000,000.

(g)　　Notwithstanding anything to the contrary contained in this Agreement or any Ancillary Agreement, in no event shall the sum of (i) the Initial Closing Consideration, plus (ii) the Aggregate Earn-out Amount, if any, exceed an aggregate amount of $130,000,000.00.

(h)　　No interest shall accrue on the unpaid portion of any Interim Earn-out Amount or any Final Earn-out Amount, as applicable, during the pendency of any dispute (pursuant to this Section 1.5 or otherwise) as to the correct amount. Calculations of the components of Adjusted EBTIDA and Compound Growth Rate shall be made in accordance with GAAP, subject to the express qualifications and limitations in the definitions of such terms.

(i)　　Upon the determination of each of the Interim Earn-Out Amount, if any, and the Final Earn-Out Amount, if any, each of the Buyer, the Company, each Beneficial Owner and the Beneficial Owner Representative agree to execute the release attached hereto as Exhibit C. Notwithstanding any other provision of this Agreement, the Buyer shall have no obligation to pay any amount under this Section 1.5 unless and until the Company, each Beneficial Owner and the Beneficial Owner Representative have executed the release attached hereto as Exhibit C with respect to the applicable payment.

(j)　　Following the Closing, the Buyer shall have the right to operate the Business, Purchased Assets and Assumed Liabilities in its sole and absolute discretion, including with respect to employee compensation (subject to Section 5.8(a)) and has no obligation to maintain or preserve any relationship with any client, customer, supplier, vendor, employee or contractor or the terms of any contract (including pricing). During the Earn-out Period, the Buyer shall maintain the Business as a separate business unit and shall not sell or transfer any material portion of the Purchased Assets to a third party that is not an affiliate of the Buyer, unless the acquiror of the Purchased Assets expressly assumes and has the financial resources and wherewithal to fulfil the Buyer's obligations under this Section 1.5 with respect to any earn-out payments that are due or may become due to the Company. Notwithstanding the foregoing, during the Earn-out Period, the Buyer (i) will not take any action the purpose and intent of which is to circumvent the payment of the Initial Earn-out Amount or the Final Earn-out Amount and (ii) will maintain separate accounting records for the Business.

Section 1.6　　Allocation. The Purchase Price (and such other amounts as shall be treated as purchase price for U.S. federal income Tax purposes) shall be allocated among the Purchased Assets and other rights acquired or obtained by the Buyer in connection with the Contemplated Transactions for all Tax purposes in accordance with their respective fair market values pursuant to an allocation schedule prepared by the Buyer and delivered to the Company as soon as reasonably practicable after the Closing, but not more than sixty (60) days following the Closing, in accordance with Section 1060 of Code and the methodology set forth on Schedule I hereto (the "Allocation"). The Company shall, within thirty (30) days after receipt of the

Buyer's determination of the Allocation, provide written notice to the Buyer if the Company disagrees with the Buyer's determination, and if the Company does not so provide written notice to the Buyer within such 30-day period, the Allocation shall be final and binding on the Parties. If the Company provides written notice to the Buyer that the Company disagrees with the Allocation and the Buyer does not accept the Company's comments, the Buyer and the Company shall make a good faith effort to resolve the dispute, after which any remaining disputed issues shall be resolved by the Neutral Auditor. Except as may be required by Law, the Parties will (i) file or cause to be filed all Tax Returns (including IRS Form 8594) in a manner consistent with the Allocation (as determined pursuant to this Section 1.6) and (ii) not take any action inconsistent therewith. Any adjustments to the Purchase Price subsequent to the initial delivery of the Allocation by the Buyer to the Company shall be reflected in amendments to the Allocation in a manner consistent with Treasury Regulation Section 1.1060-1.

Section 1.7    Withholding. The Buyer shall be entitled to deduct and withhold from any payments required to be made by the Buyer in connection with this Agreement such amounts (if any) as it is required to deduct and withhold pursuant to the Code or any applicable provision of any state, local or non U.S. Tax laws, and any amount so deducted and withheld shall be remitted to the appropriate Governmental Authority as required by applicable Law, and upon the same, such amounts shall be treated for all purposes as having been paid by the Buyer to the party to whom such payments were required to be made in connection with this Agreement.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES RELATED TO THE COMPANY

For purposes of this Article II, any reference to the "Company" means the Company and, unless otherwise specified or reasonably apparent from the nature of the context in which such term is used, also means the Seller Related Parties. The Company represents and warrants to the Buyer that the statements contained in this Article II are true and correct as of the Signing Date and the Closing Date (except that any representations and warranties that are made as of a specific date need only be true as of such date), except in all cases as set forth in the Disclosure Schedules.

Section 2.1    Organization. The Company is duly formed, validly existing and is in good standing under the Laws of the jurisdiction in which it is organized. The Company has all requisite corporate power and authority to conduct the Business and to own or lease its Assets and Properties, as now conducted, owned or leased. The Company is duly qualified to do business in each jurisdiction where required, except to the extent the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 2.2    Authority. The Company has the full power and authority to execute and deliver this Agreement and the Ancillary Agreements and perform its obligations hereunder and thereunder, and no further proceedings on the part of the Company are necessary to approve and authorize the execution and delivery of this Agreement or the Ancillary Agreements and the performance of its obligations hereunder and thereunder. This Agreement has been duly executed and delivered by the Company and, assuming that this Agreement has been duly executed and delivered by the other Parties hereto, this Agreement constitutes the valid and

binding obligation of the Company, enforceable against the Company in accordance with its terms, except as such enforcement may be limited by Laws affecting the enforcement of creditors' rights generally or by general equitable principles. All issued and outstanding Equity Interests are owned of record by the Beneficial Owners.

Section 2.3    [Reserved]

Section 2.4    No Conflicts; Consents and Approvals.

(a)    The execution and delivery of this Agreement and the consummation of the Contemplated Transactions will not result in (i) any breach or violation of or default under the Organizational Documents of the Company, (ii) any breach or violation of or default under any Law or Governmental Authorization applicable to the Company or the Purchased Assets, (iii) any breach or violation of, default under, termination or right to terminate, or acceleration of any obligation (including any payments) under any mortgage, lease, Acquired Contract, deed of trust, indenture or any other instrument to which the Company is a party or by which the Purchased Assets are bound, or (iv) the creation or imposition of any Liens (other than Permitted Liens) on any Purchased Asset, except (in the case of clauses (iii) and (iv) above) for any breach, violation, default, termination, payment or Lien that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Without limiting the generality of the foregoing, except for (x) the Buyer pursuant hereto and (y) in the ordinary course of business consistent with past practice, there are no agreements, options, commitments or rights with, of or to any Person to purchase or otherwise acquire any of the Purchased Assets.

(b)    Except as set forth on Section 2.4 of the Disclosure Schedules, no consent, approval or authorization of or filing with any third Person or any Governmental Authority is required on the part of the Company in connection with the execution and delivery of this Agreement or the consummation of the Contemplated Transactions.

Section 2.5    Financial Statements.

(a)    The Company has made available to the Buyer true and complete copies of the unaudited consolidated balance sheet and statement of income of the Company as of and for the fiscal year ended as of December 31, 2016 and the audited consolidated balance sheet and statement of income (the "Interim Financial Statements") of the Company as of and for the fiscal year ended as of December 31, 2017 (collectively, the "Financial Statements"). The Financial Statements (including the related notes and schedules) (i) have been prepared in accordance with the Books and Records of the Company, (ii) are true and correct and present fairly in all material respects the financial condition and results of operations of the Company as of the dates and for the periods indicated, and (iii) with respect only to the Financial Statement for the fiscal year ended as of December 31, 2017, have been prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated, except as described on Section 2.5(a) of the Disclosure Schedules; provided, however, that the Interim Financial Statements are subject to normal year-end adjustments and lack footnotes and other presentation items. There has been no change in the Company's accounting policies since December 31, 2017, except as disclosed in the Financial Statements.

(b)    All of the accounts receivable of the Company (collectively, the "Accounts Receivable") are reflected on the Financial Statements and arose from valid sales actually made or services actually performed in the ordinary course of business consistent with past practice on ordinary trade terms to Persons who are not Affiliates of the Company.  No portion of the Accounts Receivable is (i) required or expected to be paid to any Person other than the Company, (ii) subject to any set off, counterclaim or other defense or (iii) conditional on any performance, occurrence or event or the absence of any performance, occurrence or event (except in the case of prepayments made in the ordinary course of business consistent with past practice).  Section 2.5(b) of the Disclosure Schedules lists all of the Accounts Receivable of the Company that have been billed but for which payment is overdue by ninety (90) days or more.

(c)    The Assumed Liabilities have arisen in bona fide arm's-length transactions in the ordinary course of business consistent with past practice, and the Company has been paying its accounts payable, including, any Excluded Liabilities, as and when due. Except as set forth on Section 2.5(c) of the Disclosure Schedules, there are no unpaid invoices or bills representing amounts alleged to be owed by the Company, or other alleged obligations or the Company, which the Company has disputed or determined to dispute or refused to pay.

(d)    The aggregate amount of the Company's Indebtedness, and the holders of such Indebtedness, as of the Signing Date, is set forth on Section 2.5(d) of the Disclosure Schedules.  All such Indebtedness may be prepaid without penalty.

Section 2.6    Absence of Undisclosed Liabilities.  Except for (a) Liabilities reflected or reserved against in the Financial Statements, (b) Liabilities disclosed in Section 2.5(c) of the Disclosure Schedules, (c) obligations under Contracts entered into in the ordinary course of business consistent with past practice (other than Liabilities arising from any breach of such Contracts) or (d) Liabilities incurred in the ordinary course of business consistent with past practice since the date of the Latest Balance Sheet, the Company has no Liabilities.

Section 2.7    Property; Sufficiency of Assets.

(a)    The Company does not own any fee interest in any real property. Section 2.7(a)(i) of the Disclosure Schedules sets forth a list of the real property leased by the Company (the "Facilities"), including the amount of the current monthly rent (including base rent, CAM charges and any additional rent) and the expiration date of such Real Property Lease. Except as set forth on Section 2.7(a)(ii) of the Disclosure Schedules, with respect to each Facility, the Company holds a valid leasehold interest in such Facility, free and clear of any and all Liens other than Permitted Liens.

(b)    Each lease described on Section 2.7(a)(i) of the Disclosure Schedules (each a "Real Property Lease") is in full force and effect and, to the Knowledge of the Company, is enforceable against the landlord thereto in accordance with its terms.  The Company has furnished or made available to the Buyer complete and correct copies of the Real Property Leases (including all amendments, exhibits, attachments and waivers thereto), as in effect on the Signing Date.  The Company enjoys personal and undisturbed possession under each of the Real Property Leases.  Other than the Real Property Leases, the Company is not a party to any Contract for the lease of real property.  The Company is not a lessor, sublessor or grantor under

any lease, sublease, consent, license or other instrument granting to another Person any right to the possession, use, occupancy or enjoyment of the Facilities.  Except as set forth on Section 2.7(b) of the Disclosure Schedules, there exists no material default or material event of default (or any event that with notice or lapse of time or both would become a material default) on the part of the Company (as applicable), or, to the Knowledge of the Company, any other party, under any Real Property Lease.  Except as set forth on Section 2.7(b) of the Disclosure Schedules, since January 1, 2015, the Company has not received any written notice of any material default under any Real Property Lease nor any other termination notice with respect thereto, and to the Knowledge of the Company no event has occurred which with the giving of notice or the passage of time or both would constitute a material default by any other party, or which would give rise to any right of notice, modification, acceleration, payment, cancellation or termination, or in any manner release any party thereto from any obligation under, any Real Property Lease.

(c)    Each lease pursuant to which the Company leases any Tangible Personal Property and under which the Company is required to make payments in excess of $50,000 per annum (the "Personal Property Leases") is in full force and effect and, to the Knowledge of the Company, is enforceable against the lessor that is party thereto in accordance with its terms. The Company has furnished or made available to the Buyer complete and correct copies of the Personal Property Leases (including all amendments, exhibits, attachments and waivers thereto), as in effect on the Signing Date.  Each of such Personal Property Leases are set forth on Section 2.7(c) of the Disclosure Schedules.  The Company enjoys personal and undisturbed possession under each of the Personal Property Leases.  Except as set forth on Section 2.7(c) of the Disclosure Schedules, there exists no material default or material event of default (or any event which with notice or lapse of time or both would become a material default) on the part of the Company, or, to the Knowledge of the Company, any other party, under any Personal Property Lease.  Except as set forth on Section 2.7(c) of the Disclosure Schedules, since January 1, 2015, the Company has not received any written notice of any material default under any Personal Property Lease nor any other termination notice with respect thereto, and to the Knowledge of the Company no event has occurred which with the giving of notice or the passage of time or both would constitute a material default by any other party, or which would give rise to any right of notice, modification, acceleration, payment, cancellation or termination, or in any manner release any party thereto from any obligation under, any Personal Property Lease.

(d)    The Company has good and valid title to, or a valid leasehold interest in, or a valid and enforceable right to use, all of the Purchased Assets and, except as set forth on Section 2.7(d) of the Disclosure Schedules, free and clear of all Liens other than Permitted Liens.

(e)    The Assets and Properties constitute all of the Assets and Properties of the Company used by the Company for the conduct of the Business as presently conducted and are sufficient to enable the Buyer to conduct the Business immediately after the Closing in the same manner as conducted by the Company as of the Closing.  All tangible Assets and Properties owned or leased by, or licensed to, the Company has been maintained in a reasonably prudent manner and are in good operating condition and repair, ordinary wear and tear excepted, and are suitable for the purposes for which they are presently being used.  No personal property of the Company is located at a location other than a Facility.  All Liens (other than Liens described in

clauses (i) or (j) of the definition of the defined term "Permitted Liens") related to the Purchased Assets will be removed on or prior to the Closing.

       Section 2.8    <u>Contracts</u>.

       (a)    <u>Section 2.8(a)</u> of the Disclosure Schedules contains a complete and correct list, as of the Signing Date, of all Material Contracts.  The term "<u>Material Contracts</u>" means all of the following types of Contracts to which the Company is a party (but excluding Real Property Leases and Personal Property Leases):

       (i)    Contracts with current officers, directors, other employees or consultants of the Company or providing for the payment of any cash or other compensation or benefits upon the sale of the Business or prohibiting competition or the disclosure of trade secrets or confidential information;

       (ii)    loan agreements, notes, mortgages, indentures, security agreements or guarantees of the obligations of a third Person, or any other Contract relating to Indebtedness;

       (iii)    Contracts establishing or relating to a joint venture, partnership, strategic alliance, limited partnership agreements or otherwise involving the sharing of profits generated by or accruing to any Person other than the Company;

       (iv)    Contracts between the Company and any Person to whom the Company is obligated to pay more than $100,000 in any calendar year and that is not terminable on notice of thirty (30) days or less without penalty (other than purchase orders or service orders entered into in the ordinary course of business consistent with past practice of the Company);

       (v)    Contracts between the Company and any Person who is obligated to pay more than $100,000 to the Company in a calendar year and that is not terminable on notice of thirty (30) days or less without penalty (other than purchase orders or service orders entered into in the ordinary course of business consistent with past practice of the Company);

       (vi)    Contracts prohibiting or restricting the ability of the Company to freely engage in any business activity, including competing with any Person, engaging in the Business or operating in any geographical area, particular product or product category or dealing with client or customer;

       (vii)    Contracts between, on the one hand, the Company, and on the other hand, (A) any current or former officer or director of the Company, or (B) any Affiliate of the Company;

       (viii)    Contracts for the disposition of any portion of the Purchased Assets or of the Business of the Company or for the acquisition by the Company of the assets or business of any other Person, other than (x) such dispositions in the ordinary

course of business consistent with past practice, and (y) such dispositions contemplated by this Agreement;

(ix)    Contracts under which the Company is granted any license, option or other right or immunity (including a covenant not to be sued) with respect to any Intellectual Property, other than any such Contract that has been entered into by the Company for "off the shelf" software that is generally available and on commercially standard terms ("Inbound Licenses");

(x)    Contracts under which the Company has granted to any third party any license, option or other right or immunity (including a covenant not to be sued) with respect to any Intellectual Property ("Outbound Licenses");

(xi)    Contracts in which the Company has granted "most favored nation" or other preferential pricing terms or provisions or exclusive marketing or distribution rights relating to any products or territory or has agreed to purchase a minimum quantity of goods or services or has agreed to purchase goods or services exclusively from a certain party;

(xii)    Contract in which the Company has agreed, for a specified or unlimited period of time, to maintain a facility in a certain geographic area, to maintain a certain number of employees, to invest or expend a certain monetary amount, or to accept any other similar non-customary affirmative service obligation with respect to the operation of the Business;

(xiii)    Contracts not to solicit any customer of any Person or solicit or hire any employee, consultant or independent contractor of any Person;

(xiv)    Contracts providing for capital expenditures the Company with any outstanding amount of unpaid obligations and commitments in excess of $100,000;

(xv)    [Reserved];

(xvi)    any Contract that requires the Company or, following the Closing would require, the Buyer to screen the Workers or the Transferred Employees from a criminal, drug/alcohol, behavioral, motor vehicle history or credit perspective or other employment screening;

(xvii)    Contracts with a material vendor listed on Section 2.22 of the Disclosure Schedules;

(xviii)    Contracts with a material client listed on Section 2.23 of the Disclosure Schedules;

(xix)    Contract with any labor union or any bonus, pension, profit sharing, retirement or any other form of deferred compensation plan or any stock purchase, stock option or similar plan or practice, whether formal or informal, or any severance agreement or arrangement;

(xx)     Contracts under which the Company is subject to any obligation or requirement to make any investment (in the form of a loan or capital contribution) in any Person;

(xxi)     Contracts granting any Person a Lien on all or any material portion of the Purchased Assets, taken as a whole, other than Permitted Liens; or

(xxii)     Contracts that provide for the indemnification by the Company of any Person or the assumption of any Tax, environmental or other financial Liability of any Person, in each case that would be material to the Company.

(b)     The Company has furnished or made available to the Buyer (i) complete and correct copies of each Material Contract that is a written Contract (including all amendments, exhibits, attachments and waivers thereto) listed on Section 2.8(a) of the Disclosure Schedules, as in effect on the Signing Date and (ii) a detailed summary of each Material Contract that is not a written Contract listed on Section 2.8(a) of the Disclosure Schedules, as in effect on the Signing Date.   Except as set forth on Section 2.8(b) of the Disclosure Schedules, neither the Company, nor, to the Knowledge of the Company, any other party thereto, is in material default under any Material Contract, each Material Contract is in full force and effect as applicable to the Company, and to the Knowledge of the Company, as to each other party thereto and is not subject to any claims, charges set-offs or defenses.   Except as set forth on Section 2.8(b) of the Disclosure Schedules, since January 1, 2015, the Company has not received any written notice of any material default under any Material Contract or any other termination notice with respect thereto (other than Material Contracts expiring in accordance with their terms), and to the Knowledge of the Company, and excluding the Contemplated Transactions, no event has occurred which with the giving of notice or the passage of time or both would constitute a material default by any other party, or which would give rise to any right of notice, modification, acceleration, payment, cancellation or termination, or in any manner release any party thereto from any obligation under, any Material Contract.

Section 2.9     Employee Benefit Matters.

(a)     Section 2.9(a) of the Disclosure Schedules lists each "employee benefit plan" (as defined in Section 3(3) of ERISA) and any other Benefit Plan maintained, contributed to, or required to be contributed to by the Company or any of its ERISA Affiliates (each, a "Company Benefit Plan").  No Company Benefit Plan that provides severance benefits is subject to ERISA.    The Company Benefit Plans are all in compliance in all material respects with the applicable provisions of ERISA.

(b)     Each Company Benefit Plan and all related trusts, insurance contracts and funds have been established, maintained, operated, funded and administered in compliance in all material respects with the applicable provisions of ERISA, the Code and all other applicable Laws.

(c)     Except as set forth in Section 2.9(c) of the Disclosure Schedules, neither the Company nor any of its ERISA Affiliates has at any time participated in or made contributions to or has had material Liability with respect to a plan which is or was: (i) an

employee benefit plan subject to Title IV of ERISA or Section 412 of the Code; (ii) a multiemployer plan as defined under Section 3(37) of ERISA; (iii) an employee benefit plan that provides medical or other welfare benefits to retirees except as required by ERISA, the Code or other applicable Law, including, but not limited to, the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

(d)     All (i) insurance premiums due and required to be paid by or through the Company or any of its Subsidiaries with respect to, (ii) benefits, expenses, and other amounts due and payable under, and (iii) contributions, transfers, or payments required to be made to, any Company Benefit Plan have been timely paid or made, except as would not reasonably be expected to result in material Liability to the Company or any of its Subsidiaries.  The Company is not liable for any material payment to any trust or other fund or to any Governmental Authority with respect to unemployment compensation benefits, workers' compensation, social security, retirement fund, provident fund, pension fund or other benefits or obligations for Workers (other than routine payments to be made to the Governmental Authority in the ordinary course of business consistent with past practice that are not yet due and payable).  Except as disclosed in Section 2.9(d) of the Disclosure Schedules, there are no claims pending against the Company or any of its Subsidiaries under any workers' compensation plan or policy, for unemployment compensation benefits or for long term disability.

(e)     Except as disclosed in Section 2.9(e) of the Disclosure Schedules, neither the execution and delivery of this Agreement nor the consummation of the Contemplated Transactions will, alone or in connection with any other event (including the termination of a Worker's employment or service with the Company or one of their respective Affiliates in connection with the Contemplated Transactions), (i) result in any payment (including severance, deferred compensation, Tax gross-up, retention or other golden parachute) becoming due under any Company Benefit Plan, (ii) increase any benefits (including severance, deferred compensation or equity award) otherwise payable under any Company Benefit Plan, (iii) result in the acceleration of the time of payment, funding or vesting of any payments or benefits under any Company Benefit Plan or (iv) result in the forgiveness in whole or in part of, or accelerate the repayment date of, any outstanding loans that exist under or as part of any Company Benefit Plan.  No amounts that has been or could be received as a result of the Contemplated Transactions that otherwise would be deductible will fail to be deductible for U.S. federal income Tax purposes by virtue of Section 280G of the Code.

(f)     Each Company Benefit Plan that is a "non-qualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code and any award thereunder, in each case that is subject to Section 409A of the Code has been administered, operated and documented, material compliance with the provisions of Section 409A of the Code and the regulations thereunder.  The Company does not have any Liability to reimburse, gross-up or otherwise pay any Taxes, interest or Tax-related penalties on behalf of any Person.

Section 2.10   Intellectual Property.

(a)     The Company owns and possesses, solely and exclusively, all right, title and interest in, to and under, or has a valid and enforceable right to use pursuant to an Inbound License, all of the Intellectual Property necessary for, or used or held for use in, the conduct of

the Business (the "Company Intellectual Property"), free and clear of all Liens (except for Permitted Liens and non-exclusive licenses granted to customers in the ordinary course of business consistent with past practice). Notwithstanding the generality of the foregoing, the Company owns and possesses, solely and exclusively, all right, title and interest in, to and under all Owned Intellectual Property. The Owned Intellectual Property is fully transferable, alienable, licensable and otherwise distributable without restriction or limitation. The Company does not own any patents.

(b)      Section 2.10(b) of the Disclosure Schedules sets forth a complete and correct list of all of the following that are owned or exclusively licensed by the Company: (i) Intellectual Property that is the subject of any application, certificate, filing, registration or other document issued, filed with, or recorded by any Governmental Authority or quasi-governmental authority; (ii) all trade names; (iii) all material unregistered Intellectual Property; and (iv) all Business Software. Section 2.10(b) of the Disclosure Schedules also lists, where applicable, the title, filing date, issue date, the name of the applicant/registrant, term of validity of registration, current owner, class (including a description thereof), the jurisdiction where the application or registration is located and the application or registration number. Except as noted in Section 2.10(b)(i) of the Disclosure Schedules, all necessary registration, maintenance and renewal fees in connection with all Intellectual Property set forth on Section 2.10(b)(i) of the Disclosure Schedules have been paid and all necessary documents and articles in connection therewith have been filed with the relevant patent, copyright, trademark or other Governmental Authorities for the purposes of prosecuting, procuring and/or maintaining such Intellectual Property. Except as set forth on Section 2.10(b)(ii) of the Disclosure Schedules, there are no actions that must be taken by the Company within ninety (90) days of the Signing Date, including the payment of any registration, maintenance or renewal fees or the filing of any documents, applications or articles, for the purposes of maintaining, perfecting, preserving or renewing any Intellectual Property set forth on Section 2.10(b)(i) of the Disclosure Schedules. The Company has not knowingly misrepresented or failed to disclose any facts or circumstances for which it has a duty to disclose in any application for any Intellectual Property that would constitute fraud or a misrepresentation with respect to such application or that would otherwise adversely affect the validity or enforceability of any such Intellectual Property.

(c)      The Owned Intellectual Property is valid, enforceable and subsisting. Except as set forth on Section 2.10(c) of the Disclosure Schedules:  (i) no claim contesting the validity, enforceability, registerability, use or ownership of any Owned Intellectual Property has been made or is currently outstanding and, to the Knowledge of the Company, none is threatened and there is no reasonable basis for the same; (ii) the Company has not infringed, misappropriated or otherwise conflicted with, and the operation of the Business as currently conducted or previously conducted or as currently proposed to be conducted does not infringe, misappropriate or otherwise conflict with, any Intellectual Property of any third Person; (iii) the Company has not received any written notices of any facts which indicate a likelihood of, any infringement or misappropriation by, or conflict with, any third Person with respect to the Intellectual Property of such third Person (including any written demand or request that the Company license any Intellectual Property from a third Person); (iv) to the Knowledge of the Company, no third Person is infringing, misappropriating, or otherwise violating or conflicting with any Owned Intellectual Property, and has not in the past infringed, misappropriated or otherwise violated or conflicted with any Owned Intellectual Property; and (v) the Company has

not sent any notices, charge, claim or assertion to any third Person of infringement, misappropriation or violation of any Owned Intellectual Property, and to the Knowledge of the Company there are no facts or circumstances exist that could indicate a likelihood of the foregoing.  Immediately subsequent to the Closing, the Intellectual Property of the Company will be owned by or available for use by the Company on terms and conditions identical to those under which the Company owned or used the Intellectual Property immediately prior to the Closing.

(d)     Neither the Company nor the Owned Intellectual Property is subject to any Contract that in any way limits or restricts the rights of the Company respecting such Owned Intellectual Property anywhere in the world.  The Inbound Licenses do not grant and Person ownership rights or license rights to improvements, other modifications, or developments made by or on behalf of Company.

(e)     The Company is not in breach of any of the material terms of any license to Open Source Materials, to the extent such Open Source Materials are incorporated into or used in conjunction with any Business Software.  "Open Source Materials" refers to any Software or other material that is distributed as "free software," "open source software" or under similar licensing or distribution terms (including the GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), BSD licenses, the Artistic License, the Netscape Public License, the Sun Community Source License (SCSL), the Sun Industry Standards Standards License (SISL), the Apache License, and any license identified as an open source license by the Open Source Initiative (www.opensource.org)).  No Business Software contains, is derived from, is distributed with or is being or was developed using Open Source Materials that are licensed under any terms that:  (i) impose a requirement or condition that any such Software or part thereof:  (A) be disclosed or distributed in source code form; (B) be licensed for the purpose of making modifications or derivative works; or (C) be redistributable at no charge; or (ii) otherwise impose any other material limitation, restriction, or condition on the right or ability of the Company to use or distribute any such Software.

(f)     Except as set forth on Section 2.10(f) of the Disclosure Schedules, neither the Company nor any Person acting on behalf of the Company has disclosed or delivered to any third Person, including an escrow agent, any source code of Business Software.  No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time, or both) will, or would reasonably be expected to, require the disclosure or delivery by the Company or any other Person acting on behalf of the Company to any third Person of any source code of Business Software.  Neither the execution, delivery or performance of this Agreement, in and of itself, would reasonably be expected to result in the release of any source code Business Software from escrow or otherwise trigger any rights to such source code to be granted to any Person.

(g)     To the Knowledge of the Company, except as set forth on Section 2.10(g) of the Disclosure Schedules, the execution, delivery and performance of this Agreement, will not violate or result in the breach, modification, cancellation, termination or suspension of, or acceleration of any payments under any Inbound License or any Outbound License (or give rise to any right with respect to any of the foregoing).  Neither the execution, delivery and performance of this Agreement, nor any Contract to which Company is a party or is otherwise

bound, will cause or require (or purports to cause or require) the Buyer to (i) grant to any other Person any license, covenant not to sue, immunity or other right with respect to or under any of the Buyer's Intellectual Property; (ii) be obligated to pay any royalties or other amounts, or offer any discounts, to any other Person in excess of those amounts payable by any of them, respectively, in the absence of this Agreement; or (iii) become bound or subject to any non-compete or other material restrictions on the operations or scope of their respective businesses.

(h)     Except as disclosed in Section 2.10(h) of the Disclosure Schedules, to the Knowledge of the Company, no Business Software:  (i) contains any bug, defect, or error (including any bug, defect, or error relating to or resulting from the display, manipulation, processing, storage, transmission, or use of date data) that materially and adversely affects the use, functionality, or performance of any Business Software or any product or service containing or used in conjunction with such Software; or (ii) fails to materially comply with any applicable written, express warranty or other written, express contractual commitment relating to the use, functionality, or performance of such Software.

(i)     To the Knowledge of the Company, no Business Software contains any code, device, criteria, mechanism or function which may be used to restrict, disable, damage, destroy or otherwise shut down, provide unauthorized access to or alter the functionality of, specifications for, or access to, all or any portion of the Business Software.  Such unauthorized activity includes any computer code, programs or programming devices that are designed to, or which disrupt, modify, delete, deactivate, harm or otherwise impede any portion of software employed in the Business Software in any manner, including aesthetic disruptions or distortions, including without limitation, "back door," "drop dead device," "time bomb," "Trojan horse," "virus," or "worm" (as such terms are commonly understood in the software industry).

(j)     The Company has taken all reasonable and necessary steps to (i) document its ownership of all Intellectual Property of the Company developed by employees or independent contractors of the Company, and (ii) to protect, safeguard and maintain the secrecy of the Company's trade secrets.  Without limiting the foregoing, the Company has executed written agreements with each current and former employee, consultant and independent contractor of the Company providing for the assignment of all right, title and interest in and to Intellectual Property authored, developed, invented or otherwise created by such employee, consultant or independent contractor during the course of such Person's employment or engagement and the protection of any confidential information disclosed or made available to any such employee, consultant or independent contractor.  To the Knowledge of the Company, no current or former employee, officer, consultant or contractor of Company is in default or breach of any term of any employment, consulting or contractor agreement, non-disclosure agreement, assignment agreement, or similar agreement.  In each case in which Company has acquired ownership (or claimed or purported to acquire ownership) of any Intellectual Property from any Person (including any employee, officer, consultant or contractor of Company), Company has obtained a valid and enforceable assignment sufficient to irrevocably transfer ownership of and all rights with respect to such Intellectual Property to the Company.

(k)     All IT Assets are in good working condition, and are owned and operated by, or licensed to, or under Contract to the Company.  The IT Assets that are owned or licensed from a third Person by the Company or the Beneficial Owners, have not materially

malfunctioned or failed within the past three (3) years and, to the Knowledge of the Company, do not contain any viruses, bugs, faults or other devices or effects that (i) enable or assist any Person to access without authorization the IT Assets, or (ii) otherwise materially adversely affect the functionality of the IT Assets.  No Person has gained unauthorized access to any IT Assets during the past three years that has materially and negatively affected the Business.

Section 2.11    Governmental Authorizations; Compliance with Law.

(a)    The Company has all material Governmental Authorizations necessary for the conduct, ownership, use, occupancy or operation of the Business or the Purchased Assets, all of which are identified on Section 2.11(a) of the Disclosure Schedules, and complete and correct copies of which have previously been made available to the Buyer.

(b)    Except as set forth on Section 2.11(b) of the Disclosure Schedules, since January 1, 2015 the Company has been in compliance in all material respects with all applicable Laws and all Governmental Authorizations in connection with the conduct, ownership, use, occupancy or operation of the Business, the Purchased Assets the Excluded Assets, the Assumed Liabilities and the Excluded Liabilities, and the Company has not received any written notification alleging any noncompliance with or violation of the foregoing.  All Governmental Authorizations are in full force and effect and no event has occurred that allows, or after notice or lapse of time would allow, revocation or termination of any Governmental Authorization.

(c)    This Section 2.11 does not relate to and any asserted or claimed breach of this representation shall not be permitted with respect to the following matters:  employee benefits matters (which are the subject of Section 2.9), tax matters (which are the subject of Section 2.13), and data privacy and security matters (which are the subject of Section 2.20).

Section 2.12    Litigation.

(a)    Except as set forth on Section 2.12(a) of the Disclosure Schedules, since January 1, 2015, there are no Proceedings pending or, to the Knowledge of the Company, threatened by or against the Company or any of their current or former officers, directors or employees in their capacity as such, nor to the Knowledge of the Company, is there any reasonable basis for any such Proceeding.  The Company has not received any written notice of any demand, claim or investigation that would be reasonably likely to result in such a Proceeding.

(b)    Except as set forth on Section 2.12(b) of the Disclosure Schedules, since January 1, 2015, there has been no Order received by the Company to which the Company, the Business or the Purchased Assets are subject.

(c)    Except as set forth on Section 2.12(c) of the Disclosure Schedules, there is no Proceeding, demand, claim or investigation of the Company by any Governmental Authority as to which the Company has been duly served or given written notice or, to the Knowledge of the Company, threatened investigation of the Company by any Governmental Authority.

Section 2.13    Taxes.

(a)    The Company has filed with the appropriate taxing authorities all income and other material Tax Returns that it was required to file.  All such Tax Returns were and are correct and complete in all material respects.  All Taxes due and owing by the Company (whether or not shown on any Tax Return) have been paid or are reflected as reserves on the Financial Statements.  The Company is not currently the beneficiary of any extension of time within which to file any Tax Return or pay any Tax (other than an automatic extension of time not requiring the consent of the IRS or any other taxing authority).  There are no Liens for Taxes (other than Taxes which have been incurred in the ordinary course of business consistent with past practice and which are not yet due and payable) upon any of the Assets and Properties of the Company.

(b)    No written agreement or other document extending, or having the effect of extending, the period of assessment or collection of any Taxes payable by the Company, and no power of attorney with respect to any such Taxes, has been executed or filed with the IRS or any other taxing authority that is currently in effect.

(c)    There are no pending Proceedings in respect of Taxes payable by the Company.

(d)    Since its formation, the Company has at all times been classified as either a "disregarded entity" or "partnership" for federal income Tax purposes.

(e)    No deficiency or proposed adjustment for any amount of Tax has been proposed, asserted or assessed by any taxing authority against the Company that has not been paid, settled or otherwise resolved.

(f)    There has not been, within the past five calendar years, an examination or written notice of potential examination of the Tax Returns filed with respect to the Company by any taxing authority.

(g)    All material Taxes that are required to be withheld or collected by the Company, including, but not limited to, Taxes arising as a result of payments (or amounts allocable) to foreign persons or to employees, agents, contractors or members of the Company, have been duly withheld and collected and, to the extent required, have been properly paid or deposited in material compliance with applicable Laws.

(h)    No claim has been made in writing in the last three (3) years by any taxing authority in a jurisdiction where the Company does not file Tax Returns that it is or may be subject to taxation by that jurisdiction.

Section 2.14    Absence of Changes.  Except as set forth on Section 2.14 of the Disclosure Schedules, as of the Signing Date, since the date of the Latest Balance Sheet, (i) the Company has conducted the Business in the ordinary course consistent with past practice and has not suffered any effect on the Business or the Assets and Properties of the Company, financial condition or results of operations, which, individually or in the aggregate, has, or would reasonably be expected to have, a Material Adverse Effect and (ii) the Company has not taken any action that, if taken after the Signing Date, would constitute a breach of any of the covenants set forth in Section 5.1.

Section 2.15    <u>Employment Matters</u>.

(a)    Except as set forth on <u>Section 2.15(a)</u> of the Disclosure Schedules, since January 1, 2015:  (i) the Company has been in compliance in all material respects with all Laws relating to the employment of labor, including provisions thereof relating to employment and employment practices, harassment, discrimination, retaliation, terms and conditions of employment, immigration, workers' compensation, long term disability, occupational safety, plant closings, compensation and benefits, wages and hours, proper classification of employees and independent contractors, and the payment of social security and other Taxes (collectively, the "<u>Employment Practices</u>"); (ii) the Company has not experienced any strike, lockout, material grievance or other collective bargaining dispute, and no such action is pending or, to the Knowledge of the Company, threatened; (iii) there has not been any material workers' compensation claims pending against the Company; (iv) the Company has been in compliance in all material respects with all requirements of the Immigration and Reform Control Act of 1986, and to the Knowledge of the Company, each Worker is in compliance with all applicable visa and work permit requirements; and (v) the Company has not been a party to or bound by any collective bargaining agreement or any other labor-related agreement with any labor union, labor organization or works council.

(b)    Except as set forth on <u>Section 2.15(b)</u> of the Disclosure Schedules, all current employees of the Company are "at will" employees and do not have employment Contracts with the Company.

(c)    As of the Signing Date, (i) no collective bargaining agreement or any other labor-related agreement with any labor union, labor organization or works council is presently being negotiated, (ii) no labor union, labor organization or works council has made a pending demand for recognition or certification, (iii) there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of the Company, threatened in writing to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority, (iv) to the Knowledge of Company, there are no labor union organizing activities with respect to any employees of the Company and (v) there are no threatened, labor strikes, concerted slowdowns or work stoppages, lockouts, or any similar activity, affecting the Company.

(d)    The Company has not closed any plant or facility or effectuated any mass layoffs of employees within the past three years without complying with the Worker Adjustment and Retraining Notification Act, as amended, and any similar state or local statute, rule or regulation (collectively, the "<u>WARN Act</u>"), nor has any plant closure or mass layoff (as such terms are defined under the WARN Act) with respect to the Company been planned or announced.

(e)    <u>Section 2.15(e)</u> of the Disclosure Schedules lists all employee manuals and handbooks in effect and that have been provided to the employees as of the Signing Date and the Company has delivered to the Buyer accurate and complete copies of the same.

(f)    Except as otherwise set forth in <u>Section 2.15(f)</u> of the Disclosure Schedules, there are no Proceedings pending or, to the Knowledge of the Company, threatened in

writing involving any Worker, group of Workers, or individual. Except as otherwise set forth in Section 2.15(f) of the Disclosure Schedules, there are no charges, investigations, administrative proceedings or formal complaints relating to any Employment Practices to the Knowledge of the Company threatened in writing or pending before the Equal Employment Opportunity Commission, the National Labor Relations Board, the U.S. Department of Labor, the U.S. Occupational Health and Safety Administration, the Workers Compensation Appeals Board, or any other Governmental Authority against the Company pertaining to any Worker.

(g)    Section 2.15(g) of the Disclosure Schedules sets forth an accurate and complete list of all (i) Workers, including each employee's name, title or position, present annual or hourly compensation (including bonuses, commissions and deferred compensation), designation as exempt or nonexempt, accrued and unused paid vacation and other paid leave, years of service, and (ii) individuals who are currently performing services for the Company who are classified as independent contractors, including the respective compensation of each consultant or independent contractor. The Company is not delinquent in payments to any current or former Worker for any wages, salaries, commissions, bonuses, or other compensation for any services performed by any current or former Worker or for any other amounts required to be reimbursed by the Company or any of its Subsidiaries to any current or former Worker (including vacation, sick leave, other paid time off or severance pay).

(h)    To the Knowledge of the Company, no Worker is in violation in any material respect of any term of any employment agreement, non-disclosure, confidentiality agreement, or consulting agreement with the Company or non-competition agreement, non-solicitation agreement or any restrictive covenant with a former employer relating to the right of any such employee to be employed by or provide services to the Company because of the nature of the business conducted or presently proposed to be conducted by it or to the use of trade secrets or proprietary information of others.

Section 2.16    Insurance.   Section 2.16 of the Disclosure Schedules sets forth an accurate list of all insurance policies carried by the Company related to the Purchased Assets, the amounts and types of insurance coverage available thereunder, and all insurance and workers' compensation claims received by the Company for the past three (3) policy years.

Section 2.17    Related Party Transactions.   Except as set forth on Section 2.17 of the Disclosure Schedules, no present or former director, executive officer, employee, equityholder owning five percent (5%) or more of the Company's equity interests, or Affiliate of the Company, nor, to the Knowledge of the Company, any of such Person's Affiliates or immediate family members (each of the foregoing, a "Related Party"), (a) is a party to any Material Contract with or binding upon any of the Company or the Purchased Assets or (b) has engaged in any transaction (i) with any of the foregoing within the last twelve (12) months or that has continuing obligations, (ii) in which any Related Party had, has or will have a direct or indirect material interest, other than employment or equity-incentive compensation payable to current directors, executive officers and employees of the Company and (iii) which pertain to the Purchased Assets or Assumed Liabilities. To the Knowledge of the Company, no Related Party of the Company owns, directly or indirectly, on an individual or joint basis, any interest in any material respect, or serves as an officer or director or in another similar capacity of, any supplier

or other independent contractor of the Company, or any organization which has a Material Contract with the Company.

Section 2.18    <u>Unlawful Payments</u>.    Neither the Company, nor any director, officer, employee, equityholder, agent or representative of the Company, has directly or indirectly on behalf of the Company (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to any Person, private or public, regardless of what form, whether in money, property or services, in violation of any applicable Laws (i) to obtain favorable treatment for the Company or to secure Contracts, (ii) to pay for favorable treatment for the Company or for contracts secured, or (iii) to obtain special concessions for the Company or for special concessions already obtained, or (b) violated any of the provisions of the Foreign Corrupt Practices Act or comparable foreign law or any rules or regulations promulgated thereunder that apply to the Company.

Section 2.19    <u>Brokers' Fees</u>.    Except for the Company's engagement of Petsky Prunier LLC, all negotiations relating to this Agreement and the Contemplated Transactions have been carried out without the services of any Person acting on behalf of the Company as a broker or investment banker, which engagement shall not give rise to any valid claim against the Buyer or the Company for any brokerage or finder's commission or similar compensation.

Section 2.20    <u>Data Privacy and Security</u>.

(a)    The Company is in compliance in all material respects with applicable Laws and has for the past four (4) years materially complied with all applicable Laws regarding the collection, use, storage, transfer, or disposal of personal information, including breach notification obligations (collectively, the "<u>Privacy Laws</u>").

(b)    Except as disclosed in <u>Section 2.20(b)</u> of the Disclosure Schedules, in the past four (4) years, no Person has gained unauthorized access to or engaged in unauthorized processing of (i) any Personal Information, Company Data or confidential information related to the Business and held by the Company or any other Person on their behalf; or (ii) any databases, computers, servers, storage media (e.g., backup tapes), network devices, or other devices or systems that processes Personal Information, Company Data or confidential information related to the Business and owned or maintained by the Company, their customers or vendors, or any other Persons on their behalf (a "<u>Security Breach</u>").    The Company has at all times in the past four (4) years used industry standard controls, technologies, processes, and practices to detect, identify and remediate Security Breaches.

(c)    The Company is in compliance in all material respects with the terms of all Contracts to which the Company is a party relating to data privacy, security, or breach notification (including provisions that impose conditions or restrictions on the collection, use, storage, transfer, or disposal of Personal Information).

(d)    The Company implements, materially follows and posts privacy policies providing notice of the data privacy, data protection and data security practices of the Company regarding Personal Information in accordance with Applicable Law.

(e)     The Company has made all necessary disclosures to, and obtained any necessary consents from, users, customers, employees, contractors, Governmental Authorities and other applicable Persons as required by applicable Privacy Laws.

(f)     The Company is and has been in compliance with the applicable portions of the PCI-DSS in all material respects, as it has been amended from time-to-time.  With respect to payment card transactions or information processed in any way (including any processing, storing or communication of transaction data or payment card data), the Company is in compliance with the PCI-DSS applicable to the Business in all material respects.

(g)     Neither the execution, delivery, or performance of this Agreement nor the consummation of any of the Contemplated Transactions, nor the Buyer's nor Beneficial Owners' possession or use of any Personal Information or Company Data or confidential information of, or collected by, the Company or any data in the databases or systems of the Company, will materially violate (i) any of the Company's privacy policies currently in effect, or (ii) any applicable Privacy Law.

(h)     Except as would not be material to the Business, the Company has obtained written agreements (except as set forth in Section 2.20(h) of the Disclosure Schedules) from all subcontractors to which they have provided or disclosed Personal Information in connection with the Business that bind the subcontractor to at least the same or similar restrictions and conditions that apply to the Company with respect to processing such Personal Information, and in any event to implement reasonable means for protecting such Personal Information.

(i)     The Company has at all times during the past four (4) years maintained in place in connection with the Business industry standard security measures, controls, technologies, polices and safeguards sufficient to protect Personal Information, Company Data and confidential information from a Security Breach.  Except as would not be material to the Business, the Company has implemented, directly or indirectly,  in connection with the Business an industry standard plan, or plans, that, as appropriate, (i) identifies reasonably foreseeable internal and external risks to the security of Personal Information, Company Data and confidential information related to the Business; (ii) implements, monitors and maintains industry standard administrative, electronic and physical safeguards to control those risks; (iii) maintains notification procedures in material compliance with applicable Laws in the case of any breach of security compromising data, including data containing Personal Information, Company Data or confidential information related to the Business; and (iv) provides for the prevention of data loss.  The Company (and its data processing vendor, HygenicsData, LLC), directly or indirectly, maintains disaster recovery and business continuity plans, procedures and facilities in connection with the Business that are industry standard and that materially satisfy the Company's contractual and legal obligations with respect to the Business.

(j)     As of the Signing Date, there is no Proceeding initiated by any other Person pending or, threatened in writing, against the Company or its agents or subcontractors alleging a violation in connection with the Business of any Person's data privacy, data protection or data security rights, nor has there been any court order affecting the Company's or its agents' or subcontractors' use, disclosure or other processing of any personal information in connection

with the Business.  To the Knowledge of the Company, there are no facts or circumstances that could constitute a reasonable basis for such proceeding relating to privacy or data protection.  As of the Signing Date, to the Knowledge of the Company or its agents or subcontractors, except as set forth on Section 2.20(j) of the Disclosure Schedules, the Company has not received any written communications from or has been the subject of any investigation by, the Federal Trade Commission, a national or international data protection authority or any other Governmental Authority regarding its acquisition, use, disclosure or other processing of any Personal Information in connection with the Business.

(k)    The Company, in connection with the conduct and operation of the Business including the operation and use of the Company's services, currently and have for the past four (4) years at all times materially complied with all applicable Laws relating to the transmission of unsolicited commercial emails, phone calls, faxes and mail and marketing campaigns, including, without limitation and as applicable, the CAN-SPAM Act of 2003 (codified at 15 U.S.C. §§ 7701-7713 and 18 U.S.C. § 1037), Sections 17529.1--17529.9 and Section 17538.45 of the California Business and Professions Code, the Junk Fax Prevention Act of 2005 (Pub.L. 109–21), the Do-Not-Call Implementation Act of 2003 (Pub.L. 108–10), the Communications Act of 1934, as amended by the Telecommunications Act of 1996, the Telephone Consumer Protection Act of 1991 (Pub.L. 102–243) and all similar applicable Laws related to the Business.  No solicitation, statement, disclosure, or marketing, promotional or advertising material included in any email marketing campaigns or mail and marketing campaigns initiated, facilitated, supported, or transmitted by the Company in the past four (4) years have been in material violation of any Law.

Section 2.21    [Reserved]

Section 2.22    Vendors.  Section 2.22 of the Disclosure Schedules sets forth a complete and accurate list of (a) the ten (10) largest vendors of the Company for the calendar year ending December 31, 2017, based upon amounts owed to such client during such period, and (b) the ten (10) largest vendors of the Company for the calendar year ending December 31, 2016, based upon amounts owed to such client during such period.  No such vendor has canceled or otherwise terminated or materially and adversely modified its relationship with the Company. The Company has not received any notice, and to the Knowledge of the Company, no such vendor (a) intends to cancel or otherwise terminate or materially and adversely modify its relationship with the Company or (b) is threatened with bankruptcy or insolvency.

Section 2.23    Clients.  Section 2.23 of the Disclosure Schedules sets forth a complete and accurate list of (a) the ten (10) largest clients of the Company for the calendar year ending December 31, 2017, based upon revenues earned from such client during such period, and (b) the ten (10) largest clients of the Company for the calendar year ending December 31, 2016, based upon revenues earned from such client during such period.  No such client has canceled or otherwise terminated or materially modified its relationship (including any change in commissions, rates or payment terms) with the Company and the Company has not received any notice, and to the Knowledge of the Company, no such client (i) intends to cancel or otherwise terminate or modify its relationship (including any change in commissions, rates or payment terms) with the Company or (ii) is threatened with bankruptcy or insolvency.

Section 2.24    Government Contracts.    Except as set forth on Section 2.24 of the Disclosure Schedule, the Company is not a party to any (a) Contracts or subcontracts, directly or indirectly, with any Governmental Authority, including through any subcontractor or consultant, or (b) Contracts at any tier of subcontracting where the prime contractor provides goods or services to any Governmental Authority.    The Company is not required to comply with, and has not otherwise been advised by any client, customer, advisor, Governmental Authority or any other third party that it is required to comply with, requirements imposed upon contractors with Governmental Authorities, including affirmative action plans or E-verify.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES RELATING TO THE BENEFICIAL OWNERS

Each Beneficial Owner, severally and not jointly, represents and warrants to the Buyer that the statements contained in this Article III are true and correct as of the Signing Date (except that any representations and warranties that are made as of a specific date need only be true as of such date), except in all cases as set forth in the Disclosure Schedules.

Section 3.1    Authorization of Transaction.    Such Beneficial Owner, if an entity, is duly formed, validly existing and is in good standing under the Laws of the jurisdiction in which it is organized.    Such Beneficial Owner, if an individual, has the individual authority to enter into this Agreement.    Such Beneficial Owner has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and to perform such Beneficial Owner's obligations hereunder and thereunder.    If such Beneficial Owner is an entity, then the execution and delivery by such Beneficial Owner of this Agreement and the Ancillary Agreements to which such Beneficial Owner is a party and the performance by such Beneficial Owner of the Contemplated Transactions have been duly approved by all requisite entity action of such Beneficial Owner.    This Agreement has been duly executed and delivered by such Beneficial Owner and, assuming that this Agreement has been duly executed and delivered by the Party seeking to enforce the Agreement, constitutes the valid and binding obligation of such Beneficial Owner, enforceable against such Beneficial Owner in accordance with its terms, except as limited by Laws affecting the enforcement of creditors' rights generally or by general equitable principles.

Section 3.2    No Conflicts; Consents or Approvals.

(a)    The execution and delivery of this Agreement and the consummation of the Contemplated Transactions will not result in (i) if such Beneficial Owner is an entity, any breach or violation of or default under the Organizational Documents of such Beneficial Owner, (ii) any breach or violation of or default under any Law or Governmental Authorization applicable to such Beneficial Owner or the Equity Interests owned by such Beneficial Owner, (iii) any material breach or violation of, default under, termination or right to terminate, or give any third Person the right to terminate or accelerate any obligation under any mortgage, lease, agreement, deed of trust, indenture or any other instrument to which such Beneficial Owner is a party or by which such Beneficial Owner or the Equity Interests owned by such Beneficial Owner are bound, (iv) the creation or imposition of any Liens (other than Permitted Liens) on such Beneficial Owner or the Equity Interests owned by such Beneficial Owner or (v) require the

35

consent of any other Person, including if such Beneficial Owner is an individual, such Beneficial Owner's spouse, except (in the case of clauses (iii) and (iv) above) for any breach, violation, default, termination, payment, Lien or failure to obtain consent that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on <u>Section 3.2(b)</u> of the Disclosure Schedules, no consent, approval or authorization of or filing with any third Person (including, if such Beneficial Owner is an individual, such Beneficial Owner's spouse) or any Governmental Authority is required on the part of such Beneficial Owner in connection with the execution and delivery of this Agreement or the consummation of the Contemplated Transactions.

Section 3.3    <u>Litigation</u>.    There are no Proceedings involving such Beneficial Owner that are pending or, to the knowledge of such Beneficial Owner, threatened, which question the validity of this Agreement or any action taken or to be taken by it in connection herewith or which could prevent or delay the consummation of the Contemplated Transactions.

Section 3.4    <u>Equity Interests</u>.    Such Beneficial Owner holds of record and owns beneficially the Equity Interests set forth next to such Beneficial Owner's name on <u>Exhibit D</u>, free and clear of any Liens, other than restrictions under applicable securities Laws.    Such Beneficial Owner is not a party to, and such Beneficial Owner's Equity Interests are not subject to, any option, warrant, purchase right or other Contract that could require such Beneficial Owner to sell, transfer, or otherwise dispose of any Equity Interests (other than this Agreement). Except as disclosed on <u>Section 3.4</u> of the Disclosure Schedules, such Beneficial Owner is not a party to any voting trust, proxy or other Contract with respect to the voting of any Equity Interests.

Section 3.5    <u>Brokers' Fees</u>.    All negotiations relating to this Agreement and the Contemplated Transactions have been carried out without the services of any Person acting on behalf of the Beneficial Owners as a broker or investment banker.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES RELATING TO THE BUYER**

The Buyer represents and warrants to the Company and the Beneficial Owners that the statements contained in this <u>Article IV</u> are true and correct as of the Signing Date (except that any representations and warranties that are made as of a specific date need only be true as of such date).

Section 4.1    <u>Organization of the Buyer; Authorization of the Contemplated Transactions</u>.    The Buyer is duly organized, validly existing and in good standing under the Laws of the State of California and has the power and authority to execute and deliver this Agreement and the Ancillary Agreements and perform its obligations hereunder and thereunder.    The Buyer has the full power and authority to execute and deliver this Agreement and perform its obligations hereunder.    The execution, delivery and performance of this Agreement have been duly authorized by the managers of the Buyer, which constitutes all necessary limited liability company action on the part of the Buyer to permit the consummation of the Contemplated Transactions, and no further proceedings on the part of the Buyer are necessary to approve and

authorize the execution and delivery of this Agreement or the Ancillary Agreements and the performance of its obligations hereunder and thereunder. This Agreement has been duly executed and delivered by the Buyer and, assuming that this Agreement has been duly executed and delivered by the Party seeking to enforce the Agreement, constitutes the valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, except as limited by Laws affecting the enforcement of creditors' rights generally or by general equitable principles.

Section 4.2    No Conflicts; Consents and Approvals.

(a)    The execution and delivery of this Agreement and the consummation of the Contemplated Transactions will not result in (i) any breach or violation of or default under the Organizational Documents of the Buyer, (ii) any breach or violation of or default under any Law or Governmental Authorization applicable to the Buyer or its Assets and Properties, (iii) any breach or violation of, default under, termination or right to terminate, under any mortgage, lease, agreement, deed of trust, indenture or any other instrument to which the Buyer is a party or by which the Buyer or any of its Assets and Properties are bound, or (iv) the creation or imposition of any Liens (other than Permitted Liens) on any Assets and Properties of the Buyer, except (in the case of clauses (iii) and (iv) above) for any breach, violation, default, termination, payment or Lien that would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.

(b)    No consent, approval, waiver, authorization or other order of or filing with any third Person or Governmental Authority is required on the part of the Buyer or any Affiliate thereof in connection with the execution and delivery of this Agreement or the consummation of the Contemplated Transactions.

Section 4.3    Financial Ability to Perform.  The Buyer will have as of the Closing available cash funds, credit facilities or other sources of immediately available funds sufficient to pay the full Initial Closing Consideration, pursuant to the terms of this Agreement, and any other expenses incurred by the Buyer in connection with this Agreement and to consummate the Contemplated Transactions. The consummation of the Contemplated Transactions and the Closing are not subject to any financing conditions.

Section 4.4    Litigation.  There are no Proceedings involving the Buyer that are pending or, to the knowledge of the Buyer, threatened, which question the validity of this Agreement or any action taken or to be taken by it in connection herewith or which could prevent or delay the consummation of the Contemplated Transactions.

Section 4.5    Brokers.  All negotiations relating to this Agreement and the Contemplated Transactions have been carried out without the services of any Person acting on behalf of the Buyer or any Affiliate of the Buyer.

Section 4.6    Investigation by the Buyer.

(a)    In making the decision to enter into this Agreement and to consummate the Contemplated Transactions, the Buyer has relied solely on its own independent investigations, analysis and evaluation of the Company, the Business, and the representations,

37

warranties, covenants and agreements of the Company and Beneficial Owners set forth in this Agreement. The Buyer acknowledges and agrees that the Beneficial Owners, the Company, and their Affiliates and Representatives, have not made and are not making any representations or warranties whatsoever regarding or relating to the Company, or the Business, express or implied, and the Buyer is not relying and has not relied upon, and the Beneficial Owners shall not have any Liability with respect to, any representations or warranties, or any other information whatsoever (which includes (i) any information provided in any management presentation related to the Contemplated Transactions, (ii) any information communicated by or made available through the due diligence process or (iii) any information or documents contained in the data room), regarding or relating to the Company, or the Business, express or implied, except for the representations and warranties in <u>Article II</u> and <u>Article III</u> of this Agreement.

(b) The Buyer acknowledges that the Beneficial Owners, the Company, and their Affiliates and Representatives, have not made and are not making, and the Buyer is not relying and has not relied upon, any representation or warranty, express or implied, as to the prospects of the Company or its profitability for the Buyer, or with respect to any forecasts, projections or business plans made available to the Buyer (or its Affiliates, officers, directors, managers, employees, agents or Representatives) in connection with the Buyer's review of the Company.

**ARTICLE V**
**<u>COVENANTS</u>**

Section 5.1    <u>Conduct of Business</u>.  For purposes of this <u>Section 5.1</u>, any reference to the "Company" means the Company and, unless otherwise specified or reasonably apparent from the nature of the context in which such term is used, also means the Seller Related Parties.  From the Signing Date until the Closing, the Company will, except as disclosed on <u>Section 5.1</u> of the Disclosure Schedules, or as required by applicable Law or the terms of this Agreement or any Ancillary Agreement, (a) conduct its business in the ordinary course of business consistent with past practice, including maintaining appropriate service levels, and operating in compliance with applicable Law, (b) use Reasonable Efforts to (i) maintain and preserve intact the business organization and goodwill of the Business and the Purchase Assets, (ii) pay its debts and Taxes when due (subject to good faith disputes regarding such debts and Taxes for which reserves have been established) and pay or perform, in all material respects, other obligations when due, and (iii) maintain existing relationships with the Company's clients, operators, distributors, customers, insurance underwriters and other third Persons having business dealings with the Company, (c) preserve intact its current business organization, (d) maintain in effect all Governmental Authorizations (except as may be limited by applicable Law), (e) use Reasonable Efforts to maintain existing relations with, and keep available the services of, the Workers, and (f) not, without limiting the generality of the foregoing, without the prior written consent of the Buyer (which consent will not be unreasonably withheld, conditioned, or delayed), take any of the following actions:

(i)      [Reserved]

(ii)     [Reserved]

(iii)    revalue any of the Purchased Assets, including writing off notes or Receivables;

(iv)    cancel any Indebtedness or waive or release any material right or claim of the Company;

(v)    (A) hire, engage or terminate any employee, consultant, manager, independent contractor or director (except for the hiring of non-executive, "at-will" employees with aggregate annual compensation below $75,000 in the ordinary course of business consistent with past practice or, following reasonable consultation with the Buyer, the filling of positions that are contemplated in the Board approved Budget set forth in Section 5.1(f)(v) of the Disclosure Schedules), (B) pay, announce, promise or grant, whether orally or in writing, increase or establish (each, as applicable) any wages, base pay, fees, salaries, compensation, sales commission, bonuses, incentives, deferred compensation, pensions, severance or termination payments, retirement, profit sharing, fringe benefits, equity or equity-linked awards, employee benefit plans, or any other form of compensation or benefits payable by the Company, including without limitation, any increase or change pursuant to any Company Benefit Plan (except as required by any Law) other than in accordance with any Company Benefit Plan, Contract or compensatory arrangement in existence as of the Signing Date or wages, base pay, fees, salaries, compensation or sales commission to any newly hired non-executive, "at-will" employee hired pursuant to clause (A), (C) enter into, adopt, amend, waive any requirements under or terminate any Company Benefit Plan, (D) accelerate vesting or accelerate payment of any compensation or benefits under any Company Benefit Plan or (E) waive, amend, modify the terms of any employment agreement or take any actions that would constitute a "good reason" for termination of employment that would provide a basis for any accelerated vesting or entitlement to compensation or other benefits;

(vi)    enter into, amend, cancel or terminate (other than any termination due to expiration of the term thereof) any Material Contract or any other Contract which if entered into prior to the date hereof would have been a "Material Contract" required to be disclosed on Section 2.8(a) of the Disclosure Schedules;

(vii)    mortgage, pledge or otherwise encumber any of the Purchased Assets;

(viii)    (A) merge or consolidate with any other Person, acquire any business or assets of any other Person (whether by merger, stock purchase, asset purchase or other business combination), other than the purchase of supplies in the ordinary course of business consistent with past practice or (B) form any new Subsidiary;

(ix)    sell, assign or transfer any of the Tangible Personal Property (including the Purchased Assets), other than in the ordinary course of business consistent with past practice;

(x)    (A) materially change the operation of the Business, the Purchased Assets or the Assumed Liabilities or any method of purchase, sale, lease, management,

marketing, promotion or operation, except such changes (1) as may be required to comply with any applicable Law or (2) in the ordinary course of business consistent with past practice or (B) enter into a new line of business or abandon or discontinue an existing line of business;

(xi)     change or modify the Company's credit, collection, or payment policies, procedures or practices, including acceleration of collections or receivables (whether or not past due) or fail to pay or delay payment of payables or other Assumed Liabilities;

(xii)     incur Indebtedness of the Company for borrowed money, commit to borrow money, make or agree to make loans or guarantee Indebtedness, issue any debt securities or warrants or other rights to acquire debt securities of the Company or assume, guarantee or endorse, as an accommodation or otherwise, the obligations of any Person for Indebtedness or capital obligations, in the case of any of the foregoing;

(xiii)     cancel any debts owed to or claims held by the Company, except in the ordinary course of business consistent with past practice;

(xiv)     agree to, request or adopt (A) any moratorium or suspension of payment of any Indebtedness, (B) the appointment of a receiver, administrator, liquidator, assignee, trustee or other similar official with respect to the Company, (C) an assignment for the benefit of creditors or an admission in writing of the inability of the Company to pay its debts as they become due, or (D) any other thing under any applicable Law relating to bankruptcy or insolvency with similar effect as any of the foregoing (A) through (C);

(xv)     make any advances or capital contributions to, or investments in, any Person (other than advances of expenses to Workers in the ordinary course of business consistent with past practice);

(xvi)     transfer, lease, license, guarantee, sell, mortgage, pledge, dispose of or incur any Lien on or otherwise encumber any Purchased Assets;

(xvii)     acquire any real property or undertake or commit to undertake capital expenditures for the purchase of equipment or tangible assets exceeding $50,000 in the aggregate;

(xviii)     dispose, sell, transfer, assign, encumber, pledge, license (other than non-exclusive licenses granted by the Company in the ordinary course of business consistent with past practice), abandon, fail to maintain, or allow to lapse any Intellectual Property;

(xix)     revalue any of the assets of the Company, except as required by GAAP;

(xx)     (A) change any method of accounting or accounting practice, other than changes required under applicable Law or GAAP or (B) fail to maintain the

Company's books, accounts and records in the ordinary course of business consistent with past practice;

(xxi)    commence, settle or compromise any Proceeding, except that the Company may commence, settle or compromise any Proceeding to the extent such act does not affect any Purchased Asset or Assumed Liability, (ii) would not reasonably be expected to impact the Company's or any Beneficial Owner's ability to consummate the Contemplated Transactions on the Closing Date and (iii) would not reasonably be expected to have an adverse impact on the Business;

(xxii)    engage in any transaction with any Related Parties, except as set forth on Section 5.1(f)(xxii) of the Disclosure Schedules; or

(xxiii)    agree, whether orally or in writing, to do any of the things described in the preceding clauses (i) through (xxii) other than as expressly provided for herein.

Section 5.2    Access and Information.  From and after the Signing Date, the Company will give the Buyer and its Representatives reasonable access during normal business hours to the Books and Records and Assets and Properties of the Company and will furnish such information and documents in its possession relating to the Company as the Buyer may reasonably request, including arranging for in person or phone call meetings among the Buyer and material client/customer relationships, provided however, that (i) such access and visits shall be scheduled through a representative designated by the Company and shall not unreasonably interfere with the conduct of the Business; (ii) the Company shall have the right to have a representative present for any communication with the Company's clients or customers (iii) the Buyer shall, and shall cause its Representatives to, observe and comply with all health, safety, and security requirements of the Company, and (iv) neither the Buyer nor any of its Affiliates or Representatives, shall conduct any environmental site assessment, compliance evaluation, or any other such investigation with respect to any of the Assets and Properties of the Company without the prior written consent of the Company (which may be provided or withheld in the Company's sole discretion) and without ongoing consultation with Company with respect to any such activity.  All such information and documents obtained by the Buyer shall be subject to the terms and conditions of that certain letter agreement, dated August 11, 2017, by and between the Buyer and Petsky Prunier LLC, as authorized representative of the Company (the "Confidentiality Agreement").  Notwithstanding anything to the contrary set forth in this Agreement, the Buyer shall have no right of access to, and the Beneficial Owners and Company shall have no obligation to provide to the Buyer, information relating to (a) bids received from others in connection with the Contemplated Transactions and information and analysis (including financial analysis) relating to such bids; (b) any information, the disclosure of which could jeopardize any legal privilege available to the Company, the Beneficial Owners or any Affiliate of the Company or the Beneficial Owners relating to such information or which would cause the Company, the Beneficial Owners or any Affiliate of the Company or the Beneficial Owners to breach a confidentiality obligation contained in a binding Contract; (c) personnel records of the Company relating to individual performance or evaluation records, medical histories or other information, the disclosure of which would, in the Company's good faith opinion, violate applicable Law; or (d) any other information, the disclosure of which would result in a violation

of applicable Law. Notwithstanding anything to the contrary contained herein, without the prior written consent of the Company, which may be withheld for any reason, the Buyer shall have no right to perform invasive or subsurface investigations of any of the Assets and Properties or the Facilities of the Company (i.e. investigations involving boring or drilling upon land, soil testing or water or groundwater testing, or activities of a similar nature); provided, that in each case of clauses (b), (c) and (d), the Company shall be required to notify the Buyer that it is withholding documents or information because of such legal privilege, protection, Law or Contract and provide documents and information (or the contents thereof) to the extent practicable without waiving such privilege or protection, and shall cooperate in all reasonable respects with the Buyer in any arrangement designed to provide the Buyer with such access or information. Except as provided in this Section 5.2, this Section 5.2 shall not in any way be deemed to provide the Buyer with authority or permission to contact any customers, suppliers, and other third parties related to the Business regarding the Business without the written consent of the Beneficial Owner Representative.

Section 5.3    Authorizations and Consents.

(a)    Third Party Consents; Non-Assignable Assets.

(i)    The Buyer acknowledges that (1) certain third-party consents, authorizations, approvals, orders, and waivers with respect to the Contemplated Transactions may be required (A) from Governmental Authorities with respect to Governmental Authorizations or that new Governmental Authorizations may be required and (B) from parties to the Material Contracts, Real Property Leases, Personal Property Leases, and other Contracts to which the Company is a party (jointly (A) and (B), including those listed on Section 2.4 of the Disclosure Schedules, the "Third Party Consents"), and that such Third Party Consents have not been obtained as of the date hereof and, except for the Closing Consents (unless waived as a Closing condition by the applicable Parties), may not be obtained prior to or at Closing and (2) obtaining the Closing Consents, and not all Third Party Consents, are conditions to Closing.

(ii)    The Company and the Buyer shall cooperate in all reasonable respects with each other and use all Reasonable Efforts to obtain all Third Party Consents, and to give all notices to and make all filings with, all Governmental Authorities (including those pertaining to the Governmental Authorizations) and other third parties that may be or become necessary for its execution and delivery of, and the performance of its obligations under this Agreement and will cooperate in all reasonable respects with each other in promptly seeking to obtain all such material Third Party Consents, giving such notices, and making such filings; provided, however, the Parties acknowledge and agree that (1) only the Closing Consents are conditions to the Closing and (2) it shall not be a breach by a Party of this Section 5.3(a) if despite such Party's Reasonable Efforts, some or all of the Third Party Consents are not obtained. Notwithstanding the foregoing in this Section 5.3, the Buyer, the Company and their respective Affiliates shall not be obligated to make any payments or otherwise pay any consideration to any third party to obtain any applicable Third Party Consent. The Buyer will use its Reasonable Efforts to assist the Company in obtaining any Third Party

Consents, including providing to such third parties such financial information with respect to the Buyer as such third parties may reasonably request.

(iii)    To the extent that the transfer or assignment hereunder by the Company to the Buyer of any Purchased Asset is not permitted or is not permitted without the consent of any other Person, which consent has not been received, this Agreement shall not be deemed to constitute an assignment of any such Purchased Asset if such consent is not given or if such assignment otherwise would constitute a breach of, or cause a loss of contractual benefits under, any such Purchased Asset, and the Buyer shall not assume any Liabilities thereunder.  During the Earn-out Period, with respect to any such Purchased Asset, the Company and the Beneficial Owners shall continue to use Reasonable Efforts to obtain such consents and shall cooperate in all reasonable respects with the Buyer in any arrangement designed to provide the Buyer with the rights and benefits (subject to the obligations) under any such Purchased Asset until such consents are obtained by the Parties.  Upon the receipt of any such consent, the Company shall promptly assign and transfer such Purchased Asset to the Buyer.

Section 5.4     <u>Preservation of Books and Records</u>.  For a period of five (5) years from the Closing Date or such longer time as may be required by applicable Law:

(a)     Each of the Buyer and the Company shall not, and shall cause its Affiliates not to, dispose of or destroy any of the books and records that relate to the Purchased Assets, Assumed Liabilities, Excluded Assets and Excluded Liabilities over which such Party has control, to the extent such books and records relate to the ownership or operation of the Purchased Assets, Assumed Liabilities, Excluded Assets or Excluded Liabilities for periods prior to the Closing (the "<u>Books and Records</u>"), without first offering to turn over possession thereof to the Beneficial Owner Representative (in the case of disposition or destruction by the Buyer) or the Buyer (in case of disposition or destruction by the Company) by written notice to the applicable Party at least thirty (30) days prior to the proposed date of such disposition or destruction.

(b)     Each of the Buyer and the Company shall, and shall cause its Affiliates to, allow the Beneficial Owner Representative (in the case of the Buyer) and the Buyer (in the case of the Company) and their respective agents access to all Books and Records on reasonable notice and at reasonable times at the Buyer's or the Company's, as applicable, principal place of business or at any location where any Books and Records are stored, and the Beneficial Owner Representative and the Buyer shall have the right, at its own expense, to retain and make copies of any Books and Records; <u>provided</u> that any such access or copying shall be had or done in such a manner so as not to unreasonably interfere with the conduct of the Buyer's business.

(c)     Notwithstanding any provision of this <u>Section 5.4</u> to the contrary, neither the Buyer nor the Company shall be required to offer to, provide access to, or permit any copies of, any Books and Records (i) in connection with, or related to, any litigation, mediation, arbitration, dispute, claim or other Proceeding between or among the Parties (which instead shall be subject to the terms hereof and any applicable rules of discovery), (ii) to the extent that such offer, access or permission would constitute a waiver of the attorney-client or other privilege or would compromise any confidential information of such Party, or (iii) to the extent that doing so

would (A) violate any applicable Law or (B) conflict with the confidentiality obligations of such Party or such Party's Affiliates under a Contract (<u>provided</u> that such Party shall use Reasonable Efforts to obtain any third-party consents that would permit the supply of such information).

Section 5.5    <u>Public Statements</u>.  The Beneficial Owners, the Company, and the Buyer agree that, from the date hereof through the Closing Date, this Agreement and its terms shall be kept confidential and no public release or announcement concerning the Contemplated Transactions shall be issued or made by any Party or any Party's Representative without the prior consent of the other Parties (which consent shall not be unreasonably withheld or delayed), except (a) as such disclosure, release or announcement may be required by applicable Law or the rules or regulations of any United States or foreign securities exchange, in which case the Party required to make the disclosure, release or announcement shall allow, to the extent practicable, the other Parties reasonable time to comment on such disclosure, release or announcement in advance of such issuance, or (b) that each of the Buyer and the Company may make such an announcement to their respective employees in form and substance reasonably acceptable to the other Parties and (c) that the Parties may disclose the terms of this Agreement to their respective Representatives as necessary in connection with the ordinary conduct of their respective businesses (as long as such Persons are advised that they must keep the existence and terms of this Agreement confidential).  Notwithstanding the foregoing, in the event Buyer elects to issue any press release in respect of the Contemplated Transactions, the Beneficial Owner Representative and the Buyer shall cooperate to prepare such press release.

Section 5.6    <u>Notification; Supplemental Disclosure</u>.

(a)    From the Signing Date until the earlier of the Closing or the termination of this Agreement, the Company shall (and the Beneficial Owners shall cause the Company to) promptly notify the Buyer in writing of (i) any material adverse change in the Business or to the Company; (ii) any material breach of or default under this Agreement or event that, to the Company's Knowledge, could become such a breach or default on or prior to the Closing; (iii) any notice or other communication from any third Person alleging that the consent of such third Person is or may be required in connection with the Contemplated Transactions and (iv) any Proceedings commenced or, to the Company's Knowledge, threatened against the Company or any Beneficial Owner or that relate to the consummation of the Contemplated Transactions).

(b)    Each Party agrees that, with respect to the representations and warranties of such Party contained in this Agreement, such party may supplement or amend such party's Disclosure Schedules prior to the Closing with respect to any matter arising after the Signing Date which, if existing at the date of this Agreement, would have been required to be set forth or described in such Party's Disclosure Schedules; <u>provided, however</u>, that such updated Disclosure Schedules shall not serve as a cure to any breach or be taken into account or otherwise affect the rights of any Party or any other party under any of Article VII, Article VIII, or Article IX.  The Party supplementing or amending its Disclosure Schedules shall deliver a copy of the amendment or supplement to the other Party.

Section 5.7    <u>Satisfaction of Closing Conditions</u>.  The Parties will use their Reasonable Efforts to bring about the satisfaction as soon as possible of all of the conditions contained in

Article VII (other than conditions the satisfaction of which is in the control of one of the other Parties).

        Section 5.8     Employee Benefits.

        (a)    Schedule 5.8(a) sets forth a list of the employees of the Company that Buyer desires to hire (the "Employee Notice List"). Subject to the terms and conditions of this Section 5.8, promptly following the execution of this Agreement, Buyer shall offer employment in a written offer letter to each employee identified in the Employee Notice List, to the extent such person is an active employee of the Company or on an approved leave of absence as of such date. Each such employee who (i) accepts the Buyer's offer, (ii) executes and delivers an offer letter in the form delivered by the Buyer and (iii) actually performs services for the Buyer on the first Business Day following the Closing, shall be deemed to be a "Transferred Employee." For no less than the six (6)-month period immediately following the Closing Date, the Buyer shall, and shall cause its Affiliates (including the Company) to, provide any Transferred Employee that is not otherwise a party to a written employment agreement with the Company, with compensation and benefits (excluding equity opportunities) that are substantially similar or better, in the aggregate, to such compensation and benefits available to such employees immediately prior to the Closing Date. The Buyer may rescind any offer letter extended to any such Person, whether or not previously accepted by such Person, identified in the Employee Notice List and such Person shall not be considered a Transferred Employee.

        (b)    The employment of the Transferred Employees by the Buyer shall be considered effective, and their employment by the Company shall terminate, on the date each such Transferred Employee first performs services for the Buyer. Each Transferred Employee's employment by the Buyer shall be "at will," and nothing herein shall create any obligation on the part of the Buyer to continue the employment of any Transferred Employee for any fixed period of time following the Closing Date. As of the Closing, the Company hereby waives and agrees not to enforce the non-competition, non-solicitation and confidentiality provisions of any employment or similar agreement between the Company and any of the Transferred Employees to the extent necessary to enable (i) the Buyer to employ the Transferred Employees or (ii) the Buyer to acquire and the Transferred Employees to service the Purchased Assets and the Business.

        (c)    On or prior to the Closing Date, the Company shall pay (and the Beneficial Owners shall cause the Company to pay) to all Transferred Employees and any other employees who are terminated on or about the Closing Date (i) all accrued but unpaid salaries, wages, commissions, bonuses (including all bonuses that relate to periods prior to the Closing) and any other compensation of any kind earned by such employee through or as a result of the Closing and (ii) all accrued but unused vacation benefits and paid time off earned by such employee through the day immediately prior to the Closing Date (or the date the individual was terminated as an employee with respect to those Persons who do not become Transferred Employees). The Company shall retain all Liability for, and neither Buyer nor any of its Affiliates shall assume or be responsible for, such accrued amounts, which shall be Excluded Liabilities.

(d)     The Company shall maintain for the benefit of Transferred Employees (and their covered dependents) all participation rights in the Company's health and welfare Company Benefit Plans through the later of (i) the Closing Date or (ii) the last calendar day in the month in which the Closing occurs (the "Insurance Date").  As of the later of the Closing Date or the Insurance Date, the Transferred Employees shall cease participation in the Company Benefit Plans or COBRA, and the Buyer shall provide, or cause to be provided, to each Transferred Employee and his or her covered dependents a level of employee benefits that is at least as favorable in the aggregate as the employee benefits made available to similarly situated existing employees of the Buyer and its Affiliates; provided, however, that nothing herein shall preclude the Buyer or its Affiliates from altering, amending or terminating any of its employee benefit plans, or the participation of any of their employees in such plans, at any time.

(e)     Each Transferred Employee shall be given credit for his or her years of service with the Company prior to the Closing Date for purposes of determining eligibility and vesting and, in the case of severance, vacation and similar paid time off plans, the level of benefits to which the Transferred Employee is entitled, in the employee benefit plans of the Buyer or its Affiliates in which Transferred Employees become eligible to participate on or after the Closing Date, to the extent permitted under the terms of such plans; provided, however, that (i) such service shall be recognized only to the extent it was recognized under the corresponding Company Benefit Plan in which such Transferred Employee participated immediately prior to the Closing Date, and (ii) nothing herein shall result in the duplication of any benefits.

(f)     With respect to each welfare or fringe benefit plan maintained by the Buyer or its Affiliates in which Transferred Employees become eligible to participate on or after the Closing Date, to the extent permitted under the terms of such plans and applicable Laws, the Buyer shall use Reasonable Efforts to waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Transferred Employees (and their covered dependents), other than any such limitations that are in effect with respect to any Transferred Employee (or his or her covered dependents) and that have not been satisfied under the corresponding welfare or fringe benefit plan maintained by the Company immediately prior to the Closing Date.

(g)     The Company shall (and the Beneficial Owners shall cause the Company to) provide all notices and continuation coverage required under COBRA or any similar Law of any state (the "COBRA Continuation Coverage") to all current and former employees of the Company or any ERISA Affiliates and beneficiaries of all such employees who are or become "M&A Qualified Beneficiaries" (as such term is defined in Treasury Regulations §54.4980B-9) or any similar applicable Law of any state as a result of the consummation of the Transactions.

(h)     The Company shall be solely responsible for any obligations under the WARN Act, or under any similar provision of any federal, state, regional, foreign or local Law, rule or regulation that might arise or have arisen prior to the Closing Date, for any pre-Closing Date notice of layoff initiated by the Company.

(i)     No later than one Business Day prior to the Closing, the Company shall take all actions necessary to terminate all Company Benefit Plans effective as of immediately prior to the Closing.

(j)      This Section 5.8 shall be binding upon and inure solely to the benefit of each of the Parties, and nothing in this Section 5.8, whether express or implied, shall confer upon any Person whether or not a party to this Agreement (including any Transferred Employee) any right to continued employment with the Company.   Nothing contained herein, express or implied, shall be construed to establish, amend or modify any Company Benefit Plan or any other employee benefit plan, program, agreement or arrangement.

Section 5.9    Post-Closing Procedures for Beneficial Owners.   If any portion of the Purchase Price is payable after Closing to the Company, including the applicable portion of (a) Additional Closing Consideration, (b) a release by the Beneficial Owner Representative of a portion of the Beneficial Owner Representative Reserve Property or (c) such other consideration required to be paid to the Company under this Agreement, then, such amounts shall be paid to the Beneficial Owner Representative in cash or other immediately available funds, less that portion of the applicable payment, if any, that is required to be withheld for purposes of satisfying the applicable federal and state income Tax withholding obligations as required pursuant to applicable Law.   The Buyer shall not be liable for, or have any obligation to make any such payments to the Beneficial Owners.

Section 5.10    Exclusivity.   From the Signing Date through the Closing or the earlier termination of this Agreement, the Company shall not (and the Beneficial Owners shall not permit the Company to), and shall cause each of its Representatives (including investment bankers, attorneys and accountants), not to, directly or indirectly, enter into, solicit, initiate or continue any discussions or negotiations with, or encourage or respond to any inquiries or proposals by, or participate in any negotiations with, or provide any information to, or otherwise cooperate in any other way with, any Person or group, other than the Buyer and its Affiliates and Representatives, concerning any sale or exclusive license of all or a material portion of the Company's assets, or of any capital stock or membership interests, as applicable, of the Company, or any merger, consolidation, liquidation, dissolution or similar transaction involving the Company (each such transaction being referred to herein as a "Proposed Acquisition Transaction").   From the Signing Date through the Closing or the earlier termination of this Agreement, neither the Company nor any Beneficial Owner shall, directly or indirectly, through any member, officer, employee, Representative, agent or otherwise, solicit, initiate or encourage the submission of any proposal or offer from any Person relating to any Proposed Acquisition Transaction or participate in any negotiations regarding, or furnish to any other Person any information with respect to the Company for the purposes of, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other Person to seek or effect a Proposed Acquisition Transaction.   The Company shall promptly (and in any event within 24 hours after the Company's or its Representative's receipt) notify Buyer (orally and in writing) if any such offer, or any inquiry or contact with any Person with respect thereto, is made, including the identity of the Person making the Proposed Acquisition Transaction and the material terms and conditions thereof (including an unredacted copy of such Proposed Acquisition Transaction or, where such Proposed Acquisition Transaction is not in writing, a description of the financial and other material terms thereof).   The Company shall, and shall cause its Affiliates to, promptly request any Person that has executed a confidentiality or non-disclosure agreement in connection with any actual or potential Proposed Acquisition Transaction that remains in effect as of the Signing Date to return or destroy all confidential information in the possession of such Person or its Representatives.

Section 5.11    Confidentiality.  Each Beneficial Owner agrees not to disclose or use any Confidential Information of the Business, except that, if and as long as such Beneficial Owner is an employee of the Buyer after the Closing, then such Beneficial Owner may use the Confidential Information of the Business in the ordinary course of his or her employment on behalf of the Buyer so long as such use is in compliance with all policies and agreements applicable to such Beneficial Owner.  Upon termination of such employment, such Beneficial Owner will deliver promptly to the Buyer or destroy, at the request and option of the Buyer, all tangible embodiments (and all copies) of the Confidential Information of the Business that are in his or her possession.  If any Beneficial Owner is requested or required pursuant to written or oral question or request for information or documents in any Proceeding, interrogatory, subpoena, civil investigation demand or similar process to disclose any Confidential Information of the Business, then such Beneficial Owner will notify the Buyer reasonably promptly of the request or requirement so that the Buyer may seek an appropriate protective order or waive compliance with the provisions of this Section 5.11.  If, in the absence of a protective order or the receipt of a waiver hereunder, any Beneficial Owner is, on the advice of counsel, compelled to disclose any Confidential Information of the Business to any tribunal or else stand liable for contempt, then such Beneficial Owner may disclose such portion of the Confidential Information of the Business to the tribunal; provided, however, that the disclosing Beneficial Owner shall use its, his or her Reasonable Efforts to obtain, at the request of the Buyer and at the Buyer's expense, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information of the Business required to be disclosed as Buyer shall designate. The foregoing provisions shall not apply to any Confidential Information of the Business that is generally available to the public immediately prior to the time of disclosure unless such Confidential Information of the Business is so available due to the actions of a Beneficial Owner. "Confidential Information of the Business" means any information concerning the Business or affairs of the Company not already generally available to the public.

Section 5.12    Restrictive Covenants.

(a)    During the Restricted Period, each of the Company, the Seller Related Parties and the Beneficial Owners will not, directly or indirectly, in any manner (whether on its, his or her own account, or as an owner, operator, manager, consultant, officer, director, employee, investor, agent or otherwise), anywhere in the Applicable Area, engage in the Business, or own any interest in, manage, control, provide financing to (including through lending money), participate in (whether as an owner, operator, manager, consultant, officer, director, employee, investor, agent, representative or otherwise), provide services for or advise or consult with or render services for any Person that conducts, operates, carries out or engages in any Other Competing Business; provided, however, that the ownership by either the Company, the Seller Related Parties or a Beneficial Owner of less than five percent (5%) of the outstanding stock of any publicly-traded corporation shall not be deemed to engage solely by reason thereof in such corporation's business.

(b)    During the Restricted Period, each of the Company, the Seller Related Parties and the Beneficial Owners will not, directly or indirectly, in any manner (whether on its, his or her own account, or as an owner, operator, manager, consultant, officer, director, employee, investor, agent or otherwise), (i) call upon, solicit or provide services to any client, operator, distributor, supplier or customer of the Business that is a client, operator, distributor,

supplier or customer of the Business as of the Closing Date with the intent of selling or attempting to sell any products or services similar to those offered by the Business as of such date or solicit or induce any client, operator, distributor, supplier or customer to reduce or refrain from doing any business with the Buyer, (ii) hire or engage, or recruit, solicit or otherwise attempt to employ or engage, or enter into any business relationship with, any Person currently or formerly employed by, or providing consulting services to, the Company or any Transferred Employee, or induce or attempt to induce any Person to leave such employment or consulting arrangement, or (iii) in any way interfere with the relationship between the Buyer and (A) any employee, consultant, or sales representative of the Business as of the Closing Date, or (B) any Person that is a client, customer, broker, distributor, supplier, licensee or other business relation (or any prospective client, customer, broker, distributor, supplier, licensee or other business relation) of the Business as of the Closing Date, including inducing any such client, customer, broker, distributor, supplier, licensee or other business relation to reduce or refrain from conducting Business with the Buyer; provided, however, that nothing in this Section 5.12(b) shall prevent the Company, a Beneficial Owner or any of his, her or its Affiliates from hiring, engaging or soliciting any Person (i) whose employment or engagement was terminated by the Company more than six months prior to such hiring, engagement or solicitation or (ii) who responds to a widespread, general solicitation that does not target t Transferred Employees or the employees or consultants of the Business.

(c)    During the Restricted Period, each of the Company, the Seller Related Parties and the Beneficial Owners, agrees that it will not, directly or indirectly, whether in written or oral form, criticize, denigrate or disparage the Buyer or any of its Affiliates, or any of their respective current or former managers, equityholders, directors, officers employees or representatives, with respect to any of its past or present activities.

(d)    For purposes of this Section 5.12, the "Restricted Period" means a period beginning on the Closing Date and ending on the four (4) year anniversary of the Closing Date; provided, however, that if either the Interim Earn-out Amount or the Final Earn-out Amount becomes payable, such period shall be extended to the six (6) year anniversary of the Closing Date; provided, further, that in the event of a breach or violation by the Company, the Seller Related Parties or a Beneficial Owner (including, in each case, a failure to cause their officers and employees, Affiliates and officers and employees of their Affiliates in their capacity as such) of this Section 5.12, the Restricted Period with respect to the Party so breaching or in violation hereof shall be extended by a period of time equal to the period of time during which the Party so breaching or in violation hereof has violated the terms of this Section 5.12.

(e)    The restrictive covenants contained in this Section 5.12 shall be in addition to, and not in lieu of, and shall not in any way limit the enforceability of, any restrictive covenant covering similar subject matter contained in any other agreement to which the Company, a Seller Related Party or a Beneficial Owner is a party, including any restrictions agreed to in his, her or its capacity as an employee, consultant, officer, director or equityholder of the Company, the Buyer or any of their respective Affiliates.

(f)    The Parties intend that the covenants contained in this Section 5.12 shall be construed as a series of separate covenants, one for each state within the United States and one for each country outside the United States.  Except for geographic coverage, each such

separate covenant shall be deemed identical in terms. If any court of competent jurisdiction shall at any time deem the term of any particular restrictive covenant contained in this Section 5.12 too lengthy, the geographic area covered too extensive or the scope too broad, the other provisions of this Section 5.12 shall nevertheless stand, the term shall be deemed to be the longest period permissible by Law under the circumstances, the geographic area covered shall be deemed to comprise the largest territory permissible by Law under the circumstances and the scope shall be as broad as permissible by Law under the circumstances. The court in each case shall reduce the term, geographic area and or scope covered to the permissible duration, size or breadth.

(g)    Each of the Company, the Seller Related Parties and the Beneficial Owners represents that he, she or it is familiar with the covenants not to compete, not to solicit and not to disparage contained in this  Section 5.12 and is fully aware of his, her or its obligations hereunder. Each of the Company, the Seller Related Parties and the Beneficial Owners further agrees that the length of time, scope and geographic coverage is reasonable given the benefits he, she or it has received hereunder. Each of the Company, the Seller Related Parties and the Beneficial Owners further agrees that he, she or it will not challenge the reasonableness of the time, scope and geographic coverage in any Proceeding.

(h)    Each of the Company, the Seller Related Parties and the Beneficial Owners acknowledges and agrees that the covenants set forth in this Section 5.12 are reasonable and necessary for the protection of the Buyer's business interests, that irreparable injury will result to the Buyer if the Company, such Seller Related Party or such Beneficial Owner (or any of their officers or employees, Affiliates or any officers or employees of their Affiliates in their capacity as such) breaches any of the terms of this Section 5.12, and that in the event of an actual or threatened breach by the Company, such Seller Related Party or such Beneficial Owner (or any of their officers or employees, Affiliates or any officers or employees of their Affiliates in their capacity as such) of any of the provisions contained in this Section 5.12, the Buyer will have no adequate remedy at Law. Each of the Company, the Seller Related Parties and the Beneficial Owners further acknowledges and agrees that the covenants set forth in this Section 5.12 will not interfere with it, his or her ability to earn a living. Each of the Company, the Seller Related Parties and the Beneficial Owners accordingly agrees that in the event of any actual or threatened breach by him, her or it (or any of their officers or employees, Affiliates or any officers or employees of their Affiliates in their capacity as such) of any of the provisions contained in this Section 5.12, the Buyer shall be entitled to injunctive and other equitable relief without (i) the posting of any bond or other security, (ii) the necessity of showing actual damages and (iii) the necessity of showing that monetary damages are an inadequate remedy. Nothing contained in this Agreement to the contrary, shall be construed as prohibiting the Buyer from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of any damages that it is able to prove. Each of the Company, the Seller Related Parties and Beneficial Owners shall be liable for any breach by his, her or its officers and employees, Affiliates and any officers or employees of their Affiliates in their capacity as such of this Section 5.12.

Section 5.13    [Reserved]

Section 5.14    Post-Closing Operations.

50

(a)    Following the Closing and until the expiration of the Earn-Out Period, the Company shall not (and the Beneficial Owners shall not permit the Company to):

(i)    (A) merge or consolidate with any other Person, acquire any business or assets of any other Person (whether by merger, stock purchase, asset purchase or other business combination), other than the purchase of supplies in the ordinary course of business consistent with past practice or (B) form any new Subsidiary;

(ii)    agree to, request or adopt (A) any moratorium or suspension of payment of any Indebtedness, (B) the appointment of a receiver, administrator, liquidator, assignee, trustee or other similar official with respect to the Company, (C) an assignment for the benefit of creditors or an admission in writing of the inability of the Company to pay its debts as they become due, or (D) any other thing under any applicable Law relating to bankruptcy or insolvency with similar effect as any of the foregoing (A) through (C);

(iii)    incur any Indebtedness or issue any debt securities or warrants or other rights to acquire debt securities of the Company or assume, guarantee or endorse, as an accommodation or otherwise, the obligations of any Person for Indebtedness or capital obligations, in the case of any of the foregoing; or

(iv)    authorize or enter into any agreement, commitment or understanding (whether written or oral) with respect to the foregoing.

(b)    Following the Closing and until the Final Earn-out Amount is determined pursuant to Section 1.5(e), the Company shall discharge in full, as and when required on the terms applicable thereto, (i) any Indebtedness of the Company not repaid at Closing pursuant to Section 1.2(c)(ii), and (ii) any Unpaid Company Transaction Expenses outstanding or incurred following the Closing and not paid pursuant to Section 1.2(c)(iii).

(c)    After the Closing, the Company agrees (and the Beneficial Owners agree to cause the Company to) pay in full and discharge all of the Excluded Liabilities in accordance with their stated terms without the incurrence of any penalty or other costs applicable to prepayment, early termination, or similar provisions, as applicable, and to use Reasonable Efforts to do so in a manner that is not detrimental to any relationships of the Buyer, the Business, the Purchased Assets or the Assumed Liabilities with lessors, employees, clients, customers, suppliers or other Persons.

Section 5.15    Receivables.  The Company agrees that, on and after the Closing Date, all Receivables of the Company (whether accrued prior to, on or after the Closing Date) shall be the property of the Buyer.  In addition, the Company agrees that the Buyer shall have the right and authority to collect for the account of the Buyer all Receivables, whether accrued prior to, on or following the Closing Date.  Following the Closing, in the event that the Company receives payments on account of any such Receivables by any account debtor, it shall hold such money in trust for the benefit of the Buyer and shall promptly after receipt pay such amounts to the Buyer by wire transfer of immediately available funds to a bank account designated by the Buyer.  Until the date that is the earlier of (a) the date of receipt of the last of such Receivables, or (b) the

two (2) year anniversary of the Closing Date, the Company shall maintain a bank account for receipt of any such Receivables.

Section 5.16    Retained Policies.  To the extent a claim related to the Purchased Assets or Assumed Liabilities arises for which there may be coverage under the Retained Policies, the Company shall use Reasonable Efforts to pursue coverage under such policies and the Company and Buyer shall cooperate in all reasonable respects in pursuing such coverage and any indemnification obligations of the Company or the Beneficial Owners hereunder with respect to such claim shall be reduced by any amounts so recovered and paid to the Buyer in respect of such obligations; provided, however, that the Company's and the Beneficial Owners' indemnification obligations hereunder shall not be restricted or reduced by any amounts otherwise payable under such coverage that are unpaid subject to dispute, lack of coverage, or for any other reason are not paid, under the Retained Policies (it being understood and agreed that the risk of coverage under the Retained Policies shall remain solely with the Company).

Section 5.17    Change in Name.  Promptly following the Closing (but in no event later than five (5) Business Days after the Closing), the Company and any applicable Seller Related Party shall amend its Organizational Documents as well as all applications for registration of fictitious name or other similar organizational documents and make the necessary filings with all Governmental Authorities to change its legal names to a name that does not include the phrase "Take 5", "T5" or any variation or acronym thereof.  From and after the Closing, none of the Company or any Beneficial Owner shall use the phrase "Take 5" or any variation or acronym thereof in any commercial enterprise or endeavor similar to or competitive with the Business.

## ARTICLE VI
## TAX MATTERS

Section 6.1    [Reserved]

Section 6.2    Transfer Taxes.  The Buyer, on the one hand, and the Company on the other hand, shall each be responsible for fifty (50%) percent of any state or local transfer, sales, use, stamp, registration or other similar Taxes resulting from the Buyer's purchase of the Purchased Assets pursuant to this Agreement (such taxes, the "Transfer Taxes").  The Buyer, the Company and the Beneficial Owners shall each, and shall each cause their respective Affiliates to (if applicable), file or join in the filing of any Tax Returns required in connection with the payment of any such Transfer Taxes.

Section 6.3    Tax Returns.  After the Closing, the Company and the Beneficial Owner, on the one hand, and the Buyer, on the other hand, (a) will promptly inform the other Party in writing of any notice that it receives of any audit, investigation, request for documents or information related to Taxes that could affect the Tax liability of the other Party, (b) will each provide the other Party, at the other Party's expense, with such assistance as may reasonably be requested in connection with the preparation of any Tax Return, audit or other examination by any Governmental Authority relating to Taxes or any Proceeding relating to liability for Taxes, (c) will each retain and, at the other Party's expense, provide to the other Party all records and other information that may be relevant to any such Tax Return, audit or examination, proceeding or determination and (d) will each provide the other Party with any final determination of any

such audit or examination, proceeding or determination that affects any amount required to be shown on any Tax Return of the other Party for any period. Without limiting the generality of the foregoing, the Company will retain, until the expiration of the applicable statutes of limitation (including any extensions thereof), copies of all Tax Returns, supporting work schedules and other records relating to tax periods or portions thereof of the Company ending on or prior to the Closing Date.

Section 6.4    <u>Employees</u>. The Parties will cooperate in all reasonable respects to treat the Buyer as a "successor employer" and the Company, as applicable, as a "predecessor," within the meaning of Sections 3121(a)(1) and 3306(b)(1) of the Code, with respect to Transferred Employees for purposes of Taxes imposed under the United States Federal Unemployment Tax Act or the United States Federal Insurance Contributions Act and corresponding statutes of applicable state Law. The Company, as applicable, shall prepare and deliver a Form W-2 for each its employees for all periods prior to the Closing.

## ARTICLE VII
## <u>CONDITIONS TO CLOSING</u>

Section 7.1    <u>Conditions to Obligations of the Buyer</u>. The obligation of the Buyer to consummate the Contemplated Transactions is subject to the satisfaction of the following conditions, any one or more of which may be waived in writing by the Buyer:

(a)    <u>Representations, Warranties and Covenants of Company and Beneficial Owners</u>. (i) Each of the representations and warranties of the Company and the Beneficial Owners made in this Agreement (A) that are qualified by materiality or Material Adverse Effect shall be true and correct as of the Signing Date and as of the Closing Date (as if made anew at and as of the Closing Date, unless a specific date is set forth in such representation or warranty, in which case such representation or warranty must be true and correct as of such specific date) and (B) that are not qualified by materiality or Material Adverse Effect shall be true and correct in all material respects as of the Signing Date and as of the Closing (as if made anew at and as of the Closing, unless a specific date is set forth in such representation or warranty, in which case such representation or warranty must be true and correct as of such specific date); (ii) the Company, the Beneficial Owners and the Beneficial Owner Representative shall have performed or complied in all material respects with all of the covenants, agreements and obligations required by this Agreement to be performed or complied with by the Company, the Beneficial Owners and the Beneficial Owner Representative on or before the Closing; (iii) no Material Adverse Effect shall have occurred since the Signing Date; and (iv) the Company, the Beneficial Owners and the Beneficial Owner Representative shall have delivered to the Buyer a certificate duly executed by each Beneficial Owner and an authorized officer of the Company, dated as of the Closing Date, certifying that the conditions specified in this <u>Section 7.1(a)</u> have been fulfilled;

(b)    <u>Secretary's Certificate</u>. The Buyer shall have received a certificate from the Company, dated as of the Closing Date and executed by an officer of the Company, attaching and certifying as true and complete copies of (i) the requisite company actions, including the resolutions or consents of the Company's board of directors and equityholders, authorizing and approving the execution and delivery of this Agreement and the consummation of the

Contemplated Transactions and (ii) the Company's Organizational Documents, all as may have been amended up through the Closing Date;

(c)　　Certificate of Status.　The Buyer shall have received a certificate of existence and good standing (if applicable) with respect to the Company from its state of formation, dated as of a date not more than ten (10) days prior to the Closing Date;

(d)　　FIRPTA Certificate.　The Buyer shall have received from each Beneficial Owner a non-foreign affidavit dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code stating that such Beneficial Owner is not a "foreign person" as defined in Section 1445 of the Code;

(e)　　Consents.　All consents, authorizations and approvals set forth on Schedule 7.1(e) (the "Closing Consents") have been obtained and delivered to the Buyer;

(f)　　Contracts.　(i) None of the Contracts set forth on Schedule 7.1(f) shall have been amended or otherwise modified without the prior written consent of Buyer and each such Contract shall be in full force and effect as of the Closing (except for any Contract that has terminated due to the expiration of the term thereof, as in effect as of the Signing Date) and (ii) the Company shall have delivered evidence reasonably satisfactory to the Buyer that each of the Contracts listed on Schedule 7.1(f)(ii) has been terminated, effective as of the Closing without any Liability to the Buyer.

(g)　　Pay-Off Letters.　Between ten (10) and six (6) Business Days prior to the Closing Date, the Beneficial Owner Representative shall have delivered to the Buyer letters in the form and substance reasonably satisfactory to the Buyer (the "Pay-Off Letters") from each holder of Indebtedness of the Company;

(h)　　Broker Pay-Off Letter.　Between ten (10) and six (6) Business Days prior to the Closing Date, the Beneficial Owner Representative shall have delivered to the Buyer a letter in the form and substance reasonably satisfactory to the Buyer (the "Broker Pay-Off Letter") with respect to the Broker Payment;

(i)　　Estimated Expense Schedule.　Between ten (10) and six (6) Business Days prior to the Closing Date, the Beneficial Owner Representative shall have delivered to the Buyer (i) a schedule in the form and substance reasonably satisfactory to the Buyer setting forth (A) the Closing Date Indebtedness Amounts (the "Estimated Closing Date Indebtedness Amount"), reasonably detailed and separated by lender and corresponding to the applicable Pay-Off Letters, and (B) the Closing Date Unpaid Company Transaction Expenses (the "Estimated Closing Date Unpaid Company Transaction Expenses") reasonably detailed and separated by service provider (the "Estimated Expense Schedule") and (ii) a certificate of the Beneficial Owner Representative and the Company, signed by the Company's managing partner and chief financial officer, confirming that the Expense Schedule was prepared in good faith in accordance with (A) the definitions contained in this Agreement, (B) the Business Books and Records and in accordance with GAAP, and (C) consistent with the accounting methods, policies, principles, practices and procedures, with consistent classifications, judgments and estimation methodology as were used

in the preparation of the audited balance sheet of the Company as of the fiscal year ended December 31, 2017, in each case, to the extent in accordance with GAAP;

(j)     [Reserved]

(k)     Offers of Employment.  (i) Each of the Workers listed on Section 7.1(k)(i) of the Disclosure Schedules (the "Key Employees") and (ii) at least 80% of the Workers listed on Section 7.1(k)(ii) shall have accepted the offers of employment made to them in accordance with Section 5.8(a) and completed the Buyer's onboarding process.

(l)     Background Check.  Radetich and Gluck have completed a background check, the results of which are acceptable to the Buyer; and

(m)     Additional Closing Deliveries.  The Company (and any applicable Seller Related Parties) will have delivered or caused to be delivered the closing deliveries set forth below and all such agreements, instruments and other documents will be effective and will not have been revoked by the Persons executing the same:

(i)     an executed Assignment and Assumption Agreement in the form attached hereto as Exhibit E;

(ii)     an executed Trademark Assignment Agreement in the form attached hereto as Exhibit F (the "Trademark Assignment Agreement");

(iii)     the Company shall have entered into an amendment to the Contacts listed on Section 7.1(m)(iii) of the Disclosure Schedules in a form reasonably satisfactory to the Buyer;

(iv)     an executed Domain Name Assignment Agreement in the form attached hereto as Exhibit H (the "Domain Name Assignment Agreement");

(v)     evidence reasonably satisfactory to the Buyer that all employee obligations related to the period prior to the Closing, including payroll, accrued bonuses, vacation and paid time off, have been settled;

(vi)     an electronic copy in a format acceptable to the Buyer of the source code, object code, and internal technical documentation for all Owned Software;

(vii)     an electronic copy in a format acceptable to the Buyer of all data and records related to the operation of the Company, including any and all data generated by, stored in, or created through the Business Software; and

(viii)     an Employee Restrictions and Proprietary Information Agreement in the form attached hereto as Exhibit I, executed by each of the Key Employees (each an "Employee Restrictions and Proprietary Information Agreement").

Section 7.2    Conditions to the Obligations of the Company.    The obligation of the Company to consummate the Contemplated Transactions is subject to the satisfaction of the following conditions, any one or more of which may be waived in writing by the Company:

(a)    Representations, Warranties and Covenants of the Buyer.    (i) Each of the representations and warranties of the Buyer made in this Agreement (A) that are qualified by materiality will be true and correct in all respects as of the Signing Date and as of the Closing (as if made anew at and as of the Closing, unless a specific date is set forth in such representation or warranty, in which case such representation or warranty must be true and correct as of such specific date), and (B) that are not qualified by materiality shall be true and correct in all material respects as of the Signing Date and as of the Closing (as if made anew at and as of the Closing, unless a specific date is set forth in such representation or warranty, in which case such representation or warranty must be true and correct as of such specific date); (ii) the Buyer shall have performed or complied in all material respects with all of the covenants, agreements and obligations required by this Agreement to be performed or complied with by the Buyer on or before the Closing; and (iii) the Buyer shall have delivered to the Company a certificate duly executed by an authorized officer of Buyer, dated the Closing Date, certifying to the Company that the conditions specified in this Section 7.2(a) have been fulfilled;

(b)    Secretary's Certificate.    The Beneficial Owners shall have received a certificate from the Buyer, dated the Closing Date and executed by the Secretary of the Buyer, attaching and certifying as true and complete copies of (i) the resolutions duly adopted by the managers of the Buyer authorizing and approving the execution and delivery of this Agreement and the consummation of the Contemplated Transactions and (ii) the Buyer's Organizational Documents, all as may have been amended up through the Closing Date;

(c)    Certificate of Status.    The Beneficial Owners shall have received a certificate of existence and good standing with respect to the Buyer from its state of formation or incorporation, dated as of a date not more than ten (10) days prior to the Closing Date;

(d)    Initial Closing Consideration.    The Buyer shall have delivered the payments required by and in accordance with Section 1.2(a);

(e)    R&W Insurance Policy.    The Company shall have received from the Buyer a binder for the R&W Insurance Policy, duly executed by the underwriter and Buyer;

(f)    Additional Closing Deliveries.    The Buyer will have delivered or caused to be delivered the closing deliveries set forth below and all such agreements, instruments and other documents will be effective and will not have been revoked by the Persons executing the same:

(i)    an executed Assignment and Assumption Agreement in the form attached hereto as Exhibit E;

(ii)    an executed Trademark Assignment Agreement in the form attached hereto as Exhibit F;

(iii)    [Reserved]; and

56

(iv)    an executed Domain Name Assignment Agreement in the form attached hereto as <u>Exhibit H</u>.

Section 7.3    <u>Conditions to the Obligations of Each Party</u>.    The obligations of the Beneficial Owners, the Company and the Buyer to consummate the Contemplated Transactions are subject to the satisfaction of the following conditions, any one or more of which may be waived in writing signed by the Beneficial Owner Representative and the Buyer.

(a)    <u>No Injunction, Etc</u>.    There will not be in effect any Order issued by any Governmental Authority prohibiting or restraining the consummation of the Contemplated Transactions; <u>provided</u> that each of the Parties shall use its Reasonable Efforts to cause any such Order to be vacated or lifted; and

(b)    <u>No Proceedings</u>.    No Proceeding challenging this Agreement or the Contemplated Transactions or seeking to prohibit, alter, prevent or materially delay the Closing or seeking Damages from the Buyer, the Beneficial Owner Representative, the Beneficial Owners, or the Company with respect to this Agreement or the Contemplated Transactions, will have been instituted by any Person before any Governmental Authority and be pending.

## ARTICLE VIII
## INDEMNIFICATION

Section 8.1    <u>Survival</u>.    The right to assert a claim with respect to any (i) breach or inaccuracy of the representations and warranties contained in the Fundamental Representations shall survive the Closing until sixty (60) days following the expiration of all applicable statutes of limitations applicable to any claim for Damages with respect to such representations and warranties and (ii) breach or inaccuracy of the representations and warranties of the Parties hereto (other than the Fundamental Representations), or any breach of, or failure to perform, any of the covenants and agreements of the Parties hereto to the extent they, by their terms, contemplate or provide for performance prior to the Closing Date, in each case contained in this Agreement or any certificate delivered pursuant hereto or in connection herewith, shall survive the Closing until the thirty-six (36) month anniversary of the Closing Date, after which no claim may be made or Proceeding instituted seeking indemnification pursuant to this <u>Article VIII</u> for any breach or inaccuracy of, or failure to perform, any such representation, warranty, covenant or agreement.    All covenants and agreements of the Parties made in this Agreement to be performed, in full or in part, after the Closing shall survive the Closing in accordance with their terms or, if earlier, until sixty (60) days following the expiration of all applicable statutes of limitations applicable to any claim for Damages with respect to such covenants or agreements. The right to bring a claim for indemnity for the breach or inaccuracy of, or failure to perform, any representation, warranty, covenant or agreement in respect of which indemnity may be sought under this Agreement shall survive the time at which its survival would otherwise terminate pursuant to this <u>Section 8.1</u>, if written notice delivered in accordance with this Agreement of the inaccuracy or breach, or failure to perform, thereof giving rise to such right to seek indemnity, stating in reasonable detail the nature of the inaccuracy, breach or failure to perform (including identification of the provisions of this Agreement alleged to have been breached or inaccurate), shall have been given to the party against whom such indemnity may be sought prior to such time.    Notwithstanding anything herein to the contrary, in no event shall the

termination of any survival of any or all of the representations, warranties, covenants or agreements of the Parties affect a claim for indemnification hereunder or otherwise based on Fraud or willful misconduct of a Party.

Section 8.2    Indemnification.

(a)    Subject to the limitations and exceptions provided in this Article VIII, from and after the Closing, the Company and the Beneficial Owners, shall indemnify, defend and hold harmless the Buyer and the other Buyer Indemnified Parties from and against all Damages incurred or suffered by any Buyer Indemnified Party as a result of, or arising out of any:

(i)    inaccuracy or breach of any representation and warranty made by the Company or the Beneficial Owners in Article II or Article III of this Agreement or in any certificate contemplated by this Agreement;

(ii)    breach of, or failure to perform, any covenant or agreement of the Company or the Beneficial Owners contained in this Agreement;

(iii)    any breach of, or failure to perform any covenant or agreement of the Beneficial Owner Representative in this Agreement;

(iv)    any amount owed by the Company pursuant to Section 1.3(b);

(v)    any Company Taxes;

(vi)    any Indebtedness of the Company (to the extent not taken into account pursuant to Article II as a reduction to the Purchase Price and not repaid pursuant to Section 1.2(c));

(vii)    any Closing Date Unpaid Company Transaction Expenses (to the extent not taken into account pursuant to Article II as a reduction to the Purchase Price and not paid pursuant to Section 1.2(c)(iii));

(viii)    any Excluded Liability or the ownership and operation of the Excluded Assets;

(ix)    any Liability arising from or related to the Seller Related Parties; and

(x)    the matters set forth on Schedule 8.2(a)(ix).

(b)    Subject to the limitations and exceptions provided in this Article VIII, from and after the Closing, the Buyer will indemnify, defend and hold harmless the Company and its Affiliates and, without duplication, the respective equityholders, directors, officers, employees and agents, as well as the heirs, successors and assigns of the foregoing (the "Beneficial Owner Indemnified Parties") against any and all Damages incurred or suffered by any Beneficial Owner Indemnified Party as a result of, or arising out of any:

        (i)      inaccuracy or breach of any representation or warranty made by the Buyer in <u>Article IV</u> of this Agreement or in any certificate contemplated by this Agreement;

        (ii)    breach of, or failure to perform, any covenant or agreement of the Buyer contained in this Agreement;

        (iii)   any Assumed Liability; and

        (iv)   the ownership and operation of the Purchased Assets after the Closing Date.

Section 8.3    <u>Limitations on Liability</u>.

        (a)    The indemnification of the Buyer Indemnified Parties pursuant to <u>Section 8.2(a)</u> is subject to the following:

        (i)      the Buyer Indemnified Parties shall not be entitled to recover under <u>Section 8.2(a)(i)</u> (other than for indemnification resulting from an inaccuracy or breach of a Fundamental Representation or Fraud or willful misconduct), until the aggregate Damages which the Buyer Indemnified Parties have suffered under <u>Section 8.2(a)(i)</u> exceeds $770,000 (the "<u>Basket</u>"), at which point the Buyer Indemnified Parties will be entitled to be indemnified against the full amount of such Damages only in excess of the Basket;

        (ii)    the Buyer Indemnified Parties shall not be entitled to recover against the Company or the Beneficial Owner under <u>Section 8.2(a)(i)</u> (other than for indemnification resulting from an inaccuracy or breach of a Fundamental Representation or Fraud or willful misconduct) for Damages in excess of the amount of the Holdback Amount in the aggregate (the "<u>Ceiling</u>"); and

        (iii)   the Buyer Indemnified Parties shall not be entitled to recover under <u>Section 8.2(a)(i)</u> though <u>Section 8.2(a)(iv)</u> for Damages in excess of the Purchase Price in the aggregate (other than indemnification resulting from Fraud or willful misconduct).

        (b)    The indemnification of the Beneficial Owner Indemnified Parties pursuant to <u>Section 8.2(b)</u> is subject to the following:

        (i)      the Beneficial Owner Indemnified Parties shall not be entitled to recover under <u>Section 8.2(b)(i)</u> (other than for indemnification resulting from an inaccuracy or breach of a Fundamental Representation or Fraud or willful misconduct), until the aggregate Damages which the Beneficial Owner Indemnified Parties have suffered under <u>Section 8.2(b)</u> exceeds the Basket, at which point the Beneficial Owner Indemnified Parties will be entitled to be indemnified against the full amount of such Damages only in excess of the Basket;

        (ii)    the Beneficial Owner Indemnified Parties shall not be entitled to recover under <u>Section 8.2(b)(i)</u> (other than for indemnification resulting from an

inaccuracy or breach of a Fundamental Representation or Fraud or willful misconduct) for Damages in excess of the Ceiling; and

(iii)     the Beneficial Owner Indemnified Parties shall not be entitled to recover under Section 8.2(b)(i) though Section 8.2(b)(ii) for Damages in excess of the Purchase Price in the aggregate (other than indemnification resulting from Fraud or willful misconduct).

(c)     Any indemnification obligations under Section 8.2(a)(i) (other than for indemnification resulting from an inaccuracy or breach of a Fundamental Representation) shall be satisfied according to the following priority of recourse:

(i)     first, from the Holdback Property until depleted under this Agreement or released pursuant to Section 8.3(g); and

(ii)     thereafter, from available coverage under the R&W Insurance Policy.

(d)     Any indemnification obligations under Section 8.2(a) (other than under Section 8.2(a)(i)) shall be satisfied according to the following priority of recourse:

(i)     first, from the Holdback Property until depleted under this Agreement or released pursuant to Section 8.3(g);

(ii)     second, from available coverage under the R&W Insurance Policy, with respect to inaccuracies and breaches of the Fundamental Representations only; and

(iii)     thereafter, at the Buyer's election, (A) directly from the Company and the Beneficial Owners (which satisfaction, as among Beneficial Owners, shall be joint and several from each of Radetich and Gluck for the entire amount of all such obligations and several and not joint from any other Beneficial Owner) or (B) to the to the extent any Interim Earn-out Amount or any Final Earn-out Amount has not then been paid but may become due and payable in the future, by set-off against any such Interim Earn-out Amount or any such Final Earn-out Amount in accordance with Section 8.6.

(e)     Subject to Section 8.3(h), recovery against the Holdback Property and the R&W Insurance Policy constitutes the Buyer Indemnified Parties' sole and exclusive remedy for any and all Damages or other claims relating to or arising from Section 8.2(a)(i) (other than with respect to inaccuracies or breaches of the Fundamental Representations or Fraud or willful misconduct) of this Agreement.

(f)     Waiver of Certain Damages.  WITH RESPECT TO ANY AND ALL DAMAGES FOR WHICH INDEMNIFICATION MAY BE AVAILABLE HEREUNDER, NO INDEMNIFYING PARTIES SHALL HAVE ANY LIABILITY FOR ANY PUNITIVE OR EXEMPLARY DAMAGES WITH RESPECT TO ANY CLAIM FOR WHICH AN INDEMNIFYING PARTY MAY HAVE LIABILITY PURSUANT TO THIS AGREEMENT; PROVIDED, HOWEVER, THAT THIS WAIVER SHALL NOT APPLY TO THE EXTENT

SUCH PUNITIVE OR EXEMPLARY DAMAGES ARE AWARDED IN A PROCEEDING BROUGHT OR ASSERTED BY A THIRD PARTY AGAINST AN INDEMNIFIED PARTY.

(g)    Holdback Property.  The Holdback Property shall be allocated to, and deducted by, the Buyer to pay amounts owing or payable, as provided in Section 8.3(c) and Section 8.3(d), or otherwise allocated or deducted in accordance with the terms of this Agreement.  The Holdback Property may, at Buyer's election, be allocated to, and deducted by, the Buyer to pay amounts owing or payable to the Buyer under Section 1.3(b).  On the eighteen (18) month anniversary of the Closing Date, an amount equal to (x) the Holdback Property remaining after all allocations and deductions thereto pursuant to this Agreement at such time, less (y) the aggregate amount of claims for indemnification under Section 8.2(a) that are pending and unresolved at such time and for which notice has been provided in accordance with Article VIII, subject to the limitations set forth in Article VIII ("Pending Claims"), shall be released from the Holdback Property for distribution to the Company in accordance with the terms of this Agreement.  Thereafter, if at any time the amount of the Holdback Property exceeds the amount of any Pending Claims, such excess funds shall be released from the Holdback Property for distribution to the Company in accordance with the terms of this Agreement and to an account designated by the Beneficial Owner Representative.

(h)    Exclusivity.  Except as specifically set forth in this Agreement (including Article VIII), from and after the Closing, each Party waives, on behalf of itself and all other of its Indemnified Parties, any rights and claims such Party or any other such Indemnified Party may have against any other Party and its Affiliates, or any of their respective equityholders, general or limited partners, heirs, successors, assigns, or Representatives, whether in law or in equity, relating to the Contemplated Transactions.  Such rights and claims waived by each Party include but are not limited to claims for breach of representation or warranty, negligent misrepresentation and all claims for breach of duty, except as specifically set forth in this Agreement.  From and after the Closing, except as specifically set forth in this Agreement or the Ancillary Agreements (including this Article VIII), this Article VIII shall provide the exclusive remedy for any misrepresentation, breach of warranty, covenant or other agreement or other claim arising out of or relating to this Agreement or the Contemplated Transactions, except in the case of remedies for Fraud or willful misconduct by a Person.

(i)    Disclaimer.  EXCEPT AS AND TO THE EXTENT SET FORTH IN ARTICLE II AND ARTICLE III HEREOF AND IN ANY CERTIFICATE CONTEMPLATED BY THIS AGREEMENT, NONE OF THE COMPANY, THE BENEFICIAL OWNERS, THE BENEFICIAL OWNER REPRESENTATIVE, NOR ANY OF THEIR RESPECTIVE AFFILIATES (COLLECTIVELY, THE "COMPANY GROUP") HAS MADE, OR SHALL BE DEEMED TO HAVE MADE, ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER TO THE BUYER AND ITS REPRESENTATIVES (COLLECTIVELY, THE "BUYER GROUP").  THE BENEFICIAL OWNERS AND COMPANY HEREBY DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT, OR INFORMATION MADE, COMMUNICATED, OR FURNISHED (ORALLY OR IN WRITING) (INCLUDING, WITHOUT LIMITATION, ANY PROJECTIONS, ESTIMATES OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO ANY MEMBER OF THE BUYER GROUP OF FUTURE REVENUES, FUTURE RESULTS OF OPERATIONS, FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION OF

THE COMPANY, ANY OPINIONS, EVALUATIONS, ASSESSMENTS OR ANALYSES REGARDING THE FUTURE RESULTS OR OUTCOME OF ANY PROCEEDINGS PENDING AGAINST THE COMPANY OR ANY OF ITS ASSETS AND PROPERTIES, OR ANY OTHER INFORMATION MADE AVAILABLE TO THE BUYER GROUP AT ANY TIME IN ANY AND ALL "DATA ROOMS," MANAGEMENT PRESENTATIONS, CONFIDENTIAL INFORMATION MEMORANDA, BREAK-OUT SESSIONS, OR RESPONSES TO QUESTIONS SUBMITTED BY THE BUYER GROUP) TO ANY MEMBER OF THE BUYER GROUP BY ANY MEMBER OF THE COMPANY GROUP. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN <u>ARTICLE II</u> AND <u>ARTICLE III</u> HEREOF AND IN ANY CERTIFICATE CONTEMPLATED BY THIS AGREEMENT, BUYER IS ACQUIRING THE PURCHASED ASSETS AND ASSUMING THE ASSUMED LIABILITIES "AS IS" AND "WHERE IS." EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN <u>ARTICLE II</u> AND <u>ARTICLE III</u> HEREOF AND IN ANY CERTIFICATE CONTEMPLATED BY THIS AGREEMENT, THE COMPANY, THE BENEFICIAL OWNER REPRESENTATIVE, AND THE BENEFICIAL OWNERS HEREBY EXPRESSLY DISCLAIM AND NEGATE ANY REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO THE COMPANY INCLUDING RELATING TO (A) THE CONDITION OF THE ASSETS AND PROPERTIES OF THE COMPANY (INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OR AS TO THE CONDITION OR WORKMANSHIP THEREOF OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT) OR (B) THE OPERATION OF THE BUSINESS, INCLUDING THE PROBABLE SUCCESS OR PROFITABILITY OF THE BUSINESS. NOTHING IN THIS <u>SECTION 8.3(i)</u> IS INTENDED TO, AND SHALL NOT BE INTERPRETED TO, DISCLAIM OR OTHERWISE LIMIT THE COMPANY'S OR THE BENEFICIAL OWNERS' LIABILITY FOR FRAUD OR WILLFUL MISCONDUCT.

Section 8.4    <u>Procedures</u>.  Claims for indemnification under this Agreement shall be asserted and resolved as follows:

(a)    <u>Third Party Claims</u>.

(i)    If any Person who or which is entitled to seek indemnification under <u>Section 8.2</u> (an "<u>Indemnified Party</u>") receives notice of the assertion or commencement of any claim asserted against an Indemnified Party by a third party ("<u>Third-Party Claim</u>") in respect of any matter that is subject to indemnification under <u>Section 8.2</u>, the Indemnified Party shall, within fifteen (15) Business Days following receipt of such notice, (i) notify the Party(ies) obligated to indemnify (the "<u>Indemnifying Party</u>") of the Third-Party Claim and (ii) transmit to the Indemnifying Party a written notice ("<u>Claim Notice</u>") describing in reasonable detail the nature of the Third-Party Claim, a copy of all papers served with respect to such claim (if any), the Indemnified Party's good faith estimate of the amount of Damages attributable to the Third-Party Claim and the basis of the Indemnified Party's request for indemnification under this Agreement.  Failure to timely provide such Claim Notice shall not affect the right of the Indemnified Party's indemnification hereunder, except to the extent the Indemnifying

Party is prejudiced by such delay or omission. The Parties agree that any notice of a claim for indemnification to the Company or the Beneficial Owners as the indemnifying party shall be directed solely to the Beneficial Owner Representative on behalf of the Company and the Beneficial Owners.

(ii)     Subject to the terms and conditions of the R&W Insurance Policy and Section 8.4(a)(iv), the Indemnifying Party shall have the right, within ten (10) Business Days after receipt of the Claim Notice, to defend the Indemnified Party against such Third-Party Claim, in which case Indemnifying Party shall provide the Indemnified Party written notice thereof with such ten (10) Business Day period (a "Defense Notice"); provided, however, that the Indemnified Party shall be entitled to control the defense of any Third-Party Claim unless and until such time as the Indemnifying Party delivers a Defense Notice electing to undertake the defense of a Third-Party Claim prior to expiration of such ten (10) Business Day Period in accordance with the terms of this Section 8.4(a). If the Indemnifying Party notifies the Indemnified Party that the Indemnifying Party elects to assume the defense of the Third-Party Claim (such election shall be deemed an admission by the Indemnifying Party that the Indemnified Party is entitled to be indemnified under this Article VIII for any Damages arising from such Third-Party Claim), then (A) the Indemnifying Party shall have the right to defend such Third-Party Claim with counsel selected by the Indemnifying Party (who shall be reasonably satisfactory to the Indemnified Party), by all appropriate actions and proceedings, which actions and proceedings shall be prosecuted diligently and in good faith by the Indemnifying Party, to a final conclusion or settlement at the discretion of the Indemnifying Party in accordance with this Section 8.4(a)(ii), and (B) the Indemnifying Party shall have full control of such defense and proceedings, including any compromise or settlement thereof; provided that the Indemnifying Party shall not enter into any settlement agreement without the written consent of the Indemnified Party (which consent shall not be unreasonably withheld, conditioned or delayed); provided further, that such consent shall not be required if (1) the settlement agreement contains a complete and unconditional general release from all Liability by the third party asserting the claim to all Indemnified Parties affected by the claim, (2) such settlement agreement does not result in the finding or admission of any violation of Law or admission of Liability by any Indemnified Party, (3) such settlement agreement does not impose Liability on the part of any Indemnified Party for which the Indemnified Party is not entitled to complete and full indemnification hereunder (including amounts in excess of which the Indemnified Party may obtain recovery hereunder), (4) such settlement agreement does not contain any sanction or restriction (including any restraining order or preliminary or permanent injunction) upon the conduct of any business by the Indemnified Party or its Affiliates or provide for specific performance against the Indemnified Party or its Affiliates, and (6) the Indemnifying Party provided written notice to the Indemnified Party that it desires to compromise and settle such Third-Party Claim (including a copy of the final settlement agreement) at least ten (10) Business Days prior to the entry into  the settlement agreement with respect to such Third-Party Claim. If requested by the Indemnifying Party, the Indemnified Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate in all reasonable respects with the Indemnifying Party and its counsel in contesting any Third-Party Claim that the Indemnifying Party elects to contest, including the making of any related counterclaim

against the Person asserting the Third-Party Claim or any cross complaint against any Person, in each case as reasonably requested by the Indemnifying Party. The Indemnified Party may participate in, but not control, any defense or settlement of any Third-Party Claim controlled by the Indemnifying Party pursuant to this Section 8.4(a)(ii), and the Indemnified Party shall bear its own costs and expenses with respect to such participation; provided, that if the Indemnifying Party and the Indemnified Party have conflicting interests or different defenses available with respect to such Third-Party Claim that cause the Indemnified Party to hire its own separate counsel with respect to such claim, the reasonable fees and expenses of one firm of counsel to the Indemnified Party shall be considered Damages for purposes of this Article VIII and shall be indemnified by the Indemnifying Party. The Beneficial Owner Representative, on behalf of the Beneficial Owners, shall act on behalf of all Indemnifying Parties in the case of all third party claims with respect to which the Buyer is seeking indemnification from the Beneficial Owners under Section 8.2(a).

(iii)    If the Indemnifying Party does not notify the Indemnified Party that the Indemnifying Party elects to defend the Indemnified Party pursuant to Section 8.4(a)(ii), then the Indemnified Party shall have the right to defend, and be reimbursed for its reasonable cost and expense (but only if the Indemnified Party is actually entitled to indemnification hereunder) in regard to the Third-Party Claim with counsel selected by the Indemnified Party (who shall be reasonably satisfactory to the Indemnifying Party), by all appropriate actions and proceedings, which actions and proceedings shall be prosecuted diligently by the Indemnified Party. In such circumstances, the Indemnified Party shall defend any such Third-Party Claim in good faith and have full control of such defense and proceedings, including the compromise or settlement of such Third-Party Claim, without the prior written consent of the Indemnifying Party; provided, however, that any such compromise or settlement of such Third-Party Claim by the Indemnified Party shall not (A) contain an admission of Liability against the Indemnifying Party, or (B) be determinative of the amount of Damages relating to such claim nor shall it constitute an admission that such claim entitles any Indemnified Party to be held indemnified pursuant to this Article VIII. The Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this Section 8.4(a)(iii), and the Indemnifying Party shall bear its own costs and expenses with respect to such participation.

(iv)    Notwithstanding anything to the contrary contained herein, if the Indemnifying Party is the Company or the Beneficial Owners, the Indemnifying Party shall not be entitled to control the defense or settlement of, or appoint counsel with respect to the defense, compromise or settlement of, but may participate in, at its own expense, and the Indemnified Party shall have the right to conduct the defense and appoint counsel with respect to the defense or settlement of, and may consent to the entry of any judgment or compromise and settle, any Third-Party Claim that (A) seeks a temporary restraining order, a preliminary or permanent injunction or specific performance against the Indemnified Party, (B) involves criminal allegations, (C) involves a client, distributor, operator or customer of the Indemnified Party or any other material commercial relationship, (D) involves a current or former employee of the

Company, the Beneficial Owners or any of their Affiliates, (E) may result in any Buyer Indemnified Party incurring Liability for Taxes that are not indemnified pursuant to this Agreement, (F) is not being vigorously defended by the Indemnifying Party, or (G) the Buyer or other Buyer Indemnified Party is required to defend in or to seek or maintain coverage under the R&W Insurance Policy.

      (b)      <u>Claims for Indemnification</u>.

      (i)      In the event any Indemnified Party incurs or reasonably expects to incur Damages that do not involve a Third-Party Claim, but for which an Indemnifying Party is or may be required to provide indemnification under this Agreement, the Indemnified Party shall, as promptly as reasonably practical following its discovery of the matter giving rise to such Damages, transmit to the Indemnifying Party a Claim Notice describing in reasonable detail the nature of the Damages and the basis of the Indemnified Party's request for indemnification under this Agreement; <u>provided</u>, <u>however</u>, that failure to timely provide such Claim Notice shall not affect the right of the Indemnified Party's indemnification hereunder, except to the extent the Indemnifying Party is prejudiced by such delay or omission.

      (ii)      In the event that the Indemnifying Party disputes the validity or scope of any claim (including the Damages) set forth in the Claim Notice, the Indemnifying Party may object to all or any portion of the claims set forth in a Claims Notice by delivering written notice to the Indemnified Party (an "<u>Indemnification Objection Notice</u>") by 5:00 p.m., Pacific Time, on the date that is the tenth (10th) Business Day after delivery of the Claims Notice (the "<u>Objection Dispute Deadline</u>"). Such Indemnification Objection Notice shall describe the grounds for such objection in reasonable detail and set forth the portion of the claim (including the Damages) being disputed or that the entire claim (including the Damages) is being disputed (such disputed amount, the "<u>Disputed Amount</u>"). If the Indemnifying Party fails to deliver an Indemnification Objection Notice prior to the expiration of the Objection Dispute Deadline, the Indemnifying Party will be deemed to have irrevocably acknowledged that the Indemnified Party is entitled to indemnification under this <u>Article VIII</u> for the Damages arising from such Claims Notice. If an Indemnification Objection Notice was delivered to the Indemnified Party prior to the Objection Dispute Deadline, but the objections set forth in such Indemnification Objection Notice pertain only to a portion of the Damages claimed in the Claims Notice, the Indemnifying Party will be deemed to have irrevocably acknowledged that the Indemnified Party is entitled to indemnification under this <u>Article </u>VIII for the portion of such Damages arising from such Claims Notice that were not objected to in such Indemnification Objection Notice.

      (iii)      For a period of fifteen (15) Business Days after the Indemnifying Party's delivery of the Indemnification Objection Notice in accordance with <u>Section 8.4(b)(ii)</u>, the Indemnifying Party and the Indemnified Party shall attempt in good faith to resolve any claim for indemnification to which an Indemnification Objection Notice was provided. If such Parties are able to resolve any such claim for indemnification, they shall prepare and sign a memorandum setting forth such agreement.

If no such resolution can be reached, either the Buyer or the Company may demand arbitration of the matter in accordance with Section 10.11.

Section 8.5    Other Matters.

(a)    Each Indemnified Party shall make Reasonable Efforts to mitigate any Damages that an Indemnified Party asserts under this Article VIII after any executive officer of such Party becoming actually aware of the event or condition that gave rise to such Damages that are indemnifiable hereunder.  In the event that an Indemnified Party shall fail to make such Reasonable Efforts to mitigate any such Damages, then notwithstanding anything else to the contrary contained herein, the Indemnifying Party shall not be required to indemnify any Indemnified Party for any Damages that would have been avoided if the Indemnified Party had made such efforts.

(b)    Any claim for indemnification under this Agreement shall, to the extent practicable, describe the claim in reasonable detail, include copies of any material written evidence thereof that is in possession of the applicable Indemnified Party and indicate the estimated amount of such claim.

(c)    In the case of any claim for which there is a reasonable possibility that a Buyer Indemnified Party may have a right of recovery against the R&W Insurance Policy, such Buyer Indemnified Party shall use Reasonable Efforts to seek recovery of such claim or loss under the R&W Insurance Policy; provided such Buyer Indemnified Party shall not be required to seek such recovery until the Holdback Property is depleted pursuant to the order of recovery set forth in Section 8.3(c) and Section 8.3(d).  To the extent that an Indemnified Party obtains any recovery in respect of any claim for indemnification under the R&W Insurance Policy or other insurance policies held by such Party, as applicable, (i) such Party shall use the funds provided by such recovery (in lieu of funds provided by any other Party pursuant to the indemnification provisions of this Article VIII) to pay or otherwise satisfy such claims, (ii) the recovery shall reduce the amount of Damages for purposes of determining the amount of the indemnity obligations under this Article VIII in respect of such claim and (iii) the amount actually recovered (but not in excess of the amount of the indemnity payment previously paid by an Indemnifying Party) shall be paid to such Indemnifying Parties, in each case of the foregoing clauses (i) through (iii), net of any costs and expenses incurred or paid in obtaining any such recovery, including any deductibles, retentions or similar costs or payments and the first year of any increases in premiums (and retro premium adjustments) under such insurance policies (other than the R&W Insurance Policy) to the extent arising out of or in connection with the Damages in connection with this Agreement.

(d)    Any indemnification payable under this Article VIII shall be, to the extent permitted by applicable Law, an adjustment to the Purchase Price.

(e)    Notwithstanding anything to the contrary contained in this Agreement, the Buyer Indemnified Parties shall have no right to indemnification under Section 8.2(a) with respect to any Damages if the matter forming the basis for such Damages was specifically reserved for, or otherwise specifically identified, and included in calculating the Final Closing Date Net Working Capital.

(f)     Notwithstanding anything to the contrary contained in this Agreement, if any representation or warranty contained herein is limited or qualified based on materiality, including the terms "material," "Material Adverse Effect," or similar qualifications, such limitation or qualification shall in all respects be ignored and given no effect for purposes of (i) determining if there has been any inaccuracy or breach of any such representation or warranty and (ii) determining the amount of Damages resulting from any inaccuracy or breach of any such representation or warranty.

(g)     Notwithstanding anything in this Agreement to the contrary, the provisions of this Article VIII shall not apply to, prevent or limit any Parties recovery, or right to seek recovery, for Damages arising out of, relating to, directly or indirectly, any Fraud or willful misconduct of a Party.

(h)     Each of the Company, the Beneficial Owners and the Beneficial Owner Representative acknowledges that the Buyer is entering into the R&W Insurance Policy and that, in connection therewith, a Buyer Indemnified Party may make claims for the same Damage or series of related Damages under both this Article VIII, subject to the limitations set forth in this Article VIII, and the R&W Insurance Policy.  For the avoidance of doubt, any liability for indemnification under this Agreement shall be determined without duplication of recovery by reason of the state of facts giving rise to such liability constituting a breach of more than one representation, warranty, covenant or agreement or payment, and in the event any payment is made pursuant to Section 8.3(d)(iii) with respect to any Damages and thereafter a Buyer Indemnified Party receives proceeds from the R&W Insurance Policy with respect to such Damages, such Buyer Indemnified Party shall promptly remit such proceeds (in each case, net of the reasonable costs incurred by the Buyer Indemnified Party or its Affiliates in connection with any such recovery) to the Company or Beneficial Owner, as applicable, not to exceed the payment so made by such Party.

Section 8.6     Right of Set-Off.  Subject to the limitations set forth in this Article VIII, if an amount has been claimed in good faith pursuant to Section 8.2(a) by a Buyer Indemnified Party (whether or not finally determined to be owed by the Company or the Beneficial Owners) or the Buyer is entitled to payment under Section 1.3(b) and the Company has not made such payment, the Buyer may set-off such amounts claimed in good faith against any amount payable by the Buyer pursuant to Section 1.3(b) or Section 1.5 on a dollar for dollar basis, notwithstanding any objection by the Company or the Beneficial Owners pursuant to this Article VIII.  The exercise of such right of set-off by the Buyer in good faith, whether or not ultimately determined to be justified, will not constitute an event of default under this Agreement.  For the avoidance of doubt and subject to the limitations set forth in Section 8.3, if Buyer has provided a Claim Notice, an amount equal to the aggregate dollar amount of the Damages that has or may be suffered by Buyer for claims set forth in such Claim Notice may be set-off against any amount payable by Buyer pursuant to Section 1.3(b) or Section 1.5 as provided in this Section 8.6.  Notwithstanding this Section 8.6, once a claim is determined to be less than the amount so set-off, Buyer shall promptly inform the Company of the difference between the amount set-off by Buyer and the finally determined amount of Damages and make such payment pursuant to Section 1.3(b) or Section 1.5, as applicable.

# ARTICLE IX
# TERMINATION

Section 9.1    Termination.

(a)    This Agreement may be terminated:

(i)    at any time prior to the Closing Date by mutual written consent of the Buyer and the Company;

(ii)    by the Buyer if there has been a material breach by the Company or the Beneficial Owners of any representation or warranty of the Company or the Beneficial Owners, or by the Beneficial Owners, the Beneficial Owner Representative or the Company of any agreement or covenant, contained in this Agreement which has prevented the satisfaction of any of the conditions of the Buyer to consummate the Contemplated Transactions and, if such breach is of a character that is capable of being cured, such breach has not been cured by the Beneficial Owners, the Beneficial Owner Representative or Company, as the case may be, within thirty (30) days after written notice thereof from the Buyer;

(iii)    by the Company if there has been a material breach by the Buyer of any representation, warranty, agreement or covenant of the Buyer contained in this Agreement which has prevented the satisfaction of any of the conditions of the Beneficial Owners or Company, as the case may be, to consummate the Contemplated Transactions and, if such breach is of a character that is capable of being cured, such breach has not been cured by the Buyer within thirty (30) days after written notice thereof from the Beneficial Owners or the Company, as the case may be, except that the thirty (30) day cure period shall not apply to a breach regarding the failure or inability of the Buyer to pay any portion of the Purchase Price in accordance with Section 1.2(b) and Section 1.2(c) or a breach of the representation set forth in Section 4.3;

(iv)    by the Buyer or the Company, if (A) any Order restraining or prohibiting the consummation of the Contemplated Transactions has become final and nonappealable or (B) a Law is enacted, promulgated or issued by any Governmental Authority that would make consummation of any of Contemplated Transactions illegal; or

(v)    by the Buyer or the Company, if the Closing shall not have taken place on or before 60 days following the Signing Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(a)(v) shall not be available to the Buyer or the Company, as applicable, if the action or failure to act by such Party is the principal reason for the failure of the Closing to occur or if such Buyer, on the one hand, or the Company, the Beneficial Owners or the Beneficial Owner Representative, on the other hand, as the case may be, at the time that such termination is sought, is in material breach of any representation, warranty, covenant or agreement set forth in this Agreement.

In the event of termination pursuant to this <u>Section 9.1</u>, written notice thereof shall forthwith be given to the Buyer or the Company, as applicable, and the Contemplated Transactions will be terminated without further action by any Party.  If the Contemplated Transactions are terminated as provided herein, this Agreement will become null and void and of no further force or effect, except for <u>Section 5.2</u> (Access and Information), <u>Section 5.5</u> (Public Statements), this <u>Section 9.1</u> and <u>Article X</u>; <u>provided</u> that nothing in this <u>Section 9.1</u> will be deemed to release any Party from any Liability for any breach by such Party of the terms and provisions of this Agreement, or to impair the right of any Party to compel specific performance by any other Party of its obligations under this Agreement.

## ARTICLE X
## <u>MISCELLANEOUS</u>

Section 10.1   <u>Notices</u>.  All notices, requests, demands and other communications that are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be delivered personally, sent by facsimile transmission or e-mail of a PDF document, delivered by a recognized overnight courier or express mail service for next Business Day delivery (and requiring proof or delivery or receipt) or posted in the United States mail by registered or certified mail, with postage pre-paid, return receipt requested, and shall be deemed given when so delivered personally, sent by facsimile transmission or e-mail of a PDF document with electronic confirmation of receipt, the next day after delivered to such overnight courier or express mail service or three (3) Business Days after the date of mailing, as follows:

If to the Buyer, to:

Advantage Sales & Marketing LLC
18100 Von Karman Ave., Suite 1000
Irvine, CA 92612
Fax:  (858) 964-0245
Attention:  Chief Financial Officer

with a copy to:

Advantage Sales & Marketing LLC
18100 Von Karman Ave., Suite 1000
Irvine, CA 92612
Fax:  (858) 964-0245
Attention:  General Counsel

If to the Company or a Seller Related Party, prior to Closing to:

Take 5 Media Group, LLC
2385 NW Executive Center Drive, Suite 290
Boca Raton, FL 33431
Fax:  (561) 819-0245
E-mail:  alex@take5mg.com
Attention:  Alexander Radetich

with a copy to:

McDermott Will & Emery LLP
28 State St
Boston, MA 02109
Fax:  (617) 535-3800
E-mail:  Bkalogerou@mwe.com
Attention:  Byron Kalogerou

If to the Beneficial Owner Representative to:

Alexander Radetich
2121 NW 30th Road
Boca Raton, FL 33431
Fax:  (561) 819-0245
E-mail:  alex@take5mg.com
Attention:  Alexander Radetich

with a copy to:

McDermott Will & Emery LLP
28 State St
Boston, MA 02109
Fax:  (617) 535-3800
E-mail:  Bkalogerou@mwe.com
Attention:  Byron Kalogerou

or to such other address or addresses as the Parties may from time to time designate in writing.

Section 10.2    Assignment.    This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.    Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without (i) the prior written consent of the Beneficial Owners and, after Closing, the Beneficial Owner Representative in the case of an assignment by the Buyer and (ii) the prior written consent of the Buyer in the case of an assignment by the Beneficial Owners; provided, however, that nothing in this Agreement shall or is intended to limit the ability of the Buyer, whether before or after the Closing, to assign its rights or delegate its responsibilities, liabilities or obligations under this Agreement and the related agreements, in whole or in part, without the consent of the Beneficial Owner Representative to (a) any Affiliate of the Buyer, (b) any lender to the Buyer as security for borrowings, or (c) subject to Buyer's compliance with the provisions of Section 1.5(j) and such putative buyer's satisfaction of the requirements set forth therein, any buyer of all or substantially all of the assets or equity securities of the Buyer.  No assignment shall release the assigning Party of its obligations and Liabilities under this Agreement.

Section 10.3    Further Assurances.

(a)    Each party to this Agreement hereby covenants and agrees, without the necessity of any further consideration, to execute and deliver, or cause to be executed and

delivered, any and all such further documents and take, or cause to be taken, any and all such other actions as may be reasonably necessary or appropriate, or reasonably requested by the other Party, to carry out the intent and purposes of this Agreement and to consummate the Contemplated Transactions.

(b)     Without limiting the generality of the foregoing, the Company and the Beneficial Owners shall use Reasonable Efforts to assist the Buyer with a data transfer of all information relating to the Purchased Assets and the Assumed Liabilities.

Section 10.4    Rights of Third Parties.  Except for the provisions of Article VIII, which are intended to be enforceable by the Persons respectively referred to therein, nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the Parties, any right or remedies under or by reason of this Agreement.

Section 10.5    Expenses.  Except for (i) the Company and the Buyer each paying 50% of the premium and other costs associated with the R&W Insurance Policy or (ii) as otherwise expressly provided herein, each Party shall bear its own expenses incurred in connection with this Agreement and the Contemplated Transactions whether or not such transactions shall be consummated, including all fees of its legal counsel, financial advisers and accountants.

Section 10.6    Counterparts.    This Agreement may be executed in two or more counterparts (including by means of telecopy or PDF signature page), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any facsimile copies hereof or signature hereon shall, for all purposes, be deemed originals.

Section 10.7    Entire Agreement.  This Agreement, including the Disclosure Schedules and exhibits hereto, the documents, instruments and schedules referred to herein, including but not limited to the Ancillary Agreements, and all other documents contemplated hereby and thereby, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the Parties or any of them with respect to the subject matter hereof; provided, however, that this Agreement does not supersede the Confidentiality Agreement, the terms and conditions of which the Parties hereby expressly reaffirm.

Section 10.8    Disclosure Schedule.  The Disclosure Schedules to this Agreement are arranged in sections corresponding to those contained in this Agreement merely for convenience, and the disclosure of an item in one section or subsection of such Disclosure Schedules as an exception to any particular representation or warranty shall be deemed adequately disclosed as an exception with respect to all other representations or warranties, notwithstanding the presence or absence of an appropriate section or subsection of such Disclosure Schedules with respect to such other representations or warranties or an appropriate cross-reference thereto, in each case to the extent relevancy of such disclosure to such other representations or warranties is reasonably apparent on the face of such disclosure.  Additionally, for each of the Disclosure Schedules, the mere inclusion of an item in such Disclosure Schedules as an exception to a representation or warranty shall not be deemed an admission or acknowledgment, in and of itself and solely by virtue of the inclusion of such information in such Disclosure Schedules, that such information is required to be listed in such Disclosure Schedules or that such item (or any non-disclosed item or

information of comparable or greater significance) represents a material exception or fact, event or circumstance, that such item has had, or is expected to result in, a Material Adverse Effect that such item actually constitutes noncompliance with, or a violation of, any Law, Governmental Authorization or Contract or other topic to which such disclosure is applicable or that such item is outside the ordinary course of business consistent with past practice.  The specification of any dollar amount in the representations and warranties contained in this Agreement or the inclusion of any specific item in the Disclosure Schedules is not intended to imply that such amounts (or higher or lower amounts) are or are not material, and no Party shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Disclosure Schedules in any dispute or controversy between the Parties as to whether any obligation, item, or matter not described herein or included in a Disclosure Schedule is or is not material for purposes of this Agreement.  Capitalized terms used in the Disclosure Schedules, unless otherwise defined therein, shall have the meanings assigned to them in this Agreement.

Section 10.9   Amendments.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

Section 10.10  Severability.   Subject to Section 5.12, the Parties agree that (a) if any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect, (b) if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible and (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

Section 10.11  Arbitration.

(a)    If the Parties should have a dispute (a "Dispute") involving money damages arising out of or relating to this Agreement or any Ancillary Agreement, or the Parties' respective rights and duties hereunder or thereunder (other than a Dispute arising in connection with the calculation of any adjustment to the Purchase Price, any Interim Earn-out Amount or any Final Earn-out Amount, which shall be resolved in accordance with Section 1.3(a) and Section 1.5(c), respectively) then the Parties will resolve such Dispute in the following manner: (i) the Buyer, on the one hand, or the Beneficial Owner Representative (on behalf of the Company and the Beneficial Owners), on the other hand, may at any time deliver to the other a written dispute notice setting forth a brief description of the Dispute for which such notice initiates the dispute resolution mechanism contemplated hereby; (ii) during the 30-day period following the delivery of such notice, appropriate representatives of the Buyer and the Beneficial Owner Representative will meet and seek to resolve the Dispute through negotiation; provided that any settlement negotiations will not be discoverable by or communicated to the Arbitrator (as defined below), (iii) if representatives of the Buyer and the Beneficial Owner Representative are unable to resolve the Dispute through negotiation, then within fifteen (15) days after the

conclusion of the thirty (30) day period described above, the Parties will refer the Dispute (to the exclusion of a court of law) to final and binding arbitration in accordance with the procedures set forth in Section 10.11(b).

(b)    Any arbitration pursuant to this agreement shall be presided over by one arbitrator in Delaware, in accordance with the then existing commercial arbitration rules (the "Rules") of the American Arbitration Association ("AAA"), and judgment upon the award rendered by the Arbitrator may be entered in any court having jurisdiction thereof; provided, however, that the Law applicable to any controversy shall be the Law of the State of Delaware regardless of principles of conflicts of Laws.  In any arbitration pursuant to this Agreement, (i) discovery shall be allowed and, unless the Parties agree otherwise, the scope of and procedures for discovery shall be governed by the federal rules of civil procedure and (ii) the award or decision shall be rendered by a single arbitrator, who is a licensed attorney chosen from the AAA roster of arbitrators in the State of Delaware and experienced in Delaware Law and handling disputes of the type presented in the Dispute and who shall be appointed by mutual agreement of the Buyer and the Company; provided that if the Dispute relates primarily to accounting issues the arbitrator should, in addition to being a licensed attorney, be a licensed certified public accountant in the State of Delaware experienced in handling disputes of the type presented in the Dispute and who shall be appointed by mutual agreement of the Buyer and the Beneficial Owner Representative. In the event of failure of the Buyer and the Beneficial Owner Representative to agree within 30 days after the commencement of the arbitration proceeding upon the appointment of the single arbitrator, the single arbitrator shall be appointed by the AAA in accordance with the Rules and the provisions hereof.  The arbitrator chosen is referred to as the "Arbitrator." Upon the completion of the selection of the Arbitrator, an award or decision shall be rendered within no more than 60 days after the date of such selection.  The award or decision will be a reasoned award or decision setting forth the Arbitrator's reasoning in reaching its determinations.  The expenses of any litigation, including the Arbitrator and the arbitration and the reasonable out-of-pocket fees and expenses of the other Party, including fees of attorneys and experts, shall be paid by the non-prevailing Party, as determined by the Arbitrator, except as provided in Section 1.3(a)(iv) and Section 1.5(c).

(c)    Notwithstanding the foregoing, the request by any Party for preliminary or permanent injunctive relief, whether prohibitive or mandatory, shall not be subject to arbitration and may be adjudicated only by the courts set forth in Section 10.12, provided, however that any action for declaratory judgment regarding this Agreement or any Ancillary Agreement shall be subject to arbitration pursuant to this Section 10.11.

Section 10.12  Governing Law; Jury Waiver.

(a)    THIS AGREEMENT AND ANY DISPUTES ARISING OUT OF OR CONNECTED TO THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE LAWS THAT MIGHT BE APPLICABLE UNDER CONFLICTS OF LAWS PRINCIPLES.

(b)    SUBJECT TO SECTION 10.11, THE PARTIES AGREE THAT THE APPROPRIATE, EXCLUSIVE AND CONVENIENT FORUM FOR ANY DISPUTES

BETWEEN ANY OF THE PARTIES HERETO ARISING OUT OF THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS SHALL BE IN ANY STATE OR FEDERAL COURT IN DELAWARE AND EACH OF THE PARTIES HERETO IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS SOLELY IN RESPECT OF ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.  The Parties further agree that the Parties shall not bring suit with respect to any disputes arising out of this Agreement or the Contemplated Transactions in any court or jurisdiction other than the above specified courts.  The Parties further agree, to the extent permitted by Law, that a final and nonappealable judgment against a Party in any Proceeding contemplated above shall be conclusive and may be enforced in any other jurisdiction within or outside the United States by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and amount of such judgment.  Except to the extent that a different determination or finding is mandated due to the applicable Law being that of a different jurisdiction, the Parties agree that all judicial determinations or findings by a state or federal court in Delaware with respect to any matter under this Agreement shall be binding.

(c)    EACH OF THE PARTIES AGREE THAT THEY HEREBY IRREVOCABLY WAIVES, AND COVENANTS THAT NEITHER IT NOR ANY OF ITS AFFILIATES SHALL ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR THE SUBJECT MATTER OF SUCH AGREEMENTS OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE CONTEMPLATED TRANSACTIONS, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING.  EACH PARTY ACKNOWLEDGES THAT THIS SECTION 10.12(c) CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH SUCH PARTIES ARE RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS AND ANY OTHER AGREEMENTS RELATING HERETO OR CONTEMPLATED HEREBY.  ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 10.12(c)WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

Section 10.13  Appointment and Duties of the Beneficial Owner Representative.

(a)    In order to administer efficiently the management and resolution of any disputes arising under Section 1.3 or Section 1.5 and the defense and/or settlement of any claims for Damages for which the Beneficial Owners may be required to indemnify the Buyer Indemnified Parties pursuant to Article VIII, or otherwise, the Beneficial Owners by their adoption and approval of the Contemplated Transactions irrevocably appoint the Beneficial Owner Representative as their true and lawful agent, attorney-in-fact and representative (with full power of substitution in the premises), and grant unto said agent, attorney-in-fact and representative full power and authority to do and perform each and every act and thing necessary or desirable to be done in connection with the Contemplated Transactions, as fully to all intents and purposes as the Beneficial Owners could do in person, hereby ratifying and confirming all that the Beneficial Owner Representative may lawfully do or cause to be done by virtue hereof. Each Beneficial Owner agrees that such agency, proxy and power of attorney are coupled with

an interest, and are therefore irrevocable without the consent of the Beneficial Owner Representative and Buyer and shall survive the death, incapacity, bankruptcy or dissolution of each such Beneficial Owner.  By its execution hereof, the Beneficial Owner Representative hereby accepts such appointment.

(b)    The Beneficial Owner Representative is hereby authorized (i) to take all actions necessary or desirable, in connection with the defense and/or settlement of any claims for Damages (including the power to compromise any indemnity claim on behalf of the Beneficial Owners and to transact matters of litigation) for which the Beneficial Owners may be required to indemnify the Buyer Indemnified Parties pursuant to Article VIII, or otherwise, (ii) to take all actions necessary or desirable in connection with (A) the determination of the Initial Closing Consideration, the Final Closing Consideration, any Initial Earn-out Amount, any Final Earn-out Amount, and any and all other amounts or values related to the calculation thereof, and (B) the Closing Statement as set forth in Section 1.3(a)(i) and any Earn-out Statement as set forth in Section 1.5(a), (iii) to give and receive all notices required to be given under this Agreement and any Ancillary Agreements to which the Beneficial Owners are subject, (iv) and perform all other responsibilities or obligations assigned to the Beneficial Owner Representative under this Agreement or any Ancillary Agreement, and (v) to do or refrain from doing all such further acts and things, and to execute all such documents as the Beneficial Owner Representative shall deem necessary or appropriate in connection with the Contemplated Transactions, including, without limitation, the power:

(i)    to execute and deliver all amendments, waivers, ancillary agreements, stock powers, certificates and documents that the Beneficial Owner Representative deems necessary or appropriate in connection with the consummation of the Contemplated Transactions;

(ii)    to execute and deliver this Agreement, the Ancillary Agreements, all amendments and waivers to this Agreement or the Ancillary Agreements that the Beneficial Owner Representative deems necessary or appropriate, whether prior to, at or after the Closing;

(iii)    to receive funds, make (or cause to be made) payments of funds, and give receipts for funds;

(iv)    to receive funds for the payment of expenses of the Beneficial Owners, to deposit such funds in such accounts as the Beneficial Owner Representative deems appropriate and apply such funds in payment for such expenses;

(v)    to do or refrain from doing any further act or deed on behalf of the Beneficial Owners that the Beneficial Owner Representative deems necessary or appropriate in its sole discretion relating to the subject matter of this Agreement as fully and completely as the Beneficial Owners could do if personally present;

(vi)    to receive service of process in connection with any claims under this Agreement; and

(vii)    to engage attorneys, accountants and other professionals and experts (the Beneficial Owner Representative may in good faith rely conclusively upon information, reports, statements and opinions prepared or presented by such professionals, and any action taken by the Beneficial Owner Representative based on such reliance shall be deemed conclusively to have been taken in good faith).

(c)    In the event that the Beneficial Owner Representative dies, becomes unable to perform its responsibilities hereunder or resigns from such position, the Beneficial Owners (or, if applicable, their respective heirs, legal representatives, successors and assigns) who represent a majority of the Equity Interests, shall select another representative to fill such vacancy and such substituted representative shall be deemed to be a Beneficial Owner Representative for all purposes of this Agreement.

(d)    All decisions and actions by the Beneficial Owner Representative, including the management and resolution of any disputes arising under Section 1.3 or Section 1.5 and the defense or settlement of any claims for Damages for which the Beneficial Owners may be required to indemnify the Buyer Indemnified Parties pursuant to Article VIII, shall be binding upon all of the Beneficial Owners, and no Beneficial Owner shall have the right to object, dissent, protest or otherwise contest the same.

(e)    The Buyer shall be able to rely conclusively on the instructions and decisions of the Beneficial Owner Representative as to the determination of the Initial Closing Consideration, Final Closing Consideration, any Initial Earn-out Amount, any Final Earn-out Amount, any and all other amounts or values related to the calculation thereof, and the settlement of any claims for Damages for which the Beneficial Owners may be required to indemnify the Buyer Indemnified Parties pursuant to Article VIII and any other actions required to be taken by the Beneficial Owner Representative hereunder, and no Party shall have any cause of action against the Buyer for any action taken by the Buyer in reliance upon the instructions or decisions of the Beneficial Owner Representative.

(f)    All actions, decisions and instructions of the Beneficial Owner Representative shall be conclusive and binding upon all of the Beneficial Owners, and the Beneficial Owner Representative shall have no liability, and no Beneficial Owner shall have any cause of action against the Beneficial Owner Representative under any legal or equitable theory whatsoever, for any action taken or not taken, decision made or instruction given by the Beneficial Owner Representative under this Agreement, except to the extent involving gross negligence, bad faith or willful misconduct on its part.

(g)    The Beneficial Owner Representative shall not have by reason of this Agreement a fiduciary relationship with any Beneficial Owner, except in respect of amounts received by the Beneficial Owner Representative on behalf of such Beneficial Owner.

(h)    The Beneficial Owner Representative shall not be liable to any of the Beneficial Owners for any apportionment or distribution of payments made by her, except to the extent involving gross negligence, bad faith or willful misconduct on its part, and if any such apportionment or distribution is subsequently determined to have been made in error, the sole recourse of any Beneficial Owner to whom payment was due, but not made, shall be to recover

from other Beneficial Owners any payment in excess of the amount to which they are determined to have been entitled.

(i)    The provisions of this <u>Section 10.13</u> are independent and severable, are irrevocable and coupled with an interest and shall be enforceable notwithstanding any rights or remedies that any Beneficial Owner may have in connection with the Contemplated Transactions; and

(j)    The provisions of this <u>Section 10.13</u> shall be binding upon the heirs, legal representatives; successors and assigns of each Beneficial Owner, and any references in this Agreement to a Beneficial Owner or the Beneficial Owners shall mean and include the successors to the rights of the Beneficial Owners hereunder, whether pursuant to testamentary disposition, the Laws of descent and distribution or otherwise.

(k)    All reasonable expenses incurred by the Beneficial Owner Representative in connection with this Agreement ("<u>Charges</u>") shall be paid (i) first from the Beneficial Owner Representative Reserve Property, (ii) second (A) if the Beneficial Owner Representative Reserve Property should become exhausted and (B) if the Holdback Property is released to the Beneficial Owner Representative pursuant to the terms of this Agreement, from the Holdback Property, and (iii) finally by the Beneficial Owners on a pro rata basis if the Holdback Property should become exhausted or has not been released to the Beneficial Owner Representative.

Section 10.14  <u>Rules of Construction</u>.  For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires:

(a)    All article, section, paragraph, schedule and exhibit references used in this Agreement are to articles and sections of, and schedules and exhibits to, this Agreement unless otherwise specified.  The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).  Terms defined in the singular have the corresponding meanings in the plural, and vice versa.  Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa.  The term "include," "includes" or "including" shall mean "including without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder," "herewith" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear.

(c)    The Parties acknowledge that each Party and its attorney(s) have reviewed this Agreement and that any rule of construction to the effect that any ambiguities are to be resolved against the drafting Party, or any similar rule operating against the drafter of an agreement, shall not be applicable to the construction or interpretation of this Agreement.

(d)    A reference to any Party in this Agreement or any other agreement or document shall include such Party's predecessors, successors and permitted assigns.

(e)    The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(f)    All references to currency herein shall be to, and all payments required hereunder shall be paid in, Dollars.

(g)    Any event, the scheduled occurrence of which would fall on a day that is not a Business Day, shall be deferred until the next succeeding Business Day.

(h)    Any statement in this Agreement to the effect that any information, document or other material has been "made available" by the Company shall mean that a true and complete copy of such information, document or material was included in and available at the "Project Palm" online datasite hosted by Intralinks Inc. at least two Business Days prior to the Signing Date;

(i)    The word "or" shall be disjunctive and not exclusive.

(j)    All accounting terms used herein and not expressly defined herein shall have the respective meanings given to them under GAAP.

Section 10.15  <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that neither Party will have an adequate remedy at law.  Accordingly, the Parties agree that, in addition to any other remedies, each Party shall be entitled to enforce the terms of this Agreement by a decree of specific performance or injunctive relief without the necessity of proving the inadequacy of money damages as a remedy. Each Party hereby waives any requirement for securing or posting of any bond in connection with such remedy.  Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies which any party may have under this Agreement or otherwise. The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by the Buyer or the Company, as applicable, and each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of this Agreement.  No Party shall be required to provide any bond or other security in connection with seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, all in accordance with the terms of this <u>Section 10.15</u>.

*[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF this Agreement has been duly executed and delivered by each of the Parties as of the date first above written.

**COMPANY:**

TAKE 5 MEDIA GROUP, LLC

By:
Name: _Alex Radetich_
Title: _Managing Partner_

IN WITNESS WHEREOF this Agreement has been duly executed and delivered by each of the Parties as of the date first above written.

**BUYER:**

ADVANTAGE SALES & MARKETING LLC

By:
Name: Brian Stevens
Title: CFO & COO

IN WITNESS WHEREOF this Agreement has been duly executed and delivered by each of the Parties as of the date first above written.

**BENEFICIAL OWNERS:**

RJV MARKETING CORP.

By:

Name: JACK GLUCK

Title: PRESIDENT

Richard Gluck

Alexander Radetich

**BENEFICIAL OWNER REPRESENTATIVE:**

Alexander Radetich

ASSET PURCHASE AGREEMENT SIGNATURE PAGE

IN WITNESS WHEREOF this Agreement has been duly executed and delivered by each of the Parties as of the date first above written.

**SELLER RELATED PARTIES:**

Bottleshock Holdings, LLC

By:
Name: Alex Radetich
Title: Managing Partner

Take 5 Solutions, LLC

By:
Name: Alex Radetich
Title: Managing Partner

Radiant Data Holdings LLC

By:
Name: Alex Radetich
Title: Managing Partner

Radiant Data Holdings II LLC

By:
Name: Alex Radetich
Title: Managing Partner

Radiant Gamma LLC

By:
Name: Alex Radetich
Title: Managing Partner

Radiant Gamma LP

By:
Name: Alex Radetich
Title: Managing Partner

ASSET PURCHASE AGREEMENT SIGNATURE PAGE

**EXHIBIT A**
**DEFINITIONS**

"<u>AAA</u>" has the meaning provided such term in <u>Section 10.11(b)</u>.

"<u>Additional Closing Consideration</u>" has the meaning provided such term in <u>Section 1.3(b)(i)</u>.

"<u>Accounts Receivable</u>" has the meaning provided such term in <u>Section 2.5(b)</u>.

"<u>Adjusted EBITDA</u>" means, for the applicable measurement period, the EBITDA of the Business plus and/or minus, to the extent deducted or added, respectively, in calculating net income, any extraordinary expenses or income, using the same accounting methods, principles, policies, practices and procedures, with consistent classifications, judgments and estimation methodology; <u>provided</u>, that the determination of Adjusted EBITDA under this Agreement will substitute, for purposes of determining net income, the amount of the Minimum G&A for the amount of the actual general and administrative expenses incurred during the measurement period with respect to the items set forth in the Minimum G&A, in the aggregate (but only if the actual general and administrative expenses incurred during the measurement period with respect to such items, in the aggregate, are less than the Minimum G&A). For the avoidance of doubt, the Buyer's back office expenses associated with resources necessary to support the Business following the Closing will be included in the determination of Adjusted EBITDA.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one or more intermediaries or otherwise. For the purposes of this definition, "<u>control</u>" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "<u>controlling</u>" and "<u>controlled</u>" have correlative meanings.

"<u>Aggregate Earn-out Amount</u>" means the sum of the Interim Earn-out Amount and the Final Earn-out Amount.

"<u>Agreement</u>" has the meaning provided such term in the preamble to this Agreement.

"<u>Allocation</u>" has the meaning provided such term in <u>Section 1.6</u>.

"<u>Ancillary Agreements</u>" means any agreement, document, certificate or instrument delivered pursuant to or in connection with this Agreement or the Contemplated Transactions, including, but not limited to, the Bill of Sale, the Assignment and Assumption Agreement, the Trademark Assignment Agreement, the Domain Name Assignment Agreement, the Employee Restrictions and Proprietary Information Agreement and the release agreements.

"<u>Applicable Area</u>" means any state within the United States of America in which the Company engaged in the Business prior to the Closing Date.

"<u>Arbitrator</u>" has the meaning set forth in <u>Section 10.11(b)</u>.

"Assets and Properties" of any Person means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise and wherever situated), including the goodwill related thereto, owned or leased by such Person, including Cash, accounts and notes receivable, chattel paper, documents, instruments, Contracts, general intangibles, real estate, equipment, inventory, goods and Intellectual Property.

"Assigned Permits" has the meaning provided such term in Section 1.1(d)(ix).

"Assignment and Assumption Agreement" has the meaning provided such term in Section 1.1(c).

"Assumed Contracts" has the meaning provided such term in Section 1.1(a)(ii).

"Assumed Liabilities" has the meaning provided such term in Section 1.1(c).

"Base Purchase Price" has the meaning provided such term in Section 1.2(a).

"Basket" has the meaning provided such term in Section 8.3(a)(i).

"Beneficial Owner" has the meaning provided such term in the preamble to this Agreement.

"Beneficial Owner Indemnified Parties" has the meaning provided such term in Section 8.2(b).

"Beneficial Owner Representative" has the meaning provided such term in the preamble to this Agreement.

"Beneficial Owner Representative Reserve Deposit" has the meaning provided such term in Section 1.2(c)(i).

"Beneficial Owner Reserve Property" means the portion of the Beneficial Owner Representative Reserve Deposit remaining in the account established by the Beneficial Owner Representative for the Beneficial Owner Representative Reserve Deposit at a given time.

"Benefit Plan" means (i) any "employee benefit plan" as defined in ERISA Section 3(3) and (ii) any other bonus, incentive compensation (including equity options or incentives, restricted equity, equity bonus, phantom equity, equity appreciation and deferred bonus plans), deferred compensation, pension change in control, equity, medical, life insurance, long-term disability, dental, excess benefit, personnel policy (including vacation time, holiday pay, bonus programs, moving expense reimbursement programs and sick leave), profit sharing, severance agreement, salary reduction, employment agreement, consulting, or severance plan, program, policy or other arrangement or (iii) any other benefit, plan, Contract, program, fund arrangement or trust, whether or not written or pursuant to a collective bargaining agreement

"Bill of Sale" has the meaning provided such term in Section 1.1.

"Books and Records" has the meaning provided such term in Section 5.4(a).

"Broker Pay-Off Letter" has the meaning provided such term in Section 7.1(h).

"Broker Payment" has the meaning provided such term in Section 1.2(c)(iii).

"Business" means the business (through owning and operating the Purchased Assets) whether by the Company or any Seller Related Party prior to the Closing, or by the Buyer following the Closing, of providing (i) data-based marketing services, including email, retargeting, mobile, social media, content and direct mail marketing and (ii) data services, including appending, enhancement, verification and data licensing, but excluding the business activities of any other business unit or division of the Buyer or of any Subsidiary or Affiliate of the Buyer.

"Business Books and Records" has the meaning provided such term in Section 1.1(a)(viii).

"Business Day" means any day that is not a Saturday, Sunday or legal holiday in the State of New York and that is not otherwise a federal holiday in the United States.

"Business Software" means Owned Software and any and all other Software that is used or held for use in connection with the operation of the Business, including all (i) Software used in the Company's, the Seller Related Parties' or the Beneficial Owners' provision of products or services to customers and/or end users, including any Software incorporated in, or integrated or bundled with, any such products or services, (ii) Software intended for license to customers and/or end users, and (iii) Software, libraries, modules and other materials used by the Company, any Seller Related Party or any Beneficial Owner in the development, design, construction and testing of any of the Software described in (i) or (ii) above.

"Buyer" has the meaning provided such term in the preamble to this Agreement.

"Buyer Group" has the meaning provided such term in Section 8.3(i).

"Buyer Indemnified Parties" means, collectively, the Buyer and its Affiliates and, without duplication, the respective equity holders, directors, officers, employees and agents, as well as successors and assigns of the foregoing.

"Cash" means (a) cash or cash equivalents on hand or in the bank account of the Company (including deposits in transit) less outstanding checks or other pending payments, (b) demand deposits, amounts held in money market funds or similar accounts of the Company and (c) any highly liquid investments with original maturities of ninety (90) days or less of the Company, in each case excluding cash, cash equivalents or investments attributable to funds held for the benefit or on behalf of any client or customer.

"Ceiling" has the meaning provided such term in Section 8.3(a)(ii).

"Charges" has the meaning provided such term in Section 10.13(k).

"Claim Notice" has the meaning provided such term in Section 8.4(a).

"Closing" has the meaning provided such term in Section 1.4.

"Closing Consents" has the meaning provided such term in Section 7.1(e).

"Closing Date" has the meaning provided such term in Section 1.4.

"Closing Date Net Working Capital" means the Net Working Capital of the Company as of the close of business on the business Day immediately preceding the Closing Date.

"Closing Date Indebtedness Amount" means the aggregate amount of all unpaid Indebtedness of the Company as of the close of business on the Business Day immediately preceding the Closing Date.

"Closing Date Unpaid Company Transaction Expenses" means the Company Transaction Expenses unpaid as of the Closing.

"Closing Statement" has the meaning provided such term in Section 1.3(a)(i).

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"COBRA Continuation Coverage" has the meaning provided such term in Section 5.8(g).

"Code" means the Internal Revenue Code of 1986, as amended.

"Commercial Software" means any and all Software that (i) is commercially available, (ii) is not material to the Business, the Company or the Beneficial Owners, (iii) has not been modified or customized for the Business, the Company or the Beneficial Owners and (iv) is licensed to the Company or the Beneficial owners for a one-time or annual fee of $10,000 or less.

"Company" has the meaning provided such term in the preamble to this Agreement.

"Company Benefit Plan" has the meaning provided such term in Section 2.9.

"Company Data" means all data used by the Business, whether provided by the Company, its customers or any other Person.

"Company Group" has the meaning provided such term in Section 8.3(a)(i).

"Company Intellectual Property" has the meaning provided such term in Section 2.10(a).

"Company Taxes" means any Taxes imposed (i) on the Company, any Seller Related Party or any Beneficial Owner for any period, (ii) in connection with the acquisition, ownership, operation or disposition of the Assets or the Business for any period (or portion of any period) ending on or before the Closing Date, (iii) in connection with the Contemplated Transactions (including any Transfer Taxes), or (iv) on the Buyer as a transferee or successor of the Company.

A-4

"Company Transaction Expenses" means the collective amount payable by the Company, the Seller Related Parties, the Beneficial Owner Representative or the Beneficial Owners for all out-of-pocket fees, costs and expenses incurred or payable in connection with any efforts to sell the Company, the Equity Interests, or the Assets and Properties of the Company or relating to the Contemplated Transactions (including the preparation and dissemination of any offering or marketing materials) and the preparation negotiation, execution and delivery of this Agreement, including the Contemplated Transactions (including (i) the Transaction Bonus Payments, including Taxes payable with respect to any Transaction Bonus Payments, (ii) unpaid severance amounts relating to termination of employees occurring on or before, or relating to, the Closing Date, (iii) all fees and expenses for professional services rendered by Petsky Prunier LLC, legal counsel, accounting firms, and other professional advice, (iv) 50% of the premium and other costs associated with the R&W Insurance Policy as described in Section 10.5, and (v) any Transfer Taxes for which the Company or any Seller Related Party is responsible pursuant to Section 6.2), and that remain unpaid as of the close of business on the Business Day immediately preceding the Closing Date; provided that such amounts shall not be included in the Company Transaction Expenses to the extent they are accounted for as current liabilities in Closing Date Net Working Capital.

"Compound Growth Rate" means:

(i)     with respect to the Interim Period, the compound rate of growth of the Business calculated as:  ((Adjusted EBITDA for the Interim Period / Initial EBITDA)$^{(1/2)}$ -1) *multiplied* by 100 percent; and

(ii)     with respect to the Earn-out Period, the compound rate of growth of the Business calculated as:  ((Year 3/4 Adjusted EBITDA / Initial EBITDA)$^{(1/3.5)}$ -1) *multiplied* by 100 percent.

"Confidential Information of the Business" has the meaning provided such term in Section 5.10.

"Confidentiality Agreement" has the meaning provided such term in Section 5.2.

"Contemplated Transactions" means the transactions contemplated by this Agreement.

"Contract" means, all contracts, agreements, licenses, sublicenses, covenants-not-to-sue, settlements, options, leases, purchase orders, commitments, obligations, understandings, notes, warrants or other instrument, in any case whether written or oral, to which a Person is party or by which any of its assets or properties are bound, other than Company Benefit Plans, Governmental Authorizations or insurance policies.

"Damages" means (whether or not involving a Third-Party Claim) any direct or indirect damages, losses, lost profits, diminution in value, claims, assessments, Taxes, settlements, Liabilities, fines, penalties and expenses (including reasonable attorneys' fees and amounts paid in investigation, defense or settlement of any claim or Proceeding).

"Defense Notice" has the meaning provided such term in Section 8.4(a)(ii).

"Disclosure Schedules" means the disclosure schedules delivered by the Company and the Beneficial Owners to the Buyer concurrently with the execution and delivery of this Agreement.

"Dispute" has the meaning provided such term in Section 10.11.

"Disputed Amount" has the meaning provided such term in Section 8.4(b)(ii).

"Dollars" and "$" mean the lawful currency of the United States.

"Domain Name Assignment Agreement" has the meaning provided such term in Section 7.1(m)(iv).

"Earn-out Period" means the period beginning on the Closing Date and concluding on the four year anniversary of the last day of the month in which the Closing occurs.

"Earn-out Statement" means, for the relevant measurement period, the Buyer's calculation setting forth (i) the Adjusted EBITDA for the Interim Period or the Year 3/4 Adjusted EBITDA, as applicable, and (ii) the applicable Compound Growth Rate.

"EBITDA" means, with respect to a specified measurement period, the Business' net income before income taxes, adding thereto (i) interest expense and (ii) depreciation and amortization charges, each as determined in accordance with GAAP.

"Employee Notice List" has the meaning provided such term in Section 5.8(a).

"Employment Practices" has the meaning provided such term in Section 2.15(a).

"Employee Restrictions and Proprietary Information Agreement" has the meaning provided such term in Section 7.1(m)(viii).

"Entity" means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability company, joint venture, joint stock association, estate, trust, or other entity having legal capacity, other than a Governmental Authority.

"Equity Interests" means the equity interests of the Company as set forth in the Company's Organizational Documents.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and the regulations promulgated thereunder.

"ERISA Affiliate" means the Company and any predecessor of the Company and any other Person who constitutes or has constituted all or part of a controlled group or had been or is under common control with, or whose employees were or are treated as employed the Company, under Section 414 of the Code or under Section 4001(a)(14) of ERISA.

"Estimated Closing Date Unpaid Company Transaction Expenses" has the meaning provided such term in Section 7.1(i).

"Estimated Closing Date Indebtedness Amount" has the meaning provided such term in Section 7.1(i).

"Estimated Expense Schedule" has the meaning provided such term in Section 7.1(i).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning provided such term in Section 1.1(b).

"Excluded Contracts" has the meaning provided such term in Section 1.1(b)(v).

"Excluded Liabilities" has the meaning provided such term in Section 1.1(d).

"Facilities" has the meaning provided such term in Section 2.7(a).

"Final Closing Consideration" has the meaning provided such term in Section 1.3(a)(i).

"Final Closing Date Net Working Capital" means the definitive Closing Date Net Working Capital agreed to (or deemed to be agreed to) by the Buyer and Beneficial Owner Representative in accordance with Section 1.3(a)(iii) or resulting from the determinations made by the Neutral Auditor in accordance with Section 1.3(a)(iv) (in addition to those items theretofore agreed to by Beneficial Owner Representative and the Buyer).

"Final Earn-out Amount" has the meaning provided such term in Section 1.5(e).

"Financial Statements" has the meaning provided such term in Section 2.5.

"Fraud" means an intentional misrepresentation of an existing fact made with actual knowledge of its falsity and for the purpose of inducing the other Person to act, and upon which the other Person relies with resulting injury or damage.

"FTC" means the Federal Trade Commission.

"Fundamental Representations" means Section 2.1 (Organization), Section 2.2 (Authority), Section 2.4(a) (No Conflicts; Consents and Approvals), Section 2.7(d) (Property; Sufficiency of Assets), Section 2.19 (Brokers' Fees), Section 3.1 (Authorization of Transaction), Section 3.2 (No Conflicts; Consents and Approvals), Section 3.4 (Equity Interests), Section 3.5 (Brokers' Fees), Section 4.1 (Organization of the Buyer), Section 4.2 (No Conflicts; Consents and Approvals), Section 4.3 (Financial Ability to Perform) and Section 4.5 (Brokers).

"GAAP" means generally accepted accounting principles of the United States, consistently applied.

"Gluck" has the meaning provided such term in the preamble to this Agreement.

"Governmental Authority" means any federal, state, municipal, local or similar governmental authority, regulatory or administrative agency, court or arbitral body.

"Governmental Authorizations" means approvals, licenses, Permits, authorizations, qualifications, orders and certificates from Governmental Authorities.

"Holdback Amount" means $770,000.

"Holdback Property" means, at any given time, the Holdback Amount as adjusted pursuant to any set-off or adjustment pursuant to this Agreement.

"Inbound Licenses" has the meaning provided such term in Section 2.8(a)(ix).

"Indebtedness" of any Person means any of the following, without duplication:  (i) any indebtedness for borrowed money, including intercompany indebtedness; (ii) any obligations evidenced by bonds, debentures, notes or other similar instruments the payment of which such Person is responsible or liable; (iii) any obligations to pay the deferred purchase price of property or services, except trade accounts payable and other current liabilities; (iv) any obligations as lessee under capitalized leases; (v) any obligations, contingent or otherwise, under acceptance, letters of credit or similar facilities, in each case, solely to the extent drawn upon; (vi) the net obligations for which such Person is obligated pursuant to any hedging agreement or arrangement, (vii) all obligations, contingent or otherwise, of such Person that, in accordance with GAAP, should be classified upon the balance sheet of such Person (or notes thereto) as indebtedness, (viii) all obligations of such Person arising in connection with any acquisition of assets or businesses to the seller of such assets or businesses and the payment of which is dependent on the future earnings or performance of such assets or businesses and contained in the agreement relating to such acquisition or in an employment agreement delivered in connection therewith, (ix) all contingent obligations of such Person arising in connection with any pending or threatened actions, suits, claims or investigations by a Governmental Authority or third Person, (x) all obligations secured by Liens on property acquired by such Person, whether or not such obligations were assumed by such Person at the time of acquisition of such property, (xi) all obligations of such Person with respect to unfunded Company Benefit Plans, (xii) any guaranty of any of the foregoing; (xiii) any accrued interest, fees and charges in respect of any of the foregoing; and (xiv) any prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any of the foregoing.

"Indebtedness/Expense Excess" has the meaning provided such term in Section 1.3(b)(i).

"Indemnification Objection Notice" has the meaning provided such term in Section 8.4(b)(ii).

"Indemnified Party" has the meaning provided such term in Section 8.4(a).

"Indemnifying Party" has the meaning provided such term in Section 8.4(a).

"Initial Closing Consideration" has the meaning provided such term in Section 1.2(a).

"Initial EBITDA" means $12,600,000.

"Insurance Date" has the meaning provided such term in Section 5.8(d).

"Intellectual Property" means all of the following, in any jurisdiction throughout the world:  (i) patents, patent disclosures and inventions (whether or not patentable and whether or not reduced to practice) and any reissue, continuation, continuation-in-part, divisional, extension or reexamination thereof; (ii) trademarks, service marks and trade dress, logos, slogans, Internet domain names and other indicia of origin, and all translations, adaptations, derivations and combinations of the foregoing, together with all goodwill associated therewith (collectively, "Trademarks"); (iii) works of authorship (whether or not copyrightable) copyrights and copyrightable works; (iv) registrations, applications for registration, and renewals of any of the foregoing; (v) rights in Software; (vi) trade secrets and other confidential information, including ideas, know-how, processes and techniques, research and development information, drawings, specifications, designs, plans, proposals and technical data and manuals; (vii) all other intellectual property and proprietary rights; and (viii) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"Interim Earn-out Amount" has the meaning provided such term in Section 1.5(d).

"Interim Period" means the twelve month period ending on the two year anniversary of the last day of the month in which the Closing occurs.

"IRS" means Internal Revenue Service of the United States.

"IT Assets" means systems, servers, computers, hardware, firmware, middleware, networks, data communications lines, routers, hubs, switches and all other information technology equipment, and all associated documentation.

"Justice Department" means the United States Department of Justice.

"Key Employee" has the meaning provided such term in Section 7.1(k).

"Knowledge of the Company" or any phrase of similar import means (a) the actual knowledge of Radetich and Gluck, as to the existence or absence of facts or circumstances that are the subject of such representations and warranties and (b) the knowledge such individuals would obtain after reasonable inquiry.

"Latest Balance Sheet" means the balance sheet of the Company for the year ended December 31, 2017.

"Law" means any applicable statute, law, rule, regulation, ordinance, or Order of a Governmental Authority, in each case as in effect on and as interpreted on the Signing Date or on and as of the Closing Date, as applicable, unless the context otherwise clearly requires a different date, in which case on and as of such date.

"Liability" means any indebtedness (including any Indebtedness), liabilities, Taxes or obligations of any nature whatsoever, whether accrued or unaccrued, absolute or contingent, direct or indirect, asserted or unasserted, fixed or unfixed, known or unknown, choate or inchoate, perfected or unperfected, liquidated or unliquidated, secured or unsecured, or otherwise, and whether due or to become due, and including all costs and expenses related thereto, including all fees, disbursements and expenses of legal counsel.

"Lien(s)" has the meaning provided to such term in Section 1.1(a).

"Material Adverse Effect" means any one or more events, changes, circumstances, conditions or developments (whether or not arising in the ordinary course of business consistent with past practice), which has had or have had or could reasonably be expected to have, individually or in the aggregate, (i) a material adverse effect on the business, operations, capitalization, condition (financial or otherwise), results of operations, rights, assets or liabilities of the Company or (ii) prevent the Company or the Beneficial Owners from completing any of the Contemplated Transactions; provided, however, that none of the following shall be deemed, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Effect: (a) any adverse change, event, development or effect arising from or relating to (i) the negotiation, execution, delivery, performance or public announcement of this Agreement or the Contemplated Transactions to the extent attributable to the identity of the Buyer, (ii) general business or economic conditions in the industries or market which the Company operates, but only to the extent such conditions do not disproportionately affect the Company relative to other participants in such industries or market, (iii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war or the occurrence of any military or terrorist attack upon the United States or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, but only to the extent such conditions do not disproportionately affect the Company relative to other participants in such industries or market, (iv) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), but only to the extent such conditions do not disproportionately affect the Company relative to other participants in such industries or market, (v) changes in GAAP or any Law, but only to the extent such conditions do not disproportionately affect the Company relative to other participants in such industries or market, (vi) the failure in-and-of-itself of the Company to meet, with respect to any period or periods, any internal or industry analyst projections, forecasts, estimates of earnings or revenues, or business plans (but not, in each case, the underlying cause of such failures, unless such failures would otherwise be separately excepted from this definition), (vii) pandemics, earthquakes, hurricanes, tornados or other natural disasters, or (viii) matters that arise from any actions or omissions of Buyer and its Affiliates, (b) any action or omission of the Company or Beneficial Owners or any of their respective Affiliates taken with the written consent or written waiver of the Buyer, (c) the resignation of employment by any individual employee of the Company, by itself, as a result of the pendency of the transaction contemplated by this Agreement, including, without limitation, any resignation resulting from any employment package (including, without limitation, title, level of responsibility, location of employment or compensation) offered to such employee by or at the direction of the Buyer or its Affiliates or (d) any existing event, occurrence or circumstance with respect to which the Buyer has full and complete actual knowledge of as of the Signing Date.

"Material Contracts" has the meaning provided such term in Section 2.8(a).

"Minimum G&A" means $742,634, which is the general and administrative expenses of the Business arising from (i) finance personnel, (ii) IT personnel, (iii) human resources personnel, (iv) liability insurance, (v) legal fees and (vi) professional services fees.

"Net Working Capital" means, as of any given date, an amount (which may be positive or negative) equal to the current assets minus the current liabilities of the Company as of such date (provided, that, solely for purposes of calculating the Net Working Capital applicable to the Closing Net Working Capital, the remaining deferred revenue balance associated with the $2,100,000 payment to the Company in December 2017 under the Company's Contract with Neustar Information Services, Inc. shall not be included as a current liability), determined in accordance with GAAP and consistent with the example calculation set forth on Schedule II. Notwithstanding anything to the contrary set forth herein, (a) Cash of the Company shall not be included as a current asset to the extent it is accounted for in the Closing Cash balance, (b) deferred Tax assets shall not be included as current assets, (c) Indebtedness shall not be included as current liabilities to the extent it is accounted for in the Closing Date Indebtedness Amount, (d) the Company Transaction Expenses shall not be included as current liabilities to the extent they are accounted for as Company Transaction Expenses and (e) deferred Tax liabilities shall not be included as current liabilities.

"Net Working Capital Deficiency" is the amount equal to the difference between the Target Net Working Capital and the Closing Date Net Working Capital, if such number is a positive number

"Objection Dispute Deadline" has the meaning provided such term in Section 8.4(a)(ii).

"Objection Notice" has the meaning provided such term in Section 1.3(a)(iii).

"Open Source Materials" has the meaning provided such term in Section 2.10(e).

"Order" means any order, judgment, injunction, ruling, determination, decision, opinion, sentence, subpoena, writ or award issued, made, entered or rendered by any arbitrator, court, administrative agency or other Governmental Authority with jurisdiction.

"Organizational Documents" means any charter, certificate of incorporation, articles of association, partnership agreements, limited liability company agreements, bylaws, operating agreement or similar formation or governing documents and instruments.

"Other Competing Business" means the business of providing (i) data-based marketing services, including email, retargeting, mobile, social media, content and direct mail marketing or (ii) data services, including appending, enhancement, verification and data licensing.

"Outbound Licenses" has the meaning provided such term in Section 2.8(a)(x).

"Owned Intellectual Property" means any and all Intellectual Property that is owned or purported to be owned by the Beneficial Owners or the Company.

"Owned Software" means all Software owned or purported to be owned by the Company or the Beneficial Owners in connection with operation of the Business.

"Party" and "Parties" has the meaning provided such term in the preamble to this Agreement.

"Pay-Off Amounts" has the meaning provided such term in Section 1.2(c)(i).

"Pay-Off Letters" has the meaning provided such term in Section 7.1(g).

"PCI-DSS" means the Payment Card Industry Data Security Standard developed and maintained by the Payment Card Industry Security Standards Council related to the storing, processing, transmitting, or communicating of transaction data or credit card data.

"Pending Claims" has the meaning provided such term in Section 8.3(g).

"Permits" means authorizations, licenses, permits or certificates issued by Governmental Authorities.

"Permitted Liens" means any or all of the following:

(a)    Liens granted under the terms of lease obligations or bonding arrangements of the Company;

(b)    Liens in favor of operators, vendors, carriers, landlords, warehousemen, repairmen, mechanics, workmen and materialmen and construction or similar Liens arising by operation of law or in the ordinary course of business consistent with past practice in respect of obligations that are not yet due or delinquent that are being contested in good faith by appropriate Proceedings;

(c)    workers' or unemployment compensation Liens arising in the ordinary course of business consistent with past practice;

(d)    Liens or other encumbrances securing payment of Taxes or other similar assessments that are, in either case, not yet delinquent or, if delinquent, are being contested in good faith by appropriate Proceedings;

(e)    rights of third parties pursuant to restrictive covenants, easements, rights of way, servitudes, licenses, Permits, surface leases, surface use restrictions, sub-surface leases, mineral reservations or severances, grazing rights or logging rights or rights related to ponds, lakes, waterways, canals, ditches, reservoirs, railways, streets, roads and structures or other rights related to surface uses and impediments on, over or in respect of any of the Assets and Properties of the Company that are not such as to interfere materially with the use or enjoyment of the properties or assets to which they apply;

(f)    rights reserved to or vested in any Governmental Authority to control or regulate any of the Assets and Properties of the Company in any manner, and all applicable Laws, decrees or requirements of any Governmental Authority;

(g)    conditions in any Governmental Authorization granted or issued by any Governmental Authority for the ownership and operation of all or part of the Assets and Properties of the Company;

(h)     purchase money Liens and Liens securing rental payments under capital lease arrangements;

(i)     zoning, building, planning and other similar limitations, restrictions and rights of any Governmental Authority to regulate property that do not, individually or in the aggregate, interfere with the current use or utility or diminish the value of the encumbered property; and

(j)     the interests of the lessors and sublessors with respect to the property covered by the Real Property Leases, or Liens described or referenced in the Real Property Leases.

"Person" means any individual, Governmental Authority or Entity of any kind.

"Personal Information" means any information from or about an individual that alone or in combination with other information is regulated under any Laws.  Examples of Personal Information include Protected Health Information (as such term is defined in HIPAA), Nonpublic Personal Information (as such term is defined in GLBA) and any information about employees of Company, or the employees of their respective customers, that Company is obligated, whether by contract or applicable Law, to protect.

"Personal Property Leases" has the meaning provided such term in Section 2.7(c).

"Personnel Records" has the meaning provided such term in Section 1.1(b)(vii).

"Plaintiff Litigation" means those cases captioned (a) Take 5 Media Group, LLC and Take 5 Solutions, LLC v. Dealers United, LLC, a Florida limited liability company; Brian Pasch, as individual; and PCG Consulting, Inc. aka PCG Digital Marketing, a New Jersey corporation, no. 2015-CA-014082, and (b) Bottleshock Holdings, LLC, Richard Gluck, Alexander Radetich, Take 5 Media Group, LLC and Take 5 Solutions, LLC v. Hinshaw & Culbertson, LLP, Eliot C. Abbott, Ronald L. Kammer, Charles M. Tatelbaum, Leonor M. Lagomasino, and Tripp Scott, P.A., no. 06-2017-CA-010702-AXXXCE.

"Pre-Closing Tax Period" means any Tax period (or a portion thereof) ending on or before the Closing Date.

"Privacy Laws" has the meaning provided such term in Section 2.20(a).

"Proceeding" means an action, arbitration, audit, hearing, litigation or suit (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator.

"Proposed Acquisition Transaction" has the meaning provided such term in Section 5.9.

"Protest Notice" has the meaning provided such term in Section 1.5(b).

"Purchased Assets" has the meaning provided such term in Section 1.1.

"Purchase Price" means the (i) Base Purchase Price, minus (ii) the Net Working Capital Deficiency, if any, minus (iii) the Closing Date Indebtedness Amount, minus (iv) the Closing Date Unpaid Company Transaction Expenses, minus (v) the Holdback Amount, plus (vi) the portion of the Holdback Property released to the Company pursuant to Section 8.3(g), if any, plus (vii) the Interim Earn-out Amount, if any, plus (viii) the Final Earnout Amount, if any.

"R&W Insurance Policy" means the representation and warranty insurance policy to be obtained by Buyer prior to the Closing.

"Radetich" has the meaning provided such term in the preamble to this Agreement.

"Real Property Lease" has the meaning provided such term in Section 2.7(b).

"Reasonable Efforts" means, where applied to carrying out specific tasks and obligations of a Party, expending the efforts and resources to accomplish such task or obligation as such Party (on its own and/or acting through any of its Affiliates, agents or subcontractors) would normally use to accomplish a similar task or obligation under similar circumstances.

"Receivables" has the meaning provided such term in Section 1.1(a)(iii).

"Receiving Party" has the meaning provided such term in Section 5.6.

"Related Party" has the meaning provided such term in Section 2.17.

"Release" shall mean any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing or dumping into the indoor or outdoor environment.

"Representatives" means a Person's directors, officers, employees, agents or advisors (including, without limitation, attorneys, accountants, consultants, bankers, financial advisors and any representatives of those advisors).

"Retained Policies" means any insurance policies maintained by the Company or the Beneficial Owners on or prior to the Closing Date, including without limitation any such policies that may cover claims related to Assumed Liabilities and Purchased Assets arising prior to Closing that may be claimed at or after Closing.

"RJV" has the meaning provided such term in the preamble to this Agreement.

"Rules" has the meaning provided such term in Section 10.11(b).

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Security Breach" has the meaning set forth in Section 2.20(b).

"Seller Related Parties" means the Persons listed on Schedule A-1.

"Signing Date" has the meaning provided such term in the preamble to this Agreement.

"Software" means all (i) programs, applications, systems and code, including software implementations of algorithms, models and methodologies, and source code and object code, (ii) internet and intranet websites, databases and compilations, including data and collections of data, whether machine-readable or otherwise, (iii) development and design tools, library functions and compilers, (iv) technology supporting websites, and the contents and audiovisual displays of websites, and (v) documentation, other works of authorship and media, including user manuals and training materials, relating to or embodying any of the foregoing or on which any of the foregoing is recorded.

"Subsidiary" means, with respect to any Person (for the purposes of this definition, the "parent"), any other Person (other than a natural person), whether incorporated or unincorporated, of which at least a majority of the securities or ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions is directly or indirectly owned or controlled by the parent or by one or more of its respective Subsidiaries or by the parent and any one or more of its respective Subsidiaries.

"Tangible Personal Property" has the meaning provided such term in Section 1.1(a)(i).

"Target Net Working Capital" means $2,382,000.

"Tax Returns" means any report, return, election, document, estimated tax filing, declaration, claim for refund, information returns, or other filing relating to Taxes provided to any Governmental Authority including any schedules or attachments thereto and any amendment thereof.

"Taxes" means all taxes, assessments, charges, duties, fees, levies, or other similar charges imposed by a Governmental Authority, including all income, franchise, profits, margins, capital gains, capital stock, gross receipts, sales, use, transfer, service, occupation, ad valorem, real or personal property, excise, severance, payroll, employment, social security, unemployment, disability or withholding taxes.

"Termination Period" has the meaning provided such term in Section 5.6.

"Third-Party Claim" has the meaning provided such term in Section 8.4(a).

"Third Party Consents" has the meaning provided such term in Section 5.3(b).

"Trademarks" has the meaning provided such term in the definition of Intellectual Property.

"Trademark Assignment Agreement" has the meaning provided such term in Section 7.1(m)(ii).

"Transaction Bonus Payments" means any obligations to pay any Worker any compensation, commission or other benefit arising or resulting from, triggered by or otherwise in connection with the execution of this Agreement or the Contemplated Transactions (including any stay or retention bonuses or payments, sale or success bonuses or payments, change of

control bonuses or payments, severance payments, retention bonuses or payments or similar bonuses or payments paid, owing, payable, arising from, triggered by or otherwise in connection with the Contemplated Transactions, in each case, together with any Taxes relating thereto or arising therefrom.

"Transfer Taxes" has the meaning provided such term in Section 6.2.

"Transferred Employee" has the meaning provided such term in Section 5.8(a).

"United States" means United States of America.

"WARN Act" has the meaning provided such term in Section 2.15(d).

"Worker" means a current or former employee, director, officer, consultant or independent contractor of the Company or its Affiliates.

"Year 3/4 Adjusted EBITDA" means the Adjusted EBITDA of the Business calculated as: (Adjusted EBITDA of the Business for the 12 month period ended on the third anniversary of the last day of the month in which the Closing occurred, plus Adjusted EBITDA of the Business for the 12 month period ended on the expiration of the Earn-out Period), divided by 2.

**EXHIBIT B**

## BILL OF SALE

**THIS BILL OF SALE** (this "Bill of Sale") is effective as of _____, 2018 and is by and among Take 5 Media Group, LLC, a Florida limited liability company (the "Company"), Alexander Radetich ("Radetich"), Richard Gluck ("Gluck"), RJV Marketing Corp., a Florida corporation ("RJV"), Alexander Radetich (the "Beneficial Owner Representative"), Radiant Gamma LLC, a Delaware limited liability company ("Radiant Gamma LLC"), Bottleshock Holdings LLC, a Florida limited liability company ("Bottleshock"), Take 5 Solutions, LLC, a Delaware limited liability company ("Take 5 Solutions"), Radiant Data Holdings LLC, a Delaware limited liability company ("Radiant Holdings"), Radiant Data Holdings II LLC, a Delaware limited liability company ("Radiant II Holdings," and collectively with the Company, Radetich, Gluck, RJV, Beneficial Owner Representative, Radiant Gamma LLC, Bottleshock, Take 5 Solutions, and Radiant Holdings, the "Assignors"), and Advantage Sales & Marketing LLC, a California limited liability company (the "Assignee"). The Assignors and the Assignee are sometimes referred to herein as a "Party" and collectively as the "Parties." All capitalized terms used but not defined herein shall have the meaning attributed to them in the Purchase Agreement (defined below).

### R E C I T A L S:

**WHEREAS**, the Assignors and the Assignee are parties to that certain Asset Purchase Agreement, dated as March 15, 2018 (the "Purchase Agreement"), governing the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities; and

**WHEREAS**, the Assignors has agreed to transfer all right, title and interest in and to the Purchased Assets to the Assignee and the Assignee has agreed to accept such assignment on the terms and conditions more particularly set forth in the Purchase Agreement, exhibits, schedules and other documents to be delivered in connection therewith (collectively with the Purchase Agreement, the "Transaction Documents").

### A G R E E M E N T:

**NOW, THEREFORE**, for the good and valuable consideration set forth in the Transaction Documents, the receipt and sufficiency of which is hereby acknowledged, the Assignors and the Assignee hereby agree as follows:

1.     The Assignors do hereby sell, assign, transfer, convey and deliver to the Assignee, its successors and permitted assigns, all of the Assignors' right, title and interest in and to the Purchased Assets in accordance with the terms of the Transaction Documents.

2.     This Bill of Sale is in all respects subject to the provisions of the Transaction Documents and is not intended in any way to supersede, limit, qualify or expand any provision of the Transaction Documents.

3.     It is understood that the Assignors, contemporaneously with the execution and delivery of this Bill of Sale may be further executing and delivering to the Assignee certain assignments and

other instruments of transfer which cover certain of the Purchased Assets, the purpose of which is to supplement, facilitate and otherwise implement the transfer intended hereby.

4.      At any time and from time to time hereafter, at any other Party's request, each Party shall, at its own expense, take any and all steps and shall execute, acknowledge and deliver to the other Party any and all future instruments and assurances necessary or reasonably requested in order to more fully carry out the purposes hereof in accordance with the Purchase Agreement. This Bill of Sale shall be binding upon, and shall inure to the benefit of, the Parties hereto and their respective successors and permitted assigns.

5.      This Bill of Sale may be executed in any number of counterparts (including by facsimile and .pdf or other electronic file), each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.  The Parties to this Bill of Sale need not execute the same counterpart, and any facsimile or .pdf signature shall be deemed binding for all purposes hereof without delivery of an original signature being thereafter required.

6.      This Bill of Sale and any disputes arising out of or connected to this Bill of Sale shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its rules of conflict of laws.  Each Party hereby agrees that the appropriate, exclusive and convenient forum for any disputes between any of the Parties arising out of this Bill of Sale shall be in any state or federal court in Delaware, and each of the Parties irrevocably submits to the jurisdiction of such courts solely in respect of any legal proceeding arising out of or relating to this Bill of Sale.

7.      This Bill of Sale may be amended, supplemented or otherwise modified only by a written instrument duly executed by the Parties.  No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the Party so waiving.  The waiver by any Party of a breach of any provision of this Bill of Sale, whether intentional or not, shall not operate or be construed as a waiver of any subsequent breach.  No delay or omission on the part of any Party in exercising any right, power, or remedy under this Bill of Sale shall operate as a waiver thereof.

*      *      *

**IN WITNESS WHEREOF**, the Assignors and the Assignee have caused this Bill of Sale to be executed as of the date first set forth above.

ASSIGNORS:                                ASSIGNEE:

TAKE 5 MEDIA GROUP, LLC                    ADVANTAGE SALES & MARKETING
                                           LLC


By:_____              By:_____
Name:_____              Name:_____
Its:_____             Its:_____

RADIANT GAMMA LLC                          Address for Notices:
                                           Advantage Sales & Marketing LLC
                                           18100 Von Karman Ave., Suite 1000
                                           Irvine, CA 92612
By:     _____               Fax: (858) 964-0245
Name:   _____               Attention: Chief Financial Officer
Title:  _____

RJV MARKETING CORP.


By:     _____
Name:   _____
Title:  _____


BOTTLESHOCK HOLDINGS, LLC


By:     _____
Name:   _____
Title:  _____

TAKE 5 SOLUTIONS, LLC


By:     _____
Name:   _____
Title:  _____

RADIANT DATA HOLDINGS LLC

By:     _____
Name:   _____
Title:  _____

RADIANT DATA HOLDINGS II LLC

By:     _____
Name:   _____
Title:  _____

_____
Richard Gluck

_____
Alexander Radetich

Address for Notices:
Take 5 Media Group, LLC
2385 NW Executive Center Drive, Suite 290
Boca Raton, FL 33431
Fax: (561) 819-0245
E-mail: alex@take5mg.com
Attention: Alexander Radetich

**EXHIBIT C**

## FORM OF RELEASE

This RELEASE (the "Release") is made on [_____], 2018, by and among Advantage Sales & Marketing LLC, a California limited liability company (the "Buyer"), Take 5 Media Group, LLC, a Florida limited liability company (the "Company"), Alexander Radetich ("Radetich"), Richard Gluck ("Gluck"), RJV Marketing Corp., a Florida corporation ("RJV", collectively with Radetich and Gluck, the "Beneficial Owners" and each a "Beneficial Owner"), and Alex Radetich (the "Beneficial Owner Representative"), solely in his capacity as representative for the Beneficial Owners. Individually, each of the Buyer, the Company, the Beneficial Owners, and the Beneficial Owner Representative is a "Party" and, collectively, they are the "Parties."

WHEREAS, the Buyer, the Company, the Beneficial Owners and the Beneficial Owner Representative are parties in interest to that certain Asset Purchase Agreement dated as of March 15, 2018 (the "Agreement");

WHEREAS, Section 1.5 of the Agreement provides under certain circumstances for the Buyer to pay the Company the [Interim/Final] Earn-Out Amount;

WHEREAS, the Agreement provides for each of the Parties to execute this Release, and further provides that the Buyer shall have no obligation to pay any amount under Section 1.5 of the Agreement unless and until the Company, each Beneficial Owner and the Beneficial Owner Representative have executed this Release; and

WHEREAS, capitalized terms used herein and not defined have the meaning given such terms in the Agreement.

NOW, THEREFORE, in consideration of the payment provided for herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the terms and covenants set forth hereinafter in this document.

1.      [Interim/Final] Earn-Out Amount.  The Parties agree that the [Interim/Final] Earn-Out Amount to be paid by the Buyer pursuant to Section [1.5(d)/1.5(e)] of the Agreement is equal to [$_____] (the "Payment"), which amount was agreed upon by the parties pursuant to the Agreement/determined by the Arbitrator pursuant to Section 1.5(c) of the Agreement.

2.      Company, Beneficial Owner and Beneficial Owner Representative Release. Effective upon receipt of the Payment, each of the Company, the Beneficial Owners and the Beneficial Owner Representative, for itself and on behalf of each and all of its respective legal predecessors, successors, assigns, fiduciaries, heirs, parents, spouses, companies and Affiliates (all referred to as the "Company Releasors") hereby agrees to and does hereby irrevocably and unconditionally release, acquit, and forever discharge the Buyer and each and every one of its partners, officers, directors, members, agents, employees, parents, companies, subsidiaries, divisions, Affiliates, representatives, predecessors, successors, assigns and related organizations (collectively, the "Company Released Parties") from any and all actions, causes of action, claims, suits, damages, judgments, liens, and demands whatsoever in law and/or equity

"Claims"), which a Company Releasor had, now has, or may later have or claim to have against the Company Released Parties, now accrued or which may hereafter accrue, involving or based in whole or in part upon any facts, substantially related to the Buyer's obligations to pay the [Interim/Final] Earn-Out Amount [; provided, however, that this Release does not apply to the amounts set forth on Schedule I to this Release consisting of a portion of the [Interim/Final] Earn-Out Amount that the Buyer has informed the Company that the Buyer will withhold pursuant to the Agreement. Each of the Company, the Beneficial Owners and the Beneficial Owner Representative agrees and acknowledges that it will be required to deliver to the Buyer an additional release document substantially in the form of this Release in order to receive the amount on Schedule I if and when the matter involving the claim is resolved].

3.    Buyer Release.  Effective as of the date hereof, the Buyer for itself and on behalf of each and all of its respective legal predecessors, successors, assigns, fiduciaries, heirs, parents, spouses, companies and Affiliates (all referred to as the "Buyer Releasors") hereby agrees to and does hereby irrevocably and unconditionally release, acquit, and forever discharge the Company, the Beneficial Owners and the Beneficial Owner Representative, and each and every one of their partners, officers, directors, members, agents, employees, parents, companies, subsidiaries, divisions, Affiliates, representatives, predecessors, successors, assigns and related organizations (collectively, the "Buyer Released Parties") from any and all Claims which a Buyer Releasor had, now has, or may later have or claim to have against the Buyer Released Parties, now accrued or which may hereafter accrue, involving or based in whole or in part upon any facts, substantially related to the Buyer's obligations to pay the [Interim/Final] Earn-Out Amount [; provided, however, that this Release does not apply to the amounts set forth on Schedule I to this Release consisting of a portion of the [Interim/Final] Earn-Out Amount that the Buyer has informed the Company that the Buyer will withhold pursuant to the Agreement. The Buyer agrees and acknowledges that it will be required to deliver to the Company, the Beneficial Owners and the Beneficial Owner Representative an additional release document substantially in the form of this Release in order to receive the amount on Schedule I if and when the matter involving the claim is resolved].

4.    Company Representations and Warranties.  In entering into this Release, the Company represents that (a) the person signing below has the authority to sign this Release on behalf of the Company; (b) it has read all of the terms of this Release, has consulted with legal counsel regarding same, and fully understands the same; (c) it has knowingly and voluntarily accepted the terms of this Release; and (d) it is the sole holder and owner of any right to the amount related to the [Interim/Final] Earn-Out Amount pursuant to the Agreement, and that it has not assigned, transferred, or otherwise conveyed all or any portion of right to such amount.

5.    Beneficial Owner Representations and Warranties.  In entering into this Release, each Beneficial Owner represents that (a) the person signing below has the authority to sign this Release on behalf of such Beneficial Owner; (b) it has read all of the terms of this Release, has consulted with legal counsel regarding same, and fully understands the same; and (c) it has knowingly and voluntarily accepted the terms of this Release.

6.    Beneficial Owner Representative Representations and Warranties.  In entering into this Release, the Beneficial Owner Representative represents that (a) the person signing below has the authority to sign this Release on behalf of such Beneficial Owner Representative; (b) it has

read all of the terms of this Release, has consulted with legal counsel regarding the same, and fully understands the same; and (c) it has knowingly and voluntarily accepted the terms of this Release.

7.     <u>Buyer Representations and Warranties</u>.  In entering into this Release, the Buyer represents that (a) the person signing below has the authority to sign this Release on behalf of the Buyer; (b) it has read all of the terms of this Release, has consulted with legal counsel regarding same, and fully understands the same; and (c) it has knowingly and voluntarily accepted the terms of this Release.

8.     <u>Final</u>.  This Release cannot be revoked once executed.  This Release may not be amended, altered, revised, modified, terminated or changed except by the written consent of the Buyer.

9.     <u>Voluntary Assent</u>.  In the negotiation, drafting and execution of this Release, each of the Buyer, the Company, the Beneficial Owners and the Beneficial Owner Representative has been represented by counsel of its own choice, and each of the Buyer, the Company, the Beneficial Owners and the Beneficial Owner Representative does hereby affirm that it has read and understands the terms of this Release, executes the same as its own free and voluntary act, understands the terms and conditions of this Release and agrees to be fully bound by and subject thereto.

10.     <u>Ambiguities</u>.  In the event it is determined that any ambiguity exists in this Release, any such ambiguity shall not be resolved or otherwise construed against any particular Party, but rather shall be resolved by a fair reading of the intent of the Parties as established herein and in the Agreement.

11.     <u>Execution</u>.  An executed copy of this Release may be delivered by means of a facsimile machine or other electronic transmission (including .pdf., tif, .gif, .jpeg or similar attachment to electronic mail files), and shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No Party nor any person claiming through any Party shall raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the formation or enforceability of a contract and each Party forever waives any such defense.

[Signature page follows]

      **IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

ADVANTAGE SALES & MARKETING LLC

By: _____
Name: _____
Title: _____

**COMPANY:**

TAKE 5 MEDIA GROUP, LLC

By: _____
Name: _____
Title: _____

**BENEFICIAL OWNER REPRESENTATIVE:**

ALEXANDER RADETICH

By: _____


**BENEFICIAL OWNERS:**

ALEXANDER RADETICH

By: _____

RICHARD GLUCK

By: _____

RJV MARKETING CORP.

By: _____
Name: _____
Title: _____

<u>Schedule I</u>

Pending Claims

**Exhibit D**

**EQUITY INTERESTS**

| Beneficial Owners | Percent Interest |
|---|---|
| RJV Marketing Corp. | 11.10% |
| Richard Gluck | 44.45% |
| Alexander Radetich | 44.45% |

**EXHIBIT E**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Assignment and Assumption Agreement") is effective as of _____, 2018 and is by and among Take 5 Media Group, LLC, a Florida limited liability company (the "Company"), Alexander Radetich ("Radetich"), Richard Gluck ("Gluck"), RJV Marketing Corp., a Florida corporation ("RJV"), Alexander Radetich (the "Beneficial Owner Representative"), Radiant Gamma LLC, a Delaware limited liability company ("Radiant Gamma LLC"), Bottleshock Holdings LLC, a Florida limited liability company ("Bottleshock"), Take 5 Solutions, LLC, a Delaware limited liability company ("Take 5 Solutions"), Radiant Data Holdings LLC, a Delaware limited liability company ("Radiant Holdings"), Radiant Data Holdings II LLC, a Delaware limited liability company ("Radiant II Holdings," and collectively with the Company, Radetich, Gluck, RJV, Beneficial Owner Representative, Radiant Gamma LLC, Bottleshock, Take 5 Solutions, and Radiant Holdings, the "Assignors"), and Advantage Sales & Marketing LLC, a California limited liability company (the "Assignee").  The Assignors and the Assignee are sometimes referred to herein as a "Party" and collectively as the "Parties."  All capitalized terms used but not defined herein shall have the meaning attributed to them in the Purchase Agreement (defined below).

## R E C I T A L S:

**WHEREAS**, the Assignors and the Assignee are parties to that certain Asset Purchase Agreement, dated as of March 15, 2018 (the "Purchase Agreement"), governing the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities; and

**WHEREAS**, the Assignee has agreed to assume the Assumed Liabilities on the terms and conditions more particularly set forth in the Purchase Agreement, exhibits, schedules and other documents to be delivered in connection therewith (collectively with the Purchase Agreement, the "Transaction Documents").

## A G R E E M E N T:

**NOW, THEREFORE**, for the good and valuable consideration set forth in the Transaction Documents, the receipt and sufficiency of which is hereby acknowledged, the Assignors and the Assignee hereby agree as follows:

1.    The Assignors hereby sell, transfer, assign and deliver (collectively, the "Assignment") to Assignee all of Assignors' right, title, benefit, privileges and interest in and to, and all of Assignors' obligations and liabilities in connection with, each of the Assumed Liabilities and the Assignee hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions, obligations, liabilities, and covenants, and to pay and discharge all of the Assumed Liabilities to be observed, performed, paid or discharged from and after the date hereof in accordance with the terms of the Transaction Documents.

2.    This Assignment and Assumption Agreement is in all respects subject to the provisions of the Transaction Documents and is not intended in any way to supersede, limit, qualify or expand any provision of the Transaction Documents.

3.     At any time and from time to time hereafter, at any other Party's request, each Party shall, at its own expense, take any and all steps and shall execute, acknowledge and deliver to the other Party any and all future instruments and assurances necessary or reasonably requested in order to more fully carry out the purposes of this Assignment and Assumption Agreement.

4.     The assumption by the Assignee of the Assumed Liabilities as herein provided is not intended by the parties hereto to expand the rights or remedies of any third party against the Assignee as compared to the rights and remedies that such third party would have had against the Assignors had the parties not consummated the transactions contemplated hereby.  Nothing herein contained shall, or shall be construed to, prejudice the right of the Assignee to contest any claim or demand with respect to any obligation or liability assumed hereunder and the Assignee shall have all rights that the Assignors may have or have had to defend or contest any such claim or demand.

5.     This Assignment and Assumption Agreement shall be binding upon, and shall inure to the benefit of, the Parties hereto and their respective successors and permitted assigns.

6.     This Assignment and Assumption Agreement may be executed in any number of counterparts (including by facsimile and .pdf or other electronic file), each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.  The Parties to this Assignment and Assumption Agreement need not execute the same counterpart, and any facsimile or .pdf signature shall be deemed binding for all purposes hereof without delivery of an original signature being thereafter required.

7.     This Assignment and Assumption Agreement and any disputes arising out of or connected to this Assignment and Assumption Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its rules of conflict of laws.  Each Party hereby agrees that the appropriate, exclusive and convenient forum for any disputes between any of the Parties arising out of this Assignment and Assumption Agreement shall be in any state or federal court in  Delaware, and each of the Parties irrevocably submits to the jurisdiction of such courts solely in respect of any legal proceeding arising out of or relating to this Assignment and Assumption Agreement.

8.     This Assignment and Assumption Agreement may be amended, supplemented or otherwise modified only by a written instrument duly executed by the Parties.  No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the Party so waiving.  The waiver by any Party of a breach of any provision of this Assignment and Assumption Agreement, whether intentional or not, shall not operate or be construed as a waiver of any subsequent breach.  No delay or omission on the part of any Party in exercising any right, power, or remedy under this Assignment and Assumption Agreement shall operate as a waiver thereof.

*     *     *

**IN WITNESS WHEREOF**, the Assignors and the Assignee have caused this Assignment and Assumption Agreement to be executed as of the date first set forth above.

ASSIGNORS:                          ASSIGNEE:

TAKE 5 MEDIA GROUP, LLC             ADVANTAGE SALES & MARKETING LLC

By:_____         By:_____
Name:_____         Name:_____
Its:_____         Its:_____

RADIANT GAMMA LLC                   Address for Notices:
                                    Advantage Sales & Marketing LLC
                                    18100 Von Karman Ave., Suite 1000
                                    Irvine, CA 92612
By:  _____         Fax: (858) 964-0245
Name: _____         Attention: Chief Financial Officer
Title: _____

RJV MARKETING CORP.

By:  _____
Name: _____
Title: _____

BOTTLESHOCK HOLDINGS, LLC

By:  _____
Name: _____
Title: _____

TAKE 5 SOLUTIONS, LLC

By:  _____
Name: _____
Title: _____

RADIANT DATA HOLDINGS LLC

By: _____
Name: _____
Title: _____

RADIANT DATA HOLDINGS II LLC

By: _____
Name: _____
Title: _____

_____
Richard Gluck

_____
Alexander Radetich

Address for Notices:
Take 5 Media Group, LLC
2385 NW Executive Center Drive, Suite 290
Boca Raton, FL 33431
Fax: (561) 819-0245
E-mail: alex@take5mg.com
Attention: Alexander Radetich

**EXHIBIT F**

## TRADEMARK ASSIGNMENT AGREEMENT

**THIS TRADEMARK ASSIGNMENT AGREEMENT** (this "Trademark Assignment") is effective as of [●], 2018 and is between Take 5 Media Group, LLC, a Florida limited liability company (the "Company"), Take 5 Solutions, LLC, a Delaware limited liability company ("Solutions", and collectively with the Company, the "Assignors") and Advantage Sales & Marketing LLC, a California limited liability company (the "Assignee"). The Assignors and the Assignee are sometimes referred to herein as a "Party" and collectively as the "Parties." All capitalized terms used but not defined herein shall have the meaning attributed to them in the Purchase Agreement (defined below).

### R E C I T A L S:

**WHEREAS**, the Assignors are the owners of the trademarks set forth on Schedule A hereto, together with the goodwill of the business associated therewith (collectively referred to as the "Marks");

**WHEREAS**, pursuant to the terms of that certain Asset Purchase Agreement, dated as of March 15, 2018, by and among the Assignors, the Assignee, and certain other parties thereto (the "Purchase Agreement"), the Assignors have agreed to sell, assign, transfer, convey and deliver to Assignee, and the Assignee has agreed to purchase, acquire, accept and assume from the Assignors, all of the Assignors' right, title and interest in and to the Marks;

**WHEREAS**, in connection with the Purchase Agreement, the Assignors have agreed to transfer substantially all of the assets of the business to which the Marks relate, and that such business is ongoing; and

**WHEREAS**, in connection with the Purchase Agreement and pursuant to this Trademark Assignment, the Assignors desire to assign all of its right, title and interest in and to the Marks to the Assignee and the Assignee desires to acquire the Marks.

### A G R E E M E N T:

**NOW, THEREFORE**, for the good and valuable consideration set forth in the Purchase Agreement, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the terms and conditions of the Purchase Agreement, the Assignors and the Assignee hereby agree as follows:

1.     The Assignors hereby irrevocably sell, assign, transfer, convey and deliver to the Assignee, its successors and permitted assigns, all of the Assignor's right, title and interest in and to the Marks, and all of the goodwill of the business associated with the Marks, together with that portion of Assignor's business to which the Marks pertain, in all countries throughout the world, for the Assignee's own use and enjoyment, and for the use and enjoyment of the Assignee's successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by the Assignors if this Trademark Assignment had not been made.

2.    This Trademark Assignment is in all respects subject to the provisions of the Purchase Agreement and is not intended in any way to supersede, limit, qualify or expand any provision of the Purchase Agreement.

3.    Upon reasonable request by the Assignee, the Assignors will execute and deliver to the Assignee further papers (including, without limitation, the execution and delivery of any and all affidavits, declarations, oaths, samples, exhibits, specimens, assignments, powers of attorney or other documentation) and take such other actions as may be necessary or reasonably requested by the Assignee to effect, record, and perfect the transfer and assignment of the Marks to the Assignee or which may be necessary to obtain, renew, issue or enforce the Marks.

5.    This Trademark Assignment may be executed in any number of counterparts (including by facsimile and .pdf or other electronic file), each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.  The Parties to this Trademark Assignment need not execute the same counterpart, and any facsimile or .pdf signature shall be deemed binding for all purposes hereof without delivery of an original signature being thereafter required.

6.    This Trademark Assignment and any disputes arising out of or connected to this Trademark Assignment shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its rules of conflict of laws.  Each Party hereby agrees that the appropriate, exclusive and convenient forum for any disputes between any of the Parties arising out of this Trademark Assignment shall be in any state or federal court in Delaware, and each of the Parties irrevocably submits to the jurisdiction of such courts solely in respect of any legal proceeding arising out of or relating to this Trademark Assignment.

7.    This Trademark Assignment may be amended, supplemented or otherwise modified only by a written instrument duly executed by the Parties.  No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the Party so waiving.  The waiver by any Party of a breach of any provision of this Trademark Assignment, whether intentional or not, shall not operate or be construed as a waiver of any subsequent breach.  No delay or omission on the part of any Party in exercising any right, power, or remedy under this Trademark Assignment shall operate as a waiver thereof.

8.    This Trademark Assignment shall be binding upon, and shall inure to the benefit of, the Parties hereto and their respective successors and permitted assigns.

9.    This Trademark Assignment includes without limitation, the right to sue for past, present and future infringement of the interests assigned in this Trademark Assignment and the right to collect and receive any damages, royalties, or settlement for such past, present and future infringements and any and all causes of action relating to any of the inventions or discoveries described herein.

*      *      *

**IN WITNESS WHEREOF**, the Assignors and the Assignee have caused this Trademark Assignment to be executed as of the date first set forth above.


ASSIGNORS:                              ASSIGNEE:

TAKE 5 MEDIA GROUP, LLC                 ADVANTAGE SALES & MARKETING LLC


By:_____           By:_____
Name:_____            Name:_____
Its:_____           Its:_____

TAKE 5 SOLUTIONS, LLC
                                        Address for Notices:
By:_____           Advantage Sales & Marketing LLC
Name:_____            18100 Von Karman Ave., Suite 1000
Its:_____           Irvine, CA 92612
                                        Fax: (858) 964-0245
                                        Attention: Chief Financial Officer


Address for Notices:
Take 5 Media Group, LLC
2385 NW Executive Center Drive, Suite 290
Boca Raton, FL 33431
Fax: (561) 819-0245
E-mail: alex@take5mg.com
Attention: Alexander Radetich




NOTARY:

State of _____
County of _____

This instrument was signed or acknowledged before me on _____, 2018 by _____.


_____
Notary Signature

**<u>Schedule A</u>**

**Trademarks**

Take 5 Media Group

Take5 Solutions

**EXHIBIT H**

## DOMAIN NAME AND SOCIAL MEDIA ASSIGNMENT AGREEMENT

**THIS DOMAIN NAME AND SOCIAL MEDIA ASSIGNMENT AGREEMENT** (this "Assignment") is effective as of [●], 2018 (the "Effective Date") and Take 5 Media Group, LLC, a Florida limited liability company (the "Company"), Take 5 Solutions, LLC, a Delaware limited liability company ("Solutions", and collectively with the Company, the "Assignors") and Advantage Sales & Marketing LLC, a California limited liability company (the "Assignee"). The Assignors and the Assignee are sometimes referred to herein as a "Party" and collectively as the "Parties." All capitalized terms used but not defined herein shall have the meaning attributed to them in the Purchase Agreement (defined below).

### R E C I T A L S:

**WHEREAS**, the Assignors are the owner and registrant of the domain names set forth on Exhibit A hereto (the "Domain Names"), and the social media pages set forth on Exhibit B hereto (the "Social Media Pages");

**WHEREAS**, pursuant to the terms of that certain Asset Purchase Agreement dated as of March 15, 2018 by and among the Assignor, the Assignee and certain other parties thereto (the "Purchase Agreement"), the Assignors have agreed to sell, convey, assign, and transfer to the Assignee, and the Assignee has agreed to purchase, acquire, accept and assume from the Assignors, all of the Assignors' right, title and interest in and to the Domain Names, the Web Site Content, the Social Media Pages, and all registrations therefor, in each case free and clear of all Liens;

**WHEREAS**, the Assignors hereby requests that GoDaddy.com LLC and any other appropriate domain name registration authorities that exercise authority over the Domain Names (collectively, the "Registrars"), to transfer the Domain Names to the Assignee; and

**WHEREAS**, the Assignors desires to sell, transfer, assign, convey and deliver all of its right, title and interest in and to the Domain Names, the Web Site Content and the Social Media Pages to the Assignee and the Assignee desires to acquire the Domain Names, the Web Site Content and the Social Media Pages.

### A G R E E M E N T:

**NOW, THEREFORE**, for the good and valuable consideration set forth in the Purchase Agreement, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the terms and conditions of the Purchase Agreement, the Assignors and the Assignee hereby agree as follows:

1.     The Assignors hereby irrevocably sell, transfer, assign, convey, contribute and deliver to the Assignee, its successors and permitted assigns, all of the Assignor's right, title and interest in and to the Domain Names, the Web Site Content and the Social Media Pages, free and clear of all Liens, including all registrations therefor, any right to renew such registrations, the goodwill represented by the Domain Names, the Web Site Content and the Social Media Pages, and all claims for damages by reason of infringement of the same.

2.      The Assignors will take all steps required by the current procedures promulgated by the Registrars that are responsible for the transfer of the Domain Names, to transfer the registrations of the Domain Names to the Assignee, by completing the required forms and taking any other required actions to effect the transfer of the registrations of the Domain Names to the Assignee. Within three Business Days following the Closing Date, the Assignors shall: (i) unlock the Domain Names; (ii) provide the Assignee with the authorization codes for the Domain Names; (iii) approve all transfer requests for the Domain Names; and (iv) execute or otherwise complete any other procedures required by the Registrar, the Assignee's preferred registrar, or other relevant authority, or as may be necessary or appropriate, to transfer the Domain Names to the Assignee on an expedited basis.

3.      This Assignment is in all respects subject to the provisions of the Purchase Agreement and is not intended in any way to supersede, limit, qualify or expand any provision of the Purchase Agreement.

4.      Upon reasonable request by the Assignee, the Assignors will execute additional documents and take other action and pay any transfer fees as may be reasonably necessary or desirable to record or memorialize the assignment of the Domain Names, the Web Site Content, and the Social Media Pages set forth herein or to otherwise effect the terms of this Assignment in a manner reasonably necessary to convey title as required by the Purchase Agreement.  The Assignors hereby authorizes the Assignee, and does hereby make, constitute and appoint the Assignee, and its officers, agents, successors and assigns with full power of substitution as the Assignor's true and lawful attorney-in-fact, with power, in the Assignee's own name or the name of the Assignor, to execute any such further papers.  The Assignors have not and will not otherwise delete, transfer, or reserve registration of the Domain Names, the Web Site Content and the Social Media Pages.

5.      This Assignment may be executed in any number of counterparts (including by facsimile and .pdf or other electronic file), each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.  The Parties to this Assignment need not execute the same counterpart, and any facsimile or .pdf signature shall be deemed binding for all purposes hereof without delivery of an original signature being thereafter required.

6.      This Assignment and any disputes arising out of or connected to this Assignment shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its rules of conflict of laws.  Each Party hereby agrees that the appropriate, exclusive and convenient forum for any disputes between any of the Parties arising out of this Assignment shall be in any state or federal court in Delaware, and each of the Parties irrevocably submits to the jurisdiction of such courts solely in respect of any legal proceeding arising out of or relating to this Assignment.

7.      This Assignment may be amended, supplemented or otherwise modified only by a written instrument duly executed by the Parties.  No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the Party so waiving.  The waiver by any Party of a breach of any provision of this Assignment, whether intentional or not, shall not operate or be construed as a waiver of any subsequent breach.  No

delay or omission on the part of any Party in exercising any right, power, or remedy under this Assignment shall operate as a waiver thereof.

8.      This Assignment shall be binding upon, and shall inure to the benefit of, the Parties and their respective successors and permitted assigns.

9.      Any term or provision of this Assignment that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

*       *       *

**IN WITNESS WHEREOF**, the Assignors and the Assignee have caused this Assignment to be executed as of the date first set forth above.

ASSIGNORS:                                    ASSIGNEE:

TAKE 5 MEDIA GROUP, LLC                        ADVANTAGE SALES & MARKETING LLC


By:_____                    By:_____
Name:_____                    Name:_____
Its:_____                    Its:_____

TAKE 5 SOLUTIONS, LLC

By:_____                    Address for Notices:
Name:_____                    Advantage Sales & Marketing LLC
Its:_____                    18100 Von Karman Ave., Suite 1000
                                               Irvine, CA 92612
                                               Fax: (858) 964-0245
                                               Attention: Chief Financial Officer


Address for Notices:
Take 5 Media Group, LLC
2385 NW Executive Center Drive, Suite 290
Boca Raton, FL 33431
Fax: (561) 819-0245
E-mail: alex@take5mg.com
Attention: Alexander Radetich

**Exhibit A**

**Domain Names**

| Domain name | Owner | Expiration Date | Registrar |
|---|---|---|---|
| 2020e-consulting.com | Take 5 Media Group LLC | 8/17/2019 | GoDaddy.com, LLC |
| Americanhealthinfo.com | Take 5 Solutions | 12/16/2018 | GoDaddy.com, LLC |
| Audicommunications.com | Take 5 Media Group LLC | 10/13/2020 | GoDaddy.com, LLC |
| Autonetmail.net | Take 5 Media Group LLC | 5/6/2021 | GoDaddy.com, LLC |
| Autoserveconnect.com | Take 5 Media Group LLC | 7/31/2018 | GoDaddy.com, LLC |
| Buffalonewsmail.com | Take 5 Media Group LLC | 1/23/2020 | GoDaddy.com, LLC |
| Carwebnetwork.com | Take 5 Solutions | 1/22/2019 | GoDaddy.com, LLC |
| Cashonhandonline.com | Take 5 Solutions, LLC | 12/17/2018 | GoDaddy.com, LLC |
| Connectivprospect.com | Take 5 Media Group LLC | 2/27/2023 | GoDaddy.com, LLC |
| Dealership-exclusive-offers.com | Take 5 Media Group LLC | 2/28/2019 | GoDaddy.com, LLC |
| Dealershipautos.com | Take 5 Solutions | 10/4/2019 | GoDaddy.com, LLC |
| Deal-network.com | Take 5 Solutions | 2/6/2019 | GoDaddy.com, LLC |
| Dm4restaurants.com | Take 5 Solutions | 10/24/2018 | GoDaddy.com, LLC |
| Dynamic-beacon.com | Take 5 Media Group LLC | 1/31/2020 | GoDaddy.com, LLC |
| Ebizstudy.com | Take 5 Solutions | 2/12/2020 | GoDaddy.com, LLC |
| Ebizsurvey.net | Take 5 Solutions | 2/12/2019 | GoDaddy.com, LLC |

| Domain name | Owner | Expiration Date | Registrar |
|---|---|---|---|
| Ebusinessesurvey.com | Take 5 Solutions | 2/12/2020 | GoDaddy.com, LLC |
| Emailergroup.com | Take 5 Solutions | 1/28/2019 | GoDaddy.com, LLC |
| Enewscenterlive.com | Take 5 Solutions | 2/7/2019 | GoDaddy.com, LLC |
| Goldandgreenstockadvisor.com | Take 5 Solutions | 12/9/2018 | GoDaddy.com, LLC |
| Goodparentingtoday.com | Take 5 Solutions | 1/22/2019 | GoDaddy.com, LLC |
| Greenandgoldstockadvisor.com | Take 5 Solutions | 1/11/2019 | GoDaddy.com, LLC |
| Greenfriendlyshopper.com | Take 5 Solutions | 1/22/2019 | GoDaddy.com, LLC |
| Greenstockadvisor.com | Take 5 Solutions, LLC | 11/19/2018 | GoDaddy.com, LLC |
| Greenstockadvisors.com | Take 5 Solutions | 11/13/2018 | GoDaddy.com, LLC |
| Greenstockletter.com | Take 5 Solutions | 1/24/2019 | GoDaddy.com, LLC |
| Greenstocknewsletter.com | Take 5 Solutions | 1/24/2019 | GoDaddy.com, LLC |
| Gsaletter.com | Take 5 Solutions | 1/24/2019 | GoDaddy.com, LLC |
| Hightechhouseholds.com | Take 5 Solutions | 1/22/2019 | GoDaddy.com, LLC |
| Hitechhouseholds.com | Take 5 Solutions | 1/22/2019 | GoDaddy.com, LLC |
| Howlware.com | Take 5 Solutions, LLC | 2/21/2019 | GoDaddy.com, LLC |
| Imagegroup01.com | Take 5 Solutions, LLC | 6/11/2018 | Moniker Online Services LLC |
| Investorperformance.com | Perfect Privacy, LLC | 6/23/2018 | Network Solutions, LLC |
| Leisurewebtoday.com | Take 5 Solutions | 1/22/2019 | GoDaddy.com, LLC |
| List-concepts.com | Take 5 Media Group LLC | 1/12/2019 | GoDaddy.com, LLC |

| Domain name | Owner | Expiration Date | Registrar |
|---|---|---|---|
| Listmanagement1.com | Take 5 Solutions, LLC | 5/21/2018 | GoDaddy.com, LLC |
| Longjohnsilversoffers.com | Take 5 Media Group LLC | 10/20/2019 | GoDaddy.com, LLC |
| Lscconsumer.com | Take 5 Solutions | 3/30/2018 | GoDaddy.com, LLC |
| Marcpublishingco.com | Take 5 Solutions | 6/5/2018 | GoDaddy.com, LLC |
| Maximmediainc.com | Take 5 Solutions | 11/1/2018 | GoDaddy.com, LLC |
| Mktep1.com | Take 5 Solutions, LLC | 9/21/2018 | Moniker Online Services LLC |
| Mobiletrackers.com | Take 5 Solutions, LLC | 12/30/2018 | GoDaddy.com, LLC |
| Mytake5.com | Take 5 Solutions, LLC | 5/10/2019 | GoDaddy.com, LLC |
| Ncadirect1.com | Take 5 Solutions, LLC | 7/16/2018 | GoDaddy.com, LLC |
| Netdealio-take5.com | Take 5 Solutions | 2/23/2020 | GoDaddy.com, LLC |
| Noveltykingsllc.com | Take 5 Solutions | 6/10/2018 | GoDaddy.com, LLC |
| Realoffer-network.com | Take 5 Solutions | 2/6/2019 | GoDaddy.com, LLC |
| Roitake5.com | Take 5 Solutions | 1/5/2019 | GoDaddy.com, LLC |
| Saver-network.com | Take 5 Solutions | 2/6/2019 | GoDaddy.com, LLC |
| Shoppermail.net | Take 5 Media Group LLC | 2/6/2020 | GoDaddy.com, LLC |
| Shopperswebnow.com | Take 5 Solutions | 1/22/2019 | GoDaddy.com, LLC |
| Smokeaway.net | Take 5 Media Group LLC | 12/15/2018 | GoDaddy.com, LLC |
| T5creative.com | Take 5 Solutions | 7/14/2018 | GoDaddy.com, LLC |

| Domain name | Owner | Expiration Date | Registrar |
|---|---|---|---|
| T5esaver.com | Take 5 Solutions | 5/21/2018 | GoDaddy.com, LLC |
| T5healthyliving.com | Take 5 Solutions | 12/16/2018 | GoDaddy.com, LLC |
| T5info.mobi | Take 5 Solutions | 1/11/2019 | GoDaddy.com, LLC |
| T5link.com | Take 5 Solutions, LLC | 7/9/2018 | GoDaddy.com, LLC |
| T5link1.com | Take 5 Solutions, LLC | 8/7/2018 | Moniker Online Services LLC |
| T5mail.com | Take 5 Solutions | 9/28/2018 | GoDaddy.com, LLC |
| T5reporting.com | Take 5 Solutions, LLC | 1/6/2019 | Moniker Online Services LLC |
| T5search.com | Take 5 Solutions | 9/26/2018 | GoDaddy.com, LLC |
| T5social.com | Take 5 Solutions | 4/11/2018 | GoDaddy.com, LLC |
| T5traffic.com | Take 5 Solutions, LLC | 7/26/2018 | GoDaddy.com, LLC |
| Take5.media | Take 5 Media Group LLC | 9/29/2019 | GoDaddy.com, LLC |
| Take5deals.com | Take 5 Solutions | 4/4/2018 | GoDaddy.com, LLC |
| Take5email.com | Take 5 Solutions | 10/24/2018 | GoDaddy.com, LLC |
| Take5mailing1.com | Take 5 Solutions, LLC | 1/24/2019 | GoDaddy.com, LLC |
| Take5mailing2.com | Take 5 Solutions, LLC | 1/24/2019 | GoDaddy.com, LLC |
| Take5mailing3.com | Take 5 Solutions, LLC | 1/24/2019 | GoDaddy.com, LLC |
| Take5mailing4.com | Take 5 Solutions, LLC | 1/24/2019 | GoDaddy.com, LLC |

| Domain name | Owner | Expiration Date | Registrar |
|---|---|---|---|
| Take5mailing5.com | Take 5 Solutions, LLC | 1/24/2019 | GoDaddy.com, LLC |
| Take5marketing.com | Take 5 Solutions | 1/31/2019 | GoDaddy.com, LLC |
| Take5mediagroup.com | Take 5 Solutions | 11/4/2018 | GoDaddy.com, LLC |
| Take5mediagroup.net | Take 5 Solutions | 12/29/2024 | GoDaddy.com, LLC |
| Take5mediagroup.org | Take 5 Solutions | 12/29/2024 | GoDaddy.com, LLC |
| Take5mediagroups.com | Take 5 Solutions | 12/29/2024 | GoDaddy.com, LLC |
| Take5mg.com | Take 5 Media Group LLC | 4/3/2020 | GoDaddy.com, LLC |
| Take5mgmail.com | Take 5 Media Group LLC | 2/25/2021 | GoDaddy.com, LLC |
| Take5mobile.com | Take 5 Solutions | 6/9/2018 | GoDaddy.com, LLC |
| Take5offers.com | Take 5 Solutions | 5/21/2019 | GoDaddy.com, LLC |
| Take5postaldataq.com | Take 5 Solutions | 5/24/2019 | GoDaddy.com, LLC |
| Take5s.net | Take 5 Solutions | 4/17/2018 | GoDaddy.com, LLC |
| Take5search.com | Take 5 Solutions | 9/26/2018 | GoDaddy.com, LLC |
| Take5social.com | Take 5 Solutions | 12/12/2018 | GoDaddy.com, LLC |
| Takefivcesolutions.net | Take 5 Solutions, LLC | 5/2/2018 | Network Solutions, LLC |
| Takefiveemail.com | Take 5 Solutions | 4/14/2018 | GoDaddy.com, LLC |
| Takefivemail.com | Take 5 Solutions | 3/27/2019 | GoDaddy.com, LLC |
| Takefivepostingone.com | Take 5 Solutions, LLC | 1/24/2019 | GoDaddy.com, LLC |
| Takefivesolutions.com | Take 5 Solutions, LLC | 9/2/2020 | Network Solutions, LLC |

| Domain name | Owner | Expiration Date | Registrar |
|---|---|---|---|
| Takefivesolutions.xyz | Take 5 Solutions | 6/20/2018 | Network Solutions, LLC |
| Targetsolutions-network.com | Take 5 Solutions | 2/6/2019 | GoDaddy.com, LLC |
| Tf5mail.com | Take 5 Solutions | 5/12/2018 | GoDaddy.com, LLC |
| Tf5pro.com | Take 5 Solutions | 7/7/2019 | GoDaddy.com, LLC |
| Tfsmail1.com | Take 5 Solutions, LLC | 2/12/2019 | Moniker Online Services LLC |
| Tfsmail2.com | Take 5 Solutions, LLC | 2/12/2019 | Moniker Online Services LLC |
| Tfxdata.com | Take 5 Solutions | 8/3/2018 | GoDaddy.com, LLC |
| Theb2bsite.com | Take 5 Solutions | 2/3/2019 | GoDaddy.com, LLC |
| Thedragonletter.com | Take 5 Solutions | 1/24/2019 | GoDaddy.com, LLC |
| Thedragonreport.com | Take 5 Solutions | 1/24/2019 | GoDaddy.com, LLC |
| Tk5mailings001.com | Take 5 Solutions, LLC | 9/6/2018 | Moniker Online Services LLC |
| Tk5mailings002.com | Take 5 Solutions, LLC | 9/6/2018 | Moniker Online Services LLC |
| Tk5mailings003.com | Take 5 Solutions, LLC | 9/6/2018 | Moniker Online Services LLC |
| Tk5mailings004.com | Take 5 Solutions, LLC | 9/6/2018 | Moniker Online Services LLC |
| Tk5mailings005.com | Take 5 Solutions, LLC | 9/6/2018 | Moniker Online Services LLC |
| Tk5mailings006.com | Take 5 Solutions, LLC | 9/6/2018 | Moniker Online Services LLC |
| Tk5mailings007.com | Take 5 Solutions, LLC | 9/6/2018 | Moniker Online Services LLC |

| Domain name | Owner | Expiration Date | Registrar |
|---|---|---|---|
| Tk5mailings008.com | Take 5 Solutions, LLC | 9/6/2018 | Moniker Online Services LLC |
| Tk5mailings009.com | Take 5 Solutions, LLC | 9/6/2018 | Moniker Online Services LLC |
| Topeducationnetwork.com | Take 5 Solutions | 1/22/2019 | GoDaddy.com, LLC |
| Townsquaremediamail.com | Take 5 Media Group LLC | 8/10/2018 | GoDaddy.com, LLC |
| Upsidealert.com | Take 5 Solutions, LLC | 6/23/2018 | Network Solutions, LLC |
| Upsidealert.net | Take 5 Solutions, LLC | 8/29/2018 | Network Solutions, LLC |
| Vmt5srv001.net | Take 5 Solutions | 8/20/2018 | GoDaddy.com, LLC |
| Vmt5srv002.net | Take 5 Solutions | 9/7/2018 | GoDaddy.com, LLC |
| Vmt5srv003.net | Take 5 Solutions | 9/7/2018 | GoDaddy.com, LLC |
| Vmt5srv004.net | Take 5 Solutions | 9/7/2018 | GoDaddy.com, LLC |
| Vmt5srv005.net | Take 5 Solutions | 9/7/2018 | GoDaddy.com, LLC |
| Webgreenresources.com | Take 5 Solutions | 1/25/2020 | GoDaddy.com, LLC |
| Webinterceptor.com | Take 5 Media Group LLC | 8/24/2019 | GoDaddy.com, LLC |
| Webinterceptor.net | Take 5 Media Group LLC | 2/7/2020 | GoDaddy.com, LLC |
| Webinterceptor.tv | Take 5 Media Group LLC | 2/7/2020 | GoDaddy.com, LLC |
| Webinterceptor.us | Take 5 Media Group LLC | 2/7/2020 | GoDaddy.com, LLC |
| Weblifestylenow.com | Take 5 Solutions | 1/22/2019 | GoDaddy.com, LLC |

| Domain name | Owner | Expiration Date | Registrar |
|---|---|---|---|
| Webmailguru.com | Take 5 Media Group LLC | 1/2/2019 | GoDaddy.com, LLC |

## **Exhibit B**

### **Social Media Pages**

https://www.facebook.com/Take5MG/

https://www.facebook.com/dealblitz/

https://www.facebook.com/Instant-Auto-Deal-723020207903112/

https://www.facebook.com/MyCollegeGrant/

https://twitter.com/Take5MG

https://twitter.com/deal_blitz

https://www.linkedin.com/company/take-5-solutions/

https://www.instagram.com/Take5MG/

https://business.snapchat.com/0c7ecb6b-e811-4155-a4db-89b941773b67/

https://www.pinterest.com/thedealblitzcom/pins/

**EXHIBIT I**

**EMPLOYEE RESTRICTIONS AND PROPRIETARY INFORMATION AGREEMENT**

In consideration of my employment by Advantage Sales & Marketing LLC, a California limited liability company or any of its direct or indirect subsidiaries, affiliated entities and divisions (collectively, the "Company") and my eligibility to be considered for future salary or wage increases and other consideration set forth herein, I agree to the terms set forth herein. This Employee Restrictions and Proprietary Information Agreement ("Agreement") shall be effective as of the date on which I executed this Agreement as indicated below.

1.     **Employer**. The Company is engaged, among other things, in the business of providing sales, marketing, merchandising, promotion and consulting services to suppliers, manufacturers, distributors or retailers of consumer packaged goods and marketing services to consumer good suppliers, retailers, distributors and others, including through sales, brokerage, merchandising, retail services and promotional services, including, without limitation, building brand awareness, coordinating sampling and facilitating merchandising and fulfillment (the "Business"). The Company is engaged in the Business throughout the fifty (50) states of the United States of America and Canada (the "Geographic Area").

2.     **Maintain Confidential Information**.

(a)     Company Information. I confirm and agree that at all times from the date of execution of this Agreement, throughout my employment with the Company and thereafter that I shall hold in strictest confidence, and shall not use (except for the benefit of the Company in the performance of my job duties), or disclose to any person, firm or entity without written authorization of the Company (except as provided by applicable law), any trade secrets (as defined under applicable law), confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information, confidential personnel and other information related to employees of the Company, or other subject matter pertaining to any business of the Company or to any of its employees, clients, customers or other third parties (collectively, "Confidential Information"). The term "Confidential Information" shall not include information (i) generally available to and known by the public or the industry in which the Company operates (other than by reason of a breach of this Agreement); or (ii) which is subsequently disclosed by any third party not in breach of a confidentiality agreement.

(b)     Former Employer Information. I agree that I will not, during my employment with the Company, improperly use or disclose any confidential or proprietary information of my former or concurrent employers or companies, or any other person, and that I will not bring onto the premises of the Company any unpublished documents or any property belonging to my former or concurrent employers or companies, or any other person, unless consented to in writing by said employers, companies, or other person.

(c)     Third Party Information. I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree that I owe the Company and such third parties, during the term of my employment and thereafter, a duty to hold all such confidential and proprietary information in the strictest confidence and I will not disclose it to any person, firm, or corporation (except as necessary in carrying out my work for the Company or such third party consistent with the Company's agreement with such third party or as provided by applicable law) without the express written authorization of the Company.

3.     **Retaining and Assigning Inventions and Original Works**.

(a)    <u>Inventions and Original Works Retained by Me</u>.  I have listed in Section 14 hereof, descriptions of any and all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to my employment with the Company or its predecessor, which belong to me, which relate to the Business, and which are not assigned to the Company.  The parties hereto acknowledge that I shall not be obligated to assign inventions, original works of authorship, developments, improvements, and trade secrets that are or may be conceived or developed by me after my employment with the Company ends, even if, directly or indirectly, related to the Business except to the extent arising from the utilization of Confidential Information obtained while in the employ of the Company or of any company which sold its business to the Company.

(b)    <u>Inventions and Original Works Assigned to the Company</u>.  I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and will assign to the Company or its designees all my right, title, and interest in and to any and all inventions, original works of authorship, developments, improvements, or trade secrets which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employment of the Company which I may own now, other than those listed in Section 14 hereof, or may own at any time during my employment with the Company, which relate in any way, directly or indirectly, to the Business.  By my execution of this Agreement, I hereby assign any and all inventions, original works of authorship, developments, improvements, and trade secrets that I have developed, other than those listed in Section 14 hereof, or may develop during the term of my employment with the Company or with any company which sold its business to the Company (1) that relate to the Business or to any actual or demonstrably anticipated research, future work, or projects of the Company which I was aware of at the time, whether or not conceived or developed alone or with others, and whether or not conceived or developed during regular working hours; or (2) that results from any work performed by me for the Company, work performed by me on Company time, or work performed by me using property or resources of Company.  All such intellectual property, other than those listed in Section 14 hereof, shall be the exclusive property of the Company unless otherwise agreed by me and the Company in writing.

(i)    <u>Excluded Inventions</u>. I understand that Section 2870 of the California Labor Code and comparable statutes in certain other states prohibit employers and employees from entering into agreements requiring an employee to assign or offer to assign to an employer any invention that an employee developed entirely on his/her own time without using the employer's equipment, supplies, facilities or trade secret information ("Excluded Inventions"), except for those inventions that either: (A) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (B) result from any work performed by the employee for the employer.

(ii)    <u>Unenforceable provisions; acknowledgement of notification</u>. To the extent a provision in this Agreement purports to require me to assign an Excluded Invention, that provision does not apply.

(iii)    <u>Disclosure of Excluded Inventions</u>. I will advise the Company promptly in writing of any Excluded Inventions, and I will at that time provide to the Company in writing all evidence necessary to substantiate that belief.  I understand that the Company will keep in confidence and will not disclose to third parties without my consent any confidential information disclosed in writing to the Company relating to inventions that qualify fully under the provisions of such laws.

(iv)    <u>United States Inventions</u>. The state law exclusions described above do not apply to any patent or invention covered by a contract between the Company and the United States or any of its agencies requiring full title to such patent or invention to be in the United States. I agree to

assign to the United States government, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, improvements, or trade secrets, other than those listed in Section 14 hereof, whenever such full title is required to be in the United States by a contract between the Company and the United States or any of its agencies.

(c) <u>Works for Hire</u>.  I acknowledge that all original works of authorship which are made by me (solely or jointly with others) during the term of my employment with the Company or with any company which sold its business to the Company and which is within the scope of my employment, which relate in any way, directly or indirectly, to the Business and which are protectable by copyright are "works made for hire," as the term is defined in the United States Copyright Act, meaning the Company will be the sole owner of the copyright of such works.

(d) <u>Maintenance of Records</u>.  I agree to keep and maintain adequate and current written records of all inventions and original works of authorship made by me (solely or jointly with others) during the term of my employment with the Company, which relate in any way, directly or indirectly, to the Business.  The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company.  The records will be available to and remain the sole property of the Company at all times.

(e) <u>Assistance in Obtaining Rights</u>.  I agree that my obligation to assist the Company, at the Company's sole cost and expense, to obtain patents or copyrights covering inventions or works of authorship, respectively, assigned hereunder to the Company shall continue beyond the termination of my employment, but the Company shall compensate me at a reasonable rate for time actually spent by me at the Company's request on such assistance.  If the Company is unable because of my mental or physical incapacity or for any reason to secure my signature to apply for or to pursue any application for any United States patents or copyrights covering inventions or other rights assigned to the Company, as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and on my behalf and stead and to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of patents and copyrights with the same legal force and effect as if executed by me.  I hereby waive and quitclaim to the Company any and all claims of any nature whatsoever, which I now or may hereafter have for infringement of any patents or copyrights resulting from any such application assigned hereunder to the Company.

4.    **Conflicting Employment**.  I agree that, during my employment with the Company, I will not engage in any other employment, occupation, consulting, or other business activity directly related to the Business or the business in which the Company becomes involved during my employment, nor will I engage in any other activities that conflict with my obligations to the Company.  I also represent that my employment with the Company will not conflict with or result in the breach of any agreement to which I am a party or by which I may be bound (including without limitation any proprietary information, non-disclosure, non-competition, non-solicitation, or other similar covenant or agreement).

5.    **Non-Compete**.  I agree that while employed by the Company and for a period of twelve (12) months following the termination of my employment, I will not directly or indirectly, either for myself or any other person or entity, conduct, operate, carry out or engage in, or own any interest in, perform any services for, participate in or be connected with any Person other than the Company that conducts, operates, carries out or engages in, or receives any economic benefit in connection with, any business that is or may reasonably be considered to be competitive with the Business (including any expansions or extensions thereof which have either taken place prior to such termination or which were contemplated at the time of termination), within the Geographic Area.  Notwithstanding the foregoing, nothing contained in this Section 5 shall prohibit me or my affiliates from the passive collective

ownership, in the aggregate, of less than two percent (2%) of any class of stock listed on a national securities exchange.

6.    **Non-Solicitation**.  I agree that while employed by the Company and for a period of twelve (12) months following the termination of my employment, I will not, directly or indirectly, either for myself or any other person or entity, do any of the following:

(a)    Clients and Customers.  I will not, within the Geographic Area, (i) solicit or induce any client, operator, distributor, customer or supplier of the Company or any of its subsidiaries to reduce or refrain from doing any business with the Company or any of its subsidiaries relating to the Business, (ii) damage any relationship between the Company and any of its clients, operators, distributors, customers or suppliers in the Business (or any Person in respect of which I am actually aware that the Company has approached or has made significant plans to approach as a prospective client, operator, distributor, customer or supplier within 18 months prior thereto) or (iii) aid Persons involved in any such acts.

(b)    Employees.  I will not solicit, recruit, induce or attempt to induce, or authorize, direct or advise any third persons or entities to solicit, recruit or induce or attempt to induce, any individual who is or was an officer, employee, or consultant of the Company to leave the Company, or in any way interfere with the relationship between the Company and such individual; provided, that this clause shall not apply to any individual whose employment or engagement with the Company has been terminated (either voluntarily or involuntarily) for a period of at least one year prior to such solicitation.

7.    **Company Documents and Property**.  I agree that upon termination of employment or at the request of the Company at any time, I will deliver to the Company any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or copies of any aforementioned items belonging to the Company, its successors, assigns, clients, or customers.  I further agree that any property owned by the Company, including computers, storage devices, telephones, desks, filing cabinets, or other storage or work area is subject to inspection by Company personnel at any time, with or without notice.

8.    **No Employment Contract**.  I acknowledge that this Agreement does not constitute a contract of employment for any specific period of time nor does it modify the at-will employment relationship, meaning that either I or the Company can terminate any such employment relationship at any time.  I further acknowledge this Agreement does not constitute a guarantee of future salary or wage increases.

9.    **Future Opportunities and Obligations**.  I acknowledge and agree that compliance with this Agreement will not unduly burden or interfere with my ability to earn a living following any termination of employment with the Company and that certain obligations of this Agreement continue beyond any employment with the Company.

10.    **Remedies**.  I understand that my breach of any covenant of this Agreement may lead to immediate termination of my employment.  Termination of my employment for any reason shall not limit any remedy available to the Company, at law or in equity, which shall include, without limitation, the right to obtain damages and to obtain injunctive or other equitable relief to restrain any breach or threatened breach or otherwise to specifically enforce the provisions of this Agreement without the necessity of posting a bond, it being agreed that money damages alone would be an inadequate remedy for such breach.  The rights and remedies of the parties to this Agreement are cumulative and not alternative.

11.    **General Provisions**.

(a)    <u>Governing Law</u>.  This Agreement shall be governed by the laws of the State of Delaware, without regard to any conflicts of laws principles thereof that would call for the application of the laws of any other jurisdiction.

(b)    <u>Entire Agreement</u>.    This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions between us; provided, however, that any previously or concurrently executed agreement between the Company and me which lawfully restricts my use or disclosure of any Confidential Information or my ability to compete against the Company or to solicit clients, customers, or employees of the Company, and which is deemed to provide greater protection to the Company shall continue to be binding and shall control over obligations in this Agreement deemed to be less protective to the Company.  No modification of or amendment to this Agreement, or any waiver of any rights under this Agreement will be effective unless in writing signed by the party to be charged.  Any subsequent change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

(c)    <u>Severability; Blue Pencil</u>.  If any provision of this Agreement or portion thereof is determined by a court of competent jurisdiction to be invalid, illegal or otherwise unenforceable, then such provision will be severed and if possible replaced with a similar provision which conforms with applicable law and embodies as closely as possible the original intent of the parties, and in any event the remainder of this Agreement will remain in full force and effect according to its terms.  To the extent a court should reduce the scope, duration, and/or area of any term or provision in Sections 2 through 6 to a permissible scope, duration, or size; the applicable restricted period shall be the longest period, the geographic area covered shall comprise the largest territory, and the scope shall be as broad as possible as permitted by law under the circumstances.

(d)    <u>Successors and Assigns</u>.    This Agreement will be binding upon my heirs, executors, administrators, and other legal representatives and will be for the benefit of the Company, its successors and its assigns.

(e)    <u>Survival</u>.  The provisions of this Agreement shall survive the termination of my employment (except as otherwise stated) and the assignment of this Agreement by the Company to any successor in interest or other assignee and I will not assign my rights or delegate my duties or obligations hereunder without the prior written consent of the Company.

(f)    <u>Advice of Counsel</u>. I have had had the opportunity to consult with an attorney of my own choosing before signing this Agreement, if I elect to do so.

12.    **Other Agreements**.  This Agreement shall be in addition to, and not in lieu of, and shall not in any way limit the enforceability of the Asset Purchase Agreement made and entered into as of _____ ____, 2018 by and among the Company, Take 5 Media Group, LLC, a Florida limited liability company, Employee and the other parties thereto ("APA").  To the extent there is any conflict between the APA and this Agreement, the APA shall control. The restrictive covenants contained in this Agreement shall be in addition to, and not in lieu of, and shall not in any way limit the enforceability of, any restrictive covenant covering similar subject matter contained in any other agreement between the parties hereto which I am a party or otherwise bound.

13.    **Delivery by Electronic Delivery; Facsimile or Email**.  This Agreement, and any amendments hereto, to the extent signed and delivered by means of an electronic delivery system, facsimile machine or email with scan or facsimile attachment, shall be treated in all manner and respects

as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each other party hereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto shall raise the use of an electronic delivery system, facsimile machine or email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of an electronic delivery system, facsimile machine or email as a defense to the formation or enforceability of a contract, and each such party forever waives any such defense.

14.    **List of Inventions**.  Pursuant to Section 3(a) of this Agreement, below is a list of my prior inventions and original works of authorship.  If disclosure of such inventions and original works of authorship would cause me to violate any prior confidentiality agreement, I understand I should not disclose any confidential information and should only disclose a brief name for the invention, the parties to whom it belongs, and the existence of the confidentiality obligations.  Check here if additional sheets are attached:

_____     _____     _____

Title                                       Date                         Brief Description

In the event, as a result of my work for the Company, the Company would infringe any intellectual property right of mine listed in this Section 14, the Company shall automatically have a royalty free, nonexclusive license throughout the world to the extent necessary to permit the Company to use and to enjoy all the resulting product of such work of mine to the fullest extent, unless, prior to initiating any such work, I obtain the waiver, in writing, of the Company, by an officer of the Company, waiving the Company's license in such instance.

IF NO PRIOR INVENTIONS OR WORKS OF AUTHORSHIP ARE LISTED IN THIS SECTION 14, I HEREBY AFFIRM THAT THERE ARE NO SUCH INVENTIONS OR ORIGINAL WORKS OF AUTHORSHIP.

15.    **Consideration; Reliance**.  I accept that the consideration received pursuant to the APA, my employment with the Company and the Company's willingness to consider me eligible for future salary or wage increases as sufficient and satisfactory consideration for my execution of and compliance with this Agreement.  I understand that the consideration is being provided to me by the Company in reliance upon my acceptance of and my compliance with this Agreement.

[signature page follows]

_____     _____
Signature of Employee                Printed Name of Employee

_____
Dated


ACCEPTED AND AGREED:

COMPANY:  Advantage Sales & Marketing LLC

By: _____

Title: _____

Dated: _____

**<u>Schedule I</u>**

**Determination of Allocation of Purchase Price**

| Asset Class | Methodology for Determining FMV |
|---|---|
| Cash and Cash Equivalents | Value assigned for purposes of computing Final Closing Date Net Working Capital |
| Accounts Receivable | Value assigned for purposes of computing Final Closing Date Net Working Capital |
| Other Current Assets | Value assigned for purposes of computing Final Closing Date Net Working Capital |
| Property and Equipment and Leasehold Interests and other Tangible (Class V) | Accounting net book value on Company's books and records as determined immediately prior to Closing Date |
| Restrictive Covenants | No greater than $300,000 |
| Specific Identified Intangibles | Amount consistent with amount used for Financial Accounting purposes |
| Goodwill and Going Concern Value | Remainder of consideration to be allocated |

**Schedule II**

**Net Working Capital**

(Attached)

**Take 5 Media Group**
Calculation of Target Net Working Capital
(change in red)

| $ in thousands | Jan17 | Feb17 | Mar17 | Apr17 | May17 | Jun17 | Jul17 | Aug17 | Sep17 | Oct17 | Nov17 | Dec17 | T3M Dec17 | T6M Dec17 | TYM Dec17 | T12M Dec17 | T12M Dec17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Petty cash | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | - | 0 | 0 | 0 | 0 | 0 |
| Wells fargo 5508 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 9 | 4 | 2 | 2 | 2 | 2 |
| Wells Fargo | 10 | 10 | 10 | 10 | 10 | 10 | 9 | 9 | 9 | 9 | 9 | - | 6 | 8 | 8 | 9 | 9 |
| Bank of America | 3,071 | 571 | 571 | 571 | 571 | 571 | 571 | 571 | 571 | 571 | 571 | - | 381 | 476 | 508 | 732 | 732 |
| Bank of america | 471 | 506 | 760 | 557 | 681 | 244 | 692 | 273 | 537 | 815 | 1,154 | 610 | 860 | 680 | 618 | 609 | 609 |
| Cash and cash equivalents | 3,553 | 1,088 | 1,342 | 1,139 | 1,263 | 827 | 1,274 | 855 | 1,119 | 1,396 | 1,735 | 619 | 1,250 | 1,166 | 1,136 | 1,351 | 1,351 |
| Accounts receivable | 5,018 | 3,644 | 4,017 | 4,187 | 3,855 | 3,592 | 3,887 | 4,472 | 4,839 | 4,343 | 4,136 | 7,026 | 5,168 | 4,784 | 4,482 | 4,418 | 4,418 |
| Accounts receivable, net | 5,018 | 3,644 | 4,017 | 4,187 | 3,855 | 3,592 | 3,887 | 4,472 | 4,839 | 4,343 | 4,136 | 7,026 | 5,168 | 4,784 | 4,482 | 4,418 | 4,418 |
| Prepaid insurance | 7 | 4 | 43 | 40 | 36 | 33 | 29 | 25 | 22 | 18 | 14 | 11 | 14 | 20 | 25 | 24 | 24 |
| Prepaid income taxes | - | - | - | - | - | - | - | 9 | 9 | 9 | 9 | - | 6 | 6 | 4 | 3 | 3 |
| Prepaid assets | 7 | 4 | 43 | 40 | 36 | 33 | 29 | 34 | 31 | 27 | 23 | 11 | 20 | 26 | 29 | 27 | 27 |
| Note receivable | - | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | - | 1,667 | 2,083 | 2,222 | 2,083 | 2,083 |
| Due from Take 5 Media Group LL | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 437 | 547 | 583 | 601 | 601 |
| Employee advances | 14 | 62 | 56 | 52 | 48 | 49 | 46 | 44 | 44 | 43 | 43 | 47 | 44 | 45 | 46 | 46 | 46 |
| Other current assets | 14 | 62 | 56 | 52 | 48 | 49 | 46 | 44 | 44 | 43 | 43 | 47 | 44 | 45 | 46 | 46 | 46 |
| Current assets | 9,249 | 7,954 | 8,614 | 8,574 | 8,358 | 7,657 | 8,391 | 8,562 | 9,189 | 8,966 | 9,093 | 7,703 | 8,587 | 8,651 | 8,499 | 8,526 | 8,526 |
| Accounts payable | 1,443 | 1,514 | 1,358 | 1,236 | 1,178 | 1,040 | 1,268 | 1,094 | 1,179 | 1,292 | 1,096 | 2,275 | 1,555 | 1,367 | 1,295 | 1,331 | 1,331 |
| Accounts payable ab | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | - | 7 | 14 | 16 | 17 | 17 |
| Accrued 401k and profit sharing | 1,464 | 1,533 | 1,379 | 1,256 | 1,199 | 1,060 | 1,289 | 1,115 | 1,199 | 1,313 | 1,096 | 2,275 | 1,561 | 1,381 | 1,311 | 1,348 | 1,348 |
| Boa mastercard | 330 | 330 | 330 | 330 | 330 | 330 | 330 | - | - | - | - | 435 | 145 | 128 | 195 | 229 | 229 |
| Amex payable | 22 | 18 | 21 | - | 10 | - | (14) | - | (1) | (20) | (1) | - | (7) | (6) | (3) | 3 | 3 |
| Due to 401k plan | 141 | 86 | - | 74 | 85 | (0) | 136 | 147 | 1 | (1) | (1) | - | (1) | 47 | 49 | 56 | 56 |
| Due to 401k forfeiture | 7 | 9 | - | - | - | - | - | - | - | - | 10 | - | 3 | 2 | 1 | 2 | 2 |
| Payroll liabilities | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (1) | (0) | (0) | (0) | 2 | 0 | 0 | 0 | 0 | (0) |
| Accrued expenses | 500 | 444 | 351 | 404 | 425 | 330 | 452 | 147 | (0) | (22) | 8 | 437 | 141 | 170 | 242 | 290 | 290 |
| Line of credit payable | 2,700 | 2,700 | 2,700 | 2,700 | 2,560 | 2,560 | 2,460 | 2,460 | 2,260 | 2,260 | 2,260 | 2,260 | 2,260 | 2,327 | 2,420 | 2,490 | 2,490 |
| Due to Take 5 Solutions | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 656 | - | 437 | 547 | 583 | 601 | 601 |
| Deferred revenue, current portion | 0 | - | - | - | - | - | - | - | - | - | - | 325 | 108 | 54 | 36 | 27 | 27 |
| Loan payable-short-term | - | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | - | 1,667 | 2,083 | 2,222 | 2,083 | 2,083 |
| Current liabilities | 5,320 | 7,835 | 7,586 | 7,516 | 7,340 | 7,106 | 7,357 | 6,878 | 6,615 | 6,707 | 6,520 | 5,298 | 6,175 | 6,562 | 6,815 | 6,840 | 6,840 |
| **Reported NWC** | **3,929** | **119** | **1,028** | **1,058** | **1,018** | **550** | **1,034** | **1,684** | **2,574** | **2,259** | **2,573** | **2,405** | **2,413** | **2,088** | **1,684** | **1,686** | **1,686** |
| **Definitional adjustments:** | | | | | | | | | | | | | | | | | |
| Cash and cash equivalents | (3,553) | (1,088) | (1,342) | (1,139) | (1,263) | (827) | (1,274) | (855) | (1,119) | (1,396) | (1,735) | (619) | (1,250) | (1,166) | (1,136) | (1,351) | (1,351) |
| Prepaid income taxes | - | - | - | - | - | - | - | (9) | (9) | (9) | (9) | - | (6) | (6) | (4) | (3) | (3) |
| Employee advances | (14) | (62) | (56) | (52) | (48) | (49) | (46) | (44) | (44) | (43) | (43) | (47) | (44) | (45) | (46) | (46) | (46) |
| Line of credit payable | 2,700 | 2,700 | 2,700 | 2,700 | 2,560 | 2,560 | 2,460 | 2,460 | 2,260 | 2,260 | 2,260 | 2,260 | 2,260 | 2,327 | 2,420 | 2,490 | 2,490 |
| Note receivable | 0 | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | - | (1,667) | (2,083) | (2,222) | (2,083) | (2,083) |
| Due from Take 5 Media Group | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (437) | (547) | (583) | (601) | (601) |
| Due to Take 5 Solutions | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | - | 437 | 547 | 583 | 601 | 601 |
| Loan payable-short-term | 0 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | - | 1,667 | 2,083 | 2,222 | 2,083 | 2,083 |
| Intercompany payables/recei | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | - | (0) | (0) | (0) | (0) | (0) |
| **Total definitional adjustments** | **(867)** | **1,549** | **1,302** | **1,509** | **1,249** | **1,684** | **1,140** | **1,552** | **1,668** | **811** | **473** | **1,594** | **959** | **1,110** | **1,233** | **1,090** | **1,090** |
| **NWC** | 3,062 | 1,669 | 2,330 | 2,566 | 2,267 | 2,234 | 2,174 | 3,236 | 3,662 | 3,070 | 3,046 | 3,999 | 3,372 | 3,198 | 2,917 | 2,776 | |

**Target NWC**   2,776

**Notes:**

(1) Changed calculation method to a 12-month average

(2) Added additional definitional adjustment to exclude "Employee Advances" from current assets (to be removed from the Company's B/S prior to closing)

Deferred revenue adjustment:

| | | Jan17 | Feb17 | Mar17 | Apr17 | May17 | Jun17 | Jul17 | Aug17 | Sep17 | Oct17 | Nov17 | Dec17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Neustar (Jan 2017 co | (615) | (544) | (513) | (461) | (410) | (339) | (308) | (256) | (205) | (154) | (103) | (51) | |
| State Farm (Jan 2017 | (245) | (225) | (204) | (184) | (163) | (143) | (123) | (102) | (82) | (61) | (41) | (20) | |
| Total | | (788) | (717) | (645) | (573) | (502) | (430) | (338) | (287) | (215) | (143) | (72) | 0 |

Peg

| | Jan17 | Feb17 | Mar17 | Apr17 | May17 | Jun17 | Jul17 | Aug17 | Sep17 | Oct17 | Nov17 | Dec17 | Peg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Adjusted NWC** | 2,273 | 952 | 1,685 | 1,993 | 1,765 | 1,804 | 1,816 | 2,949 | 3,447 | 2,927 | 2,975 | 3,999 | 2,382 |