# EXHIBIT 8

# LATHAM&WATKINS LLP

355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Tel: +1.213.485.1234  Fax: +1.213.891.8763
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

August 20, 2019

Take 5 Media Group, LLC
n/k/a Petruss Media Group, LLC
2385 NW Executive Center, Suite 290
Boca Raton, FL 33431
alex@take5mg.com
Attention: Alexander Radetich
On behalf of Company and Seller Related Party

Alexander Radetich
2121 NW 30th Road
Boca Raton, FL 33431
alex@take5mg.com
On behalf of Beneficial Owner Representative

Benjamin Goldberger, Esq.
Byron Kalogerou, Esq.
McDermott Will & Emery
28 State Street
Boston, MA 02109-1775
BGoldberger@mwe.com
Bkalogerou@mwe.com

      Re:  Notice of Claim Pursuant to Section 8.4(b) and Notice of Dispute Pursuant to Section 10.11 of the Asset Purchase Agreement

Dear Messrs. Radetich, Goldberger, and Kalogerou:

      We write on behalf of our client Advantage Sales & Marketing LLC ("Advantage") and certain related parties ("Claimants") to provide: 1) notice of a claim for indemnification ("Claim Notice") pursuant to Section 8.4(b)(i) of the Asset Purchase Agreement dated March 15, 2018 by and among Advantage and your clients Alexander Radetich and Richard Gluck and their related entities (the "Asset Purchase Agreement"); and 2) notice of a dispute pursuant to Section 10.11 of the Asset Purchase Agreement.

      This Claim Notice and Notice of Dispute is being submitted on behalf of the following Claimants: Advantage, Karman Intermediate Corp., Advantage Solutions Inc., and Karman Topco L.P.

**August 20, 2019**
**Page 2**

LATHAM&WATKINS LLP

The Claim Notice and Notice of Dispute is submitted to the following entities: Take 5 Media Group, LLC now known as Petruss Media Group, LLC ("Company"), Alexander Radetich, Richard Gluck, and RJV Marketing Corp. (each a "Respondent" and collectively "Respondents"). Claimants seek indemnification and other damages jointly and severally against each and every Respondent.

Capitalized terms use and incorporate the definitions listed in Exhibit A of the Asset Purchase Agreement.

## I. CLAIM NOTICE FOR INDEMNIFICATION PURSUANT TO SECTION 8.4(B) OF THE ASSET PURCHASE AGREEMENT

### A. Background Regarding Claim

As we detailed with a specific example in our letter dated August 6, 2019, during the period it was managed by Mr. Radetich and Mr. Gluck, Take 5 had a regular practice of falsely representing to clients that emails were deployed, delivered, and opened, when in fact no such emails were sent. Instead, Take 5 employed an algorithm that would generate fictitious data to meet client expectations while engaging third party vendors to generate traffic to the client's website in an attempt to deceive the client into believing that the promised emails (which in fact were never sent) generated traffic to the client's website.

As another example, attached as Exhibit 1 is a spreadsheet summarizing documents relating to 10 client campaigns occurring prior to the acquisition. This spreadsheet shows that Take 5 represented to the listed clients that it had deployed and delivered over 18 million emails, and that approximately 2.9 million of those emails had been opened. In fact, only 15,397 emails were deployed, only 3,695 were delivered, and only 7 were opened. In short, 99.9% of the emails promised were never sent for these clients. We have included in Exhibit 1 the back-up documentation regarding this fraud. According to employees of Take 5, these campaigns were not anomalies, but in fact reflect the regular practice of Take 5 to make misrepresentations to its clients. Numerous employees confirmed that Mr. Gluck and Mr. Radetich directed this fraudulent practice. In fact, Mr. Radetich admitted in an interview with investigators that he and Mr. Gluck decided to lie to clients in order to maintain their business because they knew the Company was unable to deliver the promised emails.

The fictitious client reports were prepared by algorithms that would calculate email deployed, delivered, and open rates to meet client expectations. For example, the following image shows a portion of the computer code used to calculate the number of emails opened for

reports to clients:

```
double BasePercent = ((double)TotalClicks / (double)EmailVolume) * 100;
    double Rand = 0;
    int Remainder = 1234567890;

    Remainder = new Random(DateTime.Now.Millisecond).Next(1111, 999999999);
    System.Threading.Thread.Sleep(new Random().Next(1, 100));


Random r = new Random(DateTime.Now.Millisecond);
    Rand = r.NextDouble() * (18.0 - 15.0) + 15.0;
    System.Threading.Thread.Sleep(new Random().Next(1, 100));
    int RetVal = (int)((EmailVolume + DateTime.Now.Millisecond) * double.Parse("0." + Rand.ToString().Replace(".", "") + "" + Remainder));
```

This code would generate an open rate of 15-18% for every email campaign using a random number generator to ensure sufficient variation in the open rate so that a client would not detect that the open rates were fabricated. As shown in Exhibit 1, the percentage of emails opened for every single campaign ranged within 15-18%. Take 5 employees have stated that this algorithm was in place prior to the acquisition, and that Mr. Gluck and Mr. Radetich ensured that it was used for all client reporting of email campaigns.

Mr. Goldberger's suggestion in his August 8, 2019 letter that Mr. Gluck and Mr. Radetich were unaware of these issues is frivolous. It is absurd to contend that Mr. Gluck and Mr. Radetich were unaware that Take 5 failed to send 99.9% of the emails Mr. Radetich and Mr. Gluck promised clients it would send. Take 5 employees consistently stated that both Mr. Gluck and Mr. Radetich initiated and directed this fraudulent practice, and Mr. Radetich himself confessed in his interview that he and Mr. Gluck knew of and implemented this fraudulent practice. In addition, Take 5 did not have the infrastructure or the database to perform the services it promised its clients, as Mr. Gluck and Mr. Radetich were well aware. The database at Take 5 was filled with invalid email addresses and Take 5 lacked the technology to prevent the emails it arranged to be sent from being captured by a spam filter or other blocking mechanism used by email service providers.

These fraudulent practices continued at Mr. Gluck and Mr. Radetich's direction after Advantage purchased Take 5. Both Mr. Gluck and Mr. Radetich continued to operate Take 5 post-acquisition and took steps to hide these fraudulent practices from Advantage. When Advantage discovered these practices, it was forced to close the Take 5 business and to provide refunds of post-acquisition revenue to all clients. Advantage also reported this matter to the Federal Bureau of Investigation and United States Attorney's Office and pledged to cooperate in any investigation.

Advantage has spent considerable resources attempting to manage the potential liability arising from the fraudulent practices of Respondents. Among other things, Advantage has offered refunds to its post-acquisition clients. It has refunded several millions of dollars in revenue to date. Despite its diligent efforts, Advantage expects that it will continue paying refunds, and may be sued for damages above and beyond the offered refunds. Advantage has additionally already incurred, and expects to incur, additional expenses associated with the government investigation.

LATHAM&WATKINS LLP

Advantage has also incurred considerable expense in connection with having to restate its financial statements as a result of the matters described above. The restatement delayed and may jeopardize the anticipated initial public offering of Advantage. If the IPO does take place, the matters relating to Take 5 discussed above may have a material effect on Advantage's valuation and proceeds in the IPO.

Finally, Advantage has been forced to write off the total purchase price of the Take 5 acquisition. The Take 5 business is worthless in light of the fraudulent conduct directed by your clients, which made it impossible to continue running the business in a lawful manner. Consistent with Section 1.5(g), Advantage exercised its full right to cease the operations of Take 5.

### B. Claim

Pursuant to Section 8.2(a), and the Definitions included in Exhibit A of the Asset Purchase Agreement, Claimants seek against all Respondents individually and jointly indemnification from and against all Damages incurred as a result of the following provisions, among other things.

> **1.** Section 8(2)(a)(i): Inaccuracy or Breach of Representation and Warranty by Company

The conduct described above proves that each of Respondents, individually and collectively, made or caused to be made the following representations in the Asset Purchase Agreement which Respondents individually and collectively knew to be inaccurate at the time they were made.

> a. Section 2.5: Financial Statements

Section 2.5(a) of the Asset Purchase Agreement represents that the Interim Financial Statements and Financial Statements are "true and correct and present fairly in all material respects the financial condition of the Company" and "with respect to the Financial Statement for the fiscal year ended as of December 31, 2017, have been prepared in accordance with GAAP applied on a consistent basis ...." These representations are false. The Financial Statements and Interim Financial Statements improperly recognized revenue for services that in fact were never performed, specifically the emails that were never sent. This violated, among other GAAP provisions, ASC 606 *Revenue from Contracts with Customers*. The Financial Statements and Interim Financial Statements also failed to account for the potential liability associated with the fraudulent conduct.

Section 2.5(b) states that Accounts Receivable of Take 5 "arose from valid sales actually made or services actually performed...." This is false. As shown above, the Accounts Receivable arose from services that were never performed.

Section 2.5(d) states that the "aggregate amount of the Company's Indebtedness, and the holders of such Indebtedness," was disclosed. This is false. The conduct described above

**LATHAM&WATKINS**LLP

created an Indebtedness for (a) obligations in accordance with GAAP to reimburse revenue received for services not rendered (provision (vii) of definition of Indebtedness).

      b.  Section 2.6: Absence of Undisclosed Liabilities

This section represents that there are no Liabilities other than those disclosed in the Financial Statements, the Disclosure Schedules to the Asset Purchase Agreement, and client contracts. This is false, as Respondents were fully aware of undisclosed liabilities associated with the issues described in Section I.A. above.

      c.  Section 2.8: Contracts

Section 2.8(b) represents that Take 5 is not in material default under any material contract. That section further represents that "to the Knowledge of the Company," "no event has occurred which with the giving of notice or the passage of time or both would constitute a material default of any party" as to a Material Contract. These representations are false. As described above, Take 5 defrauded virtually every client with whom it contracted to provide email-related services, resulting in numerous events which would constitute material defaults as to Material Contracts.

      d.  Section 2.10: Intellectual Property

This section represents that Take 5 owns and possesses Company Intellectual Property necessary for the operation of the business. This is false. The Take 5 database did not have double opt-in emails as represented. Claimants suspect and believe that the database may not have had authority to retain certain data or that the data may have been obtained without proper authorization. Further, Section 2.10 warrants that Take 5 was selling intellectual property that was "valid, enforceable and subsisting" as necessary for the conduct of Take 5's business. Take 5's "intellectual property" included algorithms designed to produce fictitious results which were reported to clients as fact.

      e.  Section 2.11: Compliance With Law

Section 2.11 additionally warrants that Take 5 was "in compliance in all material respects with all applicable Laws," but, in fact, Respondents engaged in business practices that violated a host of state and federal laws, including but not limited to mail and wire fraud under 18 U.S.C. Section 1341 and 1343 respectively.

      f.  Section 2.12: Litigation

Section 2.12 states that to the Knowledge of the Company, there is no reasonable basis for a Proceeding against the Company. This is false because based on the conduct described in I.A. above, there is a basis for civil and criminal claims against the Company for its misconduct.

LATHAM&WATKINSLLP

      g.    Section 2.20: Data Privacy

This section contains various provisions regarding authorized access to data. For example, Section 2.20(g) states that Company use of any data in the databases or systems of the Company will not violate any applicable Privacy Law. Section 2.20(g) is false. The Company's database contained inaccurate and, Claimants believe, unauthorized information.

Section 2.20(k) represents that the Company has at all times materially complied with applicable Laws relating to "the transmission of unsolicited commercial emails… and marketing campaigns." This is false. All of the Company's marketing campaigns, as described in I.A. above, involved conduct that materially violated U.S. laws.

    **2.**    Section 7.1(a): Representations, Warranties and Covenants of Company and Beneficial Owners

The conduct described above proves that each of Respondents, individually and collectively, fraudulently induced Claimants to enter into the Asset Purchase Agreement with false representations and warranties, the undisclosed failure to perform or comply in all material respects with all of the covenants, agreements, and obligations required by the Asset Purchase Agreement to be performed or complied with by the Company, the Beneficial Owners, and the Beneficial Owner Representative on or before closing, and delivery of a false closing certificate.

    **3.**    Section 8.2(a)(ii): Breach of Covenant

The conduct described above proves that each of Respondents, individually and collectively, breached the following covenants to the Asset Purchase Agreement: (a) failed to operate the business "in compliance with applicable Law" as required in Section 5.1; (b) failed to notify Claimants of a material breach of the Asset Purchase Agreement as required by Section 5.6(a)(ii); (c) made or caused to be made representations in the Asset Purchase Agreement which Respondents individually and collectively knew to be inaccurate at the time they were made; and (d) interfered in the relationship between Advantage and its employees by encouraging them to lie to other Advantage personnel in connection with Take 5's fraud in violation of Section 5.12(b)(iii).

    **4.**    Section 8.2(a)(vi): Indebtedness

The conduct described above proves that each of Respondents, individually and collectively, created an Indebtedness of Take 5 for which they should be held liable pursuant to Section 8.2(a)(vi) of the Asset Purchase Agreement. Specifically, the conduct created an Indebtedness for (a) obligations in accordance with GAAP to reimburse revenue received for services not rendered (provision (vii) of definition of Indebtedness).

    **5.**    Section 8.2(a)(viii): Excluded Liability

The conduct described above proves that each of Respondents, individually and collectively, created a liability for which Respondents are liable and for which they should

LATHAM&WATKINS LLP

indemnify Claimants if any person or entity seeks to impose that liability upon Claimants. These liabilities include, but are not limited to, the following:

  a. potential "Indebtedness of the Beneficial Owners, Seller Related Parties or the Company" as defined in subsection (i);

  b. potential Liabilities as defined in subsection (iv);

  c. potential Liabilities as defined in subsection (ix) for operating the Business in a manner that constitutes unfair competition or deceptive trade practices;

  d. potential Liabilities as defined in subsection (x) for liabilities under the Asset Purchase Agreement; and

  e. potential Liabilities to indemnify officers, directors, partners, members, managers, employees or agents in their capacity as such in any litigation or investigation.

**C. Damages**

Because your clients' conduct constituted fraud and willful misconduct, Indemnification for Damages arising from these claims will not be subject to the Ceiling or a Purchase Price limitation on recovery under Section 8.3 of the Asset Purchase Agreement.

As a result of your clients' scheme to defraud, Advantage has incurred extensive damages and reasonably expects to incur additional damages, including but not limited to:

- $77 million invested by Advantage in Take 5 assets that have proven to be grounded in fraud and essentially worthless;

- Hundreds of thousands in costs incurred in the diligence, negotiations, and ultimate transaction leading to the Asset Purchase Agreement;

- Several million dollars in refunds issued to date to clients for amounts paid Take 5 for email campaigns that were paid for, but not actually completed as reported;

- Several million dollars in costs to date incurred investigating, remediating, and mitigating potential liability associated with your clients' fraudulent conduct, including costs responding to government regulators, restating financials to account for improperly recognized revenue and revalued business assets, and addressing client relationships damaged by the fraud;

- Reasonably anticipated litigation costs, settlements, further refunds, and fines, including amounts arising from litigation filed by clients regarding email campaigns, litigation arising out of required restatements of financials, and fines imposed by government agencies;

LATHAM&WATKINS LLP

- Damages suffered from the delayed Initial Public Offering, which but for conduct of Respondents would have occurred already;

- Damage suffered from the diminution in value of the Company's net worth and IPO proceeds as a result from the anticipated lower stock price resulting from the necessary disclosure of the Take 5 misconduct directed by Respondents; and

- Reasonably anticipated reputational damage, including damage suffered by other Advantage business units, arising from Advantage becoming associated with fraudulent practices and services of Take 5, even though the fraud is not attributable to Advantage conduct.

Advantage is not yet in a position to fully calculate Damages arising from your clients' fraud, but anticipates that the amounts will continue to accrue as the investigation and negotiation with Take 5 clients continues. Advantage expressly claims the right to seek indemnification for such reasonably anticipated Damages and hereby notices its claim for indemnification on such Damages under Section 8.4(b) of the Asset Purchase Agreement.

Advantage furthermore reserves the right to amend this Claim Notice to reflect additional facts, claims, or Damages, as it becomes aware of them in the future.

## II.  NOTICE OF DISPUTE PURSUANT TO SECTION 10.11 OF THE ASSET PURCHASE AGREEMENT

As stated in Section 8.3(h) of the Asset Purchase Agreement, "in the case of remedies for Fraud or willful misconduct" by Respondents, Claimants are not limited to the remedies available in Article VIII of the Asset Purchase Agreement. Here, Respondents' conduct constitutes fraud and willful misconduct, and therefore Claimants are not limited to the remedies specified in Article VIII. Claimants therefore plan to pursue fraud and racketeering claims, among others, against Respondents and others for the misconduct described herein.

Advantage therefore provides notice of dispute pursuant to Section 10.11 of the Asset Purchase Agreement. As described in detail above, Advantage has incurred extensive money damages arising out of the Asset Purchase Agreement and requests a meeting with the Respondents to negotiate full payment for the damages described above. If Respondents are unwilling to complete payment for all money damages relating to their scheme to defraud, Advantage and potentially other related parties will pursue all available remedies including without limitation arbitration in accordance with Section 10.11.

\* \* \* \* \*

**LATHAM&WATKINS**LLP

      Advantage reserves all rights to pursue any and all claims against your clients and others for harm suffered as a result of this fraudulent conduct and breaches of the Asset Purchase Agreement. If you have any questions, you may contact me at (213) 891-7889.

                                                                 Very truly yours,

                                                                 Manuel A. Abascal   /ARG
                                                                 of LATHAM & WATKINS LLP

# Exhibit 1

Take 5 Pre-Acquisition E-mail Campaign Sample - Summary Statistics

| No. | Invoice Detail | | | Information Reported to Customer (Tracking Report / Customer Report) | | | | Actual Activity (Volo / Mailwizz / Other Email Platforms) | | | | Actual Clicks Per Google Analytics |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Customer | Invoice # | Invoice Date | Deployed | Delivered | Opened | Clicks | Deployed | Delivered | Opened | Clicks | Sessions |
| 1 | Westates Automotive Promotions | 47335 | 2/15/2018 | 100,561 | 100,000 | 16,217 | 1,726 | - | - | - | - | 1,736 |
| 2 | EMG Marketing | 47382 | 2/16/2018 | 140,555 | 140,000 | 24,101 | 3,222 | - | - | - | - | 3,275 |
| 3 | INFOCORE | 48392 | 3/28/2018 | 37,761 | 37,272 | 6,218 | 1,794 | - | - | - | - | 1,821 |
| 4 | INFOCORE | 47214 | 2/12/2018 | 412,837 | 410,000 | 64,573 | 8,106 | - | - | - | - | 8,220 |
| 5 | INFOCORE | 48181 | 3/20/2018 | 549,426 | 541,107 | 92,087 | 10,834 | - | - | - | - | 10,860 |
| 6 | Mitsubishi Motors North America, Inc. | 47654 | 2/26/2018 | 230,609 | 229,162 | 40,149 | 7,135 | 15,397 | 3,695 | 7 | 28 | 7,151 |
| 7 | Princess Cruise | 47804 | 3/6/2018 | 8,059,665 | 8,000,000 | 1,222,258 | 144,971 | - | - | - | - | 145,684 |
| 8 | Princess Cruise | 47130 | 2/7/2018 | 9,107,679 | 9,000,000 | 1,385,988 | 203,734 | - | - | - | - | 205,518 |
| 9 | Team One Advertising - Lexus | 48003 | 3/14/2018 | 9,530 | 9,400 | 1,701 | 286 | - | - | - | - | Not Available |
| 10 | Team One Advertising - Lexus | 47074 | 1/25/2018 | 154,723 | 153,917 | 25,848 | 2,919 | - | - | - | - | 2,932 |
| | Totals: | | | 18,803,346 | 18,620,858 | 2,879,140 | 384,727 | 15,397 | 3,695 | 7 | 28 | 387,197 |
| | Actual Activity as a % of Reported: | | | 0.0819% | 0.0198% | 0.0002% | 0.0073% | | | | | 100.6% |