# EXHIBIT 9

## AMERICAN ARBITRATION ASSOCIATION

PETRUSS Media Group, LLC, f/k/a Take 5
Media Group, LLC,

      Claimant,

vs.

ADVANTAGE SALES & MARKETING,
LLC, a California limited liability company,

      Respondent.

## DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

Pursuant to Section 10.11 of the Asset Purchase Agreement by and among Advantage Sales & Marketing LLC ("Advantage"), Take 5 Media Group, LLC ("Company" or "Take 5"), Alexander Radetich ("Radetich" or "Beneficial Owner Representative"), Richard Gluck ("Gluck"), RJV Marketing Corp. ("RJV"), together with Radetich and Gluck, the "Beneficial Owners") (collectively, "Parties"), dated as of March 15, 2018 (the "Purchase Agreement," attached hereto as Exhibit A), Petruss Media Group, LLC, f/k/a, Take 5 Media Group, LLC ("Claimant"), hereby demands arbitration of the following claims.

## PRELIMINARY STATEMENT

Radetich and Gluck built Take 5 into a highly successful and innovative business providing clients with consumer data as well as data marketing services and products. Take 5's key asset was a massive consumer database it built over the course of 15 years. Highly regarded in the industry, the Take 5 database was the key to its success selling both the data itself and marketing

1

campaigns built on that data to its various clients.  The database, the crown jewel asset of Take 5, was regularly refreshed, cleansed, and enhanced by HygenicsData, a leading data asset company.

In late 2016, Radetich and Gluck decided to assess the market for a strategic partner for the Company or potential sale of the Company and its database and engaged Petsky Prunier ("Petsky"), a well-regarded investment banker with expertise and experience in the telecom, media and technology sectors.  Petsky conducted market research and determined significant interest for the potential acquisition of the business.  Petsky engaged with the Company, developing various tools to elicit interest amongst potential buyers.  One of the primary tools developed by Petsky was a Confidential Information Memorandum (the "CIM"), commonly used by investment banks to describe the business that is being marketed for sale.  The CIM, in its opening paragraphs, described Take 5 as follows:

> Take 5 Media Group is a fast-growing marketing data platform that owns one of the largest, most accurate, and comprehensive consumer databases in the U.S.  This robust database serves as the foundation for end-to-end, data-driven marketing solutions that enable leading national and local brands to optimize their overall business performance through advanced targeting, understanding, engagement, and retention of valuable consumer audiences.  Today's top marketers are omni-channel marketers.  Their most effective marketing programs deliver personalized and coordinated customer experiences across multiple media channels including multiple devices.
>
> According to studies from Deloitte and Abderdeen Group, omni-channel shoppers expect to spend over 70% more than single channel shoppers annually and have 30% higher lifetime value.  With comprehensive and well-managed data at its core, Take 5 has developed a differentiated ability to execute complex, data-driven marketing campaigns throughout their path-to-purchase, and ultimately drive significantly increased response rates and marketing ROI.

CIM at 1, Exhibit B.

Having determined that there were a number of potential buyers interested in Take 5, Petsky recommended, and Radetich and Gluck agreed, that Petsky should utilize an auction process to elicit a number of potential offers from prospective buyers. Pesky established a virtual data room to house and to enable third parties to review the various key agreements and materials relating to Take 5. Petsky managed the process to enable prospective buyers to access certain items of due diligence to enable prospective buyers to submit indications of interest setting forth on a non-binding basis the terms and conditions by which the prospective buyers would purchase Take 5.

Advantage was one of a number of prospective buyers that expressed interest. Advantage is a large enterprise providing a variety of services to businesses, primarily consumer goods manufacturers and retailers, with billions of dollars in revenues. Advantage pitched itself to Radetich and Gluck as a strategic partner that could provide Take 5 tremendous opportunities to grow its business through both Advantage's existing customer base and through intracompany sales. Indeed, in its letter of intent (the "LOI"), Advantage stated the following:

> Based on what we have learned about the Company from our discussions with management and the materials provided, we firmly believe Take 5 would be an excellent fit with Advantage. We see a number of opportunities to combine Take 5's proprietary database with our own data to augment our combined suite of digital marketing products. In addition, we believe we can enhance Take 5's programmatic, mobile and search capabilities and accelerate their penetration of the CPG and retail verticals.

LOI at 1, Exhibit C.

Ultimately, after reviewing and assessing a number of competitive and lucrative offers, Take 5 entered into the LOI with Advantage, which specifically conditioned its offer on completing a satisfactory due diligence of Take 5. The LOI provided as follows:

> The Company will give Advantage and Advantage's management personnel, legal counsel, accountants, and technical and financial advisors, full access and opportunity to inspect, investigate and audit the books, records, contracts, filings, and other documents of the Company as it relates to its business and all of its assets and liabilities (actual or contingent), including, without limitation, inspecting its property and reviewing financial records, contracts, operating plans, and other business records, for the purposes of evaluating issues related to the operation of the Company's business. The Company further agrees to provide Advantage with such additional information as may be reasonably requested pertaining to its business and assets.

LOI at 4.

Take 5 fully complied with its obligations as Advantage engaged in a thorough and comprehensive due diligence process that extended from December 2017 through March 2018. With the assistance of global accounting and law firms Ernst & Young and Jones Day, Advantage conducted a deep dive into all aspects and elements of Take 5's business. Advantage employees interviewed Take 5 employees directly and used the Parthenon Group, a part of Ernst & Young, to conduct confidential interviews of Take 5's customers. Advantage senior management spent extensive time in discussions with Gluck and Radetich, meeting with them in Florida, New York, and at Advantage's offices in California.

In the course of Advantage's financial due diligence, Take 5 made Advantage aware that its financial statements, which had only been used for internal reporting and for tax purposes, had been subject only to annual review rather than an annual audit. Advantage demanded that, as a condition to closing, Take 5 provide a set of audited financial statements for the fiscal year ending December 31, 2017. Take 5 management willingly complied and engaged Cherry Bekaert, one of the nation's largest accounting and consulting firms, to prepare and deliver to Take 5 audited Combined Financial Statements as of and for the year ended December 31, 2017, that were thereafter delivered to Advantage.

In the course of Advantage's legal due diligence, Take 5 disclosed two litigation matters in which customers raised complaints, either as plaintiffs or as counterclaimants after Take 5 initiated proceedings, about Take 5's digital marketing campaigns.  Jones Day, counsel for Advantage, reviewed each of these two litigation matters in detail as part of its diligence.

Advantage—having used every tool at its disposal through months of due diligence—and Take 5 entered into the Purchase Agreement on March 15, 2018, that provided for Advantage to pay $77 million in up front consideration as well as an earn-out amount of up to $53 million based on the performance of the Take 5 business post-closing.  Radetich and Gluck, recognizing the integrity of the business they had built and the purported advantages and synergies of Take 5 being part of Advantage, chose Advantage as the acquirer because of the upside presented by what they viewed as an achievable earn-out.

The transaction closed on April 1, 2018.  Immediately thereafter, Advantage designated its employee Gary Colen ("Colen") as the person in charge of the Take 5 business unit.  Surprisingly, Colen stripped Radetich and Gluck of their authority over the Take 5 business unit, sidelining them and instructing them to limit their activities to "helping with revenue."  From the outset, Colen, on behalf of Advantage, engaged in a pattern of misconduct with the purpose and intent of circumventing Advantage's earn-out obligations by improperly depressing Take 5's revenues and increasing its expenses.  Over the course of 2018 and 2019, Colen and Advantage—in violation of the Purchase Agreement—sacrificed the Take 5 business unit to benefit other Advantage business units, primarily Advantage Media Solutions, LLC ("Advantage Media"), which was led by Colen's long-time associate, Joshua Pike ("Pike").

In April 2019, Colen tried to convince Radetich and Gluck to accept an early exit from their deal with Advantage.  Advantage would agree to release Radetich and Gluck from their

obligations under the Purchase Agreement—including their indemnity obligations—and Radetich and Gluck would surrender any right to an earn-out.  With the prospect of securing a multi-year contract with significant revenues and tremendous margins that would contribute to the financial performance of Take 5, Radetich and Gluck believed that a large earn-out payment was all but assured, and rebuffed Colen's efforts.

In June 2019, more than a year after controlling and managing all aspects of the operation of Take 5, Advantage claims that it now finds that Take 5 employees committed fraud before the closing and then continued to do so for nearly 15 months after the closing as employees of Advantage.  Advantage's allegations of fraud seem to mirror complaints made by two customers in previous litigation and disclosed to Advantage by Take 5 during the due diligence process. Nevertheless, Advantage now seeks to bootstrap the "fraud" on its clients that it "uncovered" into an allegation that Advantage too was defrauded in connection with its purchase of Take 5.  It is incredulous that Advantage, a global and sophisticated marketing behemoth on the cusp of becoming a public company with all of its attendant responsibilities and obligations, can claim with a straight face that it was somehow beguiled by Take 5's founders into buying Take 5 as it now alleges.

It is only with the scrutiny that comes with becoming a public company that has triggered Advantage into now crying foul and taking the draconian actions that it has taken to irrevocably deprive the Beneficial Owners of any prospect of achieving their earn-out.  Rather than attempt to mitigate any damages, preserve valuable longstanding client relationships, and attempt to recover the significant value represented by the Take 5 database and business unit as a whole, Advantage elected to sacrifice Take 5 and scuttle the business in light of its planned IPO.  Advantage announced to employees that it viewed Take 5 as a "toxic asset" and that it was ceasing all of Take

5's business operations, including those that were untouched by any claims of fraud—and laying off nearly all of Take 5's employees.  Advantage went so far as to offer refunds to clients in exchange for releases of claims, even for clients that still wanted to conduct business with the Take 5 business unit.

Advantage has calculated and schemed to prioritize the IPO over the continued operation of the Take 5 business unit on the basis that the IPO proceeds and valuation that Advantage will achieve in the public markets are well worth the risk of defending a claim by the Beneficial Owners for their earn-out under the Purchase Agreement.  But that decision by Advantage violates the express terms of the Purchase Agreement and the implied covenant of good faith and fair dealing.  The parties negotiated a purchase price that was payable 56% at closing with 44% to be paid as part of an earn-out.  As part of that deal, Advantage was obligated to attempt, in good faith, to make the Take 5 business a success, not to siphon profits to another part of Advantage, which it did, and certainly not to shut down the business.  Although Advantage bargained for and received the right to *operate* the Take 5 business unit, Advantage never sought, and Radetich and Gluck never would have given, Advantage the right *not to operate* the business at all.  In fact, the Purchase Agreement places an affirmative obligation on Advantage to "maintain the Business as a separate business unit."  Advantage breached this provision in blatant violation of the Purchase Agreement.

Upon learning of Advantage's shut down of the Take 5 business unit, Radetich and Gluck initiated the dispute resolution procedures under the Purchase Agreement that are a necessary prerequisite to this arbitration claim.  In response, Advantage has countered by claiming a host of breaches of the Purchase Agreement, as well as claiming fraud.  Advantage has gone so far as to seek to engage law enforcement to "do its bidding" alleging fraud and seeking to intimidate

Radetich and Gluck in a commercial dispute for which the parties have negotiated contractual remedies, including the ability to seek insurance coverage for breaches of the Purchase Agreement. These false allegations by Advantage are nothing more than a transparent attempt to distract from Advantage's mismanagement of the Take 5 business and its egregious and costly breaches of the Purchase Agreement that have deprived the Beneficial Owners of their right to the earn-out, all in service of protecting the big payday presented by the pending IPO. Having failed to take Advantage public when it first tried to do so in 2017, one can understand why Advantage would stop at nothing to access the capital markets while the proverbial window is still open. Advantage's quest to go public, however, must be achieved while honoring its contractual obligations to Take 5 and the Beneficial Owners.

## PARTIES AND RELEVANT NON-PARTIES

1.    Claimant Petruss Media Group, LLC, f/k/a Take 5 Media Group, LLC, is a Florida limited liability company, with its principal place of business in Boca Raton, Florida.

2.    Respondent Advantage is a California limited liability company, with its principal place of business in Irvine, California.

3.    Non-party Radetich is an individual residing in Boca Raton, Florida and is Managing Partner of Petruss Media Group, LLC. Immediately prior to Advantage's acquisition of Take 5, Radetich was one of two Managing Directors of Take 5. Radetich held 44.45% membership units in Take 5.

4.    Non-party Gluck is an individual residing in Boca Raton, Florida and is Managing Partner of Petruss Media Group, LLC. Immediately prior to Advantage's acquisition of Take 5, Gluck was the other Managing Director of Take 5. Gluck held 44.45% membership units in Take 5.

5.      Non-party Colen is an individual residing in Pittsboro, North Carolina and is Chief Executive Officer of AMP Agency, an Advantage business unit.

6.      Non-party Pike is an individual residing in Maine and Executive Vice President, Strategy and Integrations of Advantage Media Solutions.

## JURISDICTION & VENUE

7.      Section 10.11(a) of the Purchase Agreement provides that "[i]f the Parties should have a Dispute (a "Dispute") involving money damages arising out of or relating to this Agreement," then following a dispute resolution procedure, "the Parties will refer the Dispute (to the exclusion of a court of law) to final and binding arbitration in accordance with the procedures set forth in Section 10.11(b)."

8.      Section 10.11(b) of the Purchase Agreement further provides, in relevant part:

> Any arbitration pursuant to this agreement shall be presided over by one arbitrator in Delaware, in accordance with the then existing commercial arbitration rules (the "Rules") of the [AAA], and judgment upon the award rendered by the Arbitrator may be entered into any court having jurisdiction thereof; provided, however, that the Law applicable to any controversy shall be the Law of the State of Delaware regardless of principles of conflicts of Laws.

9.      All conditions precedent have been met, waived, excused, or have occurred.

## FACTUAL BACKGROUND

*2003 to 2016: Radetich and Gluck Grow Take 5 Media into a Successful Business*

10.     Radetich and Gluck founded Take 5 in 2003, building it into a highly successful and innovative business providing clients with consumer data as well as data marketing services and products.

11.     By 2017, Take 5 had over 90 employees across two offices.  The main office was in Boca Raton, Florida and a second, smaller office was in New York, New York.  Take 5 also employed one sales representative in Georgia.

12.    Take 5's most valuable asset was a massive database it built and maintained, which contained demographic, lifestyle, and contact information for hundreds of millions of consumers— such as ages, gender, household incomes, shopping preferences, mailing addresses, email addresses, and phone numbers.  Over the span of 15 years Take 5 developed one of the most unique and sought-after consumer databases in the country.  Large national database compilers, leading insurance companies, credit bureaus and automotive marketing agencies consumed Take 5's data through well-tenured, multi-year data licensing contracts.  The database represented a significant portion of the value of the Company.

13.    Take 5 commercialized this database in two ways: data delivery and marketing campaigns.  Through its data delivery services, Take 5 delivered bulk data to clients.  This business line had exceptionally high margins: it was almost pure profit.  Take 5's other business line was producing highly targeted and personalized marketing campaigns.  Although significantly larger in terms of volume than the data delivery business, the marketing campaigns had a somewhat lower profit margin.

14.    Take 5's marketing campaigns delivered value to Take 5's clients because they successfully routed potential customers to those clients.  Take 5 achieved this result through "omni-channel" marketing, including social media, mobile device advertising, email, programmatic advertising, targeted advertising in web browsers, and direct mail (paper mail delivered by the postal service).  These comprehensive, data-driven marketing campaigns allowed clients to target, understand, engage, and retain valuable customers.

15.    By way of example, a car dealer client might want to target customers who live within a certain distance of one or more dealerships, who earn a particular level of income, and who own certain vehicles.  Take 5's extensive database would allow a marketing campaign to

target those individuals, serving up direct mail advertising, custom social media campaigns, web-based advertisements, email or mobile device ads to steer the targeted consumer to the dealer's website.

16. Clients easily recognized the value that Take 5 delivered. Software platforms such as Google Analytics allow a website operator to tell how a particular user got to their website, including whether they clicked on an advertisement, a search engine link, or a link in an electronic communication. Clients could see, in some cases nearly in real time, how Take 5's marketing campaigns drove customers to their websites. The Company achieved a remarkable client retention of **over 90 percent** for clients that spent more than $75,000 per year. Clients lauded the Take 5 database and the tremendous return on investment that they achieved through Take 5's omni-channel marketing campaigns. The bottom line for marketing campaign clients was that Take 5 generated so much in sales that coming back for additional campaigns was a smart investment of marketing dollars.

*2016 to 2017: Take 5's Financial Success Leads to Courtships by Strategic Buyers*

17. Seeking to capitalize on their Company's remarkable growth and expand it even further, Radetich and Gluck contacted Petsky Prunier, an investment banker, in late 2016 to discuss introducing Take 5 to the marketplace.

18.     To elicit potential buyers, Petsky sent out a CIM to prospective buyers in August 2017. The CIM reflected Take 5's tremendous growth, as illustrated in the graph below.  In the CIM, Take 5 projected $30.2 million in revenue for 2017, representing year-over-year growth of 22 percent, $24.7 million of gross profit, and $12.6 million of adjusted EBITDA, equating to high margins of 82 percent and 42 percent, respectively.



CIM at 6.

19.     Over 15 companies sent indications of interest in purchasing Take 5, including Advantage.

20.     After receiving Advantage's expression of interest, Radetich and Gluck met with Advantage representatives twice between November 1, 2017, and November 14, 2017, to discuss a potential sale.

21.     Radetich and Gluck received the LOI from Advantage on November 16, 2017. Radetich and Gluck also received second round bids in the form of letters of intent from five other companies.

22.     In deciding which opportunity to pursue, Radetich and Gluck continued to discuss the potential sale to Advantage with Advantage executives.

23.     To induce Radetich and Gluck to sell Take 5 to Advantage, Advantage represented that it would provide Take 5 with access to Advantage's extensive intercompany network and existing business relationships.  Advantage has at least 36 business units, including AMP Agency, Advantage Media, Upshot, Edge Marketing, IN Connected Marketing, and Adlucent.  Advantage also has lucrative business relationships with various Fortune 500 companies.  Advantage promised Radetich and Gluck access to Advantage's internal network and relationships.  Radetich and Gluck recognized that this access would undoubtedly increase Take 5's sales and revenue and allow the Company to hit its earn-out milestones.  Critically, Advantage's representations differentiated its offer from the other company that was still in the running—Advantage represented much greater synergies post-acquisition to improve Take 5's revenue and profitability.

24.     Accordingly, Radetich and Gluck turned down other highly competitive offers and chose to sell Take 5 to Advantage.  Radetich and Gluck chose Advantage in reliance on its representations that it would integrate Take 5 into Advantage and provide access to intracompany sales and Advantage's large customer base and on the basis of its easily achievable earn-out structure.

*December 2017 to March 2018: Radetich and Gluck Choose*
*Advantage and Advantage Conducts Extensive Due Diligence of Take 5*

25.    On behalf of Take 5, Radetich and Gluck signed the LOI with Advantage on

December 8, 2017.

26.    Importantly here, Advantage then conducted extensive due diligence over the

course of approximately three months.  In the course of this due diligence, Advantage asked for,

and received, audited financial statements for 2017: for prior years, Take 5's financial statements

had not been audited.  To satisfy Advantage's request, Take 5 management engaged Cherry

Bekaert, one of the country's largest accounting and consulting firms in the country, to prepare

and deliver to Take 5 and Advantage audited Combined Financial Statements as of and for the

year ended December 31, 2017.

27.    Advantage engaged the global accounting firm of Ernst & Young LLP which began

financial due diligence and the global law firm of Jones Day which conducted legal due diligence

on the Company.  Take 5 management fully cooperated with the due diligence process and

provided full access to Advantage personnel, its accountants, counsel, and advisors enabling

Advantage to conduct an exhaustive and comprehensive due diligence investigation of Take 5.

Take 5 went as far as to allow Advantage to engage a consultant, the Parthenon Group, part of

Ernst and Young, to confidentially interview Take 5's top customers before closing to assess the

strength of the relationships and the level of satisfaction that the customers had with Take 5's

offering and services.  Advantage's diligence exercise of Take 5 began in earnest in December of

2017 and lasted for nearly three months.  Advantage, acting through its counsel, peppered Take 5

management with a multitude of requests that were posed to management and its representatives.

28.    In legal diligence, Advantage utilized three different request lists—general,

supplemental, and reorganization—to conduct due diligence.  For the general legal diligence

14

request, Take 5 responded in full and provided applicable and requested documents to the virtual data room (the "VDR") over the course of December 2017.  These requests and responses included, among others, information related to general corporate governance and capitalization, contracts with Take 5's customers and vendors, historical and ongoing litigation, employee matters, intellectual property, real property, and tax.  Then, from the end of December 2017 to early March 2018, Advantage and Take 5 utilized the supplemental diligence request list as a vehicle to conduct a more detailed review of Take 5's operations.  This list included a detailed dive into Take 5 whereby Advantage requested specific agreements, amendments and exhibits to certain agreements, confirmation of various provisions contained in specific agreements, specific statements of work and invoices, various licenses, trademarks and other intellectual property, information regarding particular employees, and 55 questions on data privacy and security.

29.    Two litigation matters disclosed to Advantage during the due diligence process spoke directly to customer complaints in the omni-channel digital marketing business that Advantage now characterizes as "fraud" in an effort to excuse its breach of the Purchase Agreement.  Although these two cases represent a tiny fraction of the marketing campaigns run by Take 5 over the years, their disclosure underscored what a sophisticated buyer like Advantage already knew about the omni-channel marketing business and the potential for customer complaints.

30.    The first complaint was filed by Consumerbase LLC, d/b/a/ Exact Data against Richard Gluck, Alexander Radetich, Take 5 Solutions LLC and Take 5 Media Group, LLC (collectively, the "Defendants").  In that case, Consumerbase alleged that the Defendants agreed to deploy an email campaign, that they failed to do so in accordance with the terms of the subject contract and that they subsequently provided Consumerbase with a report that misrepresented

various of the performance metrics (*i.e.*, number of emails sent, "click through" rates, etc.). The litigation settled and in diligence Take 5 provided to Advantage the Settlement Agreement and included it in the VDR.

31.     The second litigation matter was brought by Take 5 Media Group, LLC and Take 5 Solutions as plaintiffs against Dealers United LLC, Brian Pasch, and PCG Consulting, as detailed in Section 2.12(a) of the Disclosure Schedule to the Purchase Agreement. In the complaint, Take 5 alleged that Mr. Pasch and his related entities made various defamatory allegations regarding Take 5's email marketing practices with allegations similar to those made by Advantage today. Dealers United asserted a counterclaim based on allegations that are very similar to those made by Advantage now. As part of Take 5's obligation to update Advantage on any disclosures made between the execution of the Purchase Agreement and closing, Jones Day was advised on March 29, 2018, that the litigation had been settled and that the settlement agreement would be posted to the VDR, which it was.

32.     In addition to having access to Jones Day and notice of these lawsuits, Advantage made full use of its rights in the due diligence process to interview Take 5 employees, including the employees who were responsible for fulfilling digital marketing campaigns. These interviews took place without Radetich or Gluck present.

*March 2018: Take 5 and Advantage Enter into the Asset Purchase Agreement*

33.     After extensive and robust due diligence by Advantage, Take 5 and Advantage signed the Purchase Agreement on March 15, 2018. All parties were represented by experienced counsel at international law firms: Jones Day represented Advantage and McDermott Will & Emery represented Take 5.

34.     The Purchase Agreement provided for two components of consideration for Take 5: (i) $77 million in up-front consideration, and (ii) an earn-out amount based on Take 5's

performance during the earn-out Period as set forth in Section 1.5 ("Earn-out"). The Earn-out Period is defined as the period beginning on the Closing Date (April 1, 2018) and concluding on the four-year anniversary of the last day of the month in which the Closing occurs (April 30, 2022). The Purchase Agreement provides for payment to Claimant of up to $53 million in Earn-out in 2022, with an interim payment in 2020. The exact amount of both the final payment and the interim payment is based on the Compound Growth Rate of the Take 5 business unit's EBITDA.

35.    The Earn-out was a vital upside for Radetich and Gluck and heavily influenced their decision to sell Take 5 to Advantage. Although Advantage specifically negotiated for great autonomy to run Take 5, to protect their potential to achieve the Earn-out, Radetich and Gluck bargained for and received several protections on how Advantage would run Take 5, as reflected in Section 1.5(j) of the Purchase Agreement:

> Following the Closing, the Buyer shall have the right to operate the Business, Purchased Assets and Assumed Liabilities in its sole and absolute discretion, including with respect to employee compensation (subject to Section 5.8(a)) and has no obligation to maintain or preserve any relationship with any client, customer, supplier, vendor, employee or contractor or the terms of any contract (including pricing). During the Earn-out Period, the Buyer shall maintain the Business as a separate business unit and shall not sell or transfer any material portion of the Purchased Assets to a third party that is not an affiliate of the Buyer, unless the acquiror of the Purchased Assets expressly assumes and has the financial resources and wherewithal to fulfil the Buyer's obligations under this Section 1.5 with respect to any earn-out payments that are due or may become due to the Company. Notwithstanding the foregoing, during the Earn-out Period, the Buyer (i) will not take any action the purpose and intent of which is to circumvent the payment of the Initial Earn-out Amount or the Final Earn-out Amount and (ii) will maintain separate accounting records for the business.

36.    Thus, although Advantage bargained for the right to "operate" the Business, it did not bargain for the right to "not operate" the Business, which it improperly did as soon as the transaction closed.

37.     Had Advantage demanded the right to shut down the Business at its discretion (which would deprive the Beneficial Owners of the ability to achieve the Earn-out), Radetich and Gluck certainly never would have signed the Purchase Agreement and would have sold the company to another interested party.

38.     Instead, Radetich and Gluck bargained for and received an affirmative promise from Advantage to "maintain the Business as a separate business unit."

39.     Radetich and Gluck also bargained for and received separate promises by Advantage to "not take any action the purpose and intent of which is to circumvent the payment of the Initial Earn-out Amount or the Final Earn-out Amount" and to "maintain separate accounting records for the business" so that EBITDA (and the corresponding Earn-out) could be more easily calculated.

*April 2018 to April 2019: Advantage and its Executives*
*Deliberately Choke Take 5's Business to Avoid Paying the Earn-out*

40.     The transaction between Take 5 and Advantage closed on April 1, 2018.

41.     On April 2, 2018, Colen was in the main office in Florida, addressing now former Take 5 employees about their new status as Advantage employees.

42.     From that point forward, Advantage asserted control over Take 5 and shifted leadership of Take 5 to Colen.  Radetich and Gluck were sidelined.  Gluck's new title was Senior Vice President of Sales and Radetich's new title was Executive Vice President.  Gluck reported to Radetich, and Radetich reported to Colen.  However, the shift was not just one of titles and the organization chart.  Rather, Colen took full control of and responsibility for the Take 5 business unit, and instructed Radetich and Gluck to "help out with revenue."  Radetich and Gluck reluctantly stepped aside and allowed the new owners to operate Take 5.

43.     In addition to the Take 5 business unit, Colen also oversaw Advantage Media, which was run by Joshua Pike.

44.     Pike and Colen had a long-standing relationship.  The two came to Advantage together in 2013 when Advantage bought Colen's company, AMP Agency.  Colen, in turn, had previously acquired Pike's company, Rock Coast Media, in 2009.  Although Pike had no formal role in the Take 5 business unit, Pike often functioned as Colen's "chief of staff."

45.     Over the course of 2018 and 2019, Colen and other Advantage personnel engaged in a pattern of improper conduct with the purpose and intent of circumventing Advantage's Earn-out obligations by depressing Take 5's revenues and increasing Take 5's expenses, all while inflating Advantage Media's revenues and decreasing Advantage Media's expenses.

46.     Beginning in April 2018, Colen and other Advantage leaders emphasized that all Take 5 email marketing sales activities to Advantage's agencies (UpShot, EDGE, IN Marketing, Brand Connection, AMP, etc.) had to be conducted through Advantage Media.

47.     On at least four occasions, Advantage personnel working in the Take 5 business unit created a relationship with a prospective client and secured a sale worth hundreds of thousands of dollars or more.  Advantage then would force Take 5 to relinquish the sale—and the resulting profits—to Advantage Media, drastically decreasing Take 5's revenue.  In other words, not only were the representations false that Take 5 would have the benefit of Advantage's robust client network to increase its revenues, Advantage was also using Take 5 to improperly inflate profits at another part of the company.

48.     Despite knowing that Take 5's marketing campaigns and associated revenues were dependent upon its omni-channel business model, Colen and Pike repeatedly spread the word within the Advantage corporate structure that Take 5 was an email specialist, and that other

19

Advantage business units should use Take 5 only as such.  In other words, Take 5 should sell only email campaigns, and not digital, programmatic, direct mail, social media campaigns, because Pike and Advantage Media conducted those campaigns.  Colen's and Pike's efforts significantly reduced Take 5's capacity to make sales and generate revenue.

49.     Advantage also placed unnecessary and inappropriate expenses on Take 5's books with the purpose and intent of circumventing Advantage's obligation to pay the Earn-out.  These expenses included non-Take 5 employees' salaries, travel, and incidental expenses, as well as Advantage Media's subscription costs for certain subscription services, from which Take 5 received no financial benefit.  Each expense subtracted from Take 5's profits.

50.     Advantage's promises concerning intracompany sales also turned out to be empty. Instead of providing in-house customers for Take 5 to sell its services to, Advantage required Take 5 to sell its services at a steep discount to Advantage Media, allowing Advantage Media to resell those services at a significant mark-up.  This was another way for Colen to try to help Pike and his business at the expense of the Take 5 business unit.

51.     Despite raiding Take 5 for the benefit of Advantage Media, Colen and Pike were unable to rescue Pike's business.  Advantage Media had a terrible year in 2018, and Advantage folded the Advantage Media business unit into another of its acquisitions, the Jun Group.

52.     Moreover, Advantage leaders, including Colen and Pike, engaged in a pattern of conduct that destroyed Take 5 employees' morale such as conducting lay-offs, cancelling the holiday party, and cutting commissions and bonuses.  Advantage ultimately drove away key Take 5 employees, particularly sales employees, and many went on to work for Take 5's competitors. Advantage's conduct with respect to Take 5 employees had the purpose and intent of

circumventing the Earn-out, preventing the business unit from operating productively and efficiently.

53.      Indeed, towards the end of 2018, Advantage selected twenty of Take 5's approximately 30 sales employees to lay-off.  As these employees were compensated by nominal salaries and commission, they were of minimal expense to Advantage.  These employees, however, were invaluable to Take 5, identifying prospective clients, promoting Take 5's products and services to them, and making sales.  Consequently, Take 5's revenue plummeted in the months following the lay-offs.

54.      In January 2019, Advantage cut bonuses for almost all Take 5 employees. Advantage promised to issue bonuses in March, and then postponed them again to August. Advantage also cut commissions and, in some cases, redirected commissions from employees in the Take 5 business unit by forcing sales to go through other Advantage business units. Several key Take 5 sales employees resigned due to this pattern of conduct, further reducing Take 5's capacity to make sales and generate revenue.  Before leaving, a number of the impacted sales employees sought exemptions from the reduced commission schedule.  At this point, Radetich and Gluck had been stripped of any authority to make decisions, and referred the sales employees to Colen.  Colen did nothing to stop the departures.

*April 2019 to July 2019: The Relationship Falls Apart*

55.      On or about April 16, 2019, Radetich and Gluck met with Colen in New York City at Colen's request.  Colen recognized that Radetich and Gluck were nearly obsolete to the Take 5 business unit and offered to part ways early, releasing Radetich and Gluck from their indemnity obligations under the Purchase Agreement in exchange for their foregoing any Earn-out payments. However, Radetich and Gluck were confident that, despite Colen's efforts, the Take 5 business

unit would still hit the Earn-out milestones. Advantage was close to securing a multi-year contract for Take 5's data delivery business that would result in an additional $10 million per year in revenues at exceptionally high profit margins.

56.     Advantage nearly bungled the deal to the point where Colen told Radetich that he and Gluck should sue Advantage over their Earn-out if the agreement was not signed by Advantage. Eventually, the contract was signed in June 2019.

57.     At the time, Advantage was preparing to go public. As part of that process, an outside firm was auditing Advantage.

58.     In June 2019, Radetich and Gluck learned that Advantage was conducting an internal review into how the Take 5 business unit was producing certain documents, reports, invoices, and/or both. This paperwork was not an aspect of the business that Radetich or Gluck were directly involved in or knew about in any significant detail.

59.     In late June 2019, Colen told Radetich and Gluck that the outside auditor would not agree that Advantage could recognize revenue associated with sales that had inaccurate documentation. Colen, per guidance from Advantage CFO Brian Stevens further stated that Advantage leadership felt the problem could be contained if the unrecognized revenue was limited to $10 million to $12 million.

60.     In an attempt to preserve their IPO timeline, Advantage refused to give Colen the time or flexibility that was necessary to preserve Take 5's client relationships, maintain the Take 5 business unit, or keep unrecognized revenue losses to the targeted level.

61.     Instead, on July 1, 2019, Colen and Radetich were tasked with calling clients and following a script designed with the goal of recognizing at least some past revenue instead of preserving client relationships on a going forward basis. Clients were led to believe the worst

about how the Take 5 business unit was operating.  Nevertheless, a number of clients expressed a desire to continue their relationship.

62.    The following morning, on July 2, 2019, Radetich informed Colen that he was resigning.  Colen accepted Radetich's resignation, but asked Radetich to go to a hotel near the Take 5 office to be interviewed by Advantage's attorneys.  Colen advised that he had gone through a similar interview over the weekend and that it was of no concern.  Radetich agreed.  At the time, Gluck was at the hotel being interviewed.  When Gluck returned to the office, Colen told Gluck that Gluck was being placed on administrative leave and instructed him to leave the office.

63.    On July 11, 2019, at 10:00 A.M., Advantage called an all-hands meeting and laid off almost all of the employees in the Take 5 business unit.  During the meeting announcing the lay-offs, Colen told the employees that the Take 5 business unit had become a "toxic asset," that they are all "guilty" and had to be eliminated.  The employees were summarily dismissed.  Shortly thereafter, Advantage updated its public facing website to confirm that it had ceased operation of the business unit:



Take 5 Media Group has ceased operations. If you are a client seeking additional information, contact 561-819-5555 or email solutions@take5mg.org.

64.    Advantage shut down not only the Take 5 marketing campaign line of business, which Advantage claims was allegedly infected by fraud, but also the Take 5 data delivery line of business, a business for which Advantage has not identified any problems.

65.     Advantage continues to own Take 5's most valuable asset—its database—but it is unclear whether and to what extent Advantage is continuing to use that asset following the termination of the Take 5 business unit.

*July 2019 to August 2019: The Notice of Dispute and Retaliatory Allegations of Fraud*

66.     By shutting down the Take 5 business unit, Advantage has eliminated any possibility of Radetich and Gluck receiving an Earn-out under the Purchase Agreement.

67.     Based on this flagrant breach and the other violations of the Purchase Agreement described above, counsel for Radetich and Gluck sent a Notice of Dispute to Advantage on July 17, 2019, triggering a 30-day period during which the parties were required to meet and negotiate. *See* Purchase Agreement, § 10.11.

68.     Gluck tendered a written resignation, terminating his "administrative leave," on July 26, 2019.

69.     Advantage provided no substantive response for over two weeks.  On August 16, 2019, by letter, counsel for Advantage responded by stating that the notice of dispute was premature and, for the first time, levelled false allegations that Radetich and Gluck created and directed a scheme to defraud Advantage and its clients.

70.     Specifically, Advantage alleged that, under Radetich's and Gluck's direction, Advantage's Take 5 business unit supposedly did not send emails to consumers that it promised to its clients as part of the omni-channel marketing campaign line of business and purportedly sent false reports about the amount of emails deployed, delivered, and opened by consumers. Advantage further alleged that this was a practice that began prior to the sale of the Take 5 business to Advantage.

71.     Radetich and Gluck did not create, direct, engage in, perpetrate, or even have knowledge of any fraudulent activity, much less any improper business practice at Take 5, either while employed by Advantage or while they owned Take 5.

72.     After a follow-up letter dated August 8, 2019 from counsel for the Claimant referencing the parties' duty to meet and negotiate, counsel for the Claimant and counsel for the Respondents met and conferred by telephone on August 14, 2019, but were unable to resolve their dispute.   Accordingly, Claimant commences this arbitration proceedings for damages from Advantage, pursuant to Section 10.11 of the Purchase Agreement.

### COUNT I – BREACH OF CONTRACT

73.     Claimant repeats and re-alleges each and every allegation of the paragraphs above as if fully set forth herein.

74.     Advantage entered into a binding and enforceable Purchase Agreement with Claimant, Radetich, and Gluck.

75.     Advantage engaged in a course of conduct with "the purpose and intent . . . to circumvent the payment of the Initial Earn-out Amount or the Final Earn-out Amount" in breach of Section 1.5(j) of the Purchase Agreement.

76.     Advantage also failed to "maintain Take 5 as a separate business unit" during the Earn-out Period in breach of Section 1.5(j) of the Purchase Agreement.

77.     Advantage has engaged in an anticipatory breach of the Purchase Agreement by representing that it will not now, or ever, satisfy its contractual obligations.

78.     Advantage's breaches of contract are the direct and proximate cause of substantial harm to Claimant, Radetich, and Gluck, and Advantage is liable for all damages so incurred.

## COUNT II – BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

79.     Claimant repeats and re-alleges each and every allegation of the paragraphs above as if fully set forth herein.

80.     There is a covenant of good faith and fair dealing implied in every contract as a matter of law.

81.     The implied covenant of good faith and fair dealing requires each party to refrain from arbitrary or unreasonable conduct that prevents the other party from receiving the "fruits of the bargain."

82.     Advantage breached the implied covenant of good faith and fair dealing by engaging in arbitrary and unreasonable conduct, including terminating Take 5's business operations, and engaged in such conduct with the intent of depriving—and succeeded in depriving—Radetich and Gluck of the opportunity to receive the Earn-out.

83.     Advantage's breach of the implied covenant of good faith and fair dealing resulted in damages to Radetich and Gluck and Advantage is liable for all damages so incurred.

## PRAYER FOR RELIEF

WHEREFORE, Claimant respectfully demands judgment as follows:

a)     On the first cause of for breach of contract, determine and declare that Advantage breached the Purchase Agreement and Claimant is entitled to damages in amount to be determined at a hearing, together with costs and expenses incurred by Claimant, including attorneys' fees, and award such damages, costs and expenses;

b)      On the second cause of action for the implied covenant of good faith and fair dealing, determine and declare that Advantage breached the implied covenant of good faith and fair dealing and Claimant is entitled to an award of damages in an amount to be determined at a

26

hearing, together with costs and expenses incurred by Claimant including attorneys' fees, and award such damages, costs and expenses;

c)    Awarding Claimant such other and further relief as the Arbitrator deems just and proper.

Dated:  September 3, 2019                **MCDERMOTT WILL & EMERY LLP**

                                        */s/ Ashley R. Altschuler*
                                        Ashley R. Altschuler
                                        Ethan H. Townsend
                                        Harrison S. Carpenter
                                        The Nemours Building
                                        1007 North Orange Street, 4th Floor
                                        Wilmington, DE  19801
                                        (302) 485-3910
                                        aaltschuler@mwe.com
                                        ehtownsend@mwe.com
                                        hcarpenter@mwe.com

                                        Benjamin Goldberger
                                        28 State Street
                                        Boston, MA 02109
                                        (617) 535-4000
                                        bgoldberger@mwe.com