# EXHIBIT A

**BEFORE THE**

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| Petruss Media Group, LLC, f/k/a Take 5 Media Group, LLC, | AAA Case No. 01-19-0002-7532 |
| Claimant, | Arbitrator: Hon. James R. Eyler (Ret.) |
| v. | **THE ADVANTAGE PARTIES' POST-HEARING BRIEF** |
| Advantage Sales & Marketing LLC, a California limited liability company, | |
| Respondent. | Argument Date: July 5, 2022 |
| | Argument Time: 12:00 p.m. Eastern |

Advantage Sales & Marketing LLC, Advantage Sales & Marketing Inc., Karman Intermediate Corp., Advantage Solutions Inc., and Karman Topco L.P.,

      Counter-Claimant and Cross-Claimants,

    v.

Petruss Media Group, LLC f/k/a Take 5 Media Group LLC, RJV Marketing Corp., Richard Gluck, and Alexander Radetich,

      Counter-Respondent and Cross-Respondents.

Wayne R. Gross  (*WGross@GGTrialLaw.com*)
Michael H. Strub, Jr.  (*MStrub@GGTrialLaw.com*)
Desiree N. Murray  (*DMurray@GGTrialLaw.com*)
Edward A. Danielyan  (*EDanielyan@GGTrialLaw.com*)
GREENBERG GROSS LLP
650 Town Center Drive, Suite 1700
Costa Mesa, CA 92626
(949) 383-2800

Attorneys for Advantage Sales & Marketing LLC, Advantage Sales & Marketing Inc., Karman Intermediate Corp., Advantage Solutions Inc., and Karman Topco L.P.

## TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ................................................1

II.     STATEMENT OF FACTS .................................................................................................3

    A.    Take 5 held itself out as primarily an e-mail marketing company .........................3

    B.    The acquisition..........................................................................................................7

    C.    Advantage discovers the Take 5 Parties' fraud......................................................10

        1.    Mr. McGavran discovers that Take 5 is generating falsified reports........10

        2.    Ms. Creel discovers that Take 5 is not capable of sending e-mails ..........12

        3.    Mr. Weiner discovers that Take 5 is not sending e-mails on behalf of his clients .........................................................................................13

    D.    Engagement of FTI .................................................................................................15

    E.    Project Evolve .........................................................................................................15

    F.    FTI's audit...............................................................................................................18

    G.    The tracking reports were generated by an algorithm ...........................................22

    H.    The evidence refuted Mr. Radetich and Mr. Gluck's attempts to minimize the significance of the fraud................................................................................28

        1.    Vendors did not send e-mails for Take 5 ...................................................28

            (a)    Take 5 employees admitted that vendors sent low cost PPC traffic......................................................................................28

            (b)    Evidence of individual campaigns demonstrated that the Take 5 Parties sold e-mail campaigns and fulfilled them with PPC traffic....................................................................30

        2.    Take 5's clients were not aware that their e-mail campaigns were being fulfilled with PPC traffic..................................................................34

    I.    Take 5 is shutdown, and Advantage is forced to restate its financial statements................................................................................................................36

III.    PROCEDURAL HISTORY AND DISCOVERY OF EXTENT OF FRAUD.................37

    A.    Procedural history ...................................................................................................37

    B.    Take 5 falsified e-mail counts................................................................................37

    C.    Take 5 did not have double opt-in e-mail addresses...............................................41

    D.    Take 5 designed CMS to deceive clients that tracked their campaigns into believing that e-mails were sent................................................................42

        1.    Take 5 sent tracking links and pixels to PPC vendors to conceal PPC traffic..................................................................................................42

        2.    Take 5 used "link rotator" to manipulate links ..........................................46

    E.    FTI proved that Take 5 did not deploy e-mails........................................................47

F.     Take 5 did not have a usable e-mail database ........................................................50

IV.   ARGUMENT .........................................................................................................52

A.     Legal standard .............................................................................................52

B.     Fraudulent breach of the APA ......................................................................52

   1.     Legal standard ....................................................................................52

   2.     The Take 5 Parties fraudulently breached Section 2.5(a) of the
          APA because the Financial Statements were not prepared in
          accordance with GAAP ......................................................................54

   3.     The Take 5 Parties fraudulently breached Section 2.5(b) of the
          APA because the Accounts Receivable of Take 5 did not arise
          from valid sales actually made or performed .......................................57

   4.     The Take 5 Parties fraudulently breached Section 2.10(a) of the
          APA because Take 5 did not own or possess the Intellectual
          Property necessary to conduct its business ...........................................57

   5.     The Take 5 Parties fraudulently breached section 2.11(b) of the
          APA because the Take 5 Parties committed mail and wire fraud ..............59

          (a)     The Take 5 Parties represented and warranted that Take 5
                  had complied with all applicable Laws in operating its
                  business ....................................................................................59

          (b)     Elements of mail and wire fraud ................................................60

          (c)     The Take 5 Parties engaged in a scheme to defraud their
                  clients .......................................................................................60

          (d)     Mr. Radetich and Mr. Gluck intended to defraud Take 5's
                  clients .......................................................................................62

          (e)     Take 5 used mails and wires in furtherance of their scheme .........66

          (f)     Take 5 defrauded clients of money by charging them for
                  services that were not provided ...................................................66

   6.     The Take 5 Parties, including Mr. Radetich and Mr. Gluck, have
          an obligation to pay any Damages the Advantage Parties suffered ..........67

C.     Breach of the implied covenant of good faith and fair dealing ..........................68

D.     Fraud in the inducement ..............................................................................70

   1.     Legal standard ....................................................................................70

   2.     The Take 5 Parties made false representations of fact to induce
          Advantage to acquire the assets of Take 5 ............................................70

   3.     Advantage justifiably relied on Take 5's misrepresentations ...................72

E.     Fraud .........................................................................................................73

F.     RICO .........................................................................................................75

   1.     Legal standard ....................................................................................75

2.    Take 5 is an enterprise for the purposes of RICO.....................................76

3.    Take 5 was engaged in interstate commerce..............................................76

4.    Mr. Radetich and Mr. Gluck were associated with Take 5.......................77

5.    Mr. Radetich and Mr. Gluck engaged in a pattern of racketeering
      activity....................................................................................................77

      (a)    Mr. Radetich and Mr. Gluck used Take 5 as a vehicle to
             commit mail and wire fraud..........................................................77

      (b)    The fraud that the Take 5 Parties committed before the
             acquisition, in connection with the acquisition, and
             following the acquisition are part of the same pattern of
             racketeering activity......................................................................78

             (i)     The Take 5 Parties' acts in defrauding their clients
                     are related to their acts in defrauding the Advantage
                     Parties....................................................................................78

             (ii)    The Take 5 Parties' acts were continuous...........................80

             (iii)   The acts of the Take 5 Parties in defrauding their
                     own clients satisfies the "relatedness" and
                     continuity tests .....................................................................81

6.    Mr. Radetich and Mr. Gluck's pattern of racketeering activity
      proximately caused Advantage's injuries .................................................81

G.    Damages...............................................................................................................82

      1.    Consideration funded at closing................................................................82

            (a)    Amount of purchase price ..............................................................82

            (b)    Breach of contract ..........................................................................83

            (c)    Fraud and fraud in the inducement .................................................84

            (d)    RICO ...............................................................................................85

      2.    Consequential or out-of-pocket damages..................................................86

V.    TAKE 5'S CAUSES OF ACTION......................................................................................89

A.    Breach of Contract .............................................................................................89

B.    Defamation..........................................................................................................92

VI.   CONCLUSION.........................................................................................................................93

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abry Partners V, L.P. v. F & W Acquisition LLC*,
  891 A.2d 1032 (Del. Ch. 2006).............................................................................53

*Allied Capital Corp. v. GC-Sun Holdings, L.P.*,
  910 A.2d 1020 (Del. Ch. 2006).............................................................................69

*ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*,
  50 A.3d 434 (Del. Ch. 2012), *rev'd sub nom. Scion Breckenridge Managing
  Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665 (Del. 2013) .....................69

*Aster v. United States*,
  No. CV-89-2129 (CPS), 1992 WL 198137 (E.D.N.Y. Aug. 3, 1992), *aff'd*,
  996 F.2d 303 (2d Cir. 1993)..................................................................................67

*Authentic Apparel Grp., LLC v. United States*,
  989 F.3d 1008 (Fed. Cir. 2021)............................................................................92

*In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*,
  804 F.3d 633 (3d Cir. 2015).................................................................................82

*Bowden v. Peterson*,
  2 F. App'x 701 (8th Cir. 2001) ............................................................................92

*Breslin Realty Dev. Corp. v. Schackner*,
  397 F. Supp. 2d 390 (E.D.N.Y. 2005) ..................................................................81

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 ...............................................................................................61, 82

*Carpenter v. United States*,
  484 U.S. 19 (1987).............................................................................................60

*Catamaran Acquisition Corp. v. Spherion Corp.*,
  C.A. No. 00C-09-180JRS, 2001 WL 755387 (Del. Sup. Ct. May 31, 2001) .........................84

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001)...........................................................................................77

*Cinerama, Inc. v. Technicolor, Inc.*,
  663 A.2d 1134 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995)..................................84, 85

*Cobalt Operating, LLC v. James Crystal Enters., LLC*,
  C.A. No. 714-VCS, 2007 WL 2142926 (Del. Ch. July 20, 2007) ..............................19, 71, 73

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
   187 F.3d 229 (2d Cir. 1999).....................................................................................80

*DeFalco v. Bernas*,
   244 F.3d 286 (2d Cir. 2001).....................................................................................80

*Deloitte LLP v. Flanagan*,
   C.A. No. 4125-VCN, 2009 WL 5200657 (Del. Ch. Dec. 29, 2009)..........................70

*Dunlap v. State Farm Fire & Cas. Co.*,
   878 A.2d 434 (Del.2005) ...........................................................................................69

*E.I. DuPont de Nemours & Co. v. Fl. Evergreen Foliage*,
   744 A.2d 457 (Del. 1999) ..........................................................................................70

*EMSI Acquisition, Inc. v. Contrarian Funds*,
   LLC, No. CV 12648-VCS, 2017 WL 1732369 (Del. Ch. May 3, 2017)...................53

*Firmenich Inc. v. Natural Flavors, Inc.*,
   2020 WL 1816191, No. N19C-01-320 MMJ (Del. Sup. Ct. April 7, 2020)..............85

*Galerie Furstenberg v. Coffaro*,
   697 F. Supp. 1282 (S.D.N.Y. 1988).........................................................................76

*Gerber v. Enter. Prod. Holdings, LLC*,
   67 A.3d 400 (Del. 2013), *overruled on other grounds by Winshall v. Viacom
   Int'l, Inc.*, 76 A.3d 808 (Del. 2013) .........................................................................69

*Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*,
   No. CV 7906-VCG, 2018 WL 6311829 (Del. Ch. Dec. 3, 2018)............................72

*H.J. Inc. v. Nw. Bell Tel. Co.*,
   492 U.S. 229 (1989).............................................................................................78, 81

*Hauspie v. Stonington Partners, Inc.*,
   945 A.2d 584 (Del. 2008) ..........................................................................................73

*Holmes v. The News J. Co.*,
   CV N13C-11-136 MMJ, 2015 WL 1893150 (Del. Super. Apr. 20, 2015),
   *aff'd*, 126 A.3d 1109 (Del. 2015)...........................................................................92

*Holmes v. Sec. Inv. Prot. Corp.*,
   503 U.S. 258 (1992)..................................................................................................81

*Lazo v. Summit Mgmt. Co., LLC*,
   No. 1:13-CV-02015-AWI-JL, 2014 WL 3362289 (E.D. Cal. July 9, 2014) ............86

*LCT Cap., LLC v. NGL Energy Partners LP*,
   249 A.3d 77 (Del. 2021) ............................................................................................88

*Lynch v. Vickers Energy Corp.*,
    429 A.2d 497 (Del. 1981), *overruled on other grounds by Weinberger v.*
    *UOP, Inc.*, 457 A.2d 701 (Del. 1983) .................................................84

*Maio v. Aetna, Inc.*,
    221 F.3d 472 (3d Cir. 2000).................................................................88

*Malvino v. Delluniversita*,
    840 F.3d 223 (5th Cir. 2016) ...............................................................76

*Marini v. Adamo*,
    995 F. Supp. 2d 155 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016) .......................72

*Metromedia Co. v. Fugazy*,
    983 F.2d 350 (2d Cir. 1992)................................................................80

*Nat'l Org. for Women, Inc. v. Scheidler*,
    510 U.S. 249 (1994)...........................................................................76

*Neder v. United States*,
    527 U.S. 1 (1999)..........................................................................60, 61

*Online HealthNow, Inc. v. CIP OCL Invs., LLC*,
    No. CV 2020-0654-JRS, 2021 WL 3557857 (Del. Ch. Aug. 12, 2021).................................53

*OpenGate Capital Grp. LLC v. Thermo Fischer Sci. Inc.*,
    C.A. No. 13-1475-GMS, 2014 WL 3367675 (D. Del. July 8, 2014).....................................70

*Paron Capital Mgmt., LLC v. Crombie*,
    C.A. No. 6380-VCP, 2012 WL 2045857 (Del. Ch. May 22, 2012), aff'd, 62
    A.3d 1223 (Del. 2013) ...................................................................72, 88

*Pierce v. Int'l Ins. Co. of Ill.*,
    671 A.2d 1361 (Del. 1996) ..................................................................68

*Roth v. Walsh*,
    C.A. No. 04-08-0016, 2006 WL 136429 (Del. Com. Pl. Jan. 19, 2006) ...............................70

*Rude v. United States*,
    74 F.2d 673 (10th Cir. 1935) ...............................................................66

*Scott v. Acadia Realty Tr.*,
    C.A. No. 07C-02-102RRC, 2009 WL 5177152 (Del. Super. Dec. 8, 2009),
    aff'd, 11 A.3d 228 (Del. 2010) .............................................................92

*Sebastian Int'l, Inc. v. Russolillo*,
    128 F. Supp. 2d 630 (C.D. Cal. 2001) ......................................................76

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)...........................................................................75

*Sever v. Alaska Pulp Corp.*,
    978 F.2d 1529 (9th Cir. 1992) ......................................................................77

*Siga Techs., Inc. v. PharmAthene, Inc.*,
    132 A.3d 1108 (Del. 2015) ..........................................................................84

*Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*,
    985 F.2d 102 (2d Cir. 1993)..........................................................................76

*Stegemeier v. Magness*,
    728 A.2d 557 (Del. 1999) ............................................................................84

*Stephenson v. Capano Dev., Inc.*,
    462 A.2d 1069 (Del. 1983) ..........................................................................75

*Tekstrom, Inc. v. Savla*,
    C.A. No. 05A-12-006JTV, 2006 WL 2338050 (Del. Super. July 31, 2006),
    *aff'd*, 918 A.2d 1171 (Del. 2007)..................................................................72

*United States v. Andreadis*,
    366 F.2d 423 (2d Cir. 1966).........................................................................67

*United States v. Angiulo*,
    897 F.2d 1169 (1st Cir. 1990).......................................................................78

*United States v. Bryant*,
    655 F.3d 232 (3d Cir. 2011)..........................................................................85

*United States v. Carpenter*,
    190 F. Supp. 3d 260 (D. Conn. 2016), *aff'd sub nom. United States v. Bursey*,
    801 F. App'x 1 (2d Cir. 2020) ......................................................................66

*United States v. Dfouni*,
    856 F. App'x 388 (3d Cir. 2021) ..................................................................85

*United States v. Donohue*,
    726 F. App'x 333 (6th Cir. 2018) ................................................................65

*United States v. Espinoza*,
    52 F. App'x 846 (7th Cir. 2002) ..................................................................77

*United States v. Faulkenberry*,
    614 F.3d 573 (6th Cir. 2010) .......................................................................60

*United States v. Godwin*,
    272 F.3d 659 (4th Cir. 2001) .......................................................................64

*United States v. Graham*,
    477 F. App'x 818 (2d Cir. 2012) ...........................................................61, 64

*United States v. Gravatt*,
   280 F.3d 1189 (8th Cir. 2002) ..............................................................................64

*United States v. Hodge*,
   588 F.3d 970 (8th Cir. 2009) ................................................................................66

*United States v. Howard*,
   619 F.3d 723 (7th Cir. 2010) ...............................................................................64

*United States v. Huff*,
   699 F.2d 1028–29 (10th Cir. 1983) ................................................................67, 68

*United States v. Indelicato*,
   865 F.2d 1370 (2d Cir. 1989)...........................................................................78, 80

*United States v. Kurniawan*,
   627 F. App'x 24 (2d Cir. 2015) ............................................................................76

*United States v. Locascio*,
   6 F.3d 924 (2d Cir. 1993)......................................................................................78

*United States v. McArthur*,
   850 F.3d 925 (8th Cir. 2017) ...............................................................................78

*United States v. Mehta*,
   594 F.3d 277 (4th Cir. 2010) ...............................................................................60

*United States v. Minicone*,
   960 F.2d 1099 (2d Cir. 1992)...............................................................................78

*United States v. Nascimento*,
   491 F.3d 25 (1st Cir. 2007)...................................................................................76

*United States v. Owens*,
   301 F.3d 521 (7th Cir. 2002) ...............................................................................62

*United States v. Payne*,
   591 F.3d 46 (2d Cir. 2010)....................................................................................78

*United States v. Philip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009)......................................................................65, 77

*United States v. Romano*,
   794 F.3d 317 (2d Cir. 2015)..................................................................................66

*United States v. Ruiz*,
   620 F. App'x 577 (9th Cir. 2015) .........................................................................66

*United States v. Schuler*,
   458 F.3d 1148 (10th Cir. 2006) ...........................................................................64

*United States v. Umana*,
    713 F. App'x 106 (3d Cir. 2017) ............................................................85

*United States v. Vas*,
    497 F. App'x 203 (3d Cir. 2012) ............................................................64

*Vichi v. Koninklijke Philips Elecs., N.V.*,
    85 A.3d 725 (Del. Ch. 2014) .................................................................52

*VLIW Tech., LLC v. Hewlett-Packard Co.*,
    840 A.2d 606 (Del. 2003) ......................................................................53

*Wilcox v. First Interstate Bank of Oregon, N.A.*,
    815 F.2d 522 (9th Cir. 1987) .................................................................52

*Wilmington Sav. Fund Soc'y, FSB v. Foresight Energy LLC*,
    C.A. No. 11059-VCL, 2015 WL 7889552 (Del. Ch. Dec. 4, 2015) ............69

*Zimmerman v. Crothall*,
    62 A.3d 676 (Del. Ch. 2013) .................................................................52

**Statutes and Other Authorities**

11 American Law of Torts, *Remedies; jurisdiction; burden of proof* § 34:30
    (Supp. 2022) .........................................................................................85

Fraudulent Claims Act .................................................................................47

GAAP Rule 606 ...........................................................................................55

GAAS § 3A.03 (2021) .................................................................................55

*In the Matter of Rulemaking to Adopt; Amend Rules to Address an Issue Arising
    from 2020s Senate Bill 1603; an Issue Identified in Um 2040.*, No. 21-112,
    2021 WL 1597335 (Apr. 21, 2021) .......................................................55

Racketeer Influenced and Corrupt Organizations Act (RICO) ............................ *passim*

Restatement (Second) of Torts § 435 ...........................................................82

Restatement (Second) of Torts § 538 ...........................................................61

Restatement (Second) of Torts § 541 ...........................................................72

Federal Rules of Evidence 702–704 .............................................................47

18 U.S.C. § 1341 .......................................................................................60

18 U.S.C. § 1343 .......................................................................................60

18 U.S.C. § 1346 .......................................................................................60

18 U.S.C. § 1961 .................................................................................................................. 76, 77

18 U.S.C. § 1962 ........................................................................................... 3, 75, 77, 86

18 U.S.C. § 1964 .................................................................................................................. 86, 89

**INDEX OF ARGUMENTS AND EXAMINATIONS**

| ARGUMENT/ WITNESS | DIRECT | CROSS | RE-DIRECT | RE-CROSS |
|---|---|---|---|---|
| Advantage's Opening Statement | Vol. 1, page 6, line 4, to page 15, line 19 (cited as "1:Tr. 6:4–15:19") | | | |
| Take 5's Opening Statement | (Richards): 1:Tr. 15:23–44:16<br><br>(Roth): 1:Tr. 44:20–65:7 | | | |
| Darrin Kleinman | 1:Tr. 80:17–151:16 | (Roth): 1:Tr. 152:8–271:6<br><br>(Richards): 1:Tr. 271:18–291:11 | | |
| Gary Colen | 2:Tr. 302:4–503:23 | (Richards): 2:Tr. 504:15–595:4; 3:Tr 606:11–672:18<br><br>(Roth): 3:Tr. 673:21–777:15 | 3:Tr. 779:8–782:18 | (Roth): 3:Tr. 782:24–789:3 (includes Judge's questions) |
| Corey Weiner | 3:Tr. 793:4–871:7 | (Richards): 3:Tr. 872:3–908:14<br><br>(Roth): 3:Tr. 909:19–927:15 | | |

| ARGUMENT/ WITNESS | DIRECT | CROSS | RE-DIRECT | RE-CROSS |
|---|---|---|---|---|
| Michael Wei | 4:Tr. 939:2–949:6, 952:19–1125:12 | (Richards Voir Dire): 4:Tr. 951:18–952:3<br><br>(Richards): 4:Tr. 1126:10–1205:11<br><br>(Roth): 5:Tr. 1214:6–1302:9 | 4:Tr. 1302:15–1318:3 | (Roth): 4:Tr. 1318:11–1321:22 |
| David Lasater | 5:Tr. 1325:15–1360:17 | (Richards): 5:Tr. 1362:12–1366:25<br><br>(Roth): 5:Tr. 1367:6–1384:10 | | |
| David Kalat | 5:Tr. 1386:13–1468:3 | (Richards): 5:Tr. 1469:4–1499:7<br><br>(Roth): 6:Tr. 1506:8–1574:16 | | |
| Michael Boy | 6:Tr. 1576:5–1647:11 | (Roth): 6:Tr. 1647:18–1727:6<br><br>(Richards): 6:Tr. 1731:3–1752:20 | | |
| Ryan McGavran | 7:Tr. 1765:4–1847:25 | (Roth): 7:Tr. 1848:9–1953:20<br><br>(Richards): 7:Tr. 1954:21–2005:13 | 7:Tr. 2005:20–2006:15 | |
| Eva Hodgens | 7:Tr. 2008:2–2060:13; 8:Tr. 2069:7–2112:7 | (Richards): 8:Tr. 2112:11–2199:3<br><br>(Roth): 8:Tr. 2199:10–2216:23 | 8:Tr. 2217:4–2220:6 | (Roth): 8:Tr. 2220:23–2222:12 |
| Peter Ward | 8:Tr. 2223:13–2256:18 | (Richards): 8:Tr. 2257:20–2260:23 | | |

| ARGUMENT/ WITNESS | DIRECT | CROSS | RE-DIRECT | RE-CROSS |
|---|---|---|---|---|
| Paul Brewer | 8:Tr. 2265:5–2279:6 | (Roth): 8:Tr. 2279:19–2286:5 <br><br> (Richards): 8:Tr. 2286:16–2289:2 | | |
| Prima Creel | 9:Tr. 2299:13–2371:17 | (Richards): 9:Tr. 2372:9–2444:22 | 9:Tr. 2445:8–2446:7 | (Richards): 9:Tr. 2446:13–2448:12 |
| Josh Pike | 9:Tr. 2449:24–2506:6 | (Roth): 9:Tr. 2507:19–2547:8 <br><br> (Richards): 9:Tr. 2547:22–2580:25 | | |
| Dean Kaye | 10:Tr. 2623:7–2675:11 | (Richards): 10:Tr. 2677:3–2703:20 | | |
| Don Morris | 10:Tr. 2714:18–2797:2 | 10:Tr. 2797:9–2859:5; 11:Tr. 2867:3–2933:16 | 11:Tr. 2934:9–2945:2 <br><br> Further re-direct: 11:Tr. 2949:21–2050:12 | 11:Tr. 2945:16–2949:11 |
| Michael Weintraub | 11:Tr. 2951:14–2996:3 | 11:Tr. 2996:8–3051:8 | | |
| Mark Adams | 11:Tr. 3056:7–3108:15 | 11:Tr. 3109:2–3156:22; 12:Tr. 3268:7–3331:22 | 12:Tr. 3332:12–3335:20 | |
| Erik Findeisen | 12:Tr. 3165:2–3185:14 | 12:Tr. 3185:20–3198:8 | 12:Tr. 3198:14–3200:18 | 12:Tr. 3201:14–16 |
| Rob Quadrino | 12:Tr. 3204:6–3225:16 | 12:Tr. 3225:22–3255:8 | | |
| David McCoy | 12:Tr. 3338:11–3390:23 | 12:Tr. 3392:10–3413:10 | 13:Tr. 3422:4–3432:10 | 13:Tr. 3432:16–3433:10 |
| Jeffrey Baliban | 13:Tr. 3435:13–3473:19 | 13:Tr. 3473:24–3538:4 | 13:Tr. 3538:12–3539:9 | |

| ARGUMENT/ WITNESS | DIRECT | CROSS | RE-DIRECT | RE-CROSS |
|---|---|---|---|---|
| David Noderer | 13:Tr. 3541:6–3579:8 | 13:Tr. 3583:4–3614:11 | 13:Tr. 3614:16–3617:3 | 13:Tr. 3617:9–18 |
| Brian Stevens (Deposition) | 14:Tr. 3631:18–3675:23 | | | |
| Tanya Domier (Deposition) | 14:Tr. 3676:16–3715:25 | | | |
| Jonathan Hochman | 14:Tr. 3717:15–3798:7 | 14:Tr. 3798:13–3838:22 | 14:Tr. 3839:3–3842:9 | |
| Jessie Stricchiola | 15:Tr. 3862:14–3909:11 | 15:Tr. 3909:20–3953:15 | 15:Tr. 3954:5–3964:24 | |
| Mary Jo Benjoseph (Vol. 1) | Deposition designations | | | |
| Mary Jo Benjoseph (Vol. 2) | Deposition designations | | | |
| Anna Berry | Deposition designations | | | |
| Christopher Brown | Deposition designations | | | |
| David Johnson | Deposition designations | | | |

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Advantage Sales & Marketing LLC ("Advantage") acquired the assets of Take 5 Media Group, LLC ("Take 5") because the founders, Alex Radetich and Richard Gluck, represented that Take 5 was an e-mail service provider ("ESP") that had a database of proprietary e-mail addresses used to send e-mails to targeted demographic audiences through its in-house e-mail delivery platforms.  Take 5 represented and warranted in the Asset Purchase Agreement ("APA") that Take 5 had these capabilities and was legitimately engaged in this business.[1]  These representations were false, Mr. Radetich and Mr. Gluck knew that they were false, and they made the representations to induce Advantage to acquire the assets of Take 5.

Take 5 did not fulfill campaigns by sending e-mails through its in-house e-mail delivery platforms—nor did Take 5 contract with third-party vendors to send e-mails the clients ordered. Instead, Take 5 would take the client's uniform resource location ("URL") link from the client's e-mail campaign and send it to a pay-per-click ("PPC") vendor that would generate clicks to deceive the client into believing that Take 5 had sent e-mails and that consumers were opening those e-mails and clicking on the URL link.  Take 5 then would generate a tracking report using an algorithm to make up information about the number of e-mails that were deployed, delivered, opened, and acted upon based on the number of e-mails the client had ordered.  It did this both because it lacked the data and software systems to deploy e-mail campaigns and because it was paying its PPC vendors significantly less money than it would have cost to send e-mails.

The Advantage Parties' burden of proof on their contract, fraud, and Racketeer Influenced and Corrupt Organizations Act ("RICO") claims is preponderance of the evidence. The actual proof was conclusive.  Eva Hodgens and Michael Boy, who were the Take 5 employees responsible for fulfilling e-mail advertising campaigns, testified that instead of

---

[1]  Ex. A-230 [APA] at 17–35 (Article II).

sending e-mails they used PPC vendors to generate clicks. Take 5's internal logs from its e-mail delivery systems showed that Take 5 sent a miniscule fraction of the e-mails that its clients paid it to send. The Take 5 Parties[2] did not offer any contradictory evidence.

Instead, the Take 5 Parties tried to deflect the evidence by arguing that the Advantage Parties[3] had not proved that clients were ordering e-mail campaigns or, in the alternative, that e-mails were being sent by Take 5's subcontractors. Not only did they fail to offer any evidence to support these arguments, the testimony and documents introduced during the arbitration completely refuted them.

The APA defines Mr. Radetich, Mr. Gluck, and RJV Marketing Corp., collectively, as the "Beneficial Owners" of Take 5,[4] and they are liable to indemnify Advantage and its affiliates— which are defined as the "Buyer" and the "Buyer Indemnified Parties," respectively[5]—from any Damages that they suffered as a consequence of breaches of the representations and warranties in Article II.[6] Independently, Mr. Radetich and Mr. Gluck certified to Advantage that Take 5's representations and warranties were true.[7] Therefore, they are directly liable to the Advantage Parties for the breaches of the representations and warranties in Article II of the APA. They also

---

[2] Petruss Media Group, LLC f/k/a Take 5 Media Group LLC, RJV Marketing Corp., Richard Gluck, and Alexander Radetich.

[3] Advantage, Advantage Sales & Marketing Inc., Karman Intermediate Corp., Advantage Solutions Inc., and Karman Topco L.P. are referred to collectively herein as the "Advantage Parties." The "Advantage Parties" are defined in the Asset Purchase Agreement as the Buyer and Buyer Indemnified Parties. Ex. A-230 [APA] at 1 (Preamble), A-3 (Definitions). As the Advantage Parties previously stated, the company formerly known as Advantage Solutions Inc. changed its name to ASI Intermediate Corp. as part of the reverse merger with Conyers Park II in October 2020. As a result, there is now a legal entity between ASI Intermediate Corp. and Karman Topco L.P. that is called Advantage Solutions Inc. formerly known as Conyers Park II Acquisition Corp.

[4] Ex. A-230 [APA] at 1 (Preamble), A-2 (Definitions).

[5] Ex. A-230 [APA] at 1 (Preamble), A-3 (Definitions).

[6] Ex. A-230 [APA] at 1 (Preamble), 58–59 (Section 8.2).

[7] Ex. A-230 [APA] at 53–55 (Section 7.1); Ex. A-545 [Closing Certificate].

are liable because they committed fraud and violated the RICO statute.

The Advantage Parties suffered $94,786,533.41 in damages[8]—excluding interest, fees, and costs—and, as we explain below, they are entitled to recover the full amount of their damages as a remedy for both their contract and fraud claims.  Further, they are entitled to an award of treble damages—$284,359,600.23—under the RICO statute, 18 U.S.C. § 1962.  They respectfully request that Your Honor issue an award in that amount and grant leave to seek interest and an award of additional fees and expenses to which they are entitled.

## II.    STATEMENT OF FACTS

### A.    Take 5 held itself out as primarily an e-mail marketing company

Take 5 was founded in 2003 by Mr. Radetich and Mr. Gluck.[9]  It was headquartered in Boca Raton, Florida, and had a smaller office in New York, New York.[10]

The Take 5 Parties argued throughout these proceedings that Take 5 was not an e-mail marketing company but was "an omni-channel" company.[11]  This is a red herring.  As Your Honor has recognized, the Advantage Parties do not dispute that Take 5 offered digital marketing services in addition to e-mail, but the evidence conclusively demonstrated that Take 5 primarily sold e-mail marketing campaigns:

- Mr. Radetich and Mr. Gluck described Take 5 as an e-mail marketing company.[12]

---

[8]  *See* **Kaye:** 10:Tr. 2675:6–9.

[9]  11/19/19 Take 5 Amended Statement of Claim at ¶ 16.

[10]  *Id.* at ¶ 17; **Colen:** 2:Tr. 328:22–25.

[11]  *E.g.*, **Take 5 Opening Statement:** 1:Tr. 48:3–7, 64:23–65:6 (Roth).

[12]  *See* **Kleinman:** 1:Tr. 126:19–127:5 (Mr. Radetich and Mr. Gluck described Take 5 as an e-mail marketing company), 123:2–8 (Mr. Radetich and Mr. Gluck never described Take 5 as being "anything other than an e-mail service provider that provided – that distributed 100 percent of its e-mails in-house using its proprietary database"), 128:9–14 (Mr. Radetich and Mr. Gluck represented before the acquisition that Take 5 was "performing e-mail marketing services.  That was sort of the whole basis for the transaction"); **Colen:** 2:Tr. 316:10–14 (Mr. Gluck described

- Every percipient witness who worked in Take 5's sales department confirmed that Take 5 primarily sold e-mail campaigns.[13]

---

Take 5 as "the best e-mail company in all of America"); **Weiner:** 3:Tr. 803:18–807:16 (Mr. Radetich and Mr. Gluck described Take 5 as an e-mail advertising company); **McGavran:** 7:Tr. 1783:8–1784:10 & Ex. A-164 [1/23/19 e-mail communication from A. Radetich to R. McGavran] (Mr. Radetich represented that Take 5 was primarily an e-mail marketing company); **Creel:** 9:Tr. 2303:8–17 (during Ms. Creel's interview process Mr. Radetich and Mr. Gluck described Take 5 as a marketing company with e-mail marketing as their main channel), 2312:22–2313:18 & Ex. A-169 [1/4/19 e-mail communication from A Radetich to P. Creel, *et al.*] (Mr. Radetich stating that Take 5 is "an email service provider"); Ex. A-364 [8/7/17 e-mail communication from A. Radetich to Petsky Prunier] (admission by Mr. Radetich that Advantage was interested in acquiring Take 5 to "start using email as a channel" for marketing and that Advantage had "all the other digital and social" advertising covered); *see* Ex. A-528 [Investment Considerations presentation] at 5 (According to the information that Mr. Radetich and Mr. Gluck provided to Advantage before the acquisition, e-mail advertising accounted "for the majority of the company's revenue, about two-thirds of the revenue in 2017").

[13] **Adams:** 11:Tr. 3112:22–3116:3 & Ex. A-726 [4/6/16 e-mail communication from A. Radetich to M. Adams, *et al.*] (responding favorably to characterization of Take 5 as a "high tech e-mail marketing company"), 3116:4–19 & Ex. A-734 [4/6/16 e-mail communication from M. Adams to J. Bowman] (same), 3140:5–12, 3142:9–3143:17 (Mr. Adams's clients were e-mail only or blended e-mail campaigns); **Benjoseph:** Mary J. Benjoseph Deposition Transcript ("Benjoseph Dep.") (Vol. 1) at 19:7–15 ("I would say the majority of what we did was e-mail marketing."); **Creel:** 9:Tr. 2305:6–13 ("Most of the team was primarily selling e-mail. That was a big focus."), 2306:6–13 ("Most clients wanted e-mail only campaigns."), 2433:8–16 (Take 5 "was a data company who provided multiple channels of advertising, but e-mail marketing was their heaviest and most focused channel."); **Morris:** 11:Tr. 2899:7–2902:3 (reviewing the list of his clients and confirming that all were primarily or exclusively e-mail advertising clients), 2904:7–21 (Meredith made clear that Take 5's value in the relationship was through sending e-mails), 2910:8–16 (Take 5 had clients that were spending a lot of money and only wanted e-mail), 2912:25–2913:11 (local channel partners only wanted e-mail campaigns), 2924:13–2925:2 & Ex. A-703 [7/2/19 e-mail communication from D. Gesiorski (Adtaxi) to P. Creel, *et al.*] (Adtaxi wanted e-mail only campaign), 2907:22–2909:24 (it was an "ongoing struggle" to convince clients to move from e-mail); Exs. A-158 [5/21/19 e-mail communication from D. Morris to R. McGavran] (confirming that "some fairly large legacy clients . . . are tied into email only"), A-704 [7/8/19 e-mail communication from D. Morris to M. Boy and P. Creel] (Affinitiv was receiving e-mail only campaigns, and not Omni-Reach, as of July 2019); **Quadrino:** 12:Tr. 3231:17–3232:25 & Ex. A-841 [5/3/16 e-mail communication from R. Quadrino to AMSI, *et al.*] (testimony and documentary evidence that AMSI wanted an e-mail partner); **McCoy:** 12:Tr. 3387:13–18 (explaining the difference between Take 5 and Audient Company is that Audient does not do e-mail), 3358:12–18 & Ex. T-365 [Take 5 workflow chart] (discussing e-mail campaigns).

-4-

- Ms. Hodgens and Mr. Boy, who fulfilled the campaigns, testified that Take 5 was primarily selling e-mail campaigns.[14]

- In their presentation to Advantage's management, the Take 5 Parties described e-mail marketing as "an integral part of the Company's digital marketing portfolio."[15]

- Ryan McGavran, who was Take 5's general manager from January 2019 through the time it closed, testified that Take 5's business was primarily e-mail marketing.[16]

- All the clients of Take 5 who testified—Corey Weiner, Joshua Pike, Michael Weintraub, and Anna Berry—said that they bought e-mail campaigns.[17]

- Tanya Coker, who was in client services, worked with Beth Jenkins, Take 5's CFO, and the rest of the Take 5 team in June 2019 to evaluate whether clients could be converted from e-mail marketing campaigns and, during that analysis,

---

[14] **Boy:** 6:Tr. 1586:25–1587:6 (e-mail and e-mail campaigns generated most of the revenue), 1660:10–21 (clients "were sold e-mail and were offered e-mail. They thought they were coming to an e-mail company. So the assumption is that they did want e-mail. I mean, when you buy a car, you go to a car dealership, you're expecting to get a car"); **Hodgens:** 7:Tr. 2041:8–22 & Ex. A-54 [10/27/16 Vestergaard Sales Order] ("digital media" campaigns were e-mail campaigns), 2049:24–2050:9 (same), 8:Tr. 2092:12-2093:5 & Ex. A-668 [2/7/18 Reckkit-Airwick Sales Order] (same), 2133:22–2134:10 (customers wanted e-mail).

[15] Ex. A-527 [October 2017 Management Presentation] at 527.0037; *see also* **Colen:** 3:Tr. 680:13–682:6 (discussing the Management Presentation).

[16] **McGavran:** 7:Tr. 1817:8–1818:11 & Ex. A-551 [6/11/19 e-mail communication from T. Coker to G. Colen, *et al.*] (almost all of Take 5's clients purchased e-mail).

[17] **Weiner:** 3:Tr. 807:17–19, 808:3–9 (Jun Group hired Take 5 to run e-mail marketing campaigns); **Pike:** 9:Tr. 2491:6–17, 2491:18–2492:4, 2492:13–2493:6 & Ex. A-668 [2/7/18 Reckkit-Airwick Sales Order] (Take 5 represented it would deliver e-mail services for the Finish Quantum Max and Air Wick campaigns); **Weintraub:** 11:Tr. 2956:3–16, 2985:23–2986:5 (Medicx hired Take 5 to run e-mail campaigns); **Berry:** Anna Berry Deposition Transcript ("Berry Dep.") 23:13–24:7 (IvyWise purchased e-mail marketing primarily because of Take 5's representations of its e-mail lists).

concluded that of Take 5's 149 clients, 94 (63%) were e-mail only and all but four (98%) included an e-mail component.[18]

- Clients reported to Mr. Radetich, Mr. Gluck, and Mr. Colen at the end of June and the beginning of July 2019 that they bought e-mail campaigns and did not agree to any other form of digital advertising.[19]

As discussed in Part II.B, *infra*, the Take 5 Parties also represented that Take 5 was fulfilling these campaigns with e-mails that it was sending from its own e-mail delivery platforms.

The Take 5 Parties tried to create confusion by pointing to other forms of digital media advertisement, such as social media, that clients paid Take 5 to provide. But Take 5 represented to its clients that it would use these advertising channels in addition to sending the contracted number of e-mails, often representing that they were retargeting e-mail openers.[20] The testimony

---

[18] **Creel:** 9:Tr. 2355:4–2356:4, 2356:10–21 (confirming Ms. Coker's analysis); **McGavran:** 7:Tr. 1810:18–1812:3 (same); Exs. A-551 [6/11/19 e-mail communication from T. Coker to G. Colen, *et al.*] (discussing client transition strategy), A-551A [Excel spreadsheet regarding Take 5's investigation by client].

[19] *See* **Colen:** 2:Tr. 441:14–20 (only one of the eight clients Mr. Colen spoke to with Mr. Radetich and Mr. Gluck agreed to provide written confirmation that they had agreed to accept advertising services other than e-mail); Ex. A-426 [client call notes] (relating to client calls with Meredith, Affinitiv, Meredith AZ, Neustar, InfoGroup, Media Storm, Adtaxi, and Refuel Agency).

[20] *See* **Pike:** 9:Tr. 2462:16–2464:25 & Ex. 162 [10/17/18 e-mail communication between A. Radetich and J. Pike] (based on Mr. Radetich's e-mail to Mr. Pike retargeting in this context required an e-mail be sent to a consumer first); Exs. A-681 [6/28/2017 e-mail communication with E. Hodgens, D. Gilbert, and Sans Services USA, *et al.*] (Take 5 "can offer a concurrent retargeting of email openers and clickers via social media . . ."), A-658 [1/4/18 Sandals Resort Sales Order] (line item for retargeting with description "retargeting of email openers and clickers . . ."). Mr. Morris testified about a presentation he made at a conference where he represented that social media is run concurrently with e-mail campaigns, and geo-fencing is effective when paired with e-mail targeted display advertising. **Morris:** 10:Tr. 2821:12–23.

of Don Morris, a former Take 5 sales employee and current employee of Audient Company,[21] could not be clearer on this point:

> Q. But as of June 2019, 100 percent of the clients for whom you were the sales representative wanted e-mail as at least a component of the campaign, correct?
>
> A. As a component, yes, sir.[22]

## B.    The acquisition

In 2017, Mr. Radetich and Mr. Gluck hired Petsky Prunier, an investment banking firm, to market Take 5's assets to potential investors.[23]  Advantage's business included digital marketing services, but Advantage did not have the capability in-house to fulfill e-mail marketing campaigns.[24]  Mr. Pike, the former head of Advantage Media and current Executive Vice President of Strategy and Integrations at Advantage, had retained Take 5 to fulfill e-mail marketing campaigns on behalf of Advantage Media's clients and brought the company to the attention of Advantage's executives.[25]

In June 2017, Advantage received the Confidential Information Memorandum (the "CIM") from Petsky Prunier describing Take 5's business.[26]  In the CIM, Take 5 represented that

---

[21] Audient Company was founded by Mr. Radetich and Mr. Gluck.  *See* **Morris:** 10:Tr. 2715:20–25.

[22] **Morris:** 11:Tr. 2897:20–24.

[23] *See* **Kleinman:** 1:Tr. 93:7–94:2, 98:15–99:9 (Mr. Kleiman learned that Take 5 assets were being marketed through Petsky Prunier), 94:22–95:4 & Ex. A-569 [Project Palm Teaser] (the first document Mr. Kleinman received from Petsky Prunier regarding Take 5); Ex. A-364 [8/7/17 e-mail communications between A. Radetich to Petsky Prunier, *et al.*] (discussing the initial marketing process of Take 5, including marketing to Advantage); **Colen:** 2:Tr. 319:11–25 (Petsky Prunier provided the Confidential Information Memorandum to Advantage); **Brewer:** 8:Tr. 2271:7–9 (Take 5 hired Petsky Prunier to broker the sale of Take 5).

[24] *See* **Kleinman:** 1:Tr. 97:24–98:14; **Colen:** 2:Tr. 320:25–321:16.

[25] *See* **Pike:** 9:Tr. 2491:18–2492:4, 2492:13–2493:6 & Ex. A-688 [2/7/18 Sales Order Advantage Media Solutions], (Advantage purchased e-mail marketing campaigns for Finish Quantum Max and Air Wick).

[26] Ex. A-414 [CIM]; **Colen:** 2:Tr. 319:11–320:4; **Kleinman:** 1:Tr. 96:11–97:3.

it had a "proprietary, self-reported, and double-opted-in database [containing] a wide range of information, including email and postal addresses, phone numbers, and unique demographic and lifestyle information not readily available elsewhere, including one of the deepest datasets of auto owners and intenders."[27]  The Take 5 Parties further represented that "[t]he database comprises . . . 191 million date of birth records, 160 million double opt-in emails, and 175 unique lifestyle and demographic overlays with insight into historical and projected spending behaviors."[28]

The Take 5 Parties represented that Take 5 used its data to "execute[] 100% of all email communications in-house" through its e-mail delivery systems.[29]  In the Management Presentation that they provided to the Advantage Parties in October 2017,[30] the Take 5 Parties extolled Take 5's "in-house ESP platform" and represented that this "platform provides significant advantages over utilizing third-party vendors" and "has enabled [Take 5] to maintain consistently successful email metrics":

---

[27] Ex. A-414 [CIM] at 4.

[28] Ex. A-414 [CIM] at 5; *see also* **Colen:** 2:Tr. 324:6–325:23 (Take 5 made representations in the CIM that Take 5 had 160 million double opt-in e-mail addresses and they had the ability to target to different demographics).

[29] Ex. A-414 [CIM] at 17; *see also* **Colen:** 2:Tr. 582:21–583:2 ("[A]t the time we bought the company, they kind of shared with us that 100 percent of their e-mail volume was deployed internally . . . ."); **Kleinman:** 1:Tr. 104:4–21 (Take 5 represented to Advantage that "[e]verything was done in-house").

[30] *See* Ex. 527 [Take 5 Management Presentation] at 2.



Mr. Radetich and Mr. Gluck made these same representations in oral communications with

Advantage's executives[32] and repeated these representations to clients.[33] Even during discovery

in this case, they denied that the statement in the CIM that "Take 5 executes 100% of all email

---

[31] Ex. A-527 [October 2017 Management Presentation] at 35; *see also id.* at 25 ("Take 5's proprietary ESP platform enables it to provide quick results and reporting (within 48 – 72 hours)").

[32] *See* **Colen:** 2:Tr. 326:20–327:5 (Mr. Radetich and Mr. Gluck made these representations to Mr. Colen), 399:24–400:13 (Advantage was told that Take 5 "executed . . . 100 percent of the email in-house"); **Kleinman:** 1:Tr. 123:2–8 (Mr. Radetich and Mr. Gluck described Take 5 as "an e-mail service provider that -- distributed 100 percent of its e-mails in-house using its proprietary database").

[33] *See, e.g.*, Ex. A-171 [9/6/17 e-mail communication from A. Radetich to M. Adan (InfoCore) (representing to Ms. Adan, for the purpose of an audit of InfoCore, that "[a]ll [Take 5's] email deployments are done internally by Michael Boy, so everything goes out from Florida"); **Morris:** 10:Tr. 2730:13–16, 2820:13–25 (Mr. Morris represented Take 5 as an ESP with its own platform for sending e-mails at a conference in March of 2018 (the video [T-358] still remains publicly available on Take 5's YouTube account)).

communications in-house" was false.[34]

Advantage acquired the assets of Take 5 solely because of its supposed robust e-mail marketing database and the capability to use that database to do e-mail advertising.[35]  Advantage was transparent with the Take 5 Parties about this.[36]

### C.    Advantage discovers the Take 5 Parties' fraud

#### 1.    Mr. McGavran discovers that Take 5 is generating falsified reports

Advantage acquired the assets of Take 5 pursuant to the APA, which was dated as of March 15, 2018,[37] and the transaction closed on April 1, 2018.[38]  After the acquisition, Mr. Colen had general oversight of the Take 5 division,[39] but Mr. Radetich and Mr. Gluck continued to

---

[34] Ex. A-903 [R. Gluck Response to RFA No. 56]; Ex. A-904 [A. Radetich Response to RFA No. 56].

[35] *See* **Colen:** 2:Tr. 315:21–316:4 ("[W]e were familiar with them as an e-mail company."), 316:10–317:2 (Take 5's e-mail marketing capabilities would differentiate services from across Advantage), 317:10–21 (Advantage was focused on Take 5 as an e-mail marketing company because Advantage already had many solutions in other channels); **Kleinman:** 1:Tr. 97:14–21 ("[T]he majority of [Take 5] was around e-mail and database e-mail marketing, and that's really what drove our interest."), 106:3–107:15 (Take 5 was primarily an e-mail company and was not strong on non-e-mail based campaigns); **Pike:** 9:Tr. 2454:19–2455:5 ("Take 5 represented their business as – owning a large proprietary set of personally identifiable information, which they could use to deploy targeted e-mail campaigns against . . ."); *see also* Exs. A-556 [10/20/17 e-mail communication from G. Colen to J. Pike, *et al.*] (Take 5 is "not that knowledgeable/sophisticated outside of email"), A-364 [8/7/17 e-mail communication from A. Radetich to Petsky Prunier, *et al.*] (admission by Mr. Radetich that Advantage was interested in acquiring Take 5 to "start using email as a channel" for marketing and that Advantage had "all the other digital and social" advertising covered), A-546 [9/7/17 e-mail from J. Pike to G. Colen] ("They have built a business on activating data to drive the targeting marketing programs, primarily through e-mail."), A-164 [1/23/19 e-mail communication from A. Radetich to R. McGavran] ("Only one, maybe two of our salespeople currently sell the complete vision. After all these years, most continue selling only email because that's what they're comfortable with and their brains don't want to retain or learn more.").

[36] **Colen:** 2:Tr. 321:4–16.

[37] Ex. A-230 [APA] at 1 (Preamble).

[38] **Baliban:** 13:Tr. 3505:3–5; **Domier:** 14:Tr. 3664:24–3665:8 & Ex. T-57 [J. Griffin's ELT Announcement] (announcing April 1 closing).

[39] **Colen:** 2:Tr. 335:12–24 (Mr. Radetich reported to Mr. Colen, but Mr. Radetich's and Mr. Gluck's authority over the Take 5 business unit was not limited).

control the operations of the Take 5 business.[40]  The Take 5 business did not perform well, and

its earnings were well below what the Take 5 Parties projected.[41]  Mr. Radetich and Mr. Gluck

recommended that Advantage hire Mr. McGavran to act as general manager and oversee the

commercial operations of Take 5.[42]  After Mr. McGavran arrived, Take 5's employees continued

to have allegiance to Mr. Radetich and Mr. Gluck,[43] but Mr. Boy "tried to leave Mr. McGavran

breadcrumbs,"[44] and Mr. McGavran began to discover the fraudulent nature of Take 5's

business.

The first thing that Mr. McGavran learned was that Take 5 was providing fraudulent

matchback reports.[45]  These were reports provided to clients that were supposed to represent a

list of customers that had received e-mails and had subsequently purchased the client's product.[46]

But instead of matching the customer to an e-mail recipient—which Take 5 could not have done

because it was not sending e-mails[47]—Take 5 would run the name of a purchaser against its

entire database of information and report on those matches, even if there was no possibility that

the individual in the database and the purchaser were the same person.[48]  Mr. McGavran also

---

[40] **Colen:** 2:Tr. 335:20–336:14; **Boy:** 6:Tr. 1650:11–19; **McGavran:** 7:Tr. 1784:22–1785:9 (Mr. Radetich and Mr. Gluck continued to interact heavily with the sales after the acquisition and make decisions without Mr. McGavran).

[41] **Colen:** 2:Tr. 339:7–340:2.

[42] **Colen:** 2:Tr. 345:9–346:9; **McGavran:** 7:Tr. 1782:8–14; Ex. A-399 [12/17/18 offer letter to R. McGavran].

[43] **McGavran:** 7:Tr. 1784:22–1786:8, 1790:1–1791:4.

[44] **Boy:** 6:Tr. 1635:6–1637:4.

[45] **McGavran:** 7:Tr. 1796:25–1798:9.

[46] *Id.* at 1796:25–1797:11.

[47] **Boy:** 6:Tr. 1706:23–1708:13 ("How can we matchback to an e-mail to a person that purchased the vehicle if that person never received an email from us?"); *see* Ex. A-255 [6/15/12 e-mail communication from D. Morris to R. Gluck] (Mr. Morris asking Mr. Gluck "how many matchbacks should I deliver back to [Vetstreet]?").

[48] **McGavran:** 7:Tr. 1799:8–24; **Boy:** 6:Tr. 1635:6–1637:4.

began to suspect that tracking reports that Take 5 provided to clients, purporting to show how successful the e-marketing campaign had been,[49] were not empirical but were generated by a formula.[50]

### 2.    Ms. Creel discovers that Take 5 is not capable of sending e-mails

Prima Creel was hired by Mr. Radetich and Mr. Gluck in December 2018 to be Director of Sales.[51]  Ms. Creel was a well-seasoned executive and had approximately 10 years of experience with e-mail marketing.[52]   Shortly after Ms. Creel's arrival, she began to discover that Take 5 did not have the e-mail marketing capabilities that it told clients it had.[53]  One of the first aspects of Take 5's business that concerned her was that the sales and fulfillment departments

---

[49] *See* **Berry:** Berry Dep. at 89:12–19 (IvyWise understood the tracking reports to reflect the performance of e-mail campaigns); **Quadrino:** 12:Tr. 3239:9–15 (it was procedure every month to send tracking reports to AMSI), 3243:13–18 (sending tracking reports to Faulkner University was a regular part of the process); **McCoy:** 12:Tr. 3362:4–18 (clients would take the Take 5 tracking report and put their own logo on it and send it back to their client), 3394:3–8 (enterprise clients were given tracking reports); Exs. A-849 [3/19/19 e-mail with tracking report sent to Faulkner University], A-846 [4/26/19 e-mail with tracking report sent to AMSI], A-761 [8/1/17 e-mail with final tracking report [A-761A] sent to Medicx], A-788 [4/10/19 e-mail with tracking report sent to K. Hovnanian Homes], A-790 [4/15/19 e-mail with updated tracking report sent to K. Hovnanian Homes], T-193 [2/26/18 e-mail with tracking report sent to Media Storm regarding Celebrity Cruises], A-682 [7/6/18 e-mail with tracking report [A-632] sent to Media Storm regarding Veterans campaign], A-793 [4/5/17 e-mail with tracking report sent to Trozzolo], T-08 [2/22/18 e-mail with tracking report [T-08A] sent to Mitsubishi Motors], A-80 [8/31/17 e-mail with tracking report [A-81] sent to IvyWise], A-731 [12/5/16 e-mail with tracking report sent to Infinity Concepts], A-659 [1/9/18 Sandals Tracking Report], A-660 [1/16/18 Sandals Tracking Report], A-661 [1/23/18 Sandals Tracking Report], A-643 [3/22/18 Reckitt-Airwick tracking report], A-759 [7/2/17 e-mail with tracking report [A-759A] sent to Medicx], A-637 [4/18/18 Finish Quantum Max tracking report], A-641 [2/27/18 Reckitt-Airwick tracking report], A-635 [4/20/18 Finish Quantum Max tracking report], A-642 [8/8/18 Reckitt-Airwick tracking report], A-571 [2/19/18 Celebrity Cruise tracking report].

[50] **McGavran:** 7:Tr. 1800:9–1802:5.

[51] **Creel:** 9:Tr. 2303:2–2304:2.

[52] *Id.* at 2301:14–21.

[53] *Id.* at 2313:21–2314:3 ("the e-mail capabilities that we were . . . selling and reporting . . . were not reality").

did not interact with each other.[54]  Another issue that she noticed was that smaller clients were questioning the nature of the digital traffic that Take 5 was providing and were not retaining Take 5 after the initial campaign.[55]  She did an analysis and determined that there was "about a 1 percent retention rate on people that tested [Take 5's] data and e-mails."[56]

Primarily as a consequence of her concerns about Take 5's client retention rate, Ms. Creel decided to run an e-mail test campaign with one of her former clients, DJ Media.[57]  DJ Media employees reported to Ms. Creel that, based on their observations as to how the campaign was performing, Take 5 was not sending e-mails to DJ Media's customers but was generating clicks through some other means.[58]  Ms. Creel performed an investigation and learned from Mr. Boy that Take 5 "couldn't provide real e-mail traffic."[59]  Ms. Hodgens also told Ms. Creel, "this isn't the e-mail traffic that you think it is.  We are using other forms of PPC traffic, which is why you are getting so frustrated and not seeing the responses that you expect to see."[60]

### 3.    Mr. Weiner discovers that Take 5 is not sending e-mails on behalf of his clients

Mr. Weiner is the co-founder and chief executive officer of Jun Group, an advertising and

---

[54] **Creel:** 9:Tr. 2328:11–2330:4.

[55] *Id.* at 2317:15–2319:16.

[56] *Id.* at 2320:23–2321:8.

[57] *Id.* at 2330:7–2331:8 (DJ Media was "very, very focused on e-mail marketing" and understood e-mail behavior).

[58] Ex. A-699 [3/25/19 e-mail communication from P. Creel to B. Jenkins] (including e-mail thread from representatives of DJ Media reporting that the number of sales was inconsistent with the number of clicks); **Creel:** 9:Tr. 2331:9–20, 2332:24–2334:12, 2335:10–2336:24 (describing why representatives of DJ Media were telling her that Take 5 was not sending the e-mails that DJ Media bought).

[59] **Creel:** 9:Tr. 2343:11–21; 2351:8–20; Ex. A-700 [3/21/19 e-mail communication from P. Creel to M. Boy].

[60] **Creel:** 9:Tr. 2349:16–2350:8.

digital media company that was acquired by Advantage in September 2018.[61]  In spring 2019, Jun Group hired Take 5 to provide e-mail marketing campaigns for three of its clients: Earth Balance, Juicy Juice, and Café Bustelo.[62]  Mr. Weiner's team finalized e-mail creatives and ran test e-mail campaigns to verify that the campaigns would perform as expected.[63]  Jun Group noticed, however, that the test e-mails were not being delivered to Jun Group's inbox, which meant that they might not be delivered to its clients' inboxes.[64]  Mr. Weiner instructed his team to perform further tests, and they concluded that two of the three test e-mails were not delivered because they were caught by the spam filter.[65]

Jun Group could not do a further investigation itself, so it asked Take 5 to provide a domain report from its e-mail delivery systems that would indicate the domains to which the e-mails were sent and the number of people who actually opened the e-mails.[66]  Mr. Weiner expected that Take 5 could easily provide this report.[67]  Mr. Radetich and Mr. Gluck intervened and provided a complicated explanation by e-mail to Mr. Weiner about why Take 5 could not provide the information he was requesting.[68]  Mr. Weiner testified that "[t]his e-mail heightened my anxiety about Take 5 to probably a 7 out of 10.  And the reason for that is, again, this was a

---

[61] **Weiner:** 3:Tr. 795:5–8, 795:16–24, 797:15–17.

[62] *Id.* at 808:3–18.

[63] *Id.* at 810:2–811:25.

[64] *See* **Weiner:** 3:Tr. 810:2–811:25; Exs. A-421 [4/16/19 e-mail communication between Jun Group and Take 5] (regarding problems with spam filters), A-582 [5/2/19 e-mail communication between A. Radetich and T. Coker, *et al.*] (regarding domain report request); A-423 [4/29/19 e-mail communication from A. Radetich to C. Weiner, *et al.*] (regarding Take 5 e-mail campaign results from A. Radetich).

[65] **Weiner:** 3:Tr. 813:2–814:8 (two of the three of Take 5's test e-mails "went straight to the spam box").

[66] *Id.* at 815:3–816:5.

[67] *Id.* at 816:6–817:8.

[68] Ex. A-582 [April 2019 e-mail communication from A. Radetich to C. Weiner, *et al.*] (discussing Mr. Weiner's request for a domain report); **Weiner:** 3:Tr. 818:4–820:19.

very simple request. . . .  This e-mail really scared me."[69]

Ultimately, Take 5 provided Mr. Weiner an Excel spreadsheet that purported to be the domain report,[70] but when Mr. Weiner analyzed it, it was clear that the report had been fabricated because for one campaign it reported that the open rate for every domain was identical—which was statistically impossible—and for another reported an open rate of 238%.[71] This increased Mr. Weiner's anxiety to "8, 9 out of 10,"[72] and he told Mr. Radetich, Mr. Gluck, Mr. McGavran, and Mr. Colen that "there must be something very wrong here."[73]

### D.    Engagement of FTI

In April 2019, Mr. McGavran recommended to Mr. Colen that Advantage audit Take 5's campaigns and systems,[74] and Mr. Weiner made the same recommendation in May 2019 to Bryce Robinson, General Counsel for Advantage.[75]  So, Mr. Robinson retained FTI to perform an audit.[76]

### E.    Project Evolve

While FTI was conducting its audit, Mr. McGavran directed Ms. Creel, Ms. Coker,

---

[69] **Weiner:** 3:Tr. 820:20–822:13.

[70] *See* Exs. A-627 [e-mail communication from D. Gilbert to Jun Group] (sending domain report), A-627A [Excel sheet showing breakdown by open number and campaign], A-626 [5/2/19 e-mail communication between Jun Group and Take 5] (requesting additional information), A-626A [Excel sheet showing campaign, domains, delivered, and opens].

[71] **Weiner:** 3:Tr. 827:21–830:8.

[72] *Id.* at 828:22–830:8.

[73] **Weiner:** 3:Tr. 830:14–831:4 & Ex. A-621 [5/6/19 e-mail communication between C. Weiner, A. Radetich, R. Gluck, and G. Colen]; Ex. A-590 [5/10/19 e-mail communication between M. Boy and R. McGavran] (attempting to determine actual open rates).

[74] Ex. A-566 [4/18/19 e-mail communication from R. McGavran to G. Colen]; **McGavran:** 7:Tr. 1805:22–1809:22.

[75] **Weiner:** 3:Tr. 834:6–835:5.

[76] **Wei:** 4:Tr. 954:18–955:10.  The Advantage Parties later retained Latham & Watkins to assist in the investigation of the Take 5 business unit.  **Colen:** 2.Tr. 487:6–8; **Wei:** 5:Tr. 1296:6–11 (FTI and Latham worked together during the investigation).

Ms. Jenkins, and Mr. Boy to prepare a presentation for the Advantage team[77] disclosing the *actual* state of Take 5's systems and services and the feasibility of moving Take 5's services away from e-mail advertising to other forms of digital media.[78]  The Take 5 team gave the presentation to Mr. Colen on June 19, 2019,[79] and Mr. Radetich attended.[80]  In the presentation, the team reported that Take 5 was not sending e-mails but was using low cost third-party PPC traffic to generate clicks, was providing falsified tracking reports to clients, had a fraction of the deliverable e-mail addresses it claimed to have, and did not have the capability to send e-mails it from its in-house e-mail delivery platforms:

---

[77] *See* Ex. A-340 [Project Evolve presentation]; **Colen:** 2:Tr. 352:16–353:9 (authenticating A-340 as the Project Evolve presentation put together by the Take 5 team), 365:8–366:15 ("That information came from files that Beth Jenkins pulled, who's the COO, CFO of Take 5."); **Boy:** 6:Tr. 1640:2–25 (the presentation was created by Mr. Boy, Mr. McGavran, Ms. Coker, Ms. Jenkins, and Ms. Creel); **McGavran:** 7:Tr. 1822:7–12 (The presentation "was largely a collaborative effort. I think we all had input, but primarily, my recollection is Ms. Creel, Ms. Coker, Ms. Jenkins and Mr. Boy."); **Pike:** 9:Tr. 2532:21–2533:10 (Project Evolve was a "presentation by Mr. Radetich and the Take 5 leadership team to address some issues that had arisen on the way the campaigns were being sold and the way that those campaigns were being delivered and how to evolve that into a more contemporary and, I guess, legitimate process").

[78] *See* **McGavran:** 7:Tr. 1820:23–1821:9.

[79] *Id.* at 1821:22–1822:6.

[80] *See* Ex. A-223 [6/19/19 calendar invite for Project Evolve presentation]; **Colen:** 2:Tr. 353:10–354:6 (Mr. Colen testified that Mr. McGavran, Mr. Boy, Ms. Creel, Mr. Radetich, Ms. Coker, Ms. Jenkins, Mr. Pike and Ms. Libitsky attended the presentation); **McGavran:** 7:Tr. 1821:19–1822:12 (same); **Boy:** 6:Tr. 1641:5–9 (same).

The factual statements about Take 5's business in the Project Evolve presentation were accurate,[82] and neither Mr. Radetich nor anyone else questioned or challenged any of these conclusions.[83]  Advantage had bought the assets of a supposed ESP to enhance its advertising business through e-mail marketing but now learned that Take 5 had no capability to deploy e-mail campaigns in-house.[84]

---

[81] Ex. A-340 [Project Evolve presentation] at 3; *see* **Colen:** 2:Tr. 357:19–359:9 (discussing what Take 5 represented regarding sending PPC traffic instead of the contracted e-mails), 361:3–362:8 (discussing what Take 5 represented regarding algorithmic reporting), 364:4–365:7 (discussing that Take 5 represented that the only accurate metric on the tracking reports were clicks and that is not what the client had ordered), 367:3–370:24 (Take 5 only had 25 actionable e-mails that they could deliver and send to); **Boy:** 6:Tr. 1641:23–1642:23 (Mr. Boy provided the 25 actionable e-mail number), 1643:3–1644:25 & Ex. A-403 [5/22/19 e-mail communication from M. Gordon to M. Boy] (Mr. Gordon sent the algorithms to Mr. Boy); **McGavran:** 7:Tr. 1823:14–1824:17 (Take 5 was using low cost PPC traffic instead of sending e-mails); 1824:18–1825:8 (third-party traffic used to achieve a certain click-through rate), 1825:9–25 (Mr. McGavran saw the algorithm used to generate the tracking reports), 1827:8–18 (clicks were the only empirical metric).

[82] **McGavran:** 7:Tr. 1822:13–18.

[83] **Boy:** 6:Tr. 1646:8–13 (Mr. Radetich did not disagree or challenge any statement that was made about the state of the company or Take 5's products); **McGavran:** 7:Tr. 1826:12–16 (same).

[84] *See* **Boy:** 6:Tr. 1586:19–24 (describing Take 5's capabilities to send e-mails in-house

After the Project Evolve presentation, Ms. Jenkins provided Carrie Libitsky,[85]

Mr. McGavran, and Mr. Boy reports regarding e-mails delivered from Take 5's e-mail delivery

platforms.[86]  The data Ms. Jenkins provided showed fewer than 5% of the e-mails that Take 5

had sold were actually even queued for delivery.[87]

### F.    FTI's audit

The scope of FTI's initial audit "was fairly small," simply "to look into the customer

reporting that was being provided by Take 5" and "to do a preliminary evaluation of whether the

numbers that appear on the customer tracking reports that are being sent to the customer appear

to be accurate and reliable."[88]  As Mr. Wei explained, the process seemed relatively

straightforward:  compare the tracking reports to the logs from Take 5's in-house e-mail delivery

platforms.[89]

Take 5 had three in-house e-mail delivery platforms:  Volo, MailWizz, and SendGrid.[90]

It "also had a fourth system called DMS, which was an internally developed system which they

used just to send out test e-mails."[91]  If Take 5 "actually sent out e-mails . . . [t]he information

that said what e-mails were actually sent would be recorded within [Take 5's e-mail delivery

---

as "[v]ery, very minimal to none"), 1587:20–23 (Take 5 never executed 100 percent of all e-mail communications in-house); **Hodgens:** 8:Tr. 2138:20–2139:11 ("In-house for us to do e-mail was minimal, like 1, 2 percent [business-to-business]."); **Ward:** 8:Tr. 2242:5–8 (CMS did not use information from in-house platforms).

[85] **Weiner:** 3:Tr. 854:16–21 (Ms. Libitsky was the then head of finance for Mr. Colen's group).

[86] Ex. A-597 [6/28/19 e-mail communication from B. Jenkins to C. Libitsky, *et al.*] (discussing e-mail data).

[87] *See Id.*; **Pike:** 9:Tr. 2474:19–2475:19; **Weiner:** 3:Tr. 835:24–839:5.

[88] **Wei:** 4:Tr. 954:25–955:10.

[89] *Id.* at 961:18–962:22.

[90] **Wei:** 4:Tr. 1008:4–20; **Weiner:** 3:Tr. 837:17–21; **Boy:** 6:Tr. 1589:23–1591:4; **Hodgens:** 7:Tr. 2029:16–2030:17.

[91] **Wei:** 4:Tr. 1008:4–20.

platforms] Volo, MailWizz, SendGrid or DMS."[92]  It is very common in the e-mail marketing industry to review these reports to determine how well a campaign is performing.[93]

FTI's analysis was similar to the analysis that was done in *Cobalt Operating, LLC v. James Crystal Enters., LLC*, C.A. No. 714-VCS, 2007 WL 2142926, at *2 (Del. Ch. July 20, 2007), judgment entered, (Del. Ch. 2007), and *aff'd*, 945 A.2d 594 (Del. 2008), to determine whether a radio station sold more pre-recorded commercial advertising to customers than it was able to play:  comparing the digital log of commercials played to the commercials billed. Take 5's information technology director, Cruze Mair,[94] did not provide the information FTI had requested, so Mr. Wei and his team travelled to Take 5's headquarters in Boca Raton, Florida, to try and figure out what was going on.[95]

The results of FTI's initial audit were presented to Advantage on June 26, 2019, a week after the Project Evolve presentation.[96]  As part of its audit, FTI reviewed two e-mail campaigns, one for Medicx and one for Team One, and concluded that these campaigns were not fulfilled with e-mails but were fulfilled with PPC traffic instead.[97]

FTI began its audit by examining sales orders and invoices to determine what type of

---

[92] **Wei:** 4:Tr. 1008:21–1009:11; *see also* **Weiner:** 3:Tr. 815:3–23 (discussing domain reports).

[93] **Weiner:** 3:Tr. 816:6–817:8; **Wei:** 4:Tr. 952:20–954:15 (explaining that it is "typical audit process" to review internal reporting records).

[94] **Wei:** 4:Tr. 956:16–23.

[95] *Id.* at 965:11–966:22.

[96] Ex. A-427 [6/26/19 Status Update of FTI Investigative Procedures]; **Wei:** 4:Tr. 967:17–25, 968:2–9.

[97] Ex. A-427 [6/29/19 Status Update of FTI Investigative Procedures].  FTI worked with Mr. Boy and the fulfillment department during this time to understand what Take 5 actually deployed and delivered.  The fulfilment department reported that at least three of the jobs FTI was looking at were not e-mailed at all.  *See* Ex. A-775 [6/29/19 e-mail communication between M. Boy and B. Robinson, *et al.*] (reporting that job numbers 27213, 27384, and 27387 were not e-mailed).  Included in the list of campaigns was Medicx's OFEV DTC campaign in which Medicx paid $1,500 for Take 5 for e-mail.  *See* Ex A-777 [12/6/18 Invoice for Deployment 1].

advertising campaign the client ordered.[98]  Based on his conversations with Ms. Jenkins,

Mr. Wei understood "that digital media was the term that Take 5 used within their accounting

system to identify e-mail delivery campaigns."[99]  The Take 5 Parties have criticized FTI (and the

Advantage Parties) for taking the position that the item "Digital Media" on Take 5's sales orders

and invoices referred to e-mail marketing campaigns.  During the arbitration, every fact witness

without exception confirmed that "Digital Media" was the category in Take 5's accounting

software, NetSuite, that was used to designate e-mail campaigns.[100]

        FTI next compared the tracking report provided to the client with the information about

the campaign that was generated by Take 5's Campaign Management System ("CMS") (also

known as "JOBS").[101]  FTI's comparison raised two questions.  The first was why the number of

---

[98] **Wei:** 4:Tr. 987:8–989:3.

[99] *Id.* at 989:8–990:17, 1020:22–1021:15.

[100] *See* **Boy:** 6:Tr. 1586:25–1587:6 (the term "digital media" referred to e-mail and e-mail campaigns); **Hodges:** 7:Tr. 2041:8–22 ("digital media" campaigns were e-mail campaigns), 2049:24–2050:9 (same); **Brewer:** 8:Tr. 2268:8–11 (within the accounting system the item for e-mail marketing campaigns was "digital media"); **Colen:** 2:Tr. 469:16–472:23 (the term "digital media" related to e-mail campaigns while other services were itemized differently); **Creel:** 9:Tr. 2315:18–2316:4 (when someone on the sales team ordered an e-mail marketing campaign they selected "digital media"); **Morris:** 10:Tr. 2828:16–18 (the item for the e-mail deployment on the Sales Order [Ex. A-128] is "digital media"), 2830:16–19 (the item on the Sales Order [Ex. A-129] for e-mail deployment is "digital media"), 2831:18–22 (the item on the Sales Order [Ex. A-130] for the e-mail marketing campaign is "digital media"), 2835:19–21 (the item on the Sales Order [A-131] for e-mail marketing is "digital media"); **Adams:** 11:Tr. 3134:11–22 (the portion of the Sales Order [A-747.0004] describing e-mail marketing is listed as "digital media"), 12:Tr. 3313:6–15 (the item on the Sales Order [A-787.0005] for e-mail deployment is "digital media"); **Quadrino:** 12:Tr. 3239:2–5 (the item on the Sales Order [A-845] for the e-mail campaign is listed as "digital media"), 3243:3–6 (the item on the Sales Order [A-848] for e-mail is "digital media"); Exs. A-162 [10/17/18 e-mail communication between J. Pike and A. Radetich] (admission by Mr. Radetich that "Digital Media" meant "Email + retargeting"), A-390 [12 Skies CMS video presentation to Advantage] (admission by Ms. Jenkins that for a "digital media" campaign that "we're going to actually send 100,000 emails").

[101] Ex. A-427 [6/26/19 Status Update of FTI Investigative Procedures] at 8, 17; **Wei:** 4:Tr. 974:14–977:7 (explaining Take 5's accounting systems), 992:20–995:6 (explaining FTI's analysis), 993:7–995:6 (when Take 5 is executing a campaign, all the important information

---

e-mails that the customer wanted delivered was exactly the same as the number of delivered e-mails reported in CMS.[102]  As both Mr. Weiner and Mr. Wei explained, while it was possible for Take 5 to **deploy** the number of e-mails that a client ordered, it is very unlikely that Take 5 could **deliver** precisely the number of e-mails the client ordered because some of the deployed e-mails would be caught by spam filters and not delivered.[103]

The more serious concern, however, was that the e-mail metrics in CMS were different than the e-mail metrics reported to the client.[104]  As Mr. Wei and his team dug further, they discovered that the metrics in the tracking reports that FTI was generating changed every time they ran the report even though these campaigns had supposedly been completed long ago.[105] Mr. Wei reproduced this analysis in a video that was played during the hearing.[106]

Surprised that the tracking reports changed every time they were generated, FTI investigated how many e-mails Take 5 actually sent based on its internal e-mail delivery platform logs.[107]  From that review, FTI learned that Take 5 deployed almost none of the e-mails that the clients paid it to send and that the e-mails that it did deploy were rarely opened or

---

about that campaign would be stored within CMS or Jobs); **Ward:** 8:Tr. 2238:3–2239:14 (explaining how CMS worked and how it interacted with NetSuite); Ex. A-335 [NetSuite to Campaign Manager Flow Description].

[102] Ex. A-427 [6/26/19 Status Update of FTI Investigative Procedures] at 8; **Wei:** 4:Tr. 993:7–995:6.

[103] **Wei:** 4:Tr. 993:7–995:6; **Weiner:** 3:Tr. 885:7–887:21.

[104] **Wei:** 4:Tr. 995:7–997:18, 1021:23–1022:24.

[105] Ex. A-427 [6/26/19 Status Update of FTI Investigative Procedures] at 9, 18; **Wei:** 4:Tr. 995:7–998:9, 1003:4–15, 1023:21–1025:8.

[106] Ex. A-374 [CMS video generating tracking report for job 23571]; **Wei:** 4:Tr. 998:10–1002:23 (describing the testing of the tracking reports).

[107] Ex. A-427 [6/26/19 Status Update of FTI Investigative Procedures] at 10; **Wei:** 4:Tr. 1006:6–1008:20.

clicked on.[108]  In fact, Take 5 did not have e-mail addresses at all for most of the consumers to whom it was supposed to be sending e-mails.[109]  Take 5 fulfilled the campaigns using PPC services, instead.[110]

**G.    The tracking reports were generated by an algorithm**

The Take 5 Parties represented to the Advantage Parties and Take 5's clients that Take 5's e-mail marketing campaigns were successful because Take 5's in-house delivery platforms allowed it to achieve open rates and other e-mail performance metrics above industry average.[111]  The Take 5 Parties generated tracking reports to report on the "success" of e-mail marketing campaigns.  Mr. Mair finally disclosed to FTI that these tracking reports were generated by an algorithm.[112]

After learning about the algorithm, FTI spoke to Peter Ward and Matthew Gordon of 12 Skies Tech ("12 Skies") who confirmed that the e-mail metrics reported to the client "don't come from . . . anything in real life" but are "automatically generated."[113]  Mr. Wei observed how these formulas operated within CMS,[114] which the slide below from FTI's presentation to Advantage

---

[108] Ex. A-427 [6/26/19 Status Update of FTI Investigative Procedures] at 10, 20; **Wei:** 4:Tr. 1006:6–1007:22, 1029:6–1030:5.

[109] Ex. A-427 [6/26/19 Status Update of FTI Investigative Procedures] at 19; **Wei:** 4:Tr. 1025:14–1028:21.

[110] Ex. A-427 [6/26/19 Status Update of FTI Investigative Procedures] at 11, 21; **Wei:** 4:Tr. 1011:9–1012:17, 1030:6–1031:9, 1031:14–1032:20 (summarizing conclusions of FTI's initial investigation).

[111] *See, e.g.*, Exs. A-527 [October 2017 Management Presentation] at 25, 35, 64; A-414 [CIM] at 19, 21; **Adams:** 11:Tr.  3124:21–3126:11 & Ex. 738 [7/6/16 e-mail communication from B. Hannon to J. Reid & M. Adams] (using above industry averages in e-mail metrics as a selling point); Ex. A-137 [Take 5 Marketing Presentation] at 4, 7 (discussing above average deliverability, open, and click-through rates).

[112] Ex. A-427 [6/26/19 Status Update of FTI Investigative Procedures] at 12; **Wei:** 4:Tr. 1012:23–1013:15.

[113] **Wei:** 4:Tr. 1013:16–1014:16.

[114] *Id.* at 1018:6–16.

explains:



If the client ordered a specific number of e-mails to be ***delivered***, the customer service representative would enter that number into CMS, and the algorithm would report the number of e-mails that Take 5 supposedly deployed by multiplying the number of e-mails the client wanted delivered by a random percentage of between 100.09% and 102%, because the number of e-mails deployed would ordinarily be higher than the number of e-mails delivered.[116]  Conversely, if a client ordered a specific number of e-mails to be ***deployed***, the formula would report the number of e-mails delivered by multiplying the number of e-mails the client wanted deployed by

---

[115] Ex. A-427 [6/26/19 Status Update of FTI Investigative Procedures] at 12; *see* Ex. A-578 [6/19/19 e-mail communication from P. Ward to M. Wei, *et al.*] (algorithm authenticated by Mr. Ward).

[116] **Wei:** 4:Tr. 1014:17–1016:17.

a random percentage of between 98% and 99.01%.[117]

Another algorithm in CMS would report that a random percentage of between 15% and 18% of these fictitious e-mail were opened:



[118]

During the arbitration, Mr. Ward corroborated Mr. Wei's explanation of the algorithms.[119] He testified that Take 5 created the algorithms[120] and previously used them in desktop applications, and he was hired to integrate them into CMS.[121] In other words, Take 5

---

[117] *Id.*

[118] Ex. A-427 [6/26/19 Status Update of FTI Investigative Procedures] at 13; **Wei:** 4:Tr. 1017:8–1018:5; *see* Ex. A-579 [6/19/19 e-mail communication between P. Ward and M. Wei] (algorithm authenticated by Mr. Ward).

[119] **Ward:** 8:Tr. 2244:14–2246:18.

[120] **Ward:** 8:Tr. 2233:3–2235:2; Ex. A-373 [original source code used to generate tracking reports based on clicks].

[121] **Ward:** 8:Tr. 2229:17–2230:11, 2252:11–2253:16 (explaining that Take 5 was paid to

paid 12 Skies to design a more robust system to defraud its clients.  Mr. Ward also was asked to

modify the algorithm after it was integrated into CMS.[122]

Mr. Boy knew that Take 5 was using algorithms to generate false reports to clients,[123]

and he explained his relief when Mr. McGavran told him to tell Mr. Ward "that we can no longer

have his software spit out algorithmic reporting that isn't indicative of the campaigns that we're

running":[124]

> Q.    Mr. Boy, so when you said that Ms. Jenkins was no longer your boss and that
> the false reporting had to stop, how did you feel?
>
> A.    I felt liberated.  And I'll explain why.
>
> I felt liberated because, for years, we were in a company where the right thing
> wasn't being done.  I was never in a position to change that up until that point, up
> until that very point where I reported to Ryan McGavran instead of Beth, Alex
> and Rich, I was able to make the changes that would legitimize the marketing
> campaigns and reporting that we produced.
>
> So, for me, it was – it was massive to ensure that, you know, every individual and
> every staff member that was working there was doing the right thing, and our
> clients were getting the right results, and the results were indicative of the
> reporting, which wasn't happening prior.[125]

Mr. Radetich and Mr. Gluck were aware of the algorithmic reporting,[126] and they

---

develop these systems); Ex. A-676 [12 Skies invoices] at 42 (12 Skies invoice "to discuss
changes to the opens for the tracking report"); *see id.* at 5, 20, 35, 43, 44, 45, 54 (additional
pages of invoices reflecting work on algorithm).

[122] **Ward:** 8:Tr. 2246:19–25; *see* Ex. A-676 [12 Skies invoices] at 42 (12 Skies invoice
"to discuss changes to the opens for the tracking report"); *see also id*. at 5, 20, 35, 43, 44, 45, 54
(additional pages of invoices reflecting work on algorithm).

[123] **Boy:** 6:Tr. 1585:12–24.

[124] Exs. A-552 [M. Boy and P. Ward audio recording], A-552A [transcription of audio
recording]; **Boy:** 6:Tr. 1582:14–1583:2.

[125] **Boy:** 6:Tr. 1584:14–1585:11.

[126] *See, e.g.*, **Hodgens:** 8:Tr. 2101:10–24 (spoke with Mr. Radetich regarding the tracking
reports); **Wei:** 4:Tr. 1018:25–1019:23 (12 Skies was instructed by Mr. Radetich to incorporate
the algorithm into CMS); **Ward:** 8:Tr. 2258:3–23 (Mr. Ward's perception was that Advantage
was not aware of "the way the process worked at Take 5.").

admitted that client reports were false.[127] According to Take 5's internal documents,

Mr. Radetich had ordered Take 5 employees to adjust tracking reports manually.[128] But "[i]n or

about 2015 or 2016, clients were . . . doing a deeper dive of analytics,"[129] so Take 5 needed a

way to automate the process and ensure that the information that it was providing in the tracking

reports matched the information that clients were able to see on Google Analytics.

Take 5 hired Mr. Boy in the summer of 2016,[130] and Ms. Jenkins and Ms. Hodgens gave

him the "challenge" of having the information in the tracking reports "simulate opens."[131] When

pressed about whether he understood that what he was doing was deceiving clients, Mr. Boy

responded that he was just doing his job and that "the whole entire organization was deceiving

the customer . . . anybody who was doing their job was deceiving the customer."[132] Mr. Ward

explained that he could have designed CMS so that it pulled information from Take 5's e-mail

---

[127] April 7, 2021 Petruss Media Group, LLC f/k/a Take 5 Media Group's Amended Responses To Advantage Sales & Marketing LLC's First Set Of Interrogatories at No. 9 ("The opens were based on a formula.").

[128] Exs. A-211 [11/24/15 e-mail communication from A. Radetich to T. Coker] (Mr. Radetich instructs Ms. Coker to bump up tracking report information by 85% to about 220 clicks), A-212 [11/6/15 e-mail communication from A. Radetich to T. Coker] (Mr. Radetich instructs Ms. Coker to bump both opens and clicks on tracking report up by 35%), A-216 [12/7/15 e-mail communication from A. Radetich to T. Coker] (Mr. Radetich instructs Ms. Coker to bump up clicks on tracking report for Sprint campaign), A-217 [11/23/15 e-mail communication from A. Radetich to T. Coker] (Mr. Radetich instructs Ms. Coker to bump up clicks), A-201 [8/30/16 e-mail communication from A. Radetich to T. Coker] (same). Mr. Radetich also approved Take 5 employees manually increasing numbers on tracking reports. *See* Exs. A-213 [1/5/16 e-mail communication from A. Radetich to T. Coker] (Mr. Radetich approving Ms. Coker's increasing numbers on a tracking report), A-214 [12/18/15 e-mail communication from A. Radetich to T. Coker] (same), A-215 [1/4/16 e-mail communication from A. Radetich to T. Coker] (same); A-218 [11/19/15 e-mail communication from A. Radetich to T. Coker] (Ms. Coker informing Mr. Radetich that the tracking report does not reflect "actual new clicks," and that she just "bumped" the number of clicks up).

[129] **Morris:** 11:Tr. 2870:18–21.

[130] **Boy:** 6:Tr. 1586:5–11.

[131] *Id.* at 1713:10–1714:3.

[132] *Id.* at 1714:4–1715:18.

delivery platforms rather than creating false reports but that Take 5 rejected this proposal.[133]

Mr. Radetich admitted that "he felt like the company needed to lie about results in order to

maintain clients."[134]

The Take 5 Parties have attempted to downplay the significance of the tracking reports by

arguing that clients had their own ability to track campaigns.  This argument is again belied by

the evidence.  According to Take 5's own witnesses, clients wanted tracking reports.[135]  In June

2019, 146 of Take 5's 151 clients (97%) received tracking reports.[136]  Moreover, the reason

Take 5 asked 12 Skies to incorporate these algorithms into CMS was because clients insisted on

receiving tracking reports, and the Take 5 desktop application would regularly have problems.[137]

In addition, as discussed in Part III.D, *infra*, Take 5 prevented their clients from discovering that

Take 5 was not sending e-mails by sending the e-mail link with tracking information to a PPC

vendor so clicks would imitate e-mail traffic.

The algorithm functioned in the same way for every tracking report that Take 5

generated,[138] so Take 5 was using its CMS system to defraud virtually all its clients that

---

[133] **Ward:** 8:Tr. 2241:20–2243:5.

[134] **Brown:** Christopher Brown Deposition Transcript ("Brown Dep.") 93:5–17; *see also* Ex. A-224 [6/26/19 e-mail communication between P. Creel and A. Radetich, *et al.*] (Mr. Radetich overrode Ms. Creel to continue to lie to Adtaxi because they were a client Take 5 could not lose).

[135] *See* **Morris:** 10:Tr. 2817:14–22 (channel partners paid for state-of the-art tracking reports); **Adams:** 11:Tr. 3129:15–19 (Take 5 provided clients tracking reports 24 to 48 hours after the live campaign); **Quadrino:** 12:Tr. 3234:2–11 (AMSI wanted to see tracking reports); **McCoy:** 12:Tr. 3362:14–18 (clients would take the Take 5 report and put their own logo on it); Exs. A-748 [6/24/17 Medicx purchase order for Gardasil e-mail deployment] (line item for reporting including opens and click through rates), A-767 [10/10/19 Medicx purchase order for OFEV DTC e-mail deployment] (same).

[136] *See* Exs. A-551A [Excel spreadsheet with client by client breakdown of reporting], A-340 [Project Evolve presentation] at 4 (discussing clients affected by algorithmic reporting).

[137] *See* **Ward:** 8:Tr. 2236:10–2237:2.

[138] **Wei:** 4:Tr. 1016:18–1017:7.

requested e-mail marketing services.

### H. The evidence refuted Mr. Radetich and Mr. Gluck's attempts to minimize the significance of the fraud

#### 1. Vendors did not send e-mails for Take 5

##### (a) Take 5 employees admitted that vendors sent low cost PPC traffic

Mr. Radetich and Mr. Gluck did not dispute any of the conclusions in the Project Evolve presentation nor the findings by FTI. Instead, they attempted to whitewash those conclusions with mutually exclusive explanations. Their first excuse was that Take 5's subcontractors were sending e-mails.[139] This was contrary to what the Take 5 Parties had told the Advantage Parties before the acquisition,[140] and Advantage quickly determined that this assertion was false.

As Part of Project Evolve, the Take 5 team had explained that the "vast majority of" the money it was spending on digital advertising was "comprised of low cost, poor quality, PPC traffic vendors" that were paid per click:

---

[139] Ex. A-413 [6/28/19 e-mail communication between A. Radetich and G. Colen, *et al.*] (Mr. Colen stating "Alex just called me and he indicated" that Keono and ProData "were supplemental email suppliers").

[140] Ex. A-527 [October 2017 Management Presentation] at 35; *see also id*. at 25 ("Take 5's proprietary ESP platform enables it to provide quick results and reporting (within 48 – 72 hours)").

**COGS – Current State**

The vast majority of our current media COGS are comprised of low cost, poor quality, PPC traffic vendors. The use of these vendors is driven by poor email data quality, poor email engagement, unrealistic client CTR expectations, and profit margins.

| Vendor Type | Service Provided | Associated Product | Top Vendor Names | Vendor Count | Average Cost Per Click | Jan - May 2019 Cost |
|---|---|---|---|---|---|---|
| PPC Company | Low cost, high volume PPC Traffic | Email<br>Email Blended | • eMedia Group<br>• KAD MEDIA<br>• Keono<br>• Lead Me Media, LLC<br>• Actionable Media, LLC<br>• ProDataFeed, LLC | 6 | 0.5c - 0.10c<br><br>Per Click | $1,191,066 |
| PPC Platforms | Low cost, high volume PPC Traffic | Email<br>Email Blended | • Advertise.com<br>• Ezanga.com<br>• PPCMate / Platform.IO<br>• Taboola | 4 | 0.1c - 0.5c<br><br>Per Click | $268,117 |
| Email Platforms & Hosting | Dedicated email delivery | Email | • Mailgun<br>• Sparkpost<br>• Sendgrid<br>• Volo/Ybrant<br>• Dedicatedsolutions.com<br>• Hostwinds.com | 6 | N/A | $37,101 |

[141]

Notwithstanding this admission, to be "comprehensive," Mr. Weiner subsequently investigated whether Take 5 could have been paying these vendors to send e-mails.[142]  Mr. Weiner contacted the two vendors whom Mr. Radetich had identified as supplemental e-mail providers, Keono and ProData, and each said that they were not fulfilling e-mail campaigns for Take 5.[143]

Next, Mr. Weiner and Ms. Libitsky took "all the cost of sales . . . from the Project Evolve presentation" and assumed that "100 percent of the cost of sales [was] allocated to email" and calculated how many e-mails could have been sent at the average price of $7.50 per thousand e-mails.[144]  Mr. Weiner and Ms. Libitsky confirmed that even if Take 5 paid its vendors just to

---

[141] Ex. A-340 [Project Evolve presentation] at 5.

[142] **Weiner:** 3:Tr. 840:15–842:20.

[143] *See* Exs. A-413 [6/28/19 e-mail communication from C. Weiner to R. McGavran, *et al.*] (Mr. Weiner writes that Keono "self-admits that only 5–10% of what they run with T5 is email," and that ProData did not send "tens of millions or hundreds of millions" of e-mails), A-260 [7/12/12 e-mail communication between R. Gluck and ProData] (ProData informing Mr. Gluck it can "drive conversions with a PPC social campaign"), A-263 [8/6/12 ProData invoice] (charging Take 5 for "Pay Per Click Account Setup"), A-267 [9/17/12 ProData invoice] (same).

[144] **Weiner:** 3:Tr. 854:24–855:25.

send e-mails, this would account for less than 10% of the total number of e-mails that Take 5's

clients paid it to send.[145]

> **(b)** **Evidence of individual campaigns demonstrated that the Take 5 Parties sold e-mail campaigns and fulfilled them with PPC traffic**

The argument that Take 5 was using subcontractors to send e-mails makes no sense. The

value proposition that Take 5 offered to its clients and to Advantage was that it was an ESP

sending out e-mails using its own proprietary database. Despite this, and despite the fact that

Advantage completely disproved this assertion at the time that Mr. Radetich first made it, the

Take 5 Parties have perpetuated this false narrative by criticizing FTI for not having asked

Take 5's vendors whether they sent e-mails on behalf of Take 5.[146] During the arbitration, the

evidence reinforced the proof that vendors did not send e-mails for Take 5. Ms. Hodgens and

Mr. Boy both testified that Take 5 was using vendors to generate PPC traffic, not to send

e-mails.[147]

---

[145] Ex. A-467 [6/28/19 e-mail communication from C. Libitsky to D. Kaye, *et al.*]; **Weiner:** 3:Tr. 854:24–855:25.

[146] The Take 5 Parties specifically criticize Advantage and FTI for not contacting "top" vendors they identified in Ex. T-229: eMedia Group, KAD Media, Facebook, Keono, ProDataFeed LLC, PPCMate, Google Ads, and Makaira Media. Ex. T-229 [Purchase by Vendor Summary April 1, 2018 – July 31, 2019].

[147] **Hodgens:** 8:Tr. 2219:10–17, 2159:25–2160:14 (fulfilment used the highlighted vendors [T-229] primarily for pay-per-click services and specifically used KAD Media, Facebook, ProDataFeed, PPCMate, Google Ads, and Makaira Media for all digital media *except e-mail*), 2075:8–21 (Makaira Media "fulfilled just digital media through various channels, but they ***didn't do*** e-mail. They did clicks, pay-per-click with them, yeah."), 2159:25–9 (fulfilment department only used eMedia Group and Keono "for e-mail on occasion"), 2095:16–2096:2 (Facebook was billing Take 5 for clicks), 7:Tr. 2014:2–12 (ProData did PPC traffic); **Boy:** 6:Tr. 1610:7–17 (subcontractors were not used to send e-mails), 1699:5–1700:13 (Mr. Boy testifying regarding eMedia invoice [Ex. T-187]: "It doesn't necessarily mean, because the title of the campaign has the word 'e-mail' in it, that its being fulfilled via e-mail. The reason why it has the word 'e-mail' in it is because the client is under the impression that they're receiving e-mail, so that's why it's titled e-mail."), 1700:20–1701:5 (eMedia did not send e-mails in regard to Ex. T-187), 1702:17–21 (Keono did not send e-mails); *see also* Ex. A-281 [11/3/15 e-mail

This was consistent with Mr. McGavran's understanding as well.[148]  Ms. Hodgens said directly, "I've never had a campaign go to a vendor to do all-e-mail and only e-mail and there was not supplementation.  That never happened, and I can guarantee that."[149]  The goal of the fulfilment department was to generate clicks to a client's website, not to send e-mails.[150]

Additionally, during the arbitration, the Advantage Parties reviewed a number of individual campaigns with Mr. Wei,[151] Michael Weintraub, CEO of Medicx Health,[152]

communication between A. Radetich, R. Gluck and ProData, *et al.*] ("All campaigns that [ProData runs] are PPC (click) data for campaigns."); *see also* **Hodgens:** 7.Tr. 2033:22–25 (even if a vendor hypothetically sent an e-mail on behalf of a client it was never with Take 5's data).

[148] **McGavran:** 7:Tr. 1819:17–1820:5 ("My understanding was that PPC vendors were not fulfilling e-mail campaigns, but that PPC vendors were used to drive clicks which were represented as e-mail metrics . . . .").

[149] **Hodgens:** 8:Tr. 2138:20–2139:24.

[150] **Boy:** 6:Tr. 1598:5–1599:8.

[151] **Sandals Resort Campaign:** Exs. A-658 [1/4/18 Sales Order], A-681 [6/28/17 e-mail communication between D. Gilbert and E. Hodgens, *et al.*] (discussing Sandals e-mail campaign), A-657 [1/15/18 Makaira Media Invoice], A-659 [1/9/18 Sandals Resort Tracking Report], A-651 [1/20/18 eMedia Group Invoice], A-648 [1/16/18 e-mail communication between Take 5 and eMedia regarding traffic on the Sandals campaign], A-660 [1/16/18 Sandals Resort Tracking Report], A-656 [1/29/18 Makaira Media Invoice], A-661 [1/23/18 Sandals Resort Tracking Report]; *see also* **Wei:** 4:1077:4–22, 1081:25–1082:12, 1088:4–11 &  Ex. A-324 [FTI Examples of Fraudulent Campaigns] (showing that through Take 5's own e-mail delivery systems no e-mails were sent out for drop 1 of the Sandals campaign, 6,407 e-mails were delivered for drop 2 of the Sandals campaign, and 20,512 e-mails were delivered for drop 3 of the Sandals campaign).

**Media Storm Veterans Campaign:** Exs. A-606 [6/21/18 e-mail communication from Media Storm to M. Benjoseph including Purchase Order forms for *e-mails*], A-631 [6/21/18 Sales Order], A-529 at 2 [7/3/18 eMedia Group Invoice], A-652 [7/2/18 Makaira Media Invoice], A-682 [7/6/18 e-mail communication between Take 5 and Media Storm], A-632 [6/27/18 Media Storm Veterans Tracking Report], *see also* **Wei:** 4:1091:8–19 & Ex. A-324 [FTI Examples of Fraudulent Campaigns] (showing that through Take 5's own e-mail delivery systems the client ordered 28,418,904 e-mails, 33,106 were deployed, 929 were delivered and none were opened).

[152] **Medicx Campaign – Gardasil:** Exs. A-748 [6/26/17 e-mail communication from A. Radetich to R. Gluck] (sending purchase order for e-mail from Mr. Weintraub (Medicx)), A-749 [6/27/17 e-mail communication between J. Danow and S. Crites] (Take 5 confirming with Medicx the details regarding the e-mail campaign), A-752 [6/27/17 Medicx Sales Order], A-755 [6/17/2017 e-mail communication from T. Finger to S. Crites] (sending client tracking report), A-759 [7/21/17 e-mail communication from T. Finger to S. Crites] (sending preliminary tracking

Mr. Pike,[153] Mr. Morris,[154] Rob Quadrino, a former Take 5 independent contractor who sold

Take 5 e-mail marketing campaigns,[155] and Ms. Hodgens.[156]  In each of those campaigns, the

Advantage Parties proved, based on the sales order or invoice, that the client ordered an e-mail

marketing campaign; that the client was given a tracking report falsely reporting that Take 5

fulfilled a successful e-mail marketing campaign; and, based on the invoice from the PPC

---

to Medicx), A-761 [8/1/17 e-mail communication between T. Finger and S. Crites] (sending final tracking report [A-761A] to Medicx), A-762 [7/24/17 eMedia Invoice] at 3 (invoice for $2,800 for Medicx campaign Gardasil Wave #1), A-765 [7/19/17 Medicx Invoice] (showing Medicx paid $66,666.67 for the first deployment).

[153] **AirWick Essential Mist Campaign:** Exs. A-668 [2/7/18 Sales Order], A-655 [3/5/18 Makaira Media Invoice], A-612 [3/4/18 Facebook Receipt], A-615 [3/6/18 e-mail communication between R. Allen and E. Hodgens, *et al.*] (discussing link distribution for AirWick campaign), A-641 [AirWick Tracking Report regarding deployment 2/27/18], A-650 [3/13/18 eMedia Invoice], A-611 [3/10/18 Facebook Receipt], A-642 [AirWick Tracking Report regarding deployment 3/8/18], A-643 [AirWick Tracking Report regarding deployment 3/22/18], A-674 [3/13/18 Facebook Receipt], A-653 [4/23/18 Makaira Media Invoice], A-637 [AirWick Tracking Report regarding deployment 4/18/18], A-635 AirWick Tracking Report regarding deployment 4/20/18], A-654 [3/26/18 Makaira Media Invoice].

**Finish Quantum Max Campaign:** Exs. A-634 [2/7/2018 e-mail communication between M. Benjoseph and A. Radetich, *et al.*] (discussing count request for Quantum campaign), A-653 [4/23/18 Makaira Media Invoice], A-637 [4/18/18 Quantum Tracking Report], A-635 [4/20/18 Quantum Tracking Report].

[154] **Vetstreet Campaign:** Exs. A-248 [3/15/12 e-mail communication with R. Gluck and D. Morris] (communications regarding VetStreet e-mail campaign order and pricing], A-249 [VetStreet Campaign Proposal], A-251 [5/15/12 e-mail communication between D. Morris, R. Gluck and ProData] (Mr. Morris requesting links be set up for "live traffic"), A-252 [5/23/13 e-mail communication from J. Korkin to R. Gluck and D. Morris] (Mr. Korkin of ProData stating that he is running a Twitter "experiment" and confirming ProData is to do an "ad buy" with Google), A-254 [5/30/12 e-mail communication from D. Morris to R. Gluck] (Mr. Morris asking Mr. Gluck to spend more money with Google Adwords because they needed to get Vetstreet traffic "ASAP"), A-256 [6/15/12 e-mail communication from D. Morris to A. Serio] (Mr. Morris explaining to Vetstreet regarding social media traffic), A-257 [6/27/12 ProDataFeed Invoice] (showing Google Adwords traffic for VetSreet).

[155] **Faulkner University Campaign:** Exs. A-848 [3/8/19 e-mail communication from T. Holley to H. Speizman] (Faulkner University sending creative elements for e-mail campaigns and signed Sales Orders reflecting the same), A-849 [3/19/19 e-mail communication from H. Speizman to T. Holley] (sending client tracking reports for e-mail campaigns), A-850 [3/18/19 eMedia Group Invoice] at 4 (showing click purchases for Faulkner University campaigns).

[156] *See* **Sandals Resort Campaign**, *supra* n.151; **Media Storm Veterans**, *supra* n.151, **AirWick Essential Mist Campaign** *supra* n.153, **Quantum Max**, *supra* n.153.

vendor, that the campaign was "fulfilled" with PPC traffic rather than e-mails.  ***The Take 5***

***Parties did not introduce evidence that Take 5 legitimately fulfilled a single campaign.***

The difference between the cost of sending e-mails and the cost of PPC traffic was the primary reason that Mr. Radetich and Mr. Gluck committed this fraud.  E-mail advertising "was significantly far more expensive than a digital media campaign cost."[157]  The fulfillment department was given strict budgetary constraints for fulfilling campaigns, and that is why they used the least expensive PPC traffic they could.[158]  This generated an incredible profit margin for the Take 5 Parties.  For example, Take 5 received $66,666.67 from Medicx for purportedly fulfilling an e-mail campaign, and it paid eMedia just $2,800 to send PPC traffic.[159]  Take 5 had similar astounding profit margins on each of the individual campaigns that were reviewed during the arbitration.[160]

---

[157] **Hodgens:** 7:Tr. 2031:23–2032:12, 2034:2–2035:22 (explaining why the cost of sending e-mails prevented her from fulfilling campaigns by sending e-mails).

[158] Ex. A-57B [Assignment of CTR and Budgets] (portion of Take 5 Fulfilment Manual describing budget for campaigns); **Hodgens:** 7:Tr. 2015:21–2019:22 (discussing budget constraints on fulfilling campaigns), 2030:24–2031:8 ("Q. What was the process for you to determine the best way to fulfill a campaign at Take 5? A. "[P]robably the main driver was just budget."), 2031:10–22 ("Q. Was there ever any instructions from Mr. Gluck or Mr. Radetich regarding budgets for the campaigns? A. I was very restricted to my [costs of goods sold] I could spend."), 8:Tr. 2139:18–24 (never had the budget to fulfill an e-mail campaign by sending e-mails); **Boy:** 6:Tr. 1609:12–1610:6 ("The goal was always to get the maximum amount of clicks for the lowest cost possible."), 1617:3–1619:5 (discussions with Mr. Radetich and Mr. Gluck about "how to reduce PPC costs, because the . . . margins needed to be higher profitability-wise, and the costs needed to be lower on our end."); Exs. A-262 [7/18/12 e-mail communication from B. Hannon to J. Korkin, A. Radetich, and R. Gluck] (Take 5 informing ProData that Mr. Gluck wants to spend $1,000 on PPC traffic), A-271 [12/5/13 e-mail communication from J. Korkin to R. Gluck, J. Fruman] (stating "with PPC you get what you pay for by way of traffic quality . . . lately you've been lowballing the budgets considerably").

[159] *Compare* Ex. A-765 [Take 5 invoice] *with* Ex. A-762 [eMedia invoice].

[160] *Compare* Ex. A-658 [1/4/18 Sales Order] *with* Exs. A-657 [1/15/18 Makaira Media Invoice] *and* A-651 [1/20/18 eMedia Group Invoice] (showing Take 5 received $30,000 for purportedly fulfilling the Sandals Resort e-mail campaign, while paying Makaira Media and eMedia $3,000 to send PPC traffic); *compare* Ex. A-668 [2/7/18 Sales Order] *with* Exs. A-655

## 2.    Take 5's clients were not aware that their e-mail campaigns were being fulfilled with PPC traffic

Mr. Radetich and Mr. Gluck's second attempt to deflect the conclusions reached by Advantage's internal investigation and FTI's audit was their assertion that "clients really don't want e-mails, even though that's what we sold them. . . . [W]hat they really wanted was clicks."[161]  Chris Brown, a then senior managing director at FTI and former auditing partner at KPMG,[162] designed a sampling approach to test Mr. Radetich and Mr. Gluck's argument, which was similar, conceptually, to the audit sampling that Dr. David Lasater later employed to determine whether Take 5 had complied with its contractual obligation to send e-mails.[163]

Mr. Colen asked Mr. Radetich and Mr. Gluck to identify ten clients that should be contacted to "confirm they were aware and were comfortable and approved of the approach that [Take 5] took even if it's different than recorded on the invoice."[164]  For audit purposes, to verify

---

[3/5/18 Makaira Media Invoice] *and* A-612 [3/4/18 Facebook Receipt] (showing Take 5 received $77,313.31 for purportedly fulfilling the AirWick Essential Mist e-mail campaign, while paying Makaira Media and Facebook $3,522.5 to send PPC traffic); *compare* Ex. A-765 [7/19/17 Invoice] *with* Ex. A-762 [7/24/17 eMedia Group Invoice] (showing Take 5 received $66,666.67 for purportedly fulfilling the Medicx Gardasil e-mail campaign, while paying eMedia $2,800 to send PPC traffic); *compare* Ex. A-848 [3/8/19 Sales Order] *with* Ex. A-850 [3/18/19 eMedia Group Invoice] (showing Take 5 received $1,652.72 for purportedly fulfilling the Faulkner University e-mail campaign, while paying eMedia $360 to send PPC traffic); *compare* Ex. A-631 [6/21/18 Sales Order] *with* Exs. A-529.0002 [7/3/18 eMedia Group Invoice] *and* A-652 [7/2/18 Makaira Media Invoice] (showing Take 5 received $71,047.26 for purportedly fulfilling the Media Storm Veterans e-mail campaign, while paying Makaira Media and eMedia $33,440 to send PPC traffic).

[161] **Colen:** 2:Tr. 408:6–25.

[162] **Brown:** Brown Dep. 9:22–10:16.

[163] **Brown:** Brown Dep. 83:10–22.  Advantage had recognized revenue under GAAP for the Take 5 division's sale of e-mail marketing campaigns and was aware that if it had not actually provided e-mail marketing services, it would need to restate its financials unless, perhaps, the clients agreed to accept the alternative services.  **Colen:** 2:Tr. 422:5–423:8; **Brown:** Brown Dep. 31:5–22.

[164] **Colen:** 2:Tr. 421:18–423:8, 548:12–549:2, 434:5–435:15 (describing why phone calls were made); *see* Ex. A-560 [6/29/19 e-mail communication between A. Radetich, R. Gluck, and G. Colen, *et al.*]; **Brown:** Brown Dep. 23:2–11.

that clients had been willing to accept substitute service, Mr. Brown required that the clients

provide both oral and written confirmation.[165]  Mr. Radetich or Mr. Gluck participated in all the

conversations,[166] and of the ten customers who were contacted, only two provided written

confirmation that they were comfortable with supplemental digital traffic other than e-mails.[167]

Four of them orally stated that they did not agree to accept substitute traffic,[168] and a number of

other clients later stated in writing that they did ***not*** agree to substitute traffic.[169]  Although 80%

of the clients that Mr. Radetich and Mr. Gluck identified failed to confirm their assertion that all

the clients wanted was clicks, "from a sampling approach . . . four out of ten, would be an

exceptionally high rate of exception, and it would be a rate that would not allow . . . an

independent auditor to conclude that . . . the revenue recognition is appropriate for any untested

samples."[170]  Based on the outcome of  these communications with Take 5's clients, Mr. Brown

concluded that Take 5 was substituting other forms of traffic for e-mails without its clients'

consent and should not have recognized revenue for those sales.[171]

---

[165] **Colen:** 2:Tr. 423:9–425:20; **Brown:** Brown Dep. 80:12–18.

[166] **Colen:** 2:Tr. 452:10–15.

[167] Ex. A-426 [client call notes].  Mr. Colen did not participate in the initial calls, and only one of the clients who were contacted after Mr. Colen joined the calls provided written acceptance of substitute services.  **Colen:** 2:Tr. 441:7–20.

[168] Ex. A-426 [client call notes].

[169] Exs. A-558 [7/1/19 e-mail communication between C. Brown, G. Colen, and L. Walker of Neustar] (Neustar representative stating that "I disagree that other tactics are satisfactory, the contract that Neustar has with our end customers is for e-mail, so the invoices from [Take 5] should only include emails"), A-559 [7/2/19 e-mail communication between C. Brown, D. Morris, and J. Tezanos of Meredith] (Meredith representative stating that they did not agree to advertising other than e-mails and would be "reviewing this matter internally with our executive and legal teams").  Some of the clients who said that they were unhappy with the way Take 5 fulfilled their orders were the same clients who said they were happy with Take 5's services during due diligence.  *See* Ex. A-557 [Investment Considerations Take 5 Media Group Presentation] at 19; **Colen:** 2:Tr. 452:25–455:9.

[170] **Brown:** Brown Dep. 83:10–22.

[171] **Brown:** Brown Dep. 9:22–10:16, 35:16–22, 37:18–24, 40:8–41:13, 82:25–83:22.

The evidence during the arbitration reinforced the conclusion that clients would not have been satisfied with substitute traffic.[172]  It also belies common sense to believe that clients would have been willing to pay Take 5 thousands of dollars more than the value of the services Take 5 provided.

## I.    Take 5 is shutdown, and Advantage is forced to restate its financial statements

After Advantage learned that Take 5 was selling e-mail advertising services to clients but was not actually sending e-mails and that clients were not aware that Take 5 was doing this, Advantage decided to shutdown Take 5's business, which it did on July 11, 2019.[173] Mr. McGavran and every Advantage executive who was involved in overseeing Take 5's business agreed with that decision.[174]  Clients were informed that the business was being shutdown because Advantage could not confirm or verify the services that Take 5 had been paid to deliver.[175]  Advantage reported the revenue from the Take 5 division on its financial statements, and because the Take 5 division had not performed the e-mail advertising services that its clients had paid it to perform, Advantage was required to restate its 2018 financial

---

[172] **Pike:** 9:Tr. 2498:9–22 ("If I had known that they had used Makaira or another pay-per-click vendor to fulfill at least the clicks that are represented on this campaign, I would not have been satisfied with the campaign."), 2501:17–21 (Mr. Pike as a client would not have been happy with Take 5 generating clicks through eMedia and social media instead of deploying e-mails); **Colen:** 2:Tr. 357:25–359:9; **Morris:** 11:Tr. 2913:5–11 (if local channel partner clients were told they could no longer have e-mail only campaigns they most likely would have left Take 5); Ex. A-703 [7/12/19 e-mail communication between Adtaxi, P. Creel, D. Morris, *et al.*] (confirming that Adtaxi campaigns cannot run on social or display platforms); A-554 [6/28/19 e-mail communication between R. McGavran, G. Colen, C. Weiner, and C. Libitsky] (Ms. Coker represented to Mr. McGavran that "clients are not aware and have not acknowledged that they're receiving web traffic.").

[173] **Colen:** 2:Tr. 494:7–24; **Boy:** 6:Tr. 1654:4–10.

[174] **McGavran:** 7:Tr. 1847:9–23; **Colen:** 2:Tr. 494:7–24; **Weiner:** 3:Tr. 865:8–867:23; **Stevens:** 14:Tr. 3668:19–24, 3671:7–25;  **Domier:** 14:Tr. 3686:6–18, 3688:17–3689:3.

[175] **Colen:** 2:Tr. 503:4–18; **McGavran:** 7:Tr. 1838:5–1839:14; Ex. A-404 [talking points for client calls]; **Creel:** 9:Tr. 2369:18–2371:14; **Morris:** 11:Tr. 2916:12–23.

statements.[176]

## III.    PROCEDURAL HISTORY AND DISCOVERY OF EXTENT OF FRAUD

### A.    Procedural history

The Take 5 Parties filed their initial demand for arbitration in September 2019 in which they claimed that Advantage had breached the Asset Purchase Agreement and violated the covenant of good faith and fair dealing by shutting Take 5 down and depriving Mr. Radetich and Mr. Gluck of the ability to receive future earnings from the Take 5 business.  The Advantage Parties responded to the arbitration demand, and in their first amended counter-claim, filed in October 2019, asserted claims for indemnification, breach of contract, breach of the implied covenant of good faith and fair dealing, fraud in the inducement, fraud, and RICO.  In November 2020, the Take 5 Parties amended their statement of claim to add a cause of action for defamation.

The fraud that the Advantage Parties discovered by July 2019 provided sufficient justification to close Take 5 and to support a finding of liability on their causes of action against the Take 5 Parties.  But through fact discovery, the Advantage Parties uncovered additional evidence of the Take 5 Parties' fraud, and through the course of expert discovery, they further proved that Take 5 did not fulfill any of the campaigns that its clients paid it to perform and that Take 5 did not even have a database that could have been used for e-mail marketing services.

### B.    Take 5 falsified e-mail counts

Take 5's clients wanted curated e-mail data that could target specific populations.[177]  The

---

[176] **Kaye:** 10:Tr. 2669:22–2670:17.

[177] *See, e.g.*, **Weintraub:** 11:Tr. 2956:3–16 (Medicx was looking for a "permissioned opt-in database for people with medical conditions."); **Findeisen:** 12:Tr. 3169:15–3170:4 (Take 5 was an e-mail resource compiling data in specific areas); **Berry:** Berry Dep. 18:6–17 (IvyWise was impressed by the segmentation Take 5 could offer: "they could segment based on,

Take 5 Parties claimed that they had acquired this data using surveys to which customers responded.[178]  Take 5 did not actually have surveys completed by consumers and did not have the e-mail data the Take 5 Parties claimed it had.[179]

Mr. Kalat confirmed through forensic analysis that Take 5 did not have the data to provide e-mail marketing services.  Take 5's demographic records were unavailable, inconsistent, or simply erroneous.[180]  Consumer contact information and demographic characteristics were not refreshed or updated.[181]  Fewer than one-third of the e-mail addresses that Take 5 had were verified as deliverable.[182]

Because Take 5 did not have the data it claimed it had, Take 5 falsified the reports that it provided to clients concerning the number of e-mail addresses in its database.  Mary Jo Benjoseph, former Take 5 sales representative, admitted that one way she provided clients with

---

you know, the age of students and income, location, you know, and that these were contacts that had opted in to receive communications from them").

[178] *See* **Hodgens**: 10:Tr. 2810:4–2811:8; **Weintraub:** 11:Tr. 2960:23–2962:14; 3014:22–3015:18.

[179] *See* **Boy:** 6:Tr. 1624:23–1625:7 (discussing Take 5's "fake surveys that they hosted online that they would send off to clients"), 1623:3–1626:11 (fulfillment "never saw any of that data come in or go into the database, never saw traffic go into that, to those forums"), 1625:18–1626:2 (at most, a handful of results from these surveys were recorded within the Take 5 system); **Johnson:** David Johnson Deposition Transcript ("Johnson Dep.") 37:12–14, 37:17–38:1 (Take 5 had fewer than 100 survey results produced during Take 5's existence).  Mr. Boy testified that surveys were "more of a front to show – to show clients that, hey, we have these surveys that give us all these lifestyle preferences and targeting."  **Boy:** 6:Tr. 1625:11–17.  This is consistent with Mr. Weintraub's description of how Medicx interacted with the survey "results."

[180] **Kalat:** 5:Tr. 1391:2–10, 1440:24–1441:6.

[181] *Id.* at 1425:7–1426:9 (there was no evidence that the data was regularly cleaned or updated); **Boy:** 6:Tr. 1628:13–17 (Take 5 did not update information regarding who was a college senior, pregnant or looking for a car in the next six months); **McGavran:** 7:Tr. 1857:16–1858:10 (The data at Take 5 was "uncleaned and limited in volume and the delivery metrics were poor").

[182] **Kalat:** 5:Tr. 1439:14–1440:4, 1483:16-22; *see also* Ex. A-696 [demonstrative] (illustrating Mr. Kalat's results of his Kickbox analysis).

e-mail counts was to ask Take 5 employee Asim Farooqi to use randomizing formulas in Excel to generate counts based on the overall demographic population rather than on information specifically in Take 5's database.[183]  The Advantage Parties provided a detailed summary of Ms. Benjoseph's deposition testimony concerning this process at pages 28 through 32 of their November 17, 2021 motion for summary judgment.  The Advantage Parties designated at the final evidentiary hearing all the testimony and exhibits that they summarized in their summary judgment motion.  Accordingly, and for the sake of brevity, the Advantage Parties respectfully refer Your Honor to our summary judgment brief.

Ms. Hodgens also testified that Take 5 falsified e-mail counts given to clients.[184]

Mr. Radetich and Mr. Gluck were fully aware that Take 5 was making up these e-mail counts.[185]

---

[183] *See* **Benjoseph:** Mary Jo Benjoseph Deposition Transcript ("Benjoseph Dep.") (Vol. 1) at 111:3–7, 113:22–114:3, 115:10–116:14, 119:12–123:17, 132:14–133:5, 133:6–17, 134:12–135:14, 137:23–140:11; (Vol. 2) at 163:15–171:21, Exs. A-2 [10/3/18 e-mail communication between M. Benjoseph and A. Farooqi regarding Boston University], A-4 [10/3/18 e-mail communication between M. Benjoseph and A. Desir regarding Boston University], A-8 [Excel sheet with randomizing formula], A-9–A-13 [screenshots of Excel sheet with portions of the randomizing formula], A-49 [summation document showing 131 campaigns using the randomized formulas], A-24 [7/16/18 e-mail communication from A. Farooqi to M. Benjoseph] (finalizing client counts with randomizing formula).

[184] **Hodgens:** 7:Tr. 2057:20–2060:10 & Ex. A-66 [9/11/18 e-mail communication between A. Radetich and E. Hodgens, *et al.*]

[185] *See* **Benjoseph:** Benjoseph Dep. (Vol. 2) at 192:5–22 ("I believe they knew for sure" that formulas were being used to falsify e-mail counts); Exs. A-15 [3/31/19 text message thread between M. Benjoseph and A. Radetich] (Ms. Benjoseph states that she was trained by Mr. Gluck and Mr. Radeitch and speaks specifically about count formulas), A-202 [12/11/15 e-mail communication between A. Radetich and T. Coker] (Mr. Radetich instructing Ms. Coker to tell client that Take 5 has 62,788,437 records even though Take 5 did not have that data), A-199 [1/9/18 e-mail communication between A. Radetich and T. Coker] (instruction by Mr. Radetich to Ms. Coker to increase e-mail counts by "up to 6.2% average" and then "scramble it so it is not exactly 6.2% on each line"), A-200 [7/31/18 e-mail communication between A. Radetich and T. Coker] (Mr. Radetich giving instruction to Ms. Coker after receiving e-mail count to "bump it up 5 fold"), A-204 [11/12/15 e-mail communication between A. Radetich, R. Gluck and M. Benjoseph, *et al.*] (Mr. Gluck instructing Ms. Benjoseph that e-mail counts "need to be randomly decreased all varying quantities from 27–35% less").  In fact, Mr. Radetich specifically used the expression "load the boat" in his correspondence with other

Although the direct evidence from the percipient witnesses was sufficient proof that Take 5 fabricated e-mail counts, Mr. Kalat confirmed through analyzing actual requests from Take 5's clients that Take 5 did not have the e-mail records that it told clients it had.[186]  For example, Mr. Kalat compared what Take 5 reported to Refuel Agency about the number of e-mail addresses that it could deploy on its behalf to active and retired military personnel in Arizona and concluded that Take 5 had far fewer e-mail addresses than it claimed it had:

| Table Name | Total Unique Email Results | COCHISE | CORONA DE TUCSON | GLENDALE | TUCSON | YUMA |
|---|---|---|---|---|---|---|
| State: AZ | | | | | | |
| Active Military JOINED Clean Email | 2,214 | 2 | 1 | 501 | 1,497 | 213 |
| Retired Military JOINED Clean Email | - | - | - | - | - | - |
| Misty Email JOINED Misty Base | 15,335 | 29 | 12 | 3,857 | 10,032 | 1,405 |
| ACHData | 3 | - | - | - | 3 | - |
| Ailment | - | - | - | - | - | - |
| Lawyers | 26 | - | - | - | 25 | 1 |
| PaydayLoans | 122 | - | 1 | 11 | 53 | 57 |
| All Combined | 17,620 | 31 | 14 | 4,350 | 11,556 | 1,669 |
| | | | | | | |
| Results Reported By Take 5 | 67,939 | 6,486 | - | 42,237 | 6,215 | 13,001 |
| | | | | | | |
| Combined as a Percentage of Reported by Take 5 | 26% | 0% | n/a | 10% | 186% | 13% |

[187]

---

Take 5 employees, instructing them to inflate the number of records as much as possible.  Exs. A-184 [6/5/19 e-mail communication between A. Radetich and T. Coker, *et al.*] ("We need to load this boat people"), A-185 [11/14/14 e-mail communication between A. Radetich and J. Cloyes] ("We need to load the boat as much as possible"), A-186 [3/6/15 e-mail communication between A. Radetich and M. Angelis] ("We are going to load the boat"), A-187 [4/3/15 e-mail communication between A. Radetich and S. Albert, *et al.*] ("[W]e will load the boat"), A-188 [4/8/15 e-mail communication between A. Radetich and H. Speizman, *et al.*] ("I need them to load the boat."), A-189 [4/21/15 e-mail communication between A. Radetich, R. Gluck and T. Finger] ("We need to load the boat"), A-190 [11/9/15 e-mail communication between A. Radetich and J. Gluck] ("Load the boat sunshine."), A-743 [5/2/16 e-mail communication between A. Radetich and T. Finger] (Mr. Radetich confirming Ms. Finger's random e-mail count for Medicx).

[186] **Kalat:** 5:Tr. 1451:17–1452:25 (Mr. Kalat tested four test queries from Take 5 clients from 2018), 1457:12–1459:6 (explaining how he tested the requests from clients); *see also* Ex. A-28R [7/16/18 e-mail communication between K. Santo (Refuel Agency) and M. Benjoseph, *et al.*] (Take 5 e-mail to Refuel Agency reporting e-mail counts for targeted military request).  The number reported to the client was generated by a randomizing formula for e-mail counts.  *See* Ex. A-25 [Excel spreadsheet related to Refuel Agency military counts].

[187] **Kalat:** 5:Tr. 1460:2–25 (describing one example test query results showing at best just

Take 5 did not have the data to fulfill a single one of the campaigns Mr. Kalat tested.[188]  Take 5

did not offer any evidence that Take 5 had the ability to perform any campaign it sold to its

clients.[189]

### C.    Take 5 did not have double opt-in e-mail addresses

Take 5 represented to both its clients[190] and the Advantage Parties[191] that it had

---

26 percent of the number of e-mails reported to the client as being available were actually available).

[188] *Id.* at 1461:4–7.

[189] *See* **Noderer:** 13:Tr. 3611:24–3613:8 (Mr. Noderer did not run a similar analysis regarding third party records), 3613:9–24 (Mr. Noderer could not recall what tests he even conducted regarding Mr. Kalat's semantic observations), 3550:17–3551:2, 3610:8–18 (Mr. Noderer's only opinion on staleness was formed days before his hearing testimony and is based on numbers he randomly found on Google).

[190] *See, e.g.*, **Hodgens:** 7:Tr. 2027:3–19 (Take 5 sales representatives told clients the e-mail addresses were double opt-in); **Morris:** 10:Tr. 2765:13–24 (during Mr. Morris' career with Take 5 he was always told that Take 5 had double opt-in e-mail addresses), 2811:4–8 ("The fact that Take 5 claimed that consumers opted in to Take 5's database was part of the backbone" of training the Take 5 sales team), 11:Tr. 2887:13–16 (Epsilon was told that Take 5 had 167 million double opt-in e-mails); **Weintraub:** 11:Tr. 3009:5–19 (Take 5 repeatedly represented to Medicx that they had double opt-in e-mails); **Adams:** 11:Tr. 3118:5–24 (product offering from 2016 represented Take 5 to have 200 million double opt-in e-mails) & Ex. A-736 [4/6/16 e-mail communication between Take 5 and a client, and marketing presentation] (advertising 200 million double opt-in e-mail addresses), A-738 [7/6/16 e-mail communication between Take 5 and Digicel Group] (representing Take 5's data is all "self-sourced single and double opt in"); **Findeisen:** 12:Tr. 3200:6–18 (InfoGroup would not have accepted Take 5 data if it was not double opt-in); **Berry:** Berry Dep. 22:20–23:2 ("[T]hey really sold the quality of their lists, that they were able to segment this way.  These contacts [were], you know, double opted in . . ."), 196:20–24 (Take 5 "claimed to have double op-in" e-mails).

[191] *See, e.g.*, **Kleinman:** 1:Tr. 101:10–102:11 (Ex. A-414 [CIM] represented that Take 5 had 160 million double opt-in e-mails), 102:12–103:24 (describing Take 5's representations to Advantage regarding double opt-in information); **Colen:** 2:Tr. 316:15–317:2 (Advantage acquired Take 5, in-part, because they represented they had 160 million double opt-in e-mail addresses), 324:10–325:8 (Take 5 represented they had 160 million double opt-in e-mail addresses in Ex. A-414 [CIM]), 326:20–327:5 (Mr. Radetich and Mr. Gluck represented that Take 5 had more than 160 million double opt-in e-mail addresses); **Pike:** 9:Tr. 2457:21–2458:12 (Mr. Radetich and Mr. Gluck represented that Take 5 have 168 million double opt-in e-mail addresses); Exs. A-527 [Take 5 Management Presentation] at 5, 16 (representing Take 5 had 160 million plus double opt-in e-mails and describing Take 5's "Proprietary Double Opt-in Process"), A-547 [7/31/17 e-mail communication between Petsky Prunier and Mr. Kleinman]

double opt-in e-mail addresses.  Double opt-in e-mail addresses are those in which the consumer

has expressly granted permission to receive marketing e-mails from Take 5 and so would be

particularly valuable for clients.[192]  Take 5 did not have double opt-in e-mail addresses.[193]

**D.    Take 5 designed CMS to deceive clients that tracked their campaigns into believing that e-mails were sent**

**1.    Take 5 sent tracking links and pixels to PPC vendors to conceal PPC traffic**

When Take 5 agreed to send an e-mail campaign on behalf of the client, it would work

with the client to prepare the e-mail that it would later pretend to send, called the "creative."[194]

A copy of the creative would be included in the tracking reports under the heading

"CREATIVE."

---

(representing "Project Palm" –  Take 5 – had "deployment capabilities across email (160mm double opt-in emails)").

[192] **Colen:** 2:Tr. 324:10–325:8; **Kalat:** 5:Tr. 1419:6–1421:25.

[193] **Hodgens:** 7:Tr. 2026:25–2027:2 ("Q. Were Take 5's records double opt-in? A. No, they were not."), 2027:20–2028:3 (Take 5 did not have the systems to collect and aggregate data to opt-in); **Boy:** 6:Tr. 1622:9–1623:17 (Take 5 did not have double opt-in e-mails), 1624:23–1626:11 (same), 1637:16–1639:23 ("[T]he data wasn't double opt-in."), 1677:13–1678:3 ("[T]he e-mails weren't single opt-in and/or double opt-in due to the fact that once the person emailed there was high unsubscribe rates and individuals requesting to be removed off the list because they never signed up for the data."); **Kalat:** 5:Tr. 1423:11–14 (Take 5's data showed no indication of double opt-in information), 1422:2–1423:10 (explaining what information would normally be present when recording double opt-in information).  Mr. Kalat also testified regarding problems with Take 5's limited single opt-in information.  *Id.* at 1423:15–1424:22 (describing the problems with Take 5's opt-in data).

[194] **Weiner:** 3:Tr. 810:2–811:25; **Berry:** Berry Dep. 29:25–30:7; **Weiner:** 3:Tr. 861:23–862:17; **Weintraub:** 11:Tr. 3028:5–9 (Medicx worked on e-mail creatives with Take 5) & Ex. A-755 [6/27/17 e-mail communication between Take 5 and Medicx] (discussing client edits to the creative for the e-mail campaign).



Clients would "provide [Take 5] the URL or the link that when someone clicks on the e-mail . . . that Take 5 was supposed to have been sending . . . it would go to a website the client had signed off on."[196] Those URLs would include an Urchin Tracking Module ("UTM") code that the client could use to determine whether a consumer clicked on the URL link in an e-mail that it received from Take 5.[197] Some clients also embedded a pixel in the code to separately track whether an e-mail was opened.[198]

---

[195] Ex. A-659 [1/9/18 Sandals Tracking Report]; **Wei:** 4:Tr. 1080:18–1081:10.

[196] **Weiner:** 3:Tr. 861:23–862:17.

[197] *See* **Boy:** 6:Tr. 1599:9–1601:12 & Ex. A-684 [5/17/19 internal e-mail thread regarding UTM codes], 1602:7–13 (describing the process of how Google Analytics reports on sources of traffic to a website via UTM code), 1602:24–1604:9 & Ex. A-683 [5/9/17 internal Take 5 e-mail communication] (discussing UTM codes), 1609:7–11 (the fulfilment department sent these URLs to the PPC vendors); **Weiner:** 3:Tr. 863:3–14 (defining UTM code).

[198] **McCoy**: 12:Tr. 3367:12–3368:10 (clients would track opens through use of pixels); **Stricchiola**: 15:Tr. 3887:18–3888:12 (pixels are used to track whether an e-mail was opened).

The URLs that were embedded in the client's e-mail creative would be included on the second page of the tracking report with a breakout of clicks for each link and the UTM code representing that the source of these clicks was an e-mail sent by Take 5:



199

"[B]ecause [Take 5] didn't send out the e-mails they were supposed to, and still generated the clicks, they would, instead, give that URL to third-party systems, Keono, PPCmate and others, to drive clicks that way instead."[200]

Google Analytics does not independently verify the source of the click that is included in the URL but relies on the UTM code embedded in the link.[201]  Therefore, the client's Google Analytics would show clicks generated from a Take 5 campaign based on the way the UTM was coded, which was for e-mail.[202]  Jessie Stricchiola analogized the process that Google Analytics

---

[199] Ex. A-659 [1/9/18 Sandals Tracking Report].

[200] **Weiner:** 3:Tr. 862:18–863:2.

[201] **Ward:** 8:Tr. 2248:11–14.

[202] **Boy:** 6:Tr. 1606:14–1609:3 (explaining Google Analytics reporting differences between Take 5 and Take 5's clients); **Hodgens:** 8:Tr. 2182:17–2184:6 (Take 5's Google

used to track campaigns to a license plate stating that if you are configuring a system to "count all the California vehicles, every vehicle you see that has a California license plate assume that's a vehicle from California, don't question it, right?"[203]  In response to Your Honor's question, Ms. Stricchiola confirmed that clients would not be able to detect the fraudulent code.[204]

Mr. Weiner also explained that it was simple to fool clients into believing that consumers had clicked on their websites because they had received an e-mail:

> So it's very easy to change in a way that would not show the true source of traffic by simply replacing what the UTM source is with something else.
>
> And in the example with our campaigns, we would give Take 5 a URL to drive to that would include a UTM source of e-mail, and by purchasing third-party PPC traffic and having those UTM codes carry over into those campaigns, what will be recorded in Google Analytics was that there were 100,000 clicks from a UTM source of e-mail, which obviously is not actually what happened.[205]

In addition to manipulating the UTM to disguise the source of the clicks, the Take 5 Parties also manipulated the pixel by sending PPC traffic to it to create the illusion that customers were opening e-mails, or in some instances, removed the pixel from the client's e-mail campaign altogether.[206]

---

Analytics was different than the client's Google Analytics), 2213:12–23 (only the client's Google Analytics would show whether or not a click was from an e-mail or ad display and it would only show that if the client coded that in their URL links), 2214:4–18 (Take 5 could not see the UTM information in Google Analytics); **Stricchiola**: 15:Tr. 3905:13–22 ("[I]f you configure the tracking URL to say e-mail, it will show your report. Here's all your e-mail click right? Google, on its own, is not going to try to determine whether or not that's really where the clicks came from."), 3928:15–3929:9, 3935:14–19 (confirming that if the UTM code says medium=e-mail, Google Analytics will report that the click came from e-mail); **Weiner**: 3:Tr. 864:17–865:1 (describing altering a UTM source code to depict different sources of traffic on Google Analytics); **Wei**: 4:Tr. 1033:9–1034:2 (describing the use and alterations to UTM codes).

[203] **Stricchiola**: 15:Tr. 3890:7–3891:14.

[204] **Stricchiola**: 15:Tr. 3941:13–19.

[205] **Weiner**: 3:Tr. 863:15–865:5.

[206] **Boy**: 6:Tr. 1711:9–20 ("[W]e were trained to take those pixels out of the campaign and run traffic to it to simulate opens."), 1712:5–25, 1713:2–1714:3 (explaining how the fulfillment team removed pixels from campaigns); *see also* Ex. A-59A [Take 5 Fulfillment Training Manual September 2018].

## 2.     Take 5 used "link rotator" to manipulate links

As the second page of the tracking report illustrates, the client's campaign includes multiple links to their website, such as the link to download a coupon or a link to read information about the client's privacy policy.[207]  One of the issues that raised clients' suspicions was that a large number of clicks were on portions of the client's webpage, such as the privacy link, that few consumers would actually be expected to click on.[208]

To solve this "problem," Take 5 hired 12 Skies to design a program in CMS called "link rotator" that would allow a client services representative or member of the fulfilment department to tell the PPC vendor which portions of the client's webpage should receive the most links.[209] The link rotator would take the multiple unique links in a campaign and produce one link that Take 5 could then provide to PPC vendors to generate click traffic to the specific links automatically as allocated by the link rotator.[210]  The fulfilment department was trained on how to use the link rotator within CMS.[211]

---

[207] **Colen**: 2:Tr. 357:25–359:9; **Hodgens**: 8:Tr. 2248:15–2249:8.

[208] *See, e.g.*, Ex. A-756 [7/18/17 e-mail communication from A. Radetich to E. Hodgens, M. Adams, *et al.*] (correspondence between Take 5 and Trozzolo relating to the GEHA campaign); **Adams:** 12:Tr. 3269:19–3270:15; Exs. A-191 [11/4/15 e-mail communication between D. Morris, A. Radetich, and E. Cogen] (Dealers United complaints about automated/manufactured website traffic on e-mail campaign), A-269 [10/9/12 e-mail communication with A. Radetich and R. Gluck] (LipiGesic complaints about e-mail campaign being fulfilled from "buy a visitor" websites), A-284 [5/24/16 e-mail communication E. Hodges, D. Morris, A. Cadwell, B. Jenkins, and R. Gluck] (Central Garden & Pet complaints about disproportional amount of clicks on privacy policy link).

[209] **Hodgens:** 8:Tr. 2089:22–2090:23 (explaining the link rotator system at Take 5); Ex. A-615 [3/6/18 e-mail communication from R. Allen to E. Hodgens] (regarding link distribution for Reckitt campaign); **Ward:** 8:Tr. 2248:15–2249:8 (link rotator was a tool built to allocate clicks on the client's campaign); Ex. A-676 [12 Skies invoices] at 11–14, 17–23, 43, 46, 47 (discussing work on the link rotator); **Boy:** 6:Tr. 1588:3–1589:2 (describing how Take 5 assigned clicks to the most "clickable" link in an e-mail creative).

[210] *See* Ex. A-59A [Take 5 Fulfillment Training Manual September 2018] at 28–31 (describing how to use the link rotator).

[211] *Id.*

### E.    FTI proved that Take 5 did not deploy e-mails

As part of its work, FTI determined that Take 5 sold hundreds of e-mail campaigns that it fulfilled with PPC vendors.[212]  During the arbitration, Mr. Wei went through a number of these individual campaigns that FTI had examined and explained how FTI reached its conclusions.[213]

The Advantage Parties subsequently retained FTI under Rules of Evidence 702–704 to determine the overall percentage of e-mails that clients paid for which Take 5 actually sent.[214] To do this, Mr. Wei reached out to Dr. Lasater, a statistician employed by FTI, to develop a sampling model that could be used to measure Take 5's overall compliance.[215]

Per Dr. Lasater's instructions, Mr. Wei compiled a starting population of 13,035 e-mail campaign invoices[216] for seven consecutive calendar quarters from October 2017 through June 2019.[217]  Dr. Lasater then randomly numbered the invoices and selected 15 invoices from each quarter to define a statistically significant representative sample of 105 invoices to test for compliance through attribute sampling.[218]  The size of the sample allowed FTI to be ninety-five percent confident that the findings from the 105 invoices would be representative of the larger

---

[212] Ex. A-324 [3/8/20 List of Fraudulent Campaigns].

[213] *See supra*, nn.93, 147.

[214] Ex. A-442 [Wei Expert Report].

[215] *Id.*

[216] **Wei:** 4:Tr. 1106:18–1107:21, 1113:16–22 (NetSuite indicated that the 13,035 invoices were paid by Take 5's clients).

[217] *Id.* at 1109:3–13 (the date range was selected to reflect Take 5's pre- and post-acquisition invoices).

[218] **Lasater:** 5:Tr. 1347:2–1348:22 ("random sampling is extremely widely used" and "is generally accepted in statistical practice"), 1333:23–1335:2 ("Attribute sampling is extremely widely used in internal auditing . . . engineering reliability monitoring . . . [and] in healthcare communications with the US government involving the . . . Fraudulent Claims Act."), 1335:3–10 (attribute sampling is appropriate to test whether or not delivery of e-mails was consistent with what was told to the client).

population of 13,035 invoices within a three percent margin of error.[219]  If one of the invoices

that Dr. Lasater selected could not be sampled because Take 5's systems did not include

information necessary to test the invoice, such as a tracking report, Dr. Lasater instructed

Mr. Wei to select the next invoice in line.[220]

　　　　To determine compliance, FTI compared the number of e-mails invoiced and reported to

clients from the sample with the number reported by Take 5's e-mail delivery platforms, Volo,

SendGrid, MailWizz and DMS.[221]  A particular invoice would be deemed compliant if the

number of e-mails deployed by Take 5 was consistent with the number of e-mails invoiced or

reported to the client.[222]  Based on that analysis, FTI concluded that only 1.15 percent of the

reported e-mails from the sample were actually deployed.[223]

---

[219] **Lasater:** 5:Tr. 1336:18–1341:7 ("95 percent is nearly a global standard with respect to sampling, with respect to the reporting of statistical results.  It's widely used in courts . . . international arbitrations . . . physical sciences as well as the social sciences as the appropriate level of confidence for the purposes of evaluating results."), 1342:7–1343:25.

[220] **Lasater:** 5:Tr. 1347:2–1348:22.

[221] **Wei:** 4:Tr. 1048:24–1050:14.

[222] **Wei:** 4:Tr. 1113:16–1114:21 ("[T]he point of this exercise is to see whether the information that was communicated to the client is consistent or not consistent with information in Take 5's own systems."); **Lasater:** 5:Tr. 1331:8–21.

[223] *Id.* at 1122:21–1123:9.

| Sample Information | | Invoiced Quantity[9] | Email Delivery Data Quantity | Comparisons |
|---|---|---|---|---|
| Period | Count of Invoices | Total Emails Invoiced | Total Emails Deployed | Total Deployed as a % of Total Emails Invoiced |
| 2017 Q4 | 15 | 3,012,209 | 142,871 | 4.74% |
| 2018 Q1 | 15 | 1,175,789 | 0 | 0.00% |
| 2018 Q2 | 15 | 5,465,009 | 96,789 | 1.77% |
| 2018 Q3 | 15 | 2,318,878 | 120,719 | 5.21% |
| 2018 Q4 | 15 | 27,318,400 | 99,474 | 0.36% |
| 2019 Q1 | 15 | 2,567,182 | 33,375 | 1.30% |
| 2019 Q2 | 15 | 1,197,814 | 1,227 | 0.10% |
| **Totals:** | **105** | **43,055,281** | **494,455** | **1.15%** |
| **Strata-weighted:** | | | | **2.11%** |

[224]

The chart below graphically summarizes FTI's conclusions:



[225]

FTI concluded that no more than three percent of the reported e-mails were actually

---

[224] Ex. A-312 [Lasater Expert Report] at 12.

[225] Ex. A-442 [Wei Expert Report] at 4.

deployed in the population of 13,035 invoices from October 2017 through June 2019.[226]

## F.     Take 5 did not have a usable e-mail database

As noted above, the Take 5 Parties represented to clients, prospective clients, and the Advantage Parties that Take 5 had the ability to send e-mails to certain targeted demographic audiences, such as college students between the ages of 18 and 23 in specific states.[227] Ms. Hodgens and Mr. Boy confirmed that Take 5 never had the capability to fulfill these campaigns.[228]  The Advantage Parties retained Mr. Kalat as an expert witness to perform a forensic analysis of the Take 5 database.  Mr. Kalat analyzed the database and concluded that only 29% of the e-mail addresses that Take 5 had were deliverable and only 0.2% of its e-mail addresses could be "corroborated in third-party records as being correctly associated both with a given consumer's name, address, and their demographics."[229]  Thus, the fulfillment department

---

[226] **Lasater:** 5:Tr. 1360:9–15.

[227] **Johnson:** Johnson Dep. 129:22–130:18; **Benjoseph:** Benjoseph Dep. 102:7–103:11; **McCoy:** 12:Tr. 3400:16–21; **Pike:** 9:Tr. 2457:21–2458:12.

[228] **Boy:** 6:Tr. 1592:15–18 (Take 5 never had the capability of sending 10 million e-mails), 1586:19–24 (Take 5 had "very, very minimal" to no capabilities to deploy e-mail campaigns in-house when he joined Take 5 in 2016), 1587:20–23 (Take 5 never executed 100 percent of all e-mail communications in-house), 1590:9–1591:8 (not possible for Take 5 to send e-mails because of the poor quality of the data), 1622:9–1623:17 (not possible for Take 5 to send e-mails because of the poor quality of the data), 1626:14–1628:4, 1641:23–1642:20 (Take 5 only had approximately 25 million, not 168 million, actionable e-mail addresses); **Hodgens:** 7:Tr. 2022:11–16 ("we could hit a button, but did it work? Not very often."), 2024:8–23 ("[W]e would lose 80, 90 percent of that data. And even if we put the e-mail in and it said it was a viable address, it doesn't mean it was sent."), 2025:14–2026:2 (The quality of Take 5's data was poor.); *see* **McGavran:** 7:Tr. 1857:16–1858:10 (The data at Take 5 was "uncleaned and limited in volume and the delivery metrics were poor"), 1789:7–25 (Mr. McGavran spoke with Mr. Boy and Mr. Gluck regarding the quality of the data).

[229] *See* A-350 [Kalat Report] at ¶¶ 2, 79 (only 29% of e-mail addresses that Take 5 acquired were deliverable); *id.* at ¶¶ 6, 128 ("**[O]nly 0.2%** of the e-mail addresses stored in the Take 5 Data Repository can be corroborated in third-party records as being correctly associated both with a given consumer's name, address, and their demographics."); **Kalat:** 5:Tr. 1439:21–1440:11 (less than a third of the e-mails in the Take 5 data repository were reported by Kickbox as being deliverable for marketing purposes), 1446:15–21 (only 15 percent of the e-mail

did not even have the capability to send e-mails through Take 5's e-mail delivery platforms.[230]

Even the valid data that Take 5 had was maintained in a way that made it unusable. Take 5's data containing consumer contact information and demographic characteristics was maintained by third-party data services vendor HygenicsData LLC ("Hygenics").[231]  David Johnson, who maintained Take 5's e-mail data at Hygenics,[232] testified that Take 5's "data base" was actually comprised of individual "data silos" that were not electronically correlated to one another and could not be used as a collective database.[233]  Mr. Kalat examined the data and determined that the individual silos were not connected in any way, which makes the process of searching the individual silos inefficient and a "slow-going query."[234]

Mr. Radetich was the architect of the database and responsible for acquiring Take 5's data.[235]  Mr. Radetich knew about problems with the data.[236]  Indeed, Mr. Boy spoke with both Mr. Radetich and Mr. Gluck regarding concerns about Take 5's purported double opt-in data.

---

addresses matched with a consumer's name), 1446:22–25 (only 8 percent of the e-mail addresses matched the consumer name and address).  Mr. Kalat examined a particular demographic data point that is impervious to changes over time—date of birth— and of the e-mail addresses Mr. Kalat had enough information to compare to third-party records, the date of birth matched roughly only 50% of the time.  **Kalat:** 5:Tr. 1448:21–1451:14.

[230] **Kalat:** 5:Tr. 1427:8–1429:4, 1439:21–1440:11, 6:Tr. 1554:12–22, 1557:14–1558:2.

[231] *See, e.g.*, **Wei:** 4:Tr. 976:24–7; **Kalat:** 5:Tr. 1395:24–1396:3; **Boy:** 6:Tr. 1628:18–24; **Pike:** 9:Tr. 2510:24–2511:4; **Morris:** 10:Tr. 2811:9–15 (Ex. A-123 [database training slides] contained the universe of counts housed at Hygenics).

[232] **Johnson**: Johnson Dep. 22:08–12, 23:25–24:7.

[233] *Id.* at 27:21–25, 25:25–26:12.

[234] **Kalat:** 5:Tr. 1396:4–1401:23 (explaining the poor relational design of Take 5's data).

[235] **Boy:** 6:Tr. 1628:20–1629:3 (Mr. Radetich maintained the relationship with Hygenics and was responsible for acquiring Take 5's data); **Colen:** 2:Tr. 371:6–16 ("Alex was accountable for the data."); **McGavran:** 7:Tr. 1786:18–20 (Mr. Radetich controlled the relationship with Hygenics); **Morris:** 10:Tr. 2802:2–15 (Mr. Radetich was the architect of the database and was the primary one who obtained and sourced the data).

[236] *See* Ex. A-99 [4/29/15 e-mail communication between A. Radetich and D. Johnson, *et al.*] (Mr. Radetich stating "truth is elusive" in response to Mr. Johnson informing him of bad data).

Mr. Boy testified that he told Mr. Gluck and Mr. Radetich that he would only stay with Take 5 if Take 5 stopped marketing the data as double opt-in.[237]

## IV.    ARGUMENT

### A.    Legal standard

Disputes arising under the APA are governed by Delaware law.[238]  The Advantage Parties asserted four claims against the Take 5 Parties under Delaware law:

- Fraudulent breach of the representations and warranties in the APA;

- Breaching the implied covenant of good faith and fair dealing in the APA;

- Fraudulently inducing Advantage to acquire the assets of Take 5; and

- Defrauding Advantage and its affiliates before and after the acquisition by failing to fulfill e-mail advertising campaigns they paid for and defrauding the Advantage Parties by continuing to deceive their clients post-acquisition, after Advantage bore the liability for those actions.

The Advantage Parties also asserted a civil RICO claim.

The Advantage Parties' burden of proof for all its claims is preponderance of the evidence.  *See Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013) (breach of contract); *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 787 (Del. Ch. 2014) (fraud); *Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 531 (9th Cir. 1987) ("the preponderance of evidence standard applies to proof of predicate acts in civil RICO litigation") (citing authority).

### B.    Fraudulent breach of the APA

#### 1.    Legal standard

To prevail on their claim for breach of the representations and warranties in Article II, the

---

[237] **Boy:** 6:Tr. 1630:16–1632:15.

[238] Ex. A-230 [APA] at 73 (Section 10.11(b)).

Advantage Parties must show "first, the existence of the contract, whether express or implied;

second, the breach of an obligation imposed by that contract; and third, the resultant damage to

the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). If the

breach was the result of "Fraud or willful misconduct," the Advantage Parties' right to recovery

is not limited by the APA:

> Notwithstanding anything in this Agreement to the contrary, the provisions of this
> Article VIII shall not apply to, prevent or limit any Parties recovery, or right to
> seek recovery, for Damages arising out of, relating to, directly or indirectly, any
> Fraud or willful misconduct of a Party.[239]

*See EMSI Acquisition, Inc. v. Contrarian Funds*, LLC, No. CV 12648-VCS, 2017 WL 1732369,

at *11 (Del. Ch. May 3, 2017) (interpreting similar language in a stock purchase agreement to

mean that "the parties agreed that there would be no limitations on recovery from the Sellers for

*any* action or claim" based on contract or fraud). "Contractually binding, written representations

of fact ought to be the most reliable of representations, and a law intolerant of fraud should abhor

parties that make such representations knowing they are false." *Abry Partners V, L.P. v. F & W

Acquisition LLC*, 891 A.2d 1032, 1057 (Del. Ch. 2006); *Online HealthNow, Inc. v. CIP OCL

Invs., LLC*, No. CV 2020-0654-JRS, 2021 WL 3557857, at *12 (Del. Ch. Aug. 12, 2021) ("[A]

seller who knows of the lies cannot disclaim liability out of ignorance . . . [and] 'courts [ ] find it

distasteful to enforce contracts excusing liars for responsibility for the harm their lies caused.'")

(ellipses added) (quoting *Abry*, 891 A.2d at 1062).

---

[239] Ex. A-230 [APA] at 67 (Section 8.5(g)); *see also id.* at 59 (Section 8.3(a) provides that damage limitation provisions do not apply to claims based on "Fraud or willful misconduct"), 60 (Section 8.3(e) providing the same), 61 (Section 8.3(h) providing the same), 61 (Section 8.3(i) provides: "NOTHING IN THIS SECTION 8.3(i) IS INTENDED TO, AND SHALL NOT BE INTERPRETED TO, DISCLAIM OR OTHERWISE LIMIT THE COMPANY'S OR THE BENEFICIAL OWNERS' LIABILITY FOR FRAUD OR WILLFUL MISCONDUCT."), 57 (Section 8.1 provides: "Notwithstanding anything herein to the contrary, in no event shall the termination of any survival of any or all of the representations, warranties, covenants or agreements of the Parties affect a claim for indemnification hereunder or otherwise based on Fraud or willful misconduct of a Party.").

"'Fraud' under the APA is defined as an intentional misrepresentation of an existing fact made with actual knowledge of its falsity and for the purpose of inducing the other Person to act, and upon which the other Person relies with resulting injury or damage."[240]  The Advantage Parties have shown that the Take 5 Parties have fraudulently breached many of their representations and warranties in Article II of the APA.[241]

> **2.** **The Take 5 Parties fraudulently breached Section 2.5(a) of the APA because the Financial Statements were not prepared in accordance with GAAP**

Section 2.5(a) of the APA provides, in relevant part, as follows:

> The Company has made available to the Buyer true and complete copies of the unaudited consolidated balance sheet and statement of income of the Company as of and for the fiscal year ended as of December 31, 2016 and the audited consolidated balance sheet and statement of income (the "Interim Financial Statements") of the Company as of and for the fiscal year ended as of December 31, 2017 (collectively, the "Financial Statements").  The Financial Statements (including the related notes and schedules) (i) have been prepared in accordance with the Books and Records of the Company, (ii) are true and correct and present fairly in all material respects the financial condition and results of operations of the Company as of the dates and for the periods indicated, and (iii) with respect only to the Financial Statement for the fiscal year ended as of December 31, 2017, have been prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated, except as described on Section 2.5(a) of the Disclosure Schedules . . . .

---

[240] Ex. A-230 [APA] at A-7 (Definitions).

[241] The Take 5 Parties previously argued that the Advantage Parties may not rely on representations concerning Take 5's e-mail capabilities because of the non-reliance provision in Section 4.6 of the APA.  In Section 4.6 of the APA, Advantage expressly said, and the Take 5 Parties acknowledge, that Advantage *was* relying on the Take 5 Parties' "representations and warranties" in Article II.  Ex. A-230 [APA] at 38 ("The Buyer acknowledges and agrees that the Beneficial Owners, the Company, and their Affiliates and Representatives, have not made and are not making any representations or warranties whatsoever regarding or relating to the Company, or the Business . . . *except for the representations and warranties in Article II and Article III of this Agreement.*") (emphasis added).  Further, under Section 8.2(a)(i) of the APA, the Take 5 Parties agreed to indemnify the Advantage Parties "from and against all Damages incurred or suffered by any" of them "as a result of, or arising out of any: inaccuracy or breach of any representation and warranty made by" the Take 5 Parties "*in Article II . . . of*" the APA.  *Id.* at 58 (emphasis added).

Thus, the Take 5 Parties certified that their 2017 financial statements "were in accordance with GAAP."[242]

Under ASC 606, a company is permitted to recognize revenue under GAAP only when it "satisfies a performance obligation," that is, performs the services for which it is to be paid.[243] Take 5's Financial Statements were not "prepared in accordance with GAAP" because Take 5 failed to send the e-mails that its clients paid it to send and therefore did not "satisfy the performance obligation" to those clients.[244]

Take 5 invoiced its clients for sending e-mails.[245]  To demonstrate to its auditor, Cherry

---

[242] **Kleinman:** 1:Tr. 134:6–14.

[243] **Kaye:** 10:Tr. 2669:22–2671:3 (explaining ASC 606); **Brown:** Brown Dep. 20:20–21:24 (explaining revenue recognition principles under GAAP); **Kleinman:** 1:124:7–125:8 ("[Y]ou can't say you're going to sell one thing, not do it, and then try to claim that that is revenue that can be recognized."), 125:10–16 (Q. "If Take 5 received money from a customer to send e-mails, but fulfilled those campaigns with something other than e-mails, would GAAP have allowed Take 5 to recognize revenue for those services based on your experience?  A. No."), 265:16–266:3 (GAAP does not permit a company to recognize revenue without providing the services), 277:17–278:10 (same), 279:13–280:25 (GAAP permits revenue recognition only if service is provided); **Baliban:** 13:Tr. 3506:22–3507:25 ("If somebody charges for something that's never been done, never was going to be done, never will be done, and it's just a fiction and a fraud," and revenue should not be recognized); *Revenue from Contracts with Customers (Topic 606), Identifying Performance Obligations and Licensing,* FASB Accounting Standards Update, No. 2016-10, April 2016, at 2 (available at https://asc.fasb.org/imageRoot/32/79982032.pdf); *In the Matter of Rulemaking to Adopt; Amend Rules to Address an Issue Arising from 2020s Senate Bill 1603; an Issue Identified in Um 2040.*, No. 21-112, 2021 WL 1597335, at *2 (Apr. 21, 2021) (GAAP Rule 606 "requires that a company recognize revenue when (or as) the reporting company satisfies a performance obligation"); 1 Atty's Handbook of Acct, Auditing and Fin Rep § 4.03 (2020) (under GAAP, entity is permitted to "recognize revenue when (or as) the performance obligation is satisfied"); 1 Applying GAAP and GAAS § 3A.03 (2021) ("[E]ntity should recognize revenue when the reporting entity satisfies a performance obligation.").

[244] *See* **Brown:** Brown Dep. 35:16–22.

[245] *See* **Colen:** 2:Tr. 450:8–18, 469:16–472:23; **Creel:** 9:Tr. 2315:3–23; **Berry:** Berry Dep. 23:13–19 (IvyWise contracted Take 5 to send e-mails), 23:20–24:7 (e-mail was more important than social retargeting), 27:10–28:15 (sales order reflected purchase of e-mails); 29:13-16 (IvyWise expected Take 5 to deploy 250,000 emails to members of its database); **Weintraub:** 11:Tr. 3032:4–13, 3041:11–16 (discussing invoices [Exs. A-765 and A-777]); **Quadrino:** 12:Tr. 3238:7–3239:5; Ex. A-845 [4/30/17 e-mail communication from H. Speizman to S. McCullough] (sending invoices to AMSI).

Bekaert LLP ("Cherry Bekaert"), that it had satisfied its performance obligations to its clients, Take 5 provided Cherry Bekaert with tracking reports purporting to represent how many e-mails Take 5 had sent on the clients' behalf.[246]  For example, on February 6, 2018, in connection with Invoice No. 44528, Take 5 provided Cherry Bekaert with tracking reports to verify that it had deployed 250,000 e-mails for a client called Wonder Workshop Halloween, for which it was paid $5,000.[247]

The tracking reports sent to clients, and subsequently sent to Cherry Bekaert as proof of fulfillment of campaigns, were algorithmically generated and did not represent the actual number of e-mails that Take 5 sent.[248]  The Take 5 Parties did not identify a single legitimate tracking report, nor could they because CMS was not designed to report data from Take 5's e-mail delivery platforms.  For the fourth quarter of 2017—one of the periods that Cherry Bekaert was auditing—Take 5 invoiced its clients for deploying 3,012,209 e-mails, but actually deployed only 142,871.[249]  That is, for that quarter, Take 5 deployed only 4.74% of the e-mails for which it invoiced clients.

For these reasons, the Take 5 Parties did not satisfy their performance obligations to their clients and were not permitted to recognize revenue for those services.  The Take 5 Parties breached the representation and warranty in Section 2.5(a) of the APA that the Financial Statements were prepared according to GAAP.  They knew at the time that they made this representation that they had not performed the services that clients paid Take 5 to perform and

---

[246] *See* **Brewer:** 8:Tr. 2278:4–12 (Mr. Brewer sent tracking reports "as proof of delivery for the work that was performed"), 2278:22–2279:2 (Take 5 only sent a form of a tracking report as documentation to Cherry Bekaert as proof of delivery).

[247] Ex. A-304 [2/6/18 e-mail thread with P. Brewer and Cherry Bekaert] at 1, 3, 4–7.

[248] *See* Part II.G, *supra*.

[249] Ex. A-442 [Wei Expert Report] at ¶ 54; Ex. A-312 [Lasater Expert Report] at 12.

they intentionally made this representation to induce Advantage to acquire Take 5's assets. The breach, therefore, was "an intentional misrepresentation of an existing fact made with actual knowledge of its falsity and for the purpose of inducing [the Advantage Parties] to act, and upon which the [Advantage Parties relied] with resulting injury or damage."[250]

### 3. The Take 5 Parties fraudulently breached Section 2.5(b) of the APA because the Accounts Receivable of Take 5 did not arise from valid sales actually made or performed

Section 2.5(b) of the APA provides, in relevant part, as follows:

All of the accounts receivable of the Company (collectively, the "Accounts Receivable") are reflected on the Financial Statements and arose from valid sales actually made or services actually performed in the ordinary course of business consistent with past practice on ordinary trade terms to Persons who are not Affiliates of the Company.[251]

Thus, the Take 5 Parties represented that they sold services to their clients and that the accounts were "real and collectible."[252] As explained above, the Accounts Receivable reflected on the Financial Statements did not arise from valid sales actually made or services actually performed, because Take 5 did not deploy the e-mails that clients paid it to deploy. Again, the breach was fraudulent because the Take 5 Parties made this representation knowing that it was false to induce the Advantage Parties to enter into the APA.

### 4. The Take 5 Parties fraudulently breached Section 2.10(a) of the APA because Take 5 did not own or possess the Intellectual Property necessary to conduct its business

Section 2.10(a) of the Asset Purchase Agreement provides, in relevant part, as follows:

The Company owns and possesses, solely and exclusively, all right, title and interest in, to and under, or has a valid and enforceable right to use pursuant to an Inbound License, all of the Intellectual Property necessary for, or used or held for use in, the conduct of the Business (the "Company Intellectual Property"), free and clear of all Liens (except for Permitted Liens and non-exclusive licenses

---

[250] *See* Ex. A-230 [APA] at A-7 (defining "Fraud").

[251] Ex. A-230 [APA] at 19 (Section 2.5(b)).

[252] **Kleinman:** 1:Tr. 134:15–25.

granted to customers in the ordinary course of business consistent with past practice). Notwithstanding the generality of the foregoing, the Company owns and possesses, solely and exclusively, all right, title and interest in, to and under all Owned Intellectual Property.[253]

"Intellectual Property" includes "all . . . intellectual property and proprietary rights."[254] The "Business" means "the business . . . by the Buyer following the Closing, of providing (i) data-based marketing services, including e-mail . . . marketing."[255] Thus, the Take 5 Parties represented that they owned all the intellectual property necessary to operate their business, including their e-mail database.[256]

The assets that Advantage paid for included all the Intellectual Property identified in the Disclosure Schedules,[257] and the Take 5 Parties certified that the Disclosure Schedules were "complete and correct."[258] The assets identified in the Disclosure Schedules include the following:

> 12 Skies Tech developed the following: Client Portal, a web based net platform for count requests, campaign requests, campaign tracking, and account history; an email sending platform, which is net platform for list manager, creative manager, campaign manager, reporting, and white label; and a Campaign Manager, which is a web based net platform for work flow, campaign testing, deployment, tracking, and reporting (see Take 5 Email Testing Platform Proposal dated December 21, 2017)[259]

As discussed above, 12 Skies did not develop a program to legitimately track campaigns,

---

[253] Ex. A-230 [APA] at 24–25 (Section 2.10(a)).

[254] Ex. A-230 [APA] at A-9 (Definitions).

[255] *Id*. at A-3 (Definitions).

[256] **Kleinman:** 1:Tr. 136:20–137:13.

[257] Ex. A-230 [APA] at 1–2 (Section 1.1(a)(v)).

[258] Ex. A-230 [APA] at 25 (Section 2.10(b)).

[259] Ex. A-544 [Disclosure Schedules] at 34, item 2; *see also* **Kleinman:** 1:137:14–138:16 (discussing Disclosure Schedule).

nor did Take 5 have such a program.[260]  Take 5 did not have a proprietary "e-mail sending

platform" that it could use to fulfill campaigns.[261]  And CMS developed by 12 Skies was not

capable of deploying, tracking, or reporting on e-mail marketing campaigns.[262]  The Take 5

Parties knew when they entered into the APA that Take 5 did not have the Intellectual Property

that they represented that it had, and they knew that the Advantage Parties would not have

entered into the APA had the Advantage Parties known the truth about Take 5's Property.  They

therefore committed Fraud in connection with that breach.

### 5.    The Take 5 Parties fraudulently breached section 2.11(b) of the APA because the Take 5 Parties committed mail and wire fraud

#### (a)    The Take 5 Parties represented and warranted that Take 5 had complied with all applicable Laws in operating its business

Section 2.11(b) of the Asset Purchase Agreement provides, in relevant part, as follows:

> Except as set forth on Section 2.11(b) of the Disclosure Schedules, since
> January 1, 2015 the Company has been in compliance in all material respects with
> all applicable Laws and all Governmental Authorizations in connection with the
> conduct, ownership, use, occupancy or operation of the Business, the Purchased
> Assets the Excluded Assets, the Assumed Liabilities and the Excluded Liabilities,
> and the Company has not received any written notification alleging any
> noncompliance with or violation of the foregoing.[263]

"'Law' means any applicable statute, law, rule, regulation, ordinance, or Order of a

Governmental Authority,"[264] which includes "any federal, state, municipal, local or similar

governmental authority, regulatory or administrative agency, court or arbitral body."[265]  The

Take 5 Parties were not "in compliance in all material respects with all applicable Laws and all

---

[260] *See* Part II.G, *supra*.

[261] *See id.*

[262] *See id.*

[263] Ex. A-230 [APA] at 28 (Section 2.11(b)); *see also* **Kleinman:** 1:Tr. 139:17–140:4 (discussing Section 2.11(b) of the APA).

[264] Ex. A-230 [APA] at A-9 (Definitions).

[265] Ex. A-230 [APA] at A-7 (Definitions).

Governmental Authorizations in connection with the conduct, ownership, use, occupancy or operation of the Business," either at the time the APA was executed or thereafter, because they were committing mail and wire fraud. The Advantage Parties were included among their victims.

### (b)    Elements of mail and wire fraud

Mail and wire fraud constitute criminal offenses under sections 1341 and 1343 of title 18. The elements of mail and wire fraud are: (a) a scheme to defraud by means of a material deception; (b) with the intent to defraud; (c) while using the mails, private commercial carriers, and/or wires in furtherance of that scheme; (d) that did result or would have resulted in the loss of money or property or the deprivation of honest services. *See* 18 U.S.C. §§ 1341, 1343; 18 U.S.C. § 1346 ("[T]he term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."); *see also United States v. Faulkenberry*, 614 F.3d 573, 580–81 (6th Cir. 2010) (stating elements of mail and wire fraud); *United States v. Mehta*, 594 F.3d 277, 280 (4th Cir. 2010) (same).

### (c)    The Take 5 Parties engaged in a scheme to defraud their clients

A "scheme to defraud by means of a material deception" means a scheme "'wronging one in his property rights by dishonest methods or schemes,' and 'usually signif[ies] the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Carpenter v. United States*, 484 U.S. 19, 27 (1987) (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987)). "Congress implicitly incorporated [the] common-law meaning" of materiality into the mail and wire fraud statutes, and the Supreme Court has relied on the Restatement (Second) of Torts for that definition. *See Neder v. United States*, 527 U.S. 1, 22 n.5 (1999). According to the Restatement (Second) of Torts:

The matter is material if (a) a reasonable man would attach importance to its

existence or nonexistence in determining his choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.

Restatement (Second) of Torts § 538(2)(a) & (b) (1977).

The federal fraud statutes criminalize the "'scheme to defraud,' rather than the completed fraud." *Neder*, 527 U.S. at 25; *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648 ("Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud . . . even if no one relied on any misrepresentation."). Therefore, unlike common law fraud, "justifiable reliance" is not an element of mail or wire fraud. *See Neder*, 527 U.S. at 24–25; *United States v. Graham*, 477 F. App'x 818, 824 (2d Cir. 2012).

As discussed above, the Take 5 Parties engaged in an elaborate scheme to defraud their clients that was incorporated into their business software. Take 5's former clients purchased e-mail campaigns,[266] and they expected that Take 5 would fulfill those campaigns by sending e-mails on their behalf.[267] Take 5's own witness, Mr. Morris, testified that "[i]f a client is paying . . . for an e-mail campaign, and they have no knowledge of another form of marketing going out, that would be a problem."[268] "If e-mail is contracted out for, e-mails should be what is being delivered to the client."[269] Moreover, Take 5's clients relied on the information in the tracking reports.[270]

---

[266] *See* Parts II.A, II.H.2, *supra*.

[267] *See* Part II.C, *supra*.

[268] **Morris:** 11:Tr. 2873:14–23; *see also* 10:Tr. 2800:7–17 ("if you sell an e-mail campaign, the client would be expecting e-mails" and should not receive PPC traffic).

[269] *Id*. at 2801:5–10.

[270] *See* Part II.G, *supra*.

**(d)**    **Mr. Radetich and Mr. Gluck intended to defraud Take 5's clients**

For purposes of the mail and wire fraud statutes, "[i]ntent to defraud requires a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Owens*, 301 F.3d 521, 528 (7th Cir. 2002) (citing *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000)).  During the arbitration, the Advantage Parties proved that the Take 5 Parties intended to defraud their clients.

Ms. Hodgens and Mr. Boy testified that Mr. Radetich and Mr. Gluck knew that Take 5 was fulfilling campaigns with PPC traffic and falsifying its reports.[271]  Before Advantage acquired the assets of Take 5, Ms. Hodgens asked Mr. Radetich if Advantage "[was] aware of how we were fulfilling campaigns . . . just how things were run and operating in the back.  He said they were fully aware."[272]  In January 2017, Mr. Adams, then an active Take 5 sales employee and a future employee of Audient Company, e-mailed Mr. Gluck about a potential new hire explicitly stating that he would not be put into fulfilment right away because "HE doesn't get to see behind the curtain – he's a straight shooter and I think we should avoid that . . ."[273]  Mr. Radetich attended the Project Evolve presentation and did not challenge any of the findings

---

[271] **Boy:** 6:Tr. 1617:3–1619:5 (explaining why Mr. Radetich and Mr. Gluck knew that e-mail campaigns were being fulfilled with PPC traffic), 1629:4–1630:15 (discussed poor quality of the data with Mr. Radetich), 1630:22–1633:4 (told Mr. Radetich and Mr. Gluck that Take 5 was making false representations about its data and needed to stop sending clients false tracking reports); **Hodgens:** 8:Tr. 2101:10–24 (Mr. Radetich and Mr. Gluck were aware of algorithmic reporting), 2103:18–2104:5 (Mr. Radetich and Mr. Gluck worked closely with Ms. Jenkins); *see* A-56 [7/5/17 E. Hodgens e-mail communication to Mr. Radetich, Mr. Morris, Ms. Jenkins, *et al.*] ("If we can eliminate our [sic] in our reporting the word opens to reach or impressions would be more realistic to what is happening . . . .").

[272] **Hodgens:** 8:Tr. 2111:10–2112:5.

[273] Ex. A-792 [1/16/17 e-mail communication between M. Adams and R. Gluck] (describing Logan Freeman's role at Take 5).

of the Take 5 team.[274]  When Mr. Weiner tried to investigate whether Take 5 was sending

e-mails on behalf of Jun Group's clients, Mr. Radetich and Mr. Gluck intervened to try and stop

him from uncovering the truth.[275]  Mr. Morris testified that he had many discussions with

Mr. Radetich and Mr. Gluck "to make sure that what we were doing was legitimate," and

Mr. Radetich and Mr. Gluck assured him that it was.[276]  Mr. Radetich and Mr. Gluck were

involved in numerous communications both internally and externally with clients about

suspicious traffic to clients' websites.[277]  And, in June 2019, when Mr. Radetich and Mr. Gluck

were confronted with the evidence that Take 5 was not sending e-mails, they did not deny it but

---

[274] *See* Part II.E, *supra*.

[275] Ex. A-582 [5/2/19 e-mail communication among Mr. Weiner, Mr. Radetich, and Mr. Gluck] (concerning Mr. Weiner's request for a domain report for Café Bustelo); **Weiner:** 3:Tr. 818:4–820:19.

[276] **Morris:** 11:Tr. 2874:4–2875:5; *see id.* at 2875:6–17 (Mr. Morris believed that Mr. Radetich and Mr. Gluck "had done a sufficient investigation to make that conclusion," and they "gave [him] the ammunition" to combat those accusations).

[277] Exs. A-191 [11/4/15 e-mail communication from A. Radetich to E. Cogen, D. Morris] (Dealers United complaints about automated/manufactured website traffic on e-mail campaign), A-192 [11/9/15 e-mail communication from A. Radetich to R. Gluck, D. Morris] (Mr. Radetich responds to client complaints about traffic spikes and no mobile device traffic internally by stating: "We have too much exposure, that is mounting now. We need to shore this up."), A-238 [4/18/12 e-mail communication from P. Carlson to R. Gluck, *et al.*] (PJ Next complaints about unrealistic opt out rates and non-e-mail traffic), A-242 [4/27/20 e-mail communication from P. Lee to R. Gluck, *et al.*] (PJ Next complaint about non-e-mail traffic), A-243 [5/4/12 e-mail communication from P. Carlson to R. Gluck, *et al.*] (PJ Next requesting a full refund of the contract for 8,300 e-mail clicks), A-246 [6/7/12 e-mail communication from P. Lee to R. Gluck, *et al.*] (PJ Next complaints about e-mail campaign being fulfilled with PPV traffic), A-269 [10/9/12 e-mail communication from A. Radetich to R. Gluck, B. Hannon, J. Silver] (LipiGesic complaints about e-mail campaign being fulfilled from "buy a visitor" websites), A-273 [3/19/15 e-mail communication from T. Finger to R. Gluck, A. Radetich] (Maserati complaints about e-mail campaign containing robot clicking mechanisms), A-274 [3/24/15 e-mail communication from R. Gluck to A. Radetich and B. Jenkins] (Crown College complaints about botnet, non-e-mail mail traffic), A-277 [5/28/15 e-mail communication from R. Gluck to M. Benjoseph, *et al.*] (Crown College and Saint Mary's University of Minnesota complaints about suspicious data and botnet activity), A-284 [5/24/16 e-mail communication from R. Gluck to E. Hodgens, *et al.*] (Central Garden & Pet complaints about disproportional amount of clicks on privacy policy link).

instead lied and said that clients were aware of what they were doing.[278]

"Intent" for purposes of the mail and wire fraud statutes also can be established by circumstantial evidence, including the defendant's "conduct and the nature of the scheme." *See United States v. Gravatt*, 280 F.3d 1189, 1192 (8th Cir. 2002); *see also United States v. Vas*, 497 F. App'x 203, 207 (3d Cir. 2012) (affirming jury verdict of fraudulent intent based on circumstantial evidence); *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010) ("However, '[b]ecause direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself . . . .'") (quoting *United States v. Paneras*, 222 F.3d at 410); *United States v. Schuler*, 458 F.3d 1148, 1152 (10th Cir. 2006) ("Because direct proof of fraudulent intent often is unavailable, courts have long permitted fact finders to rely on a variety of circumstantial evidence . . . .") (quoting *United States v. Welch*, 327 F.3d 1081, 1105 (10th Cir. 2003)); *Graham*, 477 F. App'x at 825 ("Proof of fraudulent intent may be established through circumstantial evidence.") (citing *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)); *United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001) (affirming that specific intent may be inferred from the totality of the circumstances even without direct evidence).

Here, the very "nature of the scheme provide[s] circumstantial evidence of fraudulent intent." *See United States v. Gravatt*, 280 F.3d 1189, 1192 (8th Cir. 2002). The sales department and the fulfillment department were kept separate so that the sales representatives

---

[278] *See* Part II.H.2, *supra*.

would not know how campaigns were being fulfilled.[279]  The Take 5 Parties hired 12 Skies to develop business software to defraud clients.[280]  It had anti-bot software to monitor the PPC traffic that its vendors were sending, which would have been completely unnecessary if it were sending e-mails.[281]  It trained the employees in its fulfillment department to copy tracking links that clients thought would be embedded in e-mails and send these tracking links to PPC vendors so that when the PPC vendors advertised using other forms of digital media, such as Google AdWords, the clicks to the client's website would appear to be coming from links embedded in e-mails.[282]

The very fact that Mr. Radetich and Mr. Gluck founded and ran Take 5 renders their claims of ignorance "false, unreasonable or unbelievable."  *See United States v. Donohue*, 726 F. App'x 333, 350 (6th Cir. 2018); *see also United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1121 (D.C. Cir. 2009) ("the district court [could] reasonably infer that the high level executives" knew about the practices of the company).  Mr. Morris, the Take 5 Parties' own witness, testified that he would expect that Mr. Radetich and Mr. Gluck were aware of Take 5's practices:

> Q.   And if Take 5 were selling e-mail campaigns, and 90 percent of those e-mail campaigns were being fulfilled with pay-per-click traffic, you would expect Alex Radetich and Richard Gluck would know about that, right?
>
> A.   If it was to that degree, I sure would, yeah.[283]

---

[279] **Colen:** 2:Tr. 329:11–330:6 ("Fulfillment department was separate from the sales department."); **Creel:** 9:Tr. 2328:11–14 (the sales and fulfillment department rarely interacted with each other).

[280] *See* Parts II.G and III.D, *supra*.

[281] **Boy:** 6:Tr. 1716:24–1717:21, 1718:6–1719:4.

[282] *See* Part III.D, *supra*.

[283] **Morris:** 10:Tr. 2803:20–2804:3.

(e)    **Take 5 used mails and wires in furtherance of their scheme**

The Take 5 Parties sent invoices and tracking reports to their clients by e-mail.[284]  The

third prong necessary for mail and wire fraud is therefore satisfied.  *See United States v. Hodge*,

588 F.3d 970, 974 (8th Cir. 2009) (upholding conviction for submitting fraudulent

reimbursement claims for life insurance health examinations where defendant submitted the

claims by e-mail); *United States v. Ruiz*, 620 F. App'x 577, 577 (9th Cir. 2015) (upholding

conviction for mail fraud based on sending e-mails); *United States v. Carpenter*, 190 F. Supp. 3d

260, 298 (D. Conn. 2016) (upholding conviction for defrauding insurance carriers where

defendant communicated with carriers by e-mail), *aff'd sub nom. United States v. Bursey*, 801 F.

App'x 1 (2d Cir. 2020).

(f)    **Take 5 defrauded clients of money by charging them for
services that were not provided**

The mail and wire fraud statutes criminalize a "scheme whereby customers are to be

induced to part with their money by leading them to believe they are receiving something

different from, superior to, and worth more than what is actually being sold."  *Rude v. United

States*, 74 F.2d 673, 676 (10th Cir. 1935); *see also United States v. Romano*, 794 F.3d 317, 335

---

[284] *See, e.g.*, Exs. A-849 [3/19/19 e-mail communication from H. Speizman to T. Holley] (sending tracking report to Faulkner University), A-845 [4/30/17 e-mail communication from H. Speizman to S. McCullough] (sending invoices to AMSI), A-846 [4/26/18 e-mail communication from H. Speizman to G. Keen] (sending tracking report  to AMSI), A-761 & 761A [8/01/17 e-mail communication and report from T. Finger to S. Crites] (final tracking sent to Medicx), A-788 [4/10/19 e-mail communication from J. Licciardi to R. Clune] (sending tracking report to K. Hovanian Homes), A-790 [4/15/19 e-mail communication from J. Licciardi to R. Clune] (same), T-193 [2/26/18 e-mail communication from L. Scott to C. Green, *et al.*] (sending tracking report to Media Storm), A-682 [7/6/18 e-mail communication from L. Scott to C. Njoku, *et al.*] (sending tracking report [A-632] to Media Storm), A-793 [4/5/17 e-mail communication from M. Paniagua to M. Nass] (tracking report sent to Trozzolo], T-08 & T-08A [2/22/18 e-mail communication from L. Scott to I. Mendoza] (sending tracking report to Mitsubishi Motors), A-80 & A-81 [8/31/17 e-mail communication from L. Scott to A. Berry] (sending tracking report to IvyWise), A-731 [12/5/16 e-mail communication from M. Paniagua to L. Palaschak] (sending tracking report to Infinity Concepts), A-759 [7/2/17 e-mail from T. Finger to S. Crites] (sending tracking report [A-759A] to Medicx).

(2d Cir. 2015) (upholding conviction for mail and wire fraud against owner of business that falsely graded coins); *Aster v. United States*, No. CV-89-2129 (CPS), 1992 WL 198137, at *1 (E.D.N.Y. Aug. 3, 1992) (defendant convicted of "wire fraud in connection with a scheme designed to pass off inferior or otherwise less valuable stamps as more valuable than they were"), *aff'd*, 996 F.2d 303 (2d Cir. 1993).

Take 5 received millions of dollars from clients for e-mail marketing campaigns.[285]  As discussed above, the Take 5 Parties substituted low-cost PPC traffic for e-mail.  Thus, the services that Take 5 provided were far less valuable than the services its clients paid it to provide, and Mr. Radetich and Mr. Gluck made a substantial profit from this scheme.  Courts have upheld convictions for mail and wire fraud in precisely this situation, where the defendant advertised and marketed services that it never provided.  *See, e.g.*, *United States v. Huff*, 699 F.2d 1028–29 (10th Cir. 1983) (in prosecution for mail fraud, evidence supported conviction of defendants who advertised service of matching buyers of businesses with sellers of businesses and who accepted fees therefor but who had been responsible for sale of only one business); *United States v. Andreadis*, 366 F.2d 423, 434–35 (2d Cir. 1966) (affirming conviction for fraudulent sale of weight-loss drug that defendants knew was ineffective).  All the elements of the mail and wire fraud statutes are therefore satisfied.

> **6.    The Take 5 Parties, including Mr. Radetich and Mr. Gluck, have an obligation to pay any Damages the Advantage Parties suffered**

Section 8.2(a)(1) of the APA provides as follows:

> Subject to the limitations and exceptions provided in this Article VIII, from and after the Closing, ***the Company and the Beneficial Owners, shall indemnify, defend and hold harmless the Buyer and the other Buyer Indemnified Parties from and against all Damages incurred or suffered by any Buyer Indemnified Party*** as a result of, or arising out of any: (i) ***inaccuracy or breach of any***

---

[285] *See, e.g.*, Exs. A-551A [Excel spreadsheet regarding Take 5's investigation by client] (indicating Take 5 received  $12,003,377.02 from e-mail campaigns), A-557 at 3, 5 (Take 5 had $29.9 million in revenue in 2017, about 2/3 of which was from e-mail).

> *representation and warranty made by the Company or the Beneficial Owners in*
> *Article II* or Article III *of this Agreement* or in any certificate contemplated by
> this Agreement . . . .

(Emphasis added). The "Beneficial Owners" are Mr. Radetich, Mr. Gluck, and RJV Marketing

Corp.[286] Mr. Radetich and Mr. Gluck also certified that every representation in Article II was

true, which provides an independent basis for their liability for any breach of the representations

and warranties in Article II.[287]

The "Buyer" is Advantage,[288] and the "Buyer Indemnified Parties" are "the Buyer and its

Affiliates and, without duplication, the respective equity holders, directors, officers, employees

and agents, as well as successors and assigns of the foregoing."[289] Advantage's "Affiliates"

include each entity "that, directly or indirectly, controls, is controlled by or is under common

control with," Advantage.[290] Therefore, under the APA, all the Take 5 Parties have a contractual

obligation to indemnify all the Advantage Parties from and against all "Damages," which, as

discussed in Part IV.G, *infra*, is defined very broadly.

## C.    Breach of the implied covenant of good faith and fair dealing

"[A] duty of good faith and fair dealing attaches to every contract, and this duty cannot

be disclaimed." *Pierce v. Int'l Ins. Co. of Ill.*, 671 A.2d 1361, 1366 (Del. 1996) (citations

omitted). When used with the implied covenant, the term "good faith" contemplates

"faithfulness to the scope, purpose, and terms of the parties' contract," while the concept of

---

[286] Ex. A-230 [APA] caption page [defining "Beneficial Owners"]; *id*. at 1 ("Alexander Radetich ('Radetich'), Richard Gluck ('Gluck'), RJV Marketing Corp., a Florida corporation ('RJV', collectively with Radetich and Gluck the 'Beneficial Owners' and each a 'Beneficial Owner')"), A-2 (defining "Beneficial Owner").

[287] Ex. A-230 [APA] at 53–55 (Section 7.1); Ex. A-545 [Closing Certificate]; **Kleinman:** 1:Tr. 141:17–143:16.

[288] Ex. A-230 [APA] caption page (defining "Buyer"); *id*. at 1 (same).

[289] Ex. A-230 [APA] at A-3 (Definitions).

[290] Ex. A-230 [APA] at A-1 (Definitions).

"[f]air dealing" similarly refers to "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose."  *Gerber v. Enter. Prod. Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013); *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440 (Del. Ch. 2012), *rev'd sub nom. Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665 (Del. 2013).  This covenant is applicable if "it is clear from the underlying contract that the contracting parties 'would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter.'"  *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del.2005) (quoting *Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)).  "The implied covenant of good faith and fair dealing embodies the law's expectation that 'each party to a contract will act with good faith toward the other with respect to the subject matter of the contract.'"  *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006) (quoting *Katz*, 508 A.2d at 880).

To the extent that Your Honor enters judgment in favor of Advantage on its claims for breach of the APA, this cause of action is moot.  *See Wilmington Sav. Fund Soc'y, FSB v. Foresight Energy LLC*, C.A. No. 11059-VCL, 2015 WL 7889552, at *10 (Del. Ch. Dec. 4, 2015) (finding that defendant breached contract rendered moot cause of action for breach of the implied covenant of good faith and fair dealing).  To the extent that Your Honor were to conclude that Take 5 did not breach the literal terms of any of the contract provisions discussed in Part IV.B, *supra*, the Advantage Parties ask that Your Honor find that the Take 5 Parties breached the implied covenant of good faith and fair dealing.

### D.   **Fraud in the inducement**

#### 1.   **Legal standard**

Under Delaware law, fraud consists of the following five elements:

(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.

*E.I. DuPont de Nemours & Co. v. Fl. Evergreen Foliage*, 744 A.2d 457, 461–62 (Del. 1999)

(quoting *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)); *see also Fraud*

*Defined*, Del. P.J.I. Civ. § 16.1 (2000) (same).  A claim of common law fraud arises from both

"silence or omissions in the face of a duty to speak, [or] active concealment of material facts."

*OpenGate Capital Grp. LLC v. Thermo Fischer Sci. Inc.*, C.A. No. 13-1475-GMS, 2014 WL

3367675, at *11 (D. Del. July 8, 2014) (citing *Transdigm Inc. v. Alcoa Global Fasteners, Inc.*,

C.A. No. 7135-VCP, 2013 WL 2326881, at *6 (Del. Ch. May 29, 2013)).  "A fact is important if

it would cause a reasonable person to decide to act in a particular way, or if the maker of the

misrepresentation knew another person would regard it as important."  *Fraud Defined*, Del. P.J.I.

Civ. § 16.1 (2000).

Knowledge is proven by establishing that the defendant "committed the misstatement

recklessly or with intent," *Deloitte LLP v. Flanagan*, C.A. No. 4125-VCN, 2009 WL 5200657, at

*8 (Del. Ch. Dec. 29, 2009), which, again, is "normally proven by circumstantial evidence,"

*Roth v. Walsh*, C.A. No. 04-08-0016, 2006 WL 136429, at *2 (Del. Com. Pl. Jan. 19, 2006)

(citing *Hull v. Hudson*, 80 A. 674 (Del. Ch. 1911)).

#### 2.   **The Take 5 Parties made false representations of fact to induce Advantage to acquire the assets of Take 5**

The nature of the Advantage Parties' claims for fraudulent inducement here are legally

indistinguishable from the claims in *Cobalt,* 2007 WL 2142926 at *1. In that case, Cobalt Operating, LLC ("Cobalt") agreed to buy the assets of a radio station from the defendants, James Crystal Enterprises, LLC and James Crystal Licenses, LLC ("Crystal") for $70 million. *Id.* After the acquisition, Cobalt discovered that Crystal sold more pre-recorded commercial advertising to its customers than the station was able to run to artificially increase its earnings and therefore its value, and it sued Crystal for fraud and breach of the asset purchase agreement. *Id.* At trial, Cobalt based its case primarily on the digital log of ads that the station aired (the Scott System), which showed that the station billed for thousands of commercials that were never played. *Id.*

  Then-Vice Chancellor Leo E. Strine "came into trial skeptical of Cobalt's claim, given the brazen type of fraud it was premised upon" and Crystal's promise that the discrepancies between the billing records and the digital logs "would be convincingly explained at trial." *Id.* at *2. As in this case, "Crystal's pre-trial explanations all fell apart or were abandoned at trial," *id.,* and the court granted judgment in favor of Cobalt on both its breach of contract and fraud claims. *Id.* at *4. As with the *Cobalt* case, the selling parties failed to produce any testimony or evidence that the contracted services were performed, but instead relied solely on arguments by the selling parties' lawyers. *Id.* at *2 ("There is no evidence that WRMF's disc jockeys engaged in any of the inconvenient contortions suggested by Crystal *in briefs* but not by witness testimony.") (emphasis in original). In this case, the fraud is even further exposed because the two heads of the fulfillment department—Ms. Hodgens and Mr. Boy—testified that e-mails were not sent.

  During the summary judgment hearing, the Take 5 Parties' only basis for distinguishing the *Cobalt* case was to argue that the only way to know exactly what Take 5 did was to look at

information from Google Analytics.[291]  The Advantage Parties disproved that assertion during

the arbitration.[292]  *See also Marini v. Adamo*, 995 F. Supp. 2d 155, 201 (E.D.N.Y. 2014)

(defendant guilty of fraud for making representations to induce plaintiffs to buy rare coins where

"plaintiffs now owned coins worth far less than they paid for them"), *aff'd*, 644 F. App'x 33 (2d

Cir. 2016).

### 3.    Advantage justifiably relied on Take 5's misrepresentations

The Advantage Parties relied on Take 5's representations concerning its database and

e-mail advertising business as this was the sole reason the Advantage Parties acquired those

assets.[293]  The Advantage Parties reasonably relied on these representations.

A plaintiff justifiably relies on material misrepresentations if the plaintiff is not aware of

the actual facts and does not have an opportunity to discover accurate information.  *See*

*Tekstrom, Inc. v. Savla*, C.A. No. 05A-12-006JTV, 2006 WL 2338050, at *11 (Del. Super. July

31, 2006), *aff'd*, 918 A.2d 1171 (Del. 2007); Restatement (Second) of Torts § 541, cmt. a

(plaintiff is "required to use his senses, and cannot recover if he blindly relies upon a

misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to

make a cursory examination or investigation").

Due diligence is evidence that a plaintiff's "reliance on a false representation was

reasonable because [the plaintiff] made efforts to verify the representation and discovered no

reason to doubt its truth."  *See Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I,*

*LLLP*, No. CV 7906-VCG, 2018 WL 6311829, at *33 (Del. Ch. Dec. 3, 2018); *see also Paron*

*Capital Mgmt., LLC v. Crombie*, C.A. No. 6380-VCP, 2012 WL 2045857, at *7 (Del. Ch. May

---

[291] 12/20/21 Hrg. Tr. at 85:19–86:4.

[292] *See* Part III.D, *supra*.

[293] *See* Part II.B, *supra*.

22, 2012), aff'd, 62 A.3d 1223 (Del. 2013) (plaintiffs justifiably relied on defendant's misrepresentations by conducting due diligence that included interviewing former clients and engaging third-party verifiers, neither of which raised any red flags).

The Advantage Parties conducted a reasonable investigation of the Take 5 business prior to acquiring it.  To verify the Take 5 Parties' representations, the Advantage Parties hired Ernst & Young to conduct financial and tax diligence, including the quality of its earnings assessments, and its Parthenon Group to investigate Take 5's business.[294]  Ernst & Young prepared a comprehensive Commercial Diligence Report which included summaries of interviews that it held with Take 5's clients and competitors.[295]  The conclusion by Take 5's professionals about Take 5's business was positive, and the Advantage Parties were given no reason to doubt the Take 5 Parties' representations about their business.[296]

Further, Mr. Radetich and Mr. Gluck prohibited Advantage's employees from communicating with Take 5's employees prior to the acquisition.[297]  Failure to uncover fraud during due diligence is not unreasonable if the fraud is intentionally hidden from a buyer.  *See Cobalt*, 2007 WL 2142926, at *28.

### E.    <u>Fraud</u>

> To state a claim for fraud a plaintiff must allege:  1) a false representation, usually one of fact . . . ; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance.

*Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008) (quoting *Gaffin v. Teledyne,*

---

[294] **Kleinman**: 1:Tr. 114:13–115:25.

[295] Ex. A-419 [Project Five:  Commercial Diligence Report].

[296] **Kleinman:** 1:Tr. 118:15–120:23; *see* 116:11–22, 125:23–126:18 (a forensic examination of Take 5's database is not part of due diligence).

[297] **Colen:** 2:Tr. 331:15–332:22.

*Inc.*, 611 A.2s 467, 472 (Del. 1992)).

Advantage was defrauded in two ways that are distinct from being defrauded in connection with the acquisition.  It was defrauded in connection with e-mail marketing services that Advantage paid it to provide but that it did not provide both before and after the acquisition.[298]  And it was defrauded after the acquisition as Advantage then became liable for the Take 5 Parties' ongoing deception of Take 5's clients.

The invoices that FTI sampled as part of its analysis included invoices that Take 5 sent following the acquisition, from approximately the second quarter of 2018 through the second quarter of 2019, and FTI proved that Take 5 only deployed a fraction of the e-mails Take 5's clients paid it to deploy during that period[299] and delivered a fraction of the e-mails it was paid to deliver.[300]  Specifically, Take 5 deployed only 351,584 of the 40,043,072 e-mails, or less than 1%, of the e-mails that it was paid to deploy after the acquisition.[301]

---

[298] *See, e.g.*, **Pike:** 9:Tr. 2486:13–2491:11 (describing AirWick Essential Mist campaign and Finish Quantum Max campaign as an e-mail marketing campaigns), 2491:18–2504:24 (walking through e-mail communications and documents transmitted via e-mail describing the services order, delivered, and invoiced for the AirWick Essential Mist campaign and Finish Quantum Max campaign), 2498:18–22 ("If I had known that they had used Makaira or another pay-per-click vendor to fulfill at least the clicks that are represented on this campaign, I would not have been satisfied with the campaign."); *see also* AirWick Essential Mist Campaign and Finish Quantum Max Campaign exhibits, *supra* n.153; **Weiner:**  3:Tr. 808:3–9 (Jun Group hired Take 5 to provide e-mail marketing campaigns), 809:20-25 (there were a number of issues about Café Bustelo campaign ran with Take 5), 808:3–835:23 (describing the problems with all of the Jun Group campaigns ran with Take 5), 836:18–839:5 (Mr. Weiner's failed campaigns led to an internal audit showing approximately less than 5% of e-mails were delivered through Take 5's e-mail delivery systems and approximately 5% of the number of e-mails sold were even queued to be deployed); *see also* Ex. A-597 [6/28/19 e-mail communication from J. Pike to C. Weiner, R. McGavran, and C. Libitsky] (summarizing audit regarding internal e-mail deployments).

[299] A-442 [Wei Expert Report] ¶ 54; Part III.E, *supra*

[300] *Id.* ¶ 55.

[301] Ex. A-312 [Lasater Expert Report] at 12.  Table 3 of Dr. Lasater's report breaks out the number of e-mails invoiced each quarter and the number of e-mails deployed or delivered each quarter from the fourth quarter of 2017 through the second quarter of 2019.  The calculation

Moreover, fraud "may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.  Thus, one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading."  *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). Mr. Radetich and Mr. Gluck had an obligation to disclose to the Advantage Parties that the Take 5 business was operating fraudulently but did not do so.

**F.    RICO**

**1.    Legal standard**

Under 18 U.S.C. § 1962(c), "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

> In order to prove that the defendants violated section 1962(c), the plaintiffs must establish by a preponderance of the evidence each of the following five elements:
>
> (1) That an enterprise existed;
>
> (2) That the enterprise affected interstate or foreign commerce;
>
> (3) That the defendants were associated with or employed by the enterprise;
>
> (4) That the defendants engaged in a pattern of racketeering activity or the collection of an unlawful debt; and
>
> (5) That the defendants conducted or participated in the conduct of the enterprise through that pattern of racketeering activity.

Instruction 9.3, Civ. *RICO Prac. Manual Form 11 Pattern Jury Instructions in Civil RICO Litigation* (3d ed. 2022 Supp.); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97 (1985) (listing elements for civil RICO violation).

---

above subtracts the number of e-mails invoiced for the last quarter of 2017 and the first quarter of 2018 for a total of 38,867,283, and subtracts the number of invoices deployed or delivered for that period for a total of 351,584.

This case presents the paradigm of a RICO scheme. *See, e.g., Malvino v. Delluniversita*, 840 F.3d 223, 226 (5th Cir. 2016) (upholding RICO conviction for defendant who sold fake rare coins); *United States v. Kurniawan*, 627 F. App'x 24, 26 (2d Cir. 2015) (upholding RICO conviction for counterfeit-wine scheme); *Sebastian Int'l, Inc. v. Russolillo*, 128 F. Supp. 2d 630, 633 (C.D. Cal. 2001) (plaintiff stated claim for violation of RICO for selling counterfeit professional hair care products); *Galerie Furstenberg v. Coffaro*, 697 F. Supp. 1282, 1286 (S.D.N.Y. 1988) (claim for selling counterfeit artwork was actionable under RICO). Here, the Take 5 Parties were profiting from selling counterfeit e-mail marketing services.

The Advantage Parties have standing to bring this RICO claim because there was a direct relationship between their injury and Take 5's "injurious conduct." *See Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102, 104 (2d Cir. 1993) (horse breeders had standing to sue purchaser of land for RICO based on alleged fraudulent representation that purchaser would use land for race track).

### 2.    Take 5 is an enterprise for the purposes of RICO

"[T]he 'enterprise' in subsection (c) connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 250 (1994). Take 5, as a limited liability company, constitutes an "enterprise" within the meaning of RICO. *See* 18 U.S.C. § 1961(4) (an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

### 3.    Take 5 was engaged in interstate commerce

"[C]rossing state lines for purpose of engaging in a commercial transaction is a paradigmatic example of an activity that falls within the compass of the" interstate commerce requirement for RICO. *United States v. Nascimento*, 491 F.3d 25, 45 (1st Cir. 2007). Take 5

sold e-mail advertising campaigns to clients throughout the United States.[302]  It therefore was engaged in interstate commerce.  *See United States v. Espinoza*, 52 F. App'x 846, 849 (7th Cir. 2002) (sale of drugs in multiple states established nexus to interstate commerce).

### 4.    Mr. Radetich and Mr. Gluck were associated with Take 5

"[A]n employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any 'person' unlawfully to conduct an 'enterprise.'" *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).  Mr. Radetich and Mr. Gluck, as owners and operators of Take 5, constitute the "persons" within § 1962(c) who conducted a pattern of racketeering through the Take 5 enterprise.  *See Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir. 1992) (individual officers of a corporation are distinct persons for RICO liability if they use an enterprise for criminal activity).

### 5.    Mr. Radetich and Mr. Gluck engaged in a pattern of racketeering activity

#### (a)    Mr. Radetich and Mr. Gluck used Take 5 as a vehicle to commit mail and wire fraud

"[R]acketeering activity" includes a series of predicate acts, including "any act which is indictable under . . . [18 U.S.C.] section 1341 (relating to mail fraud) [and 18 U.S.C.] section 1343 (relating to wire fraud)."  18 U.S.C. § 1961(1)(B).  The elements of mail and wire fraud are discussed in Part IV.B.5.b, *supra*.  "Where one scheme involves several mailings, the law is settled that each mailing constitutes a violation of the statute."  *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1116 (D.C. Cir. 2009) (quoting *Hanrahan v. United States*, 348 F.2d 363, 366 (D.C. Cir. 1965)).

---

[302] *See, e.g.*, Exs. A-845 [4/5/18 AMSI Invoice] (Georgia), A-765 [7/19/17 Medicx/Healthy Offers, Inc. Invoice] (Arizona), A-564 [7/31/18 Meredith Invoice] (Iowa), A-629 [11/22/17 D'Exposito Partners Invoice] (New York), A-561 [7/25/18 AdTaxi Invoice] (Colorado), A-304 [10/25/17 Media Matters SF, LLC Invoice] at 8 (California).

> **(b)**     **The fraud that the Take 5 Parties committed before the acquisition, in connection with the acquisition, and following the acquisition are part of the same pattern of racketeering activity**

"[T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show [1] that the racketeering predicates are related, and [2] that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (bracketed text added).

> **(i)**     **The Take 5 Parties' acts in defrauding their clients are related to their acts in defrauding the Advantage Parties**

The test for "relatedness" is whether "the predicate offenses are related to the activities of that enterprise." *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992), as amended on reh'g in part (Apr. 13, 1992). Take 5 did not use the exact same method to defraud its clients as it did to defraud the Advantage Parties, but this is irrelevant to the "relatedness" test under RICO. "[T]he relatedness requirement is satisfied even if the predicate acts are not directly related to each other so long as both are related to the RICO enterprise in such a way that they become indirectly connected to each other." *United States v. Locascio*, 6 F.3d 924, 943 (2d Cir. 1993); *see United States v. Indelicato*, 865 F.2d 1370, 1383–84 (2d Cir. 1989) ("[T]wo racketeering acts that are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise."). Courts repeatedly have held that predicate acts are related if they further the common enterprise, even if the acts and victims are different. *See, e.g.*, *United States v. McArthur*, 850 F.3d 925, 935 (8th Cir. 2017) (holding that shootings and drug distribution were related because they "further[ed] the Mob's activities"); *United States v. Angiulo*, 897 F.2d 1169, 1180 (1st Cir. 1990) (illegal gambling activity was related to conspiracy and murder because they "were linked to the affairs of" an organized crime group); *United States v. Payne*, 591 F.3d 46, 64 (2d Cir. 2010) (robberies "designed to enrich core members of the

enterprise" were related to murders that "reduced the risk of interference with the enterprise's operations").

Advantage acquired Take 5's assets for the exact same reason Take 5's clients hired it: Take 5's database and its purported ability to use that data to fulfill e-mail advertising campaigns. In addition, the Take 5 Parties sold the assets of Take 5 to the Advantage Parties to further enrich themselves from their fraudulent e-mail advertising business. Mr. Radetich and Mr. Gluck would have been entitled to an Earn-Out only if they continued to carry out and expand Take 5's high margin, low cost operation, and they could do this only if Take 5 continued to substitute low-cost PPC traffic for e-mail traffic. Take 5 also used the relationship with the Advantage Parties to develop new client relationships.[303]

Moreover, to prove that the Take 5 Parties fraudulently breached the representations and warranties in the APA and fraudulently induced Advantage to acquire the assets of Take 5, the Advantage Parties were required to prove that the Take 5 Parties defrauded their clients by selling e-mail campaigns and fulfilling them with low-cost PPC traffic. That is, proof of fraud in connection with the acquisition was based on the same evidence that each of Take 5's clients would use to show that they were individually defrauded.

In addition, Advantage became aware of Take 5 because it had purportedly performed e-mail marketing services for clients of Advantage Solutions.[304] But for the Take 5 Parties'

---

[303] **Colen**: 2:Tr. 342:22–343:9 ("Our business units brought in more than one and a half million dollars of new business that was specifically generated by Josh's kind of focus and relentless pursuit of those deals on behalf of Richie and Alex and Take 5."); **Pike**: 9:Tr. 2462:5–15 (Take 5's business increased substantially through Advantage).

[304] *See, e.g.,* **Pike**: 9:Tr. 2486:13–2491:11 (describing AirWick Essential Mist campaign and Finish Quantum Max campaign as an e-mail marketing campaigns), 2491:18-2504:24 (walking through e-mail communications and documents transmitted via e-mail describing the services order, delivered, and invoiced for the AirWick Essential Mist campaign and Finish Quantum Max campaign); *see also* AirWick Essential Mist Campaign and Finish Quantum Max Campaign exhibits, *supra* n.153.

fraudulent activity before the acquisition, Advantage never would have entered into the APA, as the sole reason that Advantage acquired Take 5's assets was the Take 5 Parties' false representation that Take 5 was an ESP with a substantial e-mail database.[305]

### (ii) The Take 5 Parties' acts were continuous

The continuity requirement is intended to ensure that a legitimate business that engages in sporadic or isolated criminal conduct will not face RICO liability. *See Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242–43 (2d Cir. 1999) ("Where the enterprise is engaged primarily in racketeering activity, and the predicate acts are inherently unlawful, there is a threat of continued criminal activity, and thus open-ended continuity."); *United States v. Indelicato*, 865 F.2d 1370, 1376 (2d Cir. 1989) ("The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective.").

"The continuity necessary to prove a pattern can be either 'closed-ended continuity,' or 'open-ended continuity.'" *DeFalco v. Bernas*, 244 F.3d 286, 320 (2d Cir. 2001). "To satisfy closed-ended continuity, the plaintiff must prove 'a series of related predicates extending over a substantial period of time.'" *Id*. at 321. Generally, courts have held that a showing of related criminal conduct for a period of at least two-years is sufficient to satisfy this test. *See id.*; *Metromedia Co. v. Fugazy*, 983 F.2d 350, 369 (2d Cir. 1992) ("Periods of 19 or 20 months, however, have been held sufficient to support a finding of continuity."). The evidence at trial demonstrated that Take 5 had been defrauding its clients for many years before the acquisition[306] and continued to do so after the acquisition.

To establish open-ended continuity, "the racketeering acts themselves include a specific

---

[305] *See* Part II.B, *supra*.

[306] *See* Parts II.G and III.D, *supra*.

threat of repetition extending indefinitely into the future." *H.J. Inc.*, 492 U.S. at 229. "If the enterprise alleged is engaged in 'inherently unlawful' acts, there is a threat of continuing criminal activity and open ended continuity exists." *Breslin Realty Dev. Corp. v. Schackner*, 397 F. Supp. 2d 390, 401 (E.D.N.Y. 2005). Take 5's entire business was illegitimate,[307] and it would have continued to engage in racketeering activity if the Advantage Parties had not shut it down. Even after Mr. McGavran tried to stop the fraud, Mr. Radetich attempted to intervene, insisting that those directions did not apply to his client, Adtaxi.[308]

> ### (iii)     The acts of the Take 5 Parties in defrauding their own clients satisfies the "relatedness" and continuity tests

The Take 5 Parties' acts in defrauding their own clients were related to each other as well. The Advantage Parties were victimized by that racketeering activity, because they were required to refund the amount that the clients had paid for those services.[309]

> ## 6.     Mr. Radetich and Mr. Gluck's pattern of racketeering activity proximately caused Advantage's injuries

To establish a claim under the RICO statute, the Advantage Parties must prove that the Take 5 Parties' violation of the statute was the proximate cause of their injuries. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). This means that there must be "some direct relation between the injury asserted and the injurious conduct alleged." *Id*. The Take 5 Parties induced Advantage to buy Take 5's assets by making fraudulent statements concerning Take 5's database and e-mail capabilities, including by sending these statements by e-mail. As a result, Advantage

---

[307] **Boy:** 6:Tr. 1714:4–1715:18 ("the whole entire organization was deceiving the customer . . . anybody who was doing their job was deceiving the customer").

[308] Ex. A-224 [6/26/19 e-mail communication between P. Creel and A. Radetich, *et al.*] at 1; **Creel:** 9:Tr. 2367:15–2368:5 ("I was given directive from Ryan in corporate that there are absolutely no exceptions to this directive" to stop providing matchback reports but Mr. Radetich 'overrode me'").

[309] **Kaye:** 10:Tr. 2668:13–15.

spent over $76 million on worthless assets and incurred almost $24 million in losses associated with refunding clients who had paid for services they did not receive.

The Advantage Parties' losses were the "foreseeable and natural consequence of [Take 5's] scheme," "there are no independent factors that account for [Advantage's] injury, there is no risk of duplicative recoveries removed at different levels of injury from the violation, and no more immediate victim is better situated to sue." *See Bridge*, 553 U.S. 658 (stating that the Restatement (Second) of Torts "specifically recognizes 'a cause of action' in favor of the injured party where the defendant 'defrauds another for the purpose of causing pecuniary harm to a third person'") (citing Restatement (Second) of Torts § 435A cmt. a (Am. Law Inst. 1965)); *see also In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633, 644 (3d Cir. 2015) (proximate cause is established where "[t]he conduct that allegedly caused plaintiffs' injuries is the same conduct forming the basis of the RICO scheme").

## G.   Damages

### 1.   Consideration funded at closing

#### (a)   Amount of purchase price

During the arbitration, Mr. Kaye summarized the damages that the Advantage Parties incurred as a consequence of the Take 5 Parties' actions.[310]  The first element of damages was the purchase consideration.  The total consideration that was to be paid to Mr. Radetich and Mr. Gluck was $77,000,000,[311] but funds were held back at closing to purchase an insurance policy to cover the Take 5 Parties' representations and warranties in the APA.[312]  Therefore, the

---

[310] *See* **Kaye:** 10:Tr. 2653:15–2675:9 & Ex. A-431A.

[311] Ex. A-230 [APA] at 7 (Section 1.2(a)).

[312] **Kaye:** 10:Tr. 2654:16–2655:14.

total consideration funded at closing was $76,343,200.[313]

Advantage made a claim with the insurance carrier that the Take 5 Parties had breached the representations and warranties. The carrier "ultimately agreed" and paid on the policy.[314] After deducting the insurance recovery under the representation and warranty insurance, the total amount of damages the sellers of Take 5 caused Advantage to incur in connection with the purchase consideration is $69,343,200.[315] The Advantage Parties are entitled to recover the full amount of the purchase consideration under each of the legal theories that they have pleaded.

### (b)    Breach of contract

Under Section 8.2 of the Asset Purchase Agreement, the Company (Take 5 Media Group, LLC) and the Beneficial Owners (Mr. Radetich, Mr. Gluck, and RJV Marketing Corp.) are required to indemnify the Buyer (Advantage) and any Buyer Indemnified Party (Advantage's affiliates) "from and against all Damages incurred or suffered by" Advantage "arising out of any: (i) inaccuracy or breach of any representation or warranty" made by [the Take 5 Parties" in Article II . . . of this Agreement . . . ."[316] "Damages" includes "any direct or indirect damages, losses, lost profits, diminution in value, claims . . . settlements, Liabilities . . . and expenses (including reasonable attorneys' fees and amounts paid in investigation, defense or settlement of any claim or Proceeding)." *Id.*

Advantage valued the business of Take 5 based on how its service capabilities could supplement Advantage's other business units.[317] Because Take 5 was not performing the actual services, and was not capable of performing the actual services, the business Advantage acquired

---

[313] *Id.* at 2654:8–15 & Ex. A-431A Schedule 3.

[314] *Id.* at 2655:15–25.

[315] *Id.* at 2656:18–2657:4.

[316] Ex. A-230 [APA] at 58–59 (Section 8.2).

[317] **Kleinman:** 1:Tr. 196:9–24; **Colen:** 2:Tr. 320:25–324:5.

was worthless.  *See Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1130 (Del. 2015) (in

breach of contract action, plaintiff is entitled to recover "what the promisee lost"); Del. P.J.I. Cov

§ 22.24 (2000) ("A party that is harmed by a breach of contract is entitled to damages in an

amount calculated to compensate [him/her/it] for the harm caused by the breach.").  Indeed,

because Advantage acquired a business that was engaged in fraud, it acquired a liability that

caused it to restate its financial statements.

**(c)**     **Fraud and fraud in the inducement**

Independently, under Delaware law, the Advantage Parties are permitted to seek recovery

of the purchase price as damages for their fraud claims.

> [R]escissory damages function to put a party in the same financial position it
> would have occupied prior to the initiation of a transaction which is found to be
> invalid or voidable.  This remedy is applied when equitable rescission of a
> transaction would be appropriate, but is not feasible.  At the most general level,
> this remedy is premised upon the idea that (1) the transaction whereby the party
> gave up an asset was wrongful in some way and (2) the nature of the wrong
> perpetrated is such that plaintiff is entitled to more than his "out-of-pocket" harm,
> as measured by the market value of the asset at or around the time of the wrong.

*Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1144 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156

(Del. 1995).

The decision in *Catamaran Acquisition Corp. v. Spherion Corp.*, C.A. No. 00C-09-

180JRS, 2001 WL 755387 (Del. Sup. Ct. May 31, 2001), is instructive.  In that case, the plaintiff

sought to amend its complaint to add a claim for rescission of an agreement to acquire a medical

practice based on the seller's failure to discover significant overpayments to Medicare.  *See id*.

at *2.  The court held that even though "the Court of Chancery would find it 'impossible to

'unscramble the eggs' by rescinding the Agreement," the court could "enter an order restoring

plaintiff to his original condition by awarding money or other property of which he had been

deprived."  *Id*. at *4; s*ee also Stegemeier v. Magness*, 728 A.2d 557, 565 (Del. 1999) (rescissory

damages are appropriate if agreement "can not be rescinded"); *Lynch v. Vickers Energy Corp.*,

429 A.2d 497, 501 (Del. 1981) (court can "order[] damages which are the monetary equivalent of rescission"), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983); *Firmenich Inc. v. Natural Flavors, Inc.*, 2020 WL 1816191, No. N19C-01-320 MMJ, at *10 (Del. Sup. Ct. April 7, 2020) (rescissory damages are available for a claim for fraud in the inducement) (analyzing cases); *Cinerama, Inc.*, 663 A.2d at 1144 (rescissory damages are appropriate if "the transaction whereby the party gave up an asset was wrongful in some way" and the plaintiff suffered more than "out-of-pocket" harm).

Advantage's recovery on its representation and warranty insurance policy is the only amount that should be offset from the purchase consideration. While Take 5 did have a data licensing business, the Take 5 Parties had the burden to prove what value, if any, this business had after Advantage shutdown its e-mail advertising business. *See United States v. Dfouni*, 856 F. App'x 388, 391 (3d Cir. 2021) ("Where a defendant claims entitlement to a restitution offset, the burden falls on the defendant to prove that reduction in restitution is appropriate."); *United States v. Umana*, 713 F. App'x 106, 111 (3d Cir. 2017) (in fraud case, defendant "was not entitled to any offset for the value of legitimate services provided to her patients" because she did not adduce any evidence that those services had any value); *United States v. Bryant*, 655 F.3d 232, 254 (3d Cir. 2011) (holding that it is the defendant's burden to prove offsets that lessen a restitution award); 11 American Law of Torts, *Remedies; jurisdiction; burden of proof* § 34:30 (Supp. 2022) ("[W]here the damages issue is one in which the defendant is claiming offsets or deductions, it has been held that the defendant bears the burden of justifying them."). The Take 5 Parties did not adduce any evidence of the independent value of its data licensing assets or any of the other assets that Advantage acquired.

### (d)    RICO

"Any person injured in his business or property by reason of a violation of [18 U.S.C.]

section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964.  "Generally, RICO damages are calculated by 'monies paid out minus any value received.'"  *Lazo v. Summit Mgmt. Co., LLC*, No. 1:13-CV-02015-AWI-JL, 2014 WL 3362289, at *15 (E.D. Cal. July 9, 2014) (quoting *Negrete v. Allianz Life Ins. Co.*, 2011 WL 4852314, *8 (C.D. Cal. Oct. 13, 2011)), report and recommendation adopted, No. 1:13-CV-02015-AWI-JL, 2014 WL 3689695 (E.D. Cal. July 24, 2014).  For the reasons discussed above, the Advantage Parties are entitled to recover "threefold" the full amount of damages, exclusive of interest, and the award of a reasonable attorney's fee after Your Honor issues your final decision.

## 2.    Consequential or out-of-pocket damages

In addition to the purchase price consideration, as Mr. Kaye explained, the Advantage Parties suffered substantial consequential or out-of-pocket damages.

- <u>Due diligence</u>:  In connection with its pre-acquisition evaluation of Take 5's assets, Advantage paid Ernst & Young $366,132, paid Deloitte $55,000, paid Jones Day $367,822, and paid $1,199.73 for a member of its finance team to travel to meet with Take 5 employees.[318]  Therefore, the total amount that Advantage paid in connection with due diligence was $790,919.46.[319]

- <u>Associate time</u>:  A number of Advantage's employees spent time both before and after the acquisition in connection with Take 5.[320]  "[A]ll of these associates spent

---

[318] **Kaye:** 10:Tr. 2658:25–2659:23, 2660:14–2661:2 & Ex. A-431A Schedule 1.

[319] *Id.* at 2661:5–8

[320] *Id.* at 2661:9–2662:2 & Ex. A-431A Schedule 2.

a lot of time on this business, and it was time and effort" that was wasted.[321]  The total amount that Advantage lost by paying salaries to these employees for time spent in connection with Take 5 was $321,047.[322]

- Investigation:  As discussed in Parts II.D–F and III.E, *supra*, Advantage retained FTI and Latham & Watkins to investigate Take 5's business and systems in June and July 2019.[323]  Take 5 paid FTI and Latham & Watkins $3,246,203.95 in connection with that investigation.[324]

- Shutdown costs:  Advantage incurred a number of expenses in connection with shutting down the Take 5 business.[325]  These included payments to the landlord of Take 5's offices, severance payments, and retention bonuses.[326]  The total amount that Advantage paid in connection with shutting down Take 5 was $1,069,273.[327]

- Refunds:  After learning that Take 5 was defrauding its clients, Advantage provided a refund or service credit to all Take 5's clients for whom it had performed services after the acquisition and to all Advantage's clients if Advantage used Take 5 to send e-mails on behalf of those clients.[328]  The total amount of refunds that Advantage paid to these clients was $23,897,890.00.[329]

---

[321] **Kaye:** 10:Tr. 2662:3–9.

[322] *Id.* at 2662:12–14.

[323] *Id.* at 2662:15–2663:2 & Ex. A-431A Schedule 6.

[324] **Kaye:** 10:Tr. 2663:3–17.

[325] **Kaye:** 10:Tr. 2663:18-2665:8 & Ex. A-431A Schedule 8.

[326] **Kaye:** 10:Tr. 2663:24–2664:19.

[327] *Id.*

[328] *Id.* at 2665:9–2668:10 & Ex. A-431A Schedule 7.

[329] **Kaye:** 10:Tr. 2668:13–15.

- <u>Restatement of financials</u>:  Following the acquisition, Advantage had rolled up Take 5's revenue into its financial statements and, as discussed in Part II.I, *supra*, after Advantage discovered that Take 5 was not providing the e-mail marketing services that Take 5 had received money to send, Advantage was required to restate those financial statements because they were not prepared according to GAAP.[330]  The total amount that Advantage paid to its auditors in connection with restating its financial statements was $918,000.[331]

Therefore, the total amount of the Advantage Parties' consequential or out-of-pocket damages that the Take 5 Parties caused is $30,243,333.40.  These damages are recoverable as a remedy under each of the causes of action that the Advantage Parties have pleaded.  *See* Ex. A-230 [APA] at 58–59 (Section 8.2 provides that the Take 5 Parties are required to indemnify the Advantage Parties for any "Damages"); § 22.24, Del. P.J.I. Civ. § 22.24 (2000) ("A party that is harmed by a breach of contract is entitled to damages in an amount calculated to compensate [him/her/it] for the harm caused by the breach); *LCT Cap., LLC v. NGL Energy Partners LP*, 249 A.3d 77, 94 (Del. 2021), corrected (Mar. 4, 2021) ("the default remedy for fraud is out-of-pocket damages," but the plaintiff is entitled to greater damages if the defendant's fraud induced the plaintiff to form a contract); *Paron Cap. Mgmt., LLC v. Crombie*, C.A. No. 6380-VCP, 2012 WL 2045857, at *8 (Del. Ch. May 22, 2012) (awarding defrauded investor costs related to the formation and operation of company, expenses for due diligence investigation, legal expenses, travel expenses, rent payments, and legal and accounting fees), *aff'd*, 62 A.3d 1223 (Del. 2013); *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (for a RICO claim, "the injury to business or property element of section 1964(c) can be satisfied by allegations and proof of actual

---

[330] **Kaye:** 10:Tr. 2668:16–2673:11 & Ex. A-431A Schedule 8.

[331] *Id.* at 2673:14–17.

monetary loss, i.e., an out-of-pocket loss").

After Advantage restated its financials to reduce its revenue, it received a tax refund of $4,800,000, which Advantage deducted from its damage calculation.[332] Therefore, the total amount of the Advantage Parties' damages is $94,786,533.41.[333] Under RICO, the total damages that the Advantage Parties are requesting is $284,359,600.23. *See* 18 U.S.C. § 1964. If Your Honor were to find RICO liability based only on Take 5's sale of e-mail advertising to its clients, the Advantage Parties would be entitled to three times the amount that they paid as refunds to clients, which would be $71,693,670 and when added with $69,343,200 for damages associated with the purchase price equals $141,036,870. These amounts are exclusive of the Advantage Parties' requests for monetary sanctions, interest, and attorneys' fees.

## V.    TAKE 5'S CAUSES OF ACTION

It is not clear whether the Take 5 Parties intend to continue to pursue their affirmative claims given the overwhelming weight of the evidence against them, but we nevertheless address them below.

### A.    Breach of Contract

In their Statement of Claim, the Take 5 Parties assert that Advantage breached Section 1.5(j) of the APA by allegedly engaging "in a course of conduct with the purpose and intent . . . to circumvent the payment of the Initial Earn-out Amount or the Final Earn-out Amount," and by failing "to maintain Take 5 as a separate business unit during the Earn-out Period."[334]

Section 1.5(j) of the Asset Purchase Agreement reads as follows:

Following the Closing, the Buyer shall have the right to operate the Business, Purchased Assets and Assumed Liabilities in its sole and absolute discretion, including with respect to employee compensation (subject to Section 5.8(a) and

---

[332] **Kaye:** 10:Tr. 2673:20–25.

[333] *Id.* at 2674:2–2675:9.

[334] 11/19/19 Take 5 Amended Statement of Claim, ¶¶ 95, 96.

has no obligation to maintain or preserve any relationship with any client, customer, supplier, vendor, employee or contractor or the terms of any contract (including pricing). During the Earn-out Period, the Buyer shall maintain the Business as a separate business unit and shall not sell or transfer any material portion of the Purchased Assets to a third party that is not an affiliate of the Buyer, unless the acquiror of the Purchased Assets expressly assumes and has the financial resources and wherewithal to fulfil the Buyer's obligations under this Section 1.5 with respect to any earn-out payments that are due or may become due to the Company. Notwithstanding the foregoing, during the Earn-out Period, the Buyer (i) will not take any action the purpose and intent of which is to circumvent the payment of the Initial Earn-out Amount or the Final Earn-out Amount and (ii) will maintain separate accounting records for the Business.

With respect to the Take 5 Parties' first claim, Advantage did not circumvent the payment of the Initial or Final Earn-out amounts. After the acquisition, Advantage became one of Take 5's largest clients.[335] Growing the Take 5 business was beneficial to both the Advantage and the Take 5 Parties, and that's precisely what Advantage attempted to do.[336] Moreover, no witness testified and no evidence was produced that even implied that Advantage shutdown the business "for the purpose and intent of which is to circumvent the payment of the Initial Earn-out Amount or the Final Earn-out Amount."

Any Earn-out payment would have been based on the growth of the Take 5 division's EBITDA.[337] That is, Advantage would be required to make an Earn-out payment *only if* the Take 5 business earned money for Advantage. The first Earn-out payment would have been due in April 2020, about a year after Take 5 was shutdown and two years after the transaction

---

[335] **Colen**: 2:Tr. 342:22–343:9 ("Our business units brought in more than one and a half million dollars of new business that was specifically generated by Josh's kind of focus and relentless pursuit of those deals on behalf of Richie and Alex and Take 5."); **Pike**: 9:Tr. 2462:5–15 (Take 5's business increased substantially through Advantage).

[336] **Colen:** 2:Tr. 348:9–349:6 ("We're trying to make sure that we can grow this company and be successful."), 495:12–496:5 ("[W]e're all motivated by the same thing. We want to grow the company."), 334:23–335:11 (Advantage desperately wanted the Take 5 business to grow), 340:16–341:7 ("[W]e were all motivated to grow the company."), 3:Tr. 706:19–707:9 (Advantage attempted to "develop solutions that would grow" the Take 5 business).

[337] Ex. A-230 [APA] at 14–16 (Sections 1.5(d) and (e)), A-5 (Definitions).

closed.[338]  For the initial payment to have been due in any amount, Take 5 would have needed to

have had an EBITDA of at least $13.2 million by April 2020.[339]

The Take 5 business, however, was not performing well following the acquisition.[340]

Over the period from April 2018 until April 2019, Take 5's EBITDA was $6.2 million.[341]  Even

if Take 5 had been operating legitimately, for Mr. Radetich and Mr. Gluck to receive any Earn-

out, the Take 5 business would have needed to double its EBITDA in under a year.[342]  Even in

the absence of fraud, the trajectory of the Take 5 business made the possibility of receiving any

Earn-out payments relatively impossible.[343]  In fact, Take 5's own forecast projected its expected

EBITDA for 2019 to be $8.3 million.[344]

We believe that the Take 5 Parties have abandoned their assertion that the phrase in the

APA that Advantage was to "maintain the Business as a separate business unit" meant that

Advantage was required to operate Take 5 throughout the four-year Earn-Out Period[345] as they

did not raise this argument during the final evidentiary hearing.  The sole reason Advantage

---

[338] Ex. A-230 [APA] at A-9 (defining "Interim Earn-out Period"); **Baliban:** 13:Tr. 3529:18–3530:17.

[339] **Baliban:** 13:Tr. 3529:18–3530:17.

[340] **Colen:** 2:Tr. 339:7–16.

[341] **Baliban:** 13:Tr. 3530:22–3531:10.

[342] **Kaye:** 10:Tr. 2651:17–2653:14 (Take 5's actual EBITDA would have been a negative number because it didn't actually perform the services to record the revenue); **Baliban:** 13:Tr. 3530:22–3531:10 ("[R]evenue would have had to grow considerably if you're going to . . . do an analysis based on those actual numbers, which I've not [done].").

[343] **Colen:** 2:Tr. 347:4–348:8.

[344] Exs. A-309 [5/13/19 e-mail communication from B. Jenkins to C. Libitsky] (regarding 2019 Take 5 budget and forecast), A-309A [Excel sheet with projected forecast]; **Baliban:** 13:Tr. 3531:19–3532:11 (the Take 5 Parties' expert did not rely on Take 5's own projections in assessing the possibility of the Initial Earn-out amount being made).

[345] Ex. A-230 [APA] at A-6 (Definitions).

shutdown the Take 5 business was because it was defrauding clients.[346]  Section 1.5(j) of the

Asset Purchase Agreement gave Advantage the "sole and absolute discretion" to shutdown

Take 5 in these circumstances.  *See Scott v. Acadia Realty Tr.*, C.A. No. 07C-02-102RRC, 2009

WL 5177152, at *8 (Del. Super. Dec. 8, 2009), aff'd, 11 A.3d 228 (Del. 2010) (lease provision

that gave tenant "sole and absolute discretion" to control parking area removed control of

parking area from owner and transferred it to tenant); *Authentic Apparel Grp., LLC v. United*

*States*, 989 F.3d 1008, 1014 (Fed. Cir. 2021) (where license agreement gave Army "sole and

absolute discretion" regarding approval of proposed products and marketing materials, licensor

"agreed to bear the risk that the Army would exercise that discretion to [licensor's] detriment, at

least so long as the government did not act arbitrarily or in bad faith"); *Bowden v. Peterson*, 2 F.

App'x 701, 702 (8th Cir. 2001) (trustees of business trust, who had "sole and absolute

discretion" under trust document to manage trust property, and pay trust income to "any one or

more" of beneficiaries, did not breach their fiduciary duty by exercising their discretion to make

distributions to some but not all of trust's intended beneficiaries).

### B.    Defamation

Mr. Radetich and Mr. Gluck also asserted that the Advantage Parties defamed them.[347]

Despite the fact that the Take 5 Parties defrauded the Advantage Parties, there was no evidence

presented at the arbitration that anyone at Advantage said that Mr. Radetich and Mr. Gluck

committed fraud.  Even if they had, "[w]here the alleged defamatory statement is shown [to be

substantially true], it is unnecessary to delve into any of the other additional factors."  *Holmes v.*

---

[346] **Colen:** 2:Tr. 494:7–495:11 (Advantage shut down Take 5 because it was not sending e-mails, not because of Take 5's financial performance, or the anticipated IPO); **Stevens:** 14:Tr. 3671:7–25 (Take 5 was shut down because it did not actually deliver e-mails on behalf of clients).

[347] 11/19/19 Take 5 Amended Statement of Claim, ¶¶ 105–112.

*The News J. Co.*, CV N13C-11-136 MMJ, 2015 WL 1893150, at *2 (Del. Super. Apr. 20, 2015), *aff'd*, 126 A.3d 1109 (Del. 2015) (bracketed text supplied).  Mr. Radetich and Mr. Gluck were on the client calls and neither commented on nor objected to the information that clients were given about Take 5's business.[348]  Furthermore, out of the hundreds of clients who received refunds, only one testified that an Advantage employee even mentioned the word "deceive."[349] Mr. Weintraub then further stated that his own views of Mr. Radetich and Mr. Gluck had not been adversely affected.[350]

## VI.     CONCLUSION

For the foregoing reasons, the Advantage Parties respectfully request that Your Honor enter judgment in favor of the Advantage Parties on all their causes of action and against the Take 5 Parties on all their causes of action and defenses.  The Advantage Parties further request that Your Honor enter a damage award in the amount of $94,786,533.41, exclusive of interest and attorneys' fees and other expenses, and that this award be trebled under the RICO statute to $284,359,600.23.

---

[348] *See* Part II.H.2, *supra*; **Colen**: 2:Tr. 452:10–20.

[349] **Weintraub**: 11:Tr. 2987:3–23.

[350] **Weintraub**: 11:Tr. 2996:15–19.

DATED:  June 29, 2022                    Respectfully submitted,

                                          GREENBERG GROSS LLP


                                          By:  _____
                                               Wayne R. Gross
                                               Michael H. Strub Jr.
                                               Desiree N. Murray
                                               Edward A. Danielyan

                                               Attorneys for Advantage Sales & Marketing LLC,
                                               Advantage Sales & Marketing Inc., Karman
                                               Intermediate Corp., Advantage Solutions Inc., and
                                               Karman Topco L.P.