# EXHIBIT B

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration
### Under AAA Commercial Rules and Mediation Procedures
### Amended and effective October 1, 2013

**Case Number: 01-19-0002-7532**

**Petruss Media group, LLC, f/k/a Take 5 Media Group , LLC (Take 5 LLC)**
**RJV Marketing Corp. (RJV)**
**Richard Gluck**
**Alexander Radetich, Claimants, Cross-Respondents, and Counter-Respondents**
**(collectively Take 5)**

**Represented by Dennis Richard, Esq., Richard A. Roth, Esq., Melissa L. Mackiewicz, Esq., Kevin Shohat, Esq.,  and Lance Willoughby, Esq.**

**-vs-**

**Advantage Sales & Marketing, LLC**
**Advantage Sales & Marketing, Inc.**
**Karman Intermediate Corp.**
**Advantage Solutions, Inc.**
**Karman Topco, L.P., Respondents, Cross-Claimants and Counter-Claimants**
**(collectively Advantage)**

**Represented by Michael H. Strub, Jr., Esq., Desiree N. Murray, Esq., and Edward A. Danielyan, Esq.**

---

### INTERIM AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated March 15, 2018, and having been duly sworn, and having duly heard the proofs, and allegations of the Parties, hereby render this Interim Award, as follows:

### BACKGROUND

On March 15, 2018, Advantage Sales & Marketing, LLC, Buyer, entered into an Asset Purchase Agreement (APA) with Take 5 Media Group, LLC, the operating business that owned the assets being sold; Alexander Radetich, Richard Gluck, and RJV Marketing Corp, Beneficial Owners of the assets; and Seller Related Parties that were signators to the APA.[1] Advantage

---

[1] The Seller Related Parties are not identified herein because they are not parties to this proceeding.

Sales & Marketing, LLC agreed to purchase the business of Take 5 Media Group, LLC, except for certain Excluded Assets.

Except when it is necessary to differentiate the parties, the Respondents and Counter-Claimants will be referred to as "Advantage" and the Claimants and Counter-Respondents will be referred to as "Take 5." "Take 5 LLC" will be used to refer to the business that was sold pre-acquisition and "Take 5 business unit" will be used to refer to the business post-acquisition, when it was owned by Advantage. Although I have distinguished between Take 5 LLC and the Take 5 business unit in order to recognize that the purchased assets became part of Advantage, the practices as found herein existed before the acquisition and after the acquisition, at least through 2018 and into 2019. Thus, the use of one of the two terms implicitly recognizes that the practices existed before and after the acquisition. A reference to an entity implicitly recognizes that it acted through its agents. The context will determine the meaning of the terms used herein.

Take 5 LLC was founded in 2003 by Messrs. Radetich and Gluck. Its principal office was in Florida. It also had a small office in New York. It was in the business of marketing, including digital marketing, and licensing. Take 5 LLC built a database and used it to sell marketing campaigns and to license or sell data to other entities. Advantage's business is sales and marketing, including digital marketing. Prior to the acquisition of Take 5 LLC's assets, Take 5 LLC was a much smaller business than Advantage. Advantage grew through developing existing businesses and acquiring new businesses.

In 2017, Take 5 hired an investment banking firm, Petsky Prunier, to market the business. Advantage was interested in purchasing it. On August 11, 2017, the parties signed a Nondisclosure Agreement. On December 18, 2017, Advantage signed a letter of intent. On March 15, 2018, after a period of formal and informal due diligence by Advantage, the parties entered into the Asset Purchase Agreement (APA). Pursuant to the APA, one of the assets purchased was a database that included email addresses and demographic information.

The sale closed on April 1, 2018. Some of the employees of Take 5 LLC, including Messrs. Radetich and Gluck, went with the business. Thereafter, the business was operated as the Take 5 business unit within Advantage.

In early 2019, as a result of complaints that it received and presentations by employees of the Take 5 business unit, Advantage's management conducted an investigation of Take 5's business practices. Advantage retained FTI Consulting, Inc. (FTI) and, later, the law firm of Latham & Watkins (L&W) to conduct the investigation. In early July 2019, Advantage management concluded that the business practices were fraudulent. On July 11, 2019, Advantage shut down the Take 5 business unit.

In September 2019, Take 5 filed a demand for arbitration, seeking an award for amounts allegedly due and unpaid pursuant to the APA (the Earn-out amount). Advantage counterclaimed, seeking an award of damages. In November 2020, Messrs. Radetich and Gluck brought claims against Advantage.

The operative causes of action by Take 5 are breach of contract and breach of an implied covenant of good faith and fair dealing. In addition, Messrs. Radetich and Gluck allege

that they were defamed. The contract claims rest primarily on the factual allegation that Advantage breached the APA by shutting down the Take 5 business unit. The defamation claims are based on the factual allegation that Advantage falsely accused Messrs. Radetich and Gluck of committing fraud and published those accusations.

The operative causes of action by Advantage are breach of contract for indemnification under the APA with an express allegation of fraud; breach of contract (the APA) with no express allegation of fraud; breach of an implied covenant of good faith and fair dealing; fraud in the inducement based on misrepresentations, including but not limited to facts underlying representations and warranties in the APA; continuing fraud; and a violation of the RICO Act, 18 U.S.C. §1961, *et seq*. The contract claims rest primarily on the factual allegation that Take 5 breached representations and warranties contained in the APA. The tort claims are based on the factual allegation that Take 5 committed fraud. The alleged fraud also serves as one of the defenses to Take 5's claims. Take 5's primary defense to Advantage's claims is that Advantage cannot prove fraud or breach of representations and warranties.

The parties engaged in extensive discovery and motions practice, leading to an evidentiary hearing. That hearing was conducted on January 25, 26, 27, 28, 31, February 1, 2, 3, 4, and May 2, 3, 4, 5, 6, and 26. Many witnesses testified, including experts. The parties introduced voluminous exhibits.

On June 29, 2022, each party filed a post-hearing brief. On July 5, 2022, counsel for the parties presented oral arguments.

Generally speaking, Advantage's position is that Take 5 represented that primarily it was an email marketing company with a database that included millions of deliverable, double opt-in email addresses and with the in-house capability of delivering the emails to targeted audiences and reporting the results to clients. In fact, according to Advantage, Take 5 (1) sold email marketing to customers; (2) did not have high quality data, including email addresses, for marketing purposes; (3) did not have the capability in house of deploying or delivering emails that had been sold and did not deploy or deliver the number of emails ordered either in-house or by vendor; (4) represented to clients that it had delivered the emails; and (5) billed the clients for services not rendered and received payment on those invoices. On July 11, 2019, after Advantage's management became aware of these alleged practices, Advantage shut down the Take 5 business unit.

Take 5's position is that Advantage used allegations of fraud as a pretext for shutting down the Take 5 business unit. According to Take 5, Advantage wanted the business off of its books because of a then-pending Initial Public Offering. In arguing that Advantage has failed to meet its burden of proof, Take 5's position generally is that its services included various forms of digital marketing described as omni channel, not just email marketing; it used third party vendors to deliver services; and although some of its reporting to customers was based on algorithms, that methodology is common in the industry.

## MOTIONS

*Take 5's Motion to Preclude Evidence Regarding Damages*

Dean Kaye was called as a fact witness by Advantage to testify with respect to damages, subject to Take 5's objection. Take 5 argued that Mr. Kaye was interviewed by L&W but the notes of his interview were not produced as ordered during the pre-evidentiary phase of this matter. In addition, Take 5 argued that, pursuant to FRCP 26(a)(1)(A)(iii), Advantage did not produce supporting documents underlying each element of damages claimed, either in response to requests for documents, or during the deposition of Mr. Kaye. In response to Advantage's argument that Take 5 did not pursue the information requested by way of specific requests and follow up, Take 5 argued that it had no obligation to do so. Even if there were discovery violations, I conclude that any violations are not unduly prejudicial and overrule the objection.

*Advantage's November 17, 2021 Motion For Evidentiary Sanctions*

Advantage argued that Take 5 failed to meaningfully respond to discovery requests and spoliated evidence in the form of text messages. Advantage requested that Take 5 be precluded from presenting certain evidence and that certain facts be deemed admitted. After considering Take 5's response to the motion and relevant portions of the record, I have determined that Take 5 did not commit sanctionable spoliation and that any other violations by Take 5 were not unduly prejudicial. Advantage's motion is denied.

*Take 5's Motion Based on Advantage's Failure to Preserve Google Analytics Data*

Take 5 argued that Advantage failed to preserve Take 5 LLC's Google Analytics data beyond July 2019. Take 5 argued that the data would have shown the source of clicks on links to clients' websites. The thrust of the argument is that the failure to preserve and analyze the data undermines the testimony of Advantage's witnesses and, in addition to any sanctions, results in the failure of Advantage to prove fraud.

> Spoliation refers to the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. A party has a duty to preserve evidence it knows or reasonably should know is relevant to the action…. Where a party neglects the duty to preserve evidence, or actively obstructs it, a court has the authority to impose sanctions. That authority includes the discretion to determine the severity of the sanction imposed. In *Schmid v. Milwaukee Elec. Tool Corp,* the Third Circuit outlined the factors for determining the appropriate sanction: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and will serve to deter such conduct in the future.

*Magnetar Techs. Corp. v. Six Flags Theme Park Inc*., 886 F. Supp. 2d 466, 480–81 (D. Del. 2012) (footnotes omitted).

Advantage argued that Take 5 could have requested access to the Google Analytics data

much sooner that it did and while Advantage had access to it. Although that may be true, it is not the basis for my ruling. Rather, my ruling is based on testimony by fact witnesses, including Eva Hodgens, p. 2212 and Michael Boy, p. 1711, *et seq.,* former employees of Take 5 LLC and the Take 5 business unit, about Take 5 LLC's use of its Google Analytics account(s); and testimony by expert witnesses, including Jessie Stricchiola, explaining the capability of Google Analytics generally.

Ms. Hodgens testified that the Take 5 LLC Google Analytics account contained limited information. It was "basically a script we put within ours to mirror the click." Once a consumer clicked on the script, it "went to the client's site, which we had no vision, no access, no view." On the Take 5 LLC Google Analytics account(s), she could see if a click came from a mobile or desktop device, the geographical area from which it originated, and sometimes the referring domain. She gave as an example that, if someone from CNN clicked on a link, she might see the CNN domain. She went on to explain, however, that she could not determine whether the click originated from an email or from an ad. Mr. Boy testified that the Take 5 LLC account would show "the campaign ID, the campaign name, and then the link number." He also testified that one could see "the referring traffic from some of our vendor services" but for "the most part," vendors did what Take 5 LLC did and put a "no refer" on a link which made it look like "it's coming as direct traffic." Mr. Boy's reference to what Take 5 LLC did was a reference to earlier testimony that Take 5 LLC converted a client link coded with an Urchin Tracking Module (UTM) into a "Take 5 link" so that when a consumer clicked on it, it would appear to a client as email. Mr. Boy testified that a client could put pixels in campaigns to get information other than clicks.[2] He also testified that the Take 5 fulfillment team was trained to take the pixels out of the client's HTML creative, put it in a separate document, and send it to a vendor so that clicks to the pixel would simulate an open.  Ms. Stricchiola testified generally with respect to what Google Analytics can do but she had no knowledge of what in fact was contained in the Take 5 account(s) or the accounts of any particular client.

The evidence indicates that Google Analytics is capable of producing extensive information. It also establishes, however, that the information available is determined by the nature of the account of a particular subscriber. Thus, clients who used Google Analytics may have had access to more information than was available to Take 5 LLC in its account.

The testimony by witnesses with personal knowledge of the Take 5 LLC Google Analytics account is sufficient to make findings relevant to disposition of the issues in this proceeding, including the sanctions issue arising out of the unavailability of the Take 5 LLC Google Analytics account(s). I find that the Take 5 LLC Google Analytics data did not contain information that would materially impact the issues in this case. After considering all of the circumstances including fault, materiality, and prejudice, I decline to impose any sanctions. The relevant, material, and otherwise admissible evidence relating to Google Analytics has been considered in determining the issues in this proceeding. Take 5's motion is denied.

---

[2] A UTM or UTM tag can determine general information whereas a pixel tracks more specific information such as filling out a form or completing an order.

## SUMMARY OF ADVANTAGE'S WITNESS TESTIMONY

<u>Darrin Kleinman</u>

Darrin Kleinman testified that he is employed by Advantage as Executive Vice President of Mergers & Acquisitions. Mr. Kleinman has a Bachelor's degree in Accounting and a Master's degree in Business Administration. He was a CPA until his certification lapsed in or about 2014.

Mr. Kleinman learned that Take 5 LLC was on the market in the summer of 2017 when Advantage was solicited by Petsky Prunier. In August 2017, he reviewed the Confidential Information Memorandum (CIM) that had been provided by Take 5 and Petsky Prunier. Ex. A414/T243.

The CIM contains 38 pages. In part, the CIM stated that Take 5 LLC's database contained "160 million double opt-in emails, and 175 unique lifestyle and demographic overlays…." It also included, *inter alia*, 242 million postal records, 191 million date of birth records and 210 million phone records. It stated that Take 5 LLC's marketing services included email, mobile, social media, display ads, SEO/content marketing, and direct mail. It contained representations describing Take 5 LLC's tracking and reporting activities to clients.

In October 2017, Mr. Kleinman received a presentation by Take 5 LLC management. Ex. A527/T249; A194. The presentation included that Take 5 LLC had "242M+ postal records, 160M+ double opt-in emails, 191M DOB records, 155M+ landlines, 183M+ auto owners/11-13M auto intenders, and 61M+ cell phones," with demographic overlays. It also included the statement: "Proprietary double opt-in process: Take 5 sends either an active or passive opt-in email pass to consumers in order to obtain double opt-in consent and verify selected consumer information." The presentation represented that Take 5 LLC's "in-house ESP platform provides significant advantages over utilizing third-party vendors." It also contained representations describing Take 5 LLC's tracking and reporting its activities to clients.

Mr. Kleinman reviewed financial information, including the Take 5 LLC 2017 financial statements that had been audited by Cherry Bekaert, Take 5 LLC's auditing firm.

Mr. Kleinman understood from conversations with others, including Messrs. Radetich and Gluck, that Take 5 LLC primarily was an email marketing company that performed those services in-house. Mr. Kleinman testified that Advantage's primary interest was in Take 5 LLC's email marketing business because Advantage already provided other marketing services but did not have email marketing capability.  He pointed out that, in the documents just referenced, Take 5 LLC represented that it had 160 million double opt-in email addresses and that 100% of its email marketing was done in house. Based on a document supplied by Take 5 LLC, he understood that double opt-in meant that the email owner twice had agreed to have the email address included in the database. He also testified that Messrs. Radetich and Gluck represented that Take 5 LLC had performed the services for which it was paid.

When Advantage issued a letter of intent on December 18, 2017, that was the beginning of formal due diligence. Advantage hired (1) Ernst & Young (EY) to do financial due diligence;

(2) the EY Parthenon Group to do commercial due diligence; and (3) the Jones Day law firm to do legal due diligence. The internal departments of Advantage also were involved. Mr. Kleinman testified that the reports from those entities were positive. The Parthenon Group contacted 11 customers of Take 5, and their responses were positive.

Mr. Kleinman acknowledged that he was aware that Take 5 LLC paid third party vendors for media services.

Mr. Kleinman testified that Advantage did not conduct a forensic analysis of Take 5 LLC and, testifying as a layperson with years of experience, opined that the due diligence process employed was prudent.

Mr. Kleinman testified as a lay person with an accounting background that GAAP would not permit the recognition of revenue for services that had not been provided.

He acknowledged that the CIM and the presentation by management identified Take 5 LLC as an omni channel marketing company. When a presentation concerning the proposed purchase was made to Advantage's Board, it described Take 5 LLC as an omni channel company. It also contained the statement that approximately two thirds of Take 5 LLC's revenue resulted from email marketing. Mr. Kleinman acknowledged that he knew of no document from Take 5 LLC or from Advantage that described Take 5 LLC as predominately an email marketing company.

Mr. Kleinman testified that Advantage did not value the Take 5 LLC database; it valued the cash flow.

I find that Mr. Kleinman was a credible witness. I accept his testimony based on his personal knowledge. I gave no weight to his testimony as to what he was told about the business practices of Take 5 LLC, or by others connected with it, as part of Advantage's internal post-acquisition discussions, relating to the issues in this proceeding.

<u>Gary Colen</u>

Gary Colen is President of Marketing and Digital Commerce for Advantage. He testified that, in his work life, he founded several companies, including AMP Agency, a digital marketing company. AMP Agency was acquired by Advantage and Mr. Colen went with it as its CEO. At Advantage, Mr. Colen has been involved in several acquisitions by Advantage, including Take 5 LLC.

Prior to Take 5 LLC's acquisition, Mr. Colen had several conversations with Messrs. Gluck and Radetich. He testified that they told him that Take 5 LLC owned over 160 million double opt-in email addresses and demographic overlays and that Take 5 LLC was the best email marketing company in North America. Mr. Colen understood that primarily Take 5 LLC was an email marketing company with in-house capability to deliver on campaigns.

Mr. Colen acknowledged that he knew that Take 5 LLC marketed itself as an omni channel company. He testified that Advantage was interested in email marketing because it complemented Advantage's existing capabilities. He acknowledged that he was aware that Take

5 LLC used third party vendors.

Mr. Colen described the due diligence process, which he characterized as typical. As part of the process, he met with Messrs. Gluck, Radetich, and Don Morris, an employee of Take 5 LLC, at its office in Florida. They discussed take 5 LLC's business generally. Because of limitations of confidentiality placed on Advantage by Take 5 LLC, the proposed acquisition was not revealed to Take 5 LLC employees.

After the acquisition, the Take 5 assets became one of Advantage's business units within Mr. Colen's jurisdiction. Mr. Radetich functioned as general manager of the Take 5 business unit and reported to Mr. Colen.

The Take 5 business unit performed poorly post-acquisition. Joshua Pike, head of strategy and integration at Advantage, got involved to assist in integration and cross marketing of the Take 5 business unit to other business units within Advantage.

The Take 5 business unit continued to perform poorly. In January 2019, at the recommendation of Mr. Radetich, Advantage hired Ryan McGavran to become general manager of the Take 5 business unit.

In the Spring of 2019, Mr. Colen became concerned about the Take 5 business unit's reporting of services to customers. As a follow up to these concerns, Mr. McGavran asked Beth Jenkins, Michael Boy, Tanya Coker, and Prima Creel[3] to prepare a presentation for Advantage management. On June 19, 2019, Mr. McGavran and the other Take 5 employees who had come with the acquisition, gave a presentation to Mr. Colen and others. Ex. A340/T213. Mr. Radetich attended the presentation. The presenters described issues with the delivery and reporting of emails and recommended changes going forward. The recommended changes were labeled as Project Evolve. Project Evolve was described as a project to transform the way the Take 5 business unit marketed, fulfilled, and reported on marketing campaigns by transitioning clients to an omni-channel product "rooted in transparent and empirically-based reporting." The omni channel product was called OmniReach, an omni channel blended experience, using all marketing channels. The use would remove the risk of questionable traffic and reporting practices. The presentation included a risk assessment for customers in terms of the risk of losing them if they converted to OmniReach.

The Project Evolve presentation included the following. The "current product state" was described as "email" or "email blend." "The vast majority of our current media COGS [cost of goods sold] are comprised of low cost, poor quality, PPC traffic vendors. The use of these vendors is driven by poor email data quality, poor email engagement, unrealistic client CTR [click through rate] expectations, and profit margins." Email deployment was described as yielding "low engagement;" vendor traffic was used to ensure a desired click through rate (CTR); reporting included the use of algorithms; clicks were the only empirical metric on reports; and Take 5 had approximately 168 million email records of which approximately

---

[3] These employees, other than Ms. Creel, had been employees of Take 5 LLC before the acquisition who came with the acquisition to Advantage. Ms. Creel began working for Advantage in the Take 5 business unit in December 2018.

"25MM records are actionable."

The presenters stated that 98 clients were email only and 47 clients were email blend. The presentation included statements that email campaigns were affected by inaccurate reporting based on algorithms and not actual data. More specifically, the presentation included the following statements: (1) "Algorithmic reporting that reflects email metrics, comprised of deployed, delivered, opens, opt-outs, bounces and opens by device;" (2) "Clicks are the only accurate metric;" (3) "Algorithmically generated responder files (email engagement by user);" and (4) "Sales attribution matchback's based off of email deployment file." The matchback files[4] were not based on actual campaign information but rather were based on the deployment file.

In late June 2019, Mr. Colen discussed the sending of emails with Mr. Radetich, who told him that third party vendors sent emails. Mr. Colen asked Cory Weiner to check that out. After receiving feedback from Mr. Weiner, Mr. Colen had a conversation with Messrs. Gluck, Radetich, and Pike. Mr. Gluck stated that clients did not care about emails, that they really wanted clicks, and that they were aware of Take 5's business practices and were fine with them.

Subsequently, Mr. Colen decided to contact clients. The clients contacted were identified by Messrs. Gluck and Radetich.  Messrs. Colen, Gluck, Radetich, and others participated in the calls on July 1 and 2, 2019. Mr. Colen participated in six of those calls. A document in evidence reflects that the responses were mixed with respect to knowledge of Take 5 LLC's practices and/or acceptance of them. Mr. Colen reviewed several invoices, including invoices relating to the clients on the call list.

Mr. Colen testified that, after the calls, he was upset and disappointed. He decided to recommend shutting down the Take 5 business unit because he believed it was not sending the emails that the clients wanted, that were reported to the clients, and for which the clients were billed. The Advantage Board approved the shutdown.

Advantage offered refunds and/or credits to all clients who received services post acquisition. Mr. Colen acknowledged that data licensing clients, as distinguished from digital marketing clients, were included.[5]

The July 1 and 2 calls form part of the basis for the defamation claims by Messrs. Radetich and Gluck.

I find that Mr. Colen was a credible witness. I accept his testimony that was based on his personal knowledge. I gave no weight to his testimony as to what he was told about the Take 5 LLC business practices in Advantage's internal post-acquisition discussions, relating to the issues in this proceeding.

---

[4] Matchback reports were given to clients when they tracked responses during a campaign and asked Take 5 LLC to match responses to the persons to whom emails were sent. The practice described in the presentation was discontinued in February 2019.

[5] Data licensing clients were included, but in this proceeding, Advantage raises no issue with respect to that portion of the business of Take 5 LLC or the Take 5 business unit.

### Cory Weiner

Advantage Media, an Advantage business unit, provided digital media services to other Advantage business units. Cory Weiner was a founder of Jun Group Productions (Jun Group). It was acquired by Advantage in September 2018. In January 2019, Advantage Media merged into Jun Group. Mr. Weiner is employed by Advantage as CEO of Jun Group.

After the merger, in February 2019, Mr. Weiner met with Mr. Gluck. In late March 2019, he met with both Messrs. Gluck and Radetich. Mr. Weiner's interest was to help integrate the Take 5 business unit into Advantage. Messrs. Gluck and Radetich told Mr. Weiner that Take 5 LLC had 100-200 million opt-in emails and that primarily it was an email marketing business.

In the Spring of 2019, Jun Group contracted with the Take 5 business unit to conduct 3 email marketing campaigns. Mr. Weiner testified that the information he received led him to believe that something was wrong. The information was not available in the time it should have been available and, when produced, contained statistically impossible information. In or about May 2019, he shared his concerns with Advantage counsel and recommended a forensic audit of the Take 5 business unit. In addition, he received information through the Project Evolve presentation. He reviewed several documents, including invoices and statements of work. He spoke to some vendors on June 28, 2019. He testified that, given the amount paid to vendors if they had sent emails, the emails would have been far fewer in number than reported and billed. The information led him to conclude that a high percentage of emails were not delivered as represented, either by the Take 5 business unit or by third party vendors.

I find that Mr. Weiner was a credible witness. I accept his testimony that was based on his personal knowledge. I gave no weight to his testimony as to what he was told about the business practices of Take 5 LLC or the Take 5 business unit in Advantage's internal post-acquisition discussions, relating to the issues in this proceeding.

### Michael Wei

Advantage called Michael Wei as a combination fact/expert witness.[6] Take 5 objected to his testimony as an expert. Mr. Wei is a managing director of FTI. He holds a Bachelor's degree. He testified that his core area of expertise is analyzing voluminous amounts of data and reading codes. He acknowledged that he is not a digital marketing expert.

In May 2019, Mr. Wei was engaged to analyze the accuracy and reliability of reports that Take 5 LLC had sent to customers. Christine Luu and Jeff Rhodes, also with FTI, assisted in that effort. Initially, Mr. Wei spoke to Cruse Mair, the information technology director at the Take 5 business unit, an employee before the acquisition, to understand Take 5 LLC and the

---

[6] With respect to all expert witnesses, I applied Delaware Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). *See M.G. Bancorporation, Inc. v. LeBeau*, 737 A. 2d 513, 5322 (Del. 1999) (adopting *Daubert*). Thus, I considered opinions only when the knowledge and training was based on sufficient facts, reliable principles and methodology, and was helpful.

Take 5 business unit's practices. Mr. Wei found no correlation between the data relating to sales and invoices and the reports to customers (tracking reports).

In June 2019, Mr. Wei, Ms. Luu, and Trevor Sullivan, Advantage's counsel, visited the Take 5 business unit's offices in Florida. They interviewed several employees who came with the acquisition and reviewed records relating to two campaigns. The campaigns were selected by Mr. McGavran. The persons interviewed included Mr. Radetich, Tanya Coker, head of the "account team," and Beth Jenkins, head of "finance and operations." Mr. Wei testified that he understood that Take 5 LLC used the program NetSuite to house customers' orders, CMS (Take's 5 LLC's campaign management system) to track campaigns, and Hygenics Data to house email addresses and other data. He understood that Take 5 LLC used Asana as a third-party management tool. He believed that was not relevant to his work. He understood from Ms. Jenkins that the entry "digital media," in documents, meant email.

Mr. Wei examined sales orders and invoices and compared tracking reports to information contained in CMS. On June 26, 2019, Mr. Wei presented his findings to Advantage personnel. Ex. A427. Mr. Wei concluded that the data did not match what was reported to customers. He ran reports on the two campaigns he reviewed and got different results. Take 5 business unit employees who came with the acquisition explained that was because the number of clicks was pulled from Google Analytics and Take 5 LLC used algorithms to produce certain results. At some point prior to the acquisition, Take 5 LLC had engaged 12 Skies to create CMS. Mr. Wei understood from Peter Ward and Matthew Gordon, employees of 12 Skies, a Take 5 LLC vendor, that they took the algorithms from a previous application that had been used by Take 5 LLC.

Mr. Wei testified about the various documents relating to the two campaigns and the contents of his report to Advantage.

 At a point in time after June 2019, Mr. Wei reviewed documents relating to additional marketing campaigns that he believed were email campaigns.  See Ex. A324 for list (produced in discovery to Take 5 by Advantage in March 2020). As before, he looked at the information in NetSuite and the email delivery systems used internally by Take 5. Again, in his testimony, Mr. Wei went through the documents in detail.

In April 2021, Advantage engaged Mr. Wei as an expert. He was asked to look at specific systems at Take 5 LLC and pull data. David Lasater, another Advantage expert, was asked to develop a scientific approach. He developed statistical sampling. To aid Dr. Lasater, Mr. Wei collected invoices from NetSuite, the reports sent to customers, and information from the internal email delivery platforms. He developed a list of campaigns that had been completed and for which payment had been received. He collected documents relating to what he understood to be email campaigns, with notations of email, "digital media," or some other indication of emails, from October 2017 through June 30, 2019. The total number of invoices, excluding related documents, was 13,035. The documents were given to Dr. Lasater. One hundred and ninety-one invoices were excluded because there was no job identification number or tracking report.

Dr. Lasater performed his analysis and arrived at a sampling number of 105. His findings are summarized in Ex. A442-Wei report-pages 19 and 20. He relied on Mr. Wei's identification of invoices.

Mr. Wei did not look at third party vendors. He reviewed documents indicating that emails were ordered and sent, based on his understanding of the documents.

Take 5 objected to Mr. Wei's testimony on the ground, *inter alia*, that he was not qualified, did not have a sufficient factual basis for his opinions, did not consider information in Take 5 LLC's account with Google Analytics, did not consider information relating to third party vendors, and assumed inaccurate facts.

Generally, Mr. Wei possessed the necessary knowledge and experience to qualify as an expert witness and is credible. I received the testimony in his limited areas of expertise but not for the truth of what Mr. Wei was told by persons with personal knowledge of facts that underlay his opinions. Mr. Wei did not have any special expertise in reading documents, and thus, I have not relied on that testimony. I relied on my reading of the documents coupled with the testimony of fact witnesses with personal knowledge to determine the underlying facts. The documents reviewed by Mr. Wei are consistent with my findings, detailed below.

<u>David Lasater</u>

David Lasater was called by Advantage as an expert witness, subject to objection by Take 5. Dr. Lasater holds Bachelor's, Master's, and doctoral degrees. His academic background and much of his work experience is in accounting. He is a CPA. Currently, he is a Senior Managing Director at FTI. He has testified as an expert on several occasions. His stated expertise includes statistics, financial economics, accounting, and auditing.

Dr. Lasater was engaged as an expert in April 2021. He was employed to design a random sample of Take 5 LLC invoices and related documents to determine whether emails ordered were deployed or delivered. Mr. Wei asked Dr. Lasater to look at 13,035 invoices. He understood that they were all of the invoices issued from October 1, 2017 through June 30, 2019.  Mr. Wei determined the criteria used to winnow down the total number of invoices subject to sampling. Dr. Lasater understood that the included invoices had to reflect a client's order of digital media or email, coupled with a tracking report showing delivery or deployment of emails, and the data to match reports with invoices. Dr. Lasater compared what was reported with what was reflected in invoices based on invoices that he understood were for email.

Dr. Lasater used attribute sampling. This is appropriate when the data is binary, *i.e.*, it fits into one of two categories. Attribute sampling is widely used by many entities to test compliance. Here, the issue was whether Take 5 LLC complied with what the customer ordered, thus involving a comparison of invoices with data concerning actual delivery of services. The test was to ascertain whether each sampled invoice was compliant with delivery.

Dr. Lasater's approach and conclusions are explained in his report. Ex. A312.  He concluded that a randomly chosen sample size of 105 was appropriate to determine the rate of compliance. Based on the sample invoices and delivery records, a total of 43,055,281 emails

were invoiced and 494,455 were deployed. The aggregate total rate of compliance across the entire time period was 1.15%. When the time period was broken down by quarter, the rate of compliance varied from 0% to 5.21%. Dr. Lasater opined that he was 95% certain that no more that 3% of invoices were compliant with what was reported. He acknowledged that the sampling technique assumed that the noncompliance was uniformly distributed throughout the population of invoices.

Take 5 argues that Dr. Lasater does not have digital media or digital marketing experience or education. Take 5 further argues that his testimony is based on incorrect and/or misleading information and that his assumptions are incorrect, more specifically, that Take 5 LLCs business was email only and that Take 5 LLC fulfilled all orders in house.

Generally, Dr, Lasater possessed the necessary knowledge and experience to qualify as an expert witness. He is credible and his statistical sampling methodology passes muster.

 As is the case with most expert witnesses, when they express opinions applying their expertise to assumed facts, their opinions cannot be any better than the assumed facts. I gave no weight to any opinion by Dr. Lasater that Take 5 LLC was an email marketing company and no weight to any opinion with respect to the truth of any underlying facts. I relied on witnesses with personal knowledge for the determination of underlying facts with respect to how Take 5 LLC conducted business.

<u>David Kalat</u>

David Kalat testified as an expert on behalf of Advantage. He is a Director at Berkeley Research Group, LLC, "a strategic advisory and expert services firm." He leads "investigations involving data analytics and forensic computer examinations." He is experienced in analyzing database systems, including the design of relational databases. He is a certified fraud examiner, a certified computer examiner, a certified information systems security professional, and a certified telecommunications analyst. His report is Ex. A350.

Mr. Kalat analyzed what was represented to him to be the Take 5 LLC database. He investigated the database's integrity, accuracy, and usability. It consisted of 98 spreadsheets that contained 442.9 million unique email addresses and "over one billion rows of corresponding information such as consumer personal identifying information and other demographic characteristics." Mr. Kalat testified that the database (1) was poorly organized and had few relational characteristics; (2) contained no evidence of double opt-in addresses; (3) contained incomplete and inaccurate single opt-in email addresses; (4) contained emails that, according to a statistical analysis performed using the email verification service Kickbox, were 29% deliverable; (5) contained demographic information that was stale or incorrect; and (6) could not adequately respond to test queries that were based on exhibits to the deposition of Mary Jo Benjoseph, a Take 5 LLC employee before the acquisition; (7) contained deliverable

emails that included spam traps[7]; and (8) did not reflect pinging or cleaning of the data.[8]

Mr. Kalat analyzed the data from a marketing perspective. He opined that historical information that is stale or unusable from a marketing perspective can have value for non-marketing purposes, a reference to data licensing.

Some aspects of Mr. Kalat's opinions are based on underlying assumptions that are dependent upon establishing that they are accurate. He relied on information from David Johnson that he had the entire database. In addition, some weaknesses in his testimony were explored on cross examination, *e.g.*, staleness; the failure to speak to Mr. Johnson; and the lack of knowledge as to how Take 5 LLC employees interfaced with the database.

The quality of the database is both a separate issue and is intertwined with deliverability and reporting. Mr. Kalat is a credible qualified expert. I considered Mr. Kalat's testimony that was based on his examination of data. Nevertheless, I gave it relatively little weight. As stated above and explained below, for fact finding purposes, I relied primarily on first level fact witnesses and documents for findings relating to Take 5's capabilities and practices, including a determination of what was ordered by a client, supplied, and reported. The practices included the difficulties in working with Take 5 LLC's database and in-house capabilities.

<u>Michael Boy</u>

Michael Boy was called as a witness by Advantage. Mr. Boy began working for Take 5 LLC in July 2016 and stayed post-acquisition, until the shutdown in July 2019. He worked in the fulfillment department the entire time. He was hired by Beth Jenkins, the CFO, and Eva Hodgens, the head of the fulfillment department, to implement a "bulk e-mail marketing platform." At that time, Take 5 LLC had "very, very minimal" to no capability to perform the email campaigns that they were selling. At no time did Take 5 LLC execute 100% of email campaigns in house. Take 5 LLC assigned a number of clicks to a particular link[9] and used PPC vendors to produce clicks to that link. Mr. Boy implemented "bulk e-mail deployment software" that permitted use of multiple IP addresses. He also created a function to permit cleaning of email data to make it deliverable.

Mr. Boy testified that he struggled because the data quality was very poor, which resulted in getting kicked off networks by software vendors. The poor quality of the data did not permit an infrastructure that could be used to send large volumes of emails.

With respect to capability, Mr. Boy described a particular campaign in which Take 5

[7] Mr. Kalat testified that spam traps are valid deliverable email addresses that are created for the purpose of entrapping senders of unwelcome emails.

[8] Mr. Kalat testified that his understanding (not an expert opinion) is that single opt-in means that a recipient of an email would go to a "landing page" and "click[] a button." Double opt-in includes a second step whereby the owner of the landing page sends something to the consumer and the consumer again interacts.

[9] Clients frequently included several links in the "creative." A click on the link would direct the consumer to a particular spot on the client's website.

LLC reported delivery of 10 million emails. It did not have that capability, however.

The open rates, delivery numbers, and click through rate (CTR) recorded on the tracking reports were generated by algorithms. Mr. Boy testified that the goal of the fulfillment department was to get PPC vendors to generate a certain number of clicks. The process was that a customer provided a link, "we wrap that link in our own tracking," and send the link to a vendor. Take 5 LLC assigned a certain number of clicks to the link that it wanted. The vendor ran PPC traffic. The clicks were recorded by Google Analytics, and the number of clicks was included in the report to the customer.

Mr. Boy distinguished a client's Google Analytics account from the Take 5 LLC Google Analytics account. Take 5 LLC employees put the clients' link into Take 5 LLC's system. Regardless of whether a consumer clicked on the link on a website, social media, or any other place, the client would see it as coming from email. In the Take 5 LLC account, Google Analytics would identify only the campaign name, the link number, the number of clicks, and "the referring traffic from some of our vendor services." "For the most part, ...vendors did the same thing," which made it look like "it's coming as direct traffic."

Sometimes clients put pixels in campaigns to gather information other than clicks. Mr. Boy testified that "we [the fulfillment team] were trained to take those pixels out of the campaign and run traffic to it to simulate opens." He explained that he was not directed to remove pixels; he was directed to solve a problem and that is how he did it.

Take 5 LLC used low cost PPC vendors, meaning two cents per click as opposed to $1 per click. On occasion, it used a vendor to send emails.

Take 5 LLC had a tracking department. Tracking reports were modified a "few times." Sales representatives or "pressure from the top" would cause individuals to "fix" reports so that the customer would see something closer to what it thought it was getting.

Mr. Boy testified that Messrs. Radetich and Gluck knew that Take 5 LLC was using PPC vendors to fulfill email campaigns because they established those relationships before Mr. Boy was hired and they discussed the vendors from time to time. The discussions related to reducing costs. Mr. Boy was concerned that orders were not being fulfilled as Take 5 LLC reported. Mr. Gluck said all of their competitors were "doing it."

Mr. Boy testified that he discussed the poor quality of the data with Mr. Radetich on multiple occasions. On many occasions, emails could not be delivered because of the poor quality of the data.

Mr. Boy testified that Take 5 LLC used PPC vendors to fulfill campaigns and used algorithms to report results. After Ms. Hudgens left Take 5 LLC in March or April 2019, Messrs. Gluck and Radetich asked Mr. Boy to take her position as head of the fulfillment department. He told them he would take the position provided that Take 5 LLC did not represent that it had double opt-in email addresses, or 300 million records; did not use algorithm reporting; and that it could not sell email only campaigns. He became head of the department.

With respect to matchback reports, Mr. Boy testified that Take 5 LLC matched back to anybody in the database and not just to people who received the campaign. The matchback reports were inaccurate.

Mr. Boy, along with Ryan McGavran, Tanya Coker, Beth Jenkins, and Prima Creel, participated in the Project Evolve presentation. Ex. A340. He reviewed some of the contents of that presentation in his testimony. During the presentation, Mr. Radetich did not disagree with its content.

Mr. Boy testified that, on April 22, 2019, he told Peter Ward and Matthew Gordon, both with 12 Skies (creators of CMS), that they had to stop using algorithms in reporting to customers. For the first time, he was able to do that because he was then reporting to Ryan McGavran. He testified that the reporting was inaccurate because they were using PPC campaigns to fulfill the majority of email traffic and some of the metrics in the reporting was based on algorithms, not actual results.

In April 2019, Mr. Boy wanted to implement OmniReach and move to Facebook, Instagram, display ads, and emails. He wanted to use actual numbers in reporting to clients.

Mr. Boy currently works for Virtua Brands engaged in digital marketing. In addition, since March 2020, he has been working as a project manager for Advantage. Between the shutdown of the Take 5 business unit in July 2019 and March 2020, he assisted in the shutdown and "this case." Since March 2020 he has been paid $40,000 per year by Advantage. Ms. Hodgens also works for Virtua Brands.

Before working at Take 5 LLC, Mr. Boy worked at BMI Elite. There, he had some of the concerns that he later had at Take 5 LLC with respect to business practices.

Clients thought Take 5 LLC was an email marketing company and that is what they were sold. He acknowledged, however, that his contact with clients was infrequent. The sales representatives interacted with clients. They sent request forms to the client services department, which interacted with the fulfillment department.

In 2017-2018, Mr. Boy first realized something was wrong with Take 5 LLC's business practices. He discussed his concerns with Ms. Jenkins and Ms. Hodgens. The Take 5 business unit was moving in an omni-channel direction by the end of 2018 as a result of his efforts and those of Ms. Hodgens. The Take 5 business unit made further strides after Mr. Boy's conversation with Messrs. Gluck and Radetich.

Clients who purchased emails did not know that PPC vendors were used. He believed that vendors did not send emails. He acknowledged that there were some documents reflecting that vendors billed Advantage for sending emails.

Mr. Boy also acknowledged that the majority of clients tracked clicks. He also testified, however, that clients could put pixels in campaigns to gather information other than clicks, but persons in the fulfillment department were trained to remove the pixels "out of the HTML creative, put it in a separate document and/or send it to a vendor, and send clicks to that pixel, which would then simulate an open."

Take 5 LLC had an anti-bot program that was "somewhat effective."

Take 5 challenges the credibility of this witness, arguing that he has a personal interest because of ties to Advantage and that he harbors animosity toward Take 5. I find Mr. Boy to be a credible witness and that his testimony is consistent with the documents.

### Ryan McGavran

Ryan McGavran first met Mr. Radetich in 2005 or 2006. In 2018, he was working for Neustar, an information services company, as Vice President of Data Strategy. Neustar licensed data from several companies, including Take 5 LLC. Neustar used data to build a database of adults and households, tying billions of pieces of information to a single individual. The purpose was to build a historical profile, not to get a marketing response.

Mr. McGavran began working at the Take 5 business unit in January 2019. He was invited to manage its business, after he corresponded with Messrs. Gluck and Radetich.

Mr. McGavran understood that the sales representatives were selling email campaigns primarily and that Advantage needed to deal with that issue. In January 2019, Mr. Radetich wrote to Mr. McGavran and stated that only one or two salespersons were selling the "complete vision." He continued and stated that most were selling email because that is what they were comfortable with. Ex. A164. After Mr. McGavran arrived, the sales personnel continued to interact with Messrs. Gluck and Radetich. When Ms. Hodgens left the Take 5 business unit, Messrs. Radetich and Gluck arranged for Mr. Boy to succeed her.

Mr. McGavran changed the sales commission structure because it was not aligned with industry standards and was internally inconsistent. That process began before his arrival. The commissions as a whole were not reduced, but commissions for some individuals were reduced.

Although Mr. McGavran did not have personal knowledge, he understood from Tanya Coker that matchback reports were given to clients when clients provided to Take 5 LLC sales information during the deployment campaign and asked Take 5 LLC to flag individuals in the deployment file. Take 5 LLC matched the client sales data to its entire database and not to the deployment file. In February 2019, based on his understanding, he instructed Ms. Coker to stop the practice of matching to the entire database.

A responder file is another report that was given to clients. Mr. McGavran understood that a client could ask for identification of the number of emails that had been opened after a campaign had run. He understood that the response to the request, a responder report, was not accurate.

In April 2019, he became aware of some internal complaints that the reports sent to clients were not accurate. Mr. Boy expressed concerns to him. He recommended to Mr. Colen that a third-party audit be performed.

Mr. McGavran was advised that clients did not know that emails were not sent and did not know that the metrics reported were determined by PPC clicks.

Mr. McGavran asked Take 5 business unit employees to do a risk assessment of losing

specific clients by implementing Project Evolve. Ex. A551A is a spreadsheet, prepared by several employees in June 2019. It identifies, *inter alia*, clients by name, describes the services provided, and contains a risk assessment of loss.

Mr. McGavran testified about the preparation and presentation of Project Evolve.  Ex. A340. The purpose of Project Evolve was to build a true omni-channel service.

The Project Evolve presentation to Advantage management communicated that Take 5 LLC was using PPC vendors and that reports were inaccurate. Mr. Radetich, who was present, did not disagree with the contents of the presentation.

Mr. McGavran was involved in making telephone calls to clients after the decision was made to shut down the business.  See Ex. A404 for the talking points. The conversations on the phone tracked the talking points.

Mr. McGavran acknowledged that Neustar licensed data from Take 5 LLC and vice versa. He had no reason to believe there was a problem with data licensing. That accounted for approximately 20% of Take 5 LLC's revenue.

While at Take 5, Mr. McGavran was on a learning curve. Some of his information was based on personal knowledge, but most of the specific information came from others, in significant part during the Project Evolve preparation and presentation. I find that Mr. McGavran was a credible witness. As with other witnesses, I gave weight only to his testimony that was based on personal knowledge.

<u>Eva Hodgens</u>

Ms. Hodgens began working for Take 5 LLC in March or April 2016, as Director of Digital Media. At that time, Take 5 LLC was having problems with client complaints, vendors, training issues, and management issues. Digital marketing campaigns were fulfilled through a person located in Costa Rica who uploaded information to ProData, a PPC digital media vendor.

Later, Ms. Hodgens became Vice President of fulfillment. Ms. Hodgens testified that her goal was "mainly just click-through traffic." She fulfilled campaigns to achieve a certain CTR. She fulfilled all campaigns and sometimes went beyond that at no extra cost to the client. Less than 5% of campaigns were fulfilled by email only.

Ms. Hodgens operated within a budget that drove her activities. Generally, the cost of fulfillment had to be 25% or less of the amount billed to the client.

She testified that, based on working with the Take 5 database to fulfill orders, she found that the quality of data was "really poor." The emails were not double opt-in. Because of the poor data, some of the emails sent in-house would get blocked. Only a "minimal" number of the names to whom to send emails were deliverable. Thus, delivering email in-house did not work "very often."

Ms. Hodgens used vendors occasionally for emails. She used vendors in 90% of campaigns but predominately for PPC traffic. If a vendor sent emails, it did not use Take 5 LLC

data. The use of vendors for email was "minimal." The cost of emails was greater than for PPC traffic.

Ms. Hodgens testified that Take 5 LLC used a "link rotator" to assign a specific number of clicks to a specific link in a client's creative.

Ms. Hodgens testified that reports to clients reflected a number of emails greater than the number sent. Ms. Hodgens attempted to stop the reporting practice but the sales force and the client services department opposed it.

Based on conversations with Mr. Radetich, she testified that he knew about the formulaic reporting, and near the end, he was supportive of fixing it. When Ms. Hodgens learned about the acquisition, she expressed her concerns to Mr. Radetich who said that Advantage was fully aware of the facts and was buying Take 5 LLC for the database.

Ms. Hodgens discussed the terminology used at Take 5 LLC. Digital media included various forms of marketing, but on a majority of orders, it meant email.

 The Take 5 LLC Google Analytics account revealed limited information. The information was "basically a script we put within ours to mirror the click." It provided the existence of a click, the geographical area from where it originated, whether it was desktop or mobile, and sometimes the referring domain. A client could get more information, depending on its setup and whether it included a "UTM tag." She acknowledged that Take 5 LLC worked with pixels but it was "not to deceive clients."

Ms. Hodgens reviewed a large number of documents reflecting orders, fulfillment, invoicing, and reporting.

I find Ms. Hodgens to be a credible witness and that her testimony is consistent with the documents.

<u>Peter Ward</u>

Mr. Ward is a founder of 12 Skies and is currently employed by it. 12 Skies is a software development company. Mr. Ward has 40 years' experience in software development. He has no experience in digital marketing.

In April 2016, 12 Skies contracted with Take 5 LLC to analyze its software applications and to convert its desktop applications, which were connected to a server, to web-based applications. The integrated platform was called the Campaign Management System (CMS). At that time, Mr. Ward was given a code that contained algorithms used to determine the percentage of deployed versus delivered emails, depending on which was the starting point, and the percentage of opens as recorded on a tracking report. The input data was the quantity of emails purchased and the number of clicks received through Google Analytics. CMS used a tool that, when a client provided links in a creative, and the link was saved in the database, the tool would replace the link so that a client would see that the click came from a Take 5 LLC link. While working with Take 5 LLC, he was asked to change and did change the algorithm 2 or 3 times. He simply accepted the algorithms as requested.

I find Mr. Ward to be a credible witness and that his testimony is consistent with the documents.

Paul Brewer

Mr. Brewer, an accountant, began working for Take 5 LLC in March 2017. He reported to Beth Jenkins. In January/February 2018, Cherry Bekaert audited Take 5 LLC's financials. He supplied information to the firm, including invoices, contracts, fulfillment records, and bank records. The auditors also interviewed Ms. Jenkins.

Prima Creel

Ms. Creel is employed at Newsmax as Director of Ad Sales & Agency Services. She has worked with digital marketing for 15 years and with email marketing for 10 years.

Ms. Creel began working for Advantage in the Take 5 business unit in December 2018 as Director of Sales. In her interview by Messrs. Gluck and Radetich, they said Take 5 LLC was an omni-channel marketing company but the main channel was email. They focused on her email marketing background.

Ms. Creel's responsibility was to drive sales and hit goals established by corporate management. Management also wanted the commission structure revised.

Most sales representatives focused on email. Some industries wanted blended campaigns.

Digital media as used at Take 5 LLC was a default. The rest of the description reveals what was being sold.

Retargeting means the tracking of opens and sending a follow up to those who opened.

Generally, email traffic has a higher conversion rate than PPC traffic.

She discussed client complaints and stated that retention of clients was an issue. She reviewed tests that she ran with clients. Ex. A699 and A401. The results appeared to be statistically impossible.

Ms. Creel helped prepare Ex. A551, relating to the transition strategy.

In June 2019, the sales team was told they could not sell email only. They were upset. The Take 5 business unit stopped sending responder files and stopped using email.

Ms. Creel participated in calls to clients, using the prepared script.

Ms. Creel obtained most of her information as to what was ordered from the sales representatives. She has not reviewed a large number of invoices.

Ms. Creel has personal knowledge about some issues, the testing emails, and what was being sold. She has relatively little knowledge of fulfillment. I find that she was a credible witness and that her testimony is consistent with the documents. I gave weight only to her testimony that was based on personal knowledge.

<u>Josh Pike</u>

Mr. Pike is employed by Advantage as Executive Vice President of Strategy & Integration. He has twenty plus years' experience in digital marketing.

Prior to his current position, Mr. Pike started a business within Advantage called Advantage Media. It acted as a media buying support group for other Advantage businesses. In January 2019, Advantage Media was absorbed into Jun Group, which had been acquired by Advantage in the fall of 2018.

Mr. Pike first learned of Take 5 LLC in 2014 or 2015 through Aventis, a sister agency in Advantage that had worked with Take 5 LLC. Mr. Pike spoke to Mr. Radetich and Mike Angelis at Take 5 LLC. They represented that Take 5 LLC was the owner of "a large proprietary set of personally identifiable information, which they could use to deploy targeted e-mail campaigns."

With respect to Advantage's acquisition of Take 5 LLC, Advantage was interested in its personally identifiable information and email capability. Messrs. Radetich and Gluck represented that Take 5 LLC had "200 plus million records," "168 million double opt-in e-mail addresses," and "275 different demographic and lifestyle attributes that were appended" to the records. They also represented that they had in-house e-mail capability and "did all of their e-mail in-house." Email was a "big area of focus" for Advantage.

After the acquisition, Mr. Pike's role was to facilitate the integration and cross-selling of the Take 5 business unit. Following the acquisition, Mr. Radetich remained focused on the database and Mr. Gluck remained focused on business development and sales.

An email from Mr. Radetich in October 2018 indicated that the bulk of Take 5 LLC's business was email and retargeting. Ex. A162.

In July 2018, a whistleblower stated that a high percentage of campaigns were fulfilled by third parties. Messrs. Gluck and Radetich said that the assertion was untrue and that third parties were used in remarketing campaigns, *i.e.* used to remarket from email opens or email interactions.

In February or March 2018, Advantage Media retained Take 5 LLC to run two campaigns. In his testimony, Mr. Pike discussed documents reflecting that Advantage Media ordered email campaigns, Take 5 LLC represented that it delivered email, but it actually used PPC vendors. Mr. Pike did not know that at the time.

Much of the information relating to the issues in this matter was obtained from others in June-July 2019. I find that Mr. Pike was a credible witness and that his testimony was consistent with the documents. I gave weight only to the testimony that was based on personal knowledge.

<u>Dean Kaye</u>

Dean Kaye was called to testify with respect to damages, subject to Take 5's objection.

Dean Kaye is a CPA, employed by Advantage as Chief Financial Officer for North America.

Mr. Kaye was involved in the decision to shut down the Take 5 business unit. He stated the bulk of the business was email and the rest of the business was not worthwhile.

Mr. Kaye discussed the Earn-out formula contained in the APA and concluded that, had the business continued, it was unlikely that any monies would have been earned.

Mr. Kaye testified that Advantage had sustained damages in the amount of the purchase price plus the costs incurred in conducting an investigation, shutting down the business, making refunds, and restating the financial statements. The purchase price funded at closing was $76,343,200 plus a holdback of $770,000. Advantage received $7,700,000 pursuant to its insurance coverage of representations and warranties contained in the APA. The net claim, according to Mr. Kaye, is $69,343,200. Mr. Kaye testified that due diligence damages are $790,919.46; the value of associates time working on Take 5 matters before and after the acquisition is $321,047; the cost of investigation is $1,711,630.72 paid to FTI and $1,534,573.23 paid to L&W; shutdown costs consisting of payments to the landlord of Take 5's office, severance payments to Take 5 employees and payments to those who assisted in the shutdown is $1,069,273.00; refunds paid to Take 5 client is $23,897,890; and the costs of restating financial statements is $918,000. Mr. Kaye credited the above with $4,800,000 in tax savings and claimed total damages in the amount of $94,786,533.41.

I find that Mr. Kaye was a credible witness and have considered his testimony based on personal knowledge.

<u>Mary Jo Benjoseph Deposition Designations</u>

Mary Jo Benjoseph began working at Take 5 LLC as a sales representative in December 2013. Take 5 LLC offered marketing services utilizing email, retargeting, display ads, social media, direct mail, and content. The majority of services consisted of email marketing but later in her employment, the services included social media and retargeting. The majority of services continued to be email.

Tanya Coker was head of client services and was Mr. Radetich's assistant, processing his book of business. Beth Jenkins was part of the executive team and Messrs. Radetich and Gluck's go-to person.

Ms. Benjoseph testified that, generally, clients were satisfied. She was unaware of any misreporting.

There was little interaction between sales and fulfillment.

At times, clients requested targeted marketing and inquired as to the number of consumers meeting certain criteria that Take 5 LLC could identify. Ms. Benjoseph testified at length with respect to the use of formulas to generate and report counts of targeted consumers to clients. Generally, clients were not advised that the counts were generated by formula. Sometimes, Ms. Benjoseph was told that Take 5 LLC did not have enough data to fulfill the

request. She would go back to the client and ask if the client wanted to expand the criteria to a larger group.

I have considered Ms. Benjoseph's testimony that was based on personal knowledge.

### David Johnson Deposition Designations

David Johnson joined Hygienics Data (Hygienics) in 2007. Take 5 LLC became a client of Hygienics in 2008.

Hygienics maintained 3-50 Take 5 LLC's databases. Its primary database was known as Misty. It contained consumer information. Each database or "silo" contained segmented information, *e.g.*, auto owners, auto intenders, weddings, divorces, military, etc. Hygienics used a tool known as Alteryx to standardize the data fields. The databases were not relational. When a request for data was received, Hygienics would use the data in Misty and append data from the relevant silos. The databases were updated separately. Data was acquired on an ongoing basis, at least monthly.

Direct mail addresses were updated quarterly through NCOA (National Change of Address).

Hygienics cleaned the data upon receipt and upon delivery to Take 5 LLC. That consisted of looking at email addresses for proper form and domain. It did not ping the emails.

Take 5 LLC had an opt in website, but it produced very few records. The database of emails contained a field for opt in information. Some fields contained source information.

Mr. Johnson's primary contacts were Mr. Radetich and Ms. Coker. From time to time, Mr. Johnson objected because he thought data was being manipulated. At least part of the response was that Take 5 LLC was using formulas to arrive at certain counts of market segments.

A portion of the emails in Misty were marked as "clean." Sometimes Mr. Johnson was asked to supplement emails marked as clean with other emails.

I have considered Mr. Johnson's testimony that was based on personal knowledge.

### Christopher Brown Deposition Designations

Christopher Brown is a CPA.  In August 2018, he joined FTI as a Senior Managing Director in its forensics and litigation practice. He left FTI in May 2021.

Mr. Brown was involved in advising Advantage with respect to regulatory compliance including issues arising from the Take 5 LLC acquisition. He based his opinion on assumed facts, *i.e.*, that clients were billed and paid for services that were not provided. He did not conduct an accuracy analysis of the underlying facts. Based on the assumed facts, he opined that Take 5 LLC revenue had not been reported in accordance with GAAP (Generally Accepted Accounting Principles).

Mr. Brown participated in ten telephone calls to Take 5 LLC clients and the interviews

conducted by L & W. One of the interviews conducted by L & W was that of Mr. Radetich. Mr. Brown could not recall the exact words used, but in substance, Mr. Radetich admitted that Take 5 LLC was not sending emails and lying about it to clients.

I have considered Mr. Brown's testimony that was based on personal knowledge.

<u>Anna Berry Deposition Designations</u>

Anna Berry is an employee of Ivy Wise. Ivy Wise used Take 5 LLC for marketing over a two-month period. Ms. Berry was impressed with the representation that Take 5 LLC could segment its targeting based on age, income, number of children, and location. Ivy Wise was interested in reaching persons with high income who had children of a certain age.

Ms. Berry testified that email marketing with retargeting was very important. The primary goal was to reach a new audience of leads with some conversions. Conversions meant some type of engagement with Ivy Wise.

After the first email drop and receipt of a tracking report, Ms. Berry was somewhat suspicious based on the fact that the number of clicks did not match Ivy Wise's own tracking through Google Analytics. There were no responses from recipients. The second drop of emails was the same.

After the third drop, there was a large number of responses that Ms. Berry concluded were "fake traffic and fake leads [persons who filled out online forms]." Ms. Berry concluded that Ivy Wise did not get what it had ordered.

Ms. Berry has no personal knowledge as to what Take 5 LLC actually did with respect to the campaigns.

I have considered Ms. Berry's testimony that was based on personal knowledge.

### TAKE 5 MOTION FOR JUDGMENT

After Advantage rested its case, Take 5 moved for judgment in favor of RJV Marketing Corp.; in favor of Messrs. Gluck and Radetich with respect to all non-RICO claims; and in favor of all Take 5 parties with respect to the RICO claim, all on the ground of insufficiency of evidence. The motions were taken under advisement. Take 5 proceeded to offer evidence as follows.

### SUMMARY OF TAKE 5'S WITNESS TESTIMONY

#### <u>Donald Morris</u>

Take 5 called Donald Morris as a witness. Currently, Mr. Morris is managing partner at Audient Co. Messrs. Gluck and Radetich provided the capital to found that company. Mr. Morris began working for Take 5 LLC in July 2010 and he was employed by the business until it was shut down. When he began employment, he was a sales associate. In 2013, he became manager of the sales department. In 2017, Messrs. Gluck and Radetich asked him to focus on existing business relationships and he became chief revenue officer. Approximately 30-40% of Take 5 LLC's client relationships were channel partners, meaning that they, in turn, served their

own clients.

Mr. Morris testified that Take 5 LLC's data was the key ingredient because it had specific audience data that was updated. He created sales manuals to sell the data and not the channel. Mr. Morris described presentations that he made to clients or potential clients, pointing out the data segments that Take 5 LLC had and the core channels that it used, *e.g.*, email, social media, targeted display, and geo fencing. The latter, targeting opt-in consumers, served advertising to them based upon their location; it was a relatively new offering in 2018.

Mr. Morris discussed several Take 5 LLC clients and described them as happy with the services. Some clients, including Epsilon, licensed data, meaning giving them access to the data to use for their own purposes. In June 2019, after a multi-channel presentation to Epsilon, a significant contract was signed to provide digital marketing services. The contract was not implemented because of the shutdown.

Take 5 LLC licensed data to other companies, including Verizon and State Farm.

Mr. Morris testified that most clients tracked their marketing campaigns, many using Google Analytics. The bulk of clients routinely included pixels embedded in a creative which enabled them to track the pixel in their own tracking software.

Mr. Morris accessed the data through ACE, selecting the relevant geographic region and demographics, which created a list. Mr. Morris was unaware of any complaints about the quality of Take 5 LLC's data. Mr. Morris was told that Take 5 LLC's email addresses were double opt-in. He did not have access to the emails.

Mr. Morris was not part of the fulfillment department and had little knowledge with respect to the client services department and the fulfillment of campaigns. There was an invisible wall around operations and fulfillment. He stated that Ms. Hodgens and Mr. Boy would be more knowledgeable about fulfillment.

According to Mr. Morris, Mr. Radetich focused on growing the database, and Mr. Gluck focused on sales.

When Mr. Morris began working for Take 5 LLC, email was predominant. He expressed the view that a multi-channel approach is better, and by 2015-2016, Take 5 LLC had moved in that direction. Less than 10% of Take 5 LLC clients wanted email only. He never represented that Take 5 LLC was an email marketing company.

The retention rate of clients at Take 5 LLC was 95%.

Mr. Morris testified that Audient Co. has not done well because Messrs. Gluck and Radetich were disparaged by Advantage.

Mr. Morris acknowledged that there were instances in which clients complained or expressed concerns. He identified several clients who wanted email only, including local channel partners. He acknowledged that if a client ordered an email campaign, it should have been fulfilled with email. He would have expected Messrs. Gluck and Radetich to understand the operation of the business but not details of specific campaigns.

In 2017-2019, Take 5 LLC was working to be a well-rounded company, offering email, social media, SEO solutions, geofencing, and mobile and content marketing.

I find that Mr. Morris is a credible witness and have considered his testimony that is based on personal knowledge.

Michael Weintraub

Michael Weintraub owns Medicx Health (Medicx). Medicx creates marketing campaigns for clients. It has a proprietary database and also uses third parties for data. Its clients are major pharmaceutical companies. The campaigns target patients and health care providers. Mr. Weintraub met Messrs. Gluck and Radetich 10-12 years ago at a trade show. Medicx was a client of Take 5 LLC for many years. Medicx asked Take 5 LLC to build a database with information related to persons with a particular disease or ailment.

Medicx's clients tracked campaigns with Google Analytics. Take 5 LLC also tracked, using "Clickmeter." They were primarily interested in whether they were getting "the news" to their audience and the cost of doing that. Mr. Weintraub, referring to forms of digital marketing other than email, testified that "clicks don't mean anything."  Neither Medicx nor its clients use pay per click services because the rates are "abysmally low."  The pharmaceutical clients used their own testing system to check on Take 5 LLC's performance. Take 5 LLC conducted surveys and collected opt-in information from those surveys relating to specific diseases or ailments. Take 5 LLC performed well and Medicx clients were happy. Mr. Weintraub has no reason to believe that Take 5 LLC had not provided the services for which it billed. He did not interact with Take 5 LLC on a regular basis. Absent a complaint, he was not particularly concerned about how a campaign was fulfilled. Take 5 LLC was a substantial help in obtaining and maintaining Pfizer as a client.

Medicx also licensed data from Take 5 LLC. Medicx continued to use Take 5 LLC until the business was shut down. When Take 5 LLC shut down, Medicx lost Pfizer and other clients.

Mr. McGavran told Mr. Weintraub that Messrs. Gluck and Radetich had deceived and duped clients. Mr. Weintraub was bewildered because Medicx had had tremendous success.

I find that Mr. Weintraub was a credible witness and have considered his testimony that is based on personal knowledge.

Mark Adams

In 2015, Mark Adams began employment at Take 5 LLC in sales. At that time, Mr. Morris was head of sales. Take 5 LLC evolved from being "email heavy" in 2015 to providing full service digital marketing. From 2016-2018, Mr. Adams continued as head of sales. In 2018, Ms. Creel became head of sales. Mr. Adams was employed by the Take 5 business unit until it was shut down in July 2019.

Mr. Adams worked with several large clients. He testified that they did their own tracking of campaigns. As head of sales, he trained sales representatives and, in doing so,

stressed omni channels. Take 5 LLC was heavy in email marketing but the market changed with the increase in social media and there was a greater emphasis on other channels from 2016 on.

Mr. Adams was not involved in fulfilling orders.

The retention rate of existing clients was 70-80%, and the retention rate of new clients was about 50%. Retention was more difficult if the client was measuring success by actual sales.

Mr. Adams testified that Ms. Creel told the sales team, in early 2019, that they could not sell email only campaigns anymore and they could sell only what the Take 5 business unit could deploy. The seasoned sales representatives were upset. The representatives were upset with Ms. Creel's approach because she was "out for herself."

Mr. Adams discussed Ex. A551A, the June 2019 spreadsheet. It showed that 94 clients were email only. With respect to clients for whom he was the contact, he disagreed with the description of some as email only.

Mr. Adams testified that there were complaints from clients. Client retention was a problem with new clients. They were able to retain them if traffic/brand awareness was the goal, not conversions.

Mr. Adams worked for Audient Co. for a period of time after the shut-down.

I find that Mr. Adams was a credible witness and have considered his testimony that is based on personal knowledge.

<u>Erik Findeisen</u>

Erik Findeisen is Chief Executive Officer of FC Data Services, a data brokerage company, brokering data to end users and resellers. He identified several companies as large sellers of data. He said he was always looking for asset owners. He met Mr. Radetich in 2010. He had heard good things about him. He understood that Take 5 LLC was a "data aggregator." He was interested in Take 5 LLC as an email supplier.

Mr. Findeison's company had a long-term contract with Infogroup, a large data provider. Mr. Findeisen brokered the licensing of data from Take 5 LLC to Infogroup. Infogroup had specific quality requirements and it tested the data. Mr. Findeisen was not involved in that process. The licensing continued until the shut-down. There were no complaints.

Mr. Findeison was not involved in Take 5 LLC's digital advertising campaigns.

I find that Mr. Findeison was a credible witness and have considered his testimony that is based on personal knowledge.

<u>Robert Quadrino</u>

Mr. Quadrino worked as an independent contractor. At some point in time, he met Mr. Gluck, and shortly thereafter, Mr. Radetich. Mr. Quadrino used Take 5 LLC to run a marketing

campaign for one of his clients, namely, City Cadillac. It ran monthly campaigns thereafter. The client was happy with the results.

In or about 2014, Mr. Quadrino began working with Take 5 LLC as an independent contractor. In the Spring of 2016, Mr. Quadrino became employed by Take 5 LLC. He was involved in opening Take 5 LLC's New York office and was Vice President of Sales and Operations in that office. City Cadillac remained a client.

The New York office conducted sales and training, not fulfillment. When Mr. Boy succeeded Ms. Hodgens, Mr. Quadrino's relationship with fulfillment deteriorated. He described Mr. Boy as "arrogant." In or about 2017, Mr. Quadrino stepped down as Vice President because it was more lucrative to focus on his own book of business. Mr. Quadrino's business was largely motor vehicle oriented. He continued his relationship with Take 5 LLC as an independent contractor.

In 2019, Take 5 business unit clients advised Mr. Quadrino that it had shut down. He was embarrassed. The clients were happy before that. After the shut-down, the clients did not trust Mr. Quadrino. He moved to the film, TV, and stage production business.

I find that Mr. Quadrino was a credible witness and have considered his testimony that is based on personal knowledge.

### David McCoy

Currently, David McCoy works for Audient Co. as a sales representative. He met Messrs. Gluck and Radetich in or about 2008. At that time, he was employed by a company that was cleaning emails for Take 5 LLC. He began working for Take 5 LLC as a sales representative in 2012. Mr. McCoy worked with larger enterprise clients. Mr. McCoy testified that, through the enterprise clients, Take 5 LLC often got business from the clients of those clients. He cited Neustar and Verizon as examples. He testified that the enterprise business was thriving at the time the business was shut down. Take 5 LLC received few complaints. Mr. McCoy did not work in Take 5 LLC's fulfillment department.

With respect to tracking campaigns by clients, a topic both parties have addressed, he testified that the enterprise clients would "take our report, take it off our paper, put it onto their paper with their logo, their heading and all that sort of thing, and then it would be sent back to their client." He also testified that: "I'm sure they looked at the numbers. No one ever questioned our report."

After the purchase of Take 5 LLC by Advantage, there was no personalization. Ms. Creel tried to redo the sales structure but she lacked people skills and experience. Mr. McCoy testified that the Advantage people did not understand Take 5 LLC's business. The clients were very upset by the shut-down and barely speak to him. He also stated that Messrs. Gluck and Radetich were disparaged by Advantage.

I find that Mr. McCoy was a credible witness and have considered his testimony that is based on personal knowledge.

<u>Jeffrey Baliban</u>

Jeffrey Baliban, an expert witness, was retained to rebut Dr. Lasater's testimony and to calculate the amount of the Earn-out claimed by the Take 5 parties. Mr. Baliban is a CPA who has been valuing businesses for 40 years.

Mr. Baliban challenged Dr. Lasater's findings and methodology and explained that he had not given enough credence to the entire factual picture but accepted certain assumptions as true. Mr. Baliban stated that, under GAAP principles, a business should not recognize revenue if it did not satisfy its performance obligations to its clients. In the context of whether Take 5 LLC's entire revenue should have been written-off, Dr. Lasater should have examined the bigger picture. That should have included the use of third-party vendors, and an exploration of how Take 5 LLC could have operated for so many years without serious complaints. He pointed out that Take 5 LLC did not have an issue with bad debt. Thus, according to Mr. Baliban, Dr. Lasater's opinion should not be considered conclusive. Mr. Baliban was not asked to opine on how he would have changed Dr. Lasater's sampling.

Using the APA formula for earnout, and using data through September 2017 and assumptions, Mr. Baliban opined that the Earn-out amount would have been $26,900,000.

Mr. Baliban was a credible qualified expert. The thrust of this testimony was to challenge conclusions reached by Advantage's experts. As stated above and explained below, I relied primarily on first level fact witnesses and documents for findings relating to Take 5 LLC's practices, before and after acquisition, including a determination of what was ordered by a client, supplied, and reported. The practices included the difficulties in working with Take 5 LLC's database, in-house capabilities, use of vendors, and reporting to clients. Given the conclusions reached herein, the testimony relating to the Earn-out is immaterial.

<u>David Noderer</u>

David Noderer, an expert witness, has been involved in software development for 30 years. Mr. Noderer was retained on October 1, 2021. He performed a deliverability analysis of the Take 5 LLC data using a service known as Kickbox. At that time, the data was two years old and stale. He did not know what cleaning (removing bad addresses) and pinging (checking for deliverability) had been performed prior to shutdown. Using algorithms, he selected and tested 105,000 emails, tied to major domains because they were more likely to be valid. The results are in Ex. T219. He disagreed with Mr. Kalat and testified that all emails contained some evidence of being opt-ins. *See* Ex. T223. He testified that there was evidence of double opt-ins based on information obtained from Mr. Radetich and the fact that many email addresses had multiple sources listed.

Mr. Noderer was a credible qualified expert. I considered his testimony that was based on his examination of data and opinions that had a sufficient basis.

<u>Brian Stevens Video Deposition</u>

Brian Stevens is Chief Financial Officer and Chief Operating Officer of Advantage. Called by Take 5 as an adverse witness, he testified that Advantage attempted to go public in

2017. The effort was aborted because Advantage lost its preferred customer status with Walmart, resulting in a decline in revenue. Take 5 LLC was one of several acquisitions that were explored in the same time period. The revenue from Take 5 LLC was "significant," not "material." He stated Advantage did not acquire Take 5 LLC to boost revenue in anticipation of an IPO. He understood that Take 5 LLC was primarily an email marketing company.

The Take 5 business unit was shut down based on a conclusion that it did not deliver the emails that it sold and its reports to clients were based on algorithms and not actual delivery of product. The conclusions were based on information received from FTI and L&W.

Mr. Stevens was a credible witness and I have considered his testimony.

Tanya Domier Video Deposition

Tanya Domier is the Chief Executive Officer of Advantage. As was the case with Mr. Stevens, Ms. Domier, called by Take 5 as an adverse witness, had little knowledge other than what she was told relating to the acquisition and shutdown. With respect to the former, she understood that Take 5 LLC was acquired to get email marketing. With respect to the latter, she testified that she was informed that only a small percentage of emails sole were delivered and that reporting to clients was based on algorithms. Ms. Domier characterized what she learned as both misrepresentation and an ethical violation.

Ms. Domier testified that clients and Advantage associates were told that the business was fraudulent. The refund of money was based on a moral high ground. The decision to shut down harmed Advantage because it owned the Take 5 business unit at the time and had been engaged in improper activities.

Before the Take 5 LLC acquisition, Advantage had decided to go public and an IPO was planned. It did not occur because Amazon purchased Whole Foods, and Walmart, a major client of Advantage, moved its business. She also testified that Take 5 LLC revenue was important but was not the driver for the IPO.

Ms. Domier was a credible witness and I have considered her testimony.

Jonathan Hochman

Jonathan Hochman, an expert witness, has a background in computer science and internet services, including marketing and cybersecurity.

Mr. Hochman viewed Take 5 LLC websites that existed before the acquisition. He noted that Take 5 LLC marketed itself as an omni-channel company. On its website in January 2019, after the acquisition, it listed new products, including geofencing.

Mr. Hochman rebutted Mr. Kalat's testimony. Mr. Hochman testified that, in analyzing the database, Mr. Kalat used the wrong methodology. In addition, the database was stale. The Take 5 LLC database, although not a relational database, was still a database. He also rebutted other opinions expressed by Mr. Kalat. He did not analyze the Take 5 LLC database.

He also criticized the process employed by Mr. Wei. Most of the criticism was directed

at what was not done. Mr. Hochman testified that, if he were doing the investigation, he would want information relating to vendors and would have explored other sources of information. He could not verify whether the problems at Take 5 LLC, as described by certain employees, were true or false. He did not conduct his own investigation.

Mr. Hochman testified that "open rates" are not a key indicator of success of an email marketing campaign. He also opined that the use of algorithms is not necessarily wrong. He did not know the origin of the Take 5 algorithms used by Take 5 LLC. Customers have "long done their own attribution." Mr. Hochman opined that the relative quality of email versus pay per click traffic depends on the application.

Mr. Hochman was a credible qualified expert and I have considered his testimony that was based on personal knowledge and opinions that had a sufficient basis.

Jessie Stricchiola

Jessie Stricchiola testified as an expert witness in various areas, including search engine optimization, web analytics, digital marketing, and PPC traffic.

With respect to Take 5 LLC's business, Ms. Stricchiola understood that it provided tracking URLs that were hosted on ad servers. A user clicking on the link would be directed to the client's website. Take 5 LLC tracked clicks to those links through the ad servers and Google Analytics. She explained that the ad servers tracked the number of clicks whereas Google Analytics tracked the number of sessions. A session occurs when a user clicks on a link more than once within a relatively short period of time. The user's behavior after the click would be determined by the client through whatever system the client was using. Ms. Stricchiola testified that, in her experience, most businesses used Google Analytics as their tracking mechanism. Take 5 LLC's Google Analytics data was pulled into its Campaign Management System (CMS) and the data was used to generate Take 5 LLC reports.

If a tracking URL is configured to show that a click on it came from an email, it will show up in Google Analytics as an email. If one wants to determine whether the click actually came from an email, one would have to look at the source data, *i.e.,* the "referral path."

Ms. Stricchiola criticized Advantage for not reviewing Take 5 LLC's Google Analytics data and not reviewing whatever referral information was available. She explained that the information would help inform the analysis of where a click on a tracking URL actually came from.

With respect to the question whether the clicks that occurred came from emails, she could not determine that without the source data.

A client may or may not get source data. It is likely that a client would see that the click came from a Take 5 LLC URL.

Ms. Stricchiola was a credible qualified expert and I have considered her testimony that was based on personal knowledge and opinions that had a sufficient basis.

**LIABILITY: ANALYSIS, FINDINGS, AND CONCLUSIONS**

The APA provides that disputes between the parties are subject to binding arbitration. It also provides that (1) Delaware law governs and (2) the scope of and procedure for discovery is governed by the Federal Rules of Civil Procedure. It does not refer expressly to a code of evidence but the reference to Delaware law, although usually intended to mean substantive law, could be read as including Delaware evidence law. APA sections 10.11 and 10.12.

There are hundreds of exhibits, most of which were reviewed during witnesses' testimony. In making the findings and reaching the conclusions expressed in this Interim Award, I have reviewed and considered all admissible, relevant, and material evidence including evidence that is not expressly referenced herein. A more detailed recitation of testimony and the content of exhibits with citations would unduly increase the length of this award and the cost to the parties.

### 1. Advantage: Fraud and Breach of Contract by Take 5

Advantage argues that Take 5 committed fraud and breached the APA.

> To state a claim for [or prove] fraud or fraudulent inducement a plaintiff must well plead the following elements:
>
>> (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.
>
> The first element of fraud, a "false representation" can take several forms, including: an "overt misrepresentation (*i.e.* a lie), a deliberate concealment of material facts, or else silence in the face of a duty to speak."

*Shareholder Representative Services, LLC v. Albertsons Companies, Inc.*, 2021WL 2311455 at *10-11 (Ct. Ch. Del.) (Quoting *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829 at *32 (Del. Ch. 2018) (Footnotes omitted).

The following quotes are relevant to the element of reliance.

> Th[e] reliance element of fraud has several facets. As an initial matter, the plaintiff must have actually relied. For example, "a party who gains actual knowledge of the falsity of a representation, structures a contract to address the risk of loss associated with the false representation, and proceeds to closing cannot claim justifiable reliance." This Court sometimes explicitly separates from justifiable reliance the requirement that reliance be reasonable. A plaintiff's diligence efforts can be evidence that her

> reliance on a false representation was reasonable because she made efforts to verify the representation and discovered no reason to doubt its truth. The fact that a plaintiff's diligence efforts do not uncover fraud does not render such efforts unreasonable, especially when the fraud was intentionally hidden. Whether reliance is justifiable is an objective standard. In addition to being reasonable, justifiable reliance also "requires that the representations relied upon involve matters which a reasonable person would consider important in determining his course of action in the transaction in question." In other words, a plaintiff can be said to "rely" on a matter only when it is material to the action she takes, or from which she forbears. For such a reliance to be actionable, the inducing "representation must not only be material, but must concern 'an essential part of the transaction.' "

*Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *33 (Del. Ch. 2018) (Footnotes omitted).

> As discussed *supra,* Plaintiffs conducted extensive due diligence on Crombie. They checked references from ten of Crombie's former clients and colleagues, extensively interviewed Crombie himself, and received two supposedly independently verified reports from accounting firms, as well as a clean background check by Kroll. Plaintiffs also searched industry databases for negative regulatory events relating to Crombie and performed testing on Crombie's program before starting Paron. Everyone they talked to, including mutual acquaintances they shared with Crombie, gave positive reviews of Crombie and none of the third-party verifiers Plaintiffs hired raised any red flags regarding him. Based on the extent of their due diligence, I find that Plaintiffs acted reasonably in investigating Crombie and were simply the victims of Crombie's deceit, as well as some bad luck, bad timing, and, perhaps, third-party failures. Therefore, I find that Plaintiffs justifiably relied on Crombie's fraudulent representations.

*Paron Cap. Mgmt., LLC v. Crombie*, 2012 WL 2045857, at *7 (Del. Ch. 2012), *aff'd,* 62 A.3d 1223 (Del. 2013).

Assuming the other elements are met, fraud may be based on a knowing contractual misrepresentation of a representation or warranty contained in the APA, *see Auschutz Corp. v. Brown Robin Capital, LLC*, 2020 WL 3096744 Del. Ch. 2020), or a misrepresentation of fact independent of the APA. With respect to contractual representations, the parties negotiated risk allocation as part of the APA. Take 5 made certain representations and warranties and Advantage was entitled to rely on them. Advantage expressly excluded fraud from any limitation on its right to rely on the representations and warranties and other representations of fact made prior to signing of the APA. *See* APA, §8.5(g) ("Notwithstanding anything in this Agreement to the

contrary, the provisions of this Article VIII shall not apply to, prevent or limit any Parties recovery, or right to seek recovery, for Damages arising out of, relating to directly or indirectly, any Fraud or willful misconduct of a Party."). See *Cobalt Operating, LLC v. James Crystal Enterprises, LLC*, 2007 WL 2142926 at *28 (Ct. Ch. Del.) ("By obtaining the representations it did, Cobalt placed the risk that WRMF's financial statements were false and that WRMF was operating in an illegal manner on Crystal. Its need then, as a practical business matter, to independently verify those things was lessened because it had the assurance of legal recourse against Crystal in the event the representations turned out to be false.").

Section 10.7 of the APA contains an integration provision. In addition, in §4.6, Advantage agreed that Take 5 made no representations and warranties and Advantage did not rely upon any representations or warranties except for those contained in the APA. These provisions do not bar fraud claims. As the Delaware Court of Chancery explained:

> Defendants next contend that Plaintiffs' fraud claim is barred by the EPA's anti-reliance provision in Section 5.6. Delaware courts enforce clear anti-reliance provisions. "[A] party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim." "To be effective, a contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." Such provisions must "identify the specific information on which a party has relied and which foreclose reliance on other information." To be effective against fraud claims, a disclaimer must unambiguously "ensure the preclusion of fraud claims for extra-contractual statements."
>
> Here, Section 5.6 cannot operate to bar Plaintiffs' fraud claim because it does not unambiguously disclaim reliance on extracontractual statements in the event of fraud. To the contrary: Section 5.6 expressly excludes fraud from its purview. Plaintiffs agreed that, when entering into the EPA, they relied only upon their "own investigation and the express representations and warranties set forth in Article III and Article IV, *except in the case of fraud.*"

*Partners & Simons, Inc. v. Sandbox Acquisitions, LLC*, 2021 WL 3159883, at *6–7 (Del. Ch. 2021) (footnotes omitted). In the instant proceeding, the APA expressly excepted fraud.

Advantage argues that Take 5 fraudulently breached the following representations and warranties in Article II of the APA, giving rise to indemnification claims under Article VIII of the APA.

Article II of the APA contains representations and warranties by the "Company." The "Company" is identified as "Take 5 Media Group, LLC." "Company" includes "Seller Related Parties" unless otherwise specified or it is apparent form the context. The "Seller Related Parties" are identified on Schedule A 1. The "Seller Related Parties" are not parties in this proceeding. Thus, the warranties in Article II are those of Take 5 LLC.

Article II, section 2.5(a) relates to Take 5 LLC's 2016 and 2017 financial statements and accounts receivable. Take 5 LLC represented that its 2016 and 2017 financial statements (1) were prepared in accordance with the books and records of Take 5 LLC; (2) were "true and correct and present fairly in all material respects the financial condition and results of operations" of Take 5 LLC; and (3) with an exception not relevant, the 2017 audited financial statements were prepared in accordance with GAAP.

In Article II, section 2.5(b), Take 5 LLC represented that its accounts receivable arose from "valid sales actually made or services actually performed in the ordinary course of business." It further represented that no portion of the accounts receivable were subject to setoff, counterclaims, or defenses.

In Article II, section 2.10(a), Take 5 LLC represented that it held all right, title, and interest in all of the intellectual property that was "necessary for, or used or held for use in, the conduct" of its business.

In Article II, section 2.11(b), Take 5 LLC represented that, since January 1, 2015, it had been in compliance "in all material respects with the applicable Laws and all Governmental Authorizations in connection with the conduct, ownership, use, occupancy or operation" of its business.

As defined in the APA, "Law" means "any applicable statute, law, rule, regulation, ordinance, or Order of a Governmental Authority…."

Article VIII, section 8.2 provides that Take 5 LLC and the "Beneficial Owners" shall indemnify Advantage from all Damages, *inter alia*, arising out of any breach of representations and warranties in Article II; breach of any covenant or agreement contained in the APA by Take 5 LLC or the Beneficial Owners; and breach of any covenant or agreement contained in the APA by the Beneficial Owners Representative, defined as Mr. Radetich. "Beneficial Owners" are identified as RJV Marketing Corporation and Messrs. Gluck and Radetich.

Article VIII, Section 8.3(a), (e), (h), and (i) provide that, absent "Fraud or willful misconduct," the above duty to indemnify the buyer is subject to specified limitations.

As defined in the APA, "Fraud" means "an intentional misrepresentation of an existing fact made with actual knowledge of its falsity and for the purpose of inducing the other Person to act, and upon which the other Person relies with resulting injury or damage."

In making findings and reaching conclusions, as stated above, I am relying primarily on the testimony of individuals with personal knowledge of first level facts, notably Take 5 LLC employees who were employed prior to the acquisition and in some instances after the acquisition, and business records, especially those reflecting personal knowledge of the author, and those

containing statements by and evidence of conversations with Messrs. Gluck and Radetich.

I find the following. Prior to the acquisition, Advantage wanted email capability as represented by Take 5. It made that known to Take 5, including Messrs. Gluck and Radetich. Also prior to the acquisition, Take 5, including Messrs. Gluck and Radetich, knowingly misrepresented to Advantage the following with the intent to induce its reliance: (1) the nature and quality of Take 5 LLC's database of email addresses, demographic overlay, and other data; (2) Take 5 LLC's in-house capability to send large numbers of targeted emails as part of advertising campaigns; and (3) that it had deployed/delivered emails for which it had billed clients and received payment when it had not done so. I further find that Advantage justifiably relied on the misrepresentations and that Advantage was harmed.

Messrs. Gluck and Radetich participated in the misrepresentations in part and had knowledge of other misrepresentations by representatives of Take 5 LLC. The knowledge is revealed in testimony and, *inter alia*, many email communications.  The misrepresentations were substantial in number and were material to Advantage's reliance and decision to purchase.

As Take 5 argues, Take 5 LLC marketed itself as an omni channel company. However, the evidence supports the finding that Take 5 LLC primarily sold email marketing services and that it sold such services beyond its capacity to deliver them. Take 5 maintains that the term "digital media" was not always used synonymously with email. Detail in the documents and the testimony by employees supports the finding that Take 5 LLC primarily sold email marketing services. Take 5 emphasizes that it employed the services of third-party vendors; but the evidence supports the finding that the third-party vendors did not supply email marketing nearly to the extent that was ordered or reported to clients. Campaigns were fulfilled but, in material and substantial part, not as ordered and represented.

With respect to reporting to clients, some of the data reported was based on algorithms. Take 5 argues that there is nothing wrong with that. The evidence does not persuasively establish the basis for the algorithms that were used. Even if there were an acceptable basis for the algorithms, it does not account for the lack of disclosure of the use of algorithms and the consequent representation that actual metrics were being reported. With respect to Advantage, Take 5 LLC's and Messrs. Gluck and Radetich's representations to it, *e.g.*, as part of the CIM and presentation of management, were that results were reported to clients. The factual implication was that reporting was based on accurate metrics.

Take 5's entire business was not based on fraud, however. Rather, fraudulent activity with respect to clients occurred in certain aspects of its business and with respect to certain clients. I cannot conclude to what extent that activity constituted fraud that would have been actionable if pursued by clients. By actionable, I mean that, with the exception of a few clients, I cannot determine questions of knowledge, consent, reliance, causation, or actual harm with respect to a specific number of clients. During the time period covered by the evidence, Take 5 was engaged in thousands of marketing campaigns. The evidence of detail relating to specific clients/campaigns was limited to a small fraction of the total number of clients and campaigns. There is evidence that some clients did not know what Take 5 actually did and that those facts were material and important to them. There is evidence that some clients may have or in fact did

know what Take 5 actually did and did not object. There is evidence that some clients were happy with the return on investment or, at least, with the services rendered. Some of those responses can be explained by the nature of the service rendered or the goal of a particular client. For example, some clients were primarily interested in increasing consumer awareness of a particular product or service, as distinguished from making a sale in the short term. Some clients licensed data from Take 5 LLC as distinguished from ordering email marketing directed to market segments, *e.g.*, age, location, marital or parental status, and others. The data licensing component of Take 5 LLC's business is not part of the fraud/breach of contract allegations in this matter.

Therefore, with respect to fraud on clients, I cannot find from the evidence that Take 5 LLC and Messrs. Gluck and Radetich misrepresented material facts to all clients or to any specific number of clients and, in addition, that they were actionable by specific clients. That does not change the fact that misrepresentations occurred and, at least in many instances, were made without the knowledge of the client.

Actionable misrepresentations to specific clients is different from actionable misrepresentations made to Advantage on which Advantage relied. Even if Take 5's actions were not fraudulent as to all clients, the evidence supports the finding that Advantage was defrauded by misrepresentations as stated above. The misrepresentations are material as to Advantage. Again, the evidence from hands-on employees is persuasive proof that the practices of Take 5 were sufficiently widespread to constitute fraud as to Advantage, as found herein.

 Messrs. Gluck and Radetich were very much involved in the operations of Take 5 LLC, Mr. Gluck primarily in sales, and Mr. Radetich primarily with the database, both before and during the acquisition. They were not hands off investors. The evidence supports a finding that they knew how the campaigns were sold, fulfilled, and reported. The evidence demonstrates that they had actual knowledge of Take 5 LLC's business practices generally and the details of many campaigns.

As explained above, Take 5 LLC and Messrs. Gluck and Radetich knowingly misrepresented material facts to Advantage with the intention of having Advantage rely on them. Advantage justifiably relied on the misrepresentations. Given the parties' understanding respecting Advantage's intended use of the assets, Advantage suffered harm in that the value of the assets was materially less than the value would have been had the facts been as represented. Take 5 LLC's database and email capability were not as represented. The reporting practices were not accurate or transparent in many instances.  Advantage was not told about inaccurate reporting but it is less clear as to what specific clients knew and wanted. Thus, Advantage has proved a claim for fraud and breach of contract as to itself.

 Applying the above findings, I conclude that Take 5, including Messrs. Gluck and Radetich, committed civil fraud in connection with the sale of the Take 5 business to Advantage based on a knowing misrepresentation of the warranties.

I conclude that they, along with RJV Marketing, breached Article II, §§ 2.5 (a) and (b), §2.10(a), and 2.11(b) and Article VIII, § 8.2.  With respect to §2.5(a) and (b), GAAP principles

were not satisfied because emails were not sent but were paid for. The same is true for accounts receivable. Again, I cannot quantify that, except that it was substantial and material with respect to Advantage. With respect to §2.10(a), the database was inadequate for the conduct of the email marketing business. With respect to §2.11(b), aside from any mail fraud violations, discussed below, Take 5 LLC violated 11 Del. C. §906(2) ("A person is guilty of deceptive business practices when in the course of business the person knowingly or recklessly: (2) sells, offers or exposes for sale, or delivers less than the represented quantity of any commodity or service…."). With respect to RJV Marketing, under Article VIII, section 8.2, it owes a duty to indemnify Advantage for Take 5 LLC's breach of warranties even if it did not commit fraud. There is no limitation on damages because of the finding of fraud.

I further conclude that, in addition to fraudulent breaches of contractual representations and warranties, misrepresentations of fact before the acquisition by Take 5, with the intent to induce reliance by Advantage, constitute fraud independent of the APA.

I am not persuaded that the evidence supports a finding that Advantage has a claim of actionable fraud that occurred after the acquisition. The continuing fraud allegations in the counterclaim are against all Take 5 parties. Messrs. Gluck and Radetich are not "sued" as employees of Advantage, the employer, for breach of employment duties. The allegations and the proof of liability and damages relate to the acquisition, not to an employee's liability to the employer for damages or indemnity.

The Take 5 business unit was owned by Advantage. The employees were employees of Advantage. Some were former employees of Take 5 LLC and some were not. Neither Take 5 LLC nor RJV Marketing were involved in the operation of the Take 5 business unit. Messrs. Gluck and Radetich were employed by Advantage and worked in the Take 5 business unit. The employees in the Take 5 business unit, including Messrs. Gluck and Radetich, were subject to the supervisory authority of Advantage corporate management.

In light of the conclusions discussed herein, there is no need to address Advantage's claim for breach of the implied covenant of good faith and fair dealing.

## 2. Advantage: RICO Violation by Take 5

Advantage argues that the evidence supports a finding that Take 5 committed actionable RICO violations and, consequently, claims treble damages. The RICO statute, 18 U.S.C. § 1962(c), provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In order to prove a violation, Advantage must prove a pattern of racketeering activity.

*Yucaipa American Alliance Fund I, L.P. v. Ehrlich*, 204 F. Supp. 3d 765, 774 (D. Del. 2016).

Racketeering activity includes a series of predicate acts, including mail and wire fraud. 18 U.S.C. §1961(1). The elements of mail or wire fraud are a scheme to defraud with the intent to defraud while using mail and/or wires that resulted or would result in loss of money, property or deprivation of honest services.18 U.S.C. §§1341,1343, and 1346. The racketeering predicates must be related and pose a threat of continued criminal activity. *H.J., Inc. v. New Bell Telephone Co*., 492 U.S. 229, 237 (1989); *Yucaipa Am. All. Fund I, L.P.,* 204 F. Supp. at 779.

> The [RICO] statute also enumerates the offenses which constitute "racketeering activity," including crimes that have traditionally been associated with the transgressions of racketeers: murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, and dealing in narcotic or other dangerous drugs. 18 U.S.C. § 1961(1). The statutory enumeration is, however, expansive and goes on to include specific federal offenses which, although they may often be committed by those whom we would categorize as "racketeers," also fall into the category of common law or "garden variety" fraud and which would, in the past, have been the subject of commercial litigation under state law. Among these broadly delineated federal offenses are mail fraud and wire fraud.[15] These offenses are the ones that many consider to be the most troublesome as RICO predicate acts. The inclusion within the scope of civil RICO of these types of fraud, more prevalent in the commercial world than in the world of racketeers, has caused concern that RICO sweeps too broad a swathe. *See, e.g.,* Note, *Civil RICO: The Temptation and Impropriety of Judicial Restriction,* 95 Harv.L.Rev. 1101, 1105 (1982) ( "Given the prevalence of mail and wire use in commercial transactions, RICO's provision for a private cause of action predicated on violations of the mail and wire fraud statutes virtually federalizes common law fraud").

*Tabas v. Tabas*, 47 F.3d 1280, 1290 (3d Cir. 1995).

> Congress' intent in enacting the RICO statute was to combat "long-term criminal conduct" and the "danger posed by organized crime-type offenses." *Hughes v. Consol–Penn. Coal Co.*, 945 F.2d 594, 611 (3d Cir.1991) (internal quotations and citations omitted). Careful scrutiny of such claims is appropriate because of the "relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Kolar v. Preferred Real Estate Investments, Inc.*, 361 Fed.Appx. 354, 363 (3d Cir.2010) (internal citations omitted)). RICO claims should be viewed with scrutiny to ensure that "only those purported RICO claims which truly fit within the intent of

the statute will proceed." *O'Malley v. BancAmerica Commercial Corp.*, 1992 WL 81394, *4 (E.D.Pa. Apr. 17, 1992).

*Yucaipa Am. All. Fund I, L.P.*, 204 F. Supp. at 775.

A pattern of racketeering activity requires that the predicate acts are related and continuous. Continuity may be open-ended or close-ended. *H.J., Inc.,* 492 U.S. at 241.

> At the outset, we note that in civil RICO complaints based on
> predicate acts of mail fraud
> > the continuity test requires us to look beyond the
> > mailings and examine the underlying scheme or
> > artifice. Although the mailing is the actual criminal
> > act, the instances of deceit constituting the
> > underlying fraudulent scheme are more relevant to
> > the continuity analysis.

*Tabas,* 47 F.3d 1280 at1294 (quoting *Kehr Packages v. Fidelcor, Inc.*, 926 F. 2d 1406, 1414 (3rd. Cir. 1991).

Various circuits have structured guidelines for determining whether a pattern of racketeering activity has been established. Courts are not uniform in their approach or perhaps in result.

> In the Third Circuit, for instance, in *Barticheck v. Fidelity Union
> Bank/First Nat'l State,* 832 F.2d 36 (3d Cir.1987), we rejected the
> district court's requirement in that case that there be two or more
> unlawful schemes, and we then set forth six factors to be used in
> determining whether a pattern of racketeering activity has
> been established in a given case. These factors are: (1) the number
> of unlawful acts; (2) the length of time over which the acts were
> committed; (3) the similarity of the acts; (4) the number of victims;
> (5) the number of perpetrators; and (6) the character of the
> unlawful activity. *Id.* at 39.

*Tabas,* 47 F.3d 1280 at1292.

> The limits of the relationship and continuity concepts that combine
> to define a RICO pattern, and the precise methods by which
> relatedness and continuity or its threat may be proved, cannot be
> fixed in advance with such clarity that it will always be apparent
> whether in a particular case a "pattern of racketeering activity"
> exists.

*H.J., Inc*., 492 U.S. at 243. Thus, when determining whether "relatedness" or "continuity" has been proven, it is appropriate to use a fact-oriented, case-by-case approach to determine whether there is a "pattern of racketeering activity." *Tabas,* 7 F.3d at 1296.

Advantage must also prove that Take 5's RICO violation was the proximate cause of its damages. *Holmes v. Sec. Inv. Prot. Corp*., 503 U.S. 258, 268 (1992).

Despite concern expressed by some about the breadth of the RICO statute, its language indeed is broad and, under appropriate circumstance, reaches otherwise legitimate enterprises that have conducted  business  through illegal means, not just organized crime enterprises.

The analysis of liability vis a vis Take 5 LLC's clients is different from the analysis with respect to Advantage. With respect to the email component of Take 5 LLC's business, I have found actionable fraud as to Advantage. I have found that Take 5's conduct of business included illegal activity but it was not always so. There were services rendered that were proper and services rendered that, even if unlawful, produced value to the client. Likely, there were instances of mail fraud as to Advantage's business units that were clients of Take 5 LLC and also as to some other clients. I cannot quantify the degree to which clients were defrauded in an actionable sense, meaning a consideration of all elements of potential causes of action.

I conclude that this is not a case that fits within the design and purpose of the RICO statute, even under the relatively broad interpretation by the Third Circuit. Moreover, there is no threat of continuing fraudulent activity. The business was shut down in July 2019 and no lawsuits have been filed. Even before Take 5 was shut down, Advantage took steps to change the business practices. See *H.J. Inc.*, 492 U.S. 229 at 237. I recognize that in and of itself, that is not a defense to a RICO action. It is relevant, however.

### 3. Take 5:  Breach of Contract and Defamation by Advantage

Take 5 materially breached the APA.  Thus, its claims based on the APA are denied. *Biolife Solutions, Inc. v. Endocare, Inc*., 838 A.2d 268, 278 (Del. Chg. 2003). (A party is excused from performance if the other party materially breaches the contract.) When an alleged defamatory statement is not false, it is not actionable.  *See Holmes v. The News Journal Co*, 2015 WL 1893150 at *2 (Del. Super. 2015), *aff'd* 126 A. 3d 1109 (Del. 2015). In light of the finding of fraud, Messrs. Gluck and Radetich's claims for defamation are denied.

### DAMAGES

Advantage seeks damages in the amount of the purchase price paid plus consequential damages. An appropriate measure of the non-consequential damages is the difference between the purchase price and the actual value at the time of the sale of the Take 5 LLC assets. *Cobalt Operating, LLC v. James Crystal Enterprises, LLC,* 2007 WL 2142926 at *4 (Ct. Ch. Del.). This is true under either a contract or tort analysis. *See Cinerama, Inc. v. Technicolor, Inc*., 663 A.2d 1134 (Del. Ch. 1994) and *Paron Capital Management, LLC v. Crombie*, 2012 WL 2045857 at *8 (Ct. Ch. Del.2012). Damages, as defined in the APA, means

> …any direct or indirect damages, losses, lost profits, diminution value, claims, assessments, Taxes, settlements, Liabilities, fines, penalties and expenses (including reasonable attorneys' fees and amounts paid in investigation, defense or

settlement of any claim or Proceeding).

Section 8.5(d) of the APA is consistent with the above. It provides that any indemnification under Article VIII shall be an adjustment to the purchase price.

Contrary to Take 5's argument, *Cobalt Operating, supra*, does not require expert testimony although expert testimony is permitted.

Advantage argues that it is entitled to an award in the amount of the full purchase price that was paid after crediting the amount received from an insurance claim. It argues the value of the assets was zero. There is evidence that the data had been successfully licensed and that there was a demand for it. There is evidence that data has value when it has uses other than for the types of digital marketing that are the subject of this case. I infer from the evidence that the data base had value at the time of the sale. As noted, Advantage has not challenged the data licensing portion of the Take 5 LLC business.

There is some conflicting evidence as to the amount of Take 5 LLC's revenue that was attributable to the data licensing portion of the business as of the time of the acquisition. Mr. McGavran testified that it was 20%. A review of the E&Y Parthenon report indicates that it may have been less than that. In addition to data licensing, Take 5 LLC performed marketing services other than email. Advantage prepared a summary of "investment considerations," Ex. A-528, which was presented to its board. The document stated that email marketing accounted for two-thirds of Take 5 LLC's revenue in 2017. Revenue is an important component of the valuation of business assets when they are part of an ongoing operation. Based on the evidence, giving significant weight to the information before the Advantage Board, I find that, at the time of the sale, the assets independent of the email marketing component had a value of one-third of the purchase price.

The APA states that the base purchase price was $77,000,000. It also provided for an Earn-out Amount if certain conditions were met. There is evidence that the Take 5 LLC assets, after the acquisition, did not perform as expected financially. I find that, absent the issues that were identified by Advantage that resulted in its decision to shut down the Take 5 business unit, there would have been no Earn-out. Thus, I find that the purchase price was $77,000,000. Putting aside closing adjustments and the Holdback, it was paid. Take 5 is receiving the benefit of the $770,000 Holdback because it is receiving a credit for insurance proceeds received by Advantage. After subtracting one-third of the price in the amount of $25,666,666.66 (representing the value of the assets other than the email marketing portion of the business,) the damages equal $51,333,333.34. At closing, monies were withheld from the consideration and closing costs paid in order to purchase insurance coverage. The purchased coverage included coverage for breach of representations and warranties. Advantage recovered $7,700,000 from a claim against the carrier. After crediting that amount, the total is $43,633.333.34. I award no credit for a reduction in taxes.

In addition, Advantage claims consequential damages as stated above. I find that Advantage is entitled to damages for the amounts paid to Ernst & Young, Deloitte, and Jones Day in the total amount of $788,954.00. Due to lack of supporting detail, I am not persuaded that

Advantage has proved entitlement to damages for the costs of its own employees who were involved in due diligence.

Advantage claims $321,047.00 for the cost of its employees who were involved in the acquisition both before and after it took place. I am not persuaded given the lack of supporting detail that Advantage has proved entitlement to those damages.

Advantage claims $3,246,203.95 for the amounts paid to FTI and L&W to perform the investigation. I find that Advantage is entitled to damages for that amount.

Advantage claims $1,069,273 as "shut down" costs. The costs include amounts paid to landlords and severance and bonus payments to employees. I award the cost of termination of leases in the amount of $657,331. I am not persuaded that Advantage has proved entitlement to the remaining portion of damages because (1) the lack of a basis; (2) some were likely voluntary; and (3) lack of support for the calculation and to provide a basis for review of the components.

Finally, Advantage claims $23,897,890 representing the amount of refunds paid to clients who received email services from the Advantage Take 5 business unit post acquisition. The great bulk of those payments were to outside clients, not intercompany. The services were rendered by Advantage as owner of the Take 5 business unit. At least some of the payments were voluntary, especially those to data licensing clients. Some of those payments may qualify as damages but there is no detail upon which to base a specific finding or a reasonable estimate. Thus, I am not persuaded that Advantage has proved entitlement to those damages.

## COSTS AND FEES AS SANCTIONS

There are pending motions for sanctions requesting the award of costs and attorneys' fees by each party related to discovery. Any and all motions, claims, or objections seeking sanctions that were not specifically addressed during the course of this proceeding or in this Interim Award, excluding claims for attorneys' fees and costs based on the prevailing party provision in §10.11(b) of the APA, and claims for interest, are denied.

## INTERIM AWARD

1. Respondents and Counter-Claimants are awarded $48,325,822.29 against Claimants and Counter-Respondents as damages on their claims.

2. Claimants and Counter-Respondents claim for damages is denied.

3. Therefore, the amount due to Respondents and Counter-Claimants is $48,325,822.29.

4. Pursuant to section 10.11(b) of the APA, "[t]the expenses of any litigation, including the Arbitrator and the arbitration and the reasonable out-of-pocket fees and expenses of the other Party, including fees of attorneys and experts, shall be paid by the non-prevailing Party, as determined by the Arbitrator."

5. Respondents and Counter-Claimants are the prevailing parties.

6. Counsel are directed to consult and attempt to agree on a process and schedule to resolve the issues in paragraph 4 above and any claim of interest on the award. Counsel shall advise the Arbitrator of the status of those discussions on or before August 19, 2022. Failing agreement, a scheduling conference will be held to discuss the issues.

7. Other than as set forth in the preceding paragraphs, this Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims and counterclaims not expressly granted in this Award are denied. This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

I, James R. Eyler, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Interim Award.

August 4 , 2022

_James R. Eyler_
_____
Judge James R. Eyler (Ret)
Arbitrator