# EXHIBIT H

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

ADVANTAGE SALES &
MARKETING LLC, et al.,

     Petitioners,                    CASE NO. 50-2022-CA-010374

v.

PETRUSS MEDIA GROUP, LLC,
F/K/A TAKE 5 MEDIA GROUP,
LLC, et al.

     Respondents.

_____/

## RESPONDENTS' OPPOSITION TO PETITION TO CONFIRM ARBITRATION AWARD, MOTION TO QUASH AND MOTION TO VACATE ARBITRATION AWARDS[1]

     Respondents Petruss Media Group LLC, f/k/a Take 5 Media Group, LLC, Alexander

Radetich, Richard Gluck, and RJV Marketing Corp. (collectively the "Take 5 Parties" or

"Respondents") hereby oppose Petitioners' Petition to Confirm Arbitration Award and for Entry

of Final Judgment (the "Petition") and respectfully move to quash the summons served upon

Respondents and move, pursuant to the Federal Arbitration Act (9 U.S.C. §§ 6, 10, 12), for an

order vacating the Interim Award entered August 4, 2022, and the Final Award entered initially

on October 4, 2022 and in a modified version on October 20, 2022, (collectively the "Awards") in

the underlying arbitration (AAA No. 01-19-002-7532) between Respondents and Petitioners

Advantage Sales & Marketing LLC, Advantage Sales & Marketing Inc., Karman Intermediate

---

[1]     Portions of this Motion have been redacted pursuant to paragraph 13 of the parties' Stipulated Order Governing the Production and Exchange of Confidential and Highly Confidential Information, executed in the underlying arbitration on July 3, 2020.  Respondents will file this document under seal but are prepared to unseal all documents and unredact all portions herein upon the agreement of the Petitioners.

Corp., Advantage Solutions Inc., and Karman Topco L.P. (collectively the "Advantage Parties" or "Petitioners"), and as grounds therefore alleges as follows:

## PRELIMINARY STATEMENT

Respondents oppose the Petition because the Respondents have brought a separate action to vacate the Arbitration Awards, for which they have established there are sufficient grounds to vacate the Awards. The Advantage Parties represent in their Petition that "[t]he Court is required to confirm the Award unless the Award is vacated, modified, or corrected. No such motion or request has been filed by Respondents." *Petition at* ¶ 24. This statement was true when the Petition was filed, forty-eight minutes after the Arbitrator issued the Modified Final Award, but is no longer accurate.

The Federal Arbitration Act ("FAA") provides that notice of a motion to vacate must be served upon the adverse party or his attorney within three months after the award is filed or delivered. The Interim Award was issued on August 4, 2022 and the Modified Final Award was issued on October 4, 2022. Respondents' initiated an action in the United States District Court for the District of Columbia, captioned *Petruss Media Group, LLC, f/k/a Take 5 Media Group, LLC, et al. v. Advantage Sales & Marketing, LLC, et al.*, No. 1:22-cv-03278, by filing a Notice of Petition to Vacate, Petition to Vacate, Motion to Vacate, and Memorandum of Points of Law and Authorities in Support of the Motion to Vacate on October 26, 2022. *See Exhibit A, Petition to Vacate or Set Aside Arbitration Awards* (ECF No. 1) (filed under seal); *Ex. B, Notice of Petition to Vacate or Set Aside Arbitration Awards* (ECF No. 1-7); *Ex. C, Composite Exhibit containing Declaration of Lauren H. Evans in Support of Take 5 Parties' Petition to Vacate or Set Aside Arbitration Awards and all exhibits thereto* (ECF Nos. 1-8 – 1-87) (filed under seal); *Ex. D, Composite Exhibit containing Motion to Vacate or Set Aside Arbitration Awards, Memorandum*

*of Points of Law & Authorities in Support of Petitioners' Motion to Vacate Arbitration Awards,*
*Declaration of Lauren H. Evans in Support of Take 5 Parties' Motion to Vacate or Set Aside*
*Arbitration Awards and all exhibits thereto* (ECF Nos. 3 – 3-82) (filed under seal).  These
documents were served upon each of the Petitioners within ninety days, on October 28 and October
31, 2022, in compliance with 9 U.S.C. § 12.  *Ex. F, Composite Exhibit with Affidavits of Service*
*for Advantage Parties* (ECF Nos. 7-11).  This motion will also be filed and served prior to the
ninetieth day following the Interim Award.

Respondents additionally oppose the Petition because it fails to discuss and seek judgment
with respect to the Interim Award.

Respondents also set forth the preliminary bases for their motion to quash in order to
preserve all rights under Florida Rule of Civil Procedure 1.140.  Respondents bring this motion to
vacate prior to receipt of affidavits of service because they are required to do so under the FAA
and thus reserve the right to amend the motion to quash prior to any hearing or court ruling.

 Respondents seek to stay this case pending resolution of the District of Columbia federal
action for all of the reasons set forth in their Motion to Stay filed concurrently herewith, but in the
alternative and in order to preserve all of their rights under Sections 10 and 12 of the FAA,
Respondents move to vacate for the same reasons already set forth in the federal action, and
provide those grounds again below.

### MOTION TO QUASH

Respondents move to quash the subpoenas improperly served upon Petruss Media Group,
LLC, f/k/a Take 5 Media Group, LLC ("Take 5") and Richard Gluck.  Additional grounds to quash
may also exist but are not yet known.

On October 28, 2022, the Petitioners attempted to serve Mr. Radetich's wife with a
summons in this action for Mr. Radetich on behalf of Take 5.  On October 29, 2022, the Petitioners

3

attempted to serve Mr. Richard Gluck's stepson with a summons in this action by throwing it over the gate of Mr. Gluck's home. While the service of Mr. Radetich appears to have been proper, statements by each of the individuals served suggest that service may have been improper pursuant to Fla. Stats. §§ 48.031 and 48.062. For example, service of Take 5 through Mr. Radetich's wife was likely not effective service because she is not authorized to accept such service, Mr. Radetich is not the registered agent of Take 5, and there are no circumstances permitting service of process upon Take 5, a limited liability company, through the spouse of a former manager at his residence, the address of which was and is not listed for the company.

Florida law states that a party must contest the sufficiency of service of process at the "first opportunity." *Romanoff v. Lazarus*, 267 So. 3d 33, 35-36 (Fla. 4th DCA 2019); *Re-Emp. Servs., Ltd. v. Nat'l Loan Acqs. Co.*, 969 So. 2d 467, 470-71 (Fla. 5th DCA 2007) (finding that parties did not waive arguments concerning motion to dismiss based sufficiency of process because they had not received the return of service at the time of their initial motion to dismiss and amended their motion prior to a ruling). However, no waiver occurs if the motion is amended to include the defenses before the motion is heard. *Romanoff*, 267 So. 3d at 35. Due to the early stage of these proceedings and Respondents' obligation to bring a motion to vacate within the 90 days prescribed by 9 U.S.C. § 12, the affidavits of service are not yet available. As a result, Respondents hereby move to quash the summons served improperly upon Take 5 and Mr. Gluck, and reserve argument with respect to Mr. Radetich, in order to preserve their rights pursuant to Florida Rule of Civil Procedure 1.140 and reserve the right to amend and supplement this motion upon receipt of additional information. Further, this motion to quash is sought *prior* to any request for affirmative relief by Respondents.

## FACTUAL AND PROCEDURAL BACKGROUND

The Awards concern the systematic destruction by the Advantage Parties of a successful business built through the expertise and hard work of two individuals, Petitioners Alexander Radetich and Richard Gluck.  Over the course of the last three years, the Advantage Parties have not just destroyed what it took Radetich and Gluck nearly twenty years to build, but they systematically attacked and sought to destroy Radetich's and Gluck's reputations in the process and to ruin their lives and those of their families.  Among other things, the Advantage Parties have sought to hold RJV Marketing Corp., which is owned 100% by Gluck's father (80 year-old Jack Gluck) wholly responsible for the alleged "fraud" that served as the excuse to allow the Advantage Parties to terminate part of Radetich's and Gluck's business, take the parts of that business that the Advantage Parties believed were most lucrative and, in the process, seek to salvage the Advantage Parties' reputations and recoup the financial losses caused by their own mismanagement of the once successful Take 5 business.  The Advantage Parties did so through procedurally improper means, and it is not surprising that the resulting Awards therefore are sufficiently flawed such that they must be vacated.

## I.    THE TAKE 5 BUSINESS AND ASSET PURCHASE AGREEMENT

In 2003, Respondents Alexander Radetich and Richard Gluck founded a consumer data and data marketing services and products business, Take 5 Media Group, LLC in 2003.  *Ex. C at Ex. 4 at 2, 11 [Take 5 Parties' Amended Statement of Claim*].[2]  Take 5's most valuable asset was a massive database it built and maintained, which contained demographic, lifestyle, and contact information for hundreds of millions of consumers.  Over the span of fifteen years, Take 5

---

[2]    For ease of reference and in the interest of efficiency, all citations to the underlying Arbitration record refer to the exhibits attached to the Declaration of Lauren H. Evans in Support of Take 5 Parties' Motion to Vacate or Set Aside Arbitration Awards, attached to this motion as Exhibit C.

developed one of the most unique and sought-after consumer databases in the country. Take 5 commercialized this database by providing clients either data licensing or marketing campaigns. Take 5's data licensing business delivered bulk data to clients, which included large national database compilers, insurance companies, credit bureaus, and automotive marketing agencies, pursuant to multi-year license agreements. Take 5's other business line was its "omni-channel" digital marketing business, which provided highly targeted and personalized marketing campaigns for clients. Take 5's "omni-channel" offerings included social media, mobile device advertising, email marketing, programmatic and display advertising, PPC (pay per click) advertising, targeted advertising in web browsers, and direct mail. *Id.* at 12. Take 5 was beneficially owned by Mr. Radetich (44.45%), Mr. Gluck (44.45%), and a third entity, RJV Marketing, Corp. ("RJV"), which held a 11.10% membership interest.

In 2017, Take 5 retained investment banking firm, Petsky Prunier, to market the company for potential sale and to seek prospective buyers. Take 5 received offers from approximately seventeen buyers, including ASM. On August 11, 2017, the Take 5 Parties and ASM signed a Nondisclosure Agreement, and on December 8, 2017, ASM signed a letter of intent. *Id.* at 4, 14-16. ASM conducted formal and comprehensive due diligence of Take 5 for a period of eight months, from December 2017 through March 2018, retaining Ernst & Young for financial diligence and Jones Day for legal diligence. ASM also hired Parthenon Group, an Ernst & Young owned consulting business, to conduct confidential interviews of Take 5 clients before closing to assess the strength of the relationships and level of satisfaction. Take 5 additionally engaged national independent accounting firm, Cherry Bekaert, at the request of ASM to prepare an audited Combined Financial Statement for the year ending December 31, 2017, which was delivered directly to ASM. *Id.* at 16-19.

On March 15, 2018, ASM entered into an Asset Purchase Agreement with the Take 5 Parties, in which ASM agreed to pay a base purchase price of $77,000,0000, as well as an earn-out of up to $53,000,0000 for Radetich and Gluck, in consideration for purchase of the assets and liabilities of Take 5. *Id.* at 19; *Ex. C* at Ex. 5. The sale of Take 5's assets closed on April 1, 2018 and ASM acquired all of Take 5's assets including the database of email addresses. As a result of the transaction, Take 5 became a business unit of ASM. *Id.* at Ex. 4 at 21; *Ex. 1 to Advantage Parties' Petition* at § 1.5(j).

The dispute resolution provision of the APA appears at Section 10.11. It states:

> (a) If the Parties should have a dispute (a "Dispute") involving money damages arising out of or relating to this Agreement or any Ancillary Agreement, or the Parties' respective rights and duties hereunder or thereunder . . . then the Parties will resolve such Dispute in the following manner: . . . (iii) . . . the Parties will refer the Dispute (to the exclusion of a court of law) to a final and binding arbitration in accordance with the procedures set forth in Section 10.11(b).

*Ex. 1 to Petition* at § 10.11. Section 10.11(b) provides:

> Any arbitration pursuant to this agreement shall be presided over by one arbitrator in Delaware, in accordance with the then existing commercial arbitration rules (the "Rules") of the American Arbitration Association ("AAA"), and the judgment upon the award rendered by the Arbitrator may be entered in any court having jurisdiction thereof; provided, however, that the Law applicable to any controversy shall be the Law of the State of Delaware regardless of principles of conflicts of Laws. . . . Upon completion of the selection of the Arbitrator, an award or decision shall be rendered within no more than 60 days after the date of such selection. The award or decision will be a reasoned award or decision setting forth the Arbitrator's reasoning in reaching its determinations. The expenses of any litigation, including the Arbitrator and the arbitration and the reasonable out-of-pocket fees and expenses of the other Party, including fees of attorneys and experts, shall be paid by the non-prevailing Party as determined by the Arbitrator, except as provided in Section 1.3(a)(iv) and Section 1.5(c).

*Id.*

## II.    ASM DECIDES TO SHUT DOWN THE TAKE 5 BUSINESS

Immediately after the transaction closed, Take 5 became a business unit of Advantage Sales & Marketing LLC ("ASM") and ASM designated its employee Gary Colen the Chief Executive

Officer of the Take 5 business unit, sidelining Radetich and Gluck, who had built the company from scratch and lead it since its first days in existence. *Ex. C* at Ex. 4 at 5-6, 21-25. In late 2018 and early 2019, ASM transferred business developed by Take 5 to other ASM business units and significantly cut the commissions of Take 5 sales personnel. As a result, the financial performance of the Take 5 business began to suffer. *Id.* The Advantage Parties claim that on or about April 11, 2019, they received two "anonymous" internal ethics complaints from Take 5 employees alleging that Take 5's clients were not receiving the email marketing services they were paying for and this purported deception was being accomplished through the use of fake marketing campaign documentation. *Ex. C at* Ex. 6 (Advantage Parties' Second Amended Counter-Demand) at ¶ 35. On or about April 16, 2019, the Advantage Parties asked Radetich and Gluck to accept an early exit from the business. ASM proposed that in exchange for $770,000 and a release of the earn-out, ASM would release Radetich and Gluck from their indemnity obligations under the APA. Radetich and Gluck rejected the offer, unwilling to walk away from up to $53 million in unpaid purchase price. *Id.* at Ex. 4 at 7, 25.

On May 28, 2019, the Advantage Parties engaged FTI Consulting to conduct an operational audit of Take 5 in connection with the "anonymous" complaints. The audit was proposed to include four different phases, as well as the review of documents and electronic information. At the recommendation of FTI, the matter was reported to the Audit Committee of Karman Topco L.P., which engaged Latham & Watkins as counsel on June 27, 2019. *Id.* at Ex. 6 ¶ 36. During the course of their forty-four day investigation, FTI and Latham conducted interviews of twenty-seven ASM and Take 5 employees. On July 2, 2019, FTI interviewed Alexander Radetich. *Id.* at ¶¶ 39, 50.

On July 7, 2019, during only phase two of the investigation and before FTI had completed its work, the Advantage Parties decided to abruptly and permanently shut down the Take 5 business unit. *Id.* at Ex. 4 at ¶¶ 73-74. On July 11, 2019, ASM called an all-hands meeting and laid off almost all employees in the Take 5 business unit effectively shutting it down. *Id.* The Advantage Parties informed employees and customers that Take 5 had engaged in fraud and alleged that the Take 5 business was a fraudulent front operated by Radetich and Gluck, which had no useable data and ran no real marketing campaigns. *Id.* at ¶ 76. The Advantage Parties additionally made an unsolicited offer to Take 5's clients of refunds or credits for other ASM services. *Id.* ASM also contacted the FBI and United States Attorneys' Office and urged them to investigate Radetich and Gluck. *Id.* at Ex. 6 at 5, 27. In little over a year, ASM had destroyed the business and reputation it had taken Take 5 nearly two decades to build and that had enjoyed significant success and client satisfaction before ASM took it over.

The Advantage Parties' abrupt and foundationless shutdown of the Take 5 business unit was without any concern for the terms of the APA, the interests of Gluck, Radetich, the individuals employed by the business, and Take 5's many longstanding customers. The shutdown was nothing more than a thinly veiled effort by the Advantage Parties to shift those parts of the Take 5 business that they believed to be the most profitable to other ASM business units as a part of a larger strategy to go public and expand capitalization. Further, the shutdown enabled the Advantage Parties to avoid having to pay millions of dollars owed to the Take 5 Parties as a part of the transaction and blame Take 5's sudden and dramatic financial issues on a "fraud" rather than what it truly was, ASM's systematic destruction of a successful business due to its deficient management. This allowed ASM and the Advantage Parties to salvage their reputations and avoid self-inflicted financial losses, at the expense of the reputations of Take 5, Gluck, and Radetich.

### III.    THE UNDERLYING ARBITRATION

#### A.    Initiation of the Proceeding

Six days after ASM took the unprecedented step of shutting down Take 5's business, on July 17, 2019, Take 5, Radetich, and Gluck sent a Notice of Dispute to the Advantage Parties, triggering the 30-day period to meet and negotiate pursuant to Section 10.11 of the APA.  *Id.* at Ex. 4 ¶ 79.  Counsel for ASM responded by stating the notice of the dispute was premature and levelled false allegations that Radetich and Gluck created and directed a scheme to defraud the Advantage Parties and its clients.  *Id.* at ¶ 80.  On August 20, 2019, the Advantage Parties sent a Notice of Claim and Notice of Dispute pursuant to pursuant to Sections 8.4(b) and 10.11 of the APA alleging that Radetich and Gluck had falsely represented to clients that marketing emails had been deployed, delivered, and opened when emails were never sent and that Take 5 allegedly employed an algorithm that generated fictitious data to meet client expectations while engaging third-party vendors to deceptively generate traffic to clients' websites. The Parties met and conferred but were unable to resolve their dispute.  *Id.* at Ex. 8 [*Advantage Parties' Notice of Claim and Notice of Dispute*].

On September 3, 2019, Take 5 filed a Demand for Arbitration and Statement of Claim bringing claims for breach of contract and breach of the implied covenant of good faith and fair dealing and seeking an award for amounts due and unpaid pursuant to the APA.  The Demand alleged that Advantage breached the APA by shutting down the Take 5 business unit and engaging in a course of conduct to circumvent the payment of the earn-out.  *Id.* at Ex. 9 (*Demand for Arbitration and Statement of Claim*).  On September 19, 2019, the Advantage Parties filed counterclaims and crossclaims, bringing claims for indemnification, breach of contract, fraud in the inducement, fraud, RICO, and breach of the implied covenant of good faith and fair dealing. *Id.* at Ex. 10 [*Respondent and Counter-Claimant/Cross-Claimant Advantage Sales & Marketing*

*LLC's Response to Arbitration Demand and Counter-Demand and Cross-Demand for Indemnification, Breach of Contract and Fraud*].

The Take 5 Parties filed an Amended Statement of Claim on November 19, 2020, which was the operative demand at the time of the Arbitration hearing, bringing claims for breach of contract, breach of the implied covenant of good faith and fair dealing, defamation *per se*, and negligence. *Id.* at Ex. 4. The Take 5 Parties alleged that the Advantage Parties shutdown the Take 5 business unit as a part of strategy developed to increase its IPO capitalization and to avoid payment of the earn-out pursuant to the APA. *Id.* The Take 5 Parties further alleged that the Advantage Parties materially damaged the reputations of Radetich and Gluck. *Id.* The negligence claim was later dismissed.

The Advantage Parties filed their Second Amended Counter-Demand and Cross-Demand on November 16, 2020, bringing claims for indemnification, breach of contract, fraud in the inducement, fraud, RICO, and breach of the implied covenant of good faith and fair dealing. *Id.* at Ex. 6. This Second Amended Counter-Demand was the Advantage Parties' operative demand at the time of the Arbitration hearing. The Advantage Parties maintained that the Take 5 business was based on a fraudulent scheme created and maintained by Radetich and Gluck in which they promised clients that Take 5 had the ability to send a large volume of targeted emails to people within a certain demographic, track responses, and generate high quality customer traffic for the client's websites, but could not and did not actually send such emails. *Id.* The Advantage Parties' further alleged that Radetich and Gluck developed a computer program that would fictitiously calculate numbers to be reported to client concerning how many emails had been sent, delivered and opened. *Id.*

The Arbitrator determined during the course of the proceedings that the Arbitration was governed by the FAA because the dispute involved interstate commerce. *Id.* at Ex. 11 at 3 [*Order Ruling on Advangage's [sic] Motion to Dismiss Cetain [sic] Counts in Take 5's Amended Statement of Claim*]. The Arbitration was administered by the American Arbitration Association ("AAA") and discovery was governed by the Federal Rules of Procedure. *Id.* at 12 [*Report of Preliminary Hearings and Scheduling Order*]. The situs of the arbitration and hearings conducted therein was Washington, DC. *Id.* at Ex. 64 at ¶ 1 [*Stipulated Order Governing Protocol for Remote Evidentiary Hearing*] ("Pursuant to ¶ 8 of the Parties' Joint Submission to the AAA on March 23, 2020, the evidentiary hearing shall be deemed to take place in Washington, DC"); *see also id.* at Ex. 65 at 1 [*Order Ruling on Admissibility of Excerpts from Certain Depositions*] ("The situs of this proceeding is the District of Columbia").

Each party filed motions for summary disposition on November 17, 2021, responses on December 7, 2021, and replies on December 15, 2021. *Id.* at Exs. 13-18. Shortly before the hearing, the Arbitrator denied the cross motions for summary disposition. *Id.* at Ex. 19 at 1 [*Order Denying Cross Motions for Summary Disposition*].

### B.    Parallel Criminal Investigation

The Advantage Parties' demands indicated that the Advantage Parties had reported Radetich and Gluck to federal authorities. The Advantage Parties' Second Amended Counter-Demand stated that "Advantage voluntarily reported [the results of their internal investigation into Take 5] to the FBI and United States Attorney's Office" and had "already spent and continues to spend considerable sums on attorney and advisor fees related to determining the full extent of the fraud, and cooperating with government law enforcement agencies." *Id.* at Ex. 6 ¶ 55. Despite the Advantage Parties' disclosure that they had reported the purported fraud to law enforcement,

the Take 5 Parties did not become aware that an active federal criminal investigation was underway until April 2021.

On April 19, 2021, an FBI agent visited Radetich's home.  *Id.* at Ex. 20 at 4 & n.2 [*Emergency Motion and Memorandum of Law of Take 5 Parties' in Support of Emergency Motion for Stay of Arbitration Action*].  During that visit, the FBI agent stated that Take 5 and Radetich were under criminal investigation, handed Radetich a business card, and requested that Radetich "be in touch."  *Id.* at 4.  Following the encounter, Radetich hired criminal defense counsel, Miles Ehrlich, who was subsequently contacted by Assistant United States Attorney for the Central District of California, Jennifer Waier, on April 20, 2021.  *Id.*  Based on subsequent conversations between prosecutors, FBI agents, and Radetich's criminal counsel, it became clear that that Radetich and Take 5 were targets of a criminal investigation instigated by the Advantage Parties and that "indictment may soon issue."  *Id.*  The criminal investigation overlapped entirely with the Advantage Parties' claims in the Arbitration, which is unsurprising given that arbitration counsel for the Advantage Parties, Wayne R. Gross, previously served as a supervisor in the United States Attorney's Office for the Central District of California and was previously the manager of the individuals who have been conducting the investigation and whom he told about Take 5's alleged acts.

On June 8, 2021, counsel for the Take 5 Parties deposed Gary Colen, an Advantage employee and former CEO of the Take 5 business unit following purchase of the Take 5 business by the Advantage Parties.  During that deposition, counsel for the Take 5 Parties learned for the first time that ▮▮▮▮▮ Redacted Pursuant to Stipulated Order ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.*

at Ex. 21 at 327:9-329:9 [*Colen Depo. Tr.*]. Redacted Pursuant to Stipulated Order

*Id.* at 329:10-330:7.  Radetich did not become

aware of that fact until Colen's deposition two years later.  *Id.*  As a result of this information

concerning undercover FBI operations, Gluck retained criminal defense counsel, Edward

Swanson.  *Id.* at Ex. 20 at 5.

In their first request for production of documents, due to the allegations concerning reports

to law enforcement in the Advantage Parties' counter-demands, the Take 5 Parties sought "[a]ll

communications from Respondents to the FBI, Department of Justice (including any U.S.

Attorney's Office) or any other state or federal agency regarding the Seller group [a/k/a the Take

5 Parties]."  *Id.* at Ex. 22 at 96 (Document Request 105) [*Advantage Parties' Response to Take 5's

First Request for Production of Documents and Information*].  The Advantage Parties objected to

this request over seven months later on the basis that the information was subject to governmental

privilege.  *Id.*  Despite numerous meet and confers, substantial motions practice, and several

discovery orders ordering the Advantage Parties to produce responsive documents, the Advantage

Parties did not ever produce any documents responsive to this Request Number 105, let alone any

documents evidencing an actual criminal investigation prior to April 2021 or at any time thereafter.

*See id.* at Ex. 23 at 9-11 [*Take 5 Parties' Motion to Compel*].

After learning of the extent of the investigation and in light of the scheduled depositions of

Gluck and Radetich, the Take 5 Parties filed an Emergency Motion for Stay of Arbitration Action

on June 23, 2021, seeking to stay the arbitration proceeding for six months or until the criminal

investigation was concluded, whichever was earlier.  *Id.* at Ex. 20.  The Take 5 Parties argued that

given the ongoing criminal investigation, particularly the recent travel by government agents

stationed in California to Radetich's home in Florida and the undercover conversations of which they had learned less than two weeks prior, both Radetich and Gluck would have no choice but to invoke their Fifth Amendment rights at their depositions and in response to other discovery, chilling their ability to testify and offer key evidence in the proceeding. *Id.* The Take 5 Parties further argued that the issues in the criminal and civil proceedings not only overlapped, but were identical and that Radetich and Gluck would be "severely prejudiced" by denial of a stay because they would be forced to choose between defending themselves in the Arbitration and waiving their Fifth Amendment rights or asserting the Fifth, undermining their ability to defend themselves as the purported masterminds of a multi-year fraudulent scheme. *Id.* at 7-11. Additionally, they argued that the Advantage Parties should not be able to "'have their cake and eat it too' – by pushing the Take 5 Parties into a corner in a situation of their own making" by virtue of the Advantage Parties having urged the authorities to commence an investigation and working to feed them information. *Id.* at 12.

The Advantage Parties responded on June 28, 2021 arguing that Radetich and Gluck would not be prejudiced because the Arbitrator could not draw an adverse inference from their invocation of the Fifth Amendment and that the Advantage Parties would be the ones "severely and unfairly prejudice[d]" by the granting of a stay because memories would fade and it would give Radetich and Gluck an opportunity "to conceal their assets or even to leave the jurisdiction." *Id.* at Ex. 24 [*Opposition of Advantage Parties to Emergency Motion for Stay of Arbitration Action*]. The Advantage Parties had previously acknowledged the significant overlap between the criminal investigation and the Arbitration arguing in an earlier unrelated opposition brief "Advantage and the USAO share a common interest in that each is litigating, or potentially litigating, the Take 5

Parties as a result of their fraudulent scheme." *Id.* at Ex. 25 at 12 [*Advantage Response to Motion to Compel*].

The Take 5 Parties replied on June 29, 2021, arguing that though the Advantage Parties had stated that they complained to law enforcement, the fact that an actual criminal investigation had been initiated did not become known (or knowable) until April 2021. *Id.* at Ex. 26 at 3 [*Reply by Take 5 Parties in Support of Emergency Motion for Stay of Arbitration Action*]. The Take 5 Parties also pointed out the Advantage Parties' contradictory position that the motion to stay was both too late because ASM has stated it reported the purported fraud to government officials prior to the commencement of the Arbitration and some discovery had taken place and too early because indictments had not yet been issued. *Id.*

On June 29, 2021, after a hearing, the Arbitrator denied the Take 5 Parties' Emergency Motion for Stay. The Arbitrator acknowledged that the "issues in the criminal investigation track or substantially overlap" the issues in the Arbitration but ultimately denied the stay because he believed the Take 5 Parties were aware of the investigation as of the date of the Advantage Parties' Counter-Claim on September 19, 2019, that it would be "speculative" to conclude the Take 5 Parties would be prejudiced by Radetich and Gluck invoking the Fifth Amendment. The Arbitrator further reasoned that he could not draw adverse inferences from the invocation of the Fifth Amendment under Delaware law and the stay was sought prematurely because it was prior to indictment. *Id.* at Ex. 27 at 3-4 [*Order Denying Take 5's Motion to Stay*].

On July 1, 2021, Alexander Radetich was deposed. At the advice of his criminal defense counsel (as reflected in the deposition transcript), he invoked his Fifth Amendment rights in response to every question aside from his name, location, and employment in order to protect his rights in the parallel criminal investigation. *See id.* at Ex. 28 at 12:9-20 [*Radetich Depo. Tr.*]

("[T]he claimants, all of them, made a motion to stay this arbitration in light of a – in light of a potential criminal indictment that's looming. As a result . . . Mr. Radetich will be taking the Fifth Amendment. It's necessary for him to do so in connection with overwhelming majority of issues that are going to be raised.").

On July 8, 2021, Richard Gluck did the same at his deposition, invoking his Fifth Amendment rights due to the parallel criminal proceeding and the Arbitrator's failure to stay the proceeding. *Id.* at Ex. 29 at 15:2-16:1 [*Gluck Depo. Tr.*] ("[G]iven that we're going forward today in the absence of a stay, in the absence of a continuance, we will need to be asserting the Fifth Amendment.").

The Advantage Parties continued to provide information to criminal investigators throughout the Arbitration, including producing copies of written submissions in the Arbitration. *See id.* at Ex. 30 at 10-11 [*Take 5's Motion for Advantage to Turn Over Records of Witness Interviews – Relied Upon in its Expert Report – Forthwith*]. ███████████████

███████████████████████████████████████████████

███████████████████ *Id.* at 11-12. Redacted Pursuant to Stipulated Order

███████████████████████████████████████████████

███████████████████████

### C.    Discovery Disputes

#### 1.    *The Advantage Parties' Failure to Produce Interview Notes*

During the course of their forty-four-day investigation, FTI and Latham conducted interviews of ASM and Take 5 employees, including Radetich. The Advantage Parties repeatedly alleged that Radetich "admitted" to fraud during that interview, but steadfastly refused to provide any documentary or testimonial evidence substantiating this baseless contention. The Take 5 Parties sought the memoranda and notes from these interviews in discovery. On November 1,

2019, Take 5 served its first Request for Documents and Information wherein they requested for the first time, among other things, all documents referring to or relating to the Latham and FTI interviews conducted in July 2019, including a specific request for documents concerning the July 2, 2019 interview of Radetich.

Take 5 specifically requested:

> Document Request No. 52: All documents that refer or relate to any of the 27 Advantage and Take 5 employee interviews Latham and FTI conducted as set forth in paragraph 39 of the Advantage Response, or any other interviews Latham and FTI conducted in connection with their respective investigations as set forth in paragraphs 36-48 of the Advantage Response, including but not limited to any documents that are audio or video recordings of such interviews, written statements, affidavits or notes.

> Document Request No. 55: All documents that refer or relate to the July 2nd interview as set forth in paragraph 43 of the Advantage Response, including all audio files, transcripts, and notes.

*Id.* at Ex. 22 at 52, 54.

Seven months later, the Advantage Parties objected to production of these documents on the basis of privilege, work product protection, and governmental privilege, among other things. *Id.* at 15, 52, 54. Following several meet and confers, the Take 5 Parties filed a Motion to Compel on August 14, 2020 seeking to compel the production of documents responsive to Requests 52, 55, and 105, among others. *Id.* at Ex. 23. On September 10, 2020 the Arbitrator granted the Take 5 Parties' motion to compel, in part, stating:

Redacted Pursuant to Stipulated Order

*Id.* at Ex. 34 at 2-3 [*Discovery Order No 2*] (internal citation omitted).

In response, the Advantage Parties Redacted Pursuant to Stipulated Order

Redacted Pursuant to Stipulated Order.  However, the Advantage Parties did not produce any contemporaneous notes of the interviews and did not log such notes on their privilege log.  *Id.* at Ex. 35 at 8 [*Take 5 Parties' Motion for Relief*].

A year after the Arbitrator's Discovery Order No 2 compelling production of the notes and months after the close of fact discovery, the Arbitrator permitted the Take 5 Parties to ask FTI employee and Advantage Parties' expert, Michael Wei, both fact and expert questions during his deposition due to the Advantage Parties late production of several other categories of responsive documents.  *Id.* at Ex. 36 [*Order Ruling on Take 5's Motion to Produce FTI Report*].  At the September 8, 2021 hearing on this issue, the Advantage Parties' counsel affirmatively represented to the Arbitrator that there were no notes of witness interviews. *Ex. C* at Ex. 30 at 1; *see also id.* at Ex. 37 at 8 [*Correspondence from M. Strub*] ("The Advantage Parties are not aware of any notes of those conversations, and the Take 5 Parties' counsel is free to ask Mr. Wei about those conversations when they take his deposition.").

Redacted Pursuant to Stipulated Order

*Id.* at Ex. 30 at 5-6 *(citing Wei Depo. Tr.* at 35:16-36:15).  As a result, on October 1, 2021, the Take 5 Parties moved to compel the Advantage Parties to produce the notes of the interviews for a second time.  *Id.*  Following briefing by both parties, on October 8, 2021, the Arbitrator again ordered the Advantage Parties Redacted Pursuant to Stipulated Order *Id.* at Ex. *38* at 3 [*Order Ruling on Take 5's Motion to Produce Notes of Witness Interviews*].

The Advantage Parties made a production on October 25, 2021, which did not contain contemporaneous notes of the 2019 FTI interviews.  *Id.* at Ex. 39 [*Take 5's Motion to Remedy*

*Advantage's Obstreperous Refusal to Comply with Orders*].  In response to a request by the Take 5 Parties to produce the contemporaneous interview notes, the Advantage Parties responded ▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆  *Id.* at 13 (*Correspondence from M. Strub*).

On December 15, 2021, the Take 5 Parties moved for third time to compel the production of the contemporaneous notes.  *Id.*  The Take 5 Parties argued that the Advantage Parties conduct was "part of a documented pattern of evasiveness while professing earnestness."  *Id.* at 5.  The Advantage Parties responded  that they had followed the Arbitrator's October 8, 2021 order.  *Id.* at Ex. 40 at 2 [*Advantage Parties' Response to Take 5 Parties' Discovery Motions*] ("The Advantage Parties did this").  But they had not.

On February 21, 2022, after the hearing had already commenced, the Arbitrator entered an order, acknowledging that the notes existed and had not been produced, and ordering for the third time that the Advantage Parties produce the contemporaneous notes.  *Id.* at Ex. 41 [*Order Relating to Notes of Interviews by FTI and L&W*] ("Advantage implicitly acknowledges that, at least in some instances, contemporaneous notes of interviews were taken and not produced.").

▆▆▆▆▆▆▆▆▆▆ Redacted Pursuant to Stipulated Order ▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆  *Id.*

at Ex. 35.  ▆▆▆▆▆▆▆▆▆ Redacted Pursuant to Stipulated Order ▆▆▆▆▆▆▆▆▆



Redacted Pursuant to Stipulated Order

On April 14, 2022, as a result of the Advantage Parties' bad faith discovery conduct, the Take 5 Parties sought to strike the Advantage Parties' pleadings, including their answer and counterclaims, preclusion of evidence of testimony concerning the interviews, preclusion of any Latham attorney testimony, and monetary sanctions. *Id.* The Arbitrator did not permit testimony

to come in concerning the FTI interviews, including the July 2, 2019 Radetich interview, however, he did not grant any of the other relief sought by the Take 5 Parties even though he acknowledged the Advantage Parties had committed discovery abuses. *Id.* at Ex. 57 at 2592:14-2597:24 [*Hearing Tr. Vol. X (Day 10)*]; *see also id.* at Ex. 42 [*Correspondence from Hon. J. Eyler*].

Prior to finally producing the notes, the Advantage Parties had repeated the accusation that Radetich admitted and/or confessed to the purported fraud throughout the entirety of Arbitration, including in their written submissions even though the accusation was and is unfounded. The Advantage Parties knew or should have known this, but nevertheless continued to repeat their inaccurate and inflammatory claims about the alleged "admission" by Radetich. Some (but not all) examples of the Advantage Parties' claimed false statements are:

- "In fact, Mr. Radetich admitted in an interview with investigators that he and Mr. Gluck decided to lie to clients in order to maintain their business . . . Mr. Radetich himself confessed in his interview that he and Mr. Gluck and knew of and implemented this fraudulent practice." *Id.* at Ex. 8 at 2-3.

- "Recognizing the jig was up, Radetich admitted during his interview by the investigation team that Take 5 was systemically and deliberately providing false reports to its clients, at Gluck's direction, as they 'needed to lie to their clients in order to keep them.'" *Id.* at Ex. 6 at 4.

- "Radetich himself admitted as much to Latham and FTI in a July 2nd interview, during which he acknowledged that he and Gluck had concluded that Take 5 needed to lie to clients in order to keep them." *Id.* at ¶ 43.

- Redacted Pursuant to Stipulated Order

  *Id.* at Ex. 13 at 16.

- Redacted Pursuant to Stipulated Order

  *Id.* at Ex. 15 at 18.

- Redacted Pursuant to Stipulated Order

  *Id.* at Ex. *35* at 161.

### 2.    *The Advantage Parties' Spoliation of the Google Analytics Evidence*

In September 2021, the Take 5 Parties' counsel sought Google Analytics data in connection with the review of the expert reports of David Lasater and Michael Wei, in advance of their expert depositions. *Id.* at Ex. 43 at 12-14 [*The Take 5 Parties' Memorandum of Law in Support of Their Motion for an Adverse Inference and Sanctions for Spoliation of Evidence Against the Advantage Parties*]. Shortly thereafter, the Take 5 Parties became aware that the Advantage Parties had not preserved access to the Google Analytics data pursuant to their obligations under Delaware and federal law, even though this data had been made available to the Advantage Parties' experts and counsel during the course of the Arbitration. *Id.*

As set forth in the Take 5 Parties' expert rebuttal report, in order to determine "how [] clicks are generated" (i.e. where they came from and whether they were generated by real users) one must first identify the source of the clicks, which include analyzing traffic data pertaining to the source of the click. *Id.* at Ex. 44 at ¶ 49 [*Rebuttal Expert Report of Jessie Stricchiola*] ("An analysis of click validity and/or traffic quality would also include analyzing click and traffic data pertaining to the source of the click (such as server log and Google Analytics data) for client tracking URLs."); *see also id.* at Ex. 45 [*Hearing Ex. T-127, Declaration of Jessie Stricchiola*].

On November 24, 2021, the Take 5 Parties moved for an adverse inference and sanctions, arguing that the Google Analytics data was relevant and material to the underlying dispute as well the expert reports, and as a result the Advantage Parties had an obligation to preserve it. *Id.* at Ex. 43. The Take 5 Parties further argued that the Advantage Parties were aware of the importance of the Google Analytics data prior to the commencement of the Arbitration as it was specifically referenced and attached to the Advantage Parties Notice of Claim and Notice of Dispute dated August 20, 2019. *Id.* at 6-7, 21; *see also id.* at Ex. 8.

The Advantage Parties responded to the Take 5 Parties' motion for sanctions, but the Arbitrator reserved ruling until after the hearing. *Id.* at Ex. 40 at 2; *id.* at Ex. 19 at 2 ("I reserve ruling on all of these motions/objections with the following caveat. Evidence that was the subject of a proper request for discovery, and should have and could have been produced in a timely manner that would have not unduly prejudiced another party, will not be considered, absent a showing of exceptional circumstances.").

In the Interim Award, the Arbitrator denied the Take 5 Parties' motion finding (without significant analysis or explanation but relying exclusively on two of the Advantage witnesses whose testimony had been procured through monetary inducement) that the Google Analytics data did not contain information that would materially impact the issues in the case and declined to impose sanctions. *Id.* at Ex. 1 at 4-5.

### 3. *Third-Parties*

In their first set of document requests served in November 2019, the Take 5 Parties' additionally sought documents concerning the Advantage Parties' payments or transfers of value by the Advantage Parties to witnesses:

> Document Request No. 8: For the period April 1, 2019 to the date of the hearing, all documents that refer or relate to a transfer of anything of value to, the release of any claim against, of the assumption of any obligation of a current or former Take 5 employee or witness in this Arbitration proceeding, or any entity affiliated with such person, or a promise, contingent or otherwise, to make such a transfer, release such a claim or assume such an obligation in the future.

*Id.* at Ex. 22 at 15. The Advantage Parties stated in response that they would "produce any responsive, non-privileged documents found during a reasonable review of the documents from the files of Respondent custodians." *Id.* Despite this response, the Advantage Parties never produced any documents responsive to Request No. 8.

On November 25, 2020, the Take 5 Parties sought the issuance of summonses to several former Take 5 employees.  The Arbitrator determined that Take 5 was permitted to contact these former employees informally and request information.  However, both parties to the Arbitration had significant problems with getting third parties to comply with discovery absent court subpoenas due to a circuit split concerning the enforceability of arbitration subpoenas, as well as the ongoing criminal investigation.  The Arbitrator acknowledged this issue numerous times, including during the course of the hearing where the parties argued the issue.  *Id.* at 46 at 1 [*December 15, 2020  Discovery Order*]. ("Take 5 has stated on several occasions . . . that the former employees refuse to cooperate.").

Most of Take 5's former employees refused to testify given the ongoing criminal investigation.  The Arbitrator also acknowledged this citing it as one of three grounds in denying the parties' motion for summary judgment.  *Id.* at Ex. 19 at 1 ("[S]everal fact witnesses have refused to testify, asserting the Fifth Amendment").  However, some former employees were willing to testify on behalf of the Advantage Parties, despite the ongoing criminal investigation, because those witnesses were paid either directly or indirectly by the Advantage Parties.

Michael Boy, a former Senior Director of the Take 5 fulfillment department, testified at his deposition ████████████ Redacted Pursuant to Stipulated Order ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████    *Id.* at Ex. 47 at 9:16-15:9 [*Boy Depo. Tr.*].

████████████ Redacted Pursuant to Stipulated Order ████████████

████████████████████████████████████████████████    *Id.* at 15:23-16:12, 18:2-24.  Boy testified to the same at the hearing.  *Id.* at Ex. 53 at 1650:22-1657:7 [*Hearing Tr. Vol. VI (Day 6)* (Boy Cross Examination)].  Remarkably, Gary Colen, former CEO

of the Take 5 business unit testified on cross-examination during the hearing that only two former

Take 5 employees remained at ASM, an accountant "to make sure that we have access to the

accounting to help these proceedings along" and Boy.  *Id.* at Ex. 49 at 520:19-4 [*Hearing Tr. Vol.*

*II (Day 2)* (Boy Cross Examination)].   In response to questions concerning Boy's role, Colen

testified:

> He's helping on these proceedings as a . . . his primary focus activity is helping
> these proceedings along, and he's kind off used to make sure that we can kind of
> respond to the different demands or requirements to make sure everybody has the
> information they need to be – to get the information they need to be successful.

*Id.* at 521:5-21.  Colen further testified that to his knowledge Boy did not have any job other than

helping with the Arbitration.  *Id.* at 521:22-24.

Eva Hodgens, a former Senior Director of the Take 5 fulfillment department, testified on

behalf of the Advantage Parties and stated for the first time during the hearing that the Advantage

Parties were paying her counsel's fees.  *Id.* at Ex. 54 at 2011:6-2012:3 [*Hearing Tr. Vol. VII (Day*

*7)* (Hodgens Direct Examination)].  On cross examination, Ms. Hodgens testified that she was not

familiar with the particulars of the arrangement with the Advantage Parties and could not recall

the amount of those fees despite having received copies of the invoices.  *Id.* at Ex. 55 at 2113:4-

19, 2116:17-2117:15 [*Hearing Tr. Vol. VIII (Day 8)* (Hodgens Cross Examination)].  She further

testified that she did not "know specifically" whether the bills since 2019 had "exceeded $20,000."

*Id.* at 2117:16-2118:12.  After the Interim Award was issued, it was revealed for the first time that

█████████ Redacted Pursuant to Stipulated Order █████████   *Id.* at

Ex. 69 at 8 [*Advantage Parties' Submission on Costs and Interest*].

Peter Ward, the founder of a software development company that provided services to Take

5, also testified at the hearing that the Advantage Parties were paying his legal expenses, despite

having never been an employee of Advantage, but he was not aware of how long that had been

taking place and did not know or recall the details of the arrangement.  *Id.* at Ex. 55 at 2258:24-

2260:21 (Ward Cross Examination).  After the Interim Award was issued, it was revealed for the

first time ████████ Redacted Pursuant to Stipulated Order ████████

████████   *Id.* at Ex. 69 at 8.

### 4.    Damages

On August 4, 2020, the Take 5 Parties served their Second Request for Documents.  At

least two of the requests specifically sought documents and information concerning damages:

> Document Request No. 129: A copy---or description by category and location---of
> all documents, ESI, and tangible things that any of the Advantage Parties has in its
> possession, custody, or control and may use to support its claims or defenses, unless
> the use would be solely for impeachment.

> Document Request No. 130: A computation of each category of damages claimed
> by any of the Advantage Parties and the documents or other evidentiary material,
> unless privileged or protected from disclosure on which each computation is based,
> including materials bearing on the nature and extent of injuries suffered.

*Id.* at Ex. 31 at 12-14 [*Advantage Parties' Responses to Take 5's Second Request for Production

of Documents and Information*].  The Advantage Parties responded, objecting on numerous bases,

including that the requests were premature, protected by privilege, and constituted expert

testimony.  *Id.*  The Advantage Parties never produced a damages expert, damages expert report,

or documents demonstrating computation of their claimed damages.  The only document the

Advantage Parties provided relevant to Request 130 was ██Redacted Pursuant to Stipulated Order██

████████.  *Id.* at Ex. 32

[*Hearing Exhibit A-0431A*].  The Take 5 Parties' later moved to exclude this information from the

hearing on the basis that it had not been properly disclosed.  *Id.* at Ex. 33 [*Take 5 Parties' Motion

to Preclude Testimony and Evidence Regarding the Advantage Parties' Damages Claims*].

### D.    The Hearing

The evidentiary hearing proceeded and was conducted virtually over the course of sixteen days on January 25, 26, 27, 28, 31, February 1, 2, 3, 4, and May 2, 3, 4, 5, 6, June 5 and July 5, 2022. *Id.* at Ex.s *48-63* [*Hearing Transcripts Volumes I-XVI*]; *see also id.* at Ex. 1 at 3. Though the hearing was conducted virtually, it was deemed to take place in Washington, DC. *Id.* at Ex. 64 at ¶ 1 ]; *see also id.* at Ex. 65 at 1 .

The Advantage Parties presented their case over the course of ten days, calling a total of eighteen witnesses: eleven fact witnesses, one combination fact/expert witness, two expert witnesses, and the designated deposition testimony of four fact witnesses. *Id.* at Ex. *1* at 6-24; *see also id.* at Exs. 48-57.

On Day 10 of the hearing, after the Advantage Parties' rested their case, the Take 5 Parties moved for a limited directed verdict arguing that no evidence had been presented concerning RJV, no evidence had been presented demonstrating Radetich and Gluck had personal knowledge of any of the fraud allegations, and the evidence presented was insufficient with respect to the RICO claims against all of the Take 5 Parties. *Id.* at Ex. 1 at 24; *id.* at Ex. 57 at 2709:09-2713:2. Counsel for the Take 5 Parties' specifically argued:

> [T]here is no evidence that Richard Gluck or Alex Radetich had personal knowledge of any of the allegations of – that have been alleged here, any of the fraud allegations. The best they have, Your Honor, the best, was after Eva Hodgens was done on her direct examination, we took a break. Mr. Strub came back and asked Eva Hodgens a few more questions, and all she said was that Alex told me the problems would be remedied after the purchase of Advantage. That's it. There's literally no evidence in front of you, Your Honor, that says that Alex Radetich or Richard Gluck, either of them, had personal knowledge of any of the fulfillment issues, of the tracking issues, et cetera.

*Id.* at Ex. 57 at 2709:16-25, 2710:17-2711:13. The Arbitrator declined to rule on the motion and took it under advisement. *Id.* at 1 at 24; *id.* at Ex. 57 at 2709:09-2713:2.

The Take 5 Parties presented twelve witnesses over the course of the remaining five days of the hearing: six fact witnesses, four expert witnesses, and video depositions of two adverse witnesses. *Id.* at Ex. *1* at 24-31; *id.* at Exs. 57-63. Radetich and Gluck did not testify at the hearing because they were forced to invoke their Fifth Amendment rights as a result of the ongoing criminal investigation at their respective depositions.

The Parties filed post-hearing briefs on June 29, 2022 and oral closing arguments were presented on July 5, 2022. *Id.* at Exs. 66-68 [*Written Summation of Petruss Media Group, LLC f/k/a Take 5 Media Group, LLC, Richard Gluck and RJV Marketing Corp.*; *Post Hearing Memorandum of Law on Behalf of Alex Radetich*; *The Advantage Parties' Post-Hearing Brief*]; *Id.* at Ex. *63* [*Hearing Tr. Vol. XVI (Day 16)*].

### E.    The Interim Award

On August 4, 2022, the Arbitrator issued an Interim Award. *Id.* at Ex. 1. The Interim Award summarized the underlying proceedings, ruled on several pre-hearing motions, and reached a decision on liability and damages. The Interim Award contains no record citations and defers ruling on costs and fees. The Arbitrator determined that he could not find from the evidence that Take 5, Gluck, and Radetich misrepresented facts to <u>clients</u> but found that they had made actionable misrepresentations to the <u>Advantage Parties</u> prior to the acquisition. *Id.* at 37. Thus, the Arbitrator found that Take 5, Gluck, and Radetich committed civil fraud. *Id.* The Arbitrator further found that each of the Take 5 Parties, including RJV, breached various sections of the APA. *Id.* at 37-38. Without citing to any evidence in the hearing record, the Arbitrator stated that pursuant to Section 8.2 of the APA, RJV owed a duty to indemnify Advantage for Take 5's breach of warranties "even if it did not commit fraud." *Id.* at 38. For avoidance of doubt, RJV, Take 5, Radetich, and Gluck deny the allegations of fraud and breach in the strongest terms. The Arbitrator ruled that he was "not persuaded that the evidence supports a finding that Advantage has a claim

of actionable fraud that occurred after the acquisition" and that there was no need to address the Advantage Parties' claim for breach of the implied covenant of good faith and fair dealing. *Id.* The Advantage Parties were similarly unsuccessful on their RICO claims. *Id.* at 38-41. With very little explanation, the Arbitrator denied the Take 5 Parties "claims based on the APA" and denied Gluck and Radetich's claim for defamation "in light of the finding of fraud." *Id.* at 41.

The Arbitrator further found that the Advantage Parties were entitled to consequential damages "in the amount of the full purchase price that was paid [for Take 5] after crediting the amount received from an insurance claim." *Id.* at 41-42. The Arbitrator determined that the $77 million base purchase price should be reduced by one-third, representing the value of the assets other than the email marketing portion of Take 5's business; a $770,000 holdback; and a $7,700,00 recovery from insurance, awarding a total of $43,633,333.34 in consequential damages. *Id.* at 42. The Arbitrator additionally found that the Advantage Parties were entitled to the amounts paid to Ernst & Young, Deloitte, and Jones Day for pre-acquisition due diligence totaling $788,954; the amounts paid to FTI and Latham in connection with the Spring 2019 investigation of Take 5, totaling $3,246.203.95; and a portion of the "shut down" costs for termination of leases in the amount $657,331. *Id.* at 42-43. Redacted Pursuant to Stipulated Order

*Id.* The Interim Award awarded a total of $48,325,822.29 in damages against the Take 5 Parties, denied the Take 5 Parties claim for damages, and denied the pending motions for sanctions and other discovery abuses, all with little to no explanation. *Id.* at 43.

F.     The Final Award

On August 19, 2022, the Advantage Parties filed a letter requesting reimbursement of litigation expenses and interest pursuant to the Section 10.11(b) of the APA, seeking

$37,765,382.77 in fees, costs, and interest. *Id.* at Ex. 69 at 8 [*Advantage Parties' Submission on Costs and Interest*]. The Advantage Parties sought hourly and contingency attorneys' fees, local counsel's attorneys' fees, attorneys' fees that the Advantage Parties paid on behalf of fact witnesses Ward and Hodgens, pre-judgment interest, post-judgment interest, subscription fees, and other court reporting and Arbitration costs, among other expenses. *Id.* On August 29, 2022, the Advantage Parties provided an additional letter on litigation expenses attaching supplemental authority. *Ex. C* at Ex. 70 [*Advantage Parties' Supplemental Submission on Costs and Interest*]. On September 16, 2022, the Take 5 Parties responded arguing that the Advantage Parties had failed to demonstrate their entitlement to the various categories of costs and interest. *Id.* at Ex. 71 [*Take 5 Parties' Submission on Costs and Interest*].

On September 20, 2022, the AAA sent the Parties a letter declaring the action closed as of September 19, 2022 and stating that "any direct exchange with the Arbitrator is terminated" and "[a]ll communications shall be directed to the AAA." *Id.* at Ex. 72 [*AAA Correspondence*]. Later the same day, counsel for the Advantage Parties sent correspondence directly to the Arbitrator by email improperly responding to the Take 5 Parties' Reply Submission on Costs and Interest. *Id.* at Ex. 73 [*Correspondence from M. Strub attaching Advantage Parties' Response to the Take 5 Parties' Reply Submission on Costs and Interest*]. Notably, the Advantage Parties admitted in their September 20, 2022 response that in the absence of them paying witnesses to provide testimony (whether through direct payments or through payment of their legal fees and expenses), the Advantage Parties would not have been able to prove fraud:

Redacted Pursuant to Stipulated Order

*Id.* at 6-7.

Following objection by counsel for the Take 5 Parties, the Arbitrator responded by email stating that he would not reopen the record.  *Id.* at Ex. *74* [*Correspondence from Hon. J. Eyler*].

On October 4, 2022, the Arbitrator issued a Final Award incorporating the Interim Award and determining that the Advantage Parties were the "prevailing parties." *Id.* at Exs. *2 & 3* at 2, 10-11 ("The Interim Award is incorporated herein and made a part hereof.").  The Final Award additionally awarded the Advantage Parties $13,760,862.50 in pre-judgment interest, $7,318,894.05 in attorneys' fees, $556,436.50 in expert witness fees, $279,287.99 in subscription fees, $116,782.57 in other costs, and $119,110.00 in the administrative fees and expenses of the American Arbitration Association and compensation and expenses of the Arbitrator.  *Id.* at 10-11.

On October 4, 2022, the AAA provided further correspondence reminding the parties that "there is to be no direct communication with the arbitrator. All communication shall be directed to the AAA." *Id.* at Ex. 75 [*AAA Correspondence*].

### G.    Modification of the Final Award

Later that same day, counsel for the Advantage Parties (again improperly) sent email correspondence directly to the Arbitrator requesting the Arbitrator enter a corrected Final Award due to a typographical issue with the final damages number provided at paragraph 1 reflecting an award of $43,633,333.34 rather than $48,325,822.29.  *Id.* at Ex. *76* [*Correspondence from M. Strub*].  AAA Director of ADR Services, Matthew Conger, sent correspondence to the parties acknowledging the Advantage Parties' improper email correspondence as a request under AAA Commercial Rule R-50 for modification of the Final Award and invited the Take 5 Parties to provide a substantive response in writing.  *Id.* at Ex. 77 [*Correspondence from M. Conger*].

The Take 5 Parties responded to the request on October 14, 2022, agreeing to the Advantage Parties proposed modification, requesting an additional clarification of the Final

Award, and objecting to the Advantage Parties continued disregard of AAA procedure.  *Id.* at Ex. 78 [*Take 5 Parties' Response to Request for AAA Commercial Rule R-50 Modification of Final Award*].

On October 20, 2022, the Advantage Parties replied that they had no objection to the Take 5 Parties' request for additional clarification of the Final Award.  *Id.* at Ex. 79 [*Correspondence from M. Strub*].  Later that day, the Arbitrator issued the Modified Final Award, modifying the damages number reflected in paragraph 1 as requested by the Advantage Parties.  The AAA also provided the clarification requested by the Take 5 Parties.  *Id.* at Ex. *3* at 10.

### H.    Initiation of this Action and Concurrent Federal Action

Less than one hour after the Modified Final Award was emailed to the parties, the Advantage Parties initiated this action by filing the Petition to Confirm Arbitration Award and for Entry of Final Judgment.  *See Dkt. No. 1, Petition*.  The Petition seeks to confirm only the Modified Final Award under Chapter 682 of the Florida Statutes.  The Advantage Parties did not seek to confirm the Interim Award.

On October 26, 2022, the Take 5 Parties initiated an action in the United States District Court for the District of Columbia seeking to vacate both the Interim Award and Modified Final Award pursuant to Section 10 of the FAA.  *See Exs. A–D.*  On October 28, 2022, the District Court for the District of Columbia issued the summons for each of the Advantage Parties and service of the summons was made on ASM and Advantage Solutions, Inc. later that same day.  *Ex. F.*  The service agents for the remaining parties were closed by the time the Take 5 Parties' process server arrived at their offices.  Accordingly, on the next business day, Monday, October 31, 2022, the remaining Advantage Parties (Advantage Sales & Marketing, Inc., Karman Intermediate Corp., and Karman Topco L.P.) were properly served through their registered service agent.  *Id.*

On October 28, 2022, the Petitioners attempted to serve Mr. Radetich's wife with a

summons in this action for Mr. Radetich, individually, as well as for Take 5. The Petitioners attempted to serve Mr. Gluck with a summons in this action through his stepson on October 29, 2022 by throwing the summons over the gate of Mr. Gluck's house.[3]

On November 1, 2022, counsel for RJV Marketing Corp. accepted service on behalf of RJV in order to facilitate the filing of this motion to vacate within the time period prescribed by 9 U.S.C. §12.

## **LEGAL STANDARD**

"Upon a motion to confirm the party opposing confirmation may apparently object upon any ground which constitutes a sufficient cause under the statute to vacate, modify, or correct, although no such formal motion has been made." *The Hartbridge*, 57 F.2d 672, 673 (2d Cir. 1932). Courts do not appear to require a particular format in moving to vacate an arbitration award, particularly in response to a motion to confirm the same award, so long as the papers "contain the allegations which would sustain such a motion." *Int'l Broth. of Elec. Workers, Local Union No. 323 v. Coral Elec. Corp.*, 576 F. Supp. 1128 (S.D. Fla. 1983) (finding that arguments to vacate in affirmative defenses filed within the 90 day window were tantamount to a motion to vacate and sufficient to preserve jurisdiction); *Carey Rodriguez Greenberg & Paul, LLP v. Arminak*, 583 F. Supp. 2d 1288, 1289 n.1 (S.D. Fla. 2008) (holding that opposition to request to confirm arbitration award filed within 90 day window was a valid motion to vacate under 9 U.S.C. § 9).

The Eleventh Circuit has suggested when a court is confronted with a motion to confirm prior to the expiration of the three-month period to move to vacate, the "best practice" to set

---

[3]    As set forth in Respondent's Motion to Quash above, the affidavits of service are not yet available making it nearly impossible for Respondents to fully challenge the sufficiency of process at this early stage of the proceeding.  However, on their face, the facts surrounding the service of Take 5 and Mr. Gluck appear to suggest improper service, giving rise to the motion to quash the summons.

simultaneous deadlines for the pother party to file an opposition to the motion to confirm, if any, and to file a separate motion to vacate. *McLaurin v. Terminix Int'l Co., LP*, 13 F.4th 1232, 1239 (11th Cir. 2021) (stating, additionally, that if the losing party files a timely motion to vacate it may ask the court to stay the proceedings to confirm the award until the court rules on the motion to vacate). Here, the Take 5 Parties make their arguments in one opposition and motion, in the interests of judicial efficiency, because the arguments in opposition to confirmation and in favor of vacating the Awards are the same.

Section 10 of the FAA provides that a court in the district where an arbitration award was made may issue an order vacating an award upon the application of any party to the arbitration based on upon four statutory grounds:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceed their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. §10(a).

Some Circuits also recognize a fifth ground, where an award was entered in "manifest disregard of the law." *Bellantuono v. ICAP Secs. USA, LLC*, 557 F. App'x 168, 174 (3d Cir. 2014) (acknowledging circuit split on issue); *Regenery Pub., Inc. v. Miniter*, 368 F. App'x 148, 149 (D.C. Cir. 2010) ("[a]ssuming without deciding that the 'manifest disregard of the law' standard survives *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 [] (2008)"). Vacating an award under the common law doctrine of manifest disregard of the law is proper "if the record before the arbitrator reveals no support whatsoever for the arbitrator's determination." *Am. Life Ins. Co. v. Parra*, 269

F. Supp. 2d 519, 526 (D. Del. 2003) (citation omitted).

Delaware state courts also recognize manifest disregard of the law as a basis to vacate an arbitration award. *Auto Equity Loans of Del., LLC v. Baird*, No. 438, 2019, 2020 WL 2764752, at *3 & n. 25 (Del. May 27, 2020) (acknowledging the circuit split following *Hall* and "assuming" that manifest disregard for the law is a ground for vacatur under federal law); *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750 (Del. 2014) ("Under the FAA, vacatur is authorized where the arbitrator acts in 'manifest disregard' of the law."). Other Delaware courts have interpreted the manifest disregard standard as the same as an argument, pursuant to 9 U.S.C. § 10(a)(4), that the arbitrator exceeded his authority. *MHP Mgmt., LLC v. DTR MHP Mgmt., LLC*, No. 2020-0365, 2022 WL 2208900, at *3 (Del. Ch. Jun. 21, 2022). Either way, the Arbitrator's manifest disregard of the law is a basis to vacate here because pursuant to the APA, this action is governed by Delaware law. *See Ex. C* at Ex. 1 § 10.11(b).

## **ARGUMENT**

## I. THE AWARDS SHOULD BE VACATED BECAUSE THE ARBITRATOR IS GUILTY OF MISCONDUCT

### A. The Arbitrator is Guilty of Misconduct in Refusing to Postpone the Hearing

An arbitration award may be vacated where "the arbitrators were guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown . . ." 9 U.S.C. § 10(a)(3). Though arbitrators are to be accorded discretion, "if the failure of an arbitrator to grant a postponement or adjournment results in the foreclosure of the presentation of pertinent and material evidence, it is an abuse of discretion." *Coastal Gen. Constr. Servs. Corp.* v. *V.I. Hous. Auth.*, 98 F. App'x 156, 159 (3d Cir. 2004) (affirming vacatur of arbitration award where arbitrator "committed misconduct by refusing to postpone the [hearing]"). A court may vacate an award if the arbitrator's "refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration

36

proceedings." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 557 (3d Cir. 2009) (citing *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 481 F.3d 813, 818 (D.C. Cir. 2007)). "In evaluating an arbitrator's decision to deny a postponement, courts consider whether there existed a reasonable basis for the arbitrator's decision and whether the denial created a 'fundamentally unfair proceeding." *Alexander Julian, Inc. v. Mimco, Inc.*, 29 F. App'x 700, 703 (2d Cir. 2002) (internal citation and quotation marks omitted); *Orner v. Country Grove Inv. Grp., LLC*, 2007 WL 3051152, at *10 (Del. Ch. Oct. 12, 2007). "A fundamentally unfair proceeding may result if the arbitrators fail to give each of the parties to the dispute an adequate opportunity to present its evidence and argument." *Id.* (internal citation and quotation marks omitted).

Here, the Arbitrator's denial of the Take 5 Parties' Motion to Stay and failure to postpone the Arbitration resulted in the foreclosure of pertinent and material evidence, which denied the Take 5 Parties the right to a fair hearing and an adequate opportunity to present evidence and argument, significantly prejudicing the Take 5 Parties and constituting an abuse of discretion. Additionally, the Arbitrator's failure to stay the Arbitration may even rise to the level of a violation of public policy as Radetich and Gluck were deprived of their due process rights.

### 1.    *Sufficient Cause to Postpone or Stay the Arbitration was Shown*

As set forth above and in the Take 5 Parties' Petition to Vacate or Set Aside the Arbitration Award, on June 23, 2021, the Take 5 Parties filed an emergency motion to stay the Arbitration, seeking a stay of the proceeding for six months or until the criminal investigation was concluded, whichever was earlier. *Ex. C* at Ex. 20. As grounds for the emergency motion, the Take 5 Parties argued the ongoing criminal investigation initiated by the Advantage Parties against Radetich and Gluck, would have a chilling effect and both would be forced to make the impossible decision between invoking the Fifth Amendment or potentially providing evidence the Government could misconstrue in its ongoing investigation, particularly given the Advantage Parties close

collaboration with the government. The Arbitrator refused to stay the Arbitration because, among other things, he found that prejudice to Radetich and Gluck was "speculative" even though the Advantage Parties failed to demonstrate any unique prejudice of a stay. *Id.* at Ex. 27.

Though Delaware courts have not articulated a specific test for determining when to stay a civil case in light of a pending criminal investigation, they often rely upon the federal standard. *A. Schulman, Inc. v. Citadel Plastic Holdings, LLC*, 2017 WL 5035497, at *1-2 (Del. Nov. 2, 2017). The two overarching considerations are (i) the status of the criminal case and (ii) the extent to which the issues in the criminal and civil cases overlap. *Id.* Courts then balance five additional factors: (1) the interest of the plaintiff in proceeding expeditiously and potential prejudice it may suffer from a delay; (2) the burden upon the defendants from going forward with any aspects of the proceedings, in particular any prejudice to their rights; (3) the convenience of the court and efficient management of judicial resources; (4) the interests of any non-parties; and (5) the interest of the public in the pending civil and criminal litigation. *Id.* at *2.

The similarity or overlap of the issues is "the most important issue at the threshold" in determining whether or not to grant a stay. *Rosin v. Univ. of Del.*, 2016 WL 5900191, at *1 (Del. Super. Ct. Oct. 3, 2016); *Walsh Secs., Inc. v. Cristo Prop. Mgmt., Ltd.*, 7 F. Supp. 2d 523, 527 (D.N.J. 1998). The Arbitrator acknowledged that the issues "substantially overlap" *(Ex. C* at Ex. 27 at 3) and the Advantage Parties themselves admitted the same arguing "Advantage and the USAO share a common interest in that each is litigating, or potentially litigating, the Take 5 Parties as a result of their fraudulent scheme." *Id.* at Ex. 25 at 12 [*Adv. Resp. to Mtn. to Compel*].

Additionally, courts have found that an overlap is "evident" where (like here) the other party provided law enforcement with the information forming the basis of the criminal action. *E.I. du Pont de Nemours & Co. v. Hou*, 2017 WL 2531940, at *1 (D. Del. Jun. 9, 2017). Here, it is

undisputed that the Advantage Parties provided the basis to the FBI and United States Attorney's Office for the Central District of California that formed the basis for the criminal investigation and that the Advantage Parties have continued to feed information to them. *Ex. C* at Ex. *6* at 5, 27; *id.* at Ex. *30* at 10-11. Thus, the factor of whether there is overlap between the issues in the criminal and civil proceedings, the most important and heavily weighted factor, weighed strongly in favor of granting the Take 5 Parties' request to stay. There unquestionably was sufficient cause for the Arbitrator to grant the motion. Each of the other five factors also weighed in favor of granting the stay.

The Arbitrator appears to have denied Take 5's request based on the status of the criminal investigation. However, the status of the criminal proceedings is but one of the many factors to weigh in determining whether to stay an action and it should not be afforded greater weight than any factor other than overlap of the issues, the most important factor. *In re Cyber Litig. Inc.*, 2021 WL 2655312, at *4 (Bankr. D. Del. Jun. 28, 2021). Here, it appears the Arbitrator afforded this factor greater weight than the other factors. Further, in light of the Take 5 Parties' limited request to stay the action for six months or until the conclusion of the investigation, whichever was *earlier*, this factor should have been afforded even less weight. As the Arbitrator acknowledged, no evidence of unique prejudice to the Advantage Parties was offered and none could be; the Advantage Parties were the ones who initiated the criminal investigation and who have been continually feeding additional information and documentation to the government. Thus, the Arbitrator erred in affording the status of the investigation such weight. Additionally, the Arbitrator claimed that knowledge of the criminal investigation for some period of time weighed against a stay. Not only is the date on which a party becomes aware of an investigation not a factor used to determine whether to stay an action, but the statement that the Advantage Parties had

reported the Take 5 Parties' conduct to the FBI and United States Attorney's Office was not sufficient to put Radetich and Gluck on notice that there was an actual criminal investigation pending against them.  It was not until mid-2021, when an FBI agent appeared at Radetich's home and Colen testified at his deposition in the Arbitration that he had been asked to wear a wire by law enforcement that the Take 5 Parties became aware there was an active investigation.

Thus, the Take 5 Parties demonstrated good cause to support their motion to stay and to postpone the hearing in this action due to the parallel criminal proceeding.

### 2. *The Arbitrator's Failure to Postpone the Arbitration Resulted in the Foreclosure of Pertinent and Material Evidence*

As a result of the Arbitrator's denial of the motion to stay and the Advantage Parties' initiation of and cooperation with an ongoing criminal investigation, Radetich and Gluck invoked their Fifth Amendment rights at their depositions, providing responses to no substantive questions. As a further result of the Arbitrator's failure to postpone the hearing, Gluck and Radetich were forced into a *Hobson's* choice between defending themselves and the business they co-founded against the Advantage Parties' spurious claims or risking exposure in the ongoing criminal investigation.  Ultimately, neither Radetich nor Gluck were able to testify at the hearing either.

As the founders of Take 5, named parties in the action, and the individuals accused of being the masterminds of an alleged fraudulent scheme, purportedly concealed from numerous individuals and entities over many years, it is without question that the testimony of Radetich and Gluck either at deposition or at the hearing would have been pertinent and material evidence.

Under Delaware law, in order to demonstrate fraud, a party must show by the preponderance of the evidence that the defendant knew the representation was false and intended for the other party to rely on that representation.  *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 807 (Del. 2014).  Ultimately, the Arbitrator found that Take 5, Gluck, and Radetich

"knowingly misrepresented materials facts to Advantage with the intention of having Advantage rely on them." *Ex. C* at Ex. 1 at 37. However, no evidence was presented during the hearing concerning the knowledge, state of mind, or intentions of Gluck and Radetich and neither were able to testify about the same. Testimony by Gluck and Radetich would have been necessary, pertinent and material evidence with respect to each individual's knowledge, state of mind, and intent. Further, their testimony could have easily refuted the unsupported allegations and circumstantial evidence that Gluck and Radetich knew of and created a plan to defraud Take 5's customers and the Advantage Parties and their intentions in making certain representations to the Advantage Parties. Based on the record, there was no testimony that directly spoke to either individual's state of mind and many of the representations that were made concerning their state of mind were made by counsel for the Advantage Parties, without any factual support whatsoever.

In fact, because no evidence was presented concerning the state of mind of Radetich and Gluck, counsel for the Take 5 Parties moved for a directed verdict at the close of the Advantage Parties' case arguing, in part, that "there is no evidence that Richard Gluck or Alex Radetich had personal knowledge of any . . . of the fraud allegations." *Ex. C* at Ex. 57 at 2709:16-25, 2710:17-2711:13. Neither counsel for the Advantage Parties, nor the Arbitrator responded to this argument.

Further, both Radetich and Gluck brought claims for defamation. Though there does not appear to be any rule that testimony by a plaintiff is necessary to prove defamation *per se*, in Delaware a plaintiff must demonstrate by a preponderance of the evidence that the defamatory statement caused the plaintiff actual injury. Del. P.J.I. Civ. 11.6 (2000) (citing *Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1183 (Del. 2000)). Factfinders should consider the reputation the individual enjoyed prior to the defamatory statement as compared to after. Del. P.J.I. Civ. 11.11 (2000); *see also Preston Hollow Cap. LLC v. Nuveen LLC*, 2022 WL 2276599, at *3-4 (Del. Super.

Ct., Jun. 14, 2022). The testimony of both Radetich and Gluck concerning the impact of the Advantage Parties' statements about them on their reputations and livelihoods was necessary to prove an essential element of their claim and thus absolutely was and is pertinent to their claims.

There is no question that deposition and/or hearing testimony by Radetich and Gluck would have been material to the Take 5 Parties' case and likely would have altered the outcome of the Arbitration had the ongoing criminal investigation not been hanging over their head preventing them from testifying. Even the Arbitrator himself acknowledged the importance of this testimony, citing the failure of various witnesses to testify as one of three grounds under which he denied the parties' cross motions for summary disposition. *Ex. C* at Ex. 27 at 1.

### 3.    *The Arbitrator's Failure to Postpone the Arbitration Prejudiced the Take 5 Parties, Denying Them a Fair Hearing*

As a result of the Arbitrator's denial of the motion to stay and the inability of Gluck and Radetich to testify, the Take 5 Parties were prejudiced such that they were deprived of fair hearing. "A 'fair hearing' is one where the parties have notice and an opportunity to present evidence and arguments before an impartial arbitrator." *CPR Mgmt., S.A. v. Devon Park Bioventures, L.P.*, 19 F.4th 236, 245 (3d Cir. 2021). Here, the Take 5 Parties, particularly Gluck and Radetich, were not given an opportunity to present evidence before the Arbitrator. The Advantage Parties acted in bad faith by causing a criminal investigation to be commenced against Gluck and Radetich, knowing that they would gain an advantage in the Arbitration because Gluck and Radetich would forced to assert their Fifth Amendment rights during the pendency of the civil action. Neither Gluck nor Radetich were able to tell their side of the story or to refute the many baseless allegations made against them. For example, in their opening statement counsel for the Advantage Parties proclaimed that the evidence would show that Eva Hodgens and Michael Boy would show that "Take 5 was committing fraud and that Alex Radetich and Richard Gluck knew about it" and that

when the purported fraud was "revealed" during a PowerPoint presentation "Radetich did not deny or challenge any aspect of it." *Ex. C* at Ex. 48 at 7:23-8:4, 11:10-12:6.

Though testimony was presented concerning certain things Radetich and Gluck allegedly said or did, it did not support the assertions the Advantage Parties' counsel made in his opening statement. *See, e.g.*, *Id.* at Ex. 49 at 355:12-23 (Colen Direct Exam.); *Id.* at Ex. 50 at 760:14-18 (Colen Cross Exam.). Radetich and Gluck themselves were never able to respond to these groundless allegations made in the Advantage Parties' opening statements. Nor was counsel for the Take 5 Parties able to effectively refute them without testimony from Radetich and Gluck.

Much of the evidence concerning Radeitch's and Gluck's purported knowledge and state of mind was presented through the testimony of the Advantage Parties' paid witnesses, who through significant payments either they or their criminal defense attorneys received did not have the threat of criminal charges hanging over them. Boy, who was paid substantial sums annually to provide assistance and information relating to the Arbitration, testified that Radetich and Gluck allegedly were aware that email campaigns were being fulfilled with PPC traffic, that Radetich was the "data architect" of Take 5's data, that Take 5 could not continue to call its data "double opt-in" or represent that it had 300 million records. *Id.* at Ex. 53 at 1616:23-1618:2, 1628:18-1633:4, 1650:22-1657:7.

Specifically, Boy testified that he had discussed the quality of the data and his concerns with Radetich "[m]ultiple times" and recalled a specific conversation with Radetich where he got "visibly upset." *Id.* at 1629:4-1633:4. However, when cross-examined on this point, Boy was impeached with his deposition testimony where he acknowledged he had not had conversations with Radetich and testified "[e]verything went through [Eva Hodgens and Beth Jenkins]–again, at that point in time, I don't have a relationship with Alex and Rich." *Id.* at 1693:18-1695:7; *see also*

*id.* at 1708:25-1709:15.

Despite, his prior inconsistent statements and Boy's overall lack of credibility, the Arbitrator gave his testimony significant weight, citing it in the Interim Award as support for his conclusions relating to the alleged fraud. *See Id.* at Ex. 1 at 15. Had Radetich and Gluck been permitted to testify, they would have disputed Boy's inconsistent and incorrect testimony and demonstrated the truth of Boy's initial deposition testimony, that he had no such discussions with Radetich and Gluck and did not even have a relationship with them.

Hodgens, who received payments from the Advantage Parties' [Redacted Pursuant to Stipulated Order] testified that Radetich and Gluck were aware of formulaic reporting. This was based on hearsay testimony from her conversations with former Take 5 employees. *Id.* at Ex. 54 at 2101:10-24. Counsel for the Take 5 Parties objected to this testimony and moved to strike because it was based upon conversations with individuals who did not testify or provide discovery in the proceeding. *Id.* at 2101:25-2102:21. But the Arbitrator ignored counsel's objection, and relied upon this unsupported testimony in the Interim Award, even misrepresenting what Hodgens actually said. *Id.* at Ex. 1 at 19 ("Based on conversations with Mr. Radetich, she testified that he knew about the formulaic reporting, and near the end, he was supportive of fixing it."). Again, but for the looming criminal investigation, Radetich would not have been prevented from presenting evidence refuting these inconsistencies, which were (at best) based on unconfirmed hearsay about what Radetich purportedly said to third parties who themselves refused to provide testimony in the Arbitration. Moreover, they did not and do not prove fraud in any event.

Radetich's inability to testify was particularly prejudicial with respect to the allegations made against him specifically. The Advantage Parties' claim that Radetich had admitted to the

purported fraud was the centerpiece of their Arbitration arguments.  They repeated the accusation throughout their written submissions even though it was and is unfounded.  *Id.* at Ex. 6 at 4, 19; *Id.* at Ex. 8 at 2-3; *Id.* at Ex. 13 at 16 [*Adv. Parties' Memo. of Points & Auths. in Supp. of their Mtn. for Summ. J.*]; *Id.* at Ex. 15 at 18 [*Reply in Supp. of Adv. Parties' Mtn. for Summary Judgment*]; *Id.* at Ex. 35 at 162.  Despite a lack of evidence to support these contentions, the Advantage Parties unabashedly repeated the same incorrect allegations during the Arbitration, arguing in their opening statement that "when confronted in July 2019, Mr. Radetich expressly admitted the fraud." *Id.* at Ex. 48 at 12:13-15.  Further, Advantage's counsel represented that "Mr. Colen would testify that he understood that, from the Latham [] interviews, that Mr. Radetich had basically acknowledged that there were fraudulent reports that were made." *Id.* at Ex. 49 at 488:14-490:17.  But no such evidence was ever put into the record, including in Colen's testimony, because no such evidence exists.  The Advantage Parties *finally* produced the contemporaneous notes of the witness interviews. **Redacted Pursuant to Stipulated Order**

The Take 5 Parties objected to the late production of these notes and the baseless allegations made concerning Radetich in a motion filed on April 14, 2022, arguing that the Advantage Parties had improperly withheld the notes, despite at least two discovery orders requiring their production, seriously prejudicing the Take 5 Parties.  Though the Arbitrator ultimately ordered that the notes of the witness interview were not admissible due to the Advantage Parties' failure to produce, the damage was done. *Id.* at Ex. 57 at 2592:17-2696:5.  Due to the late production of the notes and the Arbitrator's failure to act, combined with Radetich's inability to

testify, the Take 5 Parties were left without any cure as became clear in the Interim Award. Had Radetich been able to testify, he could have easily refuted the incorrect allegations made against him and offered the only first-hand account of what he said during his July 2, 2019 interview. The Advantage Parties delay in producing the notes made it impossible for the Take 5 Parties to conduct any other discovery, such as deposing other attendees of the interviews.

The Arbitrator stated in his order denying the motion to stay that it was "speculative" whether Radetich and Gluck would be prejudiced by a decision not to testify (in the absence of a stay), arguing that under Delaware law he could not draw adverse inferences from any invocation of their Fifth Amendment rights. *Id.* at Ex. 27 at 3. But the prejudice to Radetich and Gluck was their inability to present their side of the story and to refute the incorrect allegations made by the Advantage Parties. The prejudice suffered by Radetich and Gluck is far from speculative. Without an opportunity to present testimony, particularly concerning their knowledge and state of mind and the central allegation of Radetich's purported admission, the Take 5 Parties were prejudiced such that they were denied a fair hearing. Indeed, failing to apply an adverse inference is not the same as completely foreclosing the testimony of the two most critical witnesses in the case, the latter being a severe form of prejudice, which the Arbitrator imposed here.

Further, though the Arbitrator stated that he was unable to and would not draw an adverse inference, he effectively drew such an inference in his Interim Award, giving significant weight to the testimony of Boy and Hodgens, despite their inconsistent statements and lack of credibility. Others who were a part of conversations with Radeitch and Gluck according to Boy and Hodgens, such as Beth Jenkins and Tanya Coker, declined to testify given the criminal investigation. Absent the paid testimony of two disgruntled former employees, Boy and Hodgens, the Advantage Parties acknowledged that they would not have been able to demonstrate fraud. *See, id.* at Ex. 73 at 6-7.

It cannot be the law that a party may initiate a criminal investigation against individuals in an ongoing civil proceeding, make numerous unsupported allegations about statements purportedly made by those individuals and their state of mind, and then use that criminal investigation to prevent those same individuals from testifying in their own defense. Here, all of this was compounded by the fact that the Advantage Parties also were paying the witnesses in order to coerce them to testify against the Take 5 Parties. This is misconduct, particularly, because the parties' failure to testify resulted in liability exceeding $70 million. Thus, the Arbitrator's failure to postpone the hearing or to stay the proceeding pending the parallel criminal investigation prejudiced the Take 5 Parties resulting in a fundamentally unfair proceeding.

### B.     The Arbitrator is Guilty of Misconduct in Refusing to Hear Evidence Pertinent and Material to the Controversy

An arbitration award may be vacated where "the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). A court may vacate an award if the arbitrator's "refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings." *Century Indem. Co.*, 584 F.3d 513, 557 (3d Cir. 2009) (citing *Lessin*, 481 F.3d at 818).

The Arbitrator is first guilty of misconduct, as set forth above, for his refusal to hear the testimony of Alexander Radetich and Richard Gluck, through his failure to grant a stay of the proceeding. *See supra* Section I.A. The Arbitrator is further guilty of misconduct in refusing to hear evidence concerning Google Analytics and failing to appropriately sanction or invoke an adverse inference against the Advantage Parties for their spoliation of evidence. The Arbitrator's failure to respond to the Advantage Parties' bad-faith spoliation of evidence concerning the Google Analytics data resulted in the Take 5 Parties being deprived of a fundamentally fair hearing. As discussed above, a fair hearing is one in which a party is afforded the opportunity to present

evidence, and here the Take 5 Parties were not afforded such an opportunity.

### 1.    The Google Analytics Evidence was Pertinent and Material

As set forth during the Arbitration, including the hearing and in the post-hearing briefs, the Google Analytics evidence was pertinent and material because it is the only evidence that could conclusively establish what was delivered to Take 5's customers. *Ex. C* at Ex. 45 [Stricchiola Decl.]; *id.* at Ex. *62* (J. Stricchiola Direct Examination) at 3892:22-3893:7, 3895:18-3896:12, 3897:9-17, 3905:23-3906:8; *see also id.* at Ex. 50 at 674:9-16; *Ex. C* at Ex. 54 at 1918:17-1919:11; *id.* at Ex. 55 at 2163:15-2164:14, 2181:24-2182:5.  Throughout the Arbitration, the Advantage Parties argued that Take 5 failed to provide its customers with the deliverables promised, constituting a fraud.  However, the only evidence that could have disproven this theory and demonstrated ███Redacted Pursuant to Stipulated Order███ was the Google Analytics data, which the Advantage Parties failed to preserve.

The Advantage Parties acknowledged in their motion for summary judgment that the most important issue in this matter was "how [the] clicks are generated." *Ex. C* at Ex. 13 at 4.  As set forth in the Take 5 Parties' expert report, ███████ Redacted Pursuant to Stipulated Order ███████
████████████████████████████████████████████████
████████████████████████████████████████████  *Id.*
at Ex. 44 ¶ 49 [*Rebuttal Expert Rpt of J. Stricchiola* (Oct. 6, 2021)].  ███Redacted Pursuant to Stipulated Order███
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

Without looking at the Google Analytics data, it impossible to determine what was actually delivered to Take 5's customers. As a result of the Advantage Parties' concealment and spoliation of this Google Analytics evidence, no one in this action other than the Advantage Parties was able

to review this evidence. *Id.* at Ex. 62 (J. Stricchiola Direct Examination) at 3908:14-3909:9. The Google Analytics evidence would have demonstrated what the Take 5 Parties argued from day one, that what was promised to customers was exactly what was provided, conclusively refuting the allegations of fraud and breach of contract. However, without access to such evidence, the Take 5 Parties were forced to argue the absence of fraud, essentially trying to prove a negative. *See , e.g., id.* at Ex. 43 at 20 (because of the Advantage Parties' failure to preserve the Google Analytics evidence "the Take 5 Parties will be simply unable to prove 'how the clicks were generated.'"). Evidence conclusively proving (or disproving) the fundamental claims in an action cannot be anything other than "material" and "pertinent." Yet, the Take 5 Parties were prevented from obtaining such evidence, denied any remedy, and were held responsible for a fraud even though the Advantage Parties had destroyed the evidence that could have proven or disproven fraud.

### 2. The Arbitrator's Failure to Hear Evidence Concerning Google Analytics Prejudiced the Take 5 Parties Denying Them a Fair Hearing

The Advantage Parties' failure to preserve the Google Analytics evidence prevented the evidence from being presented to the Arbitrator, prejudicing the Take 5 Parties such that they were denied a fair hearing. The Advantage Parties spoliation is another bad-faith litigation tactic that left the Take 5 Parties hamstrung and without the evidence necessary to refute the allegations against them. This discovery misconduct did not happen in a vacuum, it is a part of a pattern of failures to preserve and produce relevant information in direct contravention of discovery orders.

The Advantage Parties argued that the Take 5 Parties were unable to demonstrate that data was actually provided to clients, but this inability to offer proof was of the Advantage Parties' own making. Because the Advantage Parties abruptly shut down the Take 5 business, Radetich and Gluck were denied access to documents or software, such as the Google Analytics data. Again, it

cannot be that a party prevents another from obtaining key evidence and then uses the absence of that evidence to demonstrate the party was liable for fraud, particularly given the high standard a party must meet in proving such a claim. Further, such evidence should have been necessary for the Advantage Parties to establish their claims. As the Take 5 Parties argued in their summary judgment briefing "Advantage cannot prove – and will never be able to prove – precisely 'how those clicks were generated.'" *Id.* at Ex. 14 at 7 n.10 [*Take 5 Parties' Opp. to the Adv. Parties' Mtn. for Summ. J.*]. The Arbitrator's failure to intervene through an adverse inference or sanctions, failure to consider evidence concerning the materiality of the Google Analytics data, and inability to consider the Google Analytics evidence itself, left the Take 5 Parties upstream without a paddle. The Take 5 Parties were significantly prejudiced such that they were not granted a fair hearing because they were not able to obtain and present evidence that would have conclusively established the fraud allegations lacked basis.

In sum, the Arbitrator is guilty of misconduct in failing to postpone the Arbitration due to the parallel criminal proceeding and failing to hear evidence concerning the Google Analytics evidence, which resulted in the foreclosure of evidence pertinent and material evidence to issues in the Arbitration, severely prejudicing the Take 5 Parties such that they were denied a fair hearing.

## II.    THE AWARDS SHOULD BE VACATED BECAUSE THEY WERE PROCURED BY CORRUPTION, FRAUD, OR UNDUE MEANS

A party may seek to vacate an arbitration award "where the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1). A party claiming an award was procured by corruption, fraud or undue means "must make a three-part showing: first, that there was a fraud in the arbitration, which must be proven with clear and convincing evidence; second, that the fraud was not discoverable through reasonable diligence before or during the arbitration; and, third, that the fraud was materially related to an issue in the arbitration." *France v. Bernstein*, 43 F.4th 367,

378 (3d Cir. 2022). "For fraud to be material within the meaning of Section 10(a)(1) of the FAA, [petitioner] ha[s] to demonstrate a nexus between the alleged fraud and the decision made by the arbitrator. The standard is relatively forgiving he need not demonstrate that the arbitrator would have reached a different result." *Id.* at 381 (internal citation and quotation marks omitted).

### A. The Advantage Parties Used Undue Means to Procure Witness Testimony and Fraudulently Withheld Information Concerning the Same

The Advantage Parties procured the Awards by corruption, fraud, or undue means by paying significant attorneys' fees and by making other payments to their fact witnesses in an effort to secure favorable testimony at the hearing. At the hearing, it was revealed that the Advantage Parties were making payments to their witnesses including to Boy, Ward, and Hodgens. However, the extent of the majority of these payments did not become clear until the Advantage Parties filed their cost submissions ***after*** the conclusion of the hearing and issuance of the Interim Award. Further, the Interim Award relies heavily and to the exclusion of other evidence on the testimony of two witnesses the Advantage Parties induced to testify: Hodgens and Boy. The Take 5 Parties objected during the course of the Arbitration to the testimony of these witnesses on the basis that they had been paid for the same. The Take 5 Parties could not anticipate that the Arbitrator would weigh their testimony so heavily, relying on testimony procured through improper means.

#### 1. The Advantage Parties' Payment of Significant Attorneys' Fees and Concealment of Same Constituted Fraud or Undue Means

During the course of the hearing, Hodgens, the former Senior Director of Fulfillment for Take 5 testified on behalf of the Advantage Parties Redacted Pursuant to Stipulated Order ███████████ Though Hodgens testified that she was not being personally compensated for her time spent on the case, she admitted that the Advantage Parties were paying her counsel's fees. *Ex. C* at Ex. 54 at 2011:6-2012:3. On cross examination, Hodgens testified that she was not familiar with the particulars of the arrangement with the Advantage Parties and seemingly could

not recall how much those fees were despite having received copies of the invoices.  *Id.* at Ex. 55 at 2113:4-19, 2116:17-2117:15.  She further testified that she did not "know specifically" whether the bills since 2019 had "exceeded $20,000."  *Id.* at 2117:16-2118:12.

In fact, Hodgens and the Advantage Parties improperly failed to disclose until after the Interim Award that the ████████████ Redacted Pursuant to Stipulated Order ████████████ ████████████████████████████████████  On August 19, 2022, long after the close of discovery, the conclusion of the hearing, and entry of the Interim Award, the Advantage Parties filed a submission seeking costs and interest, Redacted Pursuant to Stipulated Order ████████████████████████████████████████  *See Ex. C* at Ex. 69 at 8 & at Ex. 14.

The same was true with respect to Ward.  Ward testified at the hearing that the Advantage Parties were paying his legal expenses but either did not know or could not recall the particulars of the arrangement.  *Id.* at Ex. 55 at 2258:24-2260:21.  It was not until the Advantage Parties served their cost submission that the Take 5 Parties learned that Redacted Pursuant to Stipulated Order ████████████████████████████████████████████████ ████████████████████████████████████  *See id.* at Ex. 69 at 8 & at Ex. 4.

This is far more than a minor reimbursement for counsel to represent a witness at a deposition or at a single day of the hearing, but instead constitutes coercion amounting to fraud, a violation of legal ethics, and perhaps bribery and/or witness tampering in violation of law.  *See Cent'l Mgmt. Servs., Inc. v. Axa Re Vie,* 193 F.R.D. 671, 679 (D. Kan. 2000) (where compensation for witnesses is unreasonably high or disproportionate, "an inference could be drawn that the payments, in reality were made for the substance or efficacy of ... testimony."); *see also* Del. Ethics

Op. 1994-1 (Feb. 14, 1994); Del. Ethics Op. 2003-3 (2003).

18 U.S.C. § 201(c)(2) makes it a federal crime to directly or indirectly give, offer, or promise anything of value to a person for or because of testimony under oath at a trial or hearing. The statute also provides that there are exceptions for payment or receipt of witness fees provided for by law or payment of the reasonable cost of travel and subsistence incurred and reasonable value of time lost in attendance at any such trial. 18 U.S.C. § 201(d). Similarly, the Rules of Professional Conduct provide that a lawyer shall not offer an inducement to a witness. *See* Rule 3.4(b) of the Model Rules of Prof'l Conduct; Del R. of Prof'l Conduct, Rule 3.4(b). Like the federal statute, the rules provide that it is not improper to pay a witness's reasonable expenses or to compensate a witness for lost time. Further, Florida law provides that a "lawyer must not . . . offer an inducement to a witness, except a lawyer may pay a witness reasonable expenses incurred by the witness in attending or testifying at proceedings . . . and a reasonable compensation to a witness for time spent preparing for, attending, or testifying at proceedings." Fla. Bar Reg. R. 4-3.4(b); *see also Trial Pracs., Inc. v. Hahn Loeser & Parks, LLP*, 260 So. 3d 167, 171-73 (Fla. 2018). Here, Hodgens and Ward, both of whom reside and testified in Florida, were not paid for their travel expenses or to reimburse for time spent preparing for testimony and testifying; Redacted Pursuant

## Redacted Pursuant to Stipulated Order

*Ex. C* at Ex. 69 at Ex. 14 p. 54; *id.* at Ex. 4 at 1. Not only does this demonstrate

that the Advantage Parties were not compensating Hodgens and Ward for their reasonable expenses in connection with testifying, but also further supports the argument that the Advantage Parties were in fact paying Hodgens and perhaps Ward to provide support to the government for their criminal investigation and that the Take 5 Parties were entitled to a stay of the arbitration in light of the parallel criminal proceeding. ██████ Redacted Pursuant to Stipulated Order

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████ *Id.* As a result, the substantial payments made by the Advantage Parties to counsel for Hodgens and Ward, and the concealment of such payments, constitute fraud and/or the use of undue means.

### 2. The Advantage Parties' Fraud and Use of Undue Means was Not Discoverable Before or During the Arbitration

Second, the Advantage Parties' fraudulent coercion was not discoverable through reasonable diligence before or during the Arbitration. The Take 5 Parties sought discovery from the Advantage Parties' should have captured the payment by the Advantage Parties of significant sums to witnesses and their counsel in their document requests served in November 2019, yet the Advantage Parties never produced such documents. *See Ex. C* at Ex. 22 at 12, 15. Though the Advantage Parties objected to Request No. 8, they agreed that they would produce any responsive, non-privileged documents. *Id.* Despite this response, the Advantage Parties never produced documents demonstrating that they assumed Hodgens' and Ward's attorney fee obligations until after the close of discovery, the end of the hearing, and the issuance of the Interim Award.

Further, as discussed above, pursuant to Federal Rule 26(e)(1), parties have an ongoing obligation to supplement discovery. Providing invoices in connection with a costs submission after a finding of liability is hardly a "timely" disclosure under the Federal Rules. Additionally, the

Advantage Parties had no obligation to compel responses to these requests and given the Advantage Parties' repeated disregard of discovery orders, even if the Take 5 Parties had moved to compel such information–which assumes they had knowledge of the existence of this evidence, which they did not. The Arbitrator ordered it to be produced, given the Advantage Parties withheld these documents until after the hearing had concluded, there is no reason to believe they would have produced them even if ordered by the Arbitrator (again) to do so before or during the hearing.

The Take 5 Parties also attempted to get discovery from third-party former employees without success, which the Arbitrator acknowledged on several occasions. *See Ex. C* at Ex. 19 at 1*; id.* at Ex. 46 at 1. This was both due to the fact that there are limited enforcement mechanisms with respect to third party discovery in arbitration actions but also the Advantage Parties' efforts to silence witness testimony through their pursuit of criminal charges. Further, the Take 5 Parties attempted to discover information concerning witness payments through reasonable diligence during the course of the hearing, but Hodgens and Ward failed to provide any information concerning the amount of attorneys' fees the Advantage Parties paid on their behalf. *Id.* at Ex. 55 at 2116:23-2117:21, 2258:24-2260:23. It is also evident from the Take 5 Parties' questions at the hearing that they were completely unaware of the amount of money that was being paid. *Id.* at 2117:16-18. Thus, the undue means used to coerce Hodgens and Ward to testify in the Arbitration were not discoverable before the entry of the Interim Award and the Advantage Parties' costs submission.

### 3. *The Advantage Parties' Fraud and Use of Undue Means was Materially Related to Issues in the Arbitration*

Third, the amounts the Advantage Parties paid on behalf of Hodgens and Ward are materially related to issues in the Arbitration because both witnesses provided substantial support to the Advantage Parties throughout the Arbitration, Redacted Pursuant to Stipulated Order

and the Arbitrator gave their testimony, particularly Hodgens' testimony, significant weight finding both "to be a credible witness." *Id.* at Ex. 1 at 18-20.

Hodgens testified at length about the Take 5 business and the Arbitrator specifically noted her testimony as being critical to supporting a finding of fraud. *Id.* Additionally, Hodgens' testimony appeared to be the key testimony that convinced the Arbitrator to discount the Google Analytics data, which the Take 5 Parties had continuously argued was key to the claims at issue. *Id.* at 5, 19 (quoting Hodgens as testifying that "the Take 5 LLC Google Analytics account revealed limited information"). Ward's testimony was used to support the Advantage Parties' argument that Take 5 had established algorithms to generate fictitious reporting to clients. *Id.* at 16. Had the Take 5 Parties or the Arbitrator been aware of the significant sums paid by the Advantage Parties to Hodgens and Ward prior to or during the hearing, the weight and credibility given to Hodgens' and Ward's testimony would have been materially different. Further, had the testimony of Hodgens and Ward been discounted, there would have been insufficient evidence in the record to find Take 5, Gluck, and Radetich liable for civil fraud or any of the Take 5 Parties liable for breach of contract, as the Advantage Parties themselves admitted. *See id.* at Ex. 73 at 6-7.

Therefore, the Advantage Parties procured the Awards through fraud, corruption or undue means by fraudulently coercing witnesses to provide testimony material to the issues in the Arbitration by paying significant legal expenses. Because the Arbitrator relied heavily on this testimony in reaching his decision, and because the undue means were concealed from the Take 5 Parties and the Arbitrator until after issuance of the Interim Award, the Awards must be vacated .

## III.    THE AWARDS SHOULD BE VACATED BECAUSE THE ARBITRATOR EXCEEDED HIS POWERS OR IMPERFECTLY EXECUTED THEM

"The question for the court in applying § 10(a)(4) is whether the arbitrator's award is 'irrational,' meaning that the award fails to draw its essence from the agreement and cannot be

rationally derived from the agreement, or that the record contains no support for the arbitrator's determination." *QAD, Inc. v. Block & Co., Inc.*, 2022 WL 1211302, at *2 (D. Del. Apr. 25, 2022) (citing *Verizon Pa., LLC v. Commc'ns Workers of Am.*, 13 F.4th 300, 306 (3d Cir. 2021)).

### A.    The Arbitrator Exceeded His Powers in Entering an Award Against RJV

The Arbitrator exceeded his powers in entering an award against RJV because the record contains no support for the Arbitrator's determination.  In sixteen days of hearings and over 4,000 pages of hearing transcripts, RJV is only referenced **twice** (other than in the caption).  Both references appear in the transcript for Day 10 of the hearing after the close of the Advantage Parties' case, when counsel for the Take 5 Parties moved for a directed verdict.  The Take 5 Parties argued that "[t]here's literally no evidence at all with regard to RJV Marketing Corp., Your Honor. Nothing else needs to be said. So think they should be out of the case." *Ex. C* at Ex. at 57 at 2709:16-25, 2710:5-16.  Counsel for the Advantage Parties responded arguing that RJV was one of the sellers of Take 5 and thus was bound by the APA and the representations and warranties therein.  *Id.* at 2713:8-21.  Counsel for the Take 5 Parties reiterated the complete lack of evidence presented against RJV in their post-hearing brief stating that "no evidence has been presented in this proceeding against RJV Marketing Corp. who should be dismissed and awarded its fees and costs." *Id.* at Ex. 66 at 49 n.4.  The only references to RJV in the Advantage Parties post-hearing brief are that it was a "Beneficial Owner" of Take 5 as defined in the APA.  *Id.* at Ex. 68 at 2, 68. These are the ***only references*** to RJV, a party to the Arbitration, during the entirety of the proceedings.  And the underlying motions and discovery in the nearly three-year proceeding are just as bereft of any references to RJV.  RJV's lack of knowledge and participation stands uncontradicted in the record of the Arbitration.  The Advantage Parties failed to present any evidence, make any argument, or even reference RJV.  Thus, the record is devoid of any support for a finding against RJV.

Further, in a forty-four page Interim Award, RJV is referred to only six times, once on the cover page, once in reference to the motion for directed verdict made by the Take 5 Parties' counsel, once identifying the entity as a "Beneficial Owner" under the APA, and three times when the Arbitrator found RJV liable without explanation or grounds. *Id.* at Ex. 1 at 1, 24, 35, 37-38. RJV is only mentioned once in the Modified Final Award. *Id.* at Ex. 3 at 1. Despite the lack of any evidence whatsoever presented at the hearing or during the Arbitration concerning RJV and almost no discussion of RJV in the Awards, RJV was found liable for breach of contract and now is saddled with more than $48 million in damages and $22 million in costs. Thus, on the face of the record alone it is clear that the Arbitrator exceeded his powers in entering an award against RJV because *there is simply no evidence in the record to support an award against RJV*.

### B.    The Arbitrator Exceeded His Powers in Awarding Certain Damages

The Arbitrator also exceeded his powers in awarding damages in the amount of $4,692,488.95 for certain costs purportedly incurred by the Advantage Parties in connection with due diligence of Take 5 prior to acquisition, the investigation of Take 5, and shutdown costs because the record contains no support for the amount of damages claimed for these categories.

Federal Rule of Civil Procedure 26(a)(1)(A)(iii) provides that a party must provide a computation of each category of damages claimed by the disclosing party.[4] A party who fails to provide such evidence may be sanctioned by barring the admission of the damages evidence, sometimes resulting in dismissal of an entire claim. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 221 (3d Cir. 2003). Parties are "clearly prejudiced by failure to provide specific information and documentation concerning the damages in a timely fashion" because they are  impeded from

---

[4]    The APA provides that the parties agree that "the scope of and procedures for discovery shall be governed by the federal rules of civil procedure." *Ex. C* at Ex. 5 at § 10.11(b). The Arbitrator confirmed the same. *Id.* at Ex. 12.

effectively preparing "a full and complete trial strategy." *Id.* at 222-23. In *Ware*, the court found that a defendant was prejudiced by plaintiff's failure to provide its computation of damages until one week prior to trial in contravention of multiple court orders and after the close of discovery, resulting in exclusion of the evidence and dismissal of the claim. *Id.*

Here, the Advantage Parties *never* provided a computation of damages. As the Take 5 Parties argued during the hearing, they did not receive documents or evidentiary material on which the computation of damages was based. *Ex. C* at Ex. 44 at 2602:4-2606:15. As counsel for the Take 5 Parties' noted, they had served at least two requests specifically seeking documents concerning damages more than two years prior, to which objected, arguing in part that the requests were premature expert discovery. *Id.* at Ex. 31 at 12-14 (Reqs. 129-30).

Pursuant to Federal Rule of Civil Procedure 26(e)(1), parties have an ongoing obligation to supplement discovery, including responses to requests for production, "in a timely manner . . . if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." The Advantage Parties never produced documents responsive to Requests 129 and 130, never supplemented their responses to these requests, and never produced a damages expert, despite their agreement in the APA and otherwise, to comply with the Federal Rules of Civil Procedure. Thus, information concerning damages should have been precluded pursuant to Federal Rule of Civil Procedure 37(c)(1).

Though Dean Kaye testified at the hearing that the Advantage Parties paid certain amounts to various entities in connection with due diligence, investigation, and shut down of Take 5, the Advantage Parties provided no evidentiary support for these amounts. ████████████████

████████████████████████████████████████

████████████████████████ [68] *See id.* at Ex. 32. Redacted Pursuant to Stipulated Order

Redacted Pursuant to Stipulated Order

Redacted Pursuant to Stipulated Order

*Id.*

Redacted Pursuant to Stipulated Order

*See id.* at Ex. 1 at 43.

As a result of the Advantage Parties' failure to make proper disclosures and provide substantiating documents for Ex. 32, the Take 5 Parties were not able to effectively prepare for the deposition of Kaye or the hearing. Further, the Advantage Parties did not introduce a damages expert or report, leaving the Take 5 Parties with no information concerning the Advantage Parties' alleged damages. Thus, the Take 5 Parties were denied the ability to cross-examine Kaye on critical issues or to object to his testimony given the absence of documents providing a basis to do so. The Take 5 Parties moved to exclude this evidence for these reasons during the Arbitration. *Id.* at Ex. 33.

Further, parties must prove their damages by a preponderance of the evidence. Kaye's testimony is not sufficient to establish under this standard that these amounts were actually

incurred or paid by the Advantage Parties, let alone that the Advantage Parties were entitled to them.  The same is true of Kaye's barebones spreadsheet.

In sum, the Arbitrator exceeded his powers by awarding the Advantage Parties undisclosed and unproven damages for diligence, investigation, and shut down costs.  In sum, the Arbitrator exceeded his powers in entering the Awards against RJV despite a complete lack of record evidence demonstrating liability and by awarding damages against the Take 5 Parties absent record evidence to support such an award.

## IV.   THE AWARDS SHOULD BE VACATED BECAUSE THE ARBITRATOR MANIFESTLY DISREGARDED THE LAW, OR ALTERNATIVELY, EXCEEDED HIS POWERS

"A party seeking to vacate an arbitrator's decision on the ground of manifest disregard of the law must demonstrate that the arbitrator (1) knew of the relevant legal principle, (2) appreciated that this principle controlled the outcome of the disputed issue, and (3) nonetheless willfully flouted the governing law by refusing to apply it."  *Paul Green Sch. Of Rock Music Franch'g, LLC. v. Smith*, 389 F. App'x 172, 177 (3d Cir. 2010); *Millennium. Validation Servs., Inc. v. Thompson*, 2006 WL 3159821, at *5 (D. Del. Nov. 3, 2006), *aff'd*, 316 F. App'x 124 (3d Cir. 2008) ("Thus, vacating … the arbitration award [under the manifest disregard standard] would be proper only if the record before the arbitrator reveals no support whatsoever for the arbitrator's determination.") (quoting *Am. Life Ins. Co. v. Parra*, 269 F. Supp. 2d 519, 526, (D. Del. 2003)).

Delaware state courts apply the same standard.  *SPX Corp. v. Gardsa USA, Inc.*, 94 A.3d 745, 750 (Del. 2014) (finding that the arbitrator acts in manifest disregard of the law when the "arbitrator (1) knew of the relevant legal principles, (2) appreciated that this principle controlled the outcome of the disputed issue, and (3) nonetheless willfully flouted the governing law by refusing to apply it.") (citing *Paul Green Sch. Of Rock Music Franch'g, LLC. v. Smith*, 389 F. App'x 172, 177 (3d Cir. 2010); *see also Agspring, LLC v. NGP X US Holdings, L.P.*, No. 2019-

1021, 2022 WL 170068, at *3 (Del. Ch. Jan. 19, 2022). The Arbitrator Manifestly Disregarded the Law in Entering Awards Against RJV

The Arbitrator manifestly disregarded the law in entering the Awards against RJV because the record contains no support whatsoever for the Arbitrator's conclusions. As discussed above (*see supra* III.A.), no evidence whatsoever was set forth during the hearing or in the Advantage Parties' post-hearing brief concerning RJV. The Arbitrator's findings and conclusions about RJV's alleged responsibility are completely without basis and are not explained in the Interim Award. A clearer example of a situation where the record "reveals no support whatsoever for the arbitrator's determination" could not possibly exist. Thus, for all the reasons set forth herein, the Awards against RJV must be vacated due to the Arbitrator's manifest disregard of the law.

### A.    The Arbitrator Manifestly Disregarded the Law in Failing to Appropriately Sanction the Advantage Parties for their Discovery Misconduct

As set forth above, throughout the course of the Arbitration the Advantage Parties engaged in a pattern of severe discovery misconduct. The Advantage Parties failed to appropriately respond to discovery requests and failed to supplement discovery responses in dereliction of their duties under Federal Rule of Civil Procedure 26(a) & (e), failed to disclose evidence they knew was responsive in contravention of multiple discovery orders, and failed to preserve data resulting in the spoliation of material evidence. The Arbitrator manifestly disregard the law in failing to address and remedy this persistent misconduct in opposition to Delaware and Federal law.

As discussed above, the parties agreed that discovery in any arbitration action would be governed by the Federal Rules of Civil Procedure, and the Arbitrator acknowledged the same. Both the Federal and Delaware rules provide for sanctions for parties who fail to comply with discovery disclosure and preservation obligations and failure to comply with discovery orders. *See* Fed. R. Civ. P. 37; Del. Super. Ct. Civ. R. 37. Despite the Take 5 Parties' repeated pleas for relief

from the Arbitrator in the form of sanctions or preclusion of evidence, the Arbitrator failed to take action to ensure fair proceedings as a result of the Advantage Parties' improper discovery tactics in manifest disregard of the law.  *See Ex. C* at Ex. 35; *id.* at Ex. 43; *id.* at Ex. *57* at 2602:4-2606:15.

The Take 5 Parties repeatedly made the Arbitrator aware of the relevant legal principles that demonstrated the Advantage Parties' misconduct must be sanctioned by dismissing their claims.  For example, in their April 14, 2022 motion, the Take 5 Parties argued that sanctions were warranted pursuant to Federal Rule 37 citing numerous cases on point and setting forth grounds for each of the applicable factors for dismissal.  *Id.* at Ex. 35 at 16-21.  The Take 5 Parties argued that pursuant to Third Circuit, Delaware, and DC precedent the Advantage Parties willful misrepresentations and concealment of the interview notes were more than sufficient under the factors to warrant the sanction of dismissal, among other sanctions.  *Id.* (citing *Hoag v. Amex Assur. Co.*, 953 A.2d 713, 718 (Del. 2008)).  The Take 5 Parties similarly made the Arbitrator aware of the relevant legal principles under Delaware law in their motion for adverse inference and sanctions in connection with the spoliation of the Google Analytics evidence.  *Id.* at Ex. 43 at 20-24.  The Arbitrator's failure to act and follow these clear legal principles can be interpreted as nothing other than a willful refusal to apply the law.   Therefore, the Arbitrator manifestly disregarded the law in failing to appropriately sanction the Advantage Parties for their persistent discovery misconduct despite Delaware law requiring such and thus the Awards should be vacated.

### B.      The Arbitrator Manifestly Disregarded the Law in Deeming Witness Testimony Credible Despite Significant Witness Payments

The Arbitrator manifestly disregarded the law in deeming the testimony of Boy, Hodgens, and Ward credible and relying heavily on the same, despite the significant payments made directly and indirectly to those witnesses in connection with their testimony in the Arbitration.  *See supra* 24-26, 54-56.  As explained above, these payments were improper under the applicable ethical

rules and serve as a demonstration that the testimony was induced by the Advantage Parties. The Arbitrator further disregarded the law by failing to appropriately sanction the Advantage Parties or their counsel for their improper witness payments and failure to appropriately disclose discovery until after the Interim Award concerning same. Accordingly, the Awards should be vacated because the Arbitrator based his conclusions on the testimony induced by undue means to the exclusion of other, contrary evidence and in manifest disregard of the law.

### C. The Arbitrator Manifestly Disregarded the Law by Awarding Damages for the Advantage Parties' Costs

The Arbitrator manifestly disregarded the law in awarding damages for due diligence, investigation, and shutdown costs because the record contains no support whatsoever for the Arbitrator's determination. As set forth above (*see supra* III.B.), the Advantage Parties failed to disclose any documents providing for the computation of damages during discovery in violation of the Federal Rules of Civil Procedure and failed to provide sufficient support for Kaye's testimony setting forth the Advantage Parties' costs. Thus, the record reveals no support for the Arbitrator's award of cost damages. For all the reasons set forth here and above, the award of $4,692,488.95 for costs associated with the diligence, investigation, and shutdown of Take 5 should be vacated due to the Arbitrator's manifest disregard of the law.

### D. The Arbitrator Manifestly Disregarded the Law in Awarding the Advantage Parties Prejudgment Interest

The Advantage Parties argued in their Submission on Costs and Interest that they were entitled to pre-judgment interest because it is awarded as a matter of right in Delaware. *See Ex. C* at Ex. 56 at 5. However, the Advantage Parties failed to acknowledge that this right is "not self-executing." *All Pro Maids, Inc. v. Layton*, 2005 WL 82689, *1 (Del. Ch. Jan. 11, 2005); *Collins v. Throckmorton*, 425 A.2d 146, 152 (Del. 1980) (finding that a right to pre-judgment interest is not self-executing, rather "in order to get such interest in his judgment, the plaintiff ha[s] to request

it."). Because the Advantage Parties failed to seek interest until after the conclusion of the hearings in the Arbitration, under Delaware law, the Advantage Parties waived their right to such interest.

Though the Arbitrator knew of and considered this legal principle, appreciating that it controlled whether interest should be awarded, he refused to apply it, despite the fact that it was applicable. *Ex. C* at Ex. 3 at 5-6. As a result, the Arbitrator's failure to find that the Advantage Parties' right to prejudgment interest has been waived demonstrates a manifest disregard of the law.

In order to obtain prejudgment interest, a plaintiff has "to request it, at least by way of a general allegation of damages in an amount sufficient to cover his actual losses plus interest." *All Pro Maids*, 2005 WL 82689, at *1. Failure to affirmatively request prejudgment interest during the course of an action waives the parties' right to seek it. *Id.* (finding that because plaintiff failed to request prejudgment interest prior to its letter proposing a form of final judgment and because there was no reference to interest in the pretrial order or during the trial, the plaintiff was not entitled to such interest); *see also Triton Constr. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *30 n.182 (Del. Ch. May 18, 2009) (finding prejudgment interest waived where not requested in the joint pretrial order, post-trial briefing, or argument); *Christiana Marine Serv. Corp. v. Texaco Fuel & Marine Mktg. Inc.*, 2004 WL 42611, at *6-7 (Del. Super. Jan. 8, 2004) (denying prejudgment interest where not requested in the prayer, pretrial order or at trial and that a statement in pretrial filing seeking damages "exclusive of costs and interest" was insufficient.)

In its Reply Submission on Costs and Interest, the Take 5 Parties argued that the Advantage Parties failure to make any request for pre-judgment interest until the Post-Hearing Brief waived interest. *Ex. C* at Ex. 71 at 45-48. However, the mention of interest in the post-hearing brief still did not actually request pre-judgment interest but rather merely requested leave to seek interest.

*Id.* at Ex. 68 at 3.  The Advantage Parties' Second Amended Counter-Demand makes no reference to interest, including in the "Relief Requested" section which seeks seven separate remedies including attorneys' fees and costs.  *See id.* at Ex. 6  at 41.  A general prayer for "such other relief as may be just and proper" is not sufficient to give rise to a request for pre-judgment interest.  *All Pro Maids*, 2005 WL 82689, at *1-2; *Christiana Marine Serv.*, 2004 WL 42611, at *6.  Thus, the Advantage Parties' request "[f]or such other relief as the arbitrator deems just and proper" is equally unavailing.  *Ex. C* at Ex. 6 at 41.  Although the Advantage Parties requested damages "exclusive of interest" in their summary judgment briefing, a request for damages "exclusive of costs and interests" is insufficient to preserve a plaintiff's right to prejudgment interest.  2004 WL 42611, at *6-7.

The Advantage Parties, additionally, failed to present any evidence during the hearing about pre-judgment interest or make a request for it.  This prevented the Take 5 Parties from taking or presenting evidence on interest during the Arbitration and from challenging such a request.  The request for interest following entry of the Interim Award was too late.  The Advantage Parties had a duty to request interest earlier in the action and an "add on" to a costs submission following the Arbitrators decision on the merits was not sufficient under the law to preserve the claim.

The Take 5 Parties made this principle clear in their Reply.  *Ex. C* at Ex. 71.  In the Modified Final Award, the Arbitrator largely ignored the applicable Delaware law cited by the Take 5 Parties and found that "[b]ased on [his] knowledge of the record" the parties understood that Advantage was claiming interest as an element of damage and interest would be handled after a decision on the merits.  *Id.* at Ex. 3 at 6.  This decision lacks explanation or any basis in law. Delaware law is clear, a claim for prejudgment interest is waived where it is not explicitly sought early in the litigation.  Here, it was not sought.  Thus, the Arbitrator ignored the well-defined and clearly

applicable law concerning prejudgment interest evidencing manifest disregard of the law subject to vacatur.

## VACATUR OF INTERIM AWARD REQUIRES VACATUR OF FINAL AWARD

If the Court determines that the Interim Award or portions thereof should be vacated, the Modified Final Award would need to be vacated as it would be without proper basis. The Modified Final Award holds that the Advantage Parties are the prevailing parties. Thus, if the Court vacates the Interim Award, the Modified Final Award also should be vacated because the Advantage Parties would not be the "prevailing parties" and therefore not entitled to damages or costs and fees under the APA. It goes without saying that if the Court vacates the Modified Final Award, the Interim Award would automatically be vacated because it is incorporated in the Modified Final Award.

## CONCLUSION

For all of the foregoing reasons, the Take 5 Parties respectfully request that the Court deny the Advantage Parties' Petition to Confirm Arbitration of Award and stay this case pending resolution of the action currently pending in the United States District Court for the District of Columbia, or in the alternative grant the Take 5 Parties' motion and vacate the Interim Award and the Modified Final Award pursuant to 9 U.S.C. § 10 or as being in manifest disregard of Delaware law, and for such other relief as this Court deems just and proper.

Dated:  November 1, 2022                    Respectfully submitted,

                                           /s/ *Lauren H. Evans*
                                           Lauren H. Evans (Fla. Bar No. 125671)
                                           Lisa M. Richman (*pro hac vice* pending)
                                           MCDERMOTT WILL & EMERY LLP
                                           500 North Capitol Street, N.W.
                                           Washington, D.C. 20001
                                           202.756.8000
                                           202.756.8087 fax
                                           levans@mwe.com
                                           lrichman@mwe.com

                                           *Attorneys for Respondents Petruss Media*
                                           *Group, LLC, f/k/a Take 5 Media Group,*
                                           *LLC, Alexander Radetich, Richard Gluck,*
                                           *and RJV Marketing, Corp.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on all

counsel of record via Florida Courts eFiling Portal this 1st day of November, 2022.

*/s/ Lauren H. Evans*
Lauren H. Evans