# EXHIBIT A

**IN THE CIRCUIT COURT OF THE**
**FIFTEENTH JUDICIAL CIRCUIT IN AND**
**FOR PALM BEACH COUNTY, FLORIDA**

ADVANTAGE SALES & MARKETING
LLC, et al.,

                    Petitioners,

v.

                    Case No. 50-2022-CA-010374

PETRUSS MEDIA GROUP, LLC f/k/a
TAKE 5 MEDIA GOUP, LLC, et al.,

                    Respondents.

## PETITIONERS' RESPONSE TO RESPONDENTS' OPPOSITION TO AMENDED PETITION TO CONFIRM ARBITRATION AWARDS

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.    INTRODUCTION .................................................................................................1

II.    STATEMENT OF FACTS ....................................................................................5

    A.    The Advantage Parties acquired the assets of Take 5 because Mr. Radetich and Mr. Gluck represented that it was an e-mail marketing company ...................6

    B.    Advantage discovers the Take 5 Parties' fraud..........................................9

        1.    Ryan McGavran discovers that Take 5 is generating falsified reports ...........................................................................................9

        2.    Prima Creel discovers that Take 5 is not capable of sending e-mails........11

        3.    Corey Weiner discovers that Take 5 is not sending e-mails on behalf of his clients ................................................................................12

    C.    Engagement of FTI ...................................................................................14

    D.    Project Evolve ...........................................................................................14

    E.    FTI's audit ................................................................................................18

    F.    The e-mail tracking reports were generated by an algorithm ..................22

    G.    Take 5 is shut down, and Advantage is forced to restate its financial statements..................................................................................................29

III.    ADDITIONAL EVIDENCE OF FRAUD PRESENTED IN THE ARBITRATION ...............................................................................................29

    A.    The Take 5 Parties initiate the arbitration and the Advantage Parties respond.....................................................................................................29

    B.    Take 5 falsified e-mail counts..................................................................30

    C.    Take 5 did not have double opt-in e-mail addresses.................................39

    D.    Take 5 designed CMS to deceive clients that tracked their campaigns into believing that e-mails were sent................................................................40

        1.    Take 5 sent tracking links and pixels to PPC vendors to conceal PPC traffic........................................................................................40

        2.    Take 5 used "link rotator" to manipulate traffic behavior .........................44

    E.    FTI proved that Take 5 did not deploy e-mails.........................................45

    F.    Take 5 did not have a usable e-mail database...........................................49

IV.    THE ARBITRATION HEARING AND THE INTERIM AWARD ...............................51

V.    ARGUMENT .....................................................................................................54

    A.    Absent egregious circumstances, the Court should confirm the Award...............54

B.    Judge Eyler did not commit misconduct in refusing to postpone the hearing because Mr. Radetich and Mr. Gluck were under criminal investigation ......................................................................................................57

1.    The Take 5 Parties were not prejudiced by Judge Eyler's decision to deny the stay ..........................................................................57

2.    Judge Eyler's decision to deny the stay was not an abuse of discretion ........................................................................................58

(a)    The parties had engaged in substantial discovery..........................59

(b)    Mr. Radetich and Mr. Gluck had not been indicted.....................60

(c)    Under Delaware law, Judge Eyler was not permitted to draw an adverse inference if a witness invokes the Fifth Amendment .................................................................................60

(d)    The government did not request a stay and the interest of the public strongly favored denying the stay ................................65

C.    Judge Eyler did not refuse to hear evidence, and his Award cannot be vacated on that basis ..........................................................................66

D.    The Award was not procured by corruption, fraud, or undue means ...................67

E.    RJV is liable for the Advantage Parties' damages because it is a "Beneficial Owner" under the APA...........................................................71

F.    Judge Eyler did not exceed his powers in awarding the Advantage Parties' damages................................................................................73

G.    Judge Eyler did not err in awarding the Advantage Parties prejudgment interest..............................................................................75

H.    The Court cannot vacate the Award based on "manifest disregard of the law" and, in any event, Judge Eyler did not disregard the law in making the Award.................................................................................77

VI.    CONCLUSION.............................................................................79

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A. Schulman, Inc. v. Citadel Plastic Holdings,*
    LLC, 2017 WL 5035497 (Del. Ch. Nov. 2, 2017)..................................................59, 60, 65, 66

*Agspring, LLC v. NGP X US Holdings, L.P.,*
    No. CV 2019-1021-JRS, 2022 WL 170068 (Del. Ch. Jan. 19, 2022) ....................................77

*Alexander Julian, Inc. v. Mimco, Inc.,*
    29 F. App'x 700 (2d Cir. 2002) ............................................................................................56

*Am. Life Ins. Co. v. Parra,*
    269 F. Supp. 2d 519, 525–26 (D. Del. 2003), order clarified, No. CIV.A. 98-
    401 (KAJ), 2003 WL 22999543 (D. Del. Dec. 22, 2003)..................................................56, 76

*Anderson v. Am. Gen. Life Ins. Co.,*
    802 F. App'x 548 (11th Cir.), *cert. denied*, 141 S. Ct. 361 (2020)........................................66

*Matter of Arb. Between Int'l Surplus Lines Ins. Co. & People's Ins. Co. of China,*
    No. 94 C 2838, 1994 WL 502015 (N.D. Ill. Sept. 12, 1994)..................................................78

*Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC,*
    913 F.3d 1162 (9th Cir. 2019) ..............................................................................................73

*B.L. Harbert Int'l, LLC v. Hercules Steel Co.,*
    441 F.3d 905, 907 (11th Cir. 2006) .........................................................................................6

*BAE Sys. Info. & Elec. Sys. Integration Inc. v. Lockheed Martin Corp.,*
    No. CIV.A. 3099-VCN, 2011 WL 3689007 (Del. Ch. Aug. 10, 2011)..................................69

*Bankers & Shippers Ins. Co. v. Gonzalez,*
    234 So. 2d 693 (Fla. 3d DCA 1970) ........................................................................................6

*Barbier v. Shearson Lehman Hutton Inc.,*
    948 F.2d 117 (2d Cir. 1991).....................................................................................................55

*Baxter v. Palmigiano,*
    425 U.S. 308 (1976).................................................................................................................59

*Bellantuono v. ICAP Sec. USA, LLC,*
    557 F. App'x 168 (3d Cir. 2014) .............................................................................................56

*Bonar v. Dean Witter Reynolds, Inc.,*
    835 F.2d 1378, 1383 (11th Cir.1988), *aff'd*, 588 F. App'x 951 (11th Cir.
    2014). .................................................................................................................................67, 68

*Century Indem. Co. v. Certain Underwriters at Lloyd's, London*,
584 F.3d 513, 557 (3d Cir. 2009)................................................................55, 56, 73

*CM S. E. Texas Houston, LLC v. CareMinders Home Care, Inc.*,
662 F. App'x 701 (11th Cir. 2016) ........................................................................58

*Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*,
529 U.S. 193 (2000)................................................................................................54

*Dorward v. Macy's Inc.*,
No. 2:10-CV-669-FTM-29, 2013 WL 5407660 (M.D. Fla. Sept. 25, 2013)...........67

*Fairchild & Co. v. Richmond, F. & P. R. Co.*,
516 F. Supp. 1305 (D.D.C. 1981) .........................................................................58

*Fid. Funding of California v. Reinhold*,
190 F.R.D. 45 (E.D.N.Y. 1997) .............................................................................60

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995)................................................................................................55

*Floridians for Solar Choice, Inc. v. PCI Consultants, Inc.*,
314 F. Supp. 3d 1346, 1355 (S.D. Fla. 2018), *aff'd sub nom. Floridians for
Solar Choice, Inc. v. Paparella*, 802 F. App'x 519 (11th Cir. 2020) ...................68

*Ford v. Telamon Corp.*,
No. CV K21C-02-005 NEP, 2021 WL 2550208 (Del. Super. Ct. June 17,
2021) .....................................................................................................................58

*Frazier v. CitiFinancial Corp.*,
LLC, 604 F.3d 1313 (11th Cir. 2010)......................................................................6

*Frazier v. CitiFinancial Corp., LLC*,
604 F.3d 1313 (11th Cir. 2010) .............................................................................56

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991)..................................................................................................77

*Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*,
865 F. Supp. 1516 (S.D. Fla. 1994), *aff'd in part*, 117 F.3d 1328 (11th Cir.
1997) ..........................................................................................................69, 70, 71

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*,
552 U.S. 576 (2008)..........................................................................................55, 56

*Harris v. Haught*,
435 So. 2d 926 (Fla. 1st DCA 1983) .......................................................................6

*Int'l Bhd. of Firemen & Oilers, Loc. 261 v. Great N. Paper Co.*,
   765 F.2d 295 (1st Cir. 1985) ...................................................................71

*Int'l Bhd. of Pulp, Sulphite & Paper Mill Workers, Loc. Union No. 874 v. St.
Regis Paper Co.*,
   362 F.2d 711 (5th Cir. 1966) ..................................................................71

*Kane Gas Light & Heating Co. v. Int'l Bhd. of Firemen & Oilers, Loc. 112*,
   687 F.2d 673 (3d Cir. 1982) ...................................................................71

*Kasket v. Chase Manhattan Mortg. Corp.*,
   759 So. 2d 726 (Fla. 4th DCA 2000) .....................................................56

*In re Kien*,
   372 N.E.2d 376 (Ill. 1977) .....................................................................70

*Kim-C1, LLC v. Valent Biosciences Corp.*,
   756 F. Supp. 2d 1258 (E.D. Cal. 2010) .................................................55

*LCT Cap., LLC v. NGL Energy Partners LP*,
   249 A.3d 77 (Del. 2021) .........................................................................75

*Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   481 F.3d 813 (D.C. Cir. 2007) ...............................................................56

*Liberty Sec. Corp. v. Fetcho*,
   114 F.Supp.2d 1319 (S.D. Fla. 2000) .....................................................68

*Major League Baseball Players Ass'n v. Garvey*,
   532 U.S. 504 (2001) ................................................................................73

*Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*,
   939 F.3d 1145 (11th Cir. 2019) ..............................................................18

*May v. Illinois Nat. Ins. Co.*,
   771 So. 2d 1143, 1153 (Fla. 2000) .........................................................56

*Millennium Validation Servs., Inc. v. Thompson*,
   No. CIV.A. 02-1430 (GMS), 2006 WL 3159821 (D. Del. Nov. 3, 2006), aff'd,
   316 F. App'x 124 (3d Cir. 2008) ............................................................77

*Norman v. State*,
   215 So. 3d 18 (Fla. 2017) ........................................................................56

*NRI Acad. of Scis. v. Mukkamala*,
   No. 12-CV-15333, 2017 WL 5749673 (E.D. Mich. Jan. 9, 2017) ...........77

*Orner v. Country Grove Inv. Grp.*,
　LLC, No. CIV.A. 2245-VCS, 2007 WL 3051152 (Del. Ch. Oct. 12, 2007) .........................56

*Ortiz-Espinosa v. BBVA Securities of Puerto Rico, Inc.*,
　852 F.3d 36 (1st Cir. 2017).......................................................................................66

*Paron Cap. Mgmt., LLC v. Crombie*,
　C.A. No. 6380-VCP, 2012 WL 2045857 (Del. Ch. May 22, 2012), *aff'd*, 62
　A.3d 1223 (Del. 2013) ...........................................................................................75

*Paul Green Sch. Of Rock Music Franchising, LLC. v. Smith*,
　389 F. App'x 172 (3d Cir. 2010) .............................................................................77

*Regnery Pub., Inc. v. Miniter*,
　368 F. App'x 148 (D.C. Cir. 2010)...........................................................................56

*In re Robinson*,
　151 A.D. 589, 136 N.Y.S. 548 (App. Div. 1912), *aff'd*, 103 N.E. 160 (N.Y.
　1913) ......................................................................................................................70

*S. Mills, Inc. v. Nunes*,
　586 F. App'x 702 (11th Cir. 2014) ...........................................................................56

*Schmidt v. Finberg*,
　942 F.2d 1571 (11th Cir. 1991) ...............................................................................58

*Selden v. Airbnb, Inc.*,
　No. 16-CV-933 (CRC), 2019 WL 13158226, at *5 (D.D.C. Nov. 27, 2019),
　*aff'd*, 4 F.4th 148 (D.C. Cir. 2021) .........................................................................57

*Seneca Nation of Indians v. New York*,
　988 F.3d 618 (2d Cir. 2021)....................................................................................77

*Silvers v. Verbata, Inc.*,
　No. 221CV05808VAPRAOX, 2021 WL 5911690 (C.D. Cal. Nov. 10, 2021),
　*appeal dismissed*, No. 21-56341, 2022 WL 2073088 (9th Cir. Mar. 14, 2022) ...................73

*Southco, Inc. v. Reell Precision Mfg. Corp.*,
　556 F. Supp. 2d 505 (E.D. Pa. 2008), *aff'd*, 331 F. App'x 925 (3d Cir. 2009) ......................67

*SPX Corp. v. Garda USA, Inc.*,
　94 A.3d 745 (Del. 2014) ..........................................................................................77

*Sterling Nat. Bank v. A-1 Hotels Int'l, Inc.*,
　175 F. Supp. 2d 573 (S.D.N.Y. 2001)......................................................................60

*The Fla. Bar v. Jackson*,
　490 So. 2d 935 (Fla. 1986)......................................................................................70

*The Fla. Bar v. Wohl*,
  842 So. 2d 811 (Fla. 2003)....................................................................................................70

*Trustees of Plumbers & Pipefitters Nat. Pension Fund v. Transworld Mech., Inc.*,
  886 F. Supp. 1134 (S.D.N.Y. 1995)......................................................................................60

*United States v. Agostino*,
  132 F.3d 1183 (7th Cir. 1997) .............................................................................................70

*United States v. Donohue*,
  726 F. App'x 333 (6th Cir. 2018) .........................................................................................64

*United States v. Eberhard*,
  No. 03 CR.562(RWS), 2004 WL 616122 (S.D.N.Y. Mar. 30, 2004)....................................66

*United States v. Godwin*,
  272 F.3d 659 (4th Cir. 2001) ...............................................................................................64

*United States v. Graham*,
  477 F. App'x 818 (2d Cir. 2012) ..........................................................................................64

*United States v. Gravatt*,
  280 F.3d 1189 (8th Cir. 2002) ........................................................................................63, 64

*United States v. Guadagna*,
  183 F.3d 122, 129 (2d Cir. 1999).........................................................................................64

*United States v. Howard*,
  619 F.3d 723 (7th Cir. 2010) ...............................................................................................63

*United States v. Irwin*,
  354 F.2d 192 (2d Cir. 1965).................................................................................................70

*United States v. Paneras*,
  222 F.3d 406 (7th Cir. 2000) ...............................................................................................63

*United States v. Philip Morris USA Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009) ...........................................................................................65

*United States v. Schuler*,
  458 F.3d 1148 (10th Cir. 2006) ...........................................................................................63

*United States v. Vas*,
  497 F. App'x 203 (3d Cir. 2012) ..........................................................................................63

*United States v. Welch*,
  327 F.3d 1081, 1105 (10th Cir. 2003) ..................................................................................64

*W.L. Gore & Assocs., Inc. v. Long*,
  No. CIV.A. 4387-VCP, 2011 WL 6935278 (Del. Ch. Dec. 28, 2011) ...................................60

*Wagner v. Lehman Bros. Kuhn Loeb Inc.*,
  646 F. Supp. 643 (N.D. Ill. 1986) ......................................................................................70

*Walker v. Ameriprise Fin. Servs., Inc.*,
  787 F. App'x 211 (5th Cir. 2019) .......................................................................................66

*Washington Mut. Bank, F.A. v. Am. Fin. Network*,
  414 F. Supp. 2d 1155 (S.D. Fla. 2006) ...............................................................................58

*Wilson v. Sterling Foster & Co.*,
  No. 98 C 2733, 1998 WL 749065 (N.D. Ill. Oct. 15, 1998)................................................58

*Wylie v. Inv. Mgmt. & Rsch. Inc.*,
  629 So. 2d 898, 900 (Fla. 4th DCA 1993) ..........................................................................56

**Statutes and Other Authorities**

11 Del. C. §906(2) ....................................................................................................................53

18 U.S.C. § 201........................................................................................................................70

Del. Ethics Op. 2003–3 ............................................................................................................69

Del. P.J.I. Civ. § 22.24 (2000) .................................................................................................75

Federal Arbitration Act ...................................................................................................... *passim*

Florida Bar Rule 4-3.4(b).........................................................................................................70

Florida Statutes, Chapter 682.....................................................................................................1

Fraudulent Claims Act .............................................................................................................46

RICO ........................................................................................................................................30

Truth in Lending Act ...............................................................................................................56

U.S. Const. amend. II...............................................................................................................56

U.S. Const. amend. V ........................................................................................................ *passim*

I.    **INTRODUCTION**

This brief is submitted in support of an amended petition by the Advantage Parties[1] to confirm arbitration awards under Chapter 1 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–13; Chapter 682, Florida Statutes, and the asset purchase agreement between the parties (the "APA"). The Take 5 Parties'[2] opposition to the amended petition (the "Amended Opposition" or "Am. Opp.")[3] is frivolous. The grounds for vacating an award under the FAA, 9 U.S.C. § 10, are limited to fraud, corruption, and lack of jurisdiction. None of the Take 5 Parties' arguments approach the threshold of such a showing.

Advantage acquired the assets of Take 5 from the Take 5 Parties in April 2018 for approximately $77 million based on representations by Mr. Radetich and Mr. Gluck that Take 5 was an e-mail service provider ("ESP") that had a database of over 160 million valid, deliverable e-mail addresses that it could use to provide in-house e-mail marketing for its clients to a very targeted demographic population selected by the client. A year later, Advantage executives discovered that Take 5's e-mail advertising business was fraudulent. Instead of delivering e-mails, it was hiring low-cost pay-per-click ("PPC") vendors to generate clicks on the clients' Internet websites to fool clients into believing that e-mail advertisements had been sent and that customers were opening the e-mails and clicking on the links. Take 5 then provided its clients

---

[1] Advantage Sales & Marketing LLC ("Advantage"), Advantage Sales & Marketing Inc., Karman Intermediate Corp., Advantage Solutions Inc., and Karman Topco L.P.

[2] Petruss Media Group LLC, f/k/a Take 5 Media Group, LLC, Alexander Radetich, Richard Gluck, and RJV Marketing Corp. ("RJV").

[3] Take 5 filed its combined "Opposition to Amended Petition to Confirm Arbitration Awards, Motion to Quash, and Motion to Vacate Arbitration Awards" on December 1, 2022. Advantage expressly reserves the right to respond to Take 5's Motion to Quash and Motion to Vacate Arbitration Awards.

1

with fraudulent tracking reports claiming that it had delivered e-mails to customers, and customers had received and opened the e-mail.

In the APA, the Take 5 Parties made a number of representations and warranties that Take 5 was a legitimate business that was properly recording revenue and performing the services its clients paid it to perform. After a 15-day evidentiary hearing during which numerous witnesses testified and hundreds of exhibits were admitted, the arbitrator, the Hon. James R. Eyler (Ret.), found that the Take 5 Parties fraudulently breached those representations and warranties and defrauded the Advantage Parties, and he issued a 45-page single-spaced opinion that reviewed in detail the testimony of each witness and the bases for his findings. *See* Ex. 1, August 4, 2022 Interim Award ("IA"). Judge Eyler entered a Modified Final Award on October 19, 2022 and awarded the Advantage Parties $48,325,822.29 in damages and an additional $22,032,263.60 in costs, including attorney's fees.[4]

The Take 5 Parties make six arguments in opposition to the Advantage Parties' request that the Court confirm the Award, all of which are meritless. First, the Take 5 Parties argue that Judge Eyler abused his discretion by refusing to stay the arbitration because Mr. Radetich and Mr. Gluck were under criminal investigation by the federal government and needed to invoke their Fifth Amendment right not to testify. But they asked that the arbitration be stayed for only *six* months or until the investigation concluded, whichever was earlier. The final evidentiary hearing did not begin until *seven* months after Judge Eyler decided not to stay the case, and the investigation remains active but has not concluded. Section 10(a)(3) of the FAA requires that Mr. Radetich and Mr. Gluck prove that they were "prejudiced" by the refusal to grant a stay, and

---

[4] We refer to the Interim Award (Ex. 1), the Final Award of October 4, 2022 (Ex. 2), and the Modified Final Award of October 19, 2022 (Ex. 3) collectively as the "Award."

because they would have had to plead the Fifth even if Judge Eyler had granted the stay, they were not prejudiced. Moreover, as discussed below, Judge Eyler's refusal to grant the stay was 100% correct under the law and well within his discretion.

In connection with this first argument, the Take 5 Parties also assert that, because Mr. Radetich and Mr. Gluck did not testify, there was no evidence that Mr. Radetich and Mr. Gluck knew that Take 5 was not actually sending the e-mails it was paid to send. Again, this assertion is absurd. The Advantage Parties introduced substantial evidence of their knowledge and intent during the hearing, and the Arbitrator agreed. Take 5's former employees testified that Mr. Radetich and Mr. Gluck knew that Take 5 was not sending e-mail advertisements and falsely reporting that it did. Mr. Radetich was present when the findings of an internal investigation disclosing the fraud were presented and did not object. Mr. Gluck admitted that Take 5 was not sending e-mails but said that clients did not care, which makes no sense and which Advantage proved was false. Mr. Radetich and Mr. Gluck participated in many e-mail communications discussing how to deal with clients who were catching on to the fraud. Mr. Radetich and Mr. Gluck were the founders and owners of Take 5 who were the principal beneficiaries of the fraud, and numerous courts have held that this fact, standing alone, supports a finding of scienter.

Second, the Take 5 Parties argue that the Advantage Parties failed to maintain access to Take 5's Google Analytics account, which, they say, would show whether Take 5 was actually sending e-mails. This also is nonsense. The Advantage Parties proved empirically that Take 5 was not sending e-mails because the logs from its in-house delivery platforms showed that few e-mails were sent. The Take 5 Parties never subpoenaed Google Analytics, and every witness who testified about Google Analytics confirmed that (1) Take 5's Google Analytics account would

*not* provide information about whether a click was from an e-mail or PPC vendor, and (2) Take 5 manipulated Google Analytics data to trick clients into believing that clicks originated from a Take 5 e-mail. Based on this testimony, Judge Eyler found that Google Analytics was irrelevant. Ex. 1, IA at 4–5 ("I find that the Take 5 LLC Google Analytics data did not contain information that would materially impact the issues in this case.").

Third, the Take 5 Parties argue that Judge Eyler exceeded his authority when he entered the award against RJV, because, they say, there was no evidence that RJV committed fraud. What they fail to tell the Court is that in the APA, RJV agreed to indemnify the Advantage Parties for any damages caused by the fraudulent breaches of the APA by any of the other Take 5 Parties. The Take 5 Parties did not disclose this to the Court despite the fact that this section of the APA was prominent in Judge Eyler's Award and the Advantage Parties' briefing.

Fourth, the Take 5 Parties argue that Judge Eyler exceeded his powers in awarding certain damages because, they allege, the Advantage Parties did not submit sufficient evidence to support those damages. They made this same argument to Judge Eyler, and he rejected it. Moreover, this is not a legitimate basis to challenge an arbitral award. Finally, the evidence in support of the Advantage Parties' damages was overwhelming and uncontroverted.

Fifth, the Take 5 Parties argue that Judge Eyler should not have concluded that the testimony of Michael Boy and Eva Hodgens, former Take 5 employees, and Peter Ward, a third-party contractor, was credible because the Advantage Parties retained Mr. Boy as an employee and agreed to reimburse Ms. Hodgens and Mr. Ward for their attorney's fees paid to their criminal defense lawyers.[5] The Advantage Parties are not aware of a single case holding that

---

[5] Mr. Boy and Ms. Hodgens worked in Take 5's fulfillment department, which was using PPC traffic to fulfill e-mail orders, and Mr. Ward was a software engineer who designed and

such payments are improper, let alone an arbitral award can be overturned under the FAA on the basis of witness credibility, and the Take 5 Parties do not cite any. It was perfectly appropriate for the Advantage Parties to reimburse Ms. Hodgens and Mr. Ward for their out-of-pocket attorney's fees and to retain Mr. Boy as an employee. The only reason that Ms. Hodgens and Mr. Ward needed criminal counsel was because their employers, Mr. Radetich and Mr. Gluck, were operating a criminal enterprise.

Sixth, the Take 5 Parties argued that Judge Eyler exceeded his authority in awarding prejudgment interest because, they say, the Advantage Parties never asked for prejudgment interest. This also misrepresents the facts: the Advantage Parties *did* ask for prejudgment interest. Moreover, the Take 5 Parties made this argument to Judge Eyler who rejected it, and the Take 5 Parties are not permitted to ask this Court to reconsider that determination.

Finally, the Take 5 Parties argue that Judge Eyler "manifestly disregarded the law" in making his Award. This is not a basis for vacating an arbitral award. Moreover, the Take 5 Parties' arguments are simply a regurgitation of the baseless assertions summarized above under a different label.

For the foregoing reasons, and as discussed in detail below, the Advantage Parties respectfully request that the Court deny the petition to vacate the Award and confirm it.

## II.    STATEMENT OF FACTS[6]

Judge Eyler is a highly respected jurist. He was a judge on the Maryland Court of Special Appeals, the intermediate appellate court for the state of Maryland, from 1996 through

---

built Take 5's Campaign Management System ("CMS") that generated the fraudulent tracking reports.

[6] Attached to this brief as Appendix A is an index of the testimony during the evidentiary hearing. The Take 5 Parties have filed the full transcripts of this testimony as Composite

2012.[7]  Although the Take 5 Parties are not permitted to relitigate the issues raised in the

arbitration under the guise of seeking to vacate the award,[8] we summarize below the evidence

presented during the hearing to demonstrate that the evidence of fraud was overwhelming.

> **A.    The Advantage Parties acquired the assets of Take 5 because Mr. Radetich and Mr. Gluck represented that it was an e-mail marketing company**

Take 5 was founded in 2003 by Mr. Radetich and Mr. Gluck.[9]  It was headquartered in

Boca Raton, Florida.[10]  Mr. Radetich and Mr. Gluck described Take 5 to its clients and

Advantage as an e-mail marketing company.[11]

---

Exhibit C, Exhibits 48–63 to their Amended Opposition.  The Advantage Parties refer to these exhibits in effort to eliminate the filing of duplicative exhibits.

[7] *James Eyler*, Ballotpedia, https://ballotpedia.org/James_Eyler (last visited Nov. 30, 2022).

[8] *B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 905, 907 (11th Cir. 2006) ("If we permit parties who lose in arbitration to freely relitigate their cases in court, arbitration will do nothing to reduce congestion in the judicial system; dispute resolution will be slower instead of faster; and reaching a final decision will cost more instead of less."), abrogated on other grounds by *Frazier v. CitiFinancial Corp.*, LLC, 604 F.3d 1313 (11th Cir. 2010); *cf. Harris v. Haught*, 435 So. 2d 926, 928 (Fla. 1st DCA 1983) (striking affirmative defense where party was "merely attempting to relitigate the arbitration issues"); *Bankers & Shippers Ins. Co. v. Gonzalez*, 234 So. 2d 693, 695 (Fla. 3d DCA 1970) ("the very essence of an arbitration is an agreement to be bound by the factual determination of the arbitrator and thus end the factual controversy" and parties may not relitigate factual issues decided by the arbitrator).

[9] Ex. 4, 11/19/19 Take 5 Amended Statement of Claim at ¶ 16.

[10] *Id.* at ¶ 17; Am. Opp., Ex. 49 (Arbitration Testimony of Gary Colen ("Colen")) Trial Tr. vol. 2 at 328:22–25.

[11] *See* Am. Opp., Ex. 48 (Arbitration Testimony of Darin Kleinman ("Kleinman")) Trial Tr. vol. 1 at 126:19–127:5 (Mr. Radetich and Mr. Gluck described Take 5 as an e-mail marketing company), 123:2–8 (Mr. Radetich and Mr. Gluck never described Take 5 as being "anything other than an e-mail service provider that provided – that distributed 100 percent of its e-mails in-house using its proprietary database"), 128:9–14 (Mr. Radetich and Mr. Gluck represented before the acquisition that Take 5 was "performing e-mail marketing services.  That was sort of the whole basis for the transaction"); Am. Opp., Ex. 49 (Colen Trial Testimony) at 316:10–14 (Mr. Gluck described Take 5 as "the best e-mail company in all of America"); Am. Opp., Ex. 50 (Arbitration Testimony of Corey Weiner ("Weiner")) Trial Tr. vol. 3 at 803:18–807:16 (Mr. Radetich and Mr. Gluck described Take 5 as an e-mail advertising company); Am. Opp., Ex. 54 (Arbitration Testimony of Ryan McGavran ("McGavran")) Trial Tr. vol. 7 1783:8–

In 2017, Mr. Radetich and Mr. Gluck hired Petsky Prunier, an investment banking firm, to market Take 5's assets to potential investors.[12]  Advantage's business included digital marketing services, but Advantage did not have the capability in-house to fulfill e-mail marketing campaigns.[13]

In June 2017, Advantage received the Confidential Information Memorandum (the "CIM") from Petsky Prunier describing Take 5's business.[14]  In the CIM, Take 5 represented that it had a "proprietary, self-reported, and double-opted-in database [containing] a wide range of information, including e-mail and postal addresses, phone numbers, and unique demographic and

---

1784:10, Ex. 5, (Trial Ex. A-164) [1/23/19 e-mail communication from A. Radetich to R. McGavran] (Mr. Radetich represented that Take 5 was primarily an e-mail marketing company); Am. Opp., Ex. 56 (Arbitration Testimony of Prima Creel ("Creel")) Trial Tr. vol. 9 2303:8–17 (during Ms. Creel's interview process Mr. Radetich and Mr. Gluck described Take 5 as a marketing company with e-mail marketing as their main channel), 2312:22–2313:18, Ex. 6, (Trial Ex. A-169) [1/4/19 e-mail communication from A Radetich to P. Creel, *et al.*] (Mr. Radetich stating that Take 5 is "an e-mail service provider"); Ex. 7, (Trial Ex. A-364) [8/7/17 e-mail communication from A. Radetich to Petsky Prunier] (admission by Mr. Radetich that Advantage was interested in acquiring Take 5 to "start using e-mail as a channel" for marketing and that Advantage had "all the other digital and social" advertising covered); *see also* Ex. 8, (Trial Ex. A-528) [Investment Considerations presentation] at 8 (According to the information that Mr. Radetich and Mr. Gluck provided to Advantage before the acquisition, e-mail advertising accounted "for the majority of the company's revenue, about two-thirds of the revenue in 2017").

[12] *See* Am. Opp., Ex. 48 (Kleinman Trial Testimony) at 93:7–94:2, 98:15–99:9 (Mr. Kleiman learned that Take 5 assets were being marketed through Petsky Prunier), 94:22–95:4; Ex. 9, (Trial Ex. A-569) [Project Palm Teaser] (the first document Mr. Kleinman received from Petsky Prunier regarding Take 5); Ex. 7, (Trial Ex. A-364) [8/7/17 e-mail communications between A. Radetich to Petsky Prunier, *et al.*] (discussing the initial marketing process of Take 5, including marketing to Advantage); Am. Opp., Ex. 49 (Colen Trial Testimony) at 319:11–25 (Petsky Prunier provided the Confidential Information Memorandum to Advantage); Am. Opp., Ex. 55 (Arbitration Testimony of Paul Brewer ("Brewer")) Trial Tr. vol. 8 at 2271:7–9 (Take 5 hired Petsky Prunier to broker the sale of Take 5).

[13] *See* Am. Opp., Ex. 48 (Kleinman Trial Testimony) at 97:24–98:14; Am. Opp., Ex. 49 (Colen Trial Testimony) at 320:25–321:16.

[14] Ex. 10, (Trial Ex. A-414) [CIM]; Am. Opp., Ex. 49 (Colen Trial Testimony) at 319:11–320:4; Am. Opp., Ex. 48 (Kleinman Trial Testimony) at 96:11–97:3.

lifestyle information not readily available elsewhere, including one of the deepest datasets of auto owners and intenders."[15]  The Take 5 Parties further represented that "[t]he database comprises . . . 191 million date of birth records, 160 million double opt-in e-mails, and 175 unique lifestyle and demographic overlays with insight into historical and projected spending behaviors."[16]

The Take 5 Parties represented that Take 5 used its data to "execute[] 100% of all e-mail communications in-house" through its e-mail delivery systems.[17]  Mr. Radetich and Mr. Gluck made these same representations in oral communications with Advantage's executives.[18] Advantage acquired the assets of Take 5 solely because of its supposed robust e-mail marketing database and the capability to use that database to do e-mail advertising.[19]

---

[15] Ex. 10, (Trial Ex. A-414) [CIM] at 4.

[16] Ex. 10, (Trial Ex. A-414) [CIM] at 5; *see also* Am. Opp., Ex. 49 (Colen Trial Testimony) at 324:6–325:23 (Take 5 made representations in the CIM that Take 5 had 160 million double opt-in e-mail addresses and they had the ability to target to different demographics).

[17] Ex. 10, (Trial Ex. A-414) [CIM] at 17; *see also* Am. Opp., Ex. 49 (Colen Trial Testimony) at 582:17–583:2 ("[A]t the time we bought the company, they kind of shared with us that 100 percent of their e-mail volume was deployed internally . . . ."); Am. Opp., Ex. 48 (Kleinman Trial Testimony) at 104:4–21 (Take 5 represented to Advantage that "[e]verything was done in-house").

[18] *See* Am. Opp., Ex. 49 (Colen Trial Testimony) at 326:20–327:5 (Mr. Radetich and Mr. Gluck made these representations to Mr. Colen), 399:24–400:13 (Advantage was told that Take 5 "executed . . . 100 percent of the e-mail in-house"); Am. Opp., Ex. 48 (Kleinman Trial Testimony) at 123:2–8 (Mr. Radetich and Mr. Gluck described Take 5 as "an e-mail service provider that -- distributed 100 percent of its e-mails in-house using its proprietary database").

[19] *See* Am. Opp., Ex. 49 (Colen Trial Testimony) at 315:21–316:4 ("[W]e were familiar with them as an e-mail company."), 316:10–317:2 (Take 5's e-mail marketing capabilities would differentiate services from across Advantage), 317:10–21 (Advantage was focused on Take 5 as an e-mail marketing company because Advantage already had many solutions in other channels); Am. Opp., Ex. 48 (Kleinman Trial Testimony) at 97:14–21 ("[T]he majority of [Take 5] was around e-mail and database e-mail marketing, and that's really what drove our interest."), 106:3–107:15 (Take 5 was primarily an e-mail company and was not strong on non-e-mail based campaigns); Am. Opp., Ex. 56 (Arbitration Testimony of Josh Pike ("Pike")) Trial Tr. vol. 9 at 2454:19–2455:5 ("Take 5 represented their business as – owning a large proprietary set of

B.    **Advantage discovers the Take 5 Parties' fraud**

1.    **Ryan McGavran discovers that Take 5 is generating falsified reports**

Advantage acquired the assets of Take 5 pursuant to the APA, which was dated as of

March 15, 2018,[20] and the transaction closed on April 1, 2018.[21]  After the acquisition, Gary

Colen, an executive of Advantage had general oversight of the Take 5 division,[22] but

Mr. Radetich and Mr. Gluck continued to control the operations of Take 5.[23]  After the

acquisition, the earnings of the Take 5 business were well below what the Take 5 Parties

projected.[24]  Mr. Radetich and Mr. Gluck recommended that Advantage hire Ryan McGavran to

---

personally identifiable information, which they could use to deploy targeted e-mail campaigns against . . ."); *see also* Ex. 11, (Trial Ex. A-556) [10/20/17 e-mail communication from G. Colen to J. Pike, *et al.*] (Take 5 is "not that knowledgeable/sophisticated outside of e-mail"); Ex. 7, (Trial Ex. A-364) [8/7/17 e-mail communication from A. Radetich to Petsky Prunier, *et al.*] (admission by Mr. Radetich that Advantage was interested in acquiring Take 5 to "start using e-mail as a channel" for marketing and that Advantage had "all the other digital and social" advertising covered), Ex. 12, (Trial Ex. A-546) [9/7/17 e-mail from J. Pike to G. Colen] ("They have built a business on activating data to drive the targeting marketing programs, primarily through e-mail."); Ex. 5, (Trial A-164) [1/23/19 e-mail communication from A. Radetich to R. McGavran] ("Only one, maybe two of our salespeople currently sell the complete vision. After all these years, most continue selling only e-mail because that's what they're comfortable with and their brains don't want to retain or learn more.").

[20] Ex. 13, (Trial Ex. A-230) [APA] at 1 (Preamble).

[21] Am. Opp., Ex. 60 (Arbitration Testimony of Jeffrey Baliban ("Baliban")) Trial Tr. vol. 13 at 3505:3–5; Am. Opp., Ex. 61 (Arbitration Testimony of Tanya Domier ("Domier")), Trial Tr. vol. 14 at 3664:24–3665:8, & Ex. 14, (Trial Ex. T-57) [J. Griffin's ELT Announcement] (announcing April 1 closing).

[22] Am. Opp., Ex. 49 (Colen Trial Testimony) at 335:12–24 (Mr. Radetich reported to Mr. Colen, but Mr. Radetich's and Mr. Gluck's authority over the Take 5 business unit was not limited).

[23] Am. Opp., Ex. 49 (Colen Trial Testimony) at 335:20–336:14; Am. Opp., Ex. 53 (Arbitration Testimony of Michael Boy ("Boy")) Trial Tr. vol. 6 at 1650:11–19; Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1784:22–1785:9 (Mr. Radetich and Mr. Gluck continued to interact heavily with the sales after the acquisition and make decisions without Mr. McGavran).

[24] Am. Opp., Ex. 49 (Colen Trial Testimony) at 339:7–340:2.

act as general manager and oversee the commercial operations of Take 5.[25]  After Mr. McGavran

arrived, Take 5's employees continued to have allegiance to Mr. Radetich and Mr. Gluck,[26] but

Mr. Boy, who worked in the department that was fulfilling e-mail orders with PPC traffic, "tried

to leave Mr. McGavran breadcrumbs,"[27] and Mr. McGavran began to discover the fraudulent

nature of Take 5's business.

The first thing that Mr. McGavran learned was that Take 5 was providing fraudulent

matchback reports.[28]  These were reports provided to clients that were supposed to represent a

list of customers who had received e-mails and had subsequently purchased the client's

product.[29]  But instead of matching the customer to an e-mail recipient—which Take 5 could not

have done because it was not sending e-mails[30]—Take 5 would run the name of a purchaser

against its entire database of information and report on those matches, even if there was no

possibility that the individual in the database and the purchaser were the same person.[31]

---

[25] *Id.* at 345:9–346:9; Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1782:8–14;
Ex. 15, (Trial Ex. A-399) [12/17/18 offer letter to R. McGavran].

[26] Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1784:22–1786:8, 1790:2–1791:4.

[27] Am. Opp., Ex. 53 (Boy Trial Testimony) at 1635:6–1637:4.

[28] Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1796:25–1798:9.

[29] *Id.* at 1796:25–1797:11.

[30] Am. Opp., Ex. 53 (Boy Trial Testimony) at 1706:23–1708:13 ("How can we
matchback to an e-mail to a person that purchased the vehicle if that person never received an e-mail from us?"); *see* Ex. 16, (Trial Ex. A-255) [6/15/12 e-mail communication from D. Morris to
R. Gluck] (Mr. Morris asking Mr. Gluck "how many matchbacks should I deliver back to
[Vetstreet]?").

[31] Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1799:8–24; Am. Opp., Ex. 53 (Boy
Trial Testimony) at 1635:6–1637:4.

### 2.    Prima Creel discovers that Take 5 is not capable of sending e-mails

Prima Creel was hired by Mr. Radetich and Mr. Gluck in December 2018 to be Director of Sales.[32]  Ms. Creel was a well-seasoned executive and had approximately 10 years of experience with e-mail marketing.[33]  Shortly after Ms. Creel's arrival, she began to discover that Take 5 did not have the e-mail marketing capabilities that it told clients it had.[34]  One of the first aspects of Take 5's business that concerned her was that the department that sold clients e-mail marketing campaigns was not allowed to communicate with the department that fulfilled these orders.[35]  Another issue that she noticed was that smaller clients were questioning the nature of the digital traffic that Take 5 was providing and were not retaining Take 5 after the initial campaign.[36]  She did an analysis and determined that there was "about a 1 percent retention rate on people that tested [Take 5's] data and e-mails."[37]

Primarily as a consequence of her concerns about Take 5's client retention rate, Ms. Creel decided to run an e-mail test campaign with one of her former clients, DJ Media.[38]  DJ Media employees reported to Ms. Creel that, based on their observations as to how the campaign was performing, Take 5 was not sending e-mails to DJ Media's customers but was generating clicks

---

[32] Am. Opp., Ex. 56 (Creel Trial Testimony) at 2303:2–2304:2.

[33] *Id.* at 2301:14–21.

[34] *Id.* at 2313:21–2314:3 ("the e-mail capabilities that we were . . . selling and reporting . . . were not reality").

[35] Am. Opp., Ex. 56 (Creel Trial Testimony) at 2328:11–2330:4.

[36] *Id.* at 2317:15–2319:16.

[37] *Id.* at 2320:23–2321:8.

[38] *Id.* at 2330:7–2331:8 (DJ Media was "very, very focused on e-mail marketing" and understood e-mail behavior).

through some other means.[39]  Ms. Creel performed an investigation and learned from Mr. Boy

that Take 5 "couldn't provide real e-mail traffic."[40]  Ms. Hodgens, who was Mr. Boy's

supervisor, also told Ms. Creel, "this isn't the e-mail traffic that you think it is.  We are using

other forms of PPC traffic, which is why you are getting so frustrated and not seeing the

responses that you expect to see."[41]

### 3.    Corey Weiner discovers that Take 5 is not sending e-mails on behalf of his clients

Corey Weiner is the co-founder and chief executive officer of Jun Group, an advertising

and digital media company that was acquired by Advantage in September 2018.[42]  In Spring

2019, Jun Group hired Take 5 to provide e-mail marketing campaigns for three of its clients:

Earth Balance, Juicy Juice, and Café Bustelo.[43]  Mr. Weiner's team finalized the e-mail

advertisements and ran test e-mail campaigns to verify that the campaigns would perform as

expected.[44]  Jun Group noticed, however, that the test e-mails were not being delivered to Jun

Group's inbox, which meant that they might not be delivered to its clients' inboxes.[45]

---

[39] Ex. 17, (Trial Ex. A-699) [3/25/19 e-mail communication from P. Creel to B. Jenkins] (including e-mail thread from representatives of DJ Media reporting that the number of sales was inconsistent with the number of clicks); Am. Opp., Ex. 56 (Creel Trial Testimony) at 2331:9–20, 2332:24–2334:12, 2335:10–2336:24 (describing why representatives of DJ Media were telling her that Take 5 was not sending the e-mails that DJ Media bought).

[40] Am. Opp., Ex. 56 (Creel Trial Testimony) at 2343:11–21; 2351:8–20; Ex. 18, (Trial Ex. A-700) [3/21/19 e-mail communication from P. Creel to M. Boy].

[41] Am. Opp., Ex. 56 (Creel Trial Testimony) at 2349:16–2350:8.

[42] Am. Opp., Ex. 50 (Weiner Trial Testimony) at 795:5–8, 795:16–24, 797:15–17.

[43] *Id.* at 808:3–18.

[44] *Id.* at 810:2–811:25.

[45] *See* Am. Opp., Ex. 50 (Weiner Trial Testimony) at 810:2–811:25; Ex. 19, (Trial Ex. A-421) [4/16/19 e-mail communication between Jun Group and Take 5] (regarding problems with spam filters); Ex. 20, (Trial Ex. A-582) [5/2/19 e-mail communication between A. Radetich and T. Coker, *et al.*] (regarding domain report request); Ex. 21, ( Trial Ex. A-423) [4/29/19 e-mail

Mr. Weiner instructed his team to perform further tests, and they concluded that two of the three test e-mails were not delivered because they were caught by the spam filter.[46]

Jun Group could not do a further investigation itself, so it asked Take 5 to provide a domain report from its e-mail delivery systems that would indicate the domains to which the e-mails were sent (*e.g.*, @gmail.com, @yahoo.com, @hotmail.com) and the number of people who actually opened the e-mails.[47]  Mr. Weiner expected that Take 5 could easily provide this report.[48]  Mr. Radetich and Mr. Gluck intervened and provided a complicated explanation by e-mail to Mr. Weiner about why Take 5 could not provide the information he was requesting.[49]  Mr. Weiner testified that "[t]his e-mail heightened my anxiety about Take 5 to probably a 7 out of 10.  And the reason for that is, again, this was a very simple request. . . .  This e-mail really scared me."[50]

Ultimately, Take 5 provided Mr. Weiner an Excel spreadsheet that purported to be the domain report,[51] but when Mr. Weiner analyzed it, it was clear that the report had been

---

communication from A. Radetich to C. Weiner, *et al.*] (regarding Take 5 e-mail campaign results from A. Radetich).

[46] Am. Opp., Ex. 50 (Weiner Trial Testimony) at 813:2–814:8 (two of the three of Take 5's test e-mails "went straight to the spam box").

[47] *Id.* at 815:3–816:5.

[48] *Id.* at 816:6–817:8.

[49] Ex. 20, (Trial Ex. A-582) [April 2019 e-mail communication from A. Radetich to C. Weiner, *et al.*] (discussing Mr. Weiner's request for a domain report); Am. Opp., Ex. 50 (Weiner Trial Testimony) at 818:4–820:19.

[50] Am. Opp., Ex. 50 (Weiner Trial Testimony) at 820:20–822:13.

[51] *See* Ex. 22, (Trial Ex. A-627) [e-mail communication from D. Gilbert to Jun Group] (sending domain report); Ex. 23, (Trial Ex. A-627A) [Excel sheet showing breakdown by open number and campaign]; Ex. 24, (Trial Ex. A-626) [5/2/19 e-mail communication between Jun Group and Take 5] (requesting additional information); Ex. 25, (Trial Ex. A-626A) [Excel sheet showing campaign, domains, delivered, and opens].

fabricated because for one campaign it reported that the open rate for every domain was identical—which was statistically impossible—and for another reported an open rate of 238%.[52] This increased Mr. Weiner's anxiety to "8, 9 out of 10,"[53] and he told Mr. Radetich, Mr. Gluck, Mr. McGavran, and Mr. Colen that "there must be something very wrong here."[54]

### C.  Engagement of FTI

In April 2019, Mr. McGavran recommended to Mr. Colen that Advantage audit Take 5's campaigns and systems,[55] and Mr. Weiner made the same recommendation in May 2019 to Bryce Robinson, General Counsel for Advantage.[56]  So Mr. Robinson retained FTI Consulting, Inc. ("FTI"), and, later, Latham & Watkins, to perform an audit.[57]

### D.  Project Evolve

While FTI was conducting its audit, Mr. McGavran directed Take 5's employees, including its CFO, Beth Jenkins, to prepare a presentation for the Advantage team[58] disclosing

---

[52] Am. Opp., Ex. 50 (Weiner Trial Testimony) at 827:21–830:8.

[53] Id. at 828:22–830:8.

[54] Id. at 830:14–831:4, Ex. 26, (Trial Ex. A-621) [5/6/19 e-mail communication between C. Weiner, A. Radetich, R. Gluck, and G. Colen]; Ex. 27, (Trial Ex. A-590) [5/10/19 e-mail communication between M. Boy and R. McGavran] (attempting to determine actual open rates).

[55] Ex. 28, (Trial Ex. A-566) [4/18/19 e-mail communication from R. McGavran to G. Colen]; Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1805:22–1809:22.

[56] Am. Opp., Ex. 50 (Weiner Trial Testimony) at 834:6–835:5.

[57] Am. Opp., Ex. 51 (Arbitration Testimony of Michael Wei ("Wei")) Trial Tr. vol. 4 at 954:18–955:10.  The Advantage Parties later retained Latham & Watkins to assist in the investigation of the Take 5 business unit.  Am. Opp., Ex. 49 (Colen Trial Testimony) at 487:6–8; Am. Opp., Ex. 52 (Wei Trial Testimony) vol. 5 at 1296:6–11 (FTI and Latham worked together during the investigation).

[58] See Ex. 29, (Trial Ex. A-340) [Project Evolve presentation]; Am. Opp., Ex. 49 (Colen Trial Testimony) at 352:16–353:9 (authenticating A-340 as the Project Evolve presentation put together by the Take 5 team), 365:8–366:15 ("That information came from files that Beth Jenkins pulled, who's the COO, CFO of Take 5."); Am. Opp., Ex. 53 (Boy Trial Testimony) at 1640:2–25 (the presentation was created by Mr. Boy, Mr. McGavran, Ms. Coker, Ms. Jenkins, and Ms. Creel); Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1822:7–12 (The presentation

the **_actual_** state of Take 5's systems and services and the feasibility of moving Take 5's services

away from e-mail advertising to other forms of digital media.[59]  The Take 5 team gave the

presentation to Mr. Colen on June 19, 2019,[60] and Mr. Radetich attended.[61]  In the presentation,

called "Project Evolve," the team reported that Take 5 was not sending e-mails but was using

low cost third-party PPC traffic to generate clicks, was providing falsified tracking reports to

clients, had a fraction of the deliverable e-mail addresses it claimed to have, and did not have the

capability to send e-mails from its in-house e-mail delivery platforms:

---

"was largely a collaborative effort. I think we all had input, but primarily, my recollection is
Ms. Creel, Ms. Coker, Ms. Jenkins and Mr. Boy."); Am. Opp., Ex. 56 (Pike Trial Testimony) at
2532:21–2533:10 (Project Evolve was a "presentation by Mr. Radetich and the Take 5 leadership
team to address some issues that had arisen on the way the campaigns were being sold and the
way that those campaigns were being delivered and how to evolve that into a more contemporary
and, I guess, legitimate process").

    [59] _See_ Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1820:23–1821:9.

    [60] _Id._ at 1821:22–1822:6.

    [61] _See_ Ex. 30, (Trial Ex. A-223) [6/19/19 calendar invite for Project Evolve presentation];
Am. Opp., Ex. 49 (Colen Trial Testimony) at 353:10–354:6 (Mr. Colen testified that
Mr. McGavran, Mr. Boy, Ms. Creel, Mr. Radetich, Ms. Coker, Ms. Jenkins, Mr. Pike and
Ms. Libitsky attended the presentation); Am. Opp., Ex. 54 (McGavran Trial Testimony) at
1821:19–1822:12 (same); Am. Opp., Ex. 53 (Boy Trial Testimony) at 1641:5–9 (same).

**Current Product State**

| Email Only | Email Blend |
|---|---|
| • Email deployment that yields low engagement. | • Email deployment that yields low engagement. |
| • Low cost 3rd party PPC traffic (pay per click) to provide email clicks. | • Low cost 3rd party PPC traffic (pay per click) to provide email clicks. |
| • Vendor traffic is used to ensure clients desired CTR (click through rate). | • Vendor traffic is used to ensure clients desired CTR (click through rate). |
| • Algorithmic reporting which reflect email metrics. | • Algorithmic reporting which reflect email metrics. |
| • Clicks are the only empirical metric on reports. | • Clicks are the only empirical metric on reports. |
| • Take 5 Media has approx. 168MM email records of which approx. 25MM email records are actionable. | • Social & ad display used to ensure audience engagement. |

• The current execution and reporting of our email product does not accurately reflect what is sold to our clients.
• The main driver of our email engagement comes from low cost 3rd party PPC traffic.
• The reporting of those campaigns reflect email metrics that are algorithmically generated, clicks reflecting the only accurate metric.
• Open rates are inferred.

3

[62]

As part of Project Evolve, the Take 5 team had explained that the "vast majority of" the money it was spending on digital advertising was "comprised of low cost, poor quality, PPC traffic vendors" that were paid per click:

---

[62] Ex. 29, (Trial Ex. A-340) [Project Evolve presentation] at 3; see Am. Opp., Ex. 49 (Colen Trial Testimony) at 357:19–359:9 (discussing what Take 5 represented regarding sending PPC traffic instead of the contracted e-mails), 361:3–362:8 (discussing what Take 5 represented regarding algorithmic reporting), 364:4–365:7 (discussing that Take 5 represented that the only accurate metric on the tracking reports were clicks and that is not what the client had ordered), 367:3–370:24 (Take 5 only had 25 actionable e-mails that they could deliver and send to); Am. Opp., Ex. 53 (Boy Trial Testimony) at 1641:23–1642:23 (Mr. Boy provided the 25 actionable e-mail number), 1643:3–1644:25; Ex. 31, (Trial Ex. A-403) [5/22/19 e-mail communication from M. Gordon to M. Boy] (Mr. Gordon sent the algorithms to Mr. Boy); Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1823:14–1824:17 (Take 5 was using low cost PPC traffic instead of sending e-mails); 1824:18–1825:8 (third-party traffic used to achieve a certain click-through rate), 1825:9–25 (Mr. McGavran saw the algorithm used to generate the tracking reports), 1827:8–18 (clicks were the only empirical metric).

## COGS – Current State

The vast majority of our current media COGS are comprised of low cost, poor quality, PPC traffic vendors. The use of these vendors is driven by poor email data quality, poor email engagement, unrealistic client CTR expectations, and profit margins.

| Vendor Type | Service Provided | Associated Product | Top Vendor Names | Vendor Count | Average Cost Per Click | Jan - May 2019 Cost |
|---|---|---|---|---|---|---|
| PPC Company | Low cost, high volume PPC Traffic | Email<br><br>Email Blended | • eMedia Group<br>• KAD MEDIA<br>• Keono<br>• Lead Me Media, LLC<br>• Actionable Media, LLC<br>• ProDataFeed, LLC | 6 | 0.5c - 0.10c<br><br>Per Click | $1,191,066 |
| PPC Platforms | Low cost, high volume PPC Traffic | Email<br><br>Email Blended | • Advertise.com<br>• Ezanga.com<br>• PPCMate / Platform.IO<br>• Taboola | 4 | 0.1c - 0.5c<br><br>Per Click | $268,117 |
| Email Platforms & Hosting | Dedicated email delivery | Email | • Mailgun<br>• Sparkpost<br>• Sendgrid<br>• Volo/Ybrant<br>• Dedicatedsolutions.com<br>• Hostwinds.com | 6 | N/A | $37,101 |

[63]

The factual statements about Take 5's business in the Project Evolve presentation were accurate,[64] and neither Mr. Radetich nor anyone else questioned or challenged any of these conclusions.[65]  Advantage had bought the assets of a supposed ESP to enhance its advertising business through e-mail marketing but now learned that Take 5 had no capability to deploy e-mail campaigns in-house.[66]

---

[63] Ex. 29, (Trial Ex. A-340) [Project Evolve presentation] at 5.

[64] Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1822:13–18.

[65] Am. Opp., Ex. 53 (Boy Trial Testimony) at 1646:8–13 (Mr. Radetich did not disagree or challenge any statement that was made about the state of the company or Take 5's products); Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1826:12–16 (same).

[66] *See* Am. Opp., Ex. 53 (Boy Trial Testimony) at 1586:19–24 (describing Take 5's capabilities to send e-mails in-house as "[v]ery, very minimal to none"), 1587:20–23 (Take 5 never executed 100 percent of all e-mail communications in-house); Am. Opp., Ex. 55 (Arbitration Testimony of Eva Hodgens ("Hodgens")) Trial Tr. vol. 8 at 2138:20–2139:11 ("In-house for us to do e-mail was minimal, like 1, 2 percent [business-to-business]."); Am. Opp., Ex. 55 (Arbitration Testimony of Peter Ward ("Ward")) Trial Tr. vol. 8 at 2242:5–8 (CMS did not use information from in-house platforms).

After the Project Evolve presentation, Ms. Jenkins reported the percentage of e-mails actually delivered from Take 5's in-house e-mail delivery platforms.[67]  The data Ms. Jenkins provided showed fewer than 5% of the e-mails that Take 5 had sold were actually even queued for delivery.[68]

The Advantage Parties subpoenaed Ms. Jenkins and other former employees of Take 5 in connection with the arbitration, but most of them, including Ms. Jenkins, refused to testify, and the Advantage Parties were not able to enforce the subpoenas.  *See Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1160 (11th Cir. 2019) ("Section 7 does not authorize district courts to compel witnesses to appear in locations outside the physical presence of the arbitrator, so the court may not enforce an arbitral summons for a witness to appear via video conference.").  The ones with knowledge about how e-mail campaigns were actually fulfilled—Ms. Hodgens, Mr. Boy, Ms. Creel, and Mr. McGavran—all testified that Take 5 was committing fraud.

### E.    FTI's audit

The scope of FTI's initial audit "was fairly small," simply "to look into the customer reporting that was being provided by Take 5" and "to do a preliminary evaluation of whether the numbers that appear on the customer tracking reports that are being sent to the customer appear to be accurate and reliable."[69]  As Mike Wei, who lead the FTI investigation, explained, the

---

[67]Ex. 32,  (Trial Ex. A-597) [6/28/19 e-mail communication from B. Jenkins to C. Libitsky, *et al*.] (discussing e-mail data).

[68] *See id.*; Am. Opp., Ex. 56 (Pike Trial Testimony) at 2474:19–2475:19; Am. Opp., Ex. 50 (Weiner Trial Testimony) at 835:24–839:5.

[69] Am. Opp., Ex. 51 (Wei Trial Testimony) at 954:25–955:10.

process seemed relatively straightforward: compare the tracking reports sent to clients to the logs from Take 5's in-house e-mail delivery platforms.[70]

Below is an example of the tracking reports that Take 5 would provide to its clients:



The reports included a copy of the e-mail that Take 5 supposedly sent and a representation to the clients of, among other things, the number of e-mails deployed and delivered, the number of

---

[70] *Id.* at 961:18–962:22.

[71] Ex. 33, (Trial Ex. T-193).

clicks on the client's website, the percentage of customers who clicked on the e-mails, and what devices were used to open the e-mails.

Take 5 had three in-house e-mail delivery platforms:  Volo, MailWizz, and SendGrid.[72] It "also had a fourth system called DMS, which was an internally developed system which they used just to send out test e-mails."[73]  If Take 5 "actually sent out e-mails . . . [t]he information that said what e-mails were actually sent would be recorded within [Take 5's e-mail delivery platforms] Volo, MailWizz, SendGrid or DMS."[74]  It is very common in the e-mail marketing industry to review these reports to determine how well a campaign is performing.[75]

The results of FTI's initial audit were presented to Advantage on June 26, 2019, a week after the Project Evolve presentation.[76]  As part of its audit, FTI reviewed e-mail campaigns from two different clients, one for Medicx and one for Team One, and concluded that these campaigns were not fulfilled with e-mails but were fulfilled with PPC traffic instead.[77]

---

[72] Am. Opp., Ex. 51 (Wei Trial Testimony) at 1008:4–20; Am. Opp., Ex. 50 (Weiner Trial Testimony) at 837:17–21; Am. Opp., Ex. 53 (Boy Trial Testimony) at 1589:23–1591:4; Am. Opp., Ex. 54 (Hodgens Trial Testimony) vol. 7 at 2029:16–2030:17.

[73] Am. Opp., Ex. 51 (Wei Trial Testimony) at 1008:4–20.

[74] *Id.* at 1008:21–1009:11; *see also* Am. Opp., Ex. 50 (Weiner Trial Testimony) at 815:3–23 (discussing domain reports).

[75] Am. Opp., Ex. 50 (Weiner Trial Testimony) at 816:6–817:8; Am. Opp., Ex. 51 (Wei Trial Testimony) at 952:20–954:15 (explaining that it is "typical audit process" to review internal reporting records).

[76] Ex. 34, (Trial Ex. A-427) [6/26/19 Status Update of FTI Investigative Procedures]; Am. Opp., Ex. 51 (Wei Trial Testimony) at 967:17–25, 968:2–9.

[77] Ex. 34, (Trial Ex. A-427) [6/29/19 Status Update of FTI Investigative Procedures]. FTI worked with Mr. Boy and the fulfillment department during this time to understand what Take 5 actually deployed and delivered.  The fulfilment department reported that at least three of the jobs FTI was looking at were not e-mailed at all.  *See* Ex. 35, (Trial Ex. A-775) [6/20/19 e-mail communication between M. Boy and B. Robinson, *et al.*] (reporting that job numbers 27213, 27384, and 27387 were not e-mailed).  Included in the list of campaigns was Medicx's OFEV DTC campaign in which Medicx paid $1,500 for Take 5 for e-mail.  *See* Ex. 36, (Trial Ex. A-777) [12/6/18 Invoice for Deployment 1].

FTI began its audit by examining sales orders and invoices to determine what type of advertising campaign the client ordered.[78]  FTI next compared the tracking report given to the client with the information about the campaign that was generated by Take 5's Campaign Management System (CMS).[79]  FTI's comparison raised two questions.  The first was why the number of e-mails that the customer wanted delivered was exactly the same as the number of delivered e-mails reported in CMS.[80]  As both Mr. Weiner and Mr. Wei explained, while it was possible for Take 5 to *deploy* the number of e-mails that a client ordered, it is very unlikely that Take 5 could *deliver* precisely the number of e-mails the client ordered because some of the deployed e-mails would be caught by spam filters and not delivered.[81]

The more serious concern, however, was that the information in CMS was different than the information in the reports given to the clients.[82]  As Mr. Wei and his team dug further, they discovered that the e-mail tracking reports generated by CMS changed every time FTI ran the

---

[78] Am. Opp., Ex. 51 (Wei Trial Testimony) at 987:8–989:3.

[79] Ex. 34, (Trial Ex. A-427) [6/26/19 Status Update of FTI Investigative Procedures] at 8, 17; Am. Opp., Ex. 51 (Wei Trial Testimony) at 974:14–977:7 (explaining Take 5's accounting systems), 992:20–995:6 (explaining FTI's analysis), 993:7–995:6 (when Take 5 is executing a campaign, all the important information about that campaign would be stored within CMS or Jobs); Am. Opp., Ex. 55 (Ward Trial Testimony) at 2238:3–2239:14 (explaining how CMS worked and how it interacted with NetSuite); Ex. 37, (Trial Ex. A-335) [NetSuite to Campaign Manager Flow Description].

[80] Ex. 34 (Trial Ex. A-427) [6/26/19 Status Update of FTI Investigative Procedures] at 8; Am. Opp., Ex. 51 (Wei Trial Testimony) at 993:7–995:6.

[81] Am. Opp., Ex. 51 (Wei Trial Testimony) at 993:7–995:6; Am. Opp., Ex. 51 (Weiner Trial Testimony) at 885:7–887:21.

[82] Am. Opp., Ex. 51 (Wei Trial Testimony) at 995:7–997:18, 1021:23–1022:24.

report even though these campaigns supposedly had been completed long ago.[83]  Mr. Wei reproduced this analysis in a video that was played during the hearing.[84]

Surprised that the tracking reports changed every time they were generated, FTI investigated how many e-mails Take 5 actually sent based on its internal e-mail delivery platform logs.[85]  From that review, FTI learned that Take 5 deployed almost none of the e-mails that the clients paid it to send and that the e-mails that it did deploy were rarely opened or clicked on.[86]  In fact, Take 5 did not have e-mail addresses at all for most of the consumers to whom it was supposed to be sending e-mails.[87]  Take 5 generated clicks using PPC services instead.[88]

**F.**     **The e-mail tracking reports were generated by an algorithm**

The Take 5 Parties represented to the Advantage Parties and Take 5's clients that Take 5's e-mail marketing campaigns were successful because Take 5's in-house delivery platforms allowed it to achieve open rates and other e-mail performance metrics above industry

---

[83] Ex. 34 (Trial Ex. A-427) [6/26/19 Status Update of FTI Investigative Procedures] at 9, 18; Am. Opp., Ex. 51 (Wei Trial Testimony) at 995:7–998:9, 1003:4–15, 1023:21–1025:8.

[84] Am. Opp., Ex. 51 (Wei Trial Testimony) at 998:10–1002:23 (describing the testing of the tracking reports as reflected in the video).  The video containing Mr. Wei's reproduced analysis will be made available upon the Court's request.

[85] Ex. 34 (Trial Ex. A-427) [6/26/19 Status Update of FTI Investigative Procedures] at 10; Am. Opp., Ex. 51 (Wei Trial Testimony) at 1006:6–1008:20.

[86] Ex. 34, (Trial Ex. A-427) [6/26/19 Status Update of FTI Investigative Procedures] at 10, 20; Am. Opp., Ex. 51 (Wei Trial Testimony) at 1006:6–1007:22, 1029:6–1030:5.

[87] Ex. 34, (Trial Ex. A-427) [6/26/19 Status Update of FTI Investigative Procedures] at 19; Am. Opp., Ex. 51 (Wei Trial Testimony) at 1025:14–1028:21.

[88] Ex. 34, (Trial Ex. A-427) [6/26/19 Status Update of FTI Investigative Procedures] at 11, 21; Am. Opp., Ex. 51(Wei Trial Testimony) at 1011:9–1012:17, 1030:6–1031:9, 1031:14–1032:20 (summarizing conclusions of FTI's initial investigation).

average.[89]  As discussed above, the Take 5 Parties generated tracking reports to report on the

"success" of e-mail marketing campaigns.  Take 5's IT specialist, Cruze Mair, admitted to FTI

that these tracking reports were generated by an algorithm.[90]

After learning about the algorithm, FTI spoke to Mr. Ward and Matthew Gordon of 12

Skies who confirmed that the information in the tracking reports "[doesn't] come from . . .

anything in real life" but is "automatically generated."[91]  Mr. Wei observed how these formulas

operated within CMS,[92] which the slide below from FTI's presentation to Advantage explains:

---

[89] *See, e.g.*, Ex. 38, (Trial Ex. A-527) [October 2017 Management Presentation] at 24, 34, 63; Ex. 10, (Trial Ex. A-414) [CIM] at 19, 21; Am. Opp., Ex. 58 (Arbitration Testimony of Mark Adams ("Adams")), Trial Tr. vol. 11 at 3124:21–3126:11 & Ex. 39, (Trial Ex. 738) [7/6/16 e-mail communication from B. Hannon to J. Reid & M. Adams] (using above industry averages in e-mail metrics as a selling point); Ex. 40, (Trial Ex. A-137) [Take 5 Marketing Presentation] at 3, 7 (discussing above average deliverability, open, and click-through rates).

[90] Ex. 34, (Trial Ex. A-427) [6/26/19 Status Update of FTI Investigative Procedures] at 12; Am. Opp., Ex. 51 (Wei Trial Testimony) at 1012:23–1013:15.

[91] Am. Opp., Ex. 51 (Wei Trial Testimony) at 1013:16–1014:16.

[92] *Id.* at 1018:6–16.



If the client ordered a specific number of e-mails to be ***delivered***, the customer service representative would enter that number into CMS, and the algorithm would report the number of e-mails that Take 5 supposedly deployed by multiplying the number of e-mails the client wanted delivered by a random percentage of between 100.09% and 102%, because the number of e-mails deployed would ordinarily be higher than the number of e-mails delivered.[94]  Conversely, if a client ordered a specific number of e-mails to be ***deployed***, the formula would report the

---

[93] Ex. 34, (Trial Ex. A-427) [6/26/19 Status Update of FTI Investigative Procedures] at 12; *see* Ex. 41, (Trial Ex. A-578) [6/19/19 e-mail communication from P. Ward to M. Wei, *et al.*] (algorithm authenticated by Mr. Ward).

[94] Am. Opp., Ex. 51 (Wei Trial Testimony) at 1014:17–1016:17.

number of e-mails delivered by multiplying the number of e-mails the client wanted deployed by a random percentage of between 98% and 99.01%.[95]

Another algorithm in CMS would report that a random percentage of between 15% and 18% of these fictitious e-mail were opened:



---

[95] *Id.*

[96] Ex. 34, (Trial Ex. A-427) [6/26/19 Status Update of FTI Investigative Procedures] at 13; Am. Opp., Ex. 51 (Wei Trial Testimony) at 1017:8–1018:5; *see* Ex. 42, (Trial Ex. A-579) [6/19/19 e-mail communication between P. Ward and M. Wei] (algorithm authenticated by Mr. Ward).

During the evidentiary hearing, Mr. Ward corroborated Mr. Wei's explanation of the algorithms.[97] He testified that Take 5 created the algorithms[98] and previously used them in desktop applications and that he was hired to integrate them into CMS so that they would be automated.[99] In other words, Take 5 paid 12 Skies to design a more robust system to defraud its clients. Mr. Ward also was asked to modify the algorithm after it was integrated into CMS.[100]

Mr. Boy knew that Take 5 was using algorithms to generate false reports to clients,[101] and he explained his relief when Mr. McGavran told him to tell Mr. Ward "that we can no longer have his software spit out algorithmic reporting that isn't indicative of the campaigns that we're running:"[102]

> Q.  Mr. Boy, so when you said that Ms. Jenkins was no longer your boss and that the false reporting had to stop, how did you feel?
>
> A.  I felt liberated. And I'll explain why.
>
> I felt liberated because, for years, we were in a company where the right thing wasn't being done. I was never in a position to change that up until that point, up until that very point where I reported to Ryan McGavran instead of

---

[97] Am. Opp., Ex. 51 (Ward Trial Testimony) at 2244:14–2246:18.

[98] Am. Opp., Ex. 51 (Ward Trial Testimony) at 2233:3–2235:2; Ex. 43, (Trial Ex. A-373) [original source code used to generate tracking reports based on clicks].

[99] Am. Opp., Ex. 51 (Ward Trial Testimony) at 2229:17–2230:11, 2252:11–2253:16 (explaining that Take 5 paid 12 Skies to develop these systems); Ex. 44, (Trial Ex. A-676) [12 Skies invoices] at 42 (12 Skies invoice "to discuss changes to the opens for the tracking report"); *see id.* at 5, 20, 35, 43, 44, 45, 54 (additional pages of invoices reflecting work on algorithm).

[100] Am. Opp., Ex. 55 (Ward Trial Testimony) at 2246:19–25; *see* Ex. 44, (Trial Ex. A-676) [12 Skies invoices] at 42 (12 Skies invoice "to discuss changes to the opens for the tracking report"); *see also id.* at 5, 20, 35, 43, 44, 45, 54 (additional pages of invoices reflecting work on algorithm).

[101] Am. Opp., Ex. 53 (Boy Trial Testimony) at 1585:12–24.

[102] Ex. 45, (Trial Ex. A-552A) [transcription of audio recording]; Am. Opp., Ex. 53 (Boy Trial Testimony) at 1582:14–1583:2. The audio recording will be made available upon the Court's request.

Beth, Alex and Rich, I was able to make the changes that would legitimize the marketing campaigns and reporting that we produced.

So, for me, it was – it was massive to ensure that, you know, every individual and every staff member that was working there was doing the right thing, and our clients were getting the right results, and the results were indicative of the reporting, which wasn't happening prior.[103]

Mr. Radetich and Mr. Gluck were aware of the algorithmic reporting,[104] and they admitted that client reports were false.[105] According to Take 5's internal documents, Mr. Radetich had ordered Take 5 employees to adjust tracking reports manually.[106] But "[i]n or about 2015 or 2016, clients were . . . doing a deeper dive of analytics,"[107] so Take 5 needed a

---

[103] Am. Opp., Ex. 53 (Boy Trial Testimony) at 1584:14–1585:11.

[104] *See, e.g.*, Am. Opp., Ex. 55 (Hodgens Trial Testimony) at 2101:10–24 (spoke with Mr. Radetich regarding the tracking reports); Am. Opp., Ex. 51 (Wei Trial Testimony) at 1018:25–1019:23 (12 Skies was instructed by Mr. Radetich to incorporate the algorithm into CMS); Am. Opp., Ex. 55 (Ward Trial Testimony) at 2258:3–23 (Mr. Ward's perception was that Advantage was not aware of "the way the process worked at Take 5.").

[105] Ex. 46, (Trial Ex. A-439) (April 7, 2021 Petruss Media Group, LLC f/k/a Take 5 Media Group's Amended Responses To Advantage Sales & Marketing LLC's First Set Of Interrogatories at No. 9 ("The opens were based on a formula.")).

[106] Ex. 47, (Trial Ex. A-211) [11/24/15 e-mail communication from A. Radetich to T. Coker] (Mr. Radetich instructs Ms. Coker to bump up tracking report information by 85% to about 220 clicks); Ex. 48, (Trial Ex. A-212) [11/6/15 e-mail communication from A. Radetich to T. Coker] (Mr. Radetich instructs Ms. Coker to bump both opens and clicks on tracking report up by 35%); Ex. 49, (Trial Ex. A-216) [12/7/15 e-mail communication from A. Radetich to T. Coker] (Mr. Radetich instructs Ms. Coker to bump up clicks on tracking report for Sprint campaign); Ex. 50, (Trial Ex. A-217) [11/23/15 e-mail communication from A. Radetich to T. Coker] (Mr. Radetich instructs Ms. Coker to bump up clicks); Ex. 51, (Trial Ex. A-201) [8/30/16 e-mail communication from A. Radetich to T. Coker] (same). Mr. Radetich also approved Take 5 employees manually increasing numbers on tracking reports. *See also* Ex. 52, (Trial Ex. A-213) [1/5/16 e-mail communication from A. Radetich to T. Coker] (Mr. Radetich approving Ms. Coker's increasing numbers on a tracking report), Ex. 53, (Trial Ex. A-214) [12/18/15 e-mail communication from A. Radetich to T. Coker] (same), Ex. 54, (Trial Ex. A-215) [1/4/16 e-mail communication from A. Radetich to T. Coker] (same); Ex. 55, (Trial Ex. A-218) [11/19/15 e-mail communication from A. Radetich to T. Coker] (Ms. Coker informing Mr. Radetich that the tracking report does not reflect "actual new clicks," and that she just "bumped" the number of clicks up).

[107] Am. Opp., Ex. 58 (Arbitration Testimony of Don Morris ("Morris")) Trial Tr. vol. 11 at 2870:18–21.

way to automate the process and ensure that the information that it was providing in the tracking reports matched the information that clients were able to see on Google Analytics.

Take 5 hired Mr. Boy in the summer of 2016,[108] and Ms. Jenkins and Ms. Hodgens gave him the "challenge" of having the information in the tracking reports "simulate opens."[109]  When pressed about whether he understood that what he was doing was deceiving clients, Mr. Boy responded that he was just doing his job and that "the whole entire organization was deceiving the customer . . .  anybody who was doing their job was deceiving the customer."[110]  Mr. Ward explained that he could have designed CMS so that it pulled information from Take 5's e-mail delivery platforms rather than creating false reports but that Take 5 rejected this proposal.[111]  Mr. Radetich admitted that "he felt like the company needed to lie about results in order to maintain clients."[112]

The algorithm functioned in the same way for every tracking report that Take 5 generated,[113] so Take 5 was using its CMS system to defraud virtually all its clients who requested e-mail marketing services.

---

[108] Am. Opp., Ex. 53 (Boy Trial Testimony) at 1586:5–11.

[109] *Id.* at 1713:10–1714:3.

[110] *Id.* at 1714:4–1715:18.

[111] Am. Opp., Ex. 55 (Ward Trial Testimony) at 2241:20–2243:5.

[112] Ex. 56, Designated Deposition Testimony of Christopher Brown ("Brown") at 93:5–94:9; *see also* Ex. 57, (Trial Ex. A-224) [6/26/19 e-mail communication between P. Creel and A. Radetich, *et al.*] (Mr. Radetich overrode Ms. Creel to continue to lie to Adtaxi because they were a client Take 5 could not lose).

[113] Am. Opp., Ex. 51 (Wei Trial Testimony) at 1016:18–1017:7.

### G.    Take 5 is shut down, and Advantage is forced to restate its financial statements

After Advantage learned that Take 5 was being paid to provide e-mail advertising services to clients but was not actually sending e-mails and that clients were not aware that Take 5 was doing this, Advantage decided to shut down Take 5's business, which it did on July 11, 2019.[114]  Mr. McGavran and every Advantage executive who was involved in overseeing Take 5's business agreed with that decision.[115]  Advantage reported the revenue from the Take 5 division on its financial statements, and because the Take 5 division had not performed the e-mail advertising services that its clients had paid it to perform, Advantage was required to restate its 2018 financial statements.[116]

## III.    ADDITIONAL EVIDENCE OF FRAUD PRESENTED IN THE ARBITRATION

### A.    The Take 5 Parties initiate the arbitration and the Advantage Parties respond

The Take 5 Parties filed their initial demand for arbitration in September 2019 in which they claimed that Advantage had breached the APA and violated the covenant of good faith and fair dealing by shutting Take 5 down and depriving Mr. Radetich and Mr. Gluck of the ability to receive future earnings from the Take 5 business.  The Advantage Parties responded to the arbitration demand, and, among other things, requested prejudgment interest in connection with

---

[114] Am. Opp., Ex. 49 (Colen Trial Testimony) at 494:7–24; Am. Opp., Ex. 53 (Boy Trial Testimony) at 1654:4–10.

[115] Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1847:9–23; Am. Opp., Ex. 49 (Colen Trial Testimony) at 494:7–24; Am. Opp., Ex. 50 (Weiner Trial Testimony) at 865:8–867:23; Am. Opp., Ex. 61 (Arbitration Testimony of Brian Stevens ("Stevens")) Trial Tr. vol. 14 at 3668:19–24, 3671:7–25; Am. Opp., Ex. 61 (Domier Trial Testimony) at 3686:6–18, 3688:17–3689:3.

[116] Am. Opp., Ex. 57 (Arbitration Testimony of David Kaye ("Kaye")) Trial Tr. vol.10 at 2669:22–2670:17.

their answering statement and counterclaims.[117]  In their first amended counter-claim, filed in

October 2019, the Advantage Parties asserted claims for indemnification, breach of contract,

breach of the implied covenant of good faith and fair dealing, fraud in the inducement, fraud, and

RICO.  In November 2020, the Take 5 Parties amended their statement of claim to add a cause of

action for defamation.  Pursuant to APA,[118] the arbitration proceeded in accordance with the

Commercial Arbitration Rules of the American Arbitration Association ("AAA").

The fraud that the Advantage Parties discovered by July 2019 provided sufficient

justification to close Take 5 and to support a finding of liability on their causes of action against

the Take 5 Parties.  But through fact discovery, the Advantage Parties uncovered additional

evidence of the Take 5 Parties' fraud, and through the course of expert discovery, they further

proved that Take 5 did not fulfill any of the campaigns that its clients paid it to perform and that

Take 5 did not even have a database that could have been used for e-mail marketing services.

### B.    Take 5 falsified e-mail counts

Take 5's clients wanted curated e-mail data that could target specific populations.[119]  The

Take 5 Parties claimed that they had acquired this data using surveys to which customers

---

[117] Ex. 58, Arbitration Answering Statement and Counterclaim or Joinder/Consolidation Request dated September 19, 2019.

[118] Ex. 13, (Trial Ex. A-230) [APA] at § 10.11(b).

[119] *See, e.g.*, Am. Opp., Ex. 58 (Arbitration Testimony of Michael Weintraub ("Weintraub")), Trial Tr. vol. 11 at 2956:3–16 (Medicx was looking for a "permissioned opt-in database for people with medical conditions."); Am. Opp., Ex. 59 (Arbitration Testimony of Eric Findeisen ("Findeisen")) Trial Tr. vol. 12: at 3169:15–3170:4 (Take 5 was an e-mail resource compiling data in specific areas);  Ex. 59, Designated Deposition Testimony of Anna Berry ("Berry") at 18:6–17 (IvyWise was impressed by the segmentation Take 5 could offer: "they could segment based on, you know, the age of students and income, location, you know, and that these were contacts that had opted in to receive communications from them").

responded.[120]  Take 5 did not actually have surveys completed by consumers and did not have

the e-mail data the Take 5 Parties claimed it had.[121]

The Advantage Parties' expert, David Kalat, confirmed through forensic analysis that

Take 5 did not have the data to provide e-mail marketing services.  Take 5's demographic

records were unavailable, inconsistent, or simply erroneous.[122]  Consumer contact information

and demographic characteristics were not refreshed or updated.[123]  Fewer than one-third of the e-

mail addresses that Take 5 had were verified as deliverable.[124]

Because Take 5 did not have the ability to provide the e-mail services it sold to its clients,

Take 5's sales force used a variety of methods to falsify the demographic targeting it claimed it

could achieve.  Mary Jo Benjoseph, who was on Take 5's sales force, admitted that one way she

---

[120] *See* Am. Opp., Ex. 57 (Morris Trial Testimony) at 2810:4–2811:8; Am. Opp., Ex. 58 (Weintraub Trial Testimony) at 2960:23–2962:14; 3014:22–3015:18.

[121] *See* Am. Opp., Ex. 53 (Boy Trial Testimony) at 1624:23–1625:7 (discussing Take 5's "fake surveys that they hosted online that they would send off to clients"), 1623:3–1626:11 (fulfillment "never saw any of that data come in or go into the database, never saw traffic go into that, to those forums"), 1625:18–1626:2 (at most, a handful of results from these surveys were recorded within the Take 5 system); Ex. 60, Designated Deposition Testimony of David Johnson ("Johnson") at 37:12–14, 37:17–38:1 (Take 5 had fewer than 100 survey results produced during Take 5's existence). Mr. Boy testified that surveys were "more of a front to show – to show clients that, hey, we have these surveys that give us all these lifestyle preferences and targeting." Am. Opp., Ex. 53 (Boy Trial Testimony) at 1625:11–17.  This is consistent with Mr. Weintraub's description of how Medicx interacted with the survey "results."

[122] Am. Opp., Ex. 52 (Arbitration Testimony of David Kalat ("Kalat")), Trial Tr. vol. 5 at 1391:2–10, 1440:24–1441:6.

[123] *Id.* at 1425:7–1426:9 (there was no evidence that the data was regularly cleaned or updated); Am. Opp., Ex. 53 (Boy Trial Testimony) at 1628:13–17 (Take 5 did not update information regarding who was a college senior, pregnant or looking for a car in the next six months); Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1857:16–1858:10 (The data at Take 5 was "uncleaned and limited in volume and the delivery metrics were poor").

[124] Am. Opp., Ex. 52 (Kalat Trial Testimony) at 1439:14–1440:4, 1483:16–22; *see also* Ex. 61, (Trial Ex. A-696) [demonstrative] (illustrating Mr. Kalat's results of his Kickbox analysis).

provided clients with e-mail counts was to ask Take 5 employee Asim Farooqi to falsify them using a random Excel formula.  For example, Refuel Agency, a digital marketing company that targets military and college teens, among others,[125] asked Take 5 to pull e-mail counts for 14 states segmented by college freshman, sophomores, juniors, and seniors for Refuel Agency's client, Boston University.[126]  Refuel Agency directed Take 5 to notify it if Take 5 did not have data for the exact market demographics it was targeting.[127]

Ms. Benjoseph asked her colleague, Laura Scott, to provide e-mail counts for the demographics that Boston University was requesting and, believing that these estimates were "very low," asked her to increase the numbers.[128]  Ms. Scott sent her a list of the total e-mails Take 5 had—not limited to students—broken out by state, and Ms. Benjoseph then sent these counts to Mr. Farooqi, asking to have the "counts broken out by state, Freshmen, Sophomore, Juniors, Seniors."[129]  In other words, this was totally made up and had nothing to do with college students, let alone the specific demographics that Refuel Agency was seeking.  A copy of Ms. Benjoseph's e-mail in Exhibit 63 is below:

---

[125] Ex. 62, Designated Deposition Testimony of Mary Jo Benjoseph ("Benjoseph") at 111:3–7.

[126] *Id.* at 113:22–114:3, 119:12–120:13; Ex. 63, (Trial Ex. A-2) (10/03/2018 e-mail communication between M. Benjoseph and A. Farooqi, *et al.*).

[127] Ex. 62, (Benjoseph Dep.)  at 115:10–116:14; Ex. 63, (Trial Ex. A-2) (10/03/2018 e-mail communication between M. Benjoseph and A. Farooqi, *et al.*).

[128] Ex. 62, (Benjoseph Dep.) at 119:19–123:17; Ex. 64, (Trial Ex. A-5) (04/10/2016 e-mail communication between D. Johnson and A. Radetich, *et al.*).

[129] Ex. 62, (Benjoseph Dep.) at 132:11–133:5; Ex. 63, (Trial Ex. A-2) (10/03/2018 e-mail communication between M. Benjoseph and A. Farooqi, *et al.*).

**From:** Mary Benjoseph
**Sent:** Wednesday, October 3, 2018 3:41 PM
**To:** Asim Farooqi <afarooqi@take5mg.com>
**Cc:** Laura Scott <lscott@take5mg.com>; Tanya Coker <tcoker@take5mg.com>
**Subject:** Can you help me Laura is out of office? FW: Email Count Request for Boston U

Asim,
Can you help with this?
We need this counts broken out by state, Freshmen, Sophomore, Juniors, Seniors:

| | |
|---|---|
| CA | 735,334 |
| CT | 90,381 |
| DC | 36,103 |
| FL | 549,856 |
| MA | 203,179 |
| ME | 17,287 |
| NH | 10,892 |
| NJ | 241,616 |
| NY | 479,515 |
| PA | 233,412 |
| RI | 49,804 |
| TX | 486,937 |
| VA | 128,881 |
| VT | 14,900 |
| | 3,278,097 |

Mr. Farooqi sent back an Excel spreadsheet with instructions in bold and capital letters not to send the spreadsheet to the client directly because it contained formulas.[130]  That e-mail is excerpted below:

---

[130] Ex. 62, (Benjoseph Dep.) at 133:6–133:17; Ex. 63, (Trial Ex. A-2) (10/03/2018 E-mail Thread).



From: Asim Farooqi
Sent: Wednesday, October 3, 2018 3:48 PM
To: Mary Benjoseph <mbenjoseph@take5mg.com>
Cc: Laura Scott <lscott@take5mg.com>; Tanya Coker <tcoker@take5mg.com>
Subject: RE: Can you help me Laura is out of office? FW: Email Count Request for Boston U

Hi MJ,

Please find enclosed attachment for counts. **PLEASE DON'T SEND IT TO CLIENT DIRECTLY, FORMULAS ARE STILL IN THE SPREADSHEET FOR YOUR REFERENCE.**

Thanks,

**Regards,**
**Asim Zafar Farooqi**
*Client Service Executive*

2385 NW Executive Center Drive, Suite 200, Boca Raton, FL  33431
Phone: 561-819-5555 x 239
afarooqi@take5mg.com | www.take5mg.com
CONFIDENTIALITY NOTICE: This transmission (including any accompanying attachment) is confidential, is intended only for the individual or entity named above, and is likely to contain privileged, proprietary and confidential information. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use of or reliance upon any of the information contained in this transmission is strictly prohibited. Any inadvertent or unauthorized disclosure shall not compromise or waive the confidentiality of this transmission.

The Excel spreadsheet that Mr. Farooqi sent included formulas in Excel that took the raw data that Ms. Benjoseph received and created e-mail counts to give to the client, Refuel Agency, falsely representing that Take 5 had e-mail addresses for the specific demographic population that Refuel Agency wanted to target.[131]  That spreadsheet is copied below:

| | E | F | G | H | I | J | K | L | M | N | O | P | Q | R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Rand (47-63%) | Student | | Divided by 4 | Freshmen Rand inc/dec (1-10%) | Sophomore Rand inc/dec (1-10%) | Junior Rand inc/dec (1-10%) | Senior Rand inc/dec (1-10%) | | Freshmen | Sophomore | Junior | Senior |
| CA | 735,134 | 0.473985 | 348,537 | | 87,134 | 0.972135 | 1.09307 | 1.047995 | 1.013871 | | 84,706 | 95,244 | 91,316 | 88,343 |
| CT | 90,381 | 0.490834 | 44,362 | | 11,091 | 1.073078 | 0.970411 | 1.00577 | 0.956353 | | 11,902 | 10,763 | 11,155 | 10,607 |
| DC | 36,103 | 0.508277 | 18,350 | | 4,588 | 0.99097 | 0.983037 | 0.96907 | 0.934012 | | 4,547 | 4,510 | 4,446 | 4,285 |
| FL | 549,856 | 0.583012 | 320,573 | | 80,143 | 0.979005 | 0.954963 | 0.934411 | 0.946914 | | 78,460 | 76,534 | 74,085 | 75,889 |
| MA | 203,179 | 0.500436 | 101,678 | | 25,420 | 0.972913 | 1.020938 | 1.051622 | 0.905675 | | 24,732 | 25,952 | 26,732 | 23,022 |
| ME | 17,287 | 0.530109 | 9,164 | | 2,291 | 1.022295 | 1.040357 | 1.08698 | 1.066611 | | 2,342 | 2,383 | 2,490 | 2,444 |
| NH | 10,892 | 0.533074 | 5,806 | | 1,452 | 0.935796 | 0.966068 | 1.093115 | 0.917598 | | 1,359 | 1,403 | 1,587 | 1,332 |
| NJ | 241,616 | 0.560165 | 135,345 | | 33,836 | 0.908449 | 1.090416 | 0.96203 | 1.056649 | | 30,738 | 36,895 | 32,551 | 35,751 |
| NY | 479,515 | 0.601494 | 288,425 | | 72,106 | 1.025936 | 0.967523 | 0.956211 | 1.00127 | | 73,976 | 69,750 | 68,949 | 72,198 |
| PA | 233,412 | 0.582621 | 135,991 | | 33,998 | 1.09987 | 0.966501 | 1.035243 | 1.061423 | | 37,393 | 32,859 | 35,196 | 36,086 |
| RI | 49,804 | 0.609518 | 30,356 | | 7,589 | 1.019476 | 0.96284 | 1.007026 | 0.96234 | | 7,737 | 7,307 | 7,642 | 7,301 |
| TX | 486,937 | 0.567908 | 276,535 | | 69,134 | 1.08047 | 0.995177 | 0.941818 | 1.01851 | | 74,697 | 68,801 | 65,112 | 70,414 |
| VA | 126,881 | 0.545141 | 70,258 | | 17,565 | 1.034966 | 1.031443 | 1.064954 | 0.938097 | | 18,179 | 18,117 | 18,706 | 16,478 |
| VT | 14,900 | 0.576978 | 8,597 | | 2,149 | 1.074136 | 1.060729 | 0.967843 | 0.963563 | | 2,308 | 2,280 | 2,080 | 2,071 |
| | **3,278,097** | | **1,793,977** | | | | | | | | 453,076 | 452,798 | 442,047 | 446,225 |

The numbers in Column E are identical to the numbers in Ms. Benjoseph's e-mail to Mr. Farooqi in Exhibit 63.[132]  The formulas that Mr. Farooqi used are embedded in the cells, so it

---

[131] Ex. 65, (Trial Ex. A-8).  The Take 5 Excel spreadsheet will be provided in native format upon the Court's request.

[132] Ex. 62, (Benjoseph Dep.) at 134:12–135:14.

is impossible to see all the formulas at once—each one must be separately highlighted—but the description of the random calculation is in the heading above each respective column. In the excerpt above, the formula at the top of the spreadsheet is for cell F3, which is highlighted. The purpose of that formula is to take the number of "students" in Column E and then reduce it by a random percentage between 47% and 63%, leading to the result for each State in Column G.[133]

If one were to open Exhibit 65, which is the Excel spreadsheet, one would see that every cell generating an e-mail count contains a formula. For example, the formula in Column I takes the total in Column G, divides it by 4, and rounds to the nearest whole number to create the baseline number of "students" for further formulas that would randomly spread the student population among the various classes: freshmen, sophomores, juniors, and seniors.[134]

| =ROUND(G3/4,0) | | | | |
|---|---|---|---|---|
| E | F | G | H | I |
| | Rand (47-63%) | Student | | Divided by 4 |
| 735,334 | 0.473985 | 348,537 | | 87,134 |
| 90,381 | 0.490834 | 44,362 | | 11,091 |
| 36,103 | 0.508277 | 18,350 | | 4,588 |
| 549,856 | 0.583012 | 320,573 | | 80,143 |
| 203,179 | 0.500436 | 101,678 | | 25,420 |
| 17,287 | 0.530109 | 9,164 | | 2,291 |
| 10,892 | 0.533074 | 5,806 | | 1,452 |
| 241,616 | 0.560165 | 135,345 | | 33,836 |
| 479,515 | 0.601494 | 288,425 | | 72,106 |
| 233,412 | 0.582621 | 135,991 | | 33,998 |
| 49,804 | 0.609518 | 30,356 | | 7,589 |
| 486,937 | 0.567908 | 276,535 | | 69,134 |
| 128,881 | 0.545141 | 70,258 | | 17,565 |
| 14,900 | 0.576978 | 8,597 | | 2,149 |
| 3,278,097 | | 1,793,977 | | |

Additional formulas used in the spreadsheet to randomly allocate these numbers are reflected in Exhibits 66 through 70.[135]

---

[133] *Id*. at 137:23–139:24.

[134] *Id.* at 139:25–140:11.

[135] Ex. 62, (Benjoseph Dep.) at 163:15–171:21; Exs. 66–70 (Trial Exs. A-9–A-13).

The Advantage Parties identified 131 unique campaigns in which Mr. Farooqi produced Excel spreadsheets with fabricated e-mail counts and with the instruction **"PLEASE DON'T SEND IT TO CLIENT DIRECTLY, FORMULAS ARE STILL IN THE SPREADSHEET FOR YOUR REFERENCE."**[136] "The reason Mr. Farooqi instructed [Ms. Benjoseph], in all caps in bold, not to send to the client directly is because Take 5 didn't want the customer to be aware that Take 5 was using formulas to generate those numbers."[137]

Mr. Farooqi's formulas were not the only way that Take 5 fabricated e-mail counts. In other cases, Take 5 personnel, including Mr. Radetich, would simply make the number up.[138] Ms. Hodgens also testified that Take 5 falsified e-mail counts given to clients.[139]

---

[136] Ex. 62, (Benjoseph Dep.) at 315:7–316:16, 323:8–324:4; Ex. 71, (Trial Ex. A-49).

[137] Ex. 62, (Benjoseph Dep.) at 135:24–136:5.

[138] Ex. 72, (Trial Ex. A-202) (12/11/2015 e-mail communication between A. Radetich and T. Coker) (instructing Take 5 employee to tell client that Take 5 has 62,788,437 records even though Take 5 did not have that data); Ex. 73, (A-199) (1/9/2018 e-mail communication between A. Radetich and T. Coker) (instruction by Mr. Radetich to Take 5 employee to increase e-mail counts by "up to 6.2% average" and then "scramble it so it is not exactly 6.2% on each line"); Ex. 74, (7/31/2018 e-mail communication between A. Radetich and T. Coker) (A-200) (giving instruction to Take 5 employee after receiving e-mail count to "bump it up 5 fold"); Ex. 75, (A-204) (11/12/2015 e-mail communication between A. Radetich and T. Coker, *et al.*) (Mr. Gluck instructing Take 5 employee that e-mail counts "need to be randomly decreased all varying quantities from 27–35% less").

[139] Am. Opp., Ex. 54 (Hodgens Trial Testimony) at 2057:20–2060:10 & Ex. 76, (Trial Ex. A-66) [9/11/18 e-mail communication between A. Radetich and E. Hodgens, *et al.*]

Mr. Radetich and Mr. Gluck were fully aware that Take 5 was making up these e-mail counts.[140]   In fact, Mr. Radetich used the expression "load the boat" in his correspondence with other Take 5 employees instructing them to inflate the number of records as much as possible.[141]

Although the direct evidence from the percipient witnesses was sufficient proof that Take 5 fabricated e-mail counts, Mr. Kalat confirmed through analyzing actual requests from Take 5's clients that Take 5 did not have the e-mail records that it told clients it had.[142]   For example, Mr. Kalat compared what Take 5 reported to Refuel Agency about the number of e-mail addresses that it could deploy on its behalf to active and retired military personnel in Arizona and concluded that Take 5 had far fewer e-mail addresses than it claimed it had:

---

[140] Ex. 62, (Benjoseph Dep.) at 192:5–22 ("I believe they knew for sure" that formulas were being used to falsify e-mail counts); Ex. 77,  (Trial Ex. A-15) [3/31/19 text message thread between M. Benjoseph and A. Radetich] (Ms. Benjoseph states that she was trained by Mr. Gluck and Mr. Radetich and speaks specifically about count formulas), Ex. 78, (Trial Ex. A-743) [5/2/16 e-mail communication between A. Radetich and T. Finger] (Mr. Radetich confirming Ms. Finger's random e-mail count for Medicx).

[141] Ex. 79, (Trial Ex. A-184) [6/5/19 e-mail communication between A. Radetich and T. Coker, et al.] ("We need to load this boat people"); Ex. 80, (Trial Ex. A-185) [11/14/14 e-mail communication between A. Radetich and J. Cloyes] ("We need to load the boat as much as possible"); Ex. 81, (Trial Ex. A-186) [3/6/15 e-mail communication between A. Radetich and M. Angelis] ("We are going to load the boat"), Ex. 82, (Trial Ex. A-187) [4/3/15 e-mail communication between A. Radetich and S. Albert, et al.] ("[W]e will load the boat"); Ex. 83, (Trial Ex. A-188) [4/8/15 e-mail communication between A. Radetich and H. Speizman, et al.] ("I need them to load the boat."); Ex. 84, (Trial Ex. A-189) [4/21/15 e-mail communication between A. Radetich, R. Gluck and T. Finger] ("We need to load the boat"); Ex. 85, (Trial Ex. A-190) [11/9/15 e-mail communication between A. Radetich and J. Gluck] ("Load the boat sunshine.").

[142] Am. Opp., Ex. 52 (Kalat Trial Testimony) at 1451:17–1452:25 (Mr. Kalat tested four test queries from Take 5 clients from 2018), 1457:12–1459:6 (explaining how he tested the requests from clients; *see also* Ex. 86 (Trial Ex. A-28R) [7/16/18 e-mail communication between K. Santo (Refuel Agency) and M. Benjoseph, *et al.*] (Take 5 e-mail to Refuel Agency reporting e-mail counts for targeted military request).  The number reported to the client was generated by a randomizing formula for e-mail counts.  *See* Ex. 87 (Trial Ex. A-25) [Excel spreadsheet related to Refuel Agency military counts].  Exhibit 87 will be provided in native format upon the Court's request.

| Table Name | Total Unique Email Results | State: AZ | | | | |
|---|---|---|---|---|---|---|
| | | COCHISE | CORONADE TUCSON | GLENDALE | TUCSON | YUMA |
| Active Military JOINED Clean Email | 2,214 | 2 | 1 | 501 | 1,497 | 213 |
| Retired Military JOINED Clean Email | - | - | - | - | - | - |
| Misty Email JOINED Misty Base | 15,335 | 29 | 12 | 3,857 | 10,032 | 1,405 |
| ACHData | 3 | - | - | - | 3 | - |
| Ailment | - | - | - | - | - | - |
| Lawyers | 26 | - | - | - | 25 | 1 |
| PaydayLoans | 122 | - | 1 | 11 | 53 | 57 |
| All Combined | 17,620 | 31 | 14 | 4,350 | 11,556 | 1,669 |
| | | | | | | |
| Results Reported By Take 5 | 67,939 | 6,486 | - | 42,237 | 6,215 | 13,001 |
| | | | | | | |
| Combined as a Percentage of Reported by Take 5 | 26% | 0% | n/a | 10% | 186% | 13% |

[143]

Take 5 did not have the data to fulfill a single one of the campaigns Mr. Kalat tested.[144]

Take 5 did not offer any evidence that Take 5 had the ability to perform a single one of the campaigns it sold to its clients.[145]

---

[143] Am. Opp., Ex. 52 (Kalat Trial Testimony) at 1460:2–25 (describing one example test query results showing at best just 26 percent of the number of e-mails reported to the client as being available were actually available).

[144] *Id. at* 1461:4–7.

[145] *See* Am. Opp., Ex. 60 (Arbitration Testimony of David Noderer ("Noderer")) Trial Tr. vol. 13 at 3611:24–3613:8 (Mr. Noderer did not run a similar analysis regarding third party records), 3613:9–24 (Mr. Noderer could not recall what tests he even conducted regarding Mr. Kalat's semantic observations), 3550:17–3551:2, 3610:8–18 (Mr. Noderer's only opinion on staleness was formed days before his hearing testimony and is based on numbers he randomly found on Google).

C.    **Take 5 did not have double opt-in e-mail addresses**

Take 5 represented to both its clients[146] and the Advantage Parties[147] that it had

double opt-in e-mail addresses.  Double opt-in e-mail addresses are those in which the consumer

---

[146] *See, e.g.*, Am. Opp., Ex. 54 (Hodgens Trial Testimony) 2027:3–19 (Take 5 sales representatives told clients the e-mail addresses were double opt-in); Am. Opp., Ex. 57 (Morris Trial Testimony) vol 10 at 2765:13–24 (during Mr. Morris' career with Take 5 he was always told that Take 5 had double opt-in e-mail addresses); Am. Opp., Ex. 58 (Morris Trial Testimony) 2811:4–8 ("The fact that Take 5 claimed that consumers opted in to Take 5's database was part of the backbone" of training the Take 5 sales team), 2887:13–16 (Epsilon was told that Take 5 had 167 million double opt-in e-mails); Am. Opp., Ex. 58 (Weintraub Trial Testimony) at 3009:5–19 (Take 5 repeatedly represented to Medicx that they had double opt-in e-mails); Am. Opp., Ex. 58 (Adams Trial Testimony) at 3118:5–24 (product offering from 2016 represented Take 5 to have 200 million double opt-in e-mails) & Ex. 88, (Trial Ex. A-736) [4/6/16 e-mail communication between Take 5 and a client, and marketing presentation] (advertising 200 million double opt-in e-mail addresses); Ex. 39, (Trial Ex. A-738) [7/6/16 e-mail communication between Take 5 and Digicel Group] (representing Take 5's data is all "self-sourced single and double opt in"); Am. Opp., Ex. 59 (Findeisen Trial Testimony) at 3200:6–18 (InfoGroup would not have accepted Take 5 data if it was not double opt-in); Ex. 59, (Berry Dep.) at 22:20–23:2 ("[T]hey really sold the quality of their lists, that they were able to segment this way.  These contacts [were], you know, double opted in . . ."), 196:20–24 (Take 5 "claimed to have double op-in" e-mails).

[147] *See, e.g.*, Am. Opp., Ex. 48 (Kleinman Trial Testimony) at 101:10–102:11; Ex. 10, (Trial Ex. A-414) [CIM] represented that Take 5 had 160 million double opt-in e-mails), 102:12–103:24 (describing Take 5's representations to Advantage regarding double opt-in information); Am. Opp., Ex. 49 (Colen Trial Testimony) at 316:15–317:2 (Advantage acquired Take 5, in-part, because they represented they had 160 million double opt-in e-mail addresses), 324:10–325:8 (Take 5 represented they had 160 million double opt-in e-mail addresses in Ex. A-414 [CIM]), 326:20–327:5 (Mr. Radetich and Mr. Gluck represented that Take 5 had more than 160 million double opt-in e-mail addresses); Am. Opp., Ex. 56 (Pike Trial Testimony) at 2457:21–2458:12 (Mr. Radetich and Mr. Gluck represented that Take 5 have 168 million double opt-in e-mail addresses); Ex. 38, (Trial Ex. A-527) [Take 5 Management Presentation] at 5, 16 (representing Take 5 had 160 million plus double opt-in e-mails and describing Take 5's "Proprietary Double Opt-in Process"); Ex. 89, (Trial Ex. A-547) [7/31/17 e-mail communication between Petsky Prunier and Mr. Kleinman] (representing "Project Palm" –  Take 5 – had "deployment capabilities across email (160mm double opt-in emails)").

has expressly granted permission to receive marketing e-mails from Take 5 and so would be particularly valuable for clients.[148]  Take 5 did not have double opt-in e-mail addresses.[149]

### D.    Take 5 designed CMS to deceive clients that tracked their campaigns into believing that e-mails were sent

#### 1.    Take 5 sent tracking links and pixels to PPC vendors to conceal PPC traffic

When Take 5 agreed to send an e-mail campaign on behalf of the client, it would work with the client to prepare the e-mail that it would later pretend to send, called the "creative."[150] A copy of the creative would be included in the tracking reports under the heading "CREATIVE."

---

[148] Am. Opp., Ex. 49 (Colen Trial Testimony) at 324:10–325:8; Am. Opp., Ex. 52 (Kalat Trial Testimony) at 1419:6–1421:25.

[149] Am. Opp., Ex. 54 (Hodgens Trial Testimony) at 2026:25–2027:2 ("Q. Were Take 5's records double opt-in? A. No, they were not."), 2027:20–2028:3 (Take 5 did not have the systems to collect and aggregate data to opt-in); Am. Opp., Ex. 53 (Boy Trial Testimony) at 1622:9–1623:17 (Take 5 did not have double opt-in e-mails), 1624:23–1626:11 (same), 1637:16–1639:23 ("[T]he data wasn't double opt-in."), 1677:13–1678:3 ("[T]he e-mails weren't single opt-in and/or double opt-in due to the fact that once the person emailed there was high unsubscribe rates and individuals requesting to be removed off the list because they never signed up for the data."); Am. Opp., Ex. 52(Kalat Trial Testimony) at 1423:11–14 (Take 5's data showed no indication of double opt-in information), 1422:2–1423:10 (explaining what information would normally be present when recording double opt-in information).  Mr. Kalat also testified regarding problems with Take 5's limited single opt-in information.  *Id.* at 1423:15–1424:22 (describing the problems with Take 5's opt-in data).

[150] Am. Opp., Ex. 50 (Weiner Trial Testimony) at 810:2–811:25, 861:23–862:17; Ex. 59, (Berry Dep.) at 29:25–30:7; Am. Opp., Ex. 58 (Weintraub Trial Testimony) at 3028:5–9 (Medicx worked on e-mail creatives with Take 5) & Ex. 90, (Trial Ex. A-755) [6/27/17 e-mail communication between Take 5 and Medicx] (discussing client edits to the creative for the e-mail campaign).



151

Clients would "provide [Take 5] the URL or the link that when someone clicks on the

e-mail . . . that Take 5 was supposed to have been sending . . . it would go to a website the client

had signed off on."[152]  Those URLs would include an Urchin Tracking Module ("UTM") code

that the client could use to determine whether a consumer clicked on the URL link in an e-mail

---

[151] Ex. 91, (Trial Ex. A-659) [1/9/18 Sandals Tracking Report]; Am. Opp., Ex. 51 (Wei Trial Testimony) at 1080:18–1081:10.

[152] Am. Opp., Ex. 50 (Weiner Trial Testimony) at 861:23–862:17.

that it received from Take 5.[153]  Some clients also embedded a pixel in the code to separately track whether an e-mail was opened.[154]

The URLs that were embedded in the client's e-mail creative would be included on the second page of the tracking report with a breakout of clicks for each link and the UTM code representing that the source of these clicks was an e-mail sent by Take 5:



[155]

---

[153] *See* Am. Opp., Ex. 53 (Boy Trial Testimony) at 1599:9–1601:12 & Ex. 92 (Trial Ex. A-684) [5/17/19 internal e-mail thread regarding UTM codes], 1602:7–13 (describing the process of how Google Analytics reports on sources of traffic to a website via UTM code), 1602:24–1604:9 & Ex. 93, (Trial Ex. A-683) [5/9/17 internal Take 5 e-mail communication] (discussing UTM codes), 1609:7–11 (the fulfilment department sent these URLs to the PPC vendors); Am. Opp., Ex. 50 (Weiner Trial Testimony) at 863:3–14 (defining UTM code).

[154] Am. Opp., Ex. 59 (Arbitration Testimony of David McCoy ("McCoy")), Trial Tr. vol. 12 at 3367:12–3368:10 (clients would track opens through use of pixels); Am. Opp., Ex. 62 (Arbitration Testimony of Jessie Stricchiola ("Stricchiola")), Trial Tr. vol. 15 at 3887:18–3888:12 (pixels are used to track whether an e-mail was opened).

[155] Ex. 91, (Trial Ex. A-659) [1/9/18 Sandals Tracking Report].

"[B]ecause [Take 5] didn't send out the e-mails they were supposed to, and still generated the clicks, they would, instead, give that URL to third-party systems, Keono, PPCmate and others, to drive clicks that way instead."[156]

Google Analytics does not independently verify the source of the click that is included in the URL but relies on the UTM code embedded in the link.[157]  Therefore, the client's Google Analytics would show clicks generated from a Take 5 campaign based on the way the UTM was coded, which was for e-mail.[158]  The Take 5 Parties' expert, Jessie Stricchiola, analogized the process that Google Analytics used to track campaigns to a license plate stating that if you are configuring a system to "count all the California vehicles, every vehicle you see that has a California license plate assume that's a vehicle from California, don't question it, right?"[159]  In response to Judge Eyler's question, Ms. Stricchiola confirmed that clients would not be able to detect the fraudulent code.[160]

---

[156] Am. Opp., Ex. 50 (Weiner Trial Testimony) at 862:18–863:2.

[157] Am. Opp., Ex. 55 (Ward Trial Testimony) at 2248:11–14.

[158] Am. Opp., Ex. 53 (Boy Trial Testimony) at 1606:14–1609:3 (explaining Google Analytics reporting differences between Take 5 and Take 5's clients); Am. Opp., Ex. 55 (Hodgens Trial Testimony) at 2182:17–2184:6 (Take 5's Google Analytics was different than the client's Google Analytics), 2213:12–23 (only the client's Google Analytics would show whether or not a click was from an e-mail or ad display and it would only show that if the client coded that in their URL links), 2214:4–18 (Take 5 could not see the UTM information in Google Analytics); Am. Opp., Ex. 62 (Stricchiola Trial Testimony) at 3905:13–22 ("[I]f you configure the tracking URL to say e-mail, it will show your report. Here's all your e-mail click right? Google, on its own, is not going to try to determine whether or not that's really where the clicks came from."), 3928:15–3929:9, 3935:14–19 (confirming that if the UTM code says medium=e-mail, Google Analytics will report that the click came from e-mail); Am. Opp., Ex. 50 (Weiner Trial Testimony) at 864:17–865:1 (describing altering a UTM source code to depict different sources of traffic on Google Analytics); Am. Opp., Ex. 51 (Wei Trial Testimony) at 9–1034:2 (describing the use and alterations to UTM codes).

[159] Am. Opp., Ex. 62 (Stricchiola Trial Testimony) at 3890:7–3891:14.

[160] *Id.* at 3941:13–19.

Mr. Weiner also explained that it was simple to fool clients into believing that consumers had clicked on their websites because they had received an e-mail:

> So it's very easy to change in a way that would not show the true source of traffic by simply replacing what the UTM source is with something else.

> And in the example with our campaigns, we would give Take 5 a URL to drive to that would include a UTM source of e-mail, and by purchasing third-party PPC traffic and having those UTM codes carry over into those campaigns, what will be recorded in Google Analytics was that there were 100,000 clicks from a UTM source of e-mail, which obviously is not actually what happened.[161]

In addition to manipulating the UTM to disguise the source of the clicks, the Take 5 Parties also manipulated the tracking pixel by sending PPC traffic to it to create the illusion that customers were opening e-mails, or in some instances, removed the pixel from the client's e-mail campaign altogether.[162]

### 2.    Take 5 used "link rotator" to manipulate traffic behavior

As the second page of the e-mail tracking report illustrates, the client's campaign includes multiple links to their website, such as the link to download a coupon or a link to read information about the client's privacy policy.[163]  One of the issues that raised clients' suspicions was that a large number of clicks were on portions of the client's webpage, such as the privacy link, that few consumers would actually be expected to click on.[164]

---

[161] Am. Opp., Ex. 50 (Weiner Trial Testimony) at 863:15–865:5.

[162] Am. Opp., Ex. 53 (Boy Trial Testimony) at 1711:9–20 ("[W]e were trained to take those pixels out of the campaign and run traffic to it to simulate opens."), 1712:5–25, 1713:2–1714:3 (explaining how the fulfillment team removed pixels from campaigns); *see also* Ex. 94, (Trial Ex. A-59A) [Take 5 Fulfillment Training Manual September 2018].

[163] Am. Opp., Ex. 49 (Colen Trial Testimony) at 357:25–359:9; Am. Opp., Ex. 55 (Hodgens Trial Testimony) at 2248:15–2249:8.

[164] *See, e.g.*, Ex. 95, (Trial Ex. A-756) [7/18/17 e-mail communication from A. Radetich to E. Hodgens, M. Adams, *et al.*] (correspondence between Take 5 and Trozzolo relating to the GEHA campaign); Am. Opp., Ex. 59 (Adams Trial Testimony) vol. 12 3269:19–3270:15; Ex. 96, (Trial Ex. A-191) [11/4/15 e-mail communication between D. Morris, A. Radetich, and

To solve this "problem," Take 5 hired 12 Skies to design a program in CMS called "link rotator" that would allow a client services representative or member of the fulfilment department to tell the PPC vendor which portions of the client's webpage should receive the most clicks.[165] The link rotator would take the multiple unique links in a campaign and produce one link that Take 5 could then provide to PPC vendors to generate click traffic to the specific links automatically as allocated by the link rotator.[166]  The fulfilment department was trained on how to use the link rotator within CMS.[167]

### E.    FTI proved that Take 5 did not deploy e-mails

As part of its work, FTI determined that Take 5 sold hundreds of e-mail campaigns that it fulfilled with PPC vendors.[168]  During the arbitration, Mr. Wei went through a number of these individual campaigns that FTI had examined and explained how FTI reached its conclusions.[169]

---

E. Cogen] (Dealers United complaints about automated/manufactured website traffic on e-mail campaign); Ex. 97, (Trial Ex. A-269) [10/9/12 e-mail communication with A. Radetich and R. Gluck] (LipiGesic complaints about e-mail campaign being fulfilled from "buy a visitor" websites); Ex. 98, (Trial Ex. A-284) [5/24/16 e-mail communication E. Hodges, D. Morris, A. Cadwell, B. Jenkins, and R. Gluck] (Central Garden & Pet complaints about disproportional amount of clicks on privacy policy link).

[165] Am. Opp., Ex. 55 (Hodgens Trial Testimony) at 2089:22–2090:23 (explaining the link rotator system at Take 5); Ex. 99, (Trial Ex. A-615) [3/6/18 e-mail communication from R. Allen to E. Hodgens] (regarding link distribution for Reckitt campaign]; Am. Opp., Ex. 55 (Ward Trial Testimony) at 2248:15–2249:8 (link rotator was a tool built to allocate clicks on the client's campaign); Ex. 44, (Trial Ex. A-676) [12 Skies invoices] at 11–14, 17–23, 43, 46, 47 (discussing work on the link rotator); Am. Opp., Ex. 53 (Boy Trial Testimony) at 1588:3–1589:2 (describing how Take 5 assigned clicks to the most "clickable" link in an e-mail creative).

[166] *See* Ex. 94, (Trial Ex. A-59A) [Take 5 Fulfillment Training Manual September 2018] at 28–31 (describing how to use the link rotator).

[167] *Id.*

[168] Ex. 100, (Trial Ex A-324) [3/8/20 List of Fraudulent Campaigns].

[169] *See supra*, nn. 75, 77.

The Advantage Parties subsequently retained FTI in an expert witness capacity to determine the overall percentage of e-mails that clients paid for which Take 5 actually sent.[170] To do this, Mr. Wei reached out to Dr. David Lasater, a statistician employed by FTI, to develop a sampling model that could be used to measure Take 5's overall compliance.[171]

Per Dr. Lasater's instructions, Mr. Wei compiled a starting population of 13,035 e-mail campaign invoices[172] for seven consecutive calendar quarters from October 2017 through June 2019.[173]  Dr. Lasater then randomly numbered the invoices and selected 15 invoices from each quarter to define a statistically significant representative sample of 105 invoices to test for compliance through attribute sampling.[174]  The size of the sample allowed FTI to be ninety-five percent confident that the findings from the 105 invoices would be representative of the larger population of 13,035 invoices within a three percent margin of error.[175]  If one of the invoices that Dr. Lasater selected could not be sampled because Take 5's systems did not include

---

[170] Ex. 101, (Trial Ex. A-442) [Wei Expert Report].

[171] *Id.*

[172] Am. Opp., Ex. 51 (Wei Trial Testimony) at 1106:18–1107:21, 1113:16–22 (NetSuite indicated that the 13,035 invoices were paid by Take 5's clients).

[173] *Id.* at 1109:3–13 (the date range was selected to reflect Take 5's pre- and post-acquisition invoices).

[174] Am. Opp., Ex. 52 (Arbitration Testimony of Dr. David Lasater ("Lasater")) Trial Tr. vol. 5 at 1347:2–1348:22 ("random sampling is extremely widely used" and "is generally accepted in statistical practice"), 1333:23–1335:2 ("Attribute sampling is extremely widely used in internal auditing . . . engineering reliability monitoring . . . [and] in healthcare communications with the US government involving the . . . Fraudulent Claims Act."), 1335:3–10 (attribute sampling is appropriate to test whether or not delivery of e-mails was consistent with what was told to the client).

[175] *Id.* at 1336:18–1341:7 ("95 percent is nearly a global standard with respect to sampling, with respect to the reporting of statistical results.  It's widely used in courts . . . international arbitrations . . . physical sciences as well as the social sciences as the appropriate level of confidence for the purposes of evaluating results."), 1342:7–1343:25.

information necessary to test the invoice, such as a tracking report, Dr. Lasater instructed Mr. Wei to select the next invoice in line.[176]

To determine compliance, FTI compared the number of e-mails invoiced and reported to clients from the sample with the number reported by Take 5's e-mail delivery platforms, Volo, SendGrid, MailWizz and DMS.[177] A particular invoice would be deemed compliant if the number of e-mails deployed by Take 5 was consistent with the number of e-mails invoiced or reported to the client.[178] Based on that analysis, FTI concluded that only 1.15 percent of the reported e-mails from the sample were actually deployed.[179]

---

[176] Am. Opp., Ex. 52 (Lasater Trial Testimony) at 1347:2–1348:22.

[177] Am. Opp., Ex. 51 (Wei Trial Testimony) at 1048:24–1050:14.

[178] Am. Opp., Ex. 51 (Wei Trial Testimony) at 1113:16–1114:21 ("[T]he point of this exercise is to see whether the information that was communicated to the client is consistent or not consistent with information in Take 5's own systems."); Am. Opp., Ex. 52 (Lasater Trial Testimony) at 1331:8–21.

[179] *Id.* at 1122:21–1123:9.

| Sample Information | | Invoiced Quantity[9] | Email Delivery Data Quantity | Comparisons |
|---|---|---|---|---|
| Period | Count of Invoices | Total Emails Invoiced | Total Emails Deployed | Total Deployed as a % of Total Emails Invoiced |
| 2017 Q4 | 15 | 3,012,209 | 142,871 | 4.74% |
| 2018 Q1 | 15 | 1,175,789 | 0 | 0.00% |
| 2018 Q2 | 15 | 5,465,009 | 96,789 | 1.77% |
| 2018 Q3 | 15 | 2,318,878 | 120,719 | 5.21% |
| 2018 Q4 | 15 | 27,318,400 | 99,474 | 0.36% |
| 2019 Q1 | 15 | 2,567,182 | 33,375 | 1.30% |
| 2019 Q2 | 15 | 1,197,814 | 1,227 | 0.10% |
| Totals: | 105 | 43,055,281 | 494,455 | 1.15% |
| Strata-weighted: | | | | 2.11% |

[180]

The chart below graphically summarizes FTI's conclusions:



[181]

---

[180] Ex. 102, (Trial Ex. A-312) [Lasater Expert Report] at 12.

[181] Ex. 101, (Trial Ex. A-442) [Wei Expert Report] at 4.

FTI concluded that no more than three percent of the reported e-mails were actually deployed in the population of 13,035 invoices from October 2017 through June 2019.[182]

### F.    Take 5 did not have a usable e-mail database

As noted above, the Take 5 Parties represented to clients, prospective clients, and the Advantage Parties that Take 5 had the ability to send e-mails to certain targeted demographic audiences, such as college students between the ages of 18 and 23 in specific states.[183] Ms. Hodgens and Mr. Boy confirmed that Take 5 never had the capability to fulfill these campaigns.[184]  The Advantage Parties retained Mr. Kalat as an expert witness to perform a forensic analysis of the Take 5 database.  Mr. Kalat analyzed the database and concluded that only 29% of the e-mail addresses that Take 5 had were deliverable and only 0.2% of its e-mail addresses could be "corroborated in third-party records as being correctly associated both with a

---

[182] Am. Opp., Ex. 52 (Lasater Trial Testimony) at 1360:9–15.

[183] Ex. 60, (Johnson Dep.) at 129:22–130:18; Ex. 62, (Benjoseph Dep.) at 102:7–103:11; Am. Opp., Ex. 59 (McCoy Trial Testimony) at 3400:16–21; Am. Opp., Ex. 56 (Pike Trial Testimony) at 2457:21–2458:12.

[184] Am. Opp., Ex. 53 (Boy Trial Testimony) at 1592:15–18 (Take 5 never had the capability of sending 10 million e-mails), 1586:19–24 (Take 5 had "very, very minimal" to no capabilities to deploy e-mail campaigns in-house when he joined Take 5 in 2016), 1587:20–23 (Take 5 never executed 100 percent of all e-mail communications in-house), 1590:9–1591:8 (not possible for Take 5 to send e-mails because of the poor quality of the data), 1622:9–1623:17 (not possible for Take 5 to send e-mails because of the poor quality of the data), 1626:14–1628:4, 1641:23–1642:20 (Take 5 only had approximately 25 million, not 168 million, actionable e-mail addresses); Am. Opp., Ex. 54 (Hodgens Trial Testimony) at 2022:11–16 ("we could hit a button, but did it work? Not very often."), 2024:8–23 ("[W]e would lose 80, 90 percent of that data. And even if we put the e-mail in and it said it was a viable address, it doesn't mean it was sent."), 2025:14–2026:2 (The quality of Take 5's data was poor.); *see* Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1857:16–1858:10 (The data at Take 5 was "uncleaned and limited in volume and the delivery metrics were poor"), 1789:7–25 (Mr. McGavran spoke with Mr. Boy and Mr. Gluck regarding the quality of the data).

given consumer's name, address, and their demographics."[185]  Thus, the fulfillment department

did not even have the data to send targeted e-mails through Take 5's e-mail delivery platforms.[186]

Even the valid data that Take 5 had was maintained in a way that made it unusable.

Take 5's data containing consumer contact information and demographic characteristics was

maintained by third-party data services vendor HygenicsData LLC ("Hygenics").[187]  David

Johnson, who maintained Take 5's e-mail data at Hygenics,[188] testified that Take 5's "data base"

was actually comprised of individual "data silos" that were not electronically correlated to one

another and could not be used as a collective database.[189]  Mr. Kalat examined the data and

determined that the individual silos were not connected in any way, which makes the process of

searching the individual silos inefficient and a "slow-going query."[190]

---

[185] *See* Ex. 103, (Trial Ex. A-350) [Kalat Report] at ¶¶ 2, 79 (only 29% of e-mail addresses that Take 5 acquired were deliverable); *id.* at ¶¶ 6, 128 ("**[O]nly 0.2%** of the e-mail addresses stored in the Take 5 Data Repository can be corroborated in third-party records as being correctly associated both with a given consumer's name, address, and their demographics."); Am. Opp., Ex. 52 (Kalat Trial Testimony) at 1439:21–1440:11 (less than a third of the e-mails in the Take 5 data repository were reported by Kickbox as being deliverable for marketing purposes), 1446:15–21 (only 15 percent of the e-mail addresses matched with a consumer's name), 1446:22–25 (only 8 percent of the e-mail addresses matched the consumer name and address).  Mr. Kalat examined a particular demographic data point that is impervious to changes over time—date of birth— and of the e-mail addresses Mr. Kalat had enough information to compare to third-party records, the date of birth matched roughly only 50% of the time.  Am. Opp., Ex. 52 (Kalat Trial Testimony) at 1448:21–1451:14.

[186] Am. Opp., Ex. 52 (Kalat Trial Testimony) at 1427:8–1429:4, 1439:21–1440:11, vol 6 1554:12–22, 1557:14–1558:2.

[187] *See, e.g.*, Am. Opp., Ex. 51 (Wei Trial Testimony) at 976:24–7; Am. Opp., Ex. 52 (Kalat Trial Testimony) at 1395:24–1396:3; Am. Opp., Ex. 53 (Boy Trial Testimony) at 1628:18–24; Am. Opp., Ex. 56 (Pike Trial Testimony) at 2510:24–2511:4; Am. Opp., Ex. 57 (Morris Trial Testimony) at 2811:9–15 (Ex. A-123 [database training slides] contained the universe of counts housed at Hygenics).

[188] Ex. 60, (Johnson Dep.) at 22:08–12, 23:25–24:7.

[189] *Id.* at 27:21–25, 25:25–26:12.

[190] Am. Opp., Ex. 52 (Kalat Trial Testimony) at 1396:4–1401:23 (explaining the poor relational design of Take 5's data).

Mr. Radetich was the architect of the database and responsible for acquiring Take 5's data.[191]  Mr. Radetich knew about problems with the data.[192]  Indeed, Mr. Boy spoke with both Mr. Radetich and Mr. Gluck regarding concerns about Take 5's purported double opt-in data.[193]

## IV.    THE ARBITRATION HEARING AND THE INTERIM AWARD

The arbitration hearing was held on January 25, 26, 27, 28, 31, February 1, 2, 3, 4, and May 2, 3, 4, 5, 6, and June 6.  Am. Opp., Exs. 48–63.  "Many witnesses testified, including experts.  The parties introduced voluminous exhibits."  Ex. 1, IA at 3.  "On June 29, 2022, each party filed a post-hearing brief. On July 5, 2022, counsel for the parties presented oral arguments."  *Id.*

Advantage alleged that the Take 5 Parties had fraudulently breached the following representations and warranties in the APA:

- The representation and warranty in § 2.5(a) that its financial statements were prepared in accordance with GAAP;[194]

---

[191] Am. Opp., Ex. 53 (Boy Trial Testimony) at 1628:20–1629:3 (Mr. Radetich maintained the relationship with Hygenics and was responsible for acquiring Take 5's data); Am. Opp., Ex. 49 (Colen Trial Testimony) at 371:6–16 ("Alex was accountable for the data."); Am. Opp., Ex. 54 (McGavran Trial Testimony) at 1786:18–20 (Mr. Radetich controlled the relationship with Hygenics); Am. Opp., Ex. 57 (Morris Trial Testimony) at 2802:2–15 (Mr. Radetich was the architect of the database and was the primary one who obtained and sourced the data).

[192] *See* Ex. 104, (Trial Ex. A-99) [4/29/15 e-mail communication between A. Radetich and D. Johnson, *et al.*] (Mr. Radetich stating "truth is elusive" in response to Mr. Johnson informing him of bad data).

[193] Am. Opp., Ex. 53 (Boy Trial Testimony) at 1630:16–1632:15.

[194] Section 2.5(a) of the APA provides, in relevant part, as follows: "The Company has made available to the Buyer true and complete copies of the unaudited consolidated balance sheet and statement of income of the Company as of and for the fiscal year ended as of December 31, 2016 and the audited consolidated balance sheet and statement of income (the "Interim Financial Statements") of the Company as of and for the fiscal year ended as of December 31, 2017 (collectively, the "Financial Statements").  The Financial Statements (including the related notes and schedules) (i) have been prepared in accordance with the Books and Records of the Company, (ii) are true and correct and present fairly in all material respects

51

- The representation and warranty in § 2.5(b) that its accounts receivable arose from valid sales;[195]

- The representation and warranty in § 2.10(a) that it owned or possessed the intellectual property necessary to conduct its business;[196] and

- The representation and warranty in § 2.11(b) that Take 5 had complied with all applicable laws in operating its business.[197]

The APA is governed by Delaware law.[198]  Applying Delaware law, Judge Eyler found as follows:

---

the financial condition and results of operations of the Company as of the dates and for the periods indicated, and (iii) with respect only to the Financial Statement for the fiscal year ended as of December 31, 2017, have been prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated, except as described on Section 2.5(a) of the Disclosure Schedules . . . ."  Ex. 13, (Trial Ex. A-230).

[195] *Id.*  Section 2.5(b) of the APA provides, in relevant part, as follows: "All of the accounts receivable of the Company (collectively, the "Accounts Receivable") are reflected on the Financial Statements and arose from valid sales actually made or services actually performed in the ordinary course of business consistent with past practice on ordinary trade terms to Persons who are not Affiliates of the Company."

[196] *Id.*  Section 2.10(a) of the APA provides, in relevant part, as follows: "The Company owns and possesses, solely and exclusively, all right, title and interest in, to and under, or has a valid and enforceable right to use pursuant to an Inbound License, all of the Intellectual Property necessary for, or used or held for use in, the conduct of the Business (the "Company Intellectual Property"), free and clear of all Liens (except for Permitted Liens and non-exclusive licenses granted to customers in the ordinary course of business consistent with past practice). Notwithstanding the generality of the foregoing, the Company owns and possesses, solely and exclusively, all right, title and interest in, to and under all Owned Intellectual Property."

[197] *Id.*  Section 2.11(b) of the APA provides, in relevant part, as follows: "Except as set forth on Section 2.11(b) of the Disclosure Schedules, since January 1, 2015 the Company has been in compliance in all material respects with all applicable Laws and all Governmental Authorizations in connection with the conduct, ownership, use, occupancy or operation of the Business, the Purchased Assets the Excluded Assets, the Assumed Liabilities and the Excluded Liabilities, and the Company has not received any written notification alleging any noncompliance with or violation of the foregoing."

[198] Ex. 13, (Trial Ex. A-230) [APA] at § 10.11(b).

Prior to the acquisition, Advantage wanted email capability as represented by Take 5. It made that known to Take 5, including Messrs. Gluck and Radetich. Also prior to the acquisition, Take 5, including Messrs. Gluck and Radetich, knowingly misrepresented to Advantage the following with the intent to induce its reliance: (1) the nature and quality of Take 5 LLC's database of email addresses, demographic overlay, and other data; (2) Take 5 LLC's in-house capability to send large numbers of targeted emails as part of advertising campaigns; and (3) that it had deployed/delivered emails for which it had billed clients and received payment when it had not done so. I further find that Advantage justifiably relied on the misrepresentations and that Advantage was harmed.

Messrs. Gluck and Radetich participated in the misrepresentations in part and had knowledge of other misrepresentations by representatives of Take 5 LLC. The knowledge is revealed in testimony and, inter alia, many email communications. The misrepresentations were substantial in number and were material to Advantage's reliance and decision to purchase.[199]

Based on these findings, he concluded that Take 5, Mr. Gluck, and Mr. Radetich,

along with RJV Marketing, breached Article II, §§ 2.5 (a) and (b), §2.10(a), and 2.11(b) and Article VIII, § 8.2. With respect to §2.5(a) and (b), GAAP principles were not satisfied because emails were not sent but were paid for. The same is true for accounts receivable. Again, I cannot quantify that, except that it was substantial and material with respect to Advantage. With respect to §2.10(a), the database was inadequate for the conduct of the email marketing business. With respect to §2.11(b), aside from any mail fraud violations, discussed below, Take 5 LLC violated 11 Del. C. §906(2) ("A person is guilty of deceptive business practices when in the course of business the person knowingly or recklessly: (2) sells, offers or exposes for sale, or delivers less than the represented quantity of any commodity or service…."). With respect to RJV Marketing, under Article VIII, section 8.2, it owes a duty to indemnify Advantage for Take 5 LLC's breach of warranties even if it did not commit fraud. There is no limitation on damages because of the finding of fraud.

I further conclude that, in addition to fraudulent breaches of contractual representations and warranties, misrepresentations of fact before the acquisition by Take 5, with the intent to induce reliance by Advantage, constitute fraud independent of the APA.

Ex. 1, IA at 37–38.

Judge Eyler awarded the Advantage Parties $48,325,822.29 in damages and also held that the Advantage Parties were entitled to recover attorney's fees and costs.[200] The Advantage

---

[199] Ex.1, IA at 36.

[200] *Id.* at 43–44.

Parties submitted their application for attorney's fees and costs, which the Take 5 Parties opposed. On October 4, 2022, Judge Eyler issued his Final Award, which he modified on October 20, 2022, to address what both parties agreed was a clerical error.[201] In his Modified Final Award, Judge Eyler repeated his finding that the Take 5 Parties committed fraud: "As stated many times in this proceeding, the gravamen of Advantage's claims was fraud. Fraud was found."[202] Judge Eyler awarded the Advantage Parties $48,325,822.29 in damages and an additional $22,032,263.60 in costs.[203]

## V.    ARGUMENT

### A.    Absent egregious circumstances, the Court should confirm the Award

Pursuant to section 9 of the FAA,

> [i]f the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.

9 U.S.C. § 9. The APA provides that "judgment upon the award rendered by the Arbitrator may be entered in any court having jurisdiction thereof."[204]

The Take 5 Parties reside in Boca Raton, Florida.[205] This Court therefore has jurisdiction to enforce the Award. *See Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*, 529 U.S. 193, 202

---

[201] Ex. 2, FA.

[202] *Id.* at 5.

[203] *Id.* at 10–11.

[204] Ex. 13, (Trial Ex. A-230) [APA] at § 10.11(b).

[205] Am. Opp., Ex. A, at 4.

(2000) (arbitration award under the Federal Arbitration Act ("FAA") can be enforced where

defendants reside).

Absent "egregious departures from the parties' agreed-upon arbitration," *Hall St. Assocs.,*

*L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008), the Court should confirm the Award.  *See also*

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995) ("the court will set that

decision aside only in very unusual circumstance"); *Century Indem. Co. v. Certain Underwriters*

*at Lloyd's, London, subscribing to Retrocessional Agreement Nos. 950548, 950549, 950646*, 584

F.3d 513, 557 (3d Cir. 2009) ("The FAA allows district courts to vacate arbitration awards 'only

under exceedingly narrow circumstances.'"); *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d

117, 120 (2d Cir. 1991) ("It is well-settled that judicial review of an arbitration award is

narrowly limited").

The FAA provides only four circumstances in which the Award can be vacated:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).[206]

---

[206] The Take 5 Parties also argue that some Federal Circuits recognize that an award can be vacated if it was entered in "manifest disregard of the law."  Opp. at 35–36.  The Take 5 Parties inexplicably rely on Delaware law.  See Opp. at 69–70.  Section 10.11(b) of the APA provides that Delaware law governs the arbitration itself, not proceedings to enforce the Award. Ex. 13, (Trial Ex. A-230) [APA].   "Federal law and the FAA govern whether to confirm or vacate the arbitration award in this case."  *Kim-C1, LLC v. Valent Biosciences Corp.*, 756 F. Supp. 2d 1258, 1263 (E.D. Cal. 2010).

Take 5 Parties have not come close to adducing any evidence that would remotely justify their request that the Court vacate the Award under section 10 of the FAA. Indeed, it is telling that almost all the opinions cited in the Amended Opposition reject petitions to vacate the awards at issue.[207]

---

In *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008), the Supreme Court held that the FAA provides the "exclusive grounds" for vacating an arbitral award. Based on *Hall*, the Eleventh Circuit has rejected "manifest disregard of the law" as a basis for vacating an arbitral award. *See Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313, 1324 (11th Cir. 2010) ("judicially-created bases for vacatur are no longer valid"); *S. Mills, Inc. v. Nunes*, 586 F. App'x 702, 704 (11th Cir. 2014) ("In this Circuit, manifest disregard of the law is no longer a valid basis for vacating an arbitration award."). Because this Court is located in the Eleventh Circuit, it should follow Eleventh Circuit law. *See Norman v. State*, 215 So. 3d 18, 35 (Fla. 2017) (applying Eleventh Circuit law to determine whether statute violated the Second Amendment); *Kasket v. Chase Manhattan Mortg. Corp.*, 759 So. 2d 726, 726 (Fla. 4th DCA 2000) (applying Eleventh Circuit law to interpret the Truth in Lending Act); *Wylie v. Inv. Mgmt. & Rsch. Inc.*, 629 So. 2d 898, 900 (Fla. 4th DCA 1993) (court should apply law of Circuit in which it is located so "that the issue will be uniformly decided by both federal and state courts in the geographic area in which the state is located, thus discouraging forum shopping"), *overruled on other grounds*, *May v. Illinois Nat. Ins. Co.*, 771 So. 2d 1143, 1153 (Fla. 2000).

[207] *See, e.g.*, *Bellantuono v. ICAP Sec. USA, LLC*, 557 F. App'x 168, 174-176 (3d Cir. 2014) (rejecting argument that award was entered in manifest disregard of the law); *Regnery Pub., Inc. v. Miniter*, 368 F. App'x 148 (D.C. Cir. 2010) ("Appellant has not shown that the arbitrator's failure to rule on appellant's motion for recusal required vacatur of an arbitration award as set forth in the Federal Arbitration Act"); *Am. Life Ins. Co. v. Parra*, 269 F. Supp. 2d 519, 525–26 (D. Del. 2003), order clarified, No. CIV.A. 98-401 (KAJ), 2003 WL 22999543 (D. Del. Dec. 22, 2003) (party's "'manifest disregard of the law' argument is not persuasive"); *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 481 F.3d 813, 820 (D.C. Cir. 2007) (district court did not err in confirming award); *Century Indem.*, 584 F.3d at 557 (affirming decision to deny petition to vacate); *Alexander Julian, Inc. v. Mimco, Inc.*, 29 F. App'x 700, 703 (2d Cir. 2002) ("We cannot say it is fundamentally unfair for the arbitrators to have set the arbitration hearing dates for the exact dates Mimco's counsel was unavailable."); *Orner v. Country Grove Inv. Grp.*, LLC, No. CIV.A. 2245-VCS, 2007 WL 3051152, at *1 (Del. Ch. Oct. 12, 2007) ("The second argument that Orner makes is that the Award must be vacated because the Arbitrator abused his discretion by refusing to stay the Arbitration until this court ruled on Orner's request to enjoin the Arbitration. I also reject that argument.").

**B.**     **Judge Eyler did not commit misconduct in refusing to postpone the hearing because Mr. Radetich and Mr. Gluck were under criminal investigation**

        **1.**     **The Take 5 Parties were not prejudiced by Judge Eyler's decision to deny the stay**

The Take 5 Parties' primary argument is that Judge Eyler refused to postpone the arbitration hearing because Mr. Radetich and Mr. Gluck were under criminal investigation and were required to assert their Fifth Amendment right against self-incrimination. *See* Am. Opp. at 44–54. Under the FAA, to prevail on this argument, Mr. Radetich and Mr. Gluck must show "that they have been prejudiced" by that decision. 9 U.S.C. § 10(a)(3). There were not. Even if Judge Eyler had granted the stay motion, it would have made no difference because Mr. Radetich and Mr. Gluck still would have had to plead the Fifth.

The Take 5 Parties sought "to stay the arbitration proceeding for six months or until the criminal investigation was concluded, whichever was <u>earlier</u>." Am. Opp. at 15 (emphasis in original). The Arbitrator denied the motion to stay on June 29, 2021, after an hour-and-a-half hearing.[208] The first day of the arbitration was January 25, 2022, almost ***seven*** months after the Arbitrator denied the motion, Am. Opp. at 28, and it did not conclude until July 2022, a year after the Arbitrator denied the motion, Am. Opp. at 29. And, while the criminal investigation remains active, it has not concluded. Therefore, the Judge Eyler's decision not to stay the proceedings is completely irrelevant. Mr. Radetich and Mr. Gluck still would have had to take the Fifth Amendment during the arbitration hearing on in a deposition taken the day after the stay expired. Thus, the decision on the motion to stay did not prejudice Mr. Radetich and Mr. Gluck in any way. *See Selden v. Airbnb, Inc.*, No. 16-CV-933 (CRC), 2019 WL 13158226, at *5

---

[208] Ex. 105, 6/29/2021 Order Denying Take 5's Motion to Stay ("Stay Order"); Ex. 106, 6/29/2021 Hr'g Tr.

(D.D.C. Nov. 27, 2019) (to vacate award, party must show that "that [they were] prejudiced by the arbitrator's actions"), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021).

### 2.    Judge Eyler's decision to deny the stay was not an abuse of discretion

Even if the Take 5 Parties had been affected by the stay, there would have been no basis to overturn Judge Eyler's decision.  Courts are to give "great deference" to an arbitrator's decision whether to stay a proceeding. *See Washington Mut. Bank, F.A. v. Am. Fin. Network*, 414 F. Supp. 2d 1155, 1157 (S.D. Fla. 2006).  The Court may vacate an award for failure to postpone a proceeding only if that decision was "arbitrary." *See Fairchild & Co. v. Richmond, F. & P. R. Co.*, 516 F. Supp. 1305, 1313 (D.D.C. 1981).  The Court should deny a petition to vacate an award under section 10(a)(3) if "there was any reasonable basis for the arbitrators to refuse to postpone the hearing or to continue it." *Schmidt v. Finberg*, 942 F.2d 1571, 1574 (11th Cir. 1991); *see also CM S. E. Texas Houston, LLC v. CareMinders Home Care, Inc.*, 662 F. App'x 701, 705 (11th Cir. 2016) (denying petition to vacate because petitioner "cannot show that there was no reasonable basis for the arbitrator's choice" not to continue hearing).  An arbitrator does not abuse his or her discretion in refusing to stay a proceeding because a witness otherwise would be compelled to assert a Fifth Amendment privilege against self-incrimination. *See Wilson v. Sterling Foster & Co.*, No. 98 C 2733, 1998 WL 749065, at *5–6 (N.D. Ill. Oct. 15, 1998).

In this case, Judge Eyler had a substantial basis for refusing to postpone the hearing.  A stay of proceedings based on a party's fear of self-incrimination is an "extraordinary remedy" that is rarely granted. *Ford v. Telamon Corp.*, No. CV K21C-02-005 NEP, 2021 WL 2550208, at *3 (Del. Super. Ct. June 17, 2021).  The Supreme Court held long ago that it is not

unconstitutional to force a party to choose between invoking his or her Fifth Amendment right and losing a civil case. *See Baxter v. Palmigiano*, 425 U.S. 308, 318–19 (1976).

The factors that Judge Eyler considered in deciding whether to grant the stay are set forth in *A. Schulman, Inc. v. Citadel Plastic Holdings*, LLC, 2017 WL 5035497, at *1–2 (Del. Ch. Nov. 2, 2017), a case on which "Take 5 relie[d]."[209] Those factors are:

- The parties had engaged in substantial discovery, *id*. at *1;

- The defendants had not been indicted, *id*. at *2, 3;

- "The Delaware Rules of Evidence do not permit the court to draw an adverse inference from the invocation of a Fifth Amendment right," *id*. at *3;

- The government did not ask for a stay, *id*. at *3; and

- "The public has a vital interest in rooting out the fraud that the plaintiffs alleged, as well as an interest in ensuring that the aggrieved parties … are made whole in a timely fashion," *id*. at *4.

All five factors supported Judge Eyler's decision to refuse the request for a stay.

### (a)    The parties had engaged in substantial discovery

The first factor under *Schulman* is whether the parties engaged in substantial discovery. "Take 5 knew about the criminal investigation no later than September 19, 2019." Ex. 105, Stay Order at 3. "Despite that, substantial discovery … occurred" in connection with the arbitration, including the depositions of 14 witnesses. *Id*. The Take 5 Parties contend that they did not learn of the seriousness of the investigation until April 19, 2021, when an FBI agent visited Mr. Radetich's home. Am. Opp. at 13. But, as Judge Eyler noted, Ex. 105, Stay Order at 3, the Take

---

[209] *See* Ex. 105 (Stay Order) at 2.

5 Parties continued to take discovery of the Advantage Parties' witnesses after this date while delaying the depositions of their own witnesses and ultimately seeking the stay.

### (b)    Mr. Radetich and Mr. Gluck had not been indicted

Mr. Radetich and Mr. Gluck had not been indicted when they requested a stay.  As Judge Eyler held, "[g]enerally, stays are not granted absent indictments."  Ex. 105, Stay Order at 4. Counsel for the Take 5 Parties admitted this during the hearing.[210]  This is consistent with *Schulman*, which held that the fact that "the defendants have not yet been indicted" was one of the significant factors in denying the request for a stay.  *See Schulman*, 2017 WL 5035497, at *3. *See also Fid. Funding of California v. Reinhold*, 190 F.R.D. 45, 53 (E.D.N.Y. 1997) ("[A]s the court explained in denying a previous motion for a stay of this action, a stay is generally appropriate 'only after the criminal investigation of the defendant seeking the stay has ripened into an indictment.'") (quoting court's prior order); *Trustees of Plumbers & Pipefitters Nat. Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995) ("[S]tays will generally not be granted before an indictment is issued.").  An indictment affects not only the prejudice to the potential criminal defendant but also the prejudice to the adverse party in the litigation because the delay imposed before a defendant is indicted is "potentially infinite." *Sterling Nat. Bank v. A-1 Hotels Int'l, Inc.*, 175 F. Supp. 2d 573, 577 (S.D.N.Y. 2001).  This proceeding bears that out.  Mr. Radetich and Mr. Gluck still have not been indicted.

### (c)    Under Delaware law, Judge Eyler was not permitted to draw an adverse inference if a witness invokes the Fifth Amendment

Delaware law does not permit a finder of fact to draw an adverse inference from the invocation of the Fifth Amendment privilege.  *See W.L. Gore & Assocs., Inc. v. Long,* No.

---

[210] Ex. 106, 6/29/2021 Hr'g Tr. at 32:8–11 ("the most important criteria is whether there is an indictment or it's imminent").

CIV.A. 4387-VCP, 2011 WL 6935278, at *4 n.31 (Del. Ch. Dec. 28, 2011). Thus, Judge Eyler

held that whether any of the witnesses—including Mr. Radetich and Mr. Gluck—would invoke

their Fifth Amendment rights was speculative, as was the effect of them doing so. *See* Ex. 105,

Stay Order at 3–4. Because Mr. Radetich and Mr. Gluck said that they had no knowledge of the

fraud, "if they choose not to testify, because of their absence of knowledge, at this point it is

speculative to conclude that they will be prejudiced." Ex. 105, Stay Order at 4.

The Take 5 Parties argue extensively that "no evidence was presented during the hearing

concerning the knowledge, state of mind, or intentions of Gluck and Radetich and neither were

able to testify about the same." Am. Opp. at 47. This is a gross mischaracterization of the

record.

Judge Eyler explained in detail the grounds for his findings that Mr. Radetich and Mr.

Gluck knew that Take 5 was engaged in fraud:

> Messrs. Gluck and Radetich were very much involved in the operations of Take 5 LLC,
> Mr. Gluck primarily in sales, and Mr. Radetich primarily with the database, both before
> and during the acquisition. They were not hands off investors. The evidence supports a
> finding that they knew how the campaigns were sold, fulfilled, and reported. The
> evidence demonstrates that they had actual knowledge of Take 5 LLC's business
> practices generally and the details of many campaigns.

Ex. 1, IA at 37.

His opinion is overwhelmingly supported by the evidence presented during the hearing.

Ms. Hodgens and Mr. Boy testified that Mr. Radetich and Mr. Gluck knew that Take 5 was

fulfilling campaigns with PPC traffic and falsifying its reports.[211] Before Advantage acquired

---

[211] Am. Opp., Ex. 53 (Boy Trial Testimony) at 1617:3–1619:5 (explaining why
Mr. Radetich and Mr. Gluck knew that e-mail campaigns were being fulfilled with PPC traffic),
1629:4–1630:15 (discussed poor quality of the data with Mr. Radetich), 1630:22–1633:4 (told
Mr. Radetich and Mr. Gluck that Take 5 was making false representations about its data and
needed to stop sending clients false tracking reports); Am. Opp., Ex. 55 (Hodgens Trial
Testimony) at 2101:10–24 (Mr. Radetich and Mr. Gluck were aware of algorithmic reporting),
2103:18–2104:5 (Mr. Radetich and Mr. Gluck worked closely with Ms. Jenkins); *see* Ex. 107,

the assets of Take 5, Ms. Hodgens asked Mr. Radetich if Advantage "[was] aware of how we were fulfilling campaigns . . . just how things were run and operating in the back. He said they were fully aware."[212]  In January 2017, Mark Adams, then an active Take 5 sales employee, e-mailed Mr. Gluck about a potential new hire explicitly stating that he would not be put into fulfilment right away because "HE doesn't get to see behind the curtain – he's a straight shooter and I think we should avoid that . . ."[213]

Mr. Radetich attended the Project Evolve presentation and did not challenge any of the findings of the Take 5 team.[214]  When Mr. Weiner tried to investigate whether Take 5 was sending e-mails on behalf of Jun Group's clients, Mr. Radetich and Mr. Gluck intervened to try and stop him from uncovering the truth.[215]  Mr. Morris testified that he had many discussions with Mr. Radetich and Mr. Gluck "to make sure that what we were doing was legitimate," and Mr. Radetich and Mr. Gluck assured him that it was.[216]  Mr. Radetich and Mr. Gluck were involved in numerous communications both internally and externally with clients about suspicious traffic to clients' websites.[217]  And, in June 2019, when Mr. Radetich and Mr. Gluck

---

(Trial Ex. A-56) [7/5/17 E. Hodgens e-mail communication to Mr. Radetich, Mr. Morris, Ms. Jenkins, *et al.*] ("If we can eliminate our [sic] in our reporting the word opens to reach or impressions would be more realistic to what is happening . . . .").

[212] Am. Opp., Ex. 55 (Hodgens Trial Testimony) at 2111:10–2112:5.

[213] Ex. 108, (Trial Ex. A-792) [1/16/17 e-mail communication between M. Adams and R. Gluck] (describing Logan Freeman's role at Take 5).

[214] *See* Part II.E, *supra*.

[215] Ex. 20, (Trial Ex. A-582) [5/2/19 e-mail communication among Mr. Weiner, Mr. Radetich, and Mr. Gluck] (concerning Mr. Weiner's request for a domain report for Café Bustelo); Am. Opp., Ex. 50 (Weiner Trial Testimony) at 818:4–820:19.

[216] Am. Opp., Ex. 58 (Morris Trial Testimony) at 2874:4–2875:5; *see id.* at 2875:6–17 (Mr. Morris believed that Mr. Radetich and Mr. Gluck "had done a sufficient investigation to make that conclusion," and they "gave [him] the ammunition" to combat those accusations).

[217] Ex. 96, (Trial Ex. A-191) [11/4/15 e-mail communication from A. Radetich to E. Cogen, D. Morris) (Dealers United complaints about automated/manufactured website traffic

were confronted with the evidence that Take 5 was not sending e-mails, they did not deny it but instead lied and said that clients were aware of what they were doing.[218]

"Intent" for purposes of fraud also can be established by circumstantial evidence, including the defendant's "conduct and the nature of the scheme." *See United States v. Gravatt*, 280 F.3d 1189, 1192 (8th Cir. 2002); *see also United States v. Vas*, 497 F. App'x 203, 207 (3d Cir. 2012) (affirming jury verdict of fraudulent intent based on circumstantial evidence); *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010) ("However, '[b]ecause direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself . . . .'") (quoting *United States v. Paneras*, 222 F.3d at 410); *United States v. Schuler*, 458

_____

on e-mail campaign); Ex. 109, (Trial Ex. A-192) [11/9/15 e-mail communication from A. Radetich to R. Gluck, D. Morris] (Mr. Radetich responds to client complaints about traffic spikes and no mobile device traffic internally by stating: "We have too much exposure, that is mounting now. We need to shore this up."); Ex. 110, (Trial Ex. A-238) [4/18/12 e-mail communication from P. Carlson to R. Gluck, *et al.*] (PJ Next complaints about unrealistic opt out rates and non-e-mail traffic); Ex. 111, (Trial Ex. A-242) [4/27/20 e-mail communication from P. Lee to R. Gluck, *et al.*] (PJ Next complaint about non-e-mail traffic); Ex. 112, (Trial Ex. A-243) [5/4/12 e-mail communication from P. Carlson to R. Gluck, *et al.*] (PJ Next requesting a full refund of the contract for 8,300 e-mail clicks); Ex. 113, (Trial Ex. A-246) [6/7/12 e-mail communication from P. Lee to R. Gluck, *et al.*] (PJ Next complaints about e-mail campaign being fulfilled with PPV traffic); Ex. 114, (Trial Ex. A-269) [10/9/12 e-mail communication from A. Radetich to R. Gluck, B. Hannon, J. Silver] (LipiGesic complaints about e-mail campaign being fulfilled from "buy a visitor" websites); Ex. 115, (Trial Ex. A-273) [3/19/15 e-mail communication from T. Finger to R. Gluck, A. Radetich] (Maserati complaints about e-mail campaign containing robot clicking mechanisms); Ex. 116, (Trial Ex. A-274) [3/24/15 e-mail communication from R. Gluck to A. Radetich and B. Jenkins] (Crown College complaints about botnet, non-e-mail mail traffic); Ex. 117, (Trial Ex. A-277) [5/28/15 e-mail communication from R. Gluck to M. Benjoseph, *et al.*] (Crown College and Saint Mary's University of Minnesota complaints about suspicious data and botnet activity); Ex. 98, (Trial Ex. A-284) [5/24/16 e-mail communication from R. Gluck to E. Hodgens, *et al.*] (Central Garden & Pet complaints about disproportional amount of clicks on privacy policy link).

[218] *See* Part II.B, *supra*.

F.3d 1148, 1152 (10th Cir. 2006) ("Because direct proof of fraudulent intent often is unavailable, courts have long permitted fact finders to rely on a variety of circumstantial evidence . . . .") (quoting *United States v. Welch*, 327 F.3d 1081, 1105 (10th Cir. 2003)); *Graham*, 477 F. App'x at 825 ("Proof of fraudulent intent may be established through circumstantial evidence.") (citing *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)); *United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001) (affirming that specific intent may be inferred from the totality of the circumstances even without direct evidence).

Here, the very "nature of the scheme provide[s] circumstantial evidence of fraudulent intent." *See United States v. Gravatt*, 280 F.3d 1189, 1192 (8th Cir. 2002). The sales department and the fulfillment department were kept separate so that the sales representatives would not know how campaigns were being fulfilled.[219] The Take 5 Parties hired 12 Skies to develop business software to defraud clients.[220] It had anti-bot software to monitor the PPC traffic that its vendors were sending, which would have been completely unnecessary if it were sending e-mails.[221] It trained the employees in its fulfillment department to copy tracking links that clients thought would be embedded in e-mails and send these tracking links to PPC vendors so that when the PPC vendors advertised using other forms of digital media, such as Google AdWords, the clicks to the client's website would appear to be coming from links embedded in e-mails.[222]

The very fact that Mr. Radetich and Mr. Gluck founded and ran Take 5 renders their claims of ignorance "false, unreasonable or unbelievable." *See United States v. Donohue*, 726 F.

---

[219] Am. Opp., Ex. 49 (Colen Trial Testimony) at 329:11–330:6 ("Fulfillment department was separate from the sales department."); Am. Opp., Ex. 56 (Creel Trial Testimony) at 2328:11–14 (the sales and fulfillment department rarely interacted with each other).

[220] *See* Parts II.F and III.D, *supra*.

[221] Am. Opp., Ex. 53 (Boy Trial Testimony) at 1716:24–1717:21, 1718:6–1719:4.

[222] *See* Part III.D, *supra*.

App'x 333, 350 (6ᵗʰ Cir. 2018); *see also United States v. Philip Morris USA Inc.*, 566 F.3d 1095,

1121 (D.C. Cir. 2009) ("the district court [could] reasonably infer that the high level executives"

knew about the practices of the company).  Mr. Morris, the Take 5 Parties' own witness, testified

that he would expect that Mr. Radetich and Mr. Gluck were aware of Take 5's practices:

> Q.   And if Take 5 were selling e-mail campaigns, and 90 percent of those e-mail
> campaigns were being fulfilled with pay-per-click traffic, you would expect Alex
> Radetich and Richard Gluck would know about that, right?
>
> A.   If it was to that degree, I sure would, yeah.[223]

### (d)    The government did not request a stay and the interest of the public strongly favored denying the stay

The fourth factor supported Judge Eyler's decision to deny the stay because the

government did not request it.  "The fifth factor instructs the court to consider whether a stay is

in the public interest."  *Schulman*, 2017 WL 5035497, at *4.  On this factor, the teaching of

*Schulman* was squarely on point:

> Ensuring that aggrieved parties are made whole as rapidly as possible" serves the
> public interest.  Although "there are times in which the public's interest in the
> integrity of the criminal case takes precedence over the interests of the civil
> litigant," not all civil cases have the effect of undermining a criminal
> investigation.  The public also has a "vital stake in rooting out fraud."
>
> The public interest calls for having this litigation go forward.  The public has a
> vital interest in rooting out the fraud that the plaintiffs alleged, as well as an
> interest in ensuring that the aggrieved parties (should they prove their case) are
> made whole in a timely fashion. This case was filed over a year ago.  The well-
> pleaded complaint stated claims for breach of contract and fraud.  The parties
> have invested substantial efforts in discovery and are proceeding toward a trial in
> March 2018.
>
> By contrast, the criminal investigation remains at a nascent stage. No one knows
> when or if indictments will be brought. … [Derailing this case] … would reward
> individuals who engaged in more serious wrongdoing by enabling them to use a
> threatened (but not yet commenced) criminal proceeding as a shield against a
> longstanding civil case.

---

[223] Am. Opp., Ex. 57 (Morris Trial Testimony) at 2803:20–2804:3.

*Schulman*, 2017 WL 5035497, at \*4 (footnotes omitted; bracketed text and ellipses added).  The public had an interest in having the civil case against the Take 5 Parties resolved quickly and not stayed before they were indicted.  "'Ultimately, what [was] at risk [was] not [Mr. Radetich's and Mr. Gluck's] constitutional rights ... but their strategic position in the civil case.'"  *United States v. Eberhard*, No. 03 CR.562(RWS), 2004 WL 616122, at \*4 (S.D.N.Y. Mar. 30, 2004) (quoting *Sterling Nat. Bank v. A-1 Hotels Int'l, Inc.*, 175 F. Supp. 2d 573, 578 n.4 (S.D.N.Y. 2001)) (bracketed text added).  Judge Eyler properly denied their motion.

### C.     Judge Eyler did not refuse to hear evidence, and his Award cannot be vacated on that basis

The Take 5 Parties argue that Judge Eyler's Award should be vacated under section 10(a)(3) of the FAA because he refused to hear pertinent and material evidence.  Am. Opp. at 54–57.  As with all of the grounds for vacating an award, the showing required to vacate an award pursuant to this section is quite narrow.  Vacatur is appropriate only when the exclusion of relevant evidence so affects the rights of a party that it may be said that he was deprived of a fair hearing."  *Ortiz-Espinosa v. BBVA Securities of Puerto Rico, Inc.*, 852 F.3d 36, 49 (1st Cir. 2017); *see also Anderson v. Am. Gen. Life Ins. Co.*, 802 F. App'x 548, 553 (11th Cir.), *cert. denied*, 141 S. Ct. 361 (2020) (arbitrator did not engage in misconduct in denying request for spoliation sanctions); *Walker v. Ameriprise Fin. Servs., Inc.*, 787 F. App'x 211, 214 (5th Cir. 2019) (award cannot be vacated unless refusal to hear evidence "so affects the rights of a party that it may be said he was deprived of a fair hearing").

The Take 5 Parties argue that "[t]he Arbitrator's failure to respond to the Advantage Parties' bad-faith spoliation of evidence concerning the Google Analytics data resulted in the Take 5 Parties being deprived of a fundamentally fair hearing."  Am. Opp. at 54.  Judge Eyler *did* respond to the Take 5 Parties' argument; he rejected it.  Ex. 1, IA at 4–5.  As described in

detail in his Award, he found, based on the testimony of Ms. Hodgens, Mr. Boy, and Take 5's

own expert witness, Jessie Stricchiola, "that the Take 5 LLC Google Analytics data did not

contain information that would materially impact the issues in this case." *Id.* at 5.

Courts are not permitted to re-weigh the evidence to decide whether to vacate an award.

*See Southco, Inc. v. Reell Precision Mfg. Corp.*, 556 F. Supp. 2d 505, 510 (E.D. Pa. 2008), *aff'd*,

331 F. App'x 925 (3d Cir. 2009). In this case, however, every witness testified that information

from Take 5's Google Analytics account would be irrelevant to show whether Take 5 was

sending e-mails.[224] Not a single witness testified to the contrary, and the Take 5 Parties cite any

such testimony.

**D.    The Award was not procured by corruption, fraud, or undue means**

As the Take 5 Parties admit (Am. Opp. at 57), "[i]n order to establish that an award was

'procured by corruption, fraud, or undue means' under 9 U.S.C. § 10(a)(1), 'the movant must

establish the fraud by clear and convincing evidence ... the fraud must not have been

discoverable upon the exercise of due diligence prior to or during the arbitration ... [and] the

person seeking to vacate the award must demonstrate that the fraud materially related to an issue

in the arbitration.'" *Dorward v. Macy's Inc.*, No. 2:10-CV-669-FTM-29, 2013 WL 5407660, at

*2 (M.D. Fla. Sept. 25, 2013) (quoting *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378,

1383 (11th Cir.1988), *aff'd*, 588 F. App'x 951 (11th Cir. 2014). "'To vacate based on undue

means, a party must demonstrate intentional misconduct that "measures equal in gravity to

---

[224] *See* Am. Opp., Ex. 53 (Boy Trial Testimony) at 1606:14–1609:3 (explaining Google
Analytics reporting differences between Take 5 and Take 5's clients); Am. Opp., Ex. 55
(Hodgens Trial Testimony) at 2182:17–2184:6 (Take 5's Google Analytics was different than the
client's Google Analytics), 2213:12–23 (only the client's Google Analytics would show whether
or not a click was from an e-mail or ad display and it would only show that if the client coded
that in their URL links), 2214:4–18 (Take 5 could not see the urchin tracking module
information in Google Analytics).

bribery, corruption, or physical threat to an arbitrator.'" *Liberty Sec. Corp. v. Fetcho*, 114 F.Supp.2d 1319, 1321 (S.D. Fla. 2000) (quoting *Floridians for Solar Choice, Inc. v. PCI Consultants, Inc.*, 314 F. Supp. 3d 1346, 1355 (S.D. Fla. 2018), *aff'd sub nom. Floridians for Solar Choice, Inc. v. Paparella*, 802 F. App'x 519 (11th Cir. 2020)). None of the Take 5 Parties' assertions come close to meeting any of these tests, let alone all three of them.

First, the Take 5 Parties assert that the Advantage Parties committed fraud in paying the attorney's fees of Ms. Hodgens and Mr. Ward. As the Take 5 Parties admit (Am. Opp. at 58), learned that the Advantage Parties were reimbursing the witnesses for their attorney's fees ***during the arbitration***.[225] This alone defeats the Take 5 Parties' argument. *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988) ("the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration").

The Take 5 Parties argue that they did not know how much the Advantage Parties had paid to the witnesses' attorneys until the Advantage Parties served their letter seeking reimbursement for those costs, Am. Opp. at 58–59, but this is completely irrelevant because ***none of the money went to the witnesses themselves.*** Ms. Hodgens testified that she was not being personally compensated for the time she spent in connection with the case or that she was

---

[225] Am. Opp., Ex. 54 (Hodgens Trial Testimony) at 2011:6–12 ("Q. You're represented today by your own counsel, Mr. Wurtzel and Mr. Grover; am I correct? A. Yes, correct. Q. Who's paying your counsel's fees, to your understanding? A. Advantage is."); Am. Opp., Ex. 55 (Ward Trial Testimony) at 2260:15–2260:18 ("Q. So you do know -- you do know that Advantage is paying the fees of your lawyers, correct? A. Yes, I do.").

spending testifying;[226] that she was not a consultant for Advantage;[227] and that reimbursement of

her attorney's fees was not in any way dependent on her testimony or the outcome of the case.[228]

Mr. Ward also testified that the Advantage Parties had not paid or reimbursed him for expenses

other than his attorney's fees.[229]  Ms. Hodgens testified that the Take 5 Parties offered to pay her

attorney's fees, but she refused to accept that offer.[230]

     In any event, a party is fully entitled to pay the out-of-pocket expenses of witnesses.  *See*

*BAE Sys. Info. & Elec. Sys. Integration Inc. v. Lockheed Martin Corp.*, No. CIV.A. 3099-VCN,

2011 WL 3689007, at *3 n.17 (Del. Ch. Aug. 10, 2011) (a witness "may be reimbursed for his

out of pocket expenses") (quoting Delaware State Bar Association's Committee on Professional

Ethics (Del. Ethics Op. 2003–3)).

     The Take 5 Parties do not cite a single case in support of the proposition that the

Advantage Parties were prohibited from reimbursing witnesses for the fees of their criminal

defense attorneys, let alone that the Award can be overturned on this basis.  The opinion in

*Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp.

---

[226] Am. Opp., Ex. 54 (Hodgens Trial Testimony) at 2011:13–20 ("Q. Are you being personally compensated for the time you've spent in connection with this case?  A. No, I am not. Q. Are you being compensated for the time that you're spending testifying here today?  A. No, I am not.").

[227] *Id.* at  2011:21–22 ("Q. Are you a consultant or advisor to Advantage?  A. No, I am not.").

[228] *Id.* at 2011:23–2012:3 ("Q. Is Advantage's payment or reimbursement, I should say, of your attorney's fees, in any way dependent on your testimony today or the outcome of this case?  A. No, it is not.").

[229] Am. Opp., Ex. 55 (Ward Trial Testimony) at 2258:24–2259:4 ("Q. And has Advantage paid or reimbursed you for any of your expenses, legal or otherwise?  A. For my legal expenses, but not other than that, no.").

[230] Am. Opp., Ex. 55 (Hodgens Trial Testimony) at 2113:23–2115:14 ("I was approached by both parties").

1516, 1521 (S.D. Fla. 1994), *aff'd in part*, 117 F.3d 1328 (11th Cir. 1997), on which the Take 5

Parties inexplicably rely (Am. Opp. at 59–60), is directly on point.  In that case, the defendant

made payments directly "to fact witnesses *for the purpose of obtaining testimony*" as well as to

the witnesses' attorneys.  *Id*. at 1520–21 (emphasis in original).  One of the conditions of the

payments was that "the testimony had to be helpful to [the defendant] in defense of this civil

litigation."  *See id.* at 1525.  The only portion of those payments that the court found to be in

violation of Rule 4-3.4(b) were the payments directly to the witnesses, ***not the amount paid to***

***compensate the witnesses for their attorney's time***.  *See id*. at 1526.[231]

     The suggestion that reimbursing these fees constituted a bribe prohibited by 18 U.S.C.

§ 201, which prohibits "Bribery of public officials and witnesses," is facially frivolous.  To

support this argument, the Take 5 Parties would need clear and convincing evidence that the

Advantage Parties intended to influence Ms. Hodgens's and Mr. Ward's testimony by

reimbursing them for their attorney's fees.  *See United States v. Agostino*, 132 F.3d 1183, 1195

(7th Cir. 1997) (defining bribe); *United States v. Irwin*, 354 F.2d 192, 196 (2d Cir. 1965) (same).

The Advantage Parties reimbursed the witnesses for their attorney's fees to prevent them from

---

[231] The additional cases on which the Take 5 Parties rely (Am. Opp. at 60) all involved payments directly to fact witnesses in exchange for their testimony.  *See The Fla. Bar v. Jackson*, 490 So. 2d 935, 936 (Fla. 1986) (affirming sanctions against attorney who "requested that his clients be paid $50,000 for their testimony in a pending insurance claim case in New York"); *In re Kien*, 372 N.E.2d 376, 377 (Ill. 1977) (payment of $50 bribe to police officer to testify that gun was not in open view); *Wagner v. Lehman Bros. Kuhn Loeb Inc.*, 646 F. Supp. 643, 656 (N.D. Ill. 1986) ("Wagner's promise to remit up to 20% of any of his potential recovery in this case to Travis for his testimony was contingent upon the outcome of this case"); *In re Robinson*, 151 A.D. 589, 136 N.Y.S. 548, 556 (App. Div. 1912) (holding that "the payment of a sum of money to a witness to testify in a particular way" was improper but that "there are many incidental expenses in relation to the prosecution or defense of an action at law which can with propriety be paid by a party to the action"), *aff'd*, 103 N.E. 160 (N.Y. 1913); *The Fla. Bar v. Wohl*, 842 So. 2d 811, 813 (Fla. 2003) (payment was made directly to fact witness, including a bonus based on the usefulness of the testimony).

having to incur out-of-pocket expenses to testify. They did not pay them to influence their testimony. The court in *Golden Door*, 865 F. Supp. at 1523–24, held that even the payments to the witnesses themselves on the condition that the testimony be helpful did not violate this statute. No one could reasonably expect a third party witness to pay thousands of dollars for the "privilege" of testifying in a proceeding in which their testimony cannot be compelled. The allegation that the Advantage Parties bribed these witnesses is offensive and unprofessional.

Finally, the fact that the Advantage Parties reimbursed Ms. Hodgens and Mr. Ward did not relate in any way to the outcome of the arbitration. Judge Eyler was fully aware that the Advantage Parties had paid these attorney's fees and found both witnesses to be credible. IA at 19, 20. "[C]ourts are precluded from interfering with arbitration awards for mere errors in assessing the credibility of witnesses." *Int'l Bhd. of Firemen & Oilers, Loc. 261 v. Great N. Paper Co.*, 765 F.2d 295, 296 (1st Cir. 1985); *see also Int'l Bhd. of Pulp, Sulphite & Paper Mill Workers, Loc. Union No. 874 v. St. Regis Paper Co.*, 362 F.2d 711, 714 (5th Cir. 1966) (court may not review arbitral award based on "the credibility of witnesses [or] the weight to be given their testimony"); *Kane Gas Light & Heating Co. v. Int'l Bhd. of Firemen & Oilers, Loc. 112*, 687 F.2d 673, 678 (3d Cir. 1982) ("a court is precluded from overturning an award for (the arbitrator's) errors in assessing the credibility of witnesses, in the weight accorded their testimony, or in the determination of factual issues").

E.    **RJV is liable for the Advantage Parties' damages because it is a "Beneficial Owner" under the APA**

The Take 5 Parties argue that Judge Eyler exceeded his powers in entering the Award against RJV because RJV was not mentioned extensively during the hearing. Am. Opp. at 64–66. As Judge Eyler correctly found, RJV is liable for the Award because RJV assumed that liability under the APA:

Article VIII, section 8.2 provides that Take 5 LLC and the "Beneficial Owners" shall indemnify Advantage from all Damages, inter alia, arising out of any breach of representations and warranties in Article II; breach of any covenant or agreement contained in the APA by Take 5 LLC or the Beneficial Owners; and breach of any covenant or agreement contained in the APA by the Beneficial Owners Representative, defined as Mr. Radetich. "Beneficial Owners" are identified as RJV Marketing Corporation and Messrs. Gluck and Radetich.

***

With respect to RJV Marketing, under Article VIII, section 8.2, it owes a duty to indemnify Advantage for Take 5 LLC's breach of warranties even if it did not commit fraud. There is no limitation on damages because of the finding of fraud.

Ex. 1, IA at 35, 37–38. *See also id*. at 37 ("I conclude that they, along with RJV Marketing,

breached Article II, §§ 2.5 (a) and (b), §2.10(a), and 2.11(b) and Article VIII, § 8.2").

That decision was correct. Section 8.2(a)(1) of the APA provides as follows:

Subject to the limitations and exceptions provided in this Article VIII, from and after the Closing, ***the Company and the Beneficial Owners, shall indemnify, defend and hold harmless the Buyer and the other Buyer Indemnified Parties from and against all Damages incurred or suffered by any Buyer Indemnified Party*** as a result of, or arising out of any: (i) ***inaccuracy or breach of any representation and warranty made by the Company or the Beneficial Owners in Article II*** or Article III ***of this Agreement*** or in any certificate contemplated by this Agreement . . . .

(Emphasis added). The "Beneficial Owners" are Mr. Radetich, Mr. Gluck, and RJV Marketing

Corp.[232] RJV is liable for the Award. The Take 5 Parties' failure to inform the Court of the

provision in the APA that belies their argument, which was discussed extensively in the Interim

Award and the Advantage Parties' post-hearing brief, is inexcusable.

---

[232] Ex. 13, (Trial Ex. A-230) [APA] caption page [defining "Beneficial Owners"]; *id*. at 1 ("Alexander Radetich ('Radetich'), Richard Gluck ('Gluck'), RJV Marketing Corp., a Florida corporation ('RJV', collectively with Radetich and Gluck the 'Beneficial Owners' and each a 'Beneficial Owner')"), A-2 (defining "Beneficial Owner").

F.    **Judge Eyler did not exceed his powers in awarding the Advantage Parties'
damages**

The Take 5 Parties further argue that the Arbitrator exceeded his powers in awarding

certain damages because, in the view of the Take 5 Parties, the Advantage Parties did not submit

sufficient evidence to support those damages.  The Take 5 Parties made this same argument to

Judge Eyler, and he rejected it.[233]  Moreover, a court cannot vacate an arbitration award on this

basis.  *See Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) ("Courts

are not authorized to review the arbitrator's decision on the merits despite allegations that the

decision rests on factual errors or misinterprets the parties' agreement"); *Silvers v. Verbata, Inc.*,

No. 221CV05808VAPRAOX, 2021 WL 5911690, at *3 (C.D. Cal. Nov. 10, 2021) ("Although

Respondents argue there was insufficient evidence to increase the damages, and they contend the

Arbitrator's reasoning was contradictory, these are not grounds to vacate the Award."), *appeal

dismissed*, No. 21-56341, 2022 WL 2073088 (9th Cir. Mar. 14, 2022); *Aspic Eng'g & Constr.

Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162, 1166 (9th Cir. 2019) ("Neither

erroneous legal conclusions nor unsubstantiated factual findings justify federal court review' of

an arbitral award under the FAA.").  The Take 5 Parties rely solely on the Federal Rules of

Evidence in making this argument, and the very authority on which they rely states that "it is

clear that 'in making evidentiary determinations, an arbitrator need not follow all the niceties

observed by the federal courts.'"  *Century Indem.*, 584 F.3d at 557.  The Take 5 Parties'

argument therefore is not supported by the law.

Moreover, Judge Eyler refused to award the Advantage Parties damages if he found that

there was insufficient evidence to support the damages.  *See* Ex. 1, IA at 42–43 (refusing to

---

[233] *See* Am. Opp., Ex. 63 (post-hearing closing arguments) at 3998:9–24, 4087:2–4088:6;
Ex. 1, IA at 3–4.

award damages to compensate the Advantage Parties for associate time who were involved with Take 5 "[d]ue to lack of supporting detail").  Judge Eyler also refused to award the Advantage Parties the full amount of the damages that they requested.  For example, he did not award the Advantage Parties the amount of $23,897,890 that they had requested for refunds paid to clients who received e-mail services from Take 5 after the acquisition.  *Id.* at 43.

Most of the damages that Judge Eyler did award were for recovery of the purchase price, but even here, Judge Eyler did not award the full amount of the purchase price that the Advantage Parties requested.  The total consideration that was to be paid to Mr. Radetich and Mr. Gluck was $76,343,200.[234]  Judge Eyler, however, concluded that Advantage also acquired the assets of Take 5's data licensing business, which he deducted from the damage award, so the total damages he awarded was $43,633,333.34.  Ex. 1, IA at 42.  Most of the remaining damages that Judge Eyler awarded were consequential damages based on the investigation that FTI and Latham & Watkins performed in June and July 2019,[235] for which Advantage paid $3,246,203.95.[236]  Ex. 1, IA at 43.  For each of the damage amounts he did award, there was substantial evidence in the record to support that finding.[237]

---

[234] *Id.* at 2654:8–15 & Ex. 118, (Trial Ex. A-431A) at Schedule 3.

[235] Am. Opp., Ex. 57 (Kaye Trial testimony) at 2662:15–2663:2 & Ex. 118, (Trial Ex. A-431A) at Schedule 6.

[236] Am. Opp., Ex. 57 (Kaye Trial testimony) at 2663:3–17.

[237] *See, e.g.*, Am. Opp., Ex. 57 (Kaye Trial Testimony) at 2658:25–2659:23, 2660:14–2661:8 & Ex. A-431A Schedule 1 (Ex. 118) (amounts incurred in connection with due diligence); *id.* at 2662:15–2663:17 & Ex. 118, (Trial Ex. A-431A) at Schedule 6 (amounts incurred in connection with audit of Take 5 by FTI and Latham & Watkins); *id.* at 2668:16–2673:17 & Ex. 118, (Trial Ex. A-431A) at Schedule 8 (amounts incurred in connection with restatement of financials).  Exhibit A-431A will be provided in native format upon the Court's request.

74

The damages that Judge Eyler were recoverable as a remedy under each of the causes of action on which Judge Eyler found the Take 5 Parties were liable. *See* Ex. 13, (Trial Ex. A-230) [APA] at 58–59 (Section 8.2 provides that the Take 5 Parties are required to indemnify the Advantage Parties for any "Damages"); § 22.24, Del. P.J.I. Civ. § 22.24 (2000) ("A party that is harmed by a breach of contract is entitled to damages in an amount calculated to compensate [him/her/it] for the harm caused by the breach); *LCT Cap., LLC v. NGL Energy Partners LP*, 249 A.3d 77, 94 (Del. 2021), corrected (Mar. 4, 2021) ("the default remedy for fraud is out-of-pocket damages," but the plaintiff is entitled to greater damages if the defendant's fraud induced the plaintiff to form a contract); *Paron Cap. Mgmt., LLC v. Crombie*, C.A. No. 6380-VCP, 2012 WL 2045857, at *8 (Del. Ch. May 22, 2012) (awarding defrauded investor costs related to the formation and operation of company, expenses for due diligence investigation, legal expenses, travel expenses, rent payments, and legal and accounting fees), *aff'd*, 62 A.3d 1223 (Del. 2013).

G. **Judge Eyler did not err in awarding the Advantage Parties prejudgment interest**

The Take 5 Parties argue that Judge Eyler should not have awarded the Advantage Parties prejudgment interest because they did not request it. This is wrong for many reasons.

First, the Advantage Parties did request prejudgment interest. In September 2019, the Take 5 Parties filed a demand for arbitration, and the Advantage Parties filed an answer and counterclaim for breach of the APA and fraud. *Id.* The answer and counterclaim were attached to the AAA Arbitration Answering Statement and Counterclaim Or Joinder/Consolidation Request, in which they stated that the relief sought included interest.



Ex. 58.  This was the only relief request that the AAA required.  The AAA did not require the

Advantage Parties to file a new answering statement when they amended their answer and

counterclaim.

Second, the Take 5 Parties challenged the award of prejudgment interest in the arbitration

and argued that the Advantage Parties should not be awarded prejudgment interest for the same

reasons that they challenge the award of prejudgment interest here.[238]  Judge Eyler rejected that

argument and, for the reasons set forth above, the Take 5 Parties are not permitted to relitigate

this issue.  *See Am. Life Ins. Co. v. Parra*, 269 F. Supp. 2d 519, 526 (D. Del. 2003) (failure to

include prejudgment interest not grounds for vacating an arbitration award), order clarified, No.

CIV.A. 98-401 (KAJ), 2003 WL 22999543 (D. Del. Dec. 22, 2003).

---

[238] Ex. 119, Claimant's, Counter-Respondent's and Cross-Respondents' Reply
Submission on Costs and Interest September 16, 2022 ¶¶ 139–147.

**H.    The Court cannot vacate the Award based on "manifest disregard of the law" and, in any event, Judge Eyler did not disregard the law in making the Award**

As discussed on pages 54–55 n. 206, *supra*, "manifest disregard of the law" not a valid

basis for vacating an arbitration award.  Even if it were, the Take 5 Parties have not pointed to

anything that Judge Eyler did that would justify vacating the award on this basis.[239]

"To succeed in challenging an award under the manifest disregard standard, a party must

make 'a showing that the arbitrators knew of the relevant legal principle, appreciated that this

principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the

governing law by refusing to apply it.'  In addition to this 'subjective component,' a finding of

manifest disregard requires an objective determination that the disregarded legal principle was

'well defined, explicit, and clearly applicable.'"  *Seneca Nation of Indians v. New York*, 988 F.3d

618, 626 (2d Cir. 2021).

The Take 5 Parties argue that Judge Eyler manifestly disregarded the law by failing to

sanction the Advantage Parties for alleged discovery abuses.  "The Court will rarely, if ever,

question the arbitrator's discovery determinations."  *NRI Acad. of Scis. v. Mukkamala*, No. 12-

CV-15333, 2017 WL 5749673, at *6 (E.D. Mich. Jan. 9, 2017); *see also Gilmer v.

Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991) (arbitrator need not follow Federal Rules

---

[239] Each of the cases on which the Take 5 Parties rely, Opp. 69–70, rejected the argument that the arbitrators manifestly disregarded the law.  *See Paul Green Sch. Of Rock Music Franchising, LLC. v. Smith*, 389 F. App'x 172, 178 (3d Cir. 2010) (rejecting contention that arbitrator ignored defendant's counterclaims); *Millennium Validation Servs., Inc. v. Thompson*, No. CIV.A. 02-1430 (GMS), 2006 WL 3159821, at *9 (D. Del. Nov. 3, 2006) (denying motion to vacate or modify arbitration award), aff'd, 316 F. App'x 124 (3d Cir. 2008); *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 747 (Del. 2014) (reversing decision by lower court to vacate an arbitration award based on "manifest disregard of the law"); *Agspring, LLC v. NGP X US Holdings, L.P.*, No. CV 2019-1021-JRS, 2022 WL 170068, at *4 (Del. Ch. Jan. 19, 2022) ("the arbitration panel did not show manifest disregard for the law or act outside of its jurisdiction when it determined that the advancement claim was arbitrable").

of Civil Procedure in connection with discovery); *Matter of Arb. Between Int'l Surplus Lines Ins. Co. & People's Ins. Co. of China*, No. 94 C 2838, 1994 WL 502015, at *4 (N.D. Ill. Sept. 12, 1994) ("arbitrators have the authority to decide discovery issues"). This is consistent with the AAA Commercial Rules, which provide that the arbitrator "shall manage any necessary exchange of information among the parties." R-23(a), available at adr.org/rules. The Take 5 Parties do not cite a single case to support their argument that the Court can vacate the award based on their allegation that Judge Eyler should have issued evidentiary sanctions.

Moreover, their allegations are completely baseless. For example, the Take 5 Parties make much of the parties' dispute over the production of notes of witness interviews in June and July 2019 by FTI and Latham & Watkins in connection with their audit of Take 5. Judge Eyler, however, consistently ruled in the Take 5 Parties' favor on this issue, holding the Advantage Parties were required to produce them.[240] None of the statements by any of the witnesses reflected by these notes benefitted the Take 5 Parties, nor do they contend otherwise. Ultimately, he ruled that none of the notes were admissible as evidence and that, in any event, they would carry very little weight with him:

> So I am going to rule out those notes relating to Mr. Radetich, all of them.
>
> I will also tell you, and I think I made this – tried to make this clear many times during the course of this proceeding, there's evidence that is admissible, there's evidence that is inadmissible, and then there's weight. And evidence carries different amounts of weight.
>
> And I've commented on the fact that many of the expert witnesses who have testified have testified, in my opinion, to admissible items, such as things that are based on a person's knowledge, things that are based on that witness' expertise and knowledge in a particular field in terms of how a certain process may work, but when it comes to the underlying facts of this case in terms of what Take 5 did,

---

[240] *See* Ex. 120, 2/21/22 Order Relating to Notes of Interviews by FTI and Latham & Watkins.

how it did it, I am most impressed with the people who have personal knowledge of the facts.  And that included a lot of employees who testified.

And with respect to – with respect to these interview notes, these notes occurred, and I'm not talking now in a discovery sense, I'm just talking about in an evidentiary sense, these notes did not occur as part of the normal operation of Take 5's business like so many documents that have come into evidence in this case.  This is true for so many of those documents.

They did not occur in that situation and they lack – in addition to that, they lack quite a bit of specificity in terms of what was done, what wasn't done and what Mr. Radetich, for example, had knowledge of.

So even if those notes were in evidence, honestly, they would carry very little weight with me.[241]

The Take 5 Parties do not argue, nor can they, that they were prejudiced in any way by Judge Eyler's ruling.

The Take 5 Parties also argue that Judge Eyler disregarded the law in finding that RJV was liable for the damage award, Am. Opp. at 70; in finding the testimony of Mr. Boy, Ms. Hodgens, and Mr. Ward to be credible, Am. Opp. at 63; and by awarding the Advantage Parties damages, including prejudgment interest,  Am. Opp. at 73–75.  The Advantage Parties addressed these arguments in Parts V.D, V.E, and V.F of this response, *supra*.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, the Advantage Parties respectfully ask that the Court confirm the Award and deny the Take 5 Parties' petition to vacate it.

---

[241] *See* Am. Opp., Ex. 57 at 2596:3–2597:25.

Dated:  Miami, Florida
        December 5, 2022

                                 BERGER SINGERMAN LLP

                                 */s/ Justin B. Elegant*
                                 Paul Steven Singerman (Bar No. 378860)
                                 Justin B. Elegant (Bar No. 134597)
                                 1450 Brickell Avenue, Suite 1900
                                 Miami, FL 33131
                                 Telephone: (305) 755-9500
                                 Facsimile: (305) 714-4340
                                 singerman@bergersingerman.com
                                 jelegant@bergersingerman.com

                                 Michael H. Strub, Jr. (admitted *pro hac vice*)
                                 Florida PHV No. 1040785
                                 GREENBERG GROSS LLP
                                 650 Town Center Drive, Suite 1700
                                 Costa Mesa, CA 92626
                                 Telephone:  (949) 383-2800
                                 Facsimile:  (949) 383-2801
                                 mstrub@ggtriallaw.com

                                 Attorneys for Petitioners *Advantage Sales &*
                                 *Marketing LLC, Advantage Sales & Marketing*
                                 *Inc., Karman Intermediate Corp., Advantage*
                                 *Solutions Inc., and Karman Topco L.P.*

<u>**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**</u>

       I HEREBY CERTIFY that a true and correct copy of the foregoing was filed and served electronically upon all counsel of record through the Florida Court's E-Filing Portal on this 5th day of December, 2022.

                                 */s/ Justin B. Elegant*
                                 Justin B. Elegant