Case No. 1:22-cv-3278

EXHIBIT J

Page 1

1           AMERICAN ARBITRATION ASSOCIATION
2

    PETRUSS MEDIA GROUP, LLC, f/k/a Take
3   5 Media Group, LLC, et al.,
4        Claimants,
5   vs.
6   ADVANTAGE SALES & MARKETING, LLC, et al.,
7        Respondents.
    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/
8

    ADVANTAGE SALES & MARKETING, LLC, et al.,
9

         Counter-Claimants and Cross-Claimants,
10  vs.
11  PETRUSS MEDIA GROUP, LLC, f/k/a Take
    5 Media Group, LLC, et al.,
12

         Counter-Respondents and Cross-Respondents.
13  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ /
14
15                      Via Zoom
                        Monday, December 20, 2021
16                      3:13 a.m. - 6:19 p.m.
17
18
19
20
21
22
23       This cause came on for hearing before the
24  Honorable James Eyler, Circuit Court Judge, pursuant to
25  notice.

Page 2

1  APPEARANCES:
2  On behalf of Petruss Media Group, LLC, f/k/a
   Take 5 Media Group, LLC, Richard Gluck, and RJV
3  Marketing Group:
   MELISSA L. MACKIEWICZ, ESQ.
4  DENNIS RICHARD, ESQ.
   Richard and Richard, P.A.
5  825 Brickell Bay Drive
   Tower III, Suite 1748
6  Miami, Florida  33131
   melissa@richardandrichard.com
7  dennis@richardandrichard.com
8  On behalf of Alexander Radetich:
   RICHARD A. ROTH, ESQ.
9  The Roth Law Firm, PLLC
   295 Madison Avenue, 23rd Floor
10 New York, New York  10017
   rich@rrothlaw.com
11
   On behalf of Advantage Sales & Marketing LLC, Advantage
12 Sales & Marketing Inc., Karman Intermediate Corp.,
   Advantage Solutions Inc., and Karman Topco LP:
13 MICHAEL STRUB, ESQ.
   Greenberg Gross LLP, Suite 1700
14 650 Town Center Dive
   Costa Mesa, CA  92626
15 mstrub@ggtriallaw.com
16 Also present:  Bryce Robinson, Esq.
        General Counsel and Secretary of
17      Advantage Solutions
18
19
20
21
22
23
24
25

Page 3

1    THE COURT:  So I don't know I have
2  cross motions.  I don't know if you
3  discussed the order in which you want to
4  proceed, and it doesn't make any difference
5  to me either way.  But is there any
6  agreement on that?
7    MR. ROTH:  We hadn't discussed it.  It
8  doesn't matter to me.  Michael, do you want
9  to go first?
10   MR. STRUB:  I'm happy to go first.
11   MR. ROTH:  Go ahead.
12   MR. RICHARD:  Judge Eyler, are you
13 intentionally not on video?
14   THE COURT:  I'm used to, when I do it,
15 I have it automatically on.  I didn't even
16 look for myself.  Okay.
17   Mr. Strub?
18   MR. STRUB:  Good morning, Your Honor.
19 Michael Strub on behalf of the Advantage
20 parties and with me is legal counsel for
21 Advantage, Bryce Robinson.
22   We have, as Your Honor knows, provided
23 substantial amount of briefing, substantial
24 amount of evidence.  There isn't sufficient
25 amount of time to go through all of it.

Page 4

1    What I did want to do, I put together
2  a PowerPoint presentation I would like to
3  share with you and use that to kind of walk
4  through the evidence and from our
5  perspective show where we think that this
6  case is right now.
7    THE COURT:  I probably should have
8  said before you started, forgive me for
9  interrupting, but just to let you know, I
10 have read all of the memoranda and I have
11 looked at a significant portion of the
12 backup information, which as you know is
13 quite extensive.
14   I have more work to do.  But just to
15 let you know, I'm familiar with all of the
16 arguments, not necessarily the detail of
17 some of the backup information.  But I'm
18 certainly familiar with the argument.
19   MR. STRUB:  Thank you, Your Honor.
20 And please, if there is any questions that
21 come along that you have, please don't
22 hesitate to interrupt me and ask them
23 because the only purpose of this
24 presentation is to answer any questions you
25 may still have.

Page 5

1    Can everyone see the PowerPoint
2  presentation?  Is that a yes?  Okay.
3    So I want to begin by explaining this.
4  As I said earlier, there is so much
5  evidence.  We haven't tried to mass it all.
6  What I tried to do was narrow what I think
7  the disputes are and what the differences
8  are between the parties.
9    This is what I want to cover, the
10 order in which I'm going to cover it:  The
11 legal standard; evidence; the arguments
12 Take 5 has made; and then walk through the
13 claims that each party has asserted in their
14 demand.
15   Let's start with the legal standard.
16 And most summary judgment arguments that I
17 have had, this isn't really something that
18 is in dispute because it's pretty well
19 established by three United States Supreme
20 Court cases:  Mitsubishi, Celotex and sell
21 Texas and Anderson that may be in dispute
22 here.
23   To summarize, the moving party has the
24 initial burden of proving that there is no
25 factual dispute.  That's our burden.  We

Page 6

1  will put up the facts to show there is no
2  dispute.
3      However, in opposing that motion for
4  summary judgment, the opposing party must
5  come forward with competent evidence to show
6  that there is a genuine issue of material
7  fact for trial.
8      Courts have held that things that are
9  not evidence will not defeat summary
10  judgment: Factually unsupported claims,
11  metaphysical doubt as to the material facts,
12  conjecture, allegations, conclusory
13  statements, argument, speculation, rhetoric.
14      None of this will defeat summary
15  judgment. It has to be evidence. And the
16  evidence has to be that the factual dispute
17  must change the outcome of the case if it's
18  resolved one way or the other.
19      Now, one thing I want to emphasize,
20  Your Honor, is that Advantage has had
21  significant barriers to accumulating the
22  evidence to prove its claim. It has not
23  been an easy job for us.
24      MR. RICHARD: I have an objection
25  here. The Fifth Amendment privilege cannot

Page 7

1  be used against parties. And that
2  screenshot making it look like it's a post
3  office shot is inappropriate. And I would
4  request that it be taken down.
5      MR. STRUB: Your Honor, I'm just going
6  through this really quickly, just pointing
7  out the witnesses have this discussed it.
8      MR. RICHARD: I would like a ruling on
9  this. This is pointing a lot more than that
10  and this is inappropriate.
11      MR. STRUB: I will move on. In
12  addition to the fact that we haven't had the
13  testimony of the founders, we also ran into
14  a relatively recent case from the 11th
15  Circuit, Managed Care Advisory Group, in
16  which the 11th Circuit held that the Federal
17  Arbitration Act does not permit prehearing
18  depositions and discovery from nonparties.
19      The witnesses in our case are from
20  Take 5, most of them live in Florida. And
21  so as a consequence, they are in 11th
22  circuit and many of them simply refused to
23  testify.
24      We tried to get depositions from all
25  of these people, and they all refused, chief

Page 8

1  among them, Beth Jenkins, the chief
2  financial officer.
3      We will hear a little bit of
4  Ms. Jenkins later on, but she was part of
5  the core group while Mr. Radetich and
6  Mr. Gluck who ran the Take 5 compilation and
7  we were not able to get her testimony.
8      Finally, this came up at the end of
9  the briefing, Cherry Bekaert. Cherry
10  Bekaert was the auditing firm that concluded
11  that the 2017 financial statements for
12  Take 5 were prepared according to GAAP.
13      And Take 5's opposition, hey, you
14  didn't even try to get Cherry Bekaert.
15      On the contrary, we tried really,
16  really hard to get Cherry Bekaert. And as
17  the evidence we put in our reply brief
18  showed, I had numerous telephone calls with
19  Mr. Bosher, Cherry Bekaert's attorney,
20  begging him, please, produce a witness,
21  please, produce documents.
22      On the witness, Cherry Bekaert
23  ultimately refused, citing the 11th Circuit
24  case we just so talked about. And for
25  documents, I was told because Petruss Media

Page 9

1  Group was the client, I can't produce
2  documents to you voluntarily without their
3  acquiescence.
4      And he told me he had spoken with
5  Mr. Roth. And as a consequence of those
6  conversations, there was one document that
7  was produced to us, which was this
8  walk-through document that the Take 5
9  parties produced.
10      But the absence of evidence concerning
11  Cherry Bekaert isn't Advantage party's
12  fault. We tried really hard to get that.
13      Nevertheless, despite those obstacles,
14  those barriers, we were able to pull
15  together substantial, overwhelming evidence
16  to support our claims for breach of contract
17  and our claims for fraud in violation of the
18  legal act.
19      Before I walk you through that
20  evidence, I want to remind Your Honor the
21  timeline of events. This all happened very
22  quickly.
23      The asset purchase agreement was
24  entered into March 15, 2018. Latham &
25  Watkins was retained June 27, 2019.

3 (Pages 6 - 9)

Page 10

1    And Advantage made the decision -- the
2  difficult decision to shut Take 5 down three
3  weeks later.
4    That's attributed to Advantage because
5  they knew there was going to be millions of
6  dollars lost as a consequence of this
7  decision, but they were not willing to
8  continue to operate a company that engaged
9  in the type of business that Latham &
10  Watkins and FTI were reporting Take 5
11  engaged in.
12    So for now turning to the evidence.
13  Take 5 had four internal e-mail delivery
14  systems: SendGrid, Volo, MailWizz and
15  Digital Media Solutions, which is sometimes
16  referred to as DMS. There is no dispute
17  about that.
18    These were the internal e-mail systems
19  that Take 5 was supposed to be using to send
20  e-mail.
21    There is also no dispute that one can
22  look at those systems and, as
23  Ms. Stricchiola, who is Take 5's expert,
24  said, you can actually look at that server
25  and the application will also track what

Page 11

1  e-mails were sent, what e-mails bounced and
2  things like that. She is talking about
3  Volo, which is one of these servers.
4    And Mike Wei, who was FTI's expert --
5  was from FTI Advantage's expert, did exactly
6  that. Using the job ID, he went through all
7  four of those delivery systems and did
8  forensic analysis as to what those e-mail
9  delivery systems showed that Take 5 was
10  sending.
11    And this was the conclusion, the
12  forensic conclusion: Was a period from
13  October 1, 2017, through June 30, 2019,
14  Take 5 reported over 43 million e-mails
15  deployed. Internal systems records showed
16  494,000 were deployed. Take 5 reported 37.4
17  million e-mails delivered. The internal
18  systems showed that only about 72,000 were
19  delivered. And there is a similar
20  discrepancy for e-mails opened.
21    Again, this is not in dispute because
22  Take 5 parties didn't examine this data.
23  None of these forensic conclusions are
24  challenged here.
25    And Dr. Lassiter did a statistical

Page 12

1  analysis based on what Mr. Wei did. And you
2  can see from his report, he determined that
3  roughly 2 percent statistically, roughly
4  2 percent of the e-mails that were invoiced
5  were actually deployed.
6    Now, what we have gone through right
7  is the forensic investigation of the
8  internal system.
9    Let's talk about what the witnesses
10  said. Mark Adams was Take 5's witness.
11  He's in sales. He actually gave a very
12  interesting analogy in his declaration.
13    And he was explaining that sales folks
14  never spoke with the other folks and he
15  compared it to a restaurant. He said
16  fulfillment was analogous to the chef who
17  prepared the food.
18    So Take 5 had two chefs who prepared
19  the food from April 2016 until the company
20  closed: Eva Hodgens and Michael Boy. They
21  were the ones who actually viewed Mr. Adams'
22  analogy that prepared the food that was
23  served to the client.
24    What did the chef say about the food?
25  Well, Ms. Hodgens:

Page 13

1    What percentage of that deployment
2  file would you say was deliverable?
3    It really depended, but it was
4  minimal. At best maybe most campaigns, at
5  best, maybe 5, 10 percent. It wasn't -- it
6  wasn't good at all.
7    So, are you concluding that nobody
8  opted in because Take 5 did not have a
9  mechanism to link them to; is that what
10  you're saying?
11    Correct, correct. They never provided
12  it. The data was purchased. So, even if
13  someone opted in to vendor X, Y, Z who says,
14  I have the data you can buy, they never
15  opted in to us. So, that's still not a
16  credible e-mail or a deliverable e-mail.
17    She goes on to say: We, Take 5,
18  didn't have any systems to collect and
19  aggregate data. There was no infrastructure
20  in place.
21    She was asked: Did you ever express
22  concerns about that to anyone?
23    She answered: Yes.
24    To whom?
25    Beth Jenkins and Alex Radetich.

4 (Pages 10 - 13)

1       Finally, Ms. Hodgens was asked about
2   fraud.  Again, she's the one working
3   fulfillment.  She is the one carrying out
4   the client's orders.  She is the chef.  What
5   does she say?
6       The fraud was the reports.  And the
7   fraud was the viability of the data.  And
8   the fraud was what was sold to the clients.
9       So, there were many salespeople who
10  kept selling e-mail campaigns.  I would do a
11  digital campaign.  Client would complain.
12  And then I'd have to address it and say, why
13  is your sales team selling e-mail campaigns
14  when that's not what we're providing?
15      Okay.  Now, let's talk to the other
16  chef and see what he has to say, Mr. Boy.
17      So is that about, less than
18  20 percent, your testimony is, of the
19  e-mails were actually cleaned or
20  deliverable?
21      Answer:  From the campaigns that we
22  had run throughout the years, that would be
23  the estimate.
24      He was asked about what his
25  frustration was, what his displeasure was in

1   working at Take 5.
2       He said:  They are selling e-mail
3   marketing campaigns and passing them off as
4   PPC and calling it supplementation for the
5   e-mail marketing campaigns, whereas not only
6   do we not have the infrastructure to deliver
7   the said e-mails that have been sold over
8   the year, we didn't have the data to fulfill
9   that.
10      So the displeasure -- the displeasure
11  comes in, hey, what are we doing?  Why are
12  we doing it?
13      And the answer from Richard is:
14  Everyone in the industry is doing it,
15  Michael.
16      Again, the majority of the clients
17  that came through the door were sold e-mail
18  marketing campaigns based on first-party
19  data that was never acquired by Take 5,
20  e-mail marketing campaigns, one to their
21  clients on the basis they are getting e-mail
22  and getting PPC traffic.
23      THE COURT:  Mr. Strub, let me ask you:
24  The fulfillment folks, like Ms. Hodgens and
25  Mr. Boy, what kind of contacts did they have

1   with customers?
2       MR. STRUB:  They did not have
3   substantial contacts with customers, Your
4   Honor.  They would get --
5       THE COURT:  So this is kind of a
6   multistep question.  I guess my first
7   question is:  The customers, in fact,
8   understood what they were getting and were
9   not getting, would that still be fraudulent?
10      MR. STRUB:  If a customer
11  hypothetically had purchased or agreed to
12  get something other than e-mail, then there
13  wouldn't be fraud in the sense that the
14  customer was getting what they paid for.
15      THE COURT:  In this case I have very
16  little evidence from the customers.  Some of
17  what I have is inconsistent.  How do I
18  determine what customers generally thought
19  they were getting?
20      MR. STRUB:  So first of all, Your
21  Honor, there is an easy way to do that,
22  which is you look at the invoices.  The
23  invoices say that they are ordering e-mail.
24  And that's what the purpose of Mr. Wei is.
25      THE COURT:  I know you say that.

1   That's contested, the digital marketing
2   entry.  I know how you interpreted it.  But
3   the other side doesn't agree with that.
4       So I guess what I'm asking is:  If a
5   customer, generally speaking,
6   hypothetically, thought they before getting
7   some type of unchanneled marketing, not just
8   e-mails, that is arguably not fraudulent.
9       So I'm trying to figure out here what
10  I do when I have very little evidence of
11  what the customers thought they were
12  getting.
13      Do I just infer it from the documents;
14  is that what you're saying?
15      MR. STRUB:  No, Your Honor.  First of
16  all, at the end in June and July of 2019,
17  there were calls that were made to customers
18  by Chris Brown of FTI, Mr. Radetich,
19  Mr. Gluck and ultimately Gary Colen.
20  Mr. Brown prepared notes of those
21  conversations.  We refer to those notes in
22  our reply brief.
23      If you look at that document, you see
24  of the 10 customers who were contacted, only
25  two confirmed they were okay with getting

Page 18

1 supplemental at the end of the day.
2     There is a yellow box on the document.
3 I will get you the cite to it in just a
4 second. But there is a yellow box that says
5 "Waiting confirmation." That confirmation
6 never came.
7     So you have that evidence that of the
8 10 customers, at least the largest customers
9 who were contacted, only 20 percent
10 confirmed they were okay with what they were
11 getting.
12     These, by the way, were just -- so you
13 understand, most of Take 5's biggest
14 customers were themselves remarketers. They
15 weren't the direct clients.
16     So, for example, someone would come to
17 a group like Info Group, and Info Group
18 would do the marketing campaign.
19     But what Info Group was doing was
20 going to Take 5, and Take 5 was doing the
21 marketing campaign. Then Info Group was
22 saying it was doing it themselves, at least
23 that was the impression it was creating.
24     So these marketers are in a really
25 tough spot because they can't say to their

Page 19

1 own clients no e-mails are being sent.
2     Just going back to your first -- your
3 question, which is: How do you know? So
4 there is that evidence that 80 percent of
5 the largest clients, many of them
6 remarketers, didn't know.
7     In addition to that, why on earth
8 would they go through this huge charade that
9 we'll see in paper and see also of preparing
10 these tracking reports using algorithms,
11 reporting open rates and deployment rates?
12     Why did they talk about counts,
13 e-mails? Why they would go through all of
14 that trouble using a formula to create
15 e-mail accounts? Why would they falsify
16 reports? Why would they do any of that if,
17 in fact, customers knew and were okay with
18 getting supplemental traffic? There is no
19 good explanation for that.
20     And so, again, because of the
21 limitations that we have on the discovery,
22 it's been difficult to get the information
23 from customers. We managed to get
24 information from some of them that said they
25 were very unhappy.

Page 20

1     Take 5 has customers they say -- that
2 says they were happy, Mr. Winetraub.
3     So there may be some customers that
4 were happy. But that doesn't change the
5 fact that they had systems in place that
6 were designed to send e-mail.
7     Again, according to the invoices, the
8 e-mails were getting sent. And they had
9 this elaborate system set up to create these
10 tracking reports and these other reports.
11     So it just doesn't make sense.
12     Finally, if, in fact, customers were
13 happy, there would be substantial evidence
14 of that. There would be not just one or two
15 coming forward saying they are fine with it,
16 but there would be some documentation,
17 something from a customer saying, oh, yes,
18 you know, we know we're ordering e-mails,
19 but we're okay with supplementation. There
20 just isn't any of that.
21     By the way, Your Honor, the document
22 that I referred to, Mr. Brown's notes, his
23 reply is at Exhibit 261, which is a summary
24 of the calls to the clients.
25     Again, the document has a big yellow

Page 21

1 box on it that says "Waiting confirmation."
2 Those are the ones that never gave written
3 confirmation that they were okay with
4 supplemental services.
5     Does that answer your question, Your
6 Honor?
7     THE COURT: Well, it does. But I will
8 tell all of you, that one of the things I am
9 going to be struggling with is a lot of what
10 is being asserted by everybody requires the
11 drawing of inferences.
12     Once you talk about drawing of
13 inferences, you very often get into fact
14 questions because unless inferences are
15 required to be drawn as a matter of law,
16 that means they are permissible inferences,
17 not required inferences.
18     That seems to be the case here. As it
19 stands right now, the evidence is
20 substantial but not the universe. So I have
21 to figure out what to do about that in a
22 motion context.
23     MR. STRUB: Your Honor, one thing I
24 would say about that is, nothing is going to
25 change at a hearing. Right? You're not

6 (Pages 18 - 21)

Page 22

1  going to have a hearing where all of
2  Take 5's customers are going to testify
3  about what they wanted.
4      THE COURT:  I assumed that.  But what
5  will change is what I have the ability to
6  do.  I have much more ability to draw
7  inferences and make factual findings than I
8  do in a summary judgment type context.
9  That's the only point I'm making.
10     MR. STRUB:  Your Honor, understood.
11  Understood.  I guess my point was, you're
12  going to have a big struggle but the record
13  isn't really going to change.  There are no
14  witnesses are going to come forward who
15  weren't deposed.
16     It's not as if there is going to be
17  credibility issues because, as we will see
18  in a minute, the parties -- what the parties
19  dispute is exactly what the type of thing
20  you're talking about, which is, well, were
21  there some customers that were happy.
22     But what we just looked at is not in
23  dispute.  It's not in dispute they weren't
24  sending e-mails.  It's not in dispute what
25  their internal systems are reporting.

Page 23

1      It's not in dispute what the people
2  who were supposed to be sending e-mails said
3  on what was happening.  They have all been
4  deposed on these subjects.
5      So it's not as if there are going to
6  be witnesses where you can look at them and
7  say, okay, I find this one to be credible
8  and this one not.
9      Okay.  So anyway, finally, Your Honor,
10  again, this is Mr. Radetich's own admission
11  in July of 2019.  He admitted to the false
12  reporting.  He said this to Mr. Gluck.
13     Then Mr. Radetich stated what
14  Mr. Gluck responded, that Take 5 did not
15  report numbers in line with what Take 5 had
16  told the client, that the client would not
17  be happy, and Mr. Gluck wanted to keep
18  clients happy at all costs.
19     Mr. Abascal, who was the Latham &
20  Watkins' lawyer, asked:  So essentially did
21  you believe that you needed to lie to your
22  clients in order to keep your clients?
23     To which Mr. Radetich responded:  Yes.
24     Rarely in a case you have an admission
25  by the defendant that they lied and they

Page 24

1  knew they were lying.  We have that here.
2      So again, what we offered in evidence
3  is the testimony on fulfillment.
4      What Take 5 has offered is testimony
5  of sales of Mr. Adams himself who says he
6  doesn't know what is actually being
7  provided.
8      We saw Ms. Hodgens' testimony earlier.
9  And there is ample additional testimony in
10  the record on this.  Salespeople kept
11  selling e-mail.  And, yes, there was Omni
12  channel being provided, but it wasn't what
13  was being purchased.
14     Okay.  So this is what the evidence
15  shows.
16     Now I'm going to talk about Take 5's
17  arguments.
18     I don't know if Your Honor had an
19  opportunity to look at this Cobalt case.
20  But this is a fascinating case to me because
21  these facts are so similar to our facts.
22     The advertising agency for the radio
23  station was in Florida.  In this case what
24  happened was, the seller prior to the
25  acquisition was selling radio advertisement

Page 25

1  that wasn't actually being played on the
2  air.  It's doing this in order to boost its
3  revenue for purposes of getting the sales to
4  go through.
5      And just like Take 5 to sell, they had
6  a bunch of big national advertisers because
7  those are the ones that weren't paying
8  attention.
9      And in that case, the Scott's system
10  was a digital log that the radio system had
11  that kept a digital recording of everything
12  that was actually played on the air.
13     The plaintiff looked at that digital
14  recording and the records showed that there
15  were 16,000 prerecorded commercials over 18
16  months that were not played.
17     And that's exactly what happened here.
18  We have an internal recordkeeping system,
19  and it shows that there was substantial
20  numbers of e-mails that were not getting
21  played.
22     And remember what Judge Stein said.
23  He analogized all of these arguments to
24  Rosemary Woods who in the 1970s, in
25  Watergate, was President Nixon's secretary

7 (Pages 22 - 25)

Page 26

1    and offered an explanation as to why there
2    was 18 and a half minutes missing.
3         And she invited reporters into her
4    office and said, well, I was reaching for
5    the phone and I accidentally put my foot on
6    the wrong button and erased 18 and a half
7    minutes of tape.
8         And it became national news because
9    there is no way that she could have stayed
10   in that position 18 seconds, let alone 18
11   and a half minutes.
12        That's what we're seeing in this case.
13   We're not seeing a direct response to the
14   evidence. We're not seeing a forensic
15   analysis of the systems. What we're seeing
16   are excuses. The first one is
17   subcontractors sent e-mail.
18        Again, who would know what
19   subcontractors were doing?
20        By the way, Your Honor, this is at
21   odds with their position that clients were
22   happy with e-mail, with supplementation.
23        On one hand they say, clients knew
24   there was supplementation going on. On the
25   other hand, they say, oh, no, no, no,

Page 27

1    subcontractors were actually sending the
2    e-mails. And you can talk to the
3    subcontractors.
4         Remember, by the way, Your Honor, what
5    we're talking about are the substantial
6    number of e-mails that are reported being
7    deployed by Take 5, but the system shows
8    they are not being supplied. So we're not
9    talking about one or two. We're talking
10   about hundreds of millions of missing
11   e-mails.
12        Let's go back again to use Mr. Adams'
13   analogy: What did the chef say?
14        Well, what Eva Hodgens said is,
15   actually looking at these internal systems
16   was how she knew the e-mails weren't getting
17   sent because she said: If I was sending out
18   50,000 records, she knew according to the
19   internal system that only 5,000 records were
20   being deployed, not 50,000, not 48,000.
21        She also said she never required any
22   of the vendors to send e-mail.
23        And she said the only -- she said the
24   only e-mails that were sent by vendors were
25   test e-mails.

Page 28

1    So what would happen in the beginning
2    of the campaign was, Take 5 would send out
3    an e-mail to its own employees or to the
4    customer's employees, the client's
5    employees, to make sure that e-mail was good
6    and going through.
7         That's what vendors would say. They
8    wouldn't actually deploy the e-mail
9    campaign.
10        Now, let's see what Mr. Boy said.
11   Again, Mr. Boy flat out said, Take 5 was
12   misrepresenting what was being sold. This
13   isn't speculation. He is getting an order
14   for e-mail, and he knows the e-mails aren't
15   getting out.
16        When third-party vendors are sending
17   PPC traffic and not sending e-mail, and what
18   is being sold as e-mail, yes, I had a
19   problem with that.
20        So now we saw what Mr. Boy and
21   Ms. Hodgens said.
22        What did the subcontractors say? At
23   the end when Advantage was doing its
24   investigation of Take 5, Corey Weiner, who
25   was with an affiliated company, actually

Page 29

1    called some vendors as part of this
2    investigation. They said, we're not sending
3    e-mail.
4         Recently KAD, if you look at KAD, the
5    second largest vendor on this list, KAD said
6    it wasn't sending e-mail.
7         So there is just no evidence to
8    support this argument that vendors were
9    sending e-mails, subcontractors were sending
10   e-mail, and all of the direct evidence and
11   the circumstantial evidence aligns.
12        Let's look at the second argument.
13   This is what part of what Your Honor was
14   referring to before, that Take 5 was an Omni
15   channel company. That is their second
16   argument. We don't dispute that. We don't
17   dispute that Take 5 offered other services.
18        The Take 5 parties are constantly
19   referring to Advantage's argument as saying
20   Take 5 was only an e-mail marketer. That's
21   not true.
22        What we are saying though, is that
23   e-mail marketing was not being done. It was
24   being sold and not being done.
25        And the retargeting based on that

8 (Pages 26 - 29)

1    e-mail wasn't happening because you can't
2    retarget from an e-mail if no e-mails are
3    being sent.
4        That's all this case is about.  It's
5    not about any other form of marketing.
6    We're not alleging any breach of contract or
7    fraud for any form of marketing.
8        This is a new one that has just popped
9    up really in the summary judgment briefing.
10       So the assertion is, that, well,
11   Take 5 had a successful data license
12   business, and, therefore, from that you can
13   draw from that that Take 5 had good data.
14       The Advantage parties have never
15   asserted any claim based on the data
16   licensing business at all.  It doesn't show
17   up in any of our pleadings.
18       The Take 5 parties asserted no defense
19   on the Take 5 data licensing business.  It
20   doesn't show up in any of their pleadings,
21   other than except according to the
22   confidential information that they had that
23   business, but they never asserted that as a
24   defense.
25       There was no discovery concerning the

1    data licensing business.  No PMK concerning
2    the data licensing business.  There was no
3    investigation of the data licensing business
4    by anyone.
5        Only material facts relate to e-mail
6    business.  That's what is at issue here.  In
7    fact, the e-mails were being invoiced and
8    not being sent.
9        Google Analytics is another one that
10   popped up at the end of the discovery.
11       And before addressing the Take 5
12   parties' arguments about Google Analytics, I
13   want to explain what I think Your Honor
14   already understands from the papers, but
15   this is how Google Analytics is used.
16       Peter Ward was the chief technology
17   officer at 12 Skies.  His company was hired
18   in April of 2016 to take Take 5's desktop
19   applications and import them into the CMS
20   system, the campaign manager system.
21       The desktop, if you remember from our
22   opening brief, we had some screen shots of
23   Excel files that Ms. BenJoseph was working
24   on with Mr. Faroochi where they were using
25   formulas and Excel files to generate e-mail

1    accounts.
2        That was the system that Take 5 had in
3    place for a long time, these separate
4    desktop files.
5        Mr. Ward's job --
6        It's a web-based application so that
7    all of these would top on each other through
8    CMS.
9        So as he testified, he learned that
10   the information in Report Builder was
11   generated by an algorithm based on click
12   information from Google Analytics.  That's
13   how the information from Google Analytics
14   was being used.
15       Then his job was to take those
16   algorithms that Take 5 had in place and
17   build them into the CMS so that it would
18   communicate.
19       Rather than having somebody manually
20   input into Google Analytics, the desktop
21   application, would be able to draw directly
22   from Google Analytics.
23       And then he explains how the algorithm
24   works and provided a copy of the algorithm.
25       Now, Your Honor, I'm just going to

1    quickly walk through exactly how this worked
2    at CMS.  We had a video of how CMS operated,
3    Mr. Hochman.
4        We showed it to Mr. Hochman in his
5    deposition, and he confirmed this is an
6    accurate representation of how the CMS
7    Report Builder works.
8        So you log into the CMS system and
9    build the report.  And it would give you
10   options for the kind of report you want.  If
11   you click that button, it will give you the
12   report that we have shown Your Honor,
13   similar to many of the reports in this case
14   that have e-mail metrics on it.
15       This is what FTI -- this is what
16   perplexed FTI.  You see this tracking report
17   on the left.
18       Now we're going to generate one to
19   show you how this works.  These were all the
20   statistics being calculated by the
21   algorithm.
22       So you can see that this is the same
23   job but the numbers deployed are different.
24   The numbers opened are different.  And
25   whether it was desktop or mobile is

9 (Pages 30 - 33)

Page 34

1  different, but the number of clicks stays
2  the same, 1,298.
3       So again, going back to Your Honor's
4  question, if clients knew and understood
5  that any e-mails actually weren't being
6  sent, why go through this elaborate charade?
7  Why pay to have this built into your
8  campaign manager system?
9       There has been the assertion, well,
10  maybe the algorithms were empirical.  There
11  is no evidence of that at all.  No one has
12  testified to it.  There is no historical
13  data.
14       In fact, in June of 2019 with,
15  Mr. Radetich present, Take 5 employees
16  acknowledged that the only empirical methods
17  on the report are clicks.  There is nothing
18  about, well, yes, the algorithms are okay
19  because they are actual estimates.
20       So one thing now, as I said at the
21  beginning, we were going to hear from
22  Ms. Jenkins.  We're going to hear a brief
23  snippet of an audio reporting that was made
24  by Peter Ward.
25       This was in April of 2018 when

Page 35

1  Advantage was first being introduced to
2  Take 5.  A couple of people from Advantage
3  came down to see the CMS system, to see how
4  it could be integrated into Advantage's
5  accounting network.  And we saw tracking
6  reports being generated.
7       And they asked for an explanation
8  about what these statistics mean.  This is
9  what Ms. Jenkins said:
10       (Following is a transcription of audio
11  recording played.)
12       So what does this tell us?  When it
13  says delivery rate 99 percent, what does
14  this mean?
15       That's Advantage.
16       Okay.  So it means that we in-boxed
17  99.63 percent of the deployment, which is
18  petty good, which is amazing.
19       So what is that telling us?
20       Like what would bring that number
21  significantly down?
22       If it is -- if the -- if -- if a
23  client does not want us to touch their
24  creative or their ad and the ad contains a
25  lot of items that would make it considered

Page 36

1  spam, the in-box deliverability goes down.
2  So there are a lot of, a lot, a lot, a lot
3  of factors involved with in-box success.
4       And open performance, what does that
5  mean?
6       It means how many of the e-mails that
7  were deployed actually got opened.
8       (End of audio recording.)
9       So nowhere does Ms. Jenkins say, oh,
10  these are all being generated by an
11  algorithm.
12       So this is why Take 5 had to do it
13  this way because this is actually one of
14  Take 5's own arguments, customers were doing
15  their own tracking.  They were looking at
16  Google Analytics.  They knew how many clicks
17  there were.
18       And so the goal of the fulfillment,
19  Ms. Hodgens and Mr. Boy explained, was to
20  get clicks.  That was their job, get clicks.
21       Mr. Boy said:  The function of that
22  business was to ensure that clicks were met
23  at a certain percentage because the
24  reporting was built into software that only
25  registered the e-mail metrics once the

Page 37

1  clicks took place.
2       The clicking is the only thing that
3  actually mattered to Take 5 and how much did
4  they cost.
5       Again, he said that the clicks define
6  the metrics of the campaign.  That's the
7  basis for the information that is being
8  algorithmically generated.  No one disputes
9  that Googles Analytics was accurate.
10       In fact, the accuracy of the clicks,
11  because FTI scratched its head because they
12  saw the clicks were coming directly from
13  Google Analytics, something was generating
14  them.
15       But the company wasn't sending out any
16  e-mails, according to those four systems.
17  They wanted to know where the clicks are
18  coming from.
19       And in their reply brief, this is the
20  first time anyone said something about
21  Google Analytics may be having something to
22  do with e-mails, Ms. Stricchiola.
23       But she was asked that question in her
24  deposition and she said:  There is nothing
25  in the interface that is going to say this

10 (Pages 34 - 37)

1    was a fraudulent click to your e-mail.
2        Google systems are not -- they are not
3    applying their invalid traffic detection
4    applications to your e-mail traffic.
5        By the way, to get back to Your
6    Honor's question:  What is the big deal
7    about Google Analytics if, in fact, clients
8    knew they weren't getting e-mails?
9        Why is it all of a sudden, okay, well,
10    your own records, Take 5's own records don't
11    show e-mails being sent?  But only if we had
12    Google Analytics.
13        Again, as we said in our opposition
14    brief, Google Analytics was never raised
15    during discovery.
16        Like if you have an account with
17    Westlaw or Lexus, you log into it and you
18    can access it that way.  The credentials
19    expired.  We told Take 5 parties that in
20    September when they asked about it after
21    discovery closed.
22        To our knowledge, there was no effort
23    made to reinstate those credentials.  We
24    never heard about it again until it showed
25    up in the exfoliation motion.

1        I want to explain what -- to go back
2    to Mr. Wei's question:  Where were the
3    clicks coming from?  This is what was going
4    on.
5        So client would pay Take 5 for
6    e-mails.  The client would provide a URL,
7    which is the website address linked to
8    Take 5.
9        The URL would be put into an e-mail,
10    and Take 5 would work with the client on
11    that.
12        There was whole creative department.
13    We heard Ms. Jenkins say all the factors
14    that can cause e-mail to not be delivered or
15    opened.
16        And the creative department worked
17    with the client on that, the subject line.
18    Let's make sure the subject line is
19    something that a customer will be interested
20    in.  Let's make sure the content is
21    appealing.  Let's make sure the e-mail
22    doesn't contain words that could cause it to
23    be rejected by spam.
24        That would be approved.  And this is
25    what the client thought was happening, that

1    there would be a targeted e-mail audience.
2    But that isn't what happened.
3        The URL would go to PPC vendors that
4    would point it to other parts of social
5    media.
6        The final argument that we have seen
7    from Take 5 -- again, this just popped up
8    recently -- was something called return on
9    investment.
10        I'm not even sure where this is going.
11    It sounds like what they are saying, if
12    clients were getting the same return on
13    investment as they would with e-mail, then
14    it doesn't matter.
15        But this is something that was not
16    asserted in our pleadings.  Take 5 never
17    asserted this as a defense.  Again, there
18    was no discovery about this.  There were no
19    PMKs about this.
20        It would be impossible to go to tens
21    of thousands of clients and figure out what
22    the return on investment would be.  And
23    nobody tried to do that.  No third-party
24    discovery was served.
25        The only facts that are relevant to

1    this case are facts relating to the e-mail
2    business.
3        Finally, I want to walk through the
4    claims.  The first claim was for breach of
5    contract.  Those are the two elements:
6    Failure of performance and damages.
7        The first representation and warranty
8    that was breached was the representation of
9    warranty in section 2.5A that the financial
10    statements were in accordance with GAAP.
11        Take 5 parties don't dispute that GAAP
12    rule 206 does not permit you to recognize
13    revenue for deploying e-mail, unless e-mail
14    was deployed.  As we have already shown,
15    Take 5 did not deploy e-mails.
16        Section 2.5B, the accounts receivable,
17    there was a representation and warranty that
18    the accounts receivable are reflected on the
19    financial statements and arose from valid
20    sales actually made of services actually
21    made.  They weren't because Take 5 didn't
22    actually send e-mails.
23        The Take 5 parties also represented
24    that the company owned and possesses all the
25    intellectual property necessary for -- or

Page 42

1  used or held for use in the conduct of the
2  business.
3       So this was the intellectual property
4  that Take 5 claims to have had this massive
5  database it was able to segregate into
6  targeted audiences, all this data, all this
7  intellectual property that they said they
8  had.
9       And David Kalat testified that, first
10  of all, Take 5 was not capable of sending
11  these targeted e-mails to these audiences
12  that they said they sent.
13       That part of Mr. Kalat's testimony is
14  not refuted. No one said, oh, Take 5 could
15  have actually sent e-mails to these targeted
16  demographics.
17       In fact, as we pointed out in our
18  reply brief, in May of 2019 after Advantage
19  had begun its investigation, Ms. BenJoseph
20  had a text exchange with Mr. Radetich in
21  which he said: Why are you saying that we
22  can send out these e-mails to these targeted
23  groups of students?
24       She said: Because that's what we
25  always held ourselves out as doing.

Page 43

1       He said: I never said that we could
2  do that.
3       What did Ms. BenJoseph say? That
4  that's a lie. She was really upset by it,
5  that all of a sudden this was being turned
6  on her.
7       Mr. Kalat: Less than 1/3 of the
8  e-mail addresses are valid deliverable. And
9  they weren't opt-in e-mails because the
10  customers hadn't agreed to accept the
11  e-mails from Take 5 or any of the clients
12  who they were sending them to.
13       If you look at the statistics from the
14  e-mails, that's actual data from Hank Aaron
15  and Karim Abdul Jabar. That's actually from
16  some of the data.
17       What did Mr. Noderer do? Well, these
18  were all of the CFE files. Mr. Norderer
19  looked at one of them.
20       And in looking at that one, he only
21  looked at the ones that were to a recognized
22  e-mail vendor, such as Gmail. And then he
23  did an analysis using Kickbox, which is the
24  first time he had ever done it, as we
25  pointed out in our papers. All this work

Page 44

1  was done by Mr. Bennett who never testified
2  and never showed up.
3       Again, Mr. Norderer does not address
4  the first part of Mr. Kalat's testimony that
5  Take 5 is not capable of sending targeted
6  e-mails, which is exactly one of the
7  principle reasons they are in company.
8       So section 2.11 was a representation
9  that the company has been in compliance with
10  all applicable laws. We pointed out in our
11  brief these are the elements of mail and
12  wire fraud.
13       I talked about all of them except
14  intent. That is one of the things that now
15  Take 5 challenged in our last round of
16  briefing saying, there is no evidence that
17  Mr. Radetich and Mr. Gluck knew any of this
18  was going on. But it's simply not true.
19  There is substantial evidence of that.
20       Again, we looked at the support.
21  Mr. Radetich's admission he knew. The
22  statement from Ms. Benjoseph that they knew
23  that these formulas were being used.
24       That statement from Ms. Hodgens that
25  Mr. Radetich was very aware of the main

Page 45

1  channel for their campaign was PPC.
2       The statement by Mr. Boy that to his
3  knowledge, Mr. Gluck knew what was going on
4  and Mr. Radetich knew as well.
5       And the statement in the e-mail from
6  Mr. Radetich: If we returned money to
7  everyone who said that the list did not work
8  and they spent money on direct mail or
9  whatever, we would be out of business
10  tomorrow. That's circumstantial evidence of
11  knowledge, and there is a ton of it.
12       We can't go through all of it, but we
13  listed a significant portion or a
14  significant number of documents written by
15  Mr. Radetich and Mr. Gluck providing
16  circumstantial evidence of their knowledge.
17       Finally, they founded and ran the
18  business. So we cited the Classicstar Mare
19  Lease case in which the principals of the
20  business engaged in fraud even said, hey, we
21  had no idea what was going on. And the
22  court said that's thoroughly implausible.
23       They founded the business. They ran
24  it. And if they didn't have actual
25  knowledge, they were reckless, which is

Page 46

1    sufficient to establish fraudulent intent.
2        We have identified our damages.  The
3    damages aren't in dispute except for some
4    portion.
5        THE COURT:  Let me do a real quick
6    second before we get away from -- actually,
7    we haven't gotten into it, but on the
8    contract count.
9        This brings in a couple of questions
10   that are really an interpretation to see if
11   there is an issue here on the contract
12   counts.
13       As I read article 2, and you talked
14   about 2.5, the financial statement and other
15   aspects of accounts receivable, et cetera,
16   but as I read it, those reps in warranties
17   are made by Take 5 Media Group, LLC only.
18       Article 3 has the rep in warranties by
19   the beneficial owners, but they are not in
20   article 2.
21       So this leads me to two questions:
22   One is, I'm assuming from what I have seen,
23   that your position on behalf of Advantage is
24   that section 8.2, which is the
25   indemnification section, is not limited to

Page 47

1    claims by a third-party, but actually a
2    first-party indemnification claim.  I'm
3    raising it to see if there is a dispute
4    about that.
5        The other question I have is:  There
6    is actually quite a few things in here that
7    are made about Take 5 in the absence of
8    fraud, is there is a dispute about section
9    8.3 that seems to put pretty significant
10   limits on the liability in the absence of
11   fraud.
12       To put it another way:  Is your
13   contract claim for damages as you were
14   asking for them really depending on proving
15   fraud as opposed to breach of contract only?
16       MR. STRUB:  So, Your Honor, the answer
17   is that we don't think we can --
18       The fraud is interrelated to it.  Yes,
19   we understand that there are limitations on
20   the damages, that if there is no showing of
21   fraud that there are some limitations on
22   that.  We do understand that.  We're not
23   disputing that.
24       What we are saying, by the way, that
25   the provision in section 8 are -- the

Page 48

1    provisions in section 8 do run through the
2    contract and exclude any limitation on reps
3    and warranties to the extend they are
4    fraudulent.
5        In other words, this is Delaware law
6    too.  We cited the case authority that --
7        THE COURT:  One of the reasons I
8    raised the question to see if there is any
9    interpretation here, is because arguably,
10   this is what I raised, whether there was any
11   argument going to be made about it limits it
12   to third-party claims and not first-party
13   claims proving contract to parties because
14   the indemnification provision is actually
15   broader than the reps and warranties
16   provisions.
17       MR. STRUB:  We haven't seen that
18   argument yet.
19       THE COURT:  For example, as I said
20   before, the beneficial owners are not part
21   of the 2, but they are in article 3, but yet
22   when you get to indemnification, certainly
23   article 3 is in there as well as the
24   indemnification language.
25       No one has briefed this.  Maybe I'm

Page 49

1    seeing an issue where there is none.  But
2    I'm just trying to find out if there is one.
3        MR. STRUB:  If Your Honor has a
4    specific question that you would like a
5    briefing on, we can supply the briefing on
6    it.
7        THE COURT:  I don't think it's
8    necessary, at least not now.  If later I
9    feel like I need something, I will let you
10   know.
11       MR. STRUB:  Again, it's hard for me to
12   separate out the fraud claim from breach of
13   contract claim in this kind of a case
14   because this is not -- this isn't a
15   situation, for example, they were supposed
16   to supply 200 widgets and they supplied 100
17   widgets.
18       The core of our claim is that business
19   was represented to be one way and was
20   another.
21       So, for example, looking at the
22   section 2.5A claim, which is that the
23   financial statements for 2015 were not
24   prepared according to GAAP.
25       The reason that they weren't prepared

Page 50

1  according to GAAP was because the services
2  for which they were billed were never
3  provided, which is inherently fraudulent.
4      The same thing with respect to the
5  representation as to the intellectual
6  property. So they claimed that Take 5 was
7  incapable of sending targeted e-mails to
8  targets demographics and they didn't do it.
9      THE COURT: Did I understand, I
10  actually understood before now, that you are
11  primarily asserting fraud, and you are going
12  to rely on proving fraud? But at some point
13  I have to think of it conceptually because I
14  have to deal with the different causes of
15  action.
16      Theoretically, I could conclude there
17  was no fraud based on lack of knowledge or
18  perhaps some other ground but at the same
19  time, find a breach of contract. So I'm
20  just trying to think through how they can do
21  that conceptually thinking.
22      I understand your point, that the
23  contract issues basically go away because of
24  fraud.
25      MR. STRUB: Correct, Your Honor. I

Page 51

1  can see, by the way, if you were to conclude
2  there was a breach of the contract but there
3  was no fraud, yes, our damages would be
4  different.
5      It's a very complicated provision. I
6  literally spent a day trying to work through
7  it and I don't remember what the answer was.
8  But it's an extremely complicated clause.
9      If Your Honor were to reach that
10  conclusion, we would have to figure out how
11  that clause works.
12      So this is just from the Delaware jury
13  instructions and we have met our burden.
14      I'm not going to dwell on the fraud
15  claims because, as I said, we have walked
16  through most of these -- we walked through
17  all of these already.
18      The only point I want to make about
19  fraud is that, to be clear, fraud in the
20  inducement claim -- fraud in the inducement
21  claim is based on the representations that
22  were made in the confidential memorandum,
23  which, as we said, that they were -- because
24  they were fraudulent, they are carved out of
25  the exclusion of that provision but also on

Page 52

1  the representations and warranties in
2  section 2.
3      Because under Delaware case law those
4  then fell -- even though they are in a
5  contract for the fraud and inducement claim,
6  because if the courts say that the law
7  aborts fraud and if you're going to put it
8  in writing as a representation and warranty,
9  of course, it can be the basis for a fraud
10  claim.
11      So to get back to the question Your
12  Honor was asking before, there is overlap in
13  the fraud and the inducement claim and the
14  breach of contract claim under Delaware law.
15  You can state a cause of action of fraud in
16  the inducement based on those contractual
17  representations and warranties.
18      For the fraud claim, however, that's
19  different. Our fraud claim is based on what
20  happens after the acquisition.
21      So after the acquisition, Take 5
22  continued as it was operating before the
23  acquisition, and that caused a separate
24  category of damages.
25      We believe it's recoverable under all

Page 53

1  of our causes of action anyway, but the
2  amount of money that was refunded to
3  clients, that was money that was paid to
4  Advantage.
5      THE COURT: So let me -- I'm sorry for
6  interrupting.
7      MR. STRUB: Not at all.
8      THE COURT: And you maybe are going to
9  get to this later. This count, which I will
10  call the continuing fraud count and
11  particularly as it relates to the RICO
12  count, I'm not totally clear on because if
13  we keep referring to it as Take 5, and we
14  have been doing that for quite awhile
15  because it's worth doing well in terms of
16  using Take 5 as a shorthand and Advantage as
17  shorthand, but the truth of the matter, it's
18  not quite that simple and it's not a stock
19  transfer. It was an asset transfer.
20      So when it closed, Advantage owed the
21  Take 5's assets. So any continuing fraud
22  would have been by employees either direct
23  or indirect?
24      MR. STRUB: That's correct, Your
25  Honor.

14 (Pages 50 - 53)

Page 54

1    THE COURT:  So how does that --
2  explain to me how all that becomes satisfied
3  with the patterns and predicate, et cetera,
4  for RICO.  Maybe I'm jumping ahead and in
5  this case, I will just wait.
6    MR. STRUB:  So, Your Honor, the -- you
7  are absolutely right.  For the fraud claim,
8  we have been using the shorthand of Take 5.
9  It's actually the principals, the founders,
10  Mr. Radetich and Mr. Gluck, who are really
11  the parties of the fraud claim because they
12  are the ones who were causing all of it to
13  happen.
14    They are the ones who were -- because
15  of their own beneficial benefit, they not
16  only got $77 million in the sale, but to the
17  extent this fraud was moving forward
18  successfully, and the revenue of Take 5 was
19  increasing, they were the beneficiaries of
20  that.  So they are the targets of the fraud
21  claim.
22    In terms of the predicate acts for
23  RICO -- so they were -- again, whether they
24  were operating it as a standalone Petruss
25  Media Group a/k/a Take 5, which they were

Page 55

1  prior to March 15 of 2018, or whether they
2  were operating it as a Take 5 division of
3  Advantage, it's the same operation going on.
4  Nothing has changed.
5    They are engaging in this same process
6  of selling e-mails to clients and then not
7  providing e-mails, using low cost e-mail
8  traffic, sending them tracking reports
9  saying, oh, your e-mail campaign was
10  tremendously successful.
11    So that's the -- it's the same
12  operation.  It's the same predicate act.
13  The acquisition, as it relates to
14  Mr. Radetich and Mr. Gluck, because it was
15  an asset purchase agreement, the acquisition
16  doesn't change anything.
17    One of the cases, and we referred to
18  it earlier in this presentation, and we
19  referred to it in our reply brief, is the
20  Classicmare Lease Company case, which was a
21  RICO case, was decided on summary judgment,
22  and in that case what had happened was an
23  individual who had a tax writeoff program
24  leased a horse.
25    If you lease a horse, you get the

Page 56

1  benefits of farm deductions.  So his
2  investors would invest in horses and use the
3  depreciation to offset other gains.
4    Initially that was a legitimate
5  business.  But then they got together with
6  an oil and gas company and they started
7  leasing horses that never existed.
8    So investors thought they were getting
9  horses.  And not only were they -- sometimes
10  they weren't getting any horses at all.
11  Other times they were getting, instead of
12  getting thoroughbreds, they were getting
13  lower cost quarter horses.
14    The investor didn't know any of this,
15  and they poured millions of money into these
16  investors.
17    The IRS caught on and disallowed
18  hundreds of millions worth of investments.
19  And the investors sued the perpetrators of
20  this fraud for ICO.  The district court
21  decided on summary judgment and the 6th
22  Circuit affirmed and said, again, this was a
23  pattern and practice of defrauding people
24  and the investors knew about it.
25    I think that pretty much was on all

Page 57

1  fours with our case.  And the fact again --
2  the Classicmare case, the fact that they
3  subsequently went into this business with
4  the oil and gas company, it didn't change
5  anything.  It was the same pattern and
6  practice that was going on.
7    THE COURT:  So does your fraud claim
8  go to Radetich and Gluck only?
9    MR. STRUB:  Yes, Your Honor.  Petruss
10  Media Group is also a defendant on that
11  claim, but the principal targets of that
12  claim, if you will, are Mr. Radetich and
13  Mr. Gluck because they were the ones
14  involved in the business.  I haven't really
15  thought about --
16    THE COURT:  Well, Petruss Media Group
17  was inactive after the sale, was it not?
18    MR. STRUB:  I don't believe so.  I
19  believe they had other businesses, but I'm
20  not sure.
21    THE COURT:  Regardless, they weren't
22  engaged in this type of business, were they?
23    MR. STRUB:  I don't believe so.  I
24  don't believe Petruss Media Group was
25  involved.

15 (Pages 54 - 57)

Page 58

1    I think I was answering a technical
2    question. I believe they are identified as
3    defendants in the statement of claim. The
4    Petruss Media Group is identified in the
5    statement of claim.
6        However, for purposes, if Your Honor
7    is asking as a practical matter --
8        THE COURT: I'm asking, do you have
9    any evidence they committed fraud?
10       MR. STRUB: Not Petruss Media Group,
11   per se, without Mr. Radetich and Mr. Gluck.
12       THE COURT: In terms of your position
13   on applying and interpreting RICO, which I
14   always think is challenging under the best
15   of circumstances, is it your position that
16   if you had no fraud post sale, no proved
17   fraud, that you would still have a RICO
18   claim based on presale fraud?
19       What I'm first trying to do is figure
20   out whether you're relying solely or
21   primarily on your assertion of defrauding
22   customers as opposed to defrauding
23   Advantage.
24       MR. STRUB: For the RICO claim, it's
25   both because the pattern and practice --

Page 59

1    they are interrelated. We're not standing
2    in the shoes of clients or customers. We
3    don't have a standing to assert a claim that
4    they were defrauded, per se.
5        But the fraud that Take 5 was engaging
6    in, that caused Advantage to suffer its
7    damages.
8        So we were defrauded because they were
9    defrauding clients and customers. Of
10   course, if the acquisition had never
11   occurred, Advantage would have no standing
12   to assert a RICO claim because Advantage
13   would never have been defrauded.
14       THE COURT: So would the series of
15   predicate acts be satisfied from your
16   perspective if you had no fraud post sale?
17       MR. STRUB: Let me think about that.
18   If the sale went through, then yes.
19       If, for example, there were -- it's an
20   interesting hypothetical. I'm trying to
21   think of how it would play out.
22       If after the acquisition, Take 5
23   suddenly became a legitimate business and
24   was operating legitimately and was either
25   sending e-mail or not selling e-mails, then

Page 60

1    I would have to think of how Advantage would
2    be harmed by what they were doing before the
3    acquisition such that Advantage would have a
4    RICO claim.
5        THE COURT: One of the reasons I was
6    asking was, and unfortunately I can't give
7    you the cite for it offhand and I doubt I
8    have a note that even references the page,
9    but there was a sentence or two in the RICO
10   argument that only creditors were hurt.
11       You're saying that the predicate act
12   was the sale to Advantage, and in which case
13   you would be relying on the subsequent fraud
14   acts to develop a pattern.
15       But I actually may have misread it.
16   That's why I'm asking what is your take on
17   that.
18       MR. STRUB: I mean, so our position is
19   that the pattern of racketeering activity
20   was that Take 5's clients were paying for
21   services that were never performed. So it's
22   not just the acquisition.
23       Let me put it in a simpler form. Each
24   of the wire and mail communications that
25   Take 5 had with its clients were predicate

Page 61

1    acts under RICO. That's what we're saying
2    the predicate acts were.
3        THE COURT: I understand. But you're
4    also saying that you need the fraud through
5    Advantage because if that didn't occur, you
6    wouldn't be harmed.
7        MR. STRUB: Correct, Your Honor. We
8    wouldn't have standing. Because the
9    predicate acts -- the predicate acts were
10   not directed at Advantage. They occurred
11   after the acquisition because they were
12   ongoing, but Advantage never got, for
13   example, an e-mail campaign that they
14   bought. That's not part of the predicate
15   act I'm talking about.
16       THE COURT: I think I understand what
17   your argument is.
18       MR. STRUB: I'm almost done, Your
19   Honor. I just wanted to talk briefly about
20   Take 5's claims: The claim that Advantage
21   had an obligation to keep the business open
22   notwithstanding discovery of the practice
23   that it was engaged in based on the language
24   "shall maintain the business."
25       And as we pointed out in our brief,

16 (Pages 58 - 61)

Page 62

1  the actual language says "shall maintain the
2  business as a separate unit," and that is
3  exactly what Advantage did.
4      And on the defamation claims, again, I
5  think we had at least in prior hearings, a
6  lot of this depends on Your Honor's
7  assessment as to whether, in fact, Take 5
8  was engaged in the practice that we believe
9  the evidence shows was engaged in.
10     So I don't really think we need to
11 dwell much on the defamation claim.
12     The only thing I would say that hasn't
13 been responded to is that regardless of the
14 outcome of the factual findings, the
15 statements were privileged because the
16 clients who were notified had a right to
17 know what Advantage believed was going on
18 with their campaigns.
19     So, Your Honor, that concludes my
20 argument.  I appreciate your patience.
21     Do you have any other questions?
22     THE COURT:  No.  No.  Thank you.
23     MR. STRUB:  Thank you.
24     MR. RICHARD:  Your Honor, may we have
25 a 5-minute break?

Page 63

1      MR. ROTH:  I was going to ask that.
2  Before we start can we get a 5-minute break,
3  a restroom break?
4      THE COURT:  Go ahead.
5      (Recess.)
6      MR. STRUB:  Your Honor had asked about
7  predicate acts.  I had forgotten, Advantage
8  was actually a purchaser of Take 5's e-mails
9  marketing campaign before and after the
10 acquisition.
11     So, in fact, part of the reason that
12 Corey Weiner became involved in that
13 discussion with subcontractors is because
14 his group, June Group, was reaching out to
15 Take 5 about e-mail campaigns and was
16 running into some problems because
17 Mr. Weiner actually was very sophisticated
18 in this area.
19     Anyway, in terms of the predicate act,
20 yes.  Advantage was one of the victims.  So
21 I do have standing too easily.  We actually
22 did -- were clients of Take 5.
23     THE COURT:  Okay.  Thank you.
24     So who is going; Mr. Roth?
25     MR. ROTH:  Yes.  Yes.  Thank you, Your

Page 64

1  Honor.  And thank you, Mr. Strub, for your
2  short presentation.  I'm hoping mine is
3  shorter, but you know how it goes, you end
4  up getting in the middle of this and it may
5  just be as long.
6      One thing I want to say before I begin
7  though is that, I'm not going to get into it
8  here for obvious reasons, but there are two
9  other motions that we made a few weeks ago,
10 which we would ask Your Honor to decide
11 either with or before the summary judgment
12 motion.
13     You have so much in front of Your
14 Honor that possibly while you're looking at
15 it, we can fully brief the other two
16 motions.
17     They are very important because your
18 decision on those motions will have an
19 impact on the summary judgment motion, just
20 by way to refresh your memory.
21     The first one was to exclude Mr. Wei
22 and Mr. Lassiter.  We claimed that the
23 services were not limited to e-mails.  We
24 claimed that they ignored 90 percent of its
25 services by subcontractors.

Page 65

1      They aren't digital media aspects.
2      For everything we have in our motion,
3  certainly Advantage should have an
4  opportunity to respond and us to reply.
5      I think the issues involving William
6  Lassiter are so crucial that I think they
7  must be decided either with or before the
8  summary judgment.
9      If you decide, for example, to exclude
10 Mr. Wei, then a lot of the arguments they
11 have will also fail based on Mr. Wei.
12     For the same reason, there is a motion
13 for an exfoliation motion which asks you to
14 draw adverse inferences.
15     Again, I'm not getting into it now,
16 but essentially to refresh your memory, we
17 argued -- we took up on Advantage's argument
18 on their opening statement on their motion
19 where they say the issue here is how clicks
20 are generated.
21     I'm going to get into it for purposes
22 of this motion.  But I think the Court has
23 to -- should have us brief, while you're
24 looking at the motion, give us a little
25 time, and then I would like a decision on

17 (Pages 62 - 65)

1  that because if the Court rules in our
2  favor, it changes it a lot as well.
3       I'm not going to get into that today
4  but I just want to raise that with you.
5       THE COURT:  I'm aware of those, and
6  Advantage also has some motions pending.
7       MR. ROTH:  They do.  We can brief them
8  all.  Maybe their motions will relate to
9  summary judgment.  Excluding an expert,
10  exfoliation are clearly based on substance.
11  I just wanted to point that out to you.
12       Let me do this sort of like Mr. Strub
13  did.  I don't have any fancy PowerPoint.
14       I think that the breach of contract
15  claim and the fraud claims are similar, and
16  I think Mr. Strub and I are in agreement
17  with that, hopefully not the only thing, but
18  we do agree on that.  They are based on the
19  same evidence.
20       I want to focus for the purpose of
21  this discussion on the claims.  The breach
22  of contract claim is the first claim and
23  they have -- Advantage has, I think, A
24  through J list of all breaches.
25       What they don't talk about is that

1  there is a significant limitation in section
2  4.6 -- I'm sorry, yes, section 4.6 of the
3  APA, which says in essence, I can read it,
4  it says, "In making the decision to enter
5  into this agreement and to consummate the
6  contemplated transaction, the buyer has
7  relied solely on its own independent
8  investigations, analysis and evaluation of
9  the company, the business and the
10  representations, warranties, covenants and
11  agreements of the company and beneficial
12  owners set forth in the agreement."
13       It says, "The buyer's acknowledge and
14  agrees that the beneficial owners of the
15  company and its affiliates and
16  representatives have not made and are not
17  making any representations and warranties
18  whatsoever regarding or relating to the
19  company or the business, express or implied,
20  and the buyer is not relying on from the
21  owner or the beneficial owners any
22  representation and warranties or any other
23  information whatsoever."
24       It's a very important provision.  I
25  will talk about what Mr. Strub said is the

1  fraud exemption.
2       I think we have to start with the
3  breach of contract claim with that premise.
4  They have a bar to get over to sue for
5  either breach of contract -- or I would
6  argue even fraud, and they can't take any
7  representation from Take 5 -- they can't
8  rely on it but for fraud.
9       So Advantage knew that.  While we
10  certainly don't concede Advantage's due
11  diligence was reasonable, it certainly was
12  exhaustive.
13       They hired Ernst & Young.  They hired
14  Jones Day.  They hired EY-Parthenon.  They
15  had an entire team of internal investment
16  bankers looking at the company.
17       They spent over $1.2 million for eight
18  months.  The NDA was signed in July or
19  August of 2017.  The closing was on April 1,
20  2018.
21       They had a data room with over 100
22  documents.  They had financials.  They had
23  everything.  They spent a lot of money
24  exhaustively, maybe not reasonably, we'll
25  get to that, looking at the business because

1  they knew that the SIM, for example, is not
2  something they can rely on.  We have to
3  start with that premise.
4       Now, what Advantage says to counter
5  that, well, that may be true but there is a
6  provision 8.31 which states the fraud
7  disclaimer.
8       The problem with their argument -- and
9  they cite cases, they say look at these
10  cases that are identical to the fraud
11  disclaimer.
12       The problem with their argument, which
13  is one of the many problems that Advantage
14  has, is that the cases they cite are nowhere
15  near -- just are not similar to this case.
16       They cite Sandbox.
17       First of all, every case they cite is
18  a motion to dismiss, Your Honor.  No summary
19  judgment motion is it based on.  Every one.
20       They cite Sandbox.  There are two
21  major -- three major problems that Advantage
22  has in this case.  One, they come up with
23  this illogical conclusion that it's an
24  e-mail -- predominantly e-mail, e-mail only
25  company, which nobody, not one witness, not

1  one document says.
2      Two, they essentially say that the
3  financials are bad, not based on the
4  financials, not with an expert, not with a
5  fact witness. They just say it's all bad
6  because we're premising it on it's an e-mail
7  only company.
8      Three, most importantly, there is
9  really -- Your Honor knows when you're
10  dealing with a motion for summary judgment,
11  it's evidence, evidence, evidence.
12      What I'm going to do is I'm going to
13  walk through the evidence on these cases. I
14  will submit to you that the Sandbar case had
15  a very specific allegation.
16      The allegation here, so we're clear
17  is, there was an assumption of these e-mails
18  that the financials are all wrong. They
19  didn't put the financials in evidence for
20  you to see. Everything is wrong
21  notwithstanding an audit.
22      In Sandbar, quote, the company grossly
23  overstated the basis for the EBITDA
24  projection and buyer's valuation model. The
25  company's accounting fraud created

1  approximately 6.1 million in fabricated
2  EBITDA for 2019.
3      The court goes on and on and on and
4  says that the accounting fraud was in
5  connection with the way they were actually
6  attributing revenues to the company. And
7  there is a specific allegation as to dollars
8  and how they were overstated. Okay?
9      Another case, Abry Partners is about
10  how you count for magazines and what month,
11  another motion to dismiss case.
12      None of those cases is there a
13  fraud -- motion to dismiss cases, is
14  there -- in both those cases there is a
15  specific allegation of fraud in the
16  financials.
17      You don't have that here. I'm going
18  to get into it in a lot detail. You don't
19  have that here.
20      What you have here under a breach of
21  contract claim, you have audited financials.
22  No question they were audited. They have
23  not one fact witness who testified that the
24  financials are wrong and here is why.
25      In every financial fraud case or

1  financial contract case, you have a fact
2  witness saying, look at these expenses.
3  Look at these particular -- you're
4  misapplying something. They go into the
5  details of the financial statements.
6      What they do here is say it's all
7  wrong.
8      THE COURT: Let me just say, I'm going
9  to repeat what I said much early in
10  Mr. Strub's argument.
11      You-all on both sides argue a lot of
12  things that require the drawing of
13  inferences.
14      MR. ROTH: That's where I'm going.
15      THE COURT: And if they are correct
16  that the money reflected -- revenue
17  reflected in those financials came from
18  selling services fraudulently, then I could
19  infer that there is --
20      MR. ROTH: That's where I'm going.
21  That was my third point: Evidence,
22  evidence, evidence. We have audited
23  financials. You don't have to infer, imply
24  anything.
25      We have a legitimate Cherry Bekaert.

1  They audited financials. Not only do they
2  not have a fact witness, they say that
3  Cherry Bekaert was negligent.
4      You understand, Your Honor, we all
5  understand that Cherry Bekaert's audit --
6      THE COURT: The audit doesn't mean
7  that this was not a highly successful fraud
8  campaign that they didn't pick up.
9      MR. ROTH: I understand that. But
10  it's their burden. It's Advantage's burden
11  to show some fraud. We're going to get into
12  the details.
13      More importantly, they don't have an
14  expert witness, Your Honor. They could have
15  gotten an expert witness who could have come
16  in and said, well, I looked at the
17  financials and here is the basis for the
18  fraud.
19      They have no fact witness and no
20  expert witness. I will keep harping on
21  evidence, Your Honor. So what do they have?
22  What do they have?
23      They have FTI. Every witness, every
24  employee testified that it's an Omni channel
25  business and I'll get to that. They have

Page 74

1    FTI.
2         What do they have with FTI?  They have
3    essentially Chris Brown.  This guy Chris
4    Brown of FTI who said, I was a former audit
5    guy of KPMG.
6         He said, quote, Take 5's financial
7    statements are not prepared in accordance
8    with GAAP because it's undisputed that
9    Take 5 failed to send the -- this is what
10   counsel said -- that its clients paid to
11   send and, therefore, did not satisfy their
12   performance obligation to the client.
13        When I cross-examined Chris Brown, the
14   one guy -- the only guy who says that the
15   financials are fraudulent, he said the
16   following, he said, he made an assumption
17   there was an agreement between clients and
18   Take 5 to provide e-mail services for the
19   e-mails and the invoicing for those
20   campaigns that the clients received and paid
21   were inaccurate.
22        He said his financial analysis is
23   based exclusively on what he got from FTI.
24   He said he looked at sales order, doesn't
25   know how many.  He did no testing.

Page 75

1         Quote, I didn't do any testing
2    relative to determine the accuracy.  I was
3    working under the assumption, quote, based
4    on directives from Ed, Ed Westerman, that
5    the invoices reflected activity that wasn't
6    accurate.
7         I went on and said:  "So the
8    assumption you got was that the invoices of
9    your sales orders would not reflect what was
10   delivered, correct?"
11        "Yeah."
12        Question:  "And you didn't do any
13   independent analysis to determine whether or
14   not that was accurate?"
15        Answer:  "That's correct."
16        "Did you do any analysis of whether or
17   not the dollars reflected on the invoices
18   actually were accurate?"
19        Answer:  "No."
20        "Did you do any analysis to determine
21   whether or not the records reflected on the
22   invoices were delivered or weren't
23   delivered?"
24        "I did not.  I was told they were
25   not."

Page 76

1         He goes on and on and on.  I'm not
2    going to continue.
3         Basically he said, he was told there
4    was e-mail.  And once he learned it was
5    e-mail, he went -- he concluded the e-mails
6    weren't sent.  The entire financials are
7    wrong.
8         By the way, Your Honor, every single
9    case among the financial fraud, you look at
10   the value of the company.  Let's assume it
11   was an e-mail only company.  You just don't
12   get to say you get the enterprise value for
13   what you paid.  Every case.
14        We are going to talk about Cobalt
15   because Cobalt may be my favorite case that
16   Mr. Strub cited.
17        In Cobalt they said -- I will get to
18   this a later on, Cobalt said, this is the
19   value I bought it for.  This is what the
20   value should have been and here is why.
21        You don't have that here.  You have, I
22   paid X.  I got zero.  There is no analysis.
23   There is not evidence in front of you to
24   determine what the value should have been.
25   They have no expert.

Page 77

1         So that, Your Honor, is a problem with
2    the financials.  You can't get to the point
3    that -- you can't get to a point where you
4    conclude there is a contract for breach for
5    financials when you don't have the
6    financials in front of you and you have no
7    witness to tell you what the breach was,
8    other than this general it's supposed to be
9    e-mail.  The same is true with the accounts
10   receivables.
11        Then we get, Your Honor, to the --
12        THE COURT:  The evidence would permit
13   me to find that two-thirds of the revenue
14   was related to what they allege is fraud,
15   would it not?
16        MR. ROTH:  It would.  Here is the
17   problem with Advantage -- it would.  But
18   there are so many problems with Advantage's
19   case.
20        Problem number one is that every
21   single witness, Michael Boy, Eva Hodgens --
22   actually two exceptions, Michael Boy,
23   Eva Hodgens, Don Morris, Mark Adams, Ryan
24   McGaven, Gary Colen, every single one of
25   those witnesses said -- Joe Benjoseph, said

20 (Pages 74 - 77)

Page 78

1  it was an Omni channel business.
2      THE COURT: What does the dispute say?
3  Nobody disputes that.
4      MR. ROTH: They do. There are two
5  people that do. Ms. Creel -- they submitted
6  an affidavit from Ms. Creel.
7      THE COURT: That's not Advantage's
8  position. Advantage's position is to focus
9  on the e-mail component which they indicate
10  was an extremely large component that
11  e-mails were sold and they weren't
12  delivered. It's very simple.
13      MR. ROTH: Your Honor, let's go to
14  that. What does that mean, an extremely
15  very large component? Is there any document
16  in front of you, a training manual, a
17  presentation, the SIM, is there anything
18  that says that e-mails should be two-thirds,
19  e-mails should be 80 percent, e-mails should
20  be 60 percent? There is no representation
21  there.
22      They came to that conclusion. Why?
23  Because they for some reason believed -- in
24  fact, they did due diligence and concluded
25  it wasn't all the e-mails. We have

Page 79

1  documents before you there.
2      Yes. They have concluded that it's
3  e-mails only. But find me a representation
4  that says even 51 percent is e-mail. There
5  is nothing there.
6      So the point is -- I think Don Morris
7  and Mark Adams said it best. They said we
8  were e-mails primarily but we changed with
9  the times.
10      So what we concluded was, we want to
11  sell an Omni channel and we were selling
12  Omni channel.
13      My point to you, Your Honor, they need
14  evidence to show that it was predominantly
15  an e-mail company. They don't have it.
16  They don't have it from any of their own
17  witnesses.
18      So the point is, on the breach of
19  contract and the receivables, without that
20  evidence how could the Court possibly --
21      It certainly can't grant summary
22  judgment for Advantage because you wouldn't
23  know where to begin. Is it 51 percent,
24  80 percent? Show me a document that shows
25  it's a predominantly e-mail company. Right?

Page 80

1      Most importantly, because they don't
2  have it, because every single piece of
3  literature, we gave you half a dozen, I can
4  give you six dozen say that we do all kinds
5  of things, then summary judgment isn't
6  anything on breach of contract, especially
7  when they can't rely on Take 5 but for
8  fraud, I think is appropriate in our favor
9  on the breach of contract.
10      Let's go to intellectual property,
11  Your Honor. It's undisputed they bought
12  intellectual property. There are schedules
13  to the APA.
14      They may now three years later say,
15  well, we wouldn't think it was good enough.
16  They bought intellectual data. They bought
17  the data. The same data they are
18  complaining about, we are going to talk
19  about why it isn't important, they never
20  even looked at, never wanted look at the
21  data.
22      By the way, Judge, when they say it's
23  not data like, I want to be clear. It took
24  me a while to learn this business. The data
25  is the data.

Page 81

1      Don Smith has an address, has a phone
2  number, has an opt-in e-mail. That's the
3  data.
4      We are going to talk about
5  Mr. Findeisen who said when Info Group
6  bought data, it was happy with the opt-in
7  and double opt-in email attempts.
8      Data is data. I have my data where I
9  work, where I live, my e-mail, my phones.
10  So the reason why data like is important,
11  not only because they are seeking damages
12  for the data like for money, because the
13  data -- the Misty e-mail data is the 90 plus
14  percent of the database. That's everything.
15      So let me go back. They bought
16  intellectual property. They can't say they
17  didn't look at the data and got something
18  other than what they thought. I don't see a
19  representation on intellectual property. I
20  don't think they can win on that issue.
21      Let's talk for a second about the
22  algorithm. Now, Mr. Strub said that
23  everything was based on clicks. Well, let's
24  think about that.
25      I have a law firm. If I want to do

21 (Pages 78 - 81)

1    Google ads. I want to do a paper clip
2    display. I want to do an e-mail campaign.
3    The only thing important to me is who goes
4    to my website.
5        Now let's talk about car dealerships.
6    I have done a lot of car dealerships. If I
7    own a Honda, I want to know how many people
8    went to the website from this ad.
9        So Mr. Strub says there are all kinds
10   of deception going on. The clicks are the
11   clicks. That's what clients wanted to know.
12   That's what Michael Winetraub over at Medicx
13   says: All I care about is the clicks.
14       Opens is a deceptive number. If you
15   look at your e-mail, you do probably the
16   same thing as I do, I look at my e-mail.
17   It's on two-thirds on my screen on the left.
18   On the right I have this read-in thing. You
19   can read the e-mail. I can read an e-mail
20   and never open it.
21       For the same reason Mr. Hochman said,
22   opens are very hard to get and are
23   irrelevant. It's all about clicks, clicks,
24   clicks.
25       So the clients got the clicks. They

1    found out who went to the Honda website from
2    the Take 5's ad. That is intellectual
3    property. It isn't based on clicks.
4        THE COURT: What do you mean when you
5    say from the Take 5's ad?
6        MR. ROTH: Okay. Here is how it
7    works. Take 5 would go to a client, and
8    they would say -- a client would say, I want
9    to run a sale on Christmas week for my Honda
10   Accord. I want to sell Honda Accords at 10
11   percent off, hypothetically.
12       They would go to Take 5. They come up
13   with an ad. They would then send the ad out
14   through different processes, not just
15   e-mails. We'll talk about customers in a
16   minute because that's a different question.
17       THE COURT: I get that.
18       MR. ROTH: Let me just answer your
19   question. I'm sorry. Here is where I'm
20   going.
21       Honda would know who went on their
22   website from Take 5's advertising. There
23   are pixels. I'm not a guru. They know from
24   the ad that Take 5 ran who went on their
25   website.

1        THE COURT: Okay. I get that. Let's
2    stick with Advantage's theory. Would a
3    click tell you that that click resulted from
4    an e-mail that was sent?
5        MR. ROTH: So we're getting a little
6    ahead of ourselves. Google Analytics would.
7    And the answer is there is information that
8    would --
9        THE COURT: It's conflicting testimony
10   on what Google Analytics would show.
11       MR. ROTH: I don't believe there is.
12   I don't believe there is. I think Google
13   Analytics -- in fact, in fact, if you look
14   at one of our exhibits, the very first
15   document that Advantage sent to Take 5 with
16   our claim letter, they had Exhibit A, it has
17   10 campaigns and they put on those campaigns
18   what Google Analytics was.
19       They know the total. The problem is
20   that Google Analytics -- it's just like the
21   Cobalt case, Your Honor. In Cobalt there
22   was a system item called the Scott's system.
23   The Scott's system -- Cobalt was an
24   interesting decision I read after Mr. Strub
25   cited it.

1        Cobalt was a radio station, a series
2    of radio stations. The issues there were,
3    were the ads fake or were they real.
4        And what the seller had, whose name
5    was Crystal, they had something called the
6    Scott's system that actually had a -- it
7    actually tape-recorded the ad so you could
8    see how many ads there were.
9        Google Analytics, you can see what the
10   source was, where they are coming from, was
11   it pay per click, was it e-mail, was it a
12   man, was it a woman. They have everything.
13   They have everything.
14       We don't have that information. And
15   what Advantage is doing is, they are trying
16   to say because we looked at one portion of
17   what went through the internal -- I call it
18   dashboard, no e-mails went through.
19       But the answer is yes. It's just like
20   in Cobalt. If we had a Scott's system, if
21   we had Google Analytics, you would be able
22   to know.
23       Right now we're literally guessing as
24   to all we know. All their expert does is
25   look at two things: The invoice and then

Page 86

1  their internal tracking report.
2      Back to your question, we would know
3  through Google Analytics what exactly went
4  down with that campaign.
5      Better than that, Advantage could have
6  asked the customer for their own Google
7  Analytics. We don't have any Google
8  Analytics other than what we got in
9  September of 2019.
10     In any event, getting back to --
11 getting back to my --
12     THE COURT: When e-mails were sent,
13 did it include, all of them include, most of
14 them include, none of them include links to
15 click on?
16     MR. ROTH: Link to pixels? I didn't
17 hear the question.
18     THE COURT: Links, did they include
19 links to e-mails?
20     MR. ROTH: Every single campaign
21 included links. I don't think that's in
22 dispute. Because the only way you could
23 have a click would be through a link of
24 Take 5. They don't claim that the clicks
25 were wrong.

Page 87

1      THE COURT: So as I understand it, the
2  issue is not whether the clicks were wrong.
3  The issue is the force.
4      So if you send an e-mail with some
5  other ad and you embedded it with something
6  that would identify it as coming from that
7  source, I can see it.
8      But that doesn't mean that you
9  couldn't have a million clicks that just
10 were randomly -- people just randomly
11 clicked on the website, right?
12     MR. ROTH: Google Analytics would tell
13 you that. That's exactly right. We don't
14 have that data.
15     That is not something new, by the way.
16 I put it in our -- it was in our expert
17 report. There was testimony about it. Even
18 Mr. Boy, I put it in my reply papers.
19     Google Analytics are the only thing --
20 they are the Scott's system of Cobalt.
21     So what do we have here? We have --
22 what they have is the fact that there was an
23 algorithm for opens, not for clicks, for
24 opens, I think, and delivered, not for
25 clicks or deployed.

Page 88

1      What happened was, because FTI is not
2  a digital media -- they were not digital
3  media experts, they saw the word algorithm
4  and they panicked.
5      What we have presented to you, Your
6  Honor, both in our opposition and reply
7  papers is that an algorithm is the beginning
8  of the analysis.
9      The data is based on clicks. We don't
10 know how they are based on clicks. We don't
11 have that information on Google Analytics.
12     B, the expert says the algorithms are
13 very common in this industry for opens.
14     C, clicks are real.
15     D, we don't have reliance. If you
16 look at -- we gave you, Your Honor, I forget
17 the exhibit, we got from Verizon -- Verizon
18 did its own analytics. They concluded that
19 the opens were in the 15, 20 percent range,
20 exactly what we had -- exactly what was in
21 the algorithm.
22     A, they don't have reliance for
23 fraud --
24     Three, they have to show materiality.
25 Let's assume there is an algorithm, but the

Page 89

1  numbers are consistent with what the actual
2  numbers were. We don't have that either.
3      Finally, Your Honor, even assuming,
4  let's take Mr. Wei's 105 sample campaigns,
5  they excluded 199. Look at Mr. Wei's report
6  and Mr. Lassiter. They excluded 199
7  campaigns to get to 105.
8      The reason Mr. Wei says in his
9  testimony and report is because they didn't
10 have tracking reports. Well, that makes you
11 wonder, if you're excluding 199 plus 100 --
12 let's say that's 300.
13     If you're excluding two-thirds of the
14 campaigns because there is no tracking
15 reports, do they know who has tracking
16 reports? Do they know they are inaccurate?
17 Do they know there was reliance?
18     They basically stopped at the issue
19 that there was an algorithm. So you can't
20 conclude because there is an algorithm,
21 especially in this business, that everything
22 is fraudulent.
23     I think there is a lack of evidence,
24 Your Honor. There is no reliance. There is
25 nothing. And that's based on the fact that

23 (Pages 86 - 89)

1 our experts testified that algorithms are
2 common.
3     Now we go to -- let's continue this
4 e-mail marketing campaign thought. Okay?
5     They ignore the fact that Advantage
6 knew when it bought the business that it
7 wasn't just an e-mail company. It did a
8 bunch of channels.
9     There is not a piece of paper they can
10 show us, Your Honor, preclosing that says we
11 are primarily an e-mail marketing company.
12 It's not there.
13     As important, they did due diligence.
14 They concluded it was an Omni channel
15 company.
16     Continuing, the facts show it was not
17 an e-mail only company.
18     Now, let's look at the literature,
19 says it does everything. I can understand,
20 Your Honor, maybe in 2014 e-mails went away.
21 Now I go on CNN or wherever you want to go
22 and I wait there and I get hit with digital
23 media.
24     So, Your Honor, if we look at the
25 evidence that is in front of you on whether

1 or not there was a fraud, let's go to the
2 chef, hostess, waitress analogy because
3 Mr. Strub jumped right into that.
4     Mr. Strub -- what Mr. Adams said is
5 that Hodgens and Boy are chefs. They don't
6 know what is being ordered.
7     And if you read Mr. Boy's testimony,
8 and I gave it to you in our reply papers,
9 Mr. Boy said when I asked him, he
10 admitted -- I'm reading from my brief at
11 page -- I can't see a page -- I said, he
12 admitted that he has no knowledge of what
13 clients wanted as he did not speak to them.
14     Quote, I don't know. I'm not the
15 sales representative.
16     So what you have is Michael Boy, who,
17 by the way, is getting paid $40,000 a year
18 for doing almost nothing for Advantage to
19 date.
20     You have Michael Boy saying they
21 wanted e-mails only, yet he's a chef in a
22 kitchen.
23     Eva Hodgens didn't say that.
24 Eva Hodgens said it was an Omni channel
25 business.

1 Just so we know chronologically, Your
2 Honor, Eva Hodgens started and ran the
3 fulfillment up to April of 2019, right
4 before it was shut down.
5     She said it was an Omni channel
6 business. She didn't say it was
7 predominantly e-mail.
8     While I didn't give you a PowerPoint,
9 I'm going to read to you some of what she
10 said. She is the chef in the kitchen. The
11 chef in the kitchen can't tell you what the
12 customer wanted.
13     Who tells you what the customer
14 wanted? The waitresses. Who are the
15 waitresses? You have Mark Adams who said
16 unequivocally, we were not e-mail only. We
17 sold everything.
18     We have Don Morris who said, we sold
19 everything. We have Mary Benjoseph, she
20 said primarily e-mails, but there is a
21 question of fact there that was raised.
22 Then we have Prima Creel that said it was
23 e-mail only.
24     You have a lot of inconsistencies in
25 that fact, Your Honor. At a minimum there

1 is a question of fact as to what the
2 customer -- what the person was ordering
3 when they were sitting in the restaurant.
4     So then you go to -- that's
5 essentially what the salespeople said.
6     And if you look at fulfillment, Your
7 Honor, I'm going to read to you some of what
8 Eva Hodgens said. Most of it is in my
9 brief. I'm want to read this slowly because
10 I go very fast.
11     Ms. Hodgens started off saying that
12 lead media, page 74 was e-mail. So she has
13 a subcontractor doing e-mails.
14     Pro Data, quote, this is page 75, they
15 were doing e-mails.
16     Page 76, she says, quote, also, I was
17 trying to get the forward thinker of working
18 with the vice ID versus e-mail and postal
19 data for better targeting. I thought that
20 would be a better level of growth of
21 offerings that we could do that was actually
22 sophisticated, meaning we don't just do
23 e-mail.
24     Page 88, my question is: If I went
25 into a Volvo --

24 (Pages 90 - 93)

Page 94

1    By the way, remember, we said, I went
2  into Volvo locally and -- this is
3  Mr. Strub's chart, X hundred million e-mails
4  should have gone out and didn't go out.
5    I asked Ms. Hodgens: Is that a proper
6  way -- this goes right to the Daubert
7  motion -- to determine how many e-mails went
8  out?
9    I said, quote, if I went into Volvo
10  for a particular campaign would I be able to
11  determine how many e-mails went on that
12  campaign?
13    Answer: If the campaign went out is
14  that a Volo or e-mail platform?
15    I said, page 90, but what if Take 5
16  used a subcontractor? My examples were,
17  Take 5 uses a subcontractor to actually send
18  out digital media, including e-mail, Volo
19  will not pick up how many e-mails the
20  subcontractors sent out, correct?
21    Answer: Correct.
22    Eva Hodgens, the chef, said: You
23  can't do an analysis from the -- I call it
24  Volo -- Volo, Wisc mail, the internal data.
25  The problem with the analysis by Advantage

Page 95

1  is that that's all they did. They didn't
2  look at the subcontractors.
3    Eva Hodgens said, it's undisputed 90
4  percent, 9-0 percent of the campaigns were
5  fulfilled by subcontractors.
6    And what did Advantage do before the
7  closure up to today to see what did the
8  vendors do?
9    Well, I mean, unlike the Cobalt case,
10  if I know that close to 100 percent, 90
11  percent of my campaigns are done by somebody
12  other than the client, at a minimum you have
13  an obligation to figure out what they did.
14    What does Advantage rely on? I will
15  get back to the word "evidence."
16    They rely on two things: One, the
17  document Mr. Strub showed you, which was
18  prepared by we don't know who, which says
19  that Corey Weiner, an Advantage person,
20  called somebody, we don't know who, at Keono
21  and I think PPC may.
22    Quiono said, we didn't do any e-mail.
23    PPC said, we did millions but not tens
24  of e-mails.
25    That's not evidence, Your Honor.

Page 96

1    THE COURT: A little more than that --
2    MR. ROTH: The second thing. Maybe
3  there is more. Maybe I'm wrong.
4    The first thing from vendors, Your
5  Honor, they have, they have a statement by a
6  vendor, we don't know who is the vendor,
7  made to Corey Weiner, put on a document
8  which they are saying is evidence. They
9  took no attempt to take the deposition of
10  Quiono or PPC.
11    The second thing they have, Your
12  Honor -- if I missing one, please tell me --
13  is they have an e-mail -- this is
14  remarkable, it's in their reply papers --
15  from KAD media, a subcontractor, dated
16  October 2021 saying, we didn't do e-mail.
17    They want you, a judge, to rely on the
18  exclusive evidence from vendors. If there
19  is something else, please tell me.
20    A conversation by somebody at
21  Advantage to somebody we don't know who said
22  we don't do a lot of e-mails, and an e-mail
23  by somebody at KAD Media a month, two months
24  ago to Advantage saying, we didn't do
25  e-mails.

Page 97

1    That's it from the vendors, Your
2  Honor. I don't think there is anything
3  else.
4    THE COURT: Well, there is another
5  argument. It gets back to what I have said
6  several times now, which a lot of this -- a
7  lot of this evidence, putting aside the fact
8  that each side is making substantial
9  arguments that may or may not be admissible,
10  put that aside for the moment because that's
11  a different issue.
12    But one of their arguments is that if
13  you accept their numbers on e-mails, if I
14  were to find that, that the money spent on
15  third-party vendors would, in and of itself,
16  give rise to a conclusion that they were not
17  sending out e-mails.
18    MR. ROTH: But the problem, Your
19  Honor, is that the assumption -- there are
20  two problems. Problem number one is the
21  assumption they are making, this is an
22  e-mail marketing company.
23    THE COURT: I understand. That's why
24  I said these are building blocks here.
25    MR. ROTH: Right. But there is no

25 (Pages 94 - 97)

Page 98

1 evidence of that, Your Honor. There is no
2 evidence of that at all that it is an e-mail
3 marketing company. They didn't buy an
4 e-mail marketing company.
5     If you look at our expert reports,
6 they called our experts up and after we
7 hired them they said this is a digital
8 marketing company.
9     In fact, Your Honor, I will give you
10 one that is my favorite. On page 7 of their
11 motion papers, they include a sales order.
12 They say, see it says the word "e-mail."
13 That sales order is not even one of the 105
14 that they selected.
15     If you look at the invoices, they
16 don't say "e-mail." Yes. If you look at
17 200,000 invoices, you will find some with
18 "e-mail."
19     But why did Advantage have to go
20 outside of the 105 to find a sales order on
21 page 7 of their motion papers that has the
22 word "e-mail"?
23     If you don't have the word
24 "e-mails" -- first of all, looking at
25 invoices is not a proper way to do it.

Page 99

1 That's the accounting department, not what
2 actually happened.
3     Even assuming you're looking at
4 invoices, if the invoices don't say
5 "e-mails," they say "digital e-mails," they
6 haven't deployed it. As our experts both
7 said, you can't tell from the invoice what
8 was done.
9     So the problem they have is multifold.
10 One is, the invoice is not primary source
11 data as to what was done.
12     Second is, they ignored 90 percent of
13 the campaigns. So they are just making
14 these massive assumptions without evidence.
15 I'm focusing on evidence to you.
16     What evidence do they have as to what
17 the vendors did? I submit to Your Honor if
18 we were in federal court, state court no
19 less, there would be zero evidence of what
20 the vendors did.
21     Now, let's go to the customers because
22 I think Your Honor said it: What do you
23 have from the customers? I will tell you,
24 Your Honor, you have three customers, three
25 customers before the court.

Page 100

1     The first is a woman at IDY. The
2 woman at IDY testified under oath, she
3 believed Take 5 was an Omni channel
4 marketing campaign. That's one. She did a
5 whopping total of $7500, one campaign in her
6 entire existence.
7     Customer number two, AdTaxi. Now,
8 AdTaxi, the guy didn't say he thought it was
9 predominantly e-mail. Okay?
10     And Mr. Morris said, Mr. Giesorski
11 wasn't really involved in the day to day, he
12 didn't know.
13     Then you have Michael Winetraub.
14 That's the customers. We will get to
15 the 10 they called it in a minute, Your
16 Honor. I think you will find that
17 interesting.
18     Of the three customers they have,
19 Mr. Winetraub was very clear: Omni channel,
20 Omni channel, Omni channel. I represent
21 Pfizer, Merck, the biggest pharmaceutical
22 companies in the world and they were very
23 happy it was not an e-mail marketing
24 company.
25     You have three customers in this

Page 101

1 restaurant, Your Honor. Of the three, two
2 of them said, Omni channel. It's not an
3 e-mail only company.
4     How Advantage can take from that it's
5 an e-mail only company defies logic.
6     Let's talk about the 10 different
7 customers they called June 30th and July 1,
8 2019.
9     If I can share my screen for a second,
10 Your Honor, because I'm going to show you
11 the document that Mr. Strub spoke about.
12     I'm going to walk you through these 10
13 customers. Remember, let's paint -- let's
14 set a scene here, Your Honor.
15     The scene is that a customer picks up
16 the phone and says -- before I show you the
17 document, and says, I'm calling in for
18 Advantage. There is a problem with what we
19 delivered you. There is an inconsistency.
20 We think we basically did something. We
21 wronged you. That's the call, that's it,
22 with Mr. Colen on July 1st or June 30th.
23     If I call a customer today, if I
24 called Gluck or Radetich and I said,
25 Mr. Radetich, my bills are all wrong. They

26 (Pages 98 - 101)

1  want to know more.
2      Let's look at what those 10 customers
3  said, Your Honor, with that preface in mind.
4  Here is what they said. I'm going to share
5  you the document --
6      By the way, all of which is hearsay.
7  Let's ignore for a second the hearsay. I
8  will show you the document that Mr. Strub
9  says is so vital to their case. It's very
10  small, but I will try to blow it up.
11      The first customer is a company called
12  Info Group. What did Info Group say?
13  Quote, acceptance verbally acknowledged.
14  Getting Omni channel. You are not getting
15  e-mail us. We apologize. Acceptance
16  verbally acknowledged.
17      So that customer, leaving aside it's
18  hearsay, Your Honor, which it clearly is,
19  says they are happy in what they are
20  getting.
21      Let's go to customer two, Media Storm.
22  I hope this is big enough. Customer two
23  says: Noted that alternative methods were
24  never disclosed. Would like to know how
25  long this has been occurring, what

1  percentage of each deployment was
2  backfilled. Wants to know where and how.
3  The customer was like, I don't know what you
4  are talking about. I need more information.
5      Customer three -- again all hearsay.
6  This is AdTaxi. We have an affidavit. Not
7  comfortable with other sources happening
8  without our knowledge. Social and display,
9  for example, would be an issue for them.
10      So far, Your Honor, we have three
11  customers. One is content. One wants to
12  know more. And one let's say -- let's say
13  they both want to know, maybe not.
14      Let's go to customer four -- I'm
15  sorry, I started at customer 8. Let's go to
16  the top. My apologies.
17      Customer one, Your Honor, can you see
18  it?
19      THE COURT: Yes.
20      MR. ROTH: TMA, acceptance verbally
21  acknowledged. Mr. Shalat [ph], I'm sorry.
22  We are not doing what we should. We are
23  okay with it. This is what we wanted.
24      Customer two is Info Core. Acceptance
25  verbally acknowledged.

1      The first two customers they called
2  they said, no, we don't want to see them.
3      Customer 3, wants better
4  understanding. Noted we are satisfied.
5  Customer 3 is, wait a minute. You did
6  something wrong? Can you tell me more? So
7  I would put customer number 3 in a neutral
8  category, Your Honor.
9      One and two are, we know it is Omni
10  channel. Three is, you are telling us you
11  did something wrong. We don't know what it
12  is. We're happy. Maybe neutral, maybe
13  positive for Take 5.
14      Let's go to customer number four:
15  Acceptance verbally acknowledged.
16      Out of the first four customers, Your
17  Honor, the first three of them said, we know
18  it's Omni channel. This is three of the
19  biggest clients: Affinity, Info Core and
20  TMA.
21      Remember Advantage is taking the
22  position that the revenues are worth zero.
23  Yet if they called four customers right now,
24  three of them said we know it's Omni
25  channel.

1      Let's go to customer number 5.
2  Customer number five, they wanted detail on
3  the discrepancies. They mentioned issues
4  regarding Google Analytics and may explain
5  the discrepancies. They aren't saying we
6  aren't happy. They just want to know more.
7      Mr. Radetich, my bills are wrong. I
8  should have been charged X. I want to know
9  more. That is not dissatisfaction.
10      So far we have five calls. Three of
11  them are happy with Omni channel. Two of
12  them want to know more.
13      Let's two to customer number six:
14  Voiced concerns wants detail. That is not
15  expecting e-mails only.
16      So far we are six out of 10, Your
17  Honor. I would say going back we have three
18  yeses, three Take 5, and three I need to
19  know more. That's six.
20      Go to customer number seven:
21  Acceptance verbally acknowledged. That's
22  another one that says, I know you're doing
23  Omni channel.
24      Now you go to customer number eight.
25  I would say customer number eight is one

27 (Pages 102 - 105)

Veritext Legal Solutions
800-726-7007                                      305-376-8800

Page 106

1  that says maybe they -- it was not disclosed
2  to them, would like to know how long it's
3  been going on. Customer number eight I
4  would say is more in the: Maybe they
5  thought it was e-mail only.
6      Customer nine, again not comfortable.
7  Customer number ten is not comfortable.
8      Of the 10 calls they made, Your Honor,
9  they don't have any conclusive evidence.
10 They have -- let me reduce the size.
11     They have, I would argue, from their
12 document, all of which is hearsay, they have
13 one, two -- sorry, one, two happy. Three
14 and four want to know more. Five wants to
15 know more. Six wants to know more. Seven
16 happy. 8, 9 and 10 say not comfortable.
17     So what do they have -- let me stop
18 sharing. What do they have as far as
19 customers go, Your Honor?
20     They have three customers: Winetraub
21 is happy. Ivy Wise said it's Omni channel.
22 Ed Taxi wasn't happy. From those three
23 calls, they say the financials are worth
24 zero. That's all we have from customers.
25     I'm assuming that that document, which

Page 107

1  is clearly hearsay, is even coming into
2  evidence, which I would argue it shouldn't.
3      So they don't have information from
4  vendors. They don't have evidence from
5  vendors, Your Honor. They don't have
6  evidence from the customers.
7      All they have is a supposition that
8  it's predominantly e-mails. I submit to
9  you, Your Honor, on a motion for summary
10 judgment -- and I refer you to the second
11 page which Mr. Strub showed you in his
12 presentation -- you don't go on
13 suppositions. You don't go on inferences.
14 You don't go on innuendo. You go on fact.
15     I want Mr. Strub to stand up here when
16 he gets a chance to reply to tell me what
17 vendors I missed or what customers I missed,
18 actual evidence. Not we got an e-mail from
19 somebody a month ago.
20     That, Your Honor, is their evidence of
21 fraud.
22     Then we go -- it's worse than that.
23 Then we go to Mr. Findeisen. Now,
24 Mr. Findeisen, a reply affidavit was
25 submitted, which clearly isn't hearsay

Page 108

1  because he didn't say -- there is no
2  statement in it. He gave you his
3  understanding.
4      Mr. Findeisen said, I'm a broker for
5  data. Info Group is one of my largest
6  clients. They were thrilled -- I'm
7  paraphrasing -- they were thrilled with the
8  e-mails, opt-in e-mails, double opt-in
9  e-mails, very intense program. They used
10 Take 5 for five years.
11     The reason why data is important is
12 because the data is the data and because
13 Advantage has returned all the data.
14     I cited in our first papers, Your
15 Honor, Ryan McGavran, who was a data guy,
16 came to Take 5 in January 2019. He was from
17 Info Core.
18     We asked him: Was there any problem
19 with the data?
20     He said: No.
21     I said: Why did they refund all the
22 data money?
23     He said: I don't know.
24     So they can't say it's not about data
25 licensing. They refunded all the data

Page 109

1  licensing money, and the data licensing is
2  e-mail.
3      I submit to, Your Honor, they don't
4  have customer's evidence. They don't have
5  vendor's evidence. They don't have the
6  Advantage people who say it was Omni
7  channel. Find me one person that says we do
8  only or predominantly e-mail.
9      They don't even have -- out of the 10
10 phone calls, three of them were complaining.
11 Four of them said, I'm okay with it. And
12 three of them said, tell me more. That's
13 their evidence.
14     I'm so thrilled we have a judge. Your
15 Honor knows what is required and what is
16 admissible for a summary judgment motion.
17     Then we go into -- so that is our
18 evidence.
19     I want to read a little more of
20 Ms. Hodgens, the chef, who isn't a customer,
21 who never talked about it.
22     Quote, 94, all services we were able
23 to execute, both e-mail, social, retarding,
24 PPC, contextural, anything in that space,
25 e-mail was always a fundamental core. We

Page 110

1 tried because that's what the data is I had.
2 Any data access that I had in that
3 file that I could target is how I wanted to
4 get in front of those people.
5 So if you could see the ad on your
6 computer, that was additional campaign. But
7 the execution of the medium, you're mixing
8 together as one from the report.
9 She goes on.
10 I said: Is it fair to say that when a
11 campaign came in -- this is the ordering in
12 the restaurant -- you and the fulfillment
13 team would make an assessment to determine
14 best way to fulfill the campaign, that is,
15 looking at ACT parent and figuring out what
16 is the best way I can get to the audience?
17 Yes.
18 So she basically said, I know they
19 want steak. Let me make it the best steak
20 possible. I wasn't involved in the order.
21 But let me put a garnish on. Let me make
22 sure it pleases them.
23 She goes on and on and on.
24 And I said in a question page 98: How
25 did you determine -- what was the process

Page 111

1 for you to determine the best way to fulfill
2 the campaign?
3 She said: Budget. We also know that
4 each vendor -- or we assess what we felt
5 vendors performed best at so we would
6 identify that for the team.
7 After time we would say this vendor
8 works really well. We see the best quality
9 traffic for this vendor for X, Y, Z.
10 Basically those are the criteria: Budget
11 and the reliability, the quality of what we
12 were getting from the client or from the
13 vendor.
14 She also said, Your Honor: Every
15 single campaign was fulfilled, every one.
16 Now, Mr. Strub says it should have
17 been e-mail. Show me evidence of that.
18 Finally she said -- here is another
19 one.
20 The media went ahead and fulfilled in
21 part -- this is page 330 of Ms. Hodgens --
22 the media went ahead and fulfilled in part
23 the campaign through e-mails, correct?
24 Part of it, yes.
25 So we have the following: We have

Page 112

1 undisputed proof that 90 percent was the
2 subcontractor. We have undisputed proof
3 that we don't know what their magic mix was.
4 But we also have undisputed proof they did
5 e-mails.
6 What does Advantage say? We went to
7 your internal dashboard and didn't see
8 e-mails. We came up with fraud.
9 So now we get to Cobalt, Your Honor,
10 because that goes really nice into the
11 Cobalt case. I want to focus a little bit
12 on the Cobalt case because it's such an
13 important case, Your Honor. It's so
14 important.
15 In Cobalt, number one, it was a trial.
16 It wasn't a motion for summary judgment.
17 Number two, the seller had unaudited
18 financials. And the buyer hired an
19 accountant to verify whether the numbers
20 were accurate.
21 He hired a guy named Sufrin who said,
22 the revenues should have been 4 million not
23 5. The buyer accountant made several trips
24 to the radio station to review the
25 financials. He noticed a discrepancy

Page 113

1 between the revenues and, as Mr. Strub said,
2 the Scott's system.
3 There is a whole section in the
4 decision about the Scott's system. The
5 Scott's system, Your Honor, is Google
6 Analytics.
7 And also, unlike in Cobalt, they
8 didn't use any vendor. They did their own
9 ad. You don't have to go to outside
10 sources.
11 By the way, Your Honor, just so we're
12 clear, when Eva Hodgens met with Michael Wei
13 before they did their FTI investigation, she
14 told him the business. He knew 90 percent
15 of the campaign was vendors but chose not to
16 look at the vendors.
17 Now what happens? The court said --
18 basically the court says that the buyers
19 performed the proper analysis.
20 Scott's system -- this was a quote --
21 primary means to which using commercial rent
22 over the airways, a digital log of
23 everything that was played. They compared
24 Scott's system to what was shown to them.
25 Right here we don't have Scott's

29 (Pages 110 - 113)

Page 114

1  system. We have 10 percent of Scott's
2  system. We don't even have that. We have
3  this Volo. We don't have Google Analytics
4  at all.
5      The court concluded -- by the way, the
6  Cobalt case, quote, is premised on the fact
7  that the air files extracted from the
8  Scott's system do not match up to the
9  billing records, page 15.
10     Page 29, the court concludes: I
11  conclude the testimony from both sides that
12  Scott's air files accurately reflected
13  everything that was aired on Scott's system.
14  That's what they conclude.
15     The court dives into analysis about
16  financials because in that case, unlike
17  here, they said, well, the revenues aren't
18  properly recognizable. So we have to figure
19  out what the percentage is.
20     Your Honor, if they called 10
21  customers and three of them said we're happy
22  and four of them said we need to know more
23  and three of them said we're not happy,
24  there is an obligation by Advantage to do an
25  analysis of the financials.

Page 115

1      You can't just say, well, nothing --
2  we bought a bag of dirt. In Scott's -- in
3  Cobalt, the court said, adjustments are made
4  to Cobalt's post transfer revenue in order
5  to make them more comparable to Crystal's
6  pretransfer accounting methods, a comparison
7  of legitimate broadcast revenue, i.e.,
8  broadcast revenue less revenue attributable
9  to bad billings earned in 2001,
10  8.73 million, 2002, 9.27 million. They go
11  on and say, reflecting consistent annual
12  growth rate of 10 percent.
13     The court did an analysis of the
14  financials based on the testimony of
15  witnesses. We don't have that here.
16     In fact, both sides had expert
17  witnesses on the financials. And the
18  buyer's expert witness said the seller's
19  expert witness was misdirecting the court.
20     The buyer's expert witness went in and
21  did an independent valuation as to what
22  actually the business was worth. We don't
23  have that here. You have zero. You don't
24  have any financials in front of you.
25     So the court said, Cobalt based its

Page 116

1  $12 million remedy on a valuation of 58
2  million, which it contends is a reasonable
3  valuation of the company in June 2002.
4      They had a valuation expert, Your
5  Honor. The valuation evidence was presented
6  by its expert Peter Handy who said it was in
7  the range of 56 to 62 million.
8      So what happened in Cobalt was several
9  things that are different.
10     Number one, they had Google Analytics.
11  They compared it to the invoices. I'm
12  sorry. They compared it to the invoices.
13  And they said, how were the clicks generated
14  and is that what you billed for? We don't
15  have that.
16     Number two, they had an expert witness
17  who said, the financials are wrong and here
18  is why.
19     What they want you to believe, Your
20  Honor, without any evidence that everything
21  is fraudulent, therefore, it's not even -- I
22  don't know. There is no evidence.
23     Notwithstanding the fact that 7 out of
24  10 of those customers, three were fine with
25  it and four said they wanted to know more.

Page 117

1      So what I submit to you, Your Honor,
2  is that they don't have evidence by vendors,
3  by customers. I want to hear Mr. Strub's
4  response to vendors and customers by Take 5,
5  by Advantage that it was a predominantly
6  e-mail company.
7      Let's talk about Kalat and Norderer
8  because Mr. Strub brought that up. I think
9  Norderer order and Kalat is clearly an issue
10  of fact. Mr. Kalat did conclude, get the
11  data that 29 percent are deliverable.
12     Mr. Norderer said, wait a minute.
13  Mr. Kalat, you ran the system through
14  something called Kickbox. Kickbox shifts
15  out four different criteria: Deliverable,
16  undeliverable, whiskey -- I need whiskey --
17  risky and undetermined or unknown.
18     What Mr. Kalat did, notwithstanding
19  the fact that Kickbox explained to you, take
20  the unknown and you have to throw them out
21  of the window. There wasn't enough time to
22  trigger the result.
23     You take the unknown and he puts them
24  in the undeliverable. He says only 29
25  percent were undeliverable.

30 (Pages 114 - 117)

Page 118

1     Norderer says, that's not how the
2 system works.  You have to take the unknown
3 and exclude them completely because they are
4 literally unknown.
5     So Norderer concludes that 70 plus
6 percent of the e-mails were deliverable.
7 Kalat says 29 percent were deliverable.
8     So you have a question there, assuming
9 for the sake of argument that Kalat did the
10 right analysis.
11     On top of that you have a stalemate
12 argument.  In the report and testimony of
13 the expert that every year according to the
14 United States Postal Service, 10 percent of
15 the data is gone.
16     We're now two years after the fact.
17 They didn't do the analysis back when they
18 found any kind of alleged wrongdoing.  You
19 have 10 percent -- I'm not sure what the
20 e-mail for 10 is.
21     So there is an unknown rarity issue --
22 what is the word -- an unknown number that
23 has changed over time.
24     So there is a question of fact with
25 Kalat and Norderer, assuming you believe

Page 119

1 Norderer and Kalat, even though the Kickbox
2 says otherwise.
3     But as far as the opposite e-mail,
4 Mr. Norderer said, I looked at it and there
5 is an opt-in source.
6     What happens is apparently, I'm not a
7 guru, the way he explained it, when you go
8 into the database, there is a column for
9 opt-in source.  If it is checked, that means
10 it has an opt-in e-mail.
11     Mr. Norderer said, I don't have the
12 numbers, 70 percent are opt-in.
13     Mr. Finelstein says, quote, said, it
14 wouldn't be in the business if it wasn't for
15 e-mail.
16     Mr. Winetraub says, I don't think
17 Advantage badmouthed Mr. Gluck and
18 Mr. Radetich, with what the campaigns were
19 worth.
20     Mr. Strub says, return on investment,
21 what is that?
22     Every witness, and I gave Mr. Boy in
23 there said that the most important --
24     Your Honor, if I run a law firm and
25 I'm going to spend $5,000 hypothetically a

Page 120

1 year on an e-mail or digital media or Google
2 ad or advertised.com campaign, I want to
3 know whether it was worth it.  I actually do
4 run Google ads, and return on investment is
5 the most important thing.  They don't have
6 that analysis.  They don't have a conversion
7 analysis.
8     So when Verizon says, here is our
9 independent information and we were content.
10     And when most importantly when
11 Advantage says -- and he started off saying
12 you couldn't get evidence.
13     Your Honor, I say nonsense to that.
14 There is a system.  Your Honor, on September
15 9, 2020, we prepared -- we signed and
16 prepared subpoenas for several vendors,
17 several customers and several advisors, and
18 there is a process.
19     The process is, as we all know, you
20 get the subpoena.  If the nonparty doesn't
21 want to comply, you go to federal court.
22 And you have a federal court judge deal with
23 the issue.
24     Advantage knew this because it was in
25 one of their letters.  If you remember, we

Page 121

1 subpoenaed their current advisors when they
2 were doing the IPO.  They opposed it saying
3 it's not going to let the court sign.  I can
4 show you the letter.  It was footnote 5,
5 dated, I think it was, May of 2021.
6     In any event, there is a way to get
7 that evidence.  They can't say, well, Cherry
8 Bekaert would have said that.  They can't
9 say, infer what the customers would have
10 said.
11     If they decided as a matter of
12 strategy not to contact the customers and go
13 to court, not to get the vendors in court,
14 not to go after Cherry Bekaert, that's not
15 our problem.
16     Same thing with Jenkins and Coker.
17 They could have gone to a judge.  A federal
18 judge in a New York minute, Your Honor,
19 would have said, I'm issuing these subpoenas
20 they are going to appear.
21     So their trial strategy to not take
22 Cherry Bekaert as a witness, to not do a
23 customer, to not do vendors, to not keep the
24 Google Analytics, I submit to you that there
25 is not -- two things: One is an inference

1    but most importantly no evidence.
2        The irony here, Your Honor, the
3    ultimate irony here, is that from July of
4    2018 to April 2019, Advantage spent $1.2
5    million hiring Jones Day, a damn good law
6    firm, Ernst & Young, one of the top
7    accounting firms in the world and
8    EY-Parthenon.
9        For the $1.2 million, just like in
10   Cobalt, they went in and looked at the
11   financials and said, everything is fine.
12       They then spent 1.7 million in
13   literally 45 days and said, everything is a
14   fraud with FTI.
15       I submit to you, Your Honor, if they
16   did their due diligence, there is no fraud.
17   There is clearly no fraud.  There is no
18   evidence of fraud.
19       I will leave you on that, Your Honor.
20   They don't have a customer to testify there
21   was a fraud.
22       By the way, there is no evidence there
23   is one customer, not a one, has a claim,
24   started a lawsuit, did anything since the
25   date of closure.

1        If they don't have one customer and
2    they don't have one vendor and 90 percent of
3    it is vendors, then how -- where is the
4    beef?
5        I don't want you to draw any
6    inferences.  In fact, I don't want you to
7    draw inferences.  I want you to rely on the
8    evidence before you.  I submit to you that
9    any evidence in front of you, there is just
10   no case.  Thank you.
11       THE COURT:  Thank you, Mr. Roth.
12       MR. ROTH:  I'm sorry I was so long,
13   Michael and Your Honor.
14       MR. RICHARD:  Your Honor, I have
15   some -- we represent two other clients.  We
16   just have a few minutes of argument.
17       THE COURT:  Okay.
18       MR. RICHARD:  My name is Dennis
19   Richard.  And between myself and Melissa
20   Mackiewicz, we're not going to repeat all of
21   the things that Mr. Strub said.  Together we
22   have under 10 minutes.
23       My comments are quite limited.  First,
24   Mr. Strub several times in his argument and
25   probably a dozen times in his briefing,

1    argues that we have an admission of
2    wrongdoing from Mr. Radetich, and nobody has
3    answered that.
4        What Mr. Strub is talking about is a
5    Latham & Watkins memorandum that has no
6    author.  It's just from Latham & Watkins
7    LLP.
8        It says in the opening paragraph that
9    it's not a verbatim transcript of the
10   interview.  In a series of these memoranda,
11   they actually say even if it's in
12   quotations, that doesn't mean what was
13   actually said.
14       And again, there is no lawyer, there
15   is no associate that wrote this.  There is
16   no name on it.  It's obviously -- it's
17   beyond hearsay because there is not even a
18   person that is behind a single Latham &
19   Watkins' memoranda.
20       Number two, in discovery order number
21   two when we asked for those and we fought
22   over those memoranda, Your Honor ruled on
23   the second page:  There is no indication
24   that Advantage intends to introduce any of
25   those memoranda into evidence.  If they

1    attempt to do so in the future, they may be
2    excluded based on undue prejudice.  It
3    appears they are attempting to use them now
4    on summary judgment.
5        Number three, Your Honor has twice
6    ordered Advantage to produce the actual
7    notes that Your Honor noted in an order were
8    taken by an associate during the interview
9    of Mr. Radetich.
10       Advantage is in open defiance of that
11   order, saying it's irrelevant, even though
12   Your Honor ordered it would be very
13   relevant.
14       That is the subject of a separate
15   motion that I'm not going to argue today,
16   but we're asking for an order of show cause.
17       Because even as we sit here today,
18   that motion was presented on December 15,
19   it's not briefed yet, even as we sit here
20   today, we still don't have the notes that
21   Your Honor has twice ordered that we first
22   asked for two years ago.
23       And in our very first motion to
24   compel, Advantage argued that they were work
25   product.  Your Honor ruled they are not work

32 (Pages 122 - 125)

1  product. If they have any legal commentary
2  in there, they can redact them.
3      The second commentary I would make is
4  this issue about all the e-mails are Omni
5  channel marketing.
6      Mr. Strub made a concession today that
7  is not in any of his briefs. It's the first
8  time that I have heard it. I don't believe
9  it's in any of his briefs.
10     He said, and I wrote it down, about 20
11  minutes into his presentation, 25 minutes,
12  yes. There was Omni channel being provided
13  but not what was being purchased, closed
14  quote.
15     All argument in the past has been that
16  it was only an e-mail company. But if one
17  focuses on that concession now that it was
18  also an Omni channel company, that's very
19  significant, particularly when the expert
20  reports and all of the conclusions that
21  assert fraud are based on e-mails only being
22  sent internally, only being sent internally
23  by T5 from its internal data.
24     It's undisputed, and a lot of us throw
25  around the word "undisputed," but I will

1  cite the page where it appears, that Take 5
2  paid millions of dollars annually to
3  third-party vendors to send e-mails. That's
4  Exhibit 59.
5      In one year it paid over $1 million to
6  eMedia Group. Another year it paid almost a
7  million dollars to Makaria Media. It also
8  made an annual payment of $829,000 for
9  ProData Feed. And then another $829,000 to
10  a different vendor.
11     These are all listed on page 53 of
12  footnote 49 of our opposition to the motion
13  for summary judgment.
14     Paid almost a quarter of a million
15  dollars to Keono, and it paid $122,000 to
16  PPC. That's per year, annually.
17     So that this suggestion that they only
18  sent e-mails from their internal data and
19  that an expert who engages in what has long
20  been called fuzzy math says, you only sent a
21  small fraction.
22     What that expert does when one looks
23  at it carefully is: A, he is only looking
24  at what the internal e-mail data shows. He
25  doesn't know what the internal e-mail data

1  shows. He's relying on two or three other
2  people.
3      Number two, he divides it into three
4  categories. Category one is e-mails that we
5  know were sent and confirmed. Categories
6  are the ones are the kickback.
7      Category three are the ones that we
8  don't know one way or the other.
9      So then he takes all of category
10  three, and he joins it into the group that
11  were not sent as opposed to just
12  treating it neutrally. That is just
13  mathematically incorrect.
14     The second thing that I would comment
15  on is the defamation. Mr. Strub did not
16  make -- and I did write the section on
17  defamation in our response, Your Honor. I
18  will say that he didn't make much argument
19  about it here. However, it is briefed
20  before the Court.
21     Advantage has asserted three reasons
22  why they want a summary judgment on the
23  defamation: First, that the libelous
24  statements are true or is truth as a
25  defense.

1      So that the things that we have
2  established evidence on is, that they told
3  customers that our clients were dishonest
4  and deceitful, quote, unquote, page 77 of
5  our response.
6      Their talking points to all the
7  customers, their own talking points,
8  included for how long has this fraudulent
9  reporting been occurring. So that their
10  first defense on summary judgment is, well,
11  those statements were true. Well, obviously
12  that is a question of fact.
13     Their second defense is, that our
14  clients cannot prove the elements of the
15  defamation claim, i.e., we can't prove it
16  was not fraud.
17     We have set the Delaware cases into
18  our brief. It is the -- once we prove the
19  statements were made, and there is clear
20  evidence that they were, then Advantage has
21  to come forward and prove that they were
22  true. We don't have to prove the opposite.
23  That's a shifting of the burden that is not
24  permitted.
25     The third argument that they make is,

33 (Pages 126 - 129)

1  the statements were privileged.  And not a
2  single one of the cases that they cite is a
3  case where it was a per se defamation where
4  they were saying that a person in the
5  operation of their advocation, of their
6  profession, was dishonest and engaged in
7  criminal conduct or fraud.
8       Not one case finds that there is a
9  privilege to say that.  They are not even
10 arguing an absolute privilege.  They are
11 arguing a qualified privilege, which is
12 virtually always a question of fact.
13      They are even making an argument that
14 under certain circumstances they can defame
15 their own employees.  We don't believe the
16 cases say that.
17      Then they say that Radetich and Gluck
18 were former employees.  They weren't
19 employees when all of this defamation went
20 on.
21      Nevertheless, the fact is, that we
22 hadn't moved for summary judgment and
23 defamation because we know they are
24 questions of fact.  We didn't move for
25 summary judgment on our claims because we

1  know they are questions of fact.
2       Clearly, there are material issues of
3  fact.  I think when we get to the hearing,
4  Your Honor, assuming that we do, and I think
5  that there is a reasonable basis as Your
6  Honor pointed out, there is a difference
7  between inferences and the capability to
8  make a decision.
9       And also fraud cannot be established
10 with inferences.  It can be established with
11 clear evidence under Delaware law, but there
12 has got to be clear evidence of fraud.
13      It is the burden of Advantage to do
14 that.
15      I will no longer -- I will pass the
16 floor now to Melissa Mackiewicz who has a
17 different issue she is going to address for
18 our client.
19      MS. MACKIEWICZ:  Thank you, Your
20 Honor.  I'm only going to take up a brief
21 moment of your time.
22      Advantage didn't spend much time in
23 its argument talking about Take 5's breach
24 of contract claim.
25      But in the briefing, the dispute

1  between the parties is the contract
2  interpretation of paragraph 1.5J of the APA.
3       And Take 5's position is that the
4  negotiated agreement between the parties
5  under the APA is that for the period of the
6  earnout period, both the initial earnout and
7  a final earnout, which is a four-year period
8  of time, is that the buyer, Advantage Sales
9  & Marketing LLC, shall maintain the
10 business, Take 5, as a separate business
11 unit during that period of time.
12      Advantage's response to that is, since
13 they have deemed the entire business was a
14 sham and there was no legitimate business at
15 all whatsoever, notwithstanding substantial
16 evidence to the contrary, that they have the
17 absolute right in their sole discretion to
18 shut down the business at any time.
19      But what they are failing to read is
20 the paragraph concludes with the sentence,
21 "Notwithstanding the foregoing, during the
22 earnout period, the buyer will not take any
23 action for purposes and intent of which is
24 to circumvent the payments of the initial
25 earnout or the final earnout amount."

1       Your Honor, if you will recall, about
2  two months ago we went through the exercise
3  argument of Advantage defending at that
4  point amended cross demand, counter demand
5  to take out the factual component that at
6  the same time they were shutting down the
7  Take 5 business, they were preparing to go
8  forward with a $4 million IPO.
9       And we simultaneously amended our
10 statement of claim to put back in that fact
11 that it was a factor in Advantage shutting
12 down the business.
13      The evidence we have deduced during
14 discovery is that, yes, the IPO was a
15 significant factor in the timing of the
16 shutdown of Take 5.
17      As Mr. Roth explained to you, one of
18 the reasons that they wanted to count no
19 revenue is because they wanted to take the
20 Take 5's business off the books so they
21 could proceed with their IPO.
22      It turns out that the IPO did not go
23 forward in the summer of 2019.  It went
24 forward in the fall of 2020 as a fact and a
25 $5 million transaction.

34 (Pages 130 - 133)

Page 134

1  Nonetheless, all of that plays a role
2  in this. And there is a question of fact as
3  to whether Advantage took steps to
4  circumvent the seller's ability to earn what
5  it could have earned during the initial and
6  the final earnout period.
7  And how do we know that? There was
8  the project involved, which is described in
9  the papers, and I won't go forward of
10  describing it again for Your Honor now, but
11  there was a way, if Advantage is claiming
12  there was a problem with the business, there
13  is evidence that the business that they
14  complain about could have been fixed.
15  And if the business could have been
16  fixed, then the business could have gone
17  forward and Take 5 could have stayed in
18  business as a separate business unit as
19  contracted for under 1.5J of the APA, which
20  would have allowed for the payments to go
21  forward during the earnout period.
22  I will conclude with that, Your Honor.
23  THE COURT: All right. Thank you.
24  Mr. Strub, do you have any rebuttal?
25  MR. STRUB: I appreciate in advance

Page 135

1  the amount of time -- I appreciate the time
2  you have given us and your patience and
3  willingness to hear our arguments.
4  First of all, Mr. Roth read from
5  section 4.6 of the APA and argues that it
6  excludes Advantage's reliance on
7  preacquisition information and excludes our
8  breach of contract case.
9  Mr. Roth is conflating two points.
10  Section 4.6 of the asset purchase agreement
11  expressly says at the end -- and I will read
12  it -- it says: Does not apply to
13  representations and warranties in article 2
14  and article 3 of this agreement. That's
15  Exhibit 84 of our Appendix.
16  All of our breach of contract
17  arguments are based on article 2. So
18  section 4.6 is irrelevant for those
19  arguments.
20  Section 4.6, could be relevant to a
21  fraud and inducement claim and excluding
22  reliance on preacquisition representations
23  in fraudulent inducement claim.
24  But that is -- that excluded section
25  8.3I. They are two different arguments. We

Page 136

1  address that at pages 38 to 39 of our
2  opposition.
3  Mr. Roth said that there is no
4  evidence of Take 5 being primarily an e-mail
5  marketing company. I think Your Honor
6  understands our argument. I won't take the
7  bait on the e-mail only issue.
8  Anyway, on the evidence that Take 5
9  was primarily an e-mail marketing company,
10  it's at pages 5 and 6 of our opening
11  memoranda in footnote 5 and also at page 12
12  of our opposition, which includes
13  Mr. Morris' admission that 90 percent of the
14  company was e-mail marketing.
15  Mr. Morris is their witness who
16  submitted a declaration in this case.
17  On Google Analytics, there is
18  testimony that we showed Your Honor earlier
19  on indicates Ms. Stricchiola admitted in her
20  deposition that Google Analytics wouldn't
21  tell you whether the information came from
22  an e-mail.
23  The only thing that Google Analytics
24  would tell you is, whether there were clicks
25  on the links to the website. We showed you

Page 137

1  how those clicks were taken. Customers
2  thought they were getting e-mails. They
3  were being sent by PPC traffic.
4  Google Analytics won't tell you
5  whether it came from e-mail. There is no
6  evidence at all of that. And if there had
7  been, this would have come up years ago.
8  This first came up after the close of
9  discovery, after Advantage served its expert
10  report in September of 2021, after the Take
11  5 parties were initially supposed to do
12  their expert report. That's when all of
13  this came up.
14  It's like, oh, where is Google
15  Analytics? We gave them the information and
16  said, here is our account information. And
17  this is what we have. And if it no longer
18  works, that's the extent of it. Like
19  Westlaw or Lexus, if the Westlaw or Lexus
20  password doesn't work anymore, you can't get
21  into the account.
22  Did they ever subpoena Google
23  Analytics? No.
24  Did they serve a document request for
25  the password to get Google Analytics in two

35 (Pages 134 - 137)

1  years of litigation?  No.
2      Did they serve an expert report that
3  explained in detail that Google Analytics
4  would tell you that information was sent
5  from an e-mail?  No.
6      They didn't do any of that.  They are
7  just saying, oh, we don't have this Google
8  Analytics.
9      Then Mr. Roth compared Google
10  Analytics to the Scott's system in the
11  Cobalt operating case.  Of course, that's
12  not right.
13      The analogy of the Scott's system is
14  mail with Volo, Send Grid, MailWizz, the
15  four internal recordkeeping mechanisms that
16  Take 5nd had to say whether e-mails have
17  been sent, and the analysis of that data
18  shows that they weren't.
19      By the way, it's very frustrating for
20  it to come up at this time because certainly
21  at the beginning of the case, you could ask
22  for the password, maybe we could have talked
23  to Cruze, Cruze Mair, their IT person that
24  had all of this information.
25      We have no idea where he is now.  He

1  left.  He is the one who was responsible for
2  all of that.
3      They have control over that.  Jenkins
4  could presumably know.  They represented
5  her.  All the other people who they
6  represented had this information.  We don't
7  have it.  It's really very frustrating.
8      I want to respond briefly to the
9  arguments concerning customer contacts.  I
10  want to put Exhibit 238 back on the screen.
11      So Exhibit 238 was a photo that Chris
12  Brown of FTI prepared based on his
13  conversations with customers.  This is all
14  in our brief.  And all the evidence of it is
15  in our brief, including Mr. Brown's
16  testimony.
17      As you can see, the first two calls
18  were just Mr. Brown and Mr. Radetich.  And
19  as Mr. Brown testified, that was sort of a
20  chummy call.
21      Mr. Roth said people were called and
22  said they were being lied to.  No.  There is
23  no evidence of that in the record.
24      What the record is, that customers
25  were called and that they were told there is

1  some discrepancies in recordkeeping and --
2  actually, I take that back.
3      What they were told was, they were
4  trying to confirm some stuff in connection
5  with audit, and they just wanted to have a
6  discussion about what the customers had
7  bought.
8      So the process was customers were
9  called.  Then they were asked to give
10  written acknowledgment.  You see that box,
11  the second one from the end on the right, it
12  says "confirmation received."
13      What they were supposed to do is give
14  written confirmation.  And if you look at
15  Mr. Brown's testimony, which is quoted at
16  page 23 to 24 of our reply brief, he said
17  that the yellow boxes indicate there was no
18  written confirmation received.
19      So if you look down here and scroll
20  through the document, and this is what I was
21  talking about and Mr. Roth hopefully put
22  this document on the screen, you can see
23  that there were only two of these ten
24  clients who gave written confirmation that
25  what they were getting was okay, two of the

1  ten.
2      And as Mr. Brown said from an auditing
3  standpoint, if you are doing sampling, like
4  Dr. Lassiter was doing or Mr. Kalat was
5  doing from an auditing standpoint, if you
6  sample 10 and you find out that even 4 are
7  saying they were not comfortable with what
8  they were getting, under rule 606 of GAAP,
9  you can't recognize that revenue.  It's not
10  permitted.
11      Now Mr. Brown's testimony is:  Look,
12  from a sampling perspective, you just can't
13  do it as an auditor.  You can't do it.
14      Quickly on the Cobalt case, yes, that
15  was a trial, Your Honor.  We acknowledge
16  that in our briefing.  Because there were
17  witnesses in Cobalt.
18      One woman in particular who said, yes,
19  we played all of those advertisements.  We
20  did play them, even though the system says
21  we didn't.  We did play them.  They were
22  broadcasting and running from one studio to
23  another and putting it on a different
24  system.  That was part of the testimony that
25  the vice chancellor found to be incredible.

Page 142

1    In this case there is not a single
2   witness, not a single witness who said
3   Take 5 was sending e-mails to clients that
4   paid a cent, not one.
5    All we have are argument of
6   hypotheticals of what could have happened,
7   could have been subcontractors, no evidence
8   it was, it could have been subcontractors.
9   It could have been the clients wanted other
10  things.
11   No evidence that says that all the
12  clients who got social media, wanted social
13  media, it could have happened that way.
14   That's why when I get back to the
15  legal standard, when we present the
16  evidence, they have to come up with
17  evidence, not argument, saying our evidence
18  isn't enough, they have to come up with
19  affirmative evidence:  The evidence of
20  subcontractors sent all of these hundreds of
21  e-mails; the evidence that customers -- the
22  majority of customers who acquired e-mails
23  on the invoices weren't really interested in
24  e-mails.  Have to come with evidence.
25   What we have heard is, you don't have

Page 143

1   enough.  You should have contacted thousands
2   of clients and examined them about their
3   ROI.  You should have contacted all the
4   vendors.  We did contact them.  That's all
5   hearsay.  That's all hearsay.  You should
6   have deposed them.  It's never enough.  It's
7   never enough.
8    On the issue about Kalat and Norderer,
9   I'm not going to get into that, other than
10  to say, one aspect of Mr. Kalat's testimony
11  that it's unrebutted that Take 5 databases
12  didn't allow it to send targeted e-mail
13  marketing campaigns.
14   No one has talked about that other
15  than Mr. Kalat.  They weren't structured in
16  that way.  You could actually send an e-mail
17  to students as Take 5 tells that they were
18  able to do.
19   Mr. Richard's comment about
20  Mr. Radetich's statements, it's under 8.01B
21  2A, it's not hearsay.  It's a statement by a
22  party.
23   Briefly, it was not the subject of
24  hearing, but his request for the written --
25  for whatever work product Latham had that

Page 144

1   led to the notes, because as Your Honor may
2   recall, this is exactly why we didn't
3   produce the notes in the first place, was
4   opening up this huge door.
5    Okay.  Now you we want the work
6   product of the Latham lawyers.  No.  Now you
7   got that, we want the depositions of the
8   Latham lawyers.  Now we got that, we want to
9   redepose all of Advantage's witnesses
10  because we didn't have that work product
11  before.
12   Again, none of these memoranda are
13  helpful to them.  Not one.  You didn't see
14  them cite to a single one of these memoranda
15  in any of their papers.
16   On the IPO, the only thing I will say,
17  it's straight argument.  There has never
18  been any evidence about IPO having any
19  connection to this matter.
20   Then finally, Ms. Mackiewicz' point
21  was that the business could have been fixed.
22  We have no evidence as to the diminution of
23  value based on the way of Take 5's system.
24  That's a damages argument.
25   So if Take 5 had started this case out

Page 145

1   saying we were an Omni channel company.  We
2   had other services.  We could have evolved.
3   This is what it would have cost to get to a
4   legitimate business.
5    Then arguably they could have a
6   damages argument.  They were entitled to
7   some sort of reduction in damages or an
8   offset or something like that.
9    They don't even admit there was a
10  problem.  You can't say, well, we have to
11  prove what it would cost to fix the business
12  when they are saying, oh, there is no
13  problem with the business to be fixed.
14   Fix what?  What is it that they are
15  now acknowledging could be fixed?  There is
16  no admission of that.
17   You can't do both at the same time.
18  You can't argue we have an obligation to
19  show the cost of repair if the vehicle
20  wasn't broken.  Those are mutually
21  contradicted.
22   Unless Your Honor has any other
23  questions, that is all I wanted to say.
24   MR. ROTH:  Your Honor, can I get a
25  quick chance to rebut since we both moved

37 (Pages 142 - 145)

Page 146

1  for summary judgment?
2      THE COURT: Briefly.
3      MR. ROTH: I will be very quick.
4      THE COURT: There is no need to
5  repeat.
6      MR. ROTH: I won't. It is very
7  important. Number one, look at Don Morris'
8  quote. The first thing Mr. Strub just said,
9  he said the company was built on e-mails.
10 He didn't say it was e-mails. It was built
11 on e-mails. 2018 is moot.
12     Number two, Google Analytics, they
13 keep saying we didn't come up with the
14 Google Analytics. It is like a law firm
15 with Westlaw.
16     That's a perfect example. Advantage
17 is a $40 billion digital marketing company.
18 You think they knew -- did I have to tell
19 them to preserve Google Analytics when I
20 know it's a law firm to keep my Westlaw?
21 They knew all along. They even had it
22 before the case started.
23     When our experts came in, when they
24 started changing the game from 50 to 350 to
25 105, all these different campaigns, when

Page 147

1  they finally put their feet in concrete and
2  had the campaigns, they said: Give it to
3  Google Analytics. Sorry, we lost it.
4  That's crazy that advantage doesn't do that.
5      Number three, Cobalt. They say the
6  Scott's system was Volo. In Cobalt the
7  witness didn't testify that 9 out of 10
8  pieces of the pie, 90 percent of the
9  business was not in the system. That's the
10 testimony of the witnesses.
11     They can't say the Scott's system was
12 like -- Cobalt is like our case because the
13 evidence is, we don't have it internally,
14 notwithstanding that FTI did their own
15 analysis.
16     I will defer to Mr. Hochman, which
17 goes to causation. He said: If the auditor
18 had done a better job, we wouldn't be here.
19     Now let's talk about Ms. Mackiewicz'
20 comment. They had something called a
21 project involvement. They had a way to fix
22 what they believed the problems were. There
23 is a whole discussion in our papers about
24 it.
25     Had they not hired FTI and done

Page 148

1  projects at all, it's a causation issue, not
2  a damages issue.
3      Finally, Your Honor, the whole
4  thing -- I dared Mr. Strub, give me a
5  vendor, give me a customer.
6      He came back and said: We don't have
7  one. For us to get thousands would have
8  been unbelievable. How about getting three?
9  How about getting one customer? They have
10 Ivy Wise. I guess they have an affidavit.
11     They had an obligation. This is their
12 burden of proof. I don't have to sit here
13 and say how the campaigns work, which gets
14 to the discovery motion.
15     They are alleging fraud. They have
16 three customers, two whom said, I'm totally
17 fine with it. One of them whole said it was
18 e-mails only.
19     Of the Exhibit 238 he showed you, say
20 what you want, four of the ten said: I'm
21 good with it. Three of them said: I want
22 more. They didn't have written
23 confirmations. Do you shut the business
24 down?
25     I'm going to end with this -- one more

Page 149

1  thing. It's not admission because a
2  document says Radetich says. That's double
3  hearsay.
4      Yes. It could be an admission if
5  Radetich said it. But that document is not
6  from Radetich. It's clearly hearsay.
7      Finally, Your Honor, I just want to go
8  back to burden of proof and evidence. This
9  is a motion for summary judgment.
10     They had to come forward today with
11 evidence to show it was predominantly an
12 e-mail marketing campaign. They rely on Don
13 Morris who said it was built on e-mail.
14     Thank you, Your Honor.
15     THE COURT: Okay. Counsel, as always
16 your memoranda and supporting documents are
17 excellent and extensive and oral arguments,
18 excellent.
19     I know that there is a lot of money
20 riding in this case. I'm also aware that I
21 don't have the luxury of taking months to
22 look through this because we have a January
23 hearing. And quite obviously you-all need
24 to know something relatively quickly because
25 that requires preparation.

38 (Pages 146 - 149)

Page 150

1    So I'm very mindful of that. I'm
2  going to get back to you as soon as I can.
3        MR. ROTH: Your Honor, could we get a
4  briefing schedule on the other motions? We
5  can probably agree. I think it's important
6  that you get those other -- everything is
7  fully submitted. I think there are four
8  outstanding motions: Exfoliation,
9  Daubert --
10       THE COURT: I know what they are. But
11 I'm not sure -- I don't want to do that on
12 this call. I will respond to it but not at
13 the moment.
14       MR. ROTH: Okay.
15       THE COURT: What I have to say about
16 that is going to depend in part on what I
17 wind up doing here. I will deal with that.
18       MR. ROTH: That's fine. Thank you for
19 your indulgence, Your Honor. It's quite
20 long.
21       THE COURT: Listen, I understand this
22 is extremely important. You-all put in a
23 tremendous amount of time and work and
24 tremendous amount of cost to the client.
25       I didn't hear what you said a moment

Page 151

1  ago, Mr. Strub. I don't know if you were --
2        MR. STRUB: My only point was, Your
3  Honor, we tried to respond to the substance
4  of those motions in our opposition.
5        THE COURT: Yes. I'm aware of there
6  is a lot of overlap here. But I just need
7  to -- I just need to think through it before
8  I respond to that.
9        So I will get to you as soon as I can.
10 As I said, to repeat, I'm very mindful there
11 is a timetable here because I'm sure you
12 would like to know the day -- more than a
13 day before the hearing. I will get to you
14 as soon as I can.
15       MR. ROTH: Thank you.
16       THE COURT: It probably will not,
17 unless something comes up, I expect I won't
18 be talking to you-all in the next few days
19 so everybody have a happy holiday season
20 through the end of the month.
21       MR. ROTH: Yes. Stay safe, everyone.
22       MR. STRUB: Happy holidays, everyone.
23       THE COURT: Staying safe, I tell you
24 it's a good admonition because if you listen
25 at the news right now, it's sounding pretty

Page 152

1  bleak.
2        MR. STRUB: Two of our team members
3  had COVID. Sharon and Adriana and another
4  attorney I'm working with as well from our
5  firm.
6        MS. MACKIEWICZ: Michael, please send
7  Adriana and Sharon to get well soon. I hope
8  they don't end up in the hospital.
9        MR. STRUB: I don't think so.
10       MS. MACKIEWICZ: It's frightening.
11       THE COURT: Well, we just have to hope
12 that the predictions of the surge that is
13 resulting from Omicron will not be as bad as
14 they are predicting. At least around here
15 the predictions around here are pretty dire
16 in numbers.
17       So again, thank you all and have a
18 good evening.
19       MR. ROTH: Thank you very much.
20       MR. STRUB: Bye everyone.
21       MS. MACKIEWICZ: Thank you, judge.
22       (Hearing concluded at 6:19 p.m.)
23
24
25

Page 153

1
2        HEARING CERTIFICATE
3    I, Carol Hill Weng, FPR, RMR, CRR, CMRS, CRI, CPE,
4  certify that I was authorized and did stenographically
5  report the foregoing proceedings and that this
6  transcript is a true record of the proceedings before
7  the Court.
8    I further certify that I am not a relative,
9  employee, attorney, or counsel for any of the parties
10 nor am I a relative or employee of any of the parties'
11 attorney or counsel connected with the action, nor am I
12 financially interested in the action.
13
14
15 Dated this December 22, 2021.
16
17 _____
   Carol Hill Weng, FPR, RMR, CRR
18
19
20
21
22
23
24
25

## &

**&**  1:6,8 2:11,12
9:24 10:9 23:19
68:13 122:6 124:5
124:6,18 132:9

## 1

**1**  11:13 68:19 101:7
127:5
**1,298**  34:2
**1.2**  68:17 122:4,9
**1.5j**  132:2 134:19
**1.7**  122:12
**1/3**  43:7
**10**  13:5 17:24 18:8
83:10 84:17 100:15
101:6,12 102:2
105:16 106:8,16
109:9 114:1,20
115:12 116:24
118:14,19,20
123:22 141:6 147:7
**100**  49:16 68:21
89:11 95:10
**10017**  2:10
**105**  89:4,7 98:13,20
146:25
**11th**  7:14,16,21
8:23
**12**  31:17 116:1
136:11
**122,000**  127:15
**15**  9:24 55:1 88:19
114:9 125:18
**16,000**  25:15
**1700**  2:13
**1748**  2:5
**18**  25:15 26:2,6,10
26:10
**1970s**  25:24

**199**  89:5,6,11
**1st**  101:22

## 2

**2**  12:3,4 46:13,20
48:21 52:2 135:13
135:17
**2.11**  44:8
**2.5**  46:14
**2.5a**  41:9 49:22
**2.5b**  41:16
**20**  1:15 14:18 18:9
88:19 126:10
**200**  49:16
**200,000**  98:17
**2001**  115:9
**2002**  115:10 116:3
**2014**  90:20
**2015**  49:23
**2016**  12:19 31:18
**2017**  8:11 11:13
68:19
**2018**  9:24 34:25
55:1 68:20 122:4
146:11
**2019**  9:25 11:13
17:16 23:11 34:14
42:18 71:2 86:9
92:3 101:8 108:16
122:4 133:23
**2020**  120:15 133:24
**2021**  1:15 96:16
121:5 137:10
153:15
**206**  41:12
**22**  153:15
**23**  140:16
**238**  139:10,11
148:19
**23rd**  2:9
**24**  140:16

**25**  126:11
**261**  20:23
**27**  9:25
**29**  114:10 117:11
117:24 118:7
**295**  2:9
**2a**  143:21

## 3

**3**  46:18 48:21,23
104:3,5,7 135:14
**30**  11:13
**300**  89:12
**30th**  101:7,22
**330**  111:21
**33131**  2:6
**350**  146:24
**3591**  153:16
**37.4**  11:16
**38**  136:1
**39**  136:1
**3:13**  1:16

## 4

**4**  112:22 133:8
141:6
**4.6**  67:2,2 135:5,10
135:18,20
**40**  146:17
**40,000**  91:17
**43**  11:14
**45**  122:13
**48,000**  27:20
**49**  127:12
**494,000**  11:16

## 5

**5**  1:3,11 2:2 5:12
7:20 8:6,12 9:8
10:2,10,13,19 11:9
11:14,16,22 12:18
13:5,8,17 15:1,19
18:20,20 20:1

23:14,15 24:4 25:5
27:7 28:2,11,24
29:14,17,18,20
30:11,13,18,19
31:11 32:2,16
34:15 35:2 36:12
37:3 38:19 39:5,8
39:10 40:7,16
41:11,15,21,23
42:4,10,14 43:11
44:5,15 46:17 47:7
50:6 52:21 53:13
53:16 54:8,18,25
55:2 59:5,22 60:25
62:7,25 63:2,15,22
68:7 74:9,18 80:7
83:7,12,24 84:15
86:24 94:15,17
100:3 104:13 105:1
105:18 108:10,16
112:23 117:4 121:4
127:1 132:10 133:7
133:16,25 134:17
136:4,8,10,11
137:11 142:3
143:11,17 144:25
**5's**  8:13 10:23
12:10 18:13 22:2
24:16 31:18 36:14
38:10 53:21 60:20
61:20 63:8 74:6
83:2,5,22 131:23
132:3 133:20
144:23
**5,000**  27:19 119:25
**50**  146:24
**50,000**  27:18,20
**51**  79:4,23
**53**  127:11
**56**  116:7

**58**  116:1
**59**  127:4
**5nd**  138:16

**6**

**6**  136:10
**6.1**  71:1
**60**  78:20
**606**  141:8
**62**  116:7
**650**  2:14
**6:19**  1:16 152:22
**6th**  56:21

**7**

**7**  98:10,21 116:23
**70**  118:5 119:12
**72,000**  11:18
**74**  93:12
**75**  93:14
**7500**  100:5
**76**  93:16
**77**  54:16 129:4

**8**

**8**  47:25 48:1 103:15
  106:16
**8.01b**  143:20
**8.2**  46:24
**8.3**  47:9
**8.31**  69:6
**8.3i.**  135:25
**8.73**  115:10
**80**  19:4 78:19 79:24
**825**  2:5
**829,000**  127:8,9
**84**  135:15
**88**  93:24

**9**

**9**  106:16 120:15
  147:7

**9-0**  95:4
**9.27**  115:10
**90**  64:24 81:13
  94:15 95:3,10
  99:12 112:1 113:14
  123:2 136:13 147:8
**92626**  2:14
**94**  109:22
**98**  110:24
**99**  35:13
**99.63**  35:17

**a**

**a.m.**  1:16
**aaron**  43:14
**abascal**  23:19
**abdul**  43:15
**ability**  22:5,6 134:4
**able**  8:7 9:14 32:21
  42:5 85:21 94:10
  109:22 143:18
**aborts**  52:7
**abry**  71:9
**absence**  9:10 47:7
  47:10
**absolute**  130:10
  132:17
**absolutely**  54:7
**accept**  43:10 97:13
**acceptance**  102:13
  102:15 103:20,24
  104:15 105:21
**access**  38:18 110:2
**accidentally**  26:5
**accord**  83:10
**accords**  83:10
**account**  38:16
  137:16,21
**accountant**  112:19
  112:23
**accounting**  35:5
  70:25 71:4 99:1

**115:6 122:7
accounts**  19:15
  32:1 41:16,18
  46:15 77:9
**accumulating**  6:21
**accuracy**  37:10
  75:2
**accurate**  33:6 37:9
  75:6,14,18 112:20
**accurately**  114:12
**acknowledge**  67:13
  141:15
**acknowledged**
  34:16 102:13,16
  103:21,25 104:15
  105:21
**acknowledging**
  145:15
**acknowledgment**
  140:10
**acquiescence**  9:3
**acquired**  15:19
  142:22
**acquisition**  24:25
  52:20,21,23 55:13
  55:15 59:10,22
  60:3,22 61:11
  63:10
**act**  7:17 9:18 55:12
  60:11 61:15 63:19
  110:15
**action**  50:15 52:15
  53:1 132:23 153:11
  153:12
**activity**  60:19 75:5
**acts**  54:22 59:15
  60:14 61:1,2,9,9
  63:7
**actual**  34:19 43:14
  45:24 62:1 89:1
  107:18 125:6

**ad**  35:24,24 82:8
  83:2,5,13,13,24
  85:7 87:5 110:5
  113:9 120:2
**adams**  12:10,21
  24:5 27:12 77:23
  79:7 91:4 92:15
**addition**  7:12 19:7
**additional**  24:9
  110:6
**address**  14:12 39:7
  44:3 81:1 131:17
  136:1
**addresses**  43:8
**addressing**  31:11
**adjustments**  115:3
**admissible**  97:9
  109:16
**admission**  23:10,24
  44:21 124:1 136:13
  145:16 149:1,4
**admit**  145:9
**admitted**  23:11
  91:10,12 136:19
**admonition**  151:24
**adriana**  152:3,7
**ads**  82:1 85:3,8
  120:4
**adtaxi**  100:7,8
  103:6
**advance**  134:25
**advantage**  1:6,8
  2:11,11,12,17 3:19
  3:21 6:20 9:11 10:1
  10:4 28:23 30:14
  35:1,2,15 42:18
  46:23 53:4,16,20
  55:3 58:23 59:6,11
  59:12 60:1,3,12
  61:5,10,12,20 62:3
  62:17 63:7,20 65:3

66:6,23 68:9 69:4
69:13,21 77:17
79:22 84:15 85:15
86:5 90:5 91:18
94:25 95:6,14,19
96:21,24 98:19
101:4,18 104:21
108:13 109:6 112:6
114:24 117:5
119:17 120:11,24
122:4 124:24 125:6
125:10,24 128:21
129:20 131:13,22
132:8 133:3,11
134:3,11 137:9
146:16 147:4
**advantage's** 11:5
29:19 35:4 65:17
68:10 73:10 77:18
78:7,8 84:2 132:12
135:6 144:9
**adverse** 65:14
**advertised.com**
120:2
**advertisement**
24:25
**advertisements**
141:19
**advertisers** 25:6
**advertising** 24:22
83:22
**advisors** 120:17
121:1
**advisory** 7:15
**advocation** 130:5
**affidavit** 78:6
103:6 107:24
148:10
**affiliated** 28:25
**affiliates** 67:15

**affinity** 104:19
**affirmative** 142:19
**affirmed** 56:22
**agency** 24:22
**aggregate** 13:19
**ago** 64:9 96:24
107:19 125:22
133:2 137:7 151:1
**agree** 17:3 66:18
150:5
**agreed** 16:11 43:10
**agreement** 3:6 9:23
55:15 66:16 67:5
67:12 74:17 132:4
135:10,14
**agreements** 67:11
**agrees** 67:14
**ahead** 3:11 54:4
63:4 84:6 111:20
111:22
**air** 25:2,12 114:7
114:12
**aired** 114:13
**airways** 113:22
**al** 1:3,6,8,11
**alex** 13:25
**alexander** 2:8
**algorithm** 32:11,23
32:24 33:21 36:11
81:22 87:23 88:3,7
88:21,25 89:19,20
**algorithmically**
37:8
**algorithms** 19:10
32:16 34:10,18
88:12 90:1
**aligns** 29:11
**allegation** 70:15,16
71:7,15
**allegations** 6:12

**allege** 77:14
**alleged** 118:18
**alleging** 30:6
148:15
**allow** 143:12
**allowed** 134:20
**alternative** 102:23
**amazing** 35:18
**amended** 133:4,9
**amendment** 6:25
**american** 1:1
**amount** 3:23,24,25
53:2 132:25 135:1
150:23,24
**ample** 24:9
**analogized** 25:23
**analogous** 12:16
**analogy** 12:12,22
27:13 91:2 138:13
**analysis** 11:8 12:1
26:15 43:23 67:8
74:22 75:13,16,20
76:22 88:8 94:23
94:25 113:19
114:15,25 115:13
118:10,17 120:6,7
138:17 147:15
**analytics** 31:9,12
31:15 32:12,13,20
32:22 36:16 37:9
37:13,21 38:7,12
38:14 84:6,10,13
84:18,20 85:9,21
86:3,7,8 87:12,19
88:11,18 105:4
113:6 114:3 116:10
121:24 136:17,20
136:23 137:4,15,23
137:25 138:3,8,10
146:12,14,19 147:3

**anderson** 5:21
**annual** 115:11
127:8
**annually** 127:2,16
**answer** 4:24 14:21
15:13 21:5 47:16
51:7 75:15,19
83:18 84:7 85:19
94:13,21
**answered** 13:23
124:3
**answering** 58:1
**anymore** 137:20
**anyway** 23:9 53:1
63:19 136:8
**apa** 67:3 80:13
132:2,5 134:19
135:5
**apologies** 103:16
**apologize** 102:15
**apparently** 119:6
**appealing** 39:21
**appear** 121:20
**appearances** 2:1
**appears** 125:3
127:1
**appendix** 135:15
**applicable** 44:10
**application** 10:25
32:6,21
**applications** 31:19
38:4
**apply** 135:12
**applying** 38:3
58:13
**appreciate** 62:20
134:25 135:1
**appropriate** 80:8
**approved** 39:24
**approximately**
71:1

**april** 12:19 31:18 34:25 68:19 92:3 122:4
**arbitration** 1:1 7:17
**area** 63:18
**arguably** 17:8 48:9 145:5
**argue** 68:6 72:11 106:11 107:2 125:15 145:18
**argued** 65:17 125:24
**argues** 124:1 135:5
**arguing** 130:10,11
**argument** 4:18 6:13 29:8,12,16,19 40:6 48:11,18 60:10 61:17 62:20 65:17 69:8,12 72:10 97:5 118:9 118:12 123:16,24 126:15 128:18 129:25 130:13 131:23 133:3 136:6 142:5,17 144:17,24 145:6
**arguments** 4:16 5:11,16 24:17 25:23 31:12 36:14 65:10 97:9,12 135:3,17,19,25 139:9 149:17
**arose** 41:19
**article** 46:13,18,20 48:21,23 135:13,14 135:17
**aside** 97:7,10 102:17
**asked** 13:21 14:1 14:24 23:20 35:7

37:23 38:20 63:6 86:6 91:9 94:5 108:18 124:21 125:22 140:9
**asking** 17:4 47:14 52:12 58:7,8 60:6 60:16 125:16
**asks** 65:13
**aspect** 143:10
**aspects** 46:15 65:1
**assert** 59:3,12 126:21
**asserted** 5:13 21:10 30:15,18,23 40:16 40:17 128:21
**asserting** 50:11
**assertion** 30:10 34:9 58:21
**assess** 111:4
**assessment** 62:7 110:13
**asset** 9:23 53:19 55:15 135:10
**assets** 53:21
**associate** 124:15 125:8
**association** 1:1
**assume** 76:10 88:25
**assumed** 22:4
**assuming** 46:22 89:3 99:3 106:25 118:8,25 131:4
**assumption** 70:17 74:16 75:3,8 97:19 97:21
**assumptions** 99:14
**attempt** 96:9 125:1
**attempting** 125:3
**attempts** 81:7
**attention** 25:8

**attorney** 8:19 152:4 153:9,11
**attributable** 115:8
**attributed** 10:4
**attributing** 71:6
**audience** 40:1 110:16
**audiences** 42:6,11
**audio** 34:23 35:10 36:8
**audit** 70:21 73:5,6 74:4 140:5
**audited** 71:21,22 72:22 73:1
**auditing** 8:10 141:2 141:5
**auditor** 141:13 147:17
**august** 68:19
**author** 124:6
**authority** 48:6
**authorized** 153:4
**automatically** 3:15
**avenue** 2:9
**aware** 44:25 66:5 149:20 151:5
**awhile** 53:14

**b**

**b** 88:12
**back** 19:2 27:12 34:3 38:5 39:1 52:11 81:15 86:2 86:10,11 95:15 97:5 105:17 118:17 133:10 139:10 140:2 142:14 148:6 149:8 150:2
**backfilled** 103:2
**backup** 4:12,17
**bad** 70:3,5 115:9 152:13

**badmouthed** 119:17
**bag** 115:2
**bait** 136:7
**bankers** 68:16
**bar** 68:4
**barriers** 6:21 9:14
**based** 12:1 15:18 29:25 30:15 32:6 32:11 50:17 51:21 52:16,19 58:18 61:23 65:11 66:10 66:18 69:19 70:3 74:23 75:3 81:23 83:3 88:9,10 89:25 115:14,25 125:2 126:21 135:17 139:12 144:23
**basically** 50:23 76:3 89:18 101:20 110:18 111:10 113:18
**basis** 15:21 37:7 52:9 70:23 73:17 131:5
**bay** 2:5
**beef** 123:4
**begging** 8:20
**beginning** 28:1 34:21 88:7 138:21
**begun** 42:19
**behalf** 2:2,8,11 3:19 46:23
**bekaert** 8:9,10,14 8:16,22 9:11 72:25 73:3 121:8,14,22
**bekaert's** 8:19 73:5
**believe** 23:21 52:25 57:18,19,23,24 58:2 62:8 84:11,12 116:19 118:25

126:8 130:15
**believed** 62:17
78:23 100:3 147:22
**beneficial** 46:19
48:20 54:15 67:11
67:14,21
**beneficiaries** 54:19
**benefit** 54:15
**benefits** 56:1
**benjoseph** 31:23
42:19 43:3 44:22
77:25 92:19
**bennett** 44:1
**best** 13:4,5 58:14
79:7 110:14,16,19
111:1,5,8
**beth** 8:1 13:25
**better** 86:5 93:19
93:20 104:3 147:18
**beyond** 124:17
**big** 20:25 22:12
25:6 38:6 102:22
**biggest** 18:13
100:21 104:19
**billed** 50:2 116:14
**billing** 114:9
**billings** 115:9
**billion** 146:17
**bills** 101:25 105:7
**bit** 8:3 112:11
**bleak** 152:1
**blocks** 97:24
**blow** 102:10
**books** 133:20
**boost** 25:2
**bosher** 8:19
**bought** 61:14 76:19
80:11,16,16 81:6
81:15 90:6 115:2
140:7

**bounced** 11:1
**box** 18:2,4 21:1
36:1,3 140:10
**boxed** 35:16
**boxes** 140:17
**boy** 12:20 14:16
15:25 28:10,11,20
36:19,21 45:2
77:21,22 87:18
91:5,9,16,20
119:22
**boy's** 91:7
**breach** 9:16 30:6
41:4 47:15 49:12
50:19 51:2 52:14
66:14,21 68:3,5
71:20 77:4,7 79:18
80:6,9 131:23
135:8,16
**breached** 41:8
**breaches** 66:24
**break** 62:25 63:2,3
**brickell** 2:5
**brief** 8:17 17:22
31:22 34:22 37:19
38:14 42:18 44:11
55:19 61:25 64:15
65:23 66:7 91:10
93:9 129:18 131:20
139:14,15 140:16
**briefed** 48:25
125:19 128:19
**briefing** 3:23 8:9
30:9 44:16 49:5,5
123:25 131:25
141:16 150:4
**briefly** 61:19 139:8
143:23 146:2
**briefs** 126:7,9
**bring** 35:20

**brings** 46:9
**broadcast** 115:7,8
**broadcasting**
141:22
**broader** 48:15
**broken** 145:20
**broker** 108:4
**brought** 117:8
**brown** 17:18,20
74:3,4,13 139:12
139:18,19 141:2
**brown's** 20:22
139:15 140:15
141:11
**bryce** 2:16 3:21
**budget** 111:3,10
**build** 32:17 33:9
**builder** 32:10 33:7
**building** 97:24
**built** 34:7 36:24
146:9,10 149:13
**bunch** 25:6 90:8
**burden** 5:24,25
51:13 73:10,10
129:23 131:13
148:12 149:8
**business** 10:9 30:12
30:16,19,23 31:1,2
31:3,6 36:22 41:2
42:2 45:9,18,20,23
49:18 56:5 57:3,14
57:22 59:23 61:21
61:24 62:2 67:9,19
68:25 73:25 78:1
80:24 89:21 90:6
91:25 92:6 113:14
115:22 119:14
132:10,10,13,14,18
133:7,12,20 134:12
134:13,15,16,18,18
144:21 145:4,11,13

147:9 148:23
**businesses** 57:19
**button** 26:6 33:11
**buy** 13:14 98:3
**buyer** 67:6,20
112:18,23 132:8,22
**buyer's** 67:13
70:24 115:18,20
**buyers** 113:18
**bye** 152:20

**c**

**c** 88:14
**ca** 2:14
**calculated** 33:20
**call** 53:10 85:17
94:23 101:21,23
139:20 150:12
**called** 29:1 40:8
84:22 85:5 95:20
98:6 100:15 101:7
101:24 102:11
104:1,23 114:20
117:14 127:20
139:21,25 140:9
147:20
**calling** 15:4 101:17
**calls** 8:18 17:17
20:24 105:10 106:8
106:23 109:10
139:17
**campaign** 14:11
18:18,21 28:2,9
31:20 34:8 37:6
45:1 55:9 61:13
63:9 73:8 82:2 86:4
86:20 90:4 94:10
94:12,13 100:4,5
110:6,11,14 111:2
111:15,23 113:15
120:2 149:12

campaigns 13:4
14:10,13,21 15:3,5
15:18,20 62:18
63:15 74:20 84:17
84:17 89:4,7,14
95:4,11 99:13
119:18 143:13
146:25 147:2
148:13
capability 131:7
capable 42:10 44:5
car 82:5,6
care 7:15 82:13
carefully 127:23
carol 153:3,17
carrying 14:3
carved 51:24
case 4:6 6:17 7:14
7:19 8:24 16:15
21:18 23:24 24:19
24:20,23 25:9
26:12 30:4 33:13
41:1 45:19 48:6
49:13 52:3 54:5
55:20,21,22 57:1,2
60:12 69:15,17,22
70:14 71:9,11,25
72:1 76:9,13,15
77:19 84:21 95:9
102:9 112:11,12,13
114:6,16 123:10
130:3,8 135:8
136:16 138:11,21
141:14 142:1
144:25 146:22
147:12 149:20
cases 5:20 55:17
69:9,10,14 70:13
71:12,13,14 129:17
130:2,16

categories 128:4,5
category 52:24
104:8 128:4,7,9
caught 56:17
causation 147:17
148:1
cause 1:23 39:14,22
52:15 125:16
caused 52:23 59:6
causes 50:14 53:1
causing 54:12
celotex 5:20
cent 142:4
center 2:14
certain 36:23
130:14
certainly 4:18
48:22 65:3 68:10
68:11 79:21 138:20
certificate 153:2
certify 153:4,8
cetera 46:15 54:3
cfe 43:18
challenged 11:24
44:15
challenging 58:14
chance 107:16
145:25
chancellor 141:25
change 6:17 20:4
21:25 22:5,13
55:16 57:4
changed 55:4 79:8
118:23
changes 66:2
changing 146:24
channel 24:12
29:15 45:1 73:24
78:1 79:11,12
90:14 91:24 92:5
100:3,19,20,20

101:2 102:14
104:10,18,25
105:11,23 106:21
109:7 126:5,12,18
145:1
channels 90:8
charade 19:8 34:6
charged 105:8
chart 94:3
checked 119:9
chef 12:16,24 14:4
14:16 27:13 91:2
91:21 92:10,11
94:22 109:20
chefs 12:18 91:5
cherry 8:9,9,14,16
8:19,22 9:11 72:25
73:3,5 121:7,14,22
chief 7:25 8:1 31:16
chose 113:15
chris 17:18 74:3,3
74:13 139:11
christmas 83:9
chronologically
92:1
chummy 139:20
circuit 1:24 7:15,16
7:22 8:23 56:22
circumstances
58:15 130:14
circumstantial
29:11 45:10,16
circumvent 132:24
134:4
cite 18:3 60:7 69:9
69:14,16,17,20
127:1 130:2 144:14
cited 45:18 48:6
76:16 84:25 108:14
citing 8:23

claim 6:22 30:15
41:4 47:2,13 49:12
49:13,18,22 51:20
51:21 52:5,10,13
52:14,18,19 54:7
54:11,21 57:7,11
57:12 58:3,5,18,24
59:3,12 60:4 61:20
62:11 66:15,22,22
68:3 71:21 84:16
86:24 122:23
129:15 131:24
133:10 135:21,23
claimants 1:4,9,9
claimed 50:6 64:22
64:24
claiming 134:11
claims 5:13 6:10
9:16,17 41:4 42:4
47:1 48:12,13
51:15 61:20 62:4
66:15,21 130:25
classicmare 55:20
57:2
classicstar 45:18
clause 51:8,11
cleaned 14:19
clear 51:19 53:12
70:16 80:23 100:19
113:12 129:19
131:11,12
clearly 66:10
102:18 107:1,25
117:9 122:17 131:2
149:6
click 32:11 33:11
38:1 84:3,3 85:11
86:15,23
clicked 87:11
clicking 37:2

**clicks** 34:1,17 36:16,20,20,22 37:1,5,10,12,17 39:3 65:19 81:23 82:10,11,13,23,23 82:24,25 83:3 86:24 87:2,9,23,25 88:9,10,14 116:13 136:24 137:1
**client** 9:1 12:23 14:11 23:16,16 35:23 39:5,6,10,17 39:25 74:12 83:7,8 95:12 111:12 131:18 150:24
**client's** 14:4 28:4
**clients** 14:8 15:16 15:21 18:15 19:1,5 20:24 23:18,22,22 26:21,23 34:4 38:7 40:12,21 43:11 53:3 55:6 59:2,9 60:20,25 62:16 63:22 74:10,17,20 82:11,25 91:13 104:19 108:6 123:15 129:3,14 140:24 142:3,9,12 143:2
**clip** 82:1
**close** 95:10 137:8
**closed** 12:20 38:21 53:20 126:13
**closing** 68:19
**closure** 95:7 122:25
**cmrs** 153:3
**cms** 31:19 32:8,17 33:2,2,6,8 35:3
**cnn** 90:21
**cobalt** 24:19 76:14 76:15,17,18 84:21

84:21,23 85:1,20 87:20 95:9 112:9 112:11,12,15 113:7 114:6 115:3,25 116:8 122:10 138:11 141:14,17 147:5,6,12
**cobalt's** 115:4
**coker** 121:16
**colen** 17:19 77:24 101:22
**collect** 13:18
**column** 119:8
**come** 4:21 6:5 18:16 22:14 69:22 73:15 83:12 129:21 137:7 138:20 142:16,18,24 146:13 149:10
**comes** 15:11 151:17
**comfortable** 103:7 106:6,7,16 141:7
**coming** 20:15 37:12 37:18 39:3 85:10 87:6 107:1
**comment** 128:14 143:19 147:20
**commentary** 126:1 126:3
**comments** 123:23
**commercial** 113:21
**commercials** 25:15
**committed** 58:9
**common** 88:13 90:2
**communicate** 32:18
**communications** 60:24
**companies** 100:22

**company** 10:8 12:19 28:25 29:15 31:17 37:15 41:24 44:7,9 55:20 56:6 57:4 67:9,11,15,19 68:16 69:25 70:7 70:22 71:6 76:10 76:11 79:15,25 90:7,11,15,17 97:22 98:3,4,8 100:24 101:3,5 102:11 116:3 117:6 126:16,18 136:5,9 136:14 145:1 146:9 146:17
**company's** 70:25
**comparable** 115:5
**compared** 12:15 113:23 116:11,12 138:9
**comparison** 115:6
**compel** 125:24
**competent** 6:5
**compilation** 8:6
**complain** 14:11 134:14
**complaining** 80:18 109:10
**completely** 118:3
**compliance** 44:9
**complicated** 51:5,8
**comply** 120:21
**component** 78:9,10 78:15 133:5
**computer** 110:6
**concede** 68:10
**conceptually** 50:13 50:21
**concerning** 9:10 30:25 31:1 139:9

**concerns** 13:22 105:14
**concession** 126:6 126:17
**conclude** 50:16 51:1 77:4 89:20 114:11,14 117:10 134:22
**concluded** 8:10 76:5 78:24 79:2,10 88:18 90:14 114:5 152:22
**concludes** 62:19 114:10 118:5 132:20
**concluding** 13:7
**conclusion** 11:11 11:12 51:10 69:23 78:22 97:16
**conclusions** 11:23 126:20
**conclusive** 106:9
**conclusory** 6:12
**concrete** 147:1
**conduct** 42:1 130:7
**confidential** 30:22 51:22
**confirm** 140:4
**confirmation** 18:5 18:5 21:1,3 140:12 140:14,18,24
**confirmations** 148:23
**confirmed** 17:25 18:10 33:5 128:5
**conflating** 135:9
**conflicting** 84:9
**conjecture** 6:12
**connected** 153:11
**connection** 71:5 140:4 144:19

**consequence** 7:21
  9:5 10:6
**considered** 35:25
**consistent** 89:1
  115:11
**constantly** 29:18
**consummate** 67:5
**contact** 121:12
  143:4
**contacted** 17:24
  18:9 143:1,3
**contacts** 15:25 16:3
  139:9
**contain** 39:22
**contains** 35:24
**contemplated** 67:6
**contends** 116:2
**content** 39:20
  103:11 120:9
**contested** 17:1
**context** 21:22 22:8
**contextural** 109:24
**continue** 10:8 76:2
  90:3
**continued** 52:22
**continuing** 53:10
  53:21 90:16
**contract** 9:16 30:6
  41:5 46:8,11 47:13
  47:15 48:2,13
  49:13 50:19,23
  51:2 52:5,14 66:14
  66:22 68:3,5 71:21
  72:1 77:4 79:19
  80:6,9 131:24
  132:1 135:8,16
**contracted** 134:19
**contractural** 52:16
**contradicted**
  145:21

**contrary** 8:15
  132:16
**control** 139:3
**conversation** 96:20
**conversations** 9:6
  17:21 139:13
**conversion** 120:6
**copy** 32:24
**core** 8:5 49:18
  103:24 104:19
  108:17 109:25
**corey** 28:24 63:12
  95:19 96:7
**corp** 2:12
**correct** 13:11,11
  50:25 53:24 61:7
  72:15 75:10,15
  94:20,21 111:23
**cost** 37:4 55:7
  56:13 145:3,11,19
  150:24
**costa** 2:14
**costs** 23:18
**counsel** 2:16 3:20
  74:10 149:15 153:9
  153:11
**count** 46:8 53:9,10
  53:12 71:10 133:18
**counter** 1:9,12 69:4
  133:4
**counts** 19:12 46:12
**couple** 35:2 46:9
**course** 52:9 59:10
  138:11
**court** 1:24 3:1,14
  4:7 5:20 15:23 16:5
  16:15,25 21:7 22:4
  45:22 46:5 48:7,19
  49:7 50:9 53:5,8
  54:1 56:20 57:7,16
  57:21 58:8,12

59:14 60:5 61:3,16
  62:22 63:4,23
  65:22 66:1,5 71:3
  72:8,15 73:6 77:12
  78:2,7 79:20 83:4
  83:17 84:1,9 86:12
  86:18 87:1 96:1
  97:4,23 99:18,18
  99:25 103:19
  113:17,18 114:5,10
  114:15 115:3,13,19
  115:25 120:21,22
  121:3,13,13 123:11
  123:17 128:20
  134:23 146:2,4
  149:15 150:10,15
  150:21 151:5,16,23
  152:11 153:7
**courts** 6:8 52:6
**covenants** 67:10
**cover** 5:9,10
**covid** 152:3
**cpe** 153:3
**crazy** 147:4
**create** 19:14 20:9
**created** 70:25
**creating** 18:23
**creative** 35:24
  39:12,16
**credentials** 38:18
  38:23
**credibility** 22:17
**credible** 13:16 23:7
**creditors** 60:10
**creel** 78:5,6 92:22
**cri** 153:3
**criminal** 130:7
**criteria** 111:10
  117:15
**cross** 1:9,12 3:2
  74:13 133:4

**crr** 153:3,17
**crucial** 65:6
**cruze** 138:23,23
**crystal** 85:5
**crystal's** 115:5
**current** 121:1
**customer** 16:10,14
  17:5 20:17 39:19
  86:6 92:12,13 93:2
  100:7 101:15,23
  102:11,17,21,22
  103:3,5,14,15,17
  103:24 104:3,5,7
  104:14 105:1,2,13
  105:20,24,25 106:3
  106:6,7 109:20
  121:23 122:20,23
  123:1 139:9 148:5
  148:9
**customer's** 28:4
  109:4
**customers** 16:1,3,7
  16:16,18 17:11,17
  17:24 18:8,8,14
  19:17,23 20:1,3,12
  22:2,21 36:14
  43:10 58:22 59:2,9
  83:15 99:21,23,24
  99:25 100:14,18,25
  101:7,13 102:2
  103:11 104:1,16,23
  106:19,20,24 107:6
  107:17 114:21
  116:24 117:3,4
  120:17 121:9,12
  129:3,7 137:1
  139:13,24 140:6,8
  142:21,22 148:16

**d**

**d** 88:15
**damages** 41:6 46:2
  46:3 47:13,20 51:3
  52:24 59:7 81:11
  144:24 145:6,7
  148:2
**damn** 122:5
**dared** 148:4
**dashboard** 85:18
  112:7
**data** 11:22 13:12
  13:14,19 14:7 15:8
  15:19 30:11,13,15
  30:19 31:1,2,3
  34:13 42:6 43:14
  43:16 68:21 80:16
  80:17,17,21,23,24
  80:25 81:3,6,8,8,8
  81:10,12,13,13,17
  87:14 88:9 93:14
  93:19 94:24 99:11
  108:5,11,12,12,13
  108:15,19,22,24,25
  109:1 110:1,2
  117:11 118:15
  126:23 127:18,24
  127:25 138:17
**database** 42:5
  81:14 119:8
**databases** 143:11
**date** 91:19 122:25
**dated** 96:15 121:5
  153:15
**daubert** 94:6 150:9
**david** 42:9
**day** 18:1 51:6 68:14
  100:11,11 122:5
  151:12,13
**days** 122:13 151:18

**deal** 38:6 50:14
  120:22 150:17
**dealerships** 82:5,6
**dealing** 70:10
**deceitful** 129:4
**december** 1:15
  125:18 153:15
**deception** 82:10
**deceptive** 82:14
**decide** 64:10 65:9
**decided** 55:21
  56:21 65:7 121:11
**decision** 10:1,2,7
  64:18 65:25 67:4
  84:24 113:4 131:8
**declaration** 12:12
  136:16
**deduced** 133:13
**deductions** 56:1
**deemed** 132:13
**defamation** 62:4,11
  128:15,17,23
  129:15 130:3,19,23
**defame** 130:14
**defeat** 6:9,14
**defendant** 23:25
  57:10
**defendants** 58:3
**defending** 133:3
**defense** 30:18,24
  40:17 128:25
  129:10,13
**defer** 147:16
**defiance** 125:10
**defies** 101:5
**define** 37:5
**defrauded** 59:4,8
  59:13
**defrauding** 56:23
  58:21,22 59:9

**delaware** 48:5
  51:12 52:3,14
  129:17 131:11
**deliver** 15:6
**deliverability** 36:1
**deliverable** 13:2,16
  14:20 43:8 117:11
  117:15 118:6,7
**delivered** 11:17,19
  39:14 75:10,22,23
  78:12 87:24 101:19
**delivery** 10:13 11:7
  11:9 35:13
**demand** 5:14 133:4
  133:4
**demographics**
  42:16 50:8
**dennis** 2:4,7 123:18
**department** 39:12
  39:16 99:1
**depend** 150:16
**depended** 13:3
**depending** 47:14
**depends** 62:6
**deploy** 28:8 41:15
**deployed** 11:15,16
  12:5 27:7,20 33:23
  36:7 41:14 87:25
  99:6
**deploying** 41:13
**deployment** 13:1
  19:11 35:17 103:1
**deposed** 22:15 23:4
  143:6
**deposition** 33:5
  37:24 96:9 136:20
**depositions** 7:18,24
  144:7
**depreciation** 56:3
**described** 134:8

**describing** 134:10
**designed** 20:6
**desktop** 31:18,21
  32:4,20 33:25
**despite** 9:13
**detail** 4:16 71:18
  105:2,14 138:3
**details** 72:5 73:12
**detection** 38:3
**determine** 16:18
  75:2,13,20 76:24
  94:7,11 110:13,25
  111:1
**determined** 12:2
**develop** 60:14
**difference** 3:4
  131:6
**differences** 5:7
**different** 33:23,24
  34:1 50:14 51:4
  52:19 83:14,16
  97:11 101:6 116:9
  117:15 127:10
  131:17 135:25
  141:23 146:25
**difficult** 10:2 19:22
**digital** 10:15 14:11
  17:1 25:10,11,13
  65:1 88:2,2 90:22
  94:18 98:7 99:5
  113:22 120:1
  146:17
**diligence** 68:11
  78:24 90:13 122:16
**diminution** 144:22
**dire** 152:15
**direct** 18:15 26:13
  29:10 45:8 53:22
**directed** 61:10
**directives** 75:4

**directly** 32:21
37:12
**dirt** 115:2
**disallowed** 56:17
**disclaimer** 69:7,11
**disclosed** 102:24
106:1
**discovery** 7:18
19:21 30:25 31:10
38:15,21 40:18,24
61:22 124:20
133:14 137:9
148:14
**discrepancies**
105:3,5 140:1
**discrepancy** 11:20
112:25
**discretion** 132:17
**discussed** 3:3,7 7:7
**discussion** 63:13
66:21 140:6 147:23
**dishonest** 129:3
130:6
**dismiss** 69:18 71:11
71:13
**display** 82:2 103:8
**displeasure** 14:25
15:10,10
**dispute** 5:18,21,25
6:2,16 10:16,21
11:21 22:19,23,23
22:24 23:1 29:16
29:17 41:11 46:3
47:3,8 78:2 86:22
131:25
**disputes** 5:7 37:8
78:3
**disputing** 47:23
**dissatisfaction**
105:9

**district** 56:20
**dive** 2:14
**dives** 114:15
**divides** 128:3
**division** 55:2
**dms** 10:16
**document** 9:6,8
17:23 18:2 20:21
20:25 70:1 78:15
79:24 84:15 95:17
96:7 101:11,17
102:5,8 106:12,25
137:24 140:20,22
149:2,5
**documentation**
20:16
**documents** 8:21,25
9:2 17:13 45:14
68:22 79:1 149:16
**doing** 15:11,12,14
18:19,20,22 25:2
26:19 28:23 36:14
42:25 53:14,15
60:2 85:15 91:18
93:13,15 103:22
105:22 121:2 141:3
141:4,5 150:17
**dollars** 10:6 71:7
75:17 127:2,7,15
**don** 77:23 79:6
81:1 92:18 146:7
149:12
**door** 15:17 144:4
**double** 81:7 108:8
149:2
**doubt** 6:11 60:7
**dozen** 80:3,4
123:25
**dr** 11:25 141:4
**draw** 22:6 30:13
32:21 65:14 123:5

123:7
**drawing** 21:11,12
72:12
**drawn** 21:15
**drive** 2:5
**due** 68:10 78:24
90:13 122:16
**dwell** 51:14 62:11

**e**

**e** 10:13,18,20 11:1
11:1,8,14,17,20
12:4 13:16,16
14:10,13,19 15:2,5
15:7,17,20,21
16:12,23 17:8 19:1
19:13,15 20:6,8,18
22:24 23:2 24:11
25:20 26:17,22
27:2,6,11,16,22,24
27:25 28:3,5,8,14
28:14,17,18 29:3,6
29:9,10,20,23 30:1
30:2,2 31:5,7,25
33:14 34:5 36:6,25
37:16,22 38:1,4,8
38:11 39:6,9,14,21
40:1,13 41:1,13,13
41:15,22 42:11,15
42:22 43:8,9,11,14
43:22 44:6 45:5
50:7 55:6,7,7,9
59:25,25 61:13
63:8,15 64:23
69:24,24,24 70:6
70:17 74:18,19
76:4,5,5,11 77:9
78:9,11,18,19,19
78:25 79:3,4,8,15
79:25 81:2,9,13
82:2,15,16,19,19
83:15 84:4 85:11

85:18 86:12,19
87:4 90:4,7,11,17
90:20 91:21 92:7
92:16,20,23 93:12
93:13,15,18,23
94:3,7,11,14,18,19
95:22,24 96:13,16
96:22,22,25 97:13
97:17,22 98:2,4,12
98:16,18,22,24
99:5,5 100:9,23
101:3,5 102:15
105:15 106:5 107:8
107:18 108:8,8,9
109:2,8,23,25
111:17,23 112:5,8
117:6 118:6,20
119:3,10,15 120:1
126:4,16,21 127:3
127:18,24,25 128:4
136:4,7,9,14,22
137:2,5 138:5,16
142:3,21,22,24
143:12,16 146:9,10
146:11 148:18
149:12,13
**earlier** 5:4 24:8
55:18 136:18
**early** 72:9
**earn** 134:4
**earned** 115:9 134:5
**earnout** 132:6,6,7
132:22,25,25 134:6
134:21
**earth** 19:7
**easily** 63:21
**easy** 6:23 16:21
**ebitda** 70:23 71:2
**ed** 75:4,4 106:22
**effort** 38:22

eight 68:17 105:24
  105:25 106:3
either 3:5 53:22
  59:24 64:11 65:7
  68:5 89:2
elaborate 20:9 34:6
elements 41:5
  44:11 129:14
email 81:7
embedded 87:5
emedia 127:6
emphasize 6:19
empirical 34:10,16
employee 73:24
  153:9,10
employees 28:3,4,5
  34:15 53:22 130:15
  130:18,19
engaged 10:8,11
  45:20 57:22 61:23
  62:8,9 130:6
engages 127:19
engaging 55:5 59:5
ensure 36:22
enter 67:4
entered 9:24
enterprise 76:12
entire 68:15 76:6
  100:6 132:13
entitled 145:6
entry 17:2
erased 26:6
ernst 68:13 122:6
especially 80:6
  89:21
esq 2:3,4,8,13,16
essence 67:3
essentially 23:20
  65:16 70:2 74:3
  93:5

establish 46:1
established 5:19
  129:2 131:9,10
estimate 14:23
estimates 34:19
et 1:3,6,8,11 46:15
  54:3
eva 12:20 27:14
  77:21,23 91:23,24
  92:2 93:8 94:22
  95:3 113:12
evaluation 67:8
evening 152:18
event 86:10 121:6
events 9:21
everybody 21:10
  151:19
evidence 3:24 4:4
  5:5,11 6:5,9,15,16
  6:22 8:17 9:10,15
  9:20 10:12 16:16
  17:10 18:7 19:4
  20:13 21:19 24:2
  24:14 26:14 29:7
  29:10,11 34:11
  44:16,19 45:10,16
  58:9 62:9 66:19
  70:11,11,11,13,19
  72:21,22,22 73:21
  76:23 77:12 79:14
  79:20 89:23 90:25
  95:15,25 96:8,18
  97:7 98:1,2 99:14
  99:15,16,19 106:9
  107:2,4,6,18,20
  109:4,5,13,18
  111:17 116:5,20,22
  117:2 120:12 121:7
  122:1,18,22 123:8
  123:9 124:25 129:2
  129:20 131:11,12

132:16 133:13
  134:13 136:4,8
  137:6 139:14,23
  142:7,11,16,17,17
  142:19,19,21,24
  144:18,22 147:13
  149:8,11
evolved 145:2
exactly 11:5 22:19
  25:17 33:1 44:6
  62:3 86:3 87:13
  88:20,20 144:2
examine 11:22
examined 74:13
  143:2
example 18:16
  48:19 49:15,21
  59:19 61:13 65:9
  69:1 103:9 146:16
examples 94:16
excel 31:23,25
excellent 149:17,18
exceptions 77:22
exchange 42:20
exclude 48:2 64:21
  65:9 118:3
excluded 89:5,6
  125:2 135:24
excludes 135:6,7
excluding 66:9
  89:11,13 135:21
exclusion 51:25
exclusive 96:18
exclusively 74:23
excuses 26:16
execute 109:23
execution 110:7
exemption 68:1
exercise 133:2
exfoiliation 150:8

exfoliation 38:25
  65:13 66:10
exhaustive 68:12
exhaustively 68:24
exhibit 20:23 84:16
  88:17 127:4 135:15
  139:10,11 148:19
exhibits 84:14
existed 56:7
existence 100:6
expect 151:17
expecting 105:15
expenses 72:2
expert 10:23 11:4,5
  66:9 70:4 73:14,15
  73:20 76:25 85:24
  87:16 88:12 98:5
  115:16,18,19,20
  116:4,6,16 118:13
  126:19 127:19,22
  137:9,12 138:2
experts 88:3 90:1
  98:6 99:6 146:23
expired 38:19
explain 31:13 39:1
  54:2 105:4
explained 36:19
  117:19 119:7
  133:17 138:3
explaining 5:3
  12:13
explains 32:23
explanation 19:19
  26:1 35:7
express 13:21
  67:19
expressly 135:11
extend 48:3
extensive 4:13
  149:17

**extent** 54:17 137:18
**extracted** 114:7
**extremely** 51:8 78:10,14 150:22
**ey** 68:14 122:8
**eyler** 1:24 3:12

**f**

**f** 1:2,11 2:2
**fabricated** 71:1
**fact** 6:7 7:12 16:7 19:17 20:5,12 21:13 31:7 34:14 37:10 38:7 42:17 57:1,2 62:7 63:11 70:5 71:23 72:1 73:2,19 78:24 84:13,13 87:22 89:25 90:5 92:21 92:25 93:1 97:7 98:9 107:14 114:6 115:16 116:23 117:10,19 118:16 118:24 123:6 129:12 130:12,21 130:24 131:1,3 133:10,24 134:2
**factor** 133:11,15
**factors** 36:3 39:13
**facts** 6:1,11 24:21 24:21 31:5 40:25 41:1 90:16
**factual** 5:25 6:16 22:7 62:14 133:5
**factually** 6:10
**fail** 65:11
**failed** 74:9
**failing** 132:19
**failure** 41:6
**fair** 110:10

**fake** 85:3
**fall** 133:24
**false** 23:11
**falsify** 19:15
**familiar** 4:15,18
**fancy** 66:13
**far** 103:10 105:10 105:16 106:18 119:3
**farm** 56:1
**faroochi** 31:24
**fascinating** 24:20
**fast** 93:10
**fault** 9:12
**favor** 66:2 80:8
**favorite** 76:15 98:10
**federal** 7:16 99:18 120:21,22 121:17
**feed** 127:9
**feel** 49:9
**feet** 147:1
**fell** 52:4
**felt** 111:4
**fifth** 6:25
**figure** 17:9 21:21 40:21 51:10 58:19 95:13 114:18
**figuring** 110:15
**file** 13:2 110:3
**files** 31:23,25 32:4 43:18 114:7,12
**final** 40:6 132:7,25 134:6
**finally** 8:8 14:1 20:12 23:9 41:3 45:17 89:3 111:18 144:20 147:1 148:3 149:7
**financial** 8:2,11 41:9,19 46:14

49:23 71:25 72:1,5 74:6,22 76:9
**financially** 153:12
**financials** 68:22 70:3,4,18,19 71:16 71:21,24 72:17,23 73:1,17 74:15 76:6 77:2,5,6 106:23 112:18,25 114:16 114:25 115:14,17 115:24 116:17 122:11
**find** 23:7 49:2 50:19 77:13 79:3 97:14 98:17,20 100:16 109:7 141:6
**findeisen** 81:5 107:23,24 108:4
**findings** 22:7 62:14
**finds** 130:8
**fine** 20:15 116:24 122:11 148:17 150:18
**finelstein** 119:13
**firm** 2:9 8:10 81:25 119:24 122:6 146:14,20 152:5
**firms** 122:7
**first** 3:9,10 15:18 16:6,20 17:15 19:2 26:16 35:1 37:20 41:4,7 42:9 43:24 44:4 47:2 48:12 58:19 64:21 66:22 69:17 84:14 96:4 98:24 100:1 102:11 104:1,16,17 108:14 123:23 125:21,23 126:7 128:23 129:10 135:4 137:8 139:17 144:3 146:8

**five** 105:2,10 106:14 108:10
**fix** 145:11,14 147:21
**fixed** 134:14,16 144:21 145:13,15
**flat** 28:11
**floor** 2:9 131:16
**florida** 2:6 7:20 24:23
**focus** 66:20 78:8 112:11
**focuses** 126:17
**focusing** 99:15
**folks** 12:13,14 15:24
**following** 35:10 74:16 111:25
**food** 12:17,19,22 12:24
**foot** 26:5
**footnote** 121:4 127:12 136:11
**force** 87:3
**foregoing** 132:21 153:5
**forensic** 11:8,12,23 12:7 26:14
**forget** 88:16
**forgive** 4:8
**forgotten** 63:7
**form** 30:5,7 60:23
**former** 74:4 130:18
**formula** 19:14
**formulas** 31:25 44:23
**forth** 67:12
**forward** 6:5 20:15 22:14 54:17 93:17 129:21 133:8,23,24 134:9,17,21 149:10

**fought** 124:21
**found** 83:1 118:18
  141:25
**founded** 45:17,23
**founders** 7:13 54:9
**four** 10:13 11:7
  37:16 103:14
  104:14,16,23
  106:14 109:11
  114:22 116:25
  117:15 132:7
  138:15 148:20
  150:7
**fours** 57:1
**fpr** 153:3,17
**fraction** 127:21
**fraud** 9:17 14:2,6,7
  14:8 16:13 30:7
  44:12 45:20 47:8
  47:11,15,18,21
  49:12 50:11,12,17
  50:24 51:3,14,19
  51:19,20 52:5,7,9
  52:13,15,18,19
  53:10,21 54:7,11
  54:17,20 56:20
  57:7 58:9,16,17,18
  59:5,16 60:13 61:4
  66:15 68:1,6,8 69:6
  69:10 70:25 71:4
  71:13,15,25 73:7
  73:11,18 76:9
  77:14 80:8 88:23
  91:1 107:21 112:8
  122:14,16,17,18,21
  126:21 129:16
  130:7 131:9,12
  135:21 148:15
**fraudulent** 16:9
  17:8 38:1 46:1 48:4
  50:3 51:24 74:15

89:22 116:21 129:8
  135:23
**fraudulently** 72:18
**frightening** 152:10
**front** 64:13 76:23
  77:6 78:16 90:25
  110:4 115:24 123:9
**frustrating** 138:19
  139:7
**frustration** 14:25
**fti** 10:10 11:5 17:18
  33:15,16 37:11
  73:23 74:1,2,4,23
  88:1 113:13 122:14
  139:12 147:14,25
**fti's** 11:4
**fulfill** 15:8 110:14
  111:1
**fulfilled** 95:5
  111:15,20,22
**fulfillment** 12:16
  14:3 15:24 24:3
  36:18 92:3 93:6
  110:12
**fully** 64:15 150:7
**function** 36:21
**fundamental**
  109:25
**further** 153:8
**future** 125:1
**fuzzy** 127:20

**g**

**gaap** 8:12 41:10,11
  49:24 50:1 74:8
  141:8
**gains** 56:3
**game** 146:24
**garnish** 110:21
**gary** 17:19 77:24
**gas** 56:6 57:4

**general** 2:16 77:8
**generally** 16:18
  17:5
**generate** 31:25
  33:18
**generated** 32:11
  35:6 36:10 37:8
  65:20 116:13
**generating** 37:13
**genuine** 6:6
**getting** 15:21,22
  16:8,9,14,19 17:6
  17:12,25 18:11
  19:18 20:8 25:3,20
  27:16 28:13,15
  38:8 40:12 56:8,10
  56:11,12,12 64:4
  65:15 84:5 86:10
  86:11 91:17 102:14
  102:14,20 111:12
  137:2 140:25 141:8
  148:8,9
**ggtriallaw.com**
  2:15
**giesorski** 100:10
**give** 33:9,11 60:6
  65:24 80:4 92:8
  97:16 98:9 140:9
  140:13 147:2 148:4
  148:5
**given** 135:2
**gluck** 2:2 8:6 17:19
  23:12,14,17 44:17
  45:3,15 54:10
  55:14 57:8,13
  58:11 101:24
  119:17 130:17
**gmail** 43:22
**go** 3:9,10,11,25
  19:8,13 25:4 27:12
  34:6 39:1 40:3,20

45:12 50:23 57:8
  63:4 72:4 78:13
  80:10 81:15 83:7
  83:12 90:3,21,21
  91:1 93:4,10 94:4
  98:19 99:21 102:21
  103:14,15 104:14
  105:1,20,24 106:19
  107:12,13,14,14,22
  107:23 109:17
  113:9 115:10 119:7
  120:21 121:12,14
  133:7,22 134:9,20
  149:7
**goal** 36:18
**goes** 13:17 36:1
  64:3 71:3 76:1 82:3
  94:6 110:9,23
  112:10 147:17
**going** 5:10 7:5 10:5
  18:20 19:2 21:9,24
  22:1,2,12,13,14,16
  23:5 24:16 26:24
  28:6 32:25 33:18
  34:3,21,22 37:25
  39:3 40:10 44:18
  45:3,21 48:11
  50:11 51:14 52:7
  53:8 55:3 57:6
  62:17 63:1,24 64:7
  65:21 66:3 70:12
  70:12 71:17 72:8
  72:14,20 73:11
  76:2,14 80:18 81:4
  82:10 83:20 92:9
  93:7 101:10,12
  102:4 105:17 106:3
  119:25 121:3,20
  123:20 125:15
  131:17,20 143:9
  148:25 150:2,16

**good** 3:18 13:6
19:19 28:5 30:13
35:18 80:15 122:5
148:21 151:24
152:18
**google** 31:9,12,15
32:12,13,20,22
36:16 37:13,21
38:2,7,12,14 82:1
84:6,10,12,18,20
85:9,21 86:3,6,7
87:12,19 88:11
105:4 113:5 114:3
116:10 120:1,4
121:24 136:17,20
136:23 137:4,14,22
137:25 138:3,7,9
146:12,14,19 147:3
**googles** 37:9
**gotten** 46:7 73:15
**grant** 79:21
**greenberg** 2:13
**grid** 138:14
**gross** 2:13
**grossly** 70:22
**ground** 50:18
**group** 1:2,3,11,11
2:2,2,3 7:15 8:5 9:1
18:17,17,17,19,21
46:17 54:25 57:10
57:16,24 58:4,10
63:14,14 81:5
102:12,12 108:5
127:6 128:10
**groups** 42:23
**growth** 93:20
115:12
**guess** 16:6 17:4
22:11 148:10
**guessing** 85:23

**guru** 83:23 119:7
**guy** 74:3,5,14,14
100:8 108:15
112:21

## h

**half** 26:2,6,11 80:3
**hand** 26:23,25
**handy** 116:6
**hank** 43:14
**happen** 28:1 54:13
**happened** 9:21
24:24 25:17 40:2
55:22 88:1 99:2
116:8 142:6,13
**happening** 23:3
30:1 39:25 103:7
**happens** 52:20
113:17 119:6
**happy** 3:10 20:2,4
20:13 22:21 23:17
23:18 26:22 81:6
100:23 102:19
104:12 105:6,11
106:13,16,21,22
114:21,23 151:19
151:22
**hard** 8:16 9:12
49:11 82:22
**harmed** 60:2 61:6
**harping** 73:20
**head** 37:11
**hear** 8:3 34:21,22
86:17 117:3 135:3
150:25
**heard** 38:24 39:13
126:8 142:25
**hearing** 1:23 21:25
22:1 131:3 143:24
149:23 151:13
152:22 153:2

**hearings** 62:5
**hearsay** 102:6,7,18
103:5 106:12 107:1
107:25 124:17
143:5,5,21 149:3,6
**held** 6:8 7:16 42:1
42:25
**helpful** 144:13
**hesitate** 4:22
**hey** 8:13 15:11
45:20
**highly** 73:7
**hill** 153:3,17
**hired** 31:17 68:13
68:13,14 98:7
112:18,21 147:25
**hiring** 122:5
**historical** 34:12
**hit** 90:22
**hochman** 33:3,4
82:21 147:16
**hodgens** 12:20,25
14:1 15:24 24:8
27:14 28:21 36:19
44:24 77:21,23
91:5,23,24 92:2
93:8,11 94:5,22
95:3 109:20 111:21
113:12
**holiday** 151:19
**holidays** 151:22
**honda** 82:7 83:1,9
83:10,21
**honor** 3:18,22 4:19
6:20 7:5 9:20 16:4
16:21 17:15 20:21
21:6,23 22:10 23:9
24:18 26:20 27:4
29:13 31:13 32:25
33:12 47:16 49:3
50:25 51:9 52:12

53:25 54:6 57:9
58:6 61:7,19 62:19
62:24 63:6 64:1,10
64:14 69:18 70:9
73:4,14,21 76:8
77:1,11 78:13
79:13 80:11 84:21
88:6,16 89:3,24
90:10,20,24 92:2
92:25 93:7 95:25
96:5,12 97:2,19
98:1,9 99:17,22,24
100:16 101:1,10,14
102:3,18 103:10,17
104:8,17 105:17
106:8,19 107:5,9
107:20 108:15
109:3,15 111:14
112:9,13 113:5,11
114:20 116:5,20
117:1 119:24
120:13,14 121:18
122:2,15,19 123:13
123:14 124:22
125:5,7,12,21,25
128:17 131:4,6,20
133:1 134:10,22
136:5,18 141:15
144:1 145:22,24
148:3 149:7,14
150:3,19 151:3
**honor's** 34:3 38:6
62:6
**honorable** 1:24
**hope** 102:22 152:7
152:11
**hopefully** 66:17
140:21
**hoping** 64:2
**horse** 55:24,25

**horses**  56:2,7,9,10
  56:13
**hospital**  152:8
**hostess**  91:2
**huge**  19:8 144:4
**hundred**  94:3
**hundreds**  27:10
  56:18 142:20
**hurt**  60:10
**hypothetical**  59:20
**hypothetically**
  16:11 17:6 83:11
  119:25
**hypotheticals**
  142:6

**i**

**i.e.**  115:7 129:15
**ico**  56:20
**idea**  45:21 138:25
**identical**  69:10
**identified**  46:2 58:2
  58:4
**identify**  87:6 111:6
**idy**  100:1,2
**ignore**  90:5 102:7
**ignored**  64:24
  99:12
**iii**  2:5
**illogical**  69:23
**impact**  64:19
**implausible**  45:22
**implied**  67:19
**imply**  72:23
**import**  31:19
**important**  64:17
  67:24 80:19 81:10
  82:3 90:13 108:11
  112:13,14 119:23
  120:5 146:7 150:5
  150:22

**importantly**  70:8
  73:13 80:1 120:10
  122:1
**impossible**  40:20
**impression**  18:23
**inaccurate**  74:21
  89:16
**inactive**  57:17
**inappropriate**  7:3
  7:10
**incapable**  50:7
**include**  86:13,13,14
  86:14,18 98:11
**included**  86:21
  129:8
**includes**  136:12
**including**  94:18
  139:15
**inconsistencies**
  92:24
**inconsistency**
  101:19
**inconsistent**  16:17
**incorrect**  128:13
**increasing**  54:19
**incredible**  141:25
**indemnification**
  46:25 47:2 48:14
  48:22,24
**independent**  67:7
  75:13 115:21 120:9
**indicate**  78:9
  140:17
**indicates**  136:19
**indication**  124:23
**indirect**  53:23
**individual**  55:23
**inducement**  51:20
  51:20 52:5,13,16
  135:21,23

**indulgence**  150:19
**industry**  15:14
  88:13
**infer**  17:13 72:19
  72:23 121:9
**inference**  121:25
**inferences**  21:11,13
  21:14,16,17 22:7
  65:14 72:13 107:13
  123:6,7 131:7,10
**info**  18:17,17,19,21
  81:5 102:12,12
  103:24 104:19
  108:5,17
**information**  4:12
  4:17 19:22,24
  30:22 32:10,12,13
  37:7 67:23 84:7
  85:14 88:11 103:4
  107:3 120:9 135:7
  136:21 137:15,16
  138:4,24 139:6
**infrastructure**
  13:19 15:6
**inherently**  50:3
**initial**  5:24 132:6
  132:24 134:5
**initially**  56:4
  137:11
**innuendo**  107:14
**input**  32:20
**instructions**  51:13
**integrated**  35:4
**intellectual**  41:25
  42:3,7 50:5 80:10
  80:12,16 81:16,19
  83:2
**intends**  124:24
**intense**  108:9
**intent**  44:14 46:1
  132:23

**intentionally**  3:13
**interested**  39:19
  142:23 153:12
**interesting**  12:12
  59:20 84:24 100:17
**interface**  37:25
**intermediate**  2:12
**internal**  10:13,18
  11:15,17 12:8
  22:25 25:18 27:15
  27:19 68:15 85:17
  86:1 94:24 112:7
  126:23 127:18,24
  127:25 138:15
**internally**  126:22
  126:22 147:13
**interpretation**
  46:10 48:9 132:2
**interpreted**  17:2
**interpreting**  58:13
**interrelated**  47:18
  59:1
**interrupt**  4:22
**interrupting**  4:9
  53:6
**interview**  124:10
  125:8
**introduce**  124:24
**introduced**  35:1
**invalid**  38:3
**invest**  56:2
**investigation**  12:7
  28:24 29:2 31:3
  42:19 113:13
**investigations**  67:8
**investment**  40:9,13
  40:22 68:15 119:20
  120:4
**investments**  56:18
**investor**  56:14

**investors** 56:2,8,16
  56:19,24
**invited** 26:3
**invoice** 85:25 99:7
  99:10
**invoiced** 12:4 31:7
**invoices** 16:22,23
  20:7 75:5,8,17,22
  98:15,17,25 99:4,4
  116:11,12 142:23
**invoicing** 74:19
**involved** 36:3
  57:14,25 63:12
  100:11 110:20
  134:8
**involvement**
  147:21
**involving** 65:5
**ipo** 121:2 133:8,14
  133:21,22 144:16
  144:18
**irony** 122:2,3
**irrelevant** 82:23
  125:11 135:18
**irs** 56:17
**issue** 6:6 31:6 46:11
  49:1 65:19 81:20
  87:2,3 89:18 97:11
  103:9 117:9 118:21
  120:23 126:4
  131:17 136:7 143:8
  148:1,2
**issues** 22:17 50:23
  65:5 85:2 105:3
  131:2
**issuing** 121:19
**item** 84:22
**items** 35:25
**ivy** 106:21 148:10

**j**

**j** 66:24
**jabar** 43:15
**james** 1:24
**january** 108:16
  149:22
**jenkins** 8:1,4 13:25
  34:22 35:9 36:9
  39:13 121:16 139:3
**job** 6:23 11:6 32:5
  32:15 33:23 36:20
  147:18
**joe** 77:25
**joins** 128:10
**jones** 68:14 122:5
**judge** 1:24 3:12
  25:22 80:22 96:17
  109:14 120:22
  121:17,18 152:21
**judgment** 5:16 6:4
  6:10,15 22:8 30:9
  55:21 56:21 64:11
  64:19 65:8 66:9
  69:19 70:10 79:22
  80:5 107:10 109:16
  112:16 125:4
  127:13 128:22
  129:10 130:22,25
  146:1 149:9
**july** 17:16 23:11
  68:18 101:7,22
  122:3
**jumped** 91:3
**jumping** 54:4
**june** 9:25 11:13
  17:16 34:14 63:14
  101:7,22 116:3
**jury** 51:12

**k**

**k** 1:2,11 2:2 54:25
**kad** 29:4,4,5 96:15
  96:23
**kalat** 42:9 43:7
  117:7,9,10,13,18
  118:7,9,25 119:1
  141:4 143:8,15
**kalat's** 42:13 44:4
  143:10
**karim** 43:15
**karman** 2:12,12
**keep** 23:17,22
  53:13 61:21 73:20
  121:23 146:13,20
**keono** 95:20 127:15
**kept** 14:10 24:10
  25:11
**kickback** 128:6
**kickbox** 43:23
  117:14,14,19 119:1
**kind** 4:3 15:25 16:5
  33:10 49:13 118:18
**kinds** 80:4 82:9
**kitchen** 91:22
  92:10,11
**knew** 10:5 19:17
  24:1 26:23 27:16
  27:18 34:4 36:16
  38:8 44:17,21,22
  45:3,4 56:24 68:9
  69:1 90:6 113:14
  120:24 146:18,21
**know** 3:1,2 4:9,12
  4:15 16:25 17:2
  19:3,6 20:18,18
  24:6,18 26:18
  37:17 49:10 56:14
  62:17 64:3 74:25
  79:23 82:7,11
  83:21,23 84:19

85:22,24 86:2
  88:10 89:15,16,17
  91:6,14 92:1 95:10
  95:18,20 96:6,21
  100:12 102:1,24
  103:2,3,12,13
  104:9,11,17,24
  105:6,8,12,19,22
  106:2,14,15,15
  108:23 110:18
  111:3 112:3 114:22
  116:22,25 120:3,19
  127:25 128:5,8
  130:23 131:1 134:7
  139:4 146:20
  149:19,24 150:10
  151:1,12
**knowledge** 38:22
  45:3,11,16,25
  50:17 91:12 103:8
**knows** 3:22 28:14
  70:9 109:15
**kpmg** 74:5

**l**

**l** 2:3
**lack** 50:17 89:23
**language** 48:24
  61:23 62:1
**large** 78:10,15
**largest** 18:8 19:5
  29:5 108:5
**lassiter** 11:25 64:22
  65:6 89:6 141:4
**latham** 9:24 10:9
  23:19 124:5,6,18
  143:25 144:6,8
**law** 2:9 21:15 48:5
  52:3,6,14 81:25
  119:24 122:5
  131:11 146:14,20

laws 44:10
lawsuit 122:24
lawyer 23:20
 124:14
lawyers 144:6,8
lead 93:12
leads 46:21
learn 80:24
learned 32:9 76:4
lease 45:19 55:20
 55:25
leased 55:24
leasing 56:7
leave 122:19
leaving 102:17
led 144:1
left 33:17 82:17
 139:1
legal 3:20 5:11,15
 9:18 126:1 142:15
legitimate 56:4
 59:23 72:25 115:7
 132:14 145:4
legitimately 59:24
letter 84:16 121:4
letters 120:25
level 93:20
lexus 38:17 137:19
 137:19
liability 47:10
libelous 128:23
license 30:11
licensing 30:16,19
 31:1,2,3 108:25
 109:1,1
lie 23:21 43:4
lied 23:25 139:22
limitation 48:2
 67:1
limitations 19:21
 47:19,21

limited 46:25 64:23
 123:23
limits 47:10 48:11
line 23:15 39:17,18
link 13:9 86:16,23
linked 39:7
links 86:14,18,19
 86:21 136:25
list 29:5 45:7 66:24
listed 45:13 127:11
listen 150:21
 151:24
literally 51:6 85:23
 118:4 122:13
literature 80:3
 90:18
litigation 138:1
little 8:3 16:16
 17:10 65:24 84:5
 96:1 109:19 112:11
live 7:20 81:9
llc 1:2,3,6,8,11,11
 2:2,2,11 46:17
 132:9
llp 2:13 124:7
locally 94:2
log 25:10 33:8
 38:17 113:22
logic 101:5
long 32:3 64:5
 102:25 106:2
 123:12 127:19
 129:8 150:20
longer 131:15
 137:17
look 3:16 7:2 10:22
 10:24 16:22 17:23
 23:6 24:19 29:4,12
 43:13 69:9 72:2,3
 76:9 80:20 81:17
 82:15,16 84:13

85:25 88:16 89:5
 90:18,24 93:6 95:2
 98:5,15,16 102:2
 113:16 140:14,19
 141:11 146:7
 149:22
looked 4:11 22:22
 25:13 43:19,21
 44:20 73:16 74:24
 80:20 85:16 119:4
 122:10
looking 27:15
 36:15 43:20 49:21
 64:14 65:24 68:16
 68:25 98:24 99:3
 110:15 127:23
looks 127:22
lost 10:6 147:3
lot 7:9 21:9 35:25
 36:2,2,2,2 62:6
 65:10 66:2 68:23
 71:18 72:11 82:6
 92:24 96:22 97:6,7
 126:24 149:19
 151:6
low 55:7
lower 56:13
lp 2:12
luxury 149:21
lying 24:1

m
mackiewicz 2:3
 123:20 131:16,19
 144:20 147:19
 152:6,10,21
madison 2:9
magazines 71:10
magic 112:3
mail 10:13,18,20
 11:8 13:16,16
 14:10,13 15:2,5,17

15:20,21 16:12,23
 19:15 20:6 24:11
 26:17,22 27:22
 28:3,5,8,14,17,18
 29:3,6,10,20,23
 30:1,2 31:5,25
 33:14 36:25 38:1,4
 39:9,14,21 40:1,13
 41:1,13,13 43:8,22
 44:11 45:5,8 55:7,9
 59:25 60:24 61:13
 63:15 69:24,24,24
 70:6 74:18 76:4,5
 76:11 77:9 78:9
 79:4,15,25 81:2,9
 81:13 82:2,15,16
 82:19,19 84:4
 85:11 87:4 90:4,7
 90:11,17 92:7,16
 92:23 93:12,18,23
 94:14,18,24 95:22
 96:13,16,22 97:22
 98:2,4,12,16,18,22
 100:9,23 101:3,5
 102:15 106:5
 107:18 109:2,8,23
 109:25 111:17
 117:6 118:20 119:3
 119:10,15 120:1
 126:16 127:24,25
 136:4,7,9,14,22
 137:5 138:5,14
 143:12,16 149:12
 149:13
mails 11:1,1,14,17
 11:20 12:4 14:19
 15:7 17:8 19:1,13
 20:8,18 22:24 23:2
 25:20 27:2,6,11,16
 27:24,25 28:14
 29:9 30:2 31:7 34:5

36:6 37:16,22 38:8
38:11 39:6 41:15
41:22 42:11,15,22
43:9,11,14 44:6
50:7 55:6,7 59:25
63:8 64:23 70:17
74:19 76:5 78:11
78:18,19,19,25
79:3,8 83:15 85:18
86:12,19 90:20
91:21 92:20 93:13
93:15 94:3,7,11,19
95:24 96:22,25
97:13,17 98:24
99:5,5 105:15
107:8 108:8,8,9
111:23 112:5,8
118:6 126:4,21
127:3,18 128:4
137:2 138:16 142:3
142:21,22,24 146:9
146:10,11 148:18
**mailwizz** 10:14
138:14
**main** 44:25
**maintain** 61:24
62:1 132:9
**mair** 138:23
**major** 69:21,21
**majority** 15:16
142:22
**makaria** 127:7
**making** 7:2 22:9
67:4,17 97:8,21
99:13 130:13
**man** 85:12
**managed** 7:15
19:23
**manager** 31:20
34:8

**manual** 78:16
**manually** 32:19
**march** 9:24 55:1
**mare** 45:18
**mark** 12:10 77:23
79:7 92:15
**marketer** 29:20
**marketers** 18:24
**marketing** 1:6,8
2:3,11,12 15:3,5,18
15:20 17:1,7 18:18
18:21 29:23 30:5,7
63:9 90:4,11 97:22
98:3,4,8 100:4,23
126:5 132:9 136:5
136:9,14 143:13
146:17 149:12
**mary** 92:19
**mass** 5:5
**massive** 42:4 99:14
**match** 114:8
**material** 6:6,11
31:5 131:2
**materiality** 88:24
**math** 127:20
**mathematically**
128:13
**matter** 3:8 21:15
40:14 53:17 58:7
121:11 144:19
**mattered** 37:3
**mcgaven** 77:24
**mcgavran** 108:15
**mean** 35:8,14 36:5
60:18 73:6 78:14
83:4 87:8 95:9
124:12
**meaning** 93:22
**means** 21:16 35:16
36:6 113:21 119:9

**mechanism** 13:9
**mechanisms**
138:15
**media** 1:2,3,11,11
2:2,2 8:25 10:15
40:5 46:17 54:25
57:10,16,24 58:4
58:10 65:1 88:2,3
90:23 93:12 94:18
96:15,23 102:21
111:20,22 120:1
127:7 142:12,13
**medicx** 82:12
**medium** 110:7
**melissa** 2:3,6
123:19 131:16
**members** 152:2
**memoranda** 4:10
124:10,19,22,25
136:11 144:12,14
149:16
**memorandum**
51:22 124:5
**memory** 64:20
65:16
**mentioned** 105:3
**merck** 100:21
**mesa** 2:14
**met** 36:22 51:13
113:12
**metaphysical** 6:11
**methods** 34:16
102:23 115:6
**metrics** 33:14
36:25 37:6
**miami** 2:6
**michael** 2:13 3:8,19
12:20 15:15 77:21
77:22 82:12 91:16
91:20 100:13
113:12 123:13

152:6
**middle** 64:4
**mike** 11:4
**million** 11:14,17
54:16 68:17 71:1
87:9 94:3 112:22
115:10,10 116:1,2
116:7 122:5,9,12
127:5,7,14 133:8
133:25
**millions** 10:5 27:10
56:15,18 95:23
127:2
**mind** 102:3
**mindful** 150:1
151:10
**mine** 64:2
**minimal** 13:4
**minimum** 92:25
95:12
**minute** 22:18 62:25
63:2 83:16 100:15
104:5 117:12
121:18
**minutes** 26:2,7,11
123:16,22 126:11
126:11
**misapplying** 72:4
**misdirecting**
115:19
**misread** 60:15
**misrepresenting**
28:12
**missed** 107:17,17
**missing** 26:2 27:10
96:12
**misty** 81:13
**mitsubishi** 5:20
**mix** 112:3
**mixing** 110:7

**mobile** 33:25
**model** 70:24
**moment** 97:10
131:21 150:13,25
**monday** 1:15
**money** 45:6,8 53:2
53:3 56:15 68:23
72:16 81:12 97:14
108:22 109:1
149:19
**month** 71:10 96:23
107:19 151:20
**months** 25:16
68:18 96:23 133:2
149:21
**moot** 146:11
**morning** 3:18
**morris** 77:23 79:6
92:18 100:10
136:13,15 146:7
149:13
**motion** 6:3 21:22
38:25 64:12,19
65:2,12,13,18,22
65:24 69:18,19
70:10 71:11,13
94:7 98:11,21
107:9 109:16
112:16 125:15,18
125:23 127:12
148:14 149:9
**motions** 3:2 64:9
64:16,18 66:6,8
150:4,8 151:4
**move** 7:11 130:24
**moved** 130:22
145:25
**moving** 5:23 54:17
**mstrub** 2:15
**multifold** 99:9

**multistep** 16:6
**mutually** 145:20

### n

**name** 85:4 123:18
124:16
**named** 112:21
**narrow** 5:6
**national** 25:6 26:8
**nda** 68:18
**near** 69:15
**necessarily** 4:16
**necessary** 41:25
49:8
**need** 49:9 61:4
62:10 79:13 103:4
105:18 114:22
117:16 146:4
149:23 151:6,7
**needed** 23:21
**negligent** 73:3
**negotiated** 132:4
**network** 35:5
**neutral** 104:7,12
**neutrally** 128:12
**never** 12:14 13:11
13:14 15:19 18:6
21:2 27:21 30:14
30:23 38:14,24
40:16 43:1 44:1,2
50:2 56:7 59:10,13
60:21 61:12 80:19
80:20 82:20 102:24
109:21 143:6,7
144:17
**nevertheless** 9:13
130:21
**new** 2:10,10 30:8
87:15 121:18
**news** 26:8 151:25
**nice** 112:10

**nine** 106:6
**nixon's** 25:25
**noderer** 43:17
**nonparties** 7:18
**nonparty** 120:20
**nonsense** 120:13
**norderer** 43:18
44:3 117:7,9,12
118:1,5,25 119:1,4
119:11 143:8
**note** 60:8
**noted** 102:23 104:4
125:7
**notes** 17:20,21
20:22 125:7,20
144:1,3
**notice** 1:25
**noticed** 112:25
**notified** 62:16
**notwithstanding**
61:22 70:21 116:23
117:18 132:15,21
147:14
**number** 27:6 34:1
35:20 45:14 77:20
81:2 82:14 97:20
100:7 104:7,14
105:1,2,13,20,24
105:25 106:3,7
112:15,17 116:10
116:16 118:22
124:20,20 125:5
128:3 146:7,12
147:5
**numbers** 23:15
25:20 33:23,24
89:1,2 97:13
112:19 119:12
152:16
**numerous** 8:18

### o

**oath** 100:2
**objection** 6:24
**obligation** 61:21
74:12 95:13 114:24
145:18 148:11
**obstacles** 9:13
**obvious** 64:8
**obviously** 124:16
129:11 149:23
**occur** 61:5
**occurred** 59:11
61:10
**occurring** 102:25
129:9
**october** 11:13
96:16
**odds** 26:21
**offered** 24:2,4 26:1
29:17
**offerings** 93:21
**offhand** 60:7
**office** 7:3 26:4
**officer** 8:2 31:17
**offset** 56:3 145:8
**oh** 20:17 26:25 36:9
42:14 55:9 137:14
138:7 145:12
**oil** 56:6 57:4
**okay** 3:16 5:2 14:15
17:25 18:10 19:17
20:19 21:3 23:7,9
24:14 34:18 35:16
38:9 63:23 71:8
83:6 84:1 90:4
100:9 103:23
109:11 123:17
140:25 144:5
149:15 150:14
**omicron** 152:13

omni 24:11 29:14 73:24 78:1 79:11 79:12 90:14 91:24 92:5 100:3,19,20 100:20 101:2 102:14 104:9,18,24 105:11,23 106:21 109:6 126:4,12,18 145:1

once 21:12 36:25 76:4 129:18

ones 12:21 21:2 25:7 43:21 54:12 54:14 57:13 128:6 128:7

ongoing 61:12

open 19:11 36:4 61:21 82:20 125:10

opened 11:20 33:24 36:7 39:15

opening 31:22 65:18 124:8 136:10 144:4

opens 82:14,22 87:23,24 88:13,19

operate 10:8

operated 33:2

operating 52:22 54:24 55:2 59:24 138:11

operation 55:3,12 130:5

opportunity 24:19 65:4

opposed 47:15 58:22 121:2 128:11

opposing 6:3,4

opposite 119:3 129:22

opposition 8:13 38:13 88:6 127:12

136:2,12 151:4

opt 43:9 81:2,6,7 108:8,8 119:5,9,10 119:12

opted 13:8,13,15

options 33:10

oral 149:17

order 3:3 5:10 23:22 25:2 28:13 74:24 98:11,13,20 110:20 115:4 117:9 124:20 125:7,11,16

ordered 91:6 125:6 125:12,21

ordering 16:23 20:18 93:2 110:11

orders 14:4 75:9

outcome 6:17 62:14

outside 98:20 113:9

outstanding 150:8

overlap 52:12 151:6

overstated 70:23 71:8

overwhelming 9:15

owed 53:20

owned 41:24

owner 67:21

owners 46:19 48:20 67:12,14,21

**p**

p.a. 2:4

p.m. 1:16 152:22

page 60:8 91:11,11 93:12,14,16,24 94:15 98:10,21 107:11 110:24 111:21 114:9,10 124:23 127:1,11 129:4 136:11 140:16

pages 136:1,10

paid 16:14 53:3 74:10,20 76:13,22 91:17 127:2,5,6,14 127:15 142:4

paint 101:13

panicked 88:4

paper 19:9 82:1 90:9

papers 31:14 43:25 87:18 88:7 91:8 96:14 98:11,21 108:14 134:9 144:15 147:23

paragraph 124:8 132:2,20

paraphrasing 108:7

parent 110:15

part 8:4 29:1,13 42:13 44:4 48:20 61:14 63:11 111:21 111:22,24 141:24 150:16

parthenon 68:14 122:8

particular 72:3 94:10 141:18

particularly 53:11 126:19

parties 3:20 5:8 7:1 9:9 11:22 22:18,18 29:18 30:14,18 31:12 38:19 41:11 41:23 48:13 54:11 132:1,4 137:11 153:9,10

partners 71:9

parts 40:4

party 5:13,23 6:4 15:18 28:16 40:23

47:1,2 48:12,12 97:15 127:3 143:22

party's 9:11

pass 131:15

passing 15:3

password 137:20 137:25 138:22

patience 62:20 135:2

pattern 56:23 57:5 58:25 60:14,19

patterns 54:3

pay 34:7 39:5 85:11

paying 25:7 60:20

payment 127:8

payments 132:24 134:20

pending 66:6

people 7:25 23:1 35:2 56:23 78:5 82:7 87:10 109:6 110:4 128:2 139:5 139:21

percent 12:3,4 13:5 14:18 18:9 19:4 35:13,17 64:24 78:19,20 79:4,23 79:24 81:14 83:11 88:19 95:4,4,10,11 99:12 112:1 113:14 114:1 115:12 117:11,25 118:6,7 118:14,19 119:12 123:2 136:13 147:8

percentage 13:1 36:23 103:1 114:19

perfect 146:16

performance 36:4 41:6 74:12

performed 60:21 111:5 113:19

**period** 11:12 132:5
132:6,7,11,22
134:6,21
**permissible** 21:16
**permit** 7:17 41:12
77:12
**permitted** 129:24
141:10
**perpetrators** 56:19
**perplexed** 33:16
**person** 93:2 95:19
109:7 124:18 130:4
138:23
**perspective** 4:5
59:16 141:12
**peter** 31:16 34:24
116:6
**petruss** 1:2,11 2:2
8:25 54:24 57:9,16
57:24 58:4,10
**petty** 35:18
**pfizer** 100:21
**ph** 103:21
**pharmaceutical**
100:21
**phone** 26:5 81:1
101:16 109:10
**phones** 81:9
**photo** 139:11
**pick** 73:8 94:19
**picks** 101:15
**pie** 147:8
**piece** 80:2 90:9
**pieces** 147:8
**pixels** 83:23 86:16
**place** 13:20 20:5
32:3,16 37:1 144:3
**plaintiff** 25:13
**platform** 94:14
**play** 59:21 141:20
141:21

**played** 25:1,12,16
25:21 35:11 113:23
141:19
**plays** 134:1
**pleadings** 30:17,20
40:16
**please** 4:20,21 8:20
8:21 96:12,19
152:6
**pleases** 110:22
**pllc** 2:9
**plus** 81:13 89:11
118:5
**pmk** 31:1
**pmks** 40:19
**point** 22:9,11 40:4
50:12,22 51:18
66:11 72:21 77:2,3
79:6,13,18 133:4
144:20 151:2
**pointed** 42:17
43:25 44:10 61:25
131:6
**pointing** 7:6,9
**points** 129:6,7
135:9
**popped** 30:8 31:10
40:7
**portion** 4:11 45:13
46:4 85:16
**position** 26:10,21
46:23 58:12,15
60:18 78:8,8
104:22 132:3
**positive** 104:13
**possesses** 41:24
**possible** 110:20
**possibly** 64:14
79:20
**post** 7:2 58:16
59:16 115:4

**postal** 93:18 118:14
**poured** 56:15
**powerpoint** 4:2 5:1
66:13 92:8
**ppc** 15:4,22 28:17
40:3 45:1 95:21,23
96:10 109:24
127:16 137:3
**practical** 58:7
**practice** 56:23 57:6
58:25 61:22 62:8
**preacquisition**
135:7,22
**preclosing** 90:10
**predicate** 54:3,22
55:12 59:15 60:11
60:25 61:2,9,9,14
63:7,19
**predicting** 152:14
**predictions** 152:12
152:15
**predominantly**
69:24 79:14,25
92:7 100:9 107:8
109:8 117:5 149:11
**preface** 102:3
**prehearing** 7:17
**prejudice** 125:2
**premise** 68:3 69:3
**premised** 114:6
**premising** 70:6
**preparation** 149:25
**prepared** 8:12
12:17,18,22 17:20
49:24,25 74:7
95:18 120:15,16
139:12
**preparing** 19:9
133:7
**prerecorded** 25:15

**presale** 58:18
**present** 2:16 34:15
142:15
**presentation** 4:2,24
5:2 55:18 64:2
78:17 107:12
126:11
**presented** 88:5
116:5 125:18
**preserve** 146:19
**president** 25:25
**presumably** 139:4
**pretransfer** 115:6
**pretty** 5:18 47:9
56:25 151:25
152:15
**prima** 92:22
**primarily** 50:11
58:21 79:8 90:11
92:20 136:4,9
**primary** 99:10
113:21
**principal** 57:11
**principals** 45:19
54:9
**principle** 44:7
**prior** 24:24 55:1
62:5
**privilege** 6:25
130:9,10,11
**privileged** 62:15
130:1
**pro** 93:14
**probably** 4:7 82:15
123:25 150:5
151:16
**problem** 28:19 69:8
69:12 77:1,17,20
84:19 94:25 97:18
97:20 99:9 101:18
108:18 121:15

134:12 145:10,13
**problems** 63:16
69:13,21 77:18
97:20 147:22
**proceed** 3:4 133:21
**proceedings** 153:5
153:6
**process** 55:5
110:25 120:18,19
140:8
**processes** 83:14
**prodata** 127:9
**produce** 8:20,21
9:1 125:6 144:3
**produced** 9:7,9
**product** 125:25
126:1 143:25 144:6
144:10
**profession** 130:6
**program** 55:23
108:9
**project** 134:8
147:21
**projection** 70:24
**projects** 148:1
**proof** 112:1,2,4
148:12 149:8
**proper** 94:5 98:25
113:19
**properly** 114:18
**property** 41:25
42:3,7 50:6 80:10
80:12 81:16,19
83:3
**prove** 6:22 129:14
129:15,18,21,22
145:11
**proved** 58:16
**provide** 39:6 74:18
**provided** 3:22
13:11 24:7,12

32:24 50:3 126:12
**providing** 14:14
45:15 55:7
**proving** 5:24 47:14
48:13 50:12
**provision** 47:25
48:14 51:5,25
67:24 69:6
**provisions** 48:1,16
**pull** 9:14
**purchase** 9:23
55:15 135:10
**purchased** 13:12
16:11 24:13 126:13
**purchaser** 63:8
**purpose** 4:23 16:24
66:20
**purposes** 25:3 58:6
65:21 132:23
**pursuant** 1:24
**put** 4:1 6:1 8:17
26:5 39:9 47:9,12
52:7 60:23 70:19
84:17 87:16,18
96:7 97:10 104:7
110:21 133:10
139:10 140:21
147:1 150:22
**puts** 117:23
**putting** 97:7
141:23

**q**

**qualified** 130:11
**quality** 111:8,11
**quarter** 56:13
127:14
**question** 16:6,7
19:3 21:5 34:4
37:23 38:6 39:2
47:5 48:8 49:4
52:11 58:2 71:22

75:12 83:16,19
86:2,17 92:21 93:1
93:24 110:24 118:8
118:24 129:12
130:12 134:2
**questions** 4:20,24
21:14 46:9,21
62:21 130:24 131:1
145:23
**quick** 46:5 145:25
146:3
**quickly** 7:6 9:22
33:1 141:14 149:24
**quiono** 95:22 96:10
**quite** 4:13 47:6
53:14,18 123:23
149:23 150:19
**quotations** 124:12
**quote** 70:22 74:6
75:1,3 91:14 93:14
93:16 94:9 102:13
109:22 113:20
114:6 119:13
126:14 129:4 146:8
**quoted** 140:15

**r**

**racketeering** 60:19
**radetich** 2:8 8:5
13:25 17:18 23:13
23:23 34:15 42:20
44:17,25 45:4,6,15
54:10 55:14 57:8
57:12 58:11 101:24
101:25 105:7
119:18 124:2 125:9
130:17 139:18
149:2,5,6
**radetich's** 23:10
44:21 143:20
**radio** 24:22,25
25:10 85:1,2

112:24
**raise** 66:4
**raised** 38:14 48:8
48:10 92:21
**raising** 47:3
**ran** 7:13 8:6 45:17
45:23 83:24 92:2
117:13
**randomly** 87:10,10
**range** 88:19 116:7
**rarely** 23:24
**rarity** 118:21
**rate** 35:13 115:12
**rates** 19:11,11
**reach** 51:9
**reaching** 26:4
63:14
**read** 4:10 46:13,16
67:3 82:18,19,19
84:24 91:7 92:9
93:7,9 109:19
132:19 135:4,11
**reading** 91:10
**real** 46:5 85:3
88:14
**really** 5:17 7:6 8:15
8:16 9:12 13:3
18:24 22:13 30:9
43:4 46:10 47:14
54:10 57:14 62:10
70:9 100:11 111:8
112:10 139:7
142:23
**reason** 49:25 63:11
65:12 78:23 81:10
82:21 89:8 108:11
**reasonable** 68:11
116:2 131:5
**reasonably** 68:24
**reasons** 44:7 48:7
60:5 64:8 128:21

133:18
**rebut** 145:25
**rebuttal** 134:24
**recall** 133:1 144:2
**receivable** 41:16,18
46:15
**receivables** 77:10
79:19
**received** 74:20
140:12,18
**recess** 63:5
**reckless** 45:25
**recognizable**
114:18
**recognize** 41:12
141:9
**recognized** 43:21
**record** 22:12 24:10
139:23,24 153:6
**recorded** 85:7
**recording** 25:11,14
35:11 36:8
**recordkeeping**
25:18 138:15 140:1
**records** 11:15
25:14 27:18,19
38:10,10 75:21
114:9
**recoverable** 52:25
**redact** 126:2
**redepose** 144:9
**reduce** 106:10
**reduction** 145:7
**refer** 17:21 107:10
**references** 60:8
**referred** 10:16
20:22 55:17,19
**referring** 29:14,19
53:13
**reflect** 75:9

**reflected** 41:18
72:16,17 75:5,17
75:21 114:12
**reflecting** 115:11
**refresh** 64:20 65:16
**refund** 108:21
**refunded** 53:2
108:25
**refused** 7:22,25
8:23
**refuted** 42:14
**regarding** 67:18
105:4
**regardless** 57:21
62:13
**registered** 36:25
**reinstate** 38:23
**rejected** 39:23
**relate** 31:5 66:8
**related** 77:14
**relates** 53:11 55:13
**relating** 41:1 67:18
**relative** 75:2 153:8
153:10
**relatively** 7:14
149:24
**relevant** 40:25
125:13 135:20
**reliability** 111:11
**reliance** 88:15,22
89:17,24 135:6,22
**relied** 67:7
**rely** 50:12 68:8
69:2 80:7 95:14,16
96:17 123:7 149:12
**relying** 58:20 60:13
67:20 128:1
**remarkable** 96:14
**remarketers** 18:14
19:6

**remedy** 116:1
**remember** 25:22
27:4 31:21 51:7
94:1 101:13 104:21
120:25
**remind** 9:20
**rent** 113:21
**rep** 46:18
**repair** 145:19
**repeat** 72:9 123:20
146:5 151:10
**reply** 8:17 17:22
20:23 37:19 42:18
55:19 65:4 87:18
88:6 91:8 96:14
107:16,24 140:16
**report** 12:2 23:15
32:10 33:7,9,10,12
33:16 34:17 86:1
87:17 89:5,9 110:8
118:12 137:10,12
138:2 153:5
**reported** 11:14,16
27:6
**reporters** 26:3
**reporting** 10:10
19:11 22:25 23:12
34:23 36:24 129:9
**reports** 14:6 19:10
19:16 20:10,10
33:13 35:6 55:8
89:10,15,16 98:5
126:20
**represent** 100:20
123:15
**representation**
33:6 41:7,8,17 44:8
50:5 52:8 67:22
68:7 78:20 79:3
81:19

**representations**
51:21 52:1,17
67:10,17 135:13,22
**representative**
91:15
**representatives**
67:16
**represented** 41:23
49:19 139:4,6
**reps** 46:16 48:2,15
**request** 7:4 137:24
143:24
**require** 72:12
**required** 21:15,17
27:21 109:15
**requires** 21:10
149:25
**resolved** 6:18
**respect** 50:4
**respond** 65:4 139:8
150:12 151:3,8
**responded** 23:14
23:23 62:13
**respondents** 1:7,12
1:12
**response** 26:13
117:4 128:17 129:5
132:12
**responsible** 139:1
**restaurant** 12:15
93:3 101:1 110:12
**restroom** 63:3
**result** 117:22
**resulted** 84:3
**resulting** 152:13
**retained** 9:25
**retarding** 109:23
**retarget** 30:2
**retargeting** 29:25
**return** 40:8,12,22
119:20 120:4

**returned** 45:6
  108:13
**revenue** 25:3 41:13
  54:18 72:16 77:13
  115:4,7,8,8 133:19
  141:9
**revenues** 71:6
  104:22 112:22
  113:1 114:17
**review** 112:24
**rhetoric** 6:13
**rich** 2:10
**richard** 2:2,4,4,4,8
  3:12 6:24 7:8 15:13
  62:24 123:14,18,19
**richard's** 143:19
**richardandrichar...**
  2:6,7
**rico** 53:11 54:4,23
  55:21 58:13,17,24
  59:12 60:4,9 61:1
**riding** 149:20
**right** 4:6 12:6
  21:19,25 54:7
  62:16 79:25 82:18
  85:23 87:11,13
  91:3 92:3 94:6
  97:25 104:23
  113:25 118:10
  132:17 134:23
  138:12 140:11
  151:25
**rise** 97:16
**risky** 117:17
**rjv** 2:2
**rmr** 153:3,17
**robinson** 2:16 3:21
**roi** 143:3
**role** 134:1
**room** 68:21

**rosemary** 25:24
**roth** 2:8,9 3:7,11
  9:5 63:1,24,25 66:7
  72:14,20 73:9
  77:16 78:4,13 83:6
  83:18 84:5,11
  86:16,20 87:12
  96:2 97:18,25
  103:20 123:11,12
  133:17 135:4,9
  136:3 138:9 139:21
  140:21 145:24
  146:3,6 150:3,14
  150:18 151:15,21
  152:19
**roughly** 12:3,3
**round** 44:15
**rrothlaw.com** 2:10
**rule** 41:12 141:8
**ruled** 124:22
  125:25
**rules** 66:1
**ruling** 7:8
**run** 14:22 48:1 83:9
  119:24 120:4
**running** 63:16
  141:22
**ryan** 77:23 108:15

**s**

**safe** 151:21,23
**sake** 118:9
**sale** 54:16 57:17
  58:16 59:16,18
  60:12 83:9
**sales** 1:6,8 2:11,12
  12:11,13 14:13
  24:5 25:3 41:20
  74:24 75:9 91:15
  98:11,13,20 132:8
**salespeople** 14:9
  24:10 93:5

**sample** 89:4 141:6
**sampling** 141:3,12
**sandbar** 70:14,22
**sandbox** 69:16,20
**satisfied** 54:2 59:15
  104:4
**satisfy** 74:11
**saw** 24:8 28:20
  35:5 37:12 88:3
**saying** 13:10 17:14
  18:22 20:15,17
  29:19,22 40:11
  42:21 44:16 47:24
  55:9 60:11 61:1,4
  72:2 91:20 93:11
  96:8,16,24 105:5
  120:11 121:2
  125:11 130:4 138:7
  141:7 142:17 145:1
  145:12 146:13
**says** 13:13 18:4
  20:2 21:1 24:5
  35:13 62:1 67:3,4
  67:13 69:4 70:1
  71:4 74:14 78:18
  79:4 82:9,13 88:12
  89:8 90:10,19
  93:16 95:18 98:12
  101:16,17 102:9,19
  102:23 105:22
  106:1 109:7 111:16
  113:18 117:24
  118:1,7 119:2,13
  119:16,20 120:8,11
  124:8 127:20
  135:11,12 140:12
  141:20 142:11
  149:2,2
**scene** 101:14,15
**schedule** 150:4

**schedules** 80:12
**scott's** 25:9 84:22
  84:23 85:6,20
  87:20 113:2,4,5,20
  113:24,25 114:1,8
  114:12,13 115:2
  138:10,13 147:6,11
**scratched** 37:11
**screen** 31:22 82:17
  101:9 139:10
  140:22
**screenshot** 7:2
**scroll** 140:19
**se** 58:11 59:4 130:3
**season** 151:19
**second** 18:4 29:5
  29:12,15 46:6
  81:21 96:2,11
  99:12 101:9 102:7
  107:10 124:23
  126:3 128:14
  129:13 140:11
**seconds** 26:10
**secretary** 2:16
  25:25
**section** 41:9,16
  44:8 46:24,25 47:8
  47:25 48:1 49:22
  52:2 67:1,2 113:3
  128:16 135:5,10,18
  135:20,24
**see** 5:1 12:2 14:16
  17:23 19:9,9 22:17
  28:10 33:16,22
  35:3,3 46:10 47:3
  48:8 51:1 70:20
  81:18 85:8,9 87:7
  91:11 95:7 98:12
  103:17 104:2 110:5
  111:8 112:7 139:17
  140:10,22 144:13

**seeing**  26:12,13,14
   26:15 49:1
**seeking**  81:11
**seen**  40:6 46:22
   48:17
**segregate**  42:5
**selected**  98:14
**sell**  5:20 25:5 79:11
   83:10
**seller**  24:24 85:4
   112:17
**seller's**  115:18
   134:4
**selling**  14:10,13
   15:2 24:11,25 55:6
   59:25 72:18 79:11
**send**  10:19 20:6
   27:22 28:2 41:22
   42:22 74:9,11
   83:13 87:4 94:17
   127:3 138:14
   143:12,16 152:6
**sendgrid**  10:14
**sending**  11:10
   22:24 23:2 27:1,17
   28:16,17 29:2,6,9,9
   37:15 42:10 43:12
   44:5 50:7 55:8
   59:25 97:17 142:3
**sense**  16:13 20:11
**sent**  11:1 19:1 20:8
   26:17 27:17,24
   30:3 31:8 34:6
   38:11 42:12,15
   76:6 84:4,15 86:12
   94:20 126:22,22
   127:18,20 128:5,11
   137:3 138:4,17
   142:20
**sentence**  60:9
   132:20

**separate**  32:3
   49:12 52:23 62:2
   125:14 132:10
   134:18
**september**  38:20
   86:9 120:14 137:10
**series**  59:14 85:1
   124:10
**serve**  137:24 138:2
**served**  12:23 40:24
   137:9
**server**  10:24
**servers**  11:3
**service**  118:14
**services**  21:4 29:17
   41:20 50:1 60:21
   64:23,25 72:18
   74:18 109:22 145:2
**set**  20:9 67:12
   101:14 129:17
**seven**  105:20
   106:15
**shalat**  103:21
**sham**  132:14
**share**  4:3 101:9
   102:4
**sharing**  106:18
**sharon**  152:3,7
**shifting**  129:23
**shifts**  117:14
**shoes**  59:2
**short**  64:2
**shorter**  64:3
**shorthand**  53:16
   53:17 54:8
**shot**  7:3
**shots**  31:22
**show**  4:5 6:1,5
   30:16,20 33:19
   38:11 73:11 79:14
   79:24 84:10 88:24

90:10,16 101:10,16
   102:8 111:17 121:4
   125:16 145:19
   149:11
**showed**  8:18 11:9
   11:15,18 25:14
   33:4 38:24 44:2
   95:17 107:11
   136:18,25 148:19
**showing**  47:20
**shown**  33:12 41:14
   113:24
**shows**  24:15 25:19
   27:7 62:9 79:24
   127:24 128:1
   138:18
**shut**  10:2 92:4
   132:18 148:23
**shutdown**  133:16
**shutting**  133:6,11
**side**  17:3 97:8
**sides**  72:11 114:11
   115:16
**sign**  121:3
**signature**  153:16
**signed**  68:18
   120:15
**significant**  4:11
   6:21 45:13,14 47:9
   67:1 126:19 133:15
**significantly**  35:21
**sim**  69:1 78:17
**similar**  11:19 24:21
   33:13 66:15 69:15
**simple**  53:18 78:12
**simpler**  60:23
**simply**  7:22 44:18
**simultaneously**
   133:9
**single**  76:8 77:21
   77:24 80:2 86:20

111:15 124:18
   130:2 142:1,2
   144:14
**sit**  125:17,19
   148:12
**sitting**  93:3
**situation**  49:15
**six**  80:4 105:13,16
   105:19 106:15
**size**  106:10
**skies**  31:17
**slowly**  93:9
**small**  102:10
   127:21
**smith**  81:1
**snippet**  34:23
**social**  40:4 103:8
   109:23 142:12,12
**software**  36:24
**sold**  14:8 15:7,17
   28:12,18 29:24
   78:11 92:17,18
**sole**  132:17
**solely**  58:20 67:7
**solutions**  2:12,17
   10:15
**somebody**  32:19
   95:11,20 96:20,21
   96:23 107:19
**soon**  150:2 151:9
   151:14 152:7
**sophisticated**  63:17
   93:22
**sorry**  53:5 67:2
   83:19 103:15,21
   106:13 116:12
   123:12 147:3
**sort**  66:12 139:19
   145:7
**sounding**  151:25

**sounds** 40:11
**source** 85:10 87:7
  99:10 119:5,9
**sources** 103:7
  113:10
**space** 109:24
**spam** 36:1 39:23
**speak** 91:13
**speaking** 17:5
**specific** 49:4 70:15
  71:7,15
**speculation** 6:13
  28:13
**spend** 119:25
  131:22
**spent** 45:8 51:6
  68:17,23 97:14
  122:4,12
**spoke** 12:14 101:11
**spoken** 9:4
**spot** 18:25
**stalemate** 118:11
**stand** 107:15
**standalone** 54:24
**standard** 5:11,15
  142:15
**standing** 59:1,3,11
  61:8 63:21
**standpoint** 141:3,5
**stands** 21:19
**start** 5:15 63:2 68:2
  69:3
**started** 4:8 56:6
  92:2 93:11 103:15
  120:11 122:24
  144:25 146:22,24
**state** 52:15 99:18
**stated** 23:13
**statement** 44:22,24
  45:2,5 46:14 58:3,5
  65:18 96:5 108:2

**statements** 6:13
  8:11 41:10,19
  49:23 62:15 72:5
  74:7 128:24 129:11
  129:19 130:1
  143:20
**states** 5:19 69:6
  118:14
**station** 24:23 85:1
  112:24
**stations** 85:2
**statistical** 11:25
**statistically** 12:3
**statistics** 33:20
  35:8 43:13
**stay** 151:21
**stayed** 26:9 134:17
**staying** 151:23
**stays** 34:1
**steak** 110:19,19
**stein** 25:22
**stenographically**
  153:4
**steps** 134:3
**stick** 84:2
**stock** 53:18
**stop** 106:17
**stopped** 89:18
**storm** 102:21
**straight** 144:17
**strategy** 121:12,21
**stricchiola** 10:23
  37:22 136:19
**strub** 2:13 3:10,17
  3:18,19 4:19 7:5,11
  15:23 16:2,10,20
  17:15 21:23 22:10
  47:16 48:17 49:3
  49:11 50:25 53:7
  53:24 54:6 57:9,18

57:23 58:10,24
  59:17 60:18 61:7
  61:18 62:23 63:6
  64:1 66:12,16
  67:25 76:16 81:22
  82:9 84:24 91:3,4
  95:17 101:11 102:8
  107:11,15 111:16
  113:1 117:8 119:20
  123:21,24 124:4
  126:6 128:15
  134:24,25 146:8
  148:4 151:1,2,22
  152:2,9,20
**strub's** 72:10 94:3
  117:3
**structured** 143:15
**struggle** 22:12
**struggling** 21:9
**students** 42:23
  143:17
**studio** 141:22
**stuff** 140:4
**subcontractor**
  93:13 94:16,17
  96:15 112:2
**subcontractors**
  26:17,19 27:1,3
  28:22 29:9 63:13
  64:25 94:20 95:2,5
  142:7,8,20
**subject** 39:17,18
  125:14 143:23
**subjects** 23:4
**submit** 70:14 99:17
  107:8 109:3 117:1
  121:24 122:15
  123:8
**submitted** 78:5
  107:25 136:16
  150:7

**subpoena** 120:20
  137:22
**subpoenaed** 121:1
**subpoenas** 120:16
  121:19
**subsequent** 60:13
**subsequently** 57:3
**substance** 66:10
  151:3
**substantial** 3:23,23
  9:15 16:3 20:13
  21:20 25:19 27:5
  44:19 97:8 132:15
**success** 36:3
**successful** 30:11
  55:10 73:7
**successfully** 54:18
**sudden** 38:9 43:5
**suddenly** 59:23
**sue** 68:4
**sued** 56:19
**suffer** 59:6
**sufficient** 3:24 46:1
**sufrin** 112:21
**suggestion** 127:17
**suite** 2:5,13
**summarize** 5:23
**summary** 5:16 6:4
  6:9,14 20:23 22:8
  30:9 55:21 56:21
  64:11,19 65:8 66:9
  69:18 70:10 79:21
  80:5 107:9 109:16
  112:16 125:4
  127:13 128:22
  129:10 130:22,25
  146:1 149:9
**summer** 133:23
**supplemental** 18:1
  19:18 21:4

**supplementation**
15:4 20:19 26:22
26:24
**supplied** 27:8
49:16
**supply** 49:5,16
**support** 9:16 29:8
44:20
**supporting** 149:16
**supposed** 10:19
23:2 49:15 77:8
137:11 140:13
**supposition** 107:7
**suppositions**
107:13
**supreme** 5:19
**sure** 28:5 39:18,20
39:21 40:10 57:20
110:22 118:19
150:11 151:11
**surge** 152:12
**system** 12:8 20:9
25:9,10,18 27:7,19
31:20,20 32:2 33:8
34:8 35:3 84:22,22
84:23 85:6,20
87:20 113:2,4,5,20
113:24 114:1,2,8
114:13 117:13
118:2 120:14
138:10,13 141:20
141:24 144:23
147:6,9,11
**systems** 10:14,18
10:22 11:7,9,15,18
13:18 20:5 22:25
26:15 27:15 37:16
38:2

**t**

**t5** 126:23
**take** 1:2,11 2:2
5:12 7:20 8:6,12,13
9:8 10:2,10,13,19
10:23 11:9,14,16
11:22 12:10,18
13:8,17 15:1,19
18:13,20,20 20:1
22:2 23:14,15 24:4
24:16 25:5 27:7
28:2,11,24 29:14
29:17,18,20 30:11
30:13,18,19 31:11
31:18,18 32:2,15
32:16 34:15 35:2
36:12,14 37:3
38:10,19 39:5,8,10
40:7,16 41:11,15
41:21,23 42:4,10
42:14 43:11 44:5
44:15 46:17 47:7
50:6 52:21 53:13
53:16,21 54:8,18
54:25 55:2 59:5,22
60:16,20,25 61:20
62:7 63:8,15,22
68:6,7 74:6,9,18
80:7 83:2,5,7,12,22
83:24 84:15 86:24
89:4 94:15,17 96:9
100:3 101:4 104:13
105:18 108:10,16
117:4,19,23 118:2
121:21 127:1
131:20,23 132:3,10
132:22 133:5,7,16
133:19,20 134:17
136:4,6,8 137:10
138:16 140:2 142:3
143:11,17 144:23

144:25
**taken** 7:4 125:8
137:1
**takes** 128:9
**talk** 12:9 14:15
19:12 21:12 24:16
27:2 61:19 66:25
67:25 76:14 80:18
81:4,21 82:5 83:15
101:6 117:7 147:19
**talked** 8:24 44:13
46:13 109:21
138:22 143:14
**talking** 11:2 22:20
27:5,9,9 61:15
103:4 124:4 129:6
129:7 131:23
140:21 151:18
**tape** 26:7 85:7
**target** 110:3
**targeted** 40:1 42:6
42:11,15,22 44:5
50:7 143:12
**targeting** 93:19
**targets** 50:8 54:20
57:11
**tax** 55:23
**taxi** 106:22
**team** 14:13 68:15
110:13 111:6 152:2
**technical** 58:1
**technology** 31:16
**telephone** 8:18
**tell** 21:8 35:12 77:7
84:3 87:12 92:11
96:12,19 99:7,23
104:6 107:16
109:12 136:21,24
137:4 138:4 146:18
151:23

**telling** 35:19
104:10
**tells** 92:13 143:17
**ten** 106:7 140:23
141:1 148:20
**tens** 40:20 95:23
**terms** 53:15 54:22
58:12 63:19
**test** 27:25
**testified** 32:9 34:12
42:9 44:1 71:23
73:24 90:1 100:2
139:19
**testify** 7:23 22:2
122:20 147:7
**testimony** 7:13 8:7
14:18 24:3,4,8,9
42:13 44:4 84:9
87:17 89:9 91:7
114:11 115:14
118:12 136:18
139:16 140:15
141:11,24 143:10
147:10
**testing** 74:25 75:1
**texas** 5:21
**text** 42:20
**thank** 4:19 62:22
62:23 63:23,25
64:1 123:10,11
131:19 134:23
149:14 150:18
151:15 152:17,19
152:21
**theoretically** 50:16
**theory** 84:2
**thing** 6:19 21:23
22:19 34:20 37:2
50:4 62:12 64:6
66:17 82:3,16,18
87:19 96:2,4,11

120:5 121:16
128:14 136:23
144:16 146:8 148:4
149:1
**things**  6:8 11:2
21:8 44:14 47:6
72:12 80:5 85:25
95:16 116:9 121:25
123:21 129:1
142:10
**think**  4:5 5:6 31:13
47:17 49:7 50:13
50:20 56:25 58:1
58:14 59:17,21
60:1 61:16 62:5,10
65:5,6,22 66:14,16
66:23 68:2 79:6
80:8,15 81:20,24
84:12 86:21 87:24
89:23 95:21 97:2
99:22 100:16
101:20 117:8
119:16 121:5 131:3
131:4 136:5 146:18
150:5,7 151:7
152:9
**thinker**  93:17
**thinking**  50:21
**third**  28:16 40:23
47:1 48:12 72:21
97:15 127:3 129:25
**thirds**  77:13 78:18
82:17 89:13
**thoroughbreds**
56:12
**thoroughly**  45:22
**thought**  16:18 17:6
17:11 39:25 56:8
57:15 81:18 90:4
93:19 100:8 106:5
137:2

**thousands**  40:21
143:1 148:7
**three**  5:19 10:2
69:21 70:8 80:14
88:24 99:24,24
100:18,25 101:1
103:5,10 104:10,17
104:18,24 105:10
105:17,18,18
106:13,20,22
109:10,12 114:21
114:23 116:24
125:5 128:1,3,7,10
128:21 147:5 148:8
148:16,21
**thrilled**  108:6,7
109:14
**throw**  117:20
126:24
**time**  3:25 32:3
37:20 43:24 50:19
65:25 111:7 117:21
118:23 126:8
131:21,22 132:8,11
132:18 133:6 135:1
135:1 138:20
145:17 150:23
**timeline**  9:21
**times**  56:11 79:9
97:6 123:24,25
**timetable**  151:11
**timing**  133:15
**tma**  103:20 104:20
**today**  66:3 95:7
101:23 125:15,17
125:20 126:6
149:10
**told**  8:25 9:4 23:16
38:19 75:24 76:3
113:14 129:2
139:25 140:3

**tomorrow**  45:10
**ton**  45:11
**top**  32:7 103:16
118:11 122:6
**topco**  2:12
**total**  84:19 100:5
**totally**  53:12
148:16
**touch**  35:23
**tough**  18:25
**tower**  2:5
**town**  2:14
**track**  10:25
**tracking**  19:10
20:10 33:16 35:5
36:15 55:8 86:1
89:10,14,15
**traffic**  15:22 19:18
28:17 38:3,4 55:8
111:9 137:3
**training**  78:16
**transaction**  67:6
133:25
**transcript**  124:9
153:6
**transcription**  35:10
**transfer**  53:19,19
115:4
**treating**  128:12
**tremendous**  150:23
150:24
**tremendously**
55:10
**trial**  6:7 112:15
121:21 141:15
**tried**  5:5,6 7:24
8:15 9:12 40:23
110:1 151:3
**trigger**  117:22
**trips**  112:23

**trouble**  19:14
**true**  29:21 44:18
69:5 77:9 128:24
129:11,22 153:6
**truth**  53:17 128:24
**try**  8:14 102:10
**trying**  17:9 49:2
50:20 51:6 58:19
59:20 85:15 93:17
140:4
**turned**  43:5
**turning**  10:12
**turns**  133:22
**twice**  125:5,21
**two**  12:18 17:25
20:14 27:9 41:5
46:21 60:9 64:8,15
69:20 70:2 77:13
77:22 78:4,18
82:17 85:25 89:13
95:16 96:23 97:20
100:7 101:1 102:21
102:22 103:24
104:1,9 105:11,13
106:13,13 112:17
116:16 118:16
121:25 123:15
124:20,21 125:22
128:1,3 133:2
135:9,25 137:25
139:17 140:23,25
146:12 148:16
152:2
**type**  10:9 17:7 22:8
22:19 57:22

**u**

**ultimate**  122:3
**ultimately**  8:23
17:19
**unaudited**  112:17

**unbelievable** 148:8
**unchanneled** 17:7
**undeliverable**
  117:16,24,25
**understand** 18:13
  47:19,22 50:9,22
  61:3,16 73:4,5,9
  87:1 90:19 97:23
  150:21
**understanding**
  104:4 108:3
**understands** 31:14
  136:6
**understood** 16:8
  22:10,11 34:4
  50:10
**undetermined**
  117:17
**undisputed** 74:8
  80:11 95:3 112:1,2
  112:4 126:24,25
**undue** 125:2
**unequivocally**
  92:16
**unfortunately** 60:6
**unhappy** 19:25
**unit** 62:2 132:11
  134:18
**united** 5:19 118:14
**universe** 21:20
**unknown** 117:17
  117:20,23 118:2,4
  118:21,22
**unquote** 129:4
**unrebutted** 143:11
**unsupported** 6:10
**upset** 43:4
**url** 39:6,9 40:3
**use** 4:3 27:12 42:1
  56:2 113:8 125:3

**uses** 94:17

**v**

**valid** 41:19 43:8
**valuation** 70:24
  115:21 116:1,3,4,5
**value** 76:10,12,19
  76:20,24 144:23
**vehicle** 145:19
**vendor** 13:13 29:5
  43:22 96:6,6 111:4
  111:7,9,13 113:8
  123:2 127:10 148:5
**vendor's** 109:5
**vendors** 27:22,24
  28:7,16 29:1,8 40:3
  95:8 96:4,18 97:1
  97:15 99:17,20
  107:4,5,17 111:5
  113:15,16 117:2,4
  120:16 121:13,23
  123:3 127:3 143:4
**verbally** 102:13,16
  103:20,25 104:15
  105:21
**verbatim** 124:9
**verify** 112:19
**verizon** 88:17,17
  120:8
**versus** 93:18
**viability** 14:7
**vice** 93:18 141:25
**victims** 63:20
**video** 3:13 33:2
**viewed** 12:21
**violation** 9:17
**virtually** 130:12
**vital** 102:9
**voiced** 105:14
**volo** 10:14 11:3
  94:14,18,24,24
  114:3 138:14 147:6

**voluntarily** 9:2
**volvo** 93:25 94:2,9
**vs** 1:5,10

**w**

**wait** 54:5 90:22
  104:5 117:12
**waiting** 18:5 21:1
**waitress** 91:2
**waitresses** 92:14,15
**walk** 4:3 5:12 9:8
  9:19 33:1 41:3
  70:13 101:12
**walked** 51:15,16
**want** 3:3,8 4:1 5:3
  5:9 6:19 9:20 31:13
  33:10 35:23 39:1
  41:3 51:18 64:6
  66:4,20 79:10
  80:23 81:25 82:1,2
  82:7 83:8,10 90:21
  93:9 96:17 102:1
  103:13 104:2 105:6
  105:8,12 106:14
  107:15 109:19
  110:19 112:11
  116:19 117:3 120:2
  120:21 123:5,6,7
  128:22 139:8,10
  144:5,7,8 148:20
  148:21 149:7
  150:11
**wanted** 22:3 23:17
  37:17 61:19 66:11
  80:20 82:11 91:13
  91:21 92:12,14
  103:23 105:2 110:3
  116:25 133:18,19
  140:5 142:9,12
  145:23
**wants** 103:2,11
  104:3 105:14

  106:14,15
**ward** 31:16 34:24
**ward's** 32:5
**warranties** 46:16
  46:18 48:3,15 52:1
  52:17 67:10,17,22
  135:13
**warranty** 41:7,9,17
  52:8
**watergate** 25:25
**watkins** 9:25 10:10
  23:20 124:5,6,19
**way** 3:5 6:18 16:21
  18:12 20:21 26:9
  26:20 27:4 36:13
  38:5,18 47:12,24
  49:19 51:1 64:20
  71:5 76:8 80:22
  86:22 87:15 91:17
  94:1,6 98:25 102:6
  110:14,16 111:1
  113:11 114:5 119:7
  121:6 122:22 128:8
  134:11 138:19
  142:13 143:16
  144:23 147:21
**web** 32:6
**website** 39:7 82:4,8
  83:1,22,25 87:11
  136:25
**week** 83:9
**weeks** 10:3 64:9
**wei** 11:4 12:1 16:24
  64:21 65:10,11
  89:8 113:12
**wei's** 39:2 89:4,5
**weiner** 28:24 63:12
  63:17 95:19 96:7
**weng** 153:3,17
**went** 11:6 57:3
  59:18 75:7 76:5

82:8 83:1,21,24
85:17,18 86:3
90:20 93:24 94:1,7
94:9,11,13 111:20
111:22 112:6
115:20 122:10
130:19 133:2,23
**westerman** 75:4
**westlaw** 38:17
137:19,19 146:15
146:20
**whatsoever** 67:18
67:23 132:15
**whiskey** 117:16,16
**whopping** 100:5
**widgets** 49:16,17
**william** 65:5
**willing** 10:7
**willingness** 135:3
**win** 81:20
**wind** 150:17
**window** 117:21
**winetraub** 20:2
82:12 100:13,19
106:20 119:16
**wire** 44:12 60:24
**wisc** 94:24
**wise** 106:21 148:10
**witness** 8:20,22
12:10 69:25 70:5
71:23 72:2 73:2,14
73:15,19,20,23
77:7,21 115:18,19
115:20 116:16
119:22 121:22
136:15 142:2,2
147:7
**witnesses** 7:7,19
12:9 22:14 23:6
77:25 79:17 115:15
115:17 141:17

144:9 147:10
**woman** 85:12
100:1,2 141:18
**wonder** 89:11
**woods** 25:24
**word** 88:3 95:15
98:12,22,23 118:22
126:25
**words** 39:22 48:5
**work** 4:14 39:10
43:25 45:7 51:6
81:9 125:24,25
137:20 143:25
144:5,10 148:13
150:23
**worked** 33:1 39:16
**working** 14:2 15:1
31:23 75:3 93:17
152:4
**works** 32:24 33:7
33:19 51:11 83:7
111:8 118:2 137:18
**world** 100:22 122:7
**worse** 107:22
**worth** 53:15 56:18
104:22 106:23
115:22 119:19
120:3
**write** 128:16
**writeoff** 55:23
**writing** 52:8
**written** 21:2 45:14
140:10,14,18,24
143:24 148:22
**wrong** 26:6 70:18
70:20 71:24 72:7
76:7 86:25 87:2
96:3 101:25 104:6
104:11 105:7
116:17

**wrongdoing** 118:18
124:2
**wronged** 101:21
**wrote** 124:15
126:10

### x

**x** 13:13 76:22 94:3
105:8 111:9

### y

**y** 13:13 111:9
**yeah** 75:11
**year** 15:8 91:17
118:13 120:1 127:5
127:6,16 132:7
**years** 14:22 80:14
108:10 118:16
125:22 137:7 138:1
**yellow** 18:2,4 20:25
140:17
**yeses** 105:18
**york** 2:10,10
121:18
**young** 68:13 122:6

### z

**z** 13:13 111:9
**zero** 76:22 99:19
104:22 106:24
115:23
**zoom** 1:15

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.