Case No. 1:22-cv-3278

EXHIBIT W

# AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| Petruss Media Group, LLC, f/k/a Take 5 Media Group, LLC, | Case No. 01-19-0002-7532 |
| Claimant, | **DEPOSITION DESIGNATIONS OF CHRISTOPHER BROWN** |
| v. | |
| Advantage Sales & Marketing LLC, a California limited liability company, | |
| Respondent. | |

Advantage Sales & Marketing LLC, Advantage Sales & Marketing Inc., Karman Intermediate Corp., Advantage Solutions Inc., and Karman Topco L.P.,

        Counter-Claimant and Cross-Claimants,

    v.

Petruss Media Group, LLC f/k/a Take 5 Media Group LLC, RJV Marketing Corp., Richard Gluck, and Alexander Radetich,

        Counter-Respondent and Cross-Respondents.

Advantage Sales & Marketing LLC, Advantage Sales & Marketing Inc., Karman Intermediate Corp., Advantage Solutions Inc., and Karman Topco L.P. ("Advantage Parties") hereby submit the deposition designations of Christopher Brown.

The Designation Run Report, attached hereto as **Exhibit A**, includes both parties' designations of Mr. Brown's deposition testimony, and employs the following color scheme:

The Advantage Parties' designations are reflected in blue font;

The Take 5 Parties' designations are reflected in red font; and

The Advantage Parties' counter-designations are reflected in green font.

The video excerpt of Mr. Brown's deposition testimony, reflecting both parties' designations, has been uploaded to the Box.

DATED:  May 11, 2022                           Respectfully submitted,

                                               GREENBERG GROSS LLP


                                               By:
                                                   Wayne R. Gross
                                                   Michael H. Strub Jr.
                                                   Desiree N. Murray
                                                   Edward A. Danielyan

                                                   Attorneys for Advantage Sales & Marketing LLC,
                                                   Advantage Sales & Marketing Inc., Karman
                                                   Intermediate Corp., Advantage Solutions Inc., and
                                                   Karman Topco L.P.

# EXHIBIT A

**Designation Run Report**

# Brown_05012022_Final

---

**Brown, Christopher 06-23-2021**

---

**Advantage  00:15:03**

**Take 5  00:10:39**

**Advantage Counters  00:08:15**

**Total Time  00:33:57**



ID:Brown_05012022_Final

| Page/Line | Source | ID |
|---|---|---|

**Brown_05012022_Final**

| Page/Line | Source | ID |
|---|---|---|
| 6:20 - 7:4 | **Brown, Christopher 06-23-2021 (00:00:17)** | Brown_05012022_Final.1 |

6:20   Q. Good morning, Mr. Brown.  Where are
6:21 you located?
6:22   A. I live in Washougal, Washington.
6:23   Q. The State of Washington?
6:24   A. Yes.
6:25   Q. Have you ever been deposed before?
7:1 C. BROWN
7:2   A. Yes, I have.
7:3   Q. How many times?
7:4   A. Probably half a dozen.

| 9:22 - 10:16 | **Brown, Christopher 06-23-2021 (00:01:08)** | Brown_05012022_Final.2 |

9:22   Q. Okay.  And your employment, tell us
9:23 that briefly.
9:24   A. Yes.  After college, I started with
9:25 Arthur Andersen in 1996 as a staff auditor.  I
10:1 C. BROWN
10:2 was with Arthur Andersen until May of 2002, at
10:3 which time I changed employers to KPMG.
10:4 Arthur Andersen was going out of business at
10:5 the time.  I was at KPMG as a manager and, you
10:6 know, ultimately was promoted to partner, and
10:7 I was at KPMG up until February of 2018.
10:8 And then in August of 2018, I joined
10:9 FTI Consulting as a senior managing director
10:10 there in the forensics and litigation practice
10:11 and was employed at FTI Consulting in May of
10:12 2021.
10:13 I'm currently the vice president of
10:14 revenue at a company called Genesys, and I
10:15 took that role on in May of 2021 and continue
10:16 until that role.

| 12:12 - 12:14 | **Brown, Christopher 06-23-2021 (00:00:08)** | Brown_05012022_Final.3 |

12:12   Q. Okay.  And you joined FTI, it looks
12:13 like, you said in August of 2018?
12:14   A. Yes.

| 15:2 - 15:6 | **Brown, Christopher 06-23-2021 (00:00:12)** | Brown_05012022_Final.4 |

15:2   Q. And were you ever part of a forensic
15:3 investigation team at KPMG?
15:4   A. I led the investigations for my

| Page/Line | Source | ID |
|---|---|---|

Brown_05012022_Final

|  | 15:5 clients at KPMG, but I was always considered | |
|  | 15:6 an audit partner. | |
| 15:8 - 15:16 | **Brown, Christopher 06-23-2021 (00:00:29)** | Brown_05012022_Final.5 |
|  | 15:8 And how many investigations -- how | |
|  | 15:9 many forensic investigations did you perform | |
|  | 15:10 while you were at FTI? | |
|  | 15:11   A. I was part of -- I want to get this | |
|  | 15:12 right -- two. | |
|  | 15:13   Q. And Advantage was one of them? | |
|  | 15:14   A. That's correct. | |
|  | 15:15   Q. Was that the first or second? | |
|  | 15:16   A. That was the first. | |
| 16:7 - 16:15 | **Brown, Christopher 06-23-2021 (00:00:18)** | Brown_05012022_Final.6 |
|  | 16:7   Q. And what, other than telling you he | |
|  | 16:8 wanted you to help investigate -- well, what | |
|  | 16:9 did you eventually learn about this | |
|  | 16:10 investigation, before you started doing any | |
|  | 16:11 work? | |
|  | 16:12   A. I learned that the company was in | |
|  | 16:13 the process of going public, so they had filed | |
|  | 16:14 a confidential registration statement with the | |
|  | 16:15 SEC. | |
| 16:15 - 16:20 | **Brown, Christopher 06-23-2021 (00:00:16)** | Brown_05012022_Final.7 |
|  | 16:15 So there was an element that, you know, | |
|  | 16:16 they wanted to make sure they were compliant | |
|  | 16:17 with SEC rules and regulations.  That's | |
|  | 16:18 something that I spent my whole career in, so | |
|  | 16:19 my role was to help advise and ensure that | |
|  | 16:20 they stay compliant and remain compliant. | |
| 17:18 - 19:2 | **Brown, Christopher 06-23-2021 (00:01:25)** | Brown_05012022_Final.8 |
|  | 17:18   Q. When you came in to look at the | |
|  | 17:19 financials and do your investigation, what | |
|  | 17:20 exactly -- what did you do? | |
|  | 17:21   A. I was responsible for evaluating and | |
|  | 17:22 helping assist with the evaluation of internal | |
|  | 17:23 controls and deficiencies that were | |
|  | 17:24 identified.  I was asked to evaluate potential | |
|  | 17:25 impact of accounting on allegations relative | |
|  | 18:1 C. BROWN | |
|  | 18:2 to the activities at Take 5. | |

| Brown_05012022_Final | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

18:3  Q. And who asked -- I'm sorry.
18:4 Anything else?
18:5  A. And then I was also asked to go and
18:6 do additional work on other Advantage
18:7 subsidiaries to evaluate the potential risks
18:8 related to those and perform additional
18:9 testing that was requested by
18:10 PricewaterhouseCoopers.
18:11  Q. The third task that you just
18:12 described, was that related to Take 5, or was
18:13 that independent of Take 5?
18:14  A. It was independent of Take 5.
18:15  Q. What exactly did you do, for the
18:16 third task?
18:17  A. I oversaw testing of transactions
18:18 and validation of revenue transactions at
18:19 another subsidiary.
18:20  Q. And was this in anticipation of the
18:21 IPO?
18:22  A. Yes.  I think it was part of an
18:23 overall basic risk assessment related to
18:24 recent acquisitions --
18:25  Q. And --
19:1 C. BROWN
19:2  A. -- to the company.

| 19:3 - 19:12 | **Brown, Christopher 06-23-2021 (00:00:19)** | Brown_05012022_Final.9 |

19:3  Q. I'm sorry, I didn't mean to
19:4 interrupt you.
19:5 Did you form any conclusions in
19:6 connection with that independent
19:7 investigation, independent of Take 5?
19:8  A. My recollection is, we didn't find
19:9 any transactions that were concerning or any
19:10 trends that indicated that, you know,
19:11 transactions weren't recorded properly in
19:12 accordance with GAAP.

| 19:13 - 19:25 | **Brown, Christopher 06-23-2021 (00:00:43)** | Brown_05012022_Final.10 |

19:13  Q. So with regard to the two tasks, for
19:14 lack of a better word, that you did for the
19:15 Take 5 unit, internal controls and accounting,

| Page/Line | Source | ID |
|---|---|---|

**Brown_05012022_Final**

19:16 first tell me who assigned those tasks to you.
19:17  A. Ed Westerman, my supervisor.
19:18  Q. Did you work with anyone, in
19:19 connection with performing these tasks?
19:20  A. Yes.
19:21  Q. Who did you work with?
19:22  A. Internally at FTI, I worked with
19:23 Mike Wei, Jeff Rhodes, Ed Westerman.  Those
19:24 were the primary three.  I may have had some
19:25 staff do some research.

20:2 - 20:19   **Brown, Christopher 06-23-2021 (00:00:57)**                    Brown_05012022_Final.11

20:2  Q. So what did you do in connection
20:3 with the first task that you defined as
20:4 internal controls?  Can you tell me what you
20:5 looked at or what you did, in connection with
20:6 that task?
20:7  A. Sure.  So basically I looked, you
20:8 know, through where I would see documentation
20:9 around, you know, the concerns of whether or
20:10 not revenue recognition had been met at
20:11 Take 5.  You know, revenue was recorded and
20:12 presented, whether or not that revenue was in
20:13 accordance with GAAP.  I looked at the root
20:14 cause for deficiencies that were identified
20:15 relative to the acquisition of Take 5, and
20:16 then the integration of Take 5 into Advantage
20:17 Solutions, and then Advantage Solutions's
20:18 handling of whistleblower complaints that
20:19 emanated from the Take 5 business unit.

20:20 - 21:24   **Brown, Christopher 06-23-2021 (00:01:30)**                    Brown_05012022_Final.12

20:20  Q. Let's dig a little deeper here.  The
20:21 revenue recorded, what specific documents did
20:22 you look at -- well, withdrawn.
20:23 Before I get there, what did you
20:24 understand the specific issue was?  Was it
20:25 dealing with reporting to complaints; was it
21:1 C. BROWN
21:2 dealing with revenue generated?  What did you
21:3 understand the specific issue to be?
21:4  A. So my understanding of the issue was

| Page/Line | Source | ID |
|---|---|---|

**Brown_05012022_Final**

21:5 that there was agreements between the clients
21:6 and Take 5 to provide email services, so email
21:7 campaigns, and that the invoicing for those
21:8 campaigns that clients received and paid was
21:9 deemed to be inaccurate, so it reflected
21:10 emails that essentially weren't delivered.
21:11 And so, the task I was set out to
21:12 look at is, okay, is there still a position to
21:13 be had relative to completing and delivering
21:14 the services contracted, and whether or not
21:15 there was customer acceptance of those
21:16 transactions, which are both requirements to
21:17 recognize revenue under U.S. GAAP.
21:18   Q. So if I understand -- so did you
21:19 look at the actual reporting of results of
21:20 campaigns to the clients, or was your analysis
21:21 more financial?
21:22   A. My analysis was financial based on
21:23 the information provided by Mike Wei and Jeff
21:24 Rhodes and others on the team.

**23:2 - 23:11   Brown, Christopher 06-23-2021 (00:00:32)**                    Brown_05012022_Final.13

23:2 Who did you interview or who
23:3 did you speak to in connection with your task
23:4 at FTI, in connection with the Take 5
23:5 investigation?
23:6   A. Well, I spoke with -- there was, I
23:7 think, ten clients that were selected to
23:8 discuss with, you know, directly and obtain
23:9 their understanding around whether or not they
23:10 would accept other services besides email for
23:11 the services they had contracted with Take 5.

**23:15 - 23:18   Brown, Christopher 06-23-2021 (00:00:10)**                    Brown_05012022_Final.14

23:15 Who at Take 5 did you speak to on
23:16 these issues?
23:17   A. At Take 5, I was on calls with
23:18 Richard Gluck and Alex Radetich.

**23:23 - 24:6   Brown, Christopher 06-23-2021 (00:00:21)**                     Brown_05012022_Final.15

23:23   Q. My question -- I'm sorry, my
23:24 question is:  In connection with any aspect of
23:25 your investigation, who at Take 5 did you

| Page/Line | Source | ID |
|---|---|---|

**Brown_05012022_Final**

24:1 C. BROWN
24:2 speak to?
24:3   A. Those two individuals, and then I
24:4 was on interviews with probably a handful of
24:5 Take 5 employees as part of Latham & Watkins
24:6 interviews.

**24:9 - 24:14    Brown, Christopher 06-23-2021 (00:00:18)**    Brown_05012022_Final.16

24:9 Tell me, how often did you speak to
24:10 Mr. Gluck about the issues involving your
24:11 investigation?
24:12   A. I was just on calls with him
24:13 directly with Take 5 clients; the ten calls or
24:14 so.

**24:15 - 24:23    Brown, Christopher 06-23-2021 (00:00:16)**    Brown_05012022_Final.17

24:15   Q. Okay.  Other than those ten calls,
24:16 is it fair to say, then, you never had another
24:17 call with Mr. Gluck?
24:18   A. I think that's right.
24:19   Q. And Mr. Radetich, same question:
24:20 Did you have any call with Mr. Radetich, other
24:21 than being on those ten calls with the
24:22 clients?
24:23   A. No

**24:23 - 24:25    Brown, Christopher 06-23-2021 (00:00:06)**    Brown_05012022_Final.18

24:23   A. No, although I was part of the
24:24 interview with Mr. Radetich that Latham
24:25 conducted.

**25:2 - 25:8    Brown, Christopher 06-23-2021 (00:00:15)**    Brown_05012022_Final.19

25:2   Q. So is it fair to say, then, your
25:3 knowledge of what Mr. Radetich said consists
25:4 of what was said during those ten, plus or
25:5 minus, calls with the customers and the
25:6 interview of Mr. Radetich; that's all there
25:7 is, correct?
25:8   A. My direct knowledge, yes.

**25:19 - 26:20    Brown, Christopher 06-23-2021 (00:00:59)**    Brown_05012022_Final.20

25:19   Q. Sure.  Did you know who the CFO of
25:20 the Take 5 unit at Advantage was?
25:21   A. I may have.  I don't recall, at this
25:22 time, who it was.

| Page/Line | Source | ID |
|---|---|---|

Brown_05012022_Final

25:23  Q. But did you -- was it your belief
25:24 that it was not necessary to speak to the CFO
25:25 in conducting your investigation?
26:1 C. BROWN
26:2  A. For the tasks that I was tasked
26:3 with, it wasn't deemed necessary.
26:4  Q. Okay.  So let's look at the first
26:5 task.  I think what you said was -- again, I
26:6 don't want to put words in your mouth, if I'm
26:7 wrong, please correct me -- you looked at
26:8 agreements, and you looked at invoicing to
26:9 determine if it was accurate, correct?
26:10  A. Yeah, to understand the nature of
26:11 the services that were contracted to be
26:12 provided, yes.
26:13  Q. Okay.  So what agreements are you
26:14 referring to that you looked at?
26:15  A. My recollection is that I probably
26:16 saw sales orders and then invoices.
26:17  Q. And then what?  Oh, invoices.
26:18  A. Invoices.
26:19  Q. How many sales orders did you see?
26:20  A. I don't recall.

**28:20 - 28:22**    **Brown, Christopher 06-23-2021 (00:00:05)**    Brown_05012022_Final.21

28:20 No recollection as to how many
28:21 you looked at, even a range?
28:22  A. I mean, probably less than 50.

**29:18 - 29:22**    **Brown, Christopher 06-23-2021 (00:00:10)**    Brown_05012022_Final.22

29:18 You also said you looked at
29:19 invoices, correct?
29:20  A. A few, yes.
29:21  Q. Ten?  Twenty?
29:22  A. Probably in that range, yeah.

**30:7 - 31:4**    **Brown, Christopher 06-23-2021 (00:00:55)**    Brown_05012022_Final.23

30:7  Q. Okay.  So you looked at the sales
30:8 orders.  For every campaign where you looked
30:9 at the sales order, did you look at the
30:10 invoice?
30:11  A. I can't recall.
30:12  Q. Okay.  So you looked at the sales

| Page/Line | Source | ID |
|---|---|---|

Brown_05012022_Final

30:13 orders and maybe looked at the invoices on
30:14 some of the campaigns. And what did you do to
30:15 determine whether something was accurate or
30:16 inaccurate?
30:17   A. I didn't do any testing relative to
30:18 determining accuracy. There was other people
30:19 at FTI that did that. I was working under the
30:20 presumption, based on directives from Ed, that
30:21 the invoices reflected activity that wasn't
30:22 accurate, that weren't delivered.
30:23   Q. So you -- okay. So the assumption
30:24 you got from Mr. Westerman was that the
30:25 invoices and/or sales orders were not
31:1 C. BROWN
31:2 reflective of what was delivered, correct?
31:3   A. Yeah. The invoices in particular,
31:4 yes.

**31:5 - 31:22**   **Brown, Christopher 06-23-2021 (00:00:51)**    Brown_05012022_Final.24

31:5   Q. Invoices. And what did you -- okay.
31:6 What analysis did you perform? I
31:7 understand you looked at sales orders, you
31:8 looked at invoices. Then what? What did you
31:9 do, after looking at that?
31:10   A. After looking at them, my conclusion
31:11 was, if they hadn't delivered what was
31:12 invoiced, then there's a risk that they have
31:13 not met customer acceptance. And so, the
31:14 question was raised as to, okay, well, how do
31:15 we know that the customers are okay with the
31:16 alternative services that were potentially
31:17 delivered? We were told that customers were
31:18 understanding that there's other things that
31:19 could be done in replacement of email
31:20 services, and it was a common practice for
31:21 them to accept, you know, other than email
31:22 campaigns to drive clicks.

**31:23 - 32:9**   **Brown, Christopher 06-23-2021 (00:00:24)**    Brown_05012022_Final.25

31:23   Q. So am I correct in concluding that
31:24 you concluded that the client wasn't
31:25 getting -- before the phone calls, that the

| Page/Line | Source | ID |
|---|---|---|

32:1 C. BROWN
32:2 client wasn't getting what it was expecting;
32:3 you concluded that based on statements from
32:4 Mr. Westerman and others, correct?
32:5  A. Yeah, that's correct.
32:6  Q. And you didn't do any independent
32:7 analysis to determine whether or not that was
32:8 accurate, correct?
32:9  A. That's correct.

**32:9 - 32:12    Brown, Christopher 06-23-2021 (00:00:11)**    Brown_05012022_Final.26

32:9  A. I never heard
32:10 any -- let's say, I never heard any resistance
32:11 or a different narrative from anyone I
32:12 interacted with.

**32:13 - 33:5    Brown, Christopher 06-23-2021 (00:00:38)**    Brown_05012022_Final.27

32:13  Q. Okay.  And did you do any analysis
32:14 of whether or not the dollars reflected on the
32:15 invoices actually were accurate; that is, the
32:16 money was paid, or the money wasn't paid, or
32:17 the money went where it should have gone?  Did
32:18 you do that analysis at all?
32:19  A. No.  My understanding was that the
32:20 invoices were paid.  The customers --
32:21  Q. Were pink?
32:22  A. Paid.
32:23  Q. Oh, were paid.
32:24  A. Yes.  So the customers were paying.
32:25  Q. Did you do any analysis to determine
33:1 C. BROWN
33:2 whether or not the records reflected on the
33:3 invoices were delivered or weren't delivered?
33:4  A. I did not.  I was told that they
33:5 were not.

**35:16 - 35:22    Brown, Christopher 06-23-2021 (00:00:14)**    Brown_05012022_Final.28

35:16  Q. And did you conclude, based on your
35:17 investigation, that revenue was properly
35:18 generated pursuant to GAAP?
35:19  A. No, I did not.
35:20  Q. So you concluded, then, it wasn't
35:21 properly generated?

| Page/Line | Source | ID |
|---|---|---|

**Brown_05012022_Final**

35:22   A. That's right.

**36:16 - 36:24**   **Brown, Christopher 06-23-2021 (00:00:25)**   Brown_05012022_Final.29

36:16   Q. Okay.  So you concluded that the
36:17 revenue wasn't properly generated according to
36:18 GAAP, based on the assumption provided to you
36:19 and the conversations you had with customers,
36:20 correct?
36:21   A. That's correct.
36:22   Q. Anything else that led you to that
36:23 conclusion?
36:24   A. No, that's it.

**37:18 - 37:24**   **Brown, Christopher 06-23-2021 (00:00:15)**   Brown_05012022_Final.30

37:18   Q. Did you conclude, from your ten
37:19 phone calls with customers and the assumption
37:20 you provided, that the 30 million was not
37:21 proper pursuant to GAAP?
37:22   A. Yes.
37:23   Q. The entire 30 million?
37:24   A. Yes.

**40:8 - 41:13**   **Brown, Christopher 06-23-2021 (00:01:07)**   Brown_05012022_Final.31

40:8   Q. Okay.  So tell me what you looked at
40:9 specifically to do testing on whether emails
40:10 went out.
40:11   A. I looked at the summary of kind of
40:12 the results; so what our team looked at to
40:13 determine whether or not emails were sent and
40:14 then compared that to the invoice that was
40:15 sent to the customer as to whether or not
40:16 those were in agreement.
40:17   Q. As to whether or not -- I'm sorry,
40:18 you broke up.  What?
40:19   A. Whether or not the invoices agreed
40:20 with the actual transactional records.
40:21   Q. And what did you conclude?
40:22   A. The testing -- my recollection is
40:23 the testing indicated that emails were rarely
40:24 sent.
40:25   Q. Emails were rarely is the word you
41:1 C. BROWN
41:2 used?

| Brown_05012022_Final | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

41:3   A. Yes, rarely sent, and that the
41:4 invoices that we were looking at were not
41:5 accurate.
41:6   Q. But that was -- so do I understand
41:7 your testimony that other people did testing,
41:8 you took their testing and their conclusions,
41:9 and concluded that if, in fact, their
41:10 conclusions that emails were never sent were
41:11 accurate, then people were paying for
41:12 something they didn't get?
41:13   A. That's correct.

50:20 - 50:20    **Brown, Christopher 06-23-2021 (00:00:01)**    Brown_05012022_Final.32
50:20   Q. So I'm going to put in the Box 308

51:2 - 51:9    **Brown, Christopher 06-23-2021 (00:00:18)**    Brown_05012022_Final.33
51:2   Q. Do you recognize this document?
51:3   A. Yes, I do.
51:4   Q. Did you prepare it?
51:5   A. Yes, I did.
51:6   Q. Okay.  And was this the document
51:7 that you prepared in connection with the phone
51:8 calls that you made to customers?
51:9   A. That's correct.

51:10 - 51:20    **Brown, Christopher 06-23-2021 (00:00:35)**    Brown_05012022_Final.34
51:10   Q. And did you make the calls on, I
51:11 think, June 30th and July -- looking at the
51:12 call conducted, two on June 30th, the rest on
51:13 July 1, 2019?
51:14   A. That's correct.
51:15   Q. So you made two calls on the 30th;
51:16 one was Mr. Chillot and one with MaryEllen
51:17 Adan.  Who were on those calls?
51:18   A. Based on the confirmation log that I
51:19 created here, the first two calls were myself
51:20 and Alex Radetich.

53:18 - 54:4    **Brown, Christopher 06-23-2021 (00:00:27)**    Brown_05012022_Final.35
53:18   Q. Okay.  And then -- so for TMA, it
53:19 looks like you have -- and then comments on
53:20 the right in green, "Confirmation received as
53:21 confirmed."
53:22 Was that the client that received

| Page/Line | Source | ID |
|---|---|---|

53:23 the confirmation confirming what was accepted?
53:24   A. Yeah, so after the first two calls,
53:25 I came back to the company and my superiors,
54:1 C. BROWN
54:2 and said, there needs to be someone else from
54:3 the company on these calls directing the
54:4 conversations.

**57:9 - 58:8    Brown, Christopher 06-23-2021 (00:00:56)**    Brown_05012022_Final.36

57:9 Was the question whether we can
57:10 change what we're delivering, or was the
57:11 question whether or not what they received was
57:12 what they expected?
57:13   A. It was the latter.  So it was -- the
57:14 way that Alex explained it was, we might
57:15 provide, substitute other services to deliver
57:16 the results; are you okay with us using things
57:17 outside of an email campaign to deliver the
57:18 results that we did?  And the verbal
57:19 conversation said -- you know, acknowledged
57:20 that, yes, they were comfortable with that, at
57:21 least this specific conversation did.
57:22   Q. Okay.  And those are the only calls
57:23 that you had on the 30th, correct?
57:24   A. That's right.
57:25   Q. And I guess Ms. Adan never sent a
58:1 C. BROWN
58:2 written confirmation back; is that right?
58:3   A. That's correct.
58:4   Q. What's the yellow?  There's a yellow
58:5 box in this document.  Can you tell me what
58:6 that refers to?
58:7   A. Yeah, that means that I never
58:8 received a confirmation back.

**59:3 - 59:17    Brown, Christopher 06-23-2021 (00:00:32)**    Brown_05012022_Final.37

59:3   Q. So the second one we just said, I
59:4 think my last question was what that yellow
59:5 box was, and I think your answer was, that's
59:6 where they didn't give written confirmation,
59:7 correct?
59:8   A. That's correct.

| Page/Line | Source | ID |
|---|---|---|

**Brown_05012022_Final**

59:9  Q. But it's fair to say, is it not,
59:10 that even though you didn't get written
59:11 confirmation from Ms. Adan at Infocore, you
59:12 believe from the conversation that Infocore
59:13 had understood, acknowledged, and agreed to
59:14 the services they were being provided,
59:15 correct?
59:16  A. That's what the conversation
59:17 concluded, yes.

**63:16 - 64:5**   **Brown, Christopher 06-23-2021 (00:00:39)**   Brown_05012022_Final.38

63:16  Q. What do you recall Mr. Colen said on
63:17 the 1st to the customers?
63:18  A. I think there was kind of a script
63:19 that they used, at least as far as kind of a
63:20 cadence.  So it was, you know -- the crux of
63:21 the conversation was, you know, there's an
63:22 audit underway relative to, you know, the
63:23 company's IPO process, and that they wanted to
63:24 confirm that, you know, in some cases, if
63:25 email services were replaced with other
64:1 C. BROWN
64:2 services, you know, was the customer
64:3 comfortable with that replacement, and would
64:4 they accept, you know, those other services as
64:5 alternative to email?

**78:21 - 83:22**   **Brown, Christopher 06-23-2021 (00:05:57)**   Brown_05012022_Final.39

78:21  Q. Okay.  So do you agree with me that
78:22 thus far, of the six, there's only one that
78:23 affirmatively represented that they concluded
78:24 they got something different than what they
78:25 were expecting?
79:1 C. BROWN
79:2  A. No, I would say that two of these
79:3 have indicated that they're not accepting, at
79:4 least based on the information they have of
79:5 the alternative services.
79:6  Q. You're saying the two are Meredith
79:7 and team Neustar -- I mean Neustar?
79:8  A. Yeah, number 5 and number 6.
79:9  Q. Okay.  I'm not going to argue with

| Page/Line | Source | ID |
|---|---|---|

Brown_05012022_Final

79:10 you.  It says what it says.
79:11 Let's go to number 7, Infogroup.  Do
79:12 you agree -- so it looks like Gary was on the
79:13 phone with you and Alex, correct?
79:14   A. Yes.
79:15   Q. And he called Mr. Musikar, correct?
79:16   A. Yes.
79:17   Q. And Mr. Musikar verbally said
79:18 something to the effect of, I know what I'm
79:19 getting, it's totally acceptable, and then
79:20 confirmed it in an email, correct?
79:21   A. I don't think he confirmed that he
79:22 knew what he was getting.  I think he
79:23 confirmed that if he was getting something
79:24 outside of the email, that would be accepted.
79:25   Q. And then he sent an email confirming
80:1 C. BROWN
80:2 that, correct?
80:3   A. That's correct.
80:4   Q. Number 8, MediaStorm said in the
80:5 phone call that alternatives were never
80:6 disclosed to them; is that right?
80:7   A. That's correct.
80:8   Q. And it looks like, would you agree,
80:9 they were concerned; they wanted to know the
80:10 percentage that were, quote, backfilled?
80:11   A. That's correct.
80:12   Q. And when you asked them to send
80:13 something in writing to confirm that they were
80:14 unhappy, they didn't do so, correct?
80:15   A. The confirmation was not to confirm
80:16 they were unhappy; it was to confirm whether
80:17 or not they would accept alternative services
80:18 in lieu of email.  And they never respond.
80:19   Q. So you never confirmed -- you never
80:20 had confirmed in writing that they wouldn't
80:21 accept alternative forms, but you do have this
80:22 telephone call, correct?
80:23   A. That's correct.
80:24   Q. Number 9 is Adtaxi, and they say

| Page/Line | Source | ID |
|---|---|---|

**Brown_05012022_Final**

80:25 what they say.  I'm not going to read the
81:1 C. BROWN
81:2 whole thing.  And it looks like Mr. Gesiorski,
81:3 for lack of a better word, had his concerns
81:4 under the accepted and verbally acknowledged
81:5 category, correct?
81:6   A. That's right.  So he did not accept
81:7 or wouldn't accept alternative services and
81:8 wanted details to what exactly was provided
81:9 before he would confirm anything.
81:10   Q. And then he wrote a written email
81:11 telling you that he wouldn't accept it until
81:12 he understood the nature and the extent of the
81:13 service performed by Take 5, correct?
81:14   A. No, he never replied in an email.
81:15 When Gary mentioned we would be sending a
81:16 follow-up confirmation, you know, they said
81:17 that they would not confirm anything until
81:18 they had answers to all these questions.
81:19   Q. Oh, oh, oh, oh.  So this is sort of
81:20 like -- so is the red notes essentially what
81:21 was said during the conversation?
81:22   A. No, the red notes are my notes
81:23 saying I did not send a confirmation, a
81:24 written confirmation to the customer at
81:25 management's request; their view was that it
82:1 C. BROWN
82:2 wasn't going to come back as confirmed.  It
82:3 was clearly an exception and they had other --
82:4   Q. And number --
82:5   A. -- engage follow up.
82:6   Q. I'm sorry to interrupt you.
82:7 Number 10, is it the same thing;
82:8 there was no confirmation even sent?
82:9   A. That's right.  They confirmed
82:10 verbally that they would not accept those and
82:11 wanted more detail as to what exactly was
82:12 provided.
82:13   Q. So when you say, "No confirmation
82:14 consent," are you saying that you didn't

| Page/Line | Source | ID |
|---|---|---|

Brown_05012022_Final

82:15 expect them to confirm, or are you saying that
82:16 management didn't send anything?
82:17  A. All right.  So I'm -- in all of the
82:18 written confirmations, I'm the one sending the
82:19 email out to ensure that the chain of
82:20 communication is controlled.  Those last two,
82:21 I did not send those emails at the request of
82:22 management because the view was that based on
82:23 the phone calls, the company was -- the
82:24 customers were not going to confirm yes.
82:25  Q. So how many of the ten did you
83:1 C. BROWN
83:2 conclude that the customers were not going to
83:3 confirm yes?
83:4  A. Four of those, and then I think the
83:5 yellow ones that we talked about earlier, you
83:6 know, remained unconfirmed.
83:7  Q. Well, unconfirmed in writing, but
83:8 some of them were confirmed orally, correct?
83:9  A. That's correct.
83:10  Q. Okay.  So if you did this analysis
83:11 and found four that were unconfirmed, why did
83:12 you believe that all of the revenues that were
83:13 generated from the campaigns were
83:14 inappropriately -- were not according to GAAP?
83:15  A. Just from a sampling approach, the
83:16 rate of exceptions here, you know, four out of
83:17 ten, would be an exceptionally high rate of
83:18 exception, and it would be a rate that would
83:19 not allow anyone -- or, you know, an
83:20 independent auditor to conclude that, you
83:21 know, the revenue recognition is appropriate
83:22 for any untested samples.

**84:4 - 86:11**  **Brown, Christopher 06-23-2021 (00:02:17)**    Brown_05012022_Final.40

84:4  Q. Now, if I understand with Adtaxi,
84:5 they believed at all times it was emails and
84:6 emails only, right?
84:7  A. I believe so, yes.
84:8  Q. I'm sorry, yes, right?
84:9  A. Yes.

| Page/Line | Source | ID |
|---|---|---|

Brown_05012022_Final

84:10   Q. Okay.  I'm looking at your notes,
84:11 though, and I'm looking at the line, "They
84:12 won't move forward with other services like
84:13 social and display."
84:14 Do you see that?
84:15   A. I do.
84:16   Q. So did Adtaxi, during that
84:17 conversation, say, I'm not going to go forward
84:18 with other services?
84:19   A. Yeah, so, in other words, they would
84:20 not move forward if, instead of email, they
84:21 were getting social or display services, I
84:22 think is what that meant.
84:23   Q. I got it.  So it doesn't mean --
84:24 because I read it to mean, maybe it doesn't,
84:25 that they want to stop -- that they knew they
85:1 C. BROWN
85:2 were getting other services, but they don't
85:3 want to move forward with them.  Are you
85:4 saying that's not what that means?
85:5   A. Yeah, I'm saying that's not what
85:6 that means.  I think what they're saying is,
85:7 if email is not being provided, instead it's
85:8 other services, they would not accept or move
85:9 forward with that type of service.
85:10   Q. Okay.  And two lines down, it says,
85:11 "Want to know ASAP what is being held up for
85:12 deployment," and then the line below that,
85:13 "Talk about sending additional emails, they
85:14 don't want to hold up deployment."
85:15 What is the hold up deployment
85:16 referring to in those references?
85:17   A. My recollection is there was a
85:18 campaign, an email campaign that was pending,
85:19 that was about to go and get launched.  And
85:20 they were concerned with, well, one, is this
85:21 going to hold up or is process this going to
85:22 hold up their ability to execute on that
85:23 campaign; they were concerned about doing
85:24 that.  And they also wanted to make sure that

| Page/Line | Source | ID |
|---|---|---|

**Brown_05012022_Final**

85:25 that campaign was going to be email base.
86:1 C. BROWN
86:2   Q. I'm sorry, I don't know if I said
86:3 that.  Were there campaigns being stopped at
86:4 the time, not going forward, to your
86:5 knowledge?
86:6   A. At that point in time, to my
86:7 knowledge, no, but that was the concern raised
86:8 by the customer.
86:9   Q. And are those all the calls, to your
86:10 knowledge, that were made?
86:11   A. Yes.

90:18 - 91:12   **Brown, Christopher 06-23-2021 (00:00:50)**   Brown_05012022_Final.41

90:18   Q. Did you ever talk to Gary -- do you
90:19 know who Ryan McGavran is?
90:20   A. I don't recall.
90:21   Q. Okay.  Did you ever speak to Gary
90:22 Colen or anyone else at Advantage about
90:23 whether the Take 5 issues would negatively
90:24 affect going public?
90:25   A. I don't recall discussing anything
91:1 C. BROWN
91:2 like that with Gary.
91:3   Q. Or anyone at Advantage, did you ever
91:4 have those conversations?
91:5   A. We talked about the impact on
91:6 financial statements and the audit conducted
91:7 by Pricewaterhouse and whether or not, you
91:8 know, all of the material weaknesses or
91:9 internal-control deficiencies were identified
91:10 and whether or not a restatement would be
91:11 necessary.  Those conversations I did have
91:12 with Advantage.

92:2 - 92:6   **Brown, Christopher 06-23-2021 (00:00:10)**   Brown_05012022_Final.42

92:2   Q. So I'm looking at the schedule.  It
92:3 says "Individuals interviewed by Latham &
92:4 Watkins," and it's got you listed under Alex
92:5 Radetich.  Do you see that?
92:6   A. I do.

93:5 - 93:17   **Brown, Christopher 06-23-2021 (00:00:44)**   Brown_05012022_Final.43

| | Brown_05012022_Final | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

93:5   Q. Let's start at the top.
93:6 Mr. Radetich, can you tell us what he said
93:7 during that conversation?
93:8   A. I can't recall everything that he
93:9 said.  It was a long conversation.  I do
93:10 recall a couple points.
93:11   Q. So tell me what you recall he said.
93:12   A. I recall that he had -- the question
93:13 was asked as to whether or not he felt like
93:14 the company needed to lie about results in
93:15 order to maintain clients, and he had said
93:16 yes, which I remember being surprised that he
93:17 would say that.

**93:18 - 94:22**   **Brown, Christopher 06-23-2021 (00:01:39)**   Brown_05012022_Final.44

93:18   Q. So could you tell me -- and it's
93:19 important, if you could, to give me the
93:20 specific words that he used or he adopted in
93:21 saying yes.  Do you recall what those words
93:22 were?
93:23   A. I don't recall the specific words.
93:24 I just recall being surprised that he would
93:25 say he felt they needed to lie to clients to
94:1 C. BROWN
94:2 keep business.  That was one of the two things
94:3 I remember.
94:4 The second was that he cut the
94:5 interview short and left the interview and
94:6 said he was going to get a lawyer or needed to
94:7 call a lawyer.
94:8   Q. Did you take notes of that
94:9 interview?
94:10   A. I don't recall.
94:11   Q. Do you know how many people were in
94:12 that meeting, be it in person or telephonically?
94:13   A. I don't.  I remember that Manny was
94:14 in there, I think Nate Saper, as well, but I'm
94:15 sure there were others.
94:16   Q. Do you specifically recall the word
94:17 "lie" being used?
94:18   A. Yeah, I think so.  Yeah, it was --

| Page/Line | Source | ID |
|---|---|---|
| | **Brown_05012022_Final** | |

94:19 it was lying or it was using kind of a term
94:20 basically that said that they were -- they had
94:21 to lie or conceal what they were really doing
94:22 to keep their customers.

95:20 - 97:23     **Brown, Christopher 06-23-2021 (00:02:39)**     Brown_05012022_Final.45

95:20   Q. Let me do it this way:  Was the
95:21 answer to the question a yes?  I mean, do you
95:22 remember him saying that?  What do you
95:23 remember coming out of Mr. Radetich's mouth?
95:24   A. I don't remember specifically what
95:25 came out of his mouth.  I remember being
96:1 C. BROWN
96:2 surprised that he had just admitted that he
96:3 was aware that they were not sending emails,
96:4 that they were lying in their invoices.
96:5   Q. Okay.  I mean, so I guess that's my
96:6 question.  So I'm trying to understand, to the
96:7 best of your recollection, lying about not
96:8 sending emails?  You specifically recall him
96:9 saying that?
96:10   A. No, I just -- I recall being
96:11 surprised that he would admit that he was
96:12 aware that they were not sending emails and
96:13 they were lying to customers.
96:14   Q. Okay.  So not sending emails is one
96:15 thing.  Lying to customers is something else.
96:16 What did you understand the lying was about
96:17 that he admitted?
96:18   A. I think they're both one and the
96:19 same.
96:20   Q. Well, I guess my question is:  Lying
96:21 about not sending emails; lying about
96:22 reporting; lying about invoices; lying about
96:23 sales orders; lying about not recording to
96:24 GAAP?  I'm trying to find out what the
96:25 reference that you believe his lying was to.
97:1 C. BROWN
97:2   A. I think the context didn't have
97:3 anything to do with GAAP, didn't have to do
97:4 with sales orders.  It was around the

| Page/Line | Source | ID |
|---|---|---|

Brown_05012022_Final

97:5 reporting of services that were not delivered
97:6 to clients.  So not delivering the service via
97:7 email, and then lying to clients saying that
97:8 they did.
97:9  Q. Are you aware of whether anyone else
97:10 took notes during that meeting?
97:11  A. I believe someone from Latham &
97:12 Watkins was taking notes.
97:13  Q. Have you ever seen notes of that
97:14 meeting?
97:15  A. No, I have not.
97:16  Q. Anything else you recall?  I think
97:17 you said you also recalled he left early and
97:18 didn't come back, correct?
97:19  A. Yeah.  I recall he said he was going
97:20 to cut it short and I remember he was asked --
97:21 basically, they said, we'd prefer you stay and
97:22 finish, and he refused and said something
97:23 about getting a lawyer and left.

Advantage = 00:15:03
Take 5 = 00:10:39
Advantage Counters = 00:08:15
**Total Time = 00:33:57**

Advantage          Take 5          Advantage Counters