**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PETRUSS MEDIA GROUP, LLC f/k/a TAKE 5 MEDIA GROUP, LLC, et al.,

        *Petitioners*,

v.

ADVANTAGE SALES & MARKETING LLC, et al.,

        *Respondents*.

Case No. 1:22-cv-3278-RC

**PETITIONERS' OPPOSITION TO
RESPONDENTS' MOTION FOR SANCTIONS UNDER RULE 11 OF THE FEDERAL
RULES OF CIVIL PROCEDURE AND TO DISMISS ACTION**

**TABLE OF CONTENTS**

Introduction.................................................................................................................... 1

Background..................................................................................................................... 3

    A.   Factual background .......................................................................................... 3

    B.   The underlying arbitration and awards ............................................................ 4

        1.   The parallel criminal proceeding.......................................................... 5

        2.   Discovery disputes................................................................................ 5

            a.   The Advantage Parties' failure to produce interview notes ......................... 5

            b.   The Advantage Parties' spoliation of Google Analytics data ...................... 6

            c.   The Advantage Parties' payments to third parties ...................................... 6

    C.   Procedural background..................................................................................... 7

Standard of Decision...................................................................................................... 9

Argument ....................................................................................................................... 9

I.   The Advantage Parties' motion is procedurally deficient. ....................................... 9

    A.   The Advantage Parties repeatedly violated Rule 11's "safe harbor." ........................ 10

        1.   The Advantage Parties violated Rule 11's safe harbor by presenting it to the Court in their "Interim Response." ....................... 10

        2.   The Advantage Parties violated Rule 11's safe harbor by filing a motion they never served and with new grounds. ............................... 12

    B.   The Advantage Parties waived any challenge to the substance of the motion to vacate and cannot use Rule 11 to circumvent that..................................... 15

    C.   The Advantage Parties acknowledge that the Take 5 Parties filed the petition and motion to vacate in good faith................................................................. 16

II.   The Advantage Parties' motion is substantively meritless................................... 17

    A.   The implication that claims with a high standard of review are presumptively sanctionable is unsupportable. ............................................................. 17

    B.   The Advantage Parties raise no arguments sufficient to dispute that the hearing should have been stayed........................................................................ 21

    C.   The Advantage Parties' "evidence" of lack of candor is no such thing....................... 23

    D.   The Advantage Parties' arguments cannot overcome that the Take 5 Parties were denied a fair hearing because of spoliated Google Analytics data........................................................................................................... 35

    E.   The Advantage Parties improperly induced testimony. .............................................. 37

    F.   The Advantage Parties do not dispute that RJV was ignored in arbitration. ...................................................................................................................... 41

    G.   The Advantage Parties failed to prove their entitlement to damages........................... 41

    H.   The Advantage Parties failed to properly request prejudgment interest....................... 42

    I.   The Take 5 Parties have accurately represented facts to this Court and have acted in good faith and in compliance with Rule 11. ......................................... 43

III.   The Court should deny the relief requested............................................................... 44

    A.   The Advantage Parties have not shown that dismissal is warranted............................ 44

    B.   The admitted goal of wanting McDermott Will & Emery to bankroll an attorney fee award is not grounds for such relief........................................................ 45

Conclusion ....................................................................................................................... 45

**TABLE OF AUTHORITIES**

**Cases**

*Affinity Fin. Corp. v. AARP Fin., Inc.*,
794 F. Supp. 2d 117 (D.D.C. 2011) ...................................................................................18

*Ahuruonye v. U.S. Dep't of the Interior*,
312 F. Supp. 3d 1 (D.D.C. 2018) ......................................................................................10

*Al Maya Trading Estab. v. Glob. Exp. Mktg. Co.*,
2017 WL 1050123 (S.D.N.Y. Mar. 17, 2017) ..................................................................20

*All Pro Maids, Inc. v. Layton*,
2005 WL 82689 (Del. Ch. Jan. 11, 2005)..........................................................................42

*All. Sols., Inc. v. Quest Software, Inc.*,
2012 WL 692883 (D. Md. Mar. 1, 2012)...........................................................................16

*B.L. Harbert Int'l, LLC v. Hercules Steel Co.*,
441 F.3d 905 (11th Cir. 2006) .....................................................................................19, 20

*BAE Sys. Info. & Elec. Sys. Integration Inc. v. Lockheed Martin Corp.*,
2011 WL 3689007 (Del. Ch. Aug. 10, 2011) ...............................................................39, 40

*Betancourt v. New Century Mortg. Corp.*,
2017 WL 6611117 (E.D. Cal. 2017)..................................................................................43

*Brown v. FBI*,
873 F. Supp. 2d 388 (D.D.C. 2012) ...................................................................................10

*C.T. Shipping, Ltd. v. DMI (U.S.A.) Ltd.*,
774 F. Supp. 146 (S.D.N.Y. 1991)......................................................................................18

*Campmor, Inc. v. Brulant, LLC*,
2014 WL 5392036 (D.N.J. Oct. 21, 2014)..........................................................................20

*Carmody Bldg. Corp. v. Richter & Ratner Contracting Corp.*,
2013 WL 4437213 (S.D.N.Y. Aug. 19, 2013).....................................................................41

*Carswell v. Air Line Pilots Ass'n, Int'l*,
248 F.R.D. 325 (D.D.C. 2008).............................................................................................17

*Cent'l Mgmt. Servs., Inc. v. Axa Re Vie*,
193 F.R.D. 671 (D. Kan. 2000).......................................................................................38, 39

*CM S. E. Tex. Houston, LLC v. CareMinders Home Care, Inc.*,
662 F. App'x 701 (11th Cir. 2016) ......................................................................................20

*Contech Constr. Prod., Inc. v. Heierli*,
764 F. Supp. 2d 96 (D.D.C. 2011) .................................................................................18, 42

*Corp. Printing Co. v. New York Typo. Union No. 6*,
886 F. Supp. 340 (S.D.N.Y. 1995)......................................................................................18

*Crown Castle USA Inc. v. Fred A. Nudd Corp.*,
2010 WL 4027780 (W.D.N.Y. Oct. 14, 2010) ...................................................................36

**Cases—continued**

*Cuna Mut. Ins. Soc. v. Off. & Pro. Emps. Int'l Union, Loc. 39*,
443 F.3d 556 (7th Cir. 2006) ....................................................................................19

*\*Dixon v. Midland Mortg. Co.*,
2013 WL 5350906 (D.D.C. Sept. 25, 2015) ......................................................10, 12

*Dreis & Krump Mfg. Co. v. Int'l Ass'n of Machinists &*
*Aerospace Workers, Dist. No. 8*,
802 F.2d 247 (7th Cir. 1986) ..............................................................................18, 19

*E. Gluck Corp. v. Rothenhaus*,
252 F.R.D. 175 (S.D.N.Y. 2008) ................................................................................15

*Egypt Dep't of Def. v. Alboghdady*,
2022 WL 715229 (D.D.C. Mar. 10, 2022).....................................................................9

*Florida Bar v. Wohl*,
842 So. 2d 811 (Fla. 2003).........................................................................................39

*Folta v. Winkle*,
2016 WL 4087103 (D. Ariz. July 28, 2016) ..............................................................12

*Ford v. Telamon Corporation*,
2021 WL 2550208 (Del. Super. Ct. June 17, 2021) ...................................................21

*Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*,
865 F. Supp. 1516 (S.D. Fla. 1994) ............................................................................38

*Henok v. Chase Home Finance, LLC*,
925 F. Supp. 2d 46 (D.D.C. 2013)......................................................................10, 12

*Indep. Fed. Sav. Bank v. Bender*,
230 F.R.D. 11 (D.D.C. 2005)......................................................................................20

*Int'l Telepassport Corp. v. USFI, Inc.*,
89 F.3d 82 (2d Cir. 1996) ...........................................................................................20

*James v. Caterpillar, Inc.*,
824 F. App'x 374 (6th Cir. 2020) ...............................................................................44

*Jardine Matheson & Co. v. Saita Shipping, Ltd.*,
712 F. Supp. 423 (S.D.N.Y. 1989).............................................................................18

*In re Jumper*,
909 A.2d 173 (D.C. 2006) ..........................................................................................10

*Kanuth v. Prescott, Ball & Turben, Inc.*,
949 F.2d 1175 (D.C. Cir. 1991)..................................................................................18

*In re Kien*,
372 N.E.2d 376 (Ill. 1977) .........................................................................................39

*Landis & Gyr Powers, Inc. v. Powers U.K., Ltd.*,
1990 WL 165323 (N.D. Ill. Oct. 25, 1990).................................................................20

**Cases—continued**

*Leon v. IDX Sys. Corp.*,
464 F.3d 951 (9th Cir. 2006) ................................................................................36

*Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
481 F.3d 813 (D.C. Cir. 2007) .............................................................................35

*Levy v. Citigroup Glob. Markets, Inc.*,
2006 WL 8432648 (S.D. Fla. Oct. 17, 2006)........................................................18

*Mercy Hosp., Inc. v. Azar*,
891 F.3d 1062 (D.C. Cir. 2018)............................................................................11

*Murchison Cap. Partners, L.P. v. Nuance Commc'ns, Inc.*,
2013 WL 12094168 (N.D. Tex. July 30, 2013)....................................................41

*Off. & Prof'l Emps. Int'l Union, Local 2 v. Wash. Metro. Area Transit Auth.*,
724 F.2d 133 (D.C. Cir. 1983) .............................................................................18

*Optionsxpress, Inc. v. Hale*,
2009 WL 4015556 (N.D. Ill. Nov. 19, 2009) ......................................................18

*Orlett v. Cincinnati Microwave, Inc.*,
954 F.2d 414 (6th Cir. 1992) ...............................................................................45

*Perry v. Int'l Bhd. of Teamsters*,
247 F. Supp. 3d 1 (D.D.C. 2017).........................................................................20

*Quick & Reilly, Inc. v. Jacobson*,
126 F.R.D. 24 (S.D.N.Y. 1989) ...........................................................................18

*Quick v. EduCap, Inc.*,
2019 WL 95566 (D.D.C. Jan. 3, 2019)...................................................................9

*\*Ray v. Chafetz*,
236 F. Supp. 3d 66 (D.D.C. 2017).................................................................19, 21

*Reynolds v. U.S. Capitol Police Bd.*,
357 F. Supp. 2d 19 (D.D.C. 2004).......................................................................17

*Ridge v. U.S. Postal Serv.*,
154 F.R.D. 182 (N.D. Ill. 1992)...........................................................................19

*In re Robinson*,
136 N.Y.S. 548 (1912), *aff'd*, 209 N.Y. 354 (1913)...........................................39

*In re Robinson*,
151 A.D. 589 (1912) ............................................................................................37

*Rocheux Int'l of N.J. v. U.S. Merchants Fin. Grp., Inc.*,
2009 WL 3246837 (D.N.J. Oct. 5, 2009).............................................................38

*Schaden v. Bank of Am., N.A.*,
2008 WL 11469260 (S.D. Fla. Aug. 20, 2008).....................................................19

*State of N.Y. v. Solvent Chem. Co., Inc.*,
166 F.R.D. 284 (W.D.N.Y. 1996)...................................................................37, 38

**Cases—continued**

*Teamsters, Chauffeurs, Salesdrivers & Helpers, Loc. Union No. 330 v. Elgin Eby-Brown Co.*,
  670 F. Supp. 1393 (N.D. Ill. 1987) ....................................................................18

*\*Texas v. United States*,
  798 F.3d 1108 (D.C. Cir. 2015)........................................................................15

*The Florida Bar v. Jackson*,
  490 So. 2d 935 (Fla. 1986)................................................................................39

*United States v. Travelers Cas. & Sur. Co. of. Am.*,
  2014 WL 3594306 (M.D. Fla. July 18, 2014) ..................................................18

*Versus Tech. Inc. v. Radianse Inc.*,
  2005 WL 8171769 (D. Del. 2005) .....................................................................43

*W. Emps. Ins. Co. v. Jefferies & Co.*,
  958 F.2d 258 (9th Cir. 1992) .............................................................................41

*Wagner v. Lehman Bros. Kuhn Loeb Inc.*,
  646 F. Supp. 643 (N.D. Ill.1986) ......................................................................39

*Weirton Med. Ctr., Inc. v. QHR Intensive Res., LLC*,
  2016 WL 2766650 (N.D.W. Va. May 12, 2016) ...............................................38

*Young v. City of Providence ex rel. Napolitano*,
  404 F.3d 33 (1st Cir. 2005)................................................................................12

**Statutes**

9 U.S.C. § 10.........................................................................................................7

9 U.S.C. § 10(a)(3)..............................................................................................35

9 U.S.C. § 10(d) ..................................................................................................41

18 U.S.C. §201(c)(2).............................................................................................38

D.C. Code § 16-4425(c)........................................................................................18

**Other Authorities**

AAA Rule R-52 .....................................................................................................40

Am. Bar Ass'n, Model R. Prof'l Conduct 3.4(b)...............................................38

Fifth Amendment................................................................................................7, 22

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176-177 (2012) ..........................................................................................12

5A Charles Alan Wright & Arthur A. Miller, *Federal Practice and Procedure* § 1336.3 (4th ed. 2020)..........................................................................................44

DC R. Prof'l Conduct, 3.4 ...................................................................................38

Del. Ethics Op. 1994-1 (Feb. 14, 1994)..............................................................38

Del. Ethics Op. 2003-3 (2003).............................................................................38

**Other Authorities—continued**

Del. R. Prof'l Conduct 3.4 ...............................................................................38

Fed. R. Civ. P. 5...............................................................................................14

Fed. R. Civ. P. 11..............................................................................................9

Fed. R. Civ. P. 11 ...................................................................................... *passim*

Fed. R. Civ. P. 11(b) .................................................................1, 9, 14, 15, 16

Fed. R. Civ. P. 11(c) .......................................................................................11

Fed. R. Civ. P. 11(c)(2)...........................................10, 11, 12, 13, 14, 15, 44

Fed. R. Civ. P. 12(a)(1)(A)(i) .........................................................................44

Fed. R. Civ. P. 12(b)(6)...................................................................................15

Fla. Bar Reg. R. 4-3.4(b)..................................................................................38

"Present," *Merriam-Webster.com* (as of Jan. 20, 2023) ..................................11

"Present," *Webster's New Universal Unabridged Dictionary* (1989)............11

Report of the Judicial Conference Committee on Rules of Practice and Procedure
    (Sept. 1992)................................................................................................16

U.S. Const. amend. V..........................................................................................5

**INTRODUCTION**

The circumstances presented to this Court are unique and rare. The Advantage Parties admit that the Take 5 Parties' petition and motion to vacate were filed in compliance with Rule 11, to the best of the knowledge of the counsel that presented them. *See Mot. Ex. BB* at 1-2. With such an admission, it should be self-evident that the petition and motion were "sign[ed], fil[ed and] submit[ed]" with a good faith basis, to the "best of [the Take 5 Parties'] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b). As the Advantage Parties further admit, counsel for the Take 5 Parties made every effort to thoughtfully review the record and the law given the limited time available to them prior to filing and reasonably concluded their arguments were "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law" and that "the factual contentions have evidentiary support." *Id.*

Notwithstanding this, the Advantage Parties have insisted on filing their misguided Rule 11 motion not because they actually believe such violation has occurred, but because they believe it will enable them to try to recover their attorney's fees from Take 5's counsel. The Take 5 Parties repeatedly attempted to discuss these issues with the Advantage Parties, hoping to work together to address mutual concerns. Among other things, the Take 5 Parties repeatedly invited the Advantage Parties to raise concerns to counsel so that they could be addressed, asked the Advantage Parties for a call, pointed out incurable defects in the Advantage Parties' Rule 11 motion, and even suggested mediation. Instead of working amicably, the Advantage Parties filed this motion for Rule 11 sanctions one business day after the Take 5 Parties suggested mediating open issues, including the issue of the forum in which the Parties dispute should be resolved if they were unable to reach a global resolution. The Advantage Parties have left the Take 5 Parties with no choice but to explain to this Court the procedural deficiencies of the motion and the substantive inaccuracies of the Advantage Parties' contentions and to re-explain to this Court the

1

merits of their motion to vacate. The time and expense spent in addressing the Advantage Parties' improper and meritless motion are significant, to say the least.

It is settled law that a Rule 11 motion must be denied when the moving party fails to comply with Rule 11's procedural strictures. The Advantage Parties violated Rule 11's safe-harbor provision *twice*—by presenting the motion to the Court only seven days after sending a letter to counsel and by filing a motion that had never been served. They have also already waived any challenge to the substance of the petition and motion to vacate by declining to substantively oppose it. And they *admit* that the Take 5 Parties' counsel filed the petition and motion to vacate in good faith. The Advantage Parties ask the Court to simply ignore their various procedural failures and violations. But these procedural defects preclude any Rule 11 sanctions at the threshold.

The procedural violations are each a sufficient reason why this motion should fail, but the Advantage Parties' motion also fails on its substance. Although the Advantage Parties suggest that the very bringing of a motion to vacate is sanctionable because of the deferential standard of review, they cannot identify a single case that warranted sanctions in circumstances even remotely similar to those here: none consider prejudice to parties by refusing to stay an arbitration hearing, the exclusion of pertinent testimony (that could not be replaced by other witnesses), the denial of pertinent evidence (that could not be replaced by other evidence), the inducement of witness testimony, an arbitrator issuing a judgment against a party without considering that party throughout the arbitration or providing a sufficiently reasoned basis, an arbitrator awarding certain damages without any computation of those damages, or an arbitrator manifestly disregarding the law by entering awards against a party without giving any explanation for those awards, by denying a party a fair hearing by refusing to postpone an arbitration, or by refusing to hear evidence pertinent and material to the controversy. The remainder of the Advantage Parties' motion is simply a quibble with the merits of the petition and motion to vacate—to which the Advantage Parties have already waived any challenge and which are nowhere close to sanctionable.

Thus, even if the Court ignores the procedural deficiencies, the Advantage Parties have failed to prove that any of the Take 5 Parties' arguments warrant sanctions. The Take 5 Parties accurately represented facts in the petition and motion to vacate. The Take 5 Parties made colorable arguments throughout their motion to vacate, all supported by law or a good faith interpretation of how the law should be modified or extended. In short, the Advantage Parties cannot meet the high burden to demonstrate that any of these arguments warrant sanctions, and their motion must fail.

## BACKGROUND

### A.    Factual background

The facts of this case are set forth in the petition to vacate (ECF No. 1) and the memorandum supporting the motion to vacate (ECF No. 3-1). The Take 5 Parties disagree with the recitation of facts the Advantage Parties provide in their motion (*Rule 11 Mem.* (ECF No. 26-1) at 3-10) and incorporate the extensive recitation of facts they previously set forth.

Briefly, the Awards concern the systematic destruction by the Advantage Parties of a successful business built through the expertise and hard work and leadership of two individuals, petitioners Alexander Radetich and Richard Gluck. Over the course of the last three years, the Advantage Parties have not just destroyed what it took Radetich and Gluck nearly twenty years to build, but they sought to destroy Radetich's and Gluck's reputations in the process and to ruin their lives and those of their families to avoid paying the earn-out due under the agreement they signed. In 2003, Radetich and Gluck founded a consumer data and data marketing services and products business, Take 5 Media Group, LLC (Take 5). Take 5 was well-known for its large and unique database containing demographic, lifestyle, and contact information for hundreds of millions of consumers. Take 5 commercialized the database through data delivery and marketing campaigns. In 2017, following eight months of comprehensive due diligence by firms such as Ernst & Young, Jones Day, Parthenon Group, and independent accounting firm, Cherry Bekaert, Advantage Sales & Marketing (ASM) entered into an Asset Purchase Agreement (APA) with Take 5.

3

Shortly after Take 5 became a business unit of ASM on April 2, 2018, problems arose. On April 11, 2019, ASM allegedly received two "anonymous" internal ethics complaints concerning Take 5's services. *Pet. Ex. 6* ¶ 35.[1] In April 2019, ASM asked Radetich and Gluck to accept an early exit from the business in exchange for a $770,000 payment and release. *Pet. Ex. 4* at 7, 25. Both declined. *Id.* ASM hired FTI Consulting to conduct an operational audit.

During the second phase of the investigation and after only forty-four days, the Advantage Parties decided to abruptly and permanently shut down Take 5. *Pet. Ex. 4* ¶ 73. On July 11, 2019, ASM laid off nearly all of Take 5's employees. *Id.* ¶ 74. ASM contacted Take 5's clients, informed them of an alleged "fraudulent scheme" and offered refunds or credits for other ASM services. *Id.* ¶ 76. ASM also contacted the FBI and United States Attorneys' Office and urged them to investigate Radetich and Gluck. *Pet. Ex. 6* at 5, 27. In little over a year, ASM had destroyed the business and reputation it had taken Take 5 nearly two decades to build and that had enjoyed significant success and client satisfaction before ASM took it over.

## B. The underlying arbitration and awards

Following this abrupt shut down, the Take 5 Parties and the Advantage Parties participated in an arbitration administered by the American Arbitration Association pursuant to Section 10.11 of the APA. *Pet. Ex. 5*. The APA provided that the arbitration would be conducted in accordance with AAA Rules, that "the Law applicable to any controversy shall be the Law of the State of Delaware regardless of principles of conflicts of Laws," and that discovery would be governed by the Federal Rules of Civil Procedure. *Id.* § 10.11(b). By agreement, the situs of the arbitration was moved to Washington, D.C. *Pet. Ex. 64* ¶ 1; *Pet. Ex. 65* at 1. APA § 10.11 further provided that the Arbitrator's "award or decision will be a reasoned award or decision setting forth the

---

[1]  "*Pet. Ex.*" refers to exhibits filed with the petition and motion to vacate. When the Court so orders the parties' stipulation (ECF No. 14), petitioners will re-file sealed exhibits publicly. "*Ex.*" refers to exhibits filed herewith, which we have numbered sequentially to the petition exhibits. "*Mot. Ex.*" refers to the lettered exhibits filed with the Advantage Parties' Rule 11 motion.

Arbitrator's reasoning in reaching its determinations."

The arbitration proceedings involved substantial discovery and motions practice over nearly three years, and the evidentiary hearing took place over the course of sixteen days between January and July 2022. The arbitrator issued an Interim Award on August 4, 2022, making determinations concerning liability and damages but deferring rulings on costs and fees. *Pet. Ex. 1*. He issued a Final Award on October 4, 2022, incorporating the Interim Award and awarding certain costs and fees (*Pet. Ex. 2* at 10-11), and issued a Modified Final Award on October 20, 2022, correcting a typo (*Pet. Ex. 3* at 10-11) (collectively, the Awards) (*Pet. Ex. 3* at 10-11).

### 1. *The parallel criminal proceeding*

Though the Advantage Parties disclosed that they had reported the purported fraudulent scheme to law enforcement, the Take 5 Parties did not become aware that an active federal criminal investigation was underway until April 2021 when an FBI agent visited Radetich's Florida home unannounced. *Pet. Ex. 20* at 4 & n.2. After learning of the extent of the investigation, the Take 5 Parties filed an Emergency Motion for Stay of Arbitration Action on June 23, 2021. *Id.* at 1. The Take 5 Parties argued that the ongoing criminal investigation meant that both Radetich and Gluck would have no choice but to invoke their Fifth Amendment privileges at their depositions and in response to other discovery, chilling their ability to testify and offer key evidence in the proceeding. *Pet.* (ECF No. 1) ¶¶ 52-53. Following a hearing on the motion to stay, the Arbitrator denied it. *Pet. Ex. 27*. As a result, Radetich and Gluck were unable to substantively respond to questioning and were severely prejudiced. *Pet. Ex. 28* at 12:9-20; *Pet. Ex. 29* at 15:2-16:1.

### 2. *Discovery disputes*

#### a. **The Advantage Parties' failure to produce interview notes**

The Advantage Parties repeatedly alleged that Radetich "admitted" to fraud during a July 2019 interview but refused to provide any substantiating documentary or testimonial evidence. The Take 5 Parties sought the memoranda and notes from these interviews in discovery. *Pet. Ex.*

5

*22* at 52-54. The Advantage Parties finally produced the notes after being ordered by the Arbitrator to do so several times. *Pet. Ex. 34* at 2-3; *Pet. Ex. 38* at 3; *Pet. Ex. 41*. Notably, *the produced notes did not mention or substantiate the Advantage Parties' prior claims that Radetich had confessed to the alleged fraud.* The Take 5 Parties sought to strike the Advantage Parties' pleadings, to preclude evidence and testimony concerning the interviews, and monetary sanctions. The Arbitrator did not grant the relief sought but did conclude that notes relating to Mr. Radetich's interview should have been identified years prior on a privilege log by the Advantage Parties (which they were not), that the Radetich interview documents did not occur "as part of the normal operation of Take 5's business," and that the documents relating to the July 2019 Radetich interview "lack quite a bit of specificity in terms of what was done, what wasn't done and what Mr. Radetich, for example, had knowledge of." *Pet. Ex. 57* at 2597:4-24; *see also Pet. Ex. 42*.

### b.    The Advantage Parties' spoliation of Google Analytics data

The Take 5 Parties were unable to access Google Analytics data because the Advantage Parties failed to preserve or provide access to the data. *Pet. Ex. 43* at 12-14. This data was crucial to proving the Take 5 Parties' case. The Take 5 Parties moved for an adverse inference and sanctions, which the Arbitrator denied. *Pet. Ex. 1* at 4-5. The arbitrator based this conclusion wholly on two witnesses (Eva Hodgens and Michael Boy) whose testimony was induced through the payment of significant sums in the absence of testimony from Radetich and Gluck, who could have explained why Hodgens' and Boy's testimony was incorrect and self-serving.

### c.    The Advantage Parties' payments to third parties

Most former employees of Take 5 were unwilling to testify given the ongoing criminal investigation. But three former employees who testified on ASM's behalf—Michael Boy, Eva Hodgens, and Peter Ward—were directly or indirectly paid by ASM. Michael Boy, a former Senior Director of the Take 5 fulfillment team, testified that he was a current employee of ASM and was paid $40,000 per year since March 2020 despite only communicating with ASM "every couple of

months," only working about six to twelve hours per year, and only working on the case. *Pet. Ex. 46* at 9:16-15:9. Prior to March 2020, Boy was paid $160,000 a year by ASM, though the Take 5 business unit was shut down in July 2019, and he had ceased full-time work winding up the unit in September 2019. Thus, from September 2019 to March 2020, ASM paid Boyd a full salary and it is unclear what work, if any, he did during that period. *Id.* at 15:23-16:12, 18:2-24. After the Interim Award was issued, the Take 5 Parties discovered that the legal bills that the Advantage Parties paid on witness Eva Hodgens' behalf totaled over $150,000. *Pet. Ex. 69* at 8. And the legal bills that the Advantage Parties paid on Ward's behalf totaled nearly $100,000. *Id.* These were key witnesses for the Advantage Parties' case. *Pet. Ex. 48* at 7:23-8:4, 11:4-16, 14:7-14.

### C. Procedural background

On October 26, 2022, the Take 5 Parties initiated this action seeking to vacate the Interim Award, Final Award, and Modified Final Award pursuant to the FAA, 9 U.S.C. § 10. *See* ECF Nos. 1, 3. The accompanying brief painstakingly detailed the Take 5 Parties' reasons why the Award should be vacated. ECF No. 3-1. Those reasons include the Sole Arbitrator refusing to stay the arbitration or postpone the hearing in light of a pending, parallel criminal investigation that the Advantage Parties instigated against petitioners Gluck and Radetich, knowing they would be forced to assert their Fifth Amendment rights; refusing to account for the Advantage Parties' spoliation of critical evidence that would have proven petitioners' positions; awarding certain damage amounts absent documentary evidence supporting those amounts; and entering awards against a distinct entity (petitioner RJV Marketing Corp.) absent a discussion of RJV throughout the hearing or explanation of the basis for that determination.

The Advantage Parties chose not to substantively respond to the motion to vacate. Instead, on November 7, the Advantage Parties sent the Take 5 Parties a letter and cover motion, stating that they intended to seek Rule 11 sanctions if the Take 5 Parties did not respond to the letter by November 9—just two days later. The Take 5 Parties sent a preliminary response on respondents'

arbitrary two-day deadline indicating that they were looking into the contentions contained in the letter and would respond in detail as soon as possible. *Mot. Ex. Y.*

On the deadline for opposing the motion to vacate (LCvR 7(b)), the Advantage Parties filed an "Interim Response" to the motion to vacate and a motion to dismiss invoking the *Colorado River* doctrine. *See* ECF Nos. 15, 16. *Neither* filing addressed the merits of the Take 5 Parties' motion to vacate. Instead, in the "Interim Response," the Advantage Parties argued they were not required to respond to the substance of the Take 5 Parties' motion because the Advantage Parties were confident that the Take 5 Parties would withdraw the motion on account of the Advantage Parties' threat of Rule 11 sanctions. The Advantage Parties detailed their belief that the Take 5 Parties violated Rule 11, informed the Court of their intention to file a motion for Rule 11 sanctions, and offered to provide the Court with a copy of their November 7 letter. ECF No. 16 at 2. The Advantage Parties' motion to dismiss sought dismissal solely on the ground that the Court should decline to exercise federal jurisdiction under the *Colorado River* doctrine. ECF No. 15. The Take 5 Parties timely replied to and opposed both filings, explaining why the Advantage Parties were wrong and had conceded that the motion to vacate should be granted. ECF Nos. 23, 24.

Separately, on November 28, the Take 5 Parties' counsel sent a detailed letter to the Advantage Parties, pointing out the many flawed arguments in the Rule 11 letter and the various procedural violations the Advantage Parties committed. *Mot. Ex. G.* The Take 5 Parties invited the further discussions concerning the case. *Id.* at 14. But the Advantage Parties did not respond.

Weeks passed. On December 16, the Advantage Parties served the Take 5 Parties' counsel with a Rule 11 motion and memorandum of law and notified the Take 5 Parties of their intention to move for sanctions on the next business day—December 19. *Exs. 86, 87.* The Take 5 Parties' counsel requested a meet and confer with the Advantage Parties—given that the Advantage Parties' counsel had not responded to the Take 5 Parties' prior invitation to discuss the Rule 11 Motion (*Mot. Ex. Z*)—and the Advantage Parties' counsel accepted.

Counsel conferred by phone on December 21. *Richman Decl.* ¶ 10; *Mot. Ex. BB*. The Advantage Parties' counsel acknowledged that that the Take 5 Parties' counsel filed the petition to vacate in good faith and to the best of counsel's "knowledge, information, and belief." *Mot. Ex. BB* at 1. And the Take 5 Parties' counsel again pointed out several flaws in the December 16 transmission. *Id.* at 2. On December 27, the Advantage Parties filed this motion along with a new memorandum with substantive changes from both the December 16 motion and November 7 letter.

## STANDARD OF DECISION

Under Fed. R. Civ. P. 11(b), an attorney who files a paper with the Court "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the paper (1) is not being presented for an improper purpose; (2) has a sound basis for any legal contentions; (3) has evidentiary support for factual contentions; and (4) has a proper basis for denial of factual contentions. The standard is "an objective one: that is, whether a reasonable inquiry would have revealed that there was no basis in law or fact for the asserted claim" at the time of filing. *Egypt Dep't of Def. v. Alboghdady*, 2022 WL 715229, at \*12 (D.D.C. Mar. 10, 2022). Rule 11 sanctions are "not imposed lightly." *Id.* (cleaned up). They are "not intended to chill an attorney's enthusiasm or creativity pursuing factual or legal theories" (*Quick v. EduCap, Inc.*, 2019 WL 95566, at \*2 (D.D.C. Jan. 3, 2019) (quoting Fed. R. Civ. P. 11, advisory committee notes to 1983 amendment)) but instead reserved as "an extreme punishment for filing pleadings that frustrate judicial proceedings" (*Egypt*, 2022 WL 715229, at \*12).

## ARGUMENT

## I.   THE ADVANTAGE PARTIES' MOTION IS PROCEDURALLY DEFICIENT.

Fortunately, the Court need not engage with the substance of the Rule 11 motion at all because the Advantage Parties have disregarded the procedures applicable to such a motion. First, the Advantage Parties have violated Rule 11's safe-harbor provision *twice*, any single violation of which requires denying the motion. Second, the Advantage Parties have already waived any

9

challenge to the substance of the petition and motion to vacate and cannot use Rule 11 as a vehicle to unwind that waiver. Third, the Advantage Parties *admit* that the Take 5 Parties' counsel filed the petition and motion to vacate in good faith. Each of these procedural defects independently precludes the Advantage Parties' request for Rule 11 sanctions at the threshold.

### A.    The Advantage Parties repeatedly violated Rule 11's "safe harbor."

Rule 11(c)(2) contains a "safe harbor" that makes clear that a motion seeking sanctions "must not be filed or be presented to the court" until at least "21 days after service" of "[t]he motion" on the allegedly offending party. Fed. R. Civ. P. 11(c)(2); *see also Ahuruonye v. U.S. Dep't of the Interior*, 312 F. Supp. 3d 1, 26 (D.D.C. 2018). The safe-harbor "must be satisfied before the Court considers the substantive aspects of [the] motion." *Henok v. Chase Home Finance, LLC*, 925 F. Supp. 2d 46, 53 (D.D.C. 2013) (quoting *Brown v. FBI*, 873 F. Supp. 2d 388, 408 (D.D.C. 2012)). A party's failure to comply with the safe-harbor provision is "fatal to the imposition of sanctions pursuant to Rule 11" and "cannot be corrected by a latter day safe harbor exercise." *In re Jumper*, 909 A.2d 173, 175 (D.C. 2006); *Dixon v. Midland Mortg. Co.*, 2013 WL 5350906, at *2 (D.D.C. Sept. 25, 2015).

The Advantage Parties violated Rule 11's safe harbor period twice over—by presenting the motion to the Court only seven days after serving a "Rule 11 letter" and by filing the December 27 motion, which they had never served and that challenged entirely new conduct and raised new arguments. "Having failed to comply with the 'safe-harbor' provision," the Advantage Parties are "precluded from recovering sanctions under Federal Rule 11." *Dixon*, 2013 WL 5350906, at *2.

#### 1.    *The Advantage Parties violated Rule 11's safe harbor by presenting it to the Court in their "Interim Response."*

The Advantage Parties first violated the safe harbor provision by advising the Court of the motion and requesting the Court's permission to file the Rule 11 letter only seven days after sending it to the Take 5 Parties. *See* ECF No. 16 at 3.

Rule 11(c)(2) makes clear that a Rule 11 motion "must not be filed *or be presented to the*

10

*court*" until at least "21 days after service." Fed. R. Civ. P. 11(c)(2) (emphasis added). The Advantage Parties sent a Rule 11 letter and "notice of motion" on November 7 and demanded a response by November 9. Although the Take 5 Parties' counsel sent a preliminary response on November 9, explaining that counsel was in an arbitration hearing in another matter and was discussing the matter with her clients and would respond on or before November 28 (only 21 days later) (*Mot. Ex. Y*). Instead, on November 14, the Advantage Parties rushed to the Court to announce that they sent a Rule 11 letter, intended to file a motion for Rule 11 sanctions, and would provide the Court with a copy of the letter on request. ECF No. 16 at 3. The Advantage Parties' decision to raise Rule 11 in response to the Take 5 Parties' motion to vacate, beyond being inappropriate, violated the safe harbor provision and precludes any Rule 11 sanctions.

The Advantage Parties attempt to excuse this violation in a footnote by asserting that "merely notifying the Court" does not violate Rule 11(c)(2) because they did not "present" the motion until December 27 when they filed it. *See Rule 11 Mem.* 10-11 n.8. But that is wrong. Rule 11(c)(2) states that a Rule 11 motion "must not be filed *or be presented* to the court" until 21 days have passed. Fed. R. Civ. P. 11(c) (emphasis added).

The plain and ordinary meaning of "present" means "to bring before the mind; offer for consideration" or "to bring formally to the notice of the proper authority, as an offense." "Present," *Webster's New Universal Unabridged Dictionary* (1989); *accord* "Present," *Merriam-Webster.com* (as of Jan. 20, 2023) ("to bring to one's attention"; "to lay … before a court as an object of inquiry"). The Advantage Parties did just that. They brought the Rule 11 motion to the Court's attention before the 21-day safe harbor period was over—in other words, they presented it to the Court. The Advantage Parties' position—that they did not "present" the motion until they "filed" it—would render the second half of the prohibition against "present[ing]" the motion without effect. But courts presume that drafters do not "include words that have no effect" and "generally 'avoid a reading that renders some words altogether redundant.'" *Mercy Hosp., Inc. v.*

11

*Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176-177 (2012)). "Presenting" the motion must mean something other than "filing" it—and, here, the Advantage Parties *did* "present" the motion to the Court a mere seven days after sending a Rule 11 letter.

Not only does the Advantage Parties' action violate the letter of the rule, it also violates its spirit. After all, the safe harbor's purpose "is to allow a party to <u>privately</u> withdraw a questionable contention without fear that the withdrawal will be viewed by the court as an admission of a Rule 11 violation." *Folta v. Winkle*, 2016 WL 4087103, at *3 (D. Ariz. July 28, 2016) (quoting *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 33, 39 (1st Cir. 2005)).

The Advantage Parties have nothing to support their contrary argument—not a single case approving a swift rush to tell the Court that they served a Rule 11 motion. *Rule 11 Mem.* 10-11 n.8. Aside from calling our argument "facially meritless," which it is not, the Advantage Parties' argument is only that the Take 5 Parties were not "prejudice[d]" by their early presentment of the motion. *Id.* But this Court does not take a no-harm, no-foul approach to Rule 11(c)(2)'s safe-harbor provision. Instead, a party that "fail[s] to comply with the 'safe-harbor' provision" is "precluded from recovering sanctions under Federal Rule 11," full stop. *Dixon*, 2013 WL 5350906, at *2; *Henok*, 925 F. Supp. 2d at 53 (safe-harbor "must be satisfied before the Court considers the substantive aspects of [the] motion"). The Advantage Parties' premature presenting of the Rule 11 motion to the Court violated the safe-harbor provision and precludes sanctions.

### 2. *The Advantage Parties violated Rule 11's safe harbor by filing a motion they never served and with new grounds.*

The Advantage Parties further violated Rule 11's safe harbor provision by filing a motion with the Court on December 27 that they had *never* served.

Rule 11's safe harbor provision requires that a party serve "[t]he motion" for sanctions at least 21 days before filing it. Fed. R. Civ. P. 11(c)(2). Under this Court's rules, a "motion shall include or be accompanied by a statement of the specific points of law and authority that support

12

the motion." LCvR 7(a). "The motion" that the Advantage Parties filed with the Court on December 27 was *never* served on the Take 5 Parties and, indeed, raises entirely new arguments and challenges entirely different conduct than the Advantage Parties raised before.

As background, the Advantage Parties sent a "notice of motion" and a "Rule 11 letter" on November 7. *Mot. Ex. F*. The Advantage Parties did not include the "specific points of law and authority" in that motion nor an accompanying memorandum of law. Instead, the Advantage Parties asserted that the motion, when filed, would include a "supporting memorandum and evidence," citing out-of-circuit case law, and that the letter was "not intended to be a complete summary of the facts or legal authority supporting their position." *See id.* at 11, 16. The Advantage Parties' November 7 transmission, then, could not have satisfied Rule 11's safe harbor because the Advantage Parties, by their own admission, failed to serve "[t]he motion" (Fed. R. Civ. P. 11(c)(2); LCvR 7(a)), notwithstanding the Advantage Parties' self-serving assertion that the letter "meet[s] the procedural requirements" (*Rule 11 Mem.* 9 n.7). It plainly does not—a letter is not "the motion." *Cf.* Fed. R. Civ. P. 11, advisory committee note to 1993 amendment ("[T]he 'safe harbor' period begins to run only upon service of *the motion*. … [C]ounsel should be expected to give informal notice to the other party, whether in person or by a telephone call *or letter*, of a potential violation before proceeding to prepare and serve a Rule 11 motion." (emphasis added)).

Nonetheless, after we rebutted each point in the November 7 letter (*Mot. Ex. G*), the Advantage Parties went silent until they served a new motion with the necessary points and authorities in a memorandum on December 16 (*Exs. 86 & 87*)—only 11 days before filing with the Court. Although the December 16 transmission finally included a proper motion and memorandum, it added substantive new arguments and replaced certain legal and factual evidence. *Compare Mot. Ex. F*, *with Ex. 87* at 21-26 (adding substantive arguments regarding the improper witness payments); *Mot. Ex. F* at 3-4, *with Ex. 87* (removing safe-harbor cases); *Mot. Ex. F* at 7 n.3, *with Ex. 87* at 35 n.31 (replacing evidence about purported knowing misstatements).

13

The Take 5 Parties brought this issue to the Advantage Parties' attention in connection with the Parties' meet and confer call on December 21, 2022. *Mot. Ex. BB* at 2. Rather than remedy the procedural deficiencies even though they had been brought to their attention repeatedly (and their first violation is irremediable in any event), the Advantage Parties nonetheless doubled down.

In their December 27 filing with the Court, the Advantage Parties made *further* changes to "the motion," filing a motion and memorandum they had not served, that contains substantive changes based on our meet-and-confer pointing out errors, and that fundamentally alters the nature of the "specific conduct" that supposedly violates Rule 11 (*see* Fed. R. Civ. P. 11(c)(2) (requiring that "the motion" served under Rule 5 "describe the specific conduct that allegedly violates Rule 11(b)")). Among other things, the Advantage Parties reframed their as-filed motion to assert that the Rule 11 violation is that the Take 5 Parties "maintained" the motion to vacate, not that they filed it in the first place. *Rule 11 Mem.* 3. Beyond fundamentally altering the nature of the allegedly sanctionable conduct, the Advantage Parties made other changes to their arguments, including to their argument addressing their improper witness payments. *Compare Rule 11 Mem.* 22-29 *with Ex. 87* at 21-26. They also cited new law and a new argument that discussed the arbitrator's inability to subpoena witnesses to testify. *Rule 11 Mem.* 25. And they fundamentally changed citations to the record and evidence to respond to arguments made by the Take 5 Parties. *Compare Rule 11 Mem.* 36 n.31, *with Ex. F* at 6 n.3. That is, the Advantage Parties made significant substantive changes in response to the flaws that the Take 5 Parties' counsel noted in an (apparently misguided) effort to try to demonstrate to them that there was no Rule 11 violation.

The very fact that the Rule 11 motion required this iterative process is strong proof on its own that the motion lacked substantive merit to begin with. Regardless, the Advantage Parties' failure to serve the motion that they filed with the Court more than 21 days before filing violates Rule 11's safe-harbor provision and requires denying the motion. And they cannot be excused

14

from complying with the safe-harbor provision by pointing to their November 7 transmission—which differed in substance *and* in "specific conduct that allegedly violates Rule 11(b)"—from that filed with the Court on December 27. Fed. R. Civ. P. 11(c)(2).

### B. The Advantage Parties waived any challenge to the substance of the motion to vacate and cannot use Rule 11 to circumvent that.

The Advantage Parties' Rule 11 motion is further precluded because they *waived* any challenge to the substance of the Take 5 Parties' motion to vacate by failing to timely oppose it. ECF No. 23. As in *Texas v. United States*, when a party files "a three-page 'Advisory' declaring … that '[it] d[id] not intend to respond' to the motions … 'unless requested to do so by the Court," such a "deliberate refusal to join the issues raised by the motions" appropriately "waive[s] any argument" not raised. 798 F.3d 1108, 1113 (D.C. Cir. 2015) (citation omitted). Every unaddressed argument in the motion to vacate—which was *all* of them—were conceded by the Take 5 Parties. Having waived any challenge to the substance, the Advantage Parties' contention that there is a Rule 11 violation by maintaining the conceded petition and motion is absurd on its face.

What is more, Rule 11 motions "should not be employed … to test the legal sufficiency or efficacy of allegations in the pleadings; … to emphasize the merits of a party's position, …[or] to intimidate an adversary into withdrawing claims that are fairly debatable." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment. A Rule 11 motion "bolster[s] a motion to dismiss" when it "can[not] be resolved without reaching the merits of the case." *E. Gluck Corp. v. Rothenhaus*, 252 F.R.D. 175, 183 (S.D.N.Y. 2008). A Rule 11 motion should fail when it "raises issues that more properly should be addressed in a Rule 12(b)(6) motion to dismiss." *Id.* And that is exactly what the Advantage Parties have attempted to do. The Advantage Parties' motion almost exclusively "emphasizes the merits" of their position. Nowhere do the Advantage Parties actually discuss the Rule 11 standard as it applies to the Take 5 Parties' actions and the actions of their counsel—and for good reason, because the Advantage Parties have admitted that the Take 5 Parties' and their counsel filed the motion to vacate in good faith. The Advantage Parties appear

15

to know that their assertions come nowhere near the Rule 11 standard, and they therefore focus the bulk of their motion on arguing the merits of the case instead of explaining how or why their assertions meet the exceedingly high Rule 11 standards—because they do not.

### C.    The Advantage Parties acknowledge that the Take 5 Parties filed the petition and motion to vacate in good faith.

Finally, the motion should be denied at the threshold because the Advantage Parties have acknowledged the Take 5 Parties filed the petition and motion to vacate in good faith and to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances. Fed. R. Civ. P. 11(b); *All. Sols., Inc. v. Quest Software, Inc.*, 2012 WL 692883, at *11 (D. Md. Mar. 1, 2012) ("*In filing* … plaintiff's counsel was required to make an inquiry reasonable under the circumstances"). In other words, the Advantage Parties acknowledge that, at the time of filing the petition and motion to vacate, the Take 5 Parties complied with Rule 11. Only now, in the new December 27 memorandum, do the Advantage Parties argue that the issue is the Take 5 Parties' refusal to withdraw after receiving the Advantage Parties' Rule 11 letter and motion. Setting aside the numerous substantive changes they made between their November 7 letter and the December 27 filing, a Rule 11 violation must attach to the "signing, filing, submitting, or later advocating" of a particular "pleading, written motion, or other paper"—not to the simple failure to withdraw. Fed. R. Civ. P. 11(b); *accord* Report of the Judicial Conference Committee on Rules of Practice and Procedure 10 (Sept. 1992), perma.cc/RZ9N-JZLA (noting that the Committee intended "to clarify that the certification obligation of the rule apply only in connection with an affirmative presentation of papers to the court (rather than arguably upon the mere passive failure to withdraw a previously filed paper)"). Yet, on November 14, the Advantage Parties deliberately waived any challenge on the merits to the motion to vacate. ECF Nos, 16, 23. There cannot possibly be a Rule 11 violation by the Take 5 Parties "later advocat[ing]" a pleading or motion to which the opposing party has waived any opposition on the merits.

16

## II.   THE ADVANTAGE PARTIES' MOTION IS SUBSTANTIVELY MERITLESS.

The Advantage Parties' motion should be denied at the threshold because of the numerous irremediable procedural defects that infect it. Were the Court inclined to consider its substance (though it need not), the motion fails substantively as well. The Take 5 Parties raised six separate bases why the awards should be vacated; the Advantage Parties' latest effort to overcome those issues is no more effective than its prior attempts to do so.

### A.   The implication that claims with a high standard of review are presumptively sanctionable is unsupportable.

The Advantage Parties' opening suggestion is that, because the statutory standard for vacating an arbitral award is high, courts should routinely impose sanctions so long as the arbitrator "already considered and rejected" the petitioners' arguments. *Rule 11 Mem.* 12-14. This attempt to shift the burden onto the Take 5 Parties to prove the absence of a Rule 11 violation underscores that the Advantage Parties cannot show one. The mere fact that it is difficult to vacate an arbitral award does not mean that every motion to vacate warrants Rule 11 sanctions. Thus, even were the Advantage Parties correct that the Take 5 Parties' claims fail to meet the threshold to vacate an arbitral award—though we *have* met that standard and the Advantage Parties waived any argument otherwise (ECF Nos. 16, 23)—this would not serve as sufficient grounds for Rule 11 sanctions.

Instead, as the cases the Advantage Parties feature reveal (*Rule 11 Mem.* 11-13), Rule 11 sanctions follow from a combination of conduct like (1) repeatedly bringing the same claim that had been twice dismissed; (2) alleging "legal theories that have no apparent basis for application in this case" and no "factual basis" for suggesting a change in circumstances; and (3) showing "calculating indifference" to prior court rulings. *Reynolds v. U.S. Capitol Police Bd.*, 357 F. Supp. 2d 19, 23-26 (D.D.C. 2004); *Carswell v. Air Line Pilots Ass'n, Int'l*, 248 F.R.D. 325, 330 (D.D.C. 2008) (imposing a fine of $250 for making "sensational allegations with respect to a defendant without any factual basis whatsoever, and then tr[ying] to rescue his claims against that defendant from dismissal by introducing an entirely different theory of liability in his legal memoranda").

17

In the context of motions to vacate, the cases the Advantage Parties managed to identify (*Rule 11 Mem.* 13 & n.9) helpfully illustrate why the Take 5 Parties' motion is nowhere near the standard for Rule 11 sanctions. The only in-circuit cases the Advantage Parties cite (at 12-14) do not involve Rule 11 *at all* but discretionary awards of fees under D.C. Code § 16-4425(c) (*Affinity Fin. Corp. v. AARP Fin., Inc.*, 794 F. Supp. 2d 117, 122 (D.D.C. 2011)) or the standard of review on the merits (*Off. & Prof'l Emps. Int'l Union, Local 2 v. Wash. Metro. Area Transit Auth.*, 724 F.2d 133, 137 (D.C. Cir. 1983); *Contech Constr. Prod., Inc. v. Heierli*, 764 F. Supp. 2d 96, 108 (D.D.C. 2011); *Kanuth v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1178 (D.C. Cir. 1991)).

The Advantage Parties' collection of out-of-circuit cases lends them no help either. The sanctionable conduct in those cases involved:

- Filing a motion to vacate that was plainly time-barred (*Optionsxpress, Inc. v. Hale*, 2009 WL 4015556, at *4 (N.D. Ill. Nov. 19, 2009));

- Raising defenses or arguments that were plainly waived (*Teamsters, Chauffeurs, Salesdrivers & Helpers, Loc. Union No. 330 v. Elgin Eby-Brown Co.*, 670 F. Supp. 1393, 1400 (N.D. Ill. 1987); *Dreis & Krump Mfg. Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 8*, 802 F.2d 247, 254-256 (7th Cir. 1986));

- Making irrelevant arguments about "broad policy issues" "inapplicable" to the case (*Corp. Printing Co. v. New York Typo. Union No. 6*, 886 F. Supp. 340, 345 (S.D.N.Y. 1995));

- Asserting exceptionally weak claims of arbitrator bias (*United States v. Travelers Cas. & Sur. Co. of Am.*, 2014 WL 3594306, at *3 (M.D. Fla. July 18, 2014) (alleging bias because arbitrator had attended social gathering with attorneys who were part of opposing counsel's law firm); *Levy v. Citigroup Glob. Markets, Inc.*, 2006 WL 8432648, at *9 (S.D. Fla. Oct. 17, 2006) (alleging bias because, among other things, arbitrator postponed hearings due to the death of opposing counsel's family member); *Jardine Matheson & Co. v. Saita Shipping, Ltd.*, 712 F. Supp. 423 (S.D.N.Y. 1989) (alleging bias because arbitrator's employer rented office space to the lawyer for one of the parties));

- Arguing that the arbitrators "secretly included in their award an amount for attorney's fees incurred in the arbitration proceeding itself" when the award on its face showed otherwise (*C.T. Shipping, Ltd. v. DMI (U.S.A.) Ltd.*, 774 F. Supp. 146, 152 (S.D.N.Y. 1991));

- Challenging a New York Stock Exchange arbitration panel's conclusion by calling into question "the entire force of New York Stock Exchange and similar arbitration proceedings [which would be]… undermined significantly" (*Quick & Reilly, Inc. v. Jacobson*, 126 F.R.D. 24, 25 (S.D.N.Y. 1989));

18

- Arguing that an arbitrator exceeded her powers by awarding attorney fees, even though the arbitration clause was broad and a statute authorized such an award (*Schaden v. Bank of Am., N.A.*, 2008 WL 11469260, at *8 (S.D. Fla. Aug. 20, 2008));

- Failing to raise any of the grounds allowed under Seventh Circuit law for an individual employee to challenge an award arbitrated by their union (*Ridge v. U.S. Postal Serv.*, 154 F.R.D. 182, 184 (N.D. Ill. 1992)).[2]

*None* of these cases looks remotely like the arguments that the Take 5 Parties have made here: none is about prejudicing the parties by refusing to stay the arbitration, denial of pertinent testimony (that could not be replaced by other witnesses), denial of pertinent evidence (that could not be replaced by other evidence), improper payment of witnesses, issuing an award against a party without considering that party, awarding certain damages without any computation of those damages, or manifestly disregarding the law by entering awards against a party without giving any explanation for those awards, by denying a fair hearing by refusing to postpone an arbitration, or by refusing to hear evidence pertinent and material to the controversy.

The Advantage Parties also overlook numerous cases denying Rule 11 sanctions against parties that moved to vacate arbitration awards, including in this District. *See Ray v. Chafetz*, 236 F. Supp. 3d 66, 85 (D.D.C. 2017) (denying Rule 11 motion against motion to vacate an arbitration award because the party's arguments were "not wholly frivolous or deceptive," an "exceedingly

---

[2]    The Seventh Circuit, on whose case law the Advantage Parties repeatedly rely, has special rules for Rule 11 sanctions in arbitration cases, spawning from its view in the labor-arbitration context that "[a] company dissatisfied with the decisions of labor arbitrators … will not be permitted to nullify the advantages to the union by spinning out the arbitral process unconscionably." *Cuna Mut. Ins. Soc. v. Off. & Pro. Emps. Int'l Union, Loc. 39*, 443 F.3d 556, 561 (7th Cir. 2006) (quoting *Dreis & Krump*, 802 F.2d at 254-256) (requiring courts to "consider the long line of Seventh Circuit cases that have discouraged parties from challenging arbitration awards"). The Eleventh Circuit has issued similar pronouncements. *See B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 905 (11th Cir. 2006), *abrogated on other grounds by Frazier v. CitiFinancial Corp.*, 604 F.3d 1313 (11th Cir. 2010). The D.C. Circuit has not relaxed the Rule 11 standard in the context of arbitration awards, labor or otherwise, nor issued any of the types of warnings the Seventh and Eleventh Circuits have. This Court should follow D.C. Circuit law and Rule 11's text, notwithstanding the Advantage Parties' invitation otherwise.

low bar by which to gauge attorney work product").[3] This comports with this Court's rejection of arguments like the Advantage Parties' in an array of contexts. *See Perry v. Int'l Bhd. of Teamsters*, 247 F. Supp. 3d 1, 8 (D.D.C. 2017) (not imposing sanctions because "[p]laintiffs are entitled to argue the law should be extended, modified, or reversed, and are free to ask the court to establish new law"); *Indep. Fed. Sav. Bank v. Bender*, 230 F.R.D. 11, 16 (D.D.C. 2005) (declining to impose sanctions even though the party's complaint was "without merit" because it was not "patently clear" that there was no "absolutely no chance of success under the existing precedents and [that] no reasonable argument [could] be advanced to extend, modify or reverse the law as it stands").

The Take 5 Parties advance far more than colorable arguments for why the Awards should be vacated—indeed, our motion to vacate discusses many troubling facts concerning the arbitration and discusses plenty of relevant cases to justify why the law is either met or should be extended or modified. Indeed, the very fact that the Take 5 Parties openly address cases that have come out the other way, a fact that seems to convince the Advantage Parties of their position that the Take 5 Parties committed a Rule 11 violation, actually proves the opposite: the Take 5 Parties did not shy away from authorities, even those that superficially appear to cut against their position. At bottom, even though the standard to prevail on a motion to vacate is high, failing to meet that

---

[3]     *See also Int'l Telepassport Corp. v. USFI, Inc.*, 89 F.3d 82, 86 (2d Cir. 1996) (affirming denial of Rule 11 sanctions despite "barely non-frivolous argument that the award of lost-profits was improper under New York law and the Federal Arbitration Act"); *B.L. Harbert*, 441 F.3d at 913 (declining to impose sanctions where the party "and its counsel did not have the benefit of this notice and warning"); *CM S. E. Tex. Houston, LLC v. CareMinders Home Care, Inc.*, 662 F. App'x 701, 706 (11th Cir. 2016) (rejecting sanctions based on absence of precedent "discuss[ing] in any detail motions to vacate an award under the FAA based on an arbitrator's failure to postpone a hearing"); *Al Maya Trading Estab. v. Glob. Exp. Mktg. Co.*, 2017 WL 1050123, at *6 (S.D.N.Y. Mar. 17, 2017) (denying a Rule 11 motion arguing a motion to vacate an arbitration award was frivolous); *Campmor, Inc. v. Brulant, LLC*, 2014 WL 5392036, at *6 (D.N.J. Oct. 21, 2014) (denying Rule 11 motion where party "relie[d] on applicable statutes and case law" and argument of bias after failing to disclose professional contacts was not "patently unmeritorious or frivolous"); *Landis & Gyr Powers, Inc. v. Powers U.K., Ltd.*, 1990 WL 165323, at *3 (N.D. Ill. Oct. 25, 1990) (denying Rule 11 sanctions despite arguments that the motion to vacate was intended to "delay" and "harass"; "The mere fact that an argument is meritless does not subject its proponents to sanctions.").

20

standard does not make an argument "wholly frivolous or deceptive." *Ray*, 236 F. Supp. 3d at 85.

**B.    The Advantage Parties raise no arguments sufficient to dispute that the hearing should have been stayed.**

The arbitrator's denial of the Take 5 Parties' motion to stay and failure to postpone the arbitration prevented the (former) owners and co-founders of Take 5 and arguably the most important witnesses in this case, Messrs. Radetich and Gluck, from testifying. Their testimony was pertinent and material. Without an opportunity to present this evidence and argument, the Take 5 Parties were denied the right to due process and a fair hearing and were significantly prejudiced.

The Advantage Parties attempt (at 15-20) but fail to refute these arguments. In a case cited by the Advantage Parties, *Ford v. Telamon Corporation*, the court granted a partial stay, holding "that plaintiffs may not seek discovery from [the defendant] until the criminal matter has been resolved." 2021 WL 2550208, at *3 (Del. Super. Ct. June 17, 2021). As the court states, the *Schulman* test requires "analyz[ing] two overarching considerations: (1) "the status of the criminal case, including whether the defendant[] [has] been indicted," and (2) "the extent to which the issues in the criminal and civil cases overlap." *Id.* at *2. Keeping these overarching factors in mind, the court then considers five additional factors, including "the burden upon the defendants from going forward with any aspects of the proceedings, in particular any prejudice to their rights." *Id.*

Applying those factors, the *Ford* court found that a partial stay was warranted because, among other things, there was overlap between the issues in the criminal and civil cases, which would create "at least some danger that the criminal case could be prejudiced by "expanding the scope of criminal discovery" and "exposing the basis of the [criminal] defense to the prosecution in advance of trial," particularly from being subjected to direct discovery in the civil cases. *Id.*

Under that standard, a stay should have been granted here too. The Take 5 Parties were denied their right to a fundamentally fair hearing, a cornerstone requirement of any arbitration. Though the Take 5 Parties had not been indicted at the time the stay was sought, the second "overarching consideration"—the extent to which the criminal and civil proceedings overlap—

weighs heavily in favor of granting a stay. The arbitrator acknowledged that the government investigation concerned the same factual matters as those at issue in the arbitration. *Pet. Ex. 27*. And the Advantage Parties' payment of their witnesses' attorney's fees for their involvement in the criminal proceeding underscores the parallel nature of these proceedings.

Moreover, the burden upon the Take 5 Parties from going forward with the proceeding and the prejudice to their rights was heavily weighted in favor of granting a stay. The depositions of Messrs. Radetich and Gluck occurred on July 1, 2022 and July 8, 2022, mere days after the arbitrator denied the stay on June 29, 2022. Further, it is undisputed that had a stay been granted, they could have avoided invoking the Fifth Amendment at their depositions, their depositions would have been deferred, and the hearing likely would have been deferred altogether. And the arbitrator even determined the Advantage Parties had not argued or proven that there would be any prejudice to them by a delay. A further stay (after the six months elapsed) could also have been granted.[4] Yet, because they failed to testify in substance at their depositions, Messrs. Radetich and Gluck were unable to testify in substance at the hearing.

All of these undisputable facts support the Take 5 Parties' argument that the arbitrator's failure and refusal to grant the stay prejudiced their rights and denied them their right to a fundamentally fair hearing. The reason and basis the arbitrator gave for doing so was his conclusion that he could not draw an adverse inference from their inability to testify—but what resulted in his Interim Award is that he *did* draw an adverse inference because no testimony was available to replace the testimony of Messrs. Radetich and Gluck, who had the only first-hand knowledge of what they actually knew (which was critical to the allegations of fraud).

---

[4]    The Advantage Parties dwell on the fact that the Take 5 Parties did not seek a stay for longer than 6 months or until the conclusion of the criminal investigation. *Rule 11 Mem.* 5. But had the stay been granted, the Take 5 Parties could have sought an extension of the stay. Moreover, at the time of the request, the Take 5 Parties were relying on their limited understanding of the investigation, but the status of the investigation could have easily changed.

22

Compounding the problem, the arbitrator ultimately based his conclusions on two individuals whose testimony was induced. Thus, because the arbitrator refused to stay the proceedings, the Take 5 Parties were denied a fundamentally fair hearing in the matter.

Messrs. Radetich and Gluck were unable to testify about their state of mind regarding the alleged fraud, and they could not refute the allegations by Ms. Hodgens and Mr. Boy, whose testimony the Advantage Parties have admitted was central to proving fraud. Hodgens' and Boy's testimony was improperly induced by the Advantage Parties, was not based on first-hand knowledge and was unreliable, and the arbitrator should not have relied on witness testimony induced by the payment of hundreds of thousands of dollars by the Advantage Parties.

Messrs. Radetich and Gluck were further prejudiced because they were unable to respond to the alleged "evidence" that they participated in communications with clients about alleged "suspicious traffic to clients' websites." *Mot. Ex. F* at 6. Because they were denied the opportunity to testify, neither could address documents to put them into context or explain their content.

### C.      The Advantage Parties' "evidence" of lack of candor is no such thing.

In order to buttress their misguided and procedurally improper motion, the Advantage Parties contend that "[s]anctions are independently warranted here due to the Take 5 Parties' and their counsel's lack of candor with the Court." *Rule 11 Mem.* 35-38. The Advantage Parties then cite a number of irrelevant cases and attempt to connect these to this case by claiming that there are assertions in the petition and motion to vacate that purportedly are "patently untrue." *Id.*

To start, the Advantage Parties do not allege that counsel was aware when the petition and motion to vacate were filed that any statements were untrue—nor could they given their admission that the petition and motion were filed to the best of counsel's belief and knowledge. Instead, the (new) argument appears to be that the Take 5 Parties and their counsel should have known at some point *after* the filing the petition and motion to vacate that the statement that Judge Eyler should have stayed the case because "no evidence was presented during the hearing concerning the

23

knowledge, state of mind, or intentions of Gluck and Radetich" was allegedly "false." *Id.*

The Advantage Parties made a similar argument in their November 7 letter, citing both documents and testimony—evidence that differed in significant ways from the documents and testimony to which the Advantage Parties cite in support of their motion. That is, after the Take 5 Parties sent their detailed November 28 response explaining why the documents and testimony the Advantage Parties' evidence fails to support their contention (*Mot. Ex. G* at 5-9), the Advantage Parties changed their argument. Moreover, the Advantage Parties never engaged with the Take 5 Parties to discuss this issue and by their conduct (in changing the alleged "evidence" in support of their contention), it is clear the Advantage Parties understand that their assertion is incorrect and unsupported. As the Take 5 Parties stated in their November 28 letter:

> With respect to your contention that "[t]he evidence that Mr. Radetich and Mr. Gluck were aware of the fraud was overwhelming", this is again an argument that the Advantage Parties could and should have raised (if at all) in connection with their opposition to our Motion to Vacate and/or in connection with your Motion to Dismiss, neither of which you did.

*Mot. Ex. G* at 5-6 (quoting *Mot. Ex. F* at 4-5). This remains true at present. The Advantage Parties failed to make these arguments in connection with either their opposition to the motion to vacate or the motion to dismiss and now try to bring them belatedly in an incorrect procedural context. This is not an appropriate use of a Rule 11 motion.

But, in any event, the Take 5 Parties already responded in detail to the Advantage Parties' arguments and, even as substantively changed in their December 27 motion, these arguments, beyond being untimely, are substantively incorrect.

First, with respect to the Advantage Parties' arguments concerning the arbitrator's conclusions (*Rule 11 Mem.* 34-35; *Pet. Ex. 1* at 37), the Advantage Parties disregard two important things. The statement to which the Advantage Parties direct the Court followed immediately on the following sentence: "Again, the evidence from hands-on employees [Boy and Hodgens] is persuasive proof that the practices of Take 5 were sufficiently widespread to constitute fraud as to

24

Advantage, as found herein." *Pet. Ex. 1* at 37. As such, the arbitrator did not refer to any of the alleged "abundant evidence in the record" to which the Advantage Parties then cite to support their contentions. *See Rule 11 Mem.* 35 n.31. Notwithstanding this, the Take 5 Parties explain below why this "evidence" does not support the Advantage Parties' contentions in any event.

Second, the Advantage Parties then proceed to refer to testimony of Mr. Boy and Ms. Hodgens in order to support their argument.[5] The Take 5 Parties addressed the problems with this extensively in their November 28, 2022 letter. *Mot. Ex. G* at 6-7. As explained there, Ms. Hodgens' and Mr. Boy's testimony is unreliable, and the arbitrator should not have relied on the testimony of witnesses whose testimony was induced by the payment of hundreds of thousands of dollars by the Advantage Parties. ECF No. 3-1 at 34-39. The Advantage Parties have themselves argued that Ms. Hodgens' and Mr. Boy's testimony was central to proving fraud. If their testimony falls away (because it was induced), there is no basis for a finding of fraud.

As the Take 5 Parties also explained in their November 28 letter, the accuracy of the testimony of Mr. Boy and Ms. Hodgens to which the Advantage Parties cite was all on direct examination and disputed during their cross-examinations.[6] *Mot. Ex. G* at 7.

Among other things, during Mr. Boy's cross-examination, he admitted to contradictions in his testimony that the Advantage Parties now claim demonstrates that Mr. Radetich and Gluck purportedly were "aware" of the fraud. *Pet. Ex. 53* at 1669:1-1687:23 (confronting Mr. Boy with

---

[5]   One of the changes the Advantage Parties made was to add references to testimony from Mr. Colen, Mr. McGavran, Mr. Morris, Ms. Benjoseph, and Mr. Brown to try to buttress this argument. As explained below, these additions do not solve the substantive problems with their argument.

[6]   The Advantage Parties ignored this point but did add one additional piece of testimony from Mr. Boy concerning his allegation on direct that "Mr. Radetich maintained the relationship with Hygenics and was responsible for acquiring Take 5's data." But Mr. Boy admitted at his deposition and on cross-examination that (1) he had "no idea" about whether the data was single- or double-opt-in, (2) that he did not have first-hand knowledge of the relationship with Hygenics or what data/services Hygenics provided because "nobody could … without going through Alex." *E.g.*, *Pet. Ex. 53* at 1678:15-1679:5. His testimony on this point therefore proves very little and certainly is insufficient to prove fraud or a knowing misrepresentation by Messrs. Radetich or Gluck.

the fact that he testified at his deposition that he spoke about his concerns only with Mr. Hodgens and Ms. Jenkins, not Mr. Radetich or Mr. Gluck; Mr. Boy admitted he was unaware of what representations were made by Messrs. Radetich and Gluck as part of the acquisition, to clients, or about the quality and nature of the data); *see also id.* at 1671:24-1673:15, 1694:2-1695:7, 1676:3-1676:14, 1678:4-1678:15. Thus, Mr. Boy's own testimony is contradictory and provides no actual first-hand knowledge concerning what Mr. Radetich and Mr. Gluck knew or their state of mind.

The same is true with respect to Ms. Hodgens. *Pet. Ex. 55* at 2101:8-2104:5 (admitting that all of her statements about what Mr. Radetich allegedly thought and said came from Beth Jenkins, who did not testify). Further, as the Take 5 Parties also pointed out in their November 28 letter, the arbitrator permitted some of Ms. Hodgens' testimony to which the Advantage Parties refer in their letter but did not receive it "for the truth" because it was based on hearsay of what a third party (Ms. Jenkins) purportedly told Ms. Hodgens about what Mr. Radetich (but not Mr. Gluck) purportedly knew. *Id*. That is, in addition to multiple levels of hearsay testimony, the individual who purportedly spoke directly to Mr. Radetich *did not corroborate Ms. Hodgens' induced testimony*. In any event, none of the testimony to which the Advantage Parties refer demonstrates what Messrs. Radetich and Gluck knew or that they committed fraud on the Advantage Parties. Notably, Ms. Hodgens also gave testimony directly contrary to the Advantage Parties' current contentions—she confirmed that it was undisputed that Take 5 was never an email-only business (as the Advantage Parties claim and their complaints of fraud are focused) and that only 5% of Take 5's client campaigns were email only and that subcontractors could have sent out the emails in fulfillment of the campaigns assigned to them. *Ex. 90* at 61:13-62:9; *Ex. 91* at 295:24-296:23.

As also explained in the Take 5 Parties' November 28 letter, the issue here is not limited to witness credibility. It concerns information that was withheld from the arbitrator regarding the nature and extent of the inducement offered to Ms. Hodgens and *the fact that Ms. Hodgens', Mr. Ward's and Mr. Boy's testimony was procured through improper means*.

26

The Advantage Parties cite new and different testimony of Messrs. McGavran and Morris and add testimony from Mr. Colen and deposition testimony from Ms. Benjoseph to try to support their contentions. But none of the cited testimony provides evidence about the state of mind of Messrs. Radetich or Gluck because none of it demonstrates that (1) the Take 5 Parties were committing fraud or (2) that Messrs. Radetich or Gluck knew about any allegedly fraudulent acts.

Mr. Colen's testimony on direct about Mr. Radetich allegedly being "accountable for the data" neither demonstrates that Mr. Radetich had knowledge of any improper actions by Take 5 prior to the sale nor does it prove that he misrepresented the same to Advantage (the alleged fraud). Mr. Colen was testifying about what he understood from a presentation that he was given in mid-June 2019 (Project Evolve), that he later acknowledged on cross-examination was a presentation primarily given by Mr. McGavran (who was not employed by Advantage until 2019). *E.g.*, *Pet. Ex. 49* at 532-533. Further, Mr. Colen admitted that Advantage did not do an analysis of the database (for which he contends Mr. Radetich was "accountable") during due diligence or even in July 2019 when Take 5 was being closed down or even up to January 2022 (when part of the arbitration hearing occurred). *E.g.*, *Pet. Ex. 50* at 684-686. Mr. Colen also admitted that he did not determine the functionality of the database held at Hygenics and was confronted with the fact that he admitted during his deposition that Advantage was aware before the acquisition that Take 5 used pay-per-click vendors as part of their email campaigns, all of which was central to whether Messrs. Radetich and Gluck made any material misrepresentations based on knowledge of the issues that purportedly were misrepresented during diligence, the key question. *Id.* at 690, 695.

With respect to Mr. McGavran, who was hired in 2019 and was not even privy to what was disclosed (or not) to Advantage as part of the due diligence process, his testimony on direct examination was that the relationship with Hygenics, the firm that maintained Take 5's data, was "controlled" (counsel's words) by Mr. Radetich. *Rule 11 Mem.* 36 n.31 (citing *Pet. Ex. 54* at 1786). Mr. McGavran came to Advantage from Neustar, a company that was a client of Take 5 and also

27

was licensing data to Take 5 for a number of years. *Pet. Ex. 54* at 1864-1866. Towards the end of his tenure at Neustar, Neustar was licensing "virtually everything Take 5 had" at significant expense. *Pet. Ex. 54* at 1874-1875. Had Neustar found this data lacking, an argument at the heart of the Advantage Parties' claims, it would have raised concerns with Take 5 in the years they worked together. *See also Pet. Ex. 66* at 2-21 (further detailing the evidence of what clients requested, what Take 5 delivered, and what Advantage knew pre-acquisition). The evidence further was that Take 5 marketed itself to Advantage as an omni-channel company and that Mr. McGavran was told during his interview to join Advantage that this is what Take 5 was. *Ex. 92* at 101:4-14. He testified that none of Take 5's customers believed the company was exclusively an email marketing company *Id*. at 101:24-102:3; *see also Pet. Ex. 54* at 1877. And that, to the best of his knowledge, Take 5 used subcontractors to send out emails to fulfill campaigns, which he understood was known by Advantage prior to the acquisition. *Pet Ex. 54* at 1920:5-11; *Pet. Ex. 50* at 692. Again, Mr. McGavran's testimony does not support the Advantage Parties' assertions.

The testimony of Mr. Morris from his cross-examination pertaining to who was the "architect" and "primarily sourced" Take 5's database, also is of no moment. *Pet. Ex. 57* at 2802. Immediately after that testimony, Mr. Morris was asked whether Messrs. Radetich and Gluck had knowledge of how campaigns were fulfilled and he said that given the size and scale of the business it was not possible and that they "hired people to do that for them." *Id.* at 2802-2803.[7] Mr. Morris also stated expressly that he firmly believed that after working for Take 5 for many years that *the data Take 5 had and used was "legitimate and real." Pet. Ex. 58* at 2935. He personally saw various markers and reports that confirmed to him the legitimacy of the data Take 5 had and used. *Id.* at 2935-2936. Hygenics prepared fill reports based on the data updated at least on a monthly

---

[7]   Assuming for sake of argument that Take 5's employees made misrepresentations to clients—which is not admitted—none of the "evidence" to which the Advantage Parties cite prove actual or constructive knowledge by Messrs. Radetich and Gluck nor that this could have violated the representations and warranties Messrs. Radetich and Gluck made to the Advantage Parties.

28

basis that would contain, among other things, information about opt-ins. *Id.* at 2936-2937. His understanding (until mid-2019 when he was told otherwise by Advantage) was that these fill reports were accurate and reported the data that Take 5 actually had. *Id.* at 2949-2950; *see also Pet. Ex. 53* at 1734-1736 (Mr. Boy confirming that he contemporaneously confirmed that tracking reports sent to clients were accurate). He further confirmed that Take 5 sold different marketing channels which included but was not restricted to email and that they were evolving in 2017-2019 into a company that was offering many different types of things "in addition to data." *Id.* at 2938-2939. Mr. Morris also explained that there is an important difference between pay-per-click and "fraudulent clicks." *Id.* at 2934-2935. Take 5 ran 2,000 to 3,000 campaigns a month. *Id.* at 2940. Again, nothing Mr. Morris said contradicts or disproves the Take 5 Parties' arguments.

With respect to the Benjoseph deposition testimony to which the Advantage Parties cite, they misquote or misstate what she said. Ms. Benjoseph was *not* asked whether "formulas were being used to falsify e-mail counts." *But see Rule 11 Mem.* 36 n.31. She was merely asked about whether formulas **were used** and whether Mr. Radetich and Mr. Gluck were aware. It was to that question that she answered that she "believe[s] that they knew for sure." *Mot. Ex. X* at 192:5-22. Importantly, Ms. Benjoseph testified that she understood that when Take 5 promised emails, that they were delivered (*id.* at 57:25-58:05)—(testimony to which an objection was lodged as to which it is unclear how that objection was resolved[8]) and that she would have expected Mr. Boy or Ms. Hodgens to push back if Take 5 had not been able to deliver. *Id.* at 359:21-360:23. This is an issue that the Take 5 Parties addressed in their opposition to the Advantage Parties' motion for summary judgment (in which the Advantage Parties made this incorrect assertion as well). *Pet. Ex. 14* at 52.

Mr. Brown's testimony does not support the Advantage Parties' contention that the Take

---

[8]    The Advantage Parties do not discuss the objection lodged to this deposition testimony that the arbitrator was asked to resolve; the Interim Award does not specifically address this issue--it says only that all objections not specifically addressed are "denied." *See Pet. Ex. 1* at 43.

5 Parties misrepresented evidence. Beyond being an entirely new argument that the Advantage Parties did not raise in their November 7 letter, the Advantage Parties twist Mr. Brown's testimony, which was objected to (*see Pet. Ex. 65*) given on a hotly disputed and controversial issue—the question of the Latham & Watkins interview with respect to which documents were excluded because of the Advantage Parties' discovery abuses. Among other things, Mr. Brown's unspecific contention about what Mr. Radetich purportedly said—which was in any event contradicted by other evidence—must be viewed in the context of the Take 5 Parties' Letter Motion for Sanctions (filed a month before Mr. Brown's deposition) that concluded, among other things: "Take 5's counsel now knows [from evidence offered belatedly by the Advantage Parties after they were compelled to produce it] what Radetich has maintained all along: there was no admission by Radetich; there was no concession of lying to clients by Radetich; and the entire claim that somehow Take 5 admitted it committed fraud is simply fictitious." *Pet. Ex. 35* at 2.

In determining that the notes relating to Mr. Radetich's interview should have been identified years prior on the Advantage Parties' privilege log (which they were not) and that the Radetich interview documents did not occur "as part of the normal operation of Take 5's business," the arbitrator also determined that these documents "lack quite a bit of specificity in terms of what was done, what wasn't done and what Mr. Radetich, for example, had knowledge of." *Pet. Ex. 57* at 2596-2597. Mr. Brown's deposition testimony is at best disputed and provides unspecific evidence about what Mr. Radetich knew (and when) and says nothing about what Mr. Gluck allegedly knew at any time. Given the controversy concerning the Latham & Watkins interview (the alleged source of Mr. Brown's knowledge), the contradictory evidence concerning what occurred and was said at that interview, and Mr. Brown's inability to recall what Mr. Radetich supposedly said, this does not constitute "evidence" establishing Messrs. Radetich or Gluck's state of mind nor that they made knowing misrepresentations to the Advantage Parties. In sum, none of these witnesses testified that Messrs. Radetich and Gluck made knowing misrepresentations to the

Advantage Parties. Thus, the statement in the motion to vacate is not contradicted by any of the testimony the Advantage Parties cite (the meaning of which is, in any event, disputed).

The Advantage Parties have also pointed to documents as alleged "evidence" of Messrs. Radetich and Gluck's states of mind. But these documents are no more helpful than the testimony

With respect to *Mot. Ex. L*, beyond the fact that Mr. Radetich was unable to testify to explain the content and context of his statements, the email communication is in any event clear that Mr. Radetich was discussing in April 2019 with Mr. Johnson (of Hygenics) the need to address a client concern, not committing fraud on a client or Advantage. The Advantage Parties selectively and improperly quote from this email to twist Mr. Radetich's reference to the truth being "elusive." The Advantage Parties never asked Mr. Johnson about this statement during his deposition. Nor could he, in any event, have testified credibly about what Mr. Radetich meant.[9]

Although Ms. Hodgens was asked about *Mot. Exhibit M* on direct, the Advantage Parties did not ask her about Mr. Radetich or his knowledge of any purported fraudulent behavior. *Pet. Ex. 55* at 2037-2040. And, in the email, Mr. Radetich expressly states that Take 5 must be honest in response to Mr. Morris suggesting the need to attain a certain return rate. Mr. Radetich also pointed out that the client would use Google Analytics data to verify what was being provided.

*Mot. Ex. N* are text messages between Ms. Benjoseph and Mr. Radetich in March 2019 (well after Take 5 was acquired from Advantage) in which Mr. Radetich is saying Ms. Benjoseph is doing things that make him feel uncomfortable and that she has taken certain actions "without [his] knowledge and approval." *Id.* at 4. There is nothing about alleged knowledge by Mr. Radetich and Mr. Gluck about inaccurate statements to clients or Advantage pre-acquisition. The Advantage

---

9    What is more, there are other communications between Mr. Johnson and Mr. Radetich in which Mr. Radetich states definitively that taking a particular action with respect to data has nothing to do with data fabrication and that Take 5 paid significant amounts of money to have data modeled for them (another indicator that Take 5 had the data which it represented to the Advantage Parties that it had), and asks Hygenics what actions they propose Take 5 should take. *Exs. 93, 94.*

Parties' citation about what these text messages purportedly discuss is incorrect and incomplete.

The Advantage Parties allege that *Mot. Ex. O* shows that Mr. Radetich was "confirming random e-mail count for Medicx," but that is not what the email shows. In it, Mr. Radetich is communicating with Tara Finger (a former Take 5 employee, who did not testify) and is saying to her a client is seeing X, she says no, it is Y. Mr. Radetich responds that he will email the client and let her know next steps. There is nothing about fraud or making misrepresentations to a client or Advantage. Mr. Weintraub, a Medicx employee, was asked by the Advantage Parties about this document on cross-examination (*Pet. Ex. 58* at 3020-3021), but he was not asked about what Mr. Radetich knew and in any event could not have testified about what Mr. Radetich meant. He was asked about alleged misrepresentations to clients (based upon Medicx taking Take 5's data and re-selling it) and denied that any such misrepresentations were made. *Id.* at 3048:24-3049:4.

Regarding *Mot. Ex. P*, in which Mr. Radetich refers to needing to "load the boat," it is notable that Advantage did not ask one of the witnesses at the hearing what they thought this term meant. Mr. Radetich was prevented from testifying to it himself. In the context of this particular email, however, it is clear that there is no nefarious purpose and certainly nothing that suggests that Mr. Radetich had knowledge of any misrepresentations to clients or to Advantage. The context was whether Take 5 should use all available data and Mr. Radetich was confirming that the Take 5 employees should "load the boat" by using all of the data sources to which Take 5 had access.

Regarding *Mot. Ex. Q*, Mr. Radetich was communicating with Mr. Cloynes about bankruptcy information (not email records). As with *Mot. Ex. P*, this document does not support the Advantage Parties' contention; no witnesses testified that it did or were even asked about it.

*Mot. Ex. R* similarly says nothing about misrepresentations to clients or to Advantage. Mr. Radetich is asking Mr. Angelis (who did not testify) to include records for "disabled" people, people with various disabilities. "Loading the boat" in that context meant pulling in all of the legitimate data Take 5 had and not improperly excluding any such data.

32

*Mot. Ex. S* is perhaps the best document to demonstrate that "load the boat" cannot mean making misrepresentations as the Advantage Parties suggest. In this document, Mr. Radetich is saying to Microbilt, *a Take 5 client*, that Take 5 would "load the boat [and] let you know when the file is ready" in response to Take 5 having asked the client what they wanted and the client saying they wanted "good business details" and contact data. *Id.* at 2. It makes no sense that Mr. Radetich would tell a client that Take 5 (allegedly) was planning on defrauding that client. "Load the boat" has no nefarious meaning and certainly not the meaning the Advantage Parties ascribe to it.

Regarding *Mot. Ex. T*, none of the individuals on this email (Mr. Speizman, Mr. Angelis, or Mr. Radetich) testified. This email nowhere says that Take 5 plans to make misrepresentations to clients or Advantage nor does it support that Take 5 did not have the data it represented to Advantage. Instead, Mr. Radetich is again suggesting to use all available data that Take 5 has.

In *Mot. Ex. U*, Ms. Finger, Mr. Gluck, and Mr. Radetich (none of whom testified) correspond about business development efforts, and Mr. Radetich says "we need to load the boat"—i.e., demonstrate to those clients the extent of Take 5's data and capacities. *Id.* at 2. *Mot. Ex. V* is an email between Mr. Gluck and Mr. Radetich in which the former says that in response to a particular query he will request 10M email records and might end up with 4M email records. Mr. Radetich responds that Mr. Gluck should "load the boat" and use all of the data Take 5 has. *Id.* at 2. Again, these communications say nothing about misrepresentations.

As explained above, the Advantage Parties did not ask a single one of the many witnesses about what "load the boat" purportedly meant. They only argued (without support or any testimony) in their post-hearing brief that what Mr. Radetich meant was to make misrepresentations. *Mot. Dismiss. Ex. A* (ECF No. 15-2) at 39 n.185. But there is no evidence of that and from the context of how he used this expression, it is clear that he did not mean what Advantage claims. Further, because Messrs. Radetich and Gluck were denied the opportunity to testify, neither of them were able to address these documents.

The Advantage Parties did not cite to a single exhibit nor to any testimony on their contention that Messrs. Radetich and Gluck purportedly issued no denial to the false claims of the Advantage Parties and that they purportedly "lied" to the Advantage Parties in connection with their investigation in June 2019. *Mot. Ex. F* at 6. We understand that this issue was one that was particularly hotly contested in the arbitration and for which there is no credible evidence in the record.[10] The same is true of alleged misrepresentations to the Advantage Parties in connection with the Advantage Parties' due diligence in 2017 and 2018.

As Take 5 Parties explained in their November 28 letter to the Advantage Parties:

Our contention concerning the personal knowledge, state of mind, and intentions of Messrs. Gluck and Radetich is based upon the indisputable fact that they were prevented from testifying. Hearsay testimony cannot demonstrate their knowledge, state of mind or intentions. Nor can email communications taken out of context and/or testimony about what they might have known. Perhaps more importantly, the support for this contention comes from the motion for a directed verdict that arbitration counsel for the Take 5 Parties requested at the end of the Advantage Parties' evidence at the hearing.

*Mot. Ex. G* at 9 (citing *Pet. Ex. 57* at 2709-2711).

As also explained in the Take 5 Parties' November 28 response:

In short, what is at issue is fraud as it relates to the Advantage Parties. The instances of alleged fraud to which you point in your letter pertain to alleged fraud on clients not on the Advantage Parties. Accordingly, even if your factual and evidentiary contentions are correct – which we dispute – this still serves as an insufficient basis to prove fraud as it pertains to the Advantage Parties and further is an insufficient basis to permit the Take 5 Parties' fair hearing rights to be trampled on.

*Id.* While the Advantage Parties have changed some of their arguments and cite to wholly different documents than those raised in their November 7 letter, these observations remain applicable.

The Take 5 Parties' contention concerning the personal knowledge, state of mind, and intentions of Messrs' Gluck and Radetich is based upon the indisputable fact that they were

---

[10]    The Brown deposition testimony pertains to a different issue: whether Take 5 purportedly made misrepresentations to clients. Importantly, Mr. Brown's testimony does not discuss the time frame when Take 5 purportedly made misrepresentations to clients. What is more, the arbitrator declined to make any finding concerning any purported fraud as to Take 5's clients. *E.g.*, *Pet. Ex. 1* at 37.

34

prevented from testifying. Hearsay testimony cannot demonstrate their knowledge, state of mind or intentions.[11] Nor can emails taken out of context or testimony about what they might have known. And, perhaps more importantly, the support for this contention comes from the motion for a directed verdict that arbitration counsel for the Take 5 Parties requested at the end of the Advantage Parties' evidence at the hearing. *Pet. Ex. 57* at 2709:16-25, 2710:17-2711:13.

In short, the arbitrator's refusal to grant the stay prevented Messrs Gluck and Radetich from responding to the hearsay testimony and evidence offered against them and allowed the Take 5 Parties' due process and fair hearing rights to be trampled on.

> **D.     The Advantage Parties' arguments cannot overcome that the Take 5 Parties were denied a fair hearing because of spoliated Google Analytics data.**

An arbitration award may be vacated where "the arbitrators were guilty of misconduct … in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). A court may vacate an award if the arbitrator's "refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings." *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 481 F.3d 813, 818 (D.C. Cir. 2007). As explained in the motion to vacate, there is no dispute that the Google Analytics data was pertinent and material because it goes to the very crux of the case—whether Take 5 defrauded the Advantage Parties in misrepresenting the functions and abilities of their email marketing component. The Google Analytics data provided the information needed to identify the source of, and assess the validity of, Take 5's client campaign traffic (e.g., where clicks came from and/or how they were generated) to determine whether clicks from email

---

[11]   In instances where individuals testifying for Take 5 stated that they had spoken to Mr. Radetich or Mr. Gluck, that testimony was stricken from the record or not permitted. *See, e.g.*, *Pet. Ex. 60* at 3606-3608 (testimony of Mr. Noderer that Mr. Radetich told him that the millions email addresses in the Take 5 database were double opt-in); *id.* at 3621. The arbitrator apparently struck some testimony on what Mr. Radetich supposedly said because he was not going to testify, but the Advantage Parties attempt to use other testimony of what he supposedly said to someone for the truth—this is contrary to the arbitrator's rulings and emphasizes the unfairness of claiming that there is "proof" of what Messrs. Radetich and Gluck supposedly knew or said.

campaigns in fact came from emails or from other sources, as Advantage alleged.

The Advantage Parties do not credibly dispute that they had access to the Google Analytics data and that they provided it to their expert, FTI, during the arbitration. But Advantage withheld and ultimately spoliated the very evidence that would have conclusively established whether Advantage's theory supporting its fraud allegations had any basis. Despite this, the arbitrator refused to consider or even address the claims in Take 5's pleadings relating to the withholding and spoliation of evidence. *Pet. Ex. 1* at 4-5. Rather than engage with the spoliation issue, the arbitrator based his decision solely on the testimony of Mr. Stricchiola, Ms. Hodgens, and Mr. Boy, finding it not certain that the Google Analytics data would be relevant. But Ms. Stricchiola's and even Ms. Hodgens' testimony support the Take 5 Parties' contention that the Google Analytics data was critical to the central issues in dispute, including how clicks were generated. *Pet. Ex. 62* at 3891-3898; *Pet. Ex. 55* at 2162-2164. This decision is particularly jarring because withholding and spoliating evidence are serious grounds for sanctions. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 955 (9th Cir. 2006) (dismissing plaintiff's claims with prejudice and imposing monetary sanction after finding willful destruction of data on employer-owned laptop); *Crown Castle USA Inc. v. Fred A. Nudd Corp.*, 2010 WL 4027780, at *4 (W.D.N.Y. Oct. 14, 2010) (imposing sanctions where party failed to timely produce some documents and other relevant documents were destroyed under document retention policy).

To overcome these violations of the Take 5 Parties' rights, the Advantage Parties claim that the arbitrator afforded the Take 5 parties "a full opportunity to be heard" on the spoliation issue because it was briefed. *Rule 11 Mem.* 21. But, despite these extensive pleadings on such a crucial issue, the arbitrator did not engage with Take 5's argument that he was denying them pertinent and material evidence that would have rebutted the Advantage Parties' claims and to which they and their expert, FTI (but not Take 5) had access during the arbitration . *E.g., Pet. Ex. 66* at 2-10. In so doing failed to consider pertinent and material evidence that denied the Take 5

36

parties a fair hearing.

### E.    The Advantage Parties improperly induced testimony.

As explained above, two of the witnesses upon whom the arbitrator relied in reaching his conclusions (and on whom he relied in some cases to the exclusion of other evidence) were paid significant sums, whether directly or indirectly, for their testimony and assistance in the arbitration.

The Advantage Parties cannot point to a single case–because none exists–that permits paying a witness a "salary" for 6-12 hours of work solely for providing testimony. Nor is there a case that supports their contention that a party may pay a witness's criminal defense attorney fees to convince them to testify. Neither are "out-of-pocket expenses." *Rule 11 Mem.* 23.

Compensating a witness who was a former employee for testimony remains improper even when done under a "consulting agreement." *See State of N.Y. v. Solvent Chem. Co., Inc.*, 166 F.R.D. 284, 289 (W.D.N.Y. 1996). Where a company "orchestrat[ed] a settlement" of claims against the employee and agreed "not to sue" the employee, the court found those actions "were the equivalent of making cash payments to [the witness] as a means of making him 'sympathetic' and securing his testimony." *Id.* (citation omitted). An agreement for "payment of a sum of money to a witness to testify in a particular way" or "to make him 'sympathetic' with the party expecting to call him" is "absolutely indefensible." *Id.* (quoting *In re Robinson*, 151 A.D. 589, 600 (1912)). Mr. Boy's consulting agreement with Advantage Solutions is analogous.

Mr. Boy testified that that the only purpose of his employment, for which he was paid $40,000 per year over two years (after the shut-down of the company, for which he was also paid $160,000 per year), was nothing more than occasional assistance with the arbitration "maybe a couple of times over the prior year" (*Pet. Ex. 53* at 1651-1653, 1752). Because Mr. Boy only worked between 6-12 hours annually, Advantage Solutions paid him *at least* $3,333/hour to do work only on the litigation. Such a gratuitous hourly rate, entirely disproportionate to Mr. Boy's former salary, suggests that the Advantage Parties hoped to make Mr. Boy a "sympathetic" witness

37

for the purposes of securing his testimony. This is exactly the sort of inducement prohibited by 18

U.S.C. §201(c)(2)[12] and is improper. *Solvent Chem.*, 166 F.R.D. at 289.

The Take 5 Parties have repeatedly advised the Advantage Parties of numerous authorities

that demonstrate that the Advantage Parties' payments to Mr. Boy and Ms. Hodgens (whether

directly or indirectly) were inappropriate inducements, whether or not their testimony was truthful.

*E.g.*, Am. Bar Ass'n, Model R. Prof'l Conduct 3.4(b); DC R. Prof'l Conduct, 3.4; Del. R. Prof'l

Conduct 3.4; Fla. Bar Reg. R. 4-3.4(b); Del. Ethics Op. 1994-1 (Feb. 14, 1994); Del. Ethics Op.

2003-3 (2003) (finding acceptable reimbursement to the witness of out-of-pocket expenses and for

lost income opportunities, but not a payment for time where the witness otherwise was retired);

*Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp.

1516, 1525-1526 (S.D. Fla. 1994) ("Justice must not be bought or sold. Attorneys have a solemn

responsibility to assure that not even the taint of impropriety exists as to the procurement of

testimony before courts of justice."; lawyers are "clearly prohibit[ed] … from paying or offering

to pay money or other rewards to witnesses in return for their testimony, *be it truthful or not*,

because it violates the integrity of the justice system and undermines the proper administration of

justice"), *aff'd in part*, 117 F.3d 1328 (11th Cir. 1997).[13]

---

[12] The Advantage Parties argue that a violation of 18 U.S.C. §201(c)(2) only occurs when payment is offered for *false* testimony. Though most authorities do not deal with the question of whether the testimony is truthful or not, we acknowledge the criminal statute appears to address procuring false testimony. The truth or falsity of Mr. Boy's testimony is irrelevant here. Even if the testimony induced was truthful, it is still a violation of professional conduct and court rules.

[13] *See also Cent'l Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 679 (D. Kan. 2000) (where compensation for witness is unreasonably high or disproportionate, "an inference could be drawn that the payments, in reality were made for the substance or efficacy of…testimony."); *Weirton Med. Ctr., Inc. v. QHR Intensive Res., LLC*, 2016 WL 2766650, at *8 (N.D.W. Va. May 12, 2016), *aff'd*, 682 F. App'x 227 (4th Cir. 2017) (while "exceeding the statutory witness fees does not provide clear and convincing evidence of witness tampering", this was insufficient to vacate the award because the arbitrator did not primarily rely on the testimony of the paid witnesses, unlike here); *Rocheux Int'l of N.J. v. U.S. Merchants Fin. Grp., Inc.*, 2009 WL 3246837, *4 (D.N.J. Oct. 5, 2009) (excluding testimony of a witness who was paid $4,000 for "consulting services" because "the fee paid to Mr. Gutierrez most certainly did not compensate for his costs of attending trial or

The Advantage Parties largely ignore these arguments (all of which the Take 5 Parties now have repeatedly raised), giving them short shrift in a footnote. The cases the Advantage Parties rely on to justify these improper consulting payments (*Rule 11 Mem.* 23-24) are inapposite. In *BAE Sys. Info. & Elec. Sys. Integration Inc. v. Lockheed Martin Corp.*, a former employee provided consulting services in connection with the litigation where he served as a fact witness against his former employer. 2011 WL 3689007, at \*1 (Del. Ch. Aug. 10, 2011). But he was paid "a rate significantly lower than the effective hourly rate he was paid during his employment" and his time as a consultant "would require a substantial time commitment and would prevent him from taking on other consulting projects." *Id.* Central to the court's allowing the witness-consultant to testify was that he was paid "his standard consulting fee." *Id.* Likewise, in *Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, the court found paying a consultant between $125-200 per hour for litigation related work was acceptable given "years of experience in the insurance industry, his first-hand experience with the reinsurance agreements that are the subject of this lawsuit, and the complex nature of this litigation (involving numerous transactions spanning a number of years)." 193 F.R.D. 671, 680 (D. Kan. 2000). The disproportionately high rate paid to Mr. Boy is *exactly* what these cases would consider improper. Boy is paid at a significantly higher rate than his former salary—over $3,333/hr. as a consultant. The Advantage Parties offered no justification for why Boy was paid

---

time lost during trial" because paying witnesses for their testimony, "leans toward the procurement of perjury; toward the raising up of a class of witnesses who, for a sufficient consideration, will give testimony that shall win or lose the lawsuit, toward the perversion of justice; and toward corruption in our courts."); *The Florida Bar v. Jackson*, 490 So. 2d 935 (Fla. 1986) (improper for an attorney to request that his clients be paid $50,000 for their testimony in a pending insurance claim case in New York."); *In re Kien*, 372 N.E.2d 376, 379 (Ill. 1977) ("We will not tolerate payments of any sum of money by an attorney to witnesses for the opposition to secure or influence testimony, whether it be for the purpose of securing truthful testimony or otherwise."); *Wagner v. Lehman Bros. Kuhn Loeb Inc.*, 646 F. Supp. 643 (N.D. Ill.1986) (attorney disqualified for promising to remit a percentage of potential recovery in case to induce witness to tell the truth); *In re Robinson,* 136 N.Y.S. 548, 445 (1912), *aff'd*, 209 N.Y. 354 (1913) ("The payment of a sum of money to a witness to 'tell the truth' is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true."); *Florida Bar v. Wohl*, 842 So. 2d 811 (Fla. 2003).

this amount. Moreover, his work as a consultant only involves 6-12 hours of work annually. It is impossible that such an insignificant time commitment prevents Boy from taking on any other work. In other words, the bases for the conclusions in *BAE* and *Centennial* are not present here.

It is beyond dispute that the Advantage Parties improperly induced the testimony of the two witnesses upon whom the arbitrator relied heavily in reaching his Interim Award as well as the testimony of Mr. Ward. Moreover, it also is beyond dispute that the extent of the payments to Ms. Hodgens' criminal defense counsel of over $150,000, and to Mr. Ward's criminal defense counsel of nearly $100,000, was not and could not have been known by the Take 5 Parties prior to the costs submissions, which occurred after the Interim Award was issued. *See Pet. Ex. 69* at 8. The Awards must be vacated because they are founded on induced witness testimony, the extent of which was not disclosed until after the Interim Award issued.

The Advantage Parties' new arguments in their filed motion concerning the arbitrator's decision to preserve his fraud finding notwithstanding the Advantage Parties' disclosure of the amount of inducement they paid to Boy, Hodgens, and Ward in their costs submission is inapposite. Because of the significant reliance the arbitrator placed on witnesses whose testimony was induced through payment of hundreds of thousands of dollars, the Take 5 Parties were denied due process, a fundamentally fair hearing, and their rights were prejudiced. The Court need not reach the issue of whether the arbitrator was (or was not) made aware properly or timely of the extent of the inducement. What is more, the fact that the arbitrator did not change his conclusions notwithstanding having learned the details of the inducement is all the more reason to vacate the Interim Award because the Take 5 Parties could not ask for reconsideration on the basis of having learned after the Interim Award issued about the nature and scope of the inducement because AAA Rule R-52 (regarding award modification) provides that the arbitrator "is not empowered to re-determine the merits of any claim already decided" in any event.

40

**F.    The Advantage Parties do not dispute that RJV was ignored in arbitration.**

The Advantage Parties argue (at 27-29) that because RJV was a "Beneficial Owner" under the APA, the arbitrator was not required to offer *any* explanation of how or why he reached the conclusion with respect to RJV (alone) that it "breached Article II, §§ 2.5(a) and (b), §2.10(a), and 2.11(b) and Article VIII, §8.2." *Pet. Ex. 1* at 37-38. APA § 10.11.b states that the arbitration "award or decision will be a *reasoned* award or decision *setting forth the Arbitrator's reasoning in reaching its determinations*." (emphasis added). Courts generally consider a "reasoned award" to require "more than a simple result." *Carmody Bldg. Corp. v. Richter & Ratner Contracting Corp.*, 2013 WL 4437213, at *3 (S.D.N.Y. Aug. 19, 2013). The court in *Carmody* found that an arbitrator's award was reasoned when it "set forth at length the history of the dispute and his findings with regard *to each issue submitted to him*, as well as an explanation for *each* of his findings. *Id.* at *4 (emphasis added). Here, however, the arbitrator offered *no* findings for his conclusion that RJV breached the APA. While it is true that RJV was a "Beneficial Owner" under the APA and agreed to a full indemnification under the contract, the arbitrator failed to explain why this Beneficial Owner status *ipso facto* meant he could find that RJV breached the APA. Nothing in the arbitration record states that RJV committed actions that would constitute a breach. The arbitrator thus exceeded his powers under the APA by finding liability with respect to RJV.

**G.    The Advantage Parties failed to prove their entitlement to damages.**

Arbitrators exceed their authority when they fail to meet their obligations under the arbitration agreement. *See Murchison Cap. Partners, L.P. v. Nuance Commc'ns, Inc.*, 2013 WL 12094168, at *6 (N.D. Tex. July 30, 2013). In *Murchison*, a district court held that an arbitration panel exceeded its power where it failed to provide any explanation for awarding out-of-pocket damages, in violation of the arbitration agreement's requirement that the award must be "supported by findings of fact and conclusions." *Id.*; *see also W. Emps. Ins. Co. v. Jefferies & Co.*, 958 F.2d 258, 262 (9th Cir. 1992) ("[A]rbitrators can also 'exceed their powers' under 9 U.S.C. § 10(d)

41

when they fail to meet *their* obligations, as specified in a given contract, to the parties."). The arbitrator therefore exceeded his powers in awarding damages in the amount of $4,692,488.95 for certain costs purportedly incurred by the Advantage Parties in connection with due diligence of Take 5 prior to acquisition, the investigation of Take 5, and shutdown costs because the record contains no support for the amount of damages claimed for these categories. Here, the Advantage Parties *never* provided a computation of damages. As the Take 5 Parties argued during the hearing, they did not receive documents or evidentiary material on which the computation of damages was based. *Pet. Ex. 44* at 2602:4-2606:15. The motion to vacate further explains the ways in which the Take 5 Parties were prejudiced by the Advantage Parties' failure to properly provide a computation of each category of damages claimed. *See, e.g.*, ECF No. 3-1 at 31-33. As explained in detail therein, this is not a simple "factual error" or "unsubstantiated factual finding" nor a failure to follow the "niceties" of the Federal Rules of Evidence as the Advantage Parties allege. *Rule 11 Mem.* 30. The arbitrator had no basis or foundation for awarding these damages. This is a failure to provide a fundamentally fair hearing and prejudice to the Take 5 Parties.

### H.    The Advantage Parties failed to properly request prejudgment interest.

The Advantage Parties argue that the arbitrator did not err in awarding them pre-judgment interest, despite the fact that they did not properly request it, because "[i]nterest is awarded in Delaware as a matter of right and not of judicial discretion." *Rule 11 Mem.* 31 (citing *Contech Constr.*, 764 F. Supp. 2d at 116). But the Advantage Parties disregard that the right to prejudgment interest is "not self-executing" under Delaware law and must be properly requested and substantiated. *All Pro Maids, Inc. v. Layton*, 2005 WL 82689, *1 (Del. Ch. Jan. 11, 2005) (refusing to award prejudgment interest because plaintiff failed to request it before submitting a proposed form of final judgment and because there was no reference to interest in the pretrial order or trial).

Because the Advantage Parties failed to seek interest until after the conclusion of the hearings in the arbitration, under Delaware law, the Advantage Parties waived their right to

prejudgment interest. The Advantage Parties argue that this claim lacks evidentiary support because they requested prejudgment interest in the AAA "Arbitration Answering Statement And Counterclaim or Joinder/Consolidation Request" cover sheet in which they checked off the box "interest" as part of the relief sought. As explained in our November 28 response letter, the operative document concerning the relief the Advantage Parties requested is the November 16, 2019 Second Amended Counter-Demand—not the September 19, 2019 cover sheet that was superseded by the Second Amended Counter-Demand. *Mot. Ex. G* at 12. The Second Amended Counter-Demand makes no request for prejudgment interest and is ultimately the operative pleading. It is axiomatic that "[a]n amended [pleading] supersedes the original version in providing the blueprint for the future course of a lawsuit." *Versus Tech. Inc. v. Radianse Inc.*, 2005 WL 8171769, at *1 (D. Del. 2005). Additionally, "[a]n amended pleading that is complete in itself and does not reference or adopt any portion of the prior pleading supersedes the prior pleading." *Id*. The checked off box on the September 2019 cover sheet is overridden by the November 16, 2019 Second Amended Counter-Demand. *See Betancourt v. New Century Mortg. Corp.*, 2017 WL 6611117, at *5 (E.D. Cal. 2017) (finding "the allegations in the attached civil cover sheet are no longer operative" where Plaintiff has twice subsequently filed an amended pleading). Other than this thinly veiled attempt to misstate the facts, the Advantage Parties cannot point to another instance throughout the course of the arbitration where they made a timely request for prejudgment interest. Yet, despite Delaware law deeming prejudgment interest waived when not expressly requested, the arbitrator awarded the Advantage Parties prejudgment interest in manifest disregard of the law. The Advantage Parties' claim that the Take 5 Parties made a "gross misrepresentation" on this basis thus fails.

I.    **The Take 5 Parties have accurately represented facts to this Court and have acted in good faith and in compliance with Rule 11.**

The Advantage Parties' counsel agreed that counsel for the Take 5 Parties filed the motion to vacate the arbitration awards in good faith and in accordance with the "best knowledge and belief" standard contemplated under Rule 11. Counsel from McDermott has invested considerable

43

time and attention in reviewing the underlying arbitration record and made the reasoned determination that the Take 5 Parties could prevail on a motion to vacate. *Richman Decl.* ¶¶ 10-15. Accordingly, and as also explained above (at Section I.C), the Advantage Parties' argument that Take 5 and its counsel somehow committed sanctionable misconduct here is irreconcilable with the acknowledgement that the petition was filed in compliance with Rule 11.

## III.    THE COURT SHOULD DENY THE RELIEF REQUESTED.

Even assuming the Court were to rescue the Advantage Parties from their straightforward procedural violations or to agree that any of their substantive arguments has any merit (though it should not), the Court should not award dismissal of this action nor attorney fees.

### A.    The Advantage Parties have not shown that dismissal is warranted.

The Advantage Parties' request for dismissal as a Rule 11 sanction should be denied. "Dismissal with prejudice is the most severe sanction a court can impose under Rule 11." *James v. Caterpillar, Inc.*, 824 F. App'x 374, 377 (6th Cir. 2020); *see also* 5A Charles Alan Wright & Arthur A. Miller, *Federal Practice and Procedure* § 1336.3 (4th ed. 2020) (describing dismissal with prejudice as the "death penalty" sanction and stating that "dismissal remains available directly under Rule 11, although it is reserved for the rare case involving extreme misbehavior by the offending party such as fraud, contempt, and willful bad faith."). The Advantage Parties fail to meet this standard. The Advantage Parties acknowledge that the Take 5 Parties filed the motion to vacate in good faith. *Mot. Ex. BB* at 1. The Advantage Parties do not allege (and cannot plausibly allege) that the Take 5 Parties engaged in fraud or contempt. Thus, even if the Advantage Parties could overcome the procedural deficiencies of their Rule 11 motion and had any basis for it, they have not demonstrated that any alleged violation meets the "extreme misbehavior" standard.[14]

---

[14]    Insofar as the Advantage Parties might later try to misuse this motion as seeking dismissal on the merits, they cannot. A Rule 11 motion cannot be joined with any other motion (Fed. R. Civ. P. 11(c)(2)), and any opposition to the motion to vacate or a motion to dismiss was due long ago (Fed. R. Civ. P. 12(a)(1)(A)(i); LCvR 7(b)).

**B.** **The admitted goal of wanting McDermott Will & Emery to bankroll an attorney fee award is not grounds for such relief.**

The Court should also decline to award attorney fees for the filing of the Rule 11 motion because the Advantage Parties are admittedly pursuing this motion as an insurance policy to get their fees paid by McDermott Will & Emery. Specifically, during the December 21, 2022 meet and confer between counsel for the Take 5 Parties and counsel for the Advantage Parties, Mr. Strub admitted that a primary basis for bringing the present motion is because of their client's concern that Take 5 does not have the resources to pay them, but that McDermott Will & Emery "certainly has the capacity to pay." *Mot. Ex. BB* at 1-2. But "Rule 11 sanctions should not be viewed as a general fee shifting device." *Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414, 420 (6th Cir. 1992). On the contrary, "the purpose of Rule 11 sanctions is to deter rather than to compensate," and, thus, "the rule provides that, if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty" (Fed. R. Civ. P. 11, advisory committee note to 1993 amendment), not to "provide compensation for services that could have been avoided by an earlier disclosure of evidence or an earlier challenge to the groundless claims or defenses" (*id.*).

The Advantage Parties are attempting to circumvent these limitations. They abuse Rule 11 for the purpose of improving counsel's financial lot, which serves as an additional basis to deny the relief requested. And they have done so despite the need to repeatedly change their theories as we rebutted their arguments on the merits. Rule 11 motions should not be granted nor relief awarded that is brought for an improper purpose and not intended to serve any of Rule 11's ends.

## CONCLUSION

The Advantage Parties' motion fails as a matter of procedure and substance. The Court should deny the motion and award the Take 5 Parties the fees incurred in responding to this unfounded and improper motion.

Dated: January 20, 2023                    Respectfully submitted,

                                         /s/ *Lisa M. Richman*

                                         Lisa M. Richman (No. 488693)
                                         Lauren H. Evans (No. 156152)
                                         MCDERMOTT WILL & EMERY LLP
                                         500 North Capitol Street NW
                                         Washington, DC 20001
                                         (202) 756-8000
                                         lrichman@mwe.com
                                         levans@mwe.com

                                         *Counsel for Petitioners Petruss Media Group,*
                                         *LLC f/k/a Take 5 Media Group, LLC,*
                                         *Alexander Radetich, Richard Gluck, and RJV*
                                         *Marketing Corp.*

46