# EXHIBIT 35

# The Roth Law Firm, PLLC

295 Madison Avenue, 22nd Floor
New York, NY 10017
Tel.: (212) 542 8882    Fax: (212) 542 8883
www.rrothlaw.com

April 14, 2022

**By Email (eyler21@gmail.com; congerm@adr.org)**
The Honorable James R. Eyler
c/o Mr. Matthew Conger
Director of ADR Services
American Arbitration Association
1120 Connecticut Ave NW, Suite 490
Washington, D.C.  20036

Re:   ***Petruss Media Group, LLC v. Advantage Sales & Marketing, LLC***
      **AAA Case No.: 01-19-0002-7532**

Dear Judge Eyler:

We write on behalf of the Take 5 Parties ("Take 5") seeking serious relief in this matter.  As Your Honor is aware, the Advantage Parties ("Advantage") were twice ordered to produce the contemporaneous notes taken live in June and July 2019 during the interviews of the then Take 5 employees by Latham & Watkins ("L&W") and FTI Consulting ("FTI").  Each time, after motion practice, the Orders were clear.  Instead, Advantage first produced redacted summaries from interview memoranda and over a year later produced unredacted interview memoranda but not the contemporaneous notes typed or handwritten by attendees during those interviews.  On February 21, 2022, Your Honor ordered for the third time in fifteen months that Advantage produce those contemporaneous notes.

On March 10, 2022, another three weeks later, Advantage produced eighteen separate documents that had never previously had been produced but also never were identified on Advantage's privilege log.  Those eighteen documents consist of six sets of handwritten notes of the employee interviews that were contemporaneously taken by Trevor Sullivan, Esq., in-house counsel for Advantage ("Sullivan").[1]  The remaining twelve documents consist of

---

[1]  Advantage listed Sullivan on its January 14, 2022 Witness Disclosure as follows: "13. Trevor Sullivan. Mr. Sullivan is expected to testify only if necessary to authenticate and provide foundation for certain documents." Based on statements made by Advantage counsel during the first nine days of the final evidentiary hearing and having learned **for the first time 29 months** after this arbitration commenced that Sullivan took contemporaneous handwritten notes at six employee interviews, Take 5 suspects that Advantage intends to seek to elicit more than just document authentication testimony from Sullivan should he be permitted to testify.

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 2 of 22

typewritten notes of or questions for the interviews by an unidentified author or authors.[2]

It is astonishing, that after being ordered on two separate occasions – first September 10, 2020, and again on October 8, 2021 – to produce contemporaneous handwritten or typed notes of the L&W and FTI interviews, Advantage knowingly elected to withhold them from Your Honor and Take 5 for the entirety of the discovery period and throughout nine of the ten days of Advantage's case-in-chief at the final evidentiary hearing.  The contents of those contemporaneous notes reveal why Advantage consciously and intentionally sought to conceal them from Your Honor and Take 5.  As set forth below, such conduct is not only in bad faith but should be responded to with a swift and severe consequence.

Not only do the contemporaneous notes reveal a very different set of facts than the summaries, but because they were produced at such a late date in this proceeding, Take 5 has been handcuffed for the duration of this proceeding and Advantage's conduct inhibited Take 5 from being able to prepare a proper defense to Advantage's counterclaims. This is the epitome of unfair prejudice. Take 5 still does not know whether there are additional contemporaneous notes, as it has been stonewalled for almost two years on this issue.  As set forth below, however, Take 5's counsel now knows what Radetich has maintained all along: ***there was no admission by Radetich***; there was no concession of lying to clients by Radetich; and the entire claim that somehow Take 5 admitted it committed fraud is simply fictitious.[3]

Considering Advantage's egregious misconduct – all of which is set forth below – Take 5 seeks the following relief:

(1)     the striking of Advantage's pleadings, both its answer to Take 5's claims and its counterclaim in their entirety;

(2)     the preclusion or exclusion at the final evidentiary hearing of any testimony concerning the L&W or FTI interviews, notes of the interviews, or any facts relating thereto;

(3)     the preclusion of the testimony of Trevor Sullivan, Esq. at the final evidentiary hearing or in support of any motion, opposition, reply, or sur-reply;

(4)     monetary sanctions, including attorneys' fees and costs,

---

[2]   Presumably a L&W attorney or attorneys based on Wei's deposition testimony. *See* **Exhibit 1** at 35:16 – 36:15.

[3]   Even more troubling is the fact that Advantage provided the FBI and AUSA the unredacted L&W Summaries and ***not*** the contemporaneous notes of the L&W Interviews, notwithstanding the fact that, as we have now learned and Advantage has known all along, the unredacted L&W Summaries contained false information.

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 3 of 22

> against Advantage and in favor of Take 5 for Advantage's wholly inappropriate conduct – conduct that is sanctionable in any federal or state court in this land; and

(5)   such other and further relief as Your Honor deems appropriate under these egregious circumstances.

**ADVANTAGE'S MAIN FOCUS OF THIS CASE
HAS BEEN THE ALLEGED ADMISSION BY RADETICH
THAT TAKE 5 WAS KNOWINGLY "LYING" TO ITS CUSTOMERS**

The backbone of Advantage's case is premised on the allegation that Radetich, when interviewed on July 2, 2019, admitted to L&W, Advantage's then counsel, that he lied to customers for business reasons.  That allegation is front and center in the Advantage's Amended Answer and Counterclaims ("Adv. Am. Counterclaim"), Advantage's Motion for Summary Judgment (Adv. MSJ"), Advantage's Reply papers in support of its motion for summary judgment (Adv. SJ Reply") and even its oral argument in support of the motion ("Adv. MSJ Oral Argument").  Radetich's alleged admission has also been referred to regularly in numerous other documents served and filed by Advantage in this matter.  Advantage's premise is a lie.

So that Your Honor understands the depth of Advantage's lie, Take 5 will briefly repeat what Advantage has maliciously put front and center in this arbitration.  First, on September 19, 2019, Advantage alleged:

- "Recognizing the jig was up, Radetich admitted during his interview by the investigation team that Take 5 was systematically and deliberately providing false reports to its clients, at Gluck's direction, as they 'needed to lie to their clients in order to keep them.'" Adv. Am. Counterclaim, pg. 4.

- "Radetich himself admitted as much to Latham and FTI in a July 2nd interview, during which he acknowledged that he and Gluck had concluded that Take 5 needed to lie to clients in order to keep them." Adv. Am. Counterclaim, ¶ 43, pg. 20.

- "On July 2nd … [Radetich] admitted the fraud to Latham and FTI." Adv. Am. Counterclaim, ¶ 50, pg. 26.

These allegations remain unchanged in Advantage's Second Amended Counterclaim, dated November 16, 2020 ("Adv. 2nd Am. Counterclaim"). *See* Adv. 2nd Am. Counterclaim, pg. 4; ¶ 43, pg. 20; and ¶ 50, pg. 26.

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 4 of 22

    More recently, Advantage, in its motion for summary judgment and
reply papers, asserted:

- "The Take 5 Parties have admitted that client reports were
  false …. July 2, 2019 Interview of A. Radetich (B00306153)
  at 7 ('At this point, Mr. Radetich admitted the false
  reporting.')." Adv. MSJ, pg. 16.

- It was in connection with that process that Mr. Radetich
  admitted that Take 5 lied to its clients. Vol. 6, Ex. 154 (July
  2, 2019 Interview of A. Radetich) (B00306153)." Adv. MSJ,
  pg. 16.

- "Mr. Radetich admitted the false reporting. He said he had
  conversations with Mr. Gluck regarding false reports, during
  which Mr. Radetich told Mr. Gluck that they were reporting
  false data." App. Vol. 6, Ex. 154 (Latham & Watkins July 2,
  2019 Interview with Alex Radetich) (B00306153) at 7." Adv.
  SJ Reply, pg. 5.

- "On the contrary, he later admitted that Take 5's reports
  were false. App. Vol. 6, Ex. 154 (Latham & Watkins July 2,
  2019 Interview with Alex Radetich) (B00306153) at 7." Adv.
  SJ Reply, pg. 9.

- "Of course, the information that Latham & Watkins learned
  included Mr. Radetich's admission that Take 5 falsified
  reports and that he and Mr. Gluck knew it was doing that.
  App. Vol. 6, Ex. 154 (Latham & Watkins July 2, 2019
  Interview with Alex Radetich) (B00306153) at 7." Adv. SJ
  Reply, pg. 9.

- "Mr. Radetich admitted that he and Mr. Gluck knew about
  the fraud. Vol. 6, Ex. 154 (Latham & Watkins July 2, 2019
  Interview with Alex Radetich) (B00306153) at 7. Take 5's
  employees testified that Mr. Radetich and Mr. Gluck knew
  about the fraud. See Adv SJ Memo. at 40, n.20." Adv. SJ
  Reply, 39.

    That is not all.  During oral argument on the dispositive motions,
Advantage had the audacity to include, in its PowerPoint presentation, a slide
titled *"What Did The Executives Say?"* that showed not only an enlargement of
the excerpt of the L&W Summaries, but also an image made to look like a mug
shot of Radetich all so that Advantage could argue to Your Honor that Radetich
admitted during the L&W Interviews to committing a massive *criminal* fraud.
*See* **Exhibit 19**.

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 5 of 22

    And during its case-in-chief at the final evidentiary hearing, Advantage again placed the factual assertion of Radetich's so-called admission front and center. For example, Advantage argued, during its opening, that "when confronted in July 2019, Mr. Radetich expressly admitted the fraud." *See* **Exhibit 2**, 2022.01.25 Tr. at 12:13-15.   And when questioning Colen, Radetich's boss, Advantage counsel represented that Colen would testify to the following:

    MR. STRUB:  Mr. Colen would testify that he understood that, from the Latham & Watkins interviews, that Mr. Radetich had basically acknowledged that there were fraudulent reports that were made.

*See* **Exhibit 3**, 2002.01.26 Tr. 488:14-18.  Advantage's proffer resulted in the following exchange with Your Honor:

    JUDGE EYLER:· And what was -- do you know what he will say in terms of the source? I mean, was he told, did he see a document or what?

    MR. STRUB:· He was told.· He didn't see the actual admission itself, which we'll show later.

    JUDGE EYLER:· This is an issue that was part of the more recent motion practice that I have not ruled on relating to the interviews generally.  And my recollection is that I had ruled that the factual content, verbatim content of the interviews be produced on the ground that -- at least on the ground that it was either -- it was either not work product or that there was a basis for production under the circumstances, even if it was, while at the same time, ruling that the attorney/client privilege was entitled to be protected.  I will tell you all that, based on the memos I got, it's not totally clear to me what was produced because it sounded like, Mr. Strub, as I interpreted your memo, it sounded like you were actually producing the Latham & Watkins memos as opposed to just the factual content.

    So I don't know if you -- I'm not exactly sure what you produced and whether you produced Latham & Watkins memos after redacting mental impressions, et cetera, or whether there was something else that was produced.· I'm still not really clear on that.

    But, in any event, one of those memos is the one you're talking about now.  And so I think that that issue is going to come up again.

    So for -- at least for now, I'm going to treat this like we did before and say that he can -- he can respond to what he did or what he was told, how that impacted his investigation, but not treating it as

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 6 of 22

       an admission, at least not yet, until I'm a little bit more satisfied that I know what it is.

*See* **Exhibit 3**, 2022.01.26 Tr. 488:18 – 490:17.

**THE PROCEDURAL HISTORY OF ADVANTAGE'S
WHOLLY INAPPROPRIATE CONDUCT**

       As explained in detail in Take 5's Motion to Remedy Advantage's Obstreperous Refusal to Comply with Orders, dated December 15, 2021 (the "Motion to Remedy"), Advantage was twice ordered to produce the contemporaneous notes taken live during the June and July 2019 interviews of then Take 5 employees by L&W and FTI. *See* **Exhibit 4**, Motion to Remedy.

       Because there have been a multitude of discovery motions made and decided in this matter, it is appropriate to put Take 5's Motion to Remedy in context.

       At the commencement of discovery, the contemporaneous notes of the L&W and FTI interviews were among the ***first documents sought by Take 5.***[4] And those documents were the ***first*** series of documents Advantage refused to produce.[5] They were also the ***first*** documents Take 5 sought to compel by motion from Your Honor. *See* **Exhibit 5**. On ***August 14, 2020,*** Take 5, in its very first discovery motion, quoted from the pleadings, and stated in Advantage's amended counterclaim at ¶¶ 36-39:

---

[4]  *See* **Exhibit 5-F** at pgs. 54 and 54: Request Nos. 52 and 53 in Take 5's First Request for Production of Documents and Information, dated November 1, 2019:

    **DOCUMENT REQUEST NO. 52**: All documents that refer or relate to any of the 27 Advantage and Take 5 employee interviews Latham and FTI conducted as set forth in paragraph 39 of the Advantage Response, or any other interviews Latham and FTI conducted in connection with their respective investigations as set forth in paragraphs 36–48 of the Advantage Response, including but not limited to any documents that are audio or video recordings of such interviews, written statements, affidavits or notes.

    **DOCUMENT REQUEST NO. 55**: All documents that refer or relate to the July 2nd interview [of Alexander Radetich] as set forth in paragraph 43 of the Advantage Response, including all audio files, transcripts, and notes.

[5]  At first, Advantage attempted to hide behind the following objections, notwithstanding the fact that the requests went directly to the foundation of the pleadings: (i) the requests "seek information not relevant to this Arbitration; (ii) the requests are "overly cumulative and duplicative;" (iii) the terms "documents" and "investigators" are "overly broad, uncertain, vague, and ambiguous;" (iv) the terms "documents," "July 2 interview," "transcript," "audio," and "notes" are "overly broad, uncertain, vague, and ambiguous." *See* **Exhibit 5-F** at p. 54. None of Advantage's objections were made in good faith.

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 7 of 22

the Advantage Parties expressly state that they 'initiated an internal investigation into [two] whistleblower complaints' first hiring FTI Consulting ("FTI") and then the law firm of Latham & Watkins, LLP ("Latham") who 'over the course of the ensuing investigation' collectively 'interviewed 27 Advantage and Take 5 employees, ran transaction testing over 73 marketing campaigns, and reviewed over 21,000 documents.' (Response, ¶ 39). . . .

Further, [Advantage's amended counterclaim] expressly states that (*id.* at ¶ 43):

> Radetich himself admitted as much to Latham and FTI in a July 2nd interview, during which he acknowledged that he and Gluck had concluded that Take 5 needed to lie to clients in order to keep them.

In short, the Advantage Parties contend that Mr. Alex Radetich who is a Cross-Respondent in this Arbitration admitted to having perpetrated a fraud during the Advantage Parties internal investigation into the anonymous whistleblower complaints.

Counsel for the Advantage Parties have advised counsel for the Take 5 Parties during discovery that the Advantage Parties intend to call a Latham attorney to testify in this proceeding as to the substance of the information obtained by it during the internal investigation Latham performed on behalf of the Advantage Parties.

*See* **Exhibit 5**, 2020.08.14 Take 5 Motion to Compel at pg. 2.

Your Honor, in granting Take 5's first motion to compel, in part, on September 10, 2020, held as follows:

> Take 5's motion to compel is granted with respect to ***verbatim accounts*** by interviewees, ***including memoranda*** created by the interviewee or memoranda recording ***in any form*** the statements by the interviewee. This information is not work product.  *See In Re Oracle Corporation Derivative Liti*gation, 2020 WL 38567407, *6 (Del Ch. 2020). Even if it were, Take 5 has demonstrated sufficient need to obtain it when weighed against the absence of a need to protect the analysis of an attorney.

*See* **Exhibit 6**, Discovery Order No. 2, dated 09/10/2020 at pg. 2 – 3.[6]

---

[6]  Discovery Order No. 2 also acknowledged Advantage's agreement "that it has or will produce documents responsive to those requests that reflect underlying facts or data."  *See* **Exhibit 6** at pg. 3.

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 8 of 22

In response to Discovery Order No. 2, Advantage produced limited Redacted L&W Summaries of the L&W Interviews of Radetich, Gluck, and Ward. Those summaries, attached hereto as **Exhibits 7, 8 and 9** respectively, are almost fully redacted, leaving Take 5 guessing as to what those summaries state.   Along with the production, Advantage delivered a privileged log that purportedly listed all notes of the Latham conversations.  ***What Advantage failed to do was produce <u>any</u> contemporaneous notes of the L&W Interviews.  Even worse, Advantage failed to log the contemporaneous notes typed by a L&W attorney, handwritten by Sullivan, or typed by Luu on the privilege log it was ordered in Discovery Order No. 2 to provide no later than September 30, 2020, leaving Take 5 unaware as to their existence.***

Upon receipt of the limited Redacted L&W Summaries of the L&W Interviews of Radetich, Gluck, and Ward, and an updated privilege log produced by Advantage pursuant to Discovery Order No. 2, Take 5 and its counsel had no reason to believe that Advantage and its counsel had not fully complied with Your Honor's very clear mandate.

Approximately one year later, months after the close of fact discovery and during expert discovery, Your Honor allowed Take 5 to ask Wei both fact and expert questions during his scheduled expert deposition because of Advantage's late production of many categories of responsive documents. During that September 28, 2021 deposition, Radetich's counsel inquired of Wei about what notes were taken at the L&W interviews in July 2019.

What was discovered at the Wei expert deposition was that there ***were contemporaneous*** notes taken at the L&W interviews and not just summaries assembled thereafter.  Accordingly, on October 1, 2021, Take 5 made ***another motion*** for the actual notes of those interviews. *See* **Exhibit 10**. In its October 1, 2021 Motion, Take 5 repeated Advantage's contention that it was "**not aware of *any* notes** of those conversations, and the Take 5 Parties' counsel is free to ask Mr. Wei about those conversations when they take his deposition." *See* **Exhibit 10** at pg. 2 (emph. added).

Take 5's counsel did just that. Wei conceded at his September 28, 2021 deposition that he and Luu conducted interviews of Take 5 employees as part of FTI's initial investigation and that contemporaneous notes of those interviews were taken by Luu.  *See* **Exhibit 1** at 26:9-17; at 30:11-21.  Wei further testified that the scope of FTI's initial investigation was the same scope of his expert report.   *See* **Exhibit 1** at 25:5-16. Wei testified that he first reached conclusions "around the end of 2019" and that those conclusions ***never changed***. *See* **Exhibit 1** at 25:17-26:2. Wei distinguished between the initial interviews, by him and his FTI team – before the advent of L&W – and continuing interviews after L&W was brought in by Advantage. *See* **Exhibit 1** at 28.

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 9 of 22

Most importantly, Wei testified that he also attended the L&W interviews and that he witnessed contemporaneous notes being typed on the laptop of the L&W associate in the interview room during the L&W interviews which he attended:

> Q. . . . And the interviews that were performed by Latham & Watkins, you testified that some of them you attended. Were any notes taken of those interviews?
>
> A. I believe Latham took notes.
>
> Q. And have you seen any of those notes or any memos regarding those interviews?
>
> A. I have not seen -- as far as I know, I haven't seen them. I may have looked at some when they were created two years ago.
>
> Q. And what form would they have been in?
>
> A. Well, they would -- I would have looked at them while they were being created, **_so they would have been on the laptop of the person who was actually taking the notes_**.
>
> Q. So they would have been taken in digital form?
>
> A. I think so.
>
> Q. And do you remember who was taking the notes?
>
> A. An associate at Latham & Watkins. I don't remember their name. And there were also different interviews. So the person taking notes probably changed.

*See* **Exhibit 1** at 35:16 – 36:15.

On October 8, 2021, Your Honor entered the following Order incorporating Discovery Order No 2, dated September 10, 2020:

> On October 1, 2021, **Take 5 filed a motion for an order requiring the production of notes of witness interviews, which were conducted by FTI and Latham & Watkins**. On October 4, 2021, Advantage filed a response. On October 7, 2021, Take 5 filed a reply.
>
> There have been several discovery disputes between the parties. This issue was raised in prior filings. **Discovery Order No. 2**, dated September 10, 2020, **stated in pertinent part**:
>
> > With respect to requests 52 and 55, documents relating to employee interviews, Advantage's position is that the documents are protected from disclosure by the work product privilege and/or attorney client privilege.

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 10 of 22

\*       \*       \*

**Take 5's motion to compel is granted with respect to
verbatim accounts** by interviewees, **including**
memoranda created by the interviewee or **memoranda
recording *in any form* the statements by the
interviewee**. This information is **not** work product.

\*       \*       \*

It is clear from the depositions of **Michael Wei**, one of Advantage's
experts, that **the basis for his opinions includes factual
information obtained from employees of the Take 5 business.
With respect to interviews conducted by FTI, Christina Luu
*took notes*. With respect to interviews conducted by Latham &
Watkins, an associate at that firm *took notes***. Although **Mr. Wei**
is not relying on the notes as such . . . he **is relying on the
information that is contained in those notes**, albeit largely from
memory. **Thus, the factual information in the notes is very
relevant to Mr. Wei's opinions**.

Based on Discovery Order No. 2, I assume that verbatim accounts
by interviewees have been produced.

**I hereby order the production of factual content of *notes* of
interviews conducted by FTI and Latham & Watkins**. The notes
may be withheld or redacted to the extent they are protected by
attorney-client   privilege   or   contain   an   attorney's   mental
impressions, conclusions, opinions, or legal theories. **The *notes*
created by FTI of interviews conducted by FTI shall be
produced on or before October 18, 2021**. Because **the notes
created by Latham & Watkins of interviews** conducted by
Latham & Watkins may require a more extensive review and may
need to be redacted, those **notes shall be produced on or before
October 25, 2021**.

*See* **Exhibit 11**, October 8, 2021 Order at 1 – 3 (emphasis added).

Following Advantage's October 25, 2021 production in response to the
October 8, 2021 Order, Take 5 determined that Advantage produced the
Redacted L&W Summaries but again no contemporaneous notes taken live
during L&W interviews. Take 5's counsel wrote to Advantage's counsel about
the omission of the contemporaneous notes from Advantage's production:

We have had the opportunity to review the Latham & Watkins
memoranda in connection with the June and July 2019 interviews
of employees . . . which were produced by Advantage on October
25, 2021. It does not appear, however, that Advantage's October

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 11 of 22

      25 Production is in compliance with Judge Eyler's October 8, 2021 Order.  Specifically, we have not received the contemporaneous notes created by the Latham & Watkins attorneys present at the various interviews . . . .

      We ask that Advantage provide us the contemporaneous **notes taken during each of the . . . interviews** on or before 3:00 p.m. ET on Friday, November 12, 2021.

      If the contemporaneous notes **were not maintained, have been lost, were destroyed, or are unable to be located, please so state**.

*See* **<u>Exhibit 4-A</u>**, Motion to Remedy (emphasis added).

      Advantage replied that the unredacted L&W Summaries should suffice and declined to produce any contemporaneous notes taken **during** the L&W or FTI interviews.  Said Advantage's counsel:

      You have the interview memoranda and now know that nothing the witnesses said support Take 5's position in the case.  **The additional information you are seeking is completely *irrelevant*, and the demand that we turn it over is harassment**.

*See* **<u>Exhibit 4-B</u>**, Motion to Remedy (emphasis added).

      The statement by Advantage counsel was, in a word, astounding, considering Your Honor's *two* prior rulings.  Your Honor already ruled that "the factual information in the notes *is very relevant* to Mr. Wei's opinions," and that: "I hereby order the production of factual content of **notes** of interviews conducted by FTI and Latham & Watkins." *Supra*, pg. 10 (emph. added).

      The substance of Advantage's argument is similarly astonishing.  Advantage argued that because it produced editorial L&W memoranda – prepared **after** the interviews – that Take 5 "now know[s] that nothing the witnesses said support Take 5's position in the case."  This of course begs the question of what the witnesses said according to the notes taken on laptop computers or handwritten *during* the interviews.  Indeed, the Redacted L&W Summaries state on their face that they are editorial in nature and were prepared **after** the interviews.  For instance, L&W expressly states the following at the beginning of several of the memoranda:

      This memorandum does not contain a verbatim, or near verbatim, transcript of the interview; rather, **the memorandum sets forth Latham's thoughts, impressions, conclusions and opinions in**

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 12 of 22

> **connection with this interview**.  .  .  . The memorandum **may contain inaccuracies, even in apparently quoted language, and is not a complete statement of all remarks made during the interview**.

*See* **Exhibits 12 and 15**.

After intentionally disobeying Discovery Order No. 2 and the October 8, 2021 Order, Advantage had the impudence to submit as evidence and rely upon the unredacted L&W Summaries, as undisputed statements of material fact, to support its motion for summary judgment.  Advantage's presentation at oral argument included a whole page presentation with the summary of the so-called admission of Radetich and what appears to have been created to look like a mugshot of Radetich. *See* **Exhibit 19.** This conduct by Advantage is nothing short of bad faith.

Indeed, Take 5 now knows that Mr. Strub's representation, on August 20, 2021, that "[t]he Advantage Parties are **not aware of *any* notes** of those conversations  .  .  . ", is false. *Letter to Hon. James Eyler from Advantage Counsel, Mr. Strub*, 8/20/21, p. 8 (emph. added). ***Knowing that Your Honor twice ordered production of the contemporaneous notes, why would Advantage counsel respond that "we are not aware of any notes" without looking?***

Advantage also took the position that notes of the interviews "were never requested." (quoting Advantage counsel, Mr. Strub). The truth is that Take 5 requested the notes more than 27 months ago. *Supra,* p. 6, fn. 4 (RFP No. 52 requesting: "All documents that refer or relate to any of **the . . . employee interviews Latham and FTI conducted . . . including** but not limited to . . . **notes**." (emph. added).

Because of the games Advantage was playing, including claims that Take 5 had never requested that contemporaneous notes (*see* **Exhibit 1** at 31:3-16), Take 5 made its Motion for Remedy on December 15, 2021. *See* **Exhibit 4**.  In that motion, Take 5, among other relief – yet again – sought the contemporaneous notes of the L&W interviews.  In its response to this motion Advantage did what it does best – it pretended that it had produced the contemporaneous notes, knowing it had not. Advantage said:

> Your [Honor's] October 8, 2021 Order required the Advantage Parties to produce the "factual content of notes of interviews conducted by . . . Latham & Watkins." **The Advantage Parties did this**.

*See Adv. Response, 1/10/2022*, p. 2 (ellipses by Advantage/emph. added).

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 13 of 22

Thereafter, the final evidentiary hearing began with Advantage continuing to allege that Radetich admitted that he "lied" to Take 5 customers. When Advantage announced it desired to have Sullivan testify about the unredacted L&W Notes which contain double and triple hearsay, Take 5 asked again – a fourth time – for Your Honor to order that the contemporaneous notes be produced to Take 5. And on February 21, 2022, Your Honor ordered that Advantage produce the contemporaneous notes to Take 5. On March 10, 2022, Advantage turned over those contemporaneous notes that it had managed to shield from production for almost 21 months and during almost the entirety of its case-in-chief at the final evidentiary hearing.

Simply, Advantage's contempt of Your Honor's orders has tainted every aspect of this case. The abrupt and permanent shutdown of Take 5 is based on what was supposedly said in those L&W interviews as reflected in the L&W Summaries. Take 5 was forced to depose all fact and expert witnesses without the benefit of the contemporaneous notes of the L&W Interviews despite Advantage having been ordered to produce them on September 10, 2020 by Discovery Order No 2. Take 5's expedited response, to Advantage's prolix motion for summary judgment, also was written without the benefit of those contemporaneous notes of the L&W Interviews. Take 5 cross-examined Advantage's witnesses at the final evidentiary hearing without the benefit of those contemporaneous notes of the L&W Interviews. There is no going back. What Advantage's two-year dance of defiance has wrought cannot be undone.

### FINALLY, AFTER THREE ORDERS AND NINE DAYS OF HEARING, ADVANTAGE "LOCATES" THE CONTEMPORANEOUS NOTES AND THE TRUTH COMES OUT

On March 10, 2022, Advantage finally produced two sets of contemporaneous notes of the L&W Interview of Radetich. That is, Advantage did not locate one set of contemporaneous notes that it has been concealing for the past two years but found two sets. And the notes are, in a word, startling.

### A.   The Sullivan Handwritten Notes Just Produced

Although not reflected on any Advantage privilege log, Take 5 learned on March 10, 2022, that Sullivan took contemporaneous handwritten notes of the L&W Interview of Radetich on July 2, 2019. Take 5 received the contemporaneous handwritten notes taken by Sullivan of *six* L&W Interviews: Boy, Coker, Creel, Gluck, Jenkins, and Radetich. *See* **Exhibit 13**.

Regarding L&W's Interview of Radetich, Sullivan wrote:

(1)   Radetich *never knew* about "supplemental traffic" until the FTI investigation;

(2)   he had *no knowledge* "of the algorithm and how it works;

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 14 of 22

> (3)   "no one ever reported to [him] that reports were inaccurate and needed to change;"

> (4)   he "learned about the algorithm and inaccurate reporting from Ryan [McGavran] a few days ago;"

and, most importantly,

> (5)   "as more clients used GA [Google Analytics], needed to adjust report with GA."

*See* **Exhibit 13** at pgs. 9-12.

Nowhere in Sullivan's contemporaneous handwritten notes is there a reference to "lying to clients to keep them" or any admission of "false reporting" or committing a "fraud" on customers.  *Id.*  One would think that if Radetich stated in the presence of Advantage in-house counsel that he was lying to then Advantage clients (as well as his then employer and the company that had only 15 months earlier paid Take 5 more than $70 million), there certainly would be a reference to that alleged admission in counsel's contemporaneous notes. Better than that, it would presumably have stars, underlines, or highlighting for emphasis within those notes.  Yet, in Sullivan's contemporaneous notes, there is no reference to any admission at all.  *Id.*

## B.   The Type Written Notes Just Produced

The second set of contemporaneous notes that were produced on March 10, 2022 are typewritten.[7]  *See* **Exhibit 14**. The author or authors of the typed notes remain unknown.  What is most disturbing is that, despite Your Honor's ruling in Discovery Order No. 2 on September 10, 2020 that Advantage produce quotes and actual statements by Radetich or any of the other interviewees (Boy, Coker, Creel, Gluck, Hodgens, Jenkins, and McGavran), these contemporaneous notes were withheld by Advantage for more than 17 months. Advantage still has not produced any contemporaneous notes from the interviews of Brewer, Momia, or Ward. *See* **Exhibit 14**.

The face of the contemporaneous notes that Advantage did produce on March 10, 2022 purport to contain quotes from the Radetich interview (and the other seven interviewees).  Indeed, the very second bullet on the contemporaneous notes from the L&W Interview of Radetich on July 2, 2019 reads: "**Most of the below are close to verbatim quotes from Alex [Radetich]—I've omitted quotation marks.**" *See* **Exhibit 14** at pg. 26 (emphasis added).

---

[7]   The typed notes produced include questions for the L&W Interviews of Morris and Maier but no contemporaneous notes of those interviews and a third set of general questions for the interviews. *See* **Exhibit 14** at pgs. 63–72. Also, Boy was interviewed twice by L&W in July 2019.  *See* **Exhibit 14** at pgs. 10–14 and 57–62.

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 15 of 22

Thus, the entirety of the contemporaneous notes of these nine L&W Interviews should unquestionably have been produced no later than September 30, 2020 in compliance with Discovery Order No. 2.  There can be no good faith basis for Advantage's failure to comply with Your Honor's directive at that time (much less following the October 8, 2021 Order).  Advantage's deliberate acts denied Take 5 any opportunity to verify the veracity of these interview notes and summaries during the pendency of this arbitration.

On the pivotal issue, as to whether Radetich said "yes" to the question as to whether Take 5 lied to its customers – as the L&W Summaries suggest – the contemporaneous notes reveal a very different answer by Radetich.  That is, the question from Abascal was: "sounds like lying?" to which Radetich responded:

> Yes, I guess **you** could call it that. The thing is you can't lie to the client because they can verify these.

*See* **Exhibit 14** at pg. 34 (emphasis added).

Thus, after two years of Advantage reiterating the same statement – as if wishing to make it true by sheer repetition – that Radetich admitted he lied to customers, the truth finally sees daylight.  According to the L&W Summaries and as Advantage has been arguing since the inception of this arbitration:

> Mr. Abascal asked, "so essentially, did you believe that you needed to lie to your clients in order to keep your clients?," to which Mr. Radetich responded, "Yes."

*See* **Exhibit 15** at pg. 7.  This exchange between Abascal and Radetich from the L&W Summaries, however, does not appear in the contemporaneous notes typed by the unidentified L&W associate or the handwritten notes taken by Sullivan.

To make matters worse, Advantage supplied the L&W Summaries – but not the contemporaneous notes typed by L&W associates or handwritten by Trevor Sullivan – to the Assistant U.S. Attorney's ("AUSA's") office.  Thus, as it did with Take 5 over almost 30 months and Your Honor since your appointment as Arbitrator, Advantage has led the AUSA to believe that Radetich admitted to lying to customers, when the contemporaneous notes reveal he actually said the opposite, I guess **you** can call it that, but you cannot lie to customers as they have the operative data.

### TAKE 5 WAS PRECLUDED FROM TAKING DISCOVERY ON THE L&W MEMOS AND NOTES AND FROM SULLIVAN

Not only do we now know that the contemporaneous notes do not support the alleged admission, but Advantage intentionally precluded Take 5 from even taking the deposition or obtaining documents from Sullivan or the depositions of the other unidentified notetakers.

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 16 of 22

Simply, from the very onset of discovery, Take 5 desired to obtain documents and information from Sullivan along with other senior officers/counsel at Advantage and were always denied ***any*** discovery. As early as June 6, 2020, Take 5 counsel asked specifically for documents from Sullivan. Specifically, Take 5's counsel requested the following:

> please add the following individuals to the Advantage custodian list, as each of them communicated with our clients or were involved in the bigger decisions regarding Take 5:
>
> ...
>
> 6. Trevor Sullivan: in-house counsel who was present during interviews and was responsible for getting all Advantage companies compliant with the California Consumer Privacy Act and other consumer privacy laws in the US.
>
> ...
>
> 8. Bryce Robinson: Advantage Corporate Counsel. Along with Brian Stevens, Darrin Kleinman, Gary Colen and Craig Johnson, he ran the due diligence and was responsible for the acquisition and termination of Take

*See* **Exhibit 16**. On June 10, 2020, Advantage counsel responded:

> We cannot agree to produce emails of Advantage counsel, such as Mr. Robinson, Mr. Larson, or Mr. Sullivan. Virtually all of their emails would [be] privileged; those that are not would presumably be duplicated in the inboxes of other custodians. The burden of reviewing their emails (137GB for Robinson and Larson alone) and addressing privilege issues would be disproportionate to the additional value of the emails to the case.

*See* **Exhibit 17**. Thus, for close to two years Advantage refused to produce ***any*** documents created or maintained by Sullivan. Nor did it even provide documents generated by Sullivan on its privilege log.

### LEGAL STANDARD FOR DISCOVERY SANCTIONS INCLUDING DISMISSAL

The Federal Rules of Civil Procedure allow a court to impose sanctions for a party's failure to cooperate during the course of discovery. *See generally* Fed. R. Civ. P. 37. Rule 37 sets forth specific guidelines for the imposition of sanctions when a party does not disclose information or witnesses, answer interrogatories, attend a deposition, or comply with a court order. The district court has broad discretion to impose sanctions under this rule, and the "central requirement ... is that 'any sanction must be just.' " *Bonds v. Dist. of Columbia,* 93 F.3d 801, 807–08 (D.C.Cir.1996) (quoting *Ins. Corp. v. Compagnie des Bauxites de Guinée,* 456 U.S. 694, 707 (1982)). As such, "[t]he choice of

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 17 of 22

sanction should be guided by the 'concept of proportionality' between offense and sanction." *Id.* at 808 (citation omitted).

The range of available sanctions under Rule 37 includes taking facts as established, striking answers or defenses, precluding the introduction of evidence, striking pleadings, dismissing claims, default judgment, or holding a party in contempt. *See* Fed. R. Civ. P. 37(b)(2); *see also Law Office of Azita Mojarad v. Aguirre,* No. CIV.A. 05–0038, 2006 WL 785415, at *10 (D.D.C. Mar. 27, 2006). Further, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorneys' fees, caused by the failure [to comply with a discovery order], unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(c). The possible sanctions listed in Rule 37 are not mutually exclusive, and the Court may impose multiple sanctions at the same time. *See Atkins v. Fischer,* 232 F.R.D. 116, 127 (D.D.C.2005) (citation omitted).

Here, Advantage evaded producing the interview notes for over two years after the court first ordered production in 2020, and in repeated instances either denied that the notes sought even existed and attempted to conceal these documents by baselessly claiming that they were never requested or that their scope was irrelevant or overbroad to the issues in this dispute, notwithstanding Your Honor's clear mandate   Advantage unquestionably engaged in "evasive and incomplete disclosure" which substantially prejudiced Take 5, and therefore its conduct is subject to sanctions under Rule 37(a)(4).

In the Third Circuit, a court deciding whether to dismiss a case for such violations is guided by *Poulis v. State Farm Fire and Cas. Co.,* 747 F.2d 863, 868 (3rd Cir. 1984). Under *Poulis,* a court is to consider: (i) the extent of the party's personal responsibility; (ii) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (iii) a history of dilatoriness; (iv) whether the conduct of the party or attorney was willful or in bad faith; (v) effectiveness of sanctions other than dismissal; and (vi) meritoriousness of the claim or defense. *Id.*

Under the *Poulis* factors, sanctions against Advantage are warranted, and this tribunal should dismiss the counterclaim given the substantial prejudice Advantage inflicted against Take 5. Advantage repeatedly did not comply with multiple orders across a year-and-a-half time period to produce the contemporaneous notes of the L&W interviews.  Indeed, Take 5 was unable to cross examine any of Advantage's witnesses on the issues revolving around those interviews without those notes.

Simply, Advantage not only duped Take 5 but also materially misled Your Honor. Not only was Take 5 unable to prepare for the final hearing or prepare for cross-examination without full access to all material information but Take 5

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 18 of 22

was unable to ask any questions during the depositions that were taken of the witnesses that went to the heart of the matter.  What is worse is that Advantage knew all along that they had the contemporaneous notes and that their failure to produce them would prejudice Take 5.

With regard to the third factor, a history of dilatoriness and bad faith, there is no doubt but that it sat on those contemporaneous notes and simply thumbed its nose at the orders.  Advantage's year-and-a-half delay and refusal to fully supplement its discovery answers to follow this tribunal's orders evinces its deliberate and strategic history of dilatoriness; and its attempt to conceal these notes and accuse Take 5 of harassment (after Take 5 merely sought to enforce *this court's order*) evinces bad faith.

Advantage should not be allowed to have presented almost all of its witnesses at the final evidentiary hearing while depriving Take 5 of these critical contemporaneous notes. It is difficult to perceive the effectiveness of any sanctions other than dismissing the counterclaim.

Not only is dismissal supported under *Poulis*, Third Circuit precedent supplies other authority under which sanctions should be issued. District courts in the Third Circuit have imposed tailored Rule 37 sanctions for far less egregious conduct, including, *inter alia*, preventing the offending party from defending against claims, pursuing motions, or dismissing the case in its entirety. In *Osorio v. TCV Community Services*, 2020 WL 5653347 (W.D. Pa. 2020), the court issued sanctions when under court orders a *pro se* plaintiff did not produce complete discovery responses and comply with other discovery obligations.  *Id.* at 2.  As sanctions, the court prohibited the plaintiff, *inter alia*, from opposing several affirmative defenses against the plaintiff's claims and from introducing further testimonial evidence not included in initial disclosures. *Id.* at 5. *See also Lee v. Sunrise Sr. Living, Inc.*, 455 Fed. Appx. 199 (3rd Cir. 2011). In *Lee*, a district court dismissed the complaint with prejudice when the plaintiff did not comply with discovery orders by producing belated and incomplete responses and refusing to attend depositions. *Id.* The Third Circuit upheld the dismissal under the factors provided in *Poulis*. *Id.* at 202.

Here, as under *Poulis*, additional Third Circuit precedent supports a dismissal of this action. Unlike the pro se plaintiff in *Osorio*, Advantage was not proceeding pro se, but had experienced counsel who repeatedly produced incomplete discovery responses contrary to multiple court orders and failed to produce known documents prior to the final hearing. At different points in its two-year pattern to evade, Advantage represented both that it was unaware of any notes to provide, and that Take 5 had not requested these notes for production, directly contrary to the procedural history and facts of this case. Upon Take 5's attempt to merely enforce an existing court order, Advantage accused Take 5 of "harassment" for following up to obtain outstanding materials. Advantage's conduct was evasive: it was not legitimately grounded in

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 19 of 22

law or fact and was instead used to delay the production of evidence contrary to the facts it represented to the opposition and the court.

Given that the material information contained in the interview notes was not produced until close to Advantage resting at the final hearing, it should also be inferred that Advantage willfully evaded discovery in order to prejudice Take 5, conduct which is far more egregious than the petitioning parties experienced in *Osorio*, *Lee*, or *Hepler*.[8]

As Advantage's conduct substantially prejudiced Take 5 and evinces both a history of dilatoriness and willful bad faith, this court should dismiss the counterclaim . It should also hold Advantage in contempt due to the evasive and prejudicial actions of its counsel, each of whom is aware of the consequences of their conduct. While monetary sanctions against a violating party are often appropriate, given that the final hearing has already been conducted and Take 5 could not prepare a full defense due to Advantage's dilatory conduct, this case the court should impose sanctions which remedy the prejudice that Take 5 has experienced, namely, dismissal of Advantage's claims and preventing their defense of Take 5's claims. Each of these sanctions can be issued pursuant to Rule 37(b) and would sufficiently remedy the harm done while also sufficiently deter future evasive conduct.

Therefore, sanctions against Advantage are warranted under Rule 37 in order to address the prejudice imposed against Take 5 by Advantage's willful evasion of discovery. Take 5 respectfully requests that Your Honor dismiss the counterclaim in its entirety.

Under Delaware State law, Sup. Ct. R. Civ. Proc. 37 provides largely analogous provisions as Fed. R. Civ. P. 37. In fact, Delaware state courts have held that dismissal is warranted for less culpable conduct under Delaware's Rule 37. Under *Hoag v. Amex Assurance Co.*, 953 A.2d 713, 718 (DE 2008), the Delaware Supreme Court upheld dismissal of an action where a plaintiff repeatedly did not comply with four discovery orders and failed to produce evidence which supported the defendant's case. *Id.* at 713-718. The court adopted the factors from *Poulis* and concluded that the plaintiff demonstrated

---

[8]   *Osorio* and *Lee* both concerned cases which were far earlier in their respective procedural histories than this case, thereby reducing the prejudice the petitioning party experienced relative to this case. For example, in *Osorio*, the violating party failed to comply with *initial* discovery orders and did not appear for a deposition, preventing the case from proceeding. In *Osorio*, 2020 WL 5653347 at 1-3. This was also the case in *Lee*, where the violating party refused to answer initial interrogatories and discovery requests and refused to appear for depositions. *Lee*, 455 Fed. Appx. at 200. In our case, the pretrial discovery process was already completed and the final hearing was *already held* by the time Advantage produced the deposition notes.

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 20 of 22

prejudice to defendant; a history of dilatoriness; and that plaintiff's failure to comply was willful. *Id.* at 718. Nonetheless, the court cautioned that "the sanction of dismissal is severe, and courts have been reluctant to apply it except as a last resort." *Id.* at 717.

Given the severity of dismissal, other requirements are needed, which Advantage's conduct demonstrates. To order dismissal, a court must also find that a party demonstrated "willfulness or conscious disregard" of a court's discovery order. *Holt v. Holt*, 472 A.2d 820 (DE 1984). In *Holt,* a pro se litigant failed to answer interrogatories over six years before sanctions were imposed and failed to disclose an out-of-state divorce decree while contesting his wife's divorce action in Delaware . *Id.* at 824. The court held that this conduct was willful disregard of the discovery order and upheld the dismissal of the action. *Id. See also Shockley v. Wilmington Medical Center*, 553 A.2d 638 (Table) (DE 1988) (holding that a plaintiff's failure to respond to four court orders over a four-year period was "willful and conscious disregard" of discovery orders). *Id.* at 3-4.

Here, there is no question but that, under Delaware law, Advantage's conduct was willful and a conscious disregard of Your Honor's orders to produce the contemporaneous interview notes containing facts and quotes from the interviewees, calling for the severe remedy of dismissal.

Both Delaware and Third Circuit jurisprudence support a finding that Advantage willfully violated Rule 37 and prejudiced Take 5 through its actions. Such conduct should not be tolerated.

Therefore, under both federal and Delaware law this court should sanction Advantage for its willful violations of this court's discovery order by dismissing this action, or by issuing appropriate sanctions as this court deems proper.

Advantage has been arguing, since the filing of its initial pleadings, that Radetich readily admitted to committing fraud in the operation of the Take 5 business before and after the acquisition by Take 5 and thus, Advantage's abrupt and permanent shutdown of the business unit was justified.  We now know, nine days into the final evidentiary hearing, that the truth is no such admission ever happened.  And we have never had access to the note takers. Advantage's concealment of the truth tainted this proceeding from the outset and deprived Take 5 the ability to properly defend the case and prosecute its claims.  Take 5 has been unduly prejudiced.  What has been done cannot be undone.  Advantage kept Take 5 in the dark for the entirety of this arbitration, although the truth has come to light, Take 5 cannot go back and retake the depositions of each of the fact and expert witnesses with the benefit and knowledge of the facts and quotations from the contemporaneous notes that Advantage was ordered to produce no later than September 30, 2020.  Take 5

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 21 of 22

cannot go back and cross examine the witnesses who have testified during the first nine days of the final evidentiary hearing with the benefit knowledge of the facts and quotations from the contemporaneous notes that Advantage was ordered to produce no later than September 30, 2020.[9]  Advantage kept its foot on the scale, violated multiple Orders, and hid the truth for more than 17 months hoping that it would never have to reveal the truth because the truth doesn't fit within the narrative that caused Advantage to shut down the Take 5 business unit, terminate 75 employees, and announce the "fraud" to the world. This conduct was knowing and intentional and should be sanctioned to the fullest extent possible.

## CONCLUSION

Advantage's egregious misconduct necessitates the following relief:

(1)    the striking of Advantage's pleadings, both its answer to Take 5's claims and its counterclaim in their entirety;

(2)    the preclusion or exclusion at the final evidentiary hearing of any testimony concerning the L&W or FTI interviews, notes of the interviews, or any facts relating thereto;

(3)    the preclusion of the testimony of Trevor Sullivan, Esq. at the final evidentiary hearing or in support of any motion, opposition, reply, or sur-reply;

(4)    monetary sanctions, including attorneys' fees and costs, against Advantage and in favor of Take 5 for Advantage's wholly inappropriate conduct – conduct that is sanctionable in any federal or state court in this land; and

(5)    such other and further relief as Your Honor deems appropriate under these egregious circumstances.

---

[9]   There are other examples where Take 5 was prejudiced in both discovery and at the final evidentiary hearing resulting from Advantage's failure to turn over the contemporaneous notes it was ordered to produce.  For example, the Sullivan handwritten notes indicate that Creel had "no communication to clients about what they were actually getting – waiting for legal to provide guidance before taking to clients."  See **Exhibit 13** at pg. 6.  Yet, at the final evidentiary hearing, Creel testified that she had communicated with clients who expressed displeasure with the services they were being provided  Specifically, Creel testified under oath that she was "letting [the client] know that they blended in other channels without … asking for it."  *See* **Exhibit 18**, 2022.02.04 Tr. at 2338:20-22.  By concealing Sullivan's notes of the Creel interview, Advantage handcuffed Take 5 as it was unable to cross-examine Creel about her inconsistencies.

The Honorable James R. Eyler
c/o Mr. Matthew Conger
April 14, 2022
Page 22 of 22

Respectfully submitted,

THE ROTH LAW FIRM, PLLC      RICHARD AND RICHARD, P.A.

_____     _____
Richard A. Roth                  Dennis Richard
                                      Melissa L. Mackiewicz
295 Madison Avenue           825 Brickell Bay Drive
22nd Floor                     Tower III, Suite 1748
New York, NY  10017         Miami, FL  33131
(212) 542-8882               (305) 374-6688
rich@rothlaw.com           dennis@richardandrichard.com
                                      melissa@richardandrichard.com

*Counsel for Claimant / Counter-*   *Counsel for Respondents Petruss*
*Claimants/CounterRespondent*    *Media Group LLC f/k/a Take 5*
*Alex Radetich*                   *Media Group LLC and Richard Gluck*
                                      *and Cross-Respondent RJV*
                                      *Marketing Corp.*

Enclosures via ShareFile Link

cc:    all counsel of record (via email)

Interview w/ Michael Bay 9Am

- started 2016 as Digital marketing Specialist, hired by Beth, Eve
  - day to day, reported to Eva, no interaction w/ Alex & Roshae
- Michael not aware when he was hired emails not being sent.
- organized site, day today work did not realize the emails not
  really being sent out.
  ↳ How Michael discovered:
    • originally, 2 depts — fulfillment & production. Production
    led by Andrew [    ], Fulfillment by Eve. Andrew had led
    both before Eva.
    • Michael did not know what production did. Production tests creatives, and
    ensures it goes live to seeds, in other words the client gets the email. Then
    it moves to fulfillment to fulfill the campaign.
      ↳ All Production does is test & email it to clients. (creative or client designs
      ↳ MB says good they had production team send emails to clients
      b/c possess those IP addresses. MB says that is not / probably
      original intentions, b/c he was building infrastructure
      to actually send emails from fulfillment. MB says
      Andrew [    ] told him they did not send any emails
      and all PPL re door. MB believes there was no infrastructure
      prior to MB to send bulk email
- MB says no intent to do mass email (his belief). Needed to make $ from database outside of licensing, only
  other thing was email blasting & of direct mail when they started (b/c programmers did it in rather cost of
  frame)
  - They likely saw they were not getting CTR / open rate competitors were getting, so looked into
    in report of usage
- No one knows how many of our emails are mailable. MB did research of opt-ins
  through TS datacards. He said those websites where they opted in don't exist anymore.

· Need to find
· Andrew [    ]
  production head

· Chris Sedant

HIGHLY CONFIDENTIAL

**EXHIBIT 13**

<u>MB Interview Pg 2</u>  (noss)

• Clients believed the TS database captured datasets of individuals who opted
  into TS, rather than 3d party marketing
   — TS surveys are where individuals would submit PII data. MB believes those
     were for appearance. No incentive for consumers to fill out surveys.

Q: what infrastructure would he have expected for email marketing when he started?
   • what he put in place.  Vol - (multiple IP address vendor)

— who is responsible for database? (collecting datasets?)
  [ → Alex controls data ] claims he is database architect. Alex worked No Data's TS
MB understood not sending emails, but did not know what we're telling clients.
  • took him about 1yr to understand what was happening. He was just sending out
    campaigns for first yr. He did not know about sales, reports, etc.

  • MB would suggest updating data. He would pass on Contact to Alex, and
    nothing would happen.
  → Alex was the person who procured data. He manages Hyperises relationship
    relationship. Hyperises "corrects data" → so they will then pull TS
    data based on demographic data they "correct" our data to
  • MB did not hear about hyperises before TS. Has not heard about them anywhere
    else. He does not know anything about them.

  • Can anyone actually look at our database? Do we know what is in there?

Jason Korkin — starting point to discuss PPC vendors. He's from ProData
MB says Alex & Erik knew about PPC b/c ProData existed before MBS/Eva. PPC
vendors is one of TSS biggest cost/expense
   • Jason may have worked for TS, MB unsure. He's been in no effort to
     speak w/ Alex / Erik re

B00306352
F06833-003946788

MB pg 3

- Rachel, Monique, and Mason (PT) work under MB, they are the 3 responsible for bulk email campaigns. Others are cross-trained, but those are 3.

- MD raised concerns to Ryan about reporting around/end of F.6.
  - MB threatened to Alex/Rahul to resign, or he would leave. Alex agreed
    - MB told Alex they can't keep telling people they have double opt-in database, need to switch to audience-based marketing. Alex agreed.
    - All right around when Eve gave her notice. After Eve's notice, MB threatened to resign if no changes.
      → told this to Alex, Rah, and Beth

- MB says they all knew there was no double opt-in list.
- MB told Alex, Rah, Beth:
  (1) stop double opt-in emails b/c not true. Obviously Alex/Rahul knew not true, b/c may prior discussions/emails about it
  (2) stop selling counts that don't exist (e.g., may records only have postal, not email)

- emails were red flag for MB, b/c they would match back based on database rather than emails actually sent

- David Thornberry — used to be CEO Take5.
  - MB says Alex/Rah did merger or acquisition in past. Thornberry fired them. They were forced to buy back company after acquisition. MB thought it was b/c of what Thornberry saw.
    → it was "Take 5 Solutions". changed name afterwards.

- Josh — Kaitlin? Blonde hair from ADV
- Katelyn Crossley — SVP, MB & Beth had interview w/ KC right after acquisition. MB felt Beth had instruction to not let MB/or disclose what was going on. MB felt he could not be open.
  - He doesn't think that she was malicious. More motherly/protective of Alex/Rah/Take5

B00306353
F06833-003946788

MB pg 4

- MB said Rich yelled at Cory, Esteban, Eve to change reports. There is email chain that Esteban/Eve cc.
  - Richie swearing at them. Esteban said Richie told him to change reports. Sometime in last year & a half or so.
  - client here was either cruise line or automotive client. Either Taro or MJ sales client. May Be - Joseph.

Richie told MB of small group of EEs that they could get big bonus ($250K to MB) if they stick around 2yrs after acquisition. No documentation, many of these people left. MB never saw any paperwork/proof of that bonus.

Alex open to change, but nothing happened bc Richie was majority owner of shares.
- Alex / Richie never been aggressive to MB
- MB says Alex has not been aggressive to anyone. Nice/friendly person.

MB says lots of turnover for 1-1 business relationships (direct clients). Channel partners (3rd party guys for clients) consistent, they're ok w/ results

HIGHLY CONFIDENTIAL

Jeremene Vollegas
Sol Iglesias

Prima (ree)

- Started Dec 5, 2018 as director of sales (Sr.)
  - Recruiter reached out, convinced her to leave current job and join Take 5.
    - She had heard of Take 5, that they could email tapp down to zip
      ↳ uncommon. Usually if they can, white label product or only doing national, etc.
  - Rich, Alex, Gary, & Josh all involved in interview
- When she first joined, billed as CPM (cost per thousand dd). In email marketing industry world, CPM is cost per thousand delivered

- First thing she did was try to fix client complaints:
  ① Retention of employees to clients
    ↳ started to look into this: noticed vague reporting, pushed to find out more about what was actually delivered. Claims no straight answers
    ↳ she needed list of all clients since Jan 2018, went line by line and talked through w/ each rep as to why clients left. Got that feedback from clients. Lots of traffic/reporting complaints reps
    ↳ Sales reps told Prima they don't know what fulfillment was doing, not sure what was being delivered.

Around feb {
- She had old client she worked w/ previously run campaign to test traffic & reporting. Client said not real traffic.
    ↳ she discovered there is supplemental traffic being added to campaign
      - She sent that to MD, and he sent more PPC traffic
    ↳ Prima cornered Eva to ask what's going on, Eva told her about PPC supplemental traffic
      - Prima says sales team didn't know about supplemental traffic
      - Prima told her sales team the next day, told them to sell blended, or email w/explanation there is PPC too

HIGHLY CONFIDENTIAL

Prime Creek pg 2

- She says w/ new Omni.Reach, no more supplemental traffic. However w/ Blend, still using supplemental
- Prime told sales team: if they sell email-only, need to tell client not only email sales, there was supplemental traffic
- Prime told Ryan mid-Jan (2 weeks after he started) that something is wrong — reporting is off, product delivered is not the one sold.
- Is 2 months later, Ryan sets up call between Gary & Prime. (March)
  ↳ provided powerpoint of issues to Gary 2 weeks ago.

- No communication to clients about what they were actually getting — waiting for legal/corporate to provide guidance before talking to clients. But that

- Channel partners should arand be using TS as part of marketing suite, so our clicks/traffic just add to overall marketing effort, vs. doesn't/does't only rely on us for email marketing
- Ryan asked Gary for 3rd party auditor to investigate so they understand scope of issue

- Q: What did Alex/Erdine know, and when?
  - Prime was told by MB that Alex/Erdine have always known about the issues. She has not raised them b/c she still has to work with them every day.
  - Initial thought/gut feeling → Erdi is culprit. He oversells, overcommits. However, she does not think Erdi smart enough to pull this off. So, she thinks Alex is involved.

- Dara/MS may have been

- CPCs
- sales report

B00306343
F06833-003946784

<u>Tanya Coker</u>

Started 2011 as Alex E.A., then moved to client services, eventually became Director of account management (for 3yrs)

- manages & grows account, but not cold calling like sales team
- sales team has ~~all the~~ the quote, (CSR generates sales order

contents of SO: ① campaign type ② quantity (100k records) ③ what they're doing, such as demographics, zone, and # of waves

- if client says they want 100k emails delivered, how many need to be deployed (how many sent) if MBE team. Tanya not sure how that is calculated.

- not set pricing. Discretion for pricing, different for each client
  — so pricing, quantity, demographics, # waves from sales team. Then sent to CSR
    ⤷ first step is CSR & sales will run "counts" to see how many records there are. (using hygenics or Ace)

- Use 2 Vendors — IQS Holdings & Dan Kay (?) bring data into Hygenics. Alex gives approval for ~~wires~~ wires & what data is coming into Hygenics.
    — no real process; Tanya not involved in data piece. Alex only one involved in data sets

- If count is run and there are not enough records to meet what was sold, they will sometimes expand fields (geography, age); sometimes they talk to client about it, sometimes they don't
  — when Ryan started, they began running counts earlier (before sales order)

- After SO signed, CSR pulls deployment file from Hygenics, puts it into CMS for Fulfillment
  — Dedupof file will have first/last name, postal, phone or email
  — counts based on postals, not emails. "standard" practice, always bid count based on postal, Postal records are bigger database, so count is bigger than if had email.

- After campaign deployed, CSR just waiting for reports. After 7 days, CSR will pull 7-day tracking report, which is ~~uploaded by~~ tracking team. CSR reviews report to ensure lists et. nothing exploded then cut tracker.

Tanya (ctd pg 2)

- Reports were changed in past, not recently. Not since Tara left.
  - reports used to go to sales reps, then to client, and used to be excl.
  Sales reps could edit. changed to PDF about 1 year ago,
  and more CSE - client interaction, reports from cse-client.
- Tanya knew there was implemented PR traffic going on, but did not
  understand really how it worked (she used to help process invoices for Beth)

- 2 files go back client (besides tracking)
  ① Responder Files → opens/clicks. Different than tracking report, lists PPI of people who opened and clicked
  ② matchback files → match sales data to deployment file
     ↳ they send to Hygienis (cse team sends to Hygenis) to
        compare against sales Report

Tanya knew about formula that generates reports. Does not know how it works.
  - Eric Cogan. She learned about formula mostly from Michael.
     ↳ started ontop formula / desktop application (?)
    - knew about it before MB, but MB explained it. Knew
     Eric working on it around 2014. Most TS EES knew
     about formula. No explanation of why they used instead
     of actually tracking, except that not enough data.
  - believes bad data sources is reason for formula. 2 data sources
    have existed since before she joined 2014.

Alex Raletuh +/ |                    and Gary

- Spoke to Josh Pike ^ June 2018 about supplemental traffic after
  ethics complaint. Alex admitted the supplemental can
  include PPC, social, contextual, etc.
- Supplemental Traffic used if client has certain CTR (say 3%)
- Alex says he always ~~provided~~ talked about CTR between 0.1 - 1%, and
  other ~~cpi~~ re's were promising 2-3%
    ↳ ¼ provided Josh / Gary +/ invoices
  ↳ they did not ask about supplemental traffic in context of email ady
    campaigns
        ↳ so did not really admit the supplemental traffic
- Alex did not know about supplemental traffic until this investigation,
  and did not know fewer or no emails being sent. Only learned during
  investigation.
      ↳ Admitted that if he didn't know, ADV would not have known
        ↳ Customers were told $75 would over deliver in emails to hit CTR
          if there was enough inventory. Otherwise need to use supplemental
          traffic to drive client goals/LTE.
- No reason to believe inaccurate reports discussed w/ ADV prior to investigation
- Alex claims not technical guy, no knowledge of algorithm or how it works

- Audiences that are specific/granular, ~~will add~~ Have to triangulate/create model
  based on other datasets we have. He'll considers industry standard, not specifically
  disclosed to ADV b/c he believed Gary/Josh knew given their background.
- Craig Winnegrag (?) - IT contractor

  ↳ No discussion w/ ADV about inaccurate reporting. Only discussion RE supplemental traffic
    w/ Josh/Gary when showed invoices,

HIGHLY CONFIDENTIAL

Alex - pg 2

- Prior acquisition by David Thornburg's PE group, he was from data industry.
  - conversation started 2007, banker engaged, NDA in place, then recession hit and they couldn't get funding.
    - 2010 renewed interest, no bankers at this point

Acquisition Feb 2011

- Thornbury using Kinderhook PE group; 11 months of diligence
  - structure - 75% cash, 25% stock, $M million total (including stock)

  ⮡ Alex/Rich thought they would have role in new company. Dave did not run business well. Alex/Rich stayed on as EEs, felt they should run company. Thornbury was CEO, started making moves Alex/Rich/Dave did not agree with. Thornbury wanted to move database in house w/ own data server. Felt:
     ① unnecessary cost
     ② threatened b/c bringing in own people, vs. Hygieia, which they trusted

- Data vendors are Dun & Bradstreet / IQS, DE = range, urban, experian, others, etc. IQS more general, votes, automotive, etc

  ➔  disagreed on
     - management style. Ethics complaints against Thornbury, sex harassment lawsuit against TS & Thornbury.
  - claims they broke bank covenants pretty early. They fired Rich/Alex, Rich 8/9 months after acquisition, Alex 1 yr.
     ⮡ met them in parking lot, told to hand in keys/equipment, no reason given

- Tom Tuttle (Kinderhook) called Alex/Dave Feb 2012 wanted to come to a deal for Alex/Dave to buy business back, allegedly b/c business declining. Around $7m.

B00306356
F06833-003946789

Alex pg 3

• No specfc reason given for buy back. He thinks Thansey voted to more on. Kinderhook bought competitor, Specialist marketing services. Asked for copy of Take5 database, which they gave as part of buyback. Thornbury was made CEO of competitor by Kinderhook, left a yr late.

• Said kinderhook not happy w/ T5's marketing services, but not sure. Alex says database is fine. No one told Alex products/database was misrepresented.
   — Kinderhook did audit of database before aquisition, had access while they were trying to bring database in house

Reports

— believes clicks are correct/accurate and opens are inaccurate. learned about algorithm and inaccurate reporting from Ryan a few weeks ago.

• No one ever reported to Alex that reports inaccurate and needed to change.
• most important part of T5's/clients is clicks

→ learned late that reps were creating fake reports. He was told there were situations where inaccurate data, need to fix.

   — Krish, sales team, Beth.

   — first conversation probably a year ago about fixing open rates. Maybe from sales reps doing fake reports.

      • never talked to sales reps. Beth told Alex sales reps were putting fake #s in. Told Beth need to report accurate #s.

      •

— Never heard (or said) about asking anyone to create or alter reports.

— Rich would overall Alex speaks about changing reports. Both re said need to keep reports, keep clients. Though as more clients used OA, needed to align reports w/ OA.

B00306357
F06833-003946789

Alex 7/9

- Michael Boy told Alex that cannot find good, real staffer for current budget and cost pocket.
  - he would say find better vendor
  - if MB asked for more money, conversation between Beth & MB
- MB raised to Alex issue of bad data (bounce backs, etc).
  - each month bringing in fresh data to address main concerns. ongoing exercise.
- ADV has data dictionary, essentially taxonomy / table layout of database

Imaging                    As of 8:55AM, July 2, 2019
                                        26.6                    12 GB
- Alex home file (on server) — 4/6 GB. (copied 12GB
- Rich home file (on server) — 5 GB

(over

- Richard has access to shared drive (even after restrict)
- Home folders now disappeared after restrict. Did policies kick in? Can't even see them. Normally would be there, just you get access denied.

- Are laptops encrypted? Login details?

Friday - arrange for computer drop off at office by Axel / FTI

HIGHLY CONFIDENTIAL

Beth Jenkins

- started March 2012 as CFO. Grew into operations, then back to Finance post-acquisition
  - 2012, 900s & $9M revenue; 2018, $26M revenue, 85/75 EEs
  - Growth attributed to good product. BJ said product has stayed same.
    "Digital marketing company" that ffffs bw email marketing, display. She says
    display always part of blended digital marketing
- Buckets of revenue — digital marketing (email); licensing; direct marketing (postal); social
  65% Digital marketing, 20% licensing

- "customers" to supplement email marketing b/ PPC traffic. the/that different to meet    email only
  client's goals.
- Q: why if KS say email, do use supplement w/ PPC? A: that's how it was always run. She
  was not familiar w/ marketing space, did what she was shown/taught by Alex/Richard
  Looking competitors doing the same thing, thanh not sure about competitor contacts,
  acceptable practice.
- Brian Moran, Dan Morris, Tanya Coker, all there pre, during, post acquisition    (previous)
- BJ needs conversations b/ EEs asking for changes so fulfillment can deliver what sales sold,
  she pushed up to Alex/Rich, they said no additional budget
  - She claims they turned down orders they were not able to fulfill
  → She does not recall any campaigns being rejected for bad data or bandwidth. She
    says that would be a conversation w/ Alex, and she would have them talk to Alex, b/c involved "data.
    - individuals b'd come to her on those issues, but she directed to Alex and she was not
      involved the not material placement
- DonKey, IQS were 2 largest data vendors, monthly update to data. $7-15k /month /ea
- Hygiene is $17k /month
- If particular-targeting data sold didn't exist, they would find "creative solutions" and combine other
  targeting datapoints to execute campaign. Alex/Ritchie/Tanya involved here. This
  never told to customers (best of her knowledge)
- BS knew reports were accurate, pieces inaccurate. Always knew, always done like that    pieces ok

HIGHLY CONFIDENTIAL

Beth Jenkins pg 2

- conversation about inaccurate reports has been had w/ Alex/Rachre, w/top & bottom
  - Alex open to change, open to listening. Rachre was "ultimate salesman."
  - old ultimately things would be cleaned back.
- Alex told BS that ADV knew what was going on, knows how business was run. BS asked Alex if ADV knows BS supplements email traffic during acquisition. BS believed Alex was referring to the inaccurate reports, too.
- Matchback defaults: Meredith, Merkel, Infocore
- Data Licensing → Alex & David McCoy. McCoy Main Salesman (other than Alex)

~~~~~~~~~~

Cruze Interview

HIGHLY CONFIDENTIAL

Richard Glück

- Started company 2003
  - end of the day, Client cares about clicks, traffic to websites, ~~data~~ clicks/buy or offers
  - seems "we never charged the SDs/invoices" - semantics, should have been "sold" to audience of X, versus email.
  - He is not "technical" guy, not involved in reporting. But clients don't care about methods, just the clicks.
- Major issue in his eyes is language/semantics on the IO&Sl/invoice, the "email/campaign" versus audiences.
- If clients are happy, that's all that matters. Agrees clarifications to clients are needed.
  - most clients (channel partners) know about supplemental traffic, not surprise.
- Q: Did ADV know about supplemental traffic?
  - A: ADV knows social, PPC, etc.
- Q: At what point did they tell ADV?
  - A: he does not know exactly how fulfillment works, what combination of emails/PPCs
    - Does not know if anyone told ADV their email included supplemental traffic
    - He said ADV knew at the beginning, discussed all products
    - he does not know specifically, he never had those discussions w/ ADV
    - claims he did not know emails not being sent. Fulfillment had the CTR, would choose appropriate media to meet client goals.

  → ~~He said he/they told Gary about supplemental traffic~~
    → said all conversations w/ Gary, would do anything to meet client goals, and IOs/SOs outdated & needed to be changed.
    - does not know if any conversations w/ ADV about not solely emails in email campaign. That's fulfillment, Ryan Bagwan.

Richard Gluck

- Does not know if anyone ever told ADV about fake report
  - semantics issue, should say "audience" instead of email sent. End of day, clients care about CTR.
  - claims Michael Bay just told him it was audience sent instead of emails sent. "No idea about algorithm". "Trusted guy", all he knows is audience was hit, and GA/CTR accurate. Not involved in nearly at all.
  - Can't speak for Alex, he and Alex are front end, no idea how reports were created. How they arrived at final reports/clicks, no idea.
- Never met w/ ADV after ethics complaints. No one asked to talk to him, he did not know anything about those. No one at TS told ADV about report, to his knowledge. He has no idea. Does not know when supplemental traffic started.
- Dave Thornbury & PE group, Kinderhook, bought TS back in 2011
  - Asset/cash buy in 2011, $11 million cash between Alex, Rich, Rishi died (11% split owners)
  - They were out, left business. Kinderhook owned for a year, claims Thornbury did not know email, was alcoholic, business declining
    - Alex/Rishi in constant communication w/ Tom Tuttle, offered to Kinderhook to buy it back for about $2 million cash, and note for $3 million
      - on paper, sold for $15m, received $11m, bought for $5m. Net $7m
- Claims Kinderhook/Thornbury made claims that servers/profit a of what was sold to save his own "css"
  - claims Thornbury brought in new data vendor that was awful, clients left
  - No one at kinderhook made specific comp
- ADV asked about this transaction, told Gary, Josh, investment bankers, due diligence, pre-acquisition. Used same investment bankers as first deal.
- No one has ever raised issues to him with reports before last 2-3 weeks.
  - was not involved in any reporting

HIGHLY CONFIDENTIAL

Robert Clark pg 3

- Says no one should modify reports, that would be problem.
  - no one ever told RG that deployed, delivered, one rates inaccurate
  - never told fulfillment to "fix" reports. Never involved in reports sent from ops to clients.

- Looking at reports –
  - says he has never seen tracking reports
  - Never heard about algorithm
- Not involved in matchbacks. Between Exps & clients. Don't know how they do that.
- surprised to hear matchbacks compared against ethnic Hypenies database.

- During client calls, no complaints/concerns. "Sign whatever," happy w/ services. Most understood it was happening (allegedly). Some said they were unaware, but comfortable. None said they would not work w/ us.

- Hypenies — Acxiom, used them since 2006
  - did it for cost, &
  - Bill Mathy, John Sawicky (?) → Alex has relationship w/ them
  - Visa is a client? Transmin is client.

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged & Confidential

### Take 5 – Eva Hodgens Interview Notes
7/1/2019: 5:30 pm – 6:45 pm

- Attendees:  Manny Abascal, Nate Saper, Setareh Homayoni and Sara Gail Prudenti (Latham), Trevor Sullivan (Advantage), Mike Wei and Christina Luu (FTI)

- Started at Take 5 in April 2016

- Initially started as Director of Digital Media, where her job was to fulfill campaigns. They needed her to help build it out.  Andrew Colwell was in charge of tracking production. He decided to leave so she inherited his two teams.  They also put content marketing under her umbrella.

- Needed better communications/understanding especially for large budget campaigns. She didn't know how it was possible when they wanted to approve things in less than 2 hours.

- Who do you feel puts you in those positions?  It was the way the company was ran; the back didn't talk to the front etc.  The big person who didn't want me to be client facing was Rich.  Senior sales people didn't like having her on the call.

- Reported to Beth Jenkins.  Most communications went between Beth and Rich.  Beth was the gatekeeper and would tell her the reply.

- Going through inappropriate practices:

  o Audiences were sold to clients that did not exist in database.  When she first came on board she wasn't given data files.  Once she got data files, she would look at the count, then look at google, and was confused.  She didn't understand how they were saying they had X amount of people when X amount of people don't even live in the state they were targeting.

  o There was supposed "shopper data" of people who purchased XYZ products. If these people really were shoppers they wouldn't get reported as spam.

  o Client services did counts and then gave them deploy file.

  o Her team did not have access to Hygenics or Ace.

  o Tanya (Director of Client Services—there for 7/8 years) or Beth was running client services.  Beth was the main person in charge because she was the "connector" of all departments.

  o Beth's team basically got everything and then gave it to her

HIGHLY CONFIDENTIAL

**EXHIBIT 14**

B00306310
F06833-003946779

Draft
Attorney Work Product
Privileged & Confidential

o   The data file either didn't match, or didn't come w email files.  They didn't get data files for all clients, it is challenging to get data for all campaigns.

o   Hygiene issues:  it would take forever to actually clean the data but this is supposed to be done.

o   If you didn't have a file how could you execute?  All campaigns were PPC.  The goal was to bring to light that we are an email house and we use a data file.  The actual model before was just to do PPC in lieu of email.

o   There was an attempted sale of the company around 2014 or 2015.  Thinks Tanya Coker was also there at this time.

o   Josh Silver who was there before left or quit.  She was probably the eighth person in her seat.  She was chosen because she had experience

o   Why did founders have to buy back company? Because what they were selling wasn't what they were giving.  She doesn't think emails were being sent before she came on board and hired Michael.

o   All campaigns were initially fulfilled in PPC.  Overtime started doing emails but weren't doing counts.

o   Referred to someone named Vic who worked with the auto accounts.

o   An example of how the data was wrong is that the data said people were Spanish speakers but then in the spam complaints people were writing back in English.

o   Told client sold contract as digital media.  She was concerned that this was email with a  2% click through rate.

o   She said they weren't supposed to be selling this and would raise the issue.  Beth would say Rich/Alex would address it.

o   She started interjecting herself and saying "we do not do PPCs" at trainings.

o   Initially raised concerns to Beth.  After the acquisition she started raising them to Alex.  He would be more agreeable than Rich.

o   Did you ever talk to Gary or Ryan?  One conversation with Gary during the acquisition.

o   There were many times where Advantage would say they would come meet with them and they either didn't show up or if they did someone like Beth or Alex had to be sitting in the room with them.

2

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged & Confidential

- o  They were coached to not go too much into detail, etc.

- Do you think clicks were actual traffic?  She knows with Pro Data, these were not actual clicks, and that a lot of that was scripted.  You do get what you pay for-- if we are only paying the vendor 3 cents a click, we are not going to get great product.

- She was told by Rich that vendors were lying to her because you shouldn't have to pay for clicks.  Vendors would start off clean but the budget would become cheaper and then this led to bad traffic.  Vendors may not have done this purposely, it was just the corner they backed them into.

- How could a third party generate a legitimate click? One company generated newsletters, banner ads, newsletter ads.  Others would add Facebook if they could or affiliate traffic (CPA traffic).  Others had their own proprietary network with their own kinds of ads.  When she audited them she would see viable platforms with the ads (advertisements.com)

- Could not bill above 25%, certain times it would need to go to 40 or 50% to get a successful campaign.

- Do you recall raising your concerns about the data to Beth or anyone?  She said she raised concerns all the time.  Michael worked with the data more than she did.  He also started working a lot w her on social.  There were uploading data onto Facebook and Twitter.

- What was their response when you raised this?  Never really got one.  Beth would say "we're working on it, talk to Alex, he's the one who manages the data."  Then it would never be pursued more.

- Alex would tell her the used the same data provider as Neustar or whoever else.  He would just provide the same answers so you learned not to push the issue.

- Another problem identified: what is a legitimate campaign?  Email only, no supplementation.  We would do an actual email drop and they would get 2%.  We had to hit 2% click thru rate or the campaign was deemed as failed and would look bad on Eva.  Would talk to clients to try to have a reset.

- They would blame it on the client and say people didn't respond to their emails because their messaging wasn't correct.

- If they wanted higher click thru traffic would go through Omni.  This means putting it on Facebook and Twitter.  Instead of focusing on opens, focus on getting people to your site, not channel partners that will use that data file.

- What % was legitimate in terms of actually delivering the percentage we said we would?  Around 2018 (maybe 2019) she was working with someone named Diane

3

HIGHLY CONFIDENTIAL

B00306312
F06833-003946779

Draft
Attorney Work Product
Privileged & Confidential

and about 80% of all campaigns did get email (whether this meant emails that were opened, inboxed, or caused a server issue is a different question).

- When she left about 50% were legitimate.  Only 10-15% had no supplementation. The vast majority had supplementation.

- Client service reps/sales reps would ask about this and complain to Rich/Alex.  They would then be reprimanded.

- Ad Taxi:  A reseller and resold the bulk of what came in to the clients.  This is the bulk of what the routine business was.

- How many clients understood they were getting supplementation?  Maybe 5-10%. They were trying to get everything to go through Omnichannel, but were not allowed to have dialogues with all the clients.

- A particular campaign may not deliver clicks they wanted and Rich would chastise her.  She would then have to prepare an altered report.  What is the scenario for this? Wasn't always Rich, sometimes sales reps would just prepare altered reports unless they got Rich involved.

- She tried to let the 2% thing drop over time.  Sometimes if people didn't want to take a certain offer (i.e., when they tried resetting with the client), she would report as is. They thought this was unacceptable and she had to fix it.

- Would the volume of the amount sent be mischaracterized?  We would say we don't have enough and they would say its fine as long as you hit the click thru rate.  They didn't report on the volume of click thrus.

- They would report on what client ordered whether delivered or not.

- They were representing that "click thrus" were click thru emails, but they were actually other types of clicks.  Even if you don't report on email version, would be report on click thru that wasn't accurate.

- How else would reports be altered?  Sometimes if they said fix it, I would tell my team not to and deal with this myself.  Rich would then say this is unacceptable or just do it and fix it.

- What about this algorithm?

  o  Believes it came from Andrew Colwell (?) and Eric Hogan

  o  She just knows they have a reporting system and they arbitrarily report.

4

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged & Confidential

- o There were clicks reported that never happened.  She believes these came from the old team, and Josh Silver and Eric Hogan in particular.  Andrew Kastle (Colwell ?) was in charge of tracking the entire time she was there until he left before the acquisition.

- Josh Silver left because of problems with previous investigations.

- In 2018, the open rates and some of the other items were still based on the formula (but not the clicks).

- When she came on board and started helping the team, that's when they started accurately reporting clicks.

- She doesn't know how the system generated the inaccurate reports.

- She believes if a client is getting a report that has a 16% open rate, this is inaccurate, although the click is correct because this comes from Google Analytics.

- We thought you said the clicks were created by formula? Yes, before she came on board.

- Wouldn't a client be able to compare their report with Google Analytics? Yes, that was a big problem.  She would look at tracking and said she needed different networks.

- She inherited tracking right at the acquisition, and was told she would be able to fix things.  A year later this never occurred.

- Any other unethical practices or practices where client is not being told accurate information?  Doesn't know

- The process typically flows as follows:  fulfillment → production → tracking

- Matchbacks were something that client services managed.

- Interactions with Rich and Alex?  It was very hard to have conversation with Rich.  He would just act like he didn't know what I was talking about and was dismissive.  He would be adamant she didn't know what she was talking about.  Alex was more of an advocate for her.

- Beth was the gatekeeper for most of the three years Eva was there.  She would address Rich.

- Why did you leave? Stressful situation, wanted change but change wasn't happening.  Stressed and toxic.

HIGHLY CONFIDENTIAL

B00306314
F06833-003946779

Draft
Attorney Work Product
Privileged & Confidential

- Investigation from mid-April:  Believes she talked to someone named Abigail about MJ who had left.

- Any data licensing questions always go through Alex.

- Tanya sent data over.  Eva only heard of some stories of people asking for refunds because the data was not as promised.

- The same thing happened with direct mail.

- She tried to get them to change reporting, and raised the issue with Beth several times.  No one ever responded to her and they wouldn't acknowledge it.

- Once she did change the reporting structure and changed what we reported without telling them.  This led to more verbal loud conversations and she was told never to do this again.

- Michael has taken the charge on social media, and was proud they were actually doing something. Geo fencing was something else they were actually implementing.

- They only guaranteed impressions.  They would make requests for data so they could match.  If they had low match rates, they would ask for fresh data.

- Beth and Alex said Advantage was aware (after the acquisition) [it is unclear what exactly they were aware of].

6

HIGHLY CONFIDENTIAL

B00306315
F06833-003946779

Draft
Attorney Work Product
Privileged and Confidential

### Take 5 - Michael Boy Interview Notes
7/1/2019: 9:00 am – 10:00 am

- Attendees: Nate Saper and Sara Gail Prudenti (Latham), Trevor Sullivan (Advantage), Mike Wei and Christina Luu (FTI),

- Background:  Joined around July 2016

- Before Take 5 he worked at LeadFlash where he specialized in online lead generation ("pay day loans").  He didn't like this kind of work at all.

- Initially came into a generic role at Take 5, similar to "digital operations."  Facilitated the necessary infrastructure to send out emails.

- What does help the infrastructure mean?

- He didn't believe there was a lot of outgoing email to audiences.  There was infrastructure to deploy tests and emails to clients, but not audiences.

- Email marketing was getting pushed out to outdoor vendors.

- He was not told they didn't have an infrastructure when he was brought in.

- He believes he was hired because they liked his experience in email marketing and CPA (cost per acquisition marketing).

- Hired by Beth Jenkins and Eva Hodgens

- He did not have any interactions with Alex and Richie as part of hiring process

- When he started, he reported directly to Eva

- If you have a large data set that is inaccurate, you can get black listed

- When he joined Take 5 was already known as email marketing firm

- Process through which he came to understand company didn't have infrastructure?

- When he first came aboard, there were two departments, Fulfillment and Production. Production was headed by someone named Andrew who left about a year ago.

- Before Eva, Andrew handled almost everything.

- In terms of getting the proper software to be able to do the email marketing, he stated there is a  "Cloud on left hand side (production side) no one knows what it is." ███

US-DOCS\109395390.2

B00306297
F06833-003946775

Draft
Attorney Work Product
Privileged and Confidential

███████████████████████████████

- Production is supposed to test all "creatives" (creatives come from the creative team within Take 5 or the client) and ensure that the creatives go "live to seeds." This means that companies that wanted the email get this email as a sample. They are supposed to load the creative onto the Internet Service Provider ("ISP"), and ensure the correct people are on the tests. "Live to seeds" refers to the clients on the lists. Then there is another step after the live to seeds process. According to Michael, it is good that it is done in this matter because you want it to be separated from the actual deployment.

- Then it goes to fulfillment. This department would ensure it would get fulfilled by a third party vendor.

- Michael clarified that by third party vendor he means Pay Per Click ("PPC") vendor. Now it is all PPC.

- Production uses IP addresses, but he doesn't think they intended to do this. Before he started their thought process wasn't to preserve IPs.

- Michael told us we should follow up with Andrew. Michael believes they never intended to send emails, based on what people were telling him.

- Andrew sat down and said they used to load it up and send it to the vendor and it would go straight to reporting.

- Why didn't it send emails? Michael believes they would need someone with that kind of knowledge. He said they never got the right people in place, and that Take 5 were "shoot by the hip people."

- He identified an ex-employee named Chris Sadaat (or Saddat?) who was had worked there for a while and would be great to learn about how the process worked in the past.

- He believes Take 5 had data, and the only way to move it quickly was email. Instead of licensing, what is an additional revenue source? Only source is direct mail and email (no Facebook, etc. at this time).

- Michael believes they need to get click thru rates up, and needed to show open rates. To do this they would bake it into reporting, which was a process that was around for years.

- Why is bulk email so hard? Because you need people to "opt-in" → people give you their email → the email message goes out → there is some sort of vague opt in process through licensed data

2

HIGHLY CONFIDENTIAL

B00306298
F06833-003946775

Draft
Attorney Work Product
Privileged and Confidential

- He said they were sitting on a lot of records, so no one knew which addresses you could actually send emails to.

- Believes they sourced data where people opted in on a website, and then went to look at this and they learned these people don't exist

- He explained that a "double opt in" is where clients opt in by giving out their email address, and then click something on the email they receive to confirm that they have opted in.

- Take 5 was saying that 200 million people double opted in.  Michael began to realize that this doesn't seem to make sense.

- Take 5 has "T5 surveys" on website (medical surveys, etc.).  He thinks these are just a front to back up data and email addresses.

- He began discussing other companies, such as Site Impact, that are upfront about what they supplement their traffic with.

- Volo is a software that allows you to utilize IPs on a server in a bigger space.

- PowerMTA is another software that allowed them to utilize IPs on a server.

- He elaborated upon bad records and spam traps.  Spam traps are when they drop email that looks real and then when you email it, it goes to spam facility.  This lets yahoo, gmail, etc. know they are spamming

- He informed us that you need to cleanse data (hygiene) otherwise going to be a revolving door

- He said that certain statistics they were being asked to achieve such as sending out 16 campaigns an hour, or 50 million records within 24 hours, were not possible.  Gmail, etc. would not allow this.

- These kinds of numbers don't just flow through, and you would have to send them in batches.  No 3rd party can get 50 M out.  Only companies like IBM, Apple, etc. can

- Every time records go out, you are theoretically supposed to hygiene the records.  This is a very long process.  Michael had conversations with Beth that they needed to do hygiene in house because it takes too long otherwise.

- Needs incoming opt in data—there is a difference between incoming opt in data and licensing data.

- He didn't understand what they were telling clients.  A year in he started to know what was going on.

3

HIGHLY CONFIDENTIAL

B00306299
F06833-003946775

Draft
Attorney Work Product
Privileged and Confidential

- Asked himself what can we do that doesn't pertain to our data? Social media.

- He didn't know where the data was coming from, and kept sending out emails and getting blocked and kicked off networks.  It was clear the networks didn't want to interact with these messages.

- Alex controls the data.  He 100% controls it, even though no one knew this.  Didn't see this until he talked to other people and realized that he was the only one procuring data.

- Alex manages the "Hygenics" relationship (the vendor they use for data).  Michael believes there may be some sort of long contract they got into.

- Believes they used an interface called ACE to connect with Hygenics.

- Believed there should have been an in house relationship with Hygenics, and they shouldn't have their database in the cloud.

- Believes sales was told something different about Hygenics and they weren't under the impression that it was as big of a company as it was.

- Prior to he and Eva working at the company, there were 8 or 9 people in their seats.

- Take 5 tried to merge with someone at some point and it didn't go well.

- Michael began to realize that the 18% open rate they were promising didn't exist.  He though they should tell clients about this.

- He said the flow of process was: he would go to Eva to complain → Eva goes to Beth → Beth goes to Alex and Rich → then the message comes back down the chain.  Beth was the middle man.

- Then there came a stage where both Michael and Eva would talk to Beth in a room.

- He said he brought up to Alex that the data was in poor.  Michael was particular concerned about "RNC data" (data on whether people where Republicans).

- He said there were many conversations and there was a consensus that processes needed to change.

- Thinks they were always aware they didn't send emails.

- Pay per click vendors: who are they and what do they do?

- Pro Data is the biggest PPC vendor.  Michael believes it is managed by someone named Jason Korkin.  Jason builds an HTML creative into his website, then populates

4

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged and Confidential

links, then assigns weighted values to those links (based on what someone is more likely to click on), then asks how many clicks you need.

- Sold 100,000 records. Take 25% of what we thought the clients CTR goal was, which was 2% of 100,000 records.

- Jason probably has proxy servers all over the world which is how he gets clicks.

- How can PPC vendors create traffic? (1) Networks (i.e., google ad words) (2) bots/proxy servers, which are programmed to make it look like these are real people. These could blend in with real traffic, (3) "affiliate networks/network traffic," where they work with other people to get a certain amount of traffic

- PPC is an inaccurate marketing science and a massive industry.

- If we went to a Channel partner, and said by the way, your email contains some PPC, they be aware of this and wouldn't understand why it was an issue (examples of Channel partners= Affinity, Adtaxi, Infocore).

- Certain channel partners were reselling services as their own. They were handing off things to channel partners and then then they would hand off to their own partners.

- These were never your reports, these went to Take 5.

- PPC = biggest cost.

- Michael was aware of communications between Jason Korkin and Richie

- Richie was the person with the main relationship with Pro Data. Jason may have worked for Take 5 at some point.

- Michael thought Jason and Take 5 had conversations in the building at times.

- If Take 5 was actually sending emails, would it need PPC? Depends on clients' expectations. If you are promising 5% open rates, then .7 CTR would be possible.

- To meet crazy expectations, we would have to use PPCs and couldn't use only direct email.

- If we are committing to send 50 M, then would need to use PPC.

- 2 reasons to engage a PPC: 1) if you're not sending emails and need traffic, and 2) the metrics are bad and PPC is going to up my metrics.

- Reporting mechanisms are the hard part.

US-DOCS\109395390.2

HIGHLY CONFIDENTIAL

B00306301
F06833-003946775

Draft
Attorney Work Product
Privileged and Confidential

- Who is responsible for reporting of metrics?

- People created formulas that would generate a script from PPC.  Believes that this script came from when Josh Silver and Eric Hogan were employees.  But doesn't know who exactly wrote it.

- This script is the same thing as a desktop application.

- Do you know who wrote this script?  No, just know it was from around this time of these 2 people.  Josh Silver and Eric Hogan.

- Every time someone had this script, they wanted to get rid of it and hand it off to someone else.

- About a year and a half ago he became "Director of fulfillment" and realized this.

- Gave email to Rachel.

- People thought "emails lost"

- Believed 2 or 3 people were actually emailing: Rachel, Monique, and Mason (part time).  They work under him.  Core of people who bulk email and other people do it in cross training.

- He noticed around February that people who worked in tracking (Corey?) said the reports weren't right, and he asked Ryan about this.

- Brought up the fact that there were 168 million double opt in records, and this seemed excessive.  Alex said he agreed.  This conversation was around the end of February or March of this year.

- There was a power switch when Eva moved out.

- Michael told them to stop selling double opt in email.  He knew they didn't have double opt in email.  He knew it because he mailed to it.

- He said "double opt in needs to stop," our counts need to be accurate. Doesn't think all counts were reflective of email. The rest were backfilled with postal (as opposed to email). Not knowing what was being sold or said.

- He brought to Ryan McGavran's attention that Corey in tracking was flagging attribution from our client based off our database.

- "Matchbacks" were not reflective of what happened at all—and certainly the email portion.

6

HIGHLY CONFIDENTIAL

B00306302
F06833-003946775

Draft
Attorney Work Product
Privileged and Confidential

- Who creates Matchback reports?  Majority go to client services or are sent to Hygenics. They are supposed to flag individuals from this file to our database.

- Believes it was obvious to Richie and Alex that they didn't have the double opt in. Michael sent emails about this.

- Ryan is friends with Richie and Alex.

- Michael heard about the Matchback thing before he had lunch with Ryan.

- There was a push from Advantage to make sure they hit their numbers and got revenue.  The can't hit the revenue they want if they do it appropriately.

- Beth said the PPC traffic was fine.  Alex said Gary knows, its fine.  When they were getting acquired, he was supposed to get 250k 2 years after the acquisition.

- When they were getting acquired, someone named Chris O'Dell (?) had a negative reaction.  Have apparently been merged before?

- David Thornbury was the ex CEO of take 5. He merged with Take 5, fired Alex and Rich off the bat and they were forced to buy back the company.  The only thing Michael can think of is that Thornbury came in, saw what was going on, and freaked out. Michael said it is odd because if you google this, you see articles about the merger but not much about what happened afterwards.  Believes they changed their name from Take 5 Solutions to Take 5 media afterwards

- Believes Alex and Rich were just 2 owners making money "hand over first" on data and were not putting it back into the company.

- Recalls a Christmas party where Rich thanked him.  He believes he was thanking him for the acquisition.

- Michael was the only hire with experience in the email industry.

- Believes there were issues with reporting, with what clients were actually sold, and bad actors maybe in sales as well.  He believes that campaign execution was hidden from certain clients (but that the majority of clients wouldn't have cared).

- Recalled someone named Caitlin Crowley who worked with Josh from Advantage. He thought it was odd that people were sitting with Beth right after the acquisition. He recalled feeling as though he could not talk to Caitlin because Beth was in the room.

- Beth has motherly instinct re: protecting people.  Believes she fears Alex and Rich and was trying to protect them, not acting in a malicious manner.

7

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged and Confidential

- Rich would yell at people to change reports and give them a higher open percentage. Michael recalled an email chain with Esteban, Corey, and Eva. He said Rich yelled at them and they had to work until 12 at night to fix a report. Rich said "what the f*** is going on get these f***ing reports out." Esteban said similar things happened to him. This occurred within the last year and a half. Around 12 employees were on the chain and Rich was very rude to Eva.

- Believes this was from either a cruise line or automotive client. And that it was either a client of Tara Finger's or MJ'S (Mary Joseph).

- Eva's goal was to bring down client expectations on reportings.

- Believes Richie is now saying he might get $500,000 within the next two years. But could not provide documentation of this. Sales reps could've left because of the commission restructuring and the fact that they realized they weren't going to get the money.

- There were rumors Alex wanted to change but Richie is the majority owner.

- Looks like two guys making money hand over first selling bad data.

- Office is gross. He cannot see where money is repurposed back into the company.

- Beth was taken advantage of.

- Cogs = cost of media. (someone gives you 1k, you only spend $250)

- How did they make money? Through the channel partners. There was also a lot of "churn and burn" where people come and spend money and then leave and never return as a customer.

- Customers where there is a social or ad display or social and ad display component come back. They are only allowed to use 25% of what the customer is paying them to deliver a product.

- They would blame the bounce rate on the fact that sites took forever to load, and come up with reasoning to figure out why clients campaigns didn't do well. In reality campaigns failed because they were using robots instead of actually sending out emails.

US-DOCS\109395390.2

HIGHLY CONFIDENTIAL

B00306304
F06833-003946775

Draft
Attorney Work Product
Privileged and Confidential

## Take 5 – Prima Creel Interview Notes
7/1/2019 2:30 pm – 4:30 pm

- Attendees:  Nate Saper and Sara Gail Prudenti (Latham), Trevor Sullivan (Advantage), Mike Wei (FTI)

- Started December 15th, 2018 as Senior Director of Sales; has been at the company for around seven months.

- Was initially reached out to by a recruiter

- Previously was the as Senior Director of Sales for Matomy/Whitedelivery, which is a marketing company based out of Israel.

- Take 5 was/is known as an email marketing company that could target down to zip code.  This is unusual.  Usually email marketing companies can either only target nationally or can't target.  Usually if someone is saying they can target nationally, they are using someone else's data

- Matomy's ran on performance.  The client only pays if they achieve certain activity (i.e., click-throughs, leads, sales).

  - CPC's (cost per click), CPL's (cost per lead), CPA's, (cost per action) etc.

- In email campaigns, CPM means cost per thousand emails delivered.  This phrase is commonly understood in the marketing industry to mean this.

- Within minutes of emails actually being delivered, you know how many have actually been sent.

- When she first started, she wanted to solve some issues, such as the fact that there was a high turnover of clients.  She called these kinds of clients "one and dones."  They had about a  1% retention rate, which is very low.

- She has her masters in strategic marketing.  When she started, she wanted to see why Take 5's marketing campaigns were failing.  She was getting vague answers regarding reporting.  So, she created her own spreadsheet and then went line by line with everyone on the team about why the client said they didn't return.  She noticed the clients often left comments saying "QUESTIONABLE TRAFFIC."

- Believes there are 450 clients that have booked since January 2019.

- What do you mean by vague reports?  She said after she was getting vague reports she decided to contact an old client of hers (from before Take 5), and asked them to run a campaign using Take 5's data and tell her what it looks like.

US-DOCS\109402098.2

- Every link is supposed to be unique.  Her old client ran the campaign and told her he could tell this was not real traffic.

  - How could he tell?  He said this is an absurdly large amount of clicks with no conversions (conversions = the person getting the email making some sort of next step, such as clicking on something, etc.)  It was really just a flood of clicks, not any actual traffic.

- She found out about this and forwarded the results to Michael Boy on the backend.  He thought she was just telling him to send more traffic (apparently a common practice).  He then sent additional "useless bot traffic."

- Around February 2019 she decided to corner Eva Hodgens.  She told Eva that she can't run a sales team if she doesn't know what exactly they are selling.

- Eva admitted they use supplemental traffic.  This is not a normal practice.

- They pay for supplement traffic ($3^{rd}$ party web traffic) and then drive it to the customer's landing page.

- Prima told Eva they needed to either be upfront with customers about the fact they are using supplemental traffic or use the Omni, "blended," campaigns (i.e., those mixed with services other than emails).

- Hasn't been able to get a real email report.  Got her first real email report about a week ago.

- She pulled a report out of their internal program (Campaign Manager)

- The report said out of 10k sent, only 2k were delivered, and there were barely any clicks.

- Postal data was being used a lot more than clients thought.

- 3rd party web traffic is very looked down upon in the industry.  It is usually used just to pad metrics and is considered fraudulent.  This is why it is so important to sell the blend and not just email

  - Used a company called Taboola.

- The blend refers to combining email, social, and display (google ad words, etc.).  It is legitimate.  But, if you send to $3^{rd}$ party web traffic, then you are going to get crawlers and bots.

- Believes they are still adding supplemental traffic into the blended campaigns

- Had a meeting where she said we need to sell the blend.

2

US-DOCS\109402098.2

HIGHLY CONFIDENTIAL

B00306337
F06833-003946783

- Believes new clients probably didn't start truly doing the blend until a few weeks ago.

- Did get a new contract they were supposed to use for the blended product, but was not being provided to the clients as much.

- Around 2 weeks after Ryan McGavran started (around January 15, 2019), she went to his office and said there's something wrong. She said the reporting is not right, and the product is not what we're actually selling. He told her to gather data and we will fix it.

- Around two months later she told Gary Colen she wasn't comfortable. The situation had been getting worse and worse.

- She doesn't think they knew the scale of the issue until about two weeks ago when they created a large PowerPoint presentation to share with the company.

- One of first things they did was to create a set commission plan. The previous plan had no goals, no CRM (customer relationship marketing).

- Mary Jo Benjoseph ("MJ") was very close to Rich and Alex. Believes she filed a couple of ethics complaints, one saying Take 5 was a "boys club" and one about the email campaigns. She didn't know about supplement traffic until she brought it up.

- There were no communications about the supplemental traffic to clients. People have spent millions on products they weren't getting.

- Did anyone come back and say they just wanted email after you offered them the blend? PA Media found out they were getting supplemental traffic. They saw one of their ads on twitter but kept running. Michael Boy dealt with this.

- Any confirmation that they were getting email and something else? No. This company has booked itself as an email marketing company.

- Believes they stopped email campaigns 100% about a month ago.

- "Inboxing" means the email actually reaches the inbox.

- ISPs = Google, Yahoo, etc.

- Marketing collateral has changed and does not say they can achieve 99% inboxing anymore.

- They've reached out to all clients to try to get them to do Omnireach or convert, but have not told them about the supplement emails. She said we are no longer going to be using the email campaigns and here is why.

3

HIGHLY CONFIDENTIAL

- Why did clients stick around?  Most of the Channel partners are 3$^{rd}$ party resellers (agency or publisher, like a tribune).  These are most of the clients that stick around.  This is because as long as they are having an overall successful campaign, it is easy for Take 5 to slide in.

- Tribune:  sells print, inventory on website (banner ads), and inventory on social feeds.  They use data for this.  The kind of data they use depends on client.

- Raised the issue to Ryan around January 15, 2019.  She spoke to Gary herself between mid-end of February 2019.  Ethics complaints were raised in April.  When Advantage found out, Gary needed a solution so he could understand the plan.  Prima then sked for week after week pipeline weekly reports.

- She also asked for email when she found out about the supplemental email traffic earlier.

- Ryan finally said we need a third party auditor.  Also brought up need for third party auditor to Corporate.  Had also asked Gary beforehand. ███████████████ ████████████████████████████████  We have dates of ethics complaints.

- The main issues:  emails not being sent, supplemental traffic, and randomly generated reports.  She has been told Alex and Richie have always known about these practices.  She was told by Michael they have known this since Day 1 of the business, but she doesn't know.

- Rich is the wildcard and would do something crazy.  He is more of the energy and sales guy.

- Alex is the smart, data guy in the back, and the brains.

- Originally thought only Rich was guilty, now thinking Alex is guilty too.

- Nate asks to walk through Take 5's top 15 clients.  Who are these? Direct? Reseller?

  o Infocore:  Alex's client.  A reseller.  Don't even have contact for them, don't know what they run.  More protected, wouldn't be interested in email only.

  o AdTaxi:  A very high volume channel partner.  They have their own dashboard where orders come in through Alex.  Sheri (client services team) processes all orders.  Probably do not use true counts and create randomized reports.

    ▪ Use Hygenics for them.  15% randomized file.  Adtaxi gives targeting selects such as "pregnant women 25-35."  72 hours later they would say need 15% of this open rate to deploy off this.

  o Verizon:  Alex's account.  Kept very far away from it.  Thinks it is data licensing.  Data licensing is on the up and up as far as she knows.

4

HIGHLY CONFIDENTIAL

- One way you can do data licensing this is through LiveRamp.

- Thinks they are only a data partner.

o Meredith:  A very large publisher, similar to Tribune.  They also do TV and radio, not just print.  Channel partner.  There is a data licensing agreement with its parent company which Alex uses.

- Take 5 runs off Meredith's data sometimes when they work with their Corporate office.  She doesn't know what Take 5 is doing with Meredith's data.

o Affinity:  Don Morris's account.  High volume. On Omnireach.

o TMA Direct:  Has always been an Alex account.  Alex gave the account to his friend, Mark Adams, to help him out.  Believes Alex gave him accounts so he could get paid.  Believes it is a Channel partner and they are pretty upset and just asked to audit Take 5's balances.

- Take 5 runs off their data too.

o Neustar:  100% data.

o ACT:  Data

o Mediastorm:  Works with cruise lines.  Thinks they were getting email only and are a Channel partner.

o Refuel:  Channel partner, agency, works with Take 5 on campaigns

o Merkel Data Technologies:  House account close to the top, data licensing

o Untuckit: direct.  Have not rebooked—it is currently a big question if will they come back.

o prMedicx/Healthy Offers:  Channel partner.  Have to correct these reports often, the old sales rep was not giving accurate figures.

o Infogroup MA:  She doesn't know much about them. House account kept close to the top.  Channel partner.

- Also do data with them.

o AMSI Auto Mgmt. Services: sounds like a channel partner.

o Accenture:  High volume channel partner

o Criswell:  Agency for automobiles.

US-DOCS\109402098.2

HIGHLY CONFIDENTIAL

B00306340
F06833-003946783

- Why do the clients stick around?  If you get a marketing budget, you have to use it. They have no need to start investigating until things go bad.

- You really can't guarantee click thru rates and open rates. If you are doing this then it's a red flag.

- Back of house was applying 2% CTRs to everything carte blanche.  If you were not making this then Rich would say you better make that hit, add traffic to do so.

- Now Take 5 makes it clear they don't guarantee CTRs.

- This is a bad cycle because if they stop w the 2% CTR the clients will get mad.

- Tara Finger and MJ were the strongest on CTR.

- Where do tracking reports go?  No one knows.

- Reports are always in PDF format.



6

US-DOCS\109402098.2

HIGHLY CONFIDENTIAL

B00306341
F06833-003946783

Draft
Attorney Work Product
Privileged and Confidential

**<u>Take 5 – Tanya Coker Interview Notes</u>**
7/1/2019: 12:30 pm – 1:45 pm

- Attendees:  Nate Saper and Sara Gail Prudenti (Latham), Trevor Sullivan (Advantage), Mike Wei (FTI)

- Started in 2011 as Alex's administrative assistant

- Worked in client services for a few years.  She was the only one at beginning and running it.  Once the company started growing, she became Director of Account Management.

- Account management does not bring in revenue.  They create the sales order.  Sales reps have the quote ready and we make the sales order.  They then go to the client and they sign off on what was sold to them.

- Sales orders are more basic than SOWs.  Listed under "digital media."  Have quantity of campaign → so if going to 100,000. If going to live one drop or two drop, and then their selects, if targeting parents w children, etc. and then the pricing.

- Quantity: 100,000 records.  This means deployed or delivered, depending on the client.  If the client wants to deploy 100,000, just send out 100,000.  If they want 100,000 delivered, they would have to send more than how many they actually want delivered.

- The production fulfillment team would be the ones to actually deploy the quantity.

- Michael runs production, fulfillment, and tracking.

- A "drop" is a live campaign.  Client can choose to deploy one time, aka goes live one time, or can go live multiple times.  If a campaign has an expiration date next month, would have multiple drops.

- There is no set pricing.  The first drop is usually the most expensive.

- "Selects" are certain demographic information that comes from sales teams.

- Before sales orders are created, we work on "counts" and variables with the sales reps.

- What do you mean by counts?  This is the quantity available for deployment.  We either run counts with Hygenics or Ace (mirrors our database).  Can also run based on geo and demographics (i.e., hobbies, interested in travel or magazine)

- Hygenics is used for very detailed counts.  The automotive database is on Hygenics.  Prenatal and brides to be are also on Hygenics.

US-DOCS\109399831.2

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged and Confidential

- Data source comes from IQS Holdings and Dankay (?). This is not her responsibility but she sends Hygenics emails. Alex gives approval for wires and which data is coming in. The source will tell him "auto owners is ready, let me know if its approved and I'll send Tanya the wire request." They send the wire request and Tanya sends out the wire.

- She is not involved in data source vendors.

- Hygenics runs through "FTP."

- Alex is only one dealing with vendors.

- Hygenics deals with the whole database. They don't have their own software to deal with this. Some files are too large to open. Any files we need come from them on the "FTP." They do what we tell them to.

- Could house data internally, Take 5 just doesn't have the software.

- May have security database, thinks they house other data.

- They can open up the range a little bit if they need to hit certain things. Sometimes this was discussed with the client but not always.

- They are supposed to run the count and make sure they have enough data before they deploy the campaign.

- They changed the process when Ryan came on board to start figuring out the count earlier before confirming with the client.

- They may let client know via email that they may need to expand the radius.

- Once we have the count we request the creative aspect. The seeds come from client and marketing team. Then you have the live seeds, pull the deployment with Hygenics, and then goes to Case Manager (an internal software used to communicate with customer service and production).

- Import creative, front line, subject line, seeds, quantity, selects, file

- Lead time is usually between 24 and 72 hours. Her team gets deployment file from Hygenics. Hygenics file consists of first name, last name, postal info, email info, and phone.

- Why postals? We wanted to give them the largest quantity so we would just give them count on postal (because our database has more postal than email and phone)

- It was just standard to use postals.

2

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged and Confidential

- She was trained by Heidi when she started and Heidi did the postal.

- Started as a PA, before this worked for liberty property trust in client services.

- Did anyone say 72 hours was issue? Sometimes they would but we work together. If quantity is extreme (10 mil), then we would give client notification via email.

- They are supposed to work with production to get the campaign out. They would make it happen, and just deploy the campaign live.

- Campaign goes live, then on the 7th day or they would go to Campaign Manager and pull the report from there.  This is then uploaded by the tracking team. This team is under Michael and consists of Esteban, Corey, and Calvin.

- In the past, numbers have been modified.  When Tara Finger left (a sales rep), she had a lot of hands on various tracking reports for her clients.  These were all in excel formats.

- A year ago this phased out.

- Does your team have revenue or sales targets? How are you evaluated?  We are compensated off the accounts we manage.  We get an automatic percentage of sales for opening the account and keeping client happy.  Sales reps don't really deal with day-to-day activity.

- Account managers and sales reps used to share clients/profits, but it is no longer set up like that.

- Is every account manager compensated the same?  No, some have a different percentage.  Before Advantage came on, sales rep only gave them a certain % compared to the others.  Now they signed a new contract with Advantage, but some are still compensated a little differently than others.

- PPC?  She knows that its done but doesn't know how.

- What did you know about three months ago?  Just knew something on the back end was happening to drive traffic.

- How did you learn about this?  She also used to process the PPC invoices for Beth. These contained the job # and pricing.  Majority were $120/campaign.

- She never talked to clients about how many emails were being delivered.

- Ever talk about "supplemental traffic?"  Is it your impression that clients thought what they were buying is email impressions?  Yes

3

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged and Confidential

- Impressions started recently, used to run based on quantity.  They were running count and giving them record of what we're going to deploy to

- When they introduced Omnireach shortly after Ryan started, there were using impressions.

- Omnireach is based on impressions and not just email but social and other factors as well.  Ryan changed it to what it is now.

- What drove this?  When we learned Advantage was coming on knew had to change.  Things weren't 100%.  Did anyone ever say things weren't being done 100%?  Michael brought a lot of it out to light and it all started to make sense.

- There was a meeting 2 weeks ago re: Omnireach led by Ryan with Gary and Alex.

- Before that meeting, they started having meetings with clients to explain.

- Long term clients like Infocore that do strictly email will have a hard time.  Their client is Nissan.

- Doesn't think any client would not be upset re: PPC.

- Some clients would ask for customized tracking reports, like Infocore.  The tracking team prepares these and Matching reports.

- The Infocore relationship:  Amy Mcnabb, Denise Covington, and their assistants Melba and Siringa (?),

    o   Works with Epsilon

    o   Amy and Denise are the sales reps for Infocore.  Infocore sells to Epsilon, then Epsilon sells to Nissan

    o   Opt out info is on bottom of email

    o   Epsilon is also a client

- Responder files (have openers and clickers) and matchback files ("used randomly and differently")

- Files that come back from the client are then used to match sales data to our data.  Want to make sure campaign did well.

- Run through geo area on database, send this to Hygenics and ask them "could you please run this sales for the geo the campaign ran and match it."  Communications with Hygenics were via email.

4

HIGHLY CONFIDENTIAL

B00306295
F06833-003946774

Draft
Attorney Work Product
Privileged and Confidential

- Sales matchbacks were done by account managers. Responder files were managed by tracking team.

- Tracking reports were generated by a formula. She doesn't know exactly what the formula is, but it is being generated. There was a platform that Beth worked on with Peter from 12 Skies that generates these reports based on the formula.

- Eric Hogan used to work for Take 5. Beth took over the program with Peter.

- Majority of people at Take 5 knew about this program.

- Eric was working on this about 5 years ago.

- Why did this need to be based on formula? It was based on click through rate and open rate.

- Our data sources weren't good at hitting metrics. It was really just Alex and 2 data sources. Just these 2.

- Alex knew the data needed a lot of cleaning, but he said to proceed anyway.

- Responder files → consists of emails flagged with openers and clickers

- Are you familiar w a client called TMA? That is Tara Fingers' old client, and some of the campaigns that were adjusted. The majority of the campaigns were adjusted and it is a channel partner like Infocore.

- Relationship with folks at TMA? She knows James. Jody is the Take 5 account manager who works directly with them.

- TMA also gives Take 5 data sometimes. They give Take 5 data and then they are supposed to do the email deployment.

- There is a low percentage of clients that just want us to deploy. Mom and pop shop recently hired them just to send out 200 emails to a handwritten list.

- The acquisition process happened quickly, and people chose to be transparent about what was happening. Who wanted to be transparent? Michael, Tanya, former sales reps.

- She knew last year that not many emails were being sent out.

5

US-DOCS\109399831.2

HIGHLY CONFIDENTIAL

B00306296
F06833-003946774

Draft
Attorney Work Product
Privileged & Confidential

### Take 5 – Alex Radetich Interview Notes
7/2/2019: 12:00 pm – 1:45 pm

- Attendees: Manny Abascal, Nate Saper, and Sara Gail Prudenti (Latham), Trevor Sullivan (Advantage), Chris Brown and Christina Luu (FTI)

- [NTD: Most of the below are close to verbatim quotes from Alex—I've omitted quotation marks].

- Had a conversation about supplemental traffic last year when I first talked to Gary. I think it was June 2018.

- The conversation was about someone internally mentioned that we were doing supplemental traffic. There was a whistleblower/ethics complaint.

- I said yep, we do supplemental traffic, we do other things as well.

- What is supplemental traffic? Additional channels (such as video, social media) that generate additional traffic on top of email.

- When is this used? If you have a client that is trying to achieve a certain click thru rate for example. We have clients who want a certain amount of click thru rate.

- Can't achieve this through email only. Email itself gets blocked, put into spam.

- This is because of hygiene and quality, and also the content that is being sent. You can be challenged by ISPs if your list isn't clean (high bounce rate or complaints from consumers (reporting as spam) or can get blocked because of content (ex- because it's inappropriate).

- What if you are contracted to send 50k emails, and then on top of this you add a certain amount of emails? This would be an example if there is a need to meet a certain rate. Click thru rates are anywhere from .1 percent to 1%.

- Some of the other rates that have been pushing 2% guaranteed rate.

- When he explained supplemental traffic to Gary and Josh in 2018, he showed them there's a portion for this, portion for this, and portion for this.

- Any situations where it called for X amount and Take 5 was doing less than this? They didn't ask about it and he didn't tell them.

- What was asked about and what was said? They said I hear you guys are using supplemental traffic, I said yes we are using this in certain occasions. Digital can include a number of things. They were under opinion we were using email only and I said no.

Draft
Attorney Work Product
Privileged & Confidential

- There are certain circumstances where clients agree to other things?  We have "multichannel" clients like Epsilon where we itemize and say ok this is how many emails, how many banner ads, etc. we are going to do.

- Did you tell Gary and Josh that sometimes you use supplemental traffic in times where clients only contracted for email?  No they didn't ask about that and I didn't know about it.  Didn't know about it until this investigation.  Before this I was told that we are launching 60-80 M email a month from Eva and Beth.

- Did they say were not sending as many emails as were offering to clients?  I don't know I don't remember that.

- So you never believed Take 5 was sending fewer emails then its company requested?

- No.

- When did you learn this?

- I guess through this investigation.

- What do you recall being discussed about in terms of what customers were told?  Customers were told if we are short on email, we're going to try to over deliver if we have enough.  Otherwise need to generate other forms of traffic.

- Was it discussed that emails would be supplemented if they were short?  I don't think so.  Did you talk to anyone when the employee complaint came in?  Yes, through Gary.  Learned about this when we had a conversation about how we used supplemental traffic and when we used it.

- There are situations where we do use PPC, and he asked for invoices, and I showed them three samples of invoices.  We did not hear anything after that.

- What else was discussed?  I think that was about it.  They were asking about what we do and how we do it.  We discussed that and I showed them very openly.

- Other issue: reports going out are not actually reflecting number of emails sent.  Was that ever raised before the last couple of weeks?

- Not to my knowledge.  Unless they had conversations w Michael Boy, but unless Michael talked to them about that I'm not aware about that.

- Nate asks about reporting.

- Algorithmic portion of reporting:  I really didn't know how this was being done.  I didn't know how they were building these reports for opens.

2

US-DOCS\109422494.2

HIGHLY CONFIDENTIAL

B00306326
F06833-003946782

Draft
Attorney Work Product
Privileged & Confidential

- First time I saw this is when Ryan McGavran showed this to me on his phone.

- Nate says are you talking about these reports? (shows FTI's tracking reports).  No, these are the end reports, he showed me the formula for the algorithm.

- Did you ever talk to anyone at advantage about inaccurate reports to clients?  No

- Did you talk to anyone at advantage about the database?

- Yes, we talked about the database even during the M&A process.  Have had a large database for years that we've compiled.  Contained different lifestyle triggers, email addresses, phone numbers.

- Any discussion about database not having what marketing collateral reflected?  It has been changing, some have been discontinued because they are no longer active.

- If you are a list buyer or agency trying to find a list you would log on to Nextmark or SDS, and find say a database on active moms, and ours would pop up there.  Haven't done best job of updating.  Some segments aren't active but are still on there

- What does that mean?  Every two years we do kind of a sweep and say what is the size of a file because they change about every month.  Going to fluctuate.  Some segments, like active moms for example, aren't definitive.  As a title you wouldn't say "ford owners" because that is definitive, it's more like "active moms," which is inferred based on a certain segment.

- Conversations with advantage about this?  To me this was understood, this was industry talk.  For things like active moms, pre-mover (someone who has put up their house for sale) industry infers clusters or prisms based on demos or lifestyles and that is what they are portraying as diff segments.

- When Take 5 says we have a database of health food aficionados what does this mean?  We would get healthy consumers, get Florida footprint, and then look at people who go to restaurants.

- What databases or data sets go into this? (1) health conscious consumers (2) people who eat out (3) people who live in Florida.  These are 3 potential data sets you might have purchased.  To me this was understood, industry stuff.  Gary and josh are in our industry and would've understood this.

- Example: recently built campaign for women with grey hair.  Women w/in our data base 55-70 and then looked for look-alike audiences on Facebook.  Also pick up newsgroups, chat groups, etc. and that goes into building the audience.

- Was the issue of matchbacks ever discussed with Advantage?  Can you walk us through how that issuer from last summer came up and your knowledge/involvement

3

US-DOCS\109422494.2

B00306327
F06833-003946782

Draft
Attorney Work Product
Privileged & Confidential

of it?  Someone on content staff, which was a division we had.  Did not see complaint, but understood he was saying there was supplemental traffic used and that's what was raised in the conversation we had with Josh.

- Other than that did you have any connections other than anyone at Advantage?  Do you know if they met w anyone else at Take 5?  I'm sure they interviewed people and HR did interviews but I'm not sure.  Didn't sit in on any of these interviews.

- Any instruction on what to say during these interviews?  I was told what the subject matter was but wasn't given full complaint.  Didn't give anyone instructions on what to say to advantage

- What about complaints from March or April of this year?  There was one about sexual harassment that led to firing a sales manager around Jan. or Dec.

- The latest complaint came after we reduced the commissions.  We tried to restructure some of these greater or better legacy reps.  Lead to a little bit of a lash back.  One tried to extort us because she felt that she was unhappy and she raised complaint.  There was also an issue with her son.  Thinks they complained because they were disgruntled.  Complaints about database, ethics, how campaigns are run.

- Who did you meet with about those kinds of complaints at advantage?  I think Patty Johnson on the HR side.  Also a girl in Georgia.  She's on the investigation side.  What was discussed?  She asked specifically whether we discussed this future of her son working for the company; there was a discussion he was under her wing.  This is all prior to the ethics complaint and what I think led to it.  Launched complaint because she said we were treating her son unfairly.

- As far as we are concerned, especially Gary, she was out of there.  Felt that she was privileged and had other offers on the table.  Said she would need $100,000 from each of them.

- She was placed on administrative leave and then once package negotiated, she left.

- Before ethics complaint, spoke to Patty Johnson (HR) about how she was trying to expropriate this data.  Himself, Ryan, and Gluck were all trying to figure out what they should do.

- At that point, Cruze Mair put a lock on her computer and stopped access.  She tried to get him to turn around and give her data.  Then she started downloading data.

- Then she went to their contractor, Craig Winnegrad (?), and he gave her access that night.

- She was put on administrative leave, the investigation came after that.

4

HIGHLY CONFIDENTIAL

B00306328
F06833-003946782

Draft
Attorney Work Product
Privileged & Confidential

- During that conversation or any other did you discuss any of the substance of this employees complaint or was it all about what to do with her son?  We had a general discussion, Richard Gluck and I, about how to handle him.  He was remote in California.  She was looking out for him and giving him a lot of leads.

- We said we would love him to stay, son said he would.  After mom decides to bail, that's when he said he would leave too.

- In ethics complaint, this employee made allegations about quality of the database.  Any conversations about the substance of this?

    o Sent to Mary Jo about particular topic.  Of course we have this demographic.  Some things we have and some we don't.  Some of this stuff we clearly did not have.  This person as a sales rep was selling things we didn't have.  When I started talking to her, tried to set the table straight and said we have this we don't have that and set the table straight.

- Any conversations with Advantage about potentially inaccurate reporting?  No.

- Any discussion of use of sup traffic w/o clients knowledge?  No, only showed them what we were doing and showed them what an order looked like with supplemental traffic.

- <u>Buyback of company</u>:

- We were (around 2007 or 2008) going through a PE group that was spearheaded by a gentleman who used to be in our industry.  David Thornbury.  He bought and sold smoker data, voter data.  Said were interested in acquiring you but the recession hit and the conversation got picked up again in 2010.  There was an LOI in 2008.

- Exchanged pitch materials and bank was engaged (Petski).

- At what stage did it fall apart?  Didn't fall apart, they just couldn't get funding.  Silent from 2008-2010.

- 2010:  At this point, Petski (bank) wasn't involved.  Directly with us, no representation.  Thornbury was going through Kinderhook group (PE firm).

- Started whole thing over again.  Due diligence probably lasted about 11 months.  Deal = ¾ cash and roll over into new company.  There were roll over shares from old company into new company.

    o Overall price was 14 million in total, including roll-over.

- Wanted to obviously have a great role in new company because we realized David had been out of the industry for a long time and didn't really understand.  We felt we

5

HIGHLY CONFIDENTIAL

B00306329
F06833-003946782

Draft
Attorney Work Product
Privileged & Confidential

would be able to have a free hand of running the business.  Felt that we should be running the business, we stayed on as employees.

- David was still there but he started making moves.  Hygenics data is an outside management company.  Storage, sequel, and all this other stuff.  Fully managed stuff.  Only paying them $12,000 a month.  David wanted to get rid of them and use his own data center.  This created friction between us.  Also started spending money on new movers, which was same data he had.  By 2011, this data set was not a novelty even though it may have been in 2004.

- Having unique data sets = very important.  Part of what sets Take 5 apart.  We take pride in this.  Newly engaged, etc. are harder to catch because they are going through a lifestyle change.

- Vendors you buy data from?  We use Dankay (supplies data for newly engaged, newlywed, divorced, wedding) and IQS Holdings which does all the more general stuff (auto owners, general consumers, some specific files such as voters for example).

- Consumers could go to these directly, but a lot of times they aren't readily apparent, can't look them up and see what they do.  Can't buy regular data off the shelf.  We also do other things with the data.

- Disagreed with Thornbury wanting to swap it out a) cost, b) felt threatened because he was bringing in his own people.  Created conflict with us because Hygenics data was a trusted supplier.

- Thornbury thought it would be cheaper to do in house, it didn't wind up being cheaper.  Moving data in house was started, when we parted ways, he wanted to get a copy of that database, which we gave him.  Why?  Part of the deal, he said I wanted to be in the business, but I don't want to compete with you.  Said we will give you a onetime shot of the database.

- Also conflicts with his management style, he was very brash, very loud.

- Ethics complaints against Thornbury later on.  Discrimination suits by someone who was African American and also a sexual harassment complaint that him and the company settled on.  That was part of the buyback too was for him to accept liability about this issues (or for Kinderhook to).

- Also broke bank covenants fairly earlier in the process.  Also a capital call which we did not participate in.

- How long after the acquisition were you and Richard fired?  He was fired in Nov. or Dec. and I was fired in Jan. what was reason for termination?  I don't remember,

6

US-DOCS\109422494.2

Draft
Attorney Work Product
Privileged & Confidential

there was not a letter or anything.  Nothing, no reason given.  Just met us in a parking lot and said give us your keys.

- Acquisition was in February 2011.  Richard terminated Nov/Dec. 2011.  Alex terminated in Jan. 2012.

- What was next interaction w anyone about Take 5?

- At some point, the buyback happened.  Call from Tom Tuttle (the managing partner at the PE firm).  This was sometime in February (shortly after he was terminated).  He basically wanted to come to a deal to buy the business back).  Why?  I don't know, the business by that time was really declining.

- Negotiated a deal and bought the business back.  Bought it for all together 6.5 or 7 million.  Sold it in early 2011 for 14 million, bought it back in 2012.  Cash at the table was about 10.  Roll over stock was cancelled.

- PE firm gave no reason for why it wanted to sell the business?  Thornbury wanted to move on so they were looking for other opportunities.  Bought competitor within 13 months (Specialists Marketing Services—they compete in the same space).  They still own SMS.

- Thornbury was the CEO of SMS, not even there for a year.

- Did anyone say quality of business wasn't what we anticipated?  I think database was fine.  David was the database guy.  Email, marketing, weren't happy about that.

- Why would they not perform?  Lists were maybe not clean.  Offers being sent might have had high bounce rate.  2 different things that could lead to it not performing.

- Did anyone think what had been sold had been misrepresented?

- They did an audit on the database too.  When they were doing their due diligence.  Before the acquisition.  Also had access to the database when they started bringing in their own data center.

- Reports are going to have opens, clicks, # of delivered, how many were desktop, mobile, etc.

- Do you believe those reports were accurate?  I think that the clicks were accurate.  I think the opens are not accurate.  When did you come to believe the opens were not accurate?  When Ryan showed me that algorithm in the last couple of weeks.

- Before that, had any said our reports are inaccurate?  No.

7

US-DOCS\109422494.2

HIGHLY CONFIDENTIAL

B00306331
F06833-003946782

Draft
Attorney Work Product
Privileged & Confidential

- No one came to you and said these figures aren't right we need to fix it? Well they told me they would need to supplement traffic. That I knew about, but not to what extent and when.

- The most important part of the traffic is the good response rate that they can verify (the clicks).

- So no one said to you at any time I think our reports were inaccurate and we need to change them? No, but there were sales reps who were basically doing their own reports to please the customers.

- Did anyone ever say the reports were inaccurate and they needed to fix them?

- No; some reps were used to doing whatever, especially with the open rate. It's the click thru rate that I think is the credible one. Over time, I said you guys can't be reporting these kinds of things, clients are tracking everything these days.

- With whom did you have these conversations? Sales people, and Rich and I had internal conversations saying the open rates are not right.

- When is the first time you can remember having a conversation with someone about the open rates not being accurate? Probably about a year ago.

- You recognized they were inaccurate, where did you think these were coming from? Thought sales people were just putting their own numbers in there. I think Beth talked to them.

- Beth told her people they were putting in their own open rates. Sounds like Beth told you open rates were inaccurate, what did you say?

- We need to report what's going on. Change was made in some cases. Why only in some cases? Didn't happen all the time but I think now they're much more in line with reality. Had to be a longer process.

- Why such a long process? Fulfillment team and production team work on them. Doesn't know.

- Why can't you just stop reporting inaccurate data? Have to talk to client. I don't know client off the top of my head and who is in the roster. Did anyone take steps to do this before recently (to talk to client?) I assume Beth did.

- Did anyone say we need to keep numbers at what they are? We have clients who are used to getting the click thru rate. Opens are really what matters.

- No one ever said this is what really matters and what we really need to hit.

8

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged & Confidential

- Manny:  Several people have said people knew they were false is this true?  These are the conversations I had with Rich.  He wanted to keep clients happy at all costs and I said I wanted to say what we were doing.  I told Rich we were reporting inflated data.  His response was if we don't do what we tell the client were doing then they're not going to be happy.  Manny:  Sounds like lying?

- Yes, I guess you could call it that.  The thing is you can't lie to the client because they can verify these.  Manny:  Can't verify clicks but can verify emails sent right?  Yes.  Raised this issue several times with Rich.  His reaction changed over time, as clients started measuring and using google analytics, need to come in line with what the expectations were and what the client was saying.

- Did you and Rich ever share any of this with Advantage until recently?  No.

- Supplemental traffic:  Have been told by many people this might be supplemental ads like FB and Twitter, may be bots.  What can you tell us about this and its validity?

- When you talked about supplemental traffic like Facebook and Instagram, this is pretty legitimate.  It's really more in a PPC situation where you have bots.  Have used services to control bot traffic and try to eliminate it as much as possible and switch to a different source of data.

- What PPC vendors do you use?  Doesn't know.

- Are you familiar with Pro Data?  Yes.  This company delivered email and also did PPC traffic for us.  How did Pro Data come to be introduced to Take 5?  Through Richie's brother.  How did his brother know of Pro Data?  I think Richie's brother was friends with the guy who ran the place.

- Fair to say that they are the biggest PPC?

- At some time they were, but we did have fraudulent situations with PPC and bots.

- Do you ever ask your PPC vendors where they are getting PPC traffic and bots?  You don't really know if it's a bot until you later on discover it later on; through a forensic service.  There is a company called Forensics we've used.

- Have you ever asked where they're getting clicks?  I myself, no.

- Has anyone said for what we are paying per click, were not going to be able to get real traffic?  Yes, Michael Boy.  Response was you're going to need to find a new vendor or someone who could give us better traffic.

- If he asked for a bigger budget, was this approved?  Usually.  By who?  I think by Beth but I don't know.

9

US-DOCS\109422494.2

HIGHLY CONFIDENTIAL

- <u>Database issue</u>:  How is this calculated?  Calculated from the database that comes in. The database that we buy.  How do you know if its double opt in?  We go to the vendor and they tell you.  Do you do anything to know if its valid?  Auditing and cleaning it.  Some work gets done by Hygenics, some internally.

- Has anyone said our data is bad?  Yes, Michael has.  Has there been any effort to clean out records?  Each month we bring new data, constantly looking for better more deliverable data.  Ongoing exercise.

- Ever directives like "we need to say we have so many records in a given demographic so we need to keep that up?"

- The rows are the rows, you can't really.  We have companies like Acxiom, Epsilon, Transunion, that license our data.  You either have a record or you don't

- Advantage has the "full data dictionary."  A taxonomy that tells you about what each record is about or what it contains.

- Radetich is shown email correspondence (3 emails total in the chain throughout the questioning) where Darrin Kleinman (AS, SVP-M&A) requests support related to numbers describing information in Take5's database.  Tanya Coker sends Radetich (Kleinman not copied) the fill report showing ~125M figure for emails.  Radetich tells Tanya Coker (Beth Jenkins) that the emails needs to be around 167M.  Coker provides Radetich an updated report showing ~167M figure.  The updated report showing ~167M emails is provided to Darrin Kleinman.

- What is this?  Different elements and talks about what the count is for each element?  Does this mean that you have 268 million counts with a first name?  Says 125,226,133 email.  Does this mean there are that many emails?  He thinks this is unique emails.  Actual email would probably be more.

- Single email is you having one email instead of situations where people might have one Hotmail address and one Gmail address.  Saying there are 125 mill people for who you have an email address.

- We try to go on to the next email, he asks if he can go to the bathroom  Nate asks if we can just finish these docs, says let me just go to the bathroom.

- Radetich comes back and starts doing a lot of stuff on his phone.  ████████ ████

- Back to interview.

- Same chain:  Says I need emails to be at 167 changed, then she sends you back an updated filler report (July 31).  Respond to Darren's original email, attached you will

10

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged & Confidential

find filler report for the database please let us know if you have any questions.  On this version, it says just over 167 million.

- Is this 167 email number real?  We have over 167 emails.  Why did she have to edit it?  Because you have to specify that this was all emails, not just specific emails.

- Why did you say I need it to be 167?  We had these kinds of conversations with the service bureau regularly.

- So when you said I need it to be 167 million did you know where would it be from?  It would be from the same database, you just have to pull from the all available number.  Did you ever discuss w anyone at Advantage the difference between any of those points?

- ███████████████████████ asks to make a phone call.

- Goes out to make the phone call, says he's sorry, he's going to have to go and pick his daughter up from camp, asks if he can have his own lawyer next time.

- ████████████████████████████████████████████████████

11

US-DOCS\109422494.2

HIGHLY CONFIDENTIAL

B00306335
F06833-003946782

Draft
Attorney Work Product
Privileged & Confidential

### Take 5 – Beth Jenkins Interview Notes
7/2/2019:  8:00 am– 9:15 am

- Attendees:  Manny Abascal, Nate Saper, and Sara Gail Prudenti (Latham), Trevor Sullivan (Advantage), Mike Wei and Christina Luu (FTI)

- Started at Take 5 in March 2012

- Started in finance as CFO.  Grew into Operations Manager and post-acquisition she went back to finance out of operations.

- Previously spent 4 years as the Director of Operations for Unisa, a women's shoe company.

- When she joined as the CFO, there was around 9-12 million in revenue and 9 employees.

- The company grew a lot in a relatively short period of time.  Last year it made 26 million.  At its max it was worth about 85 M, now at about 75M, maybe more.

- The company was founded in 2003.

- They had good output in the industry, and a good reputation.

- Did the product mix or strategy of the company change? No, has been the same since she has been there.

- Believes they are a digital marketing company.

- About a year ago, its marketing collateral changed.  She was not really a part of or involved in marketing plans or materials or how they sold products.

- Believes digital marketing and data licensing are Take 5's two biggest services.

- 65-75% of revenue comes from digital marketing.

- Around 20% comes from data licensing.

- What are the biggest cost drivers for both of those?  For data licensing, it is Take 5's database.  For digital marketing, the majority is PPC, or web trafficking costs.

- Can you explain that?

- Email alone doesn't yield the click thru rates and the open rates.

US-DOCS\109412890.2

HIGHLY CONFIDENTIAL

B00306285
F06833-003946773

Draft
Attorney Work Product
Privileged & Confidential

- It is very common to supplement email campaigns with PPC traffic. This means marketing to the web for the click thru traffic and such so that it is exposed to more people than the direct market into the inbox.

- Oversaw functionality and was never an expert or could facilitate it.

- Who is an expert? Michael Boy and his team.

- Before Michael, Eva was the expert. Before that, Andrew Colwell who is no longer with the company, was the expert.

- Explain why email marketing doesn't get the rates? She doesn't know why. From a personal standpoint many people just delete emails so this could be why.

- Before she came in, Alex and Rich had sold Take 5 to another company, and bought it back. She came in the day after the buy back. She only knows that it was raw when she came back in and was basically a 9 million dollar start up. They had base revenue left over from the transition period but no real operational structure.

- She doesn't know much about buybacks and that conversation. People thought the new management was abusive and not a great place to work. Clients were leaving and valued employees were leaving.

- When she got there, the people that remained were Bryan Hannon (Account Manager), John Bohme (Sales Rep), Don Morris (Sales Rep), Tanya Coker (Sales Rep who left because she didn't want to work for the new management and then came back after they were gone).

- Beth came in post-acquisition.

- Manny: we understood the acquisition fell apart because the new business wasn't producing products it claimed it was producing. Is that your recollection?

  ○ She doesn't know—whatever she heard was hearsay and third party conversation. Doesn't know what part of this was real and what wasn't real.

- What is quality traffic? Traffic that is on more of a quality stream? She doesn't really know what this is, just went with what was being told. Vendors have been switched because of traffic that was of concern. Some of the traffic was robotic.

- No one has ever said PPC is not quality, has anyone ever said at the price were paying for clicks, the traffic is not going to be quality?

  ○ At the price we pay its going to be less quality than the higher price clicks, but that is not to say they are not quality.

2

HIGHLY CONFIDENTIAL

B00306286
F06833-003946773

Draft
Attorney Work Product
Privileged & Confidential

- Do you think Take 5 customers understand that distinction? Some do and some don't—it depends on the client.

- She has never had direct client contact and has never sat in on client meetings.

- Do clients know about cost of goods sold?  Who is involved in budgeting?  There is a standard from revenue that is brought in, where we default to a 25% cost of goods. The operations or fulfillment department would always just do the math.  If there was a cost of goods over 25% they had to discuss why.

- These default was around when she came in, but it was only 20%.  It was raised to 25% default around three years ago, or in 2015.

- What if you can't fulfill an order?  We turn down many orders if we can't fulfill them. They have been turned down for multiple reasons:  cost, expectation, messaging.  She can't give an example of a deal that was turned down.

- Details of campaigns always handled by Eva, Andrew, or Michael.

- She was involved because she overheard everything and was "kind of in everything" but not directly enough to know actual details.

- Sales brings in the campaign, then if Operations thought they would be unable to fulfill it, they would go to Alex and Rich and have conversations.  Alex and rich would say we can't take this kind of campaign.

- Sometimes she was in these conversations, believes most of these were due to reputational concerns for products like guns and alcohol.

- Was there ever a situation other than these kinds of concerns where Operations said we don't have the bandwith or data to do this?  No.  Not from the point of view of bandwith or data.  Doesn't think there were any campaigns specifically rejected because of bandwith or data.

- This was outside of her ability to give direction if they didn't have the data or bandwith.  This was Alex's expertise.  He may go and buy more data for it.

- If people came to her and told her the Sales Reps didn't have the capacity for the campaigns they were trying to perform, she would tell them to go talk to Alex and she wasn't involved in these conversations.  She was only involved if it wasn't a good deal for other reasons, not because of data or bandwith concerns.

- She interfaced with Alex and Richie every day.

- There are situations where we don't have exactly what clients want.

3

US-DOCS\109412890.2

HIGHLY CONFIDENTIAL

B00306287
F06833-003946773

Draft
Attorney Work Product
Privileged & Confidential

- o Example:  People say they want people who want to buy pretzels.  We don't have people who want to buy pretzels, but we have other groups such as people who like fitness so they may fit that group and we may use them.  It is normal to do this and to use these kinds of selects.

- o It is normal to create select that wasn't exactly what client asked for.

- o Why wouldn't they tell the client this?  She can't answer the question, just seems to be part of the marketing philosophy.  This was just how it worked, there was no transparency about this.

- o They never said "don't tell the customer," it was just "do it this way." Never a thought to think of telling the customer because it just wasn't.

- Alex built the database.  He would buy updates and Beth would write checks.

- Biggest data vendors are Dankay and IQS.

- Beth would wire them funds, and Take 5 still wires them funds. Each vendor costs around 7 to 15k a month.

- Hygenics costs around 4,700 a month.

- Never a conversation of hosting data in house.

- Who is involved in the conversations as to how to do this? Tanya heads up data underneath Alex, and people go to her for direction.

- Tanya doesn't have any real training in this area other than what Alex had taught her.

- Nate:  Seems as though this would require a specific analysis.

- <u>Reports</u>:  Did you ever have an idea they weren't accurate?

  - o Yes, knew they weren't accurate.  Knew some pieces were accurate and others were not.

  - o It was always done like this, and she's always done this.

  - o Tried to change reports by taking inaccurate numbers off the report and then Sales Reps and Alex/Richie would start freaking out and she had to change it

  - o Before she took the numbers off there were conversations to change the reports.  They would change the report and then there would be a big issue and they would be told to change it back.

4

US-DOCS\109412890.2

HIGHLY CONFIDENTIAL

B00306288
F06833-003946773

Draft
Attorney Work Product
Privileged & Confidential

- o From the beginning these inaccurate reports were an issue, but noticed other people they worked with doing the same thing and thought this isn't necessarily right, but this must just be how it is. They kind of became comfortable with it.

- In 2014/2015 she told Alex and Richie that this was questionable and had a conversation with both about this issue several times.

- How has each of them reacted to this?

- Rich being the ultimate sales person was always about the sale

- Alex was more open to the conversation and understanding. Removing and changing things usually came at the direction of Alex.

- Alex and Rich would say the two of us are going to consult and get back to you. No one knows what happened in these conversations.

- She knew the reports were based on quantity not necessarily performance. It was more important that the clicks were accurate.

- PPC vendors: Had no direct involvement in terms of selecting these. Pro Data was the only vendor when she got there. When Eva came in, she brought in other vendors.

- Who is largest vendor now? It is spread equally amongst 6 or so vendors.

- Do they provide documentation on how they are driving traffic?

- Who gives Michael? his budget? Does he know he can't spend more than 25%? If campaign comes in that requires additional funds to fulfill it, then he will have additional conversations with Alex, Rich, and Prima, and then notify the sales person.

- Do sales people care? YES. There is a default 25% cost of goods commission or hard cost, whichever is greater. They want to keep the cost of campaign under 25% because they will get paid the hard cost. They get paid on net revenue, not gross revenue. Sales people push back heavily on cost.

- She doesn't really side with operations or sales.

- They have campaigns come in that they can't fulfill, such as a $1.40/CPM last month.

- Is it safe to say if this came in X amount it wouldn't have been fulfilled? 3 or 4 years ago, yes. Today, awareness and accountability have changed.

- When Eva came in, she brought a lot more expertise and was more vocal on integrity (more so than her predecessor). She wanted more accurate reports.

5

US-DOCS\109412890.2

Draft
Attorney Work Product
Privileged & Confidential

- Eva was the voice of change and gave the push. Her predecessor just filled everything. She brought in knowledge, expertise, diversified and raised level of vendor portfolio. Beth didn't understand these technical parts of the business and left this to her.

- Eva left because she had other opportunities, she felt her future was better off with these.

- How did you come to the understanding that supplemental emails were industry practice? Based on conversations where people in the industry like sales people, PPC vendors, and email vendors, have said this.

- She knows they say they will not work with bot traffic. Worked with forensics to determine this. People wouldn't get paid for bot traffic. This was put in as a protection, but some still seeps in.

- Either Michael or Eva was responsible for this.

- At the time of the acquisition did anyone know if email campaigns were being supplemented with supplemental email traffic? I asked Alex and was specifically told that Advantage knows this. All he said was don't worry about it, Advantage knows how the business was run.

- Beth though this may also mean they knew about the inaccurate reporting.

- Really only had conversations with Alex about this subject—he was her go to person.

- Unfamiliar with any times a refund may have been given if a certain rate wasn't hit.

- They've done "make goods," from a client that didn't perform, but never from a Matchback report. Make goods are from the click rate. If a campaign didn't perform according to a customer's expectations, they would offer a make good in concession and drop a free campaign for them.

- But haven't "refunded" a lot of campaigns.

- Re: make goods, she doesn't think there were ever any structure or metrics around what was and what wasn't acceptable. It would really depend on relationship with that client.

- Depends on client, but estimates Matchback reports were requested or provided daily or weekly, depending on client.

    o   Meredith, Merkel, and Infocore are the clients that get these reports.

- Account managers may know more about Matchbacks.

6

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged & Confidential

- A lot of clients don't have official "contracts," the Matchback would be part of the "SO."  Things like responder files and matchback files were on the SO.

- Data licensing is done through Alex and David McCoy (?).

- For email campaigns and in terms of the actual email sent, most of the time the client sends them their creative.  The client always gives Take 5 the subject line and from line

- They do provide a service to design creatives, but in 70% of the cases the client supplies everything.

- Did not know of any issues with data licensing or direct mail other than some cases of small postal files for direct mail that haven't responded well to the client.

US-DOCS\109412890.2

HIGHLY CONFIDENTIAL

B00306291
F06833-003946773

Draft
Attorney Work Product
Privileged & Confidential

### <u>Take 5 – Richard Gluck Interview Notes</u>
7/2/2019: 9:30 am – 11:30 am

- Attendees: Manny Abascal, Nate Saper, and Sara Gail Prudenti (Latham), Trevor Sullivan (Advantage), Mike Wei and Christina Luu (FTI)

- [NTD: Most of the below are close to verbatim quotes from Richie—I've omitted quotation marks.].

- More on the front end, ra ra guy, get the guys motivated and all that, but to be honest with you I'm not a Wall Street guy, I'm a technical guy.

- The one thing I can say is in this particular business going back to 2003, email marketing was emerging.  At equinox we got trained on lists in order to reach people because this was more efficient as opposed to direct mail

- As years went on, email became effective form of communication.

- Email was being used to send out to a customized audience.

- As it goes on, evolves into digital products as well.

- Through the years, we were a casual group that developed a strong rapport with our clients.

- At the end of the day, clients asked how many visitors can you get me to my site.  They all have Google Analytics and can see how many people are going to their site, which is really what they pay for.

- The issue is the initiation of the traffic, the semantics of the "IOs" (?) should have been changed to say we're looking to send to an audience of 10k people instead of to send 10k emails.

- As years go on, you have to evolve, want to optimize and find the best way to reach them, really want other forms of digital components.

- The important part for them are the click thrus, that is what they measure.

- That's always based on maybe the offers not being so great, or that the construction of the HTML could be changed to increase interest.  They really focus on how to get many visitors to the site.

- The issue here is how you initiate it.

- They could do email, email with custom audiences, PPC, areas of display to optimize each campaign.

US-DOCS\109413591.2

Draft
Attorney Work Product
Privileged & Confidential

- You can see from the business that we have a very good reputation, we get all these emails back saying were doing a great job.

- Issue here with going public is what does it say on the invoice versus what is being provided.  What I mentioned to Gary is that the issue here is the semantics of the IO.

- It is an email based campaign, you're supposed to send out email, get responders, look-a-like responders, and expand the audience.

- We have a certain COGS where we try to measure 20 to 25% of the campaign.

- At the end of the day if we can't achieve certain results, we try to figure out the best results for the client.

- Retention has been very good for us, business has been good, clarification is probably needed, then its business as usual.

- Just got a 540,000 order and a $200,000 Chrysler order

- Publicists from Accenture took over Chrysler acct

- People love us.

- At the end of the day people are trying to get clicks to their sites and that's how were getting there.

- At one point did anyone in advantage understand this?

- Social and ad display, PPC, custom audiences, audience connect product are on CRM side, I don't get involved on fulfillment side so I don't know what discussions they've had with Michael.  They know we do social, I mean clearly.  We do have collateral across the board.

- Nate clarifies more on email campaigns → there are docs that say this contract specifies that 50 million emails will be sent out.

- At what point did you tell Advantage?  Michael would know this.  All I know is at the end of the day, the campaign goes out, don't know amount or custom audience, but he does know that we have the reach X number of people to get these kinds of results.

- One thing about the reporting I can tell you is they see Google Analytics on their side

- Disparity that occurs is because of abandonment of the site, if there is a big disparity between what we see on Google Analytics and what we see on our side, we have to look into it.

2

HIGHLY CONFIDENTIAL

B00306274
F06833-003946772

Draft
Attorney Work Product
Privileged & Confidential

- They have to measure that before they give us a new order, we're pretty sure the quality of traffic has been really good otherwise they wouldn't give us new business.

- Acquisition process: any communication to anyone at advantage about this? Anything about email campaigns?

- I would never have that conversation, maybe Eva or someone like that did. Doesn't know if Eva talked to anyone at advantage.

- Social is recent, a couple of years tops.

- I do know we were trying to pitch blended campaigns to everyone.

- You have the same issue with the way these IOs were written and it never really changed.

- At what point was advantage told we use supplemental traffic? At the beginning we always told them what we sold.

- When we try to sell a campaign we would like to add social in. I've heard on some of these calls, we have an email based campaign, but will add in some social, they may say if you want can add a free component for this part so you can see how it is going.

- A year or two ago said these campaigns that go out the door can't be email focused, have to add in some other components. We had a nice PowerPoint about that.

- If we have a k or PO that says were going to send X amount of emails did you talk to Advantage about this?

  o Sometimes we outsource email with a data partner, I thought we would do the emails and send out social too, my guess is he probably thought it was better off taking the budget and making it happen. Eva and Michael would know they had to fill it a certain way and they would do that if they could, otherwise we would have to go back to the client and say maybe we can't get you this number.

- When did you talk to Gary about supplemental traffic? A while back, pre-deal. We were excited about the prospects of what was going on. We had a .5 million dollar deal with the Marines that was just social. That was 2.5 years ago [Nate clarifies that's social and we are discussing email only campaigns]

- Conversation with Gary is to do whatever we have to in order to get those results, were going to do PPC, email targeting, etc. to get the clicks. Those conversations go way back.

3

US-DOCS\109413591.2

HIGHLY CONFIDENTIAL

B00306275
F06833-003946772

Draft
Attorney Work Product
Privileged & Confidential

- The reality is there were discussions about all of our campaigns utilizing different forms of traffic, this is what we tried to do.  He knew that from the beginning.

- A contract might say were going to send a million emails, and we might not.

- Doesn't know if there were any conversations about the above with Advantage.  Ryan is in the back, I don't know what these look like, don't really know about the technical side.

- I do know as a business man, you have to keep clients happy, keep the relationship, and keep them coming back to you

- Media Storm: 50 million emails.  We got an email saying were so excited, we just spoke to Celebrity and we love what you're doing.  They understand for the most part.  They know they want to keep doing business with us.  The biggest issue now is we want to get these out the door.

- They do know if its X number of individuals or records, they know they have to try to reach that audience.  We want to figure out the best way that would yield the best click thru or number of visitors for the client.  Using this number to reach custom audiences was done, just not generating a straight email for them.

- Reports about click thru rates have to be accurate because they see it on the other side.  Everyone has Google Analytics, they see what they're paying for.  There's talk about the open rates because how can it be "open" if it's not an email, but at the end of the day they're looking at the click thru rates.

- In my view, reporting should not include opens, should just include clicks.  No one cares about opens, they care about clicks at the end of the day.

- They use the language of "emails sent" where it should actually be "audience hit."

- Did you ever talk to anyone about the numbers coming from a formula?  I don't know, if someone asks about me I just say here's the audience that was hit.  I just think the emails should say audience hit or audience sent.

- It may have not been emailed to 200,000, but it may have still been sent to an audience of 200,000.

- I will tell you this, Michael says he sent it to that audience and we hit that audience.  On the report it says X amount of emails, instead of emails it should be audience.

- I don't know about the formulas or anything like that.

4

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged & Confidential

- Doesn't know anything about an algorithm, only thing he knows that an audience was hit and the number that went to this should have been accurate. No idea about an algorithm or mix.

- Did you know data wasn't accurate? I don't look at any of those reports. The only thing I know is those click thrus have to be accurate. If it's not accurate the client will then talk to us and say there's a big disparity of what you're reporting versus what we see, but that doesn't happen often.

- I can't speak for Alex but I'm certain Alex is in the same situation. We don't get involved with that stuff, were on the front end. I have no idea how they put those reports together. The only thing I know is that the clicks had to match Google Analytics. How they arrived there or used this algorithm, I don't know.

- Nate: There were anonymous ethics complaints. The first complaint was made in Summer 2018 and there was another series of complaints in April. Do you remember these issues?

- I don't know who it was but I do know there was one from someone. It's probably Mary Jo, she tried to steal the entire file to go somewhere else so she did stuff like this. I don't know about the first one-- I don't know the details of the one from the summer.

- Nate: our understanding is that last summer there was an anonymous complaint saying the report isn't accurate and emails were not being sent.

- I know that guy was fired. In fact, he knew he was going to be fired and it got around he was doing an awful job and that's what happened there. He had a beard and was originally brought over for content, he wasn't doing a great job. They probably fired him so he probably responded.

- Did you meet with anyone from Advantage during this time? No, they never came to me.

- Did you tell people to tell Advantage anything about email deployment (or tell them to withhold information)? No, we're totally open.

- Re: complaint from the summer, you didn't speak with anyone about these issues? Not as far as I remember.

- Other than that complaint did anyone say anything to Advantage? No, I don't know much about that. Also doesn't know time frame of when they started to supplement. My job is really to grow business, make sure sales staff is enthusiastic, and focus on relationships.

US-DOCS\109413591.2

HIGHLY CONFIDENTIAL

B00306277
F06833-003946772

Draft
Attorney Work Product
Privileged & Confidential

- I think what's important is that they reach the audience.  At the end of the day, you're not getting a new order if you don't get a certain amount of clicks to the site. Whether its branding, or trying to get people to a dealership.  Traffic has to go to the site, can determine whether this is good and keep them going.

- TV ads → x many people watch a commercial, same idea here

- Are all clicks the same?  I would imagine, yeah.

- From the perspective of a client, I would presume value of someone like me is worth more than a 5 year old?  Campaigns are different so they may have a branding idea and say we have a new model out there.

  - But different audiences have different value, right?  We have very good data like we provide to the Axcioms and we have a good reputation out there about our consumer data.  Our consumer data is very good, never had any issue with the data licensing people.

- When it comes to we're looking to hit 50 or 15 million people, the quality of clicks has to be there to keep people happy.  Has to be of a certain kind of quality and they know this.  The reporting of opens seems to be an issue.

- Who designs the emails?  Sometimes an agency will send over an HTML, sometimes we create it, we have a very good creative staff, sometimes we will work with the client.

- The client is not paying for this, either do it pro bono, or throw it in there.  The same creative goes out different ways, may want to optimize links, and spread out areas where they can click.

- Does email have any better benefit from a marketing perspective?  The reality is sometimes email could be better, sometimes could be worse, that's why you need a full email mix.

- We're like consultants and we say we can get you X number of emails but can also create a custom audience from that responder file.

- We would take a look at the offer, and see if we can optimize this.  That's what we would suggest and what we would propose.

- Weren't clients wanting email but not getting that?   I don't know if I agree or disagree.

- Given that you've said you had to have difficult conversations with clients the last day?

6

US-DOCS\109413591.2

HIGHLY CONFIDENTIAL

B00306278
F06833-003946772

Draft
Attorney Work Product
Privileged & Confidential

- For example, the media storm is the one you claim was difficult.  They were in our offices about two weeks ago and we discussed social.

- When you come out and meet with these people they like the results so they don't want to be in the position were you're putting them against the wall.  Our clients are very happy with our services.  If you corner them, then you're going to get a certain response.

- Personally Alex and I don't think this would've been the best way to handle this.  We should handle by saying, for example, "hey we have to get you on the phone with auditors because we have to be transparent, but you know when we send out emails for you there's also supplemental traffic, we just need to be 100% transparent."  They all understand this when they contract and say we just need the results however you do that I really don't care.  Rich would shape it as "sometimes we do this, sometimes we do PPC, etc., any mechanism to try to get you the business."  The clients would say "of course do you think I was born yesterday."

- But they do need to change the way the invoices are written.

- That should be the conversation and then there would be no issues.  Would've been a record month:  540,000 from Merkel, 200,000 from Chrysler.

- Epsilon is looking to give us 10 million.

- Right now campaigns are being stalled and clients are wondering what is going on.

- <u>Buyback</u>:  There was a private equity group (Kinderhook) that had no idea how to run the business, put someone in who had no experience with email and didn't know what he was doing.

  o This was around 8-9 years ago.  He didn't understand email at all.

  o They didn't know what to do so we took the side line approach (Alex and I).  This guy had a bad history and he didn't know what he was doing and he hurt the business.

  o We got the opportunity to buy back at a very big discount.  Pure inexperience.  Guy was an alcoholic w all sorts of issues (David Thornbury)

  o Sale structured as a cash buy with no stock.  We received about 11 million in cash (he and Alex—his dad is an 11% owner).  11 million includes his father.  Pure cash equity buy.

  o We were out.  We had the opportunity to buy it back because they didn't know what they were doing.  The deal closed sometime in 2010.

7

US-DOCS\109413591.2

B00306279
F06833-003946772

Draft
Attorney Work Product
Privileged & Confidential

- o Kinderhook owned about a year, within 6 months he didn't know what he was doing, clients were upset.  He brought in one of his data partners that could deliver on campaigns.

- o We presented opportunity to Tom Tuttle (Kinderhook) to buy it back

- o Roughly 2 million or 2 and a quarter between everyone to buy it back in cash and then a note (3 million).  Supposed to negotiate the note at the end but did too well so couldn't get out of paying bank 3 million 4 years later.

- o I think the deal was for 15 but we received only 11 of it.  They bought it from us for 15 we received 11.  Supposed to be some stock.

- o Sold for 11 million, bought it back for 5.  Netted about 7 million.

- o We've heard Kinderhook noticed clients weren't getting what they were supposed to?  Thornbury destroyed the business and had to say oh they're not doing XYZ to save himself.

- o Did anyone say data or reports were bad?  No, we had no problem with the clients.  When Thornbury brought in a new data partner the results weren't nearly as good as the people we have—the results were awful.  Had opportunity to buy it back, called our clients back.

- o Axciom is still one of our top customers.

- o Did you tell Advantage about this?  Yeah, when we were at Peskie (investment bank for the sale) the investment bankers asked about it.  Gary was there with josh and they asked us about the Kinderhook thing.  This was pre-acquisition.  Peskie knew about it because they did the original deal.  This was discussed with Advantage.

- **PPC**: I don't know much about them, that's a question for fulfillment.  I don't know any of them.

- How do you know clicks are good?  You see everything on Google Analytics, if they say they don't like the amount of clicks of quality of clicks, then we look at it.  Usually happens with ROI.  To me, that's all I care about.

- If a client is unhappy, I want to know, we just don't have a lot of them.

- Has anyone said the traffic isn't good?  No, that's never happened.

- Reporting: has anyone ever said reports are inaccurate?  No.  I just recently heard about reports and that there is an issue w the open rates.  Clearly there's something wrong there but in terms of the clicks my biggest thing is are these accurate.

8

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged & Confidential

- Did anyone ever come to you and say were sending inaccurate reports?  No.  I never got involved in sending reports to clients.

- If there was a major discrepancy by client, then of course we try to figure out what's going on.  Never get into discussion of open rates.

- Ever a situation in which reports were being modified?  I don't know who modified but if I found out someone modified reports, yeah that would be an issue.

- Emails deployed, emails delivered, open rates.  Did anyone come to you and said these were inaccurate?  No.  Did anyone modify the reports or tell them to modify?  No.  I never get involved in anyone's reporting, from the client to the sales rep or customer service.  If something was a big deal it would have come to my attention but no one has brought it up or showed me reports.

- Nate shows him the tracking reports

- Latham/FTI explains what these are—these are reports generated with the tracking team.  This is a campaign and we looked up what should have been reported to the client.  We noted that you go into the Campaign Manager system and say "generate report" and it would generate a report like this, but we noticed the numbers were different from reports we got to the client so we did it again, and tried to generate the report again and the numbers were changing.

- I wasn't involved in any of this.  So you're saying there was a difference in the emails?

- Latham/FTI:  We wondered why the numbers were different each time FTI ran the report.  What we've been told is that these numbers are all generated by computer algorithm, so they're not real numbers.  So who built this so called algorithm?

- No, but I would be curious to know who built it.  I also don't understand how you would have an email campaign where the emails would change the next time you look at it.  Unless its staggered.

- Nate:  It's not that, it's just that these are random

- Even on the thing, how would it change?  So if you have a campaign that went out and you looked at it again, why would the email amount change?

- Nate:  Exactly.  That's what we're trying to figure out.  Every one we've talked to in the company knows about it.

- I don't know about it and I can't speak for Alex but I don't think he would know either but you can ask him.

9

HIGHLY CONFIDENTIAL                                        B00306281
F06833-003946772

Draft
Attorney Work Product
Privileged & Confidential

- Doesn't know much about matchbacks.  I don't get involved.  Some reps provide matchbacks.

- Matchbacks are where a client would provide a file or we would provide deployment file and they would do matches against it to see how many people matched.

- Example:  If we deploy for Ad Taxi, Sheri (client services rep and rep on that account), I think this account provides matchbacks.  They send a file to match up against what we have in this file.  I would imagine some are done by Hygenics and some are done by Fulfillment.

- What data set should this be matched against on our side?  That's a question for Fulfillment.  Would have to use a data set they believe they have reached.  Use data set of people they have reached and match it up against their sales.

- Would you be surprised that this matched against entire Hygenics database?  Yes.  It depends on what the client is look for, I don't know when you're matching.

- Nate moves on to clients [Rich gets out his phone and checks his messages.  Texting someone].

- Who have you called and what have they said?

- 2 days ago called TMA (Tom Chilloutt- thinks he the Managing Director of TMA, high up).  Said company is going public, we have to dot our is and cross our ts, there's an auditor.  When we don't have the clicks, we have to supplement with other forms of digital media.  There's a script we are supposed to use.  He said of course I love you guys, no issue.

- Tom said I got a quarter million dollar Ikea order.  He loves us.  Campaign is on hold.

- Who's primary contact for TMA?  Rep for TMA is Mark Adams.  Who has relationship?  I'm the come out and entertain him guy.

- Yesterday, spoke to Infogroup (Mack Musicar- one of the digital directors).  Told them the same thing as TMA.  He said I'll sign whatever you want me to sign, whatever.

- Are TMA and infogroup channel partners?  That's funny, I don't know how you define channel partners.  They represent their clients.  Agencies handle clients.  Channel partners are more clients that are volume oriented and give you more campaigns with very little target audiences.  They do more campaigns of smaller sizes (tvs, news stations, radio).

- TMA and infogroup are agencies.  They bundled Take 5s services and resold it?  Yep, as digital services.

10

US-DOCS\109413591.2

HIGHLY CONFIDENTIAL

Draft
Attorney Work Product
Privileged & Confidential

- Media Storm: Spoke to Stephanie De Leon (associate – she's part of the team).  They are an agency.  That's the email I got later saying they want to do social and everything.  Said its Carl and them we should probably talk to.  She kind of said ok we will deal w that but want to focus on new campaign.  They represent Celebrity and they like our services.  We hit her on the head, so she's unaware if you will.

  o  Not just a customer service rep, part of the team.

  o  Who should you have talked to?  This guy Carlton seems to be a little higher up than her.  When I met with Media Storm out of New York, I met with Stephanie and I've met with other people in the past

- Affinitiv:  Spoke to Salajandro Gonzalez (digital director, handles all the campaigns).  Never spoken to him, this was Donnie's client.  This is more channel partner on the auto side.  They're very happy.

- Meredith/Accenture:  Spoke to Laura Raymond (Rayman?).  Accenture bought Meredith's division.  She's also a digital VP director.  She is a nice lady.  The problem is agencies lose business to other agencies.  Lost Chrysler, Chrysler sought us out through Publicist, which was interesting.  They wanted our contact info from her after they lost the business.

- Accenture:  both accounts went to different agencies (VW) and came to us

- Laura said she didn't know about this, but that their clients were happy and whatever.  She was unaware but comfortable.

- Ad Taxi:  They said we just need to get the campaigns out the door, stop with this kind of stuff.  Just wants to keep going with campaigns.  I was present for the conversation but didn't speak much.  Don Morris and Gary lead this one.  They kept talking about future campaigns.  At the end, Don came to me and said just FYI they're very happy with what we're doing.  Who did you talk to at Ad Taxi (doesn't know his name—Doug or Dave something) ███████████████████████████
  ████████████████████████

- Michael Weintrub:  This call was just me and him.  ███████████████████  He said I get it Rich I know that stuff.

- Medx:  Said I know this stuff Rich

- Neustar:  Never spoke with these ladies and doesn't know who they are.  Alex and Gary spoke in it.  They don't know whether the program is with us or with other vendors.  Looking at some email program they have where they use a few vendors.  They were upset we were charging them fees for matching.

US-DOCS\109413591.2

HIGHLY CONFIDENTIAL

B00306283
F06833-003946772

Draft
Attorney Work Product
Privileged & Confidential

- o What do they buy for us?  They license our data which they're happy with and then we run some campaigns for cricket, their client.  Alex can tell you more, I don't deal with them.

- o She was saying they're upset they're charging for fees for matching and that she's not really happy with any of the vendors she's using.

- o They have an unusual campaign.  Trying to figure out how they can optimize what they have.

- o Mike:  This is your largest data licensing client.  Have you ever had any issues?  Our data is very good.

- We disclosed everything to them.  And then Parthenon (?) called every one of our clients and they came back with a full report.

- <u>Data</u>:  That's question for Alex, he's the architect of the database.  He's always bringing in records which go to Hygenics.  Alex is purely the data guy.

- What do you know about Hygenics?

  - o Good name, handle visa, tucks (?), quality guys that came from First Data Corp. and Axciom.

  - o We've been dealing with them from god knows how long probably since 05/06.

  - o Thinks it is cheaper.

  - o Bill Mathy and John Sawicki are the major contacts.

  - o Thinks they were recently acquired.

  - o Had Visa as a file (Tucks file, trans union)

  - o Alex has very good rapport with them

- Eric Hogan: back in the Equifax days, he was our fulfillment guy.

- Rich informed us on his way out that he is going to France tomorrow.

12

HIGHLY CONFIDENTIAL

End approx. 2:45 (Brian).

Begin approx.. 2pm Ryan.

History with T5 owners since his prior company (Nustar).

Alex and Richie didn't historically have much board accountability.

Struggled in a handful of operational areas in the latter half of 2018

I've known the T5 guys for a long time.  Gary and I had some dialogue and we were looking for a GM, so I got put in at T5.

Match back shenanigans

Learned about this 2nd week of February.

Gary and I had a phone conference shortly thereafter.

This is what raised my eyebrows and caused me to dig into the rest of the programs, data, files, etc.

Matching against the entire database vs. matching against the persons targeted in the T5 campaign.

We immediately suspended that matchback practice.

As we went through the commissions issue, we terminated a lot of legacy sales people who had issues with counts.  Folks resigned, threatened to resign, etc.

Nate requested info from all terminated/disgruntled employees


WEB TRAFFIC

T5 was supposed to send emails that it didn't send.  It would then pay a 3rd party vendor to provide the clicks (on a pay per click basis) that the emails would have otherwise generated.

Clean data bucket.  (Became aware 3 weeks ago).  Mostly mailable to addresses.

Guaranteed click through rate is bullshit.

Buy tons of cheap volume traffic.  Low-% yield on value, but done to hit the click through target. Opens, bounces, unsubs, etc.

HIGHLY CONFIDENTIAL

Interview Notes: Michael Boy

7/23 – 10:30am

- Manny, Nate, Natasha, Michael, logan (FTI)

- Intro/privilege

- Why did all of this not come to light sooner – we want to get your recollection on the 2018 investigaiton when they talked to you? A lot of what was said went back to alex and rich. HR would call or send an email and somehow they would be notified. It doesn't really take rocket science to figure that out. One time someone lodged a complaint and rich came in and said who the fuck said this shit and we should fucking fire him. It was that reactions that scared a lot of the top people from saying anything. I think from HR someone was asking me questions and they were not specific questions – they would ask questions like "have you seen Richard gluck at anyone prior to the acquisition?" and my answer was no. someone would lodge a complaint, it would go to HR, there would be an investigation, and then immediately alex and rich would hear about it. What would they do then? They would say something like we used ot be a family – make sure people come and talk to us so we can handle things internally

- Can you remember any specific examples of that? There was one occasion when eva was under some investigation about her husband's company – and someone left the company disgruntled and then reported it. Richie wasn't happy about it at all (the investigation). And there was an incident with one of the sales execs – sandy – and rich wasn't happy about that either. Manny: did he talk to you about the freedman incident? No. i think that was one where he said who the fuck is doing this – but he would do this all the time so its hard to remember. He would get upset and bring people in and talk to them and he would say he was going to find out who it is and fire them. Eva and beth are witnesses to that too. It wasn't uncommon for him to say stuff like that.

- Manny: so with logan freedman, caroline from HR sent out questions – and several people said they'd like to talk on the phone or in person instead of responding in email – was there a feeling you cant say anything in email cause rich and alex would find out? Yes, 100%. They were scared it would come back to rich and alex and their job might be in jeopardy.

- Manny reads back some of notes from the interview – yeah i didn't realize until later that no one was aware that we were using supplemental traffic. I thought everyone was aware of it and everyone was doing it. It was hard because the business model was around longer than i was around. And so i said everyones been doing it because they've been doing it for years. Do you remember if you knew the algorithmic reporting wasn't real? I don't remember if i knew at that time. Maybe, i might have been, but i can't recall. Do you think you were concerned about saying something about it because of the pressure from rich and alex? Yes, 100%. We all just wanted to keep our jobs and move on. Its kind of shitty that you walk into a company and start working and then you strat to realize things are going south and you have a mortgage and a pregnant wife and you just

US-DOCS\109717987.1

moved – they just sold the company – you cant tell anyone because everything you say gets back to them.

- Nate: Were they able to identify particular complainers and retaliate against them or was it screaming at everyone? I think they talked to other people who helped them identify particular complainers. Alex wasn't really doing this it was mostly Richie. So alex was more along the lines of teling Richie to calm down.

- Manny ;were they trying to protect eva at the time? I wouldn't know, i think they were trying to protect their own assets. Maybe they were but in protecting her they were trying to protect themselves.

- Especialy with the 3rd party traffic – the company that was in question w/r/t eva, was one of our better traffic providers, that would provide us with results. So in effect it was better than the other people that we had, but now they were being questioned for what they were doing. These systems and processes were in place i thin kbefore eva was even on board. They keep every department segregated and when you start to go up levels you start to find out more and by then youre so far into it that you don't know how to fix it. Eva used to talk to me all the time and saying we expect alex and rich to fix this and they keep shutting it down. And i would say just keep going and get it done.

- Manny: asking if he has seen the project evolve powerpoint? Ppt was basically how to transition from algorithmic reporting to basically do things right – we wanted to see how that came to be prepared and what discussions were had? I think it started when Eva left. I think they (Alex and Rich) panicked and i saw it as an opportunity to get them to trust me and change things in the company. So to try to do things the right way. They called me into a meeting and i sat them down and said the only way i'm interested in staying is if we change everything that's wrong with the company. I said you cant call it double opt in data, and alex said yes we can't. this was after years of me figuring it out that this was a lie. When we emailed it would bounce so i don't think any of this was double opt in at all. And that was what fundamentally destroyed the company – the first lie – that the data we have is not what he said it was. And they built the marketing around that data. So i sat down with them and said we need to move into a different direction and do things differently. And told alx the data was terrible and incorrect and eva had been trying to change this and she was saying the same thing – that the data was terrible – and that we were spending money on PPC traffic when were saying its emails. I had gone out to lunch with Ryan and told him there were a few things he needed to look at. My involvement was trying to get Ryan involved – it took longer than it shoud have because Ryan was introduced as their friend first. They said he had been friends with him for 12 years so we had no one to talk to. If we don't fix things then everyone was going to lose their jobs. The further up you went the worst it got. Even if I left and someone else joined, someone else would fall in the same mold and nothing would have been changed. There was a need to have a product to go to that was authentic so we could transition away from all this garbage. I think that was the main goal from me, and then for ryan, and then alex and rich didn't really have a choice. Prior to the investigation he was the data architect (alex) and then he started saying he wasn't doing anything and told people I did everything and to talk to me. That was concerning to me. I think Ryan reached out to

US-DOCS\109717987.1

HIGHLY CONFIDENTIAL

B00306320
F06833-003946781

gary and said here is the problem there is this algorithmic reporting – i gave ryan all the information he needed to put that in front of gary – me ryan and gary thought we needed to replace the product and give a better one. And we did a risk analysis on what that would look like, and we put the powerpoint together.

- Were rich and alex involved in the powerpoint? Not to my knowledge. Alex was copied though? Then he might have been but he wasn't really part of putting it together. Was he aware you guys ewre doing that? I'm not sure at all. I remember it was me Tanya ryan. I feel like alex and rich weren't really involved – alex knew everybody and probably knew the right things to do but he was pretty much absent until we really had to go talk to clients on transitioning to a newer product then he started getting more involved. My frustration was that we strted discussing this when Eva left in February and even prior to that for some time, and there were certain big clients that he was supposed to talk to and literally he didn't even do it up until June. He took forever before doing anything about it. Those guys had known about it forever and this was an opportunity to at least try and they were the only ones that had reatoinships with these people.

- Was there ever any discussion of how clients would be transitioned from the old product to the new product? How did they intend to convince clients to switch? I think there were certain clients that we felt wouldn't be an issue – i didn't see Richie make an effort at all through this process. Our top 5 clients it was just email was wht they wanted and they had been around forever and getting this product forever. It all just took really long. We had round table in February about this an din june it still hadn't been done. Infocore was one of them. They were still trying to push the old campaigns and those reports were still going out.

- Was there ever a discussion of having conversations with clients and saying that we'd been giving them reporting that wasn't accurate or that the product wasn't performing as hoped? I don't think so it was more that 3rd party email marketing isn't working the way it used to and is slowing down  so were going to transition you to an omni reach product. And we wanted the social and ad display to really bring the engagement traffic. But it was a bit of an issue because the data itself was still bad. We didn't really know the source of the data. so we didn't want the focus to be on email, and we wanted it to be an omni channel experience

- When the presentation happened, were you there with ryan and josh ? Yes. It was on the phone. I think josh didn't say much but gary and me beth Tanya and ryan. And i thought we highlighted the problems of the email product and the challenges we were going to face in the future with re revenue loss and what that might be and moving into the new product and what it would contain and how that reporting wuld be done and how it would be transparent in the future. I thought it went pretty well because we provided materials as a group in a professional manner and that's something we hadn't been able to do here at this company because there was no leadership to guide us to do that. This was the first time gary and josh heard about the reporting – did they discuss that in the meeting? I'm pretty sure they knew about it way before that meeting. I'm pretty sure it was handed off by ryan because i had that discussion with ryan. When was the discussion with ryan about the reporting? February or March 2019 i think. When Eva left. From my perspective i

US-DOCS\109717987.1

took it was an opportunity to give someone information and move to a new product so that we could keep our jobs and still make money with the new product. After the conversation with ryan i felt comfortable enough to start giving him information. The first thing was matchback reporting. Ryan asked me to look into that andi came back and said yes. Then i started giving information about --- manny: did you talk to gary and josh too? No because i thought they had a really good relationship with alex and rich. My suspicion was that when complaints came through they went to gary and josh and they picked up the phone and called alex and rich. That was my suspicion. I had never spoken to gary. We were losing people left right and center and that was one of my and ryan's focuses – we wanted to push for the new product and maintain and keep people here and try to get all the materials everyone needed throughout the organization. And to ensure we were pulling in revenue numbers we were asked to pull in.

• It was only once i really sat down and talked to ryan i saw that he had a moral compass and i felt like i could utilize that to try to get some information out there and start fixing the product. I pretty much had done this prior too – i spoke to MJ prior and tried to give her information too and she said she had met gary and everyone from advantage so i was candid with her an said some of the products are not what they say they are and that could be a potential issue. And i wanted her to stay because she had relationships with the good clients and it would be harder to move them to the new product without her relationship that would be key in transitioning to a new product.

• Manny: so after the feb/march conversations, when did you tell ryan about the algorithmic reporting? Somewhere around that time. I have a text where i asked the developers – it was a discussion and in hindsight and maybe all that discussion shuld have been in email. Eva let me know that she also talked to ryan about the reporting prior to her leaving. I don't think anyone ever came out and said the reporting was completely fake, it was more that there were issues that needed to be looked at. Ryan really wanted to know what it was and i sent him a picture in May about trying to find out what the formulas were. On may 22$^{nd}$ i sent the reporting formulas i had asked for from the tracking team. You didn't talk to gary and josh? You assumed ryan would have done that? Yes and i think he did. I believe he reached out to them in march or april – he must have there is no way he would have just sat on that. So between feb/march and the june presentation, who did you talk to about this issue and fixing things? Well you couldn't just fix it. Step 1 was to get new data. data was key to the company. So the main thing was to get better there – i reached out to ryan right when i started to hygiene the data or get better data – i have an email and he pushed me to someone called veritas. I'll confirm to you via email after this call. That was one of the first conversations we had was about needing better data – we cant stop the PPC traffic unless we have better data. if you reported we had only 20% delivery rates we would lose all these clients. And ones that had been sold guaranteed metrics (TTR rates – click through rate) for the last 5 or 10 years. There wasn't any way around not being able to deliver that. If you ask me how it started 12 yars ago, im pretty sure it was these people looking for certain click through rates, and so people developed reporting engines that spat out whatever these people ewanted as to opens and click throughs and it was inherited by people over time andn no one said or did anything and if they did i'm guessing they were fired.

US-DOCS\109717987.1

HIGHLY CONFIDENTIAL

- How could this problem have been fixed? Was their better data to acquire? Yes 100% - according to ryan we could go out there and get it. We were trying to do a cost analysis because the PPC traffic – we were spending a couple of million – so ryan said why don't we take $500k and go to a data provider and buy it and bring it in house. I was trying to explain its not as easy as buying data – we have to be having people double optin in or providing content or value – that way they will interact rather than just buying a list and emailing these people. Emails are more of a personal space. When you receive messages youre not familiar with your reaction tends to be terrible. so the out was to get better data and transition it into the new product and slowly phase out email only but that required a capital expense and needed several approvals and that route was never taken. But the talks were there.

- If t5 had been able to show really good metrics through the fave reportig – if that transition plan had been taken do you think t5 would have been able to reach the metrics they were reporting? The metrics owul dhave been differnet because you are combining multiple channels and they would have seen the value on the back end – people buying products. So if you start off low and towards the end of the campaign you realize you need to spend more money it ssometimes too late. We were only spending about 25% of what clinets were paying us and they weren't getting the full capabilities of what this could have done. And if we started off at 40% years ago we would have been able to give our clients better results. It would have taken time – i think the next step in the powerpoint was that if we ask for an increase in COGS – i think i started asking for that in februray. Then gary and beth would push back. Rich and alex sold the company at 18% cogs to advantage and they believed anything over than that was too high. I see where gary was coming form because he thought he bought an email marketing company. but in order to produce results you had to spend money and that money was really tight. So if the cogs was over 25% rich and alex would freak out andthat would go down the line all the way to my employees which didn't create an environment that was conducive to helping our clients. There were discussions about linking up with Adlucent or Jun group on that data.

- How would you transition the reporting? All the algorithmic portions in tht reporting come from the amount of clicks you generate. So maybe we would need to eliminate those click thru rates. So it would have been providing maybe less quality clicks so that they can get more of an authentic reporting. Or we provide just clicks and no email rates. Once it was brought to light that we weren't going to – infocore still wanted to know what the clicks were – its been a leraning lesson for lcients like infocore where they probably went to other vendors and received similar results and then questioned htem. I can see that happeneing.

- One of the things in the june ppt is that there are only 25 million emails that are actually actionable – how was that number arrived at? The powerpoint itself – the actionable records are things you can use in the social realm and some form of ad display email. But but we got there was two years of my creating a data hygiene department and then us everytime we mail cleaning eamils and putting the clean emails in a bin. A lot of the emails were not actionable or made up. Hygenics didn't hygiene or maintain anything. It was just a database that would spit out records that anyone requested. So to protect – if

HIGHLY CONFIDENTIAL

you mail a lot of data to really bad data sets, people throw you off their networks, and it was becoming very stressful to be thrown off software every month or two or having to buy new IPs. It takes a lot of work to get one of them up and running. So it was more ensuring that we had as much clean data as possible and that it was labeled appropriately by the verticals and that's how we got that number.

- Is that 25 million records you can email or that are somehow useful? I cant verify how that data was acquired or whether the names mtch the emails – but those records went through a verification process of figuring out whether those emails could be emailed. It's a ping test that comes back and tells you if the email address is mailable. There could be some false positives, but the majority about 98% woud be mailable. Was there a market that would reflect whether the email was workable or not? We got on the phone with hygenics and eva and i told alex – the frustration was that every time a cmapgain goes out we have to clean the data, and we could be cleaning the same data over and overa gain and not know it. So the idea was lets put it in a separate bin of clean data. and we could immediately mail that bin without any issues. So if we look on hygenics for the clean data bin that should be there? Yes 100%.

- There is no doubt in my mind that ryan let gary know about this before the powerpoint was created. We were having conversations about the cleaned data and the 25 million records that were clean constantly. Even alex and ryan.

- We were doing something for Meredith. And it was referenced in that conversation too. It was mentioned in conversations from February until june constantly.

- End at 11:45

US-DOCS\109717987.1

B00306324
F06833-003946781

Begin approx. 12:15 pm PST.  End at

Natasha, Bobby

Cruze has been with Take 5 Media Group since January 2015. As the director of technology, he oversees Take 5 Media Group's IT infrastructures, technical vendor allocations, IT security controls and day-to-day IT operations which includes the monitor management of all hardware, software, databases, licenses and maintenance.

Cruze has a background in IT Management, IT Security & Infrastructure, Software Engineering and Development. He achieved a B.S in Computer Science and System's Engineering from Florida Atlantic University in Boca Raton, FL and his study of completion in IT Architecture from St. George's College in Kingston, JA.

12 Skies Tech – (noninfrastructure software development).  Came onboard in late 2016.

UPJOHN

- Current job title/responsibilities

- Professional background


- How did you get your job at Take 5?

- What was Take 5's reputation when you were at Neustar?  Any concerns?  Have you ever heard concerns about Take 5 from anyone at Neustar?


- Did you have any concerns about Take 5 business activities prior to the acquisition?  After?

- What is your impression about the founders (Alex and Richie)?  When did you last speak to them?  Speak at all about this investigation?  With anyone?  Did you do anything to prepare for this conversation?


- Did you have any concerns about any Take 5 employees?

- Did you have concerns about any Take 5 business practices?

- Were you aware that there was a whistleblower complaint?

- We are looking into a number of contracts where Take 5 was supposed to provide digital media services.  The contracts involved agreed upon numbers for click throughs that T5 met, but T5 used a variety of methods to get there, beyond simply emailing.

- Were you ever involved in pulling GA reports?  What data did you collect?  Why?

- Did you ever massage that data?  Did anyone ever tell you to do that?  Would that data change over time?  How  Why?

- Any involvement with client reports?


- Ever receive customer complaints?  Ever receive complaints or requests to change the data that you obtained?


If Alex/Richie reach out, please do not discuss the investigation or this interview with them. Please do not discuss Take 5 or Advantage business with them either.  Please inform us if they attempt to reach out to discuss any of these things.


Michael Boy – Fulfillment.


Email practice:
- Why didn't they just send the emails?
- Who knew emails were not being sent?
- How can we find out how many emails were actually sent?
- Vet Gary's analysis with them to verify only 5% went out.

Rationale:
- If customers only cared about clicks, why misrepresent the amount of emails?
- If customers were ok with just clicks, why not obtain this confirmation in writing?

Algorithm
- Whose idea was it?
- Who prepared it
- Why was it prepared?
- Who was aware of it?
- Why not tell clients the actual amount of emails sent?

Alternative channels for generating clicks – supplemental efforts
- What processes were used to supplement marketing beyond emails?
- Who decided when to supplement?  Who was in charge of supplementing?
- Which vendors were used to supplement?

B00306317
F06833-003946780

- Can you provide contracts for those vendors?
- What did they provide?
- Were any "click farms," bots, or other methods used to artificially inflate click volume?

Acquisition
- Did anyone discuss telling, or not telling, Advantage about the unsent emails?  The algorithm?

Matchback
- How was this prepared
- Were matchbacks compared against full database or emails sent?
- If the former, why?  Isn't this misleading?  Doesn't it suggest that Take 5 should get credit for a sale that they did not generate?

Specific customers (two?) that signed off:
- who contracted for the services?
- who was on the phone?  Same person?  If not why not?
- Can we speak to the person who contracted?
- Explain how services were delivered to that customer
- Were emails not sent?  If so, why not?
- What was provided?

HIGHLY CONFIDENTIAL

Begin approx. 12:15 pm PST.  End at

Natasha, Bobby

Cruze has been with Take 5 Media Group since January 2015. As the director of technology, he oversees Take 5 Media Group's IT infrastructures, technical vendor allocations, IT security controls and day-to-day IT operations which includes the monitor management of all hardware, software, databases, licenses and maintenance.

Cruze has a background in IT Management, IT Security & Infrastructure, Software Engineering and Development. He achieved a B.S in Computer Science and System's Engineering from Florida Atlantic University in Boca Raton, FL and his study of completion in IT Architecture from St. George's College in Kingston, JA.

12 Skies Tech – (noninfrastructure software development).  Came onboard in late 2016.

UPJOHN

- Current job title/responsibilities

- Professional background


- How did you get your job at Take 5?

- What was Take 5's reputation when you were at Neustar?  Any concerns?  Have you ever heard concerns about Take 5 from anyone at Neustar?


- Did you have any concerns about Take 5 business activities prior to the acquisition? After?

- What is your impression about the founders (Alex and Richie)?  When did you last speak to them?  Speak at all about this investigation?  With anyone?  Did you do anything to prepare for this conversation?


- Did you have any concerns about any Take 5 employees?

- Did you have concerns about any Take 5 business practices?

- Were you aware that there was a whistleblower complaint?

B00306316
F06833-003946780

- We are looking into a number of contracts where Take 5 was supposed to provide digital media services.  The contracts involved agreed upon numbers for click throughs that T5 met, but T5 used a variety of methods to get there, beyond simply emailing.

- Were you ever involved in pulling GA reports?  What data did you collect?  Why?

- Did you ever massage that data?  Did anyone ever tell you to do that?  Would that data change over time?  How  Why?

- Any involvement with client reports?

- Ever receive customer complaints?  Ever receive complaints or requests to change the data that you obtained?

If Alex/Richie reach out, please do not discuss the investigation or this interview with them. Please do not discuss Take 5 or Advantage business with them either.  Please inform us if they attempt to reach out to discuss any of these things.

Michael Boy – Fulfillment.

Email practice:
- Why didn't they just send the emails?
- Who knew emails were not being sent?
- How can we find out how many emails were actually sent?
- Vet Gary's analysis with them to verify only 5% went out.

Rationale:
-  If customers only cared about clicks, why misrepresent the amount of emails?
-  If customers were ok with just clicks, why not obtain this confirmation in writing?

Algorithm
- Whose idea was it?
- Who prepared it
- Why was it prepared?
- Who was aware of it?
- Why not tell clients the actual amount of emails sent?

Alternative channels for generating clicks – supplemental efforts
- What processes were used to supplement marketing beyond emails?
- Who decided when to supplement?  Who was in charge of supplementing?
- Which vendors were used to supplement?

B00306317
F06833-003946780

- Can you provide contracts for those vendors?
- What did they provide?
- Were any "click farms," bots, or other methods used to artificially inflate click volume?

Acquisition

- Did anyone discuss telling, or not telling, Advantage about the unsent emails?  The algorithm?

Matchback

- How was this prepared
- Were matchbacks compared against full database or emails sent?
- If the former, why?  Isn't this misleading?  Doesn't it suggest that Take 5 should get credit for a sale that they did not generate?

Specific customers (two?) that signed off:

- who contracted for the services?
- who was on the phone?  Same person?  If not why not?
- Can we speak to the person who contracted?
- Explain how services were delivered to that customer
- Were emails not sent?  If so, why not?
- What was provided?

HIGHLY CONFIDENTIAL

B00306318
F06833-003946780

Begin approx. 1:15 pm PST.  End at

Bobby, Natasha

Don Morris – Chief Revenue Officer (Take 5 Media Group).  April 2017-present.

Director of Strategic Accounts (now)

Prior to that, VP of Sales from July 2010 to April 2017.

**UPJOHN**

Email practice:
- Why didn't they just send the emails?
- Who knew emails were not being sent?
- How can we find out how many emails were actually sent?
- Vet Gary's analysis with them to verify only 5% went out.

Rationale:
- If customers only cared about clicks, why misrepresent the amount of emails?
- If customers were ok with just clicks, why not obtain this confirmation in writing?

Algorithm
- Whose idea was it?
- Who prepared it
- Why was it prepared?
- Who was aware of it?
- Why not tell clients the actual amount of emails sent?

Alternative channels for generating clicks – supplemental efforts
- What processes were used to supplement marketing beyond emails
- Who decided when to supplement?  Who was in charge of supplementing?
- Which vendors were used to supplement?
- Can you provide contracts for those vendors?
- What did they provide?
- Were any "click farms," bots, or other methods used to artificially inflate click volume?

Acquisition
- Did anyone discuss telling, or not telling, Advantage about the unsent emails?  The algorithm?

Matchback
- How was this prepared
- Were matchbacks compared against full database or emails sent?
- If the former, why?  Isn't this misleading?  Doesn't it suggest that Take 5 should get credit for a sale that they did not generate?

Specific customers (two?) that signed off:
- who contracted for the services?
- who was on the phone?  Same person?  If not why not?
- Can we speak to the person who contracted?
- Explain how services were delivered to that customer
- Were emails not sent?  If so, why not?
- What was provided?

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

B00306307
F06833-003946777

Begin approx. 8:15 am PST.  End at 8:45.

Manny, Natasha, Bobby

Email practice:
- Why didn't they just send the emails?
- Who knew emails were not being sent?
- How can we find out how many emails were actually sent?
- Vet Gary's analysis with them to verify only 5% went out.

Rationale:
- If customers only cared about clicks, why misrepresent the amount of emails?
- If customers were ok with just clicks, why not obtain this confirmation in writing?

Algorithm
- Whose idea was it?
- Who prepared it
- Why was it prepared?
- Who was aware of it?
- Why not tell clients the actual amount of emails sent?

Alternative channels for generating clicks – supplemental efforts
- What processes were used to supplement marketing beyond emails
- Who decided when to supplement?  Who was in charge of supplementing?
- Which vendors were used to supplement?
- Can you provide contracts for those vendors?
- What did they provide?
- Were any "click farms," bots, or other methods used to artificially inflate click volume?

Acquisition
- Did anyone discuss telling, or not telling, Advantage about the unsent emails?  The algorithm?

Matchback
- How was this prepared
- Were matchbacks compared against full database or emails sent?
- If the former, why?  Isn't this misleading?  Doesn't it suggest that Take 5 should get credit for a sale that they did not generate?

Specific customers (two?) that signed off:
- who contracted for the services?
- who was on the phone?  Same person?  If not why not?
- Can we speak to the person who contracted?
- Explain how services were delivered to that customer
- Were emails not sent?  If so, why not?
- What was provided?

HIGHLY CONFIDENTIAL

B00306308
F06833-003946778

HIGHLY CONFIDENTIAL

B00306309
F06833-003946778

53rd at Third
885 Third Avenue
New York, New York  10022-4834
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

# LATHAM&WATKINS LLP

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

**MEMORANDUM**
July 2, 2019

| | |
|---|---|
| **To:** | Internal File |
| **From:** | Latham & Watkins LLP |
| **File no:** | 055166-0026 |
| **Subject:** | July 2, 2019 Interview with Alex Radetich, Executive Vice President of Take 5 Media Group |

On Tuesday, July 2, 2019, Manny Abascal ("Mr. Abascal"), Nathan Saper ("Mr. Saper"), and Sara Gail Prudenti of Latham & Watkins LLP ("Latham") interviewed Alex Radetich ("Mr. Radetich"), Executive Vice President of Take 5 Media Group ("Take 5"). Also present during the interview were Trevor Sullivan of Advantage and Christina Luu and Chris Brown of FTI Consulting; Mr. Sullivan and Ms. Luu attended in person, and Mr. Brown attended telephonically. This memorandum is not a verbatim transcript of the interview. Rather, this memorandum includes Latham's thoughts and impressions in connection with the interview and reflects Latham's judgment as to the relevance of certain information. This memorandum therefore incorporates privileged and confidential information and is protected by the attorney-client and work product privileges.

## I.    SUPPLEMENTAL TRAFFIC

Mr. Saper began the interview by informing Mr. Radetich that Latham had been retained by the Audit Committee of Advantage Solutions ("Advantage") to investigate recent allegations regarding Take 5, specifically recent reports that Take 5 was not providing its customers with the email services it purported to. Mr. Saper explained to Mr. Radetich that Latham are lawyers for Advantage, not for Mr. Radetich or any other employees; that Latham are reporting to the Audit Committee for purposes of this investigation; and that, although their conversation was privileged, that privilege belonged to Advantage, and Advantage or the Audit Committee could choose to waive the privilege and disclose the contents of their discussion to Advantage's auditors or other third parties. Mr. Radetich said he understood.

US-DOCS\109441654

**EXHIBIT 15**

B00306153
F06833-003946759

ATTORNEY WORK PRODUCT
ATTORNEY-CLIENT PRIVILEGE

LATHAM&WATKINSᴸᴸᴾ

After the introduction, Mr. Radetich began providing his own view of what he perceived to be the reason we were there.  Mr. Radetich started discussing "supplemental traffic," which he defined as channels that generate additional traffic other than what email alone generates.  Mr. Radetich informed us that around June 2018, he, Gary Colen, ("Mr. Colen"), the CEO of Amp Agency, and Josh Pike ("Mr. Pike"), Executive Vice President for Advantage, met regarding an anonymous ethics complaint about Take 5's use of supplemental traffic.  Mr. Radetich informed Latham that Mr. Colen and Mr. Pike believed Take 5 was providing email services only, and that during that meeting he informed them that this was not true; they did use supplemental traffic on certain occasions.

Mr. Saper then asked Mr. Radetich to elaborate upon supplemental traffic.  He stated that it consists of services that used additional channels such as video and social media to generate traffic.  This would be used in instances where clients were trying to achieve a certain "click-through" rate.  He noted that some of their clients wanted a certain amount of click-throughs, which could not be achieved via email alone.  He informed us that there were instances where "multichannel" clients, such as Epsilon, agreed to services other than email, like banner ads.  Mr. Saper asked Mr. Radetich if he told Mr. Colen and Mr. Pike during their June 2018 meeting that Take 5 used supplemental traffic in situations where clients had only contracted for email services.  In response, he claimed that he did not know of this before this investigation.

Mr. Radetich further claimed that he was unaware that Take 5 was sending fewer emails than its customers had requested until this investigation.  He also did not believe there was a reason Advantage would have been aware of this.  He said that before this, Eva Hodgens ("Ms. Hodgens"), a prior employee, and Beth Jenkins ("Ms. Jenkins"), Vice President of Operations, would tell him they were launching between sixty to eighty million emails a month.

We then asked Mr. Radetich to elaborate on the discussions he recalled from his June 2018 meeting with Mr. Colen and Mr. Pike.  Mr. Saper asked Mr. Radetich whether he recalled discussions about what Take 5's customers were told with regard to Take 5's email services.  He responded that he recalled that Take 5 told its customers that if it was unable to generate enough email traffic as it had originally purported to, then Take 5 would try to "over deliver" if it had enough data.  If Take 5 was unable to over deliver, Take 5 would tell its clients it would need to generate other forms of traffic.

## II.    PAY-PER-CLICK VENDORS

Mr. Radetich also informed Latham that during meetings with Mr. Colen and Mr. Pike about the use of supplemental traffic, they discussed situations where Take 5 may use "pay-per-click" ("PPC") vendors.  Mr. Radetich told Latham that they asked for invoices reflecting this and that he provided them with three such examples during this meeting.

Mr. Radetich did not immediately recall the PPC vendors Take 5 used, but, when prompted, he was aware of a PPC vendor called "Pro Data."  He claimed that this company both

2

HIGHLY CONFIDENTIAL

B00306154
F06833-003946759

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGE**

LATHAM&WATKINS™

delivered emails and provided PPC traffic for Take 5. He believed Take 5 was introduced to Pro Data through the brother of Richard Gluck ("Mr. Gluck"), the Senior Vice President. He believes Mr. Gluck's brother is friends with the owners of the company.

Mr. Radetich acknowledged that at times they encountered fraudulent situations with PPC traffic and bots. He explained that customers could not tell whether traffic comes from a bot until it is discovered later on, typically through a forensic service. He claimed Take 5 had used a company called Forensics for this service.

Mr. Radetich admitted that Michael Boy ("Mr. Boy"), the Vice President of Fulfillment, informed him that at the price they were paying per click, they were not going to get real traffic. Mr. Radetich claimed he told Mr. Boy that he would need to find a new vendor or someone who would be able to provide them with better traffic. He claimed to believe that if Mr. Boy had asked for a bigger budget to spend on these services, this request would have usually been approved, perhaps by Ms. Jenkins, but Mr. Radetich could not provide details.

## III.    TAKE 5'S DATABASE

Mr. Saper then asked Mr. Radetich about Take 5's database. He stated that the database was discussed when Advantage acquired Take 5, and that Take 5 has a large database that it has compiled throughout the years. He said this database contains information such as different lifestyle triggers, email addresses, and phone numbers. Regarding Take 5's current data vendors, Mr. Radetich stated that a company called "Dankay" supplies data for more specific sets of data, such as "newly engaged," "newlywed," "divorced," and "wedding." Another company called "IQS Holdings" supplies more general data, such as "auto owners," and "general consumers." Mr. Radetich said that although customers could theoretically go to these companies directly, often times they are not readily available and cannot be looked up.

Mr. Radetich said that customers might find Take 5's various databases through Nextmark or SDS, websites where list buyers or agencies go to find databases on a certain subset of individuals, such as "active moms." He stated that Take 5 has not done the best job at updating its segments, and that Take 5 may have discontinued certain segments that were no longer active, or up-to-date. However, these discontinued segments may still appear on database sites such as Nextmark or SDS. Mr. Saper asked Mr. Radetich what he meant by "active" segments. He explained that around every two years they perform a "sweep" to determine the accurate size of the file, as they fluctuate every month or so.

Mr. Radetich then discussed how Take 5 uses and markets different segments. He stated that some of the titles of their segments – such as "active moms" – are based on certain inferences about this segment. In other words, such lists of individuals are not composed of individuals who are definitely active, or are definitely mothers; rather, Take 5 combines other attributes of individuals to infer whether they may be active moms. Mr. Radetich provided further detail about these segments, using "health food aficionados" as an example. For that kind

3

US-DOCS\109441654

ATTORNEY WORK PRODUCT
ATTORNEY-CLIENT PRIVILEGE

LATHAM&WATKINSᴸᴸᴾ

of a segment, three data sets would likely go into it: (1) health-conscious consumers, (2) people who dine out, and (3) people who live in Florida. He clarified that these three distinct data sets would have each been purchased by Take 5. Mr. Saper asked Mr. Radetich whether he had any conversations with Advantage about Take 5's use of segment titles based on inferences as opposed to definitive characteristics. He responded that to him, using these kinds of titles was understood, or standard "industry talk." He believed that Mr. Colen and Mr. Pike would understand this, as they are in the same industry; however, Mr. Radetich did not describe any point in time in which he affirmatively disclosed this practice to anyone at Advantage.

Mr. Saper asked Mr. Radetich to clarify how he would know certain data was "double opt-in" data. He informed us that the vendor would tell them this. We then asked him whether Take 5 does anything else to ensure the data's validity. He said that there are auditing and cleaning processes and that some of this work is done by Hygienics, and some is done internally. He went on to state that although Mr. Boy has informed him that Take 5's data is bad, cleaning records is an ongoing exercise. Last, he stated that Advantage has Take 5's "full data dictionary." He said this dictionary is a "taxonomy" that states the subject matter of each record as well as the information it contains.

## IV.    COMPLAINTS

Mr. Saper then asked Mr. Radetich about his knowledge of anonymous complaints from Take 5 employees around March or April of 2019. Mr. Radetich briefly mentioned a sexual harassment complaint that led to the firing of a sales manager around December 2018 or January 2019. He then discussed the latest complaint, which he believed to be the result of reducing certain sales representatives' commissions. He thought this made the sales representatives disgruntled. He also informed us that there was an issue with one sales representative in particular, who was unhappy with the way her son, who also worked for the company, was being treated.

Mr. Radetich explained that he and others, especially Mr. Colen, felt this individual needed to be removed from the company. He believes she tried to extort them and expropriate data and that he met with Patty Johnson, Advantage's Director of Associate Relations, about this issue. He clarified this was prior to the complaint being filed. He said that Cruze Mair, Take 5's Director of Technology, put a lock on her computer. However, he believed she was able to access data from their contractor, Craig Winograd. She was then placed on administrative leave.

Mr. Saper noted that in the anonymous ethics complaint, the employee made certain allegations about the quality of the database. Mr. Saper asked him whether there were any conversations about the substance of this allegation. He informed us that prior to her departure, Mary Jo Benjoseph was selling certain demographics they did not have to clients. He claimed

4

HIGHLY CONFIDENTIAL

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGE**

LATHAM&WATKINS<sub>LLP</sub>

that he tried to talk to her to inform her that Take 5 did not have certain data that she was telling customers they did.  He clarified that they did not have any conversations about inaccurate reporting or supplemental traffic.

## V.    BUYBACK OF COMPANY

Next, the buyback of Take 5, where Mr. Radetich and Mr. Gluck sold the company to another private equity firm and subsequently repurchased it, was discussed.  Mr. Radetich explained that in 2007 or 2008, Kinderhook Industries, a private equity firm, became interested in buying Take 5.  The effort was spearheaded by David Thornbury ("Mr. Thornbury"), who was also in the marketing industry.  Mr. Radetich stated that they signed a Letter of Intent in 2008, and that the deal was backed by the investment bank Petsky Prunier.  However, because of the recession, the deal fell apart and was silent for a few years.

Mr. Radetich stated that the deal was revived in 2010 and that there were about eleven months of due diligence.  He explained that the deal was comprised of 3/4 cash and stock that rolled over from the old company into the new company.  He believed the company was bought for around $14 million total, which included the rollover stock.  After the acquisition, Radetich and Gluck stayed on as employees.

Mr. Radetich stated that after the sale, there began to be friction between himself, Mr. Gluck, and Mr. Thornbury.  Specifically, Mr. Thornbury wanted to get rid of Hygienics, the data management company used by Take 5, and use his own data center.  At this time, Take 5 was paying Hygienics around $12,000 a month.  Allegedly, he also wanted to spend money on data sets such as "new movers" that were no longer considered novel or unique in 2011.  Mr. Radetich clarified that having unique data sets is very important and part of what sets them apart from other companies.

Mr. Radetich went on to discuss that Mr. Thornbury's data center ended up being more expensive and that they felt threatened by the use of Mr. Thornbury's data center, as Hygienics is a trusted supplier they had built a positive relationship with.  Radetich also mentioned they did not like Mr. Thornbury's brash management style, and that there were purported discrimination and sexual harassment suits against Mr. Thornbury.  Mr. Radetich claimed that as a result of these issues with Mr. Thornbury, he and Mr. Gluck were fired from Take 5.  He stated that Mr. Gluck was fired in November or December of 2011, and he was fired around January of 2012.

Next, Mr. Radetich discussed the buyback.  He said that around February 2012, he received a call from Tom Tuttle, the Managing Director of Kinderhook.  At this time, Mr. Tuttle wanted to make a deal where Mr. Radetich and Mr. Gluck would buy the business.  Mr. Radetich believes this was because the business was declining.  They then negotiated a deal where Mr. Radetich and Mr. Gluck bought the business back for around 6.5 or 7 million USD. He confirmed that they sold it in early 2011 for 14 million USD, and then bought it back in 2012. The rollover stock was cancelled.

5

US-DOCS\109441654

HIGHLY CONFIDENTIAL

B00306157
F06833-003946759

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGE**

LATHAM&WATKINS LLP

Mr. Saper asked Mr. Radetich to elaborate upon why Kinderhook may have wanted to sell the business. Mr. Radetich stated that Mr. Thornbury was looking to move on, and Kinderhook wished to pursue other opportunities. Mr. Radetich noted that Kinderhook bought Specialists Marketing Services ("SMS"), a company which competes in the same space as Take 5, within thirteen months. He believes Kinderhook still owns SMS and that Mr. Thornbury was also the CEO of SMS at some point, for less than a year.

Mr. Saper asked Mr. Radetich whether Kinderhook ever commented on the quality of the business or the database, and specifically whether Kinderhook wanted to sell the business because the business could not perform as Mr. Radetich and Mr. Gluck had represented. Mr. Radetich believed the database was fine at that point, but that there may have been concerns over the performance of email marketing. He acknowledged this might be because the lists were not clean, and there may have been high bounce rates. He said that Kinderhook audited the database before its acquisition, during its due diligence.

## VI.   REPORTING

### A.   *Randomized Reports*

Mr. Saper then asked Mr. Radetich about inaccurate reports provided to clients that did not reflect the number of emails that were actually sent out. At first, Mr. Radetich claimed that did not believe this had been raised before the last couple of weeks. He did not think Advantage would have been aware of this issue, and he did not think he had talked to anyone there about this issue before.

The discussion turned to the fact that these reports were generated using an algorithm that relies on a random number generator. Mr. Radetich claimed that he did not know how the reports were being made and did not know employees were building these reports. He claimed that the first time he saw these kinds of reports was when Ryan McGavran ("Mr. McGavran"), Take 5's Senior Vice President and General Manager, showed them to him on his phone.

Mr. Saper then showed Mr. Radetich an example of tracking reports that were shown to clients (attached hereto as "Exhibit A"). Mr. Saper asked whether these were the reports Mr. McGavran showed him. Mr. Radetich stated that these were the "end reports," and Mr. McGavran had shown him the formula for the algorithm.

Mr. Radetich claimed that, as a result of what Mr. McGavran had shown him, he now believed that although the "clicks" reflected on the reports were accurate, he did not think the "opens" were. He stated that he came to believe these were not accurate when Mr. McGavran showed him the reports. Mr. Radetich claimed that although employees had told him they would need to supplement traffic, no one told him that the figures were inaccurate. He claimed that the most important part of the reports is a good response rate that Take 5's customers can verify, which he perceived to be the "clicks."

6

US-DOCS\109441654

B00306158
F06833-003946759

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGE**

LATHAM&WATKINS LLP

Mr. Radetich then ████████████████████, saying that although no one had explicitly told him before recent weeks that the reports were inaccurate, he was aware that certain sales representatives would change their reports, and the open rates in particular, in order to please customers. This led him to have conversations with the sales representatives about a year ago. During these conversations, Mr. Radetich informed them that they could not falsely report these numbers, as clients are tracking everything these days. He said he also recalled Ms. Jenkins informing him that people were putting in their own open rates. After she told him this, he claimed to believe they needed to make a change and report accurate figures. He said he believed this change would be a long process and could not happen immediately, although he believes the figures are now more in line with reality.

Mr. Abascal then informed Mr. Radetich that several employees Latham had interviewed said that these reports were false and had been false for years, that employees, including Ms. Jenkins, had told Mr. Radetich the reports were false, that Mr. Radetich had on several occasions agreed with employees' protestations that they needed to correct their reporting, but that nothing was ever changed, and that it appeared Mr. Gluck convinced Mr. Radetich that if they reported correct figures to clients, they would lose the clients. Mr. Abascal asked Mr. Radetich whether this was true. At this point, Mr. Radetich admitted the false reporting. He said he had conversations with Mr. Gluck regarding false reports, during which Mr. Radetich told Mr. Gluck that they were reporting false data. Mr. Radetich stated that Mr. Gluck responded that if Take 5 did not report numbers in line with what Take 5 had told the client they could achieve, that the clients would not be happy, and Mr. Gluck wanted to keep the clients happy at all costs. Mr. Abascal asked, "so essentially, did you believe that you needed to lie to your clients in order to keep your clients?," to which Mr. Radetich responded, "Yes."

### B.   *July 2018 Email*

Mr. Saper then showed Mr. Radetich an email chain from July 30-31, 2018 (attached hereto as "Exhibit B"), wherein he appears to direct Tanya Coker, Director of Accounts, to provide inflated figures in response to a request from Darrin Kleinmann of Advantage. Mr. Kleinmann had emailed Mr. Radetich requesting a report of the number of email records in Take 5's database. Mr. Radetich forwarded this request to Ms. Coker. Mr. Saper directed Mr. Radetich's attention to the "fill report" Tanya Coker sent to Mr. Radetich in response, which reflected a "count" of 125,226,133 emails. At this point in the interview, Mr. Radetich asked if he could take a break.

Upon his return, the discussion returned to the email chain. Mr. Saper brought Mr. Radetich's attention to the next email in the chain, where he tells Ms. Coker that he needs the emails to be at "167mm or so." Ms. Coker then sends an updated filler report reflecting the 167mm number back to him, and this same number is ultimately sent to Advantage.

US-DOCS\109441654

HIGHLY CONFIDENTIAL

B00306159
F06833-003946759

**ATTORNEY WORK PRODUCT**
<u>**ATTORNEY-CLIENT PRIVILEGE**</u>

LATHAM&WATKINS LLP

      Mr. Saper asked Mr. Radetich to explain the communications and account for the discrepancy.  Mr. Radetich said that he believes the 125 million figure refers to unique email addresses, and that the 160m+ figure refers to total email addresses.  (He explained that "single email" refers to someone having one email, as opposed to situations where individuals have multiple email addresses at different domains, such as those who may have both Gmail and Hotmail email accounts).  Mr. Saper noted, however, that the name of the field on the report is the same, and that Mr. Radetich directed Ms. Coker to create a report reflecting a specific number of emails, which Mr. Saper noted could easily be read to suggest that Mr. Radetich was misrepresenting data to Advantage.  Mr. Radetich denied that this was a misrepresentation, but he acknowledged that Advantage personnel would not have had any reason to understand the supposed distinction between the numbers of unique and total email addresses.

## VII.   CONCLUSION

      At this point in the interview, Mr. Radetich stepped out, saying he had to make a phone call.  Upon his return, he said that he was leaving (claiming that he had to leave to pick his daughter up from camp), and that he would be retaining his own attorney.  Mr. Saper reminded him that he had an obligation to keep the contents of the discussion confidential.  Mr. Radetich then exited the room.

US-DOCS\109441654

HIGHLY CONFIDENTIAL

B00306160
F06833-003946759

ATTORNEY WORK PRODUCT
ATTORNEY-CLIENT PRIVILEGE

LATHAM&WATKINSLLP

Exhibit A

US-DOCS\109441654

HIGHLY CONFIDENTIAL

B00306161
F06833-003946759



**TRACKING REPORT**





**TRACKING REPORT**

HIGHLY CONFIDENTIAL

B00306162
F06833-003946759

CAMPAIGN:   **OFEV DTC Unbranded Creative Wave 1**

S.O.#:      52819
DEPLOYMENT: 12/04/2018

## CREATIVE URLs & ACTIVITY

| URLS | Clicks | Unique Clicks | Mobile Clicks | Link |
|---|---|---|---|---|
| https://www.lungsandyou.com/?sc=IPFACQWEBEMLMED1807004&utm_source=medicx&utm_medium=email&utm_campaign=medicx2018_stream&utm_term=lungsandyou_logo&utm_content=advice_support | 256 | 170 | 102 | View |
| https://www.lungsandyou.com/sign-up?sc=IPFACQWEBEMLMED1807004&utm_source=medicx&utm_medium=email&utm_campaign=medicx2018_stream&utm_term=signup&utm_content=advice_support | 547 | 394 | 360 | View |
| https://www.lungsandyou.com/sign-up?sc=IPFACQWEBEMLMED1807004&utm_source=medicx&utm_medium=email&utm_campaign=medicx2018_stream&utm_term=signup2&utm_content=advice_support | 150 | 104 | 72 | View |
| https://www.boehringer-ingelheim.us/ | 45 | 33 | 20 | View |

HIGHLY CONFIDENTIAL



**TRACKING REPORT**

S.O.#:  52819
JobID#:  27213
DEPLOYMENT: 12/04/2018

CAMPAIGN:  **OFEV DTC Unbranded Creative Wave 1**

## SEND PERFORMANCE

| | |
|---|---|
| Delivery Rate | **99.29 %** |
| Deployed | 35,968 |
| Delivered | 35,714 |

## OPEN PERFORMANCE

| | |
|---|---|
| Open Rate | **17.63 %** |
| Total Opens | 6,295 |
| Unique Opens | 6,238 |

| 998 | 2.79 % | 15.85 % |
|---|---|---|
| Total Clicks | Click Percentage | HTML CTR |

**7**
Opt Outs

## OPENS BY DEVICE

2,801  Desktop      3,494  Mobile

## CREATIVE

Subject:  Find guidance from real patients, right in your inbox

From Line:  Lungs&You



Please note: The image above is a representation of the creative used for this campaign and may appear different.



**TRACKING REPORT**

HIGHLY CONFIDENTIAL

CAMPAIGN:   **OFEV DTC Unbranded Creative Wave 1**

S.O.#:      52819
DEPLOYMENT: 12/04/2018

## CREATIVE URLs & ACTIVITY

| URLS | Clicks | Unique Clicks | Mobile Clicks | Link |
|------|--------|---------------|---------------|------|
| https://www.lungsandyou.com/?sc=IPFACQWEBEMLMED1807004&utm_source=medicx&utm_medium=email&utm_campaign=medicx2018_stream&utm_term=lungsandyou_logo&utm_content=advice_support | 256 | 173 | 102 | View |
| https://www.lungsandyou.com/sign-up?sc=IPFACQWEBEMLMED1807004&utm_source=medicx&utm_medium=email&utm_campaign=medicx2018_stream&utm_term=signup&utm_content=advice_support | 547 | 359 | 360 | View |
| https://www.lungsandyou.com/sign-up?sc=IPFACQWEBEMLMED1807004&utm_source=medicx&utm_medium=email&utm_campaign=medicx2018_stream&utm_term=signup2&utm_content=advice_support | 150 | 106 | 72 | View |
| https://www.boehringer-ingelheim.us/ | 45 | 30 | 20 | View |

B00306165
F06833-003946759

 **TAKE 5 MEDIA GROUP**

*TRACKING REPORT*

S.O.#:    52819
JobID#:    27213
DEPLOYMENT: 12/04/2018

CAMPAIGN:   **OFEV DTC Unbranded Creative Wave 1**



## SEND PERFORMANCE

Delivery Rate   **98.23 %**
Deployed    36,356
Delivered    35,714

## OPEN PERFORMANCE

Open Rate    **16.43 %**
Total Opens    5,867
Unique Opens    5,815

998    2.79 %    17.01 %
Total Clicks    Click Percentage    HTML CTR

**3**
Opt Outs

## OPENS BY DEVICE

2,610    Desktop    Mobile    3,257

## CREATIVE

Subject:    Find guidance from real patients, right in your inbox

From Line:    Lungs&You

Please note: The image above is a representation of the creative used for this campaign and may appear different.

 **TAKE 5 MEDIA GROUP**

*TRACKING REPORT*

HIGHLY CONFIDENTIAL

CAMPAIGN:   **OFEV DTC Unbranded Creative Wave 1**

S.O.#:    52819
DEPLOYMENT: 12/04/2018

## CREATIVE URLs & ACTIVITY

| URLS | Clicks | Unique Clicks | Mobile Clicks | Link |
|---|---|---|---|---|
| https://www.lungsandyou.com/?sc=IPFACQWEBEMLMED1807004&utm_source=medicx&utm_medium=email&utm_campaign=medicx2018_stream&utm_term=lungsandyou_logo&utm_content=advice_support | 256 | 169 | 102 | View |
| https://www.lungsandyou.com/sign-up?sc=IPFACQWEBEMLMED1807004&utm_source=medicx&utm_medium=email&utm_campaign=medicx2018_stream&utm_term=signup&utm_content=advice_support | 547 | 428 | 360 | View |
| https://www.lungsandyou.com/sign-up?sc=IPFACQWEBEMLMED1807004&utm_source=medicx&utm_medium=email&utm_campaign=medicx2018_stream&utm_term=signup2&utm_content=advice_support | 150 | 103 | 72 | View |
| https://www.boehringer-ingelheim.us/ | 45 | 29 | 20 | View |

B00306167
F06833-003946759

ATTORNEY WORK PRODUCT
ATTORNEY-CLIENT PRIVILEGE

LATHAM&WATKINS<sup>LLP</sup>

Exhibit B

10

US-DOCS\109441654

HIGHLY CONFIDENTIAL

B00306168
F06833-003946759

**To:** Alexander Radetich[alex@take5mg.com]; Beth Jenkins[bjenkins@take5mg.com]
**From:** Tanya Coker[/O=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TCOKER83726]
**Sent:** Mon 7/30/2018 3:40:10 PM (UTC)
**Subject:** RE: SEC Filing
Fill Report Advantage Solutions 2018.xlsx

Hi Alex,

Attached is the fill report for consumer with separate tabs for Auto Owners, Boat Owners, Auto Intenders, Auto Lease Exp and Ailments.

Is this ok to send? Or do you need any changes?

# Tanya Coker

*director account team*
*Tel: 561-819-5555 x272*
Email: **tcoker@take5mg.com**

2385 NW Executive Center Drive - Suite 290
Boca Raton, FL 33431





CONFIDENTIALITY NOTICE: This transmission (including any accompanying attachment) is confidential, is intended only for the individual or entity named above, and is likely to contain privileged, proprietary and confidential information. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use of or reliance upon any of the information contained in this transmission is strictly prohibited. Any inadvertent or unauthorized disclosure shall not compromise or waive the confidentiality of this transmission.

---

**From:** Alexander Radetich
**Sent:** Thursday, July 26, 2018 5:50 PM
**To:** Beth Jenkins <bjenkins@take5mg.com>; Tanya Coker <tcoker@take5mg.com>
**Subject:** FW: SEC Filing

Ladies — please see below request from corporate and provide them with a fill report supporting these numbers.

Thanks,
Alex

**From:** Darrin Kleinman <darrin.kleinman@advantagesolutions.net>
**Sent:** Thursday, July 26, 2018 5:43 PM
**To:** Alexander Radetich <alex@take5mg.com>
**Subject:** SEC Filing

Alex —

We would like to be able to say your database covers 90%+ of all U.S. households with 240+ million unique postal records, 190+ million date of birth records, 160 million double opt-in emails, and 175 unique lifestyle and demographic overlays with insight into historical and projected spending behaviors. As discussed, please send over the underlying support for these metrics.

Regards,
Darrin

HIGHLY CONFIDENTIAL

B00306169
F06833-003946759

**Darrin Kleinman**
SVP – M&A
**Advantage Solutions**
O: +1 949-214-2517
darrin.kleinman@advantagesolutions.net | www.advantagesolutions.net

*This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

HIGHLY CONFIDENTIAL

B00306170
F06833-003946759

| FieldName | Count |
|---|---|
| First | 268,060,836 |
| Middle | 54,485,240 |
| Last | 268,060,836 |
| suffix | 1,327,389 |
| Address | 268,060,836 |
| City | 268,060,836 |
| State | 268,060,836 |
| Zip | 268,060,836 |
| Zip4 | 268,013,378 |
| dpbc | 268,013,378 |
| last_soundx | 268,060,836 |
| first_soundx | 268,060,836 |
| activity_date | 268,041,647 |
| occupation | 15,279,583 |
| dob | 120,130,608 |
| gender | 222,237,485 |
| reserved_mp_multi_buyer_level | 154,623,112 |
| carrier_route | 268,013,378 |
| dwelling | 241,515,483 |
| congressional_district | 268,013,614 |
| county_fips | 268,013,849 |
| ethnic | 179,547,518 |
| religion | 179,154,663 |
| ethnic_minority_group | 179,531,949 |
| language | 179,558,267 |
| african_american_confidence | 8,631,478 |
| hispanic_country_of_origin | 10,160,420 |
| language_assimilation | 27,032,860 |
| number_of_children | 40,278,251 |
| child1_dob | 18,467,071 |
| child1_gender | 8,164,456 |
| child2_dob | 5,946,833 |
| child2_gender | 2,122,478 |
| child3_dob | 1,974,414 |
| child3_gender | 562,416 |
| child4_dob | 596,855 |
| child4_gender | 151,858 |
| college_grad_year | 1,034,645 |
| college_loan | 463,630 |
| college_loan_delinquent | 463,630 |
| education_level_census | 156,446,699 |
| financial_status | 3,256,816 |
| credit_card | 77,206,651 |
| premium_credit_card | 12,506,353 |
| debt_amount | 86,267 |
| debt_consolidation | 189,258 |

HIGHLY CONFIDENTIAL

| | |
|---|---|
| household_income_census | 262,118,502 |
| life_insurance_holder | 319,390 |
| homeowner | 79,184,852 |
| renter | 15,029,601 |
| home_value_census | 169,205,813 |
| home_purchase_amount | 18,035,061 |
| home_purchase_date | 22,285,895 |
| wedding_date | 1,149,184 |
| political_party | 38,921,302 |
| soho | 6,046,100 |
| taking_care_of_parents | 7,784 |
| tv_service | 12,398,348 |
| smoker | 3,447,742 |
| military_active | 752,226 |
| military_retired | 5,899,733 |
| military_branch | 2,233 |
| mail_order_responder | 69,534,934 |
| apparel | 14,802,419 |
| automotive | 12,101,602 |
| boats | 4,215,153 |
| books | 32,897,694 |
| children | 11,593,615 |
| computer | 17,220,460 |
| cooking | 26,522,515 |
| crafts | 20,796,061 |
| decorating | 16,531,756 |
| do_it_yourself | 23,348,159 |
| electronics | 13,178,751 |
| entertainment | 2,456,438 |
| family | 6,637,285 |
| female | 7,930,790 |
| financial | 6,585,062 |
| food | 7,848,872 |
| gardening | 23,775,895 |
| gifts | 11,856,466 |
| golf | 9,470,502 |
| health_fitness | 29,432,993 |
| hunting_fishing | 5,010,092 |
| investing | 18,496,879 |
| magazines | 10,978,571 |
| male | 4,330,811 |
| motorcycles | 1,118,368 |
| music | 5,629,973 |
| opportunity | 5,067,567 |
| outdoor | 18,539,127 |
| outdoor_sport_recreation | 19,220,694 |
| photography | 4,042,377 |

HIGHLY CONFIDENTIAL

| | |
|---|---|
| religious | 3,673,723 |
| sewing | 10,409,487 |
| sports_collectibles | 5,712,731 |
| stamps_coins | 7,818,864 |
| sweepstakes_gambling | 14,121,772 |
| travel | 28,744,614 |
| upscale | 3,827,729 |
| donor | 23,765,384 |
| donor_charities | 18,514,613 |
| donor_environmental | 11,853,561 |
| donor_health | 12,527,515 |
| donor_political | 21,035,343 |
| donor_democrat | 8,572,387 |
| donor_republican | 10,254,902 |
| donor_religious | 9,071,684 |
| pets | 20,450,766 |
| pets_cat | 10,397,024 |
| pets_dog | 14,645,351 |
| ip | 110,860,739 |
| optinsource | 161,581,513 |
| Marital_Status | 20,050,187 |
| newlywed | 4,429,834 |
| newlyengaged | 1,341,952 |
| new parents | 1,739,172 |
| expecting parents | 483,015 |
| divorce_date | 533,668 |
| email | 125,226,133 |

HIGHLY CONFIDENTIAL

| FieldName | Count |
|---|---|
| First | 91,626,239 |
| Middle | 26,740,649 |
| Last | 91,626,239 |
| suffix | 767,437 |
| Address | 91,626,239 |
| city | 91,626,239 |
| state | 91,626,239 |
| zip | 91,626,239 |
| Zip4 | 91,603,656 |
| Make | 87,470,029 |
| Model | 85,331,759 |
| Year | 91,480,937 |
| VIN | 88,763,002 |
| Class | 83,918,063 |
| Fuel | 54,404,939 |
| Registration | 37,714,369 |
| vehicles | 54,200,222 |
| Body | 88,930,844 |
| Manufact | 85,916,879 |
| Lien | 54,200,222 |
| Auto Purchase Type | 37,609,018 |
| Auto Transaction Date | 35,134,974 |
| Transaction Type | 54,200,222 |
| Auto Validation Date | 78,486,241 |
| Email | 20,374,751 |

HIGHLY CONFIDENTIAL

B00306174
F06833-003946759

| FieldName | Count |
|---|---|
| First | 3,545,036 |
| Last | 3,545,036 |
| Address | 3,545,036 |
| city | 3,545,036 |
| state | 3,545,036 |
| zip | 3,545,036 |
| Zip4 | 3,543,967 |
| Boat Use | 3,545,036 |
| Boat Length | 3,545,036 |
| Boat Type | 3,545,036 |
| Boat Propulsion | 3,545,036 |
| Boat Fuel | 3,545,036 |
| Boat Hull Material | 3,545,036 |
| Boat Make | 3,545,036 |
| Boat Number of Vehicles | 731,260 |
| Boat Hull Shape | 3,545,036 |
| Boat Size | 3,545,036 |
| Boat Year | 3,545,036 |
| Boat Transaction Date | 381,575 |
| Boat Transaction Type | 3,545,036 |
| Boat Validation Date | 3,545,036 |
| Email | 1,606,760 |

HIGHLY CONFIDENTIAL

| Field Name | Fill Count |
| --- | --- |
| Unique ID | 19,691,777 |
| First Name | 19,691,777 |
| Middle Name | 8,328,375 |
| Last Name | 19,691,777 |
| Name Suffix | 221,120 |
| Address | 19,691,777 |
| Address2 | 694,762 |
| City | 19,691,777 |
| State | 19,691,777 |
| Zip | 19,691,777 |
| Zip4 | 19,691,777 |
| Intent Brand 1 | 19,549,169 |
| Intent Brand 2 | 19,549,169 |
| Intent Brand 3 | 19,549,169 |
| Time Of Intent | 19,691,777 |
| Email | 3,841,867 |

HIGHLY CONFIDENTIAL

B00306176
F06833-003946759

| FieldName | Count |
|---|---|
| First | 7,871,175 |
| Last | 7,871,175 |
| Address | 7,871,175 |
| City | 7,871,175 |
| State | 7,871,175 |
| Zip | 7,871,175 |
| Zip4 | 7,870,934 |
| Phone | 3,221,415 |
| TitleLeasePlacer | 7,755,372 |
| EXP | 7,807,475 |
| Email | 1,860,889 |

HIGHLY CONFIDENTIAL

B00306177
F06833-003946759

| Ailment | Value | Postal | Email |
|---|---|---|---|
| ACNE | ACN | 158,029 | 25,964 |
| ADHD/ADD | ADH | 764 | 302 |
| ALLERGIES | ALL | 157,040 | 84,281 |
| ALZHEIMERS | ALZ | 7,729 | 2,670 |
| ANXIETY | ANX | 110,968 | 50,925 |
| ARTERIOSCLEROSIS | ARS | 12,501 | 3,678 |
| ARTHRITIS | ART | 8,348,561 | 1,615,705 |
| ASTHMA | AST | 4,025,096 | 216,404 |
| ATHLETES FOOT | ATH | 7,869 | 2,434 |
| BACK PAIN | BAC | 993,240 | 663,346 |
| BACK AND KNEE | BAK | 3,672,953 | 73,850 |
| BLADDER | BLA | 31,407 | 10,585 |
| BLOOD PRESSURE | BPR | 229,935 | 110,858 |
| BREAST CANCER | BRC | 13,024 | 3,625 |
| BRONCHITIS | BRO | 7,832 | 2,429 |
| CANCER | CAN | 380,158 | 301,690 |
| CHRONIC BRONCHITIS | CHB | 33,689 | 7,897 |
| CHRONS | CHN | 68 | 17 |
| CHOLESTEROL | CHO | 58,462 | 30,421 |
| CHRONIC PAIN | CHR | 54,887 | 18,429 |
| COLON CANCER | CLC | 239 | 78 |
| CONTACTS | CON | 23,839 | 7,594 |
| COPD | COP | 4,209,819 | 609,036 |
| CARPAL TUNNEL SYNDROME | CTS | 11,746 | 3,969 |
| DANDRUFF | DAN | 11,587 | 4,012 |
| DIABETES TYPE 1 | DB1 | 283,792 | 88,748 |
| DIABETES TYPE 2 | DB2 | 956,972 | 327,188 |
| GESTATIONAL DIABETES | DBG | 710 | 226 |
| DIABETIC | DBT | 8,746,952 | 725,945 |
| DEPRESSION | DEP | 137,732 | 54,072 |
| DEPRESSION/ANXIETY | DPA | 34,662 | 10,142 |
| ECZEMA | ECZ | 13,616 | 4,945 |
| ED | ED1 | 2,895,302 | 51,345 |
| EMPHYSEMA | EMP | 76,905 | 24,125 |
| ENDOMETRIOSIS | END | 3,146 | 1,070 |
| GERD / ACID | GER | 20,640 | 7,212 |
| GINGIVITIS | GIN | 11,625 | 3,982 |
| GLASSES | GLA | 18,263 | 6,300 |
| GLUCOPHAGE | GLC | 334 | 120 |
| HEARTBURN | HBN | 47,712 | 17,212 |
| HIGH BLOOD PRESSURE | HBP | 6,703,309 | 146,910 |
| HIGH CHOLESTEROL | HCH | 77,482 | 24,393 |
| HIP JOINT | HIP | 282 | 118 |
| HEARING | HRG | 2,140,415 | 103,527 |
| HAIR LOSS | HRL | 64,984 | 18,328 |
| HEART DISEASE OR ATTACK | HRT | 473,440 | 302,984 |

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| HYPERACIDITY AND HEARTBURN | HYP | 70,202 | 29,625 |
| IBS | IBS | 34,158 | 10,819 |
| IRRITABLE BOWEL SYNDROME-IBS | IBS | 34,158 | 10,819 |
| IMPOTENCE/ED | IED | 133,462 | 102,310 |
| IMPOTENCE | IMP | 918 | 369 |
| INDIGESTION | IND | 12,017 | 4,638 |
| INSOMNIA | INS | 42,577 | 15,228 |
| IMPAIRED VISION | IVN | 69,376 | 22,659 |
| KIDNEY | KID | 85,409 | 1,758 |
| LUNG CANCER | LGC | 1,340 | 530 |
| LIPITOR RX | LIP | 4,047 | 1,425 |
| LIVER DISEASE | LVD | 1,126,153 | 21,626 |
| MEDICAL/ MEDICADE/ DISABILITY | MED | 40,663 | 30,566 |
| MENOPAUSE | MEN | 36,376 | 11,208 |
| MIGRAINES OR HEADACHES | MIG | 170,498 | 98,510 |
| MULTIPLE SCLEROSIS | MLS | 12,764 | 4,800 |
| MENSTRUAL PROBLEMS | MNS | 14,318 | 5,181 |
| MOBILITY | MOB | 638,318 | 13,705 |
| NASAL ALLERGIES | NAS | 63,631 | 25,721 |
| NAIL FUNGUS | NLF | 339 | 168 |
| NASAL CONGESTION | NSC | 11,297 | 4,279 |
| OBESITY | OBE | 251,346 | 111,139 |
| ORAL INJECTABLE INSULIN | OII | 167 | 60 |
| OSTEOPOROSIS | OSP | 41,387 | 12,308 |
| OSTEOARTHRITIS | OST | 52,466 | 16,522 |
| PREMENSTRUAL SYNDROME-DISABLING | PMD | 939 | 338 |
| PREMENSTRUAL SYNDROME | PMS | 1,945 | 756 |
| POST NASAL DRIP | PND | 7,939 | 2,981 |
| PROSTATE CANCER | PRC | 2,502 | 854 |
| PROSTATE DISORDERS | PRO | 87,053 | 51,983 |
| PRESCRIPTION DRUGS | PRX | 2,552 | 1,451 |
| PSORIASIS | PSO | 34,008 | 12,910 |
| RHEUMATISM | RHE | 71,489 | 32,383 |
| SINUSITIS | SIN | 5,020 | 1,832 |
| SLEEP APNEA | SLE | 1,058,951 | 51,185 |
| SNORING | SNO | 6,471 | 2,307 |
| SORE THROAT | SOR | 2,970 | 1,082 |
| SPINAL INJURY | SPI | 472 | 176 |
| STROKE | STR | 162 | 140 |
| TOBACCO_USE | TOB | 5 | 5 |
| ULCERATIVE COLITIS | ULC | 16 | 6 |
| VISION | VIS | 13,856 | 7,568 |
| WEIGHT | WEI | 41,910 | 21,894 |
| WHEELCHAIR RX | WHL | 12,732 | 3,424 |

HIGHLY CONFIDENTIAL

**To:** Alexander Radetich[alex@take5mg.com]
Case 1:22-cv-02276-RC-ZMF   Document 40-43   Filed 07/18/23   Page 140 of 162
**Cc:** Beth Jenkins[bjenkins@take5mg.com]

**From:** Tanya Coker[/O=EXG7/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TCOKER83726]
**Sent:** Tue 7/31/2018 3:00:32 PM (UTC)
**Subject:** RE: SEC Filing
Fill Report Advantage Solutions 2018.xlsx

Perfect! Here is the updated fill report. Good to send?

## Tanya Coker

*director account team*
*Tel: 561-819-5555 **x272***
Email: tcoker@take5mg.com

2385 NW Executive Center Drive - Suite 290
Boca Raton, FL 33431




Google
Partner

CONFIDENTIALITY NOTICE: This transmission (including any accompanying attachment) is confidential,
is intended only for the individual or entity named above, and is likely to contain privileged, proprietary
and confidential information. If you are not the intended recipient, you are hereby notified that any
disclosure, copying, distribution, use of or reliance upon any of the information contained in this
transmission is strictly prohibited. Any inadvertent or unauthorized disclosure shall not compromise or
waive the confidentiality of this transmission.

**From:** Alexander Radetich
**Sent:** Tuesday, July 31, 2018 10:53 AM
**To:** Tanya Coker <tcoker@take5mg.com>
**Cc:** Beth Jenkins <bjenkins@take5mg.com>
**Subject:** Re: SEC Filing

Pls do. Thx.

Sent from my iPhone
On Jul 31, 2018, at 10:47 AM, Tanya Coker <tcoker@take5mg.com> wrote:

Hi Alex,

We have 200MM all available DOBs and 120MM Unique DOBs. Do you want me to insert the all available DOB
quantity in the fill report? Or use the unique number?

## Tanya Coker

*director account team*
*Tel: 561-819-5555 **x272***
Email: tcoker@take5mg.com

2385 NW Executive Center Drive - Suite 290
Boca Raton, FL 33431



<image002.png>

CONFIDENTIALITY NOTICE: This transmission (including any accompanying attachment) is confidential,
is intended only for the individual or entity named above, and is likely to contain privileged, proprietary
and confidential information. If you are not the intended recipient, you are hereby notified that any
disclosure, copying, distribution, use of or reliance upon any of the information contained in this

**From:** Alexander Radetich
**Sent:** Monday, July 30, 2018 8:56 PM
**To:** Tanya Coker <tcoker@take5mg.com>
**Cc:** Beth Jenkins <bjenkins@take5mg.com>
**Subject:** Re: SEC Filing

Thanks, we also need to show 207mm DOBs, as Hygenics stated we have

Sent from my iPhone
On Jul 30, 2018, at 12:05 PM, Tanya Coker <tcoker@take5mg.com> wrote:

Hi Alex,

I updated the quantity. Fill report attached.

## Tanya Coker

*director account team*
*Tel: 561-819-5555 x272*
Email: tcoker@take5mg.com

2385 NW Executive Center Drive - Suite 290
Boca Raton, FL 33431



<image002.png>  CONFIDENTIALITY NOTICE: This transmission (including any accompanying attachment) is confidential, is intended only for the individual or entity named above, and is likely to contain privileged, proprietary and confidential information. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use of or reliance upon any of the information contained in this transmission is strictly prohibited. Any inadvertent or unauthorized disclosure shall not compromise or waive the confidentiality of this transmission.

**From:** Alexander Radetich
**Sent:** Monday, July 30, 2018 12:01 PM
**To:** Tanya Coker <tcoker@take5mg.com>
**Cc:** Beth Jenkins <bjenkins@take5mg.com>
**Subject:** Re: SEC Filing

Thanks.  I need the emails to be at 167mm or so.

Sent from my iPhone
On Jul 30, 2018, at 11:40 AM, Tanya Coker <tcoker@take5mg.com> wrote:

Hi Alex,

Attached is the fill report for consumer with separate tabs for Auto Owners, Boat Owners, Auto Intenders, Auto Lease Exp and Ailments.

Is this ok to send? Or do you need any changes?



HIGHLY CONFIDENTIAL

**Tanya Coker**

*director account team*
*Tel: 561-819-5555 x272*
Email: tcoker@take5mg.com

2385 NW Executive Center Drive - Suite 290
Boca Raton, FL 33431



<image002.png>

CONFIDENTIALITY NOTICE: This transmission (including any accompanying attachment) is confidential, is intended only for the individual or entity named above, and is likely to contain privileged, proprietary and confidential information. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use of or reliance upon any of the information contained in this transmission is strictly prohibited. Any inadvertent or unauthorized disclosure shall not compromise or waive the confidentiality of this transmission.

**From:** Alexander Radetich
**Sent:** Thursday, July 26, 2018 5:50 PM
**To:** Beth Jenkins <bjenkins@take5mg.com>; Tanya Coker <tcoker@take5mg.com>
**Subject:** FW: SEC Filing

Ladies — please see below request from corporate and provide them with a fill report supporting these numbers.

Thanks,
Alex

**From:** Darrin Kleinman <darrin.kleinman@advantagesolutions.net>
**Sent:** Thursday, July 26, 2018 5:43 PM
**To:** Alexander Radetich <alex@take5mg.com>
**Subject:** SEC Filing

Alex —

We would like to be able to say your database covers 90%+ of all U.S. households with 240+ million unique postal records, 190+ million date of birth records, 160 million double opt-in emails, and 175 unique lifestyle and demographic overlays with insight into historical and projected spending behaviors. As discussed, please send over the underlying support for these metrics.

Regards,
Darrin

**Darrin Kleinman**
SVP – M&A
**Advantage Solutions**
O: +1 949-214-2517
darrin.kleinman@advantagesolutions.net | www.advantagesolutions.net

*This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

<Fill Report Advantage Solutions 2018.xlsx>
<Fill Report Advantage Solutions 2018.xlsx>

HIGHLY CONFIDENTIAL

| FieldName | Count |
| --- | --- |
| First | 268,060,836 |
| Middle | 54,485,240 |
| Last | 268,060,836 |
| suffix | 1,327,389 |
| Address | 268,060,836 |
| City | 268,060,836 |
| State | 268,060,836 |
| Zip | 268,060,836 |
| Zip4 | 268,013,378 |
| dpbc | 268,013,378 |
| last_soundx | 268,060,836 |
| first_soundx | 268,060,836 |
| activity_date | 268,041,647 |
| occupation | 15,279,583 |
| dob | 200,275,083 |
| gender | 222,237,485 |
| reserved_mp_multi_buyer_level | 154,623,112 |
| carrier_route | 268,013,378 |
| dwelling | 241,515,483 |
| congressional_district | 268,013,614 |
| county_fips | 268,013,849 |
| ethnic | 179,547,518 |
| religion | 179,154,663 |
| ethnic_minority_group | 179,531,949 |
| language | 179,558,267 |
| african_american_confidence | 8,631,478 |
| hispanic_country_of_origin | 10,160,420 |
| language_assimilation | 27,032,860 |
| number_of_children | 40,278,251 |
| child1_dob | 18,467,071 |
| child1_gender | 8,164,456 |
| child2_dob | 5,946,833 |
| child2_gender | 2,122,478 |
| child3_dob | 1,974,414 |
| child3_gender | 562,416 |
| child4_dob | 596,855 |
| child4_gender | 151,858 |
| college_grad_year | 1,034,645 |
| college_loan | 463,630 |
| college_loan_delinquent | 463,630 |
| education_level_census | 156,446,699 |
| financial_status | 3,256,816 |
| credit_card | 77,206,651 |
| premium_credit_card | 12,506,353 |
| debt_amount | 86,267 |
| debt_consolidation | 189,258 |

B00306183
F06833-003946759

| | |
|---|---:|
| household_income_census | 262,118,502 |
| life_insurance_holder | 319,390 |
| homeowner | 79,184,852 |
| renter | 15,029,601 |
| home_value_census | 169,205,813 |
| home_purchase_amount | 18,035,061 |
| home_purchase_date | 22,285,895 |
| wedding_date | 1,149,184 |
| political_party | 38,921,302 |
| soho | 6,046,100 |
| taking_care_of_parents | 7,784 |
| tv_service | 12,398,348 |
| smoker | 3,447,742 |
| military_active | 752,226 |
| military_retired | 5,899,733 |
| military_branch | 2,233 |
| mail_order_responder | 69,534,934 |
| apparel | 14,802,419 |
| automotive | 12,101,602 |
| boats | 4,215,153 |
| books | 32,897,694 |
| children | 11,593,615 |
| computer | 17,220,460 |
| cooking | 26,522,515 |
| crafts | 20,796,061 |
| decorating | 16,531,756 |
| do_it_yourself | 23,348,159 |
| electronics | 13,178,751 |
| entertainment | 2,456,438 |
| family | 6,637,285 |
| female | 7,930,790 |
| financial | 6,585,062 |
| food | 7,848,872 |
| gardening | 23,775,895 |
| gifts | 11,856,466 |
| golf | 9,470,502 |
| health_fitness | 29,432,993 |
| hunting_fishing | 5,010,092 |
| investing | 18,496,879 |
| magazines | 10,978,571 |
| male | 4,330,811 |
| motorcycles | 1,118,368 |
| music | 5,629,973 |
| opportunity | 5,067,567 |
| outdoor | 18,539,127 |
| outdoor_sport_recreation | 19,220,694 |
| photography | 4,042,377 |

HIGHLY CONFIDENTIAL

| | |
|---|---|
| religious | 3,673,723 |
| sewing | 10,409,487 |
| sports_collectibles | 5,712,731 |
| stamps_coins | 7,818,864 |
| sweepstakes_gambling | 14,121,772 |
| travel | 28,744,614 |
| upscale | 3,827,729 |
| donor | 23,765,384 |
| donor_charities | 18,514,613 |
| donor_environmental | 11,853,561 |
| donor_health | 12,527,515 |
| donor_political | 21,035,343 |
| donor_democrat | 8,572,387 |
| donor_republican | 10,254,902 |
| donor_religious | 9,071,684 |
| pets | 20,450,766 |
| pets_cat | 10,397,024 |
| pets_dog | 14,645,351 |
| ip | 110,860,739 |
| optinsource | 161,581,513 |
| Marital_Status | 20,050,187 |
| newlywed | 4,429,834 |
| newlyengaged | 1,341,952 |
| new parents | 1,739,172 |
| expecting parents | 483,015 |
| divorce_date | 533,668 |
| email | 167,315,549 |

HIGHLY CONFIDENTIAL

| FieldName | Count |
|---|---|
| First | 91,626,239 |
| Middle | 26,740,649 |
| Last | 91,626,239 |
| suffix | 767,437 |
| Address | 91,626,239 |
| city | 91,626,239 |
| state | 91,626,239 |
| zip | 91,626,239 |
| Zip4 | 91,603,656 |
| Make | 87,470,029 |
| Model | 85,331,759 |
| Year | 91,480,937 |
| VIN | 88,763,002 |
| Class | 83,918,063 |
| Fuel | 54,404,939 |
| Registration | 37,714,369 |
| vehicles | 54,200,222 |
| Body | 88,930,844 |
| Manufact | 85,916,879 |
| Lien | 54,200,222 |
| Auto Purchase Type | 37,609,018 |
| Auto Transaction Date | 35,134,974 |
| Transaction Type | 54,200,222 |
| Auto Validation Date | 78,486,241 |
| Email | 20,374,751 |

HIGHLY CONFIDENTIAL

B00306186
F06833-003946759

| FieldName | Count |
|---|---|
| First | 3,545,036 |
| Last | 3,545,036 |
| Address | 3,545,036 |
| city | 3,545,036 |
| state | 3,545,036 |
| zip | 3,545,036 |
| Zip4 | 3,543,967 |
| Boat Use | 3,545,036 |
| Boat Length | 3,545,036 |
| Boat Type | 3,545,036 |
| Boat Propulsion | 3,545,036 |
| Boat Fuel | 3,545,036 |
| Boat Hull Material | 3,545,036 |
| Boat Make | 3,545,036 |
| Boat Number of Vehicles | 731,260 |
| Boat Hull Shape | 3,545,036 |
| Boat Size | 3,545,036 |
| Boat Year | 3,545,036 |
| Boat Transaction Date | 381,575 |
| Boat Transaction Type | 3,545,036 |
| Boat Validation Date | 3,545,036 |
| Email | 1,606,760 |

HIGHLY CONFIDENTIAL

| Field Name | Fill Count |
|---|---|
| Unique ID | 19,691,777 |
| First Name | 19,691,777 |
| Middle Name | 8,328,375 |
| Last Name | 19,691,777 |
| Name Suffix | 221,120 |
| Address | 19,691,777 |
| Address2 | 694,762 |
| City | 19,691,777 |
| State | 19,691,777 |
| Zip | 19,691,777 |
| Zip4 | 19,691,777 |
| Intent Brand 1 | 19,549,169 |
| Intent Brand 2 | 19,549,169 |
| Intent Brand 3 | 19,549,169 |
| Time Of Intent | 19,691,777 |
| Email | 3,841,867 |

HIGHLY CONFIDENTIAL

B00306188
F06833-003946759

| FieldName | Count |
|---|---|
| First | 7,871,175 |
| Last | 7,871,175 |
| Address | 7,871,175 |
| City | 7,871,175 |
| State | 7,871,175 |
| Zip | 7,871,175 |
| Zip4 | 7,870,934 |
| Phone | 3,221,415 |
| TitleLeasePlacer | 7,755,372 |
| EXP | 7,807,475 |
| Email | 1,860,889 |

HIGHLY CONFIDENTIAL

B00306189
F06833-003946759

| Ailment | Value | Postal | Email |
|---|---|---|---|
| ACNE | ACN | 158,029 | 25,964 |
| ADHD/ADD | ADH | 764 | 302 |
| ALLERGIES | ALL | 157,040 | 84,281 |
| ALZHEIMERS | ALZ | 7,729 | 2,670 |
| ANXIETY | ANX | 110,968 | 50,925 |
| ARTERIOSCLEROSIS | ARS | 12,501 | 3,678 |
| ARTHRITIS | ART | 8,348,561 | 1,615,705 |
| ASTHMA | AST | 4,025,096 | 216,404 |
| ATHLETES FOOT | ATH | 7,869 | 2,434 |
| BACK PAIN | BAC | 993,240 | 663,346 |
| BACK AND KNEE | BAK | 3,672,953 | 73,850 |
| BLADDER | BLA | 31,407 | 10,585 |
| BLOOD PRESSURE | BPR | 229,935 | 110,858 |
| BREAST CANCER | BRC | 13,024 | 3,625 |
| BRONCHITIS | BRO | 7,832 | 2,429 |
| CANCER | CAN | 380,158 | 301,690 |
| CHRONIC BRONCHITIS | CHB | 33,689 | 7,897 |
| CHRONS | CHN | 68 | 17 |
| CHOLESTEROL | CHO | 58,462 | 30,421 |
| CHRONIC PAIN | CHR | 54,887 | 18,429 |
| COLON CANCER | CLC | 239 | 78 |
| CONTACTS | CON | 23,839 | 7,594 |
| COPD | COP | 4,209,819 | 609,036 |
| CARPAL TUNNEL SYNDROME | CTS | 11,746 | 3,969 |
| DANDRUFF | DAN | 11,587 | 4,012 |
| DIABETES TYPE 1 | DB1 | 283,792 | 88,748 |
| DIABETES TYPE 2 | DB2 | 956,972 | 327,188 |
| GESTATIONAL DIABETES | DBG | 710 | 226 |
| DIABETIC | DBT | 8,746,952 | 725,945 |
| DEPRESSION | DEP | 137,732 | 54,072 |
| DEPRESSION/ANXIETY | DPA | 34,662 | 10,142 |
| ECZEMA | ECZ | 13,616 | 4,945 |
| ED | ED1 | 2,895,302 | 51,345 |
| EMPHYSEMA | EMP | 76,905 | 24,125 |
| ENDOMETRIOSIS | END | 3,146 | 1,070 |
| GERD / ACID | GER | 20,640 | 7,212 |
| GINGIVITIS | GIN | 11,625 | 3,982 |
| GLASSES | GLA | 18,263 | 6,300 |
| GLUCOPHAGE | GLC | 334 | 120 |
| HEARTBURN | HBN | 47,712 | 17,212 |
| HIGH BLOOD PRESSURE | HBP | 6,703,309 | 146,910 |
| HIGH CHOLESTEROL | HCH | 77,482 | 24,393 |
| HIP JOINT | HIP | 282 | 118 |
| HEARING | HRG | 2,140,415 | 103,527 |
| HAIR LOSS | HRL | 64,984 | 18,328 |
| HEART DISEASE OR ATTACK | HRT | 473,440 | 302,984 |

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---:|---:|
| HYPERACIDITY AND HEARTBURN | HYP | 70,202 | 29,625 |
| IBS | IBS | 34,158 | 10,819 |
| IRRITABLE BOWEL SYNDROME-IBS | IBS | 34,158 | 10,819 |
| IMPOTENCE/ED | IED | 133,462 | 102,310 |
| IMPOTENCE | IMP | 918 | 369 |
| INDIGESTION | IND | 12,017 | 4,638 |
| INSOMNIA | INS | 42,577 | 15,228 |
| IMPAIRED VISION | IVN | 69,376 | 22,659 |
| KIDNEY | KID | 85,409 | 1,758 |
| LUNG CANCER | LGC | 1,340 | 530 |
| LIPITOR RX | LIP | 4,047 | 1,425 |
| LIVER DISEASE | LVD | 1,126,153 | 21,626 |
| MEDICAL/ MEDICADE/ DISABILITY | MED | 40,663 | 30,566 |
| MENOPAUSE | MEN | 36,376 | 11,208 |
| MIGRAINES OR HEADACHES | MIG | 170,498 | 98,510 |
| MULTIPLE SCLEROSIS | MLS | 12,764 | 4,800 |
| MENSTRUAL PROBLEMS | MNS | 14,318 | 5,181 |
| MOBILITY | MOB | 638,318 | 13,705 |
| NASAL ALLERGIES | NAS | 63,631 | 25,721 |
| NAIL FUNGUS | NLF | 339 | 168 |
| NASAL CONGESTION | NSC | 11,297 | 4,279 |
| OBESITY | OBE | 251,346 | 111,139 |
| ORAL INJECTABLE INSULIN | OII | 167 | 60 |
| OSTEOPOROSIS | OSP | 41,387 | 12,308 |
| OSTEOARTHRITIS | OST | 52,466 | 16,522 |
| PREMENSTRUAL SYNDROME-DISABLING | PMD | 939 | 338 |
| PREMENSTRUAL SYNDROME | PMS | 1,945 | 756 |
| POST NASAL DRIP | PND | 7,939 | 2,981 |
| PROSTATE CANCER | PRC | 2,502 | 854 |
| PROSTATE DISORDERS | PRO | 87,053 | 51,983 |
| PRESCRIPTION DRUGS | PRX | 2,552 | 1,451 |
| PSORIASIS | PSO | 34,008 | 12,910 |
| RHEUMATISM | RHE | 71,489 | 32,385 |
| SINUSITIS | SIN | 5,020 | 1,832 |
| SLEEP APNEA | SLE | 1,058,951 | 51,185 |
| SNORING | SNO | 6,471 | 2,307 |
| SORE THROAT | SOR | 2,970 | 1,082 |
| SPINAL INJURY | SPI | 472 | 176 |
| STROKE | STR | 162 | 140 |
| TOBACCO_USE | TOB | 5 | 5 |
| ULCERATIVE COLITIS | ULC | 16 | 6 |
| VISION | VIS | 13,856 | 7,568 |
| WEIGHT | WEI | 41,910 | 21,894 |
| WHEELCHAIR RX | WHL | 12,732 | 3,424 |

HIGHLY CONFIDENTIAL

**To:** darrin.kleinman@advantagesolutions.net[darrin.kleinman@advantagesolutions.net]
**Cc:** Alexander Radetich[alex@take5mg.com]; Beth Jenkins[bjenkins@take5mg.com]
**From:** Tanya Coker[/O=EXG7/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TCOKER83726]
**Sent:** Tue 7/31/2018 3:06:38 PM (UTC)
**Subject:** RE: SEC Filing
Fill Report Advantage Solutions 2018.xlsx

Good Morning Darrin,

Attached you will find the fill report for our database.

Please let us know if you have any questions.

Have a great day!

## Tanya Coker

*director account team*
*Tel: 561-819-5555 **x272***
Email: **tcoker@take5mg.com**

2385 NW Executive Center Drive - Suite 290
Boca Raton, FL 33431





CONFIDENTIALITY NOTICE: This transmission (including any accompanying attachment) is confidential,
is intended only for the individual or entity named above, and is likely to contain privileged, proprietary
and confidential information. If you are not the intended recipient, you are hereby notified that any
disclosure, copying, distribution, use of or reliance upon any of the information contained in this
transmission is strictly prohibited. Any inadvertent or unauthorized disclosure shall not compromise or
waive the confidentiality of this transmission.

---

**From:** Darrin Kleinman <darrin.kleinman@advantagesolutions.net>
**Sent:** Thursday, July 26, 2018 5:43 PM
**To:** Alexander Radetich <alex@take5mg.com>
**Subject:** SEC Filing

Alex –

We would like to be able to say your database covers 90%+ of all U.S. households with 240+ million unique postal records, 190+ million date of birth records, 160 million double opt-in emails, and 175 unique lifestyle and demographic overlays with insight into historical and projected spending behaviors. As discussed, please send over the underlying support for these metrics.

Regards,
Darrin

Darrin Kleinman
SVP – M&A
**Advantage Solutions**
O: +1 949-214-2517
darrin.kleinman@advantagesolutions.net | www.advantagesolutions.net

*This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and*
*protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended*
*recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

HIGHLY CONFIDENTIAL

| FieldName | Count |
| --- | --- |
| First | 268,060,836 |
| Middle | 54,485,240 |
| Last | 268,060,836 |
| suffix | 1,327,389 |
| Address | 268,060,836 |
| City | 268,060,836 |
| State | 268,060,836 |
| Zip | 268,060,836 |
| Zip4 | 268,013,378 |
| dpbc | 268,013,378 |
| last_soundx | 268,060,836 |
| first_soundx | 268,060,836 |
| activity_date | 268,041,647 |
| occupation | 15,279,583 |
| dob | 200,275,083 |
| gender | 222,237,485 |
| reserved_mp_multi_buyer_level | 154,623,112 |
| carrier_route | 268,013,378 |
| dwelling | 241,515,483 |
| congressional_district | 268,013,614 |
| county_fips | 268,013,849 |
| ethnic | 179,547,518 |
| religion | 179,154,663 |
| ethnic_minority_group | 179,531,949 |
| language | 179,558,267 |
| african_american_confidence | 8,631,478 |
| hispanic_country_of_origin | 10,160,420 |
| language_assimilation | 27,032,860 |
| number_of_children | 40,278,251 |
| child1_dob | 18,467,071 |
| child1_gender | 8,164,456 |
| child2_dob | 5,946,833 |
| child2_gender | 2,122,478 |
| child3_dob | 1,974,414 |
| child3_gender | 562,416 |
| child4_dob | 596,855 |
| child4_gender | 151,858 |
| college_grad_year | 1,034,645 |
| college_loan | 463,630 |
| college_loan_delinquent | 463,630 |
| education_level_census | 156,446,699 |
| financial_status | 3,256,816 |
| credit_card | 77,206,651 |
| premium_credit_card | 12,506,353 |
| debt_amount | 86,267 |
| debt_consolidation | 189,258 |

| | |
|---|---|
| household_income_census | 262,118,502 |
| life_insurance_holder | 319,390 |
| homeowner | 79,184,852 |
| renter | 15,029,601 |
| home_value_census | 169,205,813 |
| home_purchase_amount | 18,035,061 |
| home_purchase_date | 22,285,895 |
| wedding_date | 1,149,184 |
| political_party | 38,921,302 |
| soho | 6,046,100 |
| taking_care_of_parents | 7,784 |
| tv_service | 12,398,348 |
| smoker | 3,447,742 |
| military_active | 752,226 |
| military_retired | 5,899,733 |
| military_branch | 2,233 |
| mail_order_responder | 69,534,934 |
| apparel | 14,802,419 |
| automotive | 12,101,602 |
| boats | 4,215,153 |
| books | 32,897,694 |
| children | 11,593,615 |
| computer | 17,220,460 |
| cooking | 26,522,515 |
| crafts | 20,796,061 |
| decorating | 16,531,756 |
| do_it_yourself | 23,348,159 |
| electronics | 13,178,751 |
| entertainment | 2,456,438 |
| family | 6,637,285 |
| female | 7,930,790 |
| financial | 6,585,062 |
| food | 7,848,872 |
| gardening | 23,775,895 |
| gifts | 11,856,466 |
| golf | 9,470,502 |
| health_fitness | 29,432,993 |
| hunting_fishing | 5,010,092 |
| investing | 18,496,879 |
| magazines | 10,978,571 |
| male | 4,330,811 |
| motorcycles | 1,118,368 |
| music | 5,629,973 |
| opportunity | 5,067,567 |
| outdoor | 18,539,127 |
| outdoor_sport_recreation | 19,220,694 |
| photography | 4,042,377 |

HIGHLY CONFIDENTIAL

| | |
|---|---|
| religious | 3,673,723 |
| sewing | 10,409,487 |
| sports_collectibles | 5,712,731 |
| stamps_coins | 7,818,864 |
| sweepstakes_gambling | 14,121,772 |
| travel | 28,744,614 |
| upscale | 3,827,729 |
| donor | 23,765,384 |
| donor_charities | 18,514,613 |
| donor_environmental | 11,853,561 |
| donor_health | 12,527,515 |
| donor_political | 21,035,343 |
| donor_democrat | 8,572,387 |
| donor_republican | 10,254,902 |
| donor_religious | 9,071,684 |
| pets | 20,450,766 |
| pets_cat | 10,397,024 |
| pets_dog | 14,645,351 |
| ip | 110,860,739 |
| optinsource | 161,581,513 |
| Marital_Status | 20,050,187 |
| newlywed | 4,429,834 |
| newlyengaged | 1,341,952 |
| new parents | 1,739,172 |
| expecting parents | 483,015 |
| divorce_date | 533,668 |
| email | 167,315,549 |

HIGHLY CONFIDENTIAL

| FieldName | Count |
|---|---|
| First | 91,626,239 |
| Middle | 26,740,649 |
| Last | 91,626,239 |
| suffix | 767,437 |
| Address | 91,626,239 |
| city | 91,626,239 |
| state | 91,626,239 |
| zip | 91,626,239 |
| Zip4 | 91,603,656 |
| Make | 87,470,029 |
| Model | 85,331,759 |
| Year | 91,480,937 |
| VIN | 88,763,002 |
| Class | 83,918,063 |
| Fuel | 54,404,939 |
| Registration | 37,714,369 |
| vehicles | 54,200,222 |
| Body | 88,930,844 |
| Manufact | 85,916,879 |
| Lien | 54,200,222 |
| Auto Purchase Type | 37,609,018 |
| Auto Transaction Date | 35,134,974 |
| Transaction Type | 54,200,222 |
| Auto Validation Date | 78,486,241 |
| Email | 20,374,751 |

HIGHLY CONFIDENTIAL

B00306196
F06833-003946759

| FieldName | Count |
|---|---|
| First | 3,545,036 |
| Last | 3,545,036 |
| Address | 3,545,036 |
| city | 3,545,036 |
| state | 3,545,036 |
| zip | 3,545,036 |
| Zip4 | 3,543,967 |
| Boat Use | 3,545,036 |
| Boat Length | 3,545,036 |
| Boat Type | 3,545,036 |
| Boat Propulsion | 3,545,036 |
| Boat Fuel | 3,545,036 |
| Boat Hull Material | 3,545,036 |
| Boat Make | 3,545,036 |
| Boat Number of Vehicles | 731,260 |
| Boat Hull Shape | 3,545,036 |
| Boat Size | 3,545,036 |
| Boat Year | 3,545,036 |
| Boat Transaction Date | 381,575 |
| Boat Transaction Type | 3,545,036 |
| Boat Validation Date | 3,545,036 |
| Email | 1,606,760 |

HIGHLY CONFIDENTIAL

| Field Name | Fill Count |
| --- | --- |
| Unique ID | 19,691,777 |
| First Name | 19,691,777 |
| Middle Name | 8,328,375 |
| Last Name | 19,691,777 |
| Name Suffix | 221,120 |
| Address | 19,691,777 |
| Address2 | 694,762 |
| City | 19,691,777 |
| State | 19,691,777 |
| Zip | 19,691,777 |
| Zip4 | 19,691,777 |
| Intent Brand 1 | 19,549,169 |
| Intent Brand 2 | 19,549,169 |
| Intent Brand 3 | 19,549,169 |
| Time Of Intent | 19,691,777 |
| Email | 3,841,867 |

HIGHLY CONFIDENTIAL

B00306198
F06833-003946759

| FieldName | Count |
|---|---|
| First | 7,871,175 |
| Last | 7,871,175 |
| Address | 7,871,175 |
| City | 7,871,175 |
| State | 7,871,175 |
| Zip | 7,871,175 |
| Zip4 | 7,870,934 |
| Phone | 3,221,415 |
| TitleLeasePlacer | 7,755,372 |
| EXP | 7,807,475 |
| Email | 1,860,889 |

HIGHLY CONFIDENTIAL

B00306199
F06833-003946759

| Ailment | Value | Postal | Email |
|---|---|---|---|
| ACNE | ACN | 158,029 | 25,964 |
| ADHD/ADD | ADH | 764 | 302 |
| ALLERGIES | ALL | 157,040 | 84,281 |
| ALZHEIMERS | ALZ | 7,729 | 2,670 |
| ANXIETY | ANX | 110,968 | 50,925 |
| ARTERIOSCLEROSIS | ARS | 12,501 | 3,678 |
| ARTHRITIS | ART | 8,348,561 | 1,615,705 |
| ASTHMA | AST | 4,025,096 | 216,404 |
| ATHLETES FOOT | ATH | 7,869 | 2,434 |
| BACK PAIN | BAC | 993,240 | 663,346 |
| BACK AND KNEE | BAK | 3,672,953 | 73,850 |
| BLADDER | BLA | 31,407 | 10,585 |
| BLOOD PRESSURE | BPR | 229,935 | 110,858 |
| BREAST CANCER | BRC | 13,024 | 3,625 |
| BRONCHITIS | BRO | 7,832 | 2,429 |
| CANCER | CAN | 380,158 | 301,690 |
| CHRONIC BRONCHITIS | CHB | 33,689 | 7,897 |
| CHRONS | CHN | 68 | 17 |
| CHOLESTEROL | CHO | 58,462 | 30,421 |
| CHRONIC PAIN | CHR | 54,887 | 18,429 |
| COLON CANCER | CLC | 239 | 78 |
| CONTACTS | CON | 23,839 | 7,594 |
| COPD | COP | 4,209,819 | 609,036 |
| CARPAL TUNNEL SYNDROME | CTS | 11,746 | 3,969 |
| DANDRUFF | DAN | 11,587 | 4,012 |
| DIABETES TYPE 1 | DB1 | 283,792 | 88,748 |
| DIABETES TYPE 2 | DB2 | 956,972 | 327,188 |
| GESTATIONAL DIABETES | DBG | 710 | 226 |
| DIABETIC | DBT | 8,746,952 | 725,945 |
| DEPRESSION | DEP | 137,732 | 54,072 |
| DEPRESSION/ANXIETY | DPA | 34,662 | 10,142 |
| ECZEMA | ECZ | 13,616 | 4,945 |
| ED | ED1 | 2,895,302 | 51,345 |
| EMPHYSEMA | EMP | 76,905 | 24,125 |
| ENDOMETRIOSIS | END | 3,146 | 1,070 |
| GERD / ACID | GER | 20,640 | 7,212 |
| GINGIVITIS | GIN | 11,625 | 3,982 |
| GLASSES | GLA | 18,263 | 6,300 |
| GLUCOPHAGE | GLC | 334 | 120 |
| HEARTBURN | HBN | 47,712 | 17,212 |
| HIGH BLOOD PRESSURE | HBP | 6,703,309 | 146,910 |
| HIGH CHOLESTEROL | HCH | 77,482 | 24,393 |
| HIP JOINT | HIP | 282 | 118 |
| HEARING | HRG | 2,140,415 | 103,527 |
| HAIR LOSS | HRL | 64,984 | 18,328 |
| HEART DISEASE OR ATTACK | HRT | 473,440 | 302,984 |

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| HYPERACIDITY AND HEARTBURN | HYP | 70,202 | 29,625 |
| IBS | IBS | 34,158 | 10,819 |
| IRRITABLE BOWEL SYNDROME-IBS | IBS | 34,158 | 10,819 |
| IMPOTENCE/ED | IED | 133,462 | 102,310 |
| IMPOTENCE | IMP | 918 | 369 |
| INDIGESTION | IND | 12,017 | 4,638 |
| INSOMNIA | INS | 42,577 | 15,228 |
| IMPAIRED VISION | IVN | 69,376 | 22,659 |
| KIDNEY | KID | 85,409 | 1,758 |
| LUNG CANCER | LGC | 1,340 | 530 |
| LIPITOR RX | LIP | 4,047 | 1,425 |
| LIVER DISEASE | LVD | 1,126,153 | 21,626 |
| MEDICAL/ MEDICADE/ DISABILITY | MED | 40,663 | 30,566 |
| MENOPAUSE | MEN | 36,376 | 11,208 |
| MIGRAINES OR HEADACHES | MIG | 170,498 | 98,510 |
| MULTIPLE SCLEROSIS | MLS | 12,764 | 4,800 |
| MENSTRUAL PROBLEMS | MNS | 14,318 | 5,181 |
| MOBILITY | MOB | 638,318 | 13,705 |
| NASAL ALLERGIES | NAS | 63,631 | 25,721 |
| NAIL FUNGUS | NLF | 339 | 168 |
| NASAL CONGESTION | NSC | 11,297 | 4,279 |
| OBESITY | OBE | 251,346 | 111,139 |
| ORAL INJECTABLE INSULIN | OII | 167 | 60 |
| OSTEOPOROSIS | OSP | 41,387 | 12,308 |
| OSTEOARTHRITIS | OST | 52,466 | 16,522 |
| PREMENSTRUAL SYNDROME-DISABLING | PMD | 939 | 338 |
| PREMENSTRUAL SYNDROME | PMS | 1,945 | 756 |
| POST NASAL DRIP | PND | 7,939 | 2,981 |
| PROSTATE CANCER | PRC | 2,502 | 854 |
| PROSTATE DISORDERS | PRO | 87,053 | 51,983 |
| PRESCRIPTION DRUGS | PRX | 2,552 | 1,451 |
| PSORIASIS | PSO | 34,008 | 12,910 |
| RHEUMATISM | RHE | 71,489 | 32,389 |
| SINUSITIS | SIN | 5,020 | 1,832 |
| SLEEP APNEA | SLE | 1,058,951 | 51,185 |
| SNORING | SNO | 6,471 | 2,307 |
| SORE THROAT | SOR | 2,970 | 1,082 |
| SPINAL INJURY | SPI | 472 | 176 |
| STROKE | STR | 162 | 140 |
| TOBACCO_USE | TOB | 5 | 5 |
| ULCERATIVE COLITIS | ULC | 16 | 6 |
| VISION | VIS | 13,856 | 7,568 |
| WEIGHT | WEI | 41,910 | 21,894 |
| WHEELCHAIR RX | WHL | 12,732 | 3,424 |

HIGHLY CONFIDENTIAL

# What Did the Executive Chef Say?





At this point, Mr. Radetich admitted the false reporting. He said he had conversations with Mr. Gluck regarding false reports, during which Mr. Radetich told Mr. Gluck that they were reporting false data. Mr. Radetich stated that Mr. Gluck responded that if Take 5 did not report numbers in line with what Take 5 had told the client they could achieve, that the clients would not be happy, and Mr. Gluck wanted to keep the clients happy at all costs. Mr. Abascal asked, "so essentially, did you believe that you needed to lie to your clients in order to keep your clients?," to which Mr. Radetich responded, "Yes."

Greenberg Gross LLP   |   GGTrialLaw.com



Michael Strub

**EXHIBIT 19**