**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PETRUSS MEDIA GROUP, LLC      :
f/k/a TAKE 5 MEDIA GROUP, LLC, *et al.*     :
                                  :
     Petitioners,                 :      Civil Action No.:      22-3278 (RC)
                                    :
     v.                           :      Re Document Nos.:      3, 15, 26, 30, 33
                                    :
ADVANTAGE SALES & MARKETING,     :
LLC, *et al.*,                      :
                                    :
     Respondents.               :

<u>**MEMORANDUM OPINION**</u>

**DENYING RESPONDENTS' MOTION TO DISMISS OR STAY; DENYING RESPONDENTS' MOTION
FOR SANCTIONS; DENYING PETITIONERS' MOTION FOR ORDER; DENYING PETITIONERS'
PETITION AND MOTION TO VACATE AWARD; GRANTING RESPONDENTS' PETITION TO
CONFIRM AWARD**

## I.  INTRODUCTION

Petitioners seek to vacate an arbitration award finding that Petitioners fraudulently

induced Respondents to buy their business.  Petitioners are Petruss Media Group, LLC, which

was formerly known as Take 5 Media Group, LLC ("Take 5"), and Take 5's owners—Alexander

Radetich, a Take 5 founder who held a 44.45% ownership stake; Richard Gluck, a Take 5

founder who held a 44.45% ownership stake; and RJV Marketing Corporation ("RJV"), a Florida

company that held the remaining 11.10% stake.  *See* Pet'rs' Pet. Vacate Arb. Award ("Pet.

Vacate") ¶¶ 1–4, ECF No. 40.[1]  Respondents are Advantage Sales & Marketing LLC

---

[1] Petitioners originally filed their petition and motion to vacate with redactions and sealed
exhibits pursuant to a protective order entered in the arbitration proceeding.  *See* ECF Nos. 1–4.
After the parties stipulated that no redaction or sealing was necessary, *see* Stip. to Unseal Exs.
and Remove Redactions, ECF No. 14, the Court ordered Petitioners to refile unredacted and
unsealed versions of their petition and motion to vacate and attachments thereto, *see* Min. Order,

("Advantage") and its parent companies—Advantage Sales & Marketing Inc. ("ASM, Inc."), the parent of Advantage; Karman Intermediate Corp. ("KIC"), the parent of ASM, Inc.; Advantage Solutions Inc. ("Advantage Solutions"), the parent of KIC; and Karman Topco L.P., the parent of Advantage Solutions.  *See* Pet. Vacate ¶¶ 5–9.

Petitioners move to vacate an arbitration award to Respondents of over $70 million pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 6, 10, 12.  *See* Pet'rs' Mot. Vacate Arb. Award ("Pet'rs' Mot. Vacate"), ECF No. 41.[2]  Respondents move to dismiss or stay Petitioners' motion, *see* Resp'ts' Mot. Dismiss or Stay ("Resp'ts' Mot. Dismiss"), ECF No. 15, for sanctions, *see* Resp'ts' Mot. Rule 11 Sanctions ("Resp'ts' Rule 11 Mot."), ECF No. 26, and to confirm the arbitration award, *see* Resp'ts' Opp'n to Pet. Vacate and Pet. Confirm Award ("Resp'ts' Opp'n and Pet."), ECF No. 30.[3]  For the reasons set forth below, the Court denies Petitioners' motion to vacate the award, denies Respondents' motion to dismiss and motion for sanctions, and grants Respondents' motion to confirm the award.

---

July 12, 2023.  The Court herein refers to the unredacted, unsealed versions of those documents. *See* ECF Nos. 40-1–87; ECF Nos. 41-1–82.

[2] Petitioners simultaneously filed a Petition to Vacate, ECF No. 1, and a Motion to Vacate, ECF No. 3.  Except in citations, the Court herein generally refers to these submissions collectively and interchangeably as "the Petition to Vacate" or "the Motion to Vacate" except where context indicates that a specific reference refers to either submission independently.

[3] As discussed below, Petitioners also move for an order sanctioning Respondents for failure to timely file an opposition to their motion to vacate.  *See* Pet'rs' Resp. Status Rep. and Mot. for Order ("Pet'rs' Mot. Order"), ECF No. 32.

## II.  BACKGROUND

### A.  Factual Background[4]

Mr. Radetich and Mr. Gluck founded Take 5 in 2003.  Pet. Vacate ¶ 14.  A "direct mail and digital consumer marketing and licensing business," Take 5's most valuable asset was a large database that "contained demographic, lifestyle, and contact information" for consumers. *Id.* ¶¶ 14–15; *id.* Ex. 1 ("Interim Award") at 2, ECF 40-9.  After Take 5 began to market itself for sale in 2017, Advantage expressed interest and ultimately signed a letter of intent on December 18, 2017 commencing a period of due diligence that lasted until the parties entered into an asset purchase agreement (the "APA") on March 15, 2018.  *See* Interim Award at 2; Pet. Vacate ¶¶ 16–18.  Under the APA, Advantage agreed to pay a base price of $77,000,000 and a performance based earn-out of up to $53,000,000.  *See* Pet. Vacate Ex. 5 ("Asset Purchase Agreement") at 7, 16, ECF No. 40-13.  The sale closed on April 1, 2018, at which point Take 5 became a business unit of Advantage.  *See* Interim Award at 2.

About a year after closing, in response to "complaints that it received and presentations by employees of the Take 5 business unit," Advantage retained a consulting firm and, later, a law firm, to conduct an internal investigation of Take 5's business practices.  *Id.*  In early July 2019, Advantage management "concluded that the business practices were fraudulent" and shut down the Take 5 business unit on July 11, 2019.  *Id.*  In September 2019, Take 5 filed a demand for arbitration seeking payment of the earn-out amount and Advantage counterclaimed for damages. *See id.*  Mr. Radetich and Gluck also brought claims against Advantage.  *See id.*  After amending their claims and counterclaims, the parties engaged in extensive discovery and motions practice

---

[4] The Court draws the relevant background facts from the Arbitrator's written Interim Award and the parties' submissions.

culminating in a fifteen-day evidentiary hearing held on days in January, February, and May

2022.  *See id.* at 2–3; Pet. Vacate ¶¶ 36, 37, 102.

The Arbitrator, the Honorable Judge James R. Eyler (Ret.), took evidence on Take 5's

claims for breach of contract and an implied covenant of good faith and fair dealing, on Mr.

Radetich's and Mr. Gluck's claims for defamation, and on Advantage's claims for breach of the

APA, for breach of an implied covenant of good faith and fair dealing, for fraud in the

inducement based on misrepresentations, for continuing fraud, and for violation of the RICO

Act, 18 U.S.C. § 1961 *et seq.  See* Interim Award at 3.  After an extensive summary of the

evidence, Judge Eyler found that "Take 5 LLC's database and email capability were not as

represented."  *Id.* at 37.  Specifically, he found that Take 5 misrepresented to Advantage

> (1) the nature and quality of Take 5 LLC's database of email addresses,
> demographic overlay, and other data; (2) Take 5 LLC's in-house capability to send
> large numbers of targeted emails as part of advertising campaigns; and (3) that it
> had deployed/delivered emails for which it had billed clients and received payments
> when it had not done so.

*Id.* at 36.

Accordingly, Judge Eyler found that "Take 5 LLC and Messrs. Gluck and Radetich

knowingly misrepresented material facts to Advantage with the intention of having Advantage

rely on them," that "Advantage justifiably relied on the misrepresentations," and that "Advantage

suffered harm in that the value of the assets was materially less than the value would have been

had the facts been as represented."  *Id.* at 37.  He thus concluded that "Take 5, including Messrs.

Gluck and Radetich, committed civil fraud in connection with the sale of the Take 5 business to

Advantage based on a knowing misrepresentation of the warranties" in breach of certain

provisions of the APA.  *Id.*  He also found that "misrepresentations of fact before the acquisition

by Take 5, with the intent to induce reliance by Advantage, constitute fraud independent of the

APA." *Id.* at 38.[5]  On August 4, 2022, Judge Eyler issued an Interim Award awarding

Advantage $48,325,822.29.  *See id.* at 43.  On October 4, 2022, Judge Eyler issued a Final

Award further awarding Advantage $22,032,263.60 in additional fees and costs.  *See* Pet. Vacate

Ex. 2 ("Final Award") at 10–11, ECF No. 40-10.  By consent of the parties, on October 19, 2022

Judge Eyler issued a Modified Final Award in the same amount to correct a tabulation error and

provide certain additional clarifications.  *See* Pet. Vacate Ex. 3 ("Modified Final Award"), ECF

No. 40-11; Pet. Vacate ¶¶ 123–27.

### B.  Procedural Background

The Modified Final Award was transmitted to counsel for both parties on October 20,

2022.  *See* Pet'rs' Opp'n to Resp'ts' Mot. Dismiss Ex. 80, ECF No. 24-2.  Shortly thereafter on

the same day, Respondents filed a petition to confirm the award in a Florida state court in Palm

Beach County (the "Florida Petition").  *See* Resp'ts' Mot. Dismiss Ex. E, ECF No. 15-6.  On

October 26, 2022, Petitioners filed the Petition to Vacate and Motion to Vacate in this Court.

*See* Pet. Vacate; Pet'rs' Mot. Vacate.

On November 14, 2022, Respondents filed both a motion to dismiss or stay ("Motion to

Dismiss") and an "interim response" ("Interim Response") to Petitioners' Motion to Vacate.  *See*

Resp'ts' Mot. Dismiss; Resp'ts' Interim Resp. Mot. Vacate ("Resp'ts' Interim Resp."), ECF No.

16.  The Motion to Dismiss argues that the Court should dismiss or, in the alternative, stay,

Petitioners' Petition to Vacate the award in light of Respondents' petition to confirm it in the

Florida court pursuant to *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800

---

[5] Judge Eyler denied Advantage's claims for continuing fraud and violation of the RICO
Act.  *See id.* at 38–41.  In addition, Judge Eyler did not reach Advantage's claim for breach of an
implied covenant of good faith and fair dealing in light of his finding of fraud and denied Take
5's claims.  *See id.* at 38, 41.

(1976).[6]   The Interim Response explains that, "[i]n light of the Motion to Dismiss,

[Respondents] do not believe that their opposition to the Motion to Vacate is due, as the Motion

to Dismiss explains why the Court should not hear that motion at all."  Resp't's Interim Resp. at

2.  Accordingly, while it provisionally cites to and deems as "the response to the Motion to

Vacate" the Interim Award, Respondents' post-hearing brief, and a Rule 11 letter to Petitioners

in order "to avoid any risk of waiver," the Interim Response "request[s] that the Court first

consider the pending Motion to Dismiss and only if it subsequently determines that this matter

should proceed, then set a date for a substantive response."  *Id.* at 2–3.

On December 27, 2022, Respondents filed a motion for sanctions under Federal Rule of

Civil Procedure 11 ("Rule 11 Motion").  *See* Resp'ts' Rule 11 Mot.  Respondents principally

argue that Petitioners had "no valid legal grounds to attack" the arbitration award, and should

have withdrawn their petition "once they learned that factual assertions in the Petition . . . are

contradicted by the record."  *Id.* at 2–3.  The motion thus reads much like the kind of substantive

opposition to Petitioners' Motion to Vacate that Respondents declined to file earlier.

On June 20, 2023, Respondents filed a status report explaining that, on June 16, 2023, the

Florida court stayed consideration of the Florida Petition pending "resolution of the Federal

Action."  *See* Resp'ts' Status Report, ECF No. 31 (quoting the Florida court's order).

Concurrently, Respondents filed a substantive opposition to the Motion to Vacate and moved to

confirm the award.  *See* Resp'ts' Opp'n and Pet.  Respondents cast the opposition as restating the

arguments from their Rule 11 Motion.  *See id.* at 2 ("[I]n the event the Court does not dismiss the

Petition to Vacate based on the *Colorado River* Motion or the Rule 11 Motion, the Advantage

---

[6] As explained in detail below, *Colorado River* considered the limited "circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration."  424 U.S. at 818.

Parties request that the Court dismiss it and that the Court confirm the Award for the reasons set forth in the Advantage Parties' Rule 11 Motion.  The Advantage Parties repeat those arguments here.").  The next day, on June 21, 2022, Petitioners filed a response to Respondents' status report and moved for an order striking Respondents' untimely opposition or for other alternative relief.  *See* Pet'rs' Mot. Order.

## III.  ANALYSIS

The Court first considers Respondents' Motion to Dismiss before proceeding to consider the parties' motions on the arbitration award.

### A.  Respondents' Motion to Dismiss or Stay

Respondents move under *Colorado River* to dismiss or, in the alternative, stay Petitioners' petition to vacate in light of the pending Florida proceeding to confirm the award. *Colorado River* involved a federal action initiated by the federal government against approximately 1,000 water users to determine water rights in a designated water district of Colorado.  *See Colo. River*, 424 U.S. at 805.  Amid preexisting and related state proceedings in other water districts, a defendant in the federal action filed suit in state court seeking to join the federal government to proceedings in the designated district in order to "adjudicat[e] all of the Government's claims, both state and federal."  *Id.* at 806.  Reviewing the 10th Circuit's vacatur of the district court's order of dismissal based on abstention in the federal action, the Supreme Court, after considering a question of statutory interpretation irrelevant here, agreed that none of the "three general categories" of abstention were applicable. *Id.* at 814–17.  However, the Court explained that "there are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions." *Id.* at 817.  It is these principles, which

"rest on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation," *id.* (cleaned up), on which Respondents rely in their Motion to Dismiss.

### 1. Legal Standards

"Generally, as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to a proceeding concerning the same matter in the Federal court having jurisdiction." *Colo. River*, 424 U.S. at 817. This reflects the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Id.* Accordingly, "the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention." *Id.* at 818. Courts consider several factors to evaluate whether such "exceptional" circumstances exist, *id.*, including which "court first assum[ed] jurisdiction over [the] property . . . [;] the inconvenience of the federal forum; the desirability of avoiding piecemeal litigation; and the order in which jurisdiction was obtained by the concurrent forums," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15 (1983) (quoting *Colo. River*, 424 U.S. at 818). In addition, courts may consider whether there has been "substantial progress in the federal-court litigation" and the "presence in the suit of extensive rights governed by state law." *Id.* at 16. This "exceptional circumstances test" is not a "mechanical checklist," but rather requires "careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Id.*

The D.C. Circuit recently took an opportunity, presented in the form of an appeal from a stay entered in a federal case in deference to a preexisting state proceeding concerning a dispute

between a real estate developer and the D.C. government, to offer detailed analysis of what qualifies as exceptional circumstances in order to "ensure that *Colorado River* is confined to its banks." *Edge Inv., LLC v. District of Columbia*, 927 F.3d 549, 550 (D.C. Cir. 2019). Emphasizing the strong presumption in favor of exercising federal jurisdiction when it lies, the Circuit noted that "the Supreme Court has found sufficient justification [to defer to a state proceeding] only in the circumstances described in *Colorado River* itself, while this court has never found such circumstances." *Id.* at 553. The Circuit then reviewed the district court's entry of a stay based on its finding that three of the "*Colorado River* factors" favored abstention, while two were neutral and one was irrelevant. *Id.* at 553–54. Reversing the stay order, it found that "it is not enough that the factors favoring deferral outnumber those opposed (or neutral)," as the "factors favoring deferral must themselves be exceptional." *Id.* at 554; *see id.* (rejecting "this kind of toting up" of factors).

## 2.   Analysis

Given the stay entered by the Florida court, Respondents' motion is arguably moot. However, as Respondents apparently still press the motion, *see* Resp'ts' Opp'n to Mot. Order at 3, ECF No. 35 (noting the stay in Florida before referring to the possibility that the Court may grant Respondents' Motion to Dismiss), the Court proceeds to consideration of the relevant factors to determine whether this case presents the type of exceptional circumstance identified in *Colorado River*.

As an initial matter, the parties agree that property is not in issue, *see* Resp'ts' Mot. Dismiss at 9; Pet'rs' Opp'n Mot. Dismiss at 12, ECF No. 24, and neither party argues that this case involves "extensive rights governed by state law," *Moses H. Cone*, 460 U.S. at 16. In light of the stay entered by the Florida court, there is no risk of piecemeal or overlapping litigation—a

particularly important factor to the extent the *Colorado River* doctrine principally reflects "regard to conservation of judicial resources and comprehensive disposition of litigation." *Colo. River*, 424 U.S. at 817; *see Moses H. Cone*, 460 U.S. at 16 (explaining that the "avoidance of piecemeal adjudication of water rights in a river system" was "[b]y far the most important factor in our decision to approve the dismissal" in *Colorado River* (citation omitted)). And, as the parties' voluminous submissions attest, the federal litigation has substantially progressed, weighing against dismissal.

The only factors even arguably weighing in favor of dismissal are the inconvenience of the federal forum and the order in which each court obtained jurisdiction. Taking the latter first, the parties engage in extensive argument over the precise timing service was effected in each case. *See* Resp'ts' Mot. Dismiss at 6–7, 13–14; Pet'rs' Opp'n Mot. Dismiss at 5–7, 17–21; Resp'ts' Reply Supp. Mot. Dismiss at 11–12, ECF No. 25. But the precise timing is irrelevant, as, even assuming facts most favorable to Respondent, the state action was properly filed just six days before this proceeding. *See* Resp'ts' Mot. Dismiss at 6. This is not long enough, absent some additional indication that those days represented an unusually important period in the litigation, to implicate the "judicial administration" concerns that animate *Colorado River* deferral. *See Edge Inv.*, 927 F.3d at 557 (referring to fifteen months between initiation of state action and federal action as a "relatively brief period[]" not weighing in favor of dismissal and distinguishing cases finding the contrary that involved periods of between one and seven years); *See also Moses H. Cone*, 460 U.S. at 21 (finding that nineteen days between filing of state and federal suits did not favor dismissal because "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions").

As to the inconvenience of the federal forum, Respondents point out that Petitioners "all reside in Florida," that Petitioners took the actions forming the basis of the arbitration award "out of their office in Boca Raton, Florida," and that "most of the fact witnesses live in Florida and testified from there" in the virtual evidentiary hearing.  Resp'ts' Mot. Dismiss at 10.  On the other hand, Petitioners note that the parties agreed to D.C. as the "situs of the arbitration," notwithstanding that the hearing in fact occurred remotely via videoconference.  Pet'rs' Opp'n Mot. Dismiss at 13.  In addition, Petitioners point out that any inconvenience from a D.C. forum is limited by the fact that a "motion to vacate often proceeds much like a petition for review of agency action or a summary judgment proceeding, with a pre-set record and legal determination as to whether the award must be vacated" without extensive court proceedings.  *Id.*  The Court agrees that whatever inconvenience may attend the D.C. forum is significantly limited by the nature of this action.  Regardless, mere inconvenience, without additional support from any of the other factors, does not tip a balance otherwise "heavily weighted in favor of the exercise of jurisdiction."  *Moses H. Cone*, 460 U.S. at 16.  Respondents have not established that this case presents an exceptional circumstance under *Colorado River*.

## B.  Arbitration Award

Turning to the arbitration award, the Court first construes Respondents' unusual pattern of submissions in response to Petitioners' Motion to Vacate, considering Petitioners' motion to strike Respondents' opposition along the way.  The Court then turns to the merits of Petitioners' Motion to Vacate in conjunction with Respondents' related motion for sanctions and petition to confirm the award.

1.  Respondents' Opposition and Petitioners' Motion to Strike

As discussed above, Respondents declined to file a substantive opposition until the

Florida court issued its stay, opting instead to submit the Interim Response as a placeholder "to

avoid any risk of waiver" while the Court considered the Motion to Dismiss and Rule 11 Motion.

Resp'ts' Interim Resp. at 3.  Petitioners then filed a submission, styled as a reply in support of

their Motion to Vacate, devoted entirely to an argument that the Interim Response is inadequate

and that, "[b]y failing to respond to the substance of the motion to vacate, [Respondents] have

conceded each ground for vacating the [a]wards."  Pet'rs' Reply Supp. Mot. Vacate at 6, ECF

No. 23.  Petitioners repeated a version of this argument in opposition to Respondents' subsequent

Rule 11 Motion.  Pet'rs' Opp'n to Rule 11 Mot. at 15, ECF No. 28 ("Every unaddressed

argument in the motion to vacate—which was *all* of them—was conceded by [Respondents][7].

Having waived any challenge to the substance, [Respondents'] contention that there is a Rule 11

violation by maintaining the conceded petition and motion is absurd on its face.").  In response to

Respondents' status report updating the Court regarding the Florida stay, and perhaps reflecting

consideration of Respondents' argument that the local rule governing briefing timelines "is not a

tool to absolve [Petitioners] of their burden of proof," Resp'ts' Reply Supp. Rule 11 Mot. at 10,

ECF No. 29, Petitioners submitted a motion that somewhat moderated their position on how the

Court should treat the Interim Response.  Without repeating the request to deem the Petition to

Vacate as conceded, Petitioners moved for an order striking Respondents' untimely substantive

opposition, or, in the alternative, setting a briefing schedule either on a motion for leave to file

---

[7] The brief refers to this party as "the Take 5 Parties" (i.e., Petitioners), but context makes clear that it should instead read "the Advantage Parties" (i.e., Respondents).

the untimely opposition to be submitted by Respondents or a motion to strike to be submitted by Petitioners.  *See* Pet'rs' Mot. Order at 4–5.[8]

At the outset, it bears emphasis that the Petition to Vacate, though generally required to be "made and heard in the manner provided by law for the making and hearing of motions," 9 U.S.C. § 6, is materially different than an ordinary motion in a civil suit.  Most significantly, a motion to vacate an arbitration award puts the court functionally in the position of a limited-review appellate tribunal.  *See generally* 9 U.S.C. § 10.  Sitting in this posture, and in line with the "emphatic federal policy in favor of arbitral dispute resolution," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985), courts apply a "deferential standard" of review, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 109 (D.D.C. 2017).  *See Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568 (2013) (emphasizing the "limited judicial review" afforded under the FAA and the "very unusual circumstances" in which courts may vacate an arbitrator's decision (citation omitted)).  As such, courts lack "general equitable power to substitute a judicial resolution of a dispute for an arbitral one." *Kanuth v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1180 (D.C. Cir. 1991) (discussing vacatur under the predecessor to 9 U.S.C. § 10(a)(4)); *see United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960) ("It is the arbitrator's construction which was bargained for . . . .").

Set against all this, Petitioners offer two arguments.  First, they point to Local Civil Rule 7(b), which provides that, where an opposition is not timely filed, the court "may treat the

---

[8] The Court notes that Petitioners revived their argument that the Motion to Vacate should be deemed conceded in later filings but focuses here the relief requested in their motion in response to Respondents' status report.  *See, e.g.*, Pet'rs' Reply to Resp'ts' Opp'n to Mot. Vacate at 1, ECF No. 37 ("[T]he Advantage Parties . . . have conceded the merits of the Take 5 Parties' motion to vacate.")

motion as conceded."  In light of the deference owed to the arbitrator's findings, the Court

declines to exercise that discretion here.  Second, Petitioners argue that Respondents' "untimely

opposition should have been accompanied by a motion for leave to file [it]," citing Federal Rule

of Civil Procedure 6(b)(1)(B)'s requirement that *nunc pro tunc* extensions be granted only upon

motion demonstrating "excusable neglect."  Pet'rs' Mot. Order at 3.  It bears notice that courts

retain broad discretion even under that rule.  *See Yesudian ex rel. U.S. v. Howard Univ.*, 270 F.3d

969, 971 (D.C. Cir. 2001) (affirming district court's acceptance of untimely submission under

Rule 6(b)(1)(B) based on a generous construction of an opposition memorandum and even

without finding excusable neglect).  But, more centrally, that rule does not apply here, as

Respondents timely requested an extension in their Interim Response.  *See* Resp'ts' Interim

Resp. at 2–3 ("[W]e request that the Court first consider the pending Motion to Dismiss and only

if it subsequently determines that this matter should proceed, then set a date for a substantive

response.").  In light of this timely request, under Federal Rule of Civil Procedure 6(b)(1)(A), the

Court "may, for good cause, extend the time [to file] . . . with or without" a formal motion.

Recognizing the potential for confusion arising out of the parallel Florida proceeding and in line

with the "emphatic federal policy in favor of arbitral dispute resolution," *Mitsubishi Motors*

*Corp.*, 473 U.S. at 631, the Court in its discretion accepts Respondents' substantive opposition

and considers it alongside the Interim Response and Rule 11 Motion in evaluating the merits of

the Motion to Vacate.

### 2.  Motion to Vacate

Petitioners move under 9 U.S.C. §§ 10(a)(1), (a)(3), (a)(4) and an asserted common-law

doctrine of "manifest disregard of the law" to vacate the Interim Award and Modified Final

Award.  *See* Pet. Vacate at 35–36; Mem. Supp. Pet'rs' Mot. Vacate ("Mem. Supp. Mot. Vacate")

at 15–45, ECF No. 41-1.  For the reasons set forth below, the Motion to Vacate is denied.

### a. Legal Standards

"[J]udicial review of arbitral awards is extremely limited."  *Kanuth*, 949 F.2d at 1178.

"Th[at] limited [judicial] review . . . maintain[s] arbitration's essential virtue of resolving

disputes straightaway."  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 691 (2010)

(Ginsburg, J., dissenting).  Accordingly, courts "do not sit to hear claims of factual or legal error

by an arbitrator as an appellate court does in reviewing decisions of lower courts."  *Kanuth*, 949

F.2d at 1178 (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).

Instead, the FAA provides for vacatur of an arbitration award only in four situations, the

following three of which are raised here:

> (1) where the award was procured by corruption, fraud, or undue means; . . . (3)
> where the arbitrators were guilty of misconduct in refusing to postpone the hearing,
> upon sufficient cause shown, or in refusing to hear evidence pertinent and material
> to the controversy; or of any other misbehavior by which the rights of any party
> have been prejudiced; or (4) where the arbitrators exceeded their powers, or so
> imperfectly executed them that a mutual, final, and definite award upon the subject
> matter submitted was not made.

9 U.S.C. § 10(a).  Under 9 U.S.C. § 9, a court "must confirm an arbitration award unless it is

vacated, modified or corrected."  *Ray v. Chafetz*, 236 F. Supp. 3d 66, 75 (D.D.C. 2017) (quoting

*Owen-Williams v. BB&T Inv. Servs., Inc.*, 717 F. Supp. 2d 1, 10 (D.D.C. 2010)).

### b. Analysis

Petitioners assert six grounds for vacatur.  *See* Mem. Supp. Mot. Vacate at 15–45.  The

Court considers Petitioners' claims in the order in which they present them.

i.  Refusal to Postpone Arbitration

First, Petitioners argue under 9 U.S.C. § 10(a)(3) that Judge Eyler committed misconduct when he denied Petitioners' request for a stay of the arbitration proceeding for six months due to a related criminal investigation.  *See* Mem. Supp. Mot. Vacate at 15–16.

Petitioners explain that, after Respondents reported the results of their internal investigation into the Take 5 business unit to federal law enforcement authorities, the Federal Bureau of Investigation ("FBI") initiated an investigation.  *See* Pet. Vacate ¶¶ 42–43.  After the FBI visited Mr. Radetich's home on April 19, 2021 and informed him that he and Take 5 were under criminal investigation, he hired a criminal defense attorney.  *See id.* ¶¶ 43–44.  During a June 8, 2021 deposition of Gary Colen, an Advantage employee and former CEO of the Take 5 business unit after the acquisition, Petitioners learned that the FBI had asked Mr. Colen to "wear a wire" to record a conversation with Mr. Radetich and Mr. Gluck, though this did not ultimately happen.  *Id.* ¶ 47.  Mr. Colen also revealed that the FBI "participated on a subsequent phone call with Radetich in which Radetich was not made aware that an FBI agent was listening."  *Id.* ¶ 48. In response to "this information concerning undercover FBI operations," Mr. Gluck also retained criminal defense counsel.  *Id.* ¶ 49.  With the depositions of Mr. Gluck and Mr. Radetich scheduled for June 30, 2021 and July 1, 2021, respectively, Petitioners filed an emergency motion to stay the arbitration proceeding on June 23, 2021.  *See id.* ¶ 52.  Petitioners argued that a stay was necessary given the pending depositions because "both Radetich and Gluck would have no choice but to invoke their Fifth Amendment rights at their depositions and in response to other discovery, chilling their ability to testify and offer key evidence in the proceeding."  *Id.* ¶ 53.  They contended that forcing this choice would be *"severely prejudic[ial]"* to Petitioners. *Id.* ¶ 54.

16

The emergency motion was fully briefed and Judge Eyler held a hearing before issuing a written order on June 29, 2021 denying the request for a stay.  *See id.* ¶¶ 55, 57–58.  In the order, Judge Eyler first pointed out that Petitioners "acknowledge[d] that a stay is not constitutionally required" and "that the ruling is discretionary."  Pet. Vacate Ex. 27 at 2, ECF No. 40-35.  Judge Eyler, at Petitioners' request, next looked to the factors laid out in *A. Schulman, Inc. v. Citadel Plastic Holdings*, No. 12459-VCL, 2017 WL 5035497 (Del. Ch. Nov. 2, 2017), explaining that "the two weightiest factors are the status of the criminal investigation and the extent to which the issues in this proceeding overlap with the criminal investigation," as these factors "aid in assessing prejudice to the parties under investigation."  Pet. Vacate Ex. 27 at 3.  After acknowledging the likelihood that "the issues in the criminal investigation track or substantially overlap the issues in this proceeding," Judge Eyler found that "this is not a situation in which the criminal investigation and the civil proceeding are in their infancy."  *Id.*  He explained that "[t]he existence of the investigation and the overlap has been known or knowable" since "no later than September 19, 2019"—the date on which Respondents filed counterclaims and crossclaims in the arbitration proceeding.  *Id.*; *see* Pet. Vacate Ex. 10 at 5, 27, ECF No. 40-18 (Respondents' brief dated September 19, 2019 stating that "Advantage . . . contacted the FBI and U.S. Attorney's Office to report the fraud by Take 5 to law enforcement" and that it did so "given the potential criminal implications of both Gluck's and Radetich's conduct").  Judge Eyler then highlighted statements Mr. Radetich and Mr. Gluck made "[i]n connection with a discovery motion" in which they said that they had "no knowledge of the activity that is alleged to be fraudulent."  Pet. Vacate Ex. 27 at 4.  Accordingly, Judge Eyler found it "speculative to conclude that they will be prejudiced" by invoking the Fifth Amendment given "their absence of knowledge."  *Id.*  He also explained that, under Delaware law, he could not draw an adverse inference from the invocation

of the Fifth Amendment.  *Id.*  Finally, Judge Eyler noted that "[g]enerally, stays are not granted absent indictments," that no indictments had been issued, and that there was "no indication as to when the criminal investigation will be completed, with or without indictments."  *Id.*  Judge Eyler therefore denied the motion "without prejudice to the right to renew the motion based on additional material information."  *Id.*

Petitioners explain at length why they disagree with Judge Eyler's decision.  Mem. Supp. Mot. Vacate at 15–26.  At the outset, it bears notice that the FAA only permits vacatur for refusal to "postpone the hearing."  *Id.* at 15; 9 U.S.C. § 10.  Here, Petitioners moved on June 23, 2021 for a stay of no longer than six months.  *See* Pet. Vacate Ex. 20 at 13, ECF No. 40-28 ("[T]his arbitral court should issue an order staying this action for six months (180 days), or until the conclusion of the criminal investigations, if earlier.").  As the hearing did not begin until January 25, 2022, more than six months later, it is not altogether clear that Petitioners have pled sufficient facts to permit relief under 9 U.S.C. § 10(a)(3).  *See* Pet. Vacate Ex. 48 at 1, ECF No. 40-56 (transcript identifying "Day 1" of the hearing as January 25, 2022).

But even assuming that the denial of the stay here forms the basis of a cognizable claim under § 10(a)(3), disagreement with an arbitrator's reasoned exercise of discretion to deny a postponement is not enough to meet the high bar to establish "misconduct" within the meaning of § 10(a)(3).  The issue is "not whether this Court might have exercised its discretion to grant a postponement under the relevant circumstances, but whether the arbitrator's decision to deny the continuance was unreasonable or an abuse of discretion."  *Ray*, 236 F. Supp. 3d at 78 (quoting *Equitas Disability Advocates, LLC v. Daley, Debofsky & Bryant, P.C.*, 177 F. Supp. 3d 197, 215 (D.D.C. 2016)); *see ARMA, S.R.O. v. BAE Sys. Overseas, Inc.*, 961 F. Supp. 2d 245, 263 (D.D.C.

2013) ("[I]t is not enough for the party seeking vacatur to complain that the arbitrator made procedural missteps.").

Judge Eyler's order reflects adequate consideration of the relevant facts and legal factors bearing on the decision of whether to grant the requested stay.  Petitioners' central argument is that the denial of the stay, and consequently Mr. Radetich's and Mr. Gluck's invocation of the Fifth Amendment during their depositions, prejudiced Petitioners by precluding entry of important evidence regarding their states of mind during the events in question.  *See* Mem. Supp. Mot. Vacate at 19–21.  While refusal to grant a postponement that "results in the foreclosure of the presentation of 'pertinent and material evidence'" can rise to the level of an abuse of discretion, *Naing Int'l Enters., Ltd. v. Ellsworth Assocs., Inc.*, 961 F. Supp. 1, 3 (D.D.C. 1997) (citation omitted), Judge Eyler's finding based on Mr. Radetich's and Mr. Gluck's own words that they could not offer any such material evidence was not unreasonable, *see CPR Mgmt., S.A. v. Devon Park Bioventures, L.P.*, 463 F. Supp. 3d 525, 533–34 (E.D. Pa. 2020) (denying motion to vacate due to arbitrator's denial of motion to postpone because, notwithstanding that "the real party in interest . . . was excluded from participating," the arbitrator had a "reasonable basis" for the denial).  Nor was his finding that any prejudice was mitigated by the fact that he could not draw an adverse inference from their invocation of the Fifth Amendment.  *See Mandell v. Reeve*, No. 10 Civ. 6530, 2011 WL 4585248, at *9 n.6 (S.D.N.Y. Oct. 4, 2011) ("The fact that [petitioner's] conduct also resulted in a criminal charge against him did not automatically avail him with a shield against [respondent's] efforts to expeditiously pursue a civil arbitration against him."); *cf. Howard Univ. v. Metro. Campus Police Officer's Union*, 512 F.3d 716, 723 (D.C. Cir. 2008) (explaining that even erroneously drawing a negative inference from a refusal to testify does not "approach in gravity the type of error that justifies vacating an arbitration award for

misconduct").  Judge Eyler's denial of Petitioners' motion for a stay did not constitute

misconduct under § 10(a)(3).  *See White v. Four Seasons Hotel and Resorts*, 244 F. Supp. 3d 1, 5

(D.D.C. 2017) ("[A]ll that is required is that the arbitrator 'grant the parties a fundamentally fair

hearing.'" (quoting *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 481 F.3d 813, 816

(D.C. Cir. 2007))).

ii.   Refusal to Hear Pertinent Evidence

Petitioners next argue that Judge Eyler committed misconduct by "refusing to hear

evidence pertinent and material to the controversy."  § 10(a)(3); Mem. Supp. Mot. Vacate at 26.

Petitioners first make a one-sentence argument that Judge Eyler's denial of Petitioners' motion

for a stay, discussed above, also constitutes a refusal to hear the testimony of Mr. Radetich and

Mr. Gluck under § 10(a)(3).  Mem. Supp. Mot. Vacate at 26.  But the choice to invoke the Fifth

Amendment was in the hands of Mr. Radetich and Mr. Gluck; Judge Eyler did not refuse to hear

anything.  And regardless, as explained above, Judge Eyler found that, by their own admissions,

Mr. Radetich and Mr. Gluck had "no knowledge of the activity that is alleged to be fraudulent."

*See Lessin*, 481 F.3d at 818 (explaining that "every failure of an arbitrator to receive relevant

evidence does not constitute misconduct requiring vacatur" and "a federal court may vacate an

award only if the [arbitrator's] refusal to hear pertinent and material evidence prejudices the

rights of the parties" (cleaned up)).

Petitioners next present a more fully formed argument that Judge Eyler committed

misconduct by refusing to hear evidence concerning the spoliation of Google Analytics evidence.

*See* Mem. Supp. Mot. Vacate at 26–27.  Petitioners explain that, in September 2021, they

"sought Google Analytics data" in advance of expert depositions.  Pet. Vacate ¶ 86.  Petitioners

claim that this data was necessary in order to determine where clicks on Take 5 marketing emails

20

"came from and whether they were generated by real users." *Id.* ¶ 88. Petitioners state that, shortly after making the request for this data, they "became aware that [Respondents] had not preserved access to the Google Analytics data . . . even though this data had been made available to [Respondents'] experts and counsel during the course of the Arbitration." *Id.* ¶ 87. Accordingly, on November 24, 2021, Petitioners "moved for an adverse inference and sanctions, arguing that the Google Analytics data was relevant and material to the underlying dispute as well [as] the expert reports." *Id.* ¶ 89.

Judge Eyler analyzed and ruled on this motion in the Interim Award. *See* Interim Award at 4–5. Judge Eyler began by summarizing Petitioners' argument that "the data would have shown the source of clicks on links to clients' websites" so "the failure to preserve and analyze [it] undermines the testimony of Advantage's witnesses." *Id.* at 4. Turning to the merits, Judge Eyler first noted that "Take 5 could have requested access to the Google Analytics data much sooner tha[n] it did and while Advantage had access to it," though he explained that the delay was "not the basis for [his] ruling." *Id.* at 4–5. Next, he detailed the testimony of "witnesses with personal knowledge of the Take 5 LLC Google Analytics account" tending to show the limitations of what could be learned from the missing Google Analytics data. *Id.* at 5. Specifically, one witness testified that the Google Analytics data could show "if a click came from a mobile or desktop device, the geographical area from which it originated, and sometimes the referring domain," but not "whether the click originated from an email or from an ad." *Id.* Another witness testified that the data "would show 'the campaign ID, the campaign name, and then the link number,'" but that "for the most part" vendors "put a 'no refer' on a link which made it look like '[a click was] coming as direct traffic'" even when it was not. *Id.* As such, Judge Eyler observed that "the information available [from Google Analytics data] is determined

by the nature of the account of a particular subscriber" so "clients who used Google Analytics may have had access to more information than what was available to Take 5 LLC in its account." *Id.* Accordingly, Judge Eyler found that the data "did not contain information that would materially impact the issues in this case" and denied Petitioners' motion. *Id.*

As Judge Eyler's decision shows, he in fact *did* hear evidence concerning the spoliation of Google Analytics data. Thus, Petitioners' present claim is actually an attempt to squeeze their desire to relitigate the spoliation motion to fit § 10(a)(3)'s "narrow" path to relief. *Mesa Power Grp., LLC v. Gov't of Canada*, 255 F. Supp. 3d 175, 184 (D.D.C. 2017). This is unavailing. "[I]n making evidentiary determinations, an arbitrator 'need not follow all the niceties observed by the federal courts" and instead "need only grant the parties a fundamentally fair hearing." *Lessin*, 481 F.3d at 816 (citations omitted). Courts "do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *Kanuth*, 949 F.2d at 1178 (quoting *United Paperworkers*, 484 U.S. at 38). Permitting "attempt[s] to relitigate each and every argument that was rejected by the [arbitrator]" *de novo* would "undermine the entire concept of arbitration as a private method of resolving grievances." *Affinity Fin. Corp. v. AARP Fin., Inc.*, 794 F. Supp. 2d 117, 122 (D.D.C. 2011). Accordingly, "[i]t is not enough for petitioners to show that the [arbitrator] committed an error—or even a serious error." *Stolt-Nielsen*, 559 U.S. at 671. Judge Eyler heard Petitioners' motion and his order denying it reflects reasoned consideration of its merits. This offers no occasion for vacatur under § 10(a)(3). *See Howard Univ.*, 512 F.3d at 723 (explaining that an arbitrator's erroneously drawn negative inference would not "approach in gravity the type of error that justifies vacating an arbitration award for misconduct"); *Evan K. Halperin Revocable Living Trust v. Charles Schwab & Co., Inc.*, No. 21-cv-8098, 2022 WL 4334655, at *5–6 (D.D.C. Sept. 19, 2022)

(rejecting the argument that an arbitration panel's denial of "several discovery motions and refusal to compel [the respondent] to produce certain materials in discovery" constituted misconduct under § 10(a)(3) because there was "no indication from the record that the [petitioner's] lack of success on its several motions and at the Arbitration hearing deprived it of 'fundamental fairness'").

### iii.  Award in Excess of Authority

Petitioners argue that the arbitrator exceeded his powers under § 10(a)(4) by entering an award against RJV and in awarding certain damages.  *See* Mem. Supp. Mot. Vacate at 29–33.  In general, "judicial review of arbitral awards is extremely limited," *Kanuth*, 949 F.2d at 1178, but the D.C. Circuit has explained that "it is particularly necessary to accord the 'narrowest of readings' to the excess-of-authority provision," *id.* at 1180 (citations omitted).  "As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."  *Id.* (quoting *United Paperworkers*, 484 U.S. at 38).  Vacatur is only permissible "when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice[.]'"  *Stolt-Nielsen*, 559 U.S. at 671 (citations omitted).

Turning first to Petitioners' argument that Judge Eyler exceeded his authority in entering an award against RJV, relief under § 10(a)(4) is unwarranted because it is clear that Judge Eyler's order as to RJV was based on his interpretation of the APA.  Recall that RJV is a Florida corporation that held a 11.10% stake in Take 5 before the acquisition.  *See* Pet. Vacate ¶ 4.  Petitioners argue that because "RJV is only referenced **twice**" in the hearing transcripts, there was insufficient record evidence to support the arbitrator's award against RJV.  Mem. Supp.

Mot. Vacate at 29–30 (emphasis in original).  Petitioners presented this argument during the
hearing by way of a motion for a directed verdict, *id.* at 30, but in the Interim Award, Judge
Eyler found that Take 5, Mr. Radetich, and Mr. Gluck, "along with RJV Marketing, breached
Article II §§ 2.5(a) and (b), § 2.10(a), and 2.11(b) and Article VIII, § 8.2" of the APA, Interim
Award at 37.  He explained that, as a beneficial owner of Take 5, "under Article VIII, section 8.2
[of the APA], [RJV] owes a duty to indemnify Advantage for Take 5 LLC's breach of warranties
even if it did not commit fraud."  Interim Award at 38; *see* APA art. VIII, sec. 8.2 (listing
circumstances in which "the Company and the Beneficial Owners, shall indemnify, defend, and
hold harmless the Buyer and the other Buyer Indemnified Parties from and against all Damages
incurred or suffered by any Buyer Indemnified Party").  Because Judge Eyler's award against
RJV "draws its essence from the [contract]," *Kanuth*, 949 F.2d at 1178 (quoting *United
Steelworkers*, 363 U.S. at 599), vacatur under § 10(a)(4) is not warranted,[9] *see United
Paperworkers*, 484 U.S. at 36 ("The courts are not authorized to reconsider the merits of an
award even though the parties may allege that the award rests on errors of fact or on
misinterpretation of the contract.").

    Petitioners' next argument, that the arbitrator exceeded his authority in awarding certain
damages, is similarly unsuccessful.  Petitioners argue that "the record contains no support for"
the $4,692,488.95 the arbitrator awarded to compensate Respondents for pre-acquisition due
diligence costs, costs from the investigation into the Take 5 business, and costs from lease

---

    [9] While allegations under § 10(a)(4) often "involve[] situations in which the arbitrators
did not have the authority under the contract itself to construct the kind of remedy that they have
proposed," *Kanuth*, 949 F.2d 1180, Petitioners do not make such an argument here.  Instead, they
exclusively argue that the arbitrator exceeded his powers by entering an "award against RJV
because there is simply no evidence in the record to support an award against RJV."  Mem.
Supp. Mot. Vacate at 31 (formatting omitted).

termination as a result of the shutdown of the Take 5 business unit.  Mem. Supp. Mot. Vacate at

31; *see* Final Award at 2 (awarding $788,954 for due diligence, $3,246,203.95 in investigation

costs, and $657,331 for lease terminations).  Curiously, Petitioners then make the seemingly

contradictory acknowledgment that Judge Eyler's damages calculation for these items was

indeed based on record evidence.[10]  *See* Mem. Supp. Mot. Vacate at 32 (acknowledging that a

witness "testified at the hearing that the Advantage Parties paid certain amounts to various

entities in connection with due diligence, investigation, and shut down of Take 5," but disputing

the "evidentiary support for these amounts").  Petitioners' dispute as to the sufficiency of that

evidence is not cognizable under § 10(a)(4).[11]  *See Republic of Argentina v. AWG Grp. Ltd.*, 211

---

[10] This fact distinguishes this case from the two cases cited by Petitioners, both of which are out-of-circuit cases and appear in Petitioners' opposition to Respondents' Rule 11 Motion. *See* Pet'rs' Opp'n to Rule 11 Mot. at 41–42 (citing *Murchison Cap. Partners, L.P. v. Nuance Commc'ns, Inc.*, No. 3:12-cv-04749, 2013 WL 12094168, at *6 (N.D. Tex. July 30, 2013) and *W. Emps. Ins. Co. v. Jefferies & Co.*, 958 F.2d 258, 262 (9th Cir. 1992)).  In *Murchison*, the court confronted an arbitration award that "did not provide any findings of fact or conclusions of law to explain why [the respondent] was not entitled to out-of-pocket damages" even though the "issue of out-of-pocket damages was squarely before the panel."  *Murchison*, 2013 WL 12094168 at *5–6.  Accordingly, because, "by the terms of the Merger Agreement, the [arbitration] Panel was required to make findings of fact and conclusions of law on out-of-pocket damages," the court found that "[i]ts failure to do so exceeds its power."  *Id.* at *6.  Similarly, *Western Employers* involved a situation where an arbitration panel "did not include any findings of fact and conclusions of law in its award" in violation of the "terms of the arbitration agreement."  *W. Emps.*, 958 F.2d at 260, 262.  By contrast, here, Petitioners make no allegation that the arbitrator violated the APA by considering damages for due diligence, investigation, and shutdown costs concerning Take 5 under the terms of the APA.  Nor can there be any argument that the arbitrator failed to make findings of fact based on record evidence as to these categories of damages.  *See, e.g.*, Interim Award at 8 (describing a witness's testimony about the due diligence and investigation processes); *id.* at 21–22 (summarizing testimony of Advantage's Chief Financial Officer for North America concerning damages, including specific estimates as to due diligence, investigation, and shutdown costs).

[11] The Court also notes that Petitioners' insinuation that Judge Eyler rubber stamped Respondents' assertion of damages without serious consideration is belied by the record, as he rejected multiple of Respondents' damages requests.  *See, e.g.*, Interim Award at 42–43 ("Due to lack of supporting detail, I am not persuaded that Advantage has proved entitlement to damages for the costs of its own employees who were involved in due diligence."); *id.* at 43 (similarly rejecting requested damages from "the cost of [Advantage's] employees who were involved in

F. Supp. 3d at 335, 360 (D.D.C. 2016) ("Where, as here, 'it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." (quoting *United Paperworkers*, 484 U.S. at 38)); *Eljer Mfg., Inc. v. Kowin Dev. Corp.*, 14 F.3d 1250, 1254 (7th Cir. 1994) (explaining that "an insufficiency of evidence supporting the decision" does not "permit us to disturb the arbitrator's order").

Instead, this appears to be another attempt to relitigate the merits of a discovery motion that Judge Eyler denied.  In the Interim Award, Judge Eyler considered Petitioners' argument under Federal Rule of Civil Procedure 26(a)(1)(A)(iii) that Respondents "did not produce supporting documents underlying each element of damages claimed."  Interim Award at 4.  Respondents argued that Petitioners "did not pursue the information requested by way of specific requests and follow up," but regardless, Judge Eyler found that "[e]ven if there were discovery violations . . . any violations are not unduly prejudicial" and "overrule[d] the objection."  *Id.*  Whether or not this ruling was correct, it provides no ground for vacatur under the FAA.  *See Stolt-Nielsen*, 559 U.S. at 671 ("It is not enough for petitioners to show that the [arbitrator] committed an error—or even a serious error.").

### iv.  Award Procured by Corruption, Fraud, or Undue Means

Petitioners allege under § 10(a)(1) that Respondents "procured the Awards by corruption, fraud, or undue means by paying significant attorneys' fees and by making other payments to

---

the acquisition"); *id.* (similarly rejecting damages for "the amount of refunds paid to clients who received email services from the Advantage Take 5 business unit post acquisition" because while "[s]ome of those payments may qualify as damages . . . there is no detail upon which to base a specific finding or a reasonable estimate").  Indeed, Judge Eyler declined to award over $400,000 of requested damages for the shutdown costs Petitioners dispute here because "(1) the lack of a basis; (2) some were likely voluntary; and (3) lack of support for the calculation and to provide a basis for review of the components." *Id.*

their fact witnesses in an effort to secure favorable testimony at the hearing."  Mem. Supp. Mot. Vacate at 34.  These allegations center on three of Respondents' witnesses: Eva Hodgens, Peter Ward, and Michael Boy.

Regarding Ms. Hodgens, Petitioners acknowledge that, during the hearing, she testified that "the Advantage Parties were paying her counsel's fees," but claim that Respondents "failed to disclose until after the Interim Award that [they] had paid **over $150,000** worth of attorney's fees to Hodgens' criminal attorneys during the Arbitration."  *Id.* at 35 (emphasis in original). Petitioners allege that the "same was true with respect to Ward," who also "testified at the hearing that [Respondents] were paying his legal expenses but either did not know or could not recall the particulars of the arrangement."  *Id.*  Petitioners explain that "[i]t was not until [Respondents] served their cost submission that [Petitioners] learned that Ward . . . had incurred and [Respondents] had paid $94,575 in legal fees."  *Id.*

A claim under § 10(a)(1) requires Petitioners to "meet three cumulative conditions." *ARMA*, 961 F. Supp. 2d at 254.  "First, the party seeking vacatur must demonstrate by clear and convincing evidence that its opponent actually engaged in fraudulent conduct or used undue means during the course of the arbitration."  *Id.*  "Importantly, '[u]nder this first requirement, ordinary misconduct will not suffice; the alleged fraudulent acts must have been so prejudicial that they effectively denied the opposing party a fundamentally fair hearing.'"  *Ray*, 236 F. Supp. 3d at 76 (quoting *ARMA*, 961 F. Supp. 2d at 254).  Second, "the movant must show that the fraud could not have been discovered before or during the arbitration through the exercise of reasonable diligence."  *ARMA*, 961 F. Supp. 2d at 254.  And third, "the alleged misconduct 'must materially relate[] to an issue in the arbitration.'"  *Id.* (citation omitted).

Petitioners do not offer clear and convincing evidence that Respondents' reimbursement of Ms. Hodgens' or Mr. Ward's legal expenses was fraudulent or amounted to undue means, and even if they had, they do not show that it was so prejudicial as to deprive them of a fundamentally fair hearing.  Most significantly, Respondents offer no evidence beyond speculation to refute the hearing testimony of both Ms. Hodgens and Mr. Ward that they were not being personally compensated beyond reimbursement of their legal expenses.  On direct examination, Ms. Hodgens testified as follows:

> Q: Who's paying your counsel's fees, to your understanding?
> A: Advantage is.
> Q: Are you being personally compensated for the time you've spent in connection with this case?
> A: No, I am not.
> Q: Are you being compensated for the time that you're spending testifying here today?
> A: No, I am not.
> Q: Are you a consultant for Advantage?
> A: No, I am not.
> Q: Is Advantage's payment or reimbursement, I should say, of your attorney's fees, in any way dependent on your testimony today or the outcome of this case?
> A: No, it is not.

Pet. Vacate Ex. 54 at 2011:10–2012:3, ECF No. 40-62.  Petitioners probed this point at some length on cross-examination as well.  *See* Pet. Vacate Ex. 55 at 2113:4–2119:13, ECF No. 40-63. Similarly, Mr. Ward testified that Advantage was paying for his "legal expenses, but not other than that[.]"  *Id.* at 2258:24–2259:13.

In the absence of evidence of fraud, Petitioners ask Court to hold that the amount of legal expenses reimbursed in this large-scale arbitration was somehow unreasonable by default.  *See* Mem. Supp. Mot. Vacate at 35 ("This is far more than a minor reimbursement for counsel to represent a witness at a deposition or at a single day of a hearing, but instead constitutes coercion amounting to fraud, a violation of legal ethics, and perhaps bribery and/or witness tampering in violation of law.").  But tellingly, the only case Petitioners cite in their motion for this

proposition is *Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 679 (D. Kan. 2000).[12]  Not only did this case not involve a challenge to an arbitration award under the FAA, but the court *rejected* a motion for sanctions based on allegations that a party attempted to "'buy' the cooperation and testimony of its critical fact witness." 193 F.R.D. at 672.  The court approved the $20,000 "upfront, nonrefundable payment" that was made "on the eve" of the witness's deposition and was "unconditioned on a commensurate expenditure of time" by the witness, *id.* at 678, finding that the payment was "solely for the purpose of compensating [the witness] for the time he lost in order to give testimony in the litigation" and was reasonable under the circumstances, *id.* at 679.  The Court struggles to find any support for Petitioners in this decision.

Petitioners also contend that the fact that the precise amount reimbursed to each witness did not become known until after the hearing compels an inference that the reimbursements were fraudulent. *See* Mem. Supp. Mot. Vacate at 37.  While more information about the precise reimbursement amount no doubt would have been ideal, its absence alone certainly does not amount to clear and convincing proof that the reimbursements were fraudulent or that the

---

[12] Petitioners' motion also cites, without explanation, two opinions of the Delaware State Bar Association Committee on Professional Ethics. *See* Mem. Supp. Mot. Vacate at 36.  Both opinions, which by nature respond to inquiries concerning specific situations confronted in litigation in Delaware state court, and which both disclaim that they are "merely advisory and . . . not binding on the inquiring attorney or the courts or any other tribunal," appear to have limited relevance and if anything seem to stand for a proposition contrary to Petitioners' position. *See* Del. Ethics Op. 1994-1 (Feb. 14, 1994) (finding that counsel for a plaintiff suing corporate defendants generally may "agree to pay the reasonable fees and expenses of independent counsel chosen by" a former employee of one of the defendant corporations to represent him at a deposition); Del. Ethics Op. 2003-3 (Aug. 14, 2003) (finding it permissible to reimburse one witness for out of pocket expenses and for the reasonable value of his lost time and permissible to reimburse a second witness for out-of-pocket expenses but finding the record insufficient to permit determination as to the appropriateness of reimbursing the second witness for the loss of his time due to the fact that he was retired).

proceeding was fundamentally unfair.  To the contrary, the above-quoted passages from the

hearing transcript show that Judge Eyler was well aware of the principally relevant fact that

Respondents were reimbursing the witnesses' legal expenses before making his credibility

determinations.  *See* Interim Award at 19 ("I find Ms. Hodgens to be a credible witness and that

her testimony is consistent with the documents."); *id.* at 20 ("I find Mr. Ward to be a credible

witness and that his testimony is consistent with the documents.").[13]  Petitioners have not met

their burden to show by clear and convincing evidence that Respondents procured the award by

"corruption, fraud, or undue means" by reimbursing the legal expenses of Ms. Hodgens or Mr.

Ward.  § 10(a)(1).

Finally, Petitioners allude to payments made to a third witness, Michael Boy.  *See* Mem.

Supp. Mot. Vacate at 34.  However, the Motion to Vacate includes no factual allegations to

support an argument that any payments to Mr. Boy constitute grounds for vacatur under

§ 10(a)(1), so Petitioners have not met their burden to prove as much by clear and convincing

evidence.  Regardless, even if the Court pieced together the allegations concerning Mr. Boy from

the Petitioners' other submissions, they still would not constitute grounds for relief.

Petitioners explain that Mr. Boy, an employee of ASM, received a salary of $160,000 per

year prior to March 2020 and a salary of $40,000 thereafter.  Pet. Vacate ¶ 95.  Petitioners first

argue that the $160,000 salary was inflated, given that the "Take 5 business unit was shut down

in July 2019 and he stopped working for the unit full time in September 2019."  *Id.*  But again,

---

[13] The Court notes that the witnesses' lack of knowledge about the details of the
reimbursement arrangement tends to support Judge Eyler's determination that the witnesses were
credible notwithstanding the payments.  *See* Pet. Vacate Ex. 55 at 2117:16–21 (Ms. Hodgens
testifying as to the amount of reimbursement for her legal expenses: "I don't know specifically.
I'm not keeping a tally.  You would have to ask them."); *id.* at 2259:5–8 (Mr. Ward testifying
that he is "not sure" how long Respondents had been paying his legal expenses).

this set of facts was disclosed during the hearing, *see* Pet. Vacate Ex. 53 at 1650:22–1655:6, and Mr. Boy repeatedly clarified that he did not simply "help[] out with the Take 5 litigation" after the shutdown but also worked on "loose ends that [he] needed to fix with regards to clients and client data" as well as "closing down . . . Take 5," *id.* at 1655:7–1657:7.

Petitioners next argue that the substantially reduced $40,000 rate at which Mr. Boy was paid after March 2020 was too high because he "only worked between 6–12 hours annually." Pet'rs' Opp'n to Rule 11 Mot. at 37.  That figure comes from Mr. Boy's deposition, at which, after explaining that he did not recall the precise number of hours he worked for Advantage in the previous year, he estimated that he worked "six to twelve" hours for Advantage, plus "communications with them regarding these things, that they have to break down the actual tasks required of me to do and the time and speed that I do them."  Pet. Vacate Ex. 47 at 9:23–14:14, ECF No. 40-55.  But Petitioners did not elicit this information during the hearing in front of Judge Eyler.  *See* Pet. Vacate Ex. 53 at 1651:3–1653:11, ECF No. 40-61 (hearing testimony from Mr. Boy disputing that he only talked to Advantage "maybe six times a year" but acknowledging that he spoke to Advantage "[o]n and off . . . when requested, when needed, part time" without any discussion of the number of hours he spent working for Advantage).  In declining to do so they waived their right to raise it here.  *See ARMA*, 961 F. Supp. 2d at 254 ("If the misconduct came to light at some point during the course of the arbitral proceedings, but the movant nevertheless failed to raise its concerns in a timely fashion, it may be deemed to have waived its right to seek vacatur under § 10(a)(1).").  But even if they did not, the principally relevant fact that Mr. Boy remained on Respondents' payroll was known to Judge Eyler at the time of the hearing and he explicitly addressed it in making his credibility determination.  *See* Interim Award at 17 ("Take 5 challenges the credibility of [Mr. Boy], arguing that he has a personal

interest because of ties to Advantage and that he harbors animosity toward Take 5.  I find Mr.

Boy to be a credible witness and that his testimony is consistent with the documents.").

Petitioners fall far short of showing that the salary paid to Mr. Boy was fraudulent or rendered

the arbitration fundamentally unfair.

v.  Manifest Disregard for the Law

Petitioners' final argument for vacatur relies on a common-law doctrine of manifest

disregard of the law.  At the outset, it bears notice that "[i]t is unclear . . . whether manifest

disregard remains a valid ground for vacatur after the Supreme Court's decision in *Hall Street*

*Assocs. v. Mattel, Inc.*, 552 U.S. 576, 584–86 (2008)."  *Selden v. Airbnb, Inc.*, 4 F.4th 148, 160

n.6 (D.C. Cir. 2021).  Regardless, it would not apply here.

Manifest disregard for the law "means more than error or misunderstanding with respect

to the law."  *Kanuth*, 949 F.2d at 1180.  Instead, "a court must find that (1) the arbitrators knew

of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law

ignored by the arbitrators was well defined, explicit, and clearly applicable to the case."

*LaPrade v. Kidder, Peabody & Co., Inc.*, 246 F.3d 702, 706 (D.C. Cir. 2001).  This is "an

extremely narrow standard of review"; awards must be confirmed even "when the arbitrators

give no explanation for their decision" as long as "any justification can be gleaned from the

record."  *Kurke v. Oscar Gruss and Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006) (citations

omitted).  Accordingly, "it should come as no surprise that obtaining judicial relief for

arbitrators' manifest disregard of law is rare."  *Id.* at 355 (cleaned up).

Petitioners start by attempting to relabel several of their arguments under the FAA's

statutory grounds for vacatur as manifest disregard for the law.  *See* Mem. Supp. Mot. Vacate at

40–43 (rehashing arguments concerning the award against RJV, concerning the denial of

32

Petitioners' discovery motions, concerning Respondents' reimbursement of witnesses' legal expenses, and concerning damages awarded for due diligence, investigation, and shutdown costs regarding Take 5).  But while Petitioners explain why they disagree with Judge Eyler's conclusions, they make no allegation that he knew of but simply ignored a well-defined and clearly applicable legal principle.  Indeed, as explained above, the thorough Interim Award shows that Judge Eyler engaged substantively with the relevant law concerning each issue. Petitioners have not met the heavy burden to establish manifest disregard of the law as to these claims.  *See ARMA*, 961 F. Supp. 2 at 269 ("Nowhere does Petitioner provide proof that the Tribunal recognized and then summarily disregarded any clearly applicable principle of . . . law.").

Petitioners make one new argument: that Judge Eyler manifestly disregarded the law in awarding Respondents prejudgment interest.  *See* Mem. Supp. Mot. Vacate at 43.  Petitioners claim that, while prejudgment interest is awarded as a matter of right in Delaware, the right is "not self-executing," and Respondents "failed to seek interest until after the conclusion of the hearings."  *Id.* (citation omitted).  Petitioners acknowledge that Judge Eyler "knew of and considered this legal principle, appreciating that it controlled whether interest should be awarded" but argue that he "refused to apply it, despite the fact that it was applicable."  *Id.*  This is flatly contradicted by the Modified Final Award.  Judge Eyler laid out and applied the relevant legal framework, concluding, based on his "knowledge of the record since being appointed as Arbitrator," that "the parties understood that Advantage was claiming interest as an element of damage."  Modified Final Award at 6.  As Judge Eyler clearly considered and applied the relevant law, Petitioners' disagreement with his conclusion is not cognizable as a claim of manifest disregard of the law.  *ARMA*, 961 F. Supp. 2 at 269 ("Petitioner's various claims of

manifest disregard seem to be wholly premised upon the fact that the Tribunal reached a final conclusion that was not favorable to [petitioner's] position in the arbitration.").

### 3.  Respondents' Motion for Sanctions

Respondents' Rule 11 Motion seeks sanctions, in the form of dismissal and an award of attorney's fees, principally on grounds that Petitioners' claims for vacatur "are patently frivolous."  Mem. Supp. Rule 11 Mot. at 2, ECF No. 26-1.  As such, and as noted above, much of the motion reads like the type of substantive opposition to the Motion to Vacate that Respondents originally declined to file.  In addition, Respondents argue that sanctions are "independently warranted" based on three "patently untrue" assertions made in Petitioners' submissions.  *Id.* at 35.

Under Federal Rule of Civil Procedure 11(b), courts may impose sanctions if "a pleading, written motion, or other paper . . .  [is] presented for any improper purpose[;] . . .  the claims, defenses, and other legal contentions therein are [un]warranted by existing law[;] . . . the allegations and other factual contentions have [no] evidentiary support[; or] the denials of factual contentions are [un]warranted on the evidence[.]"  Courts "must apply an objective standard of reasonableness in determining whether there has been a violation of the Rule."  *Hourani v. Mirtchev*, 796 F.3d 1, 17 (D.C. Cir. 2015).  If the "court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."  Fed. R. Civ. P. 11(c)(1).  Rule 11 exists "to deter baseless filings in district court," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990), and the court "has the discretion to determine both whether a Rule 11 violation has occurred and what sanctions should be imposed if there has been a violation, *Cobell v. Norton*,

211 F.R.D. 7, 10 (D.D.C. 2002) (citation omitted).[14]  "Courts do not impose Rule 11 sanctions

lightly; such sanctions are an extreme punishment for filing pleadings that frustrate judicial

proceedings." *Jordan v. U.S. Dep't of Labor*, 273 F. Supp. 3d 214, 241 (D.D.C. 2017).

        While the Court finds that Petitioners have not established their entitlement to vacatur

under the FAA, it disagrees with Respondents that the arguments Petitioners pressed in their

petition and motion to vacate were so baseless as to warrant the "extreme punishment" of Rule

11 sanctions.  *Id.*  As to the alleged false statements that Respondents argue "independently

warrant[]" sanctions, Mem. Supp. Rule 11 Mot. at 35, the Court again disagrees.  All three

alleged false statements concern Petitioners' characterization of materials in the record.  *See id.*

(disputing Petitioners' characterization that "no evidence was presented during the hearing

concerning the knowledge, state of mind, or intentions of Gluck and Radetich"); *id.* at 37

(disputing Petitioners' characterization that "'no [] evidence exists' to show that during his

interview with Latham & Watkins, Mr. Radetich admitted to lying to Take 5's clients about Take

5's results to maintain clients"); *id.* (disputing Petitioners' characterization that Respondents

admitted, in a submission concerning attorney's fees, "that in the absence of them paying

witnesses to provide testimony . . . [Respondents] would not have been able to prove fraud").

These characterizations amount to fairly run-of the-mill attempts by zealous lawyers to construe

the record in the light most favorable to their clients, not objectively unreasonable falsehoods.

---

[14] Respondents cite *Rafferty v. NYNEX Corp.*, 60 F.3d 844 (D.C. Cir. 1995), and a district
court case citing *Rafferty*, for the proposition that the Court "must impose sanctions if it finds
that Rule 11 was violated." Mem. Supp. Rule 11 Mot. at 11–12.  However, *Rafferty* applied a
previous version of Rule 11, which provided that sanctions "shall" be imposed for conduct
violating the rule.  *Rafferty*, 60 F.3d at 852 n.12.  As the Circuit explained, "Rule 11 was
subsequently amended to provide that if a court finds a violation, 'the court *may* . . . impose an
appropriate sanction.'"  *Id.* (emphasis in original). The permissive formulation remains in effect
today.  *See* Fed. R. Civ. P. 11(c)(1).  Accordingly, even "once a district court finds a Rule 11
violation, it retains broad discretion in imposing sanctions."  *Hourani*, 796 F.3d at 17.

While there may well be room to disagree with these characterizations, that disagreement is appropriately expressed through briefing on the merits.  Respondents have not shown that sanctions under Rule 11 are warranted here.[15]

### 4.  Respondents' Petition to Confirm Award

Along with their substantive opposition to Petitioners' Motion to Vacate, Respondents petitioned to confirm the award.  *See* Resp'ts' Opp'n and Pet. at 2.  Petitioners requested, and Respondents agreed, to "stay a decision" on the petition to confirm "pending resolution of the motion to vacate."  Pet'rs' Opp'n to Pet. Confirm at 1, ECF No. 38; *see* Resp'ts' Reply Supp. Pet. Confirm at 1, ECF No. 39.  Having considered Petitioners' Motion to Vacate, the Court turns now to Respondents' petition to confirm the award.

9 U.S.C. § 9 provides that "at any time within one year after the award is made any party to the arbitration may apply to the court . . . for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified or corrected as prescribed in sections 10 and 11 of this title."  That is, "[u]nless the Court has grounds to vacate, modify, or correct the Final Award, it must grant the petition to confirm the award."  *Contech Const. Prods., Inc. v. Heierli*, 764 F. Supp. 2d 96, 114 (D.D.C. 2011); *see also Int'l Thunderbird Gaming Corp. v. United Mexican States*, 473 F. Supp. 2d 80, 83 (D.D.C. 2007) ("[I]n the absence of a legal basis to vacate, this court has no discretion but to confirm the award."), *aff'd* 255 Fed. App'x 531 (D.C. Cir. 2007).  Accordingly, having found that Petitioners failed to establish grounds for vacatur, the Court grants Respondents' petition to confirm the award.

---

[15] The Court does not reach Petitioners' argument that the Rule 11 Motion was procedurally deficient.  *See* Pet'rs' Opp'n to Rule 11 Mot. at 9–17.

**IV.  CONCLUSION**

For the foregoing reasons, Respondents' Motion to Dismiss or Stay (ECF No. 15) is

**DENIED**; Respondents' Motion for Sanctions is **DENIED** (ECF No. 26); Petitioners' Motion

for Order (ECF No. 33) is **DENIED**; Petitioners' Motion to Vacate Award (ECF No. 3) is

**DENIED**; and Respondents' Petition to Confirm Award (ECF No. 30) is **GRANTED**.  An order

consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 25, 2023                                          RUDOLPH CONTRERAS
                                                                 United States District Judge